**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-00739

KARAM AKHRAS, Individually and on
behalf of all others similarly situated,

     Plaintiff,

     v.

SSR MINING INC., RODNEY P. ANTAL,
and ALISON WHITE,

     Defendants.

## PLAINTIFF'S CLASS ACTION COMPLAINT
## FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Plaintiff Karam Akhras ("Plaintiff"), individually and on behalf of all other persons

similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against

Defendants (defined below), alleges the following based upon personal knowledge as to

Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based

upon, among other things, the investigation conducted by and through his attorneys,

which included, among other things, a review of the Defendants' public documents,

public filings, wire and press releases published by and regarding SSR Mining Inc. ("SSR

Mining" or the "Company"), and information readily obtainable on the Internet. Plaintiff

believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded SSR Mining securities between February 23, 2022 and February 27, 2024, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendant's violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act")

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

6.      Plaintiff Karam Akhras, as set forth in the accompanying certification, incorporated by reference herein, purchased SSR Mining securities during the Class Period and was economically damaged thereby.

7.      Defendant SSR Mining purports to be a "precious metals mining company with four producing assets located in the United States, Türkiye ["Turkey"], Canada and Argentina. The Company is engaged in the operation, acquisition, exploration and development of precious metal resource properties, producing gold doré as well as silver and lead and zinc concentrates. SSR Mining's diversified asset portfolio is comprised of high-margin, long-life assets located in some of the world's most prolific metal districts."

8.      SSR Mining is incorporated in British Columbia, Canada, and its head office is located at Suite 1300 E. Layton Ave, Denver, Colorado 80237. SSR Mining's common stock trades on the NASDAQ Exchange ("NASDAQ") under the ticker symbol "SSRM."

9.      In pertinent part, this action is about the Company's mine (the "Copler Mine") and mining activities in Çöpler ("Copler"), Turkey. The Company states the following about its activities in Copler:

> [The Copler Mine] is an open pit mine located along the Tethyan belt in east-central Turkey in the Erzincan Province, approximately 1,100 kilometers southeast of Istanbul and 550 kilometers east of Ankara. [The Copler Mine] contains oxide and sulfide ores which are mined concurrently and processed through its two processing plants using heap leach and pressure oxidation processing, respectively, to produce gold bullion. [The Copler Mine] and nearby tenements are positioned on a land package of approximately 25,800 hectares.

10.     Defendant Rodney P. Antal ("Antal") presently serves as the Executive Chairman of the Board of Directors (the "Board"), and has previously served as the

Company's Chief Executive Officer ("CEO"). He is the Company's principal executive officer.

11.     Defendant Alison White ("White") served as the Company's Chief Financial Officer ("CFO") and Executive Vice President from March 2021 through March 2024.

12.     Defendants Antal and White are collectively referred to herein as the "Individual Defendants."

13.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

14.      SSR Mining is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

15.      The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

16.      SSR Mining and the Individual Defendants are collectively referred to herein as "Defendants."

<u>**SUBSTANTIVE ALLEGATIONS**</u>

**Materially False and Misleading Statements**
<u>**Issued During the Class Period**</u>

17.      On February 22, 2022, after market hours, SSR Mining filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2021 (the "2021 Annual Report"). [1]Attached to the 2021 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Antal and White attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

18.      The 2021 Annual Report contained the following statement:

> The Company has an experienced leadership team with a proven track record of delivery and value creation. ***Across the organization, the Company has expertise*** in project construction, mining (open pit and underground), and processing (pressure oxidation, heap leach and flotation), ***with a robust commitment to health, safety***, community engagement and environmental management.

---

[1] The Amended 2021 Annual Report, filed with the SEC on Form 10-K/A on July 12, 2022, did not change the statements quoted herein.

(Emphasis added).

19.     The statement in ¶ 18 was materially false and misleading because it overstated the Company's commitment to safety.

20.     The 2021 Annual Report contained the following statement:

The Company's approach to environmental and social development is underpinned by the goal of minimizing the impact of our operations to the environment and leaving a positive legacy in the communities where the Company operates. ***For the Company, being a responsible corporate citizen means protecting the natural environment associated with its business activities, providing a safe workplace and work processes for its employees and contractors, and investing in the communities where the Company operates in an effort to enhance the lives of those who live and work in these communities beyond the life of its operations***. ***The Company takes a long-term view of its corporate responsibility***, which is reflected in the policies that guide the Company's business decisions, and in its corporate culture that fosters safe and ethical behavior across all levels of SSR Mining.

(Emphasis added).

21.     The statement in ¶ 20 was materially false and misleading because it overstated the Company's commitment to safety.

22.     The 2021 Annual Report contained the following statement:

***The Company is committed to the health and safety of its employees and does so by creating and maintaining a safe working environment, equipment, work processes, effective safety and health management systems, and by complying with all applicable health and safety laws and regulations***. The Company acknowledges that there are inherent risks associated with the Company's business and, through proactive risk management, continuously strives to maximize the safety of its operations and minimize and control health and safety risks.

***The Company's safety framework emphasizes effective risk-centered management systems, positive and effective work cultures and proactive leadership to drive culture enhancement***. The Company focuses on balancing the human and technical aspects of safety: blending leadership behaviors with traditional management activities ***to create a safe, productive culture. The Company ensures that its workers understand their individual roles and contributions to safe production and a safe workplace. In this way, the Company's employees maintain safety awareness, recognize hazards and***

*analyze risk in their daily activities*. **The technical aspects of safety are addressed through established systems, policies and procedures that enable the Company's employees to identify and assess job-related risks, and that support our efforts to provide appropriate training and verify training competencies**. Performance measurement and accountability provides feedback and maintains focus on continuous improvement.

(Emphasis added).

23.    The statement in ¶ 22 was materially false and misleading because it

overstated the Company's commitment to safety and the efficacy of its safety programs.

24.    The 2021 Annual Report contained the following risk disclosure:

**Reputation loss may result in decreased investor confidence, increased challenges in developing and maintaining community relations and an impediment to the Company's overall ability to advance its projects, thereby having a material adverse impact on the Company's financial performance, financial condition, cash flows and growth prospects.**

Damage to the Company's reputation can be the result of the actual or perceived occurrence of any number of events, and could include negative publicity, whether true or not. The increased use of social media and other web-based tools to generate, publish and discuss user-generated content and to connect with other users has made it increasingly easier for individuals and groups to communicate and share opinions and views regarding the Company and its activities, whether true or not. **The Company does not ultimately have direct control over how it is perceived by others and reputational damage could have a material adverse impact on the Company's financial performance, financial condition, cash flows and growth prospects**.

(Emphasis added).

25.    The statement in ¶ 24 was materially false and misleading because the

Company understated the likelihood of reputational risk, given its unsafe business

practices at the Copler Mine in Turkey.

26.    The 2021 Annual Report contained the following statement:

**Mining is inherently risky and subject to conditions and events beyond the Company's control.**

The development and operation of a mine or mine property is inherently risky and

involves many risks that even a combination of experience, knowledge and careful evaluation may not be able to overcome, including:

\*      \*      \*

- Failure of engineered structures

\*      \*      \*

- Community relations problems

\*      \*      \*

- Flooding, explosions, fire, rockbursts, cave-ins and **landslides**

\*      \*      \*

These risks could result in damage to, or destruction of, mineral properties, production facilities or other properties, environmental damage, delays in mining, increased production costs, asset write downs, monetary losses and possible legal liability or penalties, occupational illness or health issues, personal injury, and loss of life, and/or facility and workforce evacuation. The Company may not be able to obtain insurance to cover these risks at economically feasible premiums, or at all. The Company may suffer a material adverse effect on its business if it incurs losses related to any significant events that are not covered by the Company's insurance policies.

***Additionally, the Company's operations, particularly those operations located outside of North America, are exposed to various levels of safety and security risks which could result in injury or death, damage to property, work stoppages, product theft, or blockades of the Company's mining operations and projects***. Risks and uncertainties vary from region to region and include, ***but are not limited to, terrorism, hostage taking, local drug gang and/or other gang activities, military and/or governmental repression, labor unrest and war or civil unrest***. Local opposition to mine development projects could arise and such opposition may be violent. If the Company were to experience resistance or unrest in connection with its mines or projects, it could have a material adverse effect on the Company's operations and profitability. Additionally, to the extent that such risks and uncertainties are directed towards local populations, the Company may not be able to retain sufficient labor forces to maintain the Company's operations.

(Emphasis added).

27.     The statement in ¶ 26 materially false and misleading because it understated the likelihood of disasters which could harm its employees, as well as poor community relations as a result of its unsafe business practices.

28.     The 2021 Annual Report contained the following statement:

**The Company is subject to significant governmental regulations.**

***The Company's operations are subject to extensive and complex laws and regulations governing worker health and safety across our operating regions and failure to comply with applicable legal requirements can result in substantial penalties, civil sanctions and, in some cases, criminal sanctions, including the suspension or revocation of permits***. Future changes in applicable laws, regulations, permits and approvals or changes in their enforcement or regulatory interpretation could substantially increase costs to achieve compliance, lead to the revocation of existing or future exploration or mining rights or otherwise have an adverse impact on the Company's results of operations and financial position. Matters which may be regulated by federal, state, provincial, territorial and local laws and regulations include:

*       *       *

- Labor standards and occupational health and safety, including mine safety;

*       *       *

U.S. surface and underground mines are continuously inspected by the U.S. Department of Labor Mine Safety and Health Administration ("MSHA"), which inspections often lead to notices of violation under the *Federal Mine Safety and Health Act of 1977*. Our U.S. mine could be subject to a temporary or extended shutdown as a result of a violation alleged by MSHA. ***The Company's mining operations outside of the U.S. are similarly subject to inspection and regulation under applicable jurisdictional laws and regulations. If inspections result in an alleged violation, the Company may be subject to fines, penalties or sanctions and its mining operations could be subject to temporary or extended closures. In addition to potential government restrictions and regulatory fines, penalties or sanctions, the Company's ability to operate and thus, its results of operations and financial position, could be adversely affected by accidents, injuries, fatalities or events detrimental (or perceived to be detrimental) to the health and safety of our employees, the environment or the communities in which the Company operates***.

*       *       *

***Failure to comply with applicable laws and regulations may result in civil or criminal fines or penalties or enforcement actions***, including orders issued by regulatory or judicial authorities enjoining or curtailing operations or requiring corrective measures, installation of additional equipment or remedial actions, or the imposition of additional local or foreign parties as joint venture partners, any of which could result in significant expenditures. ***The Company may also be required to compensate private parties suffering loss or damage by reason of a breach of such laws, regulations or permitting requirements***. Future laws and regulations, or more stringent enforcement of current laws and regulations by governmental authorities, cannot be accurately predicted and it is possible that these could cause the Company to incur additional expense, divert management time and attention from revenue generating activities or restrict or delay the exploration and development of the Company's properties.

9

(Emphasis added).

29.    The statement in ¶ 28 was materially false and misleading because the Company understated its regulatory risk, given its unsafe mining practices in Turkey.

30.    The 2021 Annual Report contained the following statement:

**The Company requires permits to conduct its operations, and delays in obtaining or failing to obtain such permits, or a failure to comply with the terms of any such permits that the Company has obtained, would adversely affect the Company's business.**

***The Company's operations, including continued production at Çöpler***, Marigold, Seabee and Puna, and further exploration, development and commencement of production on the Company's other mineral properties, ***require licenses, permits and other approvals from various governmental authorities, including land and water usage permits***. ***Obtaining or renewing governmental permits is a complex and time-consuming process***. The duration and success of efforts to obtain and renew permits are contingent upon many variables not within the Company's control.

The Company's ability to obtain the required permits and approvals to explore for, develop and operate mines and to successfully operate near communities in the jurisdictions in which we operate depends in part on our ability to develop, operate and close mines in a manner that is consistent with the creation of social and economic benefits in the surrounding communities, which may or may not be required by law. ***Our ability to obtain permits and approvals and to operate near certain communities may be adversely impacted by real or perceived detrimental events associated with our activities or those of other mining companies affecting the environment, health and safety of communities in which we operate***. Further, certain communities may challenge, or seek to challenge, permits and approvals granted to the Company, which may result in temporary or permanent suspension of such permits and approvals or the cessation of Company operations. ***Any delay or suspension of the Company's operations as a result of such challenges, whether such challenges have merit, may adversely affect the Company's business, results of operations or financial condition***.
***Previously obtained permits and approvals may be suspended or revoked for many reasons, including through government or court action, or may be adjusted in a manner that adversely affects our operations, including our ability to explore or develop properties, commence production or continue operations***. There can be no assurance that all permits, licenses and approvals that are required for the operations of the Company, including any for construction of mining facilities or conduct of mining, will be obtainable or renewable on reasonable terms, or at all. Delays or a failure to obtain such required permits, or

the expiry, revocation or failure by the Company to comply with the terms of any such permits that it has obtained, would adversely affect the Company's business.

(Emphasis added).

31.    The statement in ¶ 30 was materially false and misleading because the Company understated the risk of having trouble maintaining the necessary permits to operate the Copler Mine, given that it conducted its Copler operations in an unsafe manner.

32.    On April 15, 2022, SSR Mining published its ESG and Sustainability Report for 2021 (the "2021 Sustainability Report").

33.    The 2021 Sustainability Report contained the following statement:

We regularly assess safety and health related risks across each part of our mines. These assessments **_ensure that we are aware of the specific risks_** in each part of the mine and inform the most appropriate hazard controls are implemented.

(Emphasis added).

34.    The statement in ¶ 33 was materially false and misleading because it overstated the extent of the Company's efforts to ensure safety for its employees and contractors.

35.    The 2021 Sustainability Report contained the following slide:

> Making sure we are adequately prepared for emergencies is a key part of our commitment to providing a safe environment, both for our people and the communities we work in. While the details of Emergency Plans vary by site, the fundamentals of our approach are consistent: well trained teams, appropriate equipment, effective communication and clear protocols.
>
> For example, at our Çöpler Mine in Turkey there are three dedicated emergency response personnel complemented by a team of 86 trained workers. A minimum of 20 trained emergency response workers are present on site at any one time.
>
> Mock drills are performed periodically throughout the year to ensure all workers know what to do in the event of an emergency, and we have a target of a three-minute emergency response time.
>
> The Mine also has high specialized and sophisticated equipment on site, and reflecting Çöpler's commitment to the community in 2019, the mine signed a protocol with the Sub-governor of İliç to assist the district in dealing with emergencies such as traffic incidents.

36.     The statements contained in ¶ 35 were materially false and misleading because the Company overstated the effectiveness of safety efforts at the Copler Mine.

37.     On February 22, 2023, after market hours, SSR Mining filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2022 (the "2022 Annual Report"). [2] Attached to the 2022 Annual Report were certifications pursuant to SOX signed by Defendants Antal and White attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

---

[2] The Amended 2022 Annual Report, filed with the SEC on Form 10-K/A on March 17, 2023, corrected a minor typographical error related to the date of the audit opinion included in the 2022 Annual Report, and did not change the statements quoted herein.

38.    The 2022 Annual Report contained the following statement:

The Company has an experienced leadership team with a proven track record of delivery and value creation. ***Across the organization, the Company has expertise*** in project construction, mining (open pit and underground), and processing (pressure oxidation, heap leach and flotation), ***with a robust commitment to health, safety,*** community engagement and environmental management.

(Emphasis added.)

39.    The statement in ¶ 38 was materially false and misleading because it overstated the Company's commitment to safety.

40.    The 2022 Annual Report contained the following statement:

***The Company is committed to the health and safety of its employees and does so by creating and maintaining a safe working environment, equipment, work processes, effective safety and health management systems, and by complying with all applicable health and safety laws and regulations.*** The Company acknowledges that there are inherent risks associated with the Company's business and, through proactive risk management, continuously strives to maximize the safety of its operations and minimize and control health and safety risks.

***The Company's safety framework emphasizes effective risk-centered management systems, positive and effective work cultures and proactive leadership to drive culture enhancement***. The Company focuses on balancing the human and technical aspects of safety: blending leadership behaviors with traditional management activities to create a safe, productive culture. ***The Company ensures that its workers understand their individual roles and contributions to safe production and a safe workplace***. ***In this way, the Company's employees maintain safety awareness, recognize hazards and analyze risk in their daily activities. The technical aspects of safety are addressed through established systems, policies and procedures that enable the Company's employees to identify and assess job-related risks, and that support our efforts to provide appropriate training and verify training competencies***. Performance measurement and accountability provides feedback and maintains focus on continuous improvement.

(Emphasis added).

41.    The statement in ¶ 40 was materially false and misleading because it overstated the Company's commitment to safety, as well as the efficacy of its safety programs.

42.    The 2022 Annual Report contained the following statement:

**Reputation loss may result in decreased investor confidence, increased challenges in developing and maintaining community relations and an impediment to the Company's overall ability to advance its projects, thereby having a material adverse impact on the Company's financial performance, financial condition, cash flows and growth prospects.**

Damage to the Company's reputation *can be the result of the actual or perceived occurrence of any number of events, and could include negative publicity, whether true or not.* The increased use of social media and other web-based tools to generate, publish and discuss user-generated content and to connect with other users has made it increasingly easier for individuals and groups to communicate and share opinions and views regarding the Company and its activities, whether true or not. In recent years, social media has grown to rival or even dominate traditional media outlets in reach and dissemination of information. This has resulted in an environment of information overload which is frequently infiltrated by fabricated and fraudulent information. Fabricated and fraudulent information articles multiply rapidly and act as narratives that omit or add information to facts. Social media may be the primary source of news and information in certain regions in which the Company conducts business, and traditional media outlets may pick up social media-based stories and further disseminate information beyond social media platforms. In this environment, false or fabricated information about the Company and its business may travel more quickly than the Company can issue or disseminate the truth.

The Company does not ultimately have direct control over how it is perceived by others. Fabricated and fraudulent news articles may be misinterpreted as true and may lead to increased public scrutiny on the Company. *Such increased public scrutiny may also lead to increased governmental or regulatory scrutiny, whether deserved or not, leading to potential reputational damage to the Company. Reputational damage, real or perceived, could have a material adverse impact on the Company's financial performance, financial condition, cash flows and growth prospects*.

(Emphasis added).

43.    The statement in ¶ 42 was materially false and misleading because the Company understated the likelihood of reputational risk as a result of a mining disaster, given its unsafe business practices at the Copler Mine in Turkey.

44.    The 2022 Annual Report contained the following risk disclosure about government regulations:

**The Company is subject to significant governmental regulations.**
The Company's operations *are subject to extensive and complex laws and regulations governing worker health and safety across our operating*

**regions and failure to comply with applicable legal requirements can result in substantial penalties, civil sanctions and, in some cases, criminal sanctions**, including the suspension or revocation of permits. Future changes in applicable laws, regulations, permits and approvals or changes in their enforcement or regulatory interpretation could substantially increase costs to achieve compliance, lead to the revocation of existing or future exploration or mining rights or otherwise have an adverse impact on the Company's results of operations and financial position. Matters which may be regulated by federal, state, provincial, territorial and local laws and regulations include:

\* \* \*

- Labor standards and **occupational health and safety**, **including mine safety**[.]

U.S. surface and underground mines are continuously inspected by the U.S. Department of Labor Mine Safety and Health Administration ("MSHA"), which inspections often lead to notices of violation under the *Federal Mine Safety and Health Act of 1977*. Our U.S. mine could be subject to a temporary or extended shutdown as a result of a violation alleged by MSHA. **The Company's mining operations outside of the U.S. are similarly subject to inspection and regulation under applicable jurisdictional laws and regulations. If inspections result in an alleged violation, the Company may be subject to fines, penalties or sanctions and its mining operations could be subject to temporary or extended closures**. In addition to potential government restrictions and regulatory fines, penalties or sanctions, the Company's ability to operate and thus, its results of operations and financial position, **could be adversely affected by accidents, injuries, fatalities or events detrimental (or perceived to be detrimental) to the health and safety of our employees, the environment or the communities in which the Company operates**.

\* \* \*

**Failure to comply with applicable laws and regulations may result in civil or criminal fines or penalties or enforcement actions**, including orders issued by regulatory or judicial authorities enjoining or curtailing operations or requiring corrective measures, installation of additional equipment or remedial actions, or the imposition of additional local or foreign parties as joint venture partners, any of which could result in significant expenditures. **The Company may also be required to compensate private parties suffering loss or damage by reason of a breach of such laws, regulations or permitting requirements**. Future laws and regulations, or more stringent enforcement of current laws and regulations by governmental authorities, cannot be accurately predicted and it is possible that these could cause the Company to incur additional expense, divert management time and attention from revenue generating activities or restrict or delay the exploration and development of the Company's properties.

(Emphasis added).

45.     The statement in ¶ 44 was materially false and misleading because the Company understated its regulatory risk, given its unsafe mining practices in Turkey.

46.     The 2022 Annual Report contained the following risk disclosure regarding the permits it needs to conduct its business:

**The Company requires permits to conduct its operations, and delays in obtaining or failing to obtain such permits, or a failure to comply with the terms of any such permits that the Company has obtained, would adversely affect the Company's business.**

***The Company's operations, including continued production at Çöpler***, Marigold, Seabee and Puna, and further exploration, development and commencement of production on the Company's other mineral properties, ***require licenses, permits and other approvals from various governmental authorities, including land and water usage permits***. ***Obtaining or renewing governmental permits is a complex and time-consuming process.*** The duration and success of efforts to obtain and renew permits are contingent upon many variables not within the Company's control.

The Company's ability to obtain the required permits and approvals to explore for, develop and operate mines and to successfully operate near communities in the jurisdictions in which we operate depends in part on our ability to develop, operate and close mines in a manner that is consistent with the creation of social and economic benefits in the surrounding communities, which may or may not be required by law. ***Our ability to obtain permits and approvals and to operate near certain communities may be adversely impacted by real or perceived detrimental events associated with our activities or those of other mining companies affecting the environment, health and safety of communities in which we operate***. Further, certain communities may challenge, or seek to challenge, permits and approvals granted to the Company, including, but not limited to, environmental impact assessments and other operating permits, which may result in temporary or permanent suspension of such permits and approvals or the cessation of Company operations. ***Any delay or suspension of the Company's operations as a result of such challenges, whether such challenges have merit, may adversely affect the Company's business, results of operations or financial condition***.

***Previously obtained permits and approvals may be suspended or revoked for many reasons, including through government or court action, or may be adjusted in a manner that adversely affects our operations, including our ability to explore or develop properties, commence production or continue operations***. There can be no assurance that all permits, licenses and approvals that are required for the operations of the Company, including any for construction of mining facilities or conduct of mining, will be obtainable or renewable on reasonable terms, or at all. Delays or a failure to obtain such required permits, or

the expiry, revocation or failure by the Company to comply with the terms of any such permits that it has obtained, would adversely affect the Company's business.

(Emphasis added).

47.    The statement in ¶ 46 was materially false and misleading because the Company understated the risk of having trouble maintaining the necessary permits to operate the Copler Mine, given that it conducted its Copler Mine operations in an unsafe manner.

48.    On April 14, 2023, SSR Mining published its ESG and Sustainability Report for 2022 (the "2022 Sustainability Report"). In Defendant Antal's foreword to the 2022 Sustainability Report, he stated the following:

> **Health and safety is, and always will be, our utmost priority.** Our job is to protect the health and safety of our employees and to ensure every employee returns home safely. Unfortunately, in early 2022, one of our colleagues was fatally injured in a traffic accident while returning home from our Puna Operations in Argentina. This incident led to a comprehensive review of the routes and modes of transportation to and from site **as well as an overall assessment of our safety programs at all our operating sites**.

> *          *          *

> For SSR Mining, sustainable mining means creating enduring value for all our stakeholders, maintaining a safe and healthy work environment, having respect for human rights and behaving as responsible stewards of the environment. While we advanced a number of initiatives on these fronts, **a couple of significant safety and environmental incidents had a palpable impact on our business and mindset and we are determined to learn from them.**

(Emphasis added).

49.    The statement in ¶ 48 was materially false and misleading because Defendant Antal overstated the Company's commitment to safety.

50.    In the 2022 Sustainability Report, the Company made the following statement:

> At SSR Mining, our vision is to deliver sustainable value for all stakeholders through responsible mining. **People and the environment are our most essential resources and we are committed to safeguarding them both now and in the future**. We recognize the catalyst role our operations play in local communities and commit to leaving a positive legacy.

*      *      *

***We also believe in creating value and improving the lives of the people living in the communities in which we operate*** so that we generate long-term value for our stakeholders well beyond the life of a mine.

(Emphasis added).

51.     The statement in ¶ 50 was materially false and misleading because it overstated the Company's commitment to safety.

52.     The 2022 Sustainability Report contained the following about Health, Safety & Risk:



## Health, Safety & Risk

We protect and care for the people, communities, and environments in which we do business. We actively manage risk at all levels of the business.

- Our workplaces are free of fatality, injury and occupational illness

- We believe strong environmental stewardship is centered in all aspects of our business

- Our risk management processes ensure that we measure, report and mitigate risk in everything we do

53.     The statement in ¶ 52 was materially false and misleading because the Company overstated the extent to which it managed risk.

54.     The 2022 Sustainability Report contained the following statement:

Our employees are the foundation of our business success. ***Transforming world-class ore deposits into best-in-class mines requires the talent and dedication of a highly competent and motivated workforce and a safe, healthy working environment***. Most recently, our ability to successfully navigate through a global pandemic ***underscores our commitment to a safe workplace and the resilience and dedication of our employees and business partners***.

(Emphasis added).

55.     The statement in ¶ 54 was materially false and misleading because the Company overstated its commitment to providing its employees (and contractors and working for it) a safe workplace.

56.     The 2022 Sustainability Report contained the following regarding SSR Mining's approach to safety:

At SSR Mining, health and safety ***have always been and will always be a foundational value***. Mining as an industry has a range of inherent risks and failure to implement to develop and implement robust standards can result in serious and life-altering injuries, loss of life and damage to assets. ***However, we believe that with appropriate controls, sound management of factors to minimize risk and robust employee engagement, the majority of safety incidents are preventable***.

***Our number-one objective, above anything else***, ***is to reduce harm and reduce incidents that hurt our employees and business partners***. It is clear from our performance in 2022 that we have more work to do in both of these areas. ***Safety begins with leadership and engagement, identifying and controlling risk, the elimination of hazards, improving ongoing training and responding appropriately when the unexpected happens***.

Safety at SSR Mining is governed by our Health and Safety Policy ***which sets out a commitment to:***
- A safety culture ***that addresses safety and health both as a company and a personal value for us and those we work with***[.]
- Protect the health and safety of employees and our business partners ***at all stages of the mine life cycle***[.]
- Provide employees and contractors with ***a safe working environment free from uncontrolled hazards***[.]
- Implement effective safety, health and security systems at all operations[.]

- Evaluate the health and safety implications of business decisions[.]
- Measure and monitor the safety and health performance of our operation against set objectives and targets[.]
- Promote initiatives that foster a safety culture[.]
- Promote wellness and healthy lifestyles for our employees, local communities and those we work with[.]

Our management approach to Safety and Health *is overseen by our Senior Vice President, Environment, Health, Safety and Sustainability with support from our Director of Health & Safety and dedicated site-level teams, which include subject matter experts at each operation and each project.*

(Emphasis added).

57.     This statement in ¶ 56 was materially false and misleading because the Company overstated its commitment to providing a safe workplace, and understated the extent to which it was likely that there would be a failure at one of its mines which could result in injury or loss of life.

58.     The statements contained in ¶¶ 18, 20, 22, 24, 26, 28, 30, 33, 35, 38, 40, 42, 44, 46, 48, 50, 52, 54, and 56 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Defendants materially overstated SSR Mining's commitment to safety and the efficacy of its safety measures; (2) SSR Mining engaged in unsafe mining practices which were reasonably likely to result in a mining disaster; and (3) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all times.

## THE TRUTH BEGINS TO EMERGE

59.     On February 13, 2024, before the market opened, the Company filed with the SEC a current report on Form 8-K. Attached to this current report was a press release which announced the following:

SSR MINING ANNOUNCES SUSPENSION OF OPEATIONS AT  ÇÖPLER

SSR Mining Inc. announces a suspension of operations at the  Çöpler mine as a result of a large slip on the heap leach pad. This event occurred in the morning of February 13, 2024 at approximately 6:30 am EST, and all operations at Çöpler have been suspended as a result.

60.     Also on February 13, 2024, Reuters released an article entitled "SSR Mining halts gold production in Turkey after landslide, shares tank." This article stated that "Gold miner SSR Mining on Tuesday suspended production at a mine in eastern Turkey **after a landslide, which left at least nine miners missing**[.]" (Emphasis added). Further, it stated that "[t]he mine in Erzincan province is operated by Anagold Madencilik and owned by Turkey-based Calik Holding and Denver, Colorado-based SSR Mining."

61.     The Reuters article further stated that "[s]ecurity footage showed a giant mound of soil, which authorities said had been processed for gold and piled on the hills, rapidly crumble and flow into the valley in a deluge of earth and rocks, sending clouds of dust into the air."

62.     The article further stated the following:

Interior Minister Ali Yerlikaya said 400 search and rescue workers were looking for the missing miners.

"In order to closely coordinate the rescue work, **I will interrupt my international program with our president and move to the region as of tonight**," Energy Minister Alparslan Bayraktar said in a posting on X, formerly Twitter.

The government **said it has launched an investigation into the incident**.

(Emphasis added).

63.     It soon emerged that there had been warnings about safety at the Copler Mine. During market hours on February 13, 2024, PBS Newshour released a story

entitled "Workers at gold mine in Turkey missing, assumed trapped underground after landslide." It stated the following:

> Turkey has a poor mine safety record. In 2022, an explosion at the Amasra coal mine on the Black Sea coast killed 41 workers. The country's worst mining disaster took place in 2014 at a coal mine in Soma, western Turkey, were [some] 301 people were killed.
>
> In the wake of those incidents, **engineers warned that safety risks were frequently ignored and inspections not adequately carried out**.
>
> **"The disaster that took place in Erzincan Ilic Copler gold mine is a disaster that (was) coming," the Union of Chambers of Turkish Engineers and Architects** said in a statement issued on social media.
>
> The union added that **it had filed two lawsuits against the mine's operation**. "We said that Ilic Copler gold mine should be closed and rehabilitation works should be started."
>
> (Emphasis added).

64.     On this news, the price of SSR Mining stock fell $5.22 per share, or 53.7%, to close at $4.50 on February 13, 2024, on unusually heavy trading volume, damaging investors.

65.     Then, on February 16, 2024, after market hours, Reuters released an article entitled "SSR Mining says eight employees detained after Turkey mine landslide." This article stated the following:

> Gold miner SSR Mining **said on Friday that eight of its employees have been detained amid an investigation into a landslide at its mine in Turkey and that operations there remain suspended**.
>
> SSR Mining on Wednesday suspended production at its Copler mine in eastern Turkey after the landslide, which left at least nine miners missing[.]
>
> Search and rescue operations to locate the nine missing workers at the mine are continuing, the miner said in the statement.
>
> (Emphasis added).

22

66.     Then, on February 17, 2024, Mining.com published an article entitled "Turkey cancels SSR gold environmental permits after accident." It stated the following:

> Turkey canceled the environmental licenses of a gold mine operated by a unit of SSR Mining Inc. in eastern Turkey after a landslide this week left nine workers trapped under the rubble.
>
> The nation's environmental ministry ended the miner's environmental permissions and licenses, according to a statement.
>
> The move came days after an incident that dislodged 10 million cubic meters of earth across a 200-meter slope.
>
> \*          \*          \*
>
> SSR Mining said late on Friday that all operations remained suspended at the mine, and it would provide further updates as it becomes aware of more information or during the company's 2023 financial results, scheduled for February 21.
>
> The mine's two licenses issued by Turkey's Energy Ministry are currently valid, with the company's operating license set to expire in 2026. Yet production at the mine can't resume until necessary arrangements are made to address the landslide and waste issues in the area, according to the ministry.

67.     Then, on Sunday, February 18, 2024, Sky News released an article entitled "Gold mine boss detained as search continues for missing miners trapped after huge landslide in Turkey."

68.     The article stated that "[t]he boss of a mining company, which runs a gold mine where nine miners are missing after a massive landslide, has been detained by authorities in Turkey." Further, it specified that "***Cengiz Demirci, Turkey director and senior vice-president of operations at the Denver-based SSR Mining, was detained on Sunday morning***." (Emphasis added).

69.     It further stated the following:

> ***SSR Mining is the parent company of Anagold, which has operated the mine since 2009, where more than 650 people work***.

The workers have been missing for six days after the huge landslide which, according to Turkey's interior minister, Ali Yerlikaya, involved a mound of soil extracted from the mine. Footage showed a huge mass of earth rushing down a gully, overrunning everything in its path.

\*        \*        \*

**Six Copler mine employees – out of eight detained earlier this week – have been formally arrested.**

**On Saturday, Turkey's environment ministry said it was cancelling Anagold's environmental permit and license**.

**In 2020, the same mine was shut down following a cyanide leak into the Euphrates, roughly two miles away.**

It reopened two years later after the company was fined and a clean-up operation was completed.

(Emphasis added).

70.     Also on February 18, 2024, the Company issued a press release in which it provided an update on the incident at Copler. In pertinent part, the Company did not contest that criminal charges filed against six Company employees were filed on legitimate grounds.  It stated the following:

Search and rescue efforts to locate nine missing workers following the February 13, 2024 incident at the Çöpler mine continue. Our thoughts continue to be with the families of the missing workers and the Çöpler community during this incredibly difficult time. We will continue to support the authorities on the ground in Türkiye in their search and rescue efforts. A new waiting and information point has been established within the mine area for the families of the missing workers.

**We acknowledge that several of our team members are facing charges in relation to the recent incident, and we are ensuring they receive the necessary support while respecting the legal process**.

SSR Mining has also been notified that the Çöpler environmental permit has been revoked, and the operation will remain suspended until further notice. Planning for near-term remediation efforts has begun at the direction of Ministry Officials, with an initial focus on removing heap leach material from the Sabirli valley and relocating it to a permanent storage location. SSR Mining is also deploying third party contractor resources to support the recovery and remediation efforts.

(Emphasis added).

71.　　On this news, the price of SSR Mining stock declined by $0.29 per share, or 5.90%, to close at $4.62 per share on February 20, 2024. The next day, it fell a further $0.11, or 2.38%, to close at $4.51 on February 21, 2024.

72.　　Then, on February 27, 2024, after market hours, Defendants conducted their earnings call for the Fourth Quarter of 2023.

73.　　On this call, Defendant Antal stated that "[s]ix personnel are being detained and are facing charges in relation to the incident and we're ensuring they receive the necessary support while respecting the Turkish legal process". In pertinent part, Defendant Antal did not contest that the charges were filed on legitimate grounds.

74.　　Defendant Antal stated the following regarding the financial impact of the Copler disaster:

> Looking forward, the Copler incident will have an impact on our financial results in 2024. We continue to evaluate and assess these potential impacts as laid out in today's 10-K filings.
>
> In the first quarter of '24 and as noted in the 10-K, we anticipate recording an impairment at the heap leach inventory directly impacted by the COPLER incident and will also evaluate the COPLER long-lived asset group for any additional impairment. Given the uncertainty surrounding these items, we are taking some steps to preserve our cash position until we have more fidelity around the forward-looking cash requirements of the business. As a result, we have suspended our quarterly dividend and automated share purchase plan we put in place last year.
>
> Given our focus is on [Turkey], is on COPLER, we've also temporarily placed further investment at [indiscernible] on hold at this time. We will revisit the time line and approach in due course. This has obviously been a very difficult time for everyone impacted by the events of February 13, and we are doing everything we can to support our colleagues and the various stakeholders on the ground in [Turkey].
>
> Clearly, we are in a period of some uncertainly, and there is no doubt that we have some challenges ahead as we focus on the recovery efforts at Copler. In the meantime, operations are continuing at Marigold, Seabee and Puna. As I turn the

line back to the operator for any questions, I will again note that we'll keep the discussions on the incident to my prepared remarks.

75.     On this news, the price of SSR Mining stock declined by $0.37 per share, or 7.93%, to close at $4.29 on February 28, 2024.

76.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and the other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

77.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired SSR Mining securities publicly traded on the NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

78.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

79.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

80.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

81.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

82.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

83.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's securities met the requirements for listing, and were listed and actively traded on the NASDAQ, an efficient market;

- as a public issuer, the Company filed public reports;

- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

84.     Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly available sources

and reflected such information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

85.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

### COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

86.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

87.    This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

88.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

89.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

90.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

91.     Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them

or other Company's personnel to members of the investing public, including Plaintiff and the Class.

92.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

93.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

94.      As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

95.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

96.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

97.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of revenue and profit and false financial statements.

98.     As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

99.     Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

100.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: March 18, 2024                    **THE ROSEN LAW FIRM, P.A.**


/s/ Phillip Kim
Phillip Kim, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com

*Counsel for Plaintiff*