# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-00739-DDD-SBP

KARAM AKHRAS, individually and on
behalf of all others similarly situated,

> Plaintiff,

v.

SSR MINING, INC.,
RODNEY P. ANTAL, and
ALISON WHITE,

> Defendants.

---

Civil Action No. 1:24-cv-00808-CNS-SBP

ERIC LINDEMANN, individually and on
behalf of all others similarly situated,

> Plaintiff,

v.

SSR MINING, INC.,
RODNEY P. ANTAL,
ALISON WHITE,
STEWART J. BECKMAN,
WILLIAM NEVIN, and
F. EDWARD FARID,

> Defendants.

---

## ORDER AND RECOMMENDATION ON MOTIONS TO CONSOLIDATE CASES, APPOINT LEAD PLAINTIFF, AND APPROVE LEAD COUNSEL

**Susan Prose, United States Magistrate Judge**

These putative securities class actions are before this court on seven motions to consolidate *Akhras v. SSR Mining, Inc., et al.*, 24-cv-00739-DDD-SBP ("*Akhras*"), and *Lindemann v. SSR Mining, et al*., 24-cv-00808-CNS-SBP ("*Lindemann*"), to appoint the lead plaintiff for the purported class, and to approve lead counsel. *See Akhras*, ECF Nos. 12, 14, 16, 18, 19, 21, and 22. Defendants[1] took no position. *See, e.g*., ECF No. 21 (certificate of conferral). These motions are referred to the undersigned pursuant to 28 U.S.C. § 636(b). *See* ECF No. 29 (Order of June 4, 2024).

At the outset, the court notes that Motions 12, 14, 16, and 19 have either been withdrawn or the respective movants filed a notice of non-opposition to the other, competing motions. *See* ECF Nos. 24, 25, 30, and 31 (notices). Accordingly, Motions ECF Nos. 12, 14, 16, and 19 are WITHDRAWN or TERMINATED AS MOOT. As to the three remaining motions (Nos. 18, 21, and 22), for the reasons that follow, this court respectfully RECOMMENDS granting consolidation; GRANTS the motion (ECF No. 18) of RAD Investment LLC ("RAD") to be appointed as lead plaintiff and to approve RAD's counsel as lead counsel; and DENIES the competing motions of George Lamason and Jeremy Linhardt (collectively, "L&L") (ECF No. 22) and the Employees Retirement System of the City of Baltimore ("Baltimore," ECF No. 21).

I.    *Background*

Plaintiffs bring federal securities fraud claims concerning the shares of Defendant SSR

---

[1] As the captions reflect, the second-filed action (*Lindemann v. SSR Mining, Inc., et al*., 24-cv-00808-CNS-SBP) names more Defendants than the first-filed action (*Akhras v. SSR Mining, Inc., et al*., 24-cv-00739-DDD-SBP). In this ruling, "Defendants" refers to all Defendants named in *Lindemann*. All references to ECF are in *Akhras* unless otherwise noted. All references to page numbers in ECF filings are to the pdf, not native numbering in the documents.

Mining, Inc. ("SSR"). The court takes the following allegations from the *Akhras* Complaint, ECF
No. 1.

SSR is a mining company whose shares are publicly traded on the NASDAQ Exchange
(ticker symbol: SSRM). On February 13, 2024, one of the company's mines located in Turkey
experienced a massive landslide. This will be referred to as the "Copler Disaster." Plaintiffs
allege a series of news articles and public statements by SSR ultimately disclosed the fraud they
allege in this case.

On February 13, 2024, the same day as the Copler Disaster, SSR filed a Form 8-K
attaching a press release announcing the suspension of operations at the mine. *Id.* ¶ 59. Reuters
carried an article the same day announcing further details, including that several miners were
missing and that the Turkish government had launched an investigation. *Id*. ¶¶ 60-62. PBS
Newshour released a story with further details, including a union's statement on social media
that warnings of safety risks had been ignored at the mine. *Id*. ¶ 63. On the day's news, SSR's
share price fell $5.22 per share, or 53.7%, closing at $4.50 that day on unusually heavy volume.
*Id*. ¶ 64.

On February 16, 2024, Reuters reported that several SSR employees were detained in the
investigation. *Id*. ¶ 65.

On February 17, 2024, Mining.com reported that Turkey canceled SSR's gold permits as
a result of the Copler Disaster. *Id*. ¶ 66.

On February 18, 2024, Sky News reported further details and developments, including
that a specific officer of SSR was detained in the investigation, six employees were formally
arrested, a permit and license were cancelled, and in 2020 the same mine was shut down due to a

cyanide leak. *Id*. ¶¶ 67-69. The same day, SSR issued a press release with updates on the Copler

Disaster. *Id*. ¶ 70.

On February 20, 2024, the price of SSR's shares fell by $0.29 per share or 5.90%, to

close at $4.62 per share. The next day, the share price fell another $0.11, or 2.38%, to close at

$4.51 per share. *Id*. ¶ 71.

On February 27, 2024, Defendants held a fourth quarter (of 2023) earnings call after

hours, in which they made further statements relating to the Copler Disaster and its anticipated

effect on SSR's earnings. *Id*. ¶¶ 72-74. On that news, the price of SSR's shares dropped again,

by $0.37 per share, or 7.93%, to close at $4.29 on February 28, 2024. *Id*. ¶ 75.

Plaintiffs allege that Defendants had known for some time of safety concerns and failures

to address them. Specifically, in *Akhras*, Plaintiff alleges that Defendants' made false or

misleading statements beginning with its annual report filed on February 22, 2022, and

continuing with other statements made through February 27, 2024. *Id*. ¶¶ 17-58.[2] Plaintiffs

further allege that Defendants knew that their public statements during the class period,

concerning the efficacy of SSR's safety protocols, had become false and misleading, yet they did

not timely correct those statements. *Id*. ¶ 98.

Plaintiffs claim that Defendants' failure to timely disclose SSR's safety issues violated

---

[2] In *Akhras*, the Defendants are SSR, Rodney P. Antal (Executive Chairman of the Board of Directors and former Chief Executive Officer), and Alison White (Chief Financial Officer and Executive Vice President during the class periods). Mr. Lindemann sues those same Defendants plus three additional SSR officers: Stewart J. Beckman (Executive Vice President and Chief Operating Officer), William Nevin (Executive Vice President of Operations and Sustainability), and F. Edward Farid (Executive Vice President of Operations and Chief Corporate Development Officer).

Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) (the "Exchange Act"), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"). Plaintiffs further claim that the individual Defendants also violated Section 20(a) of the Exchange Act as control persons of SSR within the meaning of that statute.

Plaintiffs propose to represent classes of all persons who purchased or otherwise acquired publicly-traded SSR shares during class periods of respectively February 23, 2022, through February 27, 2024 (*Akhras*, ECF No. 1 ¶ 1) and June 27, 2022, through February 12, 2024 (*Lindemann*, ECF No. 1 ¶ 1). For present purposes, all Movants use *Akhras's* proposed class period. *See, e.g.*, ECF Nos. 18-4, 21-2, 23-1 (loss charts). This court does likewise.

## II.      *Motions to Consolidate*

It appears that all Plaintiffs request consolidation, and Defendants took no position. As follows, this court RECOMMENDS that the cases be consolidated.[3]

### A.      *Legal Standards*

"If actions before the court involve a common question of law or fact, the court may (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay." Fed. R. Civ. P. 42(a). "[C]onsolidation is permitted as a matter of convenience and economy in administration, but does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another." *Hall v. Hall*, 584 U.S. 59, 70 (2018) (quoting *Johnson v. Manhattan R. Co.,* 289 U.S. 479, 496-97 (1933)). "[O]ne of multiple cases

---

[3] Motions to consolidate are not identified as dispositive motions in 28 U.S.C. § 636(b), but decisions in this District appear to consistently treat them as such. Accordingly, this court issues a recommendation as to consolidation.

consolidated under the Rule retains its independent character, at least to the extent it is
appealable when finally resolved, regardless of any ongoing proceedings in the other cases." *Id.*
at 66. *See also Cooper Clark Found. v. Oxy USA Inc.*, 785 F. App'x 579, 584 (10th Cir. 2019)
(citing *Hall*).

"District courts enjoy substantial discretion in deciding whether and to what extent to
consolidate cases." *Hall*, 584 U.S. at 77 (citing 9A C. Wright & A. Miller, *Federal Practice & 
Procedure* § 2383 (3d ed. 2008)). "The purpose of Rule 42(a) is to give the court broad
discretion to decide how cases on its docket are to be tried so that the business of the court may
be dispatched with expedition and economy while providing justice to the parties." *Decoteau v.
Raemisch*, 304 F.R.D. 683, 691 (D. Colo. 2014) (internal quotation marks omitted). The court
should thus consider whether "the rights of the parties will be adequately protected" and fairness.
*Harris v. Illinois-California Exp., Inc.*, 687 F.2d 1361, 1368 (10th Cir. 1982). "Rulings on
motions to consolidate shall be given priority." D.C.COLO.LCivR 42.1.

B.    Analysis

These cases involve several common questions of law or fact. Both Complaints allege
that Defendants' securities fraud caused a steep fall in the price of SSR's shares in February
2024. The two cases are of course not identical: the proposed class periods differ somewhat, and
*Lindemann* names five individuals as Defendants while *Akhras* names only two. But no one has
argued that those differences are significant enough to overcome the common questions of law
and fact for purposes of Rule 42 analysis. This court finds that consolidation will serve judicial
economy and provide justice to the parties. Accordingly, this court RECOMMENDS that the
motions to consolidate be granted.

6

III.    *Motions to Designate Lead Plaintiff and Lead Counsel[4]*

    A.    *Legal Standards*

As putative class actions alleging federal securities fraud, *Akhras* and *Lindemann* are

both cases subject to the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

Among other changes, the PSLRA amended the Exchange Act to require several class

procedures in addition to, or in lieu of, Federal Rule of Civil Procedure 23:

> The PSLRA establishes a procedure that governs the appointment of Lead Plaintiffs
> in each private action arising under [the Exchange Act] that is brought as a plaintiff
> class action pursuant to the Federal Rules of Civil Procedure. Any member of the
> purported class may move the Court to serve as Lead Plaintiff, but must do so
> within 60 days of the published notice of the potential class action.

*Armbruster v. Gaia, Inc.*, No. 22-cv-03267-NYW-STV, 2023 WL 2613817, at *1 (D. Colo. Mar.

23, 2023) (cleaned up, citing 15 U.S.C. §§ 78u-4(a)(1), 78u-4(a)(3)(A)(i)(II); *In re Ribozyme*

*Pharm., Inc. Sec. Litig.*, 192 F.R.D. 656, 657 (D. Colo. 2000); *Mariconda v. Farmland Partners*

*Inc.*, No. 18-cv-02104-DME-NYW, 2018 WL 6307868, at *2 (D. Colo. Dec. 3, 2018)).

In this case, it is undisputed that counsel timely published a satisfactory notice. *See, e.g.*,

ECF No. 18-2 (notice by the Rosen Law Firm, dated March 18, 2024). This court has also

reviewed the notice and finds that it satisfies the PSLRA's "early notice" requirement (15 U.S.C.

§ 78u-4(a)(3)(A)(i)) because it was published within twenty days of the first-filed complaint. The

notice was published in *Business Wire,* a publication that is a "widely circulated national

business-oriented publication or wire service" for purposes of the statute. *See, e.g.*, *In re*

---

[4] "Courts routinely construe motions for appointment of lead counsel under the . . . PSLRA as
non-dispositive for purposes of Rule 72." *Clifton v. Willis*, No. 22-cv-03161-DDD-JPO, 2024
WL 1508831, at *1 (D. Colo. Mar. 26, 2024) (quotation marks omitted). Accordingly, this court
issues an order on the motions for appointment of lead plaintiff and lead counsel.

*Sandridge Energy, Inc. Sec. Litig.*, No. Civ-12-1341-W, 2015 WL 3652522, at *1 (W.D. Okla.
May 11, 2015). The notice provides the specific information required by the statute: "it advises
members of the purported class of (1) the action's pendency, (2) the claims the action asserts,
(3) the purported class period, and (4) the 60-day deadline for moving to serve as lead plaintiff."
*Jaramillo v. Dish Network Corp.*, No. 23-cv-00734-GPG-SKC, 2023 WL 5312062, at *2 (D.
Colo. Aug. 16, 2023).

      In response to the notice, the court received the seven motions noted above, each timely
filed within 60 days of the notice, on May 17, 2024. As noted above, three of those motions
remain pending: RAD's (ECF No. 18); Baltimore's (ECF No. 21); and L&L's (ECF No. 22).
This court refers to these motions as the "Lead Plaintiff Motions." The Movants filed responses
and replies. *See* ECF Nos. 32-37.

      Where—as here—a motion to consolidate is pending, then "as soon as practicable" after
"the decision on the motion to consolidate is rendered," the court "shall appoint *the most
adequate plaintiff* as lead plaintiff for the consolidated actions *in accordance with this
paragraph*." 15 U.S.C. § 78u-4(a)(3)(B)(ii) (emphasis added). The statute establishes a
"rebuttable presumption" that the "most adequate plaintiff" is the "person or group of persons
that: . . . (bb) in the determination of the court, has the *largest financial interest* in the relief
sought by the class; and (cc) *otherwise satisfies* the requirements of *Rule 23* of the Federal Rules
of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) (emphasis added).[5]

---

[5] The lead plaintiff must also have "either filed the complaint or made a motion in response to a
notice." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(aa). It is undisputed that having timely filed their
present motions, RAD, Baltimore and L&L each meet that requirement.

"Though the PSLRA nominally requires courts to consider whether Federal Rule of Civil Procedural 23's requirements have been satisfied, only two of Rule 23's four requirements—typicality and adequacy—are relevant in the context of lead plaintiff appointments." *Jaramillo*, 2023 WL 5312062, at *2 (citing *Wolfe v. AspenBio Pharma, Inc.*, 275 F.R.D. 625, 627-28 (D. Colo. 2011)). In other words, "the claims . . . of the representative parties [must be] *typical* of the claims . . . of the class; and the representative parties [must] *fairly and adequately* protect the interests of the class." Fed. R. Civ. P. 23(a)(3), (4) (emphasis added). *See also Ribozyme*, 192 F.R.D. at 658 (limiting the inquiry to "these final two prongs of Rule 23(a) and defer[ring] examination of the remaining requirements [of Rule 23] until the lead plaintiffs move for class certification").

The presumption in favor of the plaintiff who has the largest financial interest "may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff: (aa) will not fairly and adequately protect the interest of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." *Id*. § 78u-4(a)(3)(B)(iii)(II).

Finally, "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." *Id*. § 78u-4(a)(3)(B)(v). The Lead Plaintiff Motions request approval of the Movants' respective counsel to represent the putative class:

> As such, approval of lead counsel is a matter within the discretion of the Court. In exercising this discretion, the Court must determine whether the proposed lead counsel are qualified, experienced, and able to vigorously conduct the proposed litigation. The Court will only disturb the lead plaintiff's choice of counsel if necessary to fairly and adequately protect the interests of the class.

*Jaramillo*, 2023 WL 5312062, at *2 (cleaned up, citing inter alia *Medina v. Clovis Oncology, Inc.*, No. 15-cv-2546-RM-MEH, 2016 WL 660133, at *4 (D. Colo. Feb. 18, 2016); *Armbruster*, 2023 WL 2613817, at *4; *Darwin v. Taylor*, No. 12-cv-01038-CMA-CBS *et al.*, 2012 WL 5250400, at *8 (D. Colo. Oct. 23, 2012); *In re Molson Coors Brewing Co. Sec. Litig.*, No. 19-cv-00455-DME-MEH, 2019 WL 10301639, at *3 (D. Colo. Oct. 3, 2019)).

    B.    *Analysis*

        1.    *Largest Financial Interest: L&L*

This court begins by determining which of the Movants has the "largest financial interest." As the Supreme Court notes:

> Which plaintiff has the largest financial interest may not be immediately apparent; the statute does not define the term, and the size of a shareholder's financial interest can depend on how many shares were purchased and sold, when, and at what price, as well as the order in which the losses are tallied.

*China Agritech v. Resh*, 584 U.S. 732, 742 n.3 (2018) (emphasis added, citing *Cortina v. Anavex Life Sciences Corp.,* No. 15-cv-10162 (JMF), 2016 WL 1337305 (S.D.N.Y. Apr. 5, 2016)). To determine the "largest financial interest," the majority of courts consider four factors that were first articulated in *Lax v. First Merchants Acceptance Corp.*, Nos. 97-Civ.-2715 et al., 1997 WL 461036 (N.D. Ill. Aug. 11, 1997). Those factors are:

    (1) the total number of shares purchased during the class period;

    (2) the number of net shares purchased during the class period;

    (3) the total net funds expended during the class period; and

    (4) the approximate financial losses suffered.

*Clifton v. Willis*, No. 22-cv-03161-DDD-JPO, 2024 WL 1508831, at *2-3 (D. Colo. Mar. 26,

2024) (finding no clear error in recommendation that applied the *Lax* test, citing *Lax*, 1997 WL

461036, at \*5). *See also Armbruster*, 2023 WL 2613817, at \*2-3 ("the weight of authority

appears to favor the . . . *Lax* test," citing *Knox v. Yingli Green Energy Holding Co. Ltd.*, 136 F.

Supp. 3d 1159, 1163 (C.D. Cal. 2015); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v.

LaBranche & Co.*, 229 F.R.D. 395, 404 (S.D.N.Y. 2004)). *See also Mariconda*, 2018 WL

6307868, at \*3 ("clear weight of authority favoring the four-factor *Lax* test"). Courts have

observed that

> a trend seems to be emerging that the *Lax* factors are properly ordered, so that the
> number of shares purchased (Factor 1) is the least important and the loss suffered
> (Factor 4) is the most important. The statute requires the selection of the class with
> the largest "financial interest." The size of the loss (and the other *Lax* factors) are
> only a proxy—and an imperfect one—for determining this issue.

*Richman v. Goldman Sachs Grp., Inc.*, 274 F.R.D. 473, 475–76 (S.D.N.Y. 2011). *See also

Cortina*, 2016 WL 1337305, at \*1 (collecting cases).

The *Lax* factors—and arguably, any other test—are imperfect in part because the court

must apply them at the very outset of the case. The Movants themselves may not have identified

all issues that will ultimately be in play in the putative class's losses.[6] Certainly, the Movants

have no incentive to identify issues that are unlikely to remove a competing Movant from

consideration as lead plaintiff.

Accordingly, this District views the *Lax* factors with some flexibility. *Clifton*, for

---

[6] As *Richman* noted in the context of addressing the extent to which plaintiffs may aggregate
their losses in order to obtain the lead plaintiff position, "[w]e have replaced what Congress
deemed to be an unseemly race by individual investors (and their pre-chosen counsel) to the
courthouse, with a new mechanism based on the lawyers' beguiling ability to arrange large
financial figures." 274 F.R.D at 478.

instance, recognized that while the fourth factor has the greatest weight, when movants have similar losses, that factor can be overcome by the combined weight of the other factors. *Clifton v. Willis,* No. 22-cv-03161-DDD-JPO, 2024 WL 1508832, at *6 (D. Colo. Mar. 5, 2024), *recommendation adopted*, 2024 WL 1508831, at *3 (noting "the *relative weight* assigned to various factors is not a binding legal rule but a guide to the exercise of discretion"). Depending on the facts, some recent decisions in this District do not even mention *Lax* or its four factors, and instead simply note that "courts routinely look to the movant's financial loss as the most significant factor." *Subramanian v. Watford*, No. 20-cv-02652-CMA-STV, 2021 WL 1697147, at *2 (D. Colo. Apr. 29, 2021); *Jaramillo*, 2023 WL 5312062, at *2-3 (not deciding which movant had the largest financial interest because the Rule 23 requirements narrowed the field to only one).[7]

　　With these legal standards in mind, this court turns to the Movants' competing assertions concerning the largest financial interest. They assert the following facts pertinent to the *Lax*

---

[7] At least where the alleged class period was quite short—only two days—an older, officially published case applied a "retention value" test, which apparently looked only to the total approximate losses. *Ribozyme*, 192 F.R.D. at 658. That case found the *Lax* test (as adopted in *In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1998)), "fortif[ied] the viability of [the retention value] . . . rule and uncover[ed] the reasons behind its application." *Id.* at 660. The court also noted an argument of counsel that the four "factors may be important where the class period is lengthy and the proposed lead plaintiffs have numerous 'in and out' purchases and sales within the class period, [but that] such factors are not particularly helpful or relevant where . . . the class period is quite short, purchases and sales activity relatively limited, and damages comparatively easy to compute." 192 F.R.D. at 661. The court did not expressly adopt that reasoning, but the very short class period in *Ribozyme* (spanning only two days) may explain why it did not apply *Lax*. Over time, however, *Ribozyme* has been seen as an outlier. *See, e.g.*, *Mariconda*, 2018 WL 6307868, at *3.

factors:[8]

| *Lax* Factor | L&L | RAD | Baltimore |
|---|---|---|---|
| Total Shares Purchased During Class Period | 1,310,735 | 1,134,028 | 74,858 |
| Net Shares Purchased During Class Period | (100,000) | 941,230 | 61,516 |
| Net Funds Expended During Class Period | ($601,311) | $5,678,446 | $618,034 |
| Approximate Losses the Movant Asserts | **$1,468,963** | **$1,137,195.50** | **$291,320** |

Thus, for the fourth and arguably most important factor for determining who has the

largest financial interest, L&L asserts the largest collective losses of **$1,468,963**. ECF No. 23-1.

RAD asserts a considerably smaller loss at **$1,137,195.50**. ECF 18-2, 18-3. And Baltimore

asserts a significantly smaller loss than either L&L or RAD, at **$291,320**. ECF No. 21 at 9, ECF

---

[8] In the Motions, RAD and Baltimore initially relied on only the fourth *Lax* factor. L&L, on the other hand, relied on the first and fourth factors, but not the second (*net* shares purchased during the class period) and third (*net* expenditure during class period). ECF No. 22 at 14. L&L substituted instead the number of shares they retained at the time of the first partial disclosure, and their *total* expenditures of $18,721,924 in purchasing shares—not their *net* expenditures. *See* ECF No. 22 at 14; ECF No. 23-1 (Lieberman Decl., Ex. 1). Considering the ubiquity of the four *Lax* factors—which L&L itself cites in its Motion—L&L's substitutions for the second and third factors are curious at best.

In any case, RAD compiles the four *Lax* factors for each of the Movants from their respective loss charts. ECF No. 33 at 9, n.2. The Movants disagree concerning the loss calculations, but they do not appear to disagree that RAD accurately sets forth the total share purchases, net share purchases, and net expenditures reflected in the respective loss charts. *See* ECF Nos. 35, 37 (passim). This court therefore relies on RAD's compilation, except as to each Movant's total losses.

No. 21-2 (loss analysis).[9] At least at face value, the Movants' losses are not "similar," and there

is little or no reason to consider the other *Lax* factors in determining that L&L has the largest

financial interest.[10] However, it bears noting that L&L's second and third *Lax* factors stand out

from RAD and Baltimore. The court will return to these facts below, in analyzing L&L's Rule 23

typicality and adequacy.

RAD and Baltimore resist the conclusion that L&L has the largest financial interest. They

argue that L&L overstates its losses because they include shares purchased and sold before any

of the corrective disclosures alleged in the Complaints, i.e., "in and out transactions." ECF No.

36 (RAD Reply) at 2-3. RAD argues that losses on those transactions are not recoverable as

damages and therefore should not count at this phase either. Removing those trades, RAD

calculates a loss for L&L of only $1,090,675. This is $378,288 less than what L&L calculated

and would be less than RAD's loss. ECF No. 33 (RAD Response) at 9.

But even assuming RAD is correct concerning what sort of losses will ultimately be

recoverable (or not) in this case,[11] "[t]he lead plaintiff provision in the PSLRA does not use the

---

[9] At least RAD and Baltimore calculate losses on a LIFO (last in, first out) basis. ECF No. 33 at 9; ECF No. 21 at 9. LIFO and FIFO (first in, first out) are accounting concepts in the American generally accepted accounting practices promulgated by the Financial Accounting Standards Board. *See, e.g.*, FIFO and LIFO accounting - Wikipedia; Generally Accepted Accounting Principles (United States) - Wikipedia. In the context of this case, they are used to calculate the gain or loss realized when a holder sells only a portion of their position in a security. For purposes of determining the largest financial interest, LIFO "is greatly preferred." *Mariconda*, 2018 WL 6307868, at *3; *In re Crocs, Inc. Sec. Litig.*, No. 07-cv-02351-REB-KLM, *et al.*, 2008 WL 4298316, at *2 n.2 (D. Colo. Sept. 17, 2008).

[10] This court makes findings and conclusions only for purposes of appointing lead plaintiff and approving lead counsel.

[11] Mr. Akhras alleges Defendants' fraud began well before the first corrective disclosure—by February *2022*—when Defendants allegedly knew that their public statements (past or present)

14

term 'damages' but instead, 'largest financial interest.' . . . [Accordingly,] 'damages' under the

PSLRA is not the proper test to determine largest financial interest.'" *Ribozyme*, 192 F.R.D. at

661-62. *Cf. Gelt Trading Ltd. v. Co-Diagnostics, Inc.*, No. 22-cv-00368-JNP-DBP, 2023 WL

5334623, at *5 (D. Utah Aug. 18, 2023) (in certifying class, "loss causation is purely an issue to

be decided on the merits," citing *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 807

(2011)).

In short, for purposes of identifying the "largest financial interest," this court sees no

reason to exclude "in and out transactions" when L&L asserts it suffered losses on those

transactions due to the alleged ongoing fraud at the time. The court thus finds that L&L has the

largest financial interest.

### 2.    *L&L Is Not Typical or Adequate*

However, the court must next determine whether RAD or Baltimore have proved that

L&L is not typical, will not fairly and adequately protect the interest of the class, or is otherwise

subject to unique defenses that render it inappropriate to be lead plaintiff. 15 U.S.C. §§ 78u-

4(a)(3)(B)(iii)(II)(aa), (bb). "If such a unique defense could be raised in the case, the lead

plaintiff might devote inordinate time and money on that defense at the expense of the more

typical class issues." *Molson Coors*, 2019 WL 10301639, at *3 (citing *In re Crocs, Inc. Sec.

Litig.*, 306 F.R.D. 672, 687 (D. Colo. 2014)).

RAD and Baltimore argue that L&L is atypical and inadequate because Mr. Lamason is a

---

were or had become false or misleading. *See, e.g.*, ECF No. 1 ¶ 88 ("[d]uring the Class Period,"
Defendants made misleading statements and failed to disclose facts necessary to make the
statements not misleading); *id.* ¶¶ 97-98 (same allegations on control person claim).

"net seller" and "net gainer" during the class periods, meaning that he sold more shares than he bought during the class period, and he received more in proceeds than he expended during the class period. Mr. Lamason's sales and gains were large enough to outweigh Mr. Linhardt's net purchases and losses. Specifically, RAD calculates that L&L is a net seller of 100,000 shares and had a net expenditure of ($601,311), i.e., a net gain. ECF No. 33 at 9. *See also supra* (table reflecting the second and third *Lax* factors for L&L). Baltimore came to the same conclusions. ECF No. 34 at 4. So does this court.[12] And as briefly noted above, RAD and Baltimore point out that L&L's Motion omits its *net* shares purchased and *net* expenditures, substituting other measures instead. ECF No. 34 (Baltimore's Response) at 4 (analyzing ECF Nos. 23-1, 23-3); ECF No. 36 (RAD Reply) at 2.

L&L recognizes that it is a *net seller and net gainer* during the class period. ECF No. 35 (L&L's Reply at 8-10). It argues that this does not make it atypical or inadequate to lead the putative class, citing cases that appointed *net sellers* as lead plaintiffs. *Id*. at 9-10 (citing *In re UTStarcom, Inc. Sec. Litig*., No. C 04-04908 JW, 2010 WL 1945737, at *6 (N.D. Cal. May 12, 2010) (holding that "the purchase of stock after partial curative disclosures does not destroy typicality"); *Foley v. Transocean Ltd*., 272 F.R.D. 126, 132 (S.D.N.Y. 2011); *In re BP P.L.C. Sec. Litig*., MDL No. 10-md-2185, 2013 WL 6388408, at *6-9 (S.D. Tex. Dec. 6, 2013). L&L

---

[12] L&L's loss chart reflects that while they rely in their Motion on their total expenditure of ($18,721,924), they also received $19,323,235 on sales. ECF No. 23-1 at 2. Thus, they collectively had a net *gain* of $601,311. *See also id*. at 49 (Mr. Lamason expended $18,449,163 in purchases but received $19,220,744 in sales, for a net gain of $771,581. Mr. Linhardt had a net expenditure of ($272,762)-$102,491=($170,271). *Id*. Mr. Lamason's gain less Mr. Linhardt's loss yields a collective gain of $601,310. The court's calculation of L&L's net gain is thus one dollar off of RAD's and Baltimore's calculations, likely due to rounding errors.

argues, as discussed above, that regardless of the specific timing of the purchases and sales, it suffered substantial investment losses—whether calculated on a LIFO or FIFO basis—due to the alleged fraud. "[C]ourts regularly find that plaintiffs are typical even when the timing of their stock sales creates different damage calculations than those of other members of the class." *Gelt Trading*, 2023 WL 5334623, at *5 (collecting cases finding "in and out" trades and differences in timing of sales do not disqualify a plaintiff). "Numerous other courts have appointed a *net share seller* as lead plaintiff when such party's losses are biggest among the competing shareholders." *Molson Coors*, 2019 WL 10301639, at *2 (emphasis added).

However, RAD and Baltimore distinguish mere net sellers, arguing that *the combination of net sales and net gains* disqualifies L&L. RAD and Baltimore are correct. Most courts find that a plaintiff who is both a net seller *and* net gainer is subject to a unique defense, or is otherwise atypical and inadequate, because it may have (unwittingly) benefited from the fraud, or it may not be as motivated to vigorously litigate and establish full damages for the class. "Because 'net sellers' and 'net gainers' may have benefitted by selling shares purchased before the class period at allegedly inflated prices during the class period, they may have difficulty proving damages at trial and are subject to unique defenses that do not befall other class members." *Plymouth Cnty. Ret. Sys. v. Apache Corp.*, 566 F. Supp. 3d 712, 718 (S.D. Tex. 2021) (citing *Born v. Quad/Graphics, Inc.*, No. 19-CV-10376 (VEC), 2020 WL 994427, at *2 (S.D.N.Y. Mar. 2, 2020), which held that the plaintiff's status as net seller and net gainer "effectively disqualifies" that plaintiff). Thus, "there is wisdom in the rule that net sellers who are also net gainers should not be lead plaintiffs." *Richman*, 274 F.R.D. at 479.[13]

---

[13] *See also Foley*, 272 F.R.D. at 131-32 ("It is true that courts have sensibly refused to appoint as

L&L cites only two cases specifically finding that a combined net seller/net gainer was typical: *In re UTStarcom*, 2010 WL 1945737, and *In re UnitedHealth Grp. Inc. PSLRA Litig.*, No. 06-cv-01691-JMR-FLN, ECF No. 93, *slip op.* (D. Minn. Sept. 14, 2006). ECF No. 35 at 8, 10. In *UTStarcom*, however, the lead plaintiff disputed that he was a net gainer. The defendant's expert calculated that the plaintiff received a net gain during the class period on a LIFO basis, but the lead plaintiff instead calculated a net loss on a FIFO basis. *UTStarcom*, 2010 WL 1945737, at *6. The court noted that in other cases it had accepted FIFO calculations at the class certification phase and in appointing lead plaintiffs, and therefore found the lead plaintiff was typical. *Id*. As for *UnitedHealth*, this court has reviewed the unpublished order in ECF. The order contains no reasoning or analysis, and it does not identify the lead plaintiff as a net gainer.[14] Even assuming that other filings in that case reflect the lead plaintiff (CalPERS) was a combined net seller and net gainer, that would not persuade this court to recommend rejecting the well-considered reasoning of the several published cases noted above.

---

lead plaintiff net sellers who are also net *gainers*," citing *In re Bausch & Lomb Inc. Sec. Litig.*, 244 F.R.D. 169, 173-74 (W.D.N.Y. 2007) (collecting cases) (emphasis in original)); *In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298, 308 (S.D. Ohio 2005) (removing net gainers from a movant group); *City of Omaha Police & Firefighters Ret. Sys. v. Cognyte Software Ltd.*, No. 23 CIV. 1769 (LGS), 2023 WL 6458930, at *2 (S.D.N.Y. Oct. 4, 2023) (a plaintiff's "status as a 'net seller' and 'net gainer' during the Class Period subjects it to unique defenses that disqualify it from adequately representing the class").

[14] The unpublished order that L&L cite is quite similar to the order appointing the lead plaintiff in *In re UnitedHealth Group S'holder Derivative Litig.*, No. 06-1216 JMR/FLN, 2006 U.S. Dist. LEXIS 100815, *1 (D. Minn. July 7, 2006). This is not to criticize the magistrate judge in those cases. To the contrary, knowing that many of the issues addressed in this ruling will likely need to be addressed again at the class certification, summary judgment, and trial phases, this court would wholeheartedly support adopting a similarly streamlined approach in this District.

In short, RAD and Baltimore prove that L&L must be disqualified because it is subject to a unique defense as a combined net seller and net gainer. Thus, although L&L has the largest financial interest, the statutory presumption in its favor has been rebutted.

### 3. The Choice Between RAD and Baltimore

With L&L out of the running, RAD has the second-largest financial interest in asserting a loss of $1,137,195.50. This well exceeds Baltimore's asserted loss of $291,320.

But Baltimore argues that RAD is atypical because RAD purchased nearly all of its SSR shares *after* the Copler Disaster substantially revealed the fraud on February 13, 2024. Following that initial, partial disclosure, "RAD quadrupled its position by purchasing 82% of its shares, with 69% of its shares purchased on one day." ECF No. 37 (Baltimore's Reply at 6, 11). *See also* ECF No. 34 (Baltimore's Response) at 13-14 (citing ECF No. 18-3, RAD's certification). Baltimore further points out that RAD "both purchased 782,000 shares and sold 90,000 shares on the date of the Copler Disaster disclosure . . . seemingly untethered to the alleged misstatements and key disclosure." ECF No. 34 at 8, n.8 (citing RAD's certification, ECF No. 18-3 at 5-6), ECF No. 37 at 8 n.9 (noting that RAD did not dispute that it both bought and sold shares on February 13, 2024).

Baltimore argues that several courts have disqualified plaintiffs whose purchases after a first, partial, corrective disclosure were similarly disproportionate to RAD's here. Baltimore argues this will be a unique defense against RAD because it "raises questions about their reliance on the misrepresentations at issue. Such reliance questions unnecessarily expose the movant and the Class to challenges at later stages." ECF No. 37 (Baltimore's Reply) at 6. In support, Baltimore cites *GAMCO Invs., Inc. v. Vivendi, S.A.*, 917 F. Supp. 2d 246, 261 (S.D.N.Y. 2013)

(holding that "post-disclosure purchases can defeat the typicality requirement . . . when plaintiffs made a disproportionately large percentage of their purchases post-disclosure"); *Erickson v. Snap, Inc*., No. 17-cv-03679-SVW-AGR, 2017 WL 11592635, at *3-4 (C.D. Cal Sept. 18, 2017) (noting that disproportionate purchases after a first, partial disclosure, notwithstanding notice of the defendants' misstatements and omissions, "undermine the ability of [the plaintiff] to assert the fraud-on-the-market presumption of reliance, thereby rendering [it] inadequate."); *Faris v. Longtop Fin'l Techs. Ltd.*, No. 11 Civ. 3658(SAS), 2011 WL 4597553, at *8 (S.D.N.Y. Oct. 4, 2011); *In re Petrobras Sec. Litig*., 104 F. Supp. 3d 618, 623 (S.D.N.Y. 2015) (rejecting movant group whose member purchased all shares after first partial disclosure); *Lundy v. Ideanomics, Inc*., No. 20 Civ. 4944 (GBD), 2020 WL 7389027, at *3 (S.D.N.Y. Dec. 16, 2020); and *Bhangal v. Hawaiian Elec. Indus, Inc*., No. 3:23-cv-04332-JSC, 2023 WL 8482871, at *3 (N.D. Cal. Dec. 7, 2023).

In reply, RAD does not dispute Baltimore's factual analysis of RAD's purchases—i.e., RAD does not dispute that it bought 82% of its SSR shares after the disclosure of the Copler Disaster, that it both bought and sold on the day of that disclosure, and "more than quadrupled its position" after that disclosure. But RAD vigorously disputes the legal significance of those facts:

> Only the Retirement System challenges the presumption on the grounds that RAD Investment purchased shares after the first of a series of alleged corrective disclosures. This type of argument, frequently rejected by most courts, is particularly inappropriate here because many class members (*including the Retirement System*) purchased shares after the first corrective disclosure. Corrective disclosures were still entering the market during the class period following the first disclosure. Accordingly, these purchases do not subject RAD Investment to any unique defenses.

ECF No. 36 (RAD's Reply) at 2 (emphasis in original). More specifically, RAD argues that

Baltimore

> more than doubled its holdings following the February 13, 2024 corrective
> disclosure. See Dkt. No. 21-2 (Retirement System's Loss Chart). At the time of the
> February 13, 2024 disclosure, the Retirement System was holding 27,597 shares.
> *See id.* Thereafter, the Retirement System purchased another 33,919 shares—
> increasing its holdings by 122%. *See id*. Of course, the Retirement System claims
> that its post-disclosure purchases are not disqualifying because, though significant,
> they are not as much as RAD Investment's. See RS Opp. at 11-13. This type of
> comparative analysis reinforces RAD Investment's position that it is not subject to
> unique defenses and that it is similarly situated to other class members including
> the Retirement System.

*Id*. at 4-5 (footnote omitted).

In other words, RAD calculates that Baltimore purchased 55 per cent of its SSR shares

after the initial disclosure of the Copler Disaster, based on the number of shares Baltimore held

as of that date. Baltimore, on the other hand, counts its total SSR share purchases during the class

period—including those that it *sold* pre-disclosure (13,342 shares; *see* ECF No. 21-2)—and thus

calculates that it purchased only 45 per cent of its shares after the initial disclosure.[15]

In RAD's view, there is no significant difference (for purposes of typicality and

adequacy) between purchasing 82 per cent and 55 per cent (or 45 per cent, in Baltimore's view)

of one's shares after the first, partial disclosure of the alleged fraud. RAD notes that

"[a]pproximately 67 million shares traded on [February] 13, 2024, following the first corrective

disclosure. The next day, February 14, 2024, more than 22 million shares were traded. Each day

the week prior, for comparison, had less than 3 million shares traded per day." ECF No. 36 at 6,

---

[15] Baltimore's briefs do not spell out how it arrives at 45 per cent. From ECF No. 21-2, it is plain
that Baltimore relies on its total share purchases, including those which it sold pre-disclosure.

n.2 (footnote omitted, citing price and volume data available at https://finance.yahoo.com/quote/

SSRM/ (last visited by RAD on June 19, 2024). In RAD's view, then, "the Class will likely

include those who purchased after the first . . . partial disclosure" and any defense applicable to

RAD Investment on that basis would therefore not be unique. *Id*. (quoting *Schneider v.*

*Champignon Brands Inc*., No. 21-cv-03120-JVS-KESx, 2021 WL 4935160, at *4 (C.D. Cal.

June 29, 2021) (finding lead plaintiff who purchased all of his shares after a partial disclosure

was not atypical)).

RAD also cites in support *Tenneson v. Nikola Corp*., No. 23-cv-02131, 2024 WL 905244,

at *10 (D. Ariz. Feb. 29, 2024) ("[C]ourts in the Ninth Circuit have regularly determined that

buying stock after a partial corrective disclosure does not per se bar a plaintiff from satisfying

[the typicality and adequacy requirements]"), *report and recommendation adopted*, 2024 WL

1796119 (D. Ariz. Apr. 25, 2024); *Ferreira v. Funko, Inc*., No. 20-cv-02319, 2020 WL 3246328,

at *6 (C.D. Cal. June 11, 2020) (appointing a movant whose loss was entirely attributable to

shares purchased after the first corrective disclosure, noting "[c]ourts typically find that

purchasing securities after a partial, or even full, disclosure of alleged fraud does not disqualify

potential lead plaintiffs") (collecting cases); *In re VEON Ltd. Sec. Litig*., No. 15-cv-8672, 2022

WL 1284547, at *6 (S.D.N.Y. Apr. 29, 2022) (appointing a plaintiff who purchased his shares

after three of the five partial disclosures), *recon. den'd*, 2023 WL 2118079 (S.D.N.Y. Feb. 17,

2023); *In re K-V Pharm. Co. Sec. Litig*., No. 11-cv-01816, 2012 WL 1570118, at *6 (E.D. Mo.

May 3, 2012) ("Courts have consistently rejected the argument that post-disclosure purchases

preclude a proposed class representative from meeting Rule 23(a) requirements in a fraud-on-

the-market suit," citing *Feder v. Electronic Data Sys. Corp*., 429 F.3d 125 (5th Cir. 2005)).

It does not appear that any cases within the Tenth Circuit address whether a plaintiff is atypical or inadequate to lead the class because it purchased a "disproportionately large" percentage of its holdings after the first of a series of partial, corrective disclosures. Do disproportionately large, post-partial disclosure purchases subject the plaintiff to a unique defense because it may not be able to rely on the "fraud on the market" theory of causation?[16]

Several officially published cases conclude that yes, disproportionately large post-disclosure purchases disqualify a plaintiff under Rule 23. *See, e.g.*, *SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 283–84 (N.D. Cal. 2020) (on class certification, analyzing whether the plaintiff had disproportionately large purchases after a disclosure, and concluding a 33% increase was not disproportional); *Arkansas Tchr. Ret. Sys. v. Insulet Corp.*, 177 F. Supp. 3d 618, 625 (D. Mass. 2016) (noting "an investor is atypical or inadequate only if it . . . made a disproportionately large percentage of its purchases post-disclosure," cleaned up); *GAMCO*, 917 F. Supp. 2d at 261 (noting, in denying the plaintiff's summary judgment motion, that "post-disclosure purchases *can* defeat the typicality requirement for class certification when 'plaintiffs made a disproportionately large percentage of their purchases post-disclosure,'" cleaned up, citing *City of Livonia Emp. Ret. Sys. v. Wyeth*, 284 F.R.D. 173, 179 (S.D.N.Y. 2012)); *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 204 n.13 (E.D. Pa. 2008), *aff'd sub nom. In re DVI, Inc. Sec. Litig.*, 639 F.3d 623 (3d Cir. 2011) ("there are certain limited circumstances under which post-disclosure purchases may defeat an investor's attempt to utilize the fraud on the market

---

[16] *See Erica P. John Fund, Inc. v. Halliburton Co*., 563 U.S. 804, 810-11 (2011) (discussing *Basic Inc. v. Levinson,* 485 U.S. 224 (1988), for the fraud on the market theory of reliance).

presumption, such as when a disproportionately large percentage of the investor's purchases are made *after* a curative disclosure," cleaned up).

On the other hand, several *other* officially published cases—in addition to the several unofficially published cases that RAD cites—reach the opposition conclusion, that post-disclosure purchases do not make a plaintiff atypical. These cases do not expressly discuss whether there is a legally significant difference when the percentage of post-disclosure purchases is "disproportionately large." For instance, in *Feder*, the Fifth Circuit notes the quantities of shares that the lead plaintiff purchased after a disclosure, but it does not discuss either the plaintiff's total holdings or the percentage thereof that it bought respectively before and after the disclosure. 429 F.3d at 137, n.8. The opinion nonetheless assumes at least *some* pre-disclosure purchases because, in affirming the district court's finding that the lead plaintiff was not atypical or inadequate, the Fifth Circuit reasoned:

> Reliance on the integrity of the market prior to disclosure of alleged fraud (i.e. during the class period) is unlikely to be defeated by post-disclosure reliance on the integrity of the market. This seems particularly so after the stock price has been "corrected" by the market's assimilation of the new information. As the district court noted, "both the high [pre-disclosure] and low [post-disclosure] prices were assumed accurate since the stocks were traded on an efficient market."

*Id*. at 138. The opinion below reflects that the lead plaintiff in *Feder* purchased 45 per cent of its holdings pre-disclosure and 55 per cent post-disclosure. *In re Elec. Data Sys. Corp. Sec. Litig.*, 226 F.R.D. 559, 562 (E.D. Tex.), *aff'd sub nom. Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125 (5th Cir. 2005) (noting the lead plaintiff purchased 940,000 shares during the class period).

Several reported decisions have found *Feder's* reasoning persuasive for purposes of typicality, regardless of the percentage of the plaintiff's holdings that it purchased post-

disclosure. *See, e.g.*, *Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1260 (11th Cir. 2014) (no abuse of discretion in finding post-disclosure purchases did not make the lead plaintiffs atypical, quoting *Feder*); *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 575-76 (N.D. Cal. 2009) (relying on *Feder* in finding that the lead plaintiff was not atypical just because it purchased shares after the first partial disclosure; the opinion reflects pre-disclosure purchases totaling 143,600 shares, liquidation of the entire position a few weeks later, and after two more partial disclosures, purchases totaling 666,800); *Pelletier v. Endo Int'l PLC*, 338 F.R.D. 446, 476 (E.D. Pa. 2021) (quoting *Feder* and reasoning that "[i]nvestors frequently purchase stocks in response to price decreases[;] doing so does not make them atypical or subject to unique defenses. Taking advantage of lower prices is a common investment strategy, not an atypical one," cleaned up). This court finds these cases—particularly those based on *Feder's* reasoning—more persuasive and concludes that even "disproportionately" large purchases after a partial disclosure do not make a plaintiff atypical or inadequate.

As *Feder* reasoned, under the efficient market theory RAD could rely on the accuracy of the market both before and after that first disclosure. As for having purchased *82%* of its holdings after the Copler Disaster was first disclosed, Plaintiffs allege significant price drops *days after* the first partial disclosure, upon disclosure of further facts. *Akhras*, ECF No. 1 ¶ 71. That is to say, this is not a case in which the cat was largely out of the bag in the first partial disclosure. *Cf. Ferreira*, 2020 WL 3246328, at *6 (noting the plaintiffs alleged a significant price drop after a second, partial corrective disclosure). The Complaints also allege (and RAD has further shown) that the trading volumes for SSR shares increased enormously after the first,

partial disclosure. It stands to reason, then, that *many* members of the putative class may have made their initial purchases (or greatly increased their existing holdings) after the first disclosure. RAD is not atypical simply because it greatly increased its share holdings after the Copler Disaster was initially disclosed.

However, "a court may [nonetheless] find atypicality where, for example, the post-disclosure purchase is connected to evidence that the investor was not relying on the market, which could lead to unique defenses in terms of reliance on the market." *Pelletier*, 338 F.R.D. at 476 (citing *Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 76-77 (D.N.J. 2019)). In this case, Baltimore argues that because RAD both purchased 782,000 shares and sold 90,000 shares on the day the Copler Disaster was disclosed, RAD's decisions were "seemingly untethered to the alleged misstatements and key disclosure." ECF No. 34 at 8, n.8 (citing RAD's certification, ECF No. 18-3 at 5-6). RAD does not specifically reply to this point.

Respectfully, on the current record, there is no support for Baltimore's argument that RAD's trading on February 13, 2024, was "untethered" to the disclosures or market prices because RAD bought and sold shares that day. Baltimore has not shown that this reflects a lack of reliance on the disclosures of that day, or on the market prices as having priced in all available information concerning the value of SSR's shares after the Copler Disaster. Nor does Baltimore show that this trading was necessarily atypical of the class.[17] In order to rebut the statutory

---

[17] RAD made numerous trades on February 13, 2024. ECF No. 18-4 at 4-5. Assuming that RAD lists those trades in chronological order, it began with three sales of 10,000 shares each, then made numerous purchases, later had two sales of 20,000 shares each, and then again made numerous additional purchases that day. *Id*. The current record does not map the times of those transactions against the times of the several disclosures that occurred that day.

presumption, the burden was on Baltimore to prove that RAD is atypical. This court does not know yet whether RAD may (or may not) be able to show a loss on the 90,000 shares it sold on February 13, 2024. But that uncertainty is small in comparison with the numerous larger trades on which RAD asserts it suffered losses, and it does not lessen RAD's typicality.

Meanwhile, the cases that Baltimore cites on this issue do not support finding RAD atypical on these facts. *GAMCO* did not find a plaintiff was atypical, but rather found a material fact issue in denying the plaintiff's motion for summary judgment. *GAMCO*, 917 F. Supp. 2d at 261 (holding that *Feder* and similar cases "do not imply that post-disclosure purchases are *never* relevant to the plaintiff's reliance") (emphasis in original). This does not suggest a typicality problem so much as a defense that can be common among classes, depending on the length of the time period over which a series of partial corrective disclosures occur.

*In re Petrobras* involves additional facts that are not asserted here concerning RAD. In rejecting a movant group, the court noted that one of its members made all of its purchases after the first partial disclosure and sold them at a net gain (i.e., it was a *net gainer*), and another member bought all of its holdings "after partial disclosures were made and *just two weeks before the end of the class period*." 104 F. Supp. 3d at 623 (emphasis added). Baltimore does not argue that RAD is a net gainer, and RAD plainly did not wait until close to the end of the class period to purchase SSR shares.

In *Erickson*, the court found *GAMCO* persuasive and concluded that a plaintiff who made 60 per cent of his purchases post-disclosure was not typical. 2017 WL 11592635, at *3-4. But the court also did not discuss *Feder* or its reasoning. In *Faris*, the court found a movant group atypical because it purchased 87 per cent of its holdings post-disclosure. 2011 WL 4597553, at

*8. The court found "[t]hese unusual trading patterns may well undermine the ability of these three members to assert the fraud-on-the-market presumption of reliance, thereby rendering them inadequate class representatives." *Id*. (note omitted). The court saw "no reason to subject the class to this potential defense where there is another movant, Danske-Local One, that purchased the *vast majority* of its Longtop shares before the first corrective disclosure was made on April 26, 2011." *Id*. (note omitted, emphasis added). But here, the only other movant who has not been disqualified—Baltimore—purchased at least 45 per cent of its holdings post-disclosure. This court is not persuaded that *Faris* would have found the plaintiff was atypical for large post-disclosure purchases if the other movant itself had 45 per cent post-disclosure purchases.

In *Lundy*, the court noted that "post-disclosure purchases are not a per se bar to an appointment as lead plaintiff, but the movant "purchased *all* his class period shares after" the partial corrective disclosure. 2020 WL 7389027, at *3 (emphasis in original). The court distinguished cases in which a movant "purchased shares both before and after the initial corrective disclosure," *id*., as is the case with RAD here. The competing movant in that case also pointed out that a statute of repose would likely pass before the court would determine class certification, and potentially could revisit the lead plaintiff question. Baltimore does not argue that there is any concern about the statute of repose in its Reply here. And as noted more recently in *Lemm v. New York Community Bancorp, Inc*., --F. Supp. 3d --, 2024 WL 2022213, at *6 (E.D.N.Y. May 7, 2024), the initial disclosure in *Lundy* "contained outright accusations of fraud or misrepresentation from third parties." In other words, the initial, partial disclosure was of such a nature that it would arguably be unreasonable to purchase *any* shares after learning such information. In contrast, the initial disclosure in this case was the news of the Copler Disaster—

which did not in itself disclose that the company allegedly had a widespread, internally-known safety problem, facts which Plaintiffs allege were not disclosed until later.

In *Bhangal*, the court found a movant was atypical not only because he bought *all* of his shares after a partial corrective disclosure but also because he sold almost all of those shares a day later. 2023 WL 8482871, at *3. The court found this "suggests his trading may have been based on strategies other than relying on the truth of Defendants' statements." *Id*. The court cited cases finding that short-selling and day trading would not be typical of the class. But Baltimore does not assert that RAD is a short-seller or day trader.

In short, while the courts in each of the cases Baltimore cites acted within their discretion—based on the facts and the competing movants that were before them—those cases do not persuade this court to recommend following them here. Baltimore has not proved that RAD is atypical, inadequate, or subject to unique defenses that are of sufficient concern to rebut the statutory presumption that RAD is the most adequate plaintiff.

Baltimore also emphasizes that it is the only institutional investor in the running and argues the PSLRA favors institutional investors as lead plaintiffs. The express language of the statute does not, of course, focus on whether a plaintiff is institutional or individual, but the legislative history includes the following statement of the House Conference Committee:

> The Conference Committee **seeks to increase the likelihood that institutional investors will serve as lead plaintiffs by requiring courts to presume that the member of the purported class with the largest financial stake in the relief sought is the "most adequate plaintiff."**
> The Conference Committee believes that increasing the role of institutional investors in class actions will ultimately benefit shareholders and assist courts by improving the quality of representation in securities class actions. Institutional investors are America's largest shareholders, with about $9.5 trillion in assets,

> accounting for 51% of the equity market. According to one representative of
> institutional investors: "As the largest shareholders in most companies, we are the
> ones who have the most to gain from meritorious securities litigation."

H.R. Conf. Rep. 104-369, p. 34, U.S. Code Cong. & Admin. News 1995, pp. 730, 733 (emphasis

added). The related Senate Report also states:

> S. 240 contains several provisions to transfer primary control of private securities
> litigation from lawyers to investors. First, S. 240 creates a presumption, rebuttable
> under certain conditions, that the member of a purported class of investors with the
> largest financial interest in the case will serve as the lead plaintiff, thereby
> increasing the role of institutional investors in securities class actions.

S. Rep. No. 104-98, p. 6, U.S. Code Cong. & Admin. News 1995, pp. 679, 685. *See also Tellabs,*

*Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 320-21 (2007) (noting this aspect of the PSLRA

"aimed to increase the likelihood that institutional investors—parties more likely to balance the

interests of the class with the long-term interests of the company—would serve as lead

plaintiffs," citing the House Conference and Senate Reports). Thus, "[a]lthough not explicitly

stated in the PSLRA, . . . many courts have demonstrated a clear preference for institutional

investors to be appointed as lead plaintiffs." *Lemm*, 2024 WL 2022213, at *7.

However, as other courts have emphasized, the statute gives the rebuttable presumption

to the "*largest financial interest*," not to institutional investors. "[T]he 'institutional investor'

factor is relevant only insofar as it represents financial stake." *Clark ex rel. DaVita, Inc. v. Thiry*,

No. 12-cv-2074-WJM-CBS, 2014 WL 4050057, at *3 (D. Colo. Jan. 7, 2014). Here, Baltimore's

financial interest is considerably smaller than RAD's. The court is not persuaded that

Baltimore's status as an institutional investor outweighs RAD's status as the plaintiff with the

largest financial interest who also satisfies Rule 23 typicality and adequacy.

Accordingly, this court finds that RAD is the most adequate plaintiff to serve as lead plaintiff for the putative class. RAD's motion (ECF No. 18) to be appointed as lead plaintiff is GRANTED.

### 4.    *Lead Counsel*

This leaves the question of whether the court should approve RAD's counsel, Robert V. Prongay of Glancy Prongay & Murray LLP ("GPM"), as lead counsel for the putative class. As noted above, the court is to determine whether counsel "are qualified, experienced, and able to vigorously conduct the proposed litigation. The [c]ourt will only disturb the lead plaintiff's choice of counsel if necessary to fairly and adequately protect the interests of the class." *Jaramillo*, 2023 WL 5312062, at *2.

Mr. Prongay has been a member of this court's bar in good standing since 2010, and he has appeared in fourteen cases in this court. He is a partner in GPM's home office in Los Angeles and focuses his practice on "complex securities cases on behalf of institutional and individual investors." ECF No. 18-5 (GPM's firm resume) at 17. He has been counsel of record in numerous securities cases published in Westlaw, at all court levels. *See, e.g.*, *Cyan, Inc. v. Beaver Cnty. Emp. Ret. Fund*, 583 U.S. 416 (2018) (noting Mr. Prongay as one of several counsel of record for the investor respondents, in whose favor the Supreme Court ruled). He is identified as one of the counsel of record in numerous appellate opinions from the First, Second, Third, and Ninth Circuits, and in even more numerous district court opinions, including six from this District reported in Westlaw.

GPM states that as a firm it has focused on representing "investors, consumers and employees for over 25 years." *Id.* at 2. In addition to its office in Los Angeles, the firm has

offices in New York City and Berkeley. It has several lawyers whose qualifications and experience allow them to assist Mr. Prongay with this case—three of whom are named in the briefs, though they have not yet entered appearances. *See, e.g.*, ECF No. 36 at 8. The court finds that Mr. Prongay and his firm are qualified, experienced, and able to vigorously litigate this case on behalf of the putative class. Accordingly, the court approves Mr. Prongay and his firm, GPM, as lead counsel for the putative class.

IV.    *Conclusion*

Consistent with the foregoing, this court respectfully **RECOMMENDS** that RAD's motion (ECF No. 18) to consolidate these cases be **granted**. That motion is also **GRANTED** to the extent that RAD is selected as lead Plaintiff, and its counsel, Mr. Prongay and his firm, GPM, is selected as lead counsel. Motions ECF Nos. 12, 14, 16, and 19 are **TERMINATED as MOOT or WITHDRAWN**. Motions ECF Nos. 21 and 22 are **DENIED**. Finally, the parties are reminded of their stipulation that

> [w]ithin fourteen (14) days of the Court's entry of the Lead Plaintiff Order, court-approved Lead Counsel for the Court-appointed Lead Plaintiff and counsel for Defendants shall meet and confer and jointly submit for the Court's approval a proposed schedule for the filing of an amended and/or consolidated complaint, or designating the initial Complaint as the operative complaint, Defendants' response to the same, and all briefing or other submissions associated with any motion(s) to dismiss.

Stipulation, ECF No. 9 at 2; ECF No. 10 (Order approving stipulation).[18]

---

[18] Rule 72 of the Federal Rules of Civil Procedure provides that within fourteen (14) days after service of a Magistrate Judge's order or recommendation, any party may serve and file written objections with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. §§ 636(b)(1)(A), (B); Fed. R. Civ. P. 72(a), (b). Failure to make any such objection will result in a waiver of the right to appeal the Magistrate Judge's order or recommendation. *See*

DATED: August 2, 2024                          BY THE COURT:

_____
Susan Prose
United States Magistrate Judge

---

*Sinclair Wyo. Ref. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 782 (10th Cir. 2021) (firm waiver rule applies to non-dispositive orders); *but see Morales-Fernandez v. INS*, 418 F.3d 1116, 1119, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review, including when a "pro se litigant has not been informed of the time period for objecting and the consequences of failing to object").