# Exhibit 9

SWORN
TRANSLATION

## REPORT OF EXPERT COMMITTEE TO
## TR İLİÇ CHIEF PUBLIC PROSECUTOR 'S OFFICE

| | | |
|---|---|---|
| **Investigation File No** | - | 2024/ 88 (İliç Chief Public Prosecutor's Office) |

**Victims** — 
1- Abdurrahman ŞAHİN (TR No-60394344586)
2- Adnan KEKLİK (TR No-26263659380)
3- Fahrettin KEKLİK (TR No-23782742128)
4- Hüseyin KARA (TR No-56164245474)
5- Kenan ÖZ (TR No-26674645606)
6- Mehmet KAZAR (TR No-56827639848)
7- Ramazan ÇİMEN (TR No-25468685958)
8- Şaban YILMAZ (TR No-24022734262)
9- Uğur YILDIZ (TR No-40210205970)

**Suspects** — 
1- Abdulkadir CANSIZ (TR No-16871135710)
2- Ali Rıza KALENDER (TR No:59869359958)
3- Hüseyin ÜSTÜNDAĞ (TR No-28996181688)
4- Iaın Ronald GUILLE (TR No-99289400304)
5- Kenan ÖZDEMİR (TR No-56683302092)
6- Mehmet TÜRK (TR No-24059301048)
7- Murat BAYRAKDAR (TR No-33958468882)
8- Soysal DOĞAN (TR No-24574715702)
9- Şenol DEMİR (TR No-12308124708)

**Fatal Accident Date** — 13.02.2024 at 14.28

**Accident Location** — Landslide (Leach Landslide) at the Mining Operation Site operated by Anagold Madencilik AŞ within the borders of Copler Village, İliç District, Erzincan Province

**Crime** — Causing Death by Negligence

**Exploration Date** — 16.03.2024

**Expert Witnesses** — 
Prof Dr Mehmet Yener ÖZKAN, Civil Engineer (METU)
Assoc Prof Nejan HUVAJ SARIHAN, Civil Engineer (METU)
Retired Lecturer Saadet Gülru YILDIZ, Civil Engineer (METU)
 Prof. Dr. Haluk AKGÜN, Geological Engineer (METU)
Prof. Dr. Ali İhsan AROL, Mining Engineer (METU)
Prof. Dr. İsmail TORÖZ, Environmental Engineer (ITU)
Prof. Dr. Ahmet ERDAL OSMANLIOĞLU, Mining Engineer (IU Cerrahpaşa) Mert ERBAŞ, Civil Engineer (METU)
Assoc Prof Deniz ADIGÜZEL, Mining Engineer (IU Cerrahpaşa)
Serhat GÜNGÖR Mechanical Engineer (METU)
 Mustafa Kemal TÜFEKCİ Geological Engineer (AFAD)



I. the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

1

## CONTENTS

1. TASK ASSIGNED TO THE EXPERT COMMITTEE ............ 4

2. INCIDENT ............ 4

3. REVIEW OF DOCUMENTS WITHIN THE SCOPE OF THE FILE ............ 4

    3.1. FINDINGS ABOUT THE VICTIMS UNDER THE GROUND ............ 4

    3.2. REVIEW OF INFORMATION GATHERING REPORTS TAKEN BY LAW ENFORCEMENT AGENCIES ............ 5

    3.3. OBSERVATIONS ON WITNESS STATEMENTS TAKEN BY THE CHIEF PUBLIC PROSECUTOR'S OFFICE; ............ 46

    3.4. OBSERVATIONS ON THE INVESTIGATION MINUTES TAKEN BY THE CHIEF PUBLIC PROSECUTOR'S OFFICE; ............ 54

4. REVIEW OF RELEVANT LEGISLATION ............ 78

    4.1. 15.06.1985 DATED 18785 NUMBERED MINING LAW , OBLIGATIONS UNDER THE MINING ACTIVITIES IMPLEMENTATION REGULATION ............ 78

    4.2. OBLIGATIONS UNDER THE ENVIRONMENTAL LAW NO. 2872 DATED 09.08.1983, THE ENVIRONMENTAL IMPACT ASSESSMENT REGULATION NO. 31907 DATED 29.07.2022, THE MINING WASTES REGULATION NO. 15.07.2015 AND NO. 29417, THE REGULATION NO. 23.01.2010 AND NO. 27471 ON THE RESTORATION OF DEGRADED LANDS TO NATURE ............ 79

        4.2.1. Implementation Articles of the Environmental Law No. 2872 Related to the Case Subject to Investigation; ............ 79

        4.2.2. Incidental Articles of the Environmental Impact Assessment Regulation dated 29.07.2022 and numbered OG - 31907 prepared on the basis of Article 10 of the Environmental Law dated 9/8/1983 and numbered 2872; ............ 80

        4.2.3. 15.07.2015 dated and OG - 29417 numbered Mining Waste Regulation Articles Related to the Incident; ............ 81

        4.2.4. Incident Related Articles of the Regulation on Landfilling of Wastes; ............ 83

        4.2.5. 23.01.2010 dated and OG - 27471 numbered Regulation on Restoration of Lands Degraded by Mining Activities to Nature ............ 84

    4.3. EXAMINATION OF MINING OPERATION ACTIVITIES AND OPERATION PHASES CARRIED OUT BY ANAGOLD MADENCİLİK SANAYİ VE TİCARET ANONİM ŞİRKETİ WITHIN THE SCOPE OF ENVIRONMENTAL LAW IMPLEMENTATION LEGISLATION BY THE MINISTRY OF ENVIRONMENT, URBANIZATION AND CLIMATE CHANGE (MOEUCC) ............ 84

5. TECHNICAL EVALUATION OF A MINING ACCIDENT ............ 97

    5.1. EVALUATION OF THE MINING ACCIDENT INCIDENT WITHIN THE SCOPE OF MINING LEGISLATION, MINING OPERATION PROJECT, MAPEG TECHNICAL REPORTS ............ 97

    5.2. 2 AND 3 DIMENSIONAL MODELING AND TECHNICAL ANALYSIS OF THE GENERAL GEOLOGY, STRUCTURAL AND GEOMORPHOLOGICAL FEATURES OF THE HEAP LEACH SITE AND ITS IMMEDIATE SURROUNDINGS WHERE THE MINING OCCUPATIONAL ACCIDENT OCCURRED ............ 112

        5.2.1. Geographical Location of Heap Leaching Site Subjected to Sliding with Slope Instability Impairment ............ 112

        5.2.2. Geological Features of the Mine Site ............ 113

        5.2.3. Location and Geology of the Heap Leach Site in the Mine Area ............ 114

        5.2.4. Characteristics of the Heap Leaching Area and Material ............ 115



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

5.2.5. *Topographic and Geomorphological Analysis of Heap Leaching Plant (HLT) Phase Surfaces*
115

5.3. THE FACTORS CAUSING SLOPE INSTABILITY AND THE EARLY WARNING SYSTEMS
(RADAR, INCAR, PRISM, PIEZOMETER, TILTMETER) USED BEFORE, DURING AND AFTER
THE RECLAMATION, MAGNETIC METHOD ETC), GEOTECHNICAL EVALUATION AND
ANALYSIS OF ALLOWABLE VERTICAL AND HORIZONTAL DISPLACEMENTS DURING
AND AFTER MINING                                                                118
    *5.3.1. GEOTECHNICAL EVALUATION OF HEAP LEACH SITE_____118*
    *5.3.2. NEGATIVE EFFECTS ON SLOPE STABILITY IN THE OPERATING PROCESS_____204*
    *5.3.3. EVALUATION OF MONITORING AND EARLY WARNING SYSTEMS_*
    *____215*

5.4. *EVALUATION OF THE INCIDENT WITHIN THE SCOPE OF OCCUPATIONAL HEALTH AND*
    *SAFETY_____222*

5.5. *ENVIRONMENTAL IMPACT ASSESSMENT OF THE POST-EVENT SPREAD OF CYANIDE*
*LEACH MATERIAL ON LAND_____226*
    *5.5.1.   EVALUATION OF THE WORKS CARRIED OUT BY THE MINISTRY AFTER THE*
    *LANDSLIDE_____*
    *_____226*
    *5.5.2.   REVIEW OF THE EXPERT REPORT PREPARED AFTER THE INCIDENT_____229*
    *5.5.3. EVALUATION OF MINISTRY (ÇŞİDB) REFERENCE LABORATORY ANALYSIS RESULTS*
    *_____230*
    *5.5.4.EVALUATION OF THE ANALYSES PERFORMED ON FISH SAMPLES_____236*
    *5.5.4. EVALUATION OF ANALYSIS RESULTS OF ANKALAB-FEPAS-ARTEK ENVIRONMENTAL*
    *LABORATORIES_*
    *____239*
    *5.5.5. FEBAS ENVIRONMENTAL LABORATORY ANALYSIS RESULTS_____245*

6.   *EVALUATION OF MINING WORK ACCIDENT INCIDENT WITHIN THE SCOPE OF PERMITS,*
*INCIDENT MANAGEMENT AND DEFECTIVES_____ 248*
    *6.1. EVALUATION OF PERMISSION DOCUMENTS_____248*
    *6.2. INCIDENT MANAGEMENT_____249*
    *6.3. THOSE AT FAULT IN THE INCIDENT AND THE REASONED ASSESSMENT OF* <u>NEGLIGENTS</u>
    *_____249*

7. CONCLUSION_____260



I, the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature:

## 1. TASK ASSIGNED TO THE EXPERT COMMITTEE

Evaluation of the Causes of the Mine Accident that occurred on 13.02.2024 at 14-28 hours within the borders of Sabırlı and Copler villages of İliç District, Erzincan Province, within the scope of Civil (Geotechnical) Engineering, Mine Operation and Planning, Geology, Environmental Law (EIA Reports), Occupational Health and Safety Laws,  -The file was submitted to the Expert Committee on 13.03.2024 in order to determine the primary and secondary fault ratios, if any, of the institutions, legal entities and individuals who are at fault in the realization of the incident. Within the scope of the task entrusted to our Expert Committee by TR İliç Chief Public Prosecutor's Office, the Prosecutor's Office and the Expert Panel together made an on-site discovery on 16.03.2024 of the mining accident incident that occurred as a result of the heap leach (Heap leach-YLT) landslide during the open pit mining activity.

## 2. INCIDENT

During the operation of the Au-Cu-Ag-Hg-Mn metallic mines (ores) extracted under the responsibility of the license holder Anagold Madencilik AŞ in the license area numbered S-847 within the borders of Erzincan province, İliç District, Sabırlı and Copler villages, a fatal mining accident occurred on 13.02.2024 at around 14-28 hours as a result of the loss of stability of the raw material stacked as heap leach. During the incident, the above-mentioned 9 mine workers were trapped under the sliding heap of leaching material and lost their lives.

## 3. REVIEW OF DOCUMENTS WITHIN THE SCOPE OF THE FILE

The documents in the case file (including CDs), technical reports, information, inquiry and statement reports, expert reports have been examined and the findings presented below have been made. Examined documents include law enforcement and prosecutor's office statement minutes, telephone and e-mail records, personnel files, training/embezzlement/health report documents, design reports, SYDF reports, EIA permit documents, measurement results, laboratory test results, MAPEG reports, operating permits and licenses, Anagold organization scheme, expert committee preliminary report, prefix report and final report received by the prosecutor's office, Muğla Sıtkı Koçman University Report, Geotechnical Report prepared by Neil Barr and all other correspondence.

### 3.1. FINDINGS ON THE VICTIMS OF SUBSOIL BURIAL

**1-Abdurrahman ŞAHİN (TR No-60394344586);** Employee of subcontractor KAR-SA Construction, Welder, was in the leached container during the incident.
**2-Adnan KEKLİK** (TR No-26263659380) (Anagold AŞ employee, Senior ADR Supervisor)
**3-Fahrettin KEKLİK** (TR No-23782742128); Anagold AŞ employee, in the leached container during the incident.
**4-Hüseyin KARA** (TR No-56164245474); Employee of subcontractor KARSA from the Process Piping Team, Welder, was in the leached container during the incident.
**5-Kenan ÖZ** (TR No-26674645606); Anagold AŞ employee, heap leach field supervisor



the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature:

SWORN
TRANSLATION

**6-Mehmet KAZAR** (TR No-56827639848); Subcontractor Asil Copler Taşımacılık employee, Dozer Operator, was in the leached container during the incident. (above authorized - Kenan Oz)
**7-Ramazan ÇİMEN** (TR No-25468685958); Anagold AŞ employee, senior crusher shift supervisor (Authorized superiors-1-Şenol Demir, 2-Murat Bayrakdar)
**8-Şaban YILMAZ** (TR No-24022734262); Subcontractor Asil Copler Taşımacılık employee, Loader/Loader, was in the container that was under leaching during the incident. (authorized superior-Kenan Öz)
**9-Uğur YILDIZ** (TR No-40210205970); Subcontractor Çiftay Employee, Truck Driver,

### 3.2. REVIEW OF INFORMATION GATHERING REPORTS TAKEN BY LAW ENFORCEMENT AGENCIES
**Law Enforcement Officers - Minutes of Information Seeking (2024-88 Investigation File pdf; Pages 40-674)**

#### Cengiz Yalcın DEMİRCİ

In his statement dated 18.02.2024 (10-50) in the minute, he declared in summary: He is based in Denver, USA and has been a senior vice president at SSR Mining for seven years. His task is to maintain relations with subsidiaries and to present financial reports. At the same time, as of September 2022, he started to work at SSR Mining as country manager. The company was established in Denver as SSR Mining and its Turkish operation is carried out by Alacer Gold AŞ. Alacer's subsidiaries include Anagold Madencilik, Kartaltepe Madencilik, Artmin Madencilik, Kızıltepe AŞ, Alkara AŞ. Kızıltepe and Alkara companies are on paper, they are not in charge here, and Alacer Mining, Anagold Mining, Kartaltepe Mining, Artmin Mining are chairmen of the board of directors since February 2024. Before becoming chairman of the board of directors, he was a board member in various companies. He is a board member of companies in the United States affiliated with SSR Mining. The CEO of SSR Mining is Rot Antal and he is Bill Macnevin's operations manager and reports to Bill Macnevin. When he started working at SSR Minig in 2017, he was responsible for the worldwide mineral exploration operations. He has been reporting to Bill Macnevin for two years and is responsible for coordinating with the companies under SSR Minig and presenting the financial reports from the bottom to his superior. He serves as the country manager of Anagold Mining company. He lives in Denver for most of the year and comes to Turkey regularly. In positions equivalent to his position at SSR Mining, Iain Ronald Guille is responsible for technical production matters. There is also a John Harmse who is responsible for the construction works. He is also responsible to John Ebbett at SSR Mining. Directors in the organizational structure of companies located in Turkey have the right to contact him. In the case of Anagold, Iain Ronald Guille served as the vice president of operations and contacted him. In particular, Kenan Özdemir, Director of Operations, was responsible for all operations at Anagold, and Iain Ronald Guille reported to Bill Macnevin at SSR Mining. General financial presentations and reports of affiliated companies came to him for information purposes. He knows that the heap leach site was built in 2009-2010. He is not fully familiar with the details. he does not have such a task in these years, SSR Minig does not work either. He/she will be able to submit it to the file by being reported from the company if he/she does not know how and how it is done. Oxide process unit is responsible for the heap leach site, which can be prepared and submitted by the company upon request, if it does not know how the heap leach site inspection is carried out by whom. Hüseyin Üstündağ is in charge of the oxide process unit.



5

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

TRANSLATION

He has been working in this position for six months, reports directly to Kenan Özdemir, Operations Manager, and is directly responsible for the heap leach field of Kenan Özdemir and Hüseyin Üstündağ. There are chief engineers and chiefs under Mr. Hüseyin and the project department is responsible for the construction of the heap leach site. Shaun Schwartz was the project manager, regarding the duties of the 9 persons who disappeared in the landslide incident, 4 of the 9 persons were employed by Anagold and the others were subcontractors and there is no clear information about their duties at the moment. He learned that he could provide reporting if requested, that he did not know the occurrence and technical part of the incident regarding the occurrence of the incident, who gave him the first news when and how, that he was in America on the day of the incident regarding the development and instructions of the process, that Onur Acar (press communication manager) informed him by phone, that he called Mr. Iain, that he said that he did not know anything, that he said that everything should be turned off, and that he called Onur afterwards. From that moment, he called everyone he could reach and tried to get information and manage the risk situation, and finally called Bill. Iain Ronald Guille, Kenan Özdemir and Hüseyin Üstündağ were responsible for the leaching area regarding whether Iain learned what he was looking for, whether there were cracks or problems in the heap leaching area, and whether he gave any instructions before the crack/cleavage event, and they did not report on the heap leaching area of these three people. On 13.02.2024, when the incident occurred, approximately 2 hours before the accident, he did not see the photo and information e-mail sent by Iain that there was a crack in the heap leach field, he was asleep due to the time difference, and he saw the incoming e-mail 3 days after the incident. There was no notification other than the e-mail sent to him before the incident, the reason why Iain did not call before the incident was that he was the authorized person in the operation area, he did not know whether he was informed about the radar warning system, and according to the statements, the purchase of 2 radars and 2 robotic devices was put in the 2024 budget. Regarding whether it has been received and if not, why it has not been received, he does not know that the devices are in the budget and approved, he does not have technical knowledge and is not responsible for their receipt, and he does not know which unit is responsible for the moment. He does not know whether the radar system can see the entire heap leach site because it is a technical issue, and he does not know whether the subcontractors were informed about the danger because it is a technical term. If an incident occurred in the company was reported, it was reported to the subcontractors; furthermore, since the company was conducting mining activities in a very hazardous class, every employee in the mining area had the authority to stop the operation depending on the hazard in case of any danger; with regard to whether blasting was carried out on the day of the incident, he knew that routine blasting was carried out at the mine site. He thinks that he does not have full command of the details, that he knows that the detonation was made at noon, that he does not know if it is a technical issue or not, but if there are cracks in the morning as he has learned, the detonation made at noon will not have a logical effect. Iain has the authority to give instructions, the report prepared by Ali Rıza Kalender and the documents prepared during the audit did not come to him, he went to the relevant manager, he is responsible for the presentation, follow-up, planning and coordination of financial reporting with the company partners as the country manager, as stated in the technical issue. The Anagold Copler enterprise is one of the few enterprises of which there are 9 in the world, and since a complex production activity is carried out in the Anagold field, each unit is headed by a relevant manager, and the relevant managers report to the directors. The heap leach site where the landslide occurred is under the oxide process unit and Kenan Özdemir, the site operations director, is the supervisor of this site together with other units, Iain Ronald Guelle, the vice president of operations, is responsible for the entire site and people at this level have the authority to give all kinds of instructions and orders in the incident. He stated that he could not answer the questions asked on technical issues because he was not knowledgeable, and that he could prepare and submit them to the file upon request.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

**Mehmet TÜRK**

In his statement dated 14.02. 2024 (12-50 ) in the minute, he declared in summary: He started working as a mining department manager at Anagold Madencilik AŞ on 12.02.2024 and received occupational safety and environmental trainings on 12.02.2024 and 13.02.2024. This training and orientation process will end as of 15.02.2024 and due to the continuation of these trainings, the authorization related to the area he is responsible for in the mine site has not been realized. Therefore, he was not authorized to give any instructionsor to do any work, he was about to hold introductory meetings with his colleagues or team since he had just started work before the incident occurred, the meeting time was planned for 14-30 hours on the day the incident occurred, at the beginning of the meeting, some of his colleagues were informed by phone that there was a landslide in the area in question. He immediately ended the meeting and went to the section called Manganese Fit, which is considered as an open pit, and observed the situation. He observed that the heap leaching area they went to was not in his area of responsibility as the manager of the mining department, his job description and responsibility area was to excavate the mine in the open pit and feed it to the crusher, and it is the responsibility of the process department for the next operations. Since it is in the orientation process and the area it knows as heap leaching is outside its field of duty, it does not have any duty of care and attention, and it is responsible for the Mine Production Operations Unit, Mine Planning Unit and Mine Technical Services Units at Anagold Mining Inc. He does not know that the contractor company Çiftay AŞ is responsible for open pit mining activities, the names of all the sub-unit employees of his unit and Çiftay AŞ managers since he started work two (2) days ago. Fuat YILMAZ, the mining operations chief of the names he knows, and Kadir Asi, the senior shift engineer. It is responsible to these individuals. As far as he knows, no blasting was carried out in the area in question on 13.02.2024, he does not personally know that a person named Mining Engineer Özgür KAYA was working in the position before him. He left Anagold Madencilik AŞ about 1 month ago, when Özgür KAYA left the company, he was replaced by a person named İzzet TEKİN, Geological Engineer, and İzzet Tekin was the assistant. He has no knowledge, no interest, no subordinate and superior relationship with the employees who were trapped under the landslide, who they worked under and who allowed them to work there. There is no communication and acquaintance, and there is no information transfer regarding the radar signals to activate the company e-mail and radio yet. Regarding why the site was not evacuated even though there was information about the crack, the area in question is outside the area of responsibility and there is no information. There is no authorization. While Çiftay AŞ was using the transportation road on the Manganese quarry, one of the trucks was under a landslide while Çiftay AŞ was producing mines from open mines as a contractor and did not know from which open pit it was made, regarding the activity that 1 truck belonging to the company was under a landslide and whether it was informed that the area was risky. It has been evaluated that Çiftay AŞ uses the transportation road passing through the Manganese quarry in order to ensure the mining production it is making, that there is a distance of approximately 100 meters between the Manganese quarry and the Heap leaching where the landslide is located, that the landslide material occurred in the Heap leaching while using this transportation road is under the landslide material as a result of the progress of the truck to the road and the Manganese quarry, that the road and the Manganese quarry used by Çiftay AŞ are not in the risky area, that the activity continues, but that this situation is not its own evaluation, and that Çiftay AŞ does not know which open quarry it works and which roads it uses, and that it does not yet dominate the operation information and planning. He stated that Çiftay AŞ is the subcontractor company that carries out the mine production of Anagold Mining and that he and his team will ensure the realization of mine production by communicating with the management staff, project manager and construction site chiefs of Çiftay AŞ, but that he has not yet started this task.



7

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

SWORN
TRANSLATION

**Iain Ronald GUILLE:**

In his statement in the minutes dated 14.02.2024 (07-30), he stated in summary:   He said that he was working as the assistant administrative manager at Anagold Madencilik AŞ, and at around 09-45 hours, Mr. Burak, OHS Specialist, and Mr. Can Serdar, Environmental Engineer, told him that there were some cracks in the leachate number 32, and he saw the pictures they showed him.

 When they heard about this situation, they talked to the managers about what kind of measures to take at the meeting held at the company at 10-00 every day, oxide officer Mr. Murat said that he sent an e-mail to all employees that that area would not be used and gave instructions about taking the relevant measures, then they went to the scene with Burak, Can Serdar, Gizem to see the scene. On the way there, the road was blocked and a supervisor friend stopped them, they told the supervisor friend who stopped them that Mr. Murat would accompany them and gave him permission, Mr. Murat went ahead and they all went to number 32 together, when they arrived at the scene they saw a few small cracks and another 6 cm deep crack and took notes.

 They decided to take a geotechnical measure in order to see the scene better and to plan the measures to be taken, when they went up the hill, they saw that the work stopped and the soil did not spill, but that the solution was still being given on the levee, and that they did not allow anyone to enter here after the observations made. They said that the solution sent there should be distributed to different units in a balanced way and they stopped sending the solution there, they returned by vehicle from the road previously closed with a barrier, the same supervisor stopped them, and they came to the office with permission.  They informed Cengiz DEMİRCİ, his supervisor living in the USA, Bill MCNEVIN, Operations Manager, and Patrick JAMES, Environmental Health and Safety Officer, and asked Ali Rıza Bey, Geotechnical Engineer, to share the latest data at 13:30. He stated that Ali Rıza Bey said that there was normally a movement of 20 mm, but this movement increased to 90 mm in their observations. Mr. Ali Rıza said by e-mail that the cracks seen could be closed with cement, then Mr. Ali Rıza said that the leach area should not be piled up in any way until the renovation was made, within half an hour Murat BAYRAKDAR sent an e-mail to Mr. Ali Rıza with a few questions about what to do for the renovation of the area. However, there was no response from Ali Rıza, he heard the noise at 14-28 hours very soon, it was like a small earthquake, they immediately removed the employees from the site, went to the administrative affairs meeting room with Abdul Kadir Bey and gave an emergency alarm there, immediately took search and rescue and security measures within the framework of the company's plan in case of emergency, and informed the relevant official institutions and organizations of the state of the situation. On the day of the incident, no blasting was carried out at the accident site or in the vicinity of its possible impact, blasting was carried out away from the accident site as legally planned, and he did not give orders or instructions to any of the nine people who were buried under the soil, including five Anagold employees, two supervisor officials, one Çiftay Company employee, one Şaban Yılmaz Company employee, Kar-Sa personnel and two people working in the oxide zone. There is no information that a negative radar report was received before the day of the accident.  In the event of such a situation, he saw the news in the common e-mail group that the relevant friends would be informed and that the first radar signal was on the morning of the accident. With regard to the information or statements of Burak ARTAL and Murat BAYRAKDAR to the law enforcement about being informed about the events, Burak ARTAL gave information about the subject just before the meeting they held every day at 10-00 a.m. In addition, the main agenda of the meeting at 10-00 a.m., which was held with all interested parties, was about the meaning of the cracks and crevices in the leach field and how this problem would be solved. He stated that he and his colleagues went to the area where the cracks were located and made on-site determinations to better understand the issue, and that Murat BAYRAKDAR only informed the participants and himself about the issue at the general meeting held at 10-00 hours.



8

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATiON

## Hüseyin Üstündağ

In his statement dated 14.02.2024 (09-25), he stated the following in summary    He stated that he had been working as Process Oxide Manager at Anagold Madencilik AŞ for 4 months, that he took 2 days leave on the last working day of 12.02.2024 and left my deputy to chief engineer Murat Bayrakdar. He stated that he expressed the proxy in a face-to-face meeting held on 12.02.2024 at 10.00 a.m.,that he sent an e-mail to Mr. Murat at approximately 23.30-00.00 p.m. on 12.02.2024 for information and instructions on the procedures to be carried out, that on 13.02.2024, while he was on his way to Istanbul, his chief engineer Murat Bayrakdar sent photographs at around 08.30 a.m., and that the photographs he sent were the same as the photographs obtained from Hakan Şahin, Anagold Security Manager.

The photographs show cracking/splitting in the heap leach field. Murat Bayrakdar said that controls would be carried out at the site and that production at the heap leach site had been halted and the area had been closed to access; he instructed that the situation should be monitored and that he should be informed; he attended the online meeting held at around 14.00 hours; during the meeting, at 14.25 hours, an earthquake was reported and the meeting was terminated.

Subsequently, he learned from Murat Bayrakdar that the heap leach site had slipped, whether he had informed anyone as Process Oxide Manager, whether he had taken safety precautions, whether he or others had knowledge of the soil separation in the region, whether any measures had been taken in advance, that he had no information about the cracking of the heap leach site where the aforementioned occupational accident landslide incident occurred, that he had learned about the situation in the photos sent by his chief engineer Murat Bayrakdar on Whatsapp around 08.30 on 13.02.2024.

He stated that he was informed that production was stopped, access was blocked, necessary e-mails would be sent to Anagold personnel, and that the Geophysics unit would do what was necessary about the region, and that the personnel responsible for the work accident where the landslided from the heap leaching area within the Anagold Mine site were, as far as he remembers, field operator Gökhan Gün, Supervisor (Piping) Soysal Doğan, Conveyor Kenan Öz (the person who was under the cave-in), ADR Supervisor Adnan Keklik (the person who was under the cave-in), Crusher Supervisor Mehmet Sarıtaş, Crusher Supervisor Ramazan Çimen (the one who was under the cave-in), Crusher Supervisor Şerif Kurt, ADR Supervisor Ethem Keklik, ADR Supervisor İsmail Keklik, ADR Supervisor Ramazan ÖZ, Chemical Preparation Supervisor Yasin Gürbüz, Crusher Engineer Şenol Demir, Engineer Kaan Murat Akpolat, Engineer Elif Reyhan, Chief Engineer Murat Bayraktar, himself as Manager, Director Kenan Özdemir, Vicepresident Iain Ronald Guılle, Country Manager Cengiz Demirci.

Regarding the radar system in the Geophysics department, whether it was checked, whether a report was sent, when the last report was sent and the responsible personnel, the Geophysics department was in charge of this department, the relevant person was Ali Rıza Kalender and he was assisted by his assistant, they sent reports every Monday, after the inspection on 13.02.2024, he does not remember the exact time, they sent the vibration report in the region after 8.30, it was obvious that there was a crack in the report.



9

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

SPECIAL
TRANSLATION

In the report sent on Monday, there was no vibration and separation, who was at fault for 9 people being trapped under the cave-in, whether it could have been prevented, and if the withdrawal of personnel from the site was implemented, how 9 people were trapped under the cave-in, he has no information about the duration and content of this permit, that the heap leaching area in question has been undergoing masonry operations since 2010, that permission was obtained from the Ministry of Environment and Urbanization for masonry operations in the region. This issue concerns the environmental unit and Can Serdar Hastürk from the unit follows it, as far as he knows, permission is given for the masonry process in terms of cubic meter tonnage, detailed information on the subject is in Can Serdar Hastürk, the Ministry of Environment and Urbanization randomly comes to inspect and control the subject, in short, there are the necessary permits for masonry in the region. He stated that his area of responsibility was the oxide process area and the place where the work accident occurred where the heap slid, that he was the Process Oxide Manager at Anagold Madencilik AŞ and that the chief engineer was Murat Bayrakdar and the area engineers were Şenol Demir, Elif Reyhan, Kaan Murat Akpolat, that blasting was carried out on 12.02.2024, that blasting was carried out every day between 12-00-12-30, that he was on leave on the day of the incident, that he was not aware of it, that most of the people who were trapped under the cave-in were the visors responsible for the area, that Adnan Keklik, Kenan Öz, Ramazan Çimen were the people he was responsible for, that 9 people got out due to the working principle of Anagold Mining, that he does not know who gave instructions and permission. He said that the others were subcontractor personnel, that the Geophysics department was responsible for the three-day advance warning in the radar system, that the relevant person in the department was Ali Rıza Kalender and that he had an assistant whose name he did not remember, that they sent reports every Monday, and that he did not remember the exact time after the inspection on 13.02.2024. After 08.30, they sent the vibration report in the region, it was clear that there was a crack in the report, that there was no vibration and separation in the report sent on Monday, that they did not see, that the employees of the Yesti Group working in the region were removed by Murat Bayraktar regarding why the site was not evacuated, and that access to the region was blocked, an e-mail was sent. He stated that since he took office four months ago, the heap leaching area plan was made by calculating the distance according to the heap level of that day and the containers were built, and that there were no risk factors in the Ministry of Environment inspections.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

SWORN
TRANSLATION

## Murat BAYRAKDAR

In his statement dated 14.02.2024 (10-01), he stated the following in summary    He stated that he started working as a crushing and screening shift supervisor at Anagold Madencilik AŞ on 03.11.2010, that he had been working as the chief engineer of Oxide Operations for approximately 1 year, and that they had a daily production meeting every morning in the field.

At the meeting held on 08-30, they first started with the occupational safety item, when ADR facility assistant engineer Elif REYHAN asked if there was an occupational safety item, Kenan ÖZ (senior heap leach supervisor) under the wreckage said that there were cracks in the heap area, that there was a risk of landslide, that he reported at the meeting, that he left the meeting urgently at that time and went to inspect the heap leach area.  At that time, Mehmet SARITAŞ, the senior supervisor of the second plant, shared the crack visuals over whatsapp group, when he arrived at the heap leach area around 08-45, Kaan Murat AKPOLAT, the heap leach area engineer, Kenan ÖZ were in the heap leach area, they carried out the area inspections together, at that time, the heap leach assistant engineer Kaan Murat AKPOLAT called geotechnical engineer Berkay MISIR and reported the cracks in the heap leach area. Kaan Murat AKPOLAT told him about this situation in the heap leach area around 08-55, whereupon he went to the room of his immediate superior, Abdulkadir CANSIZ, the acting minister, and reported the cracks in the heap leach area, that he shared the visual photographs they obtained there with him and that he shared the photographs on whatsapp with the oxide operation manager Hüseyin ÜSTÜNDAĞ, who was on leave that day, and informed him about the issue by calling him on his mobile phone, and that after conducting field inspections, he and his team went to the phase 4b-13 membrane assembly works area, which was ongoing in the southern region of heap leaching Membrane assembly work continued by YESTİ company in the relevant area, approximately 20- 25 personnel worked, YESTİ company stopped this activity at 9-00 on the day of the incident and ensured the evacuation of the area, there were also employees of the Mürekkepçiler company in the same area, this subcontractor company also stopped its activity here, removed the people there, Erdal MÜREKKEPÇİ was in the field, told him to stop his activity, the area was evacuated, and a physical barrier was placed to prevent personnel from entering the working area again. Subsequently, Berkay MISIR came to the site, controls in the heap leaching area, surface cracks, visual controls were carried out between 09-20, radar, speed and displacement movements were checked by Berkay MISIR, he reported 70 mm/day, normally this value should be 0-20 mm/day, Berkay MISIR should have noticed and reported this acceleration himself, but he reported this acceleration after they warned him. In fact, Berkay MISIR should have been the person who should have noticed the movement and raised the alarm beforehand, Berkay MISIR and Ali Rıza KALENDER carried out this task together, he did not know whether Ali Rıza KALENDER was on leave or not, he came to the heap leach area shortly after he was informed about the acceleration, during the heap leach crack control with Ali Rıza KALENDER, the cracks were superficial and there was no risk. He verbally stated that the cracks should be sealed with cement and arranged with a bulldozer, and that the first thing he did when he noticed these cracks was to stop the crusher activities and heap construction, and that he left the site to attend the daily production meeting (at the level of managers), which is held regularly at 10-00 every day, as the department manager Hüseyin ÜSTÜNDAG was on leave. When the 10-00 meeting started as usual with work safety items, Chief Geology Engineer İzzet TEKİN took the floor and said that there were cracks on the heap leach surface, then he said that the observations of cracks were observed by the department employees, oxide crusher production activities were stopped, YESTİ and MÜREKKEPÇİLER company employees were removed from the work area and the roads were closed to access. He stated that he would decide after the solution management meeting to close the area to the cyanide solution, that he had an average of at least 5 meetings a day, that the meeting topics were Occupational Safety and Production, that after the 10-00 production meeting, he went to the heap leach field for field control with Iain Ronald GUİLLE, the general manager of the operation, and Burak ARTAL, our chief OHS engineer, and carried out surface field checks.



11

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

he then informed Kaan Murat AKPOLAT that he had instructed Kaan Murat AKPOLAT to close the access roads, and since Kaan was in the field, he informed the second engineer Şenol DEMİR, who was in the office at the time.

Şenol DEMİR in the office said that the road closure information mail was sent by Şenol DEMİR to inform other stakeholder departments,and all white-collar employees of the oxide department (team leader, engineer) were found in the relevant mail distribution list.

The transmission time was 10-50, after the field inspection, the assistant engineer of the heap leach area Kaan Murat AKPOLAT told them that they should go to the geophysics department, when I called them by phone, they said that they were in the office, they shared their questions and comments in the office, they received information about the landslide speed and displacement movements, in the relevant report it was determined that the movement increased on Monday 12.02.2024 Monday,that there was no SMS notification system regarding the increase in speed in the area of the movement and that they informed them that they could not follow the movements on the east side of the heap leach, that there was no radar system in the east of the heap leach area (the area where 8 people were buried under the cave-in).

There are only prisms on the eastern side of the heap leach, the prisms can measure but they do not have enough information about its operation, they have requested an information mail summarizing the current situation in the current heap leach, as of 13-03 hours, the relevant mail was shared by Ali Rıza KALENDER.

He called Ali Rıza KALENDER by phone at approximately 13-03 hours to inform him that they did not carry out the instruction to fill the relevant cracks with cement and to arrange them with a dozer work machine in the southwest of the heap leach mentioned in his e-mail at 13-10 hours because they considered the area risky.

When I called Ali Rıza KALENDER again at around 13-30 hours and asked for information about the sliding speed and displacement movement, he informed me that it was 200 mm/day, and when I called Ali Rıza KALENDER again at around 13-30 hours, he informed me that it was 300-400 mm/day.

IAİN GUILLE, the general manager of operations, informed Mr. Ali Rıza KALENDER that the speed increased, Kaan Murat AKBOLAT was instructed to stop the assistant engineer stack leaching BLS 2 (no-load leaching solution) system, Ali Rıza KALENDER and Berkay MISIR went to the field and carried out the last crack controls,and participated in the recent information meeting at 14-00.

At around 14-28 hours, it was observed that he felt a humming and vibration coming from outside in his office, he said that there was an earthquake during the meeting and the meeting was terminated, and when we went out of the office, it was observed that the mass leech shifted towards the east and west axis.

As a result of the examinations carried out, it was determined that there was a truck belonging to Çiftay AŞ from the west side of the bulk storage area and 5 personnel in the container in the east area of the bulk storage area and 3 personnel in the vehicle, that he implemented the emergency action plan within the scope of his authority and responsibility, fully fulfilled the process requirements and ensured that his superiors were informed visually and verbally, in particular, Kenan ÖZ (Senior Supervisor), Ramazan ÇİMEN (Second Operations Senior Personnel) , Adnan KEKLİK (adr Senior Supervisor), who were trapped under the cave-in, said that he had given instructions to stop the work in the area and to close the road to access and that they left the dangerous work area in line with this instruction, but that they returned to the relevant area again without his knowledge and without his knowledge.

Due to their duties and responsibilities, they should not return to the area again, 3 foreign personnel who wanted to carry out inspections in the relevant area wanted to access the area with restricted access, but they were not allowed to enter by Mr. Soysal DOĞAN, senior supervisor of bulk piping, Soysal DOĞAN had language communication problems with foreign personnel and conveyed the situation to Kaan Murat AKPOLAT.

Kaan Murat AKPOLAT, Elif REYHAN and 3 foreign personnel learned that the accident occurred at 14-28 while they were conducting surveillance in phase 4b 1-3 area.

The Chief Engineer of Oxide Operations in relation to the area of responsibility, the unit he is responsible for and the personnel he is responsible for in the enterprise in which he operates, that the supervision carried out before the accident was not within his knowledge and that he would not have allowed this risky operation if he had knowledge.

12



i, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

SWORN
TRANSLATION

His area of responsibility includes crushing and screening plant, adr plant, SART plant, Process and Storm ponds, bulk storage and piping operations, chemical preparation operations and he is responsible for Process engineer Şenol DEMİR (crushing and screening operations) , Kaan Murat AKPOLAT is the assistant engineer of bulk storage and piping operation, Elif REYHAN is the assistant engineer of ADR SART chemical preparation.

The blasting was carried out around 12-15 pm and the blasting was carried out by the mining department, İzzet TEKİN, Fuat YILMAZ, Muhammet KILIÇ were present in the mining department, and they fulfilled their responsibilities within their duties and authorities regarding why the mine site was not evacuated after the work accident that occurred.

He stated that the evacuation of the mine site was the duty of the OHS department, that he did not have the authority to evacuate the mine site, that the employees operating in the site upon the closure of the road related to the incident came to the scene of the incident despite the road being closed, and that although the road was closed to access with physical barriers, the 3 senior supervisors who were under the debris entered the area without their knowledge, and that he learned that they entered the area he kept closed due to the incident.

**Abdulkadir CANSIZ**

In his statement dated 14.02.2024 (11-30), he stated the following in summary    He worked as a manager in the maintenance department at Anagold AŞ for four years.

On the day of the incident, on 13.02.2024, he came to the workplace at around 08.00, between 08.30 and 09.00, when they were holding a daily department meeting with the maintenance manager chief engineers, Murat BAYRAKDAR, the chief engineer in charge of the area where the landslide occurred, called heap leach, interrupted their meeting and said that he wanted to inform them that they had detected a crack on one side of the heap leach.

He said that he had asked him to send photographs if he had any, but that he had said that he had said this for information purposes only and that he would send photographs, and that he had told him to raise the issue with those concerned during the daily production meeting at around 10.00 a.m. Murat BAYRAKDAR sent the photographs and raised the issue at the 10.00 a.m. meeting.

IAIN RONALD GUILLE, who attended the meeting, said that he had told Murat BAYRAKDAR that he would go and look at the crack after the meeting, that Murat BAYRAKDAR had called him at a time he could not remember and told him that a geotechnical investigation would be carried out, that when he asked him whether anything had been done as an emergency measure, he was told that the area had been evacuated, the entrances had been closed and the supply of solution to the area had been stopped.

Between 14.00 and 15.00 hours, a meeting was held online with the Human Resources Director in Ankara and all managers and chief engineers, which was unrelated to this issue, and at 14.20 hours, the participants in the meeting said that there had been an earthquake.

Mustafa Bakır, the chief engineer, pointed to the heap leach and said that it had overturned, Burak Artal, the chief engineer of OHS (Occupational Health and Safety), said that there had been a landslide in the heap leach, BURAK ARTAL and IAIN RONALD GUILLE talked about the need to convene an emergency crisis table, in the meantime, they were informed that the emergency response team had arrived at the scene and started to work, they started to determine whether there were any people or persons trapped under the cave-in, the relevant state institutions were notified, the company's senior management was notified, it was determined that 9 people were missing, at around 16.30, the provincial administrative authorities arrived at the site and took over the crisis management, they tried to act according to the instructions given by them in the following process and continued to do so, as the maintenance manager of the heap leach area, it was not in his area of responsibility.

13



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

The Director of Operations, Mr. Kenan ÖZDEMİR, stated that since he was temporarily out of the field, he asked him to take care of some of the tasks that he normally managed, such as daily meetings, and that during this period, Mr. IAIN RONALD GUILLE would be constantly on the field and would manage the field.

He did not have any decision-making or responsible role in the incident, both in the sense that the area where the incident took place was not in his area of responsibility as the maintenance manager, that IAIN RONALD GUILLE took care of these works, and that he only started to take care of the daily works instead of Kenan ÖZDEMİR as of February 5, 2024.

Regarding his area of responsibility, he was responsible for the maintenance of electromechanical systems and was responsible to IAIN RONALD GUILLE; he did not know whether there was blasting on the day of the incident; the persons who were trapped under the landslide were working under the Oxide Operation Department; one of them was Uğur YILDIZ, an employee of Çiftay AŞ, the mine operation subcontractor; he did not know whether a signal was received from the radar before the accident.

He stated that IAIN RONALD GUILLE, who was in a higher position than him and who was more familiar with the issue, was interested in why the mine site was not evacuated after receiving information about the crack that occurred before the landslide in the heap leach area, and that Murat BAYRAKDAR conveyed the issue to him only for information and asked him about urgent measures as a general management rule, and that while he was listing the urgent measures, he said that they evacuated the areaand banned entry to the area.

### Soysal DOĞAN

In his statement dated 14.02.2024 (13-16), he stated the following He said that he started working at Anagold Madencilik AŞ in 2008, that he attended the meeting with his supervisors on 13.02.2024 at 08-00 hours at the crusher offices, that he received the tasks related to the work to be done, that he went to his own containers in the heap leaching site, and that he made daily routine site checks.

İshak DEMİR, Isa TAŞDELEN and Kenan ÖZ, one of the heap leaching team leaders, who were working in the field, called him on his cell phone and said that there was a crack in the field and that he would pick him up with a vehicle.

At around 08-20 hours, Kenan ÖZ and the engineers Kaan Murat AKPOLAT, Murat BAYRAKDAR, OHS Engineer Gizem GAZCI, Environmental Engineer Can Serdar HASTÜRK, Geology Engineer Ali RIZA KALENDER went to the site at 09-00 hours and after their inspections, YESTİ company and Mürekkepçiler company were removed from the site.

He said that the works were stopped, that they left the site after the inspections and determinations were made by the supervisors, that a road closure mail was sent on the road in front of the container where he was located and that he was notified by his supervisor Kaan Murat AKPOLAT, and that they blocked the road about 10 meters ahead of the containerwith plastic pontoons.

Around 14-00, 3 people he did not know came to the field, which was understood to be from the executive class, and they were informed that they could not enter the field, that the 3 people who came were talking in a foreign language, that he contacted his supervisor by phone and that his supervisor Kaan Murat AKPOLAT said that they could not enter these foreign persons in English and that he said "I am coming too", that his supervisor Kaan Murat AKPOLAT came with Elif REYHAN, Adnan KEKLİK, Kenan ÖZ and Ramazan ÇİMEN between 14-10 and that they said that they would make an examination in the field, that 3 foreign persons and their team, İshak DEMİR, İsa TAŞDELDİREN and 11 people together with the people who came with their supervisors, went to the field examination subject to the incident.

The distance between the containers and the site they examined is approximately 1100 meters, and they parked their vehicles in the lift 25 area and checked that area, Kaan Murat AKPOLAT and Elif REYHAN talked in a foreign language with 3 people who were foreign for information purposes, Ishak DEMİR, Isa TAŞDELDIREN and the others left the area when they knew, Ishak DEMİR, Isa TAŞDELDIREN assigned his friends to the lift 29 point for control, he went to the lift 33 area alone, the distance between them was about 30 meters, while checking the cracks, he realized that the area started to move and ran away from the area, and the area started to landslide completely.

14



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

He went to a safe area, when he looked at his own containers, he could not see anything, and he immediately called the security unit, he called the emergency rescue team Müh Muzaffer BEĞEN because he was also in the emergency rescue team, he called Kaan Murat AKPOLAT and Elif REYHAN at the point where he was, they wanted Kaan Murat AKPOLAT and Elif REYHAN to come to the interception channel, he called Fahrettin KEKLİK, Hüseyin KARA, Şaban YILMAZ, Mehmet Kazar, Abdurrahman ŞAHİN who remained in the container below, but HE could not reach them.

He went up from the point where he was and there Adnan KEKLİK called Kenan ÖZ and could not reach him , he got into the vehicle with his supervisor at 15-00 o'clock and left the field, no danger was detected before the day of the incident, but there were small superficial cracks, they noticed cracks about 4 cm wide on the morning of the incident, but they did not think that it would be a normal situation since heavy work machines passed.

The subject is not within his knowledge since it does not fall within his area of expertise, engineers know, his area of responsibility is the process piping team leadership and the unit he is responsible for is the process. The piping team consisted of a total of 13 people, 8 people and 5 subcontractor personnel, Process Piping Team- Sıddık KEKLİK, İshak DEMİR, Gökhan GÜN, Recep KURT, Kenan ÇELENK, Murat GÜRBÜZ, Nihat ŞUVAK, Sıddık GÜN, Subcontractor Personnel- İsa TAŞDİLDİREN, HÜSEYİN KARA, Osman KARA, Abdurahman ŞAHİN, Ferdi DEMİR, blasting was carried out at a distance of 1 km at 12-15 o'clock in the heap leaching area.

Upon the closure of the road, he declared that the road was closed at the scene regarding how the employees operating in the field came to the scene, but with the order of Kaan Murat AKPOLAT, the barges were removed and a controlled passage was made to the scene, the barges were closed again after the entry of the people he stated, the road he closed by placing the barges was under the ground and the wreckage went 1 km further than the road, and the attorney declared that the client applied the emergency action plan as soon as he learned about the crack.

### Ali Rıza KALENDER

In his statement dated 14.02.2024 (14-00), he stated the following: He has been working as a geotechnical engineer at Anagold AŞ for ten years, and his duty is to monitor the masonry leach site, which is where the incident occurred within the mine site, with a radar system.

Detecting the soil deformations that occurred in the region and taking measures by informing the operation units, the personnel of the unit were Engineer Berkay Egypt, field assistant Cem Beker and Fatih Özer, Berkay Egypt, who worked in the same unit on 13.02.2024 at 09.30, called him and said that there was an increase in movement in the masonry leach area.

He resides in the lodging in the Ilic Center, and he has just returned from his leave and immediately moved to the mine, and the reason for his late entry on 13.02.2024 at 10.30 is that it coincides with the day of his return from his leave.

They found that there was an increase in movement in the radar system, they saw that the region was barricaded and there was no access, they crossed to the masonry leach area together with Berkay Mısır , Murat Bayrakdar, Soysal Doğan, Şenol Demir, Kaan Murat Akpolat on 1.00, and they made examinations in the cracks and crevices in the region.

All personnel, including the membrane team in the region, requested that the works be stopped, warned Murat Bayrakdar, Şenol Demir and Kaan Murat Akpolat that no one should enter the region, they detected an increase in movement in the radar system when they moved to the Anagold Maden offices, they sent an e-mail to Iain Ronald Guile, the foreign representative of the company, about 12-00, he wrote in English that his operations were stopped due to the increase in the speed of movement in the e-mail, he also told the blood pressure cracks to be closed with cement, he switched to the office area where Murat Bayrakdar was located.

Murat Bey said that he told the cyanide to be cut, they went to his office to tell Murat Bey and Iain about the situation, he approved the situation, they discontinued the cyanide from the heap area, they went to the heap leach area again for control purposes around 13.30, they saw visible openings, they immediately passed the barricade area, they told them that there were those who wanted to pass through the barricaded area.



15

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

SWORN
TRANSLATION

Then they went to the office area and received the news of the landslide on 14,28, they arrived in the area urgently, they were left behind the barricades that were previously established behind the area, there was also Hakan Şahin, the security manager, and the area was covered with landslide-filled material.

Soysal Doğan, Kenan Öz, Kaan Murat Akpolat, Elif Reyhan, Şenol Demir, Murat Bayraktar, Hüseyin Üstündağ, Kenan Özdemir, Iain Ronald Guile, Country Manager Cengiz Demirci from the leach heap area are responsible, who is responsible for the 9 people under the collapse, whether it can be prevented or not, if the issue of withdrawing the personnel from the site is applied, they do not know how 9 people are under the dent, the heap leaching process has been carried out since 2010, as far as the membrane work in this area is known, it was carried out by the Yesti company, in the case this was done, the heap leach material will lean towards the southern wall and there will be no slope to the front side, even if it is not so large, the report of the heap leach area was made by the foreign GRE (Project Design Company).

It has been approved by the Ministry of Environment and Urbanization by making the necessary controls, in this context, masonry has been done by Anagold Madencilik AŞ, the region is closed except for Anagold personnel, the personnel who are responsible here have entered, and in short, there are the necessary permissions for masonry in the region.

At Anagold AŞ, they are the Geotechnical Unit affiliated to the Mining Geology Department and the most responsible person is İzzet Tekin Bey and Berkay Mısır, Cem Peker and Fatih Özer work in the same unit. He did not know whether blasting was carried out on the day of the incident, that blasting was carried out between 12-00-12-30 every day and that he did not think that the heap leach area was affected by the blasting because the blasting affected the area with a diameter of 250 m, that those who remained under the dent were not connected to the unit where they worked and did not give working instructions, that Murat Bayraktar, Iain Ronald Guille and Hüseyin Üstündağ were informed about the subject, that the necessary reporting and verbal warning were made at 11-00 on the day of the incident, and that they were informed by e-mail at 12-00.

It is true that the radar device gave a warning three days ago, but it was on leave on the said days and dates, and the area was checked if the warning remained below the critical level.

When they reached the risk level, they were informed to the supervisor in charge in the region and the region was evacuated, they checked the radar device between 11.02.2024 — 13. 02. 2024, they detected daily movement between 20 mm and 40mm, which is the normal warning level in the Trigger Action Plan in the Anagold Working Principle, the region where the incident occurred occurred in the eastern region of the heap leach zone, the eastern region was not clearly seen by the radar system, and they requested a budget for the purchase of a robotic total station device in the eastern region related to this situation.

In the event that this device has been used, the region can be examined in more detail, and it is possible that it may have had previous news, the consultant named NEİL BAR, who provided international consultancy services in November or December last year, supervised the geotechnical studies and submitted a report on the deficiencies, and in the report, he stated that he proposed 2 radar and 2 robotic station devices for 2024.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

### Senol Demir

In his statement dated 15.02.2024 (18-20 ), he stated the following in summary   He has been working as oxide Kıncı Engineer at Anagold Madencilik AŞ for 4 years and they started working at 07.30 on 13.02.2024.

7. He asked that they had a meeting with the crusher team(Supervisors) at 50 and then moved to the main offices area, that photos of the slits/cracks started to come from the heap leach group at 8.15, that they went to the heap leach area with Kaan Murat Akpolat around 8.30, that they attended the online meeting here, and that there was a problem about the occupational safety of Elif Reyhan at the meeting.

Kenan Öz, senior supervisor of heap leaching, said that there were cracks in the heap leaching area and asked to look for them and the meeting was ended, Murat Bayrakdar came to the heap leaching area, the Geophysics department and OHS responsible personnel were informed about the cracks and asked to come to the site.

The cracks were examined collectively, during which time he left the heap leach area and went to the crusher offices area. In the office area, Anagold security manager Hakan Şahin, Serkan Köse and Mehmet Sarıtaş from the finance department went to the heap leach area for the inspection Anagold had planned at the beginning of the month.

Halfway through the inspection, Kaan Murat met with Akpolat and his team, Kaan Murat said he was evacuating the site, he also asked him to send an information e-mail, I went to the Administrative offices area and prepared the e-mail and sent it to the occupational safety group, maintenance group, sulfite operation, oxide operation, Ilic White groups at 10.50 as far as he could remember,  saying "Until a second notification, the entrances to the heap leach zone were closed."

 He went back to my routine work, thought there was an earthquake in the office on the 14.28, went out and saw that the heap had slipped and collapsed in the leach, immediately went to the heap leach hammer area where the incident happened, and wanted to help if his purpose was for the staff or those in need.

They learned from the message from the WhatsApp group that he was stopped by the security guards on the forked part of the road leading to the heap leach area, that he called the personnel one by one, that he could not reach 8 people, that he gave this list to the security chief Hakan Şahin at approximately 15.00, that he sent an e-mail at 10-50 o'clock, that he did not know the subject in advance.

They said that they had no duty to take security measures, but nevertheless notified us by e-mail to close the entrances requested to be notified.

The personnel in charge of the landslided leach zone were supervisor (piping) Soysal Doğan, Conveyor Kenan Öz (who was under the cave-in), Engineer Kaan Murat Akpolat, Chief Engineer Murat Bayraktar, Hüseyin Üstündağ, Director Kenan Özdemir, Vice president Iain Ronald Guille, Country Manager Cengiz Demirci, the radar system report prepared in the geophysics department was not sent to him, he did not know to whom it was sent, he thought it was sent to the chief engineer and the manager, Ali Rıza Kalender, Berkay Mısır and their team were responsible for the incident, Kaan Murat Akpolat was the one who saw the incident, Elif Reyhan, 3 foreign national personnel, Soysal Doğan, İshak Demir, who is at fault for the cave-in of 9 people, whether it could have been prevented or not, if the withdrawal of personnel from the site was implemented, how come 9 people were caved in, she thinks that the company that designed the heap leach was at fault for the cave-in of 9 people, he thinks that the blasting for the expansion of the heap leach zone could also be effective, the area she is responsible for has a crusher section with a road in between next to the heap leach.

 The persons he was responsible for were Supervisor Mehmet Sarıtaş, Supervisor Ramazan Çimen and Supervisor Şerif Kurt, he was the personnel under Ramazan Çimen regarding why Ramazan Çimen was left under the dent and whether he gave instructions to go to the region, he did not know why he went to that region, he also sent the e-mail sent at 10.50 to him, he did not give instructions to go, the explosion was made on the day of the incident.

He declared that the explosion was carried out between 12-00-12-30 every day, that the explosion on the day of the incident was at a distance of 500 m from the scene, that the radar system had no information with three days' warning, and that he had no information or authority about why the mine site was not evacuated.



17

. the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

SWORN
TRANSLATION

**Hakan SAHİN**

In his statement dated 14.02.2024 (00-10), he stated the following: He had been working as a security manager at Anagold Madencilik AŞ for about 4-5 years, he started working on 13.02. 2024 at 07.30, and an inspection system other than normal OHS inspections was established by Anagold Management, which was started about 2 months ago and attended by all departments from the managers, chief engineers and chiefs.

In this context, Serkan Köse from the Finance Department and Mehmet Sarıtaş, one of the Oxide Crusher employees, went to the area around 09.35 for a planned OHS (occupational health and safety) inspection of the conveyor belts, based on the plan determined a week ago.

He said that he checked the conveyor belts in the stack about whether the missing issues seen in the previous inspections were eliminated, that he saw a movement among the personnel in the region when he wanted to go above the stack leach, that there was Şenol Demir, Kenan Öz there as far as he remembers, and when he asked them what happened, he said, "There was a rift upstairs. Don't go upstairs."They showed photos of the rift on their mobile phones.

He also saw that he asked the staff "Does the situation look like something serious, did you report it?", they reported it and said that they would close the region to traffic, then they moved to the office area, which is the main building, and they also closed the traffic when they passed.

Meanwhile, it was around 10:35, he reported the situation, that is, an e-mail was sent by Şenol Demir to all Anagold personnel at 10:50 to inform the personnel about the closed area, when he got out of his vehicle, there was a person named IAİN Guille, the vice president of operations as the security manager in the parking lot, and Can Serdar Hastürk, the Environment Manager, and there were also a few people whose names he did not remember.

When he saw that they were about to get in the car and go somewhere, he went to them and asked Iain if he was going to the heap leach, he said " Yes", he said that he had just come from there and observed that something serious was happening, the vehicle was moving and left the parking lot, then he saw Murat Bayraktar, the chief engineer of the Oxide Process department, in the parking lot with his vehicle, he called from a distance and asked where he was going and said that he was going to the heap leach, he asked if they informed you and said "Yes, I have information." When he confirmed that he saw that the region was closed to traffic as a security manager, that he saw whether he had informed anyone, whether he had taken safety precautions, and that the personnel of the oxide process department (Şenol Demir), the regional supervisor, was interested in the issue, and then Murat Bayraktara, the chief engineer of the Oxide Process department, was informed, he returned to his job.

In addition, his supervisor, IAİN Guille, who is a higher authority, reported that the incident in question was an event outside his area of responsibility and duty, that it was an event outside his technical knowledge, that he had information about the territorial separation in the region or had knowledge about the subject, that he had no information about whether measures were taken, that he was outside his area of responsibility, that he had no duty, and that he went to the region on the day of the incident due to the inspection system issued by the Anagold management 2 months ago.

They sent it to Mehmet Sarıtaş, who had no previous knowledge of the subject, that they would not report the situation to him even if such a thing happened, that when he went to the heap leach area with the landslide in question, there was mobility and panic in the personnel here, that he had learned about the possible situation in advance and that they had information, that they showed him the photo and that he learned it here, and that his photos were with him.

He received these photos from himself, the principals and his supervisor were informed verbally, he did not forward the photos to anyone because everyone had these photos, there was no request for any security personnel to be sent regarding the measure, they had already closed the road through the oxide process department.

Regarding the personnel responsible for the heap leaching area in the Anagold Mine site, that is, the place where the work accident occurred where the landslided, as far as he knows, Supervisor Şenol Demir, Engineer Kaan Murat Akpolat, Engineer Elif Reyhan, Chief Engineer Murat Bayraktar, Manager Hüseyin Üstündağ, Director Kenan Özdemir, Country Manager Cengiz Demirci, after the incident, he arrived at a point close to the scene of the incident around 14.40, and started to determine who was in the area.

Engineer Kaan Murat Akpolat and Soysal Doğan stated that they witnessed the incident but received the information that they did not have any injuries, that they said that they would be removed from there by the interception channel at the top of the mine, and that they had them removed by sending a vehicle.



18

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

### Patrik VALKO

In his statement dated 18.02.2024 (00-50), he stated the following:

WSP, the subcontractor contractor of Anagold Madencilik AŞ, had been working as Project Quality Assurance Manager for approximately 7.5 years, started working on the day of the incident at 08.00 on 13.02.2024, and had checked his e-mails when he first came to his office.

Later, around 10 o'clock, he came near to Ishak Aslan and showed him the photos he had taken on the phone and said that the cracks were large and that the area should be evacuated as soon as possible, told his team to evacuate the area immediately, then returned to the works related to the waste storage facility, which was his own business area, because there was a small job they served in Anagol besides the main works of the heap leach expansion construction, and after going to lunch at 12.45, he returned to the office at 12.45.

At about 14:00, Ailen and Jonathan came to me and asked if they wanted to check the cracks in the heap in the mine site and whether they would join them, and since Ailen and Jonathan did not have the authority to drive within the mine site, they went with Ailen and Jonathan to the heap leach site, and they passed the road on the Sabırlı Stream side at 14:20 before the landslide.

There were barriers where the containers were, they stopped because there was no one who spoke English in the area where they stopped, after waiting for 1-2 minutes, Kaan Murat AKPOLAT came to the place where they were and started to move away in the form of a convoy, after a while, they went to a suitable hill to see the inside of the heap where the cracks occurred with himself, Ailen, Jonathan, Kaan Murat and Elif REYHAN, who later joined the vehicle, when they got out of the hill, they saw that the cracks they saw in the photos expanded more, then the sounds started to come from the soil conveyors on the heap leach, and immediately afterwards, there was a landslide with that great disaster.

He said that it took about a minute, that the road was closed with barriers when they came to the heap leach region, that he did not receive any information or e-mail about this issue, that the head office of the company he was affiliated with was located in Ankara, Turkey, and that Anagold's manager in his business area was Shaun Swartz, Capital and Sustainable Projects Manager.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

SWORN
TRANSLATION

In his additional statement dated 18.02.2024 (13-00 ); He is an employee of WSP company and is responsible for quality assurance controls in the construction works of waste storage facility expansion, heap leaching expansion, Yakuplu road construction constructed by Anagold in İliç Copler Mine of WSP company.

Anagold is responsible for the design of the construction to be quality assured, and it has heard for the first time that WSP only checks that the construction works are carried out according to the design, whether a new place other than heap leach has been determined, and whether there is overloading on the existing place.

It is to control the quality of the membranes placed in the expansion of the heap leach site, who took it, whether it is authorized to enter, whether it has previously checked the area, when it last checked, and whether the membranes laid in the expansion of the heap leach site are placed in accordance with the design approved by Anagold.

For this reason, there was no restriction on access to the heap leach expansion zone, the day before the most recent event was 12.02.2024, but he did not remember the exact time, he entered the heap leach expansion zone in the afternoon, he did not see any cracks in the heap leach zone, no previous information was given that there would be cracks or danger in the heap leach, only Ishak Aslan showed a photo on the day of the incident.

When he saw the photos containing these cracks by Ishak on the morning of the incident, he did not know the 9 people whose names were mentioned in the file, he did not have subordination responsibility, he did not know who gave instructions, whether he informed anyone as Process Project Quality Assurance Manager at Anagold Madencilik AŞ about the situation, whether he took safety precautions, he did not have the authority to give direct instructions to Ishak Aslan, who is an Anagold personnel, to evacuate the site and to the contractor companies named Nural, Yesti, Mürekkepçiler in the region to inform Anagold personnel to leave the site.

He does not have the duty and authority to evacuate the area or stop the work flow of the mine, he does not know the personnel responsible for the heap leach area in the Anagold Mine site, that is, the place where the work accident occurred, whether he checked the radar system in the Geophysics department, whether a report was sent or not, and he does not have information about the responsible personnel.

Murat Akpolat, Elif, Jonathan James, Ailen Robert have no information about who is at fault for leaving 9 people under the collapse related to the incident, whether it can be prevented, whether the withdrawal of personnel from the field is applied properly or not.

It is aware of whether there is a situation with a duty and responsibility, whether it has information about whether the detonation has an effect on this situation, whether it is aware of the radar system in the heap leach area, whether it is sufficient, whether it has information about whether the system is insufficient and whether an extra radar system is requested, whether it is updated to the new or existing system, whether it is aware of a radar system in the heap leach area regarding the fact that the radar system wakes up 3 days before, and it does not have any information and comment about the radar system since it is out of its field of expertise.

He declared that he had a stack leach expansion quality assurance duty as of 2020 regarding whether or not he carried out membrane controls in the landslide leach area, or who did it, that he had no information about the operation as of this date, that he had information about the membranes laid after 2020 and that they made their controls within Anagold, and that he had no information about the membranes laid before 2020.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

**Jonathan James HOLDEN**

In his statement dated 18.02.2024 (02-00), he stated the following:

He has been working at SSR Mining for about 2 years, he has made visits to the mine site within the scope of work in the growth and innovation department within SSR Mining and made technical examinations and observations.

He did not only make these visits to Anagold, he visited all other companies within SSR Mining twice a year, they came to Ankara on 08.02.2024, they came to Ilic on 11.02.2024 after staying in the office of Anagold Mining in Ankara for 3 days, they came to the offices area at the Anagold mine site on 13.02.2024 at 06:45 on the day of the incident. After coming to work, he said that he checked his e-mails from the company e-mail on the computer, and that while they normally planned to go to the field at 13.00, they went to the field with your family at around 14.00 because the work in the office was getting longer.

Since they did not have the necessary driving license to drive in the field, they asked Patrik to accompany them, they drove together to the area where the heap was being leached, and when they arrived at the area, they saw that the road was blocked with barricades. However, they were not informed that the road was closed, they were told to wait when they arrived at the closed area, 2 people, whose names they did not remember, arrived and went up in one vehicle, they went up to a high hill to get a better view and saw large cracks, they got out of the vehicle after parking the vehicle in the parking area, they stopped in that area to look at the heap leaching area from above, they saw that the cracks were very obvious from this area, they realized that the situation there was very serious. When he asked where the workers were evacuated to, he was told that the disaster occurred in a few seconds, that he had last visited the İliç mine site in September 2023,that he had not seen any project non-conformities when he arrived,and that no relevant report had been submitted.

Regarding the statement that a new location would be determined for the heap leaching unit in December, but since it could not be done, the loading was overloaded because the loading was done on the existing location, he does not have technical knowledge about heap leaching since his area of responsibility is underground mines.

He stated that he had no knowledge, that he had no responsibility to report on his observations regarding the purpose of entering the field and whether there was anyone he was responsible for in this regard, that his purpose was to examine the innovation work done in the fields and to take opportunities to observe other practices and problems that arose during the field visits he made on this occasion. He stated that there was no one in Anagold Mining for whom he was responsible.

**Allen Robert MORRIS**

In his statement dated 18.02.2024 (03-00), he stated the following.

He stated that he has been working at SSR Mining for about 2.5 years, that he has visited the mine site and made technical examinations and observations within the scope of his work in the growth and innovation department within SSR Mining, that he did not make these visits only to Anagold, that they visited all other companies within SSR Mining twice a year, and that he came to Ankara with Jonathan on 08.02.2024.He said that they arrived in İliç on 11.02.2024 after spending 3 days at the Anagold mining company's office in Ankara,that on the day of the incident, 13.02.2024, at around 06.45 hours, he came to the offices area in the Anagold mine site with Jonathan,that after coming to work,he did his daily work on the computer,that while they normally planned to go to the field at 13.00 hours, they went to the field with Jonathan at around 14.00 hours as the work in the office took longer. He said that since they did not have the necessary driver's license to drive in the field, they asked the Patriarch to accompany them, that they drove together to the area where the heap was being leached, that when they arrived at the area he saw that the road was blocked with barricades, but we were not informed that the road was closed.

21



i. the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

SWORN
TRANSLATION

When they arrived at the closed area, they were told that they had to wait, 2 young engineers, whose names they did not remember, arrived and they got into one vehicle and went upstairs, they went up a high hill to get a better view of the cracks and saw large cracks, they got out of the vehicle after parking the vehicle in the parking area, they stopped in that area to look at the heap leaching area from above, they saw that the cracks were very visible from this area, they realized that the situation there was very serious. When Jonathan and the employees asked where they were evacuated to, he was told that the landslide occurred rapidly within seconds, that he had last visited the İliç mine site in October 2023, that he had never been to the heap leach zone in the mine site when he arrived because it was not his area of responsibility, and that no relevant information was provided.

Regarding the statement that the heap leaching unit was going to determine a new location in December, but since this could not be done, the loading was done on top of the existing location and therefore there was overloading, he stated that he had not heard any information on the subject, that the heap leaching was outside his area of responsibility, that there was no one he was responsible for at Anagold Mining, that he had come to observe the growth and innovation projects at the Sulphide plant, that he had not seen the cracks before, that he was just curious because of the rumors he had heard, and that the heap leaching area was outside his area of responsibility.

### Kaan Murat AKPOLAT

In his statement dated 14.02.2024 (07-00), he stated the following: He has been working as an Assistant Process Engineer at Anagold Madencilik AŞ for approximately 17 months.

At 08.00 in the morning, production engineer Şenol DEMİR was called by the heap leaching operator Nazım KÖSE and it was said that there were fractures in the heap leaching area, they went directly to the field with Şenol DEMİR, they attended the production meeting by phone when we arrived at the field, during the meeting, the heap leaching supervisor Kenan ÖZ informed the oxide chief engineer Murat BAYRAKDAR about the fractures, Murat BAYRAKDAR informed everyone and informed that he would come to the field, then the assistant engineer of the geotechnical department Berkay called Misir and asked him to examine the radar data and come to the field urgently.

Kenan ÖZ, Soysal DOĞAN, Şenol DEMİR, who were in the area, examined the area, took photos and informed the group.

Afterwards, OHS Chief Engineer Burak ARTAL came to the site together with Environmental Manager Can Serdar HASTÜRK, Operations Manager IAİN GÜİLLE and made a reconnaissance and shared the radar data received from Berkay MISIR with IAİN via e-mail, afterwards, Murat BAYRAKDAR OHS engineer Gizem GAZCI said that they stopped the work of a group of about 20-25 people working under the project department in the area and made them move away from the site, that they informed project engineer İshak ASLAN about the process, and that with Murat BAYRAKDAR's decision, the heap operation was stopped and the heap operators were told to retreat to their office areas.

The heap leach area was closed to access from two points with the decision of Murat BAYRAKDAR, all Anagold employees were sent a road closure information e-mail by Şenol DEMİR, then geotechnical engineer Mr. Ali Rıza, himself and Murat BAYRAKDAR re-examined the site, Mr. Ali Rıza said that a settlement occurred in the heap leach area, mr. Murat BAYRAKDAR said that he told them to stop the heaping process but that they could fill the fractures by using cement with construction machinery and that a project group of 20-25 people could work on the site, Mr. Murat BAYRAKDAR asked him to send an e-mail with all his reviews and comments and told them to continue in the current order until the e-mail arrived, then Mr. Ali Rıza received an e-mail from Mr. Ali Rıza and told them to stop the heaping process and fix the areas, but there was no information about the project team in the e-mail.

Afterwards, he said that Murat BAYRAKDAR told him that he had written an e-mail asking questions about the actions taken and the project team, that he had sent the e-mail to Murat BAYRAKDAR, that Mr. Murat had added people and shared it under his own name, and that the sending of solutions to the area should be canceled.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

In order to ensure the solution balance here, assistant process engineer Elif REYHAN, supervisor Adnan KEKLİK, Soysal DOGAN and Şenol DEMİR came together in the administrative building offices and discussed how it could be done, solution transfer to the area was stopped with the approval of Murat BAYRAKDAR, then Elif REYHAN, Adnan KEKLİK went to the piping offices, Soysal DOĞAN said that 3 foreigners wanted to go upstairs, while Berkay MISIR was encountered on the way.

"I think the fractures have increased, don't go up", they went up to show the area to foreigners and to make sure that no one was left in the area, Kenan ÖZ, Ramazan ÇİMEN, Soysal DOGAN, İshak DEMİR and one other operator were on site supervision,

they were told to evacuate the area, Soysal DOĞAN, İshak DEMİR and another operator were asked to take photos from Lift 30 and return, Elif REYHAN, herself and 3 foreign managers accompanied them to the top level of the area, the incident took place while they were inspecting the area,

### Hüseyin KORKMAZ

In his statement dated 15.02.2024 (17-17), he stated the following

He said that he had been working as an excavation driver at Çiftay AŞ for a year, that he went to the specified point to pick up excavation upon the assignment received through the truck routing system to the vehicle he was driving, that the assignments through the system came according to Anagold's work program, that on the day of the incident, he moved to unload my load in the direction of Fox upon the assignment received around 14-25 through the system.

While he was traveling on the route on the main transmission road, on 13.02.2024 at around 14-30 on 13.02.2024, he saw that the landslide from the upper left side of the road according to the direction of travel when he approached the primary crusher junction with his vehicle with 06 DZG 479 license plate and in-house 611kod number, which I was driving.

He said that he was about 500 meters away from the landslide and when the vehicles in front of him started to reverse, he put his vehicle in reverse gear and started to drive away from there, that the images in question were the images belonging to the camera on the 06 DZG 479 plate truck I was driving, that he knew the person named Uğur YILDIZ regarding whether he saw the 06 EBG 718 plate truck driven by the person named Uğur YILDIZ, that he knew the person named Uğur YILDIZ, that as soon as he saw the landslide at the time of the incident, he put the vehicle he was driving in reverse gear and started to drive away, he did not see the truck mentioned because he looked at the back.

### Kemal GÜLGEN

In his statement dated 15.02.2024 (17-17 ), Kemal Gülgen, a driver at Çiftay AŞ, gave a similar statement to Hüseyin Korkmaz.

### Furkan YILDIRIM

In his statement dated 15.02.2024 (16-48), Furkan Yıldırım, a driver at Çiftay AŞ, gave a similar statement to Hüseyin Korkmaz.



23

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

**Sıddık GÜN**

In his statement dated 15.02.2024 (17-30), he stated the following

He said that he had been working as a plant operator at Anagold Madencilik AŞ for about 15 years, that he was on leave on the day of the incident and learned about the incident by phone, that he and 3-4 of my friends immediately went to the mine site, that they saw the site where the incident took place, and that when they wanted to enter the area, the security did not allow them to do so.

He said that he saw that there were cracks in the heap leaching area where he worked every day, that he always reported the cracks to his supervisor, Soysal DOĞAN, and that the first crack had occurred in 2018 in the heap leaching area next to the container.

When they reported this to their superiors that water leaks were occurring here, they formed a pillar in front of it and covered it.

In 2010, when the first permits for the mine were obtained, Hakkı BOZ, who served as the General Director of Process when the permission for the heap leaching area was obtained, said: "This place is permitted up to the 23rd floor because its capacity can only handle that much." He said.

They said that when the Sulphite Plant will be commissioned, there will be no more space in the heap leach area where they can make heaps, but they continue to make heaps, and when they told the engineers about this situation, they said that foreign companies came and made evaluations and that it did not pose any problem.

**Selçuk CİFTLİK**

In his statement dated 14.02.2024 (02-35), he stated the following

He has been working as OHS Manager at Anagold Madencilik AŞ for about 9 years, he has been on accumulation leave for one week as of Sunday, 11.02.2024, he did not have a document to notify this situation, but he informed his supervisor IAİN GUILLE via whatsapp.

As there was no document indicating the accumulation permit, OHS Chief Engineer Burak Artal was acting in his place.

During this period, he informed him about the positive/negative situations in the mine, and at around 09.30 on 13.02.2024, a photo and information message was sent via Whatsapp via Burak Artal, informing him that there was a crack/split in the heap leaching zone, and that he told him to follow up and inform him about the aftermath.

Environment Manager Can Serdar Hastürk, OHS Specialist Gizem Gazcı, Oxide Operations Chief Engineer Murat Bayraktar and IAİN GUILLE carried out a site inspection at the site where the landslide occurred, following this, an e-mail was sent to him and Anagold personnel via Şenol Demir at 10.50, and then he received a confirmation message from Burak Artal via Whatsapp about whether there was anyone on the field or not, that he was at the Private Neon Hospital in Erzincan Center due to his wife's health problems, and that he attended the meeting held on 13.02.2024 at 14.00 via online mobile phone from the aforementioned hospital.

He said that the incident occurred during the meeting, that the meeting was terminated, that he was instructed to leave the building, that a few minutes later Burak Artal called him and told him that the heap leach site had collapsed, that as the OHS manager, he was on leave, Burak Artal provided guidance and information flow to take the necessary safety measures, and that Şenol Demir sent an e-mail to close the area to traffic.

Regarding whether he had previous knowledge about the soil separation in the area or whether anyone had knowledge about the issue and whether measures were taken, the first notification about the soil separation in the area, there is a radar system that reports the heap leaching area and this system detects and reports the soil mobility about the heap leaching, Ali Rıza Kalender and Berkan Mısır from the Geotechnical Unit of the Mining Department were interested in the control of the system, on 13.02.2024 at 13.he stated that on 13.02.2024 at 13:00, Ali Rıza Kalender sent an e-mail about a separation in the heap leaching zone, that this e-mail was not addressed to him but was sent to him for information purposes by his representative Burak Artal, that the personnel responsible for the heap leaching zone in the Anagold Mine site, i.e. the place where the work accident occurred where the landslided, were Engineer Şenol Demir, Engineer Kaan Murat Akpolat, Engineer Elif Reyhan, Chief Engineer Murat Bayraktar, Manager Hüseyin Üstündağ, Director Kenan Özdemir, Country Manager Cengiz Demirci.



24

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

SWORN
TRANSLATION

## Senol Demir

In his statement dated 14.02.2024 (06-40), he stated the following He said that he had been working as a Crusher Production Engineer at Anagold Madencilik AŞ for about 4 years, that after a meeting in the crusher area around 08.00 in the morning, the work teams were informed to start the system, that he left the crusher offices and came to the main office in the field around 08.15.

A person named Nazım KÖSE, who was working as an operator in the heap leach area, sent a photograph to the group at 08.20 and told them that cracks had appeared in the field, they went to the heap leach area together with Kaan Murat AKPOLAT, informed Murat BAYRAKTAR, who was their immediate superior,that he had arrived at the site and at the same time the Geophysics team was also informed.

The work was stopped, the operators of the construction machinery on the site were informed to evacuate the site, and then the existing crusher moved to the offices area.

Hakan ŞAHİN, Mehmet SARITAŞ and Serkan KÖSE, together with Hakan ŞAHİN, Mehmet SARITAŞ and Serkan KÖSE, went to the heap area for general inspection at 09.20, were informed that the site had been evacuated during the inspection, ended the inspection and went to the offices area.

On the road route, he said that his friends blocked the road with bollards and limited the entrances, that he left his friends and came to the office in a different vehicle and sent a general information e-mail, that there was an e-mail stating that entrances and exits to the mass area were closed until further notice, and that he continued his routine work.

In the following hours, he thought that there was an earthquake and went out of the office, when he came out he saw that the heap leaching area had shifted, he went to the crusher area with the person named Gizem GAZCI, an OHS specialist, to confirm the status of the personnel working in the field and shared the list of the personnel they could not reach with Hakan ŞAHİN, he went to the area where there was shifting soil in the Sabırlı region due to the evacuation of the area, regarding whether he informed anyone about the situation as the OHS managerand whether he took precautions, a friend from the team informed the OHS unit about this issue before going to the field for the crack.

In fact, they saw that they encountered the OHS unit while going down the site, that they also went out to the site area, whether they had previous knowledge about the soil separation in the area or whether they had knowledge about the subject, whether precautions were taken, whether they had no previous knowledge about this subject, whether they knew someone who had knowledge about the subject, when the personnel went out to the site on the day of the incident.

He stated that Kenan ÖZ, Kaan Murat AKPOLAT, Murat BAYRAKTAR and Hüseyin ÜSTÜNDAĞ were responsible for the heap leaching area in the mine site, i.e. the place where the work accident occurred where the landslided, and that as far as he knew, Soysal DOĞAN, Kaan Murat AKPOLAT and Elif REYHAN saw the incident.

## Mehmet SARITAS

In his statement dated 14.02.2024 (03-20), he stated the following

He stated that he had been working as a Crusher Supervisor at Anagold Madencilik AŞ for approximately 14 years, that he started his shift at 07.20 a.m., that he was working in the crusher section adjacent to the heap leach area, and that Nazım Köse was the operator of the heap leach area.

Nazım shared photos of the cracked/cracked places in the area via Whatsapp group at 08.20 in the morning, and since he did not have a region or supervisor staff, he did not have any instructions in terms of precautions or what to do.

Serkan Köse from the Finance Department, Security Manager Hakan Şahin and Şenol Demir went to the heap leach site area around 09.20 based on the plan determined the day before, when they reached a certain area in the heap leach site, Hakan Şahinsaid that the managers wanted to go up to the top of the heap leach site, Şenol Demir said that the supervisor said "there is a possibility of trouble up there, let's not go up there"and they went back.

He stated that when they were returning, the road started to be closed to traffic, that Şenol Demir sent an e-mail to all Anagold personnel at 10.50 a.m. to inform them of the situation, i.e. to inform the personnel of the area closed to traffic, that he did not inform anyone about the situation, whether he took safety precautions or not,that he did not tell anyone because his superior Şenol Bey was aware of the situation, that he did not have any responsibility in the area, that he also sent the photographs to Hakan Şahin, who was with him, and that he did not see the incident.



25

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

### Nazim KÖSE

In his statement dated 14.02.2024 (03-00 ), he stated the following:

He said that he had been working as a Crusher Operator at Anagold Madencilik AŞ for about 14 years, that at 08.00 in the morning he changed his clothes and went to start the system, and at 08.16 he went to the heap leach site to start the system. Afterwards, he saw that the area where they were working was completely split open, and at 08.16 he called his superior Şenol DEMİR and his supervisor Kenan ÖZ and told them about the situation, and they told him to take photos and send them to them and that they would come. At around 08.30 p.m. Şenol DEMİR, Kaan Murat AKPOLAT, Kenan ÖZ, Ramazan ÇİMEN, Murat BAYRAKTAR, Fatih ÖZER and other people whose names he did not know arrived, they looked all over the field, Chief Murat BAYRAKTAR said "Let's stop the system and leave the field", he stopped the system, got in his car and left the field, went to the founder's offices and sat down, he never went out on the field afterwards, he went to dinner at around 11.30 p.m., afterwards they noticed that his desk was shaking while he was playing with his phone. He said that he thought it was an earthquake, but then he heard a sound similar to an explosion and learned about the incident, that he called Kenan ÖZ but could not reach him, that he called Mehmet KAZAR but could not reach him either, that he did not call anyone else, that he was on leave on Monday and that there was no rift on Sunday, that Kenan ÖZ was the first supervisor as the personnel responsible for the heap leaching area in the mine site, that is, the place where the work accident occurred where the landslide happened. He stated that Kaan Murat AKPOLAT was his immediate superior and Murat BAYRAKTAR was in charge of the Crusher Section.

### Saim Serkan KÖSE

In his statement dated 14.02.2024 (04-05), he stated the following:

He said that he had been working as Finance/Cost Controllers at Anagold Madencilik AŞ for about 7 months and started his shift at 07.30.

He said that the Anagold Management had established an inspection system other than the normal OHS inspections, which was initiated about two months ago by the Anagold Management, with the participation of the manager, chief engineer, chiefs and all departments, and that he went to the area around 09.35 for the planned inspection of the conveyor belts within the scope of the inspection together with Anagold Safety Manager Hakan Şahin and Mehmet Sarıtaş, and that they went up to a certain part of the heap leaching site.

Subsequently, they were warned by Şenol Demir, they were told that there was a crack/slit on the heap leach site, they went back, the road was closed to traffic while they were returning, they then went to the finance department office, which was their own business, Şenol Demir sent an e-mail to all Anagold personnel at 10.50 to inform the personnel about the road being closed to traffic.

Regarding whether he informed anyone about the situation, whether he took security measures, he stated that he did not inform anyone, that it was not in his area of responsibility or duty, and that he did not see the incident.



26

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

### Hatun KAZAR

In her statement dated 15.02.2024 (16-30), she stated the following

She was a student, her father Mehmet KAZAR had been working as a dozer operator for about 6 years at Keklikler, a subcontractor of Anagold Madencilik AŞ,and when she and her mother Lütfiye KAZAR called her father, her father said "There is a problem today, I don't know if we are working", when they wanted to make a video call, her father said that he had turned on the internet and let's talk, then her father started to sound agitated, they called him but got no answer, then the line was completely discontinued off, they called the shift supervisor but could not reach him.

She stated that when they called Bayram, who was staying in the same unit with her father, he told them that there had been a landslide but that he was not there and that the last time they had seen her father was when he was entering the container; that her father's colleague Alparslan told her that cracks had occurred in that area that day and that the engineers had told his father to evacuate the site, move the dozers to a safe place and wait in the container.

### Bülent KARA

In his statement dated 15.02.2024 (15-50), he stated the following

He had been working as a welder at KARSA, a subcontractor of Anagold Madencilik AŞ, for about 13 years and on the day of the incident he was working on the night shift.

He said that his  Hüseyin KARA, who is currently under the ground, was working in the heap leaching area and that his  went to the area where the incident took place at around 14-00 hours with the persons named İsa TAŞDELEN, İshak DEMİR and Soysal DOĞAN.

A person named Soysal DOĞAN said to Hüseyin KARA "Close the road, move the pontoons to the road and don't let anyone pass through here", three people other than  passed towards the area where there were cracks,  waited for them below, and then the incident took place around 14.28.

The persons named İsa TAŞDELEN and İshak DEMİR were at a high altitude at the time of the incident, and although they sunk up to their knees in the ground, they somehow managed to get out of there,and even they could not carry out the photographing process, which was the reason why they went there,İsa TAŞDELEN came to the hospital,and from there they came to their homes.

İsa TAŞDELEN, Abdurrahman ŞAHİN, Hasan Hüseyin ALMALI and Muhammet ÇELEGEN stayed in the same apartment together with them,and on the morning of the incident, the companies named YESTİ and MÜREKKEPÇİLER were removed from the field, but they were not aware of this.

He stated that an e-mail had been sent to everyone, but there was no e-mail or message sent to them, that when İsa TAŞDELEN came home he saw that there was mud up to his knees,that İsa TAŞDELEN told him that his Hüseyin KARA was with them and that they had not heard from him,that approximately 2-3 hours after he came home İsa TAŞDELEN went to the hospital again with back pain, that he did not see the incident,that what he had told him was told by İsa TAŞDELEN,and that he could not reach his  in any way after that day.



27

he sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature:

### Elif REYHAN

In her statement dated 14.02.2024 (06-40), she stated the following

She said that she had been working as an Oxide Assistant Process Engineer at Anagold Madencilik AŞ for about 17 months and started her shift at 07.30 am. At the general field meeting held online at 8.30 a.m., stacking Supervisor Kenan Öz said that there were splits/cracks in the heap leach field, that they were in the ADR Office container during this time, that they were doing their daily routine work in the office area until 14.00 p.m., that they went to the heap leach field with Kaan Murat Akpolat, Adnan Keklik in the same vehicle for field control, that they were waiting in the same vehicle in the so-called area where the Patriarch, Ailen and Soysal Doğan were closed to traffic before coming to the heap leach field, that they were waiting together in the same vehicle a short time ahead of time, there were 3 vehicles in total. In the meantime, he and Kaan Murat Akpolat said that the foreign nationals were getting into their vehicles, that the other remaining personnel did not know where they were going, but that they would go down, and that they, together with three foreign nationals and Kaan Murat Akpolat, went up to the top of the heap leach, and in order to have a clear view of the heap leach, they went up to the place where the Phase 4B work was being carried out, which is higher than the heap leach hill.

In the meantime, he saw that the heap leach had slipped and the soil was flowing away, he saw Soysal Doğan running away from a place close to the heap leach hill and then he came to them, 6 of them were on their way to the upper side, a separate vehicle came and picked them up.

Regarding whether he informed anyone about the situation as Oxide Assistant Process Engineer or took safety precautions, whether he had prior knowledge about the soil segregation in the area, he said that he had not been in the incident area for two days, they did not see what happened.

He stated that no one had informed him about the issue beforehand, that he learned about it at 08.30 on the day of the incident, that an e-mail was sent by his team as a precautionary measure and that the area was closed, and that those responsible for the area were Engineer Şenol Demir, Engineer Kaan Murat Akpolat, himself, Chief Engineer Murat Bayraktar, Manager Hüseyin Üstündağ, Director Kenan Özdemir, Country Manager Cengiz Demirci.

### Caner ERBASAN

In his statement dated 14.02.2024 (07-31 ), he stated the following in summary

He had been working as a Biodiversity Specialist at the Anagold gold mine for about 3 years and went to the environmental office at the mine site at around 07.30 on business.

Gizem GAZCI, who works in the occupational safety office next to the office, said that Recep ÇALI, who works in their office, came to her and told her that he had received news of movement in the heap leach area, then she attended the production meeting around 09.15, during the meeting Elif REYHAN from the oxide department stated that they had observed movement in the heap leach area, she did not know the details and that they continued to investigate.

He then stated that the meeting ended, that at around 13.15 hours he and Tuncay KAYA were working in the area between the Sabırlı Village Stream and the TSF on a different project independent of this accident, that at 14.20 hours he left the area where he was working and went to the three-storey offices, that he then went to the greenhouse area, that while he was standing in the greenhouse area there was a noise and when he looked towards the Sabırlı Village Stream he saw that the heap leaching had slipped, that he then called the department manager Can Serdar HASTÜRK and explained the situation.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

TRANSLATION

**Ahmet Oğuz ÖZTÜRK**

In his statement dated 14.02.2024 (06-50 ), he stated the following
He had been working as the sustainability director at Anagold gold mine for about a year.
At around 09.17 in the morning, Environmental Manager Can Serdar HASTÜRK called and said that there were cracks in the stack area and that they had a short conversation about the subject, and immediately after the meeting, he sent a message via whatsapp and sent photos about the subject.
He said that this was how he had learned about the issue, that he had never heard of such an issue before, and that he should inform Mr. Serdar himself since it was not in his area of responsibility.
Afterwards, he said that he was interested in his own work and did not receive any further information about the issue, that they gathered in the office around 14.30, that they suddenly felt a tremor and went out of the building, thinking that an earthquake was happening.
Shortly afterwards, some of the people who were outside said that there was a slide in the heap leach area, he hurried to the direction of the incident and saw that there was a big cave-in, then he ordered the culverts under his responsibility to be closed, and immediately afterwards, work started to set up the crisis desk.
He stated that he did not receive any information on whether he was sent an e-mail on the subject or whether information was provided in and around the area, and that it was outside the responsibility of the piping unit.

**Recep CALI**

In his statement dated 14.02.2024 (08-16), he stated the following
He had been working as an Environmental Engineer at the Anagold gold mine for about 3 years.
He said that he arrived at the mine site at around 07.30 hours, that at 08.00 hours he entered the daily routine meeting, that there was no discussion about the existence of a landslide or a dangerous situation.
At 08.50, Gizem GAZCI, an OHS Specialist, came and said that there was a landslide in the last heap and that they were going to go to the area, she asked her supervisor to go to the area, she informed her supervisor and went to the area with Ms. Gizem, there were Kaan Murat AKPOLAT, Murat BAYRAKTAR and İshak ARSLAN in the area, they observed the area and examined the cracks and cavities and took photographs, afterwards, he called his supervisor and informed him about the issue, together with Gizem GAZCI ,Kaan Murat AKPOLAT, Murat BAYRAKTAR and İshak ARSLAN, they informed the subcontractor employees and all the contractors there that the area should be closed, then they left the area and went down to the offices section, where he gave detailed information to his supervisor face to face about the issue again.
Then Can Serdar HASTÜRK, Burak ARTAL, Gizem GAZCI, Iain Guille went to check the area again and when they came to the offices after a while, the road closure e-mail was shared with the whole field.
He said that he never left the office afterwards and that he took care of his own affairs, that at around 14.30 hours there was a sudden shaking in the office and that he went out thinking that there was an earthquake and that soon afterwards he learned that there was a cave-in in the heap leach area, that he went to the mine greenhouse area with the friends I was with to make observations and that they made an inspection in the Sabırlı Stream section, and then he returned to the office.

**Can Serdar HASTÜRK**

In his statement dated 14.02.2024 (04-20 ), he stated the following He has worked as an environmental engineer at Anagold gold mine since June 2011 and as environmental manager since September 2019.
He said that he came to my office at the mine site in the morning, and after the 08.00 meeting, Caner ERBASAN, one of his teammates, told him that cracks were seen in the place called the leaching area, and asked Caner how he learned this. He said that he learned about the incident from Gizem GAZCI, an occupational safety engineer,and directed Recep ÇALI, an environmental engineer in their team, to look at the site. Recep, who went to the site with Ms. Gizem, sent photographs from the site around 09.15, and since he could not fully understand the extent of the incident from the photographs, he decided to go to the scene himself. Afterwards, he said that he informed his director Ahmet Oğuz ÖZTÜRK and told him that he would also go to the area, then he went to the general manager Iain Guielle and asked if he was aware of the incident.



I, the sworn translator Yasin DURMAZ declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

He said that when he said he didn't know, she informed him, showed him the photos on her phone, then he attended the 10.00 meeting and he and Iain Guelle decided to go to the site.

General Manager Iain Guelle and OHS Engineer Gizem GAZCI and Chief Occupational Safety Engineer Burak ARTAL set off for the site around 10.30 **a.m.,** followed by Oxide Process Chief Engineer Murat BAYRAKTAR in his vehicle.

They went from the offices to the site of the cracks, and when they reached the site, the site supervisor Soysal DOĞAN was at the scene. Mr. Murat stated that he showed the cracks and that these were noticed during the morning shift and that the Geotechnical team was asked about an abnormal situation and that a sliding movement was seen in the area, and there was movement in the area based on the opinion of the friends using the radar.

They said that the colleagues working in the area said that he had been removed, then they took photographs from various points and after a while they left the area and went back to the offices, but Mr. Soysal remained at the scene, and they held short consultations among themselves in the offices about what they could do and the measures they could take.

Considering that the designer company is in the USA and the time difference, they thought that the subject could be discussed in the evening, the e-mails they received about the subject were an e-mail from the engineer named Şenol DEMİR that the access roads to the heap leaching area where the shift was experienced/were closed at 10:50, 13:38, Murat BAYRAKTAR and Ali Rıza KALENDER saw another e-mail that they were aware of since it was added to the information section to the previous correspondence, and when they took into account these e-mails, they reported that the works in the field were stopped and when they were transferred to the field, there was a communication between the field supervisor Soysal Doğan and the field supervisors and the other relevant persons working in the field due to the lack of others in the field.

At around 14.30, during a meeting in the office, they felt a tremor, at first they thought it was an earthquake and evacuated the building, when they went outside they saw a cloud of dust in the western part of the leach field and based on their observations in the morning, they realized that there was a landslide there.

He stated that since a crisis desk would be set up shortly afterwards, they went to the office and started to set up the crisis desk with their colleagues who participated in the issue.

### Burak ARTAL

In his statement dated 14.02.2024 (04-56), he stated the following

He worked as the Chief Occupational Safety Engineer at the company named Anagold Mining and started working between 7-30 o'clock.

At around 09.13, Gizem GAZCI, the occupational safety expert at the site where the accident occurred, sent messages on whatsapp that there were cracks in the area, and at 09.22, she sent an additional photo, which showed a small landslide at the site where the accident occurred.

Then he contacted Can Serdar HASTÜRK, the Director of Environment, and explained the situation and said that they decided to discuss the issue with Iain Guille, Deputy General Manager of Copler Anagold Mining, and they decided to discuss this issue at the managers' meeting to be held at 10.00 a.m. and then go to the site and conduct an inspection.

In the meantime, at 09.28, he saw a message sent by Gizem GAZCl, which said that work had stopped at the site of the accident and that the personnel had started to leave the site, then they attended a meeting and decided to go to the site after the meeting.

They went to the site in two vehicles at around 10.26 a.m., one of the vehicles was carrying her, Gizem GAZCI, Can Serdar HASTÜRK and Lain Guille, the other vehicle was carrying Murat BAYRAKDAR, Deputy Oxide Manager, Murat BAYRAKDAR was leading the way as he knew the area, they reached the Yığın leach site where the accident occurred and got out of the vehicle, while getting out of the vehicle, Ms. Gizem said to me "It is not safe here, chief." He said.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

Upon this, I asked Murat BAYRAKDAR, the owner of the site, whether it was safe or not, and he replied that it was safe, and since he was not satisfied with the answer, he spoke with Soysal DOĞAN, the supervisor I saw at the site, spoke to him.

When he asked him whether the area was safe or not, he was told that they were in a dangerous place, whereupon he conveyed to the deputy general manager Iain in English that this place was not safe and that our team was returning to the vehicle, and that he agreed and that they should interrupt the inspection and go to the safe area.

Upon this, they all moved to the safe area and continued the inspection remotely, at around 10.50, Oxide Production Engineer Şenol DEMİR sent the road closure information to the entire operation as an e-mail, this message relieved them and they moved to the offices area to wait for the evaluation of the Geotechnical Team.

In the meantime, while returning to the office, he said that this accident had occurred, that he had seen a personnel working on foot in the dangerous area at a distant point whose description he could not determine, and that he had called Murat BAYRAKDAR, who was coming from behind, and asked him why there were personnel in the area, and that he had told him that he was in charge of the area and that he had allowed limited personnel to enter the area for technical inspection, which was dangerous.

He said that Can Serdar HASTÜRK and Gizem GAZCI also witnessed this conversation, that they then went to the office, that he later met Murat BAYRAKDAR, Kaan AKPOLAT (Oxide Engineer) and Onur SARITAŞ (Occupational Safety Engineer) on his way to lunch, and that Murat BAYRAKDAR verbally informed him that Ali Rıza KALENDER from the geotechnical team had completed the technical inspection, that there was no landslide in the area, that there was a settlement, that there was no risky situation and that the heap work could continue.

However, he said that he would not continue with the heap work at the moment and that he would have a meeting at 17.00 with GRE Company, the design engineer of the area, and that he could start the next day after that.

After these conversations, he said that he went to dinner feeling relieved, and after dinner, while he was in the office, Ali Rıza KALENDER sent him an e-mail at 13.03.

In the content of the e-mail, contrary to what Murat BAYRAKDAR had said, there was a landslide, the landslide continued, and the information that the heap process should definitely not continue was explained together with radar reports, upon which he immediately tried to reach Murat BAYRAKDAR, but since his phone was busy, he sent him a message on whatsapp, they corresponded on this issue, he conveyed that he would reply to this e-mail, he thought that this incident was not managed well and that there were contradictory situations, and conveyed the issue to Abdulkadir CANSIZ (MINING OPERATION VICE DIRECTOR).

He said that he wanted to arrange a meeting after -15.00, he arranged the meeting at-13.28 at -15.15 and invited Ali Rıza KALENDER, Gizem GAZCI, Murat BAYRAKDAR, Abdulkadir CANSIL, Kaan AKPOLAT and Muzaffer Begen (Emergency Intervention Chief) to the meeting by e-mail, then Murat BAYRAKDAR replied to Ali Rıza KALENDER's e-mail at 13.38, and said that the area was completely closed to access, work was stopped in the 4B-3 phase, the heap process was stopped and he would hold a management meeting to close the heap leachate irrigation areas.

He also asked if there was a problem for the cracks to start being repaired, when the work on phase 4B-3 could start, and asked that the radar measurements be forwarded to his team during the noon and night shifts, then the incident in question took place at 14.28 while he was in the office, immediately after the incident the Emergency Action Plan was activated at the mine site, a crisis desk was set up, Murat BAYRAKDAR, the owner of the site, collapsed and was taken to the infirmary, he did not attend the crisis desk, Mr. Abdulkadir CANSIZ managed the crisis desk.

Regarding whether or not he went to the scene of the incident, he was responsible for coordination as he was in charge of the crisis desk, he sent emergency response chief Muzaffer BEĞEN, Onur SARITAŞ, Çağdaş BAŞ (Occupational Safety Engineer) and Gizem GAZCI from his team to the field, Murat BAYRAKDAR was responsible for the piping unit, he had no information about whether the piping unit was told to go out or not.

31



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

SWORN
TRANSLATION

Regarding whether anyone told those on the site to stay or not to stay, he said that he was not authorized to tell those working on the site to stay or not to stay, that the e-mail that the entrances to the site were closed and all work was stopped was sent by Murat BAYRAKDAR, the area supervisor, and that he had no knowledge of who gave the instruction for Elif REYHAN (Oxide Engineer), Kaan AKPOLAT and 3 foreign guests to go to the scene. However, Mr. Murat BAYRAKDAR was the supervisor to whom Mr. Kaan and Ms. Elif received orders, and he stated that he was concerned about whether he had an obligation to inform his superior, and that he constantly informed both Mr. Selçuk ÇİFTLİK, the occupational safety manager who was on leave, and Mr. Abdulkadir CANSIZ, the deputy operations director.

### Gizem GAZCI

In her statement dated 14.02.2024 (04-56), she stated the following: She said that she was working as a Senior Occupational Safety Engineer at Anagold Mining, that she started her shift at 07.30, that at 08.53 Kenan ÖZ (Bulk Supervisor of Anagold Mining) called him and said that there were cracks in the heap leach, that they had seen them in the morning, that the oxide process engineers were on site and asked him to go and check the area. She went to Mr. Burak ARTAL and informed her about the situation, Mr. Burak asked her to inform the Environmental Unit, he informed the Environmental Unit Engineer Recep Çalı, and Mr. Recep informed Can Serdar HASTÜRK, the Environmental Manager.

Mr. Can Serdar came to her in the office and asked her to be careful when they went to the area and not to enter the area if there was something risky, then he and Recep ÇALI (Environmental Engineer) went to the area, at that time Kenan ÖZ called him on the phone and asked where they were.

They said "We are on our way to the field", at that time they met Ramazan ÇİMEN and Kenan ÖZ in a car close to the field, Kenan ÖZ got out of the car and came to him and sent pictures of the field via whatsapp, he and Recep Bey looked at the pictures he sent, while Ramazan ÇİMEN was in the vehicle, he noticed the cracks on the road and showed them to Kenan ÖZ, then they left the vehicle.

They parked the vehicle, checked and took pictures of the cracks in the road, then parked the vehicle in a safe place and transmitted the pictures to Recep ÇALI and Burak ARTAL, at which time they saw that the entrance to the area with large cracks was blocked by construction machinery.

Just as they were about to return, Kaan Murat AKPOLAT called at 09.18 and said that he and Murat BAYRAKDAR were together in the area where the project department was working, that they could come there and that the area could be seen more clearly from there, Recep ÇALI and Recep ÇALI returned and went to the place mentioned by Mr. Kaan, where they questioned Kaan Murat AKPOLAT and Murat BAYRAKDAR about where the cracks in the area started and ended and when they were noticed, whether there was any information in the radar report and whether they had been informed about this. Murat BAYRAKDAR said that these cracks were noticed during the first checks of the day shift since there was no one on the night shift, that he had reported that the radar report of the previous day did not show any nonconformity, and that there was no automatic warning message from the radar (information on whether there was activity outside the limits).

Thereupon, they talked about the need to remove the employees affiliated with the project from the area due to the cracks and that the work should be stopped until clear information was received, at this time Kaan Murat AKPOLAT talked to the project engineer İshak ASLAN to evacuate the area, after which the personnel working in the area stopped working and started to recover. They told Murat BAYRAKDAR about the cracks they saw on the road and that the area should be closed further back, he said that access to the area would be closed on both sides and even Ali Rıza KALENDER from the Geotechnical team would come to the area and check, then they told Kaan Murat AKPOLAT whether solution was given to the area or not, if so, it should not be given, and they closed the solution.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

He said that he told him that they were not supplying solution to the area, that he told him that it would be more appropriate to close the solution lines leading to the area from lower down, that if there was any landslide, solution leakage could leak in the pipelines, that before leaving the area, he informed his immediate superior Burak ARTAL via whatsapp about the meetings they had before leaving the area, the determinations about the area and the problems in the area, and that he was going to meet with IAIN GUILLE, Can Serdar HASTÜRK and Murat BAYRAKDAR after the daily meeting.

Then, they saw that they left with Recep ÇALIŞ to lead a vehicle and returned to the office, that he was waiting for the end of the managers' meeting held at -10.00 every day while he was in the office, that they saw that the road was closed from the place where the piping offices were located while they were going to the area again with Burak ARTAL, Iain Guille and Can Serdar HASTÜRK after the meeting, that they waited for Murat BAYRAKDAR inside after passing through the closed area, then they went towards the scene under his leadership, that Soysal DOĞAN (Piping Supervisor) was there when they parked and walked the vehicles when they arrived at the scene, and that he was waiting there to prevent the transitions. They even asked Burak ARTAL whether it was safe to enter the area when the construction machinery blocked the road to the area where the cracks were located and when they were walking on foot to the area where the cracks were located.

He said that he would ask Murat BAYRAKDAR, that when he asked Murat BAYRAKDAR he said that there was no problem, that he saw that solution was still being given to the area, and that he said to Murat BAYRAKDAR: "You said that the solution was stopped, but it is still being given to the area". In the meantime, he asked Soysal DOĞAN (Piping Supervisor) whether the cracks were normal, and he said that they were not normal and that there had not been such cracks until now, and when he asked whether it was safe to enter the area, he said that it was not safe and that they should not enter the area, and Burak ARTAL was later involved in these conversations.

He told him that it was not safe, and he told IAIN GUILLE that the area was not safe and that they should leave the area, after which they immediately left the area together, Soysal DOĞAN continued to wait where they met, and after leaving the area they went to the area with a better view of the area.

When they went there, Kaan Murat AKPOLAT was there, he said to him "you said that the solution was not given, but I saw that it was still given", he said that he would tell IAIN GUILLE, the deputy general manager, about the situation, that he would turn off the solution if he gave his approval, Iain told him that he should turn it off, then Kaan Murat AKPOLAT called Soysal DOĞAN and said "can we discontinued the solution, if not, can we reduce the pressure, can we open another area?" Soysal DOĞAN said that he did not know what kind of response he gave, and then Kaan MuratAKPOLAT told IAIN that the cracks were a maximum of 6 cm and the directions of the shifts.

He said that the Geotechnical Team told him that they had received this information, that the managers exchanged information on these issues among themselves, that while they were walking away from the area, the e-mail about which roads leading to the Heap Leach were closed was sent to all departments, and that while they were walking away from the area, they saw Soysal DOĞAN going to the very end of the entrance, whereupon Burak ARTAL called Murat BAYRAKDAR and told him that the personnel should not stand there and hung up the phone, then they left the area and went to the office.



33

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

While he was in the office, Burak ARTAL said that he would convey all these situations to Abdulkadir CANSIZ, the deputy operations director, and then he went to dinner, and Burak called him to him after the chef returned from dinner, and he met Murat BAYRAKDAR.

Murat BAYRAKDAR told Ali Rıza KALENDER that Murat BAYRAKDAR had spoken to Ali Rıza KALENDER and that there were similar movements in the mine operations and that Murat BAYRAKDAR had told him that these were not shifts but settlements, and Chef Burak said that "we don't know better than the mines, they have always experienced these situations", so there was no need to panic.

He said that he had asked for an e-mail just in case, that he would forward it when he received it, that he said, "Don't panic too much, there is no problem for the moment." He said that before 5-10 minutes had passed, he received Murat BAYRAKDAR's e-mail in response to Ali Rıza KALENDER, that he saw that the content of the e-mail did not match what Burak ARTAL had said, that when he told this to Burak ARTAL, he said that his conversation with Murat BAYRAKDAR did not match the e-mail.

"They will not be able to manage this situation, I will meet with Abdulkadir CANSIZ and talk to him to clarify the situation under his leadership.", an e-mail invitation was received for 15.15, and the title of this meeting was determined to be about the incident in the Bulk Liquid.

Burak said that the chief told him to attend the meeting at 15.15, that he would attend and approved the e-mail, then the incident in question occurred at 14.28 while he was waiting for the meeting in the office, that the Emergency Action Plan at the Mine Site was activated immediately after the incident, that they left the office and went to the crusher offices together with Şenol DEMİR.

He then told the crisis desk that they were working to collect information from the field, that Murat BAYRAKDAR was the person in charge of the piping unit, that he had no knowledge of whether the piping unit was told to leave or not to leave, and that he had no authority to tell those working in the field to stay or not to stay.

He stated that the e-mail was sent by Murat BAYRAKDAR, the area supervisor, informing Burak ARTAL and Mr. Selçuk ÇİFTLİK, the occupational safety manager who was on leave, about the obligation to inform his superior, and that he was personally present to witness the conversations between Murat BAYRAKDAR and Burak ARTAL.

### Murat GÜRBÜZ

In his statement dated 14.02.2024 (21-35), he stated that he had been working as a Hybrid Worker at Anagold Madencilik AŞ for about 6 years, and at the end of his shift at around 08-00 in the morning, he and his shiftmate Kenan ÇELENK handed over the task to the next shift supervisor Soysal DOĞAN and İshak DEMİR, who was working as a worker.

He stated that there was no negative situation when he handed over the task, that he and Kenan ÇELENK did not see any negative situation when they checked the pressure and flow meters in the field every hour while they were working in the field, and that they did not see any cracks/cracks in the field when they visited the field.

### Kenan CELENK

In his statement dated 14.02.2024 (21-50), he gave a similar statement to Murat Gürbüz.

34



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

SWORN
TRANSLATION

### İshak DEMİR

In his statement dated 14.02.2024 (22-40 ), he stated the following

He had been working as a laborer at Anagold Mining for 13 years, his job was to deliver solution water to the ore, he took over his shift from Murat Gürbüz and Kenan Çelenk at 08-00 hours, he went on a routine site control between 08.30-09-00 hours, during the control he saw that there were cracks in the area where the heap leaching was taking place and took photographs as evidence.

Soysal DOĞAN, who was his supervisor, said that he called Soysal DOĞAN and informed him and asked him to come to the field, then Soysal DOĞAN said that he came to the field at around 10-00 hours and called his superiors, then the person named Kaan AKPOLAT also came to the field.

He said that after the necessary controls were carried out, he asked him to close the entrance and exit of the site and to check every hour and inform him, that at around 14.00, Soysal DOĞAN, Adnan KEKLİK, Kenan ÖZ, Ramazan ÇİMEN, Kaan AKPOLAT and Elif REYHAN went to the heap leach area again for control purposes, during the control he saw that the cracks went down further, Soysal DOĞAN asked him to take photographs of the cyanide lake in the heap leach area,he went to the said pool with a person named İsa TAŞDELEN to take photographs,when he reached the area he saw that the heap leach started to flow.

He stated that he and İsa TAŞDELEN were waiting in the area where they were,that the area they were in started to collapse under the ground,that they left the area with their own means after the collapse was over,that he did not hear from Soysal DOĞAN, Adnan KEKLİK, Kenan ÖZ andRamazan ÇİMEN after this incident,that he did not suffer any injuries in this incident, that he informed his supervisor Soysal Doğan about whether he informed anyone and that he closed the road to traffic in line with the instruction.

### Isa TASDELEN

In his statement dated 14.02.2024 (23-40 ), he stated the following

He said that he had been working as a laborer in Karsa Ltd Şti, a subcontractor of Anagold Mining, for about 12 years, that he was doing maintenance on the machines, that he started work at 11:00 a.m. and that a person named İshak DEMİR told him that there were cracks in the heap leaching area,and that when he started work, Soysal DOĞAN, who was the supervisor of the road, ordered the road to be closed to traffic.

At around 12.30 pm, they went to the field for control purposes with a person named Abdurrahman ŞAHİN, it was realized that there was a crack in the heap leaching area during the controls made around 08-00 in the morning,and at around 13.00 pm, he came to the place where the container was lost as a result of the landslide in the area.

At around 14.00, a person named Soysal DOĞAN said that he called İshak DEMİR and himself to the field to take photographs, whereupon Soysal DOĞAN, İshak Demir,Kenan ÖZ, Elif REYHAN,Kaan AKPOLAT and Adnan KEKLİK went to the heap leach area and examined the cracks.

He stated that Abdurrahman ŞAHİN, Hüseyin Kara, Fahrettin KEKLİK and Mehmet KAZAR were in the container that remained under the soil after the incident when they left the heap leach area,that the road was still closed to traffic when they left the heap leach area,that they were the only ones to pass through,that they then left the area with İshak Demir to take photographs of the cyanide lake,that they heard a noise around 14-28 hours, that they felt a slide,that the area they were in started to collapseand that they ran away in the opposite direction.

### Sabri EKİCİ

In his statement dated 15.02.2024 (18-30 ), he stated that he was a dozer operator at Ekiciler Company and did not witness the incident.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

**Alparslan Bazna**

In his statement dated 15.02.2024 (18-11 ), he gave a similar statement to Sabri Ekici.

**Selim GÜDER**

In his statement dated 15.02.2024 (19-05 ), he stated the following

He was working as a Loader Operator in Asilçöplerliler Ltd Şti company within Anagold mining, on the date of the incident, he was on rest day and the shift was to start at 16-00, a friend called and said that there was a cave-in in the mine, upon which he called his friends named Şaban YILMAZ, Mehmet KAZAR, Kenan ÖZ who are currently under the cave-in, but he could not reach any of them.
 On 13.02.2024, Şaban YILMAZ had sent 5 photographs at 10-58 hours before noon, but he did not see the photographs because he did not look at the whatsapp application, he called him by phone and said "they stopped the work here and evacuated the site, cracks formed", he called Mehmet KAZAR at around 13-00 hours in the afternoon and asked if they were working.
Mehmet KAZAR stated that he told me that they had not started working yet and that he had not seen any negativity in the field beforehand.

**Cihad KARADAĞ**

In his statement dated 16.02.2024 (20-00 ), he stated the following:
 He had been working as a mechanical engineer in Kar-Sa Construction Mak Ltd Şti, a subcontractor of Anagold mining company, since 2016, his duty was to organize Kar-Sa construction workers at the Anagold mine site, to carry out and plan projects, and he had been at the site since 08-00 on 13.02.2024, the day of the incident.
Abdurahman ŞAHİN and Hüseyin KARA, who were under the cave-in and were employees of their company, said that they were working as hired personnel within Anagold Mining,that he saw Abdurahman ŞAHİN and Hüseyin KARA on 13.02.2024 at 08-00 on the day of the incident when they started their shift,that when he came to the office in the crusher area around 12-30 at noon, Abdurahman ŞAHİN and Hüseyin KARA were not in the office.
He stated that he learned that they had gone to the heap leach zone, which was their working area, that he continued to work in the office, that he heard a big noise and vibration around 14-28 hours , that he went outside thinking that there was an earthquake, that he received information from his wife Nuray KARADAG, who worked at Anagold Mining, that there was a collapse in the heap leach zone and that he immediately called his staff member Abdurahman ŞAHİN, but he could not reach him, and that he called another staff member İsa TAŞDELEN, who told him that there was a landslide in the heap leach zone and that he was trying to escape from the area.
He immediately got into his vehicle and tried to go to the scene of the incident, went to the area called Şahin Pit, saw the personnel named İsa TAŞDELEN waving from above, and that İsa TAŞDELEN came to him with his own means and said that the persons named Abdurahman ŞAHİN and Hüseyin KARA were trapped under the soil, ömer Faruk KARADAĞ, the uncle of the company manager, and Barış KARACA, who served as the construction site manager,said that he immediately left the scene of the incident due to the riskiness of the area and took all his friends in the office and went to the cafeteria area, where he tried to get information about the incident.
On 10.02.2024 he was not on site on the day of the incident, that he was working as the construction site project manager and engineer, Seyfettin KARADAĞ was working as the technical office engineer, foremen Hasan Hüseyin ALMALI, Muhammet ÇELEGEN and Süleyman SEZGİN, who was in charge of administrative affairs, approximately 30 people were working in the company, Abdurahman ŞAHİN, who was buried under the cave-in, was a plastic pipe welder, Hüseyin KARA was working as a machine maintainer, Isa TAŞDELEN, who survived, was working as a machine maintainer, Abdurahman ŞAHİN and Hüseyin KARA, our workers who were buried under the soil, were working for hire at Anagold Mining, the task of directing and organizing the workers belongs to the supervisors working at Anagold Mining.

36



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

They were only contacted in case of shift changes, staffing needs and any personnel-related problems, and the authority and responsibility for the duties of the workers belonged to Anagold Mining during working hours.

Since they did not have any information about the crack that occurred in the heap leaching area on the day of the incident or before the incident, they could not inform the personnel about this issue, likewise, no information was given by the personnel about the crack in the heap leaching area, and as far as they learned after the incident, the Yesti company in the area was removed from the site due to the cracks that occurred around 10-00 hours.

Kar-Sa construction personnel continued to be kept waiting in the container in the heap leach area, and the surviving personnel, İsa TAŞDELEN, went up the hill to take photographs at that time and escaped from being trapped under the cave-in at the last moment, regarding the unit to which the citizens/citizens trapped under the cave-in belonged , why they were in the heap leach area and who gave the instruction to go to that area, the persons named Abdurahman ŞAHİN and Hüseyin KARA were working for hire in the heap leach process piping team within Anagold Mining.

He said that they were working in the heap leaching area on the day of the incident as they did every day, that they were in the heap leaching area where the incident occurred as part of their routine duties, that the supervisor of the heap leaching area was a person named Soysal DOĞAN, but he did not know who instructed the company personnel Abdurahman ŞAHİN and Hüseyin KARA to wait in the container in the heap leaching area on the day of the incident.

He stated that 2 personnel and the company vehicle with 34 BRK 204 license plate were trapped under the cave-in after the incident.

### Süleyman OĞUZ

In his statement dated 16.02.2024 (19-00), he stated the following:

He said that he worked as a manager at Asil Copler, a subcontractor of Anagold Mining Company,that there were two people with the same authority in the company and the other one was his uncle Zekeriya OĞUZ, that the company generally engaged in construction equipment and personnel leasing, that Şaban YILMAZ, who was buried under a heap of soil in the incident, had been working in their company since 18.11.2023.

As a result of the agreement they made with Anagold Mining, he has used the company's Loader, which they rented to Anagold Mining, from the date he started work until today.

On the day of the incident, 13.02.2024, at around 14:00 on 13.02.2024, while he was in the İliç district center, he was informed that there was a cave-in at the mine site,he immediately set out to go to the mine site and tried to reach Şaban YILMAZ, who was also a company employee, but his phone could not be reached, when I arrived at the mine site, I immediately learned that no one knew anything about Şaban YILMAZ, later he learned that the employee named Şaban YILMAZ was in the container that was under the soil during the landslide.

He said that he left the mine site and went to the Sabırlı Village area and watched the work in the area where the incident occurred, that he worked as a manager in the company together with Zekeriya OĞUZ, but that he managed the majority of the company's work, that there were direct workers at the lower level, that there were approximately 15 personnel and that Şaban YILMAZ and Selim GÜDER worked as loader operators.

He stated that only Şaban YILMAZ was present at the scene of the incident on the day of the incident, who was responsible at the mine site for the persons who were buried under the soil, and whether he reported any awakening on the day of the incident, Şaban Yılmaz had no responsibility for his activity and had no knowledge of the incident.



37

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

## Abdullah ÖZBEY

In his statement dated 16.02.2024 (19-14), he stated the following

He said that he had been working at Çiftay AŞ, the contractor company of Anagold Madencilik AŞ, since 2008, that he had been working as a project manager in İliç since September 2023, that he started his shift at 08.00, that he was doing routine work, checking his e-mails, visiting the quarries in the Çakmak Hill area of the mine, and then he came to the office area.

At noon he had lunch, at 13.00 he went to visit Mehmet TÜRK who had just started working at Anagold administrative/central office, at 13.45 he went to the offices of Çiftay AŞ, at 14.30 while he was sitting in the office he was told that there was a landslide, he went outside, he saw the heap leach site visible from Sabırlı stream, he saw the landslide occurring, he saw a big heap of landslide coming.

Regarding whether he had seen containers, a white Dacia SUV and a truck caught in the landslide, he said that he had not, that he had instructed his colleagues to stop work and take a count at the assembly area, and that there was another landslide other than the one he had seen.

It was the personnel within the body of Anagold that he moved to the place called manganese, there were occupational safety İlkay Ahmet Evren, Chief Erkan Yağınluray and four other people whose names he could not remember, when they went to the manganese region, they saw that the landslide was over, the personnel there said that a truck belonging to the company remained, and the 2 Loaders (construction equipment) belonging to the company started to transfer the road, that is, to clean it.

after 10-15 minutes, they realized that the company had finished counting the personnel and that a Mercedes truck with the code 803 was buried under the cave-in, and that its driver was Uğur Yıldız.

The duty of the truck was not to enter the heap leaching area, its main duty was to carry the material loaded from the C2- 1315A037 block inside the mine to the Copler dumping area inside the mine, this was the transportation route notified to their company by the main company Anagold, but the vehicle was there to perform its daily routine work.

The leach field where the landslide occurred was an area of duty and responsibility.

As far as he remembers, he was the Project Manager, Uğur Gültekin was the site supervisor, Foreman Hüseyin Aydın were in the company, there were 1170 personnel in İliç Çiftay Company, 1 person who was buried under the soil was the personnel of the truck driver and as he mentioned, he used the company's letter truck.

The incident area (heap leaching) was outside the company's area of duty and responsibility, Uğur Yıldız was carrying the excavated material during his routine shift and in the duty area, he was not aware of the cracks and splits that occurred in the heap leaching area, he did not receive any notification via e-mail, whatsapp, phone call or verbal notification, for this reason, he could not notify the 1170 personnel working in the company, he stated that the work order came to our drivers through the truck monitoring system, that the work order here came according to the work plan of Anagold, that the drivers went to the area of responsibility in accordance with the work order coming from the truck, that the personnel were not in the heap leaching area that day, that they were transporting on the main communication road called mangenez as a result of the soil landslide from the heap leaching area.

## Zekariya OĞUZ

In his statement dated 16.02.2024 (18-00 ), he stated the following:

He said that he worked as a manager at Asil Copler, a subcontractor of Anagold Mining Company, that there were two people with the same authority, the other being his nephew Süleyman OĞUZ, that he followed most of the management of the company, that he was not very interested in the activities of the company, and that he generally carried out the procurement of materials and equipment. Şaban YILMAZ, who was trapped under the debris, was working as a loader machine operator, he was at a coffee shop in the İliç bazaar center at the time of the incident, he learned about the incident from Ahmet YILMAZ, the Ak Party District Chairman of İliç, he had no previous knowledge of an accident or a crack in the mine, he did not even know what Şaban YILMAZ was doing at the scene.

He stated that they rented the machine used by Şaban YILMAZ to Anagold Mining Company, that they had no knowledge of the activities carried out there, and that all responsibility lies with Anagold Company.



38

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

**Aydin KEKLİK**

In his statement dated 16.02.2024 (19-00 ), he stated the following:

He stated that he was the partner and manager (manager) of Keklikler Ltd Şti, that they rented machinery and vehicles to Anagold Madencilik AŞ, and that the shift operators carried out the work assigned by Anagold AŞ's field shift supervisors as a result of the direction of the work to be done.

He learned from Sabri Ekici, who was working as the operator of the incident, that he was in İliç district on 13.02.2024, the day of the incident,and that he was not involved in the work and functioning as they only rented machines and operators in the field,that as Keklikler Ltd Şti, they did not take any decisions on their own in the field and did not do any work,that they provided services entirely against the demands of Anagold AŞ.

He said that he learned that Mehmet KAZAR, the operator, was inside the container under the landslide, that Mehmet KAZAR sent 2 photographs via Whatsapp application at 10-24 pm, that he saw the photographs but they did not talk, that the authorized and responsible persons of Anagold AŞ did not contact him about the issue, and why Mehmet KAZAR was inside the container under the landslide.

He stated that he did not know who or whoever told him to go there, and that the dozer used by Mehmet KAZAR, the operator of the dozer that day, was not buried under the landslide, and that it was still standing in an area above the area where the landslide occurred.

**Sami BOZ**

In his statement dated 18.02.2024 (02-00), he stated the following:

He stated that he had been working as an assistant foreman at Yesti İnşaat AŞ, a subcontractor company of Anagold Madencilik AŞ, for about 8 months and that he started working at the mine site at 08.00 on 13.02.2024.

At the mine site, their duty was to apply membrane in the heap leaching area where the incident occurred, they started their shift as a team of approximately 10 people from Yesti Company, they did not see the splits/cracks in the area when they started their shift in the morning.

On the same day, the most authorized person from Yesti company was Halis Yusuf Kılıç, his duty at the site was to help laying the membrane, at around 09.00 hours, the chief Halis Yusuf Kılıç was informed and was told that there might be a landslide and he took them out of the site, Yesti Personnel moved to the TSF Construction Site as 15 people.

He stated that they were waiting for lunch at the TSF construction site, that after eating at the Anagold dining hall at 12.00 p.m. they went back to the TSF and started to wait, that the incident occurred at around 14.30 p.m., that he did not see any containers, vehicles or anyone staying in the sliding soil, that he saw only the conveyor belt and the work machine in the sliding soil, and that after the incident they came to the campsite in İliç Center.

**Niyazi YAVAN**

In his statement dated 26.02.2024 (09-20 ), he gave a similar statement to Sami Boz.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

**İlker KIRLI**

In his statement dated 26.02.2024 (09-10 ), he gave a similar statement to Sami Boz and Niyazi Yavan.

**Akif SANDAL**

In his statement dated 26.02.2024 (09-00 ), he stated the following in summary   He stated that he had been working as a civil engineer at Yesti İnşaat AŞ, a subcontractor company of Anagold Madencilik AŞ, for about a year,that he started working at the mine site at 08.00 in the morning,that they were applying membranes on the site,that they started as a team of 15 people as Yesti company,and that he did not see any splits/cracks in the area.

 The most authorized person from Yesti company is Halis Yusuf Kılıç and he is the authorized person in the field, he stated that there were no complaints about cracks and splits in the heap leaching area, and that a team of approximately 10-15 Anagold personnel arrived around 09.00 hours.

He stated that they walked around the heap leach hill and its surroundings, then they called out from the heap leach hill and asked them to leave the area, they went to the TSF construction site as Yesti Personnel, Murat Bayrakdar and İshak Aslan, who were in the Anagold group, came to their construction site and told them to leave the area, not to work, they warned them that there was a risk of landslide in the area, they went back to TSF after lunch, the incident occurred around 14.30.

**Halis Yusuf KILIC**

In his statement dated 26.02.2024 (08-45 ), he stated the following
He stated that he had been working as a civil engineer at Yesti İnşaat AŞ, a subcontractor company of Anagold Madencilik AŞ, for approximately 4 years,that he started working at the mine site at 08.00 on the day of the incident,that they were applying membrane on the site,that they started as a team of 15 people as Yesti company,and that he did not see any splits/cracks in the area.

 He said that he was the most authorized person from Yesti, that there were no complaints about cracks and splits in the heap leach area, that at 09.00, a team of 10 to 15 Anagold personnel arrived, they walked around the heap leach hill and its surroundings, then they called out from the heap leach hill and asked them to leave the area, they went to the TSF construction site as Yesti personnel, Murat Bayrakdar and İshak Aslan, who were in the Anagold group, came to their construction site and told them to leave the area and not to work, they warned them that there was a risk of landslide in the area, after lunch they went to TSF again, the incident occurred at around 14.30.

**Yusuf YILDIZ**

In his statement dated 26.02.2024 (09-15 ), he stated the following Sami Boz gave similar testimony to İlker Kırlı and Niyazi Yavan.

**Hamit AKDUMAN**

In his statement dated 26.02.2024 (09-00 ), he stated the following: Yusuf Yıldız, Sami Boz, İlker Kırlı and Niyazi Yavan gave similar testimony.

**Alparslan Recep DÜLGER**

In his statement dated 26.02.2024 (08-40 ), he stated the following Hamit Akduman, Yusuf Yıldız, Sami Boz, İlker Kırlı and Niyazi Yavan gave similar testimony.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

### Ali CÜRÜK

In the report dated 26.02.2024 (09-30 ), A Recep Dülger gave a similar statement to Hamit Akduman, Yusuf Yıldız, Sami Boz, İlker Kırlı and Niyazi Yavan.

### Naim KARA

In his statement dated 26.02.2024 (09-05 ), he stated the following Ali Çürük, A Recep Dülger, Hamit Akduman, Yusuf Yıldız, Sami Boz, İlker Kırlı and Niyazi Yavan gave similar statements.

### Batuhan KOC

In his statement dated 26.02.2024 (09-30 ), he gave a similar statement to Naim Kara, A Recep Dülger, Hamit Akduman, Yusuf Yıldız, Sami Boz, İlker Kırlı and Niyazi Yavan.

### Aziz CELIK

In his statement dated 20.02.2024 (hours 10-20),he stated that he had been working as a Dozer Operator at Sabırlı Gold for about a year, that he started working at around 08.00 on the morning of the incident, that he was working in the TSF Waste area-fill area phase 5 area, that he was engaged in filling and paving works with the dozer until the time of the incident, that he then took the dozer aside at around 14.20 to wait for the trucks, that he heard a noise and realized that there was a landslide when he looked. He stated that he started taking videos on his phone, that he did not see any person, container, truck or vehicle at the time of the landslide, that the heap was almost filled into the Stream and that he could only see the Sabırlı Stream side, that there was no angle from which he could see the manganese field, and that he did not see any trace etc. because the speed of the flow of the soil was quite high.

### Efrail DURSUN

In his statement dated 22.02.2024 (16-15), he stated the following
 He had been working as a laborer for three years at Nurul Omum Ürünleri AŞ, a subcontractor of Anagold Madencilik AŞ, doing recycling work in the field, he started work at 8-00 on the day of the incident and worked until 9-00, the operator Hüseyin Erdal Mürekkepçiler told them that there were cracks and told them to evacuate the area urgently, and they moved to their own area, the Tesef area, where they stayed.
He stated that they stayed in the Tesef area until 12.00 p.m. and then went to the Nural Forest Products construction site to have lunch, that they returned to the work site after lunch, that they were waiting in the containers in the offices area at the time of the incident in question, that they informed their superiors in their own companies, and that they had no prior knowledge about the soil separation in the area.

### Samed CINAR

In his statement dated 22.02.2024 (15-30), he gave a similar statement to Efrail Dursun.

### Yunus SEZMİS

In his statement dated 22.02.2024 (14-30 ), he stated the following
He said that he was working as an operator at Mürekkepçiler AŞ, a subcontractor company of Anagold Madencilik AŞ, that they started work on the day of the incident, that their task was to lay membranes at the heap leach site where the incident occurred, and that while they were operating and warming up the machines at the heap leach site together with Bayram Mutluay and Bekir Koçman, they heard the voices of a group of 15 engineers about 08.30 at about 20-30 meters below the area where they were.
Murat Bayrakdar, Kenan Öz, Ramazan Çimen and Soysal Doğan were in this group, their boss Hüseyin Erdal Mürrekkepçi, who was with them, said "wait, I'm coming" and went to the group below and came back 5 minutes later and said "work has stopped, we are evacuating the area", they went to the camp area (5 containers) below, they stayed there until 11:00 pm and then went to Anagold's dining hall to eat.
He said that the place where they were working was the top of the heap leach where the landslide occurred, that they saw the cracks and splits in the area at around 08.00 in the morning on 13.02.2024, that he had not seen the cracks and splits here before, and that he might not have seen them if they existed, that the heap leach area was a large area and that he was at home in the center of İliç when the incident occurred.

41



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

### Bayram MUTLUAY

In his statement dated 22.02.2024 (14-15), he stated the following Yunus Sezmiş gave a similar testimony and stated that he had seen the cracks before.

### Bekir KOCMAN

In the report dated 22.02.2024 (14-50 ), he gave a similar statement to Yunus Sezmiş.

### Mehmet ÖZKÖK

In his statement dated 22.02.2024 (14-50), he stated the following

He was working as a foreman at Nurul İnşaat AŞ, a subcontractor of Anagold Madencilik AŞ, his job was to lay and clean the membrane at the heap leach site where the incident occurred, they started working at the heap leach site together with Efrail Dursun and Samet Çınar, at around 10.00 a.m. he met Hüseyin Erdal Mürekkepçi from Mürekkepçiler company and he said "evacuate the area".

He said that there was no warning or information from Anagold personnel, that they evacuated the heap leach area around 10 a.m. and went to the TSF area next to the tailings pond in the Çakmak Hill Region, that they went there again around 13 a.m. after lunch, that he had seen cracks and splits in the heap leach area in the morning of the day, and that the location of the incident was clearly visible from the TSF area. He stated that he saw the container and the white vehicle caught in the landslide at around 14.30 when the incident occurred, that there had been cracks and fissures in the heap leach area before, but not to this extent, and that they had seen that the number of fissures had increased in the morning of the day of the incident and that they were visibly deeper and wider.

### Münevver DOGAN

In his statement dated 29.02.2024 (12-00 ), he stated the following:

He said that he had been working as an Environmental Engineer at Anagold Mining for 15 months, that he was not at the Anagold mine site on 13.02.2024, that he came to the offices in the mining area as of February 15, that he tried to create the requested data and information about the site, and then together with his manager Can Serdar HASTÜRK, they ensured the control of environmental issues in the heap leaching area.

In this process, together with the Ministry of Environment and Urbanization employees, they monitored the samples taken from soil and water.

After continuing in this way for a certain period of time, they switched to a flexible working program, the last time he went to the heap leaching area approximately 1.5-2 months ago, in the control he made during that period, small puddles had formed in the heap leaching area due to the effect of rain and snow, these puddles could attract wildlife and birds to the site, he informed the relevant department to find a solution, Suat ARSLAN, one of his friends who visited the site in early February, sent an image from whatsap.

He stated that the image showed a pressurized solution flowing in the heap leaching area, that he sent it to Hüseyin ÜSTÜNDAĞ in the Oxide Department, that he stated that he was aware of this issue and would take care of it as soon as possible, and that a day later the Oxide Department sent him a photograph of the same place with the problem solved.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

## Suat ARSALN

In his statement dated 06.03.2024, he briefly stated that he worked as an environmental technician at Anagold Company, that he was making measurements in and around the mine site on the day of the incident, that he learned about the incident through Can Serdar Hastürk's message, that on the morning of the incident, their manager Can Serday Hastürk warned them not to enter and exit the area, and that they informed their subordinates Nural Ticaret and Çınar Çevre.

## Mehmet Alperen TURAK

In his statement dated 29.02.2024 (hours 12-15), he stated the following:

He has been working as a Civil Engineer at Anagold Madencilik AŞ for approximately 4 years and has been working as the Chief Engineer of Infrastructure Constructions for the last five years.

He stated that he was responsible for the relocation and reconstruction works of infrastructure such as roads, power lines and telecommunication lines within the scope of expansion activities in Sabırlı, Yakuplu and Ardıç Regions outside the mine, and that he was at the mine site at 07.30 on 13.02.2024, the day of the incident.

At around 10.30 a.m., his manager Shaun SWARTZ and Patrik VALKO called him and showed him the photographs of the cracks in the heap leach that were the subject of the incident, that he did not have any information other than this information that he learned at 10.30 a.m. on the day of the incident, that he was not authorized in the incident that occurred in the heap leach or in the area of the work site there, and that he was only shown for information purposes.

Later, he said that the subcontractors in the work activity there said that they had withdrawn from there, that he was in a meeting during the incident and thought that there was an earthquake, that he was working as a senior civil engineer within the scope of the construction of Heap Leaching - Phase 4 B and Phase 5 from late 2019 until June 2021, that he was working there during the Membrane (impermeable layer) works in the layer at the bottom of the Heap Leaching area.

He said that he was in charge of the coordination and work planning of the subcontractor companies in the area, that there was never any work in the heap area above the heap leach and that he did not have any knowledge or authorization about the work operations, that as far as he knew, Hüseyin ÜSTÜNDAĞ, the Oxide Manager of the heap leach area, and Murat BAYRAKTAR were the persons responsible for these areas, and that he had never seen any cracks in the heap leach area since that time.

in 2022, he stated that a small landslide occurred in the Heap Leaching area, and that he did not observe any other cracks or any other situation that could trigger the incident on 13.02.2024.

## Ali SERT

In his statement in the minutes, the mining engineer dated 29.02.2024 (12-50) stated:

He has been working at Anagold Madencilik AŞ for approximately 6 years and his duties as Technical Services Manager include budget compliance monitoring of production facilities and analysis follow-ups within the scope of analytical laboratory.

On 13.02.2024, the day of the incident, he was at the mine site at 07.30, he could not attend the daily meeting held around 10.00, he was doing field control at the Sulphide Plant,he learned about the crack in the heap leaching area after the meeting, he learned that there were cracks in the heap leaching area and that it posed a danger, therefore the entrance to the area was closed, Anagold Mining and subcontractor companies were evacuated from the area.

He stated that he was in an online meeting in the offices area at the time of the incident, that he and his team were conducting facility optimization studies, including the Oxide Operation, and monitoring the financial and production performance in the area in question, that he had no involvement or authority in the physical operation of the area, and that he knew that the responsible manager and authorized person in this area was Hüseyin ÜSTÜNDAĞ, who is currently under arrest.



43

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

SWORN
TRANSLATION

**Aydin KEKLİK**

In his statement dated 16.02.2024, he is the partner and director (manager) of Keklikler Ltd Şti.
They rented machinery and vehicles to Anagold Madencilik AŞ, the shift operators did the work given as a result of Anagold AŞ's field shift supervisors directing the work to be done, they were not involved in the work and operation as they only rented machinery and operators in the field, as Keklikler Ltd Şti, they did not make any decisions on their own in the field, they provided services against the demands of Anagold AŞ, on 13.02.2024, Sabri Ekici, who worked as an operator, called and said that there was a cave-in in the mine.

He immediately went to the mine site, he wanted to look for his operator who was under the debris, but he could not go because the landslide continued, he asked someone there where he was and learned that Mehmet KAZAR was in the container under the debris, after he learned that he never left the place where the landslide occurred, Mehmet KAZAR sent 2 photographs at 10-24 pm.

However, they did not talk, that during working hours, Anagold AŞ had a vehicle that was always on standby in and near the area where Anagold AŞ had specified that work should be carried out and where its personnel were working, that Mehmet KAZAR, who was under the wreckage, also knew this, and that he later learned that the photographs were photographs of the cracks formed at the site of the landslide, They know that the authorized and responsible persons of Anagold AŞ did not reach them by phone and / or e-mail, that they did not inform them that there was any negative situation, that as Keklikler Ltd Şti, Anagold AŞ is a company that carries out the work they have given as stated above, and that all of its personnel have the right to leave the work and leave if there is a situation that they see as negative or dangerous.

Despite this, he does not know why Mehmet KAZAR, who is currently under the landslide and who is his personnel, is in the container under the landslide, he does not know who or who told him to go there, he wants it to be investigated, the dozer used by Mehmet KAZAR, the operator, that day was not under the landslide.

He said that he was still standing in an area above the area where the slide occurred, that he and Oğuz Sami DEMIR were the managers of Keklikler Ltd Sti, that Mehmet KAZAR knew Kenan ÖZ, who was the shift supervisor, Şenol DEMİR, who was also his supervisor, and Murat BAYRAKTAR, who was also his supervisor, that he did not know any higher level responsible persons other than these, and that if something happened to one of the personnel or their machines, they contacted the 3 people mentioned above.

He stated that he did not have any responsibility, that he did not give any warning notice on the day of the incident because he did not have any meetings or information, that he did not see any situation that would pose a risk in the Heap leaching area, that he went to the site where a major malfunction was detected in his machines once or twice a year, and that Mehmet KAZAR was the operator of the dozer because Mehmet KAZAR had a shift at the time of the incident.



44

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

### Sabri EKİCİ

In his statement dated 15.02.2024, he stated that he had been working as a Dozer Operator in Keklikler Ltd Şti company located in İliç Anagold mine for 4.5 years, that he was on rest on the date of the incident,that he learned that there was a landslide around 14-31 hours with the call of a fellow operator,that he immediately came to Anagold company and went to the site.
He stated that he realized that there was nothing he could do after what he saw, that he had not seen any negative situation in the region before, that he had been working for 4.5 years at Keklikler Ltd Şti at the Anagold Madencilik work site and that he had never witnessed or heard of a landslide.

### Ishak ASLAN

In his statement dated 06.03.2024, he briefly stated that he had been working as a civil engineer in the Project Department of Anagold Company for 7 years, that they were making measurements with the mapping team at around 9-30 on the day of the incident, that Kaan Murat Akpolat called and informed them to evacuate the risky site, that they evacuated Yesti, Mürekekpçiler, Nural employees working there, that they came to the office area with OHS Engineer Meryem Koçer,that they received an e-mail at 10-30 pm that there were cracks.

### Fuat YILMAZ

In his statement dated 06.03.2024, he summarized that he had been working at Anagold Company for 13 years as a shift and drilling and blasting engineer until 2020 and then as a mine operation chief, and that at 9-00 on the day of the incident, Çiftay and Anagold teams went on a field tour in the open pits area.
He stated that he then went to the office area, that he met with Mehmet Türk at around 13-00 hours, that he attended a meeting with Mehmet Türk at 14-30 hours, that routine blasting was carried out at 12-10 hours and that it was also carried out on the day of the incident.

### Muhammed Kılıç

In his statement in the minutes dated 06.03.2024,
First of all, he worked as a shift engineer and drilling and blasting engineer at Anagold Company since 2022, on the day of the incident, he moved to the office after the in-house meeting in the field, the blasts to be made in the open pits were made in the order of drilling and the blasting calendar of the places to be produced from the planning unit, and on the day of the incident, blasting was made on 12-10. He stated that he learned about the incident before the meeting at 14-30 hours, that he received consultancy services from a company called Madser and blasting designs were made, and that at around 10-15 hours he received information from Ş Demir that two roads were closed.

### Fatih Sakarya

In his statement dated 06.03.2024, he summarized that he had been working as a shift engineer at Anagold Company for 6 years, that he had been working as a blasting engineer for the last 7 months, and that he was responsible for the open pit blasting of the unit to which he reported.
On the day of the incident, they declared that they blasted in the Main quarry area called 50 and 60 Mz at 12-10 on the day of the incident.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

## 3.3. OBSERVATIONS ON WITNESS STATEMENTS TAKEN BY THE CHIEF PUBLIC PROSECUTOR'S OFFICE;

### Gizem GAZCI

In her statement dated 16.02.2024, in addition to the statement she gave at the law enforcement office; since 2021, she has been working as an OHS engineer at Anagold and at the same time she was looking after the entry, exit and storage of chemical vehicles both at the scene of the incident and in the oxide process area and in the supply chain department, on the day of the incident, around 08-50 hours, Kenan ÖZ, who was the bulk operation supervisor, said "there are cracks here, come and take a look, it would be good".

He said that he reported the situation to his immediate superior Burak ARTAL, who told him to report the situation to Recep ÇALI, an environmental engineer, and that he and Recep ÇALI then met Kenan ÖZ and Ramazan ÇİMEN when they were driving in the same vehicle with Recep ÇALI around 09-10 at the top of the lot,and that they warned them that "there are cracks in the road" and they continued.

He later learned that they had taken photographs of the cracks, that he had sent the photographs to his supervisor Mr. Burak ARTAL, that he had also told his supervisor that the situation was bad and that he had reported the situation to the workplace supervisor Mr. IAIN GUILLE, that he had no information about how many people were in the container, but that one person was in front of the road they had blocked.

However, he said that he did not know who it was, that he saw the incident as a cloud of dust from the office area from a distance, and that the solution was not given when they met Kaan Murat AKPOLAT in the safe zone around 09-00 hours.

However, when I went to the scene for the second time, I saw that the solution was still being administered at around 10-30 p.m. Burak ARTAL, his supervisor, witnessed this situation, Burak ARTAL asked Murat BAYRAKTAR why the solution had not been stopped, Murat BAYRAKTAR stated that if it was stopped, the pools would overflow, IAIN GUILLE was with them at that time, Burak ARTAL informed the person in charge that the situation was dangerous.

He did not know afterwards, he knew that the blasting was carried out by Çiftay AŞ but the instructions were given by Anagold AŞ, he knew that blasting was carried out at 12-10 pm as it was every day, he did not know who was in charge of the blasting department, he did not know whether the heap was overbuilt or not, he did not have any foresight, he did not have the authority to give orders and instructions in the oxide process area, but they gave opinions, he knew that the workers staying in the container were working under the direction of Soysal DOGAN, he knew that they were present, he did not know who positioned the container there.

He said that he had been there since he arrived, that they did not see any risk in the container being there, that although the blasting areas varied, he did not know at which point the blasting was carried out that day, that he heard that Kenan ÖZ, Ramazan ÇİMEN and Adnan KEKLİK were there at the time of the incident, that Kenan ÖZ's immediate superiors were Kaan Murat AKPOLAT and Murat BAYRAKTAR, Ramazan ÇİMEN was under the responsibility of Şenol DEMİR, and Adnan KEKLİK was under the responsibility of Elif REYHAN.

Şenol DEMİR is the second engineer and is responsible for the crushed material until it reaches the conveyors in the leaching area, this material is first mixed with cement and water in the mixer, Şenol DEMİR and Kaan Murat AKPOLAT are responsible for the addition and mixing of cement, water and necessary materials in the mixer,the parts that previously disrupted the leaching as small water streams in the leaching area were corrected with warnings.

He said that they were deteriorations that could be corrected with minor intervention, that they went down to the offices to convey the crack situation to Abdulkadir CANSIZ, that he did not communicate one-on-one, but that he knew that Burak ARTAL had communicated, that Burak ARTAL told me that he had conveyed the situation to Abdulkadir CANSIZ, that he was still uneasy, that Burak ARTAL, seeing this situation, should not be uneasy, and that he discussed the situation with Murat BAYRAKTAR.

He told him that this situation was normal, that there was nothing to be afraid of, that it was a sitting situation, that he had received this information from the Geotechnical team, that he had also said that an e-mail would arrive, that an hour before the incident an e-mail had arrived,that when they looked at the e-mail they saw with Burak ARTAL that it was not like that at all, that it was a very dangerous situation, and that Burak ARTAL conveyed this situation directly to Abdulkadir CANSIZ. He stated that a meeting

46



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

was then organized at 15:15, that Şenol DEMİR was on his way to the scene after the incident,that when they saw the scene they saw two people trying to get out and that they saw two people trying to get out, one of them was Karsa personnel and the other was Anagold personnel,that he conveyed the information he had obtained to my emergency team chief Muzaffer BEĞEN and his supervisor Burak ARTAL,that he received instructions that no one should enter the area and that he did not let anyone into the area.


## Burak ARTAL

In his statement dated 16.02.2024, in addition to the statement he gave at the law enforcement office;
He stated that he worked as the Chief Safety Engineer at Anagold Mining Company, that he was the chief engineer of the 8-person occupational health and safety staff, that his superior was Selçuk ÇIFTLİK, the occupational health and safety manager,that on the day of the incident, Selçuk ÇIFTLİK was on leave and he was acting in his place, that Gizem GAZCI, the occupational safety expert in the area where the accident occurred, sent both a photo and a message via whatsapp at 09.13, and at 09.22, Gizem GAZCI sent a photo from a different angle.

Gizem GAZCI does not have any other information other than that at around 08.00 in the morning, the supervisor, whose name she does not remember, told her that there were problems on the field and that he would go and check.

Thereupon, he went to Can Serdar HASTÜRK, the environmental manager, told him about the situation,and together they went to inform Iain Guille, the deputy general manager of Copler Anagold Mining,and told Iain Guille, who said that they would meet at the routine meeting at 10.00 a.m.

At 09.23, Gizem GAZCI texted me and told me that approximately 30-40 people in the heap leaching site had started to be evacuated from the site, that she had spoken to Gizem and told her that she had approved the decision to evacuate, that if Gizem had not made this decision, perhaps more people would have been lost as a result of the incident, that their duty as occupational safety officers was to give the right advice to the person in charge where there were problems, that they had no obligations regarding life safety and environmental health, and that it was the responsibility of the site supervisor to implement or not.

He said that they did not have the authority to give orders to people working in the field ex officio, that Gizem told him that he had this done in consultation with Kaan AKPOLAT, that Kaan AKPOLAT was working in the heap leach field as Oxide Operation Assistant Engineer in the company, that Kaan AKPOLAT's authority to take decisions and make decisions goes only so far, but that he did so by informing Murat BAYRAKDAR, the heap leach field supervisor. He thought that it was not possible for him to take these actions ex officio without approval, and that Murat BAYRAKDAR had been informed when he evacuated the area at 09.28.

However, in such an emergency, Kaan AKPOLAT could also take a decision according to the seriousness of the situation, and they decided to go to the field at the routine meeting held at 10.00 am.

They went to the field with 2 vehicles at 10.26 a.m., in one vehicle there were Can Serdar HASTÜRK, Gizem GAZCI, Lain Guille and in the other vehicle there was Murat BAYRAKDAR, the deputy oxide manager in charge of the field, he was leading the way, when we got out of the vehicle Gizem GAZCI said "it is not safe here".

He said that he had asked Murat BAYRAKDAR, who was in charge of the area, and that he had been told that it was safe, but when he locked eyes with Can Serdar HASTÜRK, he felt that it was not safe, because when he looked at the area, he saw that there were cracks on the heap of compacted soil,and that they were in lift 33, the top layer,and he asked Soysal DOGAN, who was present at the scene, whether the place where they were now was safe.

He said that this was the most risky place, that the area was empty at the time.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

They thought that Supervisor Soysal DOGAN had accompanied Murat BAYRAKDAR as they had, that the purpose of going there was to carry out a risk assessment, but that this had to be done in a safe place, so they turned to Lain Guille and told him that this place was not safe, and that they then left the scene on Lain Guille's instructions, and that they went to a safe spot and carried out remote inspections.

While we were at the inspection, at 10.50, Şenol DEMİR, the oxide production engineer in Murat BAYRAKDAR's team, said that an e-mail was sent to all operation units of Anagold, that this e-mail information was given to the subcontractors by the relevant units, that this information should be given to the subcontractors who were obliged to work in the field, that each unit was responsible for transferring this information to the subcontractor affiliated to it, that the companies (Keklikler, Asil Çöplerliler, Karsa subcontractors) that employed the 8 people who disappeared as a result of the landslide in the heap leaching site provided services to the oxide unit.

He knew that the Karsa subcontractor could also provide services to another unit, but that the employees of the subcontractors who went missing on the day of the incident were also providing services to the oxide, that in this case Murat BAYRAKDAR or one of his team responsible for the heap leach site was obliged to inform these subcontractors, and that the Çiftay subcontractor had no work at the heap leach site at that time.

Uğur YILDIZ, who works at Ciftay, was not in the heap leach area, he was in the mine site, he did not know how far the distance between the mine site and the heap leach area was, he was a little more relaxed after the e-mail sent at 10.50 a.m. because it was stated that no one could enter the area anymore, in this case they decided to wait as a technical investigation team, they would make a risk assessment with the findings of the technical team, they left the area they were in and set off for the offices, on the way he saw someone he did not know who was still walking around in the dangerous area.

He said that Gizem had told him today that this person was Soysal DOGAN, that he had called Murat BAYRAKDAR while he was in the vehicle and asked him "why are there still people walking around in the dangerous area", and that Murat had told him on the phone that he was the owner of the area and that a few people would have to enter the area to carry out an inspection, which he said was not safe.

Gizem GAZCI and Can Serdar HASTÜRK, who were in the vehicle, witnessed this conversation.00, Murat BAYRAKDAR, Kaan AKPOLAT and Onur SARITAŞ, Mr. Murat stated that Ali Rıza KALENDER (a geotechnical engineer who was part of the technical team) had finished the technical inspection and that there was no landslide in the area, that there was a settlement, that there was no risky situation and that the heap work could continue, but that he would not continue the heap work at the moment and that he would have a meeting with the GRE company, which was the design engineer of the area, at 17. the GRE company is a company that performs the design engineering and supervision of the heap leaching site in question, it has the supervision done by a company in Turkey whose name he does not know, he does not know how long these inspections are carried out, he knows that the GRE company is in Australia, the floors added in the heap leaching site are built according to the parameters of the design determined by the GRE company, he said that he did not have extensive knowledge about this issue since he was the chief engineer for occupational safety, that Kaan AKPOLAT and Murat BAYRAKDAR, who was in charge of the site, had more information about the issue because they were the ones who were in charge of the site and who were in constant contact with the GRE company, that when Murat BAYRAKDAR said "it was not a landslide", he went to dinner in a relaxed manner, that when he went to the office, at 13. at 13.03 hours, senior geotechnical engineer Ali Rıza KALENDER sent an e-mail.

In the content of this e-mail, contrary to what Murat BAYRAKDAR said, the information that there was a landslide and that this landslide continued and that the stacking process should definitely not continue was included together with the radar reports, it was understood that there was a problem in the radar report, in this case, he wanted to call Mr. Murat immediately, but he could not talk to him because he was busy, but he returned from whatsapp.

48



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

When he told him about the situation in Ali Rıza KALENDER's e-mail, he said that he would reply to the e-mail, that he saw a risk in terms of occupational safety in this situation and that he decided to inform Abdulkadir CANSIZ, the Deputy Operations Director, about the contradiction, that he had informed him, that he had a meeting and asked him to arrange a meeting after 15.00.

At 13.28 hours, he sent an invitation to the people who would attend the meeting via e-mail in digital media and arranged the meeting at 15.15, the people who would attend the meeting were Ali Rıza KALENDER, Gizem GAZCI, Murat BAYRAKDAR, Abdulkadir CANSIZ, Kaan AKPOLAT, Muzaffer BEĞEN and himself, and at 13.38 hours Murat BAYRAKDAR replied to the e-mail sent by Ali Rıza KALENDER

(Those in the e-mail - Murat BAYRAKDAR, Ali Rıza KALENDER, lain, Abdulkadir CANSIZ, Selçuk ÇİFTLİK; Hüseyin ÜSTÜNDAĞ, İzzet TEKİN, Berkay MISIR, Kaan Murat AKPOLAT, Can Serdar HASTÜRK, Shaun SWARTZ Ali SERT, Gizem GAZCI, Şenol DEMİR and himself) your domain was completely blocked in this e-mail.

He said that he would hold a management meeting to announce that work on phase 4B-3 had been stopped, that the heap operation had been stopped and that the heap leach irrigation areas would be closed, he also asked if there were any problems to start repairing the cracks and when the work on phase 4B-3 could start, he asked that the radar measurements be forwarded to his team during the noon and night shifts, he knew that Murat BAYRAKDAR's team was working in 3 shifts at the heap leach site, he was in the office after the e-mail, he was in an online meeting at 14.28, he was in an online meeting at the time, he did not know where the persons were located during the landslide.

However, he knew that they should not be in the closed hazardous area because they were aware of the closure of the area in terms of occupational safety and from the e-mail from Murat BAYRAKDAR, that there were employees of subcontractors other than the employees of Anagold Company, that the heap leach site consisted of 33 lifts (steps) when it was demolished as far as he knew, however, my emergency response chief Muzaffer BEĞEN, Onur SARITAŞ , Çağdaş BAŞ and Gizem GAZCI from my team were assigned to the field, Murat BAYRAKDAR is ultimately responsible for the piping team and he has no knowledge of who told the piping unit to go out or not to go out before the incident.

He said that he did not know why they were on the site, that they had no authority to decide whether they should stay on the site or not, that Murat BAYRAKDAR was the area supervisor who could give a directive on whether these people should continue to work on the site or not, that he did not know how the container in question was placed and who decided on this issue, that the container had been in that area for a long time, that no one knew that a disaster of this magnitude would occur as a result of the cracks he saw in the morning, that they had never experienced anything like this before, that he became aware of the cracks in the morning when Gizem GAZCI informed him.

Normally, whoever sees such situations is obliged to inform his/her supervisor and the relevant units immediately, the general trainings include reporting the danger, he informed his manager Selçuk ÇİFTLİK, who was on leave and whom he was acting in his place, about this situation via whatsapp, and he also informed Abdulkadir CANSIZ, the acting operations director.

He said that he learned at the crisis desk that Elif REYHAN, Kaan AKPOLAT and three foreign guests were stranded, that when he went out for the first inspection, he saw that the solution was not stopped and continued, that he asked Mr. Murat about this issue, and that if he stopped it suddenly, the pools would overflow, so they would stop it gradually.



49

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

In Ali Rıza KALENDER's e-mail, he stated that he requested that the soil piling process not continue, that there was no soil piling process at around 10.30 in the morning, only solution, that he did not know whether the piping workers were there or not, that they went to the scene for inspection purposes without anyone's instructions as mentioned above, that he knew that entry and exit was prohibited in the heap leaching area, and that two entry points to the heap leaching area were closed.

He did not know how long the heap leach site had been established; Ali Rıza KALENDER was a senior geotechnical engineer working in the mine geology unit who could conduct technical inspections; his supervisor on the day of the incident was İzzet Tekin; İzzet Tekin's main unit was the Mine Geology Unit and he had been acting in his place since the end of December when the mine manager was absent.

He stated that on the date of the incident, he was a permanent employee in his own mine geology unit and that Mehmet Türk had started working as mine manager on 12.02.2024, that the training and orientation process was ongoing, that they still received signatures from İzzet Tekin, that İzzet Tekin continued to act as acting manager, and that Mehmet Türk's orientation continued on the date of the incident.

### Can Serdar HASTÜRK:

In his statement dated 16.02.2024, in addition to the statement he gave at the law enforcement office;
On the date of the incident, there was a meeting at around 8.00 pm and a person named Caner, who worked in the same department, came to me and said that he heard from Ms. Gizem that the cracks were in the mining area, he told Ms. Gizem that they should look at the area and asked Recep, who worked in the same department, to go to the area and take photographs.

He said that he went with Gizem and they took photos, that when he saw the crack in the photos, he decided to go to the mining area, that cracks had occurred in the past and that the responsibility for this was with the area supervisors, that he informed Ahmet OĞUZ, his immediate superior, about the cracks, that he then saw Iain in the construction site corridor and asked him about the events, that he showed him the photos, that he agreed that they should look at the area, that he informed the mining department and told İzzet TEKİN that at 09.54 at 09.54 hours to take photographs with a drone in the incident area, and then they entered the 10.00 meeting.

Gizem and Burak also attended the meeting, they started to go upstairs, Murat BAYRAKTAR was behind them, they saw that the road was closed while they were going upstairs, they continued after Iain had the road opened, the estimated time was around 10.30 a.m. When he checked the area, he saw that there were cracks in the area similar to the images he had received on his phone, he also saw that the cracks went down to the road while he was walking in the area.

Mr. Soysal, the area supervisor, said that he had spoken to Mr. Soysal and that he had told him that there was an abnormal situation, that he had asked Kaan AKPOLAT radar whether there was this extraordinary situation, and that the radar had informed him that there was no problem.

Probably according to the image coming from the radar, workers were removed from the area, he thought that even if there was going to be a shift or separation because of the east-west axis of the route of the rift, it would be towards the south, even Murat and Iain may have heard that, when they were analyzing with those in the area, he said that the soil could flow in the south direction, and I was glad that the workers working on the south side were also removed.

During that conversation, no one commented on the direction of the separation and contrary to his opinion, in between the conversation he said that the ground should be closed because it was wet, then Kaan said "I will close this area" if approval is given, Iain said that he did not hear what Iain replied because of the distance between them, he saw and photographed that there were cracks when he looked at the scene from the safe place where they were working for the newly built area.

He said that they evaluated among themselves that the situation could be serious, that while leaving the scene he heard Burak and Murat talking on the phone about whether Soysal should stay in the area or not, that they went downstairs and got to work during the day, that he only remembered the dark-skinned worker who opened the road at the scene, that he did not see any people inside the container.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

After landing, he said that he and Murat had consulted about the incident, that they had talked about the need to talk in the evening due to the time difference because the designer was abroad, that the drone footage came to his cell phone at 11.23 p.m., that he did not know who else the drone footage was shared with, and that the footage came from Alperen.

Iain and Ahmet Oğuz ÖZTÜRK via Whatsapp application, but Iain received a reply and the other one did not, then they attended the meeting online at 14.00, Ahmet Oğuz ÖZTÜRK came to him after the incident and offered to go to the scene of the incident, but he refused because it was risky, they participated in crisis management under the coordination of occupational safety.

He said that he did not know whether the irrigation had been stopped or not, that as far as he knew the heap at the scene was normal and not excessive, and that when he asked Hüseyin ÜSTÜNDAG about 1-2 weeks before the incident whether it was in accordance with the design, he said that it was.

He said that Alperen was with him at the time and that he had warned Hüseyin to follow the geotechnical guidelines to the letter, but he did not have a clear idea of the amount of the heap.

Hüseyin ÜSTÜNDAG was responsible for the size of the heap, Abdulkadir CANSIZ was also in charge by proxy in the hierarchy, Hüseyin continued his operations in the area after his suggestions, he knew a person named Berkay MISIR, he knew him as a geotechnical engineer, his duty was to inspect the areas via radar, a summary report of the week was sent to the unit he was responsible for once a week.

The distance between the heap and the containers is the responsibility of the people in the area, he does not think that the containers were placed there with any project, it was completely on initiative, he does not know who placed them.

He guesses that it may have been done by Kaan TOKER, Koray ŞİMŞEK, İrfan AKIN, who worked in Hüseyin's place,and he does not know exactly where the containers should be located, whether the project department or the oxide processor is looking after them.

The drawing and project execution of the heap leach area are carried out by the company named GRE, this company knows that it works with the company named INR, that blasting is carried out in certain regions between 12.00-12. 30 every day, that there is blasting on the day of the incident, that it took place in the mine at a distance of about 1 km, that it does not think that this blasting will cause the heap to landslide, that it does not have technical and sufficient knowledge, that it does not know a company or person named Neil Bar, that it does not know that it has come to the inspection, that it does not know the eastern region with radars, that Berkay Misir from Münevver Dogan requested radar on this issue, but it is not accepted as a budget, even that he heard and reported the issue to the CEO, that he may have said healing in the field, that as an environmental manager, they are the areas that were previously wiped in the material flowing to the patient stream bed.

When the heap collapsed in that direction, they closed the culverts in the stream bed, started to take samples from the streams, there has been no negative situation so far, they do not think that there is cyanide on a large scale, they do not think that it is at a level that will affect human health, they took samples from the heap, they inspected and observed by growing trees, and sent these samples to the relevant Ministry.

He stated that they are in consultation and contact with the relevant Ministries, that they have taken all precautions and that he is of the opinion that there will not be any situation harmful to human health.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

**Kaan Murat AKPOLAT**

In his statement dated 16.02.2024, he stated the following in addition to his statement before the police
He stated that he had been working as an Assistant Process Engineer at Anagold Madencilik AŞ for about 17 months, at around 8-00 am Nazım KÖSE, the heap leach operator, called Şenol DEMIR, the production engineer,and Nazım KÖSE told Şenol DEMIR that there were fractures in the heap leach laying area.

When we arrived at the site, we attended the daily production meeting via the Teams program, during which heap leach supervisor Kenan ÖZ informed Murat BAYRAKTAR, the chief oxide engineer, about the fractures that occurred during heap leaching.

Murat BAYRAKTAR informed everyone and said that he would come to the field, Kenan ÖZ very excitedly mentioned the fractures at the meeting and said that he and Şenol DEMİR were at the field where there were fractures and that they should come here, Murat BAYRAKTAR said "inform everyone and I will inform everyone".

He said that they had arrived at the site when the meeting started, that Kenan ÖZ and Soysal DOGAN were also present at the site where the fractures occurred, that immediately after the meeting they had distributed tasks among themselves, that he had called Berkay MISIR, an assistant engineer from the Geotechnical team,and that he should take Ali Rıza KALENDER, his superior, and come to the site.

After the meeting was over, Şenol DEMİR and I started to examine the fractures and about 30 workers from the project department were laying membranes, then Gizem GAZCI, an engineer from OHS, Recep ÇALI, an engineer from the environmental department, and Murat BAYRAKTAR, Chief Oxide Engineer, came to the fractures.

While waiting for the geotechnical team, Murat BAYRAKTAR said that he told them to evacuate the area and close the road, that there were two roads leading to the heap leach, one on the quarry side and one where the piping team offices were located, that the road should be closed in front of the piping team offices and that those arriving should go to where the piping team was located, that material was poured in front of the road on the quarry side with a construction machine and then New Jersey bollards were placed, and only New Jersey bollards were placed in front of the office where the piping team was located.

He said that the workers in the area were workers of the project department, that they told them to leave, that they also said that they had materials, that he called İshak DEMİR, an engineer working in the project department, to speed up the evacuation of the workers from the area and to inform him,and that İshak DEMİR came to the site, Murat BAYRAKTAR said that he would explain what he had seen at the directors' meeting to be held at 10-00 and left the area, while they were evacuating and closing the area and pulling the materials to a safe area, and Murat BAYRAKTAR gave the order to evacuate, close the areaand pull the materials to a safe area.

Then, Şenol DEMİR left the area to send an information e-mail, Şenol sent the RAILWAY road closure information e-mail at 10-50 to the joint e-mail group named İliç White, which includes all employees working within the Occupational Safety Department, Maintenance Department, Oxide Process Operations Department, Sulfide Process Operations Department, Mining Department and Anagold Company, until a second notification.

After evacuating the area, Berkay MISIR from the geotechnical department and two people he did not know came to the area, made an inspection, showed the radar map of the area, explained the situation, said that there was movement but that Ali Rıza KALENDER, who was in charge of the main department, should come and take a look, and that Ali Rıza KALENDER was eet ale and would come.

Then, Murat BAYRAKTAR OHS Chief Engineer Burak ARTAL, Environment Manager Can Serdar HASTÜRK, Operations Vice President IAİN GÜİLLE and they went to the scene and made a discovery, Murat BAYRAKTAR called him for English support, told the people here what Berkay told and showed the radar image he sent, Iain told him to send the images by e-mail, he sent it to him by e-mail at 10-52, here Murat BAYRAKTAR's area was closed, a field inspection was carried out from time to time, Ali Rıza KALENDER said that he would examine the field together after coming.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

Murat BAYRAKTAR told Iian that a meeting would be held with the oxide department about how the solution in the area would be managed and whether it could be discontinued or not and that Iian would be asked for a decision; Ali Rıza KALENDER came to the company at a time he could not remember exactly; Murat BAYRAKTAR, Ali Rıza KALENDER, himself and a person he did not know went out to the area; Ali Rıza KALENDER inspected the area.

He said that he had said that the heap leaching works in the area should stop, that construction workers could work, that there was a settlement movement in the area, that these cracks could be closed by construction machinery with cement, and that Murat BAYRAKTAR should send what Ali Rıza KALENDER said in writing via e-mail and that he should send a technical information, otherwise he would not do what he said.

They went downstairs and held a meeting with Şenol DEMİR, Assistant Process Engineer Elif REYHAN, ADR Condition Supervisor Adnan KEKLİK, piping team supervisor Soysal DOGAN on how to manage the solution, decided to discontinue the solution at the meeting, and discussed how to manage it when it was discontinued.

That they told Murat BAYRAKTAR what they had discussed, that Murat BAYRAKTAR said that he would ask Lian and tell him the decision, that he met with Lian and after a very short time he told him to discontinue the solution, that they discontinued the solution, that Adnan KEKRAKLİK called a person in his unit and told him to discontinue the solution, Ali Rıza KALENDER sent a technical e-mail about the crevices, but said that there was no information in it that workers could enter the area above, that the area could be corrected with cement, and that the heap leaching operation should be stopped.

He said that this incident took place when Murat BAYRAKTAR went to get approval from Iain for solution cutting, that he wrote down what Murat BAYRAKTAR had said on his computer and sent it as an e-mail to Murat BAYRAKTAR, that about 15-20 minutes later he was told by a person whose name he did not remember that there was a noise coming from the pipes, and that he and Elif REYHAN and Adnan KEKLİK set off for the piping office.

Soysal DOGAN said that 3 foreigners wanted to go up, at this time they met Berkay MISIR in front of the piping office, Berkay MISIR said "the fractures have increased, I don't think you should go up", they went up to show the area to 3 foreigners and to make sure that no one was left in the area, at this time Kenan ÖZ, Ramazan ÇİMEN, Soysal DOĞAN, İshak DEMİR and one more operator were on site inspection, she said that she told Soysal DOĞAN, İshak DEMİR and the operator who was with them to go back after taking photos of Leach 30,that the others told her to go back, that Elif and 3 foreigners were at the site for inspection and went up to the top leach level,that while they were there the soil started to slide,that the 3 foreigners were Patrik, Ailen Morris and John. Patrick said that he was in charge of membrane construction, that he did not know what Ailen and John were doing, that he knew that these two people were working in the office in the US and Patrik was working in Turkey, that he did not know whether blasting was taking place on the day of the incident, that blasting had been taking place near the place where the accident occurred for about 5 months.

He stated that he did not know whether the heap leach was overdone or not, that he received a confirmation message from abroad about a week ago about the compatibility of the design of the heap leach, that Murat BAYRAKTAR and Ali Rıza KALENDER told him that the engineers in charge of the area, supervisors, geotechnical team and piping operator could go to the scene of the incident, that surface cracks had been seen in the heap leach before but never a crack as big as the one on the day of the incident.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

## 3.4. OBSERVATIONS ON THE INVESTIGATION MINUTES TAKEN BY THE OFFICE OF THE CHIEF PUBLIC PROSECUTOR;

### Iain Ronald GUILLE;

In his statement dated 16.02.2024, in addition to the statement he gave at the law enforcement office, he stated that he worked as the responsible for observing and reporting the operations carried out at the mine site, that his responsibility was to report all the work and operations carried out at the mine site to a superior, that Cengiz DEMİRCİ worked above him,that the person working under him was the operations director Kenan ÖZDEMIR and that all operations were reported to Kenan ÖZDEMIR.

He did not know that he had been informed by Kenan ÖZDEMİR,that the deceased had a supervisor for each shift and received orders and instructions from him,that the manager in charge of the oxide process area was Murat BAYRAKTAR and that there were supervisors under him,and how often occupational health and safety trainings were provided.

He knows that Selçuk ÇİFTLİK is in charge of this unit,that he has no idea what caused the landslide in question, but that there were natural cracks called tension cracks before,that these cracks could be repaired with minor interventions within the framework of the advice and instructions given by the technical staff,that this was the first time they had encountered such a large crack,that Burak ARTAL and Can Serdar HASTÜRK informed him about the cracks in question in the office around 09-40 - 09-45, that one of these people is OHS and the other is an environmental engineer.

He knows that this information should have come to him from Murat BAYRAKTAR and that after the meeting held at 10-00, Murat BAYRAKTAR sent an e-mail to all employees, including subcontractors, stating that entry to the area in question was prohibited.

He thought that Murat BAYRAKTAR had given such information, that after the meeting was held with Tekin, who was in charge of geotechnics, and Murat BAYRAKTAR, who was in charge of oxide, Burak ARTAL, Can Serdar and Gizem went to the site at 10-45 - 11-00 hours, that Murat was coming in his own vehicle, that when they arrived they saw that the road was blocked with a roadblock, and that one of the supervisors had put the roadblock in question.

He said that the supervisor did not allow passage until Murat BAYRAKTAR arrived, that he did not know who gave the order to close the road, that when he went to the site he saw small cracks at first, that the biggest crack was 6 cm in size, that they went to a higher point to get a better view, that he told Murat that there should be no more stacking and that the stacking was stopped, that when he left he continued to give solution, that he told him to transfer the solution to different points, but that he had no authority to make decisions at that point.

He was only responsible for observation and reporting, he did not have the authority to give any instructions, he did not know how many people normally worked in the area, he knew that 5 people working at the incident site were oxide process workers within Anagold, 2 people were Karsa personnel and they were working in the oxide area but he did not know what they were doing.

He said that the person in charge of the mine site was Mehmet TÜRK, but that he knew that he had started 2 days before the incident, and that around 13-00 hours on the day of the incident, radar results were e-mailed to Murat BAYRAKTAR by the radar officer Ali Rıza KALENDER.

He said that the content of the e-mail stated that no more piles should be made and that the cracked areas should be sealed with cement, that this sealing process was for a healthier mining operation and to prevent rainwater from filling the cracks and to ensure stability, that when he went to the site on the day of the incident, he was informed that Murat BAYRAKTAR or Kaan Murat AKPOLAT had been informed that the radar results given on Monday were natural.

When I sent an e-mail at 11-00 on the day of the incident, I informed the center in the USA that these cracks had occurred, and when I sent an e-mail due to the time difference, there was no response because the time there was 02-00 at night.



54

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

TRANSLATION

When he first arrived in August 2022, it was reported that the height, which should normally be a maximum of 8 meters, had been exceeded, that the said reporting had been made before he started, and a report was prepared to reduce it to the required level.

The US-based GRE and Turkish-based INR, which have regular contracts in the field of heap leaching, carried out building inspections.

This project and design was carried out by a company named GRE, and the same company carried out regular inspections of the Project and all subsequent manufacturing and construction, casting and leach field organization to ensure that they were in compliance with the project, and did not have any information on whether there was any accumulation of liquid under the leach. He stated that there was daily reporting on how much material was dumped in the heap leach area, but that no heap was made every day, that this information and the breakdowns were registered on the company's e-mail address, and that Burak ARTAL said that when they went down to the office instead of upstairs, it became dangerous.

### Ali Rıza KALENDER

In addition to his statement in the minutes dated 16.02.2024, he stated the following in addition to his statement in the law enforcement;

Anagold Madencilik AŞ was working, and in 2023, it sent an e-mail to the company official İzzet, Hüseyin and Murat BAYRAKDAR due to the deficiency in the radar systems in the eastern part of the heap, asked for budget support to eliminate the deficiencies here, but could not receive a positive response, and Neil Bar requested the purchase of the radars by requesting a budget request within 2024 in line with the report.

During this period, there was no positive or negative response from the company officials, Neil Bar's report stated that the monitoring systems were not of sufficient capacity and that they should be purchased urgently, the report also stated that there was a lack of personnel in the geotechnical team and that the recruitment of personnel should be done urgently, the company did not specify any date range for the purchase of radar, these devices should be purchased at the beginning of 2024, the report clearly states this, and all chief engineers in the field are aware of this report.

Kenan, Can Serdar, Hüseyin, Iain and İzzet,that they received offers from companies in line with the planning,that the total value of the products was 3 million dollars,that there was no development despite the time that had passed,that during this period, they continued to make requests to Mr. İzzet, the chief engineer, verbally,and that no planning was made.

In fact, he said that they had done all the excavation works including the solar system in the area where the radar would be installed, that he was on his return from a 12-day leave, that he was absent from the beginning of February until the 13th of the month, that Berkay MISIR called him around 09.30 on the day of the incident and said that there were cracks and crevices in the heap leach field and that there could be a dangerous situation.

He said that he went to the field at 10.30 a.m.and at around 11.00 a.m. Berkay, Murat BAYRAKDAR, Fatih ÖZER, Şenol DEMİR and Kaan AKPOLAT went to the heap leach and urgently asked for the solution to be discontinued,the heap to be stopped and the area to be cleared.

This statement was witnessed by Berkay MISIR and Fatih ÖZER and Murat BAYRAKDAR's statement is partially true, he did not explicitly say that there was no problem, he said that a meeting should be held with a person named Louis, whose surname he does not remember, when they went to the offices, they looked at the radar graphs with Berkay, when they noticed extraordinary activity, they informed Murat BAYRAKDAR, then they went to Lain with Murat.

lain ordered the drip system (solution flow) to be stopped, when I checked the movement speed again, when I saw that I was approaching around 200 mm, Mr. Murat, Mr. Hüseyin, Mr. Abdulkadir and Mr. İzzet sent an e-mail to the authorized personnel, after the mail, Mr. Burak called and requested a meeting on the subject, then they went to dinner.



55

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

When they saw the increase in the graph after returning from lunch, they went back to the field with Berkay and Fatih, they don't remember whether they saw Murat BAYRAKDAR or not, they went to the heap leach site at that time with the permission of Soysal DOĞAN, they saw 3 foreigners, Kaan and Elif on their way back, Mr. Adnan was waiting on foot at the corner of the piping team's container.

He stated that he had told Berkay "tell them not to go out, it is too dangerous", that he did not know what they were doing despite this, that he had analyzed the report shown, that his job was to analyze this report and report it to the relevant units, that the accelerations of mm approaching 90 around 18.00 on February 6 were routine jumps, that it was necessary to look before and after, that if there was no movement supporting the jump, the jump should not be taken seriously after it was checked in the field.

He said that when averaged on the graph, it is clear that the movements on February 6 were between 30-50, so there is no need to report it.

until February 12, the average graph was between 15-20, so there was nothing objectionable; if the jump lasted around 1-2 hours, this should be checked in the field; the displacement graph should also be examined together with the velocity graph in order to fully clarify the incident; he said that he did not know whether the jump on February 6 was checked or not.

He stated that Berkay did not provide any information about this, and that in the other graph dated February 12-13 shown, it was fixed that at 00.00 on February 13, the mm movement increased to 70 and above, around 02.00 it increased to 80 mm, and at 02.00 it approached 110 mm.

He stated that they do not work night shifts, they only work during working hours, therefore they are not obliged to examine and inspect the radar at night, they only examine the radar reports when they are notified in case of a suspected tension crack and provide information accordingly, they are not obliged to determine the area at night, the area determination is as follows, regardless of the size of the vibration or landslide, if they do not determine the area on the graph, they cannot know where and at what intensity there is vibrationand landslide , after determining the area, they can report the vibration and landslide mathematically.

He stated that he did not know whether Berkay also identified the area when his shift started at night or at 7.30 a.m., that as far as he knew, Berkay looked at the radar around 9.15 a.m. when Murat BAYRAKDAR informed Berkay and then informed him, that the current situation would not have changed even if he had noticed the situation as soon as his shift started and made warnings, because the area visible on the radar was 10/1 of the area where the current shift occurred, and that the magnitude of the danger could not be realized since the radar system did not see the eastern part of the heap leach.

He also stated that since they did not deliver the area ready for laying the membrane material, which was the responsibility of the project department in the south and southwest part, Heap leach leaned north and blasted the east and west,and that these projects are the responsibility of GRE company.

That the EIA reports and company projects were inspected and approved, that this unforeseen incident had nothing to do with whether or not they were notified 2 hours early, and that the containers of the piping union had been in the same area for 5-6 years, and that it had even been an emergency gathering place for 5-6 years, he said that this was decided by the OHS department, that Mr. Evrim was the head of the department, that for about 5-6 years the heap leach field has grown by 20% transverselyand probably 40% vertically, and that despite this growth, OHS had to make a decision again and determine the location of the containers.

He said that they should do this together with Louis, the GRE project manager,that both east and west (west) of the heap leach there are areas of land called pillar support, that GRE has designed this area as a safe zone, that no landslides, no soil can reaecj here, and that accordingly there are containers in those areas, however, as I said, despite the 20% growth, the container areas were not updated, the roads were closed on the day of the incident on Murat BAYRAKDAR's instructions, the piping containers that were buried under the cave-in were on the outer side of the road and not on the inner side, and that no one except the project managers could have known that a slide could occur up to the containers.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

He also stated that no notification has been made by the project proponents, that GRE should continuously take samples from the site to check whether the growth is healthy or not, and that the amount of cyanide supplied should also be monitored by the project proponents. In his estimation, the incident was caused by the undelivered membrane area on the south side and the heap pressed towards the north, as a result of this pressure, the soil shifted from the eastern and western parts due to the strong pillar support in the north, at the same time, the ground strength of the soil, which was constantly washed with cyanide, was thoroughly reduced and caused the movement of the soil, as seen in the videos, a mass of approximately 10 million tons flowed away within 30 seconds, the reason is the liquefied soil. He stated that these issues should be supervised by the project department and the oxide process, that problems arose due to the lack of sufficient and necessary liaison between the two units, that as the geotechnical team, they fulfilled all their obligations, that there was no negligence, and that they directly informed their operational units when millimetric mobility increased. He stated that they told them not to heap, to discontinue the solution, to empty the area, and that GRE company could access the radar, that they sent the radar analysis to the company on a monthly basis, that they would inform the company if there was an unusual situation, that the company could detect it itself, that there was nothing else they could do, and that they had no responsibility.

## Cengiz Yalcın DEMİRCİ

In his statement dated 18.02.2024, in addition to his statement given at the law enforcement office; He stated that he served as the Chairman of the Board of Directors of Anagold Madencilik AŞ, and as of September 2022, he was responsible for the coordination of budget approval preparations, partnership and relations, financial reports, SSR senior executives and Çalık Holding senior executives and the coordination of this coordination to the higher authorities of the company belonging to Anagold Madencilik AŞ.

Before September 2022, he was the head of the world exploration team at SSR Mining, he was in contact with the directors of the company at Anagold Madencilik AŞ and they reported to him about the financial operation of this place, and the technical issues were reported to Iain (Vice President of Operations), who was working here, and if there was a technical problem with the country's operation, the stoppage of the mine, Iain reported it.

For example, since the suspension of the mine is financially related to the company, he is obliged to inform himself of this situation, although Kenan ÖZDEMİR (Operations Director) works in a subordinate position of Lain, he is obliged to inform himself directly, and he is affiliated with Bill McNevin at SSR Mining.

He said that he was in charge of ensuring coordination with the companies under SSR Mining and presenting them to his superior, that he served as the Country Manager of Anagold Mining Company, that he came to meetings for all companies in Turkey at regular intervals every 3 months, and that he came by taking the initiative due to the extraordinary situation here.

Iain Ronald was a sub-unit of Iain Ronald at SSR Mining, but they both worked in the same position in the company, he was responsible for technical matters and she was responsible for matters other than technical matters, Kenan ÖZDEMİR was in charge of Anagold Madencilik AŞ after Iain and he is currently in the USA/Nevada on temporary duty, Abdulkadir CANSIZ is currently acting in his place, these proxy assignments were made via e-mail, the person in charge took all the responsibilities of the person he was in charge of.

All operation officers were contacted by e-mail, video conferencing or other communication channels regarding the operation in Turkey.



57

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLAT.ON

He stated that they held meetings with the directors of Anagold Gold Mining Co. via video conference when necessary, that he did not have any meetings with Anagold Madencilik AŞ on 13.02.2024, that he became aware of the incident when Onur ACAR called him at approximately 04.30 in the morning to inform him about the incident, that this person had no obligation to inform him, that he informed him because of his personal relationship, and that he then tried to reach the people at Anagold Mining Co. to get detailed information about the incident.

An hour and a half after the incident, an e-mail was received regarding the details of the incident. lain, he told him that he should not forget to stop the whole operation, he said that he had already stopped the whole operation, he was aware of the whole situation for 24 hours, he called Bill Macnevin, who was just above him, he said that he was aware of the incident, he did not give any instructions, he had an online meeting with the senior management staff of 5 people at SSR Mining company and discussed the issues to be done on this issue, he came to Turkey on 16.02.2024.

2 hours before the incident, Lain sent an e-mail to my e-mail address that there were 3 cracks for informational purposes, that they took photos and measures regarding the cracks, that he did not see the e-mail due to the time difference, that he saw the e-mail 3 days after the incident as a result of the warning of the director friends after the incident, that in such cases the responsible person there sent informative e-mails to all senior managers, it was stated that these were routine information mails, that Lain did not send these mails to receive any instructions, and that normally in occupational health and safety training and procedures, even the lowest worker has the authority to stop when he realizes the danger because the mine site is in the very dangerous class category.

In such dangerous situations, even subcontractors have the authority to stop, in this case, the most authorized person is Lain, who has the authority to stop, and in the case in question, Lain made the decision to stop, but he does not know why the inspections were carried out at the place in question, he does not know for what purpose those people were there, he does not know whether Kenan ÖZDEMIR was informed and given information about this incident at the time of the incident, he had no knowledge of the initial establishment of the heap leach site, he was not in charge of SSR Mining at that time, he did not know who designed the project, when and how, where they got approval, he had no authority over the later expanded projects of the heap leach, he was not informed about technical issues in any way.

He did not know who supervised this place, at what intervals and in what manner, the process oxide department was in charge of the heap leach site and Hüseyin ÜSTÜNDAG was in charge of it, he knew that Hüseyin ÜSTÜNDAG was on leave on the date of the incident, he did not know the position of the person who would take care of him when he was on leave.

After the incident, he learned that Murat BAYRAKDAR had been assigned to replace Hüseyin ÜSTÜNDAG, that the oxide process department was under Kenan ÖZDEMIR, that Kenan had been replaced by Abdulkadir CANSIZ from the beginning of February 2024, and that Iain and Kenan decided that Abdulkadir CANSIZ would take over as acting manager.

Normally Abdulkadir CANSIZ was the Maintenance Manager, Abdulkadir CANSIZ was the most authorized person in the maintenance department and other department scientists could provide information and technical support to the oxide process unit related to their own subjects, he did not know who his subcontractors were, he did not know for what purpose 9 people were in heap leaching. They decided to stop the operation of this heap leach site, saying that he did not know which people were in charge, that he had not given any instructions to anyone before the incident, that he would definitely have stopped it if he had been aware of it, and that the people in charge before the incident had also decided to stop the operation of this heap leach site.



i the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

He does not know whether there was overloading at the heap leach site, he does not know whether the solution was given too much, he does not know what caused this incident, he does not know the information given to the Ministry of Environment as of yesterday that they reported that no excess solution or water was given, he does not know what the warning was about the warning on the radar system and at what acceleration. In the information given to DSİ on this issue, he said that he learned that there was activity in the radar system just before the incident,that he knew that the devices belonging to the radar system were included in this year's budget in December 2023,that he knew that approval had been received for the purchase,that the purchase process may have been prolonged because the devices were purchased from abroad,that the purchase process was a situation that depended on the internal functioning of Anagold Madencilik AŞ,and that he confirmed whether it was in line with the budget.

In terms of functioning, each department (directorate)makes the budget itself, then it is submitted to the relevant director, Iain coordinates and submits it to 5 senior managers, with the approval of these senior managers, the budget is approved, it comes to him as approved, he only monitors it, he intervenes in case the relevant department unit exceeds its budget, as far as he knows, radar devices were purchased, normally there were routine explosions at certain intervals. He did not know whether there was any explosion on the day of the incident; if there was an explosion, he did not know whether it posed a danger to the heap leach site; he did not know whether this information was given to subcontractors in case of unfavorable situations that might occur at the mine site or whether the subcontractor was obliged to stop and report this when he saw an unfavorable situation; how and under whose instructions the containers were placed there, he did not know the procedure for the placement of the solution system, he did not have any authority on the matter, he did not know whether the blasting unit had been informed about the cracks detected on the morning of the incident, he did not know whether the solution system had been stopped, he did not know who had taken precautions on the morning of the incident and how.

He did not have any information about the previous period, as he was not authorized to give instructions on this matter, he did not have any information, there was a very strict training on OHS trainings, each training unit had different characteristics, he did not know how much soil was dumped in heap leaching, he does not have any technical knowledge about heap leaching, he is not authorized in terms of the project for the expansion of the heap leaching area, but he can say that the layout, design and project design of the heap leaching is as follows: The design of the heap leaching at the mine site was designed by GRE (USA/Demmar).

The project design was given to the oxide unit after its approval, the oxide unit loaded in accordance with the project, the company GRE prepared a design project together with the project unit within the leach plant, he did not know how the inspection was carried out, the oxide process unit and the OHS unitwere responsible for the safety of the place related to the incident, the geotechnical unit examined the records in the incident and is obliged to inform the relevant departments, to make a recommendation on taking the necessary measures and to stop the incident.

He said that he does not know the amount of the sliding mass at the moment, he does not have any information about the hazard levels in the radar system, but as a result of the risk analysis, the geotechnical unit is obliged to inform the relevant persons according to the level.

In fact, in high-risk situations, SSR Mining's senior managers should have been given this information; he did not know whether Jonathan Holden (SSR's vice president of innovation department-USA Demmar) and Allan Mzuris (innovation director US/Demmar) were at the heap leach site at the time of the incident, but they worked with Anagold Madencilik AŞ to increase efficiency in feeding ore into the tanks at regular intervals and improving them.

He stated that they had nothing to do with the heap leach site, that they probably went to that area to visit the heap leach site when they came to Turkey, that he was currently managing the entire rescue operation since Iain, who was in charge of the mine site, was arrested, and that information about the issue was sent from Iain to my e-mail group for informational purposes only.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

SWORN
TRANSLATION

### Soysal DOĞAN

In his statement dated 16.02.2024, in addition to his statement before the police, he stated that he had been working at Anagold Madencilik AŞ for 19 and a half years (14-15 years as piping supervisor in the oxide process department), that he started work at 07.30 a.m., that he started work at 08.00 a.m., and that at 08.00 a meeting was held with his supervisors Kaan Murat AKPOLAT, Şenol DEMİR and supervisors Kenan ÖZ, Ramazan ÇİMEN and Mehmet SARITAŞ to discuss the work to be done in the field and the work to be done, which was a routine meeting.

Kaan Murat AKPOLAT was the immediate superior of himself and Kenan ÖZ, Şenol DEMİR was the immediate superior of Mehmet SARITAŞ and Ramazan ÇİMEN, they carried out the work and operations in line with the directives of these individuals,they did not have the authority to carry out any work on their own as supervisors, İshak DEMİR, Sıddık KEKLİK, Recep KURT, Gökhan GÜN, Nihat ÇUVAK, Sıddık GÜN, Kenan ÇELENK and Murat GÜRBÜZ (Anagold employees),as well as İsa TAŞDELEN, Hüseyin KARA, Osman KARA, Abdurrahman ŞAHİN and Ferdi DEMİR (employees of Karsan subcontractor).

Together with these workers, they were required to work during the daytime to install, maintain and repair the piping system of the solution sent by the ADR unit on the soil in the leach site,and also to determine the daily meter readings and report to their immediate supervisors whether too much or too little solution was sent during the day. The sequence of those in charge is Hüseyin ÜSTÜNDAG, then Murat BAYRAKDAR, then Kaan Murat AKPOLAT, then himself as the supervisors and Recep KURT as the team leader when he was not present, Elif REYHAN is the engineer above the supervisors in the ADR department and Murat Kaan AKPOLAT is the superior Murat Kaan AKPOLAT in the piping system, there are 8 containers at the gathering center on the way to the work site of the piping team, they use these containers for various purposes, they have been using these containers for about 7 years.

He said that he thought that the supervisors of the time had placed the containers in the least dangerous area of the leach site, that the distance of the containers closest to the leach site was 500 meters and the farthest distance was 1000 meters, that the containers from which the heap of soil came were their own containers, that on the day of the incident, Anagold worker Kenan ÖZ, the leach team leader, called and said that there were cracks on the site and that he had come to pick him up.

He is the heap leach site Supervisor (he paves the ore coming from the crusher on the 8-meter high area on the site and rippers this soil.he delivered the ore to them after ripping, repeated the same process in other areas, went to the site and went to the location of the cracks between 09.00 and 09.30 with Iain Ronald GUILLE, Kaan Murat AKPOLAT, Murat BAYRAKDAR, Fatih ÖZER, Gizem GAZCI, Burak ARTAL, Can Serdar HASTÜRK, Ali Rıza KALENDER and an engineer whose name he did not know. It was ensured by Murat BAYRAKDAR that the purpose of the visit was to talk about the determination and repair of whether there was a danger related to cracks, that the people coming shared the risks related to their own areas, that the subcontractors reported the removal from the site to Burak ARTAL Murat BAYRAKDAR from OHS and that these companies were removed from the site.

They stated that approximately 25-26 people were working on the leach field, that only workers belonging to subcontractors were removed from the heap leach field, that they asked Ali Rıza KALENDER for another measurement on vibration during the meeting, and that the solution should be cut from the ADR section.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

They said that the solution was not discontinued at that time, that they would have a meeting and discuss this issue among themselves and discontinued the solution, and that the solution was discontinued at at around 13.00, Murat Kaan AKPOLAT, Supervisor Adnan KEKLİK of the ADR unit, reached the relevant person in the ADR department in line with the instructions of ADR engineer Elif REYHAN and said that the solution was completely discontinued ,that there was no question of partial cutting of the solution,that the system did not allow it,that it was completely closed at around 13.00,that the BLS 2 area was completely closed to solution.

He said that the cracks in question were found on Lift 33rd floor, that the one in BLS 2 was the system that wetted the area in Lift 33, that everyone left as a result of the meeting they held between 09.00 and 09.30, that during the meeting Kaan Murat AKPOLAT instructed him to close the roads leading to the leach heap leaching area, and that afterwards Şenol DEMİR, the engineer working in the crusher section, sent an e-mail to all operation units regarding the road closure,that he and his team went to the designated areas and placed the bollards.

Then they went to the containers and started to wait, there was no one left at the place where the cracks were located, Ishak DEMİR (Anagold) , Fahrettin KEKLİK (Anagold), İsa TAŞDELEN (Karsan), Abdurrahman ŞAHİN (Karsan), Hüseyin KARA (Karsan), loader operator Şaban YILMAZ (Asil Copler), dozer operator Mehmet KAZAR (Keklikler Company) and himself were present, Mehmet KAZAR and Şaban YILMAZ were employees of Kenan ÖZ and the others were workers in the piping team.  He said that they waited there until 14-00 hours, that two foreign engineers, whose names he did not know, arrived, that they were told that the entrances to the site were closed, that since these people spoke English, he called Kaan Murat AKPOLAT to communicate with the foreigners, that Ali Rıza KALENDER, the geological engineer in charge of the measurement, arrived at that time,that he acted as interpreter for the foreigners due to the road closure.

When he received the phone back, he said that Kaan Murat AKPOLAT was about to arrive, Kaan Murat AKPOLAT, Adnan KEKLİK, Elif REYHAN arrived in the same vehicle and Kenan ÖZ and Ramazan ÇİMEN arrived in another vehicle, at that time Kaan Murat AKPOLAT allowed the foreigners to go to the field, Kaan Murat AKPOLAT asked him to go to the lift 29 area in the leach field with the workers and post photos on the group, İshak DEMİR, together with İsa TAŞDELEN, went in a white Transporter,s topped at Lift 25,s aw cracks in the area where Lift 25 was located, which they had closed, and that there were 2 of these cracks, 2-3 cm wide,w hile Elif REYHAN and Kaan Murat AKPOLAT, together with foreigners, went to inspect the Phase 4 area above Lift 33.

Kenan ÖZ, Adnan KEKLİK, Ramazan ÇİMEN stayed outside the vehicle in the lift 25 area where they first stopped, he drove to the lift 29 area together with İshak DEMİR and İsa TAŞDELEN,he told İshak DEMİR and İsa TAŞDELEN "you go to lift 29" and he drove to lift 33 to check whether there was any widening in the cracks.

He said that he had left the vehicle somewhere outside the site, that while he was taking photographs of the cracks in lift 33, he saw several cracks of 10-15 cm each, that these cracks were slightly wider than the cracks they had looked at around 09.00, and that he took photographs of the cracks.

They said that at that time Mr. Kaan said to him "look at the back, the cracks have gotten bigger" and that when the soil started to move under his feet, he ran to the safe area in the direction of Sabırlı, that within 30 seconds the middle part of the heap of the lift began to flow, that he shouted to his friends at that time, that he tried to see lift 29 but could not see it, that when he looked from where he was to the area where the containers were located, he saw that the containers were under the soil towards the stream, that he immediately called İsa and İshak who were on lift 29,and that they fled to the west side.

He said that he called Kenan ÖZ and Adnan KEKLİK at Lift 25 but could not reach them,that Abdurrahman ŞAHİN, Fahrettin KEKLİK, Şaban YILMAZ Mehmet KAZAK,Hüseyin KARA were in the container area,and that he did not see the truck worker at the manganese site.



61

I the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

He said that the road they had closed was a different road from the one he was on, that the distance between the heap leaching site and the manganese site was approximately 150 meters, that Kaan Murat AKPOLAT and the foreigners did not encounter any negative situation as they were already in a safe area, that they had crossed the road on the belt to another road, and that he himself crossed that road and came to the manganese area where the truck had an accident.

They told me that people were gathered there, that people in the group asked for help because I was in the ERT group, and that he was informing them about the area, and in the meantime I called Muzaffer BEGEN and told him that they were on the manganese side, and Muzaffer BEGEN told him that he was in the TSF area, and they called me to the point where the crisis desk was.

Afterwards, we went to the area where the TSF was located and one of the AFAD employees asked us for information on how to get to the area, that a general training was given by OHS once a year, that Gizem GAZCI was responsible for OHS on the day of the incident, and that they were responsible for reporting to their current supervisors by taking photographs when they saw danger.

Mehmet KAZAN and Şaban YILMAZ are subordinate to Kenan ÖZ, so Kenan ÖZ has responsibility for them, and that they had previously suffered lacerations due to the flow of solution, but that the necessary interventions were immediately carried outand the danger was eliminated.

Murat BAYRAKDAR was in charge of the oxide site on the date of the incident as he was acting in place of Hüseyin ÜSTÜNDAG, he was told by Ali Rıza KALENDER at the first meeting that the cracks in question could have happened during the night, he could have understood this from the radar system as he is a measurer,he does not know whether the site supervisors inform the subcontractor companies in case of a negative situation, he does not know whether this incident occurred due to the blasting or not, he does not know whether there was blasting in the open mine site about 1 km away at 12.15 pm on the date of the incident.

He did not know whether there was overloading or not, that they carried out their operations in line with the instructions given, that he had no information about the expansion of the site, that the area where the containers were located was known to be the safest area, that even the assembly area was the area where the containers were located, that he did not think he was responsible, for 14 years, he has been working in the piping system, Adnan KEKLİK and Fahrettin KEKLİK, who were buried under the soil, are his relatives, he evaluated the landslide as an estimated 10 km,and although the expert report on this incident, which was taken in haste, addressed the situation that the solution may have been given too much, his client has no authority to flow or discontinue this solution.

He was only involved in the distribution of the solution from the flowing ADR, he was not authorized to discontinue the solution in any way, it is not certain whether the incident occurred as a result of overflowing of the solution or not, the experts issued a report based on guesswork here, a detailed report cannot be expected to be issued in one day, and the people buried under the soil are not under the responsibility of the client.

One of them was the person who stayed in the truck in the manganese area, the other three people were the people who were in the lift 25 area, they were not the people instructed by the client, they were not there in line with his client's instructions, the 5 people who were in the container area stated that they were already in the area of the company designated as the emergency gathering area, and that the process was given for after that area in accordance with the site closure decision.



62

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

## Hüseyin ÜSTÜNDAĞ

In his statement dated 16.02.2024, he stated the following:

He said that he had been working as the oxide process manager at Anagold Mining for about 4-5 months, and that his duties in the company included crushing and screening, ore placement in heap leaching (the design and construction of the heap was not carried out by me) and ADR (the transfer of gold after it is separated from the soil).

He said that he was on leave on the day of the incident, that his leave would start at 17-00 on Monday, that he had told the managers of the company at the ordinary meeting held at 10-00 in the morning that he was on leave, that he would be out of the city for two days and that he had transferred his power of attorney to Chief Engineer Murat BAYRAKTAR, and that he left work after 17-00 on Monday and went to his residence.

He then came to the company and prepared a report stating the work to be done and meetings to be held during the period he was on leave, he forwarded this report to Murat BAYRAKTAR on Monday evening via e-mail, which they used within the company, and on Tuesday on the way Murat BAYRAKTAR sent him a photo on WhatsApp.

He said that there were cracks in the heap with the photograph, that they later contacted him by phone, that there were cracks in the heap, that he had stopped production, that he had closed the area, that he had called Ali Rıza KALENDER from the geotechnical team, that he tried to communicate with Murat BAYRAKTAR on the way, but he could not communicate with him because his phone was not working. He said that he reached Erzincan airport at around 11-00, that he contacted Murat BAYRAKTAR again, that a person named Ali Rıza KALENDER from the geotechnical team arrived, that he saw the cracks and that there was nothing to be afraid of.

He said that he had told him that small cracks could be closed with a dozer using the ripper method, that the ripper system is a continuous practice, where small cracks are filled by scraping the soil with the claws of the dozer, thus preventing ponding in the heap leachate), and that he had told him that large cracks could be filled with cement, that Murat BAYRAKTAR had told him that employees of the companies named Yesti and Mürekkepçiler were working on membrane work in the heap and that he had removed these employees from the area.

During the meeting with Murat BAYRAKTAR, he said that what they had done was correct, but that he should prepare a power point presentation on this subject and explain this incident at the meeting of the company managers held at 10-00 a.m. on Wednesday morning, Murat BAYRAKTAR said that he would do this and ended the meeting, and during the meeting with Murat BAYRAKTAR, he, Iain and Burak ARTAL went to the place where the cracks occurred and made an inspection.

Iain asked what measures had been taken, and Murat told him that ore extraction, irrigation (irrigation) operations had been stopped, production had been stopped, in other words, all operations in this area had been stopped, and entry and exit to and from the area had been blocked; he boarded the plane at 12-00, and got off the plane around 14-00-14-05. He said that he connected online to the meeting to be held at 14-00 hours, which was arranged by the human resources director of the company, that nothing was discussed at the meeting about the cracks, that it was a meeting about union rights, that they told him that there was an earthquake at 14-20 hours, that he called Murat BAYRAKTAR, that Murat BAYRAKTAR told him that the situation was bad, that the soil was coming, that he could not talk, that he called Adnan KEKLİK and could not reach him, that he called Kaan Murat AKPOLAT. He said, "It's very bad here," called Elif REYHAN and told her to call Murat, called Kenan ÖZDEMİR, who was the operations director but is now in the US, called Cengiz ŞAHİN, the director of administrative affairs, and told him to arrange a car and that I would return to Erzincan, He said that he could not find a ticket to Erzincan, he took the Istanbul-Sivas flight at 15-45 hours and arrived at the mine site, they said that the area was closed and refused to let him in, he went to the coordination center of AFAD and tried to help there, and when the Minister of Interior arrived at the mine, the scene was taken over. He said that he had discussed with Murat BAYRAKTAR, Elif REYHAN, Şenol DEMİR and Kaan Murat AKPOLAT how the incident occurred, that the containers in the place where the landslide occurred were the workplace of the piping team, and that it was also one of the emergency assembly areas designated by ISG, that since I was on leave on the day of the incident, he did not know whether the solution was given to the heap, whether it was stopped or not, and if it was stopped, when it was stopped, that the person who would carry out this operation was Murat BAYRAKTAR, the acting minister.



the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

He said that he discontinue all the feeds at 11-00 hours and then the solution was stopped being fed into the heap; he did not know whether blasting was carried out or not as he was on leave on the day of the incident; he said that at normal times blasting was carried out between 12-00 and 12-45 every day, but at some times these blasts were canceled.

He said that he did not know whether it was canceled that day or not, that the design of the heap leach pits in the mine area was sent by a foreign company called GRE, that they created the design of the heap leach pits in accordance with this design, that the company sent the height, width, slope, total height of the heap leach pits, that is, the entire design project.

Heap leaching was carried out in accordance with this project, heap leaching was carried out by the project company of Anagold, the inspection was carried out by the Ministry of Environment and Urbanization, the environmental unit knew the periods of this inspection better, the environmental unit notified the inspection, there was one inspection in the period of 4-5 months, no investigation was carried out in this inspection regarding the place and incident that caused the accident.

OHS, Oxide Process and Maintenance unit is responsible for the safety of the place where the landslide occurs and the safety of the place where the landslide occurs regarding who is responsible for reporting this situation and receiving safety at the time of the appearance of cracks.

The security in this heap leach is a complicated security and in case of a crack in the heap leach, the unit that should notify the OHS and Geotechnical unit is the oxide process unit, the geotechnical unit is responsible for reporting the movement of radars in the soil, the radar should be notified up to the manager above the company at the level between 20 and 40, the employees should receive an e-mail of interest between 20 and 40, the highest level is level 50 and at level 50 the area should be completely closed, he did not receive a notification e-mail on the day of the incident.

Since the container area is an emergency gathering area as stated, the lids are outside the area, Sosyal DOGAN, Kaan Murat AKPOLAT, Murat BAYRAKTAR and himself are responsible for the piping process, the place where the trucks pass through is outside the closure areas, the mail informing that the area is closed should have been transferred to the workplace named Çiftay where the truck drivers work, this mail went to the open operation.

He said that it should have been transmitted from here, that the place where the trucks passed was one of the assembly areas designated by the ISG, that he had not seen cracks in the heap leaching area before, and that no cracks were detected.

He said that there were no reports of any cracks, there were only cracks of 1 meter in length and 2-3 cm in width near the steel lines of the heap leaching area when he first entered the work, this was revealed during the internal audit of the SSR company, there was no radar result in this crack, it was closed with gravel and it was followed up.

It was verbally conveyed to Murat BAYRAKTAR by Ali Rıza KALENDER that no negative problems were encountered, that these cracks that occur in heap leaching occur periodically, that they should be controlled by radar, that they do not continue after the necessary intervention is made, that they can occur in leaching all over the world, that photographs of the cracks were sent on the day of the incident, that the geotechnical team should interpret these cracks, and that there was no major problem for them.

Murat BAYRAKTAR said that Murat BAYRAKTAR told him about this situation, and although the expert committee stated in its preliminary report that these cracks would not occur in a short time, Soysal DOGAN and Şenol DEMİR did not report any negativity during the controls made on Monday.

Soysal DOGAN and Şenol DEMİR said on Monday that they did not see any cracks where the incident occurred, and that if a crack had been seen, this situation would have been reported by Murat BAYRAKTAR, but no such report was received.



64

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

He stated that if the report had been received, everyone up to the deputy general manager would have been informed, that what needed to be investigated in the accident was why the soil had shifted and why the work machines and workers in the container were there when the soil shifted, that the responsibility of the workers in the container and the work machines in the area did not belong to the client, and that the cause of the landslide could not be fully determined.

Although the preliminary report given by the expert committee stated that these cracks may not occur in a short period of time but in a long period of time, the client stated that this is a speculative information that has no scientific basis, that the client was not given any report that there were cracks in the soil before the incident, and that the comprehensive report should be waited for the determination of the fault situation.

### Abdulkadir CANSIZ

In addition to his statement in the minutes dated 16.02.2024, he stated that he has been working at Anagold Madencilik AŞ since 2018, that he started working as maintenance manager by proxy in November 2020, that he started working as maintenance manager by proxy in February or March 2021,that he has been performing this duty, that since Kenan ÖZDEMİR, the operations director, went to the USA temporarily, he gave him proxy as of 05/02/2024,and that he verbally said that while he was leaving, he should do the daily, routine works such as meeting management, and that Lain should do the field works

After that, in a meeting with Hüseyin ÜSTÜNDAG, Faruk DEĞİRMENCİ, Ali SERT and himself, he said that he had left the daily routine work and meetings to him, that everyone should pay attention to their own area of responsibility since he was not informed about the operations, and that he said that Lain would be here all the time,that the reason he said this was because Lain was going on leave from time to time and that he would not go on leave during this period.

On 05/02/2024, after working hours in the evening, Kenan ÖZDEMİR called and sent an e-mail saying that he was in the USA,that he had given the list of work to be done to Lain, that he should be aware of it and that he should also have the list,and then human resources received a written record from Kenan ÖZDEMİR, he said that the approval authorization would be opened in the timetable, upon this situation, he notified Kenan ÖZDEMİR via e-mail that human resources requested an e-mail, Kenan ÖZDEMİR sent an approving e-mail, human resources did not process this e-mail,he came to work at 08-00 on the day of the incident.

Every day between 08-30 and 09-00 between the chief engineers, there was an internal meeting of the maintenance department, during the meeting Murat BAYRAKTAR, who was the chief engineer of the heap where the accident occurred and who was not under my responsibility, came and said that he would give information about a subject and that there were cracks in a part of the heap leach, he said that since it was not in his area of responsibility, he informed the person named Iain, who was the most authorized person in the field, that he should tell this situation at the meeting held at 10-00 hours, which he would attend as he was acting as acting department manager, and that the reason he said this was because this area had no connection with him.

He stated that he was not familiar with these works since he was an electrical engineer, that the person named Iain had been working in this field for a long time, that no one working in his department had any working areas and responsibilities in the area where the accident occurred, that he asked Murat BAYRAKTAR to share the photographs of the area and even to show these photographs at the meeting to be held at 10-00, and that this issue came up after other issues were discussed at the meeting held at 10-00.

Murat BAYRAKTAR was the one who brought it up, Murat BAYRAKTAR offered the executive named Iain to project the photographs on television, Iain said there was no need, Iain said that he would go to the region after the meeting by looking at Murat BAYRAKTAR.



65

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

After the meeting was over, he saw Lain moving in a vehicle to go to the area, but he did not know who was in the vehicle; later he heard that Murat BAYRAKTAR, Chief Occupational Safety Engineer Burak ARTAL and an unknown person from the environmental department went to the area with Lain.

Gizem GAZCI, who is an occupational safety engineer and responsible for occupational safety in the area where the accident occurred, also went to the place where the accident occurred, but. He didn't know whether he went with Iain or not.

He said that he had heard that Ali Rıza KALENDER from the Mining Geology unit was with Lain at the site of the accident, but he did not know whether he was with Lain or not, and that Murat BAYRAKTAR called him at an hour between 11-00 and 14-00, the exact time he could not remember, and told him that the cracks were getting bigger.

He said that he also mentioned the speed unit, that he did not understand exactly what it meant as it was not his area of expertise, that he asked Murat BAYRAKTAR what urgent measures were taken, and that the area was evacuated, entrances were closed, and the flow of solution to that area was stopped.

After this conversation, he said that he was not involved in the process as it was not his area of responsibility until the meeting to be held at 14-00 hours, which was requested by the human resources to be held at 14-00 hours and requested by Cengiz DEMIRCİ, the country manager, to be attended by all of the invitees, and that he did not get involved in the process because the relevant units had done the necessary work,that he continued his own duty,that he attended meetings related to his own unit,and that he attended the meeting at 14-00 hours. During the meeting, some of the participants said that there was an earthquake, he realized that there was a tremor and he went to the emergency meeting place in front of the workplace,he was in lain at the emergency meeting place, Mustafa BAKIR, Electrical Instrument Chief Engineer, said "the heap leach is gone-it has shifted", when he looked at the place he showed, he saw that a mass that was there before was not there, he showed it to Iain, Burak ARTAL came to the emergency gathering area, he said that there was a shift in the heap leach, not an earthquake, a crisis desk was set up. That he called Faruk DEGERMENCİ, the sulphide operations manager at the crisis desk,and told him to go to the oxide plant and check there, and that he also told Ali SERT, the technical services manager, to check the Sabırlı stream on the other side of the slide to determine whether there was any leakage or leakage,he knew that Murat BAYRAKTAR had told me on the phone that the solution had been stopped, that there were two different pipelines, BLS1 and BLS2, leading to this area,and he did not remember whether Murat BAYRAKTAR had said that this area was completely stopped or that only one pipeline and the flow of solution had been stopped. He said that this could be understood by looking at the oxide automation system, that the blasting operations were under the responsibility of the company's mining department and the subcontractor company named Çiftay, that he had no work or responsibility for the blasting, that before the periodic blasts carried out by the company, employees were sent an e-mail informing them that the blasting would take place, not to control the blasting but to avoid worrying about the noise. He said that he did not have any information about whether there was an explosion inside the mine on the day of the incident, that only the maintenance and repair of the metal pipes coming out of the process pools in the heap leach area and going to the heap leach heap from outside belonged to the department he was responsible for, that the pipes made of HDPE material separated from the metal pipes were under the responsibility of the heap leach piping team, that they took these pipes to the place to be watered, that the piping workers at the accident site were the employees of this heap leach piping team.
On the day of the incident, he said that he never went to the place where the accident occurred, he was not invited,he followed this job lain, only the relevant people were invited and went to the place where the accident occurred, and whether he was trained on taking action and intervention in case of risk, there was no such training.



The sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

The reason was that the place where the accident occurred was related to his work, he knew that a form was filled out and explained to the personnel working in the construction site in order to take quick action in case of risk, but he did not have information about its content, regarding the determination made in the expert report that he was primarily at fault in the accident, although it was stated in the expert report that as a competent authorized person, he did not analyze the factors that led to the identification of dangerous situations that may arise at the construction site and turn them into risks, he did not have such a duty.

Although it was thought that Kenan ÖZDEMİR was acting as a proxy, there was no such proxy, since this date was 05/02/2024, there was no time when he would have been authorized to fulfill the specified matters, he did not have any participation in the design of heap leaching, preparation and implementation of emergency plans, possible risk assessments, engineering calculations, implementation, testing, controls and other works. There is no duty area, the duty area is for the elimination of electro-mechanical failures and maintenance works, there is no duty to take the necessary measures to protect from the risks that will occur as mentioned above at the place of the accident, there is no duty and responsibility related to heap leaching, there is no duty and responsibility to establish the necessary supervision and control mechanism in order not to adversely affect the health of the employees in the workplace, there is no duty and responsibility to implement the established system, the person who should take precautions about the cracks in the heap is Iain, there was no duty and responsibility in the heap leaching.

He declared that they would not give a job here even if he did not have expertise and competence, that he did not take responsibility for a task related to heap leaching in any period he worked, that there was no area he knew, that he would not be listened to even if he expressed his opinion, that the accident occurred outside his duty, responsibility and jurisdiction, that his responsibility was the maintenance and repair of electrical systems, pumps, pipes, tanks and similar fixed equipment in the oxide and sulfide plant, that he was not regionally responsible for the area, and that he was only responsible for repair and maintenance.

### Mehmet TÜRK

In his statement dated 16.02.2024, he stated the following:

He started to work as a mine manager at Anagold Madencilik AŞ on 12.02.2024 and attended a one-week orientation training on the date of his appointment.

This training will end on 14.02.2024, during the orientation process, occupational safety was given training on meeting with other units, what the scope of these units is, what are their relations with their units, the functioning of the environment, introduction , adaptation.

Normally, after this orientation training, he would start by getting information about the areas in which the working team of his unit operates, what they can do, what their equipment capacity is and what they can do, but when this situation happened one day after my orientation training, the orientation training was left, the site where he was assigned was actually the area where the open mine accident took place, he did not have any responsibility in the area where he was heap leached.

He said that he would be in charge after orientation training at the manganese site where some of the heap leach flowed, and that as far as he knew, the open mine area where the manganese site was located was not an ore extraction area, but only where transportation operations took place.

That there was no production activity at this location, that Özgür KAYA was the mine manager in charge before he arrived, that he resigned about a month ago, and that İzzet TEKİN, the chief geological engineer, was acting in his place, that he learned about the information from Mr. İzzet on the date of the incident, that the e-mail had not yet been opened regarding internal correspondence with the company, that İzzet TEKİN continued to be in charge of the department he was assigned to during the orientation training process, that the team met with İzzet TEKİNand ensured the necessary functioning.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

He was not in a position to give instructions, he did not even know the area he was assigned to, he did not know how and where the truck transportation operations in the manganese field came from and where they went, when he started his duty, when the danger was reported from heap leaching, maybe they could take relevant measures if it was a manganese field, İzzet TEKİN did not receive any instruction or warning from the management or occupational safety unit that mining activities should be stopped due to this risk.

It was not possible for anyone in my unit to know that there was a distance of about 100-200 meters between the heap leach site and the manganese, and that the road was under threat without a declaration of the magnitude of the risk.

He knew that he had not received any information about the closure of the open pit mines, that since I did not have access to the mine by e-mail, Mr. İzzet would be informed and he would receive information from Mr. İzzet,that neither Mr. İzzet nor he had received any such information,that the risk was not related to their area,that the people in charge at the heap leach site did not estimate the magnitude of the risk and that it could threaten the open pit mines,that the Çiftay employee, whose name he did not know, who was on the road during the landslide in the area, was still under the ground.

The contractor named Çiftay is a company that also provides services to the open mine site and he did not know whether the Çiftay subcontractor had been informed about the incident, it may not have been thought that the incident was so extensive and would affect other areas, the authorization for the area in the mine site had not yet taken place on the date of the incident, therefore he was not authorized to give any instructions or do any work, he did not see the site, he did not know, they were planning a meeting at 14-30 on the date of the incident to meet his team.

He said that when this news came before the meeting started, they immediately canceled the meeting and that he went to the field for the first time that day, that he was responsible for the mine operation unit, mine planning and technical services unit under the mining management unit, that he was responsible for the open pit mine production activities of the contractor company Çiftay AŞ,that he did not know Mr. Abdullah, the project manager of Çiftay AŞ, whose last name I do not know,and that he did not know the names of many people even from his own team, that at the morning meeting, Mr. IAİN would consult with the consultant company that looked after the heap leaching abroad.

He said that the meeting was ended after the determinations were made and the meeting was ended by saying let's meet again, that he did not know whether this notification was made to Çiftay AŞ, that the occupational health and safety unit should make this notification, that it is their responsibility, that they can make a decision to stop where there is a danger, that they will notify the management when it is not complied with, but that he does not know the method of notification, that neither he nor my unit has ever been notified about stopping the open pit activities, and that he will notify the subcontractors when it is done.

He said that they will definitely take the relevant measures, that he knows that Mr. İzzet, the chief geological engineer, has not received any information from anywhere about stopping the open pits,that he knows that there is an occupational health and safety specialist attached to the mine site,that there is no instruction from the occupational safety science about stopping the work,and that he does not know what and who caused the landslide at the heap leach site.

The radar system was a sub-unit of the department in which it was located, Ali Rıza Kalender, the chief of Geotechnics, was in charge of the radar system, and Ali Rıza Kalender was in charge of transferring the information in the system to other sciences.

He said that he knew that he worked under him, that Ali Rıza Kalender reported the warning on the radar to İzzet Tekin and that İzzet Tekin reported it to the management,that Ali Rıza Kalender should have notified him if he had completed his orientation training, but no information was shared on this matter as he was not authorized to do so.



I. the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

Ali Rıza Kalender stated that the radar in the field does not cover the entire heap leaching area, that 2 new radars should be purchased and that this was included in the budget, and that the radar system is an adjustable system and sends warnings according to movement speed and mass.

He stated that he sends e-mails or messages to the relevant people according to the severity of the speed or the size of the mass because it can be adjusted, but that he does not know how the radar in the Anagold mining system works, that it will be shown in the orientation training, that he heard that a new phase should be built in the heap leaching area and delivered in December, but that he heard that this activity was delayed, that the incident may have occurred due to overloading, that he does not know whether there is liquid accumulation in the area, and if there is, it may have triggered or caused the incident.

### Senol Demir

In the minutes dated 16.02.2024, he stated the following:

"I have already given a statement to the police regarding the accusation against me. My statement is true and to repeat it verbatim; I have been working as an oxide crusher engineer at Anagold AŞ for about 4 years.

I didn't witness the incident. Murat BAYRAKTAR is my superior officer.

He assigned me as an engineer in the crusher department. Our oxide director Hüseyin ÜSTÜNDAĞ had already made the last update in this way. As far as I know, there were two Karsa personnel in the container area, and I later learned that their names were Abdurrahman ŞAHİN and Hüseyin KARA. I found out later that the dozer and loader operators were also sitting there. Dozer operator is Mehmet KAZAR and Loader operator is Şaban YILMAZ.

As far as I know, Kaan Murat AKPOLAT is primarily responsible for these employees and Murat BAYRAKTAR is their superior. I also learned that a person named Fahrettin KEKLİK went to get his belongings from the container. However, Fahrettin KEKLİK is an administrative employee.

I don't know this person's superior. I know that two Karsa personnel took office on June 21, 2022. I know that the loader operator started 1.5-2 months ago and the dozer operator has been there for 4 years, since I arrived. Ramazan ÇİMEN is under my responsibility. He was working as a crusher supervisor shift manager.

I don't know why he was there at the time of the incident or who sent him. **As far as I am concerned, he left on his own decision together with his heap leach supervisor Kenan ÖZ...**"

Occupational health and safety trainings are provided strictly once a year. Ms. Gizem GAZCI was in charge of our department. As far as I know, Adnan KEKLİK was the ADR supervisor.

He was operating independently from the Hipliç area. I heard that Adnan KEKLİK also went out with Elif REYHAN and Kaan Murat AKPOLAT. I have no responsibility in the hippie field.

Responsible for this area are Soysal DOGAN (piping supervisor), Kenan ÖZ (stacking supervisor) Kaan Murat AKPOLAT (assistant engineer) Murat BAYRAKTAR (chief engineer) Hüseyin ÜSTÜNDAĞ (Oxide Manager). On the day of the incident, we received photographs of the cracks at around 08-15 in the morning.

These photos were sent to all my engineer friends, I was with Kaan Murat AKPOLAT, who was in charge of the hippocampus, and we went to the place where the cracks were at 0830 hours.

When I was there, there was Kenan ÖZ, the heap leach supervisor; Soysal DOGAN, the piping supervisor; Nazım KÖSE, the dozer and loader operator; Nazım KÖSE, the operator; and Hüseyin MÜREKKEPÇI, from the MÜREKKEPÇI manufacturers company. In the following process, Murat BAYRAKTAR, Berkay MISIR and two other people from his team, whose names I do not know, came to the scene.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

As I was leaving the field, he was continuing his inspections. On the way back, I met OHS Gizem GAZCI and Recep ÇALI. They were on their way to the scene by car. Later, I also met Isak Arslan from the project unit on the road. He was going to the area where the cracks were.

I went back to the crusher. For the routine inspection at the crusher, we went out again to the heap leaching area to check the inspection actions together with Hakan ŞAHİN, Safety Manager, Serkan KÖSE from the finance department and Mehmet SARITAŞ, crusher supervisor. The reason I left was because Kaan Murat AKPOLAT was busy.

When we were going to check this area for inspection around 9-30 pm, Kaan told us that it was closed and evacuated. He told me that he would be in the field and I should send an e-mail from my office that it was closed. All units related to occupational safety are registered in my e-mail. I sent e-mails to all of them around 10-40-10-50. I have been informed.

Normally this information is not my task. It's Kaan Murat AKPOLAT's duty. When I was there, the solution was being administered. The ADR unit will handle the solution. The head of this unit is Elif REYHAN. Elif REYHAN's superior is Murat BAYRAKTAR.

I heard that the solution was stopped before the accident. I guess that it slipped because the heaped up ore pressurized and exploded from the weak point. As far as I know, a team of 25 to 30 people was working on phase extension.

I know they were taken out urgently. I don't have any information about the radar system. I haven't received any information from this unit. Geotechnical engineer Ali Rıza KALENDER and his team are responsible for the radar unit.

I don't know who was responsible for Ali Rıza KALENDER. The material that comes out of our crusher and becomes ready is weighed daily on the scale and goes to the leaching area and is reported daily. An average of 7-8 thousand tons of material per day is crushed and sent to the leaching area. I have not received any information that there is a puddle of liquid in the subsoil.

I made no such observation. I know that 12 kg of cement 2 kg of lime per ton in accordance with the standards in the mixing tool called aglemerator is put between 25-35 m3 of water from the machine as an automatic system.

I think that the cracks are not due to a lack or excess of cement or other material. I do not accept the accusations against me.


**Murat BAYRAKTAR**

In the report dated 16.02.2024; the suspect stated the following his statement

I still reside at the above address. I repeat exactly the statement I made at the police station. We have daily routine meetings. While I was in the meeting, I was told by Kenen ÖZBEY around 8.30 in the morning that there were cracks in the heap leach via the teams application, so I left the meeting and went to the heap leach area alone to see the cracks. Around 08.45, I informed Hüseyin ÜSTÜNDAG, who was in charge of the main oxide process, where I took his place. I continued to provide information at later stages, which I will describe in detail below. He even saw my diligence and devotion and told me to evacuate the area, stop production, close the roads and prepare a presentation in congratulations.

He made a presentation on the morning of February 14 and told me to share a sample study with the manager. Our supervisors Kaan, Ramazan, Kenan and I were in the field. In the field, we first started to investigate. In the meantime, we called Berkay MISIR and told him that there were cracks in the area and asked him to examine the radar system. When checked by radar, it was said to have a speed and displacement of 70 mm. Normally, we should be alerted when the value is observed between 20 and 50. I was told that the crack had started to accelerate on Monday around 11.00 a.m. when I went to Berkay and Ali Rıza with Kaan. I saw that the value ratio was 70 percent.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

We then asked why we had not informed them. I was told that the drawing and evaluation of the eastern region was not included in the sms system and that no measurements could be taken in the eastern region. Back to 09.30; when I arrived at the scene, I gave instructions to close the roads. I then attended the meeting at 10.00.

Me, Iain, Abdulkadir, Can Serdar, Burak and Izzet were at the meeting. Mr. Abdulkadir was making the presentation. During the meeting, Can Serdar told me outside the meeting hall that he did not want the Iain photos to be published. I was told that there were cracks in the heap leach area.

After the meeting, Can Serdar, me, Burak, Iaian, and Kaan went upstairs and looked at the area. I told them that the stack and crusher operation in the oxide unit would not work and that the operations were stopped, and then the team with Can Serdar left the scene.

Later, Berkay and Ali Rıza also came to the site and investigated. I have been told by Ali Rıza that these cracks are superficial and there will be no problems, that they can be closed with cement and that such cracks are usual on the side. Kaan Murat AKPOLAT witnessed this incident. I don't know if Berkay heard what I was told.

So I asked Ali Rıza to send me an e-mail of this incident. Mr. Ali Rıza said he would send me the e-mail. He sent me an e-mail around 1:00 p.m. He said that there was a sudden rise in the Heap leach area and vibrations increased during the field inspection in the content of the e-mail.

He said the cracks should be filled with a excavator. Based on his instructions, I returned to him and raised questions, but there was no response.

When there was no response to the email, I called Ali Rıza on the phone at around 1:30 p.m. and asked him what the situation was and he told me that the values were on the rise and that he had gone to dinner.

Later, when I called him again and asked him about the situation around 13.45, he told me that the values had risen even higher, up to 400 mm/g.

I knew it was an emergency, so Ali Riza and I told Iain about it. I was informed that the values had risen but I was not given any instructions.

I had a mandatory meeting to attend at 14.00. I learned from Dilara ÇOR that I was a mandatory participant in this meeting. I participated.

Then Ali Rıza and Berkay left their vehicles on the ramp between lifts 32 and 33 in the southern part of the heap leach and walked to the Heap leach.

At that time I was in a meeting in my car using the Teams app.

I was in the heap leach field for about 10 minutes. When I was here, I didn't see Adnan, Kaan, Elif or the three strangers. I didn't see anyone in the area, including Soysal. So I went back to my office and continued the meeting. Adnan, Ramazan and Kenan entered the field without my knowledge. According to what I heard from Kaan and Elif, Adnan drove into the heap leach area alone behind them. In fact, 3 foreigners (Jonathan, Alan and Patrick) wanted to cross the road in the piping offices area controlled by Soysal, but Soysal called Kaan, who was below me but above him, and informed him.

Kaan then took Elif and went to the door, followed by Adnan. I have no knowledge or involvement in the entry of these people. I have been working in the company for 13 years. I was oxide ADR operations chief for the last 2 years. In the last year, I have been working as chief engineer of oxide operations. One day before the incident, I was in charge of the heap leach area as the temporary deputy of Hüseyin ÜSTÜNDAG. On the day of the incident, I realized the danger and informed the geotechnical department myself at around 09.30.

I requested urgent radar analysis. Not content with this, they even told me verbally that there was no problem, but I asked for a written examination of this situation. Burak ARTAL's statement was read and he was asked what he had to say- I partially agree with the statement of the person. There were meetings and conversations, but I did not imply that I am in charge of this area and everything is under my control. I cleared the area with all the authority in my power. I did not request the meeting at 15:15.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

TRANSLATION

I asked for an emergency meeting. The container under the heap had been in its current location for about 6 years. Gathering areas are determined by OHS. Containers housing piping teams have also been in place since 2022 as emergency assembly areas. OHS teams revise and relocate in the face of risks. For this reason, the only thing I can say as the acting manager of the oxide processor is that the possibility of a heap-up could not be foreseen due to the fact that ISG has designated an emergency gathering, safe zone area where the container areas of the heap leach area are located. As I said, it was already designated as a safe zone.

As far as I remember, the decision to make it a safe and assembly zone was taken during Selçuk ÇİFTLİK's time. In November-December 2023, a presentation was made by the Nail Bar company on the deficiencies in the radar system in the Eastern region. Ali Rıza , Berkay, İzzet, Kenan, Iain, Özgür KAYA, Ali SERT and Faruk were also present at this presentation.

At the end of the meeting, as far as I remember, it was stated that the positioning of a radar for the eastern region was mandatory. It was even said that the cost of this radar was 45.000 Euros. I don't know why the radar was not taken afterwards. I don't know if it is about in the budget etc. The mine manager for this project is Mr. İzzet or Mr. Özgür. At the same time, blasting is carried out in the south and south west of the heap leach with the cooperation of the project department, mining department and Çiftay. I think that these blasts cause 70 percent of heap leaching to move. I think that the routine blasting at the mine site every day may have affected around 10 percent.

There is a reporting system called tarp used in our unit. Accordingly, 0-20 is the usual obligation, 20-50 is the obligation to notify the immediate supervisor, 50-75 is the obligation to notify the chief engineer, and over 75 is the obligation to notify the manager and operations chief. No radar notification was made to me by the geotechnical teams on the day of the incident. That's why I was not able to give any early notice. We were not sent the breakdown of the movement close to 90 mm around 18.00 on February 6 in the graph you showed me. On 13. 02.2024 at 13.00, Ali Rıza informed that the shift was approaching 200 mm. If the notification had been made in time, there could have been a complete shutdown and perhaps no loss of life.

Since we were informed too late, I did my duty to evacuate my area. The heap leach area is approximately 61 million tons in size. The landslide mass is thought to be around 10 million cubic meters. We did it in the heap leach field without going out of the stack design system. There is no overrun. We are practitioners. Project work is carried out by the project department and the relevant units of the ministry. The foreign-based company named GRE prepares the drawings and projects through the company named INR in the country and submits them to the ministry, and then the project is activated with the control of the ministry.

The GRE company supervising this project is Louis Inturg.... At the same time SSR senior metallurgist James Harold organized meetings twice a month. It reports its relevant comments and opinions to us. About 1 or 2 years ago, he did the inspection and left. This project has been active since approximately 2010, when it moved from Phase I to Phase 4. It has been in Phase 4 for about 3 years.

On December 21, area 4b1-3 was supposed to be handed over to oxide operations by the project department, but the handover date was postponed to February 29. This is important because the area to be transferred would act as a kind of cushioning, filling in the south and southwest area of the Heap leach. The fact that the containers remain in the same place despite the growth of the area is due to the upward growth of the area.

We even have batch operation containers in our heap leach area. Kenan Özbey Nazım Köse, Keklikler AŞ and Asilçöpler AŞ employees were on board these containers. On the day of the incident, I told these friends to leave the area through Kaan. On the 3rd page of the 3rd page of the statement taken by the police, I perceived the 3rd question as the entire mine site.

72



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

That's why I said it was the ISG department's duty. I did everything I could within the scope of my duties and powers. I separated about 30 people from the area. I do not accept the accusations against me. That's all I have to say. He said. "I fully agree with my client's statements. As soon as he found out about the cracks in the heap leach field, he stopped the activity. He blocked the necessary roads, discontinue the field solution.

All employees, including subcontractors, were evacuated from the area. It has implemented a related emergency action plan. The client has fully fulfilled all the responsibilities of his duty. The expert report, which shows that the client is primarily at fault, does not include my client's statement.

Even this point clearly shows that the expert report is incomplete and erroneous. We therefore strongly disagree with the primary negligent in the expert report. In addition, the project of the heap leach site is supervised by consultant companies. My client is only an implementer here. After the implementation, the consultant companies audited the implementation again and gave their approval. No work has been done contrary to the design and project. After the evacuation, the missing persons under the soil re-entered the area without my client's knowledge and consent. If my client had known about this, he would never have allowed this to happen. At the same time, my client is a person who is both competent and ready to provide assistance if necessary and has 2 children aged 11 months and 7 years.

We are of the opinion that the material reality in the file will be revealed correctly by applying all of them, including the harshest form of house arrest or protection measures such as not leaving the mining area. We request that a request be made in this direction. Therefore, we are of the opinion that he is not at fault. First of all, we demand his release, otherwise we demand the application of judicial control provisions.

### İzzet TEKİN

In his statement dated 02.03.2024, he stated the following

He had been working at Anagold Madencilik AŞ as Chief Geology Engineer since May 2022, he was working in the mine site department until 12.02.2024, and after 12.02.2024 he was working in the newly created Geology department, he was in charge of ore control in the field and controlling development drilling.

Doğukan AŞKIN, who is the manager of the geology department, is the supervisor of the geology department, he reports to him, there are 2 geology engineers and 19 workers working under him, the workers who were buried under the soil were not in his sub-unit, he did not have any information about the heap leaching area, it was an area outside the area where he worked, he did not receive any information about heap leaching cracks or any other incident until the day of the incident, Berkay MISIR, the geology engineer who followed the radar on the day of the incident, informed him at around 08.15. He thought that they had recommended that work and irrigation in the heap leach area be stopped, that there was no recommendation for the mine site, that the radar system could monitor part of the mine site and part of the leach site, i.e. the western part, that he knew that MAPEG supervised the part of the mine site for which he was responsible, and that the mining and land rights department might have information on this, although he was not aware of it.

He heard that the oxide operation unit was responsible for the leach field, that his manager was Hüseyin ÜSTÜNDAG, that he did not know the duties of Uğur YILDIZ (truck driver), Adnan KEKLİK (oxide operation supervisor) and Kenan ÖZ (oxide operation supervisor) who were under the ground, that he went out when he felt a vibration in the event that the incident occurred while he was in an online meeting in his office in the mining department related to another issue at the time of the incident, and that there was a shift in the heap leach area from other employees.

He said that he had no special duty in such an emergency, that he had heard that the landslide in the heap leaching area might be related to the over-solution of the solution, that he had no information about the amount of material dumped per day, how many steps the leaching area consisted of, how much area it covered, or the private companies that carried out inspections.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

He stated that only the unit officials know the technical issues, that in the event of a vibration or other situation that would affect the work in the mining area, if this is confirmed by the geotechnical team and in the event of a visible problem, they are generally informed by the geotechnical team that the work in the mining section should be stopped, and recommended that radar and robotic monitoring devices should be included in the budget for the department in 2022-2023.

With the purchase of radar devices, he received verbal approval in December 2023, but he received the information that it could be obtained in April within the budget of 2024, that he learned about the radar movement for the first time on the day of the incident, that he knew that there was no notification to the subcontractor companies in the mine site, that there may have been a notification to the subcontractor company in the heap leach area, that in case of any problem in the mine area, the notification should be made by the geotechnical team or by the mining operation chief Fuat YILMAZ, that the explosion was made as usual around 12.15 on the day of the incident, and that the distance to the heap leach area was more than 1.5 km, and he could not fully know whether the explosion would affect the leach heap because he was not a mining expert.

However, there was a time difference between the time of the blasting and the time of the flow of the lump leachate and considering the distance from the blasting site, he did not think that there would be any impact; he did not know when, for what and on whose instructions the containers were placed there as he had never been to the site; he did not know whether any measures were taken to address the cracks other than the advice he had heard mentioned above; he did not receive any mail about the cracks.

Therefore, he said that he did not inform anyone, that although 16 hours of occupational health training is compulsory every year, we, as the geology department, receive training for a maximum of half an hour per week, that he was obliged to inform Mr. Mehmet TÜRK, who was working in the geology department at the time of the incident, but was only in the orientation process, but that he could not transfer such information to the mine manager because he did not receive a stop notice that there was any problem with the mining department.

However, Kenan ÖZDEMİR, the operations director responsible for the entire site, stated that he was authorized to stop the mine work.

### Kaan Murat AKPOLAT

In the minute dated 02.03.2024; in the minute dated 02.03.2024 he declared that:
" I have been working as an assistant process engineer at Anagold Madencilik AŞ for 17 months. Elif REYHAN (assistant process engineer), Şenol DEMİR (production engineer) and I all three of us go to the heap leaching area daily and make the necessary controls. My immediate superior is chief engineer Murat BAYRAKDAR. Kenan ÖZ (supervisor in charge of the heap) and Soysal DOĞAN (piping unit) appear to me on the list. I can give them the instructions I received from Murat BAYRAKDAR. And they will fulfill it.

Although I don't know the exact date of the start of the mass liquidation, I had heard that it had been going on for 10 years. A design project is prepared by GRE, a US company.

This project is approved in Turkey. After this approval process, it comes to the project department of Anagold AŞ and the boundary zones of the leaching area are determined by the cartographers in this department. According to these limits, the material is passed through the crusher unit and after the necessary mixing and processing in the agglomerator device, the material is started to be piled up in the leaching area with the belt system.

As the material is piled up, it is spread by dozers and construction equipment. Then pipe laying is done and the pipes are supplied with solution. I know that this is how it is done. in the interim periods of 2-3 months, very small cracks were observed and photos of these were sent to GRE, the auditor company,and the company was not advised by the company to close the cracks by blending the cracks with its own material. These closed cracks are natural cracks.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

We have never seen such a big crack before. GRE company comes for inspection approximately every 3 months. I have not been inspected by the ministry. Perhaps this inspection was observed by our managers. The oxide process department, environmental department, occupational health department, geotechnical department and project department are responsible for the leach field.

I know Hüseyin ÜSTÜNDAG as the manager of the oxide process unit, Can Serdar HASTÜRK as the manager of the environmental department, Selçuk ÇİFTLİK as the manager of the occupational health unit,and Ali Rıza KALENDER as the manager of the geotechnical unit. I know the skills of the nine workers buried under the ground. I think that Uğur YILDIZ (driver in the mining department), Kenan ÖZ (stack supervisor), Ramazan ÇİMEN (crusher supervisor) , Adnan KEKLİK (ADR, CART Supervisor), Mehmet KAZAR, Hüseyin KARA, Abdurrahman ŞAHİN and Şaban YILMAZ are subcontractor workers and could be dozer/loader drivers.

Fahrettin KEKLİK is an administrative affairs personnel and I know that the head of the administrative affairs unit is Cengiz ŞAHİN. At around 08.00 when the incident occurred, Nazmi KÖSE, a bulk operator, called Şenol DEMİR, the production engineer. Şenol DEMİR and I share the same room. Nazmı KÖSE told Şenol DEMİR that he had fractures in the heap paving area.

Afterwards, Şenol DEMİR and I set off to go directly to the site of the fractures that had been reported to us. Nazım KÖSE may have called Şenol DEMİR because he saw that he was more experienced. It is enough when one person is already informed. After we went to the field, we had already informed Murat BAYRAKDAR, our superior, about the cracks.

When we arrived at the field, we participated in the daily production meeting through the Team's program. As far as I remember, I was driving the car. I don't remember whether I attended the meeting from my phone or through Şenol DEMİR's session. In this meeting, Kenan ÖZ, the supervisor of the heap leach, informed Murat BAYRAKDAR, the chief oxide engineer, about the fractures that occurred in the heap leach. Because Kenan ÖZ has the task of controlling the heap leaching area.

He was already there when we left. Murat BAYRAKDAR informed everyone and said that he would come to the field. Şenol DEMİR and I told Murat BAYRAKDAR that we were on the field and that they should come here. Soysal DOGAN was present at the time. Immediately after the meeting, we distributed tasks among ourselves.

I called Berkay MISIR, an assistant engineer from the geotechnical department. I told him to take his superior, Ali Rıza KALENDER, and come to the field.

I gave this instruction as an instruction from Murat BAYRAKDAR. After the meeting was over, Şenol DEMİR and I got out of the car and started to examine the fractures. Around 30 workers from the project department were laying the membrane.

Then Gizem GAZCI, engineer from OHS, Recep ÇALI, engineer from the Environment department, and Murat BAYRAKDAR, chief oxide engineer, arrived at the site of the fractures. While we were waiting for the geotechnical team, Murat BAYRAKDAR told us to evacuate the area and close the road. There are two routes to heap leaching. One by the furnace and the other by the piping offices.

Murat BAYRAKDAR said that the road should be blocked in front of the offices of the piping team and that those coming should go to where the piping team is located.

On the road on the quarry side, the construction equipment removed material and then pontoons called newjerse were put in place. Bollards were also placed in front of the office where the piping team was located. The workers at the site were project department workers. We told them to come out. The workers said they had the materials. I called İshak ASLAN, an engineer working in the project department, to inform him and to speed up the evacuation.



75

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

Ishak ASLAN came on the field. Murat BAYRAKDAR left the field saying that he would explain what he had seen at the directors' meeting to be held at 10.00 am. In the meantime, we were evacuating and closing the area and taking the materials to a safe area. Murat BAYRAKDAR gave us all the instructions about the area.

Afterwards, Şenol DEMİR also left the area to send an e-mail. Şenol DEMİR sent the road closure notification e-mail at 10:50 a.m. to the common e-mail group named İliç White, which includes the occupational safety department, maintenance department, oxide process operation department, sulfide process operation department, mining department and Anagold employees, stating that the road was closed until further notice. As far as I know, the subcontractor authorities are not aware of this e-mail notification to İliç White.

After we evacuated the area, Berkay MISIR from the geotechnical department and two people I did not know came to the area and made an inspection. Berkay MISIR showed me the radar map and explained the situation to me. He said that there was a movement but Ali Rıza KALENDER, who was in charge of the main department, should come and take a look and that Ali Rıza KALENDER would come.

He showed me a photo of the radar map. Later on, Murat BAYRAKDAR went to the scene of the incident together with Burak ARTAL, the chief engineer of OHS, Can Serdar HASTÜRK, the environmental engineer, and Iain Guille, the vice president of operations, to conduct a reconnaissance, and Murat BAYRAKDAR called me and I joined this reconnaissance later on. I told those present what Berkay MISIR had told me and showed them the radar image he had sent me.

Berkay MISIR told me that he couldn't make sense of it and pointed to Ali Rıza KALENDER about the importance of the event. Iain asked me to e-mail you the footage. I sent the images by e-mail at 10.52 pm. While we were in the field, Murat BAYRAKDAR said that the field was closed and that he would inspect the field together with Ali Rıza KALENDER after his arrival. Murat BAYRAKDAR told Lain that a meeting would be held with the oxide department about how the solution in the area would be managed and whether it could be discontinued or not, and that Lain would be asked for a decision.

Ali Rıza KALENDER came to the company at a time I can't remember the exact time, but it could have been around 12:00. Murat BAYRAKDAR, Ali Rıza KALENDER, myself and a person I didn't know went out to the field. Ali Rıza KALENDER examined the area.

He said that heap leaching work in the area should stop, that construction workers could work, that there was a settlement movement in the area, and that these cracks could be closed with construction machinery together with cement. Ali Rıza KALENDER can make such a recommendation, but we receive instructions from Murat BAYRAKDAR in the leaching area and we can stop work or carry out other work accordingly. Murat BAYRAKDAR said that Ali Rıza KALENDER should be sent a written e-mail and that he should send a technical information, otherwise he would not do what he said. We went down and started to have a meeting on how to manage the solution at around 13.20.

In this meeting, I, Şenol DEMİR, assistant process engineer Elif REYHAN, ADR supervisor Adnan KEKLİK, piping supervisor Sosyal DOGAN were present. At this meeting, we explained how to manage the solution in case it is interrupted. We told this to Murat BAYRAKDAR. Murat BAYRAKDAR said I will ask Iain about it and he will tell us the decision.

Very soon he came back to us and told us to stop the solution and we stopped the solution. Adnan KEKLİK called a member of his department and told him to stop the solution. Ali Rıza KALENDER sent us an e-mail about the heap-ups, but there was no information about the accessibility of the workers he mentioned above. He said the area could be fixed with cement.

He called a halt to the mass murder operation. This incident took place when Murat BAYRAKDAR went to get approval from Lain for solution cutting. I wrote what Murat BAYRAKDAR had said on his own computer and sent it to Murat BAYRAKDAR as an e-mail. After 15-20 minutes, I was told by a person whose name I don't remember that there was a noise coming from the pipes.

I, Elif REYHAN and Adnan KEKLİK set off for the piping office. Since Adnan KEKLİK was responsible for the solution flow in the pipes, I and Elif REYHAN decided to go together since we had a control duty at the Leach site.

76



I, the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature

SWORN
TRANSLATION

I think Adnan KEKLİK made an assessment that it was his duty. Because Murat BAYRAKDAR did not give me such an instruction. That's when we met Berkay MISIR. Berkay MISIR told us that the fractures had increased. We were told by the construction manager (I know the name of a different company as Patrik) and two other foreigners that I did not know that these people knew about construction and that they would look into the status of the construction.

I was authorized in this field, so I went out with him. Meanwhile, Kenan ÖZ, Ramazan ÇİMEN, Soysal DOGAN, İshak DEMİR and one other operator, who I know was under Murat BAYRAKDAR's instruction, were on the inspection. We told them to evacuate the area.

5-10 minutes after I said that, landslide occurred.

Murat BAYRAKDAR asked me to send him photographs of cracks in the field. I just told Soysal DOGAN and İshak DEMİR to take photos at leach 30. I'm Elif REYHAN and three strangers went up to the top Leach level for inspection. While we were here, the land started to slide… " This is how it happened. In my time there was not much loading. There was only occasional puddling, but it was fixed with minor operations.

I know that about 7-8 tons of material is being piled up per day at the moment.

This is already communicated via e-mail. GRE and INR companies were able to carry out normal inspections about once every 3 months and drone inspections once every 1 month. The trigger action plan specifies the moment when the stack will be closed. I know that such an instruction will be given to me by Murat BAYRAKDAR. I have no knowledge of radar systems. I know that Berkay MISIR and Ali Rıza KALENDER are the geotechnical unit related to radar systems. It is Murat BAYRAKDAR's authority to stop the piping workers.

The construction work was stopped, but I know that Murat BAYRAKDAR gave instructions so that the piping workers could stay there for inspection. I don't know which department will inform the subcontracting authorities.

On the day of the incident, I heard no explosions in the immediate area. I don't know who is giving information about the containers being there. The solution was discontinued at 13:58. Occupational health and safety trainings are held every 3 months and every 6 months. There is also general training once a year. I believe that Kenan ÖZ and Ramazan ÇİMEN were there at the leach site for control purposes upon Murat BAYRAKDAR's general instruction to check the area.

I know that Fahrettin KEKLİK was attached to the administrative affairs unit, and that the supervisor of this unit was Cengiz ŞAHİN. I have nothing further to add." Defendant Attn Cem AKTOLGALI : "We agree with the client's statements. The client is not in a position to know the meaning and significance of the cracks there. It also has no ability to interpret radar. For these cases, the company has a geotechnical unit,which is not only responsible for radar.

Responsible for monitoring areas and reporting such hazards. In addition, this duty of the geotechnical unit is written in the trigger action plan we have submitted to the file. The client didn't take anyone there without a mission. He was also present during the incident. It is clear that he did so in accordance with the oral and written information he received from the geotechnical unit.

This is all we have to say."



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

## 4. REVIEW OF RELEVANT LEGISLATION

### 4.1. 15.06.1985 DATED 18785 NUMBERED MININGLAW , OBLIGATIONS UNDER THE MINING ACTIVITIES IMPLEMENTATION REGULATION

- *Under the Purpose title of the Mining Law No. 3213; "Article 1- This Law regulates the principles and procedures regarding the exploration, operation, ownership and abandonment of mines in accordance with national interests."*

- *Under the title of Operation activity of the Mining Law No. 3213; Article 29 – (Amended- 4/2/2015 – 6592/14 article) Operation activity is carried out according to its project and the relevant provisions of this Law. In case it is determined that activities contrary to the operation project have been carried out, the license holder shall be given a period of up to six months to carry out activities in accordance with the project. If no activity is carried out in accordance with the project at the end of this period, an administrative fine of 50.000 TL is imposed and the production activity is stopped.*

*However, if it is determined that the activities contrary to the project are dangerous for the enterprise, production activities are directly stopped until the dangerous situation is eliminated. Operating projects and amendments must be submitted to the General Directorate before they are put into practice. Otherwise the production activity is stopped. Documents related to enterprise projects and their amendments, as well as the procedures for the suspension of the activities of the enterprises shall be made mutually accessible electronically by the Ministry of Labor and Social Security and the Ministry.*

*Reports, projects and all technical documents prepared by authorized legal entities shall be submitted to the General Directorate by the license holder. The license holder is obliged to submit to the General Directorate until the end of April each year the technical documents related to the operation activity carried out in the previous year, the operation activity report and the information related to the exploration if exploration has been carried out in the operation area. If the obligation is not fulfilled, an administrative fine of 30.000 TL is imposed. Production activity is suspended until the obligation is fulfilled."* -article 125th of the Mining Regulation published in the Official Gazette dated 21 September 2017 and numbered 30187, titled Duties, powers and responsibilities of the permanent supervisor, reads as follows: "(1) Duties, powers and responsibilities of the permanent supervisor-

a)The permanent supervisor carries out the supervision duty within the scope of the Law and this Regulation.

b) Plans, coordinates and ensures the execution of mining operation activities within the license area in accordance with the operation project.

When there is a dangerous situation that is contrary to the operation project, it recommends the necessary measures to be taken and supervises the measures to be taken.

c) The permanent supervisor supervises the compliance of the measures taken in relation to occupational health and safety.

C) Ensures that preparation, production and all operation activities within the license area are carried out in accordance with the operation project.

d) It is obligatory to keep a separate permanent supervisor book for each field where a permanent supervisor is appointed, and in case more than one permanent supervisor is appointed in a field, it is obligatory to keep a separate book for each supervisor.

e)The permanent supervisor is authorized to carry out inspections and obtain all necessary information related to his/her duty and to ensure that the necessary measures under the Law are taken. Any liability arising in case this authorization is not exercised and the measures are not fulfilled shall be borne by those who request the appointment of a permanent supervisor.

f)The permanent supervisor is obliged to examine the compliance of the activities of the enterprise to which he is assigned and for which he is responsible with the project every day of operation and to record his findings and suggestions in the permanent supervisor's book at least once a week. If a new situation arises in the enterprise within this period, this issue is recorded in the book on the same day. Otherwise, the permanent supervisor shall be warned by the General Directorate.



78

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

If these obligations are not fulfilled for the second time in relation to the same license, the declarations to be made by the permanent supervisor in accordance with the Law shall be deemed invalid for one year. In each repetition of the act, the disqualification will continue. The applied warning and disqualification shall be notified to the Chamber of Mining Engineers.

g) The permanent supervisor's book must be signed by the permanent supervisor and the license holder/raw material production permit holder/royalty owner/operator.

The maintenance of the permanent supervisor's book is the responsibility of the permanent supervisor's employer.

## 4.2. OBLIGATIONS UNDER THE ENVIRONMENTAL LAW DATED 09.08.1983 AND NUMBERED 2872, THE ENVIRONMENTAL IMPACT ASSESSMENT REGULATION DATED 29.07.2022 AND NUMBERED OG - 31907, THE MINING WASTES REGULATION DATED 15.07.2015 AND NUMBERED OG - 29417, THE REGULATION ON THE RESTORATION OF THE DEGRADED LANDS TO NATURE WITH MINING ACTIVITIES DATED 23.01.2010 AND NUMBERED OG - 27471

**Implementation Articles of the Environmental Law No. 2872 Related to the Incident Subject to Investigation; …, "Article 3- (Amended- 26/4/2006-5491/3 article) The general principles regarding the protection, improvement and prevention of pollution of the environment under the** Title of Principles are as *follows-*

*a) Everyone, especially the administration, professional chambers, associations and non-governmental organizations, are responsible for protecting the environment and preventing pollution and are obliged to comply with the measures to be taken and the principles determined in this regard. "...",*

*f) In order to use natural resources and energy efficiently during all kinds of activities, it is essential to use environmentally compatible technologies that reduce waste generation at the source and ensure the recovery of waste.*

*g) Expenses incurred for the prevention, limitation and remediation of pollution and degradation and for the improvement of the environment shall be borne by the polluter or the person causing the degradation.* The necessary expenditures made by public institutions and organizations due to the polluter's failure to take the necessary measures to stop, eliminate or reduce pollution or deterioration, or due to the direct taking of these measures by the competent authorities, shall be collected from the polluter in accordance with the provisions of the Law No. 6183 on the Procedure for Collection of Public Receivables. ", "...","Article 8 - It is forbidden to directly or indirectly discharge, store, transport, remove or carry away all kinds of wastes and residues into the receiving environment in violation of the standards and methods set out in the relevant regulations in a way that harms the environment. In cases where there is a possibility of pollution, those concerned are obliged to prevent pollution; in cases where pollution occurs, the polluter is obliged to take the necessary measures to stop pollution, to eliminate or reduce the effects of pollution.", "...", under the heading of Environmental Impact Assessment ; "Article 10 - (Amended-26/4/2006- 5491/7 Article) Institutions, organizations and enterprises that may cause environmental problems as a result of their planned activities are obliged to prepare an Environmental Impact Assessment Report or project introduction file. *Unless an Environmental Impact Assessment Positive Decision or Environmental Impact Assessment Not Required Decision is obtained, no approvals, permits, incentives, building and occupancy licenses can be granted for these projects; no investment can be started and no tender can be held for the project. (Canceled third paragraph by the Constitutional Court Decision dated 15/1/2009 and numbered E.-2006/99, K.-2009/9) The projects subject to Environmental Impact Assessment and the plans and programs subject to Strategic Environmental Assessment and the procedures and principles related to the subject shall be determined by regulations to be issued by the Ministry.", "...", under the heading of* **Obligation to obtain permits, treatment and disposal**; *"Article 11 - (Amended- 26/4/2006-5491/8 Article) Facilities and enterprises and settlements that are not deemed appropriate to directly or indirectly discharge their wastes generated as a result of production, consumption and service activities to receiving environments are obliged to treat and dispose of their wastes in accordance with the standards and methods specified in the regulations and to obtain the prescribed permits.*



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

TRANSLATION

Facilities, enterprises and settlements that have the obligation specified in the first paragraph shall not be granted a building license unless they submit the projects and documents showing that they will fulfill this obligation to the relevant institution at the building license stage. "

...",The permits required to be obtained for the implementation of this Law and the procedures and principles governing such permits shall be determined by regulations to be issued by the Ministry. Institutions, organizations and enterprises that may have negative impacts on the environment due to their activities are obliged to prepare emergency plans to be implemented in order to control and reduce the negative effects of the accident on the environment in the event of an accident related to their activities. The procedures and principles regarding this shall be regulated by a regulation to be issued by the Ministry. ","...",

"Article 12 - (Amended- 26/4/2006-5491/9 Article) The authority to inspect whether the provisions of this Law are being complied with belongs to the Ministry. When necessary, this authority shall be delegated by the Ministry to special provincial administrations, municipalities establishing environmental inspection units, Undersecretariat of Maritime Affairs, Turkish Environment Agency, General Directorate of Security, Gendarmerie General Command and Coast Guard Command (...). Audits shall be conducted within the framework of the audit procedures and principles determined by the Ministry. ",
"...",Hazardous chemicals and waste under the heading;

"Article 13 - (Amended- 26/4/2006- 491/10 Article) Procedures and principles regarding the identification, production, import, usage areas and quantities, labeling, packaging, classification, storage, risk assessment, transportation and export of hazardous chemicals until they become waste shall be determined by a regulation to be issued by the Ministry by taking the opinions of the relevant institutions and organizations. Those engaged in the production, sale, storage, use and transportation of hazardous chemicals and (...)17 the collection, transportation, temporary and interim storage, recovery, reuse and disposal of wastes and waste management companies are jointly and severally liable for the obligations imposed by this Law. The responsible persons are obliged to take out hazardous chemical and hazardous waste financial liability insurance against the damages they may cause to third parties due to an accident arising from their professional activities specified in this Law, and they shall obtain the necessary permission from the Ministry before starting their activities. Institutions, organizations and enterprises that do not comply with the obligation to take out insurance are not allowed for these activities.","... ",

Additional Article 1- (Annex- 26/4/2006-5491/23) of the Environmental Law; "... ","b) The procedures and principles regarding the recovery of the natural structure degraded by excavations, castings and wastes left to nature for quarrying and mining activities, material and soil supply shall be determined by the regulation to be issued by the Ministry by taking the opinions of the relevant institutions."


**4.2.1. Articles of the Regulation on Environmental Impact Assessment dated 29.07.2022 and numbered OG- 31907, prepared on the basis of Article 10 of the Environmental Law dated 9/8/1983 and numbered 2872;**

**Under the Title of Authority;** "ARTICLE 5- (1) The authority to make "EIA Positive", "EIA Negative", "EIA Required" or "EIA Not Required" decisions on projects subject to this Regulation belongs to the Ministry. However, the Ministry may delegate its authority to the Provincial Directorate to decide whether "EIA is Necessary" or "EIA is Not Necessary" in cases where it deems necessary."


**Under the title of the obligation to prepare an environmental impact assessment application file, an environmental impact assessment report or a project introduction file;** "ARTICLE 6- (1) Natural or legal persons who plan to carry out a project within the scope of this Regulation are obliged to prepare the EIA Application File and the EIA Report for their projects subject to Environmental Impact Assessment, and the Project Introduction File for their Projects Subject to Environmental Impact Preliminary Examination and Evaluation, to have the Ministry-qualified institutions/organizations prepared, to ensure that they are submitted to the relevant authority and to comply with the commitments they make within the scope of the project."



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

Under the title of **monitoring and audit of the investment**; "..., ARTICLE 18- (1) The Ministry monitors, controls and audits whether the issues committed in the final EIA report based on the" EIA Positive "decision or the project introduction file based on the" EIA Not Required "decision have been fulfilled in relation to the projects for which the" EIA Positive "decision or the" EIA Not Required "decision has been made. The Ministry checks the accuracy of the works and transactions specified in the project progress reports.",  under the title of **Capacity increases**; " ..., ARTICLE 20- (1) In the event that it is planned to increase the capacity and/or expand the area in projects with an "EIA Positive" or "EIA Not Required" decision and a threshold value, the amount of each capacity increase shall be collected with the existing project capacity and if this sum remains above the threshold value in the list in Annex-1, an application shall be made within the scope of Article 8. (b) If it remains above the threshold value in the list in Annex-2, an application shall be made within the scope of Article 16. <u>(2) In the event that capacity increase and/or expansion is planned in projects with "EIA Positive" or "EIA Not Required" decision, impacts of the planned project, cumulatively assessed together with the environmental impacts that are the basis for the current decision." "...</u>"

_Annex-3, General Format of Environmental Impact Assessment, Section III - Environmental Impacts and Measures to be taken during the Construction and Operation Phase of the Project_ ;

the necessity of taking "a) Identification of potential problems that may affect the environment, amount of pollutants, interaction with the receiving environment, determination of cumulative effects. b) The impact of the project on climate (nature and magnitude of greenhouse gas emissions) and how the project will be affected by climate change, c) The risk of disaster or accident related to the project due to climate change, d) Measures to be taken to mitigate the negative impacts of the project on the environment.(...)".

**4.2.2.  15.07.2015 dated and OG - 29417 numbered Mining Waste Regulation Articles Related to the Incident;**

**Chapter Two, General Provisions, Duties, Authorities and Obligations**,  under the heading "ARTICLE 5 - (1) During the temporary storage, transportation and processing of mining wastes, it is essential to use methods and processes that will not create risks for water, air, soil, plants, animals and humans, will not cause disturbance through noise, vibration and odor, will prevent the natural environment from being adversely affected and thus will not harm the environment and human health." (...), (3) It is essential to select and apply the best available techniques and technologies in the management of mine waste, taking into account the principles of sustainable environment and human health and sustainable development.

**Duties and powers of the Ministry ARTICLE 6 - (1)** Under the heading of  "..., C) To evaluate the waste management plan prepared for mine waste disposal facilities." Under the heading of **duties and obligations of the operator** e) To have the construction supervision of the facility where mine wastes are stored and the reporting works related to the construction supervision carried out in accordance with the procedures and principles determined by the Ministry, (...),  g) In the case of tailings piles from the parameters in Annex 5 of **the Mining Waste Regulation**, for which the financial guarantee is responsible for the Category A mine waste disposal facility, in the risk assessment - Size and characteristics of the facility, - Quantity and nature of the waste in the facility, - Slope angle of the heap, - Potential for internal groundwater formation in the heap, -The stability of the ground, - Topography, - Proximity to waterways, structures and buildings, - If there is a possibility of any permanent or long-term environmental impact as a result of a possible landslide / landslide type structural failure to the stability of the material heap -Depending on topographical constraints, if the design of the facility is not adequate against potential collapse-type deterioration, the facility should be classified as Category A.



81

ne sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

Under the title of **impermeability system of the facilities where mining wastes are stored**; "ARTICLE 11 – (1) The permeability and conductivity properties of the rocks in the area where the facility will be established are determined by conducting a geological, hydrogeological, geochemical, hydrochemical and engineering geology study of the area where the facilities where mining wastes will be stored.

(2) The bottom and side surfaces of the facilities where mine waste is stored should have an impermeable layer to prevent leachate from entering the groundwater. If this layer does not exist naturally, it is created artificially. Naturally, the layer to be found should have the same physical, chemical, mechanical and hydraulic properties as the clay.

(3) Clay group minerals to be used in the formation of impermeability are primarily sought by drilling/excavation in the mining license area.

4) In the formation of the impermeability layer formed on the floor and side surfaces of the facilities where hazardous mining wastes will be stored, at least two layers of at least 50 cm thick and permeability of maximum 10-9 m/sec clay group mineral is laid and this layer is reinforced using HDPE (high density polyethylene) geomembrane. In order to protect the geomembrane, suitable natural material or geotextile is laid on top. On the side surfaces, if it is technically difficult to reduce the slope slope due to topographical conditions and it is possible to ensure stability on steep slope slopes, a geosynthetic clay layer is applied together with HDPE geomembrane instead of clay.

(5) In the facilities where non-hazardous mining wastes will be stored, if there is a clay group mineral required for the formation of an impermeability system in the license area, the clay layer is 50 cm thick in total with appropriate moisturizing and compaction in at least two layers and its permeability is maximum 10-9 m/sec is laid on the base.

If the clay group mineral required for the formation of the impermeability system is not available in the license area and will not be brought from outside the facility, this system is formed with geosynthetic materials, in this case, geosynthetic clay layer and HDPE geomembrane are applied together on the buffer layer on the base after the excavation at the base of the facility. On the side surfaces, clay layer or geosynthetic clay layer and HDPE geomembrane are applied together.

(6) In hazardous and non-hazardous mine waste storage facilities where geosynthetic impermeable materials are used, rough geomembrane and palletized system are applied on the side surfaces to keep the materials from flowing on the surface.

(7) Where there is groundwater at the base of the facilities where mining waste is stored or where there is a possibility that the groundwater may rise and damage the impermeability system to be established at the base, a system to drain the groundwater at the base shall be established. Natural or geosynthetic materials are used in this system.

(8) In order to prevent potential risks posed by leachate to soil and groundwater and to ensure the long-term stability of the facility where mine waste is stored after closure, a leachate drainage, collection and, if necessary, treatment system shall be constructed at the bottom of the repository in addition to the impermeability system. In the formation of the drainage system, natural or geosynthetic materials suitable for collecting the leakage are selected by considering the characteristics of the waste such as grain size and clay content.

(9) In order to prevent the entry of rainwater into the facilities where mine wastes are stored and thus the hydraulic load it will create, the necessary rainfall calculation is made and the necessary air space is left in the storage facility.

(10) In case the collected leachate is discharged to the receiving environment, the provisions of the Regulation on Water Pollution Control published in the Official Gazette dated 31/12/2004 and numbered 25687 and the Regulation on Surface Water Quality Management published in the Official Gazette dated 30/11/2012 and numbered 28483 shall apply.

(11) The thickness of HDPE geomembrane to be used in the formation of impermeability should be at least 2 mm and its density should be at least 941 - 965 kg/m3. Furthermore, impermeable materials should comply with national or international standards in terms of their technical properties. (12) At least the thickness and permeability provisions of the fourth paragraph of this Article must be applied to the base of heap leach facilities..."

(13) Although the provisions of this article are not applied in waste settling ponds, special impermeable concrete is coated on all surfaces that will come into contact with waste.

(14) Although the provisions of this Article do not apply to the storage areas for waste, stability measures shall be taken at appropriate height and slope gradient.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

*In addition, sulfur-containing and acid rock drainage potential rusts are stored in such a way as to prevent contact with air and water, buffered with rusts with neutralization capacity or with the techniques necessary for the collection and treatment of leachate, with appropriate slope slope and palliated systems and rehabilitated after storage.*

*The effects of these sites on surface/ground and groundwater are monitored through water samples to be taken from observation points and observation wells." (...).*

**Chapter Four, Emergency Action Plan Waste Management Plan, Environmental Permit/License Emergency Action Plan**

*under the heading*

*ARTICLE 13 - (1) Emergency Action Plan is included in the Waste Management Plan.*

*(2) The Internal Emergency Action Plan shall be prepared in accordance with the criteria specified in Annex-2 to cover only the risks that may create an emergency situation within the facility.*

*(3) For Category A facilities, the necessary notifications shall be made by the operator in accordance with the provisions of the Regulation on Prevention and Mitigation of the Effects of Major Industrial Accidents.*

*(4) The operator shall check the effectiveness of the Internal Emergency Action Plan at least once a year.*

*(5) The operator must appoint an authorized personnel who is responsible for the overall control of the Internal Emergency Action Plan and who will take all final decisions.*

**Chapter Four, Method of Preliminary Examination and Assessment, Projects whose environmental impacts are subject to preliminary examination and assessment** *"ARTICLE 15- (1) Of this Regulation;*

*a) Projects included in the list in Annex-2,*

*b) In the event that capacity increase and/or expansion is planned for projects that are considered out of scope or exempted by law, it is obligatory to prepare a project introduction file for the projects whose new capacity of the project together with the sum of the existing project capacity and capacity increases is specified in the list in Annex-2."*

*Under the title of **Internal Emergency Action Plan in ANNEX-2nd article of the Regulation** ;*

*1) The operator determines a prevention policy against major accidents that may occur during the operations of the facility. This policy should include objectives and principles for controlling the risk of accidents.*

*2) The operator is obliged to establish a safety management system in accordance with the major accident prevention policy. The safety management system should include sections such as emergency action plan organizational structure, responsibilities, practices, processes and resources.*

*3) The manager and key personnel responsible for the management of the Internal Emergency Action Plan should be identified by the operator and the duties and responsibilities of these personnel should be clearly defined.*

*4) In the plan, tools, equipment, clothing, equipment and resources to be used in emergencies should be defined and their locations should be shown schematically.*

*5) The personnel in charge of the facility in case of emergencies should be trained on the work to be done in emergencies and training certificates should be included in the annex of the Emergency Action Plan.*

*6) Potential accidents that may arise from the activities of the facility, which may affect the facility and its immediate surroundings, and the negative impacts on the environment and human health in the short and long term due to accidents, and the measures to be taken, including rehabilitation/restoration, should be identified.*

*7) The work to be carried out in order to maintain the safe operation of the enterprise in all kinds of malfunctions, interruptions, etc. that may arise during operation should be defined.*

**4.2.3. The Incidental Articles of the Regulation on the Regular Storage of Wastes; Under the Purpose section of the Regulation;** *"ARTICLE 1 – (1) The purpose of this Regulation; In the process of disposal of wastes by regular storage method;*

*a) Prevent environmental pollution by minimizing the negative effects of possible leachate and storage gases on soil, air, groundwater and surface water,*

*b) Making appropriate warehouse floor technical designs according to the type of wastes and constructing sanitary landfill facilities,*



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

c) Waste acceptance processes to regular storage facilities,

C) Operation, closure and post-closure control and maintenance processes of sanitary landfill facilities,

d) To prevent negativities that may pose a risk to the environment and human health, including the greenhouse effect, in the operation, closure and post-closure maintenance processes,

e) To determine the technical and administrative issues related to the rehabilitation, closure and post-closure maintenance processes of existing sanitary landfill facilities and the general rules to be followed."

Under the **scope** section heading; "ARTICLE 2 – (1) This Regulation covers the technical principles regarding sanitary landfill facilities and the procedures and principles regarding the acceptance of wastes to sanitary landfill facilities and the regular storage of wastes, as well as the measures to be taken, the inspections to be carried out and the responsibilities to be subjected."

Establishment of the warehouse floor; ARTICLE 16 – (1) (Amended-RG-26/12/2019-30990) An impermeability layer is formed on the floor and side surfaces of the sanitary landfill facility to prevent leachate from mixing with groundwater. The physical, chemical, mechanical and hydraulic properties of the impermeability layer must be such as to prevent the potential risks that the storage facility will pose to soil and groundwater.

Impervious materials must comply with Turkish Standards Institute standards in terms of technical specifications.

(2) (Amended-RG-26/12/2019-30990) According to the landfill classes, the landfill floor must have at least the following permeability and thickness characteristics-

a) Class I landfill - $K \leq 1.0 \times 10^{-9}$ m/sec and clay or clay group impermeable layer with a thickness of at least 5 m,

b) Class II landfill - $K \leq 1.0 \times 10^{-9}$ m/sec and clay or clay group impermeable layer with a thickness of at least 1 m,

c) Class III landfill - $K \leq 1.0 \times 10^{-7}$ m/sec and clay or clay group impermeable layer with a thickness of at least 1 m.

(3) (Amended-RG-26/12/2019-30990) If the geological impermeability layer cannot naturally meet the conditions given in the second paragraph, the impermeability layer;

a) Ith Class sanitary landfill facility- $K \leq 1.0 \times 10^{-9}$ m/s permeability and compressed clay or clay group minerals with at least four layers and a total thickness of at least 1 m,

b) IIth Class sanitary landfill facility- $K \leq 1.0 \times 10^{-9}$ m/s permeability and compressed clay or clay group minerals with at least two layers and a total thickness of at least 50 cm,

c) IIIth Class sanitary landfill facility- $K \leq 1$ is formed of clay or clay group minerals with a permeability of $0 \times 10^{-7}$ m/s and at least two layers compressed and a total thickness of at least 50 cm,

homogeneous permeability values are provided throughout the layer and reinforced using geomembrane in Class I and Class II sanitary landfill facilities." "... "th Article 16 - (4) In order to prevent potential risks posed by leachate to soil and groundwater, in addition to the natural impermeability layer in landfills, a leachate collection and drainage system with the following technical specifications shall be constructed-"...",

"C) Drainage pipes are located inside the drainage layer. The pipe diameter is large enough to allow for inspection and cleaning.

The tank floor is equipped with a sufficient number of drainage pipes, main collectors and manholes made of a leachate-resistant material.

The leachate collection and drainage system ends with a leachate collection pond. The leachate collection pool is designed and constructed in such a way that it does not cause any adverse effects by taking into consideration the meteorological conditions of the place where the facility will be established and the water content of the wastes to be stored.

d) The longitudinal slope of the warehouse floor cannot be less than 3%."

**4.2.4. 23.01.2010 dated and OG - 27471 numbered Regulation on the Restoration of Lands Degraded by Mining Activities to Nature;**

(...); ARTICLE 5 – (1) Before starting the works by the operator, the re-arrangement of the natural structure that will deteriorate, the establishment of the natural balance, the restoration of the area to the nature in such a way that it can be safely benefited by humans or other living things are evaluated and finalized as a whole in the EIA process related to the mining activity in question.

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

*(2) The fact that the area to be restored to nature during an activity has negative characteristics such as barrenness and inefficiency in the pre-use period cannot be cited as a reason for not carrying out restoration work in the area. (...).*

### 4.3.  MONITORING AND AUDITS OF MINING ACTIVITIES AND OPERATIONPHASES CARRIED OUT BY ANAGOLD MINING INDUSTRY AND TRADE ANONİM ŞİRKETİ WITHIN THE SCOPE OF ENVIRONMENTAL LAW IMPLEMENTING LEGISLATION BY THE MINISTRY OF ENVIRONMENT, URBANIZATION AND CLIMATE CHANGE (ÇŞİB)

**In the letter dated 24.12.2014 and numbered 58003700/220.01/20461 of the MoEU on EIA Positive Decision on "Copler Complex Mine Capacity Increase" Project;**
The EIA Report submitted to the Ministry through the Online EIA Process Management System regarding the Copler Complex Mine Capacity Increase project planned to be constructed byAnagold Madencilik Sanayi ve Ticaret AŞin Copler Village Mevkii, İliç District, Erzincan Province was reviewed and evaluated by the Review and Evaluation Commission.

"Environmental Impact Assessment Positive" decision was given by the Ministry in accordance with Article 14th of the Provisional Article 1st of the EIA Regulation on the Copler Complex Mine Capacity Increase.
 It has been stated that the decision should be announced to the public by the Erzincan Governorship (Provincial Directorate of Environment and Urbanization), the issues specified in the Final EIA Report and its annexes and the relevant provisions of the regulations entered into force in accordance with the Environmental Law No. 2872, the necessary permissions should be obtained from the relevant institutions/organizations in accordance with the applicable legislation and the changes subject to the Regulation to be made in the project should be communicated to the Ministries or the Erzincan Governorship (Directorate of Environment and Urbanization) in accordance with the 18th article of the EIA Regulation.

It has been determined that the EIA Positive Decision dated 24.12.2014 and numbered 3723 attached to this letter was given to the area covered by Phase 4 and Phase 1, 2, 3 heap leach areas.

**In the recommendations section of the "Stability Report, Phase 4 Leach Pad Expansion Copler Gold Mine" Waste Storage Facility Design and Stability Report prepared by Global Resource Engineering Ltd for Anagold in 2016;**

Anagold  should review its risk-assessed tolerances and decide whether the minimum values of the GRE submitted for the buttresses meet the risk profiles, Anagold should evaluate the waste rock transportation and determine whether placing additional material on the 4th Stage East and West buttresses will provide savings in the transportation cost, Anagold should also consider the cost of head-to-head transportation for the buttresses with the advantage of increasing HLF stability above the minimum values recommended by the GRE, routine sampling and testing of the ore in terms of strength and permeability is required for ongoing verification, verification and routine monitoring of the free surface in the HLF through the installed vertical pipe piezometers in the stack, GRE's design assumes 1 meter, any discrepancies should be recorded and evaluated in more detail, installation of the stability instrumentation in Stage 4 to continuously monitor HLF and buttress performance, continuous monitoring of the installed stability instrumentation from Stage 1 to Stage 3 to measure the movement of the Stack is recommended.

**In the Letter of the MoEU dated 08.05.2018 and numbered 79380874-145.09-E.78574**
In the letter on the approval of Anagold Mining Waste Dam-1 and Heap Leaching Phase 1,2,3 mine waste disposal facility, it was stated that the Copler waste dam and heap leaching Phase 1-2-3 moments were examined on-site by the technical personnel of the Ministry and as a result, it was understood that the facility whose coordinates are given in the annex of the letter was constructed in accordance with the application project.



) the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

TRANSLATION

In the letter of the MoEU dated 29112018 and numbered 79380874-145.09-E.212415 on Anagold Heap Leach 4th phase Implementation Project Approval; dated 17.09.2018 and numbered E.160480 with the letter numbered "...", it was stated that it was deemed appropriate to start the construction of the heap leach 4th phase of Anagold Mad San ve Tic AŞ in accordance with the application project approved by the Ministry, the service contract and the current legislation, the construction supervision and control of the project approved by the Ministry should be carried out by the said company according to the contract signed with Ore Mineral Sondaj İnşaat Müh San Tic Ltd Şti and "...", monthly inspection reports should be reported to the Ministry.

**In the letter dated 11.03.2019 and numbered 79380874-145.09-E.56883 of the MoEU on Anagold Mining Waste Storage Facility Approval Certificate (Copler Waste Dam Phase 1 and Heap Leach Phase 4)**;
With the summary, it was stated that the Copler Phase-4 Heap Leach Expansion Project, Water Structures Inspection Services Activity Reports and Project End Final Report, which was commissioned by the investor Anagold to Ore Mineral Drilling Inc Ltd. were submitted, and that the Phase 4 project is in compliance with the project, and that a mining waste storage facility approval certificate must be obtained from the Ministries for each stage of the construction of the Tailings Dam.

**In the Copler Phase-4 Heap Leach Extension Project, Water Structures Inspection Services Activity Reports and Project End Final Report (003) commissioned by the Investor Anagold dated 18.02.2019 to Ore Mineral Sondaj İnş  Ltd Şti;**

In summary, in accordance with the contract numbered ANO-1734 signed with the Investor Anagold Madencilik San ve Tic AŞ on 02/05/2018, it is stated that the inspection services to be carried out in accordance with the Ministry of Environment Legislation for the construction of the Leach Site under construction within the scope of the Copler Phase-4 heap leach Expansion project in the borders of Erzincan Province, İliç district, Copler Village are carried out by the "Ore Mineral Sondaj İnşaat Mühendislik Sanayi Ticaret Limited Şirketi" authorized by the General Directorate of State Hydraulic Works with the permission certificate of the Water Structures Authorized Inspection Company No. 067, according to the Implementation Project Report; According to the analyzes made, the Copler heap leach Plant is designed to meet the requirements of the IIth Class Non-Hazardous Waste Storage, the Regulation on the Regular Storage of Wastes (ADDDY) and is built in accordance with its design, and as a result, this report is prepared in three copies () for the inspections of the Stage 3A and Stage 3B area, the production of which is completed in the construction of the Phase-4 heap leach Expansion.

The **report "Stability Report, Phase 4 Leach Pad Expansion Copler Gold Mine" was prepared by the investor Anagold to GRE Engineering Ltd. on 01.08.2016and the report** includes a summary of the stability and technical results and recommendations.

Recommendations at the end of the report; Based on the results of the analysis, GRE recommends that-

-Anagold should review its risk-assessed tolerances and decide whether the minimum values of the GRE submitted for the buttresses meet the risk profiles, -Anagold should evaluate the waste/backfill rock transport and determine whether placing additional material on the 4th Stage East and West buttresses will provide savings in the transport cost, - Anagold should also consider the break even transport cost for the buttresses with the advantage of increasing the stability of the HLF (batch leach plant) above the minimum values recommended by the GRE, - Routine sampling of the ore for ongoing verification and testing in terms of strength and permeability, - Verification and routine monitoring of the free surface in the HLF through the vertical pipe piezometers installed in the heap, assuming that the design of the GRE is 1 meter, -Any discrepancies should be recorded and evaluated in more detail, - Ensuring the installation of the stability instrumentation at Stage 4 to continuously monitor the stability of the HLF and the buttress performance, ensuring the measurement of the stability instrumentation at Stage 1 to 3 to measure the movement of the heap is continuously monitored.

86



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

**Detail Design Report Phase 4b Leach Pad Expansion Report" report was prepared by the investor Anagold to GRE Engineering Ltd. on 27.03.2020, and the report summarizes**
• The assumption that the free liquid level in the heap is 1 meter above the cushion liner is a requirement not only for stability analysis but also for operation, It is recommended to maintain proper irrigation for regular irrigation of the heaps and monitoring of liquid levels, groundwater level and excessive cavity water pressure will develop, Readings from lateral piezometer pipes placed at the end of the heap should be continuously monitored and recorded,
- It is suggested that the MDE analysis presented here does not include final closure conditions, which may include buttressing as well as reclassification and stacking, and that the stability of the closure condition should be considered independently once the closure condition is achieved.

"Copler Gold Mine Phase-4b Heap Leaching Expansion Project (Design) Report" commissioned by Investor Anagold to INR Engineering Consultancy Inc. on 27.04.2020
The Design Report prepared by INR Engineering Consultancy Inc. summarizes that Anagold Mining operates an open pit gold mine in Copler Village, İliç District, Erzincan Province, according to the characteristics of the ore in the site,
gold production is carried out using the heap leaching method, there is currently a heap leaching plant consisting of 3 phases with a capacity of approximately 34 million tons, the maximum height of the existing leach heap from the bottom coating system is 100 meters, in the existing system, the leaching process was carried out in 5 cells.
With the Phase-4 expansion, cells 6 and 7 will be created and the leaching capacity will be increased to 58 million tons. In the current system, the collection ponds consisting of process and flood ponds at the pillar of the Phase-1 leach heap were constructed in 2012.
Anagold will convert the flood pond into a secondary process pond in order to meet the process needs, the new flood pond was commissioned in 2014, the projects for Phase-4 were approved by the Ministry of Environment and Urbanization on 29.11.2018, Anagold Madencilik (Anagold) decided to increase capacity with increasing mining activities and Phase 4-B expansion was needed, In this context, the projects were prepared jointly by the American-based design firm (GRE,Global Resources Engineering) and INR Engineering (INR).
INR said that the design made by GRE was reviewed and submitted to the Ministry after checking its compliance with the regulations and engineering principles, and that the Phase 4b expansion will be carried out in two phases, Phase-1 will be Phase-4 expansion along the slope towards the south.
In Phase-2, Phase-4 will expand into the existing spoil field to the west, and this report included detailed engineering studies for the Phase-4 YLT expansion.
Design studies and engineering analyses formed the basis of the report, and the main headings of the studies were given as items.
Evaluation of existing data related to the project, -Performing geotechnical studies on the leaching materials stored in the existing GCL, -Determining project criteria and general needs by conducting site visits, -Determining geotechnical investigations and clay field, -Performing geotechnical studies on the membrane GCL used in the coating system, - Determining design criteria and design principles, - Determining geological, topographical, seismic, geological, topographicaland seismic studies related to the site, evaluation of climatic and geotechnical conditions, processing of climatic data, abstraction, general layout and site arrangement studies, development of detailed design elements such as cell partitions, berm, lining systems and drainage networks, - preparation of maximum ore heap configuration and storage plan, - stability analysis according to Phase 4-B heap geometry, determination of quantities, Technical Specification Project drawings.



87

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

Under the heading of Authorization and Assignment; Copler Gold Mine Phase-4B Heap Leach Expansion Project Engineering Services was awarded to INR under the contract signed between Anagold and INR. This report was prepared within the scope of the aforementioned contract, the design of the Copler Phase-4B Heap Leach Plant expansion work was carried out by the design team assigned by the client, the design team consisted of INR, GRE and Hydrodesign (SYDF).

In low grade gold mines in the field, heap leaching was the preferred method to separate the ore from the rock.

With this method, the ore, whose grain size was reduced by crushers, was laid in layers on the leach-proofed area, and in cases where it was necessary for the material sent to the heap to be in homogeneous contact with the solution, the ore was given a homogeneous structure by agglomeration method.

At this stage, the geotechnical properties of the leach material are very important in terms of heap stability, After the heap is completed, the solvent (solution) is delivered to the top of the heap by irrigation or sprinkling with the help of pumps, and the unloaded (mineral-free - barren) and loaded (mineral-containing - pregnant) solutions are collected through drainage, The metal in the loaded solution is removed, the unloaded solution is pumped back onto the heap with the help of pumps, after the feeding for the laid layer is completed, the second stage layer is laid and the feeding with the solution is repeated, Geometrically, there were basically 3 types of heap leaching plants.

Pad type heap leaching plant "in this type, the ore is stacked on a relatively horizontal wide pad which is impermeable, therefore, a large and flat area is required, the solutions collected by pipes are transferred to the ponds. Valley type heap leaching plant "In places where the topography is not flat, there are leaching plants built like dams in the valleys,it may be necessary to build a berm at the end of the valley in order to ensure stability due to the sloping topography, without making a loaded solution pool of this type, that it is possible to remove the solution accumulated in the berm, that it is closed at the end of the operation like the tailings storage facilities, that the open-close heap leaching plant is washed after the ore metal processed in the smaller pad type heap leaching plant is removed, that this heap is then lifted from the pad surface and stacked in the dry type tailings storage facility to be built, that the pad is taken to the next operation.

In this type, the cost of the initial investment is low", Copler YLT is a pad type plant, stacking is done in heap layers after ensuring base impermeability in the area to be arranged as flat as possible and with excavation / filling works, Copler existing heap leaching plant is located on the natural drainage basin of Copler Stream with a north-northwest orientation.

Phase- 4 expansion will be carried out towards the slope with natural slopes of approximately 20%-55% in the south direction and towards the southwest over the tailings dump site. In the Conclusions section, it is stated that the Project site is located in the vicinity of Copler village, 120 km west of Erzincan province, 900 m southwest of İliç district,and the gold production method selected for the Project is heap gold.

In this method; after sizing the ore to be extracted from the open pit, it is stacked in heaps in an impermeable area, the gold in the stacked ore is taken by homogeneously dropping the prepared solution on the heap, the gold solution that descends to the bottom of the heap is collected by the drainage system allocated at the bottom.

the remaining solution is fed back into the system and the process is repeated,the project site already has a heap leaching plant consisting of phases 1-2-3 and 4a, the 4th phase heap area has been designed in line with the needs of the mine and the projects have been approved by the MoEU, 58 million tons of ore is stored in the 4th phase, and the leaching capacity will increase to 64 million tons with the new Phase 4B. Munzur limestones form the bedrock at the base of the leachate, the need for blasting will arise in the excavations to be carried out in these sections, the final heap height will be 1414 m, 35 layers of 8 meters high paving will be carried out, and the general heap angle was determined as 2.5Y-1D.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

In the southeastern part of the area where the base of the heap is located, there is a rust filling, this material will be scraped in the base arrangement, Geological geotechnical investigations were carried out within the scope of the site feasibility and implementation project studies, Drilling and field tests were carried out in the investigations, the data obtained constitute the basis for this study, As a result of the mining research and geotechnical studies carried out in the field, the dominant geological units in the field are limestones.

Limestone, mostly has poor rock quality, groundwater observation was not made in the drillings made in the field, the project area according to the Earthquake Research Department of Turkey Seismicity map 2. The horizontal earthquake acceleration coefficient for the site is 0.15 g for the operational phase (OBE) and 0.27 g for long-term stability (MDE), the boundary safety coefficients in stability analyses are selected as 1.5 and 1.2 for static and seismic conditions respectively for the operational phase, and the boundary safety coefficients are considered as 1.5 and 1.0 for seismic and static conditions respectively for the end of operation.

The air allowance in the flood channels was calculated as 0.26 m, 1 encirclement channel was previously designed and constructed in order to prevent the structures designed for the project from coming into contact with surface waters, so that the site was connected to other channels in accordance with the general water management plan and discharged to the sabırlı stream.

The lining system, which is one of the most critical systems for YLT, consists of geomembrane, GCL or clay layers, the lining system will be formed by laying 50 cm thick clay and geomembrane,the upper drainage and collection system, which is the most important element of production, is designed above the lining system, In this system, tertiary, secondary and main collection pipes and a minimum 0.60 m thick filter layer protecting these pipes and acting as a filter will be laid on the bottom before the heap leaching process starts.

Solution collection ponds (process ponds) were designed and constructed in previous phases, Flood ponds were designed and constructed in previous years to meet possible flooding of the facility, After the completion of production in the facility; it will be closed in accordance with the Mining Waste Regulation after the necessary geometric arrangements, Engineering calculations should be reviewed again considering the long-term stability of the facility during the closure phase, Safe slope angles for the structures planned within the project were determined as a result of stability analyzes.

In the analyses, the safety coefficients required for the operation phase were met, hydraulic analyses were performed for the site and channel sizing was carried out based on 100 and 500 year flood flows, Recommendations of the report; In the state of Copler gold mine section of the report, it is an operation with a heap leaching plant consisting of phases 1-2-3 and 4a, and capacity increase will be realized with Phase-4b leaching expansion.

Phase- 4 (a and b) heap geometric alternatives are limited due to the existing infrastructure in operation, topographic conditions and integration constraints with other facilities, Therefore,the heap geometry is stable for the operation phase (short term) with the projected support structures, but it is an issue that needs to be revisited for the long term (post-closure), It is recommended to prepare stable closure projects for the long term after the completion of the operation, Under the heading of Constraints; Seismic risk analysis data were taken from USGS and BU Kandilli Observatory and scientific studies conducted for the region.

Determination of surface or foundation displacements due to fault thrust or identification and characterization of possible new active faults at a scale relevant to the site that are not discussed in this report require detailed field work and are not included in the scope of this study, Hydrological data were obtained from the closest observation stations to the site, stations installed on the site and previous studies.

It is stated in the design report that the data used as input in the calculations may differ from the actual flow values, the geological information presented in the report is based on the geotechnical investigation carried out during the conceptual design phase and general literature data, the borings, field tests, logging and laboratory tests carried out in the field were carried out by 3rd parties and/or companies authorized by the Employer, the geological boundaries and geological relations, geomechanical parameters and kinematic analyses, engineering interpretations based on geological-geotechnical investigations presented in the report are based on these limited data obtained.



the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

TRANSLATION

**Copler Heap Leaching Plant Expansion Project Phase-4b Water Structures Audit Services Audit Report No-8 - 01/1/12/2020- 31/12/2020 by Anagold Madencilik;**

This report includes the Monthly Audit Report of the main work items of the construction and manufacturing works carried out within the scope of the Heap Leaching Plant (HLP) Expansion Project Phase-4B, evaluating the physical realization rates of the main work items as of 31/12/2020, their weight in the overall project, in the light of the inspections carried out in the construction of the HLP between 01/12/2020 - 31/12/2020 and the quantities provided by the Investor's surveying group.

**MoEU dated 07.10.2021 and numbered E-20289998-220.01-1917939 and 847, 49729 and 20067313**
License No. Copler Complex Mine 2nd Capacity Increase and Flotation Plant Project EIA Positive Decision;

The EIA Report submitted to the Ministry through the Online EIA process Management System regarding the Copler Complex Mine 2nd Capacity Increase and Flotation Plant project with License Nos. 847, 49729 and 20067313 planned to be constructed by Anagold Madencilik San ve Tic AŞ in Copler Mevkii, İliç District, Erzincan Province was reviewed and evaluated by the Review and Evaluation Commission. 847, 49729 and 20067313 License Numbers Copler Complex Mine 2nd Capacity Increase and Flotation Plant was given an "Environmental Impact Assessment Positive" decision by the Ministries in accordance with Article 14 of the EIA Regulation.

It has been stated that the issues specified in the Final EIA Report and its annexes and the relevant provisions of the regulations entered into force in accordance with the Environmental Law No. 2872, the necessary permissions should be obtained from the relevant institutions/organizations in accordance with the applicable legislation, the changes subject to the Regulation to be made in the project should be communicated to the Ministries or Erzincan Governorship (Provincial Directorate of Environment and Urbanization), and the Project Progress Report containing the developments recorded after the beginning, construction and operation should be submitted to the Ministries in 3 (three) months periods from the date of the EIA Positive Decision within the scope of the provision in the Article 5 of the EIA Regulation (Amended-RG-08/07/2019-30825) published by the project owner in the Official Gazette dated 25.11.2014 and numbered 29186. EIA Positive Certificate has been issued with the date of 07.10. 2021 and Decision Number 6421.

Copler complex mine 2nd Capacity Increase and flotation plant capacity and project location information of Copler complex mine 2nd Capacity Increase and flotation plant capacity and project with license numbers 847, 49729 and 20067313 planned to be constructed by Anagold Madencilik San Ve Tic AŞ in Erzincan ili iliç district Copler locality are given below.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

Project Area and Capacity Information

| Units | Available | 2, Planned with Capacity Increase | Final Status |
|---|---|---|---|
| Oxide ore production (Million tons) | 77,4 | 7,9 | 85,3 |
| Sulphide ore production (Million tons) | 31,7 | 31,13 | 31,13 |
| Tallow (Million tons) | 273 | 147 | 420 |
| Sulphide ore beneficiation plant (tons per day) | 6000 | 3000 | 9000 |
| Flotation plant) | - | 150 | 150 |
| Mobile crushers (ton hour) | 1 400 ton hour | 1 160 ton hour 2 200 ton hours | 4 mobile crushers |
| YLS capacity (Million tons) | 58 | 27,3 | 85,3 |
| ADT-1 capacity (Million tons) | 36,7 | 15.7 | 52.4 |
| ADT-2 capacity (Million tons) - conceptual | 21.0 planned | 13,7 | 13,7 |
| Clay field | - | 300,000 tons per year for register 76817 650,000 tons per year for register 76818 | |
| Study area size (ha) | 1.686 | 60,52 | 1.746,52 |



Capacity and location information of the project for which EIA Positive decision was given with Decision No. 6421 dated 07.10.2021



91

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

**In the "Copler Gold Mine Heap Leach Site Phase 4a East Area Rehabilitation Works" Report dated 07.07.2022 commissioned by the investor Anagold to Ore Mineral Drilling Inc;**



ANAGOLD Copler Heap Leaching Plant Phase 4A
East Area Rehabilitation Works

Start Date- 29 06 2022
Start Date 07 07.2022

Pursuant to the contract numbered ANO-3025 signed with the Investor ANAGOLD Madencilik San ve Tic AŞ on 30.06.2021,

The inspection services required to be carried out in accordance with the TR Ministry of Environment, Urbanization and Climate Change Legislation for the Phase-4 Waste Storage Facility (ADT) and Heap Leaching Facility (YLT) Expansion Project under construction within the scope of the Copler Sulfide Project in Erzincan province, İliç district, Copler Village are carried out by "ORE Mineral Son İnş Müh San Tic Ltd Şti" authorized by the General Directorate of DSI with the permission certificate of the Water Structures Authorized Inspection Company No. 067.

TR Ministry of Environment, Urbanization and Climate Change On 28.06.2022, due to the cyanide solution leakage that started in the eastern area of the heap leaching Plant at midnight, connecting the day of 21.06.2022 to the day of 22. 06. 2022 at the ANAGOLD Copler Gold Mine heap leaching Plant, all work activities of the ANAGOLD Copler Gold Mine were stopped until the rehabilitation works were approved by the Ministry.

In the letter dated 01.07.2022 and numbered E-79380874-145.09-4039595 of the TR Ministry of Environment, Urbanization and Climate Change, General Directorate of Environmental Management, SYDF ORE Mineral Drilling Construction Engineering San Tic Ltd Şti was requested to prepare a report on the rehabilitation works carried out due to the cyanide solution leakage in the eastern area of the Heap Leaching Field.

The cause of the leakage in the pressurized pipe carrying cyanide solution in the Phase 4A eastern area of the Heap leaching Site was stated by the Investor ANAGOLD company as a result of the cracking of the HDPE T-piece with which the valve was installed in the field examination carried out on 06.07.2022 together with the delegation of the TR Ministry of Environment, Urbanization and Climate Change and the delegation of the TR Erzincan Governorship Provincial Directorate of Environment, Urbanization and Climate Change.

For this reason, all quality assurance works of the geomembrane surfaces to be laid, geosynthetic clay primer, geomembrane and geocomposite productions made IN the Heap leaching Site, which do not cause the explosion in the pressure pipe carrying cyanide solution, the shift in Phase-4B Phase-1 and Phase-2 in the western area of the Heap leaching Site, are carried out by Investor Consultant GOLDER Associates Inc.



92

I. the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

On 28.06.2022, SYDF ORE Mineral was called by Investor ANAGOLD at 16-24 and called to the east side of the heap leach Facility where there was a leak of cyanide solution.

As a result of the meeting with the ANAGOLD official Ministry, it was stated that SYDF ORE Mineral was asked to monitor the rehabilitation works to be carried out in the eastern and western areas of Anagold and to prepare a report to be submitted to the Ministry regarding the works, the cyanide solution coming out of the exploding pipe flowed from the slope surfaces shown in green in Photo 3, descended to the eastern area access road and flowed down the sloping road shown in red and went out of the mine site. (Photo 3, taken from Anagold company),



**Photograph 3 Path of Cyanide Solution Leakage**



Photograph 32 Location of the Pool in the East



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

As a result; Anagold Copler Gold Mine stopped all its work activities on 28.06.2022 by the TR Ministry of Environment, Urbanization and Climate Change due to the cyanide solution leakage that started on the east side of the heap leaching facility at midnight, connecting the day of 21.06.2022 to the day of 22. 06. 2022 at the Anagold Copler Gold Mine Heap Leaching Facility, until the approval of the rehabilitation productions by the Ministry.

The rehabilitation works carried out in this context were started on 29.06. 2022 and completed on 07.07.2022, and the rehabilitation works were designed by the Investor Anagold and organized by the construction department.

SYDF ORE Mineral followed the works carried out in the field, followed and monitored SYDF ORE Mineral's works in the works carried out within the scope of rehabilitation, 1) ÇİFTAY company carried out rough construction (excavation, filling, soil) works, 2) YESTİ company carried out fine construction (damaged geomembrane and geotextile clay primer works, placing the new geotextile clay primer in place, placing the new geomembrane in place, welding the new geomembrane, patching the old geomembrane, testing all welds and patches made).

3) Nural company carried out construction works other than the parts of rough construction works carried out with the machine (precision excavation with shovel, removal of damaged materials and loading on vehicles), 4) GOLDER company, as Investor Consultant and quality control company, approved all kinds of construction works (earthwork material approval, filling compaction and surface acceptance before geosynthetic clay primer, geosynthetic clay primer and geomembrane, and conducting trial and approval tests).

5) Within the scope of rehabilitation, SENSOR company carried out the MIT test and control works of geomebrane welding and patching works. 1) A total of 148.80 meters of bund rehabilitation was carried out.

2) The road route has been changed against possible leakages in the future and the leakage has been prevented from going out of the mine site, 3) The surface water collection pool can also serve for possible cyanide solution leakage, information about this pool built at lower elevations is given in the previous sections.

4) It is stated that sensor discontinue valves are installed in the solution lines on the Heap Leach, this report covers the works carried out for the East Side Rehabilitation works of the Heap Leach Facility starting on 29.06.2022 and ending on 07.07.2022, and the Report and its annexes cover the documents supplied from the investor ANAGOLD and GOLDER.

**In the "Copler YLT Phase-4B Phase-1 and Phase-2 West Area Rehabilitation Studies" Report dated 02.08.2022 commissioned by the investor Anagold to Ore Mineral Drilling Inc;**

In connection with the "Copler Gold Mine Heap Leaching Site Phase 4a East Area Rehabilitation Studies" dated 07.07.2022, it was determined that the cyanide solution-laden ore material was eaten in the western area of the heap leaching site, and the cyanide solution-laden collector pipes, geomembrane and geosynthetic clay liners were disintegrated.

For this reason, starting from the top point where the failure occurred, the ore material loaded with cyanide solution was moved to other areas in the heap leach site. This was done in order to replace the crumbling geomembrane, geosynthetic clay liner and collector pipes.

It is seen in Photo 3 that the defeat that occurred in the heap leaching area, which led to the start of the rehabilitation works, occurred on 27.03.2022.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:



**Photograph 3 Heap Leaching Site Phase-4B Phase -1 Regeneration Zone (28.03.2022)**

As a result, due to the solution spillage that started in the Eastern Area Phase-4A at the Anagold Copler Gold Mine Batch Leaching Facility at midnight on 28.06.2022, connecting 21. 06. 2022 to 22. 06.2022 by the TR Ministry of Environment, Urbanization and Climate Change, all work activities of the Anagold Copler Gold Mine were stopped until the rehabilitation works were approved by the Ministry.

In this context, the Phase-4B Phase-2 rehabilitation works of the heap leaching Facility West Area were started on 29.06.2022 and completed on 02.08.2022, and the rehabilitation works were designed and organized by the Investor Anagold construction department.

In the works carried out within the scope of rehabilitation, SYDF ORE Mineral company controls and follows the works, in addition, it prepares a report about the works carried out, and the companies working in this context; 1) ÇİFTAY company carries out rough construction (excavation, filling, soil) works.

2) MÜREKKEPÇİLER company carried out rough construction (excavation) works with a clawless excavator bucket, 3) YESTÎ company carried out fine construction (damaged geomembrane and geotextile clay primer works, placing the new geotextile clay primer in place, placing the new geomembrane in place, making new geomembrane welds, patching on the old geomembrane, testing all welds and patches made),

4) Nural company carried out construction works other than the parts of rough construction works carried out with the machine (precision excavation with shovel, removal of damaged materials and loading on vehicles), 5) GOLDER company, as Investor Consultant and quality control company, approved all kinds of construction works (earthwork material approval, filling compaction and surface acceptance before geosynthetic clay primer, geosynthetic clay primer and geomembrane, and conducting trial and approval tests),

6) SENSOR company carried out control works with mit test of geomembrane welding and patch works within the scope of rehabilitation,

In rehabilitation processes; the sliding ore material was moved to other regions in the heap leach Site Phase-4b Stage-1, due to the renewal IN the heap leach Site Phase-4b Stage-1, the damaged geotextile clay primer and geomembranes in the area between the elevations of +1. 289,50, 1. 305, 50 and 1.332,50 were replaced with new materials in the Phase-4b Stage-2, and the locking channel filling at the elevation of +1.305, 50 was gradually filled and compressed with the appropriate filling material.

Within the scope of Copler Gold Mine Heap Leach Site Phase-4B Phase-1 and Phase-2 West Area Rehabilitation Works, the West Area Rehabilitation Works at Copler Gold Mine Heap Leach Site Phase-4B Phase-1 and Phase-2, for which quality assurance reports are provided in Section 6, were completed on 02.08.2022 and the area was made ready for use.

It is stated that this report covers the works carried out for the West Area Phase-4b Phase-1 and Phase-2 rehabilitation works of the Heap Leaching Facility starting on 29. 06. 2022 and ending on 02. 08. 2022.

95



ıe sworn translator Yasin DURMAZ,
ıeclare that I have translated this
ıocument to English language completely
and correctly in accordance with the
original Turkish text.
Signature

SWORN
TRANSLATION

**Muğla Sıtkı Koçman University, Faculty of Engineering, Department of Civil-Mining Engineering on 23.08.2022, Anagold Madencilik San Ve Tic AŞ Copler Gold Mine Heap Leach Site Phase 4 Part Rehabilitation Studies Evaluation Report with a summary;**

In the design report prepared by INR (in section 5.6 Ore heap), it is stated that the fill slope gradients should be maximum 2.5D/1Y in the heap leaching zone and stability analyses were performed according to this criterion. As a result of the review of the report prepared by the SYDF representative ORE Mineral and the interviews made during the technical visit, it is understood that the slope landslide in the western area of Phase-4 occurred due to the construction of the embankment steeper than the slopes specified in the design criteria.

After the failure of the slope, the investor ANAGOLD inspected the other areas in the heap leach area and had the GRE company perform stability analyses (EKZ) and accordingly excavated the slopes and made them suitable for the design.

Phase-4 solved the slope stability problem by removing all of the sliding mass on the geomembrane in the west area (Figure 41).

When the stability analyses made in the design reports and the inspections made on site on August 16-17, 2022 are evaluated together, it is concluded that the slopes and heights of the other slopes that are being rehabilitated within the Phase-4 west pile will not pose any stability problems under the current situation and conditions, The report, in which the rehabilitation works were monitored in detail and all phases of the rehabilitation works were evaluated by the SYDF representative ORE Mineral, the test and quality documents of all geomembrane and GCL fabrications followed by the investor consultant GOLDER during the rehabilitation works at the heap leach site, and all design documents and technical specifications prepared by INR for Phase-4B were reviewed.

The improvement works were checked on site, and during the on-site inspections on August 16-17, 2022, it was concluded that the berm was constructed in accordance with the design and geomembrane, manufacturing and control tests werecarried out in accordance with the technical specifications.

**In the Letter of the MoEU dated 11.03.2024 and numbered E-74694234-622.03-8961893**

Mine Waste Management Plan and Mine Waste Disposal Facility, Heap Leaching Phase 4 Implementation Project, Heap Leaching Phase 4 Mine Waste Storage Facility, Heap Leaching Phase 4B Implementation Project, Heap Leaching Phase 4B/1 Part Mine Waste Storage Facility, It is stated that the letters regarding the approvals of Heap Leach Phase 4B/2 Part Mine Waste Storage Facility, Heap Leach Phase 4B/3 Part Mine Waste Storage Facility, Heap Leach Phase 4B/4 Part Mine Waste Storage Facility and the Final Audit Report of Phase 4B Water Structures Audit Firm have been approved.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

## 5. TECHNICAL EVALUATION OF A MINING ACCIDENT

Within the scope of the task assigned to our Expert Committee by TR İliç Chief Public Prosecutor's Office, on 16.03.2024, the site of the accident was explored together with the Prosecutor's Office and Expert Panel.

-Evaluation of the causes of mining accidents within the scope of Civil (Geotechnical) Engineering, Mine Operation and Planning, Geology, Environmental Law (EIA Reports) , Occupational Health and Safety Laws,

-This report has been prepared to determine the primary and secondary fault ratios, if any, of the institutions, legal entities and individuals who are at fault in the realization of the incident.

Investigation of the accident, evaluation of the information and documents submitted within the scope of the investigation file, investigation minutes taken by the Chief Public Prosecutor's Office, statements taken by law enforcement officers and the reports they prepared, photographs taken and videos recorded, technical reports prepared by various companies for design purposes, test results for determining geotechnical and mechanical strength parameters, monitoring of the mining activity, by utilizing radar measurements, magnetic measurements, drone images, solution measurements, blasting-friction measurements, toxic substance measurements taken from water and soil samples within the scope of EIA, expert reports prepared within the scope of the file, technical reports prepared for hazard and risk, technical evaluations were made by taking into account the Environmental Law and EIA Regulation, Mining and OHS Law Implementation Regulations that will help to clarify the accident incident. Details are given in the subsections.

## 5.1. EVALUATION OF THE MINING ACCIDENT INCIDENT WITHIN THE SCOPE OF MINING LEGISLATION, MINE OPERATION PROJECT , MAPEG TECHNICAL REPORTS

**On-Site Inspection and Evaluation Reports of the General Directorate of Mining and Petroleum (Department of License Inspection) between 2004-2024;**

- About the License Site; License Registration Number; RS-847, License Access Number; 1027313 The first application for the IV Group Mining Site within the borders of Erzincan province, İliç District was made on 06.11.1986 and the License entered into force on 06.11.1986.
 The type of mine is Gold+Silver, Gold+Silver+Gold+Copper+ Mercury, Manganese,and the operating permit date of the Manganese mine has been in force since 06.11.1986.
It is stated that the operation permit date of the Gold+Silver + Copper +Mercury mine has been in force since 03.11.2004 and the license holder is ANAGOLD MADENCİLİK SANAYİ VE TİCARET ANONİM ŞİRKETİ.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

SWORN TRANSLATION

| On-Site Inspection and Evaluation Report Date | Are activities carried out in accordance with the project? | DETERMINATIONS THAT ACTIVITIES ARE NOT CARRIED OUT IN ACCORDANCE WITH THE PROJECT<br>1. (IF ANY) GENERAL CONSIDERATIONS, OTHERFINDINGS ,RECOMMENDATIONS , CONCLUSION (EXPLANATION) |
|---|---|---|
| 02/22/2024 | No | Determinations that the activities are not carried out in accordance with the project - Due to the hazardous conditions detected in the West open pit and in the 39.29 hectare area between the Marble and Main open pit quarries, production activities have been stopped in accordance with paragraph 1 of Article 29 of the Mining Law, with the letter of our General Directorate dated 14.02.2024 and numbered 2024077289.<br>1. (If any) General Considerations, Other Findings, Suggestions, Conclusion (Explanation)- West gradational open pit at representative coordinates Y-457978 X-4363438 with no activity on site at the time of the audit, The main open pit with 40 levels at representative coordinates Y458893 X-4363951, the main open pit Y-459538, the Marble open pit with 28 levels at representative coordinates X-4364137, the Manganese open pit with 26 levels at representative coordinates Y-460139 X-4364382.<br>Activities in open pits have been suspended as of the date of the audit. *13.on 02.2024 at around 14-28 hours at the representative coordinates of Y-460636-X.4364323, a landslide occurred as a result of the sliding of the leach heap with a height of approximately 270 meters.*<br>As a result of the slide, it was determined that some of the material flowed into the 26-stage Manganese open pit at coordinates Y-459975 X-4364350 and some of it flowed towards the Sabırlı stream in the eastern part of the heap.<br>It has been declared that the property is private property, treasury, pasture and forest land, and it has been informed to work in accordance with the principles of the Mining Law and Regulation.<br>The issues identified as a result of the audit at the mine site reflect the current situation at the site as of the date of the on-site audit.<br>Since the working environment in this mine site has a constantly changing and dynamic structure, it is the obligation of the license holder / royalty holder / operator to ensure the compliance of the mining activities in the license site with the mining legislation and its continuity.<br>It has been declared that the license holder / royalty holder / operator is responsible for any negative consequences that may arise due to failure to fulfill this obligation. |
| 09/04/2023 | No | Determinations that the activities are not carried out in accordance with the project - Since the issues specified in the letter dated 22.09.2022 and numbered 2022339558 continue, the continuation of the suspension of activity in the 11-stage West open pit at the representative coordinates Y-457978 X-4363438, the Main open pit at the representative coordinates Y-458893 X.-4363951 and the dangerous conditions in the landslide area in the section of the Marble open pit at the representative coordinates Y-459538 X-4364137. 39.in the 29 ha area, it was declared by the committee that the partial suspension of activity should be continued.<br><br>1. (If any) General Considerations, Other Determinations, recommendations, Conclusion (Explanation) - In the examination made on the date of the inspection, 11-stage Western open pit at the Y-457978 X-4363438 representative coordinates that are not active in the field, 40-stage Main open pit at the Y-458893 X; 4363951 representative coordinates, 28-stage Marble open pit at the Y-459538 X-4364137 representative coordinates that are not active, 26-stage Manganese open pit at the Y-460139 X-4364382 representative coordinates that are not active, in the region between the Marble open pit and the Main open pit, it is seen that pickling activities continue at the upper levels in order to take loads to prevent slippage. In addition, it has been declared that the Geotechnical Unit monitors landslide/deformation with radar devices and field controls in the area of partial cessation of activity and throughout all quarries. |
| 09/22/2022 | No | Determinations that the activities are not carried out in accordance with the project - As stated in the Explanations section,<br>1. (If any) General Considerations, Other Findings, Suggestions, Conclusion (Explanation)- 11-stage West Open pit at representative coordinates Y-458034 XI-4363463, which was not active at the site at the time of the inspection, At representative coordinates Y2-458738 X2-4363913, 43-stage Main Open Pit, at representative coordinates Y3-459457 X3-4364222, 28-stage Marble Open Pit, at representative coordinates Y4-459975 X3-4364350, 26-stage Manganese Open Pit.<br>In the West quarry; no activity was carried out after the previous committee's findings.<br>In the area located at the intersection of the marble quarry and the main quarry and whose coordinates are given below; it has been declared that no activity has been carried out after the previous committee determinations, that the activity suspension should continue due to the continuation of dangerous situations, and that the coordinates of the area where the partial activity suspension will continue are stated below.<br>Coordinates of the Area where the Partial Suspension of Activities will continue (Plot- 141Al-Area-39.29 ha)<br><br>Y1 459494  X1 4364312  Y2 459787  X2 4363806  Y3 459541  X3 4363472  Y4 459229  X4 4363462  Y5 459048  X5 4364017 |

I Yasin DURMAZ, the sworn translator, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature



SWORN
TRANSLATION

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

|  |  |  |
|---|---|---|
|  |  | In the main quarry, it was determined by the committee that no activity was carried out after the previous committee's determinations, that it is in compliance with the operation project in its current state, but since slope cutting works will be carried out for deepening the quarry, it is necessary to warn that production and production preparation activities should be carried out in a way to go from upper elevations to lower elevations without carrying out production activities on the quarry floor, and that no activity was carried out in the manganese quarry after the previous committee's determinations, and that it is in compliance with the operation project in its current state.<br><br>In addition, in the examinations carried out on the site based on the Temporary Activity Certificate issued by the Ministry of Environment, Urbanization and Climate Change, which is available in the petition dated 20/09/2022 and numbered 2022335943 and dated 20/09/2022 and numbered 2022335654, which is requested to be evaluated in the delegation request dated 20/09/2022 and numbered 2022335943; With the letter dated 07/07/2022 and numbered E 4092374, the Environmental Permit and License was canceled.<br><br>Based on this, it has been declared that the committee has determined that there is no objection to carry out mining activities in the quarries mentioned above in accordance with the relevant articles of the Mining Law No. 3213 and the Mining Regulation in accordance with the relevant articles of the Mining Law No. 3213 and the Mining Regulation, since it is stated that the 'Temporary Activity Certificate' was given with the letter dated 20/09/2022 and numbered E.2538 and that there is no objection to carry out the activity.<br><br> |
| 07/07/2022 | No | **Determinations that the activities are not carried out in accordance with the project** - Since it has been determined that the dangerous conditions that caused the suspension of production activities within the scope of Article 29/1 of the MINING LAW in the West Quarry located at the representative coordinates Y-458034 X-4363463 are still continuing, *it is necessary to continue the suspension of production activities within the scope of Article 29/1 of the MINING LAW, Y-459417*, X-4364222 representative coordinate marble quarry and Y-458738X-4363913 themed coordinate main quarry section in the landslide area in the landslide area, which is located in the main quarry section, it has been determined that the dangerous situations that caused the cessation of production activities within the scope of Article 29/1 of the MINING LAW are still continuing, so it has been determined that the production activities should continue to be stopped within the scope of Article 29/1 of the MINING LAW.<br><br>**1. (If any) General Considerations, Other Determinations, recommendations, Conclusion (Explanation)** - In the examination made on the date of the inspection, 11-stage West Open pit was seen at the representative coordinates of Y1-458034 X1-4363463, there was no activity on the day of the inspection, 43-stage Main Open pit was seen at the representative coordinates of Y2-458738 X2-4363913 on the date of the inspection, no activity was seen on the day of the inspection, 28-stage Mermer Open pit was seen at the representative coordinates of Y3-459457 X3-4364222 on the date of the inspection, there was no activity on the day of the inspection, 26-stage Manganese Open pit was seen at the representative coordinates of Y4459975 X3-4364350 on the date of the inspection, *all activities in the license area were stopped by the Ministry of Environment on the day of the inspection.*<br>*As a result of the investigation carried out regarding the malfunction in the pipelines carrying cyanide-containing solution to the leaching site on 21.06.2022; It was understood that there was a leakage in the pipes with the realization of low pressure in the pipeline carrying cyanide-containing solution to the leaching site around 01.50 on 21.06.2022 at the license site and a search was made for leakage detection throughout the leaching site.*<br>*At 05.20, it was determined that the leakage was caused by a rupture at the connection point of the solution main pipe (10 inch) line and the side line (4 inch) located at the representative coordinates Y-460635 x-4363878 within the leach site and the main solution line was completely stopped.*<br>*In the statement of the company official, it was stated that 210 cubic meters of solution (with a cyanide content of 415 ppm) flowed out during the 3.30 hours it took to detect the leak, of which 190 cubic meters remained in the leach area with the membrane and 20 cubic meters flowed into the area without membrane.*<br>It is stated that the soil contaminated by the solution in the area without membrane was removed by heavy machinery and transported to the leaching area, the areas that could not be reached by machinery were washed with Hypochloric acid, and it was declared to the committee that the solution did not reach the Sabırlı stream near the leaching area. |

SWORN
TRANSLATION

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

| | | |
|---|---|---|
| | |  |
| 01/20/2022 | No | **Determinations that the activities are not carried out in accordance with the project** - Since it is determined that the hazardous situations that cause the production activities to be stopped within the scope of Article 29/1 of the MINING LAW are still ongoing at the representative coordinates of Y-457897, X-4363326, it has been determined that the production activities should continue within the scope of Article 29/1 of the Mining Law, and that the hazardous situations that cause the production activities to be stopped within the scope of Article 29/1 of the MINING LAW should continue in the landslide area at the intersection of the Y-459417, X-4364222 representative coordinated marble quarry and the Y-458738, X-4363913 representative coordinated main quarry.<br><br>**1. (If any) General Considerations, Other Findings, Suggestions, Conclusion (Explanation)**- It has been determined that there has been no activity in the 11-stage West Hearth located at the representative coordinates Y-457897, X-4363326 since the date of the last mission inspection. It was observed that production activities and landslide load reduction/staging works are ongoing in the 25-stage Marble quarry located at representative coordinates Y-459417, X-4364222.<br> It has been determined that there has been no activity in the 27-stage Manganese quarry located at the representative coordinates of Y-459975, X-4364350 since the date of the last committee audit. It was observed that landslide load reduction/staging works are ongoing at the 37-stage Main Quarry located at representative coordinates Y-458738, X-4363913.<br> Since it has been determined that the dangerous situations causing the cessation of production activities within the scope of Article 29/1 of the MINING LAW are still continuing in the West January located at the representative coordinates of Y-457897, X-4363326, it has been determined that the production activities should continue within the scope of Article 29/1 of the Mining Law, and that the dangerous situations causing the cessation of production activities within the scope of Article 29/1 of the MINING LAW should continue in the landslide region located at the intersection of the Y-458738, X-4363913 representative coordinates with the Y-459417, X-4364222 representative coordinated marble quarry. |

100

SWORN
TRANSLATION

| 09/16/2020 | No | **Determinations that the activities are not carried out in accordance with the project** - In the main quarry, the step geometry is deteriorated, the step geometry in the main quarry is completely deteriorated and shifts occur, the marble quarry and Manganese quarry in the NE of the main quarry are affected, the determination of the sliding surface in accordance with a geotechnical report to be received from the universities regarding these shifts in the main quarry, the determination of the groundwater level and the slope stability related to the subject are ensured and the steps are made in accordance with the project, it is stated as the opinion of the committee that no mining activities are carried out in the following coordinates, |
|---|---|---|

|  | Point 1 | Point 2 | Point 3 | Point 4 | Point 5 | Point 6 |
|---|---|---|---|---|---|---|
| Right (X) | 458171 | 458517 | 459073 | 459810 | 460166 | 459669 |
| Left (Y) | 4362944 | 4364121 | 4364359 | 4364623 | 4364157 | 4363148 |

**1. (If any) General Considerations, Other Findings, Suggestions, Conclusion (Explanation)**- On the date of the audit, activities were carried out only in the Manganese quarry, - As a result of the examinations made in the field; the step geometry was completely broken due to landslide in the main quarry.

According to the declarations, as a result of the measurements made with Georadar, it is seen that the sliding is 10 mm / day, whether the Marble and Manganese quarry located NE of this sulphurous quarry will be affected by these shifts, determination of the sliding surface, determination of the groundwater level, re-evaluation of the slope stability, and if necessary, making changes in the project, a geotechnical report should be obtained from universities and/or an accredited organization in relation to all these, and no production activities should be carried out within the coordinates we have mentioned above until these deteriorated slopes are made in accordance with the project.

-- Within the coordinates given by the license holder in the attachment of the petition dated 18.03.2020 and numbered 15897, the change of Pasture Status was found appropriate by the committee.

Also, deterioration of the steps occurred in the West quarry located at the representative coordinate Y- 457913 X- 4363514.

It was stated as the opinion of the committee that the works to be carried out on the subject that caused the suspension of production activities should be carried out in the field and production activities should be started after the on-site determination and approval by the on-site inspection committee of the General Directorate.

| 10/31/2019 | Yes | **Determinations that the activities were not carried out in accordance with the project** - 2013- 8,483,256 tons, 2014- 8,856,076 tons, 2015- 7,840,357 tons, 2016- 6,806,407 tons, 2017- 8,180,217 tons, 2018- 4,239,050 tons, as of the date of the 2019 audit, 3,037,246.817 tons of ore was shipped to the enrichment plant. |
|---|---|---|

**1. (If any) General Considerations, Other Findings, Suggestions, Conclusion (Explanation)**- On the date of the audit, the contractor company Çiftay AŞ continues its activities in the large-scale quarry, which is interconnected and in the form of a continuation of each other, the coordinates of which are specified above, and there is no activity and a buffer zone is left for the landslide area on the side of the marble quarry, which was also determined by the previous delegations.

It has been determined that there has been no activity for the Manganese Operation Permit for a long time, *a georadar system has been established in which the sliding movements up to the size of mm in the current quarry are instantly monitored at the representative coordinate of Y-459395 X-4364734*, the oxide and sulfur raw ore produced in the field is fed to the enrichment facility belonging to the license holder, and the limestone allowed to be produced within the scope of Article 16 is used for in-pit roads and activities for the facility.

the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text. Signature:

101



| | | |
|---|---|---|
| 07/03/2018 | Yes | **1. (If any) General Considerations, Other Determinations, recommendations, Conclusion (Description)** - On the date of the inspection, *complex ore (Au+Ag + Cu + Mn+Hg) production activities are carried out by the license holder company and the contractor company Çiftay AŞ* in four quarries opened as adjacent to each other around the coordinates of Y-459589-X-4364034 (marble quarry), Y-459975-X-4364402 (manganese quarry), Y-458738-X-4363913 (main quarry) and Y-457913-X-4363514 (west quarry). *Manganese production activities in the license area were terminated a long time ago, mercury* production is not being carried out, although the number of employees working in the field varies, approximately 1000 personnel are working, and there is a complex ore stock of around 8.500.000 tons. In addition, clay and limestone production is also carried out under Article 16. All of them are used in enrichment processes and quarry road arrangements and there is no market sale. In order to ensure safe operation in the existing quarries in the field, an early warning system was established by placing a radar monitoring device in the field. With the radar device in question, the deformations in the quarries are monitored instantaneously and in case the deformation rate reaches a critical level, the areas in danger will be evacuated with the automatic warning system, and it was declared that there was no need for an emergency evacuation situation in the existing quarries in the field until the date of the audit. During the inspection made on the date of the audit; it was observed that there was no activity in the area where there was a regional/partial sliding movement/landslide between the coordinates of approximately Y-459600-X-4363800, which occurred between the marble and manganese quarry in 2006, and that the lower elevations of the sliding plane were reinforced with four levels of pillar and the entrances to this section were closed. The license official who participated in the delegation stated that no production activity is planned in this area. On the date of the audit, the heap leaching area, the existing oxide ore processing plant and the sulphide ore processing plant under construction were visited and information was obtained. It has been declared that the sulfide ore processing plant under construction, the approximate cost of which is estimated to reach 750 million dollars, will be completed within the next few months and that the sulfide ore produced from the quarry and kept in stock until today will be enriched in this plant after trial production starting in the summer months. Approximately 43,000,000 tons of apparent reserves for oxide ore from this field and an average Au ore production of 1.13 g/ton are reported in the project. In addition, reserves of up to 190 Million Tons and an average Au grade of 1.53 g/tons are reported for sulphide ore. It was declared that a total of 1200 RC drillings of over 128,000 meters have been carried out in this field until today. |

SWORN TRANSLATION

the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature



| 06/06/2017 | Yes | 1. (If any) General Considerations, Other Findings, Suggestions, Conclusion (Explanation)- <br> 7- FINDINGS ON THE AUDIT AND OPINIONS ON TECHNICAL AND FINANCIAL ISSUES <br> The following issues were determined in the on-site inspection of the license area numbered Sic-847 carried out in accordance with the relevant articles of the Mining Law No. 3213 with the approval of the Authority dated 03/05/2017 and numbered 802839. <br> - Complex ore (Au+Ag+Cu+Mn+Hg) production activities are being carried out by the license holder company and the contractor company Çiftay AŞ in four quarries opened adjacent to each other around coordinates Y-459589-X-4364034 (marble quarry), Y-459975-X-4364402 (Manganese quarry), Y-458738-X-4363913 (main quarry) and Y-457913-X-4363514 (West quarry). Manganese production activities in the license area have long since ceased. <br> the 2016 production map given in the annex of the 29th article form is appropriate except for 2017 activities. 8.000.000 tons of complex ore stockpile is available. <br> In addition, clay and limestone are also produced under Article 16 (All of which is used in beneficiation processes and quarry road arrangements. <br> There is no market sale). - The current pit designs at the site were created as a result of geotechnical studies conducted by Sial Engineering-Consultancy in December 2004, Ban Engineering in April 2012 and Golder Associates in April 2014. <br> As a result of the studies; maximum step height of 15 meters, 750 step slope angle and 52.500 quarry design with a general slope angle was created. <br> According to the examination made on the date of the audit, the step slope angles are 74-750 around 15 meters in height, and step heights around 15 meters. <br> Ore production is carried out in stages of 5-meter slices, resulting in a final stage of 15 meters. <br> Currently, it has been declared that the evaluation of the existing pit designs and the collective work by Golder Company and Hacettepe / Middle East Technical Universities within the scope of the Sulphide Project (Production and beneficiation of sulphide ore) are continuing and a joint report will be prepared in the near future. <br> License authorities were warned to submit the projects related to the design of the hearth to our General Directorate. In order to ensure safe operation in the existing quarries in the field, an early warning system was established by placing a radar monitoring device around the coordinates Y-459918-X-4363906. <br> With this radar device, the deformations in the quarries are monitored instantaneously and if the deformation rate reaches a critical level, the dangerous areas are evacuated with an automatic warning system. Until the date of the audit, it was declared that there was no need for an emergency evacuation in the existing quarries in the field. <br> -In the committee report assigned with the approval of the authority dated 14/01/2015 and numbered 212, it was stated that there was a landslide in the quarry opened around the coordinate Y-459486-X-4363909. <br> In line with this determination, a warning letter was written to the license holder within the scope of paragraph 1 of Article 29. During the inspection on the date of the audit, it was observed that production activities continued in the area specified in the committee report and this area was exceeded. <br> According to the inspection made on the date of the audit; regional/partial sliding movement has started between the coordinates Y-459682-X-4363953 and Y-459257-X-4363721 of the quarry called marble zone (in a different area than the area determined by the previous committee), due to the start of the sliding movement, load reduction work was carried out by pickling in 5 stages on the +1200 code, deformation monitoring stations were established at various points around the +1200 code. <br> It was observed that there were no signs of landslide/leakage at higher elevations, and production activities continued with a pillar of approximately 40 meters on the quarry floor. As a result of the geotechnical examination of the landslide zone, it was determined that the landslide movement was more in the nature of in-situ spreading due to the formation characteristics, and load reduction works were carried out at the upper elevations of the landslide movement. It was stated that the flow/landslide zone in question was monitored 24 hours a day by radar and also by setting up deformation monitoring stations at many points and that no negative issues were detected as a result of the evaluations made, that production work will be carried out in a 5-meter slice on the quarry floor and that the area will be used as an internal casting area in a short time. |

I, the sworn translator Yasin DURMAZ declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text. Signature

SWORN TRANSLATION

103



SWORN
TRANSLATION

Due to the fact that the production activities in the landslide/leakage zone in question were continuing on the date of the audit and the direction of the quarry progress was towards this zone, the license holder company had to be warned in writing to take the necessary safety measures in this zone.- Details regarding the permits under Article 7th of the Mining Law are given in the relevant section, and the current production areas are within the operating permit and Article 7th Permit areas.

i -Technical and permanent supervisor appointment list is attached to the report, Karabey TURAN was last appointed as permanent supervisor on 17/02/2016, the notarized supervisor book was kept regularly and appropriately, the activities were carried out within the supervisor appointment period - In the ÇİMER application dated 18/03/2017 by Arzu KEKLİK; cyanide was used and blasting was carried out 500 meters from their village.

It was stated that the dust clouds were all around, their health was deteriorating, they were cornered because of the mine and İbrahim ÇEÇEN dam, some of the villagers were silenced by giving money under the name of aid money again, there were not even 10 meters between them and the fence.

it was stated that every day someone dies of cancer.

Arzu KEKLİK was contacted by phone number 0539 694 2857 and did not reside in the vicinity of the mine.

A complaint was made that he resided in the İliç district center and that there were reports of increased deaths in the region.

It has been declared that it will not participate in the committee, a statement has been made in the following sections with the complaint of blasting, and other complaints should be evaluated within the scope of EIA since they are related to the negative effects of mining activities on the environment, — In the complaint petition dated 04/1/2016 made by Eşref DEMİR to BİMER; mining activities have been started by Anagold company in the village adjacent area.

There are almost no pasture areas for grazing animals, the grass yield has decreased due to intense dusting, and animals have been caught in dust-related diseases.

It was stated that the chemicals used caused animal diseases, that explosive materials were used during mining exploration, that animals suffered serious traumas due to the intense noise generated, that it was learned externally that legal permits were not obtained, and that there were results affecting human health during the work carried out.

It was requested that the necessary investigation be made about the suspicious company and a public case be opened to punish the suspects, On the date of the inspection, the complainant Eşref DEMİR also participated in the committee and stated in the minutes that "The complaint made about the license area is more related to the permits of the license, the leaching area and the adjacent area belong to the legal entity of Sabırlı Village, but the area in question was shown in the name of Copler Village and permission was obtained in this way.

It was stated in the petition that the matter has been brought to the judiciary and the court phase is ongoing, and that the complaints about the environment continue in the petition. In the examination of the transaction file of the license area numbered S-847; it was determined that all of the property permits (and other permits within the scope of Article 7) related to the areas used within the license area were obtained. The complaint that the leaching area, for which the pasture allocation has been amended, remains within the boundaries of Sabırlı Village should be evaluated by the relevant institutions. In the Investigation made regarding the complaint of blasting in the license area; in the blasts, delayed capsules were used between the holes and 102 mm diameter drills were drilled and the hole depth was around 5.6 meters in the production stages, so a maximum of 24-25 kg of explosive material was used per drill (per instantaneous delay).

in 15-meter drills, it was determined that a maximum of 80 kg of explosive material could be used.

The quantities of explosives in question were found to be appropriate. Other complaints (pollination, animal diseases, reduction of pasture areas, etc.) should be evaluated by the relevant institutions within the scope of EIA.

within the scope of Article 11, the committee assigned with the decree numbered 14/01/2015/212 examined up to number 606881, and in the examination made on the shipment receipts and sales invoices submitted for the years 2015, 2016; the shipment receipts were based on the number of trips made daily to the oxide stock area and sulfur stock area located next to the quarry and the facility, and the amount of tonnage taken by the vehicle, and a single daily shipment receipt was issued over the total.

In addition, there is a weighbridge receipt list showing the daily weighing in the annex where the shipment was made from the stock area to the enrichment facility (heap leaching), and a shipment receipt was used in dore-bulb shipments after the

facility. According to the sales invoices submitted for 2015; 243.747 ounces of gold, 39,084 ounces of silver, 110.904,05 kg of copper, 47.325 tons of limestone, 73.912 tons of clay sales and 654,222.853.37 TL income was obtained.

Deducted from the official accounting records and cost calculations of the facility, it was determined that the average stove head sales prices were appropriate. -according to 2016 sales invoices submitted for the year 2016; 150,167 ounces of dore gold, 30,416 ounces of silver, 1,197,548 kg of copper, 1,165,491 tons of limestone and 450,455,091.94 TL. revenue was obtained from the sale of 150 ,167 ounces of dore gold, 30,416 ounces of silver, 1,197,548 kg of copper, 1,165,491 tons of limestone, and it was determined that the average quarry head sales prices were appropriate by deducting 213,669,938 TL cost expenses from the official accounting records and cost calculations of the facility.

-until the 2017 audit date, it has been declared that 1,728,800 tons of limestone was shipped to the oxide stockpile, 185,726 tons to the sulphide stockpile, 1,703,178 tons to the enrichment plant (heap leaching), 59,287.50 tons to the crushing and screening plant with the shipment receipts belonging to our General Directorate, and it has been seen from the MBYBS system records that the operating license fees, license fees and environmental compliance guarantees have been paid.

the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature



| 02/26/2015 | Yes | **Determinations that the activities are not carried out in accordance with the project-** a) General Information (Starting from the first application, license stage, transfer status, final status)- The law of the license numbered S.847 comes from the period of Law No. 6309. For the license numbered IR-257 (S-847), Unimangan Manganese San AŞ requested the adaptation of the license to the Mining Law No. 3213 with the manganese operation project attached to the petition dated 14/02/1986 and numbered 7179, which was submitted to the General Directorate by Unimangan Manganese San AŞ, and the request was found appropriate and a 40-year operating license and manganese operation permit valid from 06/11/1986 was issued. The license numbered S-847 was transferred to Çukurdere Mad San ve Tic Ltd Şti on 23/10/2000, and the second mining operation permit was requested with the gold + copper operation project attached to the petition dated 13/01/2004 and numbered 79911 submitted to the General Directorate. *The request was found appropriate and the second mine gold + copper permit was issued on 04/11/2004, the title was changed on 18/08/2009 and it became Çukurdere Mad San ve Tic AŞ, the operation project prepared as a result of the detection of silver ore was submitted to our General Directorate on 22/12/2006.* *As a result of the examination made at the site and after the approval of the Authority, a silver operation permit was issued on 18/03/2011, the* title was changed with the petition dated 04/11/2010 and *numbered 145086,* and the law of the license numbered 847 continues. |
|---|---|---|

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION



It has been determined that the license in question has not been transferred, the license holder company for the license numbered S-847 has requested the expansion of the permit area with the petition dated 11/06/2014 and numbered 102850 submitted to the General Directorate by the license holder company and the request for the inclusion of 941.42 ha facility, infrastructure facility and waste dams in the operating permit area with the committee determinations assigned *The operating permit arrangement was found appropriate* and approved with the approval dated 05.09.2014 and numbered 6284.

With the petitions dated 03.12.2014 and numbered 148912 and dated 16.12.2014 and numbered 151881 submitted by the license holder company, it was stated that the committees were assigned for the examination in accordance with Articles 7.11,24/4-12,29,31,46 (Expropriation and Public Benefit) of the Mining Law No. 3213 and Article 14 of the Pasture Law No. 4342, c) If There is Production, By Whom? It has been declared that **production activities have been carried out by the subcontractor company Çiftay İns Taah ve Tic AŞ in the field.**

t) Are activities carried out in accordance with the Declaration of the License Holder? Yes

**I. (If any) General Considerations, Other Determinations, Suggestions, Conclusion (Explanation)-** 7- DETERMINATIONS RELATED TO THE AUDIT AND OPINIONS RELATED TO TECHNICAL AND FINANCIAL ISSUES (Regarding the subject of the assignment and other issues that need to be added; the determinations and opinions on technical and financial issues will be explained in paragraphs) - ... - As of the date of the audit, production activities continue in the license area numbered S-847.

it was observed that four quarries were opened in the operation permit area with the representative coordinates of Y-457996 - X-4363492 West Quarry, Y-458261 - X-4363890 Main Quarry, Y-459545 - X-4364005 Limestone Quarry, Y-460156 - X-4364621 Manganese Quarry,and production was carried out by the subcontractor company Çiftay İnş Taah ve Tic AŞ. - the quarries opened in the operation permit area have gradual production, the step heights are around 10 meters, the current situation as of the date of the audit does not pose a danger to life and property safety, however

Y-459486 X-4363909 representative coordinate, therefore, a ground survey should be carried out in the area in question and measures should be taken to prevent the formation of landslides, the slope angle, slope height and step width should be warned to make the steps suitable according to the results of the survey, and a warning sign should be placed in the area in question not to enter the landslide area until the necessary safety measures are taken, -Within the Scope of Other Determinations- With the petitions dated 29.12.2014 dated and 155413 numbered petition by the license holder, it is requested that the areas within the operation permit area and the areas to be built in the rust dump area and the areas to be built in the belt channel are within the pasture areas and accordingly, the pasture allocation change is requested.

As a result of the examination made in accordance with Article 14 of the Pasture Law No. 4342 and since it has been determined that there is no contrary situation to the criteria in the commission report dated 26.01.2011 and numbered 481, it has been found appropriate by the committees to make the pasture allocation change requests for the areas within the parcels numbered 107, block 103 and 108, block 106, parcel numbered 40 and block 108, parcel numbered 67 within the coordinates given below.

It has been declared that the areas of the waste areas for which the Pasture Allocation Amendment request is approved are defined as Polygon 1, 2, 3, and the area of the Avigation Channel for which the Pasture Allocation Amendment request is approved is defined as Polygon-1 (P-1) and Polygon-2 (P-2).



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

SWORN
TRANSLATION

| 06/27/2014 | Yes | **1. (If any) General Considerations, Other Determinations, recommendations , Conclusion (Explanation)- -** In the examination made at the site, a quarry has been opened in 4 different areas in the existing operation permit area, raw gold + copper + silver ore production has been made in the opened quarries, and the established facility has been established for the enrichment of oxidized ore in the license area.<br>it has been observed by our committee that new enrichment plants and tailings dams are needed for the sulphide ore decided to be operated, that there is no topography suitable for the establishment of a proper facility in the license area, and that the waste is dumped in suitable areas within the existing operation permit area.<br>In accordance with Articles 7.11.29.24/4-12 of the Mining Law No. 3213 in accordance with the approval of the Authority dated 19.06.2014 and numbered 3190 and the petition annexes submitted to our General Directorate for this request are appropriate. Coordinates of the operation permit area requested and approved by our committee |

|   | 1st Point | 2nd Point | 3rd Point |
|---|-----------|-----------|-----------|
| Y | 457280 | 462600 | 457620 |
| X | 4366400 | 4363600 | 4362680 |

| 1/2/2014 | Yes | **Determinations that the activities are not carried out in accordance with the project - c)** By whom the production is carried out by the subcontractor company Çiftay İnş Taah. ve Tic AŞ.<br>**1st (If any) General Considerations, Other Determinations, Recommendations, Conclusion (Expansion of Permit) - >** In the petition dated 04/07/2013 and numbered 112166 given to the General Directorates by the license holder; As a result of the efforts to increase and search for reserves in the field, it was requested to expand the operation permit area due to the observation of gold+silver+copper ore and the production plan in the regions outside the existing operation permit area.<br>> 3 samples were taken from the core chests preserved to represent the core drilling locations previously opened in the areas where operation permit area expansion was requested from the site.<br>the samples taken were analyzed at the Acme laboratory, which has an accredited certificate.<br>As a result of the analysis conducted, it was determined that there is gold + silver + copper mineralization in the area where the permit expansion is requested.<br>Maps showing drilling locations and sample analysis results are attached to the report.<br>> Since it has been determined that there is gold+silver+copper mineralization in the area where permission expansion is requested, it has been found appropriate by the delegations to expand the operation permit area within the area whose map sheets and coordinates are specified below.<br>It has been declared that the map boundaries of the extended gold + silver + copper operation permit area approved by the committees are shown below. |

I, the sworn translator Yasin DURMAZ declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

107

SWORN
TRANSLATION

the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text. Signature

| | | |
|---|---|---|
| | |  |
| .../05/2012 | Yes | **Determinations that the activities are not carried out in accordance with the project -§)** *Information on Tallow and Balance* - In the 2nd Mine Au+Ag+Cu operation project approved by the General Directorates, tallow material (y-460200, x-4363800, y-459800, x-44364600) will be stored in two different areas. one of these sites is located in the southeast and the other in the southwest of the mine, the tallow extracted from the main zone will be stored in the southwest site, and some of the tallow will be used in the waste storage facility, heap leach Unit. These issues are stated, permission has been obtained for the clay and limestone produced as a result of the necessity of production within the scope of Article 16, and the resulting material is used in the heap leach area.<br><br>**1. (If any) General Considerations, Other Determinations, Suggestions, Conclusion (Explanation)- 6-** DETERMINATIONS RELATED TO THE INSPECTION AND OPINIONS RELATED TO TECHNICAL AND FINANCIAL ISSUES (Regarding the subject of the assignment and other issues that need to be added; opinions on the determination and technical and financial issues will be explained in paragraphs)- During the inspection and observations made in the mining license site numbered IR;257-S;847 within the scope of Articles 2, 16 and 36 of the Mining Law No. 3213, the following issues were determined in addition to the above-mentioned issues.<br>◆ As of the date of the audit, the contractor company (Çifttaylar) continues production activities for gold and silver production in the quarry with the representative coordinates Y-460203-4364044, which was opened by the contractor company (Çifttaylar) within the operation permit area in the field<br>◆ As a result of the correlation of the data of many drillings made in the field with each other, the geological structure / model of the ore is revealed by determining the gold-silver mineralization and the quarry was opened with the open operation method.<br>The mineralization zone was descended to the mineralization zone with the stepping made within the scope of the open pit plan and gold and silver production was started, and as of the date of the audit, production activities are continuing in the ore mineralization.<br>In addition, it was declared to the delegation that Au-Ag production will start in the south of Copler village in the 2012 plans, where the village of Copler was moved to the new settlement area where it was removed,and that Au-Ag production will start in the south of Copler village.<br>◆ Since Au+Ag production activities will start outside the 65.05 ha area previously permitted for clay-calcare and mercury production within the scope of Article 16th, it was requested to expand the Article 16th permit area to cover the areas to be studied<br>◆ In the new area to be studied (drilled), clay and limestone in the upper levels In the manganese zone where production is made, the surface is generally covered with marble, mineralization is related to the contacts between diorite intrusive branches, marble and diorites, and disseminated mineralization occurred outside the contact zone.<br>As a result of the analysis made by sampling the area to be dismantled by blasting without production / on-site blasting during ore production in limestones where mineralization develops in the field, limestones that do not contain gold / silver / gem are taken as a result of the analysis made to represent the area to be removed without dismantling the rock and the limestone pasha storage area northeast of the clay storage area at approximately Y-459925-X-4364561 coordinates and the nearby limestone pasha storage area.<br>Limestone that can be sized is sized by breaking by means of mobile crushers. The sized limestone is used in the heap leaching area, and clay formations have been observed in different levels of limestone cracks/mineralization area in the quarry.<br>The compressible/sealed geotextile with bentonite impregnation (equivalent impermeability to clay) on which the compressible/sealed clay was laid in the<br>◆ heap leach area, which was first tested with a thickness of approximately 30 cm, was laid above this level,<br>It has been declared that pipes were placed on it in a way to collect the solution/drain it to the facility and that the leach area was prepared by laying +12 mm-35 mm dimensions (sized limestone) on it for filter purposes.<br>It has been declared that the leaching area consisting of 3 phases (3 separate areas adjacent to each other) covers an area of approximately 50 ha.(500.000 m2), 500.000 m2 x0,3=150.000 m3 of clay and 500.000 m2x 1 m= 500.000 m3 of limestone is needed, the 1st area of 3 separate areas has been completed and the construction of the 2nd and 3rd areas has started, 500.000 m3 x2/3=333.333,33 m3 x2,7 tons/m3 = approximately 900.000 tons of limestone is needed for the 2nd and 3rd areas. The crusher units (the first gyratory crusher, the second cone crusher, the third cone crusher, the third cone crusher, were recently installed on the three prepared areas, the ore was heap leached in 2010, but the cyanide solution does not take the gold and silver in the ore-containing part into solution, but it takes the gold and silver on the surface of the ore-containing part into solution, that is, as the size decreases, the ore recovery increases. From here, it is transferred to the leaching area by means of belts. In the prepared leaching area, layers are formed by laying ore approximately 8 meters thick, |

SWORN TRANSLATION

The process of creating a leaching area is being carried out from the lowest elevation, *it is declared that a total of 13 layers (each floor 8 meters) will be created,* a solution *(350 g of cyanide per 1 ton of water,* lime is added to raise the *pH above 10.5)* on the ore *(a grid of 20 cm x 20 cm is formed on the ore andthe ore is subjected to three with the solution flowing from the holes in the side corners of all the grids)* , so that the entire ore surface is subjected to this solution and the solution containing gold and silver is taken to the plant through the pipes at the bottom.

*This solution is applied to the ore in each layer for 45 days, After application, a new layer is laid on top of the previous one, and the layer below is subjected to three layers again due to the top layer. The gold-silver content of the solution coming to the plant from each leaching area is continuously controlled and floor plans are made accordingly, and it is declared that most of the valuable minerals are taken into solution after 30 months of the bulk ore subjected to approximately three times,* In this respect, the manganese zone and the marble contact zone, which will soon be active, produce limestone and clay as a result of the production activities for gold and silver.

*During the inspection of the facility, Au+Ag in the solution containing gold and silver taken from the leaching area in the field is first passed through carbon and then Au+Ag is taken on activated carbon, the solution is sent to the leaching area again in closed circuit after adjusting the cyanide content and pH in the tanks.

The Au+Ag-containing carbon, which is then brought to the gold stripping column, is passed under high temperature, high solubility cyanide and 3 bar pressure to remove the metals (Au+Ag), subjected to acid washing to activate and reuse the carbon, and used in a closed circuit (treated with diluted nitric acid to increase the gold retention capacity and the oil on the carbon with this process, lime etc. is being removed), there is also a copper stripping unit that was not used at the time of the audit but is planned to be used in the future (in the presence of economic copper).

Au+Ag, which is in the ionic state of Au(CN) in the cyanide environment, is reduced to metallic state and collected in the cathode made of stainless steel in solid form, the gold cake taken is filtered and dewatered, the Hg in the ore can come up to the crucible by showing the same chemical properties as Au+Ag during these processes, after the filter process, Hg is given to the furnace for removal, where Hg evaporates at 425 degrees.

Gold, on the other hand, is subjected to a temperature of about 1250 degrees, about 520 degrees in an oxygen-free environment, Hg evaporates in the gold cake and is taken into the pipes with vacuum, the vapor coming to the heat exchanger is condensed by being subjected to sudden cooling in the heat exchanger,and comes to the accumulation tanks with the pipe.

If the vapor passes through here, it is subjected to the same treatment in a second heat exchanger, and from here it is taken to the mercury collection tank with pipes, and if it passes through here, it is kept in 2 separate flue gas treatment units. It has been declared that no Hg findings have been found in the chimney discharge so far, and after Hg removal, the gold cake is subjected to a temperature of 1300 degrees with silica, borax and soda added to the crucible.

As a result of the sudden spillage of the magma melt, the gold first cools and solidifies at the bottom due to the difference in the degree of melting between gold and slag. The slag solidifies by maintaining its molten state for a certain period of time.

With the petition dated 01/07/2011 and numbered 114358 submitted to our General Directorate, it has been declared that it is not economical to utilize the requested mercury, that 90 kg. of mercury was obtained in 2010 and 152 kg. in 2011 by distillation from the specified process, that it is planned to be sold, that the Hg separation unit was established due to the negative environmental impact of Hg, and that this issue is included in the EIA legislation.

Declaring that it is the opinion of the committees that there is no objection to the evaluation of mercury within the scope of Article 16th of the Mining Law, the coordinates of the clay + chalk + Hg permit area in accordance with Article 16th in addition to the previous 65.05 ha. area found appropriate by the committees are 104.20 ha. and shown below.

|  | 1. Point | 2. Point | 3. Point | 4. Point | 5. Point | 6. Point | 7. Point | 8. Point | 9. Point | 10. Point |
|---|---|---|---|---|---|---|---|---|---|---|
| Right Y | 458473 | 459088 | 459649 | 459540 | 459550 | 459334 | 459218 | 458911 | 458639 | 458453 |
| Upper X | 4364185 | 4364206 | 4364475 | 4363700 | 4363500 | 4363309 | 4363257 | 4363201 | 4363308 | 4363671 |

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:



SWORN TRANSLATION

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:



| 07/13/2011 | Yes | 1. (If any) General Considerations, Other Determinations, Suggestions, Conclusion (Explanation)- 7- DETERMINATIONS REGARDING THE INSPECTION AND OPINIONS REGARDING TECHNICAL AND FINANCIAL ISSUES - During the inspection and observations made within the scope of Articles 2, 7, 11, 24/3,24/4 ,24/12 , 29 and 32 of the Mining Law No. 3213 in the mining license area numbered IR-257-S-847, the following issues were determined in addition to the issues mentioned above (in the report).

As of the date of the audit, production activities for gold and silver production continue in the quarry at coordinates Y-.460203, X-4364044, which was opened by the contractor company in the manganese zone within the operating permit area in the field.

As a result of the correlation of the data of many drillings made in the field with each other; *Gold-Silver mineralization was made and the geological structure / model of the ore was revealed, the manganese zone (marble contact zone and no activity in the main zone) is approximately 450 meters in the north-south directionand 700 meters in the east-west direction, the manganese zone mineralization occurred under the surface / Buried.*

*it was revealed that the mineralization was approximately 300 meters deep from the surface and an open pit design was made for the economic production of the ore by taking into account the lowest elevation of the mineralization, taking into account the topography, geological location of the mineralization, economic operation, occupational safetyand economic sufficiency.*

After this process was carried out, the open pit plan was being implemented in the quarry at the specified coordinates from the upper elevations (at levels that did not contain ore), the mineralization zone was descended to the mineralization zone with the stepping made within the scope of the open pit plan and gold-silver production was started.

As of the date of the audit, production activities are continuing in the ore mineralization, the surface is generally covered with marble in the manganese zone where production is made, the mineralization is related to the contacts between diorite intrusive branches, marble and diorites, and disseminc mineralization occurred outside the contact zone.

The result of the analysis made by sampling the area to be removed by blasting without production / on-site blasting during ore production in limestones where mineralization develops in the field to represent the area to be removed without removing the rock *as a result of the removal of limestones that do not contain gold - silver / jewel-free limestones at an economic rate, it is poured into the limestone rust storage area northeast of the clay storage area and nearby limestone rust storage area at approximately Y-459925-X-4364561 coordinates, limestone that can be sized is crushed and sized by mobile crushers, the sized limestone is used in the heap leaching area,* In addition, clay formations were observed in the limestone cracks/mineralization area at different levels within the quarry.

In areas where clay formations are present, as a result of on-site sampling before removal, it is observed that there are also clay levels that are not economical / do not contain ore, it is determined whether these levels contain ore or not by on-site sampling and technological tests (compressibility, impermeability, etc.) are carried out, it is planned to use non-ore containing, compressible impermeable clay as impermeable material at the base of the heap leaching areas.

On the quarry floor in the manganese zone, a gray clay formation (declared to be ore-free and impermeable as a result of the tests) was observed on the quarry floor with dimensions of approximately 20 m x 30 meters.

It has been declared that the heap leaching area was firstly prepared by laying approximately 30 cm thick clay with compressible / impermeable clay, which has been tested, compaction process was carried out, bentonite impregnated geotextile (equivalent impermeability to clay) was laid on this level, polyethylene / geomembrane was laid on this level, pipes were placed on it in a way and feature to collect / drain the solution to the facility, and the leaching area was prepared by laying +12 mm -35 mm sized (dimensioned limestone) for filter purposes, It is produced from the quarry on the prepared leaching area and transported by trucks to the crusher units installed near the quarry **(the first crusher is a gyratory crusher, the second is a cone crusher, the third is a cone crusher, recently installed, the ore was heap leached in 2010, but the cyanide solution does not dissolve the goldand silver in the ore-containing part, but *dissolves the gold and silver on the surface ofthe ore-containing part , that is, as the size decreases, the ore recovery increases).*** |



SWORN TRANSLATION

From here, it is transferred to the leaching area by means of belts, and layers are formed by laying approximately 8 meters thick ore in the prepared leaching area. It was declared that the leaching area is being created from the lowest elevation and a total of 13 floors (each floor 8 meters) will be created.

By applying the solution (350 g of cyanide per 1 ton of water, lime is added to raise the pH above 10.5) on the laid ore, rubber pipes are laid transversely and dripping system is used on the ore (a 20 cm x 20 cm grid was created on the ore.

The ore is liquefied with the solution flowing from the holes in the corners of all the grid sections), thus, the entire ore surface is subjected to this solution and the solution containing gold-silver is taken to the plant through pipes at the bottom.

This solution is applied to the ore in each layer for 45 days, after the application, a new layer is laid on top of the previous one, and the layer below is subjected to liquor again due to the upper layer. The gold-silver content of the solution coming to the plant from each leaching area is constantly controlled and floor plans are made accordingly, bulk ore subjected to liquefaction for approximately 30 months (2.5 years) after which most of the valuable minerals are declared to have been taken into solution. In this respect, limestone and clay are/will be produced as a result of the production activities carried out for gold and silver in the manganese zone where there is activity and in the marble contact zone where there will be activity in the near future. In the petition numbered 24/06/2011-112537 submitted to the General Directorates by the license holder company within the scope of Article 16th of the Mining Law, the calculation. In the petition numbered 29/06/2011- 113730, it was stated that permission was requested to use the clay in their own processes, and it was stated as the opinion of the committees to grant the limestone and clay permission requested within the scope of Article 16th of the Mining Law to include the manganese and marble contact zone.

The coordinates of the 16th substance limestone-clay permit approved by the committees are given below. During the inspection made at the facility, Au+Ag in the solution containing gold and silver taken from the leaching area in the field is first passed through carbon and Au+Ag is taken on activated carbon.

After adjusting the amount of cyanide and pH of the solution in the tanks, it is sent to the closed-circuit re-leaching area, then the Au+Ag-containing carbon brought to the gold stripping columns is passed under high temperature, high solubility cyanide and 3 bar pressure to remove metals (Au+Ag), the carbon is subjected to acid washing for activation and reuse and used in closed circuit (it is treated with diluted nitric acid to increase the gold retention capacity and the oil on the carbon with this process, lime etc. is being removed), it was observed that there is a copper stripping unit that was not used at the time of the audit but is planned to be used in the future (in case of economic copper availability), Au+Ag, which is in the ionic state of Au(CN) in the cyanide environment, is reduced to metallic state and collected in solid form in the cathode made of stainless steel, the gold cake taken is filtered and dewatered.

The Hg in the ore can reach the ladle by showing the same chemical properties as Au + Ag during these processes, and after the filter process, it is given to the furnace for Hg removal, where Hg evaporates at 425 degrees, in the gold cake, which is subjected to a temperature of about 1250 degrees, about 520 degrees in an oxygen-free environment, Hg evaporates and is taken into the pipes by vacuum, the vapor coming to the heat exchanger is condensed by being subjected to sudden cooling in the heat exchanger, and comes to the accumulation tanks with the pipe.

If the vapor passes through here, it is subjected to the same treatment in a second heat exchanger, from where it is taken to the mercury collection tank with pipes, and if it passes through here, it is kept in 2 separate flue gas treatment units, It was declared that no Hg findings were found in the chimney discharge until today. After Hg removal, the gold cake is subjected to a temperature of 1300 degrees with silica, borax and soda added to the crucible. Due to the difference in the degree of melting between gold and slag, gold first cools and solidifies at the bottom, while slag solidifies by maintaining its molten state for a certain period of time.

With the petition dated 01/07/2011 and numbered 114358 submitted to the General Directorate, it was stated that it was not economical to utilize the requested mercury, that it was planned to sell 150 - 200 kg of mercury by distilling from the specified process annually, and that the Hg separation unit was established due to the negative environmental impact of Hg.

In addition, it has been declared that this issue is included in the EIA legislation, it has been stated as the opinion of the committee that there is no objection to the evaluation of mercury within the scope of Article 16 of the Mining Law, a copy of the most recent analysis results made after electrolysis and before casting were submitted to the committee and given in the annex of the report.

In the determinations made within the scope of Article 7 of the Mining Law, the reports are required to be prepared in accordance with Article 6. In the examinations carried out within the scope of Article 11 of the Mining Law, as stated in the Section; the activities carried out in the license area continued in accordance with the project, and the shipment receipts received from the General Directorates were used in the shipments.

Weighbridge receipts were attached to the shipment receipts, sales information and activity information forms were submitted on time, the shipment receipts and invoices issued with the 29th article documents submitted to the General Directorates were compatible, and it was determined that the state rights incurred were paid.

Within the scope of Article 16, the area coordinates and map representation that are deemed appropriate to grant a limestone-clay permit are given below.

|   | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| Y | 459660 | 460150 | 460430 | 459880 | 459650 | 459550 | 459540 |
| X | 4364560 | 4364730 | 4364260 | 4363640 | 4363500 | 4363500 | 4363700 |

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

111

SWORN
TRANSLATION

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:



| | |
|---|---|
| 9/8/2010 | Yes |

**1. (If any) General Considerations, Other Findings, Suggestions, Conclusion (Explanation)-**

The drilling stamps made at the sampled locations, the results of the analysis made by the company in its own laboratories were presented to the committee by hand, and when examined, it was seen that there was gold presence. Therefore, the committee found it appropriate to extend the Gold (Au), Copper (Cu) operating permit for the area whose coordinates are given below, and the boundaries are given below.

Extended Gold (Au), Copper (Cu) coordinates 245hk.

| no | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| y | 458400 | 459081 | 459464 | 459608 | 459925 | 460233 | 460369 | 460386 | 459894 |
| X | 4364200 | 4364225 | 4364413 | 4364474 | 4364679 | 4364637 | 4364397 | 4364120 | 4363561 |
| no | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| y | 459783 | 459600 | 458593 | 458364 | 457770 | 457750 | 457788 | 458079 | 458400 |
| X | 4363512 | 4363100 | 4363100 | 4363038 | 4363302 | 4363415 | 4363569 | 4363674 | 4363745 |

112



SWORN
TRANSLATION

| | | coordinates of the permit requested under Article 16 (9.23HK.) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| no | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| y | 459866 | 459893 | 459914 | 459946 | 460061 | 460163 | 460240 | 460398 | 460481 |
| X | 4364153 | 4364171 | 4364175 | 4364105 | 4364283 | 4364271 | 4364287 | 4364248 | 4364219 |
| no | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| y | 460436 | 460357 | 460339 | 460292 | 460241 | 460151 | 459987 | 459968 | 459905 |
| X | 4364192 | 4364147 | 4364138 | 4364123 | 4364070 | 4364031 | 4364049 | 4364066 | 4364059 |
| no | 19 | 20 | 21 | 22 | 23 | | | | |
| y | 459867 | 459859 | 459865 | 459842 | 459840 | | | | |
| X | 4364058 | 4364071 | 4364071 | 4364091 | 4364095 | | | | |

**1/19/2009** — **Yes**

1. (If any) General Considerations, Other Determinations, Suggestions, Conclusion (Explanation)- The parcel numbers, areas and usage locations of the privately owned lands that are required to be expropriated for the Copler tailings area, the main quarry area, the area near the main quarry, the area within the main quarry and the Copler tailings area are given in the table below. (The parcel areas to be expropriated are listed in the annex of the report)

| Island No | Parcel No | Intended use | Area |
|---|---|---|---|
| 109 | 39, 40, 47,48 | Copler tallow area, main pit area, area near the main pit, main pit and Copler | 2.949,89 m2 |
| 110 | 11, 13 | the area within the field of tallow | |

However, these areas are located to the west of the manganese quarry outside the scope of the landslide leach area.

**11/28/2006**

Determinations that the activities are not carried out in accordance with the project - It has been declared that project studies for open operation are ongoing. 1(If any) General Considerations, Other Findings, Suggestions, Conclusion (Explanation)- During the inspections conducted at the site numbered IR.257 within the scope of Articles 11, 29 and 37 of the Mining Law; - Within the scope of Article 11, no delivery receipt was received, no production and shipment was made.
Accrued State Rights have been deposited, - The production map under Article 29th is appropriate.
- within the scope of Article 37; it has been determined that, as stated in the petition, reserve development studies for silver, as well as project studies for open operation are continuing since the water problem in the well cannot be overcome in the closed operation method since the closed operation method is not considered to be profitable.

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

113



SWORN
TRANSLATION

## 5.2. 2D AND 3D MODELING AND TECHNICAL ANALYSIS OF THE GENERAL GEOLOGY , STRUCTURAL AND GEOMORPHOLOGICAL CHARACTERISTICS OF THE HEAP LEACH SITE AND ITS VICINITY WHERE THE MINING ACCIDENT OCCURRED

**5.2.1. Geographical Location of the Heap Leach Field Exposed to landslide by Deteriorating Slope Stability** The geographic location of the Heap Leach Field is located in the western part of the Eastern Anatolia Region, approximately 4 km southwest of the residential area of Erzincan province, İliç district center, within the borders of Copler and Sabırlı Villages. In the 1/25000 scale J41a1 country map, this area is limited to Sabırlı Stream from the east and the cattle bed ridge from the south, and the Main quarry and the Old Manganese Open Operating Quarry in the west and northwest direction.



*Figure 1. - Location map (Google map and its location on HGM-J41a1, 1/25000 scale, country map) of the Mining Enterprise where the Mine Accident occurred.*



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

### 5.2.2  Geological Features of the Mine Site

Copler porphyria-epitermal gold mineralization is a bed directly associated with an opening/expansion tectonic multicollinearity magmatism located in the "Tethys Eurasian Orogenic Belt" (Jankovic, 1986; Jingwen et al, 2014) in the Alpine-Himalayan orogenic belt, and the basis of the study area is the regional metamorphism product of Keban Metamorphites, Permo-Triassic aged methasedimentary rocks (Özgül et al, 1981; Özgül and Pickle, 1984), which are stratigraphically lower levels, and the metasedimentary stack ophioliterin, which forms the lower levels, has undergone low-grade metamorphism (lower greenishist facet) in relation to the placement of the Taurus towards the northern edge in the Late Cretace, Metasedimanter rocks are mainly represented by phyllites, they are characterized by the combination of chlorite + quartz + cerisite/mica + epidote minerals representing their metamorphism in low temperature green schist facies, Metamorphic foundation is assumed by the Late Triassic-Cretaceous aged allocton carbonate platform Munzur Limestone (Özgül et al, 1981) along a tectonic boundary, the thickness of Munzur limestones is composed of massive and layered mostly crystallized limestones (intrabiomicrite) reaching 1200 m, it turns into granoblastic textured marbles with the effect of contact metamorphism around the granitoid intrusions, epidote granate, scapolite, chlorite and tremolite/actinolite minerals develop at the Plutonic-mar marble boundaries and brown-colored biotite-rich and pale green-colored diopsite-rich hornfes developed by researchers who have worked in the region (İmer et al, 2013, 2016; Canbaz and Gökçe, 2014). It was stated by Imer et al (2016) that the introduction of Middle Eocene igneous rocks (porphyric granitoids) into meta-sedimentary foundations and limestones reached from a few hundred meters to a few kilometers, and that early porphyric mineralization developed in granodiorite porphyria, which emerged in the main zone, and was surfacing in an area of 300 × 500 m, and that the region also contained small-scale epitermal mineralization affecting the porphyria system (figures 2, 3).



*Figure 2.Rock units observed at the mine site (tectono-stratigraphic map taken from Imer et al, 2016) and the location of the heap leach area indicated as phase (ED50-UTM6D-CM37).*

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature



*Figure 3.General tectono-stratigraphic vertical section of the region (taken from Bilgiç,2001)*

. Bozkaya et al. (2018) determined the following in the researches conducted in the region; It was determined that large-scale and widespread argillic alteration spread over large areas in and around the Copler gold deposit, the zones of argillic alteration were generally located in the granodiorite porphyry near the Munzur limestone overlay boundary. The argillic alteration exhibits a light colored (white, light cream) appearance due to the abundant clay and silica content (the samples belonging to the argillic zone show quartz + I-S (illite-symectite), quartz + krandallite + jarosite and cristobalite in the inner sections close to the phyllic zone, while the "argillic zone" in the outer sections exhibits quartz + smectite + kaolinite associations), They stated that the clay-rich alteration zones, which are accompanied by yellowish-orange-burgundy/brown zones in places due to iron oxide-hydroxide (limonite) alteration, are observed in the form of large-scale spreads of tens of meters, as well as in the form of 50-100 cm thick vein fills rich in limonite-rich 50-100 cm thick veins with white interiors rich in silica and clay minerals and yellowish orange walls within the degraded granodiorite porphyry mass.

### 5.2.3 Location and Geology of the Heap Leach Site in the Mine Area

On 13.02. 2024 (Tuesday, time 14-28), the heap leach site (Phase 1, 2, 3 and 4), which was destroyed by the slope stability, is located in the eastern part of the Copler mine operation site numbered RS-847, which is under the responsibility of Anagold AŞ. The basement rock of the heap leach consists of Munzur limestones, which are composed of Lower Triassic-Cretaceous aged marbles and limestones. This stack overlies the Keban Metamorphics with a tectonic contact. The area where the mine site is located is defined as the Copler window as a result of the erosion of the unit in the Copler region after the allochthonous Munzur Limestones settled in the region. The limestone rock units have a massive and thick layered structure with abundant fractures and cracks. From the observations made in the field, it was observed that karstic voids are commonly observed in this unit and steep slopes are formed in the areas where narrow valleys and stream beds developwithin the unit.

114



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

**52.4  Characteristics of the Heap Leaching Area and Material**

The evaluation of the heap leaching plant and material properties within the scope of the determinations and statements of the operator in the inspection and audit reports made by MAPEG regarding the control and inspection of the mining operation site within the scope of the mining law is given below. The mineralization zone is descended to the mineralization zone with the stepping made within the scope of the open pit plan and gold-silver production is started, mineralization is developed in the contact zone between diorite intrusive branches, marble and diorites, disseminated mineralization occurs outside the contact zone, the limestone that can be sized from these zones is crushed by mobile crushers and the sized limestone is used in the heap leaching area. Clay formations develop in the mineralization area in the cracks of limestones at different levels in the quarry. Ore-free, compressible impermeable clay is used as a sealing material at the base of heap leach fields. At the bottom of the quarry in the manganese zone, clay in gray tones (clay material taken from these areas due to the fact that it is ore-free and impermeable as a result of the tests carried out) is laid on the quarry floor with a size of approximately 20 m x 30 meters, and bentonite-impregnated geotextile (equivalent impermeability to clay) is laid on top of the clay layer laid on the leveled surface in order to provide compressible / impermeable properties with a thickness of approximately 30 cm before the heap leaching area, and polyethylene / geomembrane is laid on this level. The leaching area is prepared by placing pipes on it in a way and feature to collect the solution and drain it to the facility, and by laying limestone with a size of +12 mm -35 mm (sized) for filter purposes on it. On the prepared leaching area, the ore produced from the quarry and prepared in the crushing units installed near the quarry is laid as a raw ore and heap leaching is formed. The cyanide solution does not dissolve the gold and silver in the ore-containing part, only the gold and silver on the surface of the aggregate/part. Ore recovery increases as the particle size in the heap leach decreases. The material transported by trucks is laid out and transferred to the leach area by means of belts, and layers are formed by laying approximately 8 meters of ore in the leach area. The process of creating a leach area is carried out from the lowest level, a total of 13 layers (each layer is 8 meters) are formed and a solution is applied on the ore laid (350 g of cyanide is added to 1 ton of water, lime is added to increase it above pH 10,5). Transverse longitudinal rubber pipes are laid and the ore surface is subjected to this solution with the drip system (a grid of 20 cm x 20 cm is formed on the ore and the ore is subjected to the solution flowing through the holes in the edge corners of all the grid). After the solution filtered to the heap leaching bottom dissolves and absorbs metals such as Au+Ag+Hg from the heap, the solution is taken to the plant through pipes located at the bottom of the heap. This solution is applied to the ore in each layer for 45 days.

After the application, a new layer is laid on top of the previous one, the layer below is subjected to leaching again due to the upper layer, and the gold-silver content of the solution coming to the plant from each leaching area is constantly checked and floor plans are made. It is accepted that after 30 months (2.5 years), most of the valuable minerals of the liquefied bulk ore are taken into solution.

75.2.5. Topographic and Geomorphological Analysis of the Phase Surfaces of the Heap Leaching Plant (HLP) Within the scope of the prosecution investigation file, the areas where the landslide occurred at the Heap Leaching Plant (HLP) were analyzed through the analysis of digital elevation and surface models taken in different periods and 3 geological lines and 1 topographic profile covering the HLP phases.
 QGIS, Global Mapper software, Slide (Rocscience), MS Office (Excel), Notepad etc. software including GIS and UA techniques were used in the classification, organization and analysis of verbal and numerical data.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

SWORN
TRANSLATION



Figure 4.Geological Profile of Line A-B



Figure 5.Geological Profile of Line C-D



Figure 6.Geological Profile of Line E-F

116



I, the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature:



*Figure 7. Topographic Profile of G-H Line*

According to the analyses made on the geological profiles, the upper topographic surface of the slipped YLT after the landslide (shown by the red colored line in the AB-CD-EF sections) is parallel to the topographic surface before the mining operation period (shown by the black colored line in the AB-CD-EF sections), and the landslide started from the upper elevations of Phase-4 (Phase-4B region) in the south-north direction, After the junction line of Phase 4 and Phase 3, it was determined that the sliding event changed direction and moved parallel to the old dry Stream bed under Phase 3 and Phase 4 in approximately N45D direction, a very small part of the leachate moved into the Manganese Open Pit, and in the area where the old dry Stream bed connected to the Sabırlı stream, the sliding changed direction again and flowed again in the south-north direction along the Sabırlı stream line.

After proceeding approximately 350-400 meters along the membrane placed on the natural topography, where the YLT sliding event started at the upper elevations of Phase 4B, the sliding surface continued its movement within the YLT, not from the natural topographic surface, but from the average 50-55 meters lower elevations of the topographic surface dated 30.12.2023, and continued its flow by exploding the YLT slope surface in the area where 1195 elevations are located in the direction of approximately 200 meters K35B of the containers in the assembly area in the eastern region.

In the mining accident that occurred, the event developed rapidly and instantaneously, after the start of the sliding event, the sliding movement remained under the influence of geomorphological and topographical elements, among the causes of the YLT slide, the heap leaching design / design project did not contain sufficient safety criteria and geomorphological and topographical effects (dry stream beds, slopes of valley and slope surfaces, valley types, slope orientation etc.) were not sufficiently taken into account in the project design to ensure slope stability, For these reasons; "When it comes to the parameters in Annex 5 of the Regulation on Mining Wastes, in the risk assessment, factors such as - Size and characteristics of the facility, - Amount and nature of the waste in the facility, - Slope angle of the heap, - Potential for internal groundwater formation in the heap, - Stability of the ground, - Topography, - Proximity to waterways, structures and buildings should be taken into consideration,-If there is a possibility of any permanent or long-term environmental impact as a result of a potential landslide/landslide-type structural failure to the stability of the material heap -If the design of the facility is not adequate against potential collapse-type failures due to topographical constraints, the requirements for classification of the facility as Category A" are not fulfilled.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

**5.3.    THE FACTORS CAUSING SLOPE INSTABILITY AND THE EARLY WARNING SYSTEMS (RADAR ,INCAR , PRISM,PIEZOMETER , TILTMETER) USEDBEFORE , DURING AND AFTER THE FAILURE, MAGNETIC METHOD ETC)INVESTIGATION , GEOTECHNICAL EVALUATION AND ANALYSIS OF ALLOWABLE VERTICAL AND HORIZONTAL DISPLACEMENTS DURING AND AFTER MINE OPERATION**

**5.3.1. GEOTECHNICAL EVALUATION OF HEAP LEACH SITE**

Answers to the following questions were sought and the details are explained at the bottom of the table-

| Questions | Answers in summary (details can be seen below the table) |
|---|---|
| Could the landslide at the heap leach site have been triggered by a natural phenomenon such as an earthquake or heavy rainfall? | No. |
| Is the material in the heap leach site the same/similar material as the materials tested by taking samples for each phase and sending them to the soil mechanics laboratory? | In principle, yes. There was no significant difference between the materials.<br><br>Although it cannot be concluded with certainty whether the material sent to the heap leach site and laid down undergoes a gradation change over time due to irrigation with cyanide solution or due to additional vertical pressures created by materials in other phases piled on top of it, there may be a slight increase in the fines percentage of the material in the heap leach site after the application of cyanide solution. |
| When cyanide solution is introduced over the material laid in the heap leach area, is a change in soil properties expected over time during and after these processes? Could that have had any effect on the landslide? | Although no definite conclusion can be made, there may be a slight increase in the fines percentage of the material in the heap leach area after application of the cyanide solution and a slight decrease in the shear strength. |
| Is similar material piled/laid in each phase? Does the material at the heap leach site vary? If there is variability, can this be effective on slope stability? | No, similar material is not laid in each phase.<br>The material in the heap leach area contains some variability. This should be taken into consideration in slope stability analyses. |



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

| | |
|---|---|
| | The majority of the material in the heap leach area is "silty sand, SM", with a secondary majority of "silty gravel, GM", with an average fines percentage of 22% (range 16%-28%) and an average plasticity index of 9% (maximum 21%). According to the company, the total amount of ore in the heap leach area is approximately 60 million tons, of which approximately 21% is "clay ore processed in the clay plant and stacked in the heap leach area". |
| What is the tightness of the material laid in the heap leaching area? Is the specimen tightness similar to that used in laboratory triaxial compressive shear strength tests? If there is a difference, could this have an impact on slope stability? | At the heap leach site, the in-situ tightness in the field and the tightness at which the shear strength is determined in the laboratory are not sufficiently different to have a significant effect on the shear strength of the material; for the most different case, it is conceivable that the shear strength measured at the tightness in the laboratory, for example, the value of the angle of internal friction, may be as much as 1 degree lower in the field. This should be taken into account in the calculation of the slope stability safety number. |
| Are the shear strength parameters of the heap leach material determined correctly? Could this have an impact on the slope stability analysis results? | It has not been determined correctly. However, the sliding surface often passes through the geosynthetic-soil, geosynthetic-geosynthetic interfaces at the base, or through the geosynthetic clay cover. Therefore, the heap leaching strength parameters do not have a very serious effect; however, lower values of the heap leaching strength parameters should have been taken. |
| A buttress was constructed on the east and west sides of the heap leaching area to support slope stability. Are the strength parameters of this material selected correctly? | It was chosen approximately correctly, but it would have been a better engineering approach to use slightly lower parameters. |
| Have tests been conducted to determine the interface shear strength between the geosynthetic products (geomembrane, geosynthetic clay cover, geotextile) materials used in the heap leach site and the heap leach or soil materials that will be under and above these geosynthetic materials? | Yes, geosynthetic-soil interface experiments were conducted. The correct parameters were not used in the analysis. There is considerable variability in the experimental data. This is because the shear strengths of geosynthetic-geosynthetic and geosynthetic-soil interfaces are affected by many factors. |



I. the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

| | |
|---|---|
| According to the results of the experiment, were the correct parameters used in the analysis? | |
| It is known that the failure envelope can be nonlinear under high normal pressures in both rock-soil materials and geosynthetic-soil interface shear strength. Could the nonlinear shear strength envelope have had an effect on this landslide? | Non-linearity of the failure envelopes under high vertical pressures such as 1800 kPa was investigated, but it was considered that it would not have a significant impact on the slope stability analysis. |
| According to the ground motion measurements determined by radar measurements, is there a defect in terms of giving warnings and taking necessary measures? After which ground motion velocity value, which level of warning-alarm should be given, are these values defined correctly? When should a warning-alarm have been given? | There is a defect. It is understood that the limit values were not selected correctly and the necessary warnings were not given and that there were flaws in the execution of the emergency action plan. |
| Is it likely that there will be a higher water level caused by the cyanide solution and has this been taken into account in the slope stability analysis? | Not received.<br>It would have been appropriate to conduct slope stability analyses for different water conditions, considering the possibility that the water, which currently rises 1 m at the base, may rise further. |
| Are sufficient number of critical sections used in 2-dimensional analyses in design and slope stability analyses? | No. The sections used are inadequate. |
| Is the minimum safety number value that should be provided in slope stability analyses selected correctly? | No Although the values of 1.0-1.3 for the safety number were found sufficient by GRE, these values are insufficient. |
| Have 3-dimensional slope stability analyses been performed? | Yes.<br>However, the strength parameters used are not accurate. |



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

## PROPERTIES OF HEAP LEACH MATERIAL

In order to identify the material in the heap leach area, samples were taken from the heap leach area at the Anagold Copler mine site in Erzincan İliç on March 16, 2024 during the expert committee's reconnaissance work.

Five material samples (samples 1, 2, 3A, 3B and 3C) were taken at 3 different locations (Locations 1, 2, 3A, 3B and 3C) in the heap leaching area. A limited number of locations could be sampled due to safety considerations and the possibility of continued sliding movements in and around the heap leach site. Photographs of the sample locations and where they were taken are presented in Figure 1-Figure 9. Sample 1 and Sample 2 were taken from the heap leaching steps in the heap leaching area in the non-landslide/stable zones, while Samples 3A, 3B and 3C were taken from the material that had slipped and flowed into Sabırlı Stream, in other words, from the material that had been mixed and spatialized due to landslide.

## Sample Location-1

Coordinate-
X- 460 291.66m  Y- 4 363 769.49m  Z- 1
289.04m





*Figure 1. Sample Location-1 (images and coordinates provided by the company)*



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

## Sample Location-2

Coordinate-
X- 460 677.06m  Y- 4 363 627.14m  Z- 1
362.24m





*Figure 2. Sample Location-2 (images and coordinates provided by the company)*



*Figure 3. point where sample 2 was taken (Phase 4B material). Photo taken by Nejan Huvaj on March 16, 2024. The photo is also important as it shows the landslide mirror (the upper part of the sliding surface). The sample was taken from the stable part, behind the sliding surface.*

122



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature



*Figure 4. point where sample 2 was taken (Phase 4B material). Photo taken by Nejan Huvaj on March 16, 2024. The landslide mirror (sliding surface) can be seen in the photo.*



*Figure 5. point where sample 2 was taken (Phase 4B material). Photo taken by Nejan Huvaj on March 16, 2024.*

123



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

## Sample Location-3

Coordinate-
X- 461 024.85m  Y- 4 364 801.03m  Z-
1086.29m




Figure 6. Sample Location-3 (images and coordinates provided by the company)



Figure 7. Sample location No. 3, mixed heap leach material that slipped and flowed into
Sabırlı Stream. Photo taken by Nejan Huvaj on March 16, 2024.

124



I, the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature

SWORN
TRANSLATION



*Figure 8. location 3 (material that flowed into the Sab* *le stream bed after the landslide) from which samples 3A, 3B and 3C were taken. Photo taken by Nejan Huvaj on March 16, 2024.*



Sample 1              Sample 2

Sample 3B             Sample 3C

*Figure 9. Close-ups at the points where samples were taken. Photos taken by Nejan Huvaj on March 16, 2024.*



128

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

SWORN
TRANSLATION

The material samples were taken from Erzincan Central District Gendarmerie Command gendarmerie officers on March 18, 2024 by Assoc Prof Nejan HUVAJ in METU Civil Engineering Department in two blue thermos containers in the form of 6 taped bags (2 bags of sample were taken from sample number 2). A total of 5 samples, named as 1, 2, 3A, 3B and 3C, were subjected to experiments. All experiments were conducted by Assoc Prof. Nejan HUVAJ and Research Assistant Mert ERBAŞ at the Soil Mechanics Laboratory of METU Civil Engineering Department.

Due to the possibility of containing cyanide solution, the soil samples received on 18 March 2024 were opened using personal protective materials according to the necessary occupational health and safety rules, removed from their bags, divided into parts for the experiments planned to represent the sample by quartering method (Figure 10) and the following experiments were carried out - natural water content, sieve analysis (by dry method), sieve analysis (by washing method), hydrometer test, Atterberg limits, free weight (specific gravity).



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION





*Figure 10. Opening the sample bags brought to the laboratory and view of sample number 2*

The reason for sieve analysis with two different methods is that - in soils containing fine-grained and coarse-grained soils (mixed), in order to accurately determine the percentage of fine grains, the fine grains adhered to the coarse grains must be separated by washing with water and therefore a washing sieve test is required (Figure 11). For the determination of natural water content, dry sample weight between 2.1 kg and 2.9 kg was used to be representative considering the grain size. In the washed sieve test, the grains passing through the No200 sieve (grains smaller than 0.074 mm) were collected and after drying, hydrometer test was performed on this part.

127



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

The specific gravity test was performed on the No200 sieved grains (grains smaller than 0.074 mm) obtained from the washing sieve test. The Atterberg limits test was carried out by preparing samples in two different ways - (1) on No40 sieved grains (less than 0.420 mm) obtained from the dry sieve test. (2) The washed sieve test was performed on the fraction of grains passing through the No200 sieve (less than 0.074 mm). In the Atterberg limit experiments prepared in both types, the Casagrande container method was used, from "wet to dry", with the "multi-point method". The results were also confirmed by the "single point method". results of all experiments conducted between March 18, 2024 - April 11, 2024 are presented below.

 

Sample 3C                                        Sample 3B

*Figure 11. In the washed sieve analysis, the image of the grains (larger than 0.074 mm) remaining on the No200 sieve after the samples were washed through the No200 sieve and dried in the oven*

Grain size distribution and gradation curves obtained from sieve analysis and hydrometer tests are shown in Figure 12- Figure 13. Sieve analysis results and soil classifications according to the Unified Soil Classification System( USCS) are presented in Table 1 and the results of Atterberg limit tests are presented in Table 2.

Sample 1 (dry
Sample 2 (dry
Sample 3A
Sample 3B (dry
Sample 3C (dry

*Figure 12. Grain size distribution, gradation curves obtained as a result of sieve analysis (dry method)*





the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature



*Figure 13. Grain size distribution, gradation curves obtained from sieve analysis (washing method) and hydrometer tests*

*Table 1. on March 16, 2024, the results of sieve analysis tests on the samples taken and soil classification*

| Sample number- | 1 | 2 | 3A | 3B | 3C |
|---|---|---|---|---|---|
| Natural water content | 8.0 | 12.4 | 12.0 | 13.0 | 13.0 |
| Specific gravity of grains smaller than 0.074 mm, Gs | 2.748 | 2.804 | 2.725 | 2.781 | 2.780 |
| **SIEVE ANALYSIS (DRY METHOD)** | | | | | |
| Gravel percentage, % (percentage of grains larger than 4.76 mm) | 60.4 | 48.2 | 44.8 | 51.9 | 51.6 |
| Sand percentage, % (percentage of grains between 0.074 mm and 4.76 mm) | 36.3 | 45.9 | 45.8 | 44.6 | 42.3 |
| Fine grain percentage, % (percentage of grains smaller than 0.074 mm) | 3.3 | 5.9 | 9.5 | 3.6 | 6.1 |



I the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

| Unified Soil Classification System, soil classification name according to USCS | GW (well-graded gravel) | GW-GM (well-graded gravel-silt gravel) | SP-SM (poorly graded sand - silty sand) | SW (well-graded sand) | GW-GC (well-graded gravel-clay gravel) |
|---|---|---|---|---|---|
| **SIEVE ANALYSIS (BY WASHING METHOD)** | | | | | |
| Gravel percentage, % | 55.6 | 44.6 | 41.1 | 38 | 42.5 |
| Percent sand, % | 29.8 | 35.9 | 44.5 | 40.1 | 35 |
| Fine grain percentage, % | **14.5** | **19.5** | 14.4 | 21.9 | 22.5 |
| Percentage of clay in the whole sample, %, CF (Percentage of grains smaller than 0.002 mm) | 4.0 | 5.5 | 3.0 | 6.6 | 7.3 |
| USCS soil classification name | **GM** (Silty gravel) | **GM** (silty gravel) | **SM** (silty sand) | **SM** (silty sand) | **GC** (clay gravel) |

Table 2. on March 16, 2024, the results of the Atterberg limits experiments on the samples taken

| Sample number- | 1 | 2 | 3A | 3B | 3C |
|---|---|---|---|---|---|
| **Atterberg Limits-** **Made on dry sieved, No40 sieved (less than 0.425 mm) grains, Casagrande multi-point method (wet to dry)** | | | | | |
| Liquid Limit, LL (%)- Plastic Limit, PL (%)- Plasticity Index, PI | 30 24 6 | 30 24 6 | 21 21 0 | 32 24 8 | 30 22 8 |
| Name of the fine grain part according to USCS classification | ML (low plasticity silt) | ML (low plasticity silt) | N.P. (Non-plastic) (ML) | ML (low plasticity silt) | CL (low plasticity clay) |
| **Atterberg Limits-** **Made on washed sieved, No200 sieved (less than 0.074 mm) grains, Casagrande multi-point method (wet to dry)** | | | | | |
| Liquid Limit, LL (%)- Plastic Limit, PL (%)- Plasticity Index, PI | 45 30 15 | 40 26 14 | 36 36 0 | 47.5 29.4 18.1 | 44 26 18 |
| Name of the fine grain part according to USCS classification | ML | ML | N.P. (Non-plastic) (ML) | ML | CL |
| Activity- Plasticity index / Clay percentage, (PI/CF)- | 6/4 = 1.5 or 15/4=3.7 | 6/5.5 = 1.1 or 14/5.5=2.5 | 0.0 | 8/6.6 = 1.2 Or 18.1/6.6 = 2.7 | 8/7.3 = 1.1 or 18/7.3 = 2.5 |



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

Only samples 1 and 2 taken from the field on 16.03.2024 are the original materials in the heap leach area, on the steps, and samples 3A, 3B and 3C are the materials that flowed into Sabırlı Stream with the landslide on 13 February 2024 and came from different parts of the heap leach and mixed with each other. Therefore, samples 3A, 3B and 3C will not represent the gradation characteristics of the material in heap leach (in situ). For example, in those samples, the "percent fines in the sample" is not representative of the percent fines in the heap leach, as different levels of material may have been mixed as it flowed. Therefore, the **characteristics of Specimen-1 and Specimen-2 will be emphasized.**

As stated in national and international standards, sieve analysis by the washed method more accurately reflects the gradation and percentage of fine grains (compared to the dry sieve method) of fine- to coarse-grained mixed soils. According to the washed sieve analysis results, Sample-1 and Sample-2 have 14.5% and 19.5% fine grain percentages, respectively; both samples are classified as "silty gravel" (GM). Sample-3C has a fine grain percentage of 22.5% and the soil classification is "clayey gravel"; however, as mentioned, this sample cannot be said to represent the material in the pre-landslide steps of the heap leach site; it is flowed-mixed material.

The clay-grain-size fraction( CF), i.e. the percentage of grains smaller than 0.002 mm,as a percentage of total dry weight for the whole sample is 4% for Sample 1 and 5.5% for Sample 2.

For Sample 1 and Sample 2, liquid limit values were obtained as 30% and plasticity index values were obtained as 6% according to ASTM method (in Atterberg limits tests performed on the part of the sample with a grain size less than 0.425 mm); in Atterberg limits tests performed on the part of the sample with a grain size less than 0.074 mm, the liquid limit and plasticity index values were obtained as LL=45% and PI=15% for Sample 1 and LL=40% and PI=14% for Sample 2 and the fine grain fraction of both samples was classified as "low plasticity silt, ML".

On the other hand, activity values (plasticity index / percentage of clay in the whole sample) were calculated to give an idea about the mineralogy of the fine grain part of the samples. In the literature, if the activity value is greater than 1.25, it is classified as "active clay" and if it is between 0.75-1.25, it is classified as "normally active clay" (Skempton, 1953); for example, the activity value of calcium Ca-montmorillonite mineral is 1.5 and that of sodium Na-montmorillonite is greater than 3. The activity value for sample-1 is 1.5 or 3.7 (If the plasticity index is obtained from grains smaller than 0.425 mm, PI=6% and accordingly the activity is 1.5. If the plasticity index is obtained from grains smaller than 0.074 mm, PI=15% and the activity is 3.7. In this case, it can be concluded that Sample-1 contains "active clay".

Samples of the materials to be laid in the heap leach area have been taken by the Company for some time and sent to the soil mechanics laboratories of Toker Sondaj AŞ in Ankara and some experiments have been carried out. The submitted materials were generally labeled as "heap leach", "agglomerator" or "crusher"; a small number of samples had lift numbers such as "Lift 32 Cell 08" etc. Between December 2022 and January 2024, the data of the experiments conducted by Toker Sondaj AŞ were analyzed.

A question that comes to mind here is **whether Sample-1 and Sample-2 taken from the heap leach site on 16.03.2024 give similar results to the experiments carried out by Toker Sondaj AŞ by the company?**



the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

In other words, how much do the material properties in the heap leach area change before placement in the heap leach area and after irrigation with cyanide solution, as well as after additional vertical pressures are exerted on the material? Or, in general, how variable is the material to be spread in the heap leach field; how much variability in material properties?

It was examined whether the samples taken by our expert committee from the heap leach site on March 16, 2024 were similar to the experiments conducted by Toker Sondaj AŞ.

The results of the sieve analysis conducted by Toker Sondaj AŞ between December 2022 and January 2024 with the dry sieving method in the "heap leach" and "agglomerator" material and the results of the experiment conducted with the same method at METU on the samples taken from the site by the expert committee on 16.03.2024 were compared. On 16.03.2024, only samples 1 and 2 were taken from the site and only samples 1 and 2 were taken into consideration in the comparison since only samples 1 and 2 were the original materials found on the steps in the heap leach area.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

*Figure 14. Grain size distribution obtained as a result of sieve analysis (dry method), comparison of gradation curves. Gray curves are the sieve analysis test results of Toker Sondaj AŞ on 8 different "heap leach" and "agglomerator" materials.*

133



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

SWORN
TRANSLATION

In the sieve analysis results of the dry sieving method on the "heap leach" and "agglomerator" material by Toker AŞ lab between December 2022 and January 2024, the percentage of fine grains of 8 different samples was in the range of 0.5-1.2% (Figure 14), while the results of the experiment conducted at METU with the same method on the samples taken from the site by the expert committee on 16.03.2024 were 3.3% and 5.9% for Sample 1 and 2, respectively. In addition, according to Hazen's (1892) empirical equation, the effective grain size, $D10$ (the grain size at which 10% of the material is smaller), which is known to control the hydraulic conductivity (water permeability) in the water-saturated state in granular materials, is $D10 = 0.51 - 0.83$ mm according to the sieve analysis performed by Toker AŞ lab with the dry sieving method in 8 different materials of "heap leach" and "agglomerator", and $D10$ values for Sample 1 and Sample 2 are 0.30 mm and 0.15 mm. In soils containing fine and coarse grains (mixed), sieve analysis by dry method does not accurately determine the gradation curve and the percentage of fine grains. Therefore, sieve analysis should be carried out by the washed method. Nevertheless, even with the dry method, it can be said that the percentage of fines increases slightly; and the increase in the percentage of fines may slightly reduce the hydraulic conductivity (water permeability) of the soil in the water-saturated state. The material at the bottom of the heap leach zone is expected to be water saturated; on the other hand, the majority of the material laid in the heap leach zone is expected to be in a "non-water saturated state" (i.e., in a "semi-saturated" state), except during the solution drip cycle, which lasts 45 to 60 days (the company stated that solution continues to be introduced to the ore until it reaches saturation). For the same material, the hydraulic conductivity (permeability) in the water-saturated state is higher than in the water-insaturated state.

It should be taken into consideration that the samples sent to Toker Sondaj AŞ laboratory were named as "heap leach" and "agglomerator" and were sent to the laboratory before being laid in heap leach, whereas the samples tested at METU were materials that were located on the steps in the heap leach area and were subjected to additional vertical pressures due to the cyanide solution applied and the lifts laid on them.

A simple literature search was carried out to determine whether the material sent to the heap leach site and laid out undergoes a gradation change over time due to irrigation with cyanide solution or due to additional vertical pressures created by the materials in other phases piled on top of it, and whether the percentage of fine grains increases, but no information was found on the subject. However, there may be such a possibility.

Samples from only two locations (Sample 1 and Sample 2) from the heap leach site are representative of the material in the steps, and it would be inaccurate to make a definitive judgment based on tests performed on only two samples. There may also be differences in the gradation characteristics of samples laid in different phases and located at different elevations in the field. On the other hand, even if the same sample is sent to two different laboratories (e.g. Toker Sondaj AŞ laboratory and METU Soil Mechanics laboratory) in the "dry sieve" method in the sieve analysis experiment, it is known in the international literature that there may be slight differences between the test results of two different laboratories on the same sample.

Gradation curves according to the results of sieve analysis performed by Toker AŞ lab between December 2022 and January 2024 on "heap leach" and "agglomerator" material by washing method and the gradation curves of the samples taken after the landslide are presented in Figure 15 and Table 3. sample-1 and Sample-2 taken on March 16, 2024 are in the range-band of Toker AŞ Lab gradation curves; in other words, they are not materials with different gradations.



134

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION



*Figure 15. Results of sieve analysis performed by Toker AŞ lab between December 2022 and January 2024 on "heap leach" and "agglomerator" material by washing method. sample-1 and Sample-2 taken on March 16, 2024 are within the band of Toker AŞ Lab gradation curves, in other words, they are not materials with different gradations.*

*Table 3. Washing method sieve analysis of heap leach and agglomerator material performed by TOKER lab*

135



the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature

*between December 2022 and January 2024 and classification of 24 different samples according to the Unified Soil Classification System (USCS)*

| Sample classification | Fine grain percentage (% ≤ | Liquid limit, LL (%) | Plasticity index, PI (%) |
|---|---|---|---|
| GM (silty gravel) | 21% on average in 9 samples (range 16-24%) | 35% average in 9 samples (range 30-41%) | 7.5% on average in 9 samples (range 4.5-11.7%) |
| SM (silty sand) | average 21% in 11 samples (range 17-25%) | average 36% in 11 samples (range 28-48%) | 8% on average in 11 samples (range 4-18%) |
| GC (clay gravel) | 24% and 23.5% | 37.1% and 37.3% | 16.4% and 13.2% |
| SC (clay sand) | 28.2% and 24.5% | 48.8% and 40.2% | 21.4% and 15.9% |

According to Toker AS lab December 2022-January 2024 experiments-



I. the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

Of the 24 samples, 11 (about 46%) were classified as "silty sand, SM"; 9 (about 37%) as "silty gravel, GM"; 2 (about 8%) as "clayey gravel, GC"; and 2 (about 8%) as "clayey sand, SC". In 24 samples, the average percentage of fine grains was 21.7% (min=16.2%, max=28.2%) In 24 samples, the average liquid limit was 36.6% (min=28%, max=48.8%) In 24 samples, the average plasticity index was 9.3% (min=3.8%, max=21.4%). Figure 16 shows the average values and variation-variability of fine grain percentage obtained from the washing sieve test performed on 24 samples at Toker AŞ Lab; Figure 17 shows the liquid limit and plasticity index values for 24 samples.



*Figure 16. Percentage of fine done and natural water content of 24 different samples according to the washing method sieve analysis performed by TOKER lab on heap leach and agglomerator material between December 2022 and January 2024 (Natural water content of Sample-1 and Sample-2 taken on March 16, 2024 are 8% and 12.4% and these values are within the average value and range-band obtained from 24 samples at Toker AS Lab.*





I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

*Figure 17. According to the tests carried out by TOKER lab on "heap leach" and "agglomerator" material between December 2022 and January 2024, the liquid limit and plasticity index values of the fine grain percentages of Sample-1 and Sample-2 (14.5% and 19.5%, respectively); liquid limit values of 30% (for grains smaller than 0. 425 mm) and 45% and 40% (for grains smaller than 0. 074 mm); plasticity index values of 6% (for grains smaller than 0. 425 mm) and 15% and 14% (for grains smaller than 0.074 mm) from the samples taken by the expert committee on 16 March 2024 are in the range of values obtained in Toker AŞ lab. When these results are evaluated, it is understood that the materials (Sample-1 and Sample-2), which are located on the steps in the heap leaching area and have been subjected to additional vertical pressures due to the cyanide solution applied and the lifts laid on them, do not differ significantly from the material before it was laid in the heap leaching area in terms of gradation and plasticity properties, but there may be a small increase in the percentage of fine grains after solution application.*

**In summary, according to Toker AŞ lab experiments,** it is understood **that the majority of the samples in the heap leach area are "silty sand, SM"and the second majority are "silty gravel, GM", the average fine grain percentage is 22% and max 28% with variability (in the range of 16%-28%), the average plasticity index** is 9%, but this value varies and max 21%.

The heap leached materials (SM, GM, SC, GC) are classified as "coarse grained soil" according to the Unified Soil Classification System (USCS) and contain an average percentage of 22% (and up to 28% max) fines. Depending on the plasticity and mineralogical properties of the fine-grained fraction in such soils, sometimes the fine-grained fraction can control the shear strength and the drained and undrained behavior of the material (Park and Santamarina 2017, Ekici 2022). The Revised Soil Classification System( RSCS) is a soil classification system developed by Park and Santamarina (2017) that emphasizes the consideration of the behavior of the material (separately in terms of mechanical properties-strength and water flow) compared to the Unified Classification System (USCS), especially for "coarse-grained and fine-grained (mixed)" materials, as in heap leaching. Some of the parameters used in this classification system (e.g., shape/angularity of coarse grains in the sample) are not known to be exact for heap leached samples, but the empirical relationships proposed by Park and Santamarina (2017) can be used to estimate them. Sample-1 and Sample-2 taken from the heap leach area on March 16, 2024 are classified as "transitional mixture" according to the Revised Soil Classification System (RSCS). These materials are transitional mix materials that show a behavior between "coarse-grained soil behavior" such as sand and gravel and "fine-grained soil behavior" such as silt and clay. For example, according to the RSCS, Sample-1is classified as GF(F); and while coarse grains and fines together control the mechanical behavior, only the fines control the water flow behavior. This should be taken into account when assessing the shear strength of the heap leach material.

On the other hand, according to the company, the total amount of ore spread in the heap leach area is approximately 60 million tons, of which approximately 21% is "clay ore processed in the clay plant and stacked in the heap leach area". In other words, the probability that there are zones with more "clayey material" in the materials laid in the heap leaching area can be considered to be around 20%.

**Another issue that needs to be examinedis the tightness of the heap leached material in place in the steps and the tightness at which the shear strength tests performed at Toker AŞ Laboratory were performed** on the prepared samples. As known from the principles of soil mechanics, granular soils (sandy, gravelly soils) can have different shear strengths depending on their compactness. For example, **a loose sand** with more space between the grains has a lower shear strength (internal friction angle, □) **than the tightened state of the same sand.**



i. the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

In order to examine the density of the material laid in the heap leach field and how much it varies in the field, the measurements made by Toker Sondaj AŞ on 06.08.2018-07.08.2018 in Erzincan İliç heap leach field with a nuclear density meter device were analyzed (Table 4). The measurements were made at different phases of heap leaching, on heap material laid (uncompacted) by systems such as grasshopper conveyors, etc. and represent the tightness of the soil from the surface to a depth of 0.3 m at the point of measurement.

Table 4. In-situ tightness measurements in the heap leach material (measured by Toker Sondaj AŞ on 06.08.2018 - 07.08.2018. The measured values represent the ground from the surface to a depth of 0.3 m at the point of measurement)

| Step of the measured point in heap leaching (lift) | Average natural unit volume weight * (kg/cm3) | Natural unit volume weight Std. deviation * (kg/cm3) | Average dry unit volume weight *(kg/cm3) | Average dry unit volume weight (kN/m3) | Average water content * (%) | Water content Std. deviation (%) * |
|---|---|---|---|---|---|---|
| Lift 9 (C6) | 1518.4 | 78 | 1379.8 | 13.5 | 9.9 | 1.5 |
| Lift 9 (C4) | 1883.0 | 84 | 1635.4 | 16.0 | 15.3 | 2.5 |
| Lift 22 | 1617.1 | 97 | 1572.4 | 15.4 | 2.9 | 1 |
| Lift 23 | 1855.8 | 136 | 1785.3 | 17.5 | 3.9 | 1.2 |
| Lift 24 | 1954.9 | 91.5 | 1852.9 | 18.2 | 5.5 | 1.2 |
| Lift 25 (C3) | 1891.9 | 59 | 1739.5 | 17.1 | 8.7 | 0.6 |
| Lift 25 (C5) | 1948.2 | 88 | 1740.7 | 17.1 | 11.9 | 1.6 |
| Lift 25 (C6) | 1955.6 | 59 | 1773.5 | 17.4 | 10.3 | 1 |
| Lift 25 (C8) | 1711.3 | 96 | 1593.1 | 15.6 | 7.5 | 1.6 |
| Average | 1815.1 | 87.6 | 1674.7 | 16.4 | 8.4 | 1.4 |

* each value is the average of data from 6 to 13 experiments measured at the same level (elevation) in the same area. In the field, the smallest dry unit volume weight measured in situ was 13.5kN/m3, the average value was 16.4 kN/m3 and the highest value was 18.2kN/m3. The dry unit volume weight values measured in-situ indicate "how dense" the material is compared to the state in which it has been thoroughly compacted by exerting an effort; to understand this, either the "relative density" (relative density, Dr) or , when this cannot be obtained, the "Proktor % density ratio", which is often used in compaction processes, for example in highway construction (% Proctor firmness ratio = dry unit volume weight of the sample / highest dry unit volume weight obtained in Proctor test for that material). **In-situ tightness measurements in the field correspond to an average Proktor tightness of 83% (68% Proktor tightness at its lowest).**



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

Consolidated undrained (CU) triaxial compression (triaxial) tests were carried out to determine the shear strength of the materials sent to Toker AŞ laboratory by Anagold Company between December 2022 and January 2024. The samples are mostly silty sand, SM, secondary mostly silty gravel, GM, and a small number of clayey sand, SC, and clayey gravel, GC, with fines percentages in the range of 17%-25% and plasticity index values in the range of 5%-18%. The cell pressures used in the experiments were 300, 600 and 900 kPa. The specimens prepared by compressing to a certain target firmness level specified by the design firm GRE had an average dry unit volume weight of 16.5 kN/m3and an average water content of 13.6% at the beginning of the test. After the specimens were consolidated under cell pressure in the triaxial compression test, their average dry unit volume weight was 18.5kN/m3. **In the triaxial compression tests performed at Toker AŞ lab, the tightness of the specimens at the beginning of the test corresponds to an average 84% Proctor tightness ratio (Proctor tightness ratio in the range of 80%-86% for specimens in different tests).** After the specimens have been consolidated under a certain cell pressure in the triaxial compression test, these Proktor tightness ratio values increase slightly. Similarly, newly laid material in the heap leach field will compress slightly over time due to the additional steps/vertical pressures on top of it and the % Proctor tightness ratio may increase slightly. **In summary, at the heap leach site, the in-situ tightness in the field and the tightness at which the shear strength is determined in the laboratory are not sufficiently differentfrom each other to significantly affect the shear strength of the material; for the most different case, it is conceivable that the shear strength measured at the tightness in the laboratory, for example, the value of the angle of internal friction, may be as much as 1 degree lower in the field.** For example, according to the NAVFAC "Soil Mechanics DESIGN MANUAL 7.01 (1986)" used in the USA, when the relative density( Dr) decreases from 75% to 50% for poorly graded gravel, GP, the angle of internal friction decreases from 38 degrees to 35 degrees; for silty sand-poorly graded sand, SM-SP, the angle of internal friction decreases from 35-37 degrees to 32-34 degrees (by 3 degrees).

The drained cohesion value (c') and internal friction angle (φ') value pairs obtained in 13 specimens according to the results of consolidated drained (CU) triaxial compression tests performed between December 2022 and January 2024 on specimens prepared in Toker AŞ laboratory at the tightness specified by GRE company are presented in Figure 18 and linear failure envelopes are presented in Figure 19. **Cohesion values (c') vary between 0-12 kPa, with the lowest internal friction angle (φ') value is 27 degrees and the highest value is 38 degrees. When the failure envelopes are analyzed, for the average linear failure envelope, the shear strength parameters c'=4.7 kPa φ'=32.8 degrees. For the lowest failure envelope, shear strength parameters c'=4.4 kPa φ'=27.2 degrees.**

**The values used by the design firm for heap leach material in slope stability analysis are c'=0 kPa φ'=37 degrees. This failure envelope used in the design slope stability analysesis close to the upper limit of the values obtained from all laboratory shear strength tests on heap leachate as shown in Figure 19.**



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLAT.ON



Column C, GM, Thin 24%, PI=4.5%    K column, GM, thin 23.8% PI=3.7    F column u, SM, Thin 20.6% FI=N. P.
I column, SM, thin 24.2% OI=18.3%    J column, SC, Thin 24.5% PI=15.9%    L column, SM, Thin 244% PI=9.6%
M column, GM, thin 23,5% PI=13-2%    U column, G M, Thin 17.2% PI=8.6%    V column, SM, thin 7.1.7% PI=6.7
W column, GM, Thin 22.5% PI=11.7%    X column, GM, Thin 22%PI=6.1%    Y-column, SM, Thin 18.9% PI=5%
Z column, GM, Thin 20.8% PI=6.2%

*Figure 18. Pairs of drained shear strength parameters obtained from 13 consolidated undrained (CU) triaxial compression tests performed at Toker AŞ laboratory between December 2022 and January 2024*



*Figure 19. Drained shear strength failure envelopes obtained from 13 consolidated undrained (CU) triaxial compression tests performed at Toker AŞ laboratory between December 2022 and January 2024*



I, the sworn translator Yaşin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

Figure 20 shows the shear strength failure envelope for the materials used in the pillar fills/rockfill on the eastern and western edges of the heap leaching area. There are granular fills such as the eastern toe buttress in the area and in the slope stability analyses, in some reports, the failure envelope parameters recommended by Leps (1970) for rockfill materials (c=48.7 kPa φ=37.8 degrees if assumed linear) were used for the toe fill material; in some reports, a linear failure envelope of c=0 φ =35 degrees was used. As it can be seen in Figure 20, **the rockfill material used in the pillar embankments also contains a certain amount of variability.**



*Figure 20. Shear strength failure envelope for materials used in pillar fills/rockfill on the eastern and western edges of the heap leach area*

The shear strength assessment for geosynthetic materials is presented in the slope stability assessment section.

## SLOPE STABILITY ANALYSIS

In the report with the file name "2020.04.27-INR-Mass Leaching Phase 4B Expansion Project Report", it is stated that "The projects ... were prepared jointly by GRE and INR. INR reviewed the design made by GRE, checked its compliance with the regulations and engineering principles and submitted it to the Ministry." It is said. In addition, "Copler Gold Mine Phase-4B Heap Leach Expansion Project Engineering Services work was awarded to INR with the contract signed between Anagold and INR. ... The Copler Phase-4B Heap Leaching Plant expansion work was designed by the design team commissioned by the client. The design team consists of INR, GRE and Hydrodesign (SYDF)," It is said. Aerial photographs and videos of the project site from past to present and during and after the slide were analyzed, as they provide important information on the landslide mechanism and landslide surface, and some visuals are presented in the figures below.



142

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

SWORN
TRANSLAT.ON



*Figure 21. Sabırlı Stream, towards south (Google Earth, 2006). There is no mining site yet. There is a stream bed/valley coming to Sabırlı Stream from the west.*



*Figure 22. Sabırlı Stream, towards south (Google Earth, 2012). The mine site is operational. The stream bed/valley coming to Sabırlı Stream from the west was filled with fill material.*

143



I. the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature

SWORN
TRANSLAT,ON



*Figure 23. Sabırlı Stream, towards south (Google Earth, 2013). The mine site is operational. In the heap leaching area, shaving is carried out towards the south at the higher elevations of the hill.*



*Figure 24. Sabırlı Stream, towards south (Google Earth, 2023). The mine site is operational. At the edge of the heap leach site, a buttress was constructed towards the upper elevation of the road.*

144



the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature:

SWORN
TRANSLATION



*Figure 25. Aerial view after the landslide*

145

i, the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature



Figure 26. Aerial view after the landslide

I, the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature:

SWORN
TRANSLATION





*Figure 27. Images after landslide*



147

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION



Figure 28. Images after landslide

148

I, the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature:

SWORN
TRANSLATION



*Figure 29. Images after landslide*

translator Yasin DURMAZ,
that I have translated this
ument to English language completely
d correctly in accordance with the
Turkish text.
re

SWORN
TRANSLATION



*Figure 30. Images after landslide*

150

I, the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature:





*Figure 31. Images after landslide*



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

TRANSLATION



*Figure 32. Images after landslide*



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

SWORN
TRANSLATION



*Figure 33. Post-landslide images, north*

153

I, the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature



*Figure 34. View after landslide, north*



*Figure 35. Post-landslide image, material flowing into Sabırlı stream and landslide surfaces in the background*



I, the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature

SWORN
TRANSLAT.ON



*Figure 36. The development of the landslide moment, and the landslide surface (taken from the company's video recording from a vantage point overlooking the site)*

155

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION





*Figure 37. Development of the moment of landslide, and landslide surface*



*Figure 38. Development of the landslide moment and landslide surface*



156

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature



*Figure 39. The development of the landslide moment, and the exit of the landslide surface from the road elevation, above the road level (https-//www.youtube.com/watch?v=m1xUoiH7WCc)*

157

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION





*Figure 40. The development of the landslide moment, and the exit of the landslide surface from the road elevation, above the road level (https-//www.youtube.com/watch?v=m1xUoiH7WCc)*



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION





*Figure 41. The development of the landslide moment, and the exit of the landslide surface from the road elevation, above the road level (https-//www.youtube.com/watch?v=m1xUoiH7WCc)*



159

I the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION





*Figure 42. The development of the landslide moment, and the exit of the landslide surface from the road elevation, above the road level ([https://www.youtube.com/watch?v=m1xUoiH7WCc](https://www.youtube.com/watch?v=m1xUoiH7WCc))*

First of all, the parties responsible for the design and control of the design should be identified. In the "2020.04.27-INR- Heap Leaching Phase 4B Expansion Project Report", it is stated that "The projects ... were prepared jointly by GRE and INR. INR reviewed the design made by GRE, checked its compliance with the regulations and engineering principles and submitted it to the Ministry." It is said. In addition, "Copler Gold Mine Phase-4B Heap Leach Expansion Project Engineering Services work was awarded to INR with the contract signed between Anagold and INR.

160



I the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature

... The Copler Phase-4B Heap Leaching Plant expansion work was designed by the design team commissioned by the client. The **design team consists of INR, GRE and Hidrodizayn (SYDF)."**

**Accurate assessment of the intrinsic strength of geosynthetics and the geosynthetic-geosynthetic, and geosynthetic-soil interface shear strengths are crucial for slope stability assessments in the field.**

In particular, geosynthetic clay liner( GCL) should be considered with particular care in slope stability analyses due to its very low shear strength after hydration/wetting/saturation of the bentonite clay mineral between the two geotextile layers (Ross and Fox 2015).

Generally, the peak shear strength within the GCL itself is higher than the geomembrane GM-GCL interface shear strength (Ross and Fox 2015), but under high normal stresses, shear through the GCL itself can also be observed. **There are many factors affecting the interface shear strength between GM-GCL or geosynthetics and the soil they are in contact with.** Some of the factors affecting the GM-GCL interface shear strength are the level of vertical stress on the geosynthetics, whether the geosynthetics (especially the GCL) are in a dry, moist or saturated state, or whether they are hydrated (the shear strength is higher in the dry state), hydration time, the chemical characteristic of the hydration fluid (e.g. pure water, tap water, waste landfill leachate, cyanide solution, etc.), the type of geosynthetic materials (woven or non-woven geotextile, rough or smooth geomembrane, etc.) and the shear rate (shear stress application rate, fast shear, slow shear, etc.). **Furthermore, geosynthetics (such as soils) have different shear strengths depending on the degree of shear deformation to which they are subjected. In other words, the amount of shear deformationis another factor affecting the shear strength.**

Ross and Fox (2015) gave values of c=5- 11 kPa and $\phi$ =15-16 degrees for GM-GCL interface shear strength depending on the shear stress rate; and revealed that the post-peak strength decrease with increasing shear stress application rate can be in the order of 35%-55% of the peak strength. Fox et al (2015) reported c= 1 kPa $\phi$= 5 degrees as the residual strength for shear strength through GCL in their experimental study and revealed that the strength can vary depending on the shear rate and vertical pressure level. He also stated that these values are consistent with the values in the literature as residual strength values, zero cohesion and low internal friction angle values for sliding through hydrated GCL. In case of rapid shearing, c= 10-50 kPa and internal friction angle 3-6 degrees were specified as residual strength.

Koerner (2012) defines E, "efficiency" for interface shear strength (E value is a number between 0-100%), according to this definition, **the interface shear strength of the geosynthetic and the soil with which the geosynthetic is in contact cannot be greater than the shear strength of the soil itself.** The interface shear strength can be at most the shear strength of the soil with which it is in contact (i.e.the E value can be at most 100%, usually in the order of 70-98% for different geosynthetic interfaces).



the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

In the layers prepared for impermeability in the site, there is a layer of compacted clay at the bottom in some places. **When evaluating the interface shear strength of geosynthetics, it should be taken into account that they will not have a strength higher than the shear strength of the clay they are in contact with. In this case, the peak and/or residual strength of the underlying compacted clay layer with which they are in contact is also important.** It is reported that the clay layer laid and compacted under the heap leach pad (to meet the required impermeability criteria) is high plasticity clay (CH).

For example, in the report titled "STABILITY ANALYSIS REPORT, PHASE 4B- STAGE 1 AND STAGE 2, Copler Phase 4B HLP Expansion, Erzincan Province, Turkey, November 6, 2019, Project No 19-1210, Revision C" with the file name "2019.11.06-GRE-Phase 4B Stability Report", it is stated that "GCL (geosynthetic clay cover) will be laid where the slope angles are higher than 3Y-1D and clay will be laid where the slope angles are 3Y-1D and less". In the report with the file name "2018.10.10-INR-Batch Leaching Phase 4 Expansion Project Report", it is stated that "The leach bottom is double-sided rough, 2 mm thick HDPE geomembrane, underneath it is GCL and underneath that is 0.5 m thick clay." It is said. in the report with the file name "2020.04.27-INR-Batch Leaching Phase 4B Expansion Project Report", it is stated that "A composite coating system consisting of 2 mm HDPE membrane on the base and GCL or clay underneath is planned". The clay used in the large direct shear geosynthetic-soil interface shear strength tests presented in the "2016.08.01-GRE-Phase 4 Stability Report" is described as "light brown sandy fat clay, CH" with a liquid limit LL=51%, and a plasticity index PI=31%.

**In the report with the file name "2007.11.01-Tetratech-Heap Leach Pad Facility Final Design Report" -**

Large-scale direct shear tests conducted by Vector Engineering (California) on February 24, 2007 are presented. 1.5 mm thick LLDPE geomembrane with rough surfaces on both sides and clay "underlying clay soil liner (CH, sandy fat clay, liquid limit LL=74%, plasticity index PI=45%)" and ore (GP) materials on top of them were tested for interface strength under vertical pressures of 193, 393 and 787 kPa (dry or unflooded). It was reported that the most displacement was observed at the clay and geomembrane interface. In the slope stability analyses, c=0 $\phi$ =15 degrees was used for the interface between the smooth surface LLDPE geomembrane and the clay (CH) layer. According to the literature review for the geosynthetic clay cover (GCL) interface with LLDPE geomembrane with two rough surfaces (Zornberg et al. 2005, CETCO 2002, Triplett and Fox 2001) c=0 $\phi$ =23 degrees. in the report with the file name "2007.11.01-Tetratech-Heap Leach Pad Facility Final Design Report", the strength parameters used in slope stability analysis can be seen in the table below-



162

I the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature

SWORN
TRANSLATION

**Table 5.2:     Material Properties in Stability Analyses**

| Material | Moist Unit Weight (kN/m³) | Effective Cohesion (kN/m²) | Effective Friction Angle (degrees) |
|---|---|---|---|
| Heap Ore | 18.1 | 0 | 40 |
| Smooth Geomembrane/Soil Liner Interface | 17.8 | 0 | 15 |
| Double-Side Textured Geomembrane/GCL Interface | 17.8 | 0 | 23 |
| Site Grading Rockfill | 22.0 | Non-Linear Shear Strength Envelope (Table 5.1) | |
| Slope Debris (Gravelly Clay) Foundation | 19.0 | 0 | 35 |
| Conglomerate Foundation | 23.0 | 600 | 30 |

in the report with the file name **"2007.11.01-Tetratech-Heap Leach Pad Facility Final Design Report"** -

in the analyses and cross-sections presented, there is information about the old stream bed-valley filled towards Sabırlı Stream, and the geosynthetics at the base, which are important as the lower part of thelandslide surface of the February 2024 landslide exited from this surface, the road elevation, and can be seen in the figures below.



In the 110 m wide area shown shaded, there are 1.5 mm LLDPE geomembrane, under which (instead of clay) geosynthetic clay cover (GCL) is laid, outside the 110 m zone, there is compacted clay in the laban. The base of the February 2024 landslide surface passes through this flat/near-flat area, shown as 110 m wide, the road elevation indicated as "access road" is east / north - east with horizontal movement.

2007.11.01-Tetratech-Heap Leach Pad Facility Final Design Report" file named report.



the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature



2007.11.01-Tetratech-Heap Leach Pad Facility Final Design Report" file named report.



2007.11.01-Tetratech-Heap Leach Pad Facility Final Design Report" file named report.



i, the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature

SWORN
TRANSLATION

**In the report with the file name "2016.08.01-GRE-Phase 4 Stability Report" -**

16  In the GRE memorandum letter dated December 2015, GRE communicated to Anagold its reservations regarding slope stability. **Inconsistencies in the laboratory geosynthetic interface test results** (smooth geomembrane and geosynthetic clay cover (GCL) interface strength is higher than the rough geomembrane interface, vertical stresses in laboratory tests are not as high as desired, the geomembrane-GCL interface strength does not decrease under high normal pressures etc. In the letter sent by Alacer to GRE on April 1, 2016, Alacer informed about the independent stability condition assessment studies conducted by Golder in December 2015 and SRK Consulting in January 2016. **The slope stability studies of Golder and SRKalso questioned the water level (Phreatic line) used by GRE in their slope stability analysis. Golder and SRK stability studies focused on the geomembrane-GCL interface strengthand suggested residual strength at 20 cm (8 inch) deformations for smooth and rough geomembrane.**

**Golder** compiled the results of a large direct shear test for geomembrane-GCL interface strength for the Copler site between 2007 and 2015. SRK conducted a literature review on geomembrane-GCL interface strength and compiled 14 papers. Based on this literature review, SRK stated that the geomembrane-GCL interface shear strength **is controlled by the bentonite within the GCL rather than the geomembrane-GCL interface at pressures higher than 700 kPa vertical pressures.**

GRE commissioned GLA to conduct large-scale direct shear tests in March-May 2016, and the results were graphed together with the shear strength values recommended by Golder and SRK (figures and tables below are taken from GRE's memorandum). In addition, **geosynthetics of different types and properties that have been laid at different elevations in the past to provide base impermeability in the heap leach area can be seen in the drawing in the Figure below. As can be understood, there are manydifferent types of geosynthetic-geosynthetic and geosynthetic-soil interface strengths in the area and these will be effective in slope stability calculations.**

165



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

**Figure 2: Large Strain (6") Smooth Geomembrane/GCL Residual
Shear Strength Envelope Comparison**



**Figure 3: Large Strain (6") Textured Geomembrane/GCLResidual
Shear Strength Envelope Comparison**



Retrieved from GRE company memorandum letter dated December 17, 2015



I, the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature:

The tables below are taken from the GRE memorandum letter dated December 17, 2015.

**Table 4: Laboratory Testing Residual Smooth Geomembrane/GCL Strength Envelopes**

| Test Date | Peak Friction Angle (degrees) | Residual Friction Angle[1] (degrees) |
|---|---|---|
| 8/12/2014 | 16 | 14 |
| *2/18/2016 | 17 | 12 |
| 2/18/2016 | 14 | 13 |
| +3/29/2016 | 15 | 12 |

[1] Calculated at 3-inch strain

*GCL installed with woven side against the GM

+test completed to 270 pounds per square inch (psi) normal load (~105 meters of ore), all other tests listed were completed at 115 psi (~45 meters of ore)

**Table 5: Laboratory Testing Residual Textured Geomembrane/GCL Strength Envelopes**

| Test Date | Peak Friction Angle (degrees) | Residual Friction Angle[1] (degrees) |
|---|---|---|
| +5/2/2016 | 11 | 9 |
| 2/4/2015 | 25 | 10 |

[1] Calculated at 3-inch strain

*+test completed to 270 pounds per square inch (psi) normal load (~105 meters of ore), all other tests listed were completed at 115 psi (~45 meters of ore)



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature



Figure. Geosynthetics of different types and properties laid on the ground at different levels in the area

168

I, the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature

SWORN
TRANSLATION

In the report with the file name **"2016.08.01-GRE-Phase 4 Stability Report"**,

For geosynthetics, using the residual shear strength at 7.5 cm (3 inch) displacement, the **minimum FOS** of **1.0 to 1.3 is used as the "acceptable slope safety number"** (minimum FOS of 1.0 to 1.3) **by GRE.** The minimum safety number obtained using the peak shear strength parameters is 1.3 to 1.5, which is defined as "Acceptable safety number".

**It is also noted that, regardless of peak or residual, the geomembrane-GCL interface and GCL internal strength are the lowest strengths in the system.** In the case of using residual strengths, the following statement is included as to why the minimum safety number value to be achieved was set low - (a) the system (at the heap leach site and bottom) should never achieve the strain required to fully mobilize residual strengths over large areas ("the system should never achieve the strain required to fully mobilize residual strengths over large areas"). (b) Contributions of 3D effects to the slope stability safety number. However, it is known from the literature that even very small soil shear displacements are sufficient to achieve residual shear strength in clayey units in horizontal or near horizontal layers (Mesri and Shahien, 2003; Huvaj-Sarihan (2009). During the operation, the heap leach area, which is elevated by piling up in steps on top of each other, experiences vertical-horizontal ground movements as observed by radar measurements. **These movements indicate that the clay and/or geosynthetics laid on the base will also be subjected to a certain amount of deformation during operationand will reach residual shear strength values. In this case, the residual strength of the clay-containing units (compacted clay layer laid on the bottom, clayey zones in the ore, geosynthetic clay cover containing bentonite on the bottom, geosynthetic-soil interfaces, etc.) at the heap leach site should be taken into account.**

On the other hand, **on the heap leach pad floor with a large number of different geosynthetic and soil interfaces,** the **sliding surface will pass through the material with the lowest shear strength.** In other words, for example, if the geomembrane-GCL peak or residual interface strength is higher than the residual strength of the compacted clay layer laid beneath, the sliding surface will pass through the underlying clay layer which has less strength. The company stated that approximately 21% ofthe total heap leach material in the area is "clay ore processed at the clay plant and stacked at the Heap Leach site". It is mentioned in another report that the clay material laid and compacted at the base of the site is "light brown sandy fat clay, CH" with liquid limit LL=51% and plasticity index PI=31%, and in another report it is mentioned as "underlying clay soil liner (CH, sandy fat clay, liquid limit LL=74%, plasticity index PI=45%)". According to Mesri and Shahien (2003), (According to Mesri and Shahien (2003), it has a nonlinear failure envelope, but for practicality, linear failure envelope parameters are given here).

The average drained residual shear strength parameters of a clay with a plasticity index, PI=25%, are c'=0 kPa and $\phi$= 17.3 degrees (Mesri and Shahien, 2003);

The average drained residual shear strength parameters of a clay with PI=45% are c'=0 kPa and $\phi$ =10.7 degrees (Mesri and Shahien, 2003).



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

In this case, if the geosynthetic-geosynthetic or geosynthetic-clay interface shear strengths are higher than such shear strength parameters, the lower shear strength parameters, i.e. the residual shear strength parameters of the clay, should be used. The fact that this was ignored is seen as a defect on the part of the GRE company responsible for the design. **In the report with the file name "2016.08.01-GRE-Phase 4 Stability Report",**

GRE has shown 7 critical sections in terms of slope stability. 5 of these are the 5 sections mentioned by Golder (2015) and SRK (2016) evaluation reports and GRE added 2 more sections. **GRE, in its slope stability analyses, stated that the safety number for the static state using the peak shear strength of the materials is "minimum 1.3-1.5 depending on the site-specific conditions"and using the residual shear strength, the minimum acceptable safety number is "1.0 to 1.3 depending on the site-specific conditions".** 1.a safety number value of 0 is a structure such as a heap leach site, which has been and will be in operation for a long time (years); where the topography and material properties are variable due to the continuous elevation of the heap in the site; and in the words of the company, "a structure that is continuously fed with cyanide-containing solution by dripping method and where the amount of liquid in it increases with rain and snow water from time to time". **The value range of 1.0-1.3 for slope stability in such an area, using residual shear strength parameters, is not the "minimum acceptable safety number" and has no national-international basis. Therefore, the GRE firm responsible for the design is at fault for not correctly determining the "minimum number of safeguards to be provided" in the area.**

**Figure 5: HLF Stability, Critical Sections**



**It is an engineering-design flaw of GRE that among the critical sections identified, the axis on the west side of the heap leaching area, which includes the additional pillar support embankmentand where the landslide towards the manganese quarry occurred in February 2024, was not included, such a section was not considered critical and was not considered in the slope stability calculations with revised material parameters.**



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

Using the shear strength parameters to be provided by GRE, Anddes was assigned to perform 3D slope stability analyses and 3D slope stability analyses were also performed for 3 sections.

**in the file named "2018.10.10-INR-Batch Leaching Phase 4 Expansion Project Report" -**

past geosynthetic interface strength experiments are reviewed.

"The leach bottom is a double-sided, 2 mm thick HDPE geomembrane, underlain by GCL and 0.5 m thick clay below that.

Sub-Coating 2- The permeability of the material obtained by mixing the material taken from the rust in 2014 (clayey sand, SC, LL=44%, PI=23%, fine grain percentage 47.6%) with 2 different bentonite materials at the rate of 5% was examined. in 2009, a large-scale pole shear test of NAUE Bentofix NSP 3300 GCL interface with 1.5 mm thick Solmax LLDPE GM with double side roughness was carried out. in 2009, large-scale pole shear test of interface with CETCO Bentomat ST GCL with 1.5 mm thick Agru LLDPE GM with double side roughness In 2011, interface with Geomas Bentoshield 5000 GCL with double side roughness, 1.5 mm thick Solmax LLDPE GM with Geomas Bentoshield 5000 GCL interface with Geomas Bentoshield 3500 GCL and GSE 1.5 mm landslided surface LLDPE GM stack with sandy silt (ML) soil cover, Geomass Bentoshield 3500 GCL and GSE 1.5 mm landslided surface LLDPE GM stack with clay sand (SC) soil cover, Geomas Bentoshield Smax 3500 R GCL and GSE double side rough 1.5 mm thick LLDPE GM stack in 2014, Atarfill LTMT double side roughened, 1.5 mm thick LLDPE GM, Geomas GCL underneath and crushed stone stack representing overburden on top in 2015, double side roughened 1.5 mm thick LLDPE GM, Geomas GCL underneath and crushed stone stack representing top coating on top Crushed stone stack representing 1.5 mm thick LLDPE GM, Eurobent 3500/240 combo GCL underneath and top coating on top with double side roughness in 2015"

The tables below are taken from the file named "2018.10.10-INR-Batch Leaching Phase 4 Expansion Project Report".



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

Table 3.10 Composite coating system laboratory test results

| Geomembrane | OCL | PIK Shear Strength | | Residual Shear Strength | |
|---|---|---|---|---|---|
| | | Effective Adhesion (kN/m²) | Friction Angle (degrees) | Effective Adhesion (kN/m²) | Effective Friction Angle (degrees) |
| GSE 1.5 mm double side rough LLDPE | Sandy Hair-Covering | 98.2 | 18 | 55.5 | 6 |
| Solmax 1.5 mm double side rough LLDPE | Naje Bentofix NSP 3300 | 72.8 | 9 | 40.2 | 4 |
| Agru 1.5 mm double side rough LLDPE | Cetco Bentomat ST | 47.4 | 18 | 76.6 | 4 |
| Solmax 1.5 mm double side rough LLDPE | Geonias Bentoshield 5000 | 85,7 | 13 | 73.7 | 4 |
| GSE 1.5 mm smooth LLDPE | Geomas Bentoshield 3500 | 0 | 16 | 0 | 14 |
| GSE 1.5 mm double side roughened LLDPE ISmcvteouiability) | Geomas Bentoshield Smax R 3500 (reinforced) | 30.6 | 23 | 64.6 | 7 |

| Atarfil 1.5 mm double side rough LLDPE | Geomas Bentoshield Smax R 3500 (reinforced) | 8,1 | 29 | 101,0 | 9 |
|---|---|---|---|---|---|
| GSE 1.5 mm double side rough LLDPE (0.7 mm asperity) | Geomas Bentoshield Smax R 3500 (reinforced) | 31,6 | 25 | 71,3 | 10 |
| GSE 1.5 mm double side rough LLDPE (0.7 mm asperity) | Eurobent 3500/240 combo (reinforced) | 22,0 | 25 | 54.1 | 8 |

According to the "Mine Waste Regulation" which entered into force on July 15, 2017, Phase-4 leach floor is 2 mm HDPE GM and GCL below (0.5 m clay below GCL is recommended at 3Y-1D and lower slopes. 1.5 mm smooth LLDPE GM in Phase- 1 and 2, 1.5 mm double side rough LLDPE GM in Phase-3. In Phase-4, it was decided to use 2-mm HDPE GM to comply with the Mining Waste regulations.

**It is stated in the report titled "2018.10.10-INR - Heap Leaching Phase 4 Expansion Project Report" that 2 support embankment structures were designed at critical points of the heap leach since the heap leach structure would not be stable without any support structure. The table below is taken from the same report and is the shear strength parameters used by the designer in some slope stability analyses.**

The material parameters used in stability analysis are given in the table below.

Table 6.4 Material Parameters

| Units | Unit Volume Weight (kN/m³) | Cohesion (kPa) | internal Friction Angle (Degree) |
|---|---|---|---|
| Bedrock | 25 | Not Critical | |
| Regulation Filling | 22 | Not Critical | |
| Ore | 18.1 | 0 | 37 |
| GCL/Geomembrane Interface | 17.8 | Variable | |
| Tallow Filler | 20 | 0 | 35 |



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

SWORN
TRANSLATION

The images and tables below are taken from the file named "2018.10.10-INR-Batch Leaching Phase 4 Expansion Project Report".



**Figure 6.3 Critical Sections**

The results of the 2D limit equilibrium analysis are given in the table below. **Table 6.5 2D Stability Analysis Results**

| Cross Section | Static Peak Strength | Static Residual Strength | Pseudo Static OBE(0.15g) | Displacements under Seismic Load | |
|---|---|---|---|---|---|
| | | | | OBE(0.15g) | MDE(0.24g) |
| 1 | 1,51 | 1,48 | 0,96 | 2 | 10 |
| 2 | 1,51 | 1,39 | 0,94 | 2 | 13 |
| H | 1,51 | 1,22 | 0,86 | 7 | 32 |
| K | 1,66 | 1,29 | 0,88 | 3 | 20 |
| L | 1,51 | 1,15 | 0,75 | 7 | 32 |
| N | 1,69 | 1,23 | 0,74 | 12 | 52 |
| A | 1,59 | 1,33 | 0,78 | 10 | 45 |



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

Accordingly, 3D stability analyses were performed on H, L and N sections and the results are given in the table below.

Table 6.6 3D Stability Analysis Results

| Cross Section | Surface Strength Condition | Static Condition | Safety Coefficients | |
|---|---|---|---|---|
| | | | Pseudo Static State | |
| | | | Short Term (OBE) | Long Run (MDE) |
| 1 | Peak | 1.91 | 1.32 | 1,04 |
| | Residue | 1,44 | 0.96 | 0.73 |
| 2 | Peak | 2.21 | 1.34 | 1.01 |
| | Residue | 1,84 | 1,14 | 0,86 |
| 3 | Peak | 2,58 | 1,66 | 1.23 |
| | Residue | 1.47 | 0,93 | 0,79 |
| 4 | Peak | 2,31 | 1,44 | 1.12 |
| | Residue | 1.45 | 0.95 | 0,75 |
| 5 | Peak | 1,86 | 1,29 | 1.02 |
| | Residue | 1,50 | 1,06 | 0,87 |

Taking these values into account, In H. L and N sections, the analysis was repeated by optimizing the pillar pad. The results of the repeated analysis with the revised pillar waders are given in the table below.

Table 6.7 3D Residual Strength Static Case Analysis Results

| 2B Analysis | | 3D Analysis | |
|---|---|---|---|
| Section | Static GK | Area | Static GK |
| H | 1,09 | 4 | 1.36 |
| L | 1.10 | | |
| N | 1,11 | 3 | 1.38 |

**As can be seen in the above tables taken from the report titled "2018.10.10-INR-Stack Leach Phase 4 Expansion Project Report", when residual strength parameters are used in the L section, the safety number value of 1.15 for the static state (1.22 values in the H section and 1.23** values in the N section) was obtained by GRE and INR companies. In 3-dimensional analyzes, very low safety number values were obtained at the level of 1.09. These values are below the minimum number of safeguards that should be provided, and are unacceptable. **The design firm GRE and INR are considered to have a flaw here.**

**In the same report, as can be seen from the following statement, it is stated that material strength properties play a very sensitive role in heap stability.**



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

The stability analyses show that the structure is generally stable in the static state or under seismic loads accepted for the short term, but stability problems will occur under long term seismic loads. Material strength also plays a very sensitive role in the stability of the heap. The heap leaching plant consists of 4 phases. 3 of these phases are already on site, built and in production. Therefore, there are not many alternatives for restoring the Phase-4 heap stability to a stable geometry in the long term (post-closure) due to spatial reasons during the operational phase. The stability of the heap should be reviewed periodically during the operation of the mine (determination of material parameters, control of heap geometry, continuous observation of the static line), stability analyses should be repeated based on periodic measurements, tests and observations, and arrangements should be made to increase stability in sections deemed risky,

**Within the scope of this expert committee report, evaluations ongeosynthetic-geosynthetic and geosynthetic-soil interfaces and slope stability analyses were conducted. In the "2020.04.27-INR-Stack Leach Phase 4B Expansion Project Report",**

the results of interface shear strength tests of different geosynthetics, ore and compacted base clay are presented.



4428D-3 Post Test : Shering between GCL vs Soil and Textile vs GM



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION



| Project Name: | | INTERFACE SHEAR TEST REPORT | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | GRE Çöpler HLF Project | | | | | |
| Project Number: | | | | | | |
| | 19115121.2000.2030 | SPECIMEN PHOTOGRAPH - | | 414 | kPa | |
| Sample ID: | | Technician: | Checked: | Reviewed: | Date: | Point: |
| | Low Perm Clay Soil Configuration #1 | LH | PH | RFN | 4-Feb-2020 | 2 |

For example, in the Figure above, the failure occurred at the geomembrane-soil interface and internally within soil ("414 kPa- failure occurred GM-drainfill interface and internally within soil", Golder, 4 February 2020).

**Some of the GCL interface shear strength experiments were tested in dry condition, some in moist condition, some after a certain period of hydration, etc. in different conditions.**

**The table and the failure envelope graph below present the different geosynthetic interface strength laboratory test data compiled within the scope of this expert committee report.**

176



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLAT.ON

177



I, the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.

Signature,

178

SWORN
TRANSLATION

As can be seen from the figure above and the discussion of the strength of soil materials in the previous section, the shear strength of soil and geosynthetic materials is influenced by many factorsand varies in the field. In this case, considering this variabilityin material properties when designing for shear strength parametersis not a requirement under a specification, but should be a matter of engineering judgment/responsibility and safe design. This can be considered either by performing analyses using the value of "mean value minus 1 standard deviation" for a soil parameter, as suggested in the Eurocode etc design specifications; or by checking the safety condition using the worst soil parameter; or by performing a probabilistic slope stability analysis using a statistical distribution for material properties, etc. In addition, the **possible rise in the water level at the base of the heap leachate area was not taken into account in the GRE designs, and a single water level was used in all analyses.** This is also a flaw in the eyes of the designer GRE.

In the reports of the design firm GRE, only one value for the shear strength of the material in heap leaching and for the interface shear strength between different types of geosynthetics and different types of soils (although different values were used in revision reports over time) was determined and these values were used in the analysis; the slope stability of the material, which may be variable, was not taken into account. This is considered a design engineering flaw of the GRE. **in the file named "2018.10.10-INR-Batch Leaching Phase 4 Expansion Project Report"** -

gRE 27 June 2018 Technical Memorandum note- "Subject- Copler HLF Phase 4 Stability Revision" (Prepared by- Luis Quirindongo and Vinh Luu Le, Reviewer- Kevin Gunesch) **includes analyzes on the geometry and optimization of the additional toe buttress to be made in order to ensure the slope stability on the east and west sides of the heap leach.**

**Figure 1 - Plan View of L Section**





I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

**Figure 2 - Geometry Analyzed for the Existing Condition of the L Section**



**Figure 3 - Analyzed Geometry for the Final Phase 4 Condition of L Section**





I, the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature

SWORN
TRANSLATION

**Figure C-2 - Static Final Phase 4 Condition; Last Designed Outrigger; Deep landslide Surf**



| Color | Name | Model | Uni | Streng | Coh | P |
|-------|------|-------|-----|--------|-----|---|
|  | 1_Base | Foundation |  |  |  |  |
|  | 2_ore | Mohr | 18.1 |  | 0 | 57 |
|  | 3_Mine | Mohr | 20 |  | 0 | 35 |
|  | LLDPE/GCL | landslide/Normal Fn. | 17.8 | GMX/NP (NW) GCL, |  |  |
|  | Interface in | Mohr-Coulomb | 17.8 |  | 82 | 18 |

For the above section taken from the GRE Technical Memorandum of June 27, 2018, the slope stability analysis conducted within the scope of this expert committee report is presented below.





I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

SWORN
TRANSLATION



| Material Name | Color | Unit Weight (kN/m3) | Strength Type | Cohesion (kPa) | Phi (deg) | Water Surface |
|---|---|---|---|---|---|---|
| Cevher | | 18.1 | Mohr-Coulomb | 5 | 27 | Piezometric Line 1 |
| Temel kaya | | 20 | Mohr-Coulomb | 100 | 35 | Piezometric Line 1 |
| Payanda | | 20 | Mohr-Coulomb | 0.1 | 35 | Piezometric Line 1 |
| LLDPE/ GCL arayüz | | 17.8 | Mohr-Coulomb | 1 | 13 | Piezometric Line 1 |

| Shear strength parameters | | Water level | Number of security obtained, F.S. value |
|---|---|---|---|
| Ore - c=5 kPa φ =27 degrees pillar buttress - c=0.1 φ =35 degrees | LLDPE/GCL interface c=1 kPa φ =13 degrees | 1 m high water level at the base | Static state FS=1.032 |
| Ore - c=5 kPa φ =27 degrees pillar buttress - c=0.1 φ =35 degrees | LLDPE/GCL interface c=1 kPa φ =13 degrees | 2 m high water level at the base | Static state FS=1.024 |
| Ore - c=5 kPa φ =27 degrees pillar buttress - c=0.15 kPa φ=28.3 degrees | LLDPE/GCL interface c=1 kPa φ =17 degrees | 1 m high water level at the base | Static state FS=1.23 |
| Ore - c=5 kPa φ =27 degrees pillar buttress - c=0.15 kPa φ=28.3 degrees | LLDPE/GCL interface c=1 kPa φ =13 degrees | 1 m high water level at the base | Static state FS=0.996 |

Only by increasing the internal friction angle of the geosynthetic interface by 4 degrees, the slope stability safety number increases from 1.0 to 1.23. **Thisindicates that the correct determination of the geosynthetic interface shear strength is critical in slope stability analyses in the heap leach area** and points out the importance of designing to stay on the safe side in case these parameters cannot be determined correctly.

182



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

Figure 6-3 YLT Phase 4B Expansion Plan and Sections



I. the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature:

SWORN
TRANSLATION



**Figure 6-4 Section-A View**



**Figure 6-5 Section-B View**



**Figure 6-6 Section-C View**

The figures above are taken from the report titled "2018.10.10-INR-Batch Leaching Phase 4 Expansion Project Report"



184

I, the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature

The following table is taken from the report titled "2018.10.10-INR-Batch Leaching Phase 4 Expansion Project Report"

Table 6-2 Peak strength parameters of materials

| Material | B.H.A (kN/m²) | Model | Corrosion | Intrinsic friction angle | Reference |
|---|---|---|---|---|---|
| Ore | 18.1 | Mohr-Coulumb | 0 | 37° | Ref-1 |
| Tallow Backfill - compacted | 20.0 | S/N Function Leps-Average | Value | Value | Ref-2 |
| Bedrock | - | Infinite Durability | - | - | Ref-5 |
| GCL-GM interface from the previous phase [Phase 4a] | 17.8 | Mohr-Coulumb | 82 | 18° | Ref-3 Table 6-3 |
| GT-GM Interface | 18.0 | Mohr-Coulumb | 55 | 23° | Ref-6 |
| Kil-GM Interface | 18.0 | Mohr-Coulumb | 51 | 16° | Ref-4 Table 6-4 |

Reference documents for material strength parameters are listed below.

- Reference 1- GRE. Copler Phase-4 Leach Pad Expansion, 3 March.2015
- Reference-2- Leps. T. (1970). Review of the shearing strength of rockfill", 96(No SM4, Proc. Paper 7394. July 1970, 1159-1170). J. of Soil Mech. and Found. Div., ASCE.
- Reference-3- The annexes of the report conducted for stability analysis in 2016 were used. (Global Resource Engineering, Copler Phase 4 Leach Pad Expansion. August 1.2016)

- Reference 4- Direct shear test analyses for Phase 4b (attached.September 19, 2019)

- B.H.A- Unit Volume Weight
- S/N- Shear/ Normal Function, Shear and normal stress function
- Reference 5- Sliding surfaces/circles through bedrock are not considered critical. In this context, the maximum strength of the bedrock was entered.
- Referan5-6- Results of direct shear test performed at Golder Associates Inc Denver Laboratory on February 28, 2020

**In "2020.04.27-INR-Batch Leaching Phase 4B Expansion Project Report",**

**"In the interface tests with clay, failure occurred between GM-Clay" and "Although the GM-pebble interface was the primary landslide plane in all three tests for the GCL-Clay interface, the landslide surface occurred within the clay at the two highest loadings." It is said. This indicates that the shear strength of the clay itself is as important a factor as the shear strength of the geosynthetic-soil interface.**



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

SWORN
TRANSLATION

Normal loading versus peak shear strengths for all interface types were plotted and lines were constructed to obtain Mohr-Coulornb parameters. The point where the line crosses the y-axis gives the cohesion and the angle of the line gives the angle of internal friction. Mohr-Coulornb peak parameters of the interfaces are presented below. Clay coating and single GT/GM interface parameters were used for static stability analysis.

Table 6-4 Peak Mohr-Coulornb parameters

| Interface | Cohesion C.kPa | Friction Angle (Degree) |
|---|---|---|
| Bristle coating | 51 | 16 |
| GCL/Clay (Avg.) | 84 | 20 |
| Volume GT/GM | 45 | 25 |
| Single GT/GM | 55 | 23 |
| GCL/Rock | 25 | 32 |

**Figure 1: Section A – Static Stability Output**



The above table and figure are taken from the "2020.04.27-INR-Batch Leaching Phase 4B Expansion Project Report".



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

**Figure 7: Section C – Static Stability Output**



It is also stated that 3D slope stability analyses were performed by GRE with Soil Vision software, images from 3D slope stability analyses taken from the "2020.04.27-INR- heap leaching Phase 4B Expansion Project Report" are presented below. **Although the safety number appears to be greater than 1 in 3-dimensional analyses, it does not reflect the reality because the shear strength parameters used are not accurate.**

**Figure 8: Section A – 3D Stability Output OBE**





I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLAT;ON

Figure 22: Section C – Cross-Section



Within the scope of these expert committee studies, 2-dimensional slope stability analyses were carried out on the Y-T section shown in the plan view below.



188



, the sworn translator Yasın DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature

SWORN
TRANSLATiON



| Material Name | Color | Unit Weight (kN/m3) | Strength Type | Cohesion (kPa) | Phi (deg) | Water Surface |
|---|---|---|---|---|---|---|
| HEAPLEACH | | 18.1 | Mohr-Coulomb | 5 | 27 | Piezometric Line 1 |
| Topuk Kaya dolgu (Toe Buttress) | | 22 | Mohr-Coulomb | 0 | 35 | Piezometric Line 1 |
| ANA KAYA | | 22 | Mohr-Coulomb | 100 | 35 | Piezometric Line 1 |
| GCL | | 18 | Mohr-Coulomb | 1 | 13 | Piezometric Line 1 |

Within the scope of this expert committee report, the slope stability analyses performed in the Y-T section-

| Shear strength parameters | | Water level | Security Number, |
|---|---|---|---|
| Ore - c=5 kPa φ =27 degrees pillar buttress - c=0 φ =35 degrees | LLDPE/GCL interface c=1 kPa φ =13 degrees | 1 m high water level at the base | Static state **FS=0.938** |
| Ore - c=5 kPa φ =27 degrees pillar buttress - c=0 φ =35 degrees | LLDPE/GCL interface c=1 kPa φ =15.5 degrees | 1 m high water level at the base | Static state **FS=1.11** |
| Ore - c=5 kPa φ =27 degrees pillar buttress - c=0 φ =35 degrees | LLDPE/GCL interface c=1 kPa φ =14 degrees | 1 m high water level at the base | FS=1.006 |
| Ore - c=5 kPa φ =27 degrees pillar buttress - c=0 φ =28.3 degrees | LLDPE/GCL interface c=1 kPa φ =17 degrees | 1 m high water level at the base | Static state FS=1.214 |
| **For the A-Section given in the image below** Ore - c=5 kPa φ =27 degrees pillar buttress - c=0 Fi=35 degrees | LLDPE/GCL interface c=1 kPa φ =13 degrees | 1 m high water level at the base | 1.134 |



I, the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature

| For the A-Section given in the image below Ore - c=5 kPa φ =27 degrees pillar buttress - c=0 Fi=28.3 degrees | LLDPE/GCL interface c=1 kPa φ =13 degrees | 1 m high water level at the base | 1.088 |
|---|---|---|---|





I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION



| Material Name | Color | Unit Weight (kN/m3) | Strength Type | Cohesion (kPa) | Phi (deg) | Water Surface |
|---|---|---|---|---|---|---|
| Heap Leach | | 20 | Mohr-Coulomb | 5 | 27 | Piezometric Line 1 |
| Ana kaya | | 22 | Mohr-Coulomb | 100 | 35 | Piezometric Line 1 |
| GCL | | 18 | Mohr-Coulomb | 1 | 13 | Piezometric Line 1 |
| Toe Buttress | | 22 | Mohr-Coulomb | 0 | 35 | Piezometric Line 1 |

**Another question that comes to mind from a safety point of viewis, what kind of impact does blasting near the heap leach site have on the interface shear strengths of the material laid down in the heap leach and/or the different geosynthetics and the different soils underneath it?**

**Blasting-induced vibrations are likely to reduce the shear strength of the material in the heap leach and/or the interface strengths of the geosynthetics and the soil, affect stability due to the acceleration/vibration effect, and cause settlement and cracks in the ground, and widen existing cracks.**

Dynamic slope stability analysis of a mine site for blasting-induced vibrations requires the acceleration-time or ground shaking particle velocity-time graph of the blasting event. Bazzi et al (2020), in their numerical modelling study on blasting-induced mine slope stability, **stated that when the material strength internal friction angle decreases from 30 degrees to 26 degrees, for example, sudden and serious movement occurs at the reference points on the slope surface, but if it decreases to 27 degrees, no serious ground surface movement occurs; It revealed that there is a critical internal friction angle value at which sudden ground movements will occur**.

Ross and Fox (2015) investigated the shear strength between a HDPE rough geomembrane and a hydrated non woven (felt-type) geosynthetic clay cover (under vertical stresses of about 2000 kPa) under a monotonic dynamic loading condition of unidirectional shear loading and found that blasting may have an effect on shear strength. It has been reported that blasts can reduce shear strength depending on factors such as acceleration, particle velocity and repetition frequency-interval.

191



I. the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

## ADDITIONAL EVALUATION OF RADAR DATA-

<u>as of February 13, 2024 at 10-00 am, the fact that the personnel on site had not been removed from the area appears to be a defect-</u>

As can be seen in the movements measured in the radar data between 12-17 hours on February 12, 2024 and 12-17 hours on February 13, 2024, it should have been understood by the decision-makers responsible for the radar data that the movement limit of "20 mm in 1 day" (Figure 1) was exceeded in the morning hours of February 13, 2024 (for example, as of 08-00 on February 13, 2024, when the working day started).



*Figure 1. Graph of ground movement measured between February 12, 2024 at 12-17 hours and February 13, 2024 at 12-17 hours (file named "1-day Displacement Graph.bmp")*

On the other hand, a movement limit of "20 mm in 1 day" means a movement speed of "0.83 mm/hour". It is understood from the measurements that the velocity of the measured movement is 11 mm/6 hours (1.83 mm/hour) between 16-00-22-00 hours on February 12, 2024, and the movement accelerates from morning hours on February 13, 2024. For example, between 01-00-06-00 on February 13, 2024, the movement speed was 15 mm/5 hours (3 mm/hour) and between 08-00-10-00 hours it was 8 mm/2 hours (4 mm/hour). In "displacement-time" ground motion graphs, it is known that such increasing values of ground motion velocity (i.e. asymptotic continuation of the graph in the upward infinite direction) indicate that the ground/slope is moving towards the "collapse state". **From 08-00 or 10-00 on February 13, 2024, this assessment should have been made and the personnel in the field should have been removed from the area.**

**It could not have been predicted how far away from the point where the movement was measured a landslide would occurand how far the landslide would flow from the point where it was triggered.** For example, it could not have been foreseen that this landslide would mobilize and mobilize a mass so large that it would flow into Sabırlı Stream, and how far this mass would flow. However, it is still clear from the radar data that the width of the moving area can be seen (Figure 2). If the images in Figure 1 and Figure 2 were available to the relevant authorized persons prior to the landslide event, the boundaries of the area where the movements occurred should have been understood, and it would have been safe to remove personnel from an area larger than the area in Figure 2 as a precautionary measure.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

SWORN
TRANSLATION



*Figure 2. Areas where ground movements are observed in the file named "1-Day Displacement Map.bmp"*

Although it is not known how the velocity values are calculated in the 1-day movement velocity graph in Figure 3, it is **clear that the movement velocity graph in Figure 3 is a graph that does not clearly indicate the hazard compared to the one in Figure 1** (as the velocity values in Figure 3 increase and decrease zigzaggingly (with a signal noise-like appearance) over time).



*Figure 3. 1-day velocity graph, file named "1-Day Velocity Graph.bmp"*



193

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

**Failure to take into account the acceleration of the movement on February 11-12, 2024 from the last 7 days of movement data before February 13, 2024 appears to be a flaw**

As can be seen in the movements measured between 12-23 hours on February 6, 2024 and 12-21 hours on February 13, 2024 in the last 7 days of radar data, after February 9, 2024, increasing movement speeds were measured on February 10, 11 and 12, 2024 (Figure 4). The images in Figure 5 show the areas where this movement was observed intensively.



*Figure 4. Graph of ground movement measured between 12-23 hours on February 6, 2024 and 12-21 hours on February 13, 2024 (file named "7-day Displacement Graph.bmp")*

If the images in Figure 4 and Figure 5 were available for viewing before the landslide event, the boundaries of the area where the movements occurred should have been clear. From the measurements on February 11 and 12, 2024, it can be observed that the speed of the movement accelerated by 2 times on February 12, even before the end of 1 day, and the speed of movement continued to increase during the day on February 12. As a precaution, it would have been a safe-correct practice to remove personnel from an area larger than the area in Figure 5.

194



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature



*Figure 5. The areas where ground movements were observed are shown in the file named "7-Day Displacement Map.bmp" (the gray colored area on the left side of the figure cannot be observed by the radar, therefore it is not known whether movement was observed in that area or not. Ground motion measurement data for prisms PL10, PL20, PL21, PL22 in the gray area could not be obtained)*

Although it is not known how the velocity values are calculated in the 7-day graph in Figure 6, it appears that the velocity graph in Figure 6 does not clearly indicate the hazard compared to Figure 4 (as the velocity values in Figure 6 increase and decrease over time).



*Figure 6. 7-day velocity graph, file named "7-Day Velocity Graph.bmp"*



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLAT.ON

The photographs in the email sent by Ali Rıza Kalender in Figure 7 and the photographs in the email sent by Iain Guille in Figure 8 clearly show that the tensile cracks, splits and separations observed at the site are serious. Figure 9 shows the area where these cracks are observed. Figure 10 shows additional photographs of the cracks.

It seems to be a defect that these tensile cracks were not marked on the map from the moment they were first detected and observed in the area where the cracks occurred, when they were still less wide cracks, and it was not followed whether these cracks widened over time or whether they were observed in different areas.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature





*Figure 7. Photos in the email sent by Ali Rıza Kalender*



the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature

SWORN
TRANSLATION





*Figure 8. Photos in the email sent by Iain Guille*



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION



Figure 9. *More photos showing cracks in the site*



I, the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature

SWORN
TRANSLATION



Figure 10. The area where the cracks are observed in the photos above

200

I, the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature

SWORN
TRANSLATION

The measurements of the prisms numbered PL on the east side in Figure 11 were not available. If measurements were not taken from the prisms that would show the ground motion on the surface in this area, or if measurements were taken but not evaluated for decision-making, this is also an important deficiency.



*Figure 11. Locations of prisms in the field*



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

## SOURCES

Bazzi, H., Noferesti, H., and Farhadian, H. (2020) Modelling the effect of blast-induced vibrations on the stability of a faulted mine slope. Journal of the Southern African Institute of Mining and Metallurgy, vol. 120, No 10, pp. 591–598.

CETCO Lining Company (2002) Bentomat Direct Shear Testing Summary, Laboratory Data Reports Ekici, A. (2022). Geotechnical properties of coarse-fine mixtures and their interaction with geogrids through large direct shear testing, Doktora tezi, ODTÜ İnşaat Mühendisliği Bölümü, https-//open.metu.edu.tr/handle/11511/98202 Fox, P. J., Sura, J. M., & Nye, C. J. (2015). Dynamic shear strength of a needle-punched GCL for monotonic loading. Journal of Geotechnical and Geoenvironmental Engineering, 141(7), 04015025. Haselsteiner, R., Pamuk, R., & Ersoy, B. (2017). Aspects concerning the shear strength of rockfill material in rockfill dam engineering. geotechnik, 40(3), 193-203.

Hazen, A. (1892), Physical Properties of Sands and Gravels With Reference to Their Use Infiltration, Massachusetts State Board of Health, Boston, Mass Huvaj-Sarıhan, N. (2009) Movement of Reactivated Landslides, Ph.D. Thesis, University of Illinois at Urbana-Champaign, USA.

Koerner, R. M. (2012). Designing with geosynthetics-Vol. 1 (Vol. 1, Vol. 2). Xlibris Corporation. Leps, T. (1970) "Review of the shearing strength of rockfill" 96 (No SM4, Proc. Paper 7394, 11591170, J. of Soil Mech. And Found. Div. ASCE Li, X., Li, Q., Hu, Y., Chen, Q., Peng, J., Xie, Y., & Wang, J. (2022). Study on three-dimensional dynamic stability of open-pit high slope under blasting vibration. Lithosphere, 2021(Special 4), 6426550.

Mesri, G., & Shahien, M. (2003). Residual shear strength mobilized in first-time slope failures. Journal of geotechnical and geoenvironmental engineering, 129(1), 12-31.

Ovalle, C., Linero, S., Dano, C., Bard, E., Hicher, P. Y., & Osses, R. (2020). Data compilation from large drained compression triaxial tests on coarse crushable rockfill materials. Journal of Geotechnical and Geoenvironmental Engineering, 146(9), 06020013.

Park, J., & Santamarina, J. C. (2017). Revised soil classification system for coarse-fine mixtures. Journal of Geotechnical and Geoenvironmental Engineering, 143(8), 04017039.

Ross, J. D., & Fox, P. J. (2015). Dynamic shear strength of GMX/GCL composite liner for monotonic loading. Journal of Geotechnical and Geoenvironmental Engineering, 141(7), 04015026.

Skempton, A.W. (1953) The Colloidal "Activity" of Clays, Proc. III Int. Conf. on Soil Mechanics and Foundation Engineering, 1, 57-61, https-//www.issmge.org/publicationson ofnline-library Terzaghi, Peck, Mesri (1996) Soil Mechanics in Engineering Practice (kitap) Triplett, E.J. and Fox, P.J. (2001) Shear Strength of HDPE Geomembrane/Geosynthetic Clay Liner Interfaces, Journal of Geotechnical and Geoenvironmental Engineering, ASCE, June, pp.543-552 Zornberg, J.G., McCartney, J.S. and Swan, R. H. (2005) Analysis of a Large Database of GCL Internal Shear Strength Results, Journal of Geotechnical and Geoenvironmental Engineering, ASCE, March, pp.367-380.



I the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
signature

SWORN
TRANSLATION

*__Slope Slides on Membrane__*

at the 15-acre, 30-meter-high Kettleman hazardous waste landfill, lateral displacements of up to 12 meters and vertical settlements of up to 4.5 meters have been measured in slope failures over the membrane system (Mitchell, J. K., Seed,R., Seed, H. B, 1990) Direct shear and tensile tests have shown that the interface angle between some geosynthetics and the compacted saturated clay layer can be as low as 8 degrees. The most critical interface condition was observed between HDPE and geotextile, HDPE and geonet, and HDPE and compacted clay.

Breitenbach, A.J., has shown that in past slope failures at landfills, heap leach sites, and waste closure projects, slides caused by the impermeable layer (liner) usually occurred at the interface between the planar geomembrane layer and weak underlying or overlying materials. It is reported that the geomembrane surface generally has lower frictional strength properties and special designs and operating conditions are needed to avoid stability problems of the membrane system due to the overlying fill and underlying foundation materials.

Vaid and Rinne (1995) pointed out that in many cases the interface friction angle between the membrane mobilized by displacement and the ground is smaller than the ground friction angle and that the potential sliding surface can be one of the determining factors in design.

Negussby T-O (1988) investigated the interface friction between HDPE geomembrane and angular and rounded sand, gravel and geotextile in a ring cutting apparatus and reported that sliding at composite interfaces occurred more easily at a fine-grained interface than at a coarse-grained geomembrane interface, and that the interface friction angles between geotextile and geomembrane were very low without any distinction.

Toulegilan T-O (2020) reported that the effect of leaching in natural soils manifests itself in the form of changes in the mechanical parameters of the soil, and one of the consequences of the strength reduction in soils due to seepage is slope instability in the form of landslide. They reported that a series of chemical, physical and mechanical tests were carried out to investigate the effect of leaching on the stability of a clay slope in northern Iran. The results showed that leaching removes soluble salts from the soil, leaving a porous and unstable structure, resulting in a decrease in the mechanical properties of the parent soil, including parameters of deformation and shear strength in leaching, drained and undrained condition.

Ismael and Mollah (1998) studied the effect of leaching on the properties of cemented sand deposits in Kuwait and conducted laboratory experiments on samples from two sites with different levels of cementation. The results showed that the compressibility increased with leaching and the effective shear strength parameters $c'$ and $\phi$ decreased due to seepage, and this effect was more pronounced in weakly cemented sands than in medium to strong cemented sands.

Thiel and Smith (2004), in their paper on design problems in copper and gold heap leaching, concluded that in deep embankments, shear strength tests should be performed at larger stress ranges because, typically, the shear strength envelope is no longer linear at large stress ranges, they stated that the shear strength will become a curved curve in such a way that the shear strength will decrease as the normal stresses increase, and that the determination of the shear strength by extending (extrapolating) the strength envelope found for normal experimental limits forward cannot be conservative and cannot remain on the safe side.



the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature

SWORN
TRANSLAT.ON

The authors emphasized that these principles apply to both the internal strength of the ore material and the interface between the ore and the membrane.

*References*

*Vaid ve Rinne ," Geomembrane Coefficients Of Interface Friction ", Geosynthetics International · January 1995 Negussby, D; Wijewickkreme W.K.D; Vaid, P. Y.," ve Vaid, Geomembrane interface friction" Canadian Geotechnical Journal, 2011 Toulegilan; M.M; Chenari, R.J; Neshaei, A.L; Forghani, A." Changes in stability conditions of clay slopes due to leaching- a case study", SN Applied Sciences ,2,2030;2020 Nabil F. Ismael, Member, ASCE,, and M. A. Mollah Leaching Effects on Properties of Cemented Sands in Kuwait Journal of Geotechnical and Geoenvironmental Engineering,Volume 124, Issue 10 Thiel, R and Smith,M.E., State of the practice review of heap leach pad design issues, Geotextiles and Geomembranes, Volume 22, Issue 6, December 2004, Pages 555-568)*

*(Mitchell, J.K., Seed, R. , and Seed, H.B , . Kettleman Hills Waste Landfill Slope Failure. I- Liner- System Properties Journal of Geotechnical Engineering, Volume 116, Issue 4, 1990) By . Breitenbach, A.J., P.E., SME Member, Vector Colorado c Heap Leach Pad Design And Construction Practices In The 21st Century.*

*Vaid, P. Y., Geomembrane Coefficients of Interface Friction ,Geosynthetics International · January 1995*



ne sworn translator Yasin DURMAZ, pciare that I have translated this document to English language completely and correctly in accordance with the original Turkish text. Signature

SWORN
TRANSLATION

TABLE 2. Interface friction angles

| Interface | Normal stress, kPa | Peak friction angle, deg | Residual friction angle, deg |
|---|---|---|---|
| **Single stage** | | | |
| Sand – geomembrane (80 mil) – gravel (dry) | 50 | 24.9 | 18.5 |
| | 100 | 24.3 | 18.5 |
| | 250 | 28.4 | 22.0 |
| | 400 | 27.2 | 18.7 |
| **Multistage** | | | |
| Sand – geomembrane (40 mil) – gravel (dry) | 50 | 22.0 | 19.0 |
| | 100 | — | 17.0 |
| | 250 | — | 16.5 |
| | 400 | — | 16.7 |
| | 800 | — | 16.5 |
| Geomembrane (60 mil) – geotextile (Texel 7612) (dry) | | — | 6.5 |
| Geomembrane (60 mil) – geotextile (Texel 7612) (saturated) | | — | 6.5 |
| Geomembrane (60 mil) – Ottawa sand (ASTM-C-109) | | 17.6 ($\sigma$ = 50 kPa) | 15.0 |

NOTE: 40 mil geomembrane is equivalent to approximately 1.02 mm thickness; 60 mil to approximately

*Interface friction angles (Geomembrane interface friction, Negussey, Wijewickre , Vaid, 1988)*

In the light of this information, the results of the static stability analysis performed on the 3-3 section, where the landslide shown in Figure 1 was observed, are given in Figure 2.

The shear strength of heap leachate was analyzed by examining the results obtained in TOKER Ltd experiments and 27 degrees and cohesion 5 kPa were taken as representative values. The cavity water pressure parameter, ru=0.05 was accepted.

The back-analysis for the static case shows that the safety number of the soil block against sliding on the membrane is close to 1. It is understood that there is a decrease in the strength parameters of the soil with the leaching effect passing through the uncompacted stacked soil piles, which decreases the interface strength angle between the geomembrane and the soil, and these values approach the residual strength values over time. It is also possible that the strength parameters obtained from the strength tests performed under laboratory conditions may not fully reflect the strength parameters that will be mobilized under a pressure of approximately 1400 kPa under the ground mass at a height of up to 80 meters.

Figure 3 shows that under a very small seismic effect (0.005 g or 5 gal) from microtremor, which may be induced by quarry blasting in the vicinity, the safety against landslide is further reduced.



I the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature

SWORN
TRANSLATION

It can be said that the slope, which has a safety number of around 1 before landslide, may make small deformations in time with the effect of quarry blasting, and with the accumulation of these movements, cracks may form and finally landslide may occur.

As a result, as pointed out above, it is concluded that the strength parameters of the soil decreased due to the leaching effect passing through the uncompacted stacked soil piles, this decreased the interface strength angle between the geomembrane and the soil, and over time, with the effect of the quarry blasting, these values approached the residual strength values and landslide occurred.



*Figure 1. Location of section lines taken over the numerical surface model dated 30.12.2023 and used in stability analyses.*



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

SWORN
TRANSLATION



Figure 2. Static state



Figure 3. Seismic condition slope analysis result



I, the sworn translator Yasın DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature

## 5.3.2. NEGATIVE EFFECTS ON SLOPE STABILITY DURING OPERATION
### 5.3.2.1.Blasting

The most important negative effect of blasting on the environment is ground shaking. Blasting-induced ground shaking has similar effects on structures as earthquakes. In various sectors where blasting is inevitable, such as quarrying, mining, construction infrastructure excavations, wells and tunnels, pipelines and dams, environmental problems caused by ground shaking are frequently encountered and discussed. Especially in stability-sensitive engineering structures, blasting-induced ground shaking damages are frequently observed. In this context, the blasting excavation works carried out at the operation site were examined and the damages that may be caused by blasting-induced ground shaking in heap leaching were determined.

When the explosions in close proximity around the heap leach where the slide occurred were analyzed, it was determined that the explosions during the construction of the heap leach Phase-5 were carried out at very close distances to the heap leach. **In line with the on-site observations and company reports, it has been determined that the ground formation where Phase-5 is constructed is Munzur limestone and that this formation is formed in highly resistant limestones. Therefore, it is an engineering necessity that the excavation works to be carried out in this soil should be carried out by blasting (Fugro sial,2014; Gokceoglu et al,2016; Ozer et al, 2008).** The blasting pattern applied by the company in open pit production is given in Table 1. In line with the data received from the company, the step parameters and distances to heap leach for all blasting conducted during Phase-5 construction (as of November 2023) are summarized in Table 2. In addition, the distances of some pulses to heap leaching are shown in Figure 1. In addition, the step blasting pattern applied by the company in open pit production is given in Figure 2.

*Table 1. Step Blasting Pattern Applied by the Company in Open Operation Production*

| Blasting parameters | Parameters Used for Routine Blasting | Parameters Used for Controlled Detonations |
|---|---|---|
| Step Height (m) | 5 | 5 |
| Bottom Drill (m) | 0,5-0,7 | 0,5-0,7 |
| Load Distance (m) | 3-3,25 | 2-2,5 |
| Distance Between Holes (m) | 3-3,75 | 2,5-3 |
| Hole Diameter (m) | 0,102 | 0,102 |
| Clamping Distance (m) | 2,44-2,69 | 3-3,25 |
| **Explosive Amount per Hole** | **20** | **12,4** |
| **Safety Distance (m)** | **500** | **300** |
| Delay Between Holes Capsule | 17/500 | 17/500 |
| Inter-queue Latency Capsule | 42 | 42 |



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature



*Figure 1st Phase 5 construction blasted excavation workings distances to heap leaching*

I, the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature

SWORN
TRANSLATION

The sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

*Table 2. Blast excavation works for construction of heap leach Phase 5 (from November 2023)*

| No | Name | Date | Coordinate | | | Hole Length | Max.Explosive Amount (kg) | Total Explosive Amount (kg) | Hole Number | Heap Leaching Distance (m) |
| | | | Y | X | Z | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Phase5- | 03.11.2023 | 460252,48 | 4363682,08 | 1.308,31 | 18,52 | 95,65 | 20223 | 281 | 100 |
| 2 | Phase5- | 10.11.2023 | 460045,69 | 4363681,76 | 1.307,73 | 15,49 | 74,67 | 8003 | 329 | 100 |
| 3 | Phase5- | 24.11.2023 | 460060,41 | 4363673,93 | 1.307,99 | 16,54 | 81,48 | 12095 | 213 | 100 |
| 4 | Phase5- | 01.12.2023 | 460080,65 | 4363649,30 | 1.307,93 | 8,43 | 35,30 | 6573 | 283 | 100 |
| 5 | Phase5- | 01.12.2023 | 460110,98 | 4363657,39 | 1.306,97 | 7,47 | 29,03 | 2050 | 106 | 100 |
| 6 | Phase5- | 29.12.2023 | 460164,77 | 4363649,89 | 1.306,47 | 6,97 | 27,40 | 4983 | 261 | 100 |
| 7 | Phase5- | 29.12.2023 | 460182,96 | 4363658,35 | 1.306,86 | 7,36 | 28,36 | 2507 | 139 | 100 |
| 8 | Phase5- | 02.01.2024 | 460062,63 | 4363713,92 | 1.301,08 | 10,04 | 44,15 | 8518 | 299 | 123 |
| 9 | Phase5- | 05.01.2024 | 460213,14 | 4363663,61 | 1.307,20 | 7,70 | 30,58 | 5720 | 294 | 59 |
| 10 | Phase5- | 05.01.2024 | 460255,27 | 4363674,35 | 1.309,99 | 10,49 | 47,05 | 8493 | 330 | 59 |
| 11 | Phase5- | 12.01.2024 | 460093,11 | 4363721,01 | 1.300,24 | 9,62 | 43,02 | 9643 | 346 | 217 |
| 12 | Phase5- | 08.01.2024 | 460252,67 | 4363683,56 | 1.308,10 | 8,60 | 34,78 | 3382 | 157 | 96 |
| 13 | Phase5- | 12.01.2024 | 460127,26 | 4363691,68 | 1.300,57 | 9,54 | 40,91 | 4078 | 190 | 217 |
| 14 | Phase5- | 14.01.2024 | 460246,90 | 4363722,35 | 1.299,77 | 10,47 | 45,28 | 2277 | 139 | 101 |
| 15 | Phase5- | 14.01.2024 | 460225,28 | 4363703,10 | 1.300,59 | 11,11 | 49,48 | 3355 | 148 | 101 |
| 16 | Phase5- | 16.01.2024 | 460121,32 | 4363692,24 | 1.300,91 | 9,77 | 40,77 | 2525 | 105 | 76 |
| 17 | Phase5- | 16.01.2024 | 460228,73 | 4363703,56 | 1.300,86 | 11,38 | 51,21 | 9346 | 217 | 76 |
| 18 | Phase5- | 19.01.2024 | 460211,39 | 4363691,65 | 1.300,66 | 11,01 | 47,52 | 6743 | 200 | 143 |
| 19 | Phase5- | 24.01.2024 | 460260,75 | 4363674,47 | 1.300,56 | 10,63 | 46,36 | 7727 | 266 | 64 |
| 20 | Phase5- | 30.01.2024 | 460216,15 | 4363660,08 | 1.299,97 | 9,87 | 43,01 | 2927 | 117 | 147 |
| 21 | Phase5- | 30.01.2024 | 460131,94 | 4363697,69 | 1.300,10 | 9,72 | 42,08 | 5038 | 148 | 147 |
| 22 | Phase5- | 30.01.2024 | 460131,92 | 4363700,68 | 1.299,87 | 9,53 | 42,48 | 4039 | 192 | 147 |
| 23 | Phase5- | 06.02.2024 | 460141,52 | 4363712,20 | 1295,27 | 5,24 | 17,80 | 336 | 50 | 172 |
| **Average** | | | | | | 10,24 | 45,15 | 6112 | 209 | 115 |



When the step blasting patterns in Table 1 and Table 2 are examined, it is seen that the maximum amount of detonator applied by the company is 12.4 kg for controlled blasting and 20 kg for routine blasting. However, the maximum amount of explosives used in all blasts in Phase 5 construction is well above these values. The maximum amount of explosives used, which is 8 times more in some shots, is a highly effective parameter in the occurrence of blasting-induced ground shaking. In addition, safety distances in the open pit company pattern are applied as 500 m and 300 m for routine and controlled blasting, respectively. However, as can be seen in Table 2, the Phase 5 construction blasts are on average 115 m from the heap leach. This is the distance at which blasting ground shaking is very effective and therefore blasting here must be controlled and carried out very precisely. This increases the risk of blasting-induced ground shaking damaging heap leaching.

In the blast damage criteria developed by various researchers, the parameters of ground shaking particle velocity and frequency are used to determine the risk of structural damage. In addition, according to our country's Environmental Noise Control Regulation (Official Gazette Date- 30.11.2022 Number- 32029), these parameters are used in blasting-induced building damages. The "Limit values of ground vibrations due to blasting in mines, quarries and similar areas" given in this regulation are given in Table 3.

Table 3. The maximum permissible values of the ground vibrations caused by the vibrations caused by blasting in mines, quarries and similar areas on the nearest structure

| | Structure Type | Maximum Vibration Velocity at the Foundation of Buildings, (mm/s) (by frequency, f=Hz) | | | On the top floor slab for all frequencies (2) |
|---|---|---|---|---|---|
| | | f= 1-10 | f=10-50 | f=50-100(1) | |
| 1 | Industrial buildings | 20 | 40 | 50 | 40 |
| 2 | Durable structures such as houses, bricks and concrete | 5 | 15 | 20 | 15 |
| 3 | Buildings, historical and natural structures that are sensitive to vibration and excluded from 1 and 2nd article (3) | 2 | 8 | 10 | 8 |

(1) for frequencies greater than 100 cycles/sec, a large vibration level is permissible.
(2) For multi-storey buildings, measurements need to be taken both at the foundation of the buildings and at the slab of the top floor.
(3) These limit values determined for historical and natural structures may be limited by precise, comprehensive vibration measurements and scientific studies to be carried out on-site.



Page **207** /

the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
final Turkish text.
nature

In order to determine the potential for a total of 23 blasts during Phase 5 construction, for which blast pattern information is given in Table 2, to damage the adjacent heap leach, it is necessary to determine the particle velocity and frequency values of the post-blast ground shaking. Two basic methods are applied to determine these values.

The first one is to directly measure these parameters with vibration meters and the second one is to estimate these values using empirical formulas developed for the region. No measurements were made using a vibration meter device near the heap leach during blast excavation operations. Although this is not a legal obligation, it does not comply with the principles of controlled blasting. There is also a vibrometer in the area, but pulse records could not be obtained due to its location (~2km) too far from the heap leach. Due to the lack of direct measurement results 2. The method was used to determine these values. The empirical formulas to be used in the estimation are taken from a scientific study conducted in the region and another study conducted in a similar formation (limestone) (Taşdemir,2013; Adiguzel,2006). With these empirical formulas, the amount of explosive material used during blasting and the distance values of the blast are used to estimate the values of ground shaking that may occur as a result of blasting (Equation 1,2). In addition, the dominant frequency value of the blasts in the region is determined by the frequency values of all pulses.

PPV = 578.92 x SD-1.46 A study in a similar formation (1) PPV = 136.36 x SD-1.132 A study in the region (2) Here;
PPV=maximum particle velocity(mm/sec)

SD=Scaled distance, the ratio of the blasting distance (R) to the amount of explosives (W) ;R/W0,5

In order to determine the accuracy of the empirical formulas given in Equations 1 and 2, the blasting vibration meter result in the field was predicted by these equations and compared with the actual measurement result (Table 4).

Table 4. Comparison of prediction formulas with actual measurement result

| Forecast Formula | pPV prediction of 11.02.2024 pulse (mm/sec) | measured PPV of 11.02.2024 pulse (mm/sec) | Deviation |
|---|---|---|---|
| PPV=136.36 x SD-1.132 | 0,17 | 0,24 | 0,07 |
| PPV= 578.92*SD-1,46 | 0,11 | | 0,13 |

PPV- peak particular velocity

SD- Scaled distance (R/W^0.5), R-distance, W- explosive charge

As can be seen from Table 4, the prediction formulas given in Equations 1 and 2 predict the actual measurement results with a very small deviation value. This shows that empirical formulas can be used in PPV estimation.



I. the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

The maximum explosive amounts and distances to heap leaching of the 23 pulses given in Table 2 were used in Equations 1 and 2 to estimate the maximum particle velocity values that would be generated by these pulses. The frequency value (6.2Hz) of a pulse record (Figure 2) taken with a vibration meter device in the region is quite compatible with the frequency values of blasting-induced frequency values in a scientific study conducted in the region. For this reason, this value was accepted as the dominant frequency value and the frequency range of 1-10 Hz in our country's damage norm was taken into consideration. Accordingly, the evaluation of ground vibrations caused by blasting excavation works in Phase 5 Construction according to the Environmental Noise Control Regulation is given in Figure 3.



*Figure 2. 11.02.2024 vibration meter recording of blasting at magnesite open pit site (Blasting distance ~2km to heap leach)*



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature



**a)** GROUND VIBRATIONS CAUSED BY BLASTING EXCAVATION
WORKS IN PHASE 5 CONSTRUCTION

* Estimated PPV based on a study in a similar formation
* Estimated PPV according to a Study in the Region

Maximum permissible value of floor vibrations in houses

Maximum permissible value of ground vibrations in natural

PPV (mm/s)

Blasting NO

**b)**

Industrial buildings

Houses and concrete structures

Historical and natural structures

PPV (mm/s)

Earthquake data from blasting in Phase 5 construction

Frequency (Hz)

Page **210** /

I the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.

*Figure 3. Evaluation of Ground Vibrations Resulting from Explosive Excavation Works in Phase 5 Construction according to Environmental Noise Control Regulation a) According to damage limits at 1-10 Hz frequency values b) Damage norm at all frequency values*

As can be seen from Figure 3, the estimated ground vibration velocities of the blasts in Phase 5 construction are considerably higher than the limit value (2mm/s) determined for "Environmental Noise Control Regulation - Buildings, historical and natural structures that are sensitive to vibration and excluded from Article 1 and 2". It is even observed that the ground vibration values of many beats are higher than the limit values set for houses (5mm/s).



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

Some of the discharges pose a risk of damage to industrial buildings. This shows the potential harm of these discharges to heap leaching. It is inevitable that these repeated blasting operations using high amounts of explosives at close distances to the heap leach will increase the internal cracks in the leach over time and cause the stability of the structure to deteriorate.

In the damage assessments, the highest amount of explosive material per hole was taken into account due to the use of delayed detonators. However, as can be seen in Table 2, most of the blasts have a large number of holes, which increases the total amount of explosive material (average amount of explosive material =6112kg). Even if the holes are blasted one by one with a delay, the vibration waves generated by the blasting overlap at certain delay values and create a superpose effect, which increases the vibration velocity and causes more damage to the structures. This also needs to be taken into account in heap leach blasting damage.

Note- The references related to section 5.3.2.1 are given in section 5.3.4.1 since they are evaluated together.

### 5.3.2.2. Water Balance

One of the possible causes of landslides at the İliç Gold Mine heap leach site is the amount of water in the heap material. The difference between the total water entering the heap (uncharged leaching solution + precipitation + constituent moisture of the heap material) and the total water leaving the heap (charged solution removed from the heap + evaporation) equals the amount of water retained in the heap material. Water in the bulk material accumulates in the pores, creating pore pressure.
When this pressure is above a certain value, it can cause sliding of fine sized loose soil piles such as the material in the İliç heap leach site 1.
Therefore, this should have been taken into account in the design and implementation of the İliç Gold Mine Heap Leach Project. None of the projects prepared for the Iliç Gold Mine Heap Leach have addressed this issue, nor have potential risks and measures been identified.
In these studies, the water balance in the leach piles was designed in terms of the adequacy of the capacities of the process water and storm water ponds to contain the overflow that may occur in case of excessive rainfall. However, design values for the quantities of water to be fed to the leach piles and water to be collected from the piles are stipulated in the projects. In order to determine whether these values are complied with in practice, the design values and actual values are given comparatively in the table below. As can be seen from the table, the design values and the actual values of the amounts of solution fed to and returned from the stack have always been different from each other. Except for a few months between May 2018 and May 2022 (September, October, November 2018; April, June, July, August 2019), the value of "Solution fed into the stack (Design)-Solution fed into the stack (Actual), m3/month" has always been negative, meaning that more solution was fed into the stack than the design value.
 Between these dates, a total of 1,407,220 m3 more solution was fed into the heap than the design value. The opposite was the case between June 2022 and February 2024. The amount of Solution (Actual) fed into the stack was consistently less than the amount of Solution (Design) fed into the stack. Between these dates, a total of 1,953,382 m3 less solution was fed into the heap than the design value. A similar situation is seen in the amount of solutions returned from the stack.

---

1 Smith, E. S., 1979, The Role of Water in the Failure of Tailings Dams, http-//www.imwa.de/docs/imds_1979/IMDS1979_Smith_627.pdf



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

In practice, feeding more solution into the piles than the design values is problematic for the stability of the piles. However, it is not possible to determine the impact of this situation between May 2018 and May 2022 on the landslide that occurred on February 13, 2024.

The values and assessments in the design reports and the amounts of solution actually applied to the heaps at the site indicate that the water balance in the heap, which may cause the leach heaps to shift, has not been properly and adequately assessed/ taken into account.

At this stage, it is not possible to determine whether the slide at the İliç Gold Mine was affected by this phenomenon, as there is insufficient data available. However, it is a significant deficiency that this issue is not addressed in the project design reports and that potential risks and risk management are not identified. The project company GRE is responsible for this.

In addition, as explained above, in practice, at times solution was fed into the piles in excess of the quantities specified in the project reports and monitoring of the water in the heap was not carried out properly, as indicated in the geotechnical report prepared by Neil Barr. Since this situation was spread over a long period of time (May 2018 - date of the accident), it is considered that the personnel in charge of the Oxide Operations Department were at fault in proportion to their responsibility.

Footnotes to the chart given below-

(*)The *Copler Gold Mine Phase-4 Heap Leach Expansion Project Report* No INR-018-004-Rep-001 and "*Evaluation of Storage Requirements of Copler Heap Leach Facility*" Report No INR-021-010-TEM-002-Rev B prepared by INR Engineering Consulting AS and Project No 19-1210 Revision - 2 *Detail Design Report Phase 4b Leach Pad Expansion Copler Gold Mine Erzincan Province, Turkey, March 2, 2020* prepared by Global Resource Engineering (GRE), Ltd.200 m3/h (9.78 l/h/m2 ) solution is foreseen to be fed solution with no solution load. Monthly values, as in the projects, 1,200 m3/h is calculated based on.

(**) The data is taken from the file Feeding and Returning Flow Amounts to the Heap Leach Site.xlsx , which was placed in the case file by Anagold.

(***)Solution Returned from the heap Values are based on the 25,637 m of solution returned from the Project No 19-1210 Revision - 2 Detail Design Report Phase 4b Leach Pad ExpansionÇopler Gold Mine Erzincan Province, Turkey, March 2, 2020 prepared by Global Resource Engineering (GRE), Ltd3/day based on the average returned solution.

(****)Taken from *Copler Gold Mine Phase-4 Heap Leach Expansion Project Report* No. INR-018-004-Rep-001 and "*Evaluation of Storage Requirements of Copler Heap Leach Facility*" Report No. INR-021-010-TEM-002-Rev B prepared by INR Engineering Consulting AS.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

| Date | Solution fed to the Heap, m3/month, Design Value (*) | Solution fed to the Heap, m3/month, Realized(* *) | Solution fed to stack (Design)- Solution fed to Heap(Actual), m3/month | Solution Returned from Heap, m3/month, Realized (**) | Solution Returned from Stack, m3/month, Design Value(***) | Design Value of Solution Returned from Heap(***)- Solution Returned from Batch, Realized, m3/month | Solution Returned from Heap, m3/month, Design Value(****) | Design Value of Solution Returned from Heap(****)- Solution Returned from Batch Realized, m3/month |
|---|---|---|---|---|---|---|---|---|
| May 2018 | 892.800 | 915.598 | -22.798 | 833.887 | 794.747 | -39.140 | No data | No data available |
| June 2018 | 864.000 | 887.504 | -23.504 | 820.042 | 769.110 | -50.932 | No data | No data available |
| July 2018 | 892.800 | 900.720 | -7.920 | 836.704 | 794.747 | -41.957 | No data | No data available |
| August | 892.800 | 899.868 | -7.068 | 831.094 | 794.747 | -36.347 | No data | No data available |
| September | 864.000 | 781.853 | 82.147 | 679.579 | 769.110 | 89.531 | No data | No data available |
| October | 892.800 | 883.550 | 9.250 | 833.593 | 794.747 | -38.846 | No data | No data available |
| November | 864.000 | 835.292 | 28.708 | 812.128 | 769.110 | -43.018 | No data | No data available |
| December | 892.800 | 895.352 | -2.552 | 845.393 | 794.747 | -50.646 | No data | No data available |
| January | 892.800 | 919.187 | -26.387 | 840.135 | 794.747 | -45.388 | No data | No data available |
| February | 806.400 | 831.677 | -25.277 | 780.632 | 717.836 | -62.796 | No data | No data available |
| March | 892.800 | 894.890 | -2.090 | 841.326 | 794.747 | -46.579 | No data | No data available |
| April 2019 | 864.000 | 845.783 | 18.217 | 824.642 | 769.110 | -55.532 | No data | No data available |
| May 2019 | 892.800 | 893.910 | -1.110 | 877.644 | 794.747 | -82.897 | No data | No data available |
| June 2019 | 864.000 | 861.354 | 2.646 | 844.978 | 769.110 | -75.868 | No data | No data available |
| July 2019 | 892.800 | 892.259 | 541 | 847.523 | 794.747 | -52.776 | No data | No data available |
| August | 892.800 | 864.934 | 27.866 | 836.749 | 794.747 | -42.002 | No data | No data available |
| September | 864.000 | 865.700 | -1.700 | 783.072 | 769.110 | -13.962 | No data | No data available |
| October | 892.800 | 900.295 | -7.495 | 800.780 | 794.747 | -6.033 | No data | No data available |
| November | 864.000 | 870.177 | -6.177 | 1.005.217 | 769.110 | -236.107 | No data | No data available |
| December | 892.800 | 936.474 | -43.674 | 1.084.039 | 794.747 | -289.292 | No data | No data available |
| January | 892.800 | 969.651 | -76.851 | 951.608 | 794.747 | -156.861 | No data | No data available |
| February | 806.400 | 930.776 | -124.376 | 772.690 | 743.473 | -29.217 | No data | No data available |
| March | 892.800 | 893.513 | -713 | 890.760 | 794.747 | -96.013 | No data | No data available |
| April 2020 | 864.000 | 899.423 | -35.423 | 868.021 | 769.110 | -98.911 | No data | No data available |
| May 2020 | 892.800 | 957.957 | -65.157 | 897.316 | 794.747 | -102.569 | No data | No data available |
| June 2020 | 864.000 | 910.576 | -46.576 | 868.351 | 769.110 | -99.241 | No data | No data available |
| July 2020 | 892.800 | 929.146 | -36.346 | 907.710 | 794.747 | -112.963 | No data | No data available |
| August | 892.800 | 947.807 | -55.007 | 909.819 | 794.747 | -115.072 | No data | No data available |
| September | 864.000 | 913.265 | -49.265 | 863.538 | 769.110 | -94.428 | No data | No data available |
| October | 892.800 | 954.763 | -61.963 | 898.661 | 794.747 | -103.914 | No data | No data available |
| November | 864.000 | 954.662 | -90.662 | 878.441 | 769.110 | -109.331 | No data | No data available |
| December | 892.800 | 998.246 | -105.446 | 909.164 | 794.747 | -114.417 | No data | No data available |
| January | 892.800 | 984.840 | -92.0 | 905.223 | 794.747 | -110.476 | No data | No data available |
| February | 806.400 | 895.625 | -89.225 | 817.360 | 717.836 | -99.524 | No data | No data available |
| March | 892.800 | 982.044 | -89.244 | 900.131 | 794.747 | -105.384 | No data | No data available |

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN TRANSLATION



SWORN TRANSLATION

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| April 2021 | 864.000 | 941.563 | -77.563 | 815.610 | 769.110 | -46.500 | No data | No data |
| May 2021 | 892.800 | 954.929 | -62.129 | 893.664 | 794.747 | -98.917 | No data | No data |
| June 2021 | 864.000 | 912.432 | -48.432 | 865.352 | 769.110 | -96.242 | No data | No data |
| July 2021 | 892.800 | 940.449 | -47.649 | 798.158 | 794.747 | -3.411 | No data | No data |
| August 2021 | 892.800 | 946.969 | -54.169 | 880.027 | 794.747 | -85.280 | No data | No data |
| September 2021 | 864.000 | 915.584 | -51.584 | 867.164 | 769.110 | -98.054 | No data | No data |
| October 2021 | 892.800 | 941.351 | -48.551 | 891.868 | 794.747 | -97.121 | No data | No data |
| November 2021 | 864.000 | 885.923 | -21.923 | 867.155 | 769.110 | -98.045 | 877.831 | 10.676 |
| December 2021 | 892.800 | 862.915 | 29.886 | 814.464 | 794.747 | -19.717 | 900.825 | 86.361 |
| January .2022 | 892.800 | 836.948 | 55.852 | 758.883 | 794.747 | 35.864 | 907.167 | 148.284 |
| February 2022 | 806.400 | 768.637 | 37.764 | 702.805 | 717.836 | 15.031 | 835.049 | 132.244 |
| March 2022 | 892.800 | 945.359 | -52.559 | 840.442 | 794.747 | -45.695 | 930.957 | 90.515 |
| April 2022 | 864.000 | 877.295 | -13.295 | 785.320 | 769.110 | -16.210 | 897.242 | 111.922 |
| May 2022 | 892.800 | 919.000 | -26.200 | 805.405 | 794.747 | -10.658 | 909.494 | 104.090 |
| SUBTOTAL (May 2018-May 2022) | 42.940.800 | 44.348.020 | -1.407.220 | 41.684.265 | 38.250.404 | -3.433.861 | 6.258.565 | 684.091 |
| June 2022 | 864.000 | 861.639 | 2.361 | 780.625 | 769.110 | -11.515 | 843.084 | 62.459 |
| July 2022 | 892.800 | 871.513 | 21.288 | 800.189 | 794.747 | -5.442 | 853.013 | 52.824 |
| August 2022 | 892.800 | 839.865 | 52.935 | 602.598 | 794.747 | 192.149 | 848.500 | 245.902 |
| September 2022 | 864.000 | 719.756 | 144.245 | 222.585 | 769.110 | 546.525 | 836.505 | 613.920 |
| October 2022 | 892.800 | 817.656 | 75.145 | 802.061 | 794.747 | -7.314 | 893.893 | 91.832 |
| November 2022 | 864.000 | 767.379 | 96.621 | 741.084 | 769.110 | 28.026 | 871.223 | 130.139 |
| December 2022 | 892.800 | 750.074 | 142.726 | 718.072 | 794.747 | 76.675 | 895.664 | 177.592 |
| January .2023 | 892.800 | 766.613 | 126.187 | 734.822 | 794.747 | 59.925 | 897.222 | 162.400 |
| February 2023 | 806.400 | 709.095 | 97.305 | 654.256 | 717.836 | 63.580 | 824.634 | 170.378 |
| March 2023 | 892.800 | 806.296 | 86.504 | 721.082 | 794.747 | 73.665 | 919.538 | 198.456 |
| April 2023 | 864.000 | 773.004 | 90.996 | 711.383 | 769.110 | 57.727 | 887.835 | 176.452 |
| May 2023 | 892.800 | 802.414 | 90.386 | 751.169 | 794.747 | 43.578 | 899.611 | 148.442 |
| values | 864.000 | 772.605 | 91.395 | 728.131 | 769.110 | 40.979 | 834.202 | 106.071 |
| July 2023 | 892.800 | 790.386 | 102.414 | 751.461 | 794.747 | 43.286 | 845.887 | 94.426 |
| August 2023 | 892.800 | 805.541 | 87.259 | 772.707 | 794.747 | 22.040 | 842.173 | 69.466 |
| September 2023 | 864.000 | 768.211 | 95.789 | 750.933 | 769.110 | 18.177 | 831.161 | 80.228 |
| October 2023 | 892.800 | 788.482 | 104.318 | 801.928 | 794.747 | -7.181 | 896.413 | 94.485 |
| November 2023 | 864.000 | 753.487 | 110.513 | 794.963 | 769.110 | -25.853 | 875.228 | 80.265 |
| December 2023 | 892.800 | 758.295 | 134.505 | 778.062 | 794.747 | 16.685 | 897.879 | 119.817 |
| January .2024 | 892.800 | 759.002 | 133.798 | 892.800 | 794.747 | -98.053 | 892.844 | 44 |
| February 2024 | 374.400 | 307.707 | 66.693 | 333.379 | 333.281 | -98 | 394.474 | 61.095 |
| SUBTOTAL (June 2022-February) | 17.942.400 | 15.989.019 | 1.953.382 | 14.844.291 | 15.971.851 | 1.127.560 | 17.780.983 | 2.936.692 |

### 5.3.3. EVALUATION OF MONITORING AND EARLY WARNING SYSTEMS

The landslides caused by the loss of sensitivity of the leach heap in open pit mining operations in 2007 Costa Rica Bella Vista, 2011 Australia Pajingo , 2012 Alaska Fort Knokx, 2014 Cerro Verde , Peru are a few examples of landslide/leakage events that have occurred in leaching facilities and it is a known fact that landslides occur/may occur during the leaching process and should be taken as a matter of course. Landslide studies also show that there is an increase in landslides not caused by natural conditions/man-made landslides. Monitoring and warning systems are of great importance in order to take early precautions in case of possible landslides. In order to reduce the risk of landslides and ensure the stability of heap leach areas, it is essential to establish a monitoring system with various technological and managerial components. In this context, leach piles are generally monitored and tracked against possible risks by the methods described below.

- Topographic monitoring-
  To continuously monitor movements on the surface of the stack, sensitive GPS sensors can detect millimeter movements anywhere in the stack.
  The creation of 3D (three-dimensional) topographic maps of the heap at regular intervals is effective in identifying potential landslide zones.
- Geotechnical monitoring-
  Inclonometers are installed to determine/track in-bulk movements, shear percentages , pneumometers to monitor in-bulk water pressure, deformation meters (deformation gauges) to monitor/track in-bulk stresses and deformations.
- Remote Monitoring-
  LIDAR (Light Detection and Ranging) monitors changes in the bulk surface. With radar data
- Data Collection/Analysis System-
- An instrumentation system is set up to collect and monitor data in real time and to alert in case of identified risk situations.

At the Copler mine, heap leaching deformations are monitored by radar and prism data. However, as mentioned in the previous section, cavity water pressures are not monitored. Measuring instruments have not been adequately installed and a central data collection/analysis unit has not been built.

### 5.3.3.1.Radar tracking

With the RADAR device (IDS Georadar) placed on the northern hill of the Marble northern expansion quarry for close monitoring of the Open Pit operations, the company can scan the Open Pit, the western surface of the Heap Leach and most of the dump areas and provide data transfer via mobile communication (Figure 4) (Copler,TARP, 2022). Due to the maximum measurable movement speed of the radar device of 130.7 mm / hour and 4 minutes delayed monitoring, it is not possible to detect rockfalls in advance. On the other hand, it allows measures to be taken in cases of instability such as landslide, flowing and spalling where the movement speed is less than 13 cm per hour.


I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION



*Figure 4- RADAR Displacement Map Plan View*

The company has identified 12 separate TARP Trigger Action Response Plan Zones (Figure 5 - 6) by identifying the moving areas detected by radar, road routes and areas where deformations increase during rainy periods



*Figure 5- RADAR Alarm Scanning Areas Perspective View*

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature



*Figure 6- Panoramic View of RADAR Alarm Scanning Areas*

The critical alarm levels in these regions were determined by considering the failure rates of lithological and geotechnical units in the areas where local failures occurred during the RADAR scanning process. Accordingly, the displacement critical level values according to the TARP plan for heap leaching and the actions to be taken in case of exceeding these values are given in Table 5 (Copler TARP, 2022). After the warning is given, the Butress road for the Heap Leach Zone will be closed on both sides to prevent vehicles and workers from entering the zone and the road will be closed for 2 hours. if there is no warning after 2 hours, the road will be opened to traffic after checking and making sure that there are no material spills and flows, cracks and solution flows on the road. In RADAR deformation analyzes, there is no international acceptance in the literature for critical level values. For the determined critical levels, the regeneration rate values obtained from different lithological units are used with the existing field scanning data. The scenario in which the movements at the critical level will cause regeneration after 2 hours is taken as a basis. In the Trigger Action Response Plan, the Oxide process operations team receives SMS messages when routine movement is monitored by radar. The trigger limit is set by the mining unit and limits are shared through the weekly radar report shared every Monday. The weekly radar report provides a brief summary of the movement during the week. The heap leach displacement graph for the last week before landslide is given in Figure 7 and the reference areas used in the heap leach radar measurements are given in Figure 8.

*Table 5. Displacement critical level values according to the Trigger Action Response Plan (TARP) for heap leaching and actions to be taken if these values are exceeded (Copler TARP, 2022)*

| | Operation Response Plan | | Emergency Response Plan | |
|---|---|---|---|---|
| Level | Green - Normal operation | Yellow - Warning | Orange - High Risk | Red - Loss of Integrity |
| Triggers, Visual inspections, Study | • No movement or abnormaliti es observed | • <10 mm/day slight movement <br> • Continuous monitoring of YL using radar | •Moderate movement, movement rate between 10-20 mm/day <br> •Continuous | •>20mm/day Instantaneous movement speed Continuous monitoring of YL using• radar. |
| Anagol d employ | - | No discernible leaching movement | • Ensure that it is not in the area of close movement | |



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

| Security | NO | Notify the shift supervisor immediately | |
|---|---|---|---|
| YL Operator | NO | Notify the shift supervisor immediately. | Contact the YL stacking operator immediately to stop the stacking operation. |
| Supervisor / Regional Engineer | NO | • Inform Geotechnical Engineer for guidance on the degree of barricading required<br>• The Geotechnical Engineer will decide if there is an HL failure<br>• Barricade the area as directed by the Geotechnical Team<br>• Determine if this is a minor HL malfunction.<br>• Together with the Geotechnical Engineer, assess the need to reduce the risk of further movement by stopping stacking and/or reducing irrigation, secure the area to prevent access by unauthorized personnel | |
| Geotechn ical Engineer | NO | • Assess potential failure inside or outside the beam<br>• Instruct the Supervisor and/or District Engineer to secure the area, including barricading<br>• Provide instructions on next steps, including additional monitoring for movement and corrective actions | |



*Figure 7. Heap leaching displacement graph for the last week before landslide*



Page **218** /

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION



*Figure 8. Reference fields used in heap leaching radar measurements*

As seen in Figure 7, the 10 mm/day limit for orange warning was exceeded on 08.02.2024. However, as can be seen from the suspect statements, no security measures were taken.

Radar displacement measurements for the last 6 months according to heap leach reference areas are given in Figure 9 and Figure 10. These measurements cover the date range from 13.08.2023 until the landslide. Displacement quantities are given cumulatively and blasting during Phase 5 construction is shown on these graphs.



I the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION



*Figure 9. Displacement measurements according to Reference Point S1 (last 6 months)*

As seen in Figure 9 and Figure 10, there is a direct correlation between the radar displacement amounts and phase 5 construction blasting operations. It is seen that displacement movements have increased especially since January at both reference points. Accordingly, the values of the displacements according to the date range are given in Table 6.



*Figure 10. Displacement measurements according to Reference Point FY (last 6 months)*



Page **220** /

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

*Table 6. Breakdown of Displacements by Date Range*

| Date Range | Number of Days | Total Displacement (mm) | Velocity (mm/day) | Number of Blasting Activities Conducted within the Scope of Phase 5 Construction |
|---|---|---|---|---|
| 13.08.2023-02.11.2023 | 82 | 28,36 | 0,345854 | - |
| 03.11.2023-01.01.2024 | 60 | 32,5 | 0,541667 | 8 |
| 02.01.2024-13.02.2024 | 43 | 192,8 | 4,483721 | 15 |

An analysis of the blasting during the construction of Phase 5 shows that 18 of the 23 blasts were carried out between January 2024 and the landslide realization date. Among the blasts, blasts 9 (05.01.2024), 10 (05.01.2024) and 19 (24.01.2024) gave the highest vibration velocity and following these, the displacement values of the heap leach started to increase. This can also be seen in the displacement velocity graph of the last 2 months given in Figure 11.



*Figure 11. Displacement Speed Change (last 2 months)*

As can be seen in Figure 11, the displacement rate was measured as ~25 mm/day after 05.01.2024 when blasts 9 and 10 were performed. This value requires red warning actions as seen in Table 5.

Sources-
-Fugro*Sial, Copler Gold Mine Project 4th Stage Heap Leach Site Slope Stability Report, September 2014*
-C. Gokceoglu, A. Turer, H.A. Nefeslioglu, D. Turer, C. Meral, *Safety assessment of limestone- based engineering structures to be partially flooded by dam water- A case study from northeastern Turkey, Engineering Geology 209 (2016) 44-55*



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

*-U. Ozer, A. Kahriman, M Aksoy, D Adiguzel, A Karadogan, The analysis of ground vibrations induced by bench blasting at Akyol quarry and practical blasting charts, Environ Geol (2008) 54-737-743*
*-S. Taşdemir, Erzincan-İliç-Copler Mine Site Investigation of the Environmental Impacts of Basamak Explosions, Dokuz Eylül University Institute of Science and Technology, Master's Thesis - February, 2013*
*-D. Adıgüzel, Çatalca Yöresi Akyol Taşocağında Patlatma Kaynaklanan Vibration Effects Investigation, Istanbul University Institute of Science and Technology, Master's Thesis, June, 2006 -Copler TARP Anagold, Heap Leach Structural Integrity Trigger Action Response Plan (TARP) , September 2022*

## 5.4. EVALUATION OF THE INCIDENT WITHIN THE SCOPE OF OCCUPATIONAL HEALTH AND SAFETY

As mentioned above in the sections on project and monitoring, since the design parameters of the leach plant change over time (loading, water supply, precipitation, etc.), it is very important to continuously monitor the stability of the leach plant and to establish the necessary warning prompts. Again, as mentioned earlier, it is the responsibility of the project manager to design the monitoring systems and the project department to ensure their installation and functioning. In terms of occupational health and safety legislation, every employer is obliged to ensure the health and safety of its employees under allcircumstances2. In this context, it is also obliged to carry out / have risk assessments carried out and renewed [3].

---

*2 law No. 6331 on Occupational Health and Safety-*
*Article 4 on the general obligation of the employer. (1); "The employer is obliged to ensure the occupational health and safety of employees and within this framework-*
*a) It works to prevent occupational risks, to take all kinds of measures including training and information, to organize, to provide the necessary tools and equipment, to adapt health and safety measures to changing conditions and to improve the current situation.....*

*Article 5 of the Regulation on Occupational Health and Safety in Mining Workplaces, titled General obligations of the employer, states "(1) The employer is obliged to fulfill the following matters-*
*a) To ensure the health and safety of employees;*
*1) Workplaces are designed, constructed, fitted out, commissioned, operated and maintained in a manner that does not endanger the health and safety of workers.*
*2) All work to be carried out in the workplace shall be carried out under the supervision and responsibility of the authorized person.*
*4) All safety instructions are prepared in a way that employees can understand.*
*5) Adequate first aid equipment is provided in accordance with the Regulation on Emergencies in the Workplaces published in the Official Gazette dated 18/6/2013 and numbered 28681 and (Amended phrase-RG-24/3/2016-29663) necessary drills are carried out regularly, at the latest every 6 months.*

*3 Law No. 6331 Article 4.1.c, c) Conduct or have conducted a risk assessment."*
*Article 5-(1) on the principles of risk protection states that "the following principles shall be taken into account in the fulfillment of the employer's obligations-*
*Avoiding risks Analyzing risks that cannot be avoided Combating risks at their source Adapting to technical developments Replacing the hazardous with non-hazardous or less hazardous Giving appropriate instructions to employees"*



he sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text. signature

Although there is no risk assessment report among the documents delivered to our committee within the scope of the file, it is stated in the final report of the expert committee dated 15.03.2024 that there is a risk analysis report prepared by Anagold Mining, and by referring to Article 42, it is stated that the compatibility of the heap with the project cannot be controlled against the environmental spillage hazard resulting from landslide in the heap operations, there are no devices to measure the heap mobility, the array is not suitable for the area, the slope stability is low, there is no trigger action plan in the slope mobility, excessive rainfall, leaks in BLS lines, earthquakes, heap leaching of the heap clay stone ratio It has been given that it is different from the standards specified in function stacking and there are radar, prism tracking systems, trigger action plan as a precaution, training is made, measurements are taken by topography in the HL area, heap leach OWS document is prepared, OMS trainings are given, the pressure changes are kept under control by putting supports on the pipelines, line connections and resources are checked, radar reports evaluation trainings are completed, the report is shared by the mining geology unit every week, critical levels are updated for radar general and locale scanning and information is received through the SMD system, solution lines and flows are controlled by the DCS system, solution (BLS)pumps stopped automatically in pressure value changes, pillar support was made in the east-west regions, and seismic stability analyzes were performed.

However, although a risk assessment report was prepared, the risks were certainly not analyzed correctly/adequately. As mentioned in the previous sections, a system to control the design parameters has not been developed. As mentioned earlier, it is the responsibility of the project manager and the project department to design and install the system.

However, employers are obliged to prepare an emergency action plan under the Regulation on emergencies inworkplaces4. Although there was no emergency action plan in the documents delivered to us, it is understood from the statements taken after the accident that the emergency action plan was activated.

---

*Risk assessment, control, measurement and research;*
*Article 10.1 states that "The employer is obliged to make or have made a risk assessment in*
*terms of occupational health and safety".*
*4 Obligations of the employer ARTICLE 5 - (1) The obligations of the employer regarding emergencies are*
*set out below-*
*a) Identifies possible emergencies by taking into account the working environment, the substances used,*
*work equipment and environmental conditions and evaluating the emergencies that may occur and affect*
*the employee and the working environment in advance.*
*b) Takes measures to prevent and limit the negative effects of emergencies.*
*c) Makes the necessary measurements and evaluations to protect from the negative effects of*
*emergencies. C) Prepares emergency plans and ensures that drills are carried out....*
*g) (Amended-RG-1/10/2021-31615) Ensures that the employees of the sub-employer and the employer*
*with whom a temporary work relationship is established, if any, customers and visitors, participants and*
*other persons present in the workplace for collective activities such as meetings, seminars, conferences*
*and training are informed about emergencies, evacuation plan, escape routes, gathering places and*
*emergency teams.*
*Emergency plan ARTICLE 7 - (1) Emergency planis prepared for all workplaces starting from the*
*design or establishment phase by following the stages of identifying emergencies, taking measures to*
*prevent and limit their negative effects, determining the persons to be assigned, establishing emergency*
*response and evacuation methods, documentation, drills and renewal of the emergency plan.....*



Page **223** /

I the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

However, this was the case after the accident. However, landslides have frequently occurred in leach sites in the past and it is known to be a potentially dangerous situation and there has been no proper planning against this situation. In particular, relations and communication with subcontractors are irregular and inadequate.5

The five workers who died in the accident were buried under the soil inside the container. As it is clear from the statements, the area where the border is located is also a gathering place. However, as can be seen in the figure below, the location of the container is very close to the place where the pillar support is made in case of landslide and it is just below the leach heap. In this case, the area where the container is located, which is not designated as a gathering place, is a place that is likely to be buried under the ground and its location is not correctly positioned.

SMS and e-mail communication was also insufficient on the day of the incident and some units could not be notified. In the event of a possible landslide, a communication system that ensures fast communication with all employees within the scope of the emergency action plan has not been established. Indeed, the deceased truck driver Uğur Yıldız continued to work. The geotechnical report prepared by Neil Barr for the company also mentions the need for audio/visual warning systems against disruptions in SMS and e-mail communications.

In this context, the fact that a comprehensive emergency action plan against the risk of landslides was not prepared / inadequately prepared had a serious impact on the accident, which was warned early in the morning and took place around 14-30 at noon.

It was concluded that the project department and the OHS department were at fault for the incorrect positioning of the container area, which is also an emergency gathering place, and that the OHS department was at fault for the correct preparation of the emergency action plan.

---

*ARTICLE 9 - (1)The employer shall take the necessary measures to prevent the damages and limit the greater effects of possible and probable emergencies identified by him.*
*(2) Measurements and assessments shall be made where necessary when determining measures to protect against the adverse effects of emergencies.*
*3) The measures to be taken comply with the principles of risk protection and are based on collective protection.*

*5 ARTICLE 17 - (1) In the event that more than one employer shares the same workplace, an emergency plan shall be prepared jointly by the employers for the works carried out, taking into account the works carried out by other employers.*
*REGULATION ON OCCUPATIONAL HEALTH AND SAFETY IN MINING WORKSITES, Article 5;*
*(4) The presence of employees belonging to more than one employer in a workplace(2) Employer,*
*a) Ensures that health and safety documents are prepared and updated in line with the provisions of Articles 4, 10, 14 and 16 of the Law.*
*b) Ensures that the health and safety document includes in particular the following-*
*1) Identification and assessment of risks, including psychosocial risks, to which workers may be exposed at work.*
*2) Each employer is responsible for the works under its control, if they are to be taken to fulfill the provisions of this Regulation. However, the employer responsible for the entire workplace shall coordinate the implementation of measures to protect the health and safety of workers. In its own health and safety document, it determines the purpose of coordination and the measures to be taken and methods to be applied to ensure this coordination. This coordination does not affect the responsibility of each employer under the Law"*



I, the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
signature

SWORN
TRANSLATION

ORTHOPHOTO IMAGE BEFORE THE LEACH LANDSLIDE

ORTHOPHOTO IMAGE AFTER LEACH LANDSLIDE

*Figure 1. Location of the confluences (Red colored line shows approximately 96.8 ha affected by the slide)*



Page 225 /

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

## 5.5. ENVIRONMENTAL IMPACT ASSESSMENT OF THE POST-EVENT SPREAD OF CYANIDE LEACH MATERIAL ON LAND

**Incident -** The flow of cyanide soil material as a result of sliding in the Heap Leach site, which is one of the mining activities carried out by Anagold Madencilik San ve Tic AŞ in the Copler Complex Mining Site, within the borders of Erzincan Province Ilic district on 13.02.2024.

**Question about the incident that the Chief Public Prosecutor's Office (CBS) asked the expert to answer -**

Whether the heap shifting event causes environmental pollution.

**Documents reviewed –**

1- All analysis reports given to us within the scope of the CBS investigation ( inthe files in the 3rd item )
2- Expert report dated 15.03.2024 (Evaluation notes in terms of chemical and environmental expert)
3- Files sent by CBS (with names from CBS)-
   a. İLİÇ GIS Investigation No-2024/88 (2484 pages)
   b. ILİÇ GIS Investigation No-2024/88 (Annex) (1152 pages)
   c. ILIC GIS Investigation No-2024/88 Annex-2 (2840 pages)
   d. ILIC GIS Investigation No-2024/88 Annex-3 (583 pages)
   e. Anagold Technical Report 2024.04.05 (46 pages)
   f. Annex3 (1399 pages)
   g. New incoming documents in addition to the investigation (59 pages) 4- Relevant legislation

**Review topics -**

1- Whether any pollution has occurred in surface water resources
2- Whether there is any contamination of groundwater
3- Whether any contamination occurred in soil samples taken from the site and its immediate surroundings
4- Whether there is any pollution in the air environment samples at the site and its immediate vicinity

## RESULTS OF THE REVIEW

## 5.5.1. EVALUATION OF THE WORKS CARRIED OUT BY THE MINISTRY AFTER THE LANDSLIDE



Page **226 /**

I the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

**5.5.1.1. Actions taken under the supervision of the Ministry within the scope of measures taken after landslides**

2024-88 Investigation In the file titled Annex-2 (pages given as Annex-14, pdf pages 1166-1276), in the letter dated 05.03.2024 and numbered ORE-057-2024 of Ore Mineral Sondaj İnş Müh San Tic Ltd Şti, authorized by the Ministry, about the transportation of the soil material (wastes) sliding after the landslide from their location to temporary and permanent areas, It is stated that "their company was authorized for the removal of the material spilled on the east and west sides of the heap leaching plant from the places where it was spilled and for the follow-up of the works of safely transporting and storing it to the storage areas determined" and that "in this context, 15-day follow-up activity reports made between 20.02.2024-04.03. 2024-04.03.2024", and that the reports attached to the letter are titled "Anagold Madencilik Copler Complex Mining Operation, Temporary Waste Storage - Waste Transfer Field Works After Landslide Water Structures Audit Firm Daily Follow-up Report".

From the information on the front page of the reports, it is stated that "6 million m3 of material was shifted in the event that occurred on both sides, 2 temporary and 1 permanent storage areas were identified as a result of the studies carried out in the field, and the information of the identified areas ;

- Temporary storage area-1 (Former marble quarry) - approx. 1,950,000 m3 capacity
- Temporary storage area-2 (under the church) - capacity of approximately 7,000,000 m3

- Permanent storage area (Manganese quarry) - approximately 45,000,000 m3 capacity, it is understood that in these areas, after the ground is made impermeable with a clay layer, the landslide material will be transported safely and storage will be carried out, and Ore Mineral Sondaj İnş Müh San Tic Ltd Şt is authorized for the supervision of the application in a healthy way."

**5.5.1.2. In the letter undated and numbered 8910306 dated Erzincan Governorship Provincial Directorate of Environment and Urbanization Directorate, in summary, "within the scope of the investigation, the results of the examination carried out on the subject in terms of environmental pollution at the incident site were requested urgently, as a result of the examination, the environmental permit and license certificate issued on behalf of the enterprise was canceled by the Ministry, in order to determine and follow up whether environmental pollution occurred due to landslides, first of all, 2 culverts on Sabırlı stream were closed in order to protect the environment, the flow of soil and water was stopped by building a dike in front of the flowing material due to the risk of landslides in the area, membrane pools were built and the collected waste water was directed to the waste dam located within the facility site with the help of pumps and vacuum trucks, in addition, soil samples from the site, daily water samples were taken from surface and groundwater monitoring observation wells (from the points shown in the picture below, Picture 1) and sent for analysis, the analyses are performed and compared daily at the Ministry Mobile Water and Wastewater Analysis Laboratory, the Ministry Environment and Reference Laboratory and authorized laboratories in the area (the tables given as Annex-4 in the annex of the letter, which are attached to this report as it is (the evaluations regarding the relevant tables are made in the following sections), the air quality of the region is monitored continuously (24 hours a day) by the Ministry Mobile Air Quality Monitoring Vehicle and 6 Air Quality Monitoring Stations in the region, no negativity has been encountered in the samples taken and in the air quality of the region so far (on the dates when the samples were taken), that the sampling and air quality monitoring process is ongoing within the scope of environmental monitoring studies (given as Annex-5 in the annex of the letter), that Temporary and Permanent Waste Storage Areas have been determined by the Ministry in order to prevent environmental pollution by taking the flowing soil to a safe area, that a company has been assigned for this purpose, and that an assignment has been made for academic consultancy".**



Page **227** /

I the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

It was seen that sampling points (Figure 1.1 and Table 1.1) and analysis results were given in the annex of the letter, and the evaluation of the analysis results was made in the following sections.



*Figure 1.1 - Map showing the location of surface and groundwater monitoring observation wells Table 1.1 - Description and coordinates of surface and groundwater monitoring observation wells*

| | Sample Code | | | |
|---|---|---|---|---|
| 1 | SW01 (upstream of Water. | Surface Water | 09.409138 | 56.535007 |
| 2 | Sw08 (point | Surface | 59.451027 | 38.535206 |
| 3 | SW02 dam | Surface | 39.447050 | 38.462640 |
| 4 | wm36 | Observation | 39.412394 | 38.523467 |
| 5 | SW04(Copier | Surface | 39.442560 | 38.521932 |
| 6 | SW06-B | Surface | 39.446561 | 38.537323 |
| 7 | WM08 | Observation | 39.443440 | 38.536362 |
| 8 | WM39 | Observation | 39.443408 | 38.536263 |
| 9 | SW06 | Surface | 39.448112 | 38.537955 |



Page 228 /

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

### 5.5.2.    REVIEW OF THE EXPERT REPORT PREPARED AFTER THE INCIDENT

Within the scope of the investigation initiated after the incident, in the Expert Report (121 pages) dated 15.03.2024 prepared by 10 experts from 10 different fields of expertise, it was seen that the conclusions of the Chemistry Expert and the Environmental Expert, who were seen to have examined and evaluated the issue of environmental pollution, on the above-mentioned issues were as follows.

In the information provided by the Chemistry Expert in the evaluation section, the results of the analysis of 9 water samples taken by ANKALAB-FEPAS-ARTEK environmental laboratories dated 26.02.2024 around the mine site were found below the method detection limit (determination limit) for cyanide. Therefore, it was concluded that the discharge limit values were not exceeded due to the discharge caused by landslide. Similarly, it was observed that the results of measurements for heavy metals were reported as not exceeding the limit values.

(Note- The evaluation results of the same analysis results within the scope of this report are given in the following sections) In the section titled "General evaluation in terms of chemistry expert", it is stated that "Following the slide of the Heap Leach area at the Copler mining operation on 13.02.2024 at the Copler mining operation on 13.02.2024, groundwater and surface water, waste and waste water to be taken by accredited laboratory staff on different dates from different coordinates within the framework of the sampling program on Karasu for 40 days after the Heap Leach area in the mine slipped, according to the results of cyanide and heavy metal analyzes to be carried out by an accredited laboratory in soil and air samples, according to the Regulation on Water Pollution Control (amended table 1- RG-13/02/2008-26786) Table 1- Quality Criteria According to the Classes of Continental and Water Resources, Regulation on Soil Pollution Control and Point Source Contaminated Sites. *It is necessary to investigate whether the discharge criteria are met and whether there is pollution in the soil.*

It can be determined whether there is contamination by looking at whether there is a difference between the quality class before the plant was installed and before the Heap Leach site landslide event." Therefore, it is understood that the chemical engineering expert made an assessment that it is not possible to decide whether there is contamination with the samples dated 26.02.2024 taken after the incident, and that it would be appropriate to make a decision after the completion of the ongoing sample procedures.

In the evaluation part of the chemistry expert's evaluation of the soil analysis results, it is stated that "A significant part of the analysis results of 3 soil samples by the same laboratories were measured below the relevant regulation limit values, cobalt in 1 soil sample and arsenic concentrations in 3 soil samples were found to exceed the generic pollutant limit values, but these substances also pose a risk for ingestion of soil and skin contact, however, it was evaluated that there was no risk due to the higher limit values for inhalation of dust, no comparison could be made since the reference sample information could not be accessed, and since the soil heavy metal concentrations were close to each other, it was thought that there was no pollution caused by the shift in the heap leach site for arsenic and cobalt pollutants".

It was observed that the chemistry expert included information compiled from the literature in the section titled "risks that cyanide may pose", but there was no information on the source or sources from which the information was obtained.



Page **229** /

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

In the evaluation made by the Environmental Expert in the same Expert Report, in summary, mentioning the actions taken by the official institutions in the first stages of the incident, it was stated that the license certificate of the mine was revoked, 7 questions asked to be answered by the prosecutor's office within the scope of the investigation were included, and in the continuation of the report, explanations were given under the headings of "general framework, determination and observations of the current situation, the existence of environmental effects in the occurrence of the accident, the category of environmental evaluation of the accident".

In the following sections, the EIA Report dated 2021 prepared for the company is mentioned, information on risk issues is given in the report, it is stated that it is understood from the report that there is no possibility of landslide / collapse, although the Final EIA Report has been evaluated under the headings of "landslide to the heap leaching site" and "collapse at the heap leaching site", and in the section titled Evaluation of the incident in terms of environment and legal regulations, it is seen that the articles of the regulations on air quality, water and soil pollution are mentioned.

In the assessments made, no statement was found to express an opinion on whether there was any contamination.

It is understood that the environmental expert's assessments were in compliance with the relevant legislation and to answer the prosecution's questions by utilizing the EIA Report, and since the assessment of whether there was contamination was made by the Chemical Expert, it should be accepted that it was not made by the Environmental Expert.

### 5.5.3. EVALUATION OF MINISTRY (CSIDB) REFERENCE LABORATORY ANALYSIS RESULTS

5.5.3.1. Document - 3.c In response to the letter dated 08.03.2024 and numbered 43846157/(2024/88)/890 of İliç CBS dated 08.03.2024 and numbered 43846157/(2024/88)/890, the Ministry of Environment, Urbanization and Climate Change General Directorate of Environmental Impact Assessment, Permitting and Inspection sent a letter undated E-77551409-641.99-9047406 undated sent by the General Directorate of Environmental Impact Assessment, Permitting and Inspection of the Ministry of Environment, Urbanization and Climate Change in response to the letter numbered "Air Quality measurement results, the results of the analysis of air, water and soil samples made in the laboratory of our General Directorate and made in accredited laboratories are sent in the annex".

It was seen that the air quality measurement results were given in Annex-1 as 20 pages, and on the page titled Information Note (pdf page 2375) in the annex of the letter, it was stated that "measurements were made using the Mobile Air Quality Measurement Vehicle affiliated to the Ministry as of 23.02.2024. The measured parameters were Particulate matter (PM10 and PM2.5), Sulphur dioxide (SO2), Carbon monoxide (CO), Nitrogen oxides (NOx), Ozone (O3), sampling was also carried out at 4 points to determine Lead (Pb), Nickel (Ni), Cadmium (Cd) and Arsenic (As) parameters, filter samples were analyzed at the Ministry's Environmental Reference Laboratory, 42 sample analyzes were completed and the analysis of 64 samples is ongoing."

In the Annex-2 file (pdf pages 2355-2375), 20 pages of air quality measurement results are given in the following limit values for the relevant parameters in the Air Quality Assessment and Management Regulation published in the OG dated 06.06.2008 and numbered 26898;



the sworn translator Yasin DURMAZ,
declare that I have translated this
document to English language completely
and correctly in accordance with the
original Turkish text.
Signature

*Table 3.1- HKDRM limit values*

| Parameter | PM10 | PM2.5 | SO2 | CO | NOx | O3 |
|---|---|---|---|---|---|---|
| Hourly limit value, µg/m3 | 50 | - | 350 | 10.000 | 200 | 120 |

when the evaluation is made by taking into account :

-It was observed that the maximum measured PM10 values were 143.8 mg/m3, but when the evaluation was made according to the statement in Annex-1 of the regulation that the limit value cannot be exceeded more than 35 times in 1 year, it was seen that this number was exceeded in a 20-day period, while other parameters remained below the limit values in all measurements.

-In the Final EIA Report "Copler Complex Mine 2nd Capacity Increase and Flotation Plant Project with License Nos. 847, 49729 and 20067313" dated March-2021 prepared for Anagold Mining on page II-196 (pdf page 350), "Table II.67 Background Air Quality Measurement Results (PM10 and Settled Dust)" (measurements were made instantaneously on 13.09.2018-10.10.2018 and 08.11.2018), it is seen from this table that the lowest value of 0.499 mg/Nm3 (499 µg/m3) and the highest value of 1.041 mg/Nm3 (1041 µg/m3) were measured for PM10 among the measurement results made at 14 points in total. These values were compared with the limit value of 3 mg/Nm3 in Annex-1 b.2.2 of the Regulation on the Control of Industrial Air Pollution and it was stated that the limit value was not exceeded. However, for the limit value of 3 mg/Nm3, the regulation states that "the hourly average value of dust concentration (PM 10) at a distance of 3 meters from the dust source should not exceed 3 mg/Nm3", and it is understood that comparing the measurement results made in and around the project area (assuming that this statement in the EIA Report is written correctly) with the limit value of 3 mg/Nm3 is an incorrect evaluation, and that a comparison should be made with the ambient air quality values given in Table 3.1 above. If the assessment had been made as stated, it would have been seen that the ambient PM10 limit values were exceeded.

Therefore, when the results of the analysis made with the mobile device between 23.02.2024-13.03.2024 are compared with the previous situation of the facility, it is understood that in terms of the PM10 parameter, both in the previous situation of the facility and as of the dates of measurement, the limit values have been exceeded and the limit values have been below the limit values for other parameters.

-Looking at the Mobile Air Quality Measurement Results table given in Document 3.c between pages 2355-2375 of the pdf, it is seen that no measurement was made for a parameter (HCN) that refers to the cyanide parameter mentioned in the case in question.
From the process and literature information, it is known that the pH of the soil environment is kept above 10 in order to prevent the cyanide used in the leaching process from volatilizing under operating conditions, and as the pH decreases in the material separated from the environment, cyanide is removed from the soil environment in the form of HCN.
Therefore, it is necessary to measure HCN in the air within a few days after the event in order to understand whether the cyanide in the material flowing as a result of the landslide has been mixed into the air environment.
The fact that mobile air quality measurements started on 21.02.2024 means that 10 days have passed since the incident, and therefore there is no longer any possibility to get accurate data on the presence of HCN in the air. The fact that there is no mention of cyanide in the Regulation on Air Quality Assessment and Management indicates that this substance should not be encountered under normal conditions, and that different regulations (**REGULATION ON HEALTH AND SAFETY PRECAUTIONS IN WORKING WITH CHEMICAL SUBSTANCES**) should be consulted for sudden exposure situations (in workplace environments).



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

**Since there is no measurement result, there is no point in giving any relevant exposure limit value from the mentioned regulation.**

-Evaluation of heavy metal measurement results in air samples

Annex-2 pdf pages 2661-2786 contain air quality monitoring reports, measurements were started on 21.02.2024, heavy metal measurements were made on dust samples taken on 20 gram filter papers, measurement results were given in the form of µg/filter (NOTE - since the filter weight is given as 20 grams, the value in the table can be divided by 20 grams and switched to µg/gram unit, although it is understood that a value in ppm in mass can be given here, the concentration unit (µg/Nm3) is generally used for air pollutants, but since there is no information on how much air is drawn and measured in these reports, the concentration unit cannot be used.)

Moreover, it is not understood why the Ministry, to which the unit performing the measurements is affiliated, has given air quality monitoring results by using a unit that is not included in the Air Quality Assessment and Management Regulation published in the OG dated 6/6/2008 and numbered 26898. In Annex-1 of the Annexes to the Regulation, in the Definitions section, the units in which concentration values should be expressed*(ng/m³ for arsenic, cadmium, nickel, mercury and benzo(a)pyrene)* are given.

As a result, it is not possible to evaluate whether the landslide caused heavy metal contamination in the air environment, since no unit was used to compare the heavy metal values found as a result of the analysis of the dust samples kept on filter papers. Since it has been a long time since the incident, there will be no repeatability of the measurements.

After the landslide, no HCN-related results were found in the air quality measurement reports.

### 5.5.3.2. Examination and Evaluation of Water, Soil Analysis Studies

In the INFORMATION NOTE ON THE STUDIES of ERZİNCAN İLİÇ LABORATORY, MEASUREMENT and MONITORING DEPARTMENT (Document 3.c, pdf page 2375), in summary, "water samples were taken from a total of 11 different points, 5 of which were observation wells, 6 of which were surface and leachate water, and 3 observation wells from the mine site waste storage area on a weekly basis, where the air quality and water quality of the region were regularly monitored by the ministry from the first day of the event.

In addition, 6 samples of mine waste taken from both the waste and clean area on Sabırlı Stream, where the mine waste came as a result of the accident, and soil samples taken from 7 different points, including 1 from the mine production area, which were not exposed to pollution, were analyzed on-site at the ministry's mobile water and wastewater analysis laboratory and in detail at the ministry's Environmental Reference Laboratory, 42 waste/soil samples (in eluate and original form) in total 1.176 parameters were studied, and 7986 physical and chemical parameters were analyzed in a total of 256 water samples taken regularly on a daily basis.

It has been seen that the analysis and reporting studies are in progress (as of 29.03.2024, when the file was sent to us), in addition, all samples were sent simultaneously to the accredited Çınar Environmental Analysis Laboratory and Segal Environmental Analysis Laboratory, and the data tables containing the results of these laboratories are included in the CD record", the analysis reports in the annex of the letter were examined separately and the results obtained are given below.



Page **232** /

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

### 5.5.3.2.1. Evaluation of analysis results of water samples

(Document 3.c (Annex-2), pdf pages 2376- 2822)

**Relevant Regulation and Annex for Assessment -** Surface Water Quality Regulation ANNEX-5

(Amended-RG10/8/2016-29797) Table 4 - Specific Pollutants and Environmental Quality Standards for Surface Water Resources Date of reports - 12.03.2024

*Table 3.2- Evaluation of the Analysis Results of the Environmental Reference Laboratory of the MoEU*

| Point of sample collection | Report no | Whether limit values are exceeded* | Example parameters |
|---|---|---|---|
| AFAD under the accumulation point | 24-SU-0053-M4 | Exceeding YO-CDS values<br><br>Exceeding the MAK-CCS values | Antimony, Arsenic, Copper, Silver, Nickel, Cobalt, Iron, Vanadium Mercury, Arsenic, Copper, Zinc, Nickel, Silver, Cobalt, Iron |
| Sabırlı Stream (WM-39) | 24-SU-0033-M4 | Exceeding YO-CDS values | Chromium, Copper, Lead, Zinc, Aluminum Mercury, Aluminum, Iron |
| Copler Stream (WM-36) | 24-SU-0034-M4 | Exceeding YO-CDS values | Chromium, Copper, Lead, Zinc, Aluminum Mercury, Aluminum |
| Sabırlı Stream Area (WM-08) | 24-SU-0035-M4 | Exceeding YO-CDS values | Chromium, Copper, Lead, Zinc, Aluminum, Cobalt, Vanadium, Mercury, Cobalt |
| Copler Stream (SW-04) | 24-SU-0036-M4 | Exceeding YO-CDS values<br><br>Exceeding the MAK- | Cadmium, Copper, Lead, Iron, Aluminum, Arsenic, Cobalt, Vanadium, Chromium Copper, Iron, Aluminum, Arsenic, Mercury |
| Culvert Dam Connection (SW-08) | 24-SU-0037-M4 | Exceeding YO-CDS values<br><br>Exceeding the MAK- | Cadmium, Copper, Chromium, Lead, Aluminum, Cobalt, Iron Mercury, Aluminum, Cobalt, Iron, |
| Dam downstream (SW-02) | 24-SU-0038-M4 | Exceeding YO-CDS values | Cadmium (Class I), Chromium, Copper, Lead, Antimony, Aluminum, Cobalt, Mercury, Aluminum |



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

| Upstream (SW-01) | 24-SU-0039-M4 | Exceeding YO-CDS values | Cadmium (Class I), Chromium, Copper, Lead, Antimony, Aluminum, Cobalt, Iron, Vanadium, Mercury, Aluminum, |
|---|---|---|---|
| | | Exceeding the MAK-CCS | |
| Sabırlı Stream Observation Well (WM-39) | 24-SU-0046-M4 | Exceeding YO-CDS values | Cadmium (Class I), Chromium, Copper, Lead, Antimony, Zinc, Aluminum, Cobalt, Vanadium, Mercury, Copper |
| | | Exceeding the MAK-CCS | |

\* YO-ÇKS - Annual average environmental quality standard MAK-ÇKS - Maximum permissible environmental quality standard

In the analysis result reports of the water samples taken from the sampling points given above, the heavy metals exceeding the YO-ÇKS and MAK-ÇKS quality standard values are given in the sample parameters column, and in the analysis reports not given here (in Annex-2, which are given as pdf in other approximately 400 pages), similar heavy metals exceeded the YO-ÇKS and MAK-ÇKS quality standard values.

In particular, it was observed that the mercury parameter was measured above the quality value of 0.07 µg/L in almost all water samples (61 occurrences were found in the Annex-2 report). It is understood that even if the water samples are evaluated only in terms of the mercury parameter, it can be said that there is a contamination in the water resources. (NOTE - When the EIA Report dated 2021 is examined regarding the process in which mercury is used in the operation, it is seen that it is mentioned in the section titled "Gold Electro Recovery" on page I-54 and in the section titled "Refining Unit" on page I-66-67)

In the table in Document 3.a (İLİÇ GIS Investigation No-2024/88) pdf pages 1220 -1259, the water analysis results made by the Environmental Reference Laboratory are given collectively, the results of the samples taken between 14.02.2024 - 26.02.2024 are given (it was seen that there were no results since no samples were taken at some points in this interval), the following were seen at the sampling points:
;
Upstream (SW-01), Dam River mouth (SW-02), Copler Stream (SW-04), Culvert Inlet (SW-06), Culvert Outlet (SW-06-B), Culvert Dam Connection (SW-08), Sabırlı Stream Observation Well (WM-08), Copler Stream Observation Well (WM-36), Sabırlı Stream Observation Well (WM-39), Facility Upstream Observation Well (WM-48), It is stated in the description part that they have been named as Pre-Dam Accumulation Water (SW-10), BAGISTAS-1 Dam Dam Reservoir (SW-08B), Sabırlı Stream Culvert (MW-26), Copler Stream Observation Well (WM-32), BAGISTAS-1 Dam Cover Section (BKK), Below Dam Well (BAK);

SW coded samples surface water or leachate
WM coded samples are well water
SW-01, SW-02, SW-08, SW-08B Samples taken from the Euphrates River
SW-10, SW-04 Leachate entering the storm

In the evaluation of the measurement results in the table, the values given in "SKKY Table 7.1 Mining Industry" table and "YSKY Table 2 Water Quality Classes", "YSKY Table 4- Environmental Quality Standards" are taken into consideration.



Page **234** /

the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

From the table, it is seen that Arsenic, Mercury, Cadmium, Cobalt, Chromium, Iron, Lead, Zinc parameters are above the quality standards in 1 or more than 1 sample. Since the analyses were carried out on samples taken from receiving environments, it is not correct to compare the results with the SKKY limits given in the table (since they are given as discharge limits), and an evaluation should be made by comparing them with the NCCSD ESCS values.

A more detailed assessment of which parameters were exceeded in the samples in question has been made in Table 3.2 above and in the following section, and it is also understood from the table given collectively on the pages starting from page 1220 in the reference 3a in the pdf that the measured values for similar parameters in the receiving environment samples exceed the YO-ÇKS and MAK-ÇKS quality standards.

In the "Copler Complex Mine 2nd Capacity Increase and Flotation Facility Project Final EIA Report No. 847, 49729 and 20067313 dated March-2021", page II.128 (pdf page 237), when the pH values given by years at the Monitoring & Sampling Stations are examined, it is seen that the average lowest pH is 7,3, and the highest pH is 8, but when the water analysis results given on pdf pages 1220-1259 in the source no. 3a are examined, it is seen that the pH values are higher and there is an increase in the conductivity values compared to 2021. in Table II.25 on page II-98 of the EIA Report dated 2021, the MAK-ÇKS value for Mercury is given.
In the same table, it is seen that both YO-ÇKS and MAK-ÇKS values were exceeded in all samples for Nickel, both standard values were exceeded in SW-03 and SW-04 for Lead and Cadmium, MAK-ÇKS was exceeded in SW-06 for Lead, YO-ÇKS was exceeded in SW-05 and both limit values were exceeded in SW-06 for Cadmium.

In the same EIA Report, on page II-95, it is stated that "When the average values of all measurements in the Anagold water quality database are compared with the criteria of Annex-5 Table 5 of the NWPP Annex-5 (Table II.24), aluminum, copper, iron, cobalt and titanium concentrations at all stations are above the annual average and maximum limit values." Accordingly, it is understood that there are measurements above the limit values in water quality as of 2021.
However, although it is seen that the concentration of Mercury, for example, among the substances marked in green color in the table (Table II.24), is below the MAK-ÇKS value as of 2021, it is seen that the limit values were exceeded in the measurements made after the event subject to the lawsuit (for example SW-01, SW-02, SW-03 and SW-05), and a similar situation was observed for Cadmium (SW-01, SW-02 and SW-05 for YO-ÇKS).

### 5.5.3.2.2. Evaluation of soil analysis results

(Document 3.c, pdf pages 2787- 2804, analysis reports)

**Relevant Regulation and its Annex for the assessment** - Regulation on Soil Pollution Control and Point Source Contaminated Sites Annex-1 Generic Pollutants Date of sampling - 15.02.2024 In Document 3.a on pdf page 1260, the results of soil analysis are given collectively, in the table, there are parameters exceeding generic values.
Accordingly, it has been observed that the parameters exceeding the limit values in 1 or more samples are pH, Total Cyanide (TCN), Sulfur, Silver, Antimony, Arsenic, Copper, Barium, Mercury, Zinc, Cadmium, Cobalt, Lead, Molybdenum, Nickel, Selenium, Thallium, Titanium, Vanadium, and it has been understood that most of these parameters are above the "Transport of pollutants to groundwater and drinking groundwater" criterion in the Generic Pollutants table.



I the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

It was observed that the sampling points were 1- Below the Disaster Collection Point (T1, T2, T3), 2-Below the Radar Surveillance Point (R1, R2, R3), the measurement results of pH and conductivity parameters of the reference points for T and R points and the witness sample taken from the field and the main quarry reference points were given (0.00 was given for all of them because no measurement was made for salinity), while the results of heavy metals were not given.

From the table on page 1261, which is a continuation of the table on page 1260 of the pdf in Document 3.a, it is understood that samples were taken from Sabırlı stream (SD-01, 02-03), but only pH and conductivity measurements were made in these samples, and 0.00 was written for the salinity parameter.

### 5.5.3.2.3.   Evaluation of soil eluate test results

The eluate test results of the soil samples are also given in source 3.c on pdf pages 2805-2822, the analysis results are evaluated according to 3 criteria within the scope of the "Regulation on Landfilling of Wastes", the measurement results in the reports of 6 samples are given in a table in source 3.a (pdf pages 1262- 1263, pages that need to be enlarged by 600% to see the results).

It is understood that 3 of them are under the Disaster Collection Point (T1, T2, T3) and the others are under the Radar Surveillance Point (R1, R2, R3), from the table, Arsenic, Mercury and Nickel parameters are marked with red color, when the analysis results are analyzed, it is understood that they have values between the 2-B and 2-C criteria of the regulation, the analysis results are below the 2-C criteria and should be evaluated according to the 2-B criteria, accordingly, it can be said that the soil samples are classified as non-hazardous wastes.

In the explanation at the bottom of the table "*1) Eluate (sample diluted 10 times with water) values are consistent with the results obtained in the original waste (extracted with NaOH)*".

### 5.5.4. EVALUATION OF THE ANALYSES PERFORMED ON FISH SAMPLES

**Reviewed Document No - 3.c (2024-88 Investigation Annex-2 (pdf pages 1303-1310))**

It has been seen that the Ministry of Agriculture and Forestry Elazığ Veterinary Control Institute Directorate stated in the letter dated 05.03.2024 dated 43846157/(2024/88)/805 dated 13715047 written in response to the letter of İliç Preparation Office dated 05.03.2024 and numbered 13715047 that the requested analyzes were made in the fish samples sent by İliç District Directorate of Agriculture and Forestry and that the analysis reports were presented in the annex of the letter.

In the 2-page analysis report in the annexes (protocol number - BVE/2024/380 / MERT ŞAHİN) , it is stated that the sample was sent by ELAZIĞ VETERINARY CONTROL INSTITUTE DIRECTORATE to "MINISTRY OF AGRICULTURE AND FORESTRY, IZMIR BORNOVA VETERINARY CONTROL INSTITUTE DIRECTORATE", the analysis was carried out here, the sample acceptance date was 08.03.2024, in the explanations section, "Sudden deaths of carp species fish are encountered near Dostal Village, which is located near the Bağıştaş Hes-1 dam in our district. There is a suspicion of viral disease", and the results of the analysis dated 19.03.2024 by the Virology Department for 2 different disease types (COD HERPES VIRUS DISEASE, SPRING VIREMIA OF CARP) in fish (carp) samples were stated as "Negative".



I the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

The 3-page analysis report with the protocol number ELZ/2024/152 / MERT ŞAHİN was prepared by ELAZIĞ VETERINARY CONTROL INSTITUTE DIRECTORATE, the date of sample collection was 05.03.2024, the written explanation in the above report is included in the description section, the results of the analyzes made in fish (carp) samples are separately for the disease types in the results section;

- Rejected for COPD HERPES VIRUS DISEASE, (Method of Analysis - Nested-PCR)
- Positive for VIBRIBIOZIS OF FISH, (Method of Analysis - Conventional cultural method) In the description section, "Bacterial growth was observed as a result of cultivation of blood agar, TSA, TCBS from the internal organs of 5 fish sent for disease diagnosis after necropsy. The bacteria was isolated and identified as Aeromonas sobria with Vitek 2 compact device."
- Positive for PARASITOLOGICAL SCREENING, (Method of Analysis - Macroscopic Examination (Method Union in Diagnosis)) In the description section, "5 fish samples were screened for fish parasites and Monogenea parasite was detected",
- Negative for COPD HERPES VIRUS DISEASE, (Analysis Method - Real Time PCR)
- Negative for POISONING (PESTICIDE), (Analysis Method - GC-MS) with the information "PESTICIDES SPECIFIED IN THE REPORT APPENDIX WERE NOT FOUND AT DETECTABLE LEVELS" in the Description section,
- Negative for SPRING VIREMIA OF CARP, (Method of Analysis - Identification by cultivation in cell culture)

- It has been seen that the statement "The result of the analysis of the Virology Laboratory of Izmir Bornova Veterinary Control Institute Virology Laboratory, which is a reference in terms of Viral Fish Diseases, is attached" is included in the explanation section, the statement "Not found at detectable level" for all the sought parameters in the 2-page Toxicology Laboratory results table, and the statement "PESTICIDES specified in the table above were NOT FOUND AT DETECTABLE LEVEL in the analysis performed on the fish sample sent" in the Decision section.

From the above results, it is understood that the effect of a chemical poisoning was not observed in the fish, but a biological contamination was detected.

**Examination of the other report on Fish Deaths on pdf page 2323-2337 in the source no. 3.c**

-

In the letter dated 20. 03. 2024 and numbered E-81297481 - 140. 99-13682442 sent by the Provincial Directorate of Agriculture and Forestry of ERZİNCAN GOVERNORSHIP to the General Directorate of Legal Services of the Ministry of Agriculture and Forestry, it was stated that; "However, unlike all these requested information and documents, it is unknown whether it is related to the landslide incident, and it is predicted that these deaths, which are stated to have occurred in a single fish species in previous years, may be caused by seasonal transition periods and fish diseases in Bağıştaş-1 Hepp Dam Lake, which is approximately 2 km away from the place where the nearest land border landslide occurred, due to the occurrence of fish deaths on different days and different locations. In order to determine the exact diagnosis and diagnosis of fish deaths, fish and water samples were taken from the field and sent to the relevant Laboratory and Institute Directorates for analysis, and while some of the analysis results have reached our Provincial Directorate, some of them have not yet been received.



Page 237 /

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

All the studies, information and documents we have regarding the **fish deaths in question are sent in the** annex of our letter." It has been seen that the reports prepared by **the Provincial Directorate of Agriculture** and Forestry are given as an annex, in addition to the reports on fish deaths, the analysis results of the water samples taken from Bağıştaş - 1 Dam Lake are also given in the reports, and the reports of Elazığ Fisheries Research Institute are also included.

In the fish mortality assessment form (given as Annex-1), it was seen that the cause of death was stated as "bacteria/viruses et al", there was a note that "no specific pollutants were found", the measurement date was 05.03.2024, pH was 8.45, Dissolved Oxygen was 11.2 mg/L, Conductivity was 540 µS/cm, water temperature was 8.1 oC, and "mortalities were observed throughout the dam site, including the coastal areas".

In the Information Note submitted to the General Directorate, it is stated that "the deaths occurred between 27.02.2024 - 05.03.2024, that there were around 109 fish deaths in 8 days, that the deaths were not mass deaths, that an average of 14 dead adult (between 2-7 kg) scaly and mirror carp were washed ashore at different points of the dam, that no abnormality was observed in the color and odor of the water on the day of the inspection, that fish deaths continued to decrease, that a factor that would cause deaths could not be determined with certainty, and that water and fish samples were sent to the relevant laboratories". In the Inspection and Analysis Report of Erzincan Food Control Laboratory Directorate with 08.03.2024 Report Date, it was seen that ammonium, nitrite, nitrate, dissolved oxygen, electrical conductivity, fecal coliform, pH, total suspended solids parameters were analyzed in the water sample taken from the receiving environment (Bağıştaş-1) and no evaluation was made about the analysis results.
*B.person Note - It is understood that it is not possible to conclude whether there is any chemical contamination in the water environment (especially in terms of cyanide, arsenic and other heavy metals) from the parameters given in the report and the analysis results of these parameters.*

**- Examination of analysis reports where chemical substance measurements are also requested - (pdf page 2337 in source 3.c)**
In the letter dated 05.03.2024 and numbered E-44473183-325.01-13498182 (Annex-2 file pdf page 2337) written by İliç District Governorship District Directorate of Agriculture and Forestry addressed to Elazığ Veterinary Control Institute Directorate; "In the samples taken on 05.03.2024 (16 fish, 4 liters of water) "Pathogen (Bacteria, Virus, Parasite etc.) Dissolved Oxygen (DO - mg / lt), Pesticide, Heavy Metal, Cyanotoxin, Phenol, Sodium Cyanide (NaCN), Hydrogen Cyanide (HCN), Cyanogen Chloride (CNCl)" analyzes were made to determine the factor / factors causing fish deaths.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

In the letter dated 05.03.2024 and numbered E-16933810-145-13442160 (Annex-2 in the file pdf page 2339) sent by Elazığ Directorate of Fisheries Research Institute to Erzincan Governorship Provincial Directorate of Agriculture and Forestry, it is stated that "On 27.02.2024, water (4 stations) and fish samples (3) were taken to investigate fish deaths in Bağıştaş HES-1 Dam Lake in İliç district upon a report (given as Annex-2 in the annex of the report), as a result of the water analyzes carried out in line with the possibilities (given as Annex-1 in the annex of the report), no value with a lethal effect for carp fish was found, and no gold, cyanide, etc. analyzes were carried out at the institute, although no symptoms of disease and signs of poisoning were found in the external examination of the fish, it was seen that more samples were needed for detailed analyzes, and it would be appropriate to send a sufficient number of samples to the Elazığ Veterinary Control Institute Directorate for disease detection", and it was understood from the previous letter given above (pdf page 2339) that a sufficient number of samples were sent. When the water analysis report of Elazığ Fisheries Research Institute Directorate given in the annex of the above-mentioned letter is examined, it is understood that the analysis parameters made at 4 different points (points named Dam pond, Dostal, Copler Village, Mesire) are known classical water quality parameters and it is not possible to make an assessment whether there is chemical pollution based on these parameters.

Note on the report - When the analysis report was evaluated in terms of the analysis methods used and the way the analysis results were expressed, it was found that the analysis methods were not expressed as standard methods (in other words, the measurements were not carried out according to standard methods), and that for the pH, conductivity and temperature parameters, the gravimetric analysis method (a method based on weighing) was incorrectly stated (although the results show normal water quality values as an order of magnitude!), some of the analysis results were not expressed in meaningful figures (for example, if the analysis error for chloride or sulphate is assumed to be 1%, the fact that the result is given with 4 digits after the comma does not make sense), but even if the results are expressed in meaningful figures, it is understood that the samples are within the values of a normal dam water quality.

### 5.5.4.    EVALUATION OF ANALYSIS RESULTS OF ANKALAB-FEPAS-ARTEK ENVIRONMENTAL LABORATORIES

NOTE - It has been seen that the analyzes given in the tables below were made in cooperation with ANKALAB and ARTEK. ANKALAB performed sampling and pH measurements, and all other parameters were performed by ARTEK.
Evaluation

For the Total Cyanide parameter, it was observed that YSKY gave values of 1,2 µg/L for YO-ÇKS and 6 µg/L for MAK-ÇKS, and when compared with the value of <0,02 mg/L (20 µg/L) given in the tables below, it is understood that the assay limits given for the measurement are above the quality standards, therefore, the free cyanide in the samples is below 20 µg/L, however, it is not understood whether it is below the values of 1, 2 µg/L or 6 µg/L.

When comparisons were made for other parameters, all were found to be above environmental quality standards.
When the analysis results for soil samples were examined, it was seen that the limit values were exceeded according to SF-10 for some parameters and SF-1 for some parameters.



Page **239** /

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

### 5.5.4.1. Water sample results - (Date of sample collection - 14.02.2024)

| PARAMETER | UNIT | 240215132943709 (number 5) | 240215132943975 (number 8) | 240215132943820 (number 9) | SBCC* Table 4- Environmental Quality Standards | | METHOD USED |
|---|---|---|---|---|---|---|---|
| | | | | | YO-QCS (mg/L) | MAK-CCS (mg/L) | |
| Free cyanide | mg/L | <0,02 | <0,02 | <0,02 | 0,0012 | 0,006 | SM 4500 CN-E |
| Total Cyanide | mg/L | <0,02 | <0,02 | <0,02 | - | - | SM 4500 CN- E SM 4500 CN- C |
| Weak Acid Soluble Cyanide (Wad Cyanide) | mg/L | <0,02 | <0,02 | <0,02 | - | - | SM 4500 CN-C,E,I |
| *Arsenic | mg/L | 0,017 | 0,019 | 0,296 | 0,053 | 0,053 | EPA 200.7 |
| *Copper | mg/L | 0,021 | 0,016 | 0,109 | 0,0016 | 0,0031 | EPA 200.7 |
| *Zinc | mg/L | 0,036 | 0,026 | 0,019 | 0,0059 | 0,231 | EPA 200.7 |
| *Cadmium1 | mg/L | <0,0005 | <0,0005 2 | <0,0005 2 | <0,00008 (Class 1) | <0,00045 (Class 1) | EPA 200.7 |
| *Chromium Determination | mg/L | 0,011 | 0,011 | 0,011 | 0,0016 | 0,142 | EPA 200.7 |
| *Lead | mg/L | 0,031 | 0,024 | 0,014 | 0,0012 | 0,014 | EPA 200.7 |
| *Nickel | mg/L | 0,027 | 0,019 | 0,021 | 0,004 | 0,034 | EPA 200.7 |

1 It was observed that this parameter was written as Cadmium in ANKALAB reports, and Cadmium was written in the reports of the collaborating ARTEK lab. Cadmium is used in these reports.

2 Since the value written as 0.005 in ANKALAB reports is written as 0.0005 in ARTEK laboratories, it is accepted that the number 0.005 was written by mistake and the value of 0.0005 is taken into consideration here.

SWORN TRANSLATION

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature



### 5.5.4.2. Soil sample results - (Date of sample collection - 14.02.2024)

| PARAMETER | UNIT | 24021513301 6043 (1 Numbered Soil) | 24021513301 6152 (2 Numbered Soil) | 24021513301 6262 (3 Numbered Soil) | 24021513301 6371 (4 Numbered Soil) | 24021513301 6484 (6 Numbered Soil) | 24021513301 6594 (7 Numbered Soil) | Generic pollutant value in Annex-1* A-B | METHOD USED |
|---|---|---|---|---|---|---|---|---|---|
| Total Cyanide | mg/Kg | 7,88 | 0,72 | 15,94 | <0,5 | 15,75 | <0,5 | 5 - 0,5 ** | ISO 11262 |
| Arsenic | mg/Kg | 175,5 | 20,1 | 904,1 | 20,05 | 351,3 | 77,57 | 3 - 0,3 | EPA 3051A/EPA 200.7 |
| Copper | mg/Kg | 412 | 45,64 | 902 | 37,41 | 813,8 | 86,67 | 514 - 51 | EPA 3051A/EPA 200.7 |
| Zinc | mg/Kg | 377,7 | 75,95 | 769,6 | 58,14 | 484,9 | 103,1 | 6811 - 681 | EPA 3051A/EPA 200.7 |
| Cadmium | mg/Kg | 2,498 | 0,36 | 4,096 | <0,2 | 2,394 | 0,268 | 27 - 3 | EPA 3051A/EPA 200.7 |
| Total Chromium | mg/Kg | 8,384 | 163,9 | 33,03 | 40,31 | 9,4 | 16,5 | 900000 - 1 | EPA 3051A/EPA 200.7 |
| Lead | mg/Kg | 149,5 | 31,28 | 75,44 | 21,56 | 78,43 | 49,61 | 135 - 14 | EPA 3051A/EPA 200.7 |
| Nickel | mg/Kg | 16,41 | 362,6 | 22,46 | 84,78 | 11,74 | 16,5 | 13 - 1 | EPA 3051A/EPA 200.7 |
| Cobalt | mg/Kg | 5,091 | 21,3 | 10,72 | 7,232 | 5,732 | 2,16 | 5 - 0,5 | EPA 3051A/EPA 200.7 |
| Mercury | mg/Kg | 0,764 | <0,5 | 2,636 | <0,5 | 0,811 | <0,5 | 3 - 0,6 | EPA 3051A/EPA 200.7 |
| pH | | 10,04 | 7,53 | 9,77 | 9,77 | 8,07 | 9,27 | - | |

* A - Transport of contaminants to groundwater and drinking groundwater (mg/kg oven dry soil) SF=10 B - Transport of contaminants to groundwater and drinking groundwater (mg/kg oven dry soil) SF=1

If the distance to the aquifer is less than 3 m, if the aquifer is fractured or karstic, or if the pollution source area is 10 hectares or larger, the dilution factor should be SF "1"; in other cases SF "10".

** Values given for cyanide.

Page **242** /

SWORN TRANSLATION

## 5.5.4.3. Water sample results - (Date of sample collection - 26.02.2024)

| Parameter | Unit | 240227133 445 797 (number 4) | 240227133 445 359 (number 5) | 2402271 334 45469 (number 6) | 2402271 334 45906 (number 7) | 240227133 446 015 (number 8) | 2402271 534 45978 (number 9) | 24022713344 56 87 (number 10) | 24022713344 51 10 (number 11) | 240227133 445 250 (number 12) | SBCC* Table 4- Environmental Quality Standards YD'CDS (mg/L) | MAK-ÇKS (mg/L) | METHOD USED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Free cyanide | mg/L | <0,02 | <0,02 | <0,02 | <0,02 | <0,02 | <0,02 | <0,02 | <0,02 | <0,02 | 0,0012 | 0,006 | SM 4500 CN-E |
| Total Cyanide | mg/L | <0,02 | <0,02 | <0,02 | <0,02 | <0,02 | <0,02 | <0,02 | <0,02 | <0,02 | | | SM 4500 CN- E SM 4500 CN- C |
| Weak Acid Soluble Cyanide (Wad Cyanide) | mg/L | <0,005 | <0,005 | <0,005 | <0,005 | <0,005 | <0,005 | <0,005 | <0,005 | <0,005 | | | SM 4500 CN-C,E,I |
| *Arsenic | mg/L | 0,004 | <0,004 | 0,016 | 0,004 | 0,004 | 0,195 | 0,011 | 0,018 | 0,014 | 0,053 | 0,053 | TS EN ISO 15587- 1,2 TS EN ISO 17294-1,2 |
| *Copper | mg/L | 0,030 | 0,021 | 0,026 | 0,027 | 0,021 | 0,069 | 0,020 | 0,018 | 0,039 | 0,0016 | 0,0031 | TS EN ISO 15587- 1,2 TS EN ISO 17294-1,2 |
| *Zinc | mg/L | 0,038 | 0,094 | 0,040 | 0,040 | 0,031 | 0,096 | 0,015 | 0,033 | 0,018 | 0,0059 | 0,231 | TS EN ISO 15587- 1,2 TS EN ISO 17294-1,2 |
| *Cadmium | mg/L | <0,0002 | <0,0002 | <0,0002 | <0,0002 | <0,0002 | <0,0002 | <0,0002 | <0,0002 | <0,0002 | <0,00008 (Class 1) | <0,00045 (Class 1) | TS EN ISO 15587- 1,2 TS EN ISO 17294-1,2 |
| *Chromium Determination | mg/L | 0,012 | 0,014 | 0,014 | 0,018 | 0,013 | 0,016 | 0,005 | 0,007 | 0,013 | 0,0016 | 0,142 | TS EN ISO 15587- 1,2 TS EN ISO 17294-1,2 |
| *Lead | mg/L | 0,0012 | <0,001 | 0,008 | 0,0011 | 0,0011 | 0,050 | <0,001 | <0,001 | <0,0014 | 0,0012 | 0,014 | TS EN ISO 15587- 1,2 TS EN ISO 17294-1,2 |
| *Nickel | mg/L | 0,018 | 0,059 | 0,012 | 0,019 | 0,015 | 0,030 | 0,005 | 0,005 | 0,014 | 0,004 | 0,034 | TS EN ISO 15587- 1,2 TS EN ISO 17294-1,2 |

I, the sworn translator, Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.

Signature

SWORN TRANSLATION



*5.5.4.4. Soil sample results - (Date of sample collection - 26.02.2024)*

| PARAMETER | UNIT | 240227133557154 (Soil No. 1) | 24022713355726 0 (Soil No. 2) | 2402271335573 69 (Soil No. 3) | Generic pollutant in Annex-1 | METHOD USED |
|---|---|---|---|---|---|---|
| Total Cyanide | mg/K | <0,5 | <0,5 | <0,5 | 5 - 0,5 ** | ISO 11262 |
| Arsenic | mg/K | 20,8 | 18,28 | 142,3 | 3 - 0,3 | EPA 3051A/EPA 200.7 |
| Copper | mg/K | 59,2 | 24,51 | 9 | 514 - | EPA 3051A/EPA 200.7 |
| Zinc | mg/K | 200, | 53,83 | 44,46 | 6811 - 681 | EPA 3051A/EPA 200.7 |
| Cadmium | mg/K | 1,73 | 0,651 | 1,074 | 27 - 3 | EPA 3051A/EPA 200.7 |
| Total Chromium | mg/K | 120, | 63,92 | 6,196 | 900000 - 1 | EPA 3051A/EPA 200.7 |
| Lead | mg/K | 67,9 | 12,49 | 34,51 | 135 - | EPA 3051A/EPA 200.7 |
| Nickel | mg/K | 162, | 92,83 | 10,81 | 13 - 1 | EPA 3051A/EPA 200.7 |
| Cobalt | mg/K | 20,3 | 11,03 | 43,1 | 5 - 0,5 | EPA 3051A/EPA 200.7 |
| Mercury | mg/K | <0,5 | <0,5 | <0,5 | 3 - 0,6 | EPA 3051A/EPA 200.7 |
| pH | - | 7,56 | 7,58 | 7,33 | - | |

* **A - Transport of contaminants to groundwater and drinking groundwater (mg/kg oven dry soil) SF=10 B - Transport of contaminants to groundwater and drinking groundwater (mg/kg oven dry soil) SF=1**

If the distance to the aquifer is less than 3 m, if the aquifer is fractured or karstic, or if the pollution source area is 10 hectares or larger, the dilution factor should be SF "1"; in other cases SF "10".

** Values given for cyanide.

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.

Signature

SWORN TRANSLATION



SWORN
TRANSLAT.ON

### 5.5.5. FEBAS ENVIRONMENTAL LABORATORY ANALYSIS RESULTS

Document No - 3.a (pdf page 1188-1212) From the letter of İLİÇ District Governorship District Gendarmerie Command dated February 14, 2024, it was seen that a water and soil analysis request was made to the company named FEBAS Çevre Lab Analiz San ve Tic Ltd Şti, and that the analyzes specified in the table below were requested to be made in 6 soil and 3 water samples taken by AFAD personnel, and from the sampling report dated 14.02.2024, it was seen that the explanations of the places where the samples were taken ;

Soil samples

1- Sample taken from contaminated soil ( sample taken at coordinates 39.431208 - 38.547548 at 10.50 am)
2- Sample taken from uncontaminated soil approximately 30 meters from sample 1
3- Sample taken from contaminated soil ( sample taken at coordinates 39.431981 - 38.547382 at 11.06)
4- Sample taken from uncontaminated soil approximately 30 meters from sample 3

Water sample

5- Water sample taken from a puddle ( sample taken at coordinates 39.443211 - 38.538665 at 12.11 pm)

Soil sample

6- Sample taken from contaminated soil ( sample taken at coordinates 39.428320 - 38.538206 at 12.11pm )
7- Sample taken from uncontaminated soil approximately 30 meters from sample 6

Water sample

8- Water sample taken from the Euphrates River ( sample taken at coordinates 39.450985 - 38.535057 at 12.30 pm)
9- water sample taken from the stream bed flowing through the mine site about 30 meters from sample 8

Evaluation

In the water analysis results given in the above section (analysis results of ANKA et al. Laboratories), the determination limit for free cyanide was given as <0,02 mg/L, but it was seen that the determination limit was given as <0,005 mg/L in FEBAS laboratory analysis results. However, as can be seen from both tables, although the methods of analysis are the same, there is no justification for the determination limits of 20 μg/L in one and 5 μg/L in the other.

In the comparison of water analysis results with environmental quality standards, it was observed that the values of most parameters were high.

Page **20** /



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

### 5.5.6.1 Water analysis results (Sampling date - 14.02.2024)

| PARAMETER | UNIT | Sample No - N-0402/24 (point 5) | Sample No - N- 0403/24- Water (point 8) | Sample No - N- 0404/24- Water (Point 9) | SBCC* Table 4- Environmental Quality | | METHOD USED |
|---|---|---|---|---|---|---|---|
| | | | | | YO-QCS (mg/L) | MAK-CCS (mg/L) | |
| Total Cyanide | mg/L | <0,005 | <0,005 | <0,005 | 0,0012 | 0,006 | SM 4500 CN-C SM 4500 |
| Free cyanide | mg/L | <0,005 | <0,005 | <0,005 | - | - | SM 4500 CN-E |
| Soluble Cyanide in weak acid | mg/L | <0,005 | <0,005 | <0,005 | - | - | SM 4500 CN-C SM 4500 |
| Arsenic | mg/L | <0,001 | <0,001 | 0,112 | 0,053 | 0,053 | TS EN ISO 15587- 1,2 TS EN ISO 17294-1,2 |
| Copper | mg/L | 0,006 | 0,006 | 0,015 | 0,0016 | 0,0031 | |
| Zinc | mg/L | 0,012 | 0,012 | 0,007 | 0,0059 | 0,231 | |
| Cadmium | mg/L | <0,0002 | <0,000 | <0,000 | <0,00008 | <0,00045 (Class 1) | |
| Total Chromium | mg/L | 0,022 | 0,015 | 0,013 | 0,0016 | 0,142 | |
| Lead | mg/L | <0,001 | <0,001 | <0,001 | 0,0012 | 0,014 | |
| Nickel | mg/L | <0,002 | <0,002 | <0,002 | 0,004 | 0,034 | |

*REGULATION ON UNDERGROUND WATER QUALITY, (Amended-RG- 10/8/2016-29797)

SWORN TRANSLATION

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature



### 5.5.6.2 Soil analysis results (Sampling date - 14.02.2024)

| PARAMETER | UNIT | Contaminated Sample No - N-0405/24- Soil (Point 1) | Reference soil Sample No - N-0406/24- Soil (Point 2) | Contaminated soil Sample No - N-0407/24- Soil (Point 3) | Reference Sample No - N-0408/24- Soil (Point 4) | Contaminated soil Sample No - N-0409/24- Soil (Point 6) | Reference Sample No - N-0410/24- Soil (Point 7) | Annex 1 the value of the generic pollutant in ** A-B | METHOD USED |
|---|---|---|---|---|---|---|---|---|---|
| pH | - | 8,57 | 8,38 | 9,02 | 7,67 | 8,76 | 8,35 | - | TS ISO 10390 |
| Arsenic | mg/k | 124 | 11,8 | 657 | 30,8 | 237 | 110 | 3 - 0,3 | |
| Cadmium | mg/k | 2,86 | 0,528 | 2,63 | 0,487 | 4,10 | 1,0 | 27 - 3 | |
| Cobalt | mg/k | 3,31 | 17,1 | 7,12 | 6,39 | 5,68 | 1,26 | 5 - 0,5 | |
| Total | mg/k | 4,15 | 63,4 | 11,1 | 33,5 | 12,2 | 4,08 | 900000 - | |
| Copper | mg/k | 244 | 27,2 | 495 | 39,6 | 563 | 51,8 | 514 - 51 | |
| Mercury | mg/k | <0,1 | <0,1 | 0,582 | < 0,1 | 0,392 | < 0,1 | 3 - 0,6 | |
| Lead | mg/k | 49,2 | 32,1 | 53,2 | 14,6 | 112 | 79 | 135 - 14 | EPA 3051 A EPA 6020 B |
| Zinc | mg/k | 287 | 38,4 | 489 | 36,7 | 280 | 68 | 6811 - | |
| Nickel | mg/k | 14,1 | 232 | 18 | 72,2 | 16,6 | 10,3 | 13 - 1 | |
| *Total Cyanide | mg/k | 4,95 | < 0,4 | 17,32 | <0,4 | 20,18 | <0,4 | 5 - 0,5 *** | EPA 9013 A, EPA 9010 C |

\* Analysis conducted by ALKA Lab within the scope of the cooperation

\*\* A - Transport of contaminants to groundwater and drinking of groundwater (mg/kg oven dry soil) SF=10 B - Transport of contaminants to groundwater and drinking of groundwater (mg/kg oven dry soil) SF=1 If any of the following conditions apply: the distance to the aquifer is less than 3 m, the aquifer is fractured or karstic, or the pollution source area is 10 hectares or larger, the dilution factor SF should be considered as "1"; otherwise SF should be considered as "10".

\*\*\* Values given for cyanide.

I the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN TRANSLATION



## 6. EVALUATION OF A MINING ACCIDENT IN THE CONTEXT OF PERMITS, INCIDENT MANAGEMENT AND DEFECTS

As a result of the examination and evaluation of the analysis results made by private and official institutions about whether the cyanide soil material caused environmental pollution in the receiving environments (water, soil and air) as a result of the slide that occurred in the Heap Leach site within the mining activities carried out by Anagold Madencilik San ve Tic AŞ operating in Erzincan İli İliç district in the Copler Complex Mine Site, the following opinions have been reached;

1- In surface water sources, YO-CCS and MAK-CCS values were exceeded in some parameters,

2- In groundwater, YO-ÇKS and MAK-ÇKS values were exceeded in some parameters,

3- In soil samples taken from the site and its immediate vicinity, generic contaminant values were exceeded in some parameters,

4- In the air ambient samples in the site and its immediate vicinity, the limit values were exceeded in terms of PM10 parameter, there is no problem in terms of other parameters, it is not possible to make an assessment within the scope of the relevant regulations due to the difference in the unit (μg / filter) used for the heavy metal concentrations stated to be measured in the filter,

5- In receiving environments, environmental pollution has occurred due to the fact that the limit values in the relevant regulations have been exceeded in terms of some parameters.

### 6.1. EVALUATION OF PERMISSION DOCUMENTS

- As detailed in Section 5.5, it is seen in the 2021 EIA Report that some pollutant parameters in the receiving environments were given EIA authorization despite being above the limit values. In the report, especially the high level of mercury parameter in receiving environments shows that the capacity of the activity is high. Despite this, capacity was increased.

-ÇŞİB's letter dated 07.10.2021 and numbered E-20289998-220.01-1917939 and numbered 847, 49729 and 20067313 License Numbers Copler Complex Mine 2nd Capacity Increase and Flotation Plant Project EIA Positive Decision, the EIA Report submitted to the Ministries from the Online EIA process Management System regarding the Copler Complex Mine 2nd Capacity Increase and Flotation Plant project planned to be built by Anagold Madencilik San ve Tic AŞ in Copler Mevkii, İliç District, Erzincan Province has been examined and evaluated by the Review and Evaluation Commission. In accordance with Article 14 of the EIA Regulation on the 2nd Capacity Increase and Flotation Plant, "Environmental Impact Assessment Positive" decision was given by the Ministries. In addition, it is understood from the scope of the file that the Mining Waste Management Plan and Mining Waste Disposal Facility, Heap Leaching Phase 4 Implementation Project, Heap Leaching Phase 4 Mining Waste Storage Facility, Heap Leaching Phase 4B Implementation Project, Waste Storage Facilities of Phase 4B/1,2,3 and 4th Sections, Phase 4B Final Inspection Report prepared by the Phase 4B Water Structures Inspection Firm was approved with the Letter of the MoEU dated 11.03.2024 and numbered E-74694234-622.03-8961893.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

## 6.2. INCIDENT MANAGEMENT

The development of the incident on the day of the incident is briefly summarized below.

After the cracks were noticed by workers and supervisors at the start of the morning shift and shared in the whatsapp group, chief oxide engineer Murat Bayraktar and production engineers Kaan Murat Akpolat and Şenol Demir discussed the issue in a field meeting. OHS Specialist Gizem Gazcı and Recep Çalı, an engineer working in the Environment unit, also arrive on site. Senior geotechnical engineer Ali Rıza Kalender and assistant engineer Berkay Mısır, responsible for monitoring and evaluating the radar data, are notified. Murat Bayraktar instructs Şenol Demir and Kaan Murat Akpolat to clear the field and block the road.

Şenol Demir sends an e-mail to the common e-mail group named İliç White, which includes the Occupational Safety Department, Maintenance Department, Oxide Process Operation Department, Sulfide Process Operation Department, Mining Department and all employees working within Anagold Company, that the roads are closed until further notice. KM Akpolat informs Senior Project Engineer İshak Demir from the project department and he comes to the site. After the 10-00 meeting, Murat BAYRAKTAR, OHS Chief Engineer Burak ARTAL, Environmental Manager Can Serdar HASTÜRK, Vice President of Operations IAİN GÜİLLE arrive on site. AR Kalender states beforehand that the cracks are settlement cracks and should be filled with cement grout. Şenol DEMİR, Assistant Process Engineer Elif REYHAN, ADR Condition Supervisor Adnan KEKLİK, Piping Team Supervisor Soysal DOGAN, KM Akpolat decided to discontinue the solution at their meeting and communicated it to Murat BAYRAKTAR; Vice President of Operations Ian OGuille was also informed and the solution was discontinued (around 13-00 hours). Adnan Keklik informs about that the solution will be discontinued.

Meanwhile, Ali Rıza Kalender received an e-mail from Ali Rıza Kalender stating that the work should stop. KM Akpolat, E Reyhan, Patrick Valko, Alien and Johnatan come to the field for observation. Kenan ÖZ, Ramazan ÇİMEN, Soysal DOĞAN, İshak DEMİR and İsa Taşdelen conduct field inspections. KM Akpolat assigns Soysal DOĞAN, İshak DEMİR and İsa Taşdelen to take photographs. With the assignment of Kaan Murat Akpolat for the photo shoot, Soysal Doğan went to lift 33 and İsa Taşdelen and İsa Demir went to lift 29. Adnan Keklik, Kenan Öz and Ramazan Çimen stay at lift 25 and KM Akpolat, E.Reyhan, P.Valko and two other foreigners go to the upper levels. At this point, a landslide occurred and Soysal Doğan ran out of the landslide area, while the other two supervisors, İsa Taşdelen and İsa Demir, escaped by their own means, even though they were trapped in a mound of earth. Kenan Öz, Ramazan Çimen and Adnan Keklik were in the landslide area and could not escape.

Fahrettin Keklik, Hüseyin Kara, Şaban Yılmaz, Mehmet Kazar and Abdurrahman Şahin evacuated the area but remained in the landslide area together with the container. Uğur Yıldız was driving a truck as part of an open pit mining operation when he was caught in a landslide zone on the west quarry side.

## 6.3. NEGLIGENTS IN THE INCIDENT AND THE REASONED ASSESSMENT OF NEGLIGENCE

As a result of the examination, determination and evaluation made in the relevant sections above, it was evaluated that the main causes of the incident were the capacity increase on topography with much more unfavorable conditions after the construction of phases 1,2,3, the incomplete and inadequate project designed within the scope of the relevant conditions, the fact that this situation was ignored in the project supervision, the extremely inadequate / negligent monitoring of stability during the operation phase, and finally, the landslide event, which warned early in the morning on the day of the incident, was not well managed until the time of realization (14-30).



I, the sworn translator Yasın DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

The most effective aspect of the incident was that the project management was extremely inadequate and the mechanism to accurately estimate and manage the size of the landslide, which had been warned on the day of the incident, was not established.

The persons to whom negligence is attributed in the incident are given below one by one with the grounds for negligence .

**John HARMSE (SSR, Vice President Global Projects) -**

The job description includes "Within SSR, lead the implementation of the company's global projects, manage the project team Develop and implement a framework of project controls and project management standards, including projects, project control standards and procedures, and progress measurement, forecasting and reporting standards and procedures Communicate effectively with relevant parties throughout the project process, fostering alignment and collaboration among stakeholders, Regularly reporting project progress, reviewing financial progress, evaluating performance and sharing with management, Managing project safety, environment and risks in accordance with company policies..." and project management is a direct duty and the project was deemed to be **PRIMARY NEGLIGENT** due to the fact that the project was not managed correctly due to the lack of a project manager within the scope of the project, the delegation of authority was not determined, and the project risks were not determined.

**Cengiz Yalcın DEMİRCİ (Anagold Country Manager, Chairman of the Board of Directors of Anagold**

In his statement, he states that he is not responsible for technical issues but for administrative issues. However, when the organizational chart and job description are examined, it is seen that he reports to Bill Mc Nevin, Vice President of Operations and Sustainability at SSR Mining Company, and within his job description "Ensuring communication and coordination between company partners, informing the company's shareholders about the high-level functioning of the company and encouraging cooperation,... Sharing high-level information received from company directors with partner company officials,transferring decisions back to the company directors,..." is observed.
Although he was informed of the situation on the day of the incident, he was unable to manage the incident due to the lack of a serious communication and management mechanism.
He also stated in his testimony that he tried to manage the risk situation. Although he communicated the situation to his superior, Bill Mc Nevin, and met with various people, it was too late and no action was taken. He was deemed to be a **PRIMARY NEGLIGENT** due to the lack of an adequate mechanism for communication and coordination, which is included in the job description.

**Iain Ronald GUILLE (Anagold, Vice President of Operations)-**

He reports to Country Manager Cengiz Yalçın Demirci and on technical matters to Bill Mac Nevin, Senior Vice President. And on the day of the incident, he briefed Bill Mc Nevin. The job description includes "Determining the production strategies of the mining operation, Following the expansion projects,... Preparing, budgeting and managing projects for the development and commissioning of the mine site in line with the Company's growth and development targets, Regularly evaluating the performance of those reporting to him/her and providing guidance when necessary, Taking necessary measures for the effectiveness, efficiency and sustainability of operations and determining improvement strategies, Participating in and managing monthly risk, budget and management meetings. ." and is directly responsible for project follow-up, management, production efficiency and taking measures. Although he was informed on the day of the incident, he was not able to manage the incident as the OHS directorate was also within the scope of his duties and, as mentioned before, a properly functioning risk planning and emergency management plan had not been established. He was deemed to **PRIMARY NEGLIGENT.**



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

**Shaun SCHWARTZ (Anagold, Sustainable Investment Projects Manager) -**

He reports to the Vice President of Global Projects at SSR Mining Company and his job description includes "Leading, providing effective supervision and management of project development processes, effectively managing, administering, directing and monitoring projects, ensuring that all work is carried out safely and efficiently while achieving the development objectives of investment projects and meeting key stakeholder expectations, ... Identifying and obtaining resources to sustain project performance, operations and subcontractor management,... Ensuring compliance with and auditing of company standards, policies, procedures and core values,... Leading, managing and monitoring the project team to achieve project development objectives (cost schedule, quality and safety),... Ensuring project development performance, progress, cost and Health, Safety and Environmental performance, ..." and is directly responsible for project monitoring. In this context, as explained in the relevant sections above, controlling and reporting has been insufficient to follow up, monitor and evaluate the project design criteria. It has been concluded that the company was not evaluating the possible landslide scenarios and was also found to be at **PRIMARY NEGLIGENT** as it was responsible for the positioning of the container in the pillar area just below the leaching area, despite the expansion of the project as Phase 4.

**Luis QUIRINDONGO and Vinh LUU LE (GRE Design Engineers), Kevin GUNESCH (GRE Control Engineer)-**

As stated in the GRE June 27, 2018 Technical Memorandum note- "Subject- Copler HLF Phase 4 Stability Revision" in the file titled "2018.10.10-INR- Heap Leach Phase 4 Expansion Project Report", the preparers and supervisors are deemed to be at **PRIMARY NEGLIGENT** due to design deficiencies/errors as detailed above in the discussion of the impacts on project stability.

**Ali Rıza KALENDER (Anagold, Senior Geotechnical Engineer)-**

He works as a senior engineer in the Geotechnical Unit under the Mine Operations Department and is responsible for "Geotechnical monitoring and monitoring of the entire site, primarily in the operation areas, determining the necessary areas where monitoring devices will be positioned, placing the devices in these areas, maintenance and repair of the devices, determining the geotechnical risks in the site and the measures to be taken regarding these risks, monitoring and controlling the work to be carried out regarding these measures, collecting, analyzing, recording and storing geotechnical data of the site, Detection of soil deformations and ensuring that the necessary measures are taken by informing the operation units, Effective use of early warning systems, Informing the relevant people in the field in case of any hazardous situation within the Trigger Action Response Plan (TARP) and ensuring that the necessary actions are taken in a timely manner, Preparation and distribution of geotechnical reports, Implementation, management and updating of the Ground Control Management Plan, Planning of training and consultancy services to be received within and outside the department".



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

In the incident that occurred, Ali Rıza Kalender was on leave beforehand, but on the day of the incident, he accessed the radar data, saw the site and as a senior geotechnical engineer, he could not predict the size/mechanism of the landslide. In addition, although the deformations in the morning hours exceeded the values allowed in the TARP report, he gave incorrect/incomplete information/assessment that there might be a collapse crack. It is also responsible for the geotechnical control of the site. Although the radar data gave warning, it was not evaluated sufficiently, which led to the incident. It is also responsible for informing and taking necessary actions in a timely manner in such cases. Ali Rıza Kalender has been found to be **PRIMARY NEGLIGENT**.

### Fuat YILMAZ (Anagold, Mine Operations Supervisor)

He reports to the Chief Mining Engineer/Mine Manager in the Mine Operations Department and his duties include "Monitoring the open pit mines and open pit activities of Çiftay AŞ, evaluating daily mining activities by receiving reports from mine shift engineers and drilling and blasting engineers, observing the open pit drilling, blasting, excavation...... activities physically carried out by Çiftay AŞ with mine shift engineers, ... carrying out studies in order to improve open pit mine production activities and to complete them in a safe and effective manner." During the construction of Phase 5, blasting was deemed to be a PRIMARY NEGLIGENT due to blasting exceeding permissible values and possible leaching instability.

### Muhammed KILIC (Anagold, Drilling Blasting Engineer)

He works under the Mine Operation Chief in the Mine Operation Department and within his field of duty, "Monitoring the drilling and blasting activities carried out by Çiftay AŞ in open pit mines, developing open pit drilling and blasting activities, carrying out studies in order to complete open pit drilling and blasting activities in a safe and effective manner, designing and controlling open pit blasting patterns, ... control and monitoring of site activities during open pit blasting, ..."....during the construction of Phase 5, blasting was deemed to be a PRIMARY NEGLIGENTdue to blasting exceeding permissible values and possible deterioration of leaching stability.

### Ömer ARDIC (INR, Project Coordinator)

Since he was the project coordinator responsible for the project errors in the "2018.10.10-INR-Stack Leaching Phase 4 Expansion Project Report" and "2020.04.27-INR-Stack Leaching Phase 4B Expansion Project Report", which were effective in the loss of stability of the leachate, he was deemed to be a **PRIMARY NEGLIGENT**.

### Selcuk CİFTLİK (Anagold, OHS Manager)-

Deputy Head of Operations I. OGuille and within the scope of his/her duties, he/she is responsible for "Managing the Occupational Health and Safety team, ensuring compliance with the Occupational Health and Safety targets set by the Company and ensuring reporting, providing guidance by the Occupational Health and Safety unit in all routine and non-routine works to be carried out in the workplace, participation from the Occupational Health and Safety unit in risk assessment studies for the safety of the workplace and the work carried out, Ensuring that recommendations are made and followed up on the measures to be taken as a result of the risk assessment, Ensuring the periodic inspection planning of the working environment, making and following up recommendations for the elimination of nonconformities, Reporting nonconformities, following up and informing the relevant persons, 02. 03.2019 date 30702 numbered Official Gazette "Regulation on the Prevention of Major Industrial Accidents and Mitigation of their Effects" published in the Official Gazette dated 02.03.2019 date 30702 numbered "General obligations, Issues Related to the Safety Report, Emergency Plans, Miscellaneous and Final Provisions" is responsible for making recommendations to ensure that the requirements specified in the headings are met.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

SWORN
TRANSLATION

In cooperation with the project department, a landslide was also experienced on 27.03.2022 and although it was known that possible landslides in heap leaching are a serious danger, an adequate risk assessment was not prepared and clear/concrete measures to be taken were not determined, only warning criteria for certain deformation levels were determined in the TARP reports and informing the "senior supervisor" was defined as an action. On the day of the incident, employees of the oxide unit and other responders informed their superiors and tried to manage the incident with their own means. In the event of a possible landslide (at the relevant crack size), emergency measures (such as road closure and ensuring that no one is allowed on site, ensuring that all employees are notified) have not been determined. In this context, the OHS manager who did not ensure that the necessary/adequate emergency precaution plan was prepared for the possible landslide situation was deemed to be **PRIMARY NEGLIGENT**.

**Bill MC NEVIN (SSR, Senior Vice President/Operations and Sustainability) -**

The job description includes "Ensuring that global Environment, Health, Safety, Health, Security and Sustainability policies and standards are implemented and enforced by each business unit, developing operations teams and local stakeholder relations at each of the Company's mine sites". . I.O Guille, Vice President Operations, reports to him on technical matters. It was deemed to be at **SECONDARY NEGLIGENT** for failing to ensure the establishment of a mechanism where the job description/authority/responsibility of each unit would be clear in order to manage the project correctly in the mining area. On the day of the incident, I.O Guiile and C.Y. Demirci were informed, but it was too late.

**Patrick VALKO (WSP Project Quality Assurance Manager)-**

He reported to Project Manager Sahun Schwartz and testified that he was in charge of quality assurance controls for the expansion of the tailings storage facility, the expansion of the heap leach, and the construction of the Yakuplu road constructed by Anagold at the Iliç Copler Mine, although he states that he did not have the duty or authority to evacuate the area or to stop the work flow of the mine, he states in his statement that upon learning of the incident from İshak Aslan in the morning, he advised him to evacuate the area and to inform the contractor companies in the area, namely Nural, Yesti and Mürekkepçi, to inform Anagold personnel to leave the area. As can be seen, the area is being evacuated with advice and there is no emergency action/contingency plan. The company he is working for has been authorized by DSİ with permit number 067 to provide inspection services for the Expansion Project Phase-5 Facility constructed within the scope of the Heap Leaching Facility in accordance with the legislation of the Ministry of Environment. In this context, the company, together with its project manager **M. Yusuf ÇELEN (WSP Project Manager)**, is deemed to be at **SECONDARY NEGLIGENT** for failing to carry out adequate inspections to monitor the environmental impacts of the blast excavation process during the construction of Phase 5 Leaching, to keep these impacts under control and to determine the possible effects of blasting-induced ground shaking on heap leaching. On the same grounds, the Quality Assurance Engineers Alkın YEŞİLTEPE, Emrah Ergon Ahmet Furkan ELÇİ, Hasan Aydın, Sertan Aydın, who were incompetent in conducting the necessary inspections in the construction of Phase 5, were found **SECONDARY NEGLIGENT**.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

**Karabey Turan (Anagold, Project Chief Engineer)-**

He reports to the Sustainable Investment Projects Manager and his job description includes "Management of Waste Storage Facility and Heap Leach Site construction projects (ground preparation, lining, embankment placement and compaction, drainage systems) and delivery of completed projects to operations departments, Identification of Health, Safety and Environmental risks associated with construction projects and ensuring that adequate controls are in place to mitigate risk, Lead, manage and monitor the project team to achieve project development objectives (cost schedule, quality and safety), Ensure compliance and oversight of company standards, policies, procedures and core values, Ensure effective supervision and management of project development activities, Ensure, control and report on project development performance, progress, cost and Health, Safety and Environmental performance,... " is included. It has been deemed to be **SECONDARY NEGLIGENT** for its inadequacy in project follow-up within its scope of duty / positioning of the container in the risky area.

**İshak ASLAN (Anagold, Senior Project Civil Engineer) -**

He reports to the project chief engineer in the project unit and his job description includes following the construction projects of the Heap Leaching Site (ground preparation, lining, embankment placement and compaction, drainage systems), Coordinating the existing subcontractors according to the instructions, design and work program and informing the senior supervisor, Observing the compliance of the existing subcontractors regarding occupational safety and informing the senior supervisor, ...Controlling the production made by the subcontractors according to the design and criteria and informing the senior supervisor, ... ". Although the project was not adequately monitored, especially during Phase 5, and Patrick Valko, having been on site on the day of the incident, evacuated the site as instructed by Valko, the landslide extent was not estimated and other subcontractors were not adequately informed.

**İzzet TEKİN (Anagold, Chief Engineer of Mining Geology) -**

He reports to the mine manager in the Mine Geology Department and his job description includes "Ensuring the preparation and updating of all standard operating procedures required for Mine Geology and controlling the implementation of the work done...". Mine Manager Özgür Kaya has been acting as mine manager since his resignation and until Mehmet Türk took his place the day before. Therefore, within the scope of the mandate, the radar data, which was very effective in not taking adequate precautions in the incident, was deemed to have been a **SECONDARY NEGLIGENT** due to the deficiencies/omissions and failures in the follow-up / monitoring / evaluation process.

**Berkay MISIR (Anagold, Assistant Geotechnical Engineer)**

He works as an assistant engineer to Ali Rıza Kalender in the Geotechnical Unit under the Operations Department. Assisting the Senior Geotechnical Engineer responsible for the geotechnical follow-up and monitoring of the entire field, primarily in the operation areas, fulfilling the tasks assigned by the Senior Geotechnical Engineer, performing the necessary documentation procedures with the guidance of the Senior Geotechnical Engineer for the collection, analysis, recording and storage of geotechnical data belonging to the field, Assist the Senior Geotechnical Engineer responsible for the preparation and distribution of geotechnical reports, Assist the Senior Geotechnical Engineer responsible for the organization and storage of geotechnical data and reports, Assist the Senior Geotechnical Engineer responsible for the implementation, management and updating of the Ground Control Management Plan".



I the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

Considering the area of duty, it is understood that data collection, monitoring and assisting a senior geotechnical engineer. Prior to the day of the incident, A.R. Kalender had deputized for A.R.Kalender while he was on leave, and although the radar data gave warnings, they were not adequately evaluated. For the aforementioned reasons, it has been deemed to be a **SECONDARY NEGLIGENT**.

**Ahmet YURDASAN (Ore Mineral Inspection Officer), Hayriye ÖNTÜRK GÜRSOY (Ore Mineral, Supervising Engineer), Talat Bulbul (Ore Mineral, Control Engineer), Dindar Tosun (Ore Mineral, Control Engineer)-**

Ore Mineral Drilling Construction Engineering San Tic Ltd Şti has been authorized by DSİ with the permit number 067 to carry out the inspection services of the Expansion Project Phase-5 Plant constructed within the scope of the Heap Leaching Plant in accordance with the legislation of the Ministry of Environment. In this context, the above-mentioned supervisors Talat Bülbül, Dindar Tosun, Hayriye Öntürk Ahmet Yurdaşan were found to be SECONDARY NEGLIGENT , due to the failure to carry out adequate inspections to monitor the environmental impacts of the blast excavation process carried out during the construction of Phase 5 Leaching, to keep these impacts under control and to determine the possible effects of blasting-induced ground shaking on heap leaching. In addition, Hayriye Öntürk as the supervising engineer of Ore Mineral Company and Ahmet Yurdaşan as the Supervising Engineer and Ahmet Yurdaşan as the Supervision Officer of Ore Mineral Company, who undertook the supervision of the "2018.10.10-INR-Heap Leaching Phase 4 Expansion Project Report", which contains design defects as detailed above, are at fault.

**Ramazan KARAKAPLAN (Ciftay, Project Manager), Ahmet MUMYAKMAZ (Ciftay, Assistant Project Manager), Yusuf YAZICI (Ciftay, Site Supervisor)-**

Çiftay Madencilik AŞ is the contractor of the Phase-5 Facility of the Expansion Project Phase-5 Facility, which is being constructed within the scope of the Heap Leaching Facility. In this context, the employees of the above-named company are deemed to be **SECONDARY NEGLIGENT** due to the failure to perform operations in accordance with the controlled step blasting techniques during the blast excavation process during the Phase 5 Leaching construction, failure to monitor the environmental impacts of the blasts and failure to take adequate precautions regarding the possible effects of blast-induced ground shaking on heap leaching.

**Burak ARTAL (Anagold, OHS Chief Engineer), Gizem Gazcı (Anagold, Senior OHS Engineer)-**

Burak Artal reports to the OHS manager and Gizem Gazcı reports to the OHS Chief Engineer, and their job descriptions include managing and supervising the OHS team, guiding the OHS unit, ensuring participation in risk assessment and making recommendations, etc. It has been concluded that they fulfilled their responsibilities as OHS experts within the framework of the Regulation on the Duties and Responsibilities of OHS Experts and that they have no fault.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

**Kenan ÖZDEMİR (Anagold, Operations Director), Abdülkadir CANSIZ (Anagold, Maintenance Manager)-**

As Chief Operating Officer, he is responsible for the management of all operational departments. It is responsible for coordinating the operational activities of the departments, monitoring and improving the performance of each department, and ensuring that all operations are carried out in an integrated manner. "Supervision and management of daily operations, Determination and implementation of operational strategies at the mine site, Control and supervision of all operational activities and identification of risks, Preparation of operational plans for all operational departments and control of their implementation, .... Establishing, implementing and controlling appropriate policies and procedures to ensure safety and environmental management at the mine site, ..., Identifying and analyzing potential risks and developing appropriate risk management strategies, Implementing measures to minimize risks and ensure business continuity, ...,"

Identification of risks, establishment and control of safety and environmental management policies and procedures are within the scope of the task, but the risk of leach ingestion that may occur during production at the leach site has not been identified, and a system to monitor the effect of water fed into/out of the leach has not been established.

He was on leave prior to the incident and was replaced by Abdülkadir Cansız, the Maintenance Manager responsible for the maintenance and repair of production plant equipment.

If it was stated in the statements that the administrative matters related to the field where he was deputized were under the responsibility of I.OGuille, he was informed about the cracks as a supervisor. The fact that Kenan Özdemir was not present at the time of the incident, that he had delegated his authority to the maintenance manager, and that Process Oxide Manager Hüseyin Üstündağ, who directly reports to Kenan Özdemir, was also on leave, had an impact on the management of the incident. For the aforementioned reasons, Kenan Özdemir is deemed to be **PRIMARY NEGLIGENT.**

Abdülkadir Cansız, acting as acting operations director, did not intervene in the management of the incident on the grounds that it was not his area of duty and responsibility when he was notified about the cracks, and he was deemed to be **SECONDARY NEGLIGENT** in the incident by causing management incompetence.

**Murat BAYRAKTAR (Anagold, Oxide Process Chief Engineer)-**

He was in charge of the area on the day of the incident. "Ensuring that the oxide process plant is put into production and production is carried out, crushing, screening, pelletizing (agglomeration), preparing the ore for stacking, transporting the ore to the heap, piping, leaching, gold recovery (ADR) plant and cyanide recovery and copper production (SART) plant operations within the scope of oxide operation, fulfilling the instructions received from the Oxide Process Manager, Providing support to the Oxide Process Manager in the creation of oxide operation plans, Participation in daily oxide operation meetings, Providing support to the Oxide Operation Manager in the creation of policies and procedures required for oxide operation, Providing support to the Oxide Operation Manager in determining the resource needs of the oxide operation, Providing department trainings for the professional development of oxide operation department employees."

After learning about the incident in the morning, he ordered the evacuation of the area and the closure of the roads. Responsible engineers K M Akpolat and S. Demir was assigned for this task.

Roads were closed; relevant information e-mails were sent. However, as already mentioned, the site was not fully evacuated due to the lack of a properly prepared emergency procedure.

He himself was constantly on the ground with production engineers and supervisors trying to understand and control the situation. He informed his superiors within the scope of his responsibility.



As sworn translator Yasin DURMAZ, I declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

Although it was planned to stop the solution in the morning, the solution was stopped only at 13-00 hours due to the overflow of the pools. Although there is no data available, it is thought that the continued application of the solution despite the presence of large cracks triggered/accelerated the landslide process. He gave instructions to evacuate the site, but did not give any instructions for the five people who died in the container to go there.

As mentioned earlier, these people were waiting for instructions to start working here again, as they had stated in the phone call before they died, on the grounds that it was a safe area. Although Murat Bayraktar managed the task very well, he was found to be **SECONDARY NEGLIGENT** for not taking an early decision to discontinue the solution.

### Erdi SEYHAN, Aykut AYDERMAN, Funda ARDIC (INR, Design Engineers)-

The design engineers of the "2018.10.10-INR-Stack Leaching Phase 4 Expansion Project Report" and "2020.04.27-INR-Stack Leaching Phase 4B Expansion Project Report", which were effective in the loss of leaching stability, were deemed to **SECONDARY NEGLIGENT** due to their incomplete / faulty designs.

### Bürgehan AKARSU (Hydro Design, Audit Engineer), Osman BAYRAK (Hydro Design, Audit Supervisor) -

Osman BAYRAK and Bürgehan AKARSU have been deemed to be **SECONDARY NEGLIGENT** due to the deficiency/negligence in the control of the design errors detailed above in the "2020.04.27-INR-Batch Leaching Phase 4B Expansion Project Report".

### Kaan Murat AKPOLAT (Anagold, Assistant Oxide Process Engineer)

Reporting to the Oxide Manager, working within the scope of YL storage and piping works and within the scope of Oxide operation, carrying out and following the daily transportation of ore to the heap in the heap leaching area, piping and leaching operations in line with the instructions of the managers in the Oxide Process Department, following the necessary daily operations in the heap leaching area in line with the targets set by the Operations Director, Responsible for attending the daily meetings of the department and assisting the managers in the Oxide Process Department, attending the weekly maintenance meetings and following the maintenance operations to be performed, assisting the managers in the Oxide Process Department in the preparation, organization and storage of the documents requested by the department managers.

Upon learning of the incident within the scope of his/her area of duty, he/she informed his/her superiors and fulfilled the duties of his/her superiors. He was found faultless in the case.

### Senol DEMİR (Anagold, Production Engineer)-

He works as a crusher reporting to the Oxide Manager and within the scope of Oxide operation, in line with the instructions of the Oxide Process Chief Engineer, the oxide ore stockpiled in the stockpiles is blended according to the tonnage and grade values, sent to the crusher units and sized, crushing, screening and pelletizing operations are followed, necessary daily operations are followed in the crusher area in line with the targets set by the Operations Director, Responsible for attending the daily meetings of the department and assisting the Oxide Process Chief Engineer, attending the weekly maintenance meetings and following the maintenance operations to be performed, assisting the Oxide Process Chief Engineer in the preparation, organization and storage of the documents requested by the department managers.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature:

Upon learning of the incident within the scope of his/her area of duty, he/she informed his/her superiors and fulfilled the duties of his/her superiors. When Soysal Doğan requested photographs from him, S Doğan left his position and survived the accident. He was found faultless in the case.

### Mehmet TÜRK (Anagold, Resource Development Director/Mine Operations Manager)-

He reports to the Operations Director and is responsible for radar data monitoring, which had a direct impact on the incident, and his job description includes "Within the scope of the Mine Geotechnical Unit; controlling the monitoring of radar tracking and warning systems, controlling the slope stability of open pits, slag dumps, ore stockpiles and heap leach slope stability, controlling, supervising and managing the site designs from a geotechnical point of view,..." However, he started his duty one day ago and was considered flawless since he was still in the orientation and familiarization phase with the staff.

### Hüseyin ÜSTÜNDAĞ (Anagold, Process Oxide Manager)

On the day of the incident, he was working as a manager in the process area where the work was carried out and was on leave. Job description "Ensuring that the oxide process plant is up and running, Controlling the operations of the oxide operation including crushing, screening, pelletizing (agglomeration), preparing the ore for stacking, transporting the ore to the heap, piping, leaching, gold recovery (ADR) plant and cyanide recovery and copper production (SART) plant, Coordinating the oxide process engineering and operations team personnel to achieve production targets, Managing the oxide process plant optimization projects, Company vision, determining, monitoring and reporting the performance indicators and targets in the processes for which it is responsible within the framework of company targets in line with its mission, establishing the necessary policies and procedures for oxide operation, determining the resource needs of oxide operation, providing department trainings for the professional development of oxide operation department employees, preparing the annual budget of oxide operation department, submitting it to the approval of the Operations Director and managing the approved budget." On the grounds that he was on leave on the day of the incident and that he fulfilled his responsibilities within the scope of his duty, it was concluded that he was faultless.

### Soysal DOĞAN (Anagold, senior piping supervisor, worker)-

He worked as a piping supervisor in the company for 14-15 years, and although it was discussed that the solution may have been given too much, he had no authority to flow or discontinue this solution, he was only involved in distributing the solution from the flowing ADR, he had no authority to discontinue the solution in any way, It is understood that he was responsible for assisting the Chief Engineer of the Oxide Process, that he informed his superiors upon learning of the incident within the scope of his area of duty, that he fulfilled the duties of his superiors, that he was present at the scene of the incident, that he left the scene of the incident when he was asked to take photographs, and that he survived the accident.



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

# ORGANIZATION CHART

SWORN TRANSLATION

I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

- Bill Mv Nawin (SSR) (Senior Vice President Operations and ...)
  - John Harmise (SSR) (Vice President ...)
    - Shawn Schwartz (Sustainability Projects)
      - Alperen Turan
        - Alperen Turak (TSF/HL Chief Engineer)
        - Karabey Turan (TSF Chief ...)
      - Patridk Valleo (WPS Project)
    - Ahmet Oguz Ozturk (Sustainability)
      - Can Serdar Hasturk
        - Recep Çalı (Environme...)
  - (Ülke Md.)
    - Cengiz Demirci (Country Manager)
      - Hakan Sahin (Security ...)
        - Abdülkadir Cansız
        - Ali Seri (Technical ...)
      - Emre Tasdildiren (Director of ...)
        - Hüseyin Üstündağ (Process ...)
          - Abdülkadir Cansız
            - Kaan Murat Akpolat (Production Engineer)
              - Kenan Öz
              - Soysal Doğan
                - NAZIM KÖSE
          - (Process Ünti Baş)
            - Murat Bayraktar (Process Oxide Chief Engineer)
              - Mehmet Saritas
              - Ramazan Çimen
            - Elif Reyhan (Production Engineer) (LEAD)
              - Adnan Keklik
                - Ramazan Öz
              - Yasin Gürbüz
      - Kenan Özdemir
      - Mehmet Turk (Resource ...)
        - Izzet Tekin (Chief Engineer of Mining)
          - Ali Riza Kalender (Senior Geotechnical ...)
            - Berkay Mısırı (Assistant ...)
          - Fuat Yilmaz (Mine Operations ...)
  - Patrick James (SSR) (Vice President Global Environment, Health, Safety ...)
    - Selcuk Ciftci (Occupational ...)
      - Burak Arkal
        - Gizem Guzel (Burak Artal) (Senior OHS ...)



SWORN
TRANSLATION

## 7. CONCLUSION

In the light of the above assessments, our expert committee has determined the following issues;

-The incident is a **"WORK ACCIDENT"** in accordance with Article 13/a-b of the SSI Law No. 5510 in force ,

-The following factors contributed to the incident;

- Lack of proper/working project management mechanism;
- Increase in capacity as Phase 4B and design deficiencies/errors in the projects prepared,
- Inadequate follow-up of project design criteria during the operation phase,
- Failure to identify the risks of potential damage to the heap leach from blasting during Phase 5 construction, which was carried out at close distances to the heap leach and using large quantities of explosives,
- Inadequate warning systems,
- The lack of a system to effectively manage the event after the cracks have given warning is effective,

- The incident caused environmental pollution,

- In the reports prepared for the stability analysis of the heap leach at the design and project design stage, the data sets to meet the requirements of the applicable legislation were not used, and the obligations under the Mining and Environmental Law were not fulfilled,

| S.N | NEGLIGENCE | NAME SURNAME | DUTY |
|-----|-----------|--------------|------|
| 1 | PRINCIPAL | John HARMSE | SSR, Vice President Global Projects |
| 2 | PRIMARY NEGLIGENT | Cengiz Yalçın DEMİRCİ | Anagold Country Manager, Anagold Chairman |
| 3 | PRIMARY | Iain Ronald GUILLE | Anagold, Vice President of Operations |
| 4 | PRIMARY NEGLIGENT | Shaun SCHWARTZ | Anagold, Sustainable Investment Projects Manager |
| 5 | PRIMARY | Ali Rıza KALENDER | Anagold, Senior Geotechnical Engineer |
| 6 | PRIMARY | Fuat YILMAZ | Anagold, Mine Operation Chief |
| 7 | PRIMARY | Selçuk ÇİFTLİK | Anagold, OHS Manager |
| 8 | PRIMARY | Ömer ARDIÇ | INR, Project Coordinator |
| 9 | PRIMARY | Kenan ÖZDEMİR | Anagold, Operations Director |
| 10 | PRIMARY | Luis QUIRINDONGO | GRE, Design Engineer |
| 11 | PRIMARY | Vinh LUU LE | GRE, Design Engineer |
| 12 | PRIMARY | Kevin GUNESH | GRE, Control Engineer |
| 13 | PRIMARY | Muhammed KILIÇ | Anagold, Drill Blasting Engineer |



The sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

| S.N | DEFECT | NAME SURNAME | DUTY |
|---|---|---|---|
| 1 | SECONDARY NEGLIGENT | Bill MC NEVIN | SSR, Senior Vice President/Operations and Sustainability |
| 2 | SECONDARY | Karabey TURAN | Anagold, Chief Project Engineer |
| 3 | SECONDARY NEGLIGENT | Ishak ASLAN | Anagold, Senior Project Construction Engineer |
| 4 | SECONDARY | Patrick VALKO | WSP Project Quality Assurance |
| 5 | SECONDARY | M. Yusuf ÇELEN | (WSP Project Manager) |
| 6 | SECONDARY | Alkın YEŞİLTEPE | Quality Assurance Engineer WSP |
| 7 | SECONDARY | Emrah Ergon | Quality Assurance Engineer WSP |
| 8 | SECONDARY | Ahmet Furkan ELÇİ | Quality Assurance Engineer WSP |
| 9 | SECONDARY | Hasan Aydin | Quality Assurance Engineer WSP |
| 10 | SECONDARY | Sertan Aydin | Quality Assurance Engineer WSP |
| 11 | SECONDARY | İzzet TEKİN | Anagold, Chief Mining Geology |
| 12 | SECONDARY | Berkay MISIR | Anagold, Assistant Geotechnical |
| 13 | SECONDARY | Ahmet YURDAŞAN | Ore Mineral Inspection Supervisor |
| 14 | SECONDARY | Hayriye ÖNTÜRK GÜRSOY | Ore Mineral, Supervising Engineer |
| 15 | SECONDARY | Talat BÜLBÜL | Ore Mineral, Control Engineer |
| 16 | SECONDARY | Dindar TOSUN | Ore Mineral, Control Engineer |
| 17 | SECONDARY | Ramazan KARAKAPLAN | Çiftay, Project Manager |
| 18 | SECONDARY | Ahmet MUMYAKMAZ | Çiftay, Deputy Project Manager |
| 19 | SECONDARY | Yusuf YAZICI | Çiftay, Site Supervisor |
| 20 | SECONDARY | Abdülkadir CANSIZ | Anagold, Maintenance Manager |
| 21 | SECONDARY | Murat BAYRAKTAR | Anagold, Oxide Process Chief Engineer |
| 22 | SECONDARY | Erdi SEYHAN | INR, Design Engineer |
| 23 | SECONDARY | Aykut AYDERMAN | INR, Design Engineer |
| 24 | SECONDARY | Funda ARDIÇ | INR, Design Engineer |
| 25 | SECONDARY | Osman BAYRAK | Hydro Design, Inspection Supervisor |
| 26 | SECONDARY | Bürgehan AKARSU | Hydro Design, Supervising Engineer |

-In the incident in which nine people lost their lives, the **13 people named above are the PRIMARY NEGLIGENT,**

-In the incident in which nine people lost their lives, **26 of the above-mentioned 26 people were SECONDARY NEGLIGENT,**

-In addition, the Authorities who issued the Environmental Impact Assessment (EIA) Positive Decision dated 07.10.2021 and registration number 6421 are **PRIMARY NEGLIGENT,**



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature.

SWORN
TRANSLATION

- That there was no element of inevitability in the accident,

A common opinion has been reached. Respectfully submitted to the discretion of the Supreme Public Prosecutor's Office 23.05.2024.

## EXPERT COMMITTEE

**Prof. Dr. Mehmet Yener ÖZKAN**
Civil Engineer (METU)

**Prof. Dr. Haluk AKGÜN** Geological Engineer (METU)

**Prof. Dr. Ahmet ERDAL OSMANLIOĞLU** Mining Engineer (IU

**Serhat GÜNGÖR** Mechanical

**Assoc Prof Nejan HUVAJ SARIHAN**
Civil Engineer (METU)

**Prof. Dr. Ali İhsan AROL** Mining Engineer (METU)

**Mert ERBAS**
Civil Engineer (METU)

**Mustafa Kemal TÜFEKCİ** Geological Engineer (AFAD)

**Saadet Gülru YILDIZ**
Civil Engineer (METU)

**Prof. Dr. İsmail TORÖZ**
Environmental Engineer (ITU)

**Assoc Prof Deniz ADIGÜZEL** Mining Engineer (IU Cerrahpaşa)



I, the sworn translator Yasin DURMAZ, declare that I have translated this document to English language completely and correctly in accordance with the original Turkish text.
Signature

SWORN
TRANSLATION

# T.C.
# İLİÇ
## CUMHURİYET BAŞSAVCILIĞINA
## BİLİRKİŞİ HEYETİ RAPORU

**Soruşturma Dosya No** : 2024/ 88 (İliç Cumhuriyet Başsavcılığı)

**Maktüller** :
1- Abdurrahman ŞAHİN (T.C No:60394344586)
2- Adnan KEKLİK (T.C No:26263659380)
3- Fahrettin KEKLİK (T.C No:23782742128)
4- Hüseyin KARA (T.C No:56164245474)
5- Kenan ÖZ (T.C No:26674645606)
6- Mehmet KAZAR (T.C No:56827639848)
7- Ramazan ÇİMEN (T.C No:25468685958)
8- Şaban YILMAZ (T.C No:24022734262)
9- Uğur YILDIZ (T.C No:40210205970)

**Şüpheliler** :
1- Abdulkadir CANSIZ (T.C No:16871135710)
2- Ali Rıza KALENDER (T.C No;59869359958)
3- Hüseyin ÜSTÜNDAĞ (T.C No:28996181688)
4- Iaın Ronald GUILLE (T.C No:99289400304)
5- Kenan ÖZDEMİR (T.C No:56683302092)
6- Mehmet TÜRK (T.CNo:24059301048)
7- Murat BAYRAKDAR (T.C No:33958468882)
8- Soysal DOĞAN (T.C No:24574715702)
9- Şenol DEMİR (T.C No:12308124708)

**Ölümlü Kaza Tarihi** : 13.02.2024 günü saat 14.28'de

**Kaza Yeri** : Erzincan ili, İliç ilçesi, Çöpler Köy Sınırları içerisinde faaliyet gösteren ve Anagold Madencilik A.Ş. tarafından işletilen Maden İşletme Sahasında Meydana Gelen Toprak Kayması (Leach Heyelanı)

**Suç** : Taksirle Ölüme Neden Olma

**Keşif Tarihi** : 16.03.2024

**Bilirkişiler** :
Prof. Dr. Mehmet Yener ÖZKAN, İnşaat Yüksek Mühendisi (ODTÜ)
Doç. Dr. Nejan HUVAJ SARIHAN, İnşaat Yüksek Mühendisi (ODTÜ)
E. Öğr. Gör. Saadet Gülru YILDIZ, İnşaat Yüksek Mühendisi (ODTÜ)
Prof. Dr. Haluk AKGÜN, Jeoloji Yüksek Mühendisi (ODTÜ)
Prof. Dr. Ali İhsan AROL, Maden Yüksek Mühendisi (ODTÜ)
Prof. Dr. İsmail TORÖZ, Çevre Yüksek Mühendisi (İTÜ)
Prof. Dr. Ahmet ERDAL OSMANLIOĞLU, Maden Y. Müh. (İÜ Cerrahpaşa)
Mert ERBAŞ, İnşaat Yüksek Mühendisi (ODTÜ)
Doç. Dr. Deniz ADIGÜZEL, Maden Yük. Mühendisi (İÜ Cerrahpaşa)
Serhat GÜNGÖR Makine Mühendisi (ODTÜ)
Mustafa Kemal TÜFEKCİ Jeoloji Yüksek Mühendisi (AFAD)



1

SWORN
TRANSLATION

# İÇİNDEKİLER

1. BİLİRKİŞİ HEYETİNE TEVDİ EDİLEN GÖREV _____ 4

2. OLAY _____ 4

3. DOSYA KAPSAMINDA EVRAKLARIN İNCELENMESİ _____ 4

   3.1. TOPRAK ALTINDA KALAN MAĞDUR KİŞİLER HAKKINDAKİ TESPİTLER _____ 4

   3.2. KOLLUK KUVVETLERİ TARAFINDAN ALINAN BİLGİ ALMA TUTANAKLARININ İNCELENMESİ _____ 5

   3.3. CUMHURİYET BAŞSAVCILIĞI TARAFINDAN ALINAN TANIK İFADE TUTANAKLARINA İLİŞKİN TESPİTLER; _____ 46

   3.4. CUMHURİYET BAŞSAVCILIĞI TARAFINDAN ALINAN SORUŞTURMA TUTANAKLARINA İLİŞKİN TESPİTLER; _____ 54

4. İLGİLİ MEVZUATLARIN İNCELENMESİ _____ 78

   4.1. 15.06.1985 TARİH 18785 SAYILI MADEN KANUNU, MADENCİLİK FAALİYETLERİ UYGULAMA YÖNETMELİĞİ KAPSAMINDAKİ YÜKÜMLÜLÜKLER _____ 78

   4.2. 09.08.1983 TARİH 2872 SAYILI ÇEVRE KANUNU, 29.07.2022 TARİH VE R.G - 31907 SAYILI ÇEVRESEL ETKİ DEĞERLENDİRME YÖNETMELİĞİ, 15.07.2015 TARİH VE R.G - 29417 SAYILI MADEN ATIKLARI YÖNETMELİĞİ, 23.01.2010 TARİH VE R.G - 27471 SAYILI  MADENCİLİK FAALİYETLERİ İLE BOZULAN ARAZİLERİN DOĞAYA YENİDEN KAZANDIRILMASI YÖNETMELİĞİ KAPSAMINDAKİ YÜKÜMLÜLÜKLER _____ 79

      4.2.1. 2872 Sayılı Çevre Kanunun Soruşturmaya Esas Olayla İlişkili Uygulama Maddeleri; _____ 79

      4.2.2. 9/8/1983 tarihli ve 2872 sayılı Çevre Kanunu'nun 10 uncu maddesine dayanılarak hazırlanan 29.07.2022 tarih ve R.G- 31907 Sayılı Çevresel Etki Değerlendirme Yönetmeliğinin Olaya İlişkin Maddeleri; _____ 80

      4.2.3. 15.07.2015 tarih ve R.G - 29417 Sayılı Maden Atıkları Yönetmeliğinin Olaya İlişkin Maddeleri; ____ 81

      4.2.4. Atıkların Düzenli Depolanmasına Dair Yönetmeliğinin Olaya İlişkin Maddeleri; _____ 83

      4.2.5. 23.01.2010 tarih ve R.G - 27471 Sayılı  Madencilik Faaliyetleri İle Bozulan Arazilerin Doğaya Yeniden Kazandırılması Yönetmeliğinin Olaya İlişkin Maddeleri; _____ 84

   4.3. ANAGOLD MADENCİLİK SANAYİ VE TİCARET ANONİM ŞİRKETİ TARAFINDAN YÜRÜTÜLEN MADEN İŞLETME FAALİYETLERİ VE İŞLETME FAZLARININ ÇEVRE, ŞEHİRCİLİK VE İKLİM DEĞİŞİKLİĞİ BAKANLIĞI (ÇŞİB) TARAFINDAN ÇEVRE KANUNU UYGULAMA MEVZUATLARI KAPSAMINDAKİ İZLEME VE DENETİMLERİNİN İNCELENMESİ _____ 84

5. MADEN İŞ KAZASI OLAYININ TEKNİK DEĞERLENDİRMESİ _____ 97

   5.1. MADEN KAZASI OLAYININ MADEN MEVZUATI, MADEN İŞLETME PROJESİ, MAPEG TEKNİK RAPORLARI  KAPSAMINDA DEĞERLENDİRİLMESİ _____ 97

   5.2. MADEN İŞ KAZASI OLAYININ MEYDANA GELDİĞİ YIĞIN LİÇ SAHASI VE YAKIN ÇEVRESİNİN GENEL JEOLOJİSİ, YAPISAL VE JEOMORFOLOJİK ÖZELLİKLERİNİN 2 VE 3 BOYUTLU MODELLENMESİ VE TEKNİK ANALİZİ _____ 112

      5.2.1. Şev Duraylılığı Bozularak Kaymaya Maruz Kalan Yığın Liç Sahasının Coğrafi Konumu _____ 112

      5.2.2. Maden Sahasının Jeolojik Özellikleri _____ 113

      5.2.3. Yığın Liç Sahasının Maden Sahasındaki Konumu ve Jeolojisi _____ 114

      5.2.4. Yığın Liç Sahasının ve Malzemesinin Özellikleri _____ 115



SWORN
TRANSLATION

*5.2.5. Yığın Liç Tesisi (YLT) Faz Yüzeylerinin Topografik Ve Jeomorfolojik Analizi* _____ 115

*5.3. LİÇ SAHASINDA, ŞEV DURAYSIZLIĞINA NEDEN OLAN ETKENLER İLE YENİLMENİN ÖNCESİ, ANI VE SONRASI KULLANILAN ERKEN İKAZ SİSTEMLERİNİN (RADAR, İNSAR, PRİZMA, PİEZOMETRE, TİLTMETRE, MANYETİK YÖNTEM VB.) İNCELENMESİ, MADEN İŞLETME SÜRESİ VE SONRASINDA İZİN VERİLEBİLİR DÜŞEY VE YATAY YÖNDEKİ YER DEĞİŞTİRMELERİN GEOTEKNİK DEĞERLENDİRMESİ VE ANALİZİ* _____ 118

   *5.3.1. YIĞIN LİÇ SAHASININ GEOTEKNİK DEĞERLENDİRMESİ* _____ 118

   *5.3.2. İŞLETME SÜRECİNDEKİ ŞEV SATBİLİYESİNE OLUMUSUZ ETKİLER* _____ 204

   *5.3.3. İZLEME (MONİTORİNG) VE ERKEN UYARI SİSTEMLERİ (EARLY WARNİNG) SİSTEMLERİ DEĞERLENDİRMESİ* _____ 215

*5.4. İŞ SAĞLIĞI VE GÜVENLİĞİ KAPSAMINDA OLAYIN DEĞERLENDİRİLMESİ* _____ 222

*5.5. OLAY SONRASI SİYANÜRLÜ LİÇ MALZEMESİNİN ARAZİYE YAYILIMININ ÇEVRESEL ETKİ DEĞERLENDİRME KAPSAMINDA İNCELENMESİ* _____ 226

   *5.5.1.   HEYELAN SONRASI BAKANLIK TARAFINDAN YAPILAN ÇALIŞMALARIN DEĞERLENDİRİLMESİ* _____ 226

   *5.5.2.   OLAY SONRASI HAZIRLANAN BİLİRKİŞİ RAPORUNUN İNCELENMESİ* _____ 229

   *5.5.3. BAKANLIK (ÇŞİDB) REFERANS LABORATUVAR ANALİZ SONUÇLARININ DEĞERLENDİRİLMESİ* _____ 230

   *5.5.4.BALIK NUMUNELERİNDE YAPILAN ANALİZLER HAKKINDA DEĞERLENDİRME* _____ 236

   *5.5.4. ANKALAB-FEPAS-ARTEK ÇEVRE LABORATUVARLARININ ANALİZ SONUÇLARININ DEĞERLENDİRİLMESİ* _____ 239

   *5.5.5. FEBAS ÇEVRE LABORATUVARI ANALİZ SONUÇLARI* _____ 245

6.   MADEN İŞ KAZASI OLAYININ İZİN BELGELERİ, OLAY YÖNETİMİ VE KUSURLULAR KAPSAMINDA DEĞERLENDİRİLMESİ _____ 248

6.1. İZİN BELGERİNİN DEĞERLENDİRLMESİ _____ 248

6.2. OLAYIN YÖNETİMİ _____ 249

6.3. OLAYDA KUSURLU OLANLAR VE GEREKÇELİ KUSUR DEĞERLENDİRMESİ _____ 249

7. SONUÇ _____ 260



SWORN
TRANSLATION

## 1. BİLİRKİŞİ HEYETİNE TEVDİ EDİLEN GÖREV

Erzincan ili, İliç İlçesi, Sabırlı ve Çöpler köy sınırları içerisinde, 13.02.2024 tarihinde saat 14:28'de meydana gelen Maden Kazası Olayının gerçekleşmesinde **Etkin Olan Nedenlerin** İnşaat (Geoteknik) Mühendisliği, Maden İşletmesi ve Planlaması, Jeoloji, Çevre Kanunu (ÇED Raporları), İş Sağlığı ve Güvenliği Kanunları kapsamında değerlendirilmesi,
-Olayın gerçekleşmesinde kurum, tüzel kişi ve şahıslardan kusurlu olanlar var ise asli ve tali kusur oranların belirlenmesi amacı ile 13.03.2024 tarihinde dosya Bilirkişi Heyetine tevdi edilmiştir.
T.C. İliç Cumhuriyet Başsavcılığı tarafından, Bilirkişi Heyetimize tevdi edilen görev kapsamında, Savcılık ve Bilirkişi Heyeti birlikte açık işletme maden faaliyeti esnasında yığın liçinin (Heapleach-YLT) kayması sonucu gerçekleşmiş olan maden kazası olayı, 16.03.2024 tarihinde mahallinde keşfi yapılmıştır.

## 2. OLAY

Erzincan ili, İliç İlçesi, Sabırlı ve Çöpler köy sınırları içerisinde, S:847 sayılı ruhsat sahasında, ruhsat sahibi Anagold Madencilik A.Ş şirketi uhdesinde çıkarılan Au-Cu-Ag-Hg-Mn metalik madenlerin (cevherlerin) işletilmesi aşamasında yığın liç (Heapleach) olarak istiflenen tüvenan malzemenin duraylılığını yitirerek 13.02.2024 tarihinde saat 14:28 sularında kayması sonucu ölümlü maden kazası olayı gerçekleşmiştir. Olay esnasında yukarıda isimleri belirtilen 9 maden çalışanının kayan yığın liç malzemesi altında kalarak hayatlarını kaybetmiştir.

## 3. DOSYA KAPSAMINDA EVRAKLARIN İNCELENMESİ

Dava dosyası içindeki belgeler (CD'ler dahil), teknik raporlar, bilgi alma, sorgulama ve ifade tutanakları, bilirkişi raporları incelenerek aşağıda sunulan tespitler yapılmıştır. İncelenen evraklar arasında kolluk ve savcılık ifade tutanakları, telefon ve e-mail kayıtları, özlük dosyaları, eğitim/zimmet/sağlık raporu belgeleri, tasarım raporları, SYDF raporları, ÇED izin belgeleri, ölçüm sonuçları, laboratuvar deney sonuçları, MAPEG raporları, işletme izin ve ruhsatları, Anagold organizyon şeması, savcılık tarafından alınan bilirkişi heyeti ön raporu, ön ek raporu ve nihai raporu, Muğla Sıtkı Koçman Üniversitesi Raporu, Neil Barr tarafından hazırlanan Geoteknik Raporu ve diğer tüm yazışmalar yer almaktadır.

## 3.1. TOPRAK ALTINDA KALAN MAĞDUR KİŞİLER HAKKINDAKİ TESPİTLER

**1-Abdurrahman ŞAHİN (T.C No:60394344586);** Alt taşeron KAR-SA İnş. çalışanı, Kaynakçı, olay sırasında liç altında kalan konteynırda bulunmakta.
**2-Adnan KEKLİK** (T.C No:26263659380) (Anagold A.Ş. çalışanı, Kıdemli ADR Süpervizör)
**3-Fahrettin KEKLİK** (T.C No:23782742128); Anagold A.Ş. çalışanı, olay sırasında liç altında kalan konteynırda bulunmakta.
**4-Hüseyin KARA** (T.C No:56164245474); Proses Borulama Ekibinden Alt taşeron KARSA çalışanı, Kaynakçı, olay sırasında liç altında kalan konteynırda bulunmakta.
**5-Kenan ÖZ** (T.C No:26674645606); Anagold A.Ş. çalışanı, yığın liç saha süpervizör

4



SWORN
TRANSLATION

**6-Mehmet KAZAR** (T.C No:56827639848); Alt Taşeron Asil Çöpler Taşımacılık çalışanı, Dozer Operatörü, olay sırasında liç altında kalan konteynırda bulunmakta. (yetkili üstü: Kenan Öz)

**7-Ramazan ÇİMEN** (T.C No:25468685958); Anagold A.Ş. çalışan, kıdemli kırıcı vardiya süpervizör (Yetkili üstü:1-Şenol Demir, 2-Murat Bayrakdar )

**8-Şaban YILMAZ** (T.C No:24022734262); Alt Taşeron Asil Çöpler Taşımacılık çalışanı, Yükleyici/Loader, olay sırasında liç altında kalan konteynırda bulunmakta. (yetkili üst: Kenan Öz)

**9-Uğur YILDIZ** (T.C No:40210205970); Alt Taşeron Çiftay Çalışanı, Kamyon Şoförü,

### 3.2. KOLLUK KUVVETLERİ TARAFINDAN ALINAN BİLGİ ALMA TUTANAKLARININ İNCELENMESİ

**Kolluk Kuvvetleri- Bilgi Alma Tutanakları (2024-88 Soruşturma Dosyası pdf; 40-674 Sayfalar Arası)**

<u>Cengiz Yalçın DEMİRCİ;</u>

18.02.2024 tarihli (saat 10:50) tutanaktaki ifadesinde özetle Amerika/Denver şehrinde ikamet ettiğini, SSR Mining şirketinde kıdemli başkan yardımcısı olarak yedi yıldır görev yaptığını, görevinin alt şirketler ile ilişkileri sağlamak ve finansal raporları sunmak olduğunu, aynı zamanda 2022 yılı Eylül ayı itibari ile ülke müdürü olarak SSR Mining şirketinde göreve başladığını, şirketin Denver şehrinde SSR Mining olarak kurulmuş olup şirketinin Türkiye operasyonunu Alacer Gold A.Ş'nin yaptığını, Alacer'e bağlı olarak Anagold Madencilik, Kartaltepe Madencilik, Artmin Madencilik, Kızıltepe A.Ş, Alkara A.Ş şirketleri bulunduğunu, Kızıltepe ve Alkara şirketlerinin kağıt üzerinde bulunduklarını, buralarda görevli olmayıp Alacer Madencilik, Anagold Madencilik, Kartaltepe Madencilik, Artmin Madencilik 'te Şubat 2024 tarihinden itibaren yönetim kurulu başkanı olduğunu, yönetim kurulu başkanı olmadan önce çeşitli şirketlerde yönetim kurulu üyeliği bulunduğunu, SSR Mining bağlı Amerika'da şirketlerde yönetim kurulu üyeliği olduğunu, SSR Mining şirketinin Ceo'su Rot Antal olup Bill Macnevin'in operasyonlar yöneticisi olduğunu ve Bill Macnevin'e bağlı çalıştığını, 2017 yılında SSR Minig şirketinde çalışmaya başladığında tüm dünyadaki maden arama operasyonlarından sorumlu olduğunu, iki yıldır Bill Macnevin'e bağlı olarak SSR Minig'in altında bulunan şirketler ile koordinasyonu sağlamak ve alttan gelen finansal raporları üst amirine sunmakla görevli olduğunu, Anagold Madencilik şirketi özelinde ülke müdürü olarak görev yaptığını, yılın büyük kısmında Denver şehrinde yaşadığını, Türkiye'ye düzenli gelip gittiğini, SSR Mining'de pozisyonuna eş değer olarak bulanan görevlerde Iain Ronald Guille'nin teknik üretim konulardan sorumlu olduğunu, ayrıca aynı konuda John Harmse isimli şahıs bulunmakta olup inşaat işlerinden sorumlu olduğunu, SSR Mining'de John Ebbett'in de karşı sorumlu olduğunu, Türkiye'de bulanan şirketlerin organizasyon yapısında bulunan direktörlerin kendisi ile iletişime geçme hakları olduğunu, Anagold özelinde Iain Ronald Guille'nin operasyon başkan yardımcısı olarak görev yaptığını ve iletişime geçtiğini, özellikle Operasyonlar Direktörü Kenan Özdemir'in Anagold'da tüm operasyonlardan sorumlu olup raporlamayı Iain Ronald Guille'nin SSR Mining'de Bill Macnevin'a yaptığını, genel finansal sunumlar, bağlı şirketlerin raporları bilgi amaçlı kendisine geldiğini, yığın liç sahasının 2009-2010 yıllarda yapıldığını bildiğini, detaylarına tam hakim olmadığını, bu yıllarda böyle bir görevi olmadığını, SSR Minig de çalışmadığını, nasıl ve ne şekilde yapıldığını bilmediğini, talep edilmesi halinde şirketten rapor edilerek dosyaya sunabileceğini, yığın liç sahası denetiminin kim tarafından ne şekilde yapıldığını bilmediğini talep

5



SWORN
TRANSLATION

edilmesi halinde şirketten hazırlatıp sunabileceğini, yığın liç sahasından Oksit proses birimi sorumlu olduğunu, Oksit proses birimi başında Hüseyin Üstündağ olduğunu, altı aydır bu pozisyonda görev yaptığını, doğrudan Operasyonlar müdürü Kenan Özdemir'e bağlı olup Kenan Özdemir ve Hüseyin Üstündağ'ın yığın liç sahasından doğrudan sorumlu olduklarını, Hüseyin beyin altında baş mühendisler ve şefler olup yığın liç sahası inşasını proje birimi yaptığını, genişlemesi ile ilgili proje bölümü sorumlu olup Shaun Schwartz'ın proje müdürü olduğunu, toprak kayması olayında kaybolan 9 şahsın görevleri ile ilgili olarak 9 şahsın 4 ü Anagold bünyesinde olup diğerleri alt taşeron firmasında olduklarını ve görevleri hakkında şuan için net bilgiye sahip olmadığını, talep edilmesi halinde raporlamasını sağlayabileceğini, olayın oluşu ile ilgili olarak olayın oluş ve teknik kısmını bilmediğini, kendisine kim ne zaman ne şekilde ilk haberi verdiği, sürecin gelişimi ve talimatları ile ilgili olarak olay olduğu gün Amerika'da olduğunu, Onur Acar'ın (basın iletişim müdürü) telefon ile haber verdiğini, kendisinin Iain Beyi aradığını, bir şey bilmediğini söylediğini, her şeyin kapatılmasını söylediğini, sonrasında Onur'u aradığını kaymanın büyük olduğunu öğrendiğini, o andan itibaren ulaşabildiği herkesi arayarak bilgi almaya ve risk durumunu yönetmeye çalıştığını, son olarak Bill'i aradığını, Iain'ın aradığını öğrendiğini, yığın liç alanında çatlak veya problem olduğuna dair raporlama yapılıp yapılmadığı ve çatlak/yarılma olayı öncesinde herhangi bir talimat verip vermediği ile ilgili olarak liç alanında Iain Ronald Guille, Kenan Özdemir ve Hüseyin Üstündağ sorumlu olduklarını, bu üç kişinin yığın liç sahası ile ilgili raporlamada bulunmadıklarını, olayın olduğu 13.02.2024 günü kazadan yaklaşık 2 saat önce yığın liç sahasında çatlak olduğuna dair Iain 'in attığı fotoğraf ve bilgilendirme mailini görmediğini, aradaki saat farkından dolayı uyuyor olduğunu, gelen maili olaydan 3 gün sonra gördüğünü, olay olmadan önce kendisine atılan okumadığı mail dışında bir bildirimde bulunulmadığını, Iain'in olay öncesinde aramamasının nedeninin kendisinin operasyon sahasında yetkili kişi olması olduğunu, radar uyarı sistemi hakkında bilgi verilip verilmediği ile ilgili olarak bilgisi olmadığını, ifadelere göre 2 adet radar ve 2 robotik cihaz alımı 2024 bütçesine konmuş olduğunu, alınıp alınmadığı ve alınmadı ise neden alınmadığı ile ilgili olarak cihazların bütçede olduğunu ve onaylandığını bilmediğini, teknik konuda bilgi sahibi olmadığını ve alınmasından sorumlu olmadığını, şua an için hangi birimin sorumlu olduğunu bilmediğini, radar sisteminin tüm yığın liç sahasını görüp görmediğini teknik bir konu olduğu için detayını bilmediğini, alt taşeronlara tehlike olduğu hususunda bilgi verilip verilmediği ile ilgili olarak teknik tabir olduğu için bilmediğini, şirkette meydana gelen bir olay raporlandı ise alt taşeronlara bildirildiğini, ayrıca şirketiin çok tehlikeli sınıfta madencilik faaliyeti yürüttüğü için her hangi bir tehlike anında maden alanında bulunan her çalışanın tehlikeye bağlı olarak operasyonu durdurma yetkisi olduğunu, olayın olduğu gün patlatma yapılıp yapılmadığı ile ilgili olarak maden sahasında rutin patlatma yapıldığını bildiğini, detaylarına tam hakim olmadığını, patlatmanın öğlen saatlerinde yapıldığını bildiğini, teknik bir konu olup tetikleyip tetiklemediğini bilmediğini, ancak öğrendiği şekilde sabah çatlaklar mevcut ise öğlen yapılan patlatmanın mantıken etki etmeyeceğini düşündüğünü, Iain'in talimat verme yetkisi olduğunu, Ali Rıza Kalender tarafından hazırlanan rapor ve düzenlenen denetimde hazırlanan belgelerin kendisine gelmediğini, ilgili müdüre gittiğini, teknik konu olup belirtiği gibi ülke müdürü olarak finans raporlamasını sunumu, takibi, planlaması ve şirket ortakları ile koordinasyonundan sorumlu olduğunu, Anagold çöpler işletmesinin dünyada 9 tane bulunan sayılı işletmelerden olup Anagold sahasında kompleks bir üretim faaliyeti sürdürüldüğü için her birimin başında ilgili müdür bulunduğunu, ilgili müdürlerin direktörlere bağlı olduklarını, toprak kaymasının meydana geldiği yığın liç sahasının oksit proses birimine

6



bağlı olup saha operasyon direktörü Kenan Özdemir'in diğer  birimler ile birlikte burasının amiri durumunda olduğunu, operasyon başkan yardımcısı Iain Ronald Guelle'nin  tüm sahadan sorumlu olup bu seviyede olan kişilerin meydana gelen olayda her türlü talimat ve emir verme yetkisine sahip olduklarını, teknik konularda sorulan sorulara bilgi sahibi olmadığı için cevap veremediğini, talep edilmesi hususunda hazırlanıp dosyaya sunabileceği beyan edilmiştir.

**Mehmet TÜRK;**

14.02.2024 tarihli (saat12:50) tutanaktaki ifadesinde  özetle; Anagold Madencilik A.Ş. firmasına 12.02.2024 tarihinde maden departmanı müdürü olarak işbaşı yaptığını, 12.02.2024 ve 13.02.2024 tarihlerinde iş güvenliği ve çevre eğitimleri aldığını, bu eğitim ve oryantasyon sürecinin 15.02.2024 tarihi itibari ile bitecek olduğunu ve bu eğitimlerin devam etmesi sebebiyle maden sahasında sorumlu bulunduğu alan ile alakalı yetkilendirilme de gerçekleştirilmediğini, dolayısıyla herhangi bir talimat verme, iş yapma izni  bulunmadığını, olayının meydana gelmesinden önce işe yeni başladığından dolayı çalışma arkadaşları veya ekibi ile tanışma toplantıları yapmak üzere olduğunu, toplantı saatinin olayın meydana geldiği gün saat:14:30 olarak planlanmış olduğunu, toplantının başında bahse konu alanda heyelan olduğu bilgisi çalışma arkadaşlarından birkaçına telefon aracılığı ile bildirilmiş olduğunu, toplantıyı hemen bitirip açık ocak olarak değerlendirilen Manganez Fit isimli kısım tarafına giderek durumu gözlemlediklerini, gitmiş oldukları yığın liçi alanının maden departman müdürü olarak sorumluluk alanında olmadığını, görev tanımı ve sorumluluk alanının açık ocakta madenin kazılarak kırıcıya beslenmesi olduğunu, bundan sonraki işlemlerin proses departmanının sorumluluğunda olduğunu, oryantasyon sürecinde bulunduğu için ve Yığın Liçi olarak bildiği alanın  görev alanı dışında olması sebebiyle herhangi bir özen ve dikkat yükümlülüğü bulunmadığını, Anagold Madencilik A.Ş firmasında, Maden Üretimi Operasyon birimi, Maden Planlama birimi, Maden Teknik Hizmetler Birimlerinden sorumlu olduğunu, yüklenici firma olarak müteahhit firma Çiftay AŞ nin açık ocak maden üretim faaliyetlerinden sorumlu olduğunu, birimine bağlı alt birim çalışanları ve Çiftay A.Ş. yöneticilerinin hepsinin isimlerini iki (2) gün önce işe başladığı için bilmediğini, bildiği isimlerin maden operasyon şefi Fuat YILMAZ, kıdemli vardiya mühendisi Kadir AŞIK olduklarını, bu şahıslara karşı sorumlu olduğunu, patlatma ile ilgili olarak bahse konu bölgede bildiği kadarıyla 13.02.2024 günü patlatma yapılmadığını, çalıştığı pozisyonda kendisinden önce Maden Mühendisi Özgür KAYA isimli şahısın çalışmakta olduğunu, şahsen  tanımadığını, Anagold Madencilik A.Ş firmasından yaklaşık 1 ay önce ayrılmış olduğunu, Özgür KAYA şirketten ayrılınca onun yerine vekaleten Jeoloji Mühendisi İzzet TEKİN isimli şahıs üstlendiğini ve işi ile alakalı İzzet TEKİN'in yardımcı olduğunu, toprak kayması altında kalan çalışanların kime bağlı olarak çalıştıkları ve onların orada çalışmasına kim müsaade ettiği ile ilgili olarak herhangi bir bilgisi, ilgisi olmadığını, astlık ve üstlük ilişkisi de olmadığını, iletişimi ve tanışıklığı da olmadığını, radar sinyalleri ile ilgili olarak şirket maili ve telsizi henüz aktive edilmeği için herhangi bir bilgi aktarımı olmadığını, çatlak bilgisi olduğu halde sahanın neden boşaltılmadığı ile ilgili olarak bahse konu alanın sorumluluk alanı dışında olup  herhangi bir bilgisi olmadığını, yetkilendirmesi de olmadığını, Çiftay A.Ş firması hangi faaliyeti yaparken şirkete ait 1 adet kamyonun heyelan altında kaldığı, kendisinin alanın riskli olduğu hakkında bilgilendirilip bilgilendirilmediği ile ilgili olarak Çiftay A.Ş firmasının açık ocaklardan yüklenici olarak maden üretimi yaptığını, hangi açık ocaktan yapıldığını bilmediği maden üretimi esnasında Manganez ocağı üzerinde bulunan nakliye yolunu kullanırken kamyonlardan biri heyelan altında kaldığını,  Çiftay A.Ş yapmakta olduğu maden

7



SWORN
TRANSLATION

üretimini sağlamak amacıyla Manganez ocağından geçen nakliye yolunu kullandığını, Manganez ocağı ile heyelanın olduğu Yığın Liçi arasında bildiğim kadarıyla yaklaşık 100 metre mesafe olduğunu, söz konusu kamyonun bu nakliye yolunu kullanırken Yığın Liçi'nde meydana gelen heyelan malzemesinin yola ve Manganez ocağına kadar ilerlemesi sonucunda kamyonun heyelan malzemesinin altında kaldığını heyelan sonrasında araziye çıktığında öğrendiğini, Çiftay A.Ş. firmasının kullanmakta olduğu yolun ve Manganez ocağının riskli bölgede olmadığı değerlendirilmiş olmalı ki faaliyet devam ettiğini, ancak bu durumun kendi değerlendirmesi olmayıp daha önce sahaya çıkmadığı için Çiftay A.Ş. firmasının hangi açık ocakta çalıştığını ve hangi yolları kullandığını bilmediğini, operasyon bilgi ve planlamasına henüz hakim olmadığını, Çiftay A.Ş. firması Anagold Madenciliğin maden üretimini yapan taşeron firma olduğunu, kendisi ve ekibinin Çiftay A.Ş'nin yönetim kadrosunda, proje müdürü ve şantiye şefleri ile iletişim halinde olarak maden üretiminin geçekleşmesini sağlayacak olduklarını, ancak bu göreve henüz başlamadığını ifade etmiştir.

### Iain Ronald GUILLE;

14.02.2024 (07:30) tarihli tutanaktaki ifadesinde özetle; Anagold Madencilik A.Ş. de idari müdür yardımcılığı görevinde bulunduğunu, saat 09:45 sıralarında İSG Uzmanı Burak Bey ve Çevre Mühendisi Can Serdar Bey'in kendisine 32 numaralı liçte bazı çatlaklar olduğunu söylediklerini ve gösterdikleri resimlerde gördüğünü, bu durumu haber alınca her gün saat 10:00 da şirkette yapılan toplantıda yöneticilerle ne gibi bir önlem alınacağı ile ilgili konuştuklarını, oksit sorumlusu Murat Bey bütün çalışanlara o bölgenin kullanılmayacağına dair mail attığını ve ilgili tedbirlerin alınması ile ilgili talimatlar verdiğini söylediğini, daha sonra Burak, Can Serdar, Gizem Hanım ile olay yerini görmek için araç ile olay mahalline gittiklerini, oraya giderken yolun kapatıldığını ve bir süpervizör arkadaşın durdurduğunu, durduran Süpervizör arkadaşa Murat Bey 'in eşlik edeceğini söylediklerini ve müsaade ettiğini, Murat Bey de önden giderek hep birlikte 32 numaralı liçe gittiklerini, olay yerine gittiklerinde birkaç küçük çatlak ve 6 cm derinliğinde bir çatlak daha gördüklerini ve not aldıklarını, olay yerini daha iyi görmek, alınacak tedbirleri tam olarak planlamak amacıyla en tepeye çıktıklarını, tepeye çıktıklarında çalışma durmuş olup toprak dökülmediğini, ancak liçin üzerine hala solisyon verilmeye devam edildiğini gördüklerini, yapılan gözlemler sonrası buraya hiç kimsenin girmesine izin vermediklerini, jeoteknik bir önlem alınması kararı aldıklarını, oraya gönderilen solisyonun farklı birimlere dengeli bir şekilde dağıtılması gerektiğini söylediğini ve oraya solüsyon göndermeyi durdurduklarını, daha önce bariyer ile kapatılan yoldan araç ile geri döndüklerini, aynı süpervizörün durdurduğunu, izin alarak ofise geldiklerini, saat 11:30 gibi Amerika'da yaşayan amiri Cengiz DEMİRCİ' ye, Operasyon Müdürü Bill MCNEVIN'e ve Çevre Sağlığı Güvenlik Sorumlusu Patrick JAMES' e mail atarak bilgi verdiğini, saat 13:30 sıralarında Jeoteknik Mühendisi Ali Rıza Bey'den elindeki son verileri paylaşmasını istediğini, Ali Rıza Bey'in normalde 20 mm bir hareketlenme olduğunu söylediğini, fakat yaptıkları gözlemde bu hareketlenmenin 90 mm ye yükseldiğini ifade ettiğini, Ali Rıza Bey görülen çatlakların çimento ile kapatılabileceğini mail atarak söylediğini, daha sonra Ali Rıza Bey'in liç bölgesine artık tadilat yapılana kadar hiçbir şekilde yığın yapılamaması gerektiğini söylediğini, yarım saat içinde Murat BAYRAKDAR, Ali Rıza Bey'e bölgenin tadilatı için neler yapılacağı ile ilgili birkaç sorunun olduğu bir mail gönderdiğini, fakat Ali Rıza' dan herhangi bir cevap gelmediğini, çok kısa bir süre sonra saat 14:28 de gürültüyü duyduğunu küçük bir deprem gibi olduğunu, hemen çalışanları sahadan uzaklaştırdıklarını, Abdul Kadir Bey ile idari işler

8



SWORN
TRANSLATION

toplantı salonuna giderek orada acil durum alarmı verdiklerini, şirketin acil durumlarda oluşturduğu plan çerçevesinde derhal arama kurtarma ve güvenlik tedbirleri aldıklarını ve devletin ilgili resmi kurum ve kuruluşlarını da durumdan haberdar ettiklerini, olay günü kaza mahallinde veya etkisi muhtemel çevresinde patlatma yapılmadığını, kaza mahallinin uzağında yasal olarak planlanan şekilde patlatma yapıldığını, toprak altında kalan Anagold çalışanı iki süpervizör yetkilisi olmak üzere beş kişi, bir Çiftay firması çalışanı, bir Şaban Yılmaz Firması çalışanı ve Kar-Sa personeli ve oksit bölgesinde çalışan iki kişi olmak üzere dokuz kişiden hiç birine emir ve talimat vermediğini, kaza gününden önce radardan olumsuz bir rapor alındığına ilişkin bir bilgisi olmadığını, böyle bir durum olduğu durumda ilgili arkadaşların haberdar edeceklerini, ilk radarın sinyal verdiği zaman kazanın meydana geldiği sabah olduğu haberini ortak mail grubunda gördüğünü, Burak ARTAL'ın ve Murat BAYRAKDAR'ın olaylar ile ilgili bilgi verildiği ile ilgili kolluktaki bilgi verme veya ifadeleri ile ilgili olarak Burak ARTAL'ın her gün saat: 10:00' da yapıkları toplantıdan az önce konu hakkında bilgi verdiğini, ayrıca bütün ilgilerle beraber yapılan saat: 10:00' da ki toplantının ana gündeminin de liç sahasındaki çatlama ve yarıkların ne anlama geldiği olup bu sorunun nasıl çözüleceğine ilişkin olduğunu, sorumlu arkadaşlarla beraber çatlakların yer aldığı bölgeye giderek konunun daha iyi anlaşılması için yerinde tespit yaptıklarını, Murat BAYRAKDAR'ın ise sadece saat: 10:00' da yapılan genel toplantıda konu hakkında toplantıya katılanlara ve kendisine bilgi verdiğini ifade etmiştir.

### Hüseyin Üstündağ

14.02.2024 (saat 09:25) tarihli tutanaktaki ifadesinde özetle; Anagold Madencilik AŞ 'de 4 aydır Proses Oksit Müdürü olarak çalıştığını, 12.02.2024 son mesai gününde 2 gün izine ayrıldığını ve vekâletimi başmühendis Murat Bayrakdar'a bıraktığını, vekaleti 12.02.2024 günü saat 10.00 da yapılan yüz yüze toplantısında dile getirdiğini, 12.02.2024 günü tahmini saat 23.30-00.00 sıralarında Murat Bey'e yapılacak işlemler hakkında bilgi ve talimat amaçlı e-posta gönderdiğini, 13.02.2024 günü İstanbul iline gittiği esnada başmühendisi Murat Bayrakdar'ın saat 08.30 sıralarında fotoğraf gönderdiğini, göndermiş olduğu fotoğrafların Anagold Güvenlik Müdürü Hakan Şahin'den temin edilen fotoğraflar ile aynı olduğunu, fotoğrafların yığın liç sahasında çatlama/yarılma olduğuna ilişkin olduklarını, Murat Bayrakdar'ın sahada kontroller yapılacağını ve yığın liç sahasında üretim durdurulduğunu ve bölgenin erişeme kapatıldığını söylediğini, durumun takip edilmesi ve tarafına bilgi verilmesi talimatı verdiğini, saat 14.00 sıralarında yapılan online toplantıya katıldığını, toplantı yapıldığı esnada saat 14.25 sıralarında deprem oluyor dendiğini toplantıya son verildiğini, devamında Murat Bayrakdar'dan yığın liç sahasının kaydığını öğrendiğini, Proses Oksit Müdürü olarak kimseye bilgi verip vermediği, emniyet tedbiri alıp almadığı, bölgedeki toprak ayrılması hakkında kendisinin ya da başkalarının bilgisi olup olmadığı, önceden tedbir alınıp alınmadığı ile ilgili olarak bahse konu iş kazası toprak kayması olayının olduğu yığın liç sahasının çatlaması ile ilgili her hangi bir malumatı olmadığını, durumu 13.02.2024 günü saat 08.30 sıralarında baş mühendisi Murat Bayrakdar'ın Whatsapp üzerinden göndermiş olduğu fotoğraflarda öğrendiğini, konu hakkında bu tarihte bilgi sahibi olduğunu, konu hakkında üretimin durdurulduğu, erişimin engellendiği, Anagold personeline gerekli mailin atılacağı ayrıca Jeofizik biriminin bölge hakkında gerekeni yapacağı bilgisini edindiğini, Anagold Maden sahası içerisinde bulunan yığın liç bölgesinden toprağın kaydığı iş kazasının olduğu yerden sorumlu personellerin hatırladığı kadarıyla saha operatörü Gökhan Gün, Süpervizör (Borulama) Soysal Doğan, Konveyör Kenan Öz (Göçük altında olan kişidir), ADR Süpervizörü Adnan

9



SWORN
TRANSLATION

Keklik(Göçük altında olan kişidir), Kırıcı Süpervizörü Mehmet Sarıtaş, Kırıcı Süpervizörü Ramazan Çimen(Göçük altında olan kişidir),Kırıcı Süpervizörü Şerif Kurt, ADR Süpervizörü Ethem Keklik, ADR Süpervizörü İsmail Keklik, ADR Süpervizörü Ramazan ÖZ, Kimyasal Hazırlama Süpervizörü Yasin Gürbüz, Kırıcı Mühendis Şenol Demir, Mühendis Kaan Murat Akpolat, Mühendis Elif Reyhan, Baş Mühendis Murat Bayraktar, Müdür olarak kendisi, Direktör Kenan Özdemir, Vicepresident Iain Ronald Guille, Ülke Müdürü Cengiz Demirci olduklarını, Jeofizik bölümünde bulunan radar sistemi hakkında kontrol yapıp yapmadığı, rapor gönderilip gönderilmediği, en son raporun ne zaman gönderildiği ve sorumlu personeller ile ilgili olarak bu bölüm hakkında Jeofizik bölümü sorumlu olduğunu, ilgili kişi Ali Rıza Kalender olup yanında yardımcısı olduğunu, her Pazartesi rapor gönderdiklerini, 13.02.2024 günü yapılan denetimden sonra saatini tam olarak hatırlamadığını ve 8.30 dan sonra bölgedeki titreşim raporunu gönderdiklerini, raporda çatlak olduğunun belli olduğunu, Pazartesi gönderilen raporda titreşim ve ayrılma olmadığını,  meydana gelen göçük altında 9 kişinin kalması hususunda kimin kabahati olduğu, önlenip önlenemeyeceği ve sahadan personellerin çekilmesi hususu uygulandıysa nasıl 9 kişinin göçük altında kaldığı ile ilgili olarak bahse konu yığın liç alanına 2010 yılı itibari ile yığma işlemi yapılmakta olduğunu, bölgede yığma işlemi yapılması için Çevre Şehircilik Bakanlığından izin alındığını, bu izin belgesinin süresi ve içeriği hakkında bilgisi olmadığını, bu konunun çevre birimini ilgilendirdiğini ve birimden de Can Serdar Hastürk takip ettiğini, bildiği kadarıyla yığma işlemi hakkında kat kat metre küp tonaj olarak izin verildiğini, konu hakkında detaylı bilgi Can Serdar Hastürk'te olduğunu, konu ile ilgili Çevre Şehircilik Bakanlığından denetlemek amaçlı rastgele gelinip kontrol edildiğini, kısacası bölgede yığma yapılması için gerekli izinler mevcut olduğunu, sorumluluk alanının oksit proses alanı olup yığının kaydığı iş kazasının olduğu yer olduğunu, Anagold Madencilik A.Ş'de Proses Oksit Müdürü olup başmühendis Murat Bayrakdar ve alan mühendisleri Şenol Demir, Elif  Reyhan, Kaan Murat Akpolat olduklarını, 12.02.2024 günü patlatma yapıldığını, her gün 12:00-12:30 arası patlatma yapıldığını, olay gününde izinli olduğu için haberi olmadığını, göçük altında kalanların bir çoğunun bölgeden sorumlu vizörler olduklarını, Adnan Keklik, Kenan Öz, Ramazan Çimen'in kendi sorumlu olduğu kişiler olduklarını, 9 kişinin Anagold Madencilik çalışma prensibi gereği çıkmış olduklarını, talimat ve izin vereni bilmediğini, diğerlerinin taşeron personelleri olduklarını, radar sistemindeki üç gün öncesi uyarı ile ilgili Jeofizik bölümü sorumlu olup bölümde ilgili kişinin Ali Rıza Kalender olduğunu ayrıca yanında ismini hatırlamadığı yardımcısı olduğunu, her pazartesi rapor gönderdiklerini, 13.02.2024 günü yapılan denetimden sonra saatini tam olarak hatırlamadığını, 8.30 dan sonra bölgedeki titreşim raporunu gönderdiklerini, raporda çatlak olduğunun belli olduğunu, Pazartesi gönderilen raporda titreşim ve ayrılma olmadığını, görmediğini, sahanın neden boşaltılmadığı ile ilgili olarak Murat Bayraktar tarafından bölgede çalışma yapan Yesti Grubu çalışanlarının çıkartıldığını, bölgeye erişim engellendiğini, mail atıldığını, göreve  dört ay önce başlamış olduğundan yığın liç alanı planının o günkü yığın seviyesine göre mesafe hesaplanıp konteynırlar yapıldığını, Çevre Bakanlığı denetimlerinde de risk faktörü bulunmadığını beyan etmiştir.

**Murat BAYRAKDAR**

14.02.2024 (saat:10:01) tarihli tutanaktaki ifadesinde özetle; Anagold Madencilik A.Ş'de 03.11.2010'da kırma eleme vardiya süpervizörü olarak göreve başladığını, Oksit Operasyonları başmühendisi olarak yaklaşık 1 yıldır görev yaptığını, sahada  her sabah günlük üretim toplantısı

10



SWORN
TRANSLATION

yaptıklarını, 08:30 da yapılan toplantıda ilk önce iş güvenliği maddesi ile başladıklarını, ADR tesisi asistan mühendis Elif REYHAN hanım iş güvenliği maddesi var mı şeklinde soru yönelttiğinde, enkaz altında bulunan Kenan ÖZ (kıdemli yığınlıç süpervizörü) yığınlıçi alanında çatlaklar olduğunu, kayma riski olduğunu, toplantıda bildirdiğini, o sırada toplantıdan acil olarak çıktığını ve yığınlıç alanına denetlemede bulunmaya gittiğini, o esnada ikinci tesisi kıdemli süpervizörü Mehmet SARITAŞ tarafından whatsapp grubu üzerinden çatlak görsellerinin paylaşıldığını, yığınlıç alanına 08:45 sıralarında geldiğinde yığınlıç alan mühendisi Kaan Murat AKPOLAT, Kenan ÖZ yığınlıç alanında olduklarını, alan denetimlerini birlikte gerçekleştirdiklerini, o esnada yığınlıç asistan müh. Kaan Murat AKPOLAT tarafından jeoteknik Müh. Berkay MISIR aranılarak yığın lıç alanındaki çatlakların bildirildiğini, bu durumu Kaan Murat AKPOLAT'ın 08:55 sıralarında yığınlıç alanında söylediğini, bunun üzerine üst amiri olan vekaleten bakan Abdulkadir CANSIZ'ın odasına giderek yığınlıç alanındaki çatlakları bildirdiğini, orada elde ettikleri görsel fotoğrafları kendisi ile paylaştığını ve o gün izinde olan oksit operasyon müdürü Hüseyin ÜSTÜNDAĞ' a whatsapp üzerinde fotoğraflan paylaştığını ve cep telefonundan arayarak konu hakkında bilgilendirdiğini, alan saha denetimlerini gerçekleştirdikten sonra Yığın lıçin güney bölgesinde devam etmekte olan faz 4b-13 mebran montaj işleri alanına ekibi ile gittiklerini, ilgili alanda YESTİ firması tarafından mebran montaj işi devam ettiğini, yaklaşık 20-25 personel çalışma yaptığını, olay günü saat 9:00 sıralarında YESTİ firmasının bu faaliyetini durdurduğunu ve alanın boşaltılmasını sağladığını, aynı alanda Mürekkepçiler firması çalışanları da bulunduğunu, bu taşeron firmanın da buradaki faaliyetini durdurduğunu, oradaki kişileri çıkarttığını, Erdal MÜREKKEPÇİ'nin sahada olduğunu, ona faaliyetini durdurmasını söylediğini, alanın boşaltıldığını, çalışma alanına tekrar personel girmesini engelleme amaçlı fiziksel bariyer yerleştirttiğini, devamında Berkay MISIR'ın sahaya geldiğini, 09:20 sıralarında yığınlıç alanındaki kontrollerin, yüzey çatlakları, görsel olarak gerçekleştirildiğini, Berkay MISIR tarafından radar, hız ve deplasman hareketlerinin kontrol edildiğini, 70 mm/gün olduğunu bildirdiğini, normalde bu değerin 0-20 mm/gün olması gerektiğini, Berkay MISIR'ın bu hızlanmayı kendisi fark edip bildirmesi gerekirken kendileri uyardıktan sonra bu hızlanmayı bildirdiğini, aslında öncesinde hareketi fark edip alarm vermesi gereken kişinin Berkay MISIR olması gerektiğini, Berkay MISIR ile Ali Rıza KALENDER bu görevi birlikte yürüttüklerini, Ali Rıza KALENDER'in izinde olup olmadığını bilmediğini, hızlanmadan haberdar olduktan kısa bir süre sonra yığınlıç alanına geldiğini, Ali Rıza KALENDER ile yığınlıçi çatlak kontrolünde, çatlakların yüzeysel olduğu, herhangi bir risk bulunmadığı, ilgi çatlakların çimento ile kapatılması, dozer iş makinası ile düzenlenmesi konusunda sözlü olarak beyanda bulunduğunu, kendisi ise bu çatlakları fark ettiğinde ilk işinin kırıcı faaliyetlerini ve yığın yapmayı durdurmak olduğunu, her gün düzenli olarak saat 10:00 da gerçekleştirilen günlük üretim toplantısına (müdürler düzeyinde) bölüm müdürleri Hüseyin ÜSTÜNDAG izinde olduğu için katılım sağlamak amacıyla sahadan ayrıldığını, 10:00 toplantısı her zamanki gibi iş güvenliği maddeleri ile başladığında jeoloji baş müh. İzzet TEKİN söz hakkı aldığını ve yığınlıç yüzeyinde çatlaklar bulunduğunu söylediğini, ardından kendisi çatlak gözlemlerinin departman çalışanları tarafından gözlemlendiği, oksit kırıcı üretim faaliyetlerinin durdurulduğu, YESTİ ve MÜREKKEPÇİLER firması çalışanlarının çalışma alanından uzaklaştırıldığını ve yolların erişime kapatıldığını söylediğini, alanın siyanür solüsyonuna kapatılması için solüsyon yönetim toplantısı sonrasında karar vereceklerini ifade ettiğini, bir günde ortalama en az 5 toplantısı olduğunu, toplantı konularının, İş güvenliği ve Üretim olduğunu, saat 10:00 üretim toplantısı sonrasında operasyon genel müdürü Iain Ronald

11



SWORN
TRANSLATION

GUİLLE ve ISG başmühendisimiz Burak ARTAL ile alan kontrolü için yığınliç sahasına çıktıklarını, yüzeysel saha kontrolleri gerçekleştirdiklerini, daha sonra Kaan Murat AKPOLAT'a ulaşım yollarının kapatılması talimatı verdiğini, Kaan da sahada olduğundan, o sırada ofiste bulunan ikinci mühendis Şenol DEMİR e bildirdiğini, ofiste bulunan Şenol DEMİR tarafından yol kapatma bilgilendirme maili diğer paydaş departmanların bilgisi olması için gönderildiğini, ilgili mail dağıtım listesinde oksit departmanı tüm beyaz yaka çalışanları (ekip lider, mühendis) bulunduğunu, iletim saati 10:50 olduğunu, saha denetimi sonrası yığınliç alan asistan mühendisi Kaan Murat AKPOLAT ile jeofizik bölümüne gitmeleri gerektiğini söylediğini, telefon ile aradığımda kendilerinin ofiste olduğunu söylediklerini, ofiste soru ve yorumlarını paylaştıklarını, kayma hızı ve deplasman hareketleri konuları hakkında bilgi aldığını, ilgili raporda hareketin 12.02.2024 pazartesi günü artış gösterdiği tespit edilmiş olduğunu, hareketin olduğu alanda hızın artması ile ilgili SMS bilgilendirme sistemi bulunmadığı ve ayaca yığınliç doğu tarafında hareketleri takip edemediklerini kendilerine bildirdiklerini, yığınliç alanın doğusunda (8 kişinin göçük altında kaldığı bölge) radar sisteminin olmadığını bildiğini, Yığın liçin doğu tarafında sadece prizmalar bulunduğunu, prizmaların ölçüm yapabildiğini ancak çalışması hakkında yeterli bilgiye sahip olmadığını, kendilerinden şuanki yığınliçdeki mevcut durumu özetleyen bilgilendirme maili talep edildiğini, saat 13:03 itibari ile ilgili mailin Ali Rıza KALENDER tarafından paylaşıldığını, Ali Rıza KALENDER in saat 13:03 mailinde Yığınliç Güneybatısında bahsetmiş olduğu ilgili çatlakların çimento ile doldurulması ve dozer iş makinası ile düzenlenmesi talimatını alanı riskli gördüğü için gerçekleştirmediklerini, yaklaşık Saat 13:10 da Telefon ile Ali Rıza KALENDER'i aradığını, kayma hızı ve deplasman hareketi ile ilgili durum hakkında bilgilendirme istediğini, 200mm/gün olduğunun kendisine iletildiğini, ardından Saat 13:30 sıralarında Ali Rıza KALENDER'i tekrar arayıp bilgi istediğimde 300-400 mm/gün olduğunu ilettiğini, bu değerin çok yüksek olduğu konu hakkında operasyon genel müdürü IAİN GUİLLE, Ali Rıza KALENDER beyle birlikte hızın arttığını bilgilendirdiğini, Kaan Murat AKBOLAT'a asistan mühendis yığınliç BLS 2 (yüksüz liç Solüsyonu) sisteminin durdurulması talimatı verildiğini, Ali Rıza KALENDER ve Berkay MISIR sahaya çıkıp son çatlak kontrollerini gerçekleştirdiklerini, saat 14:00 te katılımı zorunlu olan son dönem yaşananlar bilgilendirme toplantısına katılım sağladığını, Saat 14:28 civarında ofisinde dışardan gelen bir uğultu ve titreşim hissettiğini, deprem olduğunu toplantı esnasında söylediğini ve toplantı sonlandırıldığını, ofis dışına çıktığımızda Yığın liçinin doğu ve batı eksinine doğru kaydığı gözlemlendiğini, yapılan incelemeler sonucunda yığınliçi batı tarafından Çiftay A.Ş ye ait bir kamyonun ve Yığın liçin doğu bölgesi konteynerinde 5 personel ve araç içerisinde 3 personelin bulunduğu tespit edildiğini, acil durum eylem planının görev yetki ve sorumluluğu dahilinde uyguladığını, proses gerekliliklerini tam anlamıyla yerine getirdiğini ve üst amirlerinin bilgilendirilmesini görsel ve sözlü olarak sağladığını, özellikle göçük altında kalan Kenan ÖZ (yığınliçi kıdemli Süpervizörü), Ramazan ÇİMEN (İkinci operasyonlar kıdemli personeli), Adnan KEKLİK (adr kıdemli Süpervizörüne) bölgede çalışmaların durdurulması ve yolun erişime kapatılması talimatını verdiğini ve bu talimat doğrultusunda tehlikeli çalışma alanını terk ettiklerini ancak nedenini bilmediği ve bilgisi haricinde tekrar ilgili alana dönmüş olduklarını, görev ve sorumlulukları gereği bölgeye tekrardan geri dönmemeleri gerektiğini, ilgili alanda denetim yapmak isteyen 3 yabancı personelin erişimi kısıtlı olan alana erişmek istediğini fakat yığınliçi borulama kıdemli süpervizörü Soysal DOĞAN bey tarafından girişlerine izin verilmediğini, Soysal DOĞAN yabancı personeller ile dil iletişim problemi yaşadığından durumu Kaan Murat AKPOLAT'a aktardığını, Kaan Murat AKPOLAT,



SWORN
TRANSLATION

Elif REYHAN ve 3 yabancı personel faz 4b 1-3 alanında gözetim gerçekleştirdikleri esnada saat 14:28' de kazanın meydana geldiğini öğrendiğini, kazadan önce yapılan gözetimin bilgisi dahilinde olmadığını, bilgisi olduğu durumda bu riskli işleme de müsaade etmeyeceğini, faaliyet gösterdiği işletmede sorumluluk alanı, sorumlu olduğu birim ve sorumlu olduğu personeller ile ilgili olarak Oksit Operasyonları Başmühendisi olduğunu, sorumluluk alanının kırma eleme tesisi, adr tesisi, SART tesisi, Proses ve Fırtına havuzları, yığınliçi depolama ve borulama operasyonları, kimyasal hazırlama operasyonları olup sorumlu olduğu kişilerin Proses mühendisi Şenol DEMİR (kırma eleme operasyonları), Kaan Murat AKPOLAT yığınliçi depolama ve borulama operasyonu asistan mühendisi, Elif REYHAN ADR SART kimyasal hazırlama asistan mühendisi olduklarını, patlatma saat 12:15 sıralarında yapılmış olup patlatmayı maden departmanı yaptığını, Maden departmanında İzzet TEKİN, Fuat YILMAZ, Muhammet KILIÇ bulunduğunu, meydana gelen iş kazasından sonra maden sahasının neden boşaltılmadığı ile ilgili olarak görev ve yetkileri arasında üzerine düşen sorumlulukları gerçekleştirdiğini, Maden sahasının boşaltılmasının İSG departmanı görevi olduğunu, maden sahasını boşalmak gibi yetkisi bulunmadığını, olay ile ilgili yolun kapatılması üzerine sahada faaliyet gösteren çalışanların yolun kapalı olmasına rağmen olay yerine nasıl geldikleri ile ilgili olarak olay mahali için yol kapatma maili atılmış ve fiziksel bariyerlerle yol erişime kapatılmasına rağmen enkaz altında kalan 3 kıdemli süpervizörün bilgisi dışında alana girdiklerini, kapalı bulundurduğu alana girildiğini olay sebebi ile öğrendiğini ifade etmiştir.

### Abdulkadir CANSIZ

14.02.2024 (saat 11:30) tarihli tutanaktaki ifadesinde özetle; Anagold A.Ş.'de dört yıldır bakım bölümü olarak adlandırılan alanda müdür olarak görev yaptığını, olay günü 13.02.2024 günü saat 08.00 sıralarında iş yerine geldiğini, 08.30 ile 09.00 arasında bakım müdürü baş mühendisleri ile günlük bölüm toplantısı yaptıkları sırada yığın liçi olarak adlandırılan toprak kaymasının olduğu bölgede sorumlu işletme başmühendisi Murat BAYRAKDAR isimli şahıs toplantılarını bölerek, yığın liçinin bir kenarında çatlak tespit ettiklerini bildirmek istediğini söylediğini, kendisinden fotoğraf var ise göndermesini istediğini, ancak sadece bilgi amaçlı söylediğini belirttiğini ve fotoğraf göndereceğini söylediğini, saat 10.00 sıralarında günlük üretim toplantısı sırasında konuyu ilgililere belirtmesini söylediğini, Murat BAYRAKDAR'ın fotoğrafları gönderdiğini ve saat: 10.00 toplantısında konuyu gündeme getirdiğini, toplantıya katılan IAIN RONALD GUILLE isimli şahıs Murat BAYRAKDAR'a toplantıdan sonra gidip meydana gelen çatlağa bakalım dediğini, tam olarak hatırlamadığı bir saat diliminde Murat BAYRAKDAR'ın arayarak jeoteknik inceleme yapılacağını söylediğini, kendisine acil önlem olarak bir şey yapılıp yapılmadığını sorduğunda bölgenin boşaltılıp, girişlerin kapatıldığını ve bölgeye solüsyon verilmesinin durdurulduğunu söylediğini, saat: 14.00 ile 15.00 arasında çevrimiçi olarak Ankara'daki İnsan Kaynakları Direktörü ile bütün müdür ve başmühendislerin katıldığı ve bu konu ile ilgisiz bir toplantı yapıldığı sırada saat: 14.20 sıralarında toplantıya katılanların bir deprem olduğunu söylediklerini, sarsıntıyı hissettiğini, toplantıyı sonlandırıp acil durum toplanma sahasına gittiklerini, orada bulunan başmühendis Mustafa Bakır yığın liçini göstererek devrildiğini söylediğini, İSG (İş Sağlığı ve Güvenliği)başmühendisi Burak Artal'ın yığın liçinde kayma olduğunu söylediğini, BURAK ARTAL ve IAIN RONALD GUILLE ile acil durum kriz masası toplanması gerektiğini konuştuklarını, bu sırada acil durum müdahale takımının olay yerine gittiği ve göreve başladığı bilgisini aldıklarını, göçük altında kalan kişi ve kişilerin olup olmadığını tespite başladıklarını, ilgili devlet kurumlarına haber verildiğini, şirket üst yönetime haber

13



TRANSLATION

verildiğini, 9 kişinin kayıp olduğu tespit edildiğini, saat: 16.30 gibi il bazında idari makamların sahaya intikal ettiğini ve kriz yönetimini devraldıklarını, bundan sonraki süreçte onların verdiği talimatlar ile hareket etmeye çalıştıklarını ve devam ettiklerini, yığın liçi bölgesinin bakım müdürü olarak kendi sorumluluk alanında olmadığını, Operasyonlar Direktörü Kenan ÖZDEMİR isimli şahıs geçici bir süre ile saha dışında olduğu için bu süreçte günlük toplantılar gibi normalde kendisinin yönettiği bazı işler ile ilgilenmesini istediğini ve bu süreçte IAIN RONALD GUILLE isimli şahsın sürekli sahada olacağını ve sahayı yöneteceğini belirttiğini, gerek olayın meydana geldiği Yığın Liçi bölgesinin bakım müdürü olarak sorumluluk alanında olmaması, gerek bu işlerde IAIN RONALD GUILLE isimli şahsın ilgilenmesi, gerekse Kenan ÖZDEMİR isimli şahsın yerine sadece gündelik işler ile ilgilenmeye başlamasının 5 Şubat 2024 tarihinden itibaren olması çerçevesinde yaşanan olayda herhangi bir karar verici veya sorumlu bir rolünün bulunmadığını, sorumluluk alanı ile ilgili olarak elektromekanik sistemlerinin bakımından sorumlu olup IAIN RONALD GUILLE'ye karşı sorumlu olduğunu, olay günü patlatma olup olmadığını bilmediğini, toprak kayması altında kalan şahıslar Oksit Operasyon bölümüne bağlı olarak çalıştıklarını, aralarından bir şahsın maden operasyonu taşeronu Çiftay A.Ş Firması çalışanı olup Uğur YILDIZ olduğunu, kaza öncesi radardan sinyal alınıp alınmadığı hususunda bilgisi olmadığını, Yığın Liçi alanında toprak kayması olayı öncesinde meydana gelen çatlak bilgisi alındıktan sonra neden maden sahası boşaltılmadığı hususunda kendisinden daha üst bir pozisyonda bulunan ve konuya daha hakim olan IAIN RONALD GUILLE'nin ilgilendiğini, Murat BAYRAKDAR'ın konuyu kendisine sadece bilgi için ilettiğini ve genel yöneticilik kuralı olarak acil önlemleri sorduğunu, kendisi de acil önlemleri sayarken alanı boşaltıp, alana girişleri yasakladıklarını söylediğini beyan etmiştir.

### Soysal DOĞAN

14.02.2024 (saat 13:16) tarihli tutanaktaki ifadesinde; Anagold Madencilik AŞ'de 2008 yılında işe başladığını, 13.02.2024 günü saat 08:00 kırıcı ofislerinde amirleri ile olan toplantıya katıldığını, yapılması istenilen işlerle ilgi görevleri aldığını, yığınliç sahasında bulunan kendi konteynırlarına gittiğini, günlük rutin saha kontrollerini yaptığını, sahada çalışan İshak DEMİR, İsa TAŞDELEN ve yığınliç ekip liderlerinden Kenan ÖZ cep telefonundan arayarak sahada çatlak olduğunu araç ile kendisini alacağını söylediğini, saat 08:20 sıralarında, Kenan ÖZ ile beraber olayın meydana gelen sahaya çıktıklarını, mühendisler Kaan Murat AKPOLAT, Murat BAYRAKDAR, İSG Mühendisi Gizem GAZCI, Çevre Müh. Can Serdar HASTÜRK, Jeoloji Müh. Ali RIZA KALENDER birlikte olaya konu sahaya saat 09:00 sıralarında geldiklerini, incelemeleri sonrası sahada bulunan YESTİ firması ve Mürekkepçiler firmasının sahadan çıkarıldığını, çalışmaların durdurulduğunu, gelen amirler tarafından incelemeler ve tespitler yapıldıktan sonra sahadan ayrıldıklarını, bulunduğu konteyner önündeki yolda yol kapa maili iletildiğini ve amiri Kaan Murat AKPOLAT tarafından bildirildiğini, bulunduğu konteynırın yaklaşık 10 metre ilerisindeki yolu, plastik dubalar ile kapattıklarını, 14:00 sıralarında tanımadığı 3 kişi yönetici sınıfından olduğu anlaşılan sahaya geldiğini ve sahaya giremeyecekleri konusunda bilgilendirme yapıldığını, gelen 3 şahıs yabancı dilde konuştuklarından amiri ile telefonla irtibat sağladığını ve amiri Kaan Murat AKPOLAT'ın bu yabancı şahıslara İngilizce giremeyeceklerini söylediğini ve kendisine de "ben de geliyorum yetiştim" dediğini, amiri Kaan Murat AKPOLAT'ın 14:10 sıralarında yanında Elif REYHAN, Adnan KEKLİK, Kenan ÖZ ve Ramazan ÇİMEN ile geldiğini ve sahada inceleme yapacaklarını söylediklerini, orada bulunan 3 yabancı şahıs ve ekibinde bulunan İshak DEMİR,



14

SWORN
TRANSLATION

İsa TAŞDELDİREN ve amirleri ile gelen şahıslarla birlikte 11 kişi olaya konu saha incelemesine gittiklerini, konteynırları ile inceleme yaptıkları saha arasındaki mesafe yaklaşık 1100 metre olup lift 25 alanında araçlarını park ederek o alanın kontrolünü yaptıklarını, Kaan Murat AKPOLAT ve Elif REYHAN bilgilendirme amacıyla yabancı olan 3 kişi ile yabancı dilde konuşma yaptıklarını, sahayı kontrol etme amaçlı İshak DEMİR, İsa TAŞDELDİREN ile bildikte diğerlerinin yanından ayrıldıklarını, İshak DEMİR, İsa TAŞDELDİREN isimli arkadaşlarını lift 29 noktasına kontrol için görevlendirdiğini, kendisinin de yalnız olarak lift 33 bölgesine gittiğini, aralarındaki mesafe yaklaşık 30 metre olduğunu, çatlakları kontrol ederken alanın hareketlenmeye başladığını fark ettiğini ve alandan koşarak uzaklaştığını, alanın komple kaymaya başladığını, kendisinin güvenli bir alana gittiğini, kendi konteynırlarına baktığında hiçbir şey göremediğini, ve derhal güvenlik birimini aradığını, kendisi de acil kurtarma ekibinde olduğu için acil kurtarma ekibi müh. Muzaffer BEĞEN'i aradığını, olduğu noktada Kaan Murat AKPOLAT ve Elif REYHAN'ı aradığını, Kaan Murat AKPOLAT ve Elif REYHAN'ın kuşaklama kanalına gelmesini istediklerini, aşağıda konteynırda kalan Fahrettin KEKLİK, Hüseyin KARA, Şaban YILMAZ, Mehmet KAZAR, Abdurrahman ŞAHİN isimli şahısları aradığını ancak ulaşamadığını, bulunduğu noktadan yukarıya çıktığını ve orada da Adnan KEKLİK, Kenan ÖZ'ü aradığını ve ulaşamadığını, saat 15:00 sıralarında amiri ile beraber araca binerek sahadan uzaklaştıklarını, olay günü öncesinde herhangi bir tehlike sezilmediğini, ancak yüzeysel ufak çatlaklar olduğunu, olay günü sabahında yaklaşık 4 cm genişliğinde çatlaklar fark ettiklerini ancak ağır iş makineleri geçtiğinden normal bir durum olacağını düşündüklerini, konunun uzmanlık alanına girmediğinden bilgisi dahilinde olmadığını, mühendislerin bildiğini, sorumluluk alanının proses borulama ekip liderliği olup sorumlu olduğu birimin proses olduğunu, borulama ekibi 8 kişi ve 5 taşeron personel olmak üzere toplam 13 kişi olduğunu, Proses Borulama Ekibi: Sıddık KEKLİK, İshak DEMİR, Gökhan GÜN, Recep KURT, Kenan ÇELENK, Murat GÜRBÜZ, Nihat ŞUVAK, Sıddık GÜN, Taşeron Personel: İsa TAŞDİLDİREN, Hüseyin KARA, Osman KARA, Abdurahman ŞAHİN, Ferdi DEMİR olduklarını, yığın liç alanında saat 12:15'de 1 km mesafede patlatma yapıldığını, yolun kapatılması üzerine sahada faaliyet gösteren çalışanların olay yerine nasıl geldikleri ile ilgili olarak olay mahallinde yolun kapalı olduğunu ancak Kaan Murat AKPOLAT emri ile dubaların kaldırılarak olay yerine kontrollü geçiş yapıldığını, belirttiği kişilerin giriş yapmasından sonra dubalar ile tekrar kapatıldığını, duba yerleştirerek kapattığı yolun toprak altında kaldığını ve enkazın da yoldan 1 km daha ileriye gittiğini beyan etmiş vekili müvekkilin çatlağı öğrendiği anda acil eylem planını uyguladığını beyan etmiştir.

### Ali Rıza KALENDER

14.02.2024 (saat 14:00) tarihli tutanaktaki ifadesinde; Anagold A.Ş.'de on yıldır jeoteknik mühendisi olarak çalıştığını, görevinin maden sahası içerisinde bulunan olayın meydana geldiği yer olan yığma liç sahasını radar sistemi ile gözetlemek olduğunu, bölgede meydana gelen zemin deformasyonlarını tespit etmek ve operasyon birimlerine bilgi vererek tedbir almak olduğunu, birimde personeli Mühendis Berkay Mısır, saha asistanı Cem Beker ve Fatih Özer olduklarını, 13.02.2024 günü saat 09.30 gibi yine aynı birimde çalışan Berkay Mısır kendisini arayarak yığma liç bölgesinde hareket artışı olduğunu söylediğini, İliç Merkezde bulunan Lojmanda ikamet etmekte olup izinden yeni döndüğünü ve hemen madene geçtiğini, 13.02.2024 günü saat 10.30 geç giriş yapmasının sebebinin izinden dönüş gününe denk gelmesi olduğunu, radar sisteminde hareket artışı olduğunu tespit ettiklerini, bölgenin barikatlı olup erişimin olmadığını gördüğünü, 1.00'de

15



SWORN
TRANSLATION

yığma liç bölgesine Berkay Mısır, Murat Bayrakdar, Soysal Doğan, Şenol Demir, Kaan Murat Akpolat ile birlikte geçiş yaptıklarını, bölgedeki çatlak ve yarıklarda incelemelerde bulunduklarını, bölgede bulunan membran ekibi dahil ve tüm personelin çalışmaların durdurulmasını talep ettiklerini, kimsenin bölgeye girmemesi hususunda Murat Bayrakdar, Şenol Demir ve Kaan Murat Akpolat'ı uyardıklarını, Anagold Maden ofisleri bölgesine geçtiklerinde radar sisteminde hareket artışı tespit ettiklerini, konu ile ilgili şirketin yabancı temsilcisi Iain Ronald Guile'e 12:00 sularında mail attığını, mailde hareket hızı artışından oradaki operasyonlarının durdurulmasını İngilizce olarak yazdığını, ayrıca tansiyon çatlaklarının çimento ile kapatılmasını söylediğini, Murat Bayrakdar'ın bulunmuş olduğu ofis bölgesine geçiş yaptığını, Murat Beye siyanürün kesilmesini söylediğini, Murat Bey ile Iain'a durumu söylemek üzere ofisine geçtiklerini, durumu onayladığını yığın bölgesinden siyanürü kestiklerini, 13.30 gibi tekrar Yığın Liç bölgesine kontrol amaçlı gittiklerini, gözle görülür açıklıklar gördüklerini, barikat bölgesine hemen geçtiklerini, barikatlı bölgeden geçmek isteyenler olduğunu, durumu kendilerine anlattığını, daha sonrasında ofis bölgesine geçtiklerini ve 14,28'de toprak kayması haberini aldıklarını, ivedi bir şekilde bölgeye intikal ettiklerini, bölgenin gerisinde daha önceden kurulmuş olan barikatların geresinde kaldıklarını, orada güvenlik müdürü Hakan Şahin'in de olduğunu, bölgenin heyelan dolu malzeme ile kaplı olduğunu gördüklerini, Liç yığın bölgesinden Soysal Doğan, Kenan Öz, Kaan Murat Akpolat, Elif Reyhan, Şenol Demir, Murat Bayraktar, Hüseyin Üstündağ, Kenan Özdemir, Iain Ronald Guile, Ülke Müdürü Cengiz Demirci'nin sorumlu olduklarını, meydana gelen göçük altında 9 kişinin kalması hususunda kimin kabahati olduğu, engellenip engellenemeyeceği, sahadan personellerin çekilmesi hususu uygulandıysa nasıl 9 kişinin göçük altında kaldığı ile ilgili bilgisi olmadığını, yığın liç alanına yığma işleminin 2010 yılından itibaren yapıldığını, bu bölgede membran çalışmasının bildiği kadarıyla Yesti firması tarafından yapıldığını, burasının yapılmış olduğu durumda yığın liç malzemesinin güney duvarına doğru yaslanacağını ve ön tarafa bir eğim olmayacağını, olsa bile bu kadar büyük çaplı olmayacağı kanaatinde olduğunu, yığın liç alanının raporunun yabancı GRE (Proje dizayn firması) tarafından yapıldığını, Çevre Şehircilik Bakanlığı tarafından gerekli kontroller yapılarak onay verildiğini, bu kapsamda Anagold Madencilik A.Ş tarafından yığma yapıldığını, bölgenin Anagold personeli haricine kapalı olduğunu, personellerden de burada sorumluluğu olan kişilerin girdiğini ve kısacası bölgede yığma yapılması için gerekli izinler bulunduğunu, Anagold A.Ş.'de Maden Jeoloji Departmanına bağlı Jeoteknik Birim olduklarını ve en sorumlu kişi olduğunu, üzerinde İzzet Tekin Bey olup Berkay Mısır, Cem Peker, Fatih Özer'in de aynı birimde görev yaptıklarını, olay günü patlatma yapılıp yapılmadığını bilmediğini, her gün 12:00-12:30 arası patlatma yapıldığını ve patlatmanın 250 m çapında alanı etkilediğinden yığın liç bölgesinin patlatmadan etkilendiğini düşünmediğini, göçük altında kalanların çalıştığı birime bağlı olmadıklarını ve çalışma talimatı da vermediğini, konu ile ilgili Murat Bayraktar, Iain Ronald Guille ve Hüseyin Üstündağ'a bilgi verildiğini, gerekli raporlama ve olay günü saat 11:00'de sözlü uyarı yapıldığını, 12:00 sularında e-posta ile bilgilendirme yapıldığını, radar cihazının üç gün önce uyarı verdiğinin doğru olduğunu, ancak bahse konu gün ve tarihlerde izinde olduğunu, ayrıca uyarı kritik seviye altında kalması durumunda bölgenin kontrol edildiğini, risk seviyesine ulaştığında bölgede sorumlu amire bilgi verilip bölge tahliye edildiğini, 11.02.2024 — 13.02.2024 tarihleri arasında radar cihazını kontrol ettiğini, 20 mm ile 40mm arası günlük hareket tespit ettiklerini, bunun da bağlı oldukları Anagold Çalışma Prensibinde geçen Tetikleyici Eylem Planında normal uyarı seviyesi olduğunu, olayın olduğu bölge yığın liç bölgesinin doğu bölgesinde meydana geldiğini, doğu bölgesini radar sistemi net

16



SWORN
TRANSLATION

olarak görmediğini, bu durum ile ilgili doğu bölgesine robotik total station cihazı alınması ile ilgili bütçe talebinde bulunduklarını, bu cihaz olmuş olduğu durumda bölgenin daha detaylı incelenebileceğini, muhtemelen de daha önceden haberleri olabileceğini, geçen sene Kasım veya Aralık aylarında uluslararası danışmanlık hizmetinde bulunan NEİL BAR isimli danışmanın jeoteknik çalışmaları denetlediğini ve eksikler ile ilgili rapor sunduğunu, Raporda 2024 yılı için 2 radar ve 2 robotik station cihazı önerdiğini beyan etmiştir.

### Şenol DEMİR

15.02.2024 (saat 18:20) tarihli tutanaktaki ifadesinde özetle; Anagold Madencilik A.Ş'de 4 yıldır Oksit Kıncı Mühendisi olarak çalıştığını, 13.02.2024 günü saat 07.30'da mesaiye başladığını, 7.50'de kırıcı ekibi(Süpervizörler) ile toplantı yaptıklarını ve devamında ana ofisler bölgesine geçtiklerini, 8.15'de yığın liç grubundan yarık/çatlaklara ait fotoğrafların gelmeye başladığını, Kaan Murat Akpolat ile beraber yığma liç bölgesine 8.30 sıralarında çıktıklarını, burada online toplantıya katıldıklarını, toplantıda Elif Reyhan'ın iş güvenliği hakkında sıkıntı var mı diyerek sorduğunu, yığın liç kıdemli süpervizörü Kenan Öz'ün yığın liç bölgesinde çatlaklar var diyerek bakılmasını söylediğini ve toplantı sonlandırıldığını, Murat Bayrakdar'ın yığın liç bölgesine geldiğini, Jeofizik departmanına ve ISG sorumlu personeline çatlaklar ile ilgili bilgi verilerek sahaya gelmeleri istendiğini, toplu bir şekilde çatlakların incelendiğini, bu sırada yığın liç alanından ayrılarak kırıcı ofisler bölgesine geçtiğini, ofis bölgesinde Anagold güvenlik müdürü Hakan Şahin, finans departmanından Serkan Köse ve Mehmet Sarıtaş beraber Anagold'un ay başından planladığı denetleme üzere yığın liç bölgesine gittiklerini, denetlemenin yarısında Kaan Murat Akpolat ve ekibi ile karşılaştıklarını, Kaan Murat'ın sahayı boşaltıyoruz dediğini, kendisinden de ayrıca bilgilendirme maili atmasını istediğini, İdari ofisler bölgesine giderek maili hazırladım ve "İkinci bir bildirime kadar yığın liç bölgesine girişler kapatılmıştır." diyerek maili hatırladığı kadarıyla iş güvenliği grubuna, bakım gurubuna, sülfit operasyon, oksit operasyon, İliç White gruplarına 10.50'de gönderdiğini, rutin işlerime geri döndüğünü, 14.28 'de ofiste deprem olduğunu düşünerek dışarı çıktığını ve yığın liçinde kaymış yıkılmış olduğunu gördüğünü, hemen olayın olduğu yığın liç kırıcı bölgesine gittiğini, amacının personellere veya yardıma muhtaç olanlar varsa yardım etmek olduğunu, yığın liç bölgesine giden yolda yolun çatallaşan kısmında güvenlikler tarafından durdurulduğunu, burada personelleri tek tek aradığını, 8 kişiye ulaşamadığını, bu listeyi de tahmini 15.00'de güvenlik amiri Hakan Şahin'e verdiğini, Saat 10:50'de mail attığını konuyu önceden bilmediğini, sabah whatsapp grubundan gelen mesajdan öğrendiğini, güvenlik tedbiri alma görevinin bulunmadığını, ancak yine de bildirilmesi istenen girişlerin kapatılması hususunu mail ile bildirdiğini, kayan liç bölgesinde sorumlu personellerin süpervizör(borulama) Soysal Doğan, Konveyör Kenan Öz(Göçük altında olan kişidir), Mühendis Kaan Murat Akpolat, Baş Mühendis Murat Bayraktar, Hüseyin Üstündağ, Direktör Kenan Özdemir, Vicepresident Iain Ronald Guille, Ülke Müdürü Cengiz Demirci olduklarını, jeofizik bölümünde düzenlenen radar sistemi raporunun kendisine gönderilmediğini, kime gönderildiğini bilmediğini, baş mühendis ve müdüre gittiğini düşündüğünü, burada sorumluların Ali Rıza Kalender, Berkay Mısır ve ekibi olduklarını, olayı görenlerin Kaan Murat Akpolat, Elif Reyhan, 3 yabancı uyruklu personel, Soysal Doğan, İshak Demir olduklarını, 9 kişinin göçük altında kalması ile ilgili olarak kimin kabahati olduğu, engellenip engellenemeyeceği, sahadan personellerin çekilmesi hususu uygulandıysa nasıl 9 kişinin göçük altında kaldığı ile ilgili olarak yığın liç dizaynı yapan şirketin kabahati olduğunu düşündüğünü, yığın liç bölgesi genişletilmesi için

17



SWORN
TRANSLATION

yapılan patlatmaların da etkili olabileceğini düşündüğünü, sorumlu olduğu alanın Yığın liçinin yanında arada yol olan kırıcı bölümü olduğunu, sorumlu olduğu kişilerin Süpervizör Mehmet Sarıtaş, Süpervizör Ramazan Çimen ve Süpervizör Şerif Kurt olduklarını, göçük altında kalan Ramazan Çimen'in neden kaldığı, bölgeye gitme talimatını verip vermediği ile ilgili olarak Ramazan Çimen'in altında olan personel olup neden o bölgeye gittiğini bilmediğini, ayrıca 10.50'de atılan maili de kendisine gönderdiğini, gitmesine ilişkin talimat vermediğini, olay günü patlatma yapıldığını, her gün 12:00-12:30 arası yapıldığını olay günü yapılan patlatmanın olay yerine 500 m mesafede olduğunu, radar sisteminin üç gün öncesi uyarısı ile bilgisi olmadığını, maden sahasının neden boşaltılmadığı ile ilgili bilgisi de yetkisi de olmadığını beyan etmiştir.

### Hakan ŞAHİN

14.02.2024 (saat 00:10) tarihli tutanaktaki ifadesinde; Anagold Madencilik A.Ş'de güvenlik müdürü olarak yaklaşık 4-5 yıldır görev yaptığını, 13.02.2024 günü mesaiye saat 07.30'da başladığını, Anagold Yönetimi tarafımdan yaklaşık 2 ay önce başlatılan müdür, baş mühendis ve şeflerden tüm bölümlerin katıldığı normal ISG denetimleri dışında bir denetleme sistemi kurulmuş olduğunu, bu kapsamda 1 hafta önce belirlenmiş olan plan üzerine yanında Finans Departmanından Serkan Köse ve Oksit Kırıcı çalışanlarından Mehmet Sarıtaş ile birlikte konveyör bantlarını planlı İSG (iş sağlığı güvenliği) denetlemesi için bölgeye 09.35 sıralarında gittiğini, daha önceki denetlemelerde görülen eksik hususların giderilip giderilmediği hakkında yığın içindeki konveyör bantlarını kontrol ettiğini, yığın liçinin daha üstüne çıkmak istediği esnada bölgede personel arasında bir hareketlilik gördüğünü, hatırladığı kadarıyla orada Şenol Demir, Kenan Öz bulunduğunu, kendilerine ne olduğunu sorduğunda "Yukarıda yarık oluştu. Yukarı çıkma." diyerek cep telefonlarından yarığın fotoğraflarını gösterdiklerini, kendisinin de personele hitaben "Durum ciddi bir şeye benziyor, bunu raporladınız mı diyerek" sorduğunu, raporladıklarını ve bölgeyi trafiğe kapatacaklarını söylediklerini, devamında ana bina olan ofis bölgesine geçtiğini, geçtiği esnada trafiği de kapattıklarını gördüğünü, bu sırada saat 10.35 civarında olduğunu, durumu bildirir yani trafiğe kapalı bölgeyi personele bildirme amaçlı Şenol Demir tarafından tüm Anagold personeline 10.50'de e-posta gönderildiğini, aracından indiğinde otoparkta güvenlik müdürü olarak bağlı olduğu operasyonlardan sorumlu başkan yardımcısı IAİN GUILLE isimli şahıs ve Çevre Müdürü Can Serdar Hastürk ayrıca ismini hatırlamadığı birkaç kişi daha olduğunu, arabaya binip bir yere gitmek üzere olduklarını görünce yanlarına giderek Iain'e yığın liçine mi gidiyorsun diyerek sorduğunu, " Evet" dediğini, biraz önce oradan geldiğini ve ciddi bir şeyler olduğunu gözlemlediğini söylediğini, aracın hareket ettiğini ve otoparktan çıktığını, daha sonrasında Oksit Proses departmanı baş mühendisi olan Murat Bayraktar 'ı da otoparkta aracı ile gördüğünü, uzaktan seslenerek nereye gittiğini sorduğunu ve yığın liçine gidiyorum dediğini, seni bilgilendirdiler mi diyerek sorduğunu ve "Evet bilgim var." dediğini, güvenlik müdürü olarak kimseye bilgi verip vermediği, emniyet tedbiri alıp almadığı ile ilgili olarak bölgenin trafiğe kapalı olduğunu gördüğü ve bölge sorumlusu oksit proses departmanı personelinin (Şenol Demir) konu ile ilgilendiğini gördüğü ve devamında Oksit Proses departmanı baş mühendisi olan Murat Bayraktara'da bilgi verildiğini teyit edince kendi işine döndüğünü, ayrıca durumu bir üst merci olan amiri IAİN GUILLE bildirdiğini, bahse konu olan olayın sorumluluk ve görev alanı dışında olan bir olay olduğunu, teknik bilgisi dışında olan olay olduğunu, bölgedeki toprak ayrılması hakkında bilgisi olup olmadığı veya konu hakkında bilgisi olan olup olmadığı, tedbir alınıp alınmadığı ile ilgili olarak bilgisi olmadığını, sorumluluk alanı dışında olduğunu, görevi de

18



SWORN
TRANSLATION

olmadığını, Anagold yönetimi tarafından 2 ay önce çıkartılan denetleme sistemi nedeniyle olay günü tesadüfen bölgeye gitmiş olduğunu, konu hakkında daha önceden bilgi sahibi olmadığını, böyle bir şey olsa bile kendisine durumu bildirmeyeceklerini, bahse konu toprak kayması olan yığın liç bölgesine gittiğinde saat 09.35 sıralarında olup buradaki personelde hareketlilik ve panik olduğunu, muhtemel durumu önceden öğrenmiş olup bilgileri olduğunu, kendisine de fotoğrafı gösterdiklerini ve burada öğrendiğini, fotoğrafları yanında bulunan Mehmet Sarıtaş'a gönderdiklerini, bu fotoğrafları kendisinden aldığını, şifahen müdürlere ve amirine bilgi verildiği ne herkeste bu fotoğraflar bulunduğu için fotoğrafları kimseye iletmediğini, tedbir hususunda her hangi bir güvenlik personeli gönderilmesi talebi olmadığını, zaten yolu trafiğe oksit proses departmanı aracılığı ile kapatmış olduklarını, Anagold Maden sahası içerisinde bulunan yığın liç bölgesinden yani toprağın kaydığı iş kazasının olduğu yerden sorumlu personeller kimler olduğu ile ilgili olarak bildiği kadarıyla Süpervizör Şenol Demir, Mühendis Kaan Murat Akpolat, Mühendis Elif Reyhan, Baş Mühendis Murat Bayraktar, Müdür Hüseyin Üstündağ, Direktör Kenan Özdemir, Ülke Müdürü Cengiz Demirci olduklarını, olay olduktan sonra saat 14.40 gibi olay yerine yakın bir noktaya intikal ettiğini, bölgede kimlerin bulunduğu tespit çalışmalarına başladığını, Mühendis Kaan Murat Akpolat ile Soysal Doğan'ın olaya şahit olduklarını ancak her hangi bir yaralanmalarının olmadığı bilgisini aldığını, kendilerini madenin üst tarafında bulunan kuşaklama kanalının oradan aldıracağını söylediğini, araç göndererek aldırdığını beyan etmiştir.

### Patrik VALKO

18.02.2024 (saat 00:50) tarihli tutanaktaki ifadesinde; Anagold Madencilik A.Ş'nin alt taşeron yüklenici firması olan WSP Proje Kalite Güvence Müdürü olarak yaklaşık 7.5 yıldır görev yaptığını, olay günü 13.02.2024 günü mesaiye saat 08.00'da başladığını, ofisine ilk geldiğinde maillerine baktığını, daha sonra Saat 10 civarlarında İshak ASLAN'ın yanına gelerek elinde telefonda çekmiş olduğu fotoğrafları gösterip çatlakların büyük olduğunu söyleyerek alanın en kısa sürede boşaltılması gerektiğini söylediğini, kendi ekibine bu durumu anlatarak derhal alanı boşaltmalarını söylediğini, daha sonra kendi iş alanı olan atık depolama tesisi ile ilgili işlere geri döndüğünü, çünkü yığın liçi genişleme inşaatının asıl işleri yanında Anagolda hizmet verdikleri küçük bir iş olduğunu, Saat 12'de öğle yemeğine gittikten sonra 12.45'te ofise geri döndüğünü, Saat 14.00 sıralarında Ailen ve Jonathan yanıma gelerek maden sahasındaki yığın içinde bulunan çatlaklıkları kontrol etmek istediklerini kendilerine katılıp katılmayacağını sorduklarını, Ailen ve Jonathan maden sahası içerisinde araç kullanabilecek yetkiye sahip olmadıkları için Ailen ve Jonathan ile beraber yığın liçinin bulunduğu yere gittiklerini, toprak kayması olmadan önce yani saat 14.20'de Sabırlı Deresi tarafındaki yoldan geçtiklerini, konteynerlerin olduğu yerde bariyerler olduğu için durduklarını, durdukları bölgede İngilizce bilen kimse olmadığı için 1-2 dakika bekledikten sonra Kaan Murat AKPOLAT bulundukları yere gelip konvoy şeklinde oradan uzaklaşmaya başladıklarını, bir süre gittikten sonra tek araç içerisinde kendisi, Ailen, Jonathan, Kaan Murat ve sonradan araca dahil olan Elif REYHAN ile çatlaklıkların oluştuğu yığının içini görmek için uygun bir tepeye gittiklerini, tepeye çıktıklarında araçtan inip baktıklarında fotoğraflarda gördükleri çatlakların daha fazla genişlemiş olduğunu gördüklerini, sonrasında yığın liçinin üzerinde bulunan toprak taşıyıcı bantlardan sesler gelmeye başladığını, hemen akabinde o büyük felaketin olduğu toprak kayması yaşandığını, yaklaşık bir dakika kadar sürdüğünü, Yığın Liç bölgesine geldiklerinde yolun bariyerlerle kapalı olduğunu söylediğini bu konuda herhangi bir bilgi verilip verilmediği veya mail atılıp atılmadığı ile ilgili olarak bu konuda herhangi bilgi veya

19



SWORN
TRANSLATION

mail gelmediğini,  bağlı bulunduğu firmanın ana merkezi Türkiye'de Ankara'da bulunduğunu, Anagold da kendi iş alanda bağlı olduğu yönetici Kapital ve Sürdürülebilir Projeler Müdürü Shaun Swartz isimli kişi olduğunu,

18.02.2024 (saat 13:00) tarihli tutanaktaki ilave ifadesinde; WSP şirketinde görevli olup WSP şirketinin  İliç Çöpler Madeninde Anagold tarafından inşa edilen atık depolama tesisi genişletilmesi, Yığın Liç genişletilmesi, Yakuplu yolu inşaatı yapım işlerinde kalite güvence kontrollerini yapmakla görevli olduğunu, kalite güvencesi yapılacak yapımın dizayn işi Anagold sorumluluğunda olup WSP'nin  sadece dizayna göre inşaat işlerinin yapıldığını kontrol ettiğini, yığın liç dışında yeni bir yer belirlenip belirlenmediği, mevcut yere fazla yükleme yapılıp yapılmadığı ile ilgili olarak bu durum hakkında bilgisi olmadığını, ilk defa duyduğunu, Yığın Liç sahasına kendisini kimin aldığı, girmeye yetkisi olup olmadığı, bölgeyi daha önce kontrol edip etmediği, en son ne zaman kontrol ettiği, sorumlu olduğu işin yığın liç sahasının genişlemesinde serilen membranların Anagold tarafından onaylanan dizayna uygun olarak yerleştirip yerleştirilmediğinin kalitesinin kontrolü yapmak olduğunu, bu neden ile yığın liç genişleme bölgesine erişimde kısıtlaması olmadığını, en son olaydan bir gün önce 12.02.2024 günü ancak saatini tam hatırlamadığını, öğleden sonra Yığın liç genişleme bölgesine girmiş olduğunu, yığın liç bölgesinde herhangi bir çatlak yarılma görmediğini, yığın liçde  yarılma çatlama veya tehlike olacağına dair daha önceden bilgi verilmediğini, sadece olayın olduğu gün İshak ASLAN'ın fotoğraf gösterdiğini, dosyada isimleri geçen olay günü kaybolan 9 şahsı tanımadığını, astlık üstlük sorumluluğu olmadığını, kimin  talimat verdiği hakkında bilgisi olmadığını, durum ile ilgili Anagold Madencilik A.Ş'de Proses Proje Kalite Güvence Müdürü olarak kimseye bilgi verip vermediği, emniyet tedbiri alıp almadığı ile ilgili olarak olayın olduğu gün sabahtan İshak tarafından bu çatlakları içeren fotoğrafları gördüğünde Anagold sahasında direk talimat verme yetkisi olmadığından Anagold personeli olan İshak Aslan'a sahanın boşaltılması için ve bölgede bulunan Nural, Yesti, Mürekkepçi isimli yüklenici şirketlere Anagold personelinin sahadan ayrılması için bilgilendirme yapması konusunda tavsiyede bulunduğunu, sorumluluğunda bölgenin boşaltılması veya madenin iş akışını durdurma gibi görev ve yetkisi olmadığını, Anagold Maden sahası içerisinde bulunan yığın liç bölgesinden yani toprağın kaydığı iş kazasının olduğu yerden sorumlu personelleri bilmediğini,  Jeofizik bölümünde bulunan radar sistemi hakkında kontrol yapıp yapmadığı, rapor gönderilip gönderilmediği, sorumlu personeller ile ilgili bilgisi olmadığını, sorumlulukları bulunmadığını, olayı gördüğünü, bulunduğu yer çok yüksek olup yanında Murat Akpolat, Elif, Jonathan James, Ailen Robert'da olduğunu, yaşanan olay ile ilgili meydana gelen göçük altında 9 kişinin kalması hususunda kimin kabahati olduğu, engellenip engellenemeyeceği, sahadan personellerin çekilmesi düzgün uygulanıp uygulanmadığı ile ilgili olarak bilgisi olmadığını, görev ve sorumluluğu  olan bir durum olmadığını, yapılan patlatmanın bu duruma etkisi olup olmadığı hakkında bilgisi olmadığını, yığın liç bölgesindeki radar sisteminden haberi olup olmadığı, yeterli olup olmadığı, sistemin yetersiz kaldığı ve ekstradan radar sistemi talep edildiği hususunda bilgisi olup olmadığı,  yeni veya mevcut sisteme ekleme güncelleme yapılıp yapılmadığı, radar sisteminin 3 gün öncesinde uyarı vermesi ile ilgili olarak yığın liç bölgesinde bir Radar sisteminden olduğundan haberi olup uzmanlık alanı dışı olduğu için radar sistemi hakkında bilgisi ve yorumu bulunmadığını, kayma liç alanında mebran kontrollerini yapıp yapmadığı, ya da kimin yaptığı ile ilgili olarak 2020 yılı itibari ile yığın liç genişletme kalite güvence görevi yaptığını, bu tarih itibari operasyonla alakalı hiçbir bilgisi olmadığını, 2020 sonrası

20



SWORN
TRANSLATION

serilen mebranlar hakkında bilgisi olup kontrollerini Anagold bünyesinde yaptıklarını, 2020 öncesi serilen mebranlar hakkında bilgisi olmadığını beyan etmiştir.

## Jonathan James HOLDEN

18.02.2024 (saat 02:00) tarihli tutanaktaki ifadesinde; SSR Mining firmasında yaklaşık 2 yıldır görev yaptığını, SSR Mining bünyesinde büyüme ve inovasyon departmanında çalışmalar kapsamında maden sahasına ziyaretler yapıp teknik inceleme ve gözlem yaptığını, bu ziyaretleri sadece Anagold'a yapmadığını, SSR Mining bünyesinde bulunan diğer bütün firmaları yılda 2 kez gezdiklerini, Ankara'ya 08.02.2024 tarihinde geldiklerini,  Anagold madenciliğin Ankara'da bulunan ofisinde 3 gün kaldıktan sonra İliç'e 11.02.2024 tarihinde geldiklerini, olay günü 13.02.2024 günü saat 06.45 sıralarında Anagold maden sahasında bulunan ofisler bölgesine geldiğini, işe geldikten sonra bilgisayardan şirket e postasından gelen maillerine baktığını, normalde 13.00'de sahaya çıkma planları  varken ofisteki işler uzadığından saat 14.00 civarı Ailen ile sahaya çıktıklarını, saha içinde araç kullanma için gerekli olan sürücü belgesine sahip olmadıkları için Patrik'ten eşlik etmesini rica ettiklerini, birlikte yığın liç olan bölgeye doğru gittiklerini, alana geldiklerinde yolun barikatlarla kapatılmış olduğunu gördüğünü, fakat yolun kapalı olduğu ile ilgili herhangi bir bilgilendirme yapılmadığını, kapalı alana geldiklerinde beklemeleri gerektiği söylendiğini, isimlerini hatırlamadığı 2 kişi geldiklerini ve tek araca binerek yukarı çıktıklarını, daha iyi görebilmek için yüksek bir tepeye çıktıklarını ve burada büyük çatlaklar gördüklerini, aracı park alanına park ettikten sonra araçtan indiklerini, yukardan yığın liç bölgesine bakmak için o bölgede durduklarını, bu bölgeden yarıkların çok belirgin olduğunu gördüklerini, oradaki durumun çok ciddi olduğunun farkına vardıklarını, çalışanların nereye tahliye edildiğini sorduğu sırada birkaç saniye içinde büyük felaket gerçekleştiğini, en son İliç maden sahasına Eylül 2023 tarihinde geldiğini, geldiği zaman herhangi bir proje uygunsuzluğu görmediğini,  alakalı herhangi bir rapor sunulmadığını, Aralık ayında yığın liç birimi için yeni yer belirleneceğini, fakat yapılamadığı için yükleme var olan yerin üzerine yapıldığından  haliyle fazla yükleme olduğunun belirtildiği ile ilgili olarak sorumluluk alanı yer altı madenleri olduğundan dolayı yığın liç ile ilgili teknik bilgiye sahip olmadığını, hiçbir bilgisi olmadığını, sahaya girme amaçlarının ne olduğu ve bu konuda sorumlu olduğu kimse olup olmadığı ile ilgili olarak amacının sahalarda yapılan inovasyon çalışmalarını incelemek olup bu vesile ile gittiği saha ziyaretlerinde oluşan başka uygulamaları, sorunları gözlemlemek için fırsatları değerlendirmek olduğunu, bu konuda yaptığı gözlemlerle ilgili bir raporlama sorumluluğu olmadığını, Anagold madencilikte sorumlu olduğu kimse bulunmadığını ifade etmiştir.

## Allen Robert MORRIS

18.02.2024 (saat 03:00) tarihli tutanaktaki ifadesinde; SSR Mining firmasında yaklaşık 2.5  yıldır görev yaptığını, SSR Mining bünyesinde büyüme ve inovasyon departmanında çalışmalar kapsamında maden sahasına ziyaretler yapıp teknik inceleme ve gözlem yaptığını, bu ziyaretleri sadece Anagold'a yapmadığını, SSR Mining bünyesinde bulunan diğer bütün firmaları yılda 2 kez gezdiklerini, Ankara'ya 08.02.2024 tarihinde Jonathan ile beraber geldiklerini, Anagold madenciliğin Ankara'da bulunan ofisinde 3 gün kaldıktan sonra İliç'e 11.02.2024 tarihinde geldiklerini, olay günü 13.02.2024 günü saat 06.45 sıralarında Anagold maden sahasında bulunan ofisler bölgesine Jonathan ile geldiğini, işe geldikten sonra bilgisayardan günlük işlerini yaptığını, normalde 13.00'de sahaya çıkma planları  varken ofisteki işler uzadığından saat 14.00 civarı

21



SWORN
TRANSLATION

Jonathan ile sahaya çıktıklarını, saha içinde araç kullanma için gerekli olan sürücü belgesine sahip olmadıkları için Patrik'e eşlik etmesini rica ettiklerini, birlikte yığın liç olan bölgeye doğru gittiklerini, alana geldiklerinde yolun barikatlarla kapatılmış olduğunu gördüğünü, fakat bize yolun kapalı olduğu ile ilgili herhangi bir bilgilendirme yapılmadığını, kapalı alana geldiklerinde beklemeleri gerektiğinin söylendiğini, isimlerini hatırlamadığı 2 genç Mühendis kişi geldiğini ve tek araca binerek yukarı çıktıklarını, daha iyi görebilmek için yarıkları, yüksek bir tepeye çıktıklarını ve burada büyük çatlaklar gördüklerini, aracı park alanına park ettikten sonra araçtan indiklerini, yukardan yığın liç bölgesine bakmak için o bölgede durduklarını, bu bölgeden yarıkların çok belirgin olduğunu gördüklerini, oradaki durumun çok ciddi olduğunun farkına vardıklarını, Jonathan ile çalışanların nereye tahliye edildiğini sordukları sırada çok geçmeden saniyeler içinde toprak kayması hızlı bir şekilde gerçekleştiğini, son İliç maden sahasına Ekim 2023 tarihinde geldiğini, geldiği zaman maden sahası içerisinde bulunan yığın liç bölgesine görev alanı olmadığı için hiç gitmediğini, alakalı hiçbir bilgi verilmediğini, aralık ayında yığın liç birimi yeni yer belirleyeceğini fakat yapılamadığı için yükleme var olan yerin üzerine yapıldığından haliyle fazla yükleme olduğunun belirtildiği ile ilgili olarak konu hakkında bilgi duymadığını, kaldı ki yığın liçin sorumluluk alanını dışında olduğunu, Anagold madencilikte sorumlu olduğu kimse olmadığını, Sülfit tesisindeki büyüme ve inovasyon projelerini gözlemlemek için geldiğini, çatlakları daha önce görmediğini, sadece aldığı duyumlardan dolayı merakından çıktığını, yığın liç alanının sorumluluk alanı dışında olduğunu ifade etmiştir.

**Kaan Murat AKPOLAT**

14.02.2024 (saat 07:00) tarihli tutanaktaki ifadesinde; Anagold Madencilik A.Ş'de Asistan Proses Mühendis olarak yaklaşık 17 aydır görev yaptığını, sabah 08.00 de yığın liçi operatörü Nazım KÖSE tarafından üretim mühendisi Şenol DEMİR arandığını ve yığın liçi serim alanında kırıklar olduğu söylendiğini, Şenol DEMİR ile doğrudan sahaya çıktıklarını, alana vardığımızda üretim toplantısına telefondan katıldıklarını, toplantı sırasında yığın liçi süpervizörü Kenan ÖZ kırıklardan oksit baş mühendisi Murat BAYRAKDAR'a bilgi verdiğini, Murat BAYRAKDAR'ın da herkese bilgi verip sahaya geleceğini bildirdiğini, sonrasında jeoteknik departman asistan mühendisi Berkay MISIR'ı arayıp radar verilerini incelemesini ve acilen sahaya gelmesini istediğini, alanda bulunan Kenan ÖZ, Soysal DOĞAN, Şenol DEMİR alanı inceleyip fotoğraflar çekip gruptan bilgilendirmeler yaptıklarını, sonrasında sahaya İSG Baş mühendisi Burak ARTAL çevre müdürü Can Serdar HASTÜRK, operasyon müdürü IAİN GÜİLLE ile birlikte sahaya gelip keşif yaptıklarını, Berkay MISIR'dan aldığı radar verisini IAİN ile mail yoluyla paylaştığını, sonrasında Murat BAYRAKDAR İSG mühendisi Gizem GAZCI alanda proje departmanına bağlı çalışan yaklaşık 20-25 kişilik bir grubun işini durdurup sahadan uzaklaşmasını sağladıklarını, süreç hakkında proje mühendisi İshak ASLAN'a bilgi verdiklerini, Murat BAYRAKDAR'ın kararıyla yığın işlemi durduruldu ve yığın operatörlerinin ofis bölgelerine çekilmeleri söylendiğini, yığın liçi alanı Murat BAYRAKDAR'ın kararıyla iki noktadan erişime kapandığını, bütün Anagold çalışanlarına Şenol DEMİR tarafından yol kapama bilgilendirme maili paylaşıldığını, sonrasında jeoteknik mühendisi Ali Rıza bey, kendisi ve Murat BAYRAKDAR sahayı tekrar incelediklerini, Ali Rıza bey yığın liçi alanında bir oturmanın meydana geldiğini söylediğini, yığın işleminin durdurulmasını söylediğini ancak iş makinaları ile çimento kullanarak kırıkları doldurabileceklerini ve 20-25 kişilik proje grubunun sahada çalışabileceğini söylediğini, Murat BAYRAKDAR bütün incelemelerini ve yorumlarını mail olarak atmasını istediğini, mail

22



gelene kadar mevcut düzende devam etmelerini söylediğini, sonrasında Ali Rıza Beyden mail geldiğini, yığın işlemini durdurmalarını, alanları düzeltmelerini söylediğini ancak mailde proje ekibi hakkında bilgi olmadığını, sonrasında Murat BAYRAKDAR'ın kendisine söyleyerek alınan aksiyonları ve proje ekibi hakkında soru soran bir mail yazdırdığını, maili Murat BAYRAKDAR'a attığını, Murat Beyin 'de kişi eklemeleri yaparak kendi adı ile paylaştığını, alana solüsyon gönderilmesinin iptal edilmesini söylediğini, buradaki solüsyon dengesini sağlayabilmek adına asistan proses mühendisi Elif REYHAN, süpervizör Adnan KEKLİK, Soysal DOGAN ve Şenol DEMİR ile idari bina ofislerinde bir araya gelerek nasıl yapılabileceğini tartıştıklarını, Murat BAYRAKDAR'ın onayı ile alana solüsyon transferi durdurulduğunu, sonrasında Elif REYHAN, Adnan KEKLİK ile borulama ofislerinin oraya gidildiğini, Soysal DOĞAN 3 tane yabancının yukarı çıkmak istediğini söylediğini bu sırada yolda Berkay MISIR ile karşılaşıldığını, ''Kırıklar artmış bence çıkmayın" dediğini, alanı yabancılara göstermek ve alanda kimsenin kalmadığına emin olmak için yukarı çıkıldığını, yukarıda Kenan ÖZ, Ramazan ÇİMEN, Soysal DOGAN, İshak DEMİR ve bir operatör daha saha denetiminde olduklarını, onlara alanı boşaltmalarının söylendiğini, Soysal DOĞAN, İshak DEMİR ve bir diğer operatöre Lift 30 bölgesinden fotoğraf çekip geri dönmeleri istendiğini, Elif REYHAN, kendisi ve 3 yabancı yöneticiye eşlik ederek alanın en üst kotuna çıktıklarını, alanda onlar inceleme yaparken olayın gerçekleştiğini,

## Hüseyin KORKMAZ

15.02.2024 (saat 17:17) tarihli tutanaktaki ifadesinde; Bir yıldır Çiftay A.Ş. firmasında hafriyat şoförü olarak çalıştığını, kullanmakta olduğu araca kamyon yönlendirme sistemi üzerinden gelen görevlendirme üzerine hafriyat almak üzere belirtilen noktaya gittiğini, sistem üzerinden görevlendirmelerin Anagold'un iş programına göre geldiğini, olayın meydana geldiği gün sistem üzerinden 14:25 sıralarında gelen görevlendirme üzerine yükümü fox istikametine boşaltmak üzere hareket ettiğini, ana iletim yolu üzerinde bulunan güzergâhta seyir halinde iken 13.02.2024 günü saat 14:30 sıralarında sürücülüğünü yaptığım 06 DZG 479 plakalı ve firma içi 611kod numaralı aracı ile primer kırıcı kavşağına yaklaştığı esnada gidiş istikametine göre yolun sol üst kısmından toprak kaydığını gördüğünü, toprak kaymasına yaklaşık 500 metre mesafesi olup önündeki seyir halinde olan araçlar geri geri gelmeye başlayınca aracını geri vitese alarak oradan uzaklaşmaya başladığını, söz konusu görüntülerin kullanmakta olduğum 06 DZG 479 plakalı kamyonda bulunan kameraya ait görüntüler olduklarını, sürücülüğünü Uğur YILDIZ isimli şahsın yaptığı 06 EBG 718 plakalı kamyonu görüp görmediği ile ilgili olarak Uğur YILDIZ isimli şahsı tanıdığını, olayın meydana geldiği anda toprak kaymasını görür görmez kullandığı aracı geri vitese alarak uzaklaşmaya başladığını, arka tarafına baktığı için belirtilen kamyonu görmediğini,

## Kemal GÜLGEN

15.02.2024 (saat 17:17) tarihli tutanaktaki ifadesinde, Çiftay A.Ş.'de şoför olan Kemal Gülgen Hüseyin Korkmaz ile benzer ifade vermiştir.

## Furkan YILDIRIM

15.02.2024 (saat 16:48) tarihli tutanaktaki ifadesinde, Çiftay A.Ş.'de şoför olan Furkan Yıldırım Hüseyin Korkmaz ile benzer ifade vermiştir.



SWORN
TRANSLATION

### Sıddık GÜN

15.02.2024 (saat 17:30) tarihli tutanaktaki ifadesinde; Anagold Madencilik A.Ş isimli firmada yaklaşık 15 yıldır tesis operatörü olarak görev yaptığını, olay günü izinli olup olayı telefonla öğrendiğini, yanımda bulunan 3-4 arkadaşımla beraber hemen maden sahasına gittiklerini, olayın olduğu sahayı gördüklerini alana girmek istediklerinde güvenliğin bırakmadığını, her gün çalıştığı alan olan yığınlıç sahasında çatlamalar olduğunu gördüğünü, amiri olan Soysal DOĞAN isimli şahsa çatlamaları her zaman bildirdiklerini, 2018 yılında Yığınlıç bölgesinde konteynırın yanında ilk çatlağın oluştuğunu, buradan su sızmaları meydana geldiğini, bu durumu üst amirlerine bildirdiklerinde önüne topuk oluşturarak üstünü kapattıklarını, 2010 yılında madenin ilk izinleri alındığı zamanda Proses Genel Direktörü olarak görev yapan Hakkı BOZ Yığınlıç alanının iznini alırken "Buraya 23.kata kadar izin alınmıştır çünkü kapasitesi ancak o kadarını kaldırabilir." dediğini, fakat şu anda yığınlıç alanına 33.kat atılmış durumda yani kapasitesinin oldukça üzerinde bir yükleme yapılmış durumda olduğunu, Sülfit Tesisi devreye gireceği zaman Yığınlıç alanında artık yığın yapabilecekleri alan kalmamış olduğunu, ancak yığın yapılmaya devam edildiğini, bu durumu mühendislere söylediğin de yabancı firmaların gelip değerlendirme yaptığını ve herhangi bir sorun teşkil etmediğini söylediklerini,

### Selçuk ÇİFTLİK

14.02.2024 (saat 02:35) tarihli tutanaktaki ifadesinde; Anagold Madencilik A.Ş'de ISG Müdürü olarak yaklaşık 9 yıldır görev yaptığını, 11.02.2024 Pazar günü itibari ile bir hafta biriktirme iznine ayrıldığını, bu durumu bildirir belgesi olmadığını ancak whatsapp üzerinden amiri IAİN GUILLE'e bildirdiğini, biriktirme iznini belirtir belge olmadığını, yerine vekalet olarak İSG Başmühendisi Burak Artal baktığını, bu süre zarfında maden içerisindeki olumlu/olumsuz durumları kendisine bildirdiğini, 13.02.2024 saat 09.30 sıralarında Whatsapp üzerinden Burak Artal aracılığı ile fotoğraf ve bilgi mesajı Gönderildiğini, yığın lıç bölgesinde çatlak/yarılma olduğu bilgisini verdiğini, takibi yapılmasını ve akıbetinde kendisine bilgi verilmesini söylediğini, takibini yaptığını, Çevre Müdürü Can Serdar Hastürk, ISG Uzmanı Gizem Gazcı, Oksit Operasyonları Başmühendisi Murat Bayraktar ve IAİN GUILLE ile birlikte bahse konu kayma olan yere saha denetimini gerçekleştirdiklerini, buna müteakip kendisine ve Anagold personellerine Şenol Demir aracılığı ile 10.50'de e-posta gönderildiğini, devamında sahada kimse olup olmadığı ile ilgili olarak Burak Artal'dan sahada kimsenin olmadığı teyit mesajını Whatsapp üzerinden aldığını, bu esnada Erzincan Merkezde eşinin sağlık sorunları nedeni ile Özel Neon Hastanesinde olduğunu, 13.02.2024 günü saat 14.00'de online cep telefonu üzerinden yapılan toplantıya bahsettiği hastaneden katıldığını, toplantı yapılığı esnada olayın meydana geldiğini, toplantı sonlandırıldığını, binadan çıkma talimatı verildiğini, bu durumdan birkaç dakika sonra Burak Artal'ın arayarak yığın lıç sahasının çöktüğünü söylediğini, ISG müdürü olarak kimseye bilgi verip vermediği ve emniyet tedbiri alıp almadığı ile ilgili olarak izinde olduğu için vekili Burak Artal'ın gerekli emniyet tedbirlerinin alınması hususunda rehberlik ve bilgi akışını sağladığını, Şenol Demir'in de bölgenin trafiğe kapatılması hususunda e-posta gönderdiğini, bölgedeki toprak ayrılması hakkında daha önceden bilgisi olup olmadığı veya konu hakkında bilgisi olan olup olmadığı, tedbir alınıp alınmadığı ile ilgili olarak bölgedeki toprak ayrılması hususundaki ilk bildirim, yığın lıç sahasını raporlayan radar sistemi mevcut olup bu sistemin yığın lıçi hakkındaki toprak hareketliliğini tespit edip raporladığını, sistemin kontrolünün Maden Bölümü Jeoteknik Biriminden Ali Rıza Kalender ve Berkan Mısır ilgilendiklerini, 13.02.2024

24



günü saat 13.00'da Ali Rıza Kalender Yığın Liç bölgesinde ayrılma olduğu hakkında e-posta gönderdiğini, bu mailin tarafına iletilmemiş olup vekili olan Burak Artal tarafından kendisine bilgi amaçlı gönderildiğini, Anagold Maden sahası içerisinde bulunan yığın liç bölgesinden yani toprağın kaydığı iş kazasının olduğu yerden sorumlu personellerin Mühendis Şenol Demir, Mühendis Kaan Murat Akpolat, Mühendis Elif Reyhan, Baş Mühendis Murat Bayraktar, Müdür Hüseyin Üstündağ, Direktör Kenan Özdemir, Ülke Müdürü Cengiz Demirci olduklarını belirtmiştir.

### Şenol DEMİR

14.02.2024 (saat 06:40) tarihli tutanaktaki ifadesinde; Anagold Madencilik A.Ş'de Kırıcı Üretim Mühendisi olarak yaklaşık 4 yıldır görev yaptığını, sabah 08.00 civarında kırıcı bölgesinde toplantı yaptıktan sonra sisteme start verilmesi için çalışma ekiplerinin bilgilendirildiğini, kırıcı ofislerinden ayrılarak saha içerisinde bulunan ana ofise saat 08.15 sıralarında geldiğini, yığın liç bölgesinde operatör olarak çalışan Nazım KÖSE isimli şahsın gruptan saat 08.20 sıralarında fotoğraf atarak sahada çatlakların oluştuğunu söylediğini, Kaan Murat AKPOLAT ile birlikte yığın liç alanına gittiklerini, üst amirleri olan Murat BAYRAKTAR isimli şahsı bilgilendirdiklerini, kendisinin sahaya geldiğini, aynı zamanda Jeofizik ekibine de bilgi verildiğini, çalışmanın durdurulduğunu, sahada bulunan iş makinaları operatörlerine sahayı boşaltması bilgisi verildiğini, daha sonra mevcut kırıcı ofisler bölgesine geçtiğini, Hakan ŞAHİN, Mehmet SARITAŞ ve Serkan KÖSE ile birlikte yığın alanına genel denetim amacıyla saat 09.20 sıralarında çıkış yaptıklarını, denetim sırasında sahanın boşaltılması bilgisinin geldiğini, denetimi sonlandırarak ofisler bölgesine geçtiklerini, yol güzergâhında arkadaşların yolu dubalarla kapatarak girişleri sınırlandırdıklarını, arkadaşlarından ayrılarak farklı bir araç ile ofise gelip genel bilgilendirme maili attığını, yığın alanına ikinci bir bildirime kadar giriş ve çıkışlar kapatıldığına dair bir mail olduğunu, rutin işlerine devam ettiğini, ilerleyen saatlerde deprem olduğunu sanarak ofisten dışarı çıktığını, çıktığında yığın liç bölgesinin kaydığını gördüğünü, ISG uzmanı Gizem GAZCİ isimli şahıs ile birlikte kırıcı bölgesine giderek sahadaki çalışan personel durumunu teyit edip, ulaşamadıkları personellerin listesini Hakan ŞAHİN ile paylaştığını, alanın boşaltılması nedeniyle Sabırlı bölgesindeki kayan toprağın olduğu alana gittiğini, durumu ISG müdürü olarak kimseye bilgi verip vermediği, tedbir alıp almadığı ile ilgili olarak, çatlak için sahaya çıkmadan önce ekipten bir arkadaşın bu konu hakkında ISG birimine bilgi verdiğini, hatta sahadan aşağı inerken ISG birimi ile karşılaştıklarını, onların da saha bölgesine çıktıklarını, bölgedeki toprak ayrılması hakkında daha önceden bilgisi olup olmadığı veya konu hakkında bilgisi olan olup olmadığı, tedbir alınıp alınmadığı ile ilgili olarak bu konu hakkında daha önceden bir bilgisi olmadığını, konu hakkında bilgisi olan birisi olup olmadığını bilmediğini, personelin olay günü sahaya çıktıklarında görmüş olduklarını, Maden sahası içerisinde bulunan yığın liç bölgesinden yani toprağın kaydığı iş kazasının olduğu yerden Kenan ÖZ, Kaan Murat AKPOLAT, Murat BAYRAKTAR ve Hüseyin ÜSTÜNDAĞ'ın sorumlu olduklarını, bildiği kadarı ile olayı Soysal DOĞAN, Kaan Murat AKPOLAT ve Elif REYHAN'ın gördüklerini beyan etmiştir.

### Mehmet SARITAŞ

14.02.2024 (saat 03:20) tarihli tutanaktaki ifadesinde; Anagold Madencilik A.Ş'de Kırıcı Süpervizör olarak yaklaşık 14 yıldır görev yaptığını, saat 07.20 de mesaiye başladığını, Yığın Liç sahası bitişiğinde bulunan kırıcı bölümünde görev yaptığını, Nazım Köse'nin de Yığın Liç



bölgesinin operatörü olduğunu, Nazım'ın sabah saat 08.20'de Whatsapp grubu üzerinden alandaki çatlak/yarık olan yerlerin fotoğraflarını paylaştığını, bölgesi veya amiri personeli olmadığı için tedbir açısından veya yapılması gerekenler hakkında talimatı olmadığını, bir gün önce belirlenmiş olan plan üzerine Finans Departmanından Serkan Köse, Güvenlik Müdürü Hakan Şahin ve Şenol Demir ile birlikte yığın liç sahası bölgesine 09.20 sıralarında gittiklerini, Yığın Liç sahasında belirli bir bölgeye geldikleri sırada yığın liçinin daha üstüne Hakan Şahin, müdürlerin çıkmak istediklerini, Şenol Demir amirin de "yukarı tarafta sıkıntı olma ihtimali var yukarıya çıkmayalım." dediğini, geri döndüklerini, döndükleri esnada yolun trafiğe kapatılmaya başlandığını, durumu bildirir yani trafiğe kapalı bölgeyi personele bildirme amaçlı Şenol Demir tarafından tüm Anagold personeline 10.50'de e-posta gönderildiğini, durum ile ilgili kimseye bilgi verip vermediği, emniyet tedbiri alıp almadığı ile ilgili olarak kimseye bilgi vermediğini, amiri Şenol bey durumdan haberdar olduğu için söylemediğini, ayrıca bölgede her hangi bir sorumluluğu da bulunmadığını, ayrıca fotoğrafları yanında bulunan Hakan Şahin'e de gönderdiğini, olayı görmediğini ifade etmiştir.

### Nazım KÖSE

14.02.2024 (saat 03:00) tarihli tutanaktaki ifadesinde, Anagold Madencilik A.Ş'de Kırıcı Operatörü olarak yaklaşık 14 yıldır görev yaptığını, sabah 08.00 da üstümü değiştirdiğini ve sistemi çalıştırmaya gittiğini, 08.16'da yığma liç sahasına sisteme start vermek amacıyla çıktığını, sonrasında çalıştıkları alanın komple yarıldığını gördüğünü, 08.16'da üst amirim olan Şenol DEMİR ve amiri olan Kenan ÖZ isimli şahısları aradığını ve durumu anlattığını, onların da fotoğraf çekip kendilerine atmasını ve geleceklerini söylediklerini, 08.30 civarında Şenol DEMİR, Kaan Murat AKPOLAT, Kenan ÖZ, Ramazan ÇİMEN, Murat BAYRAKTAR, Fatih ÖZER ve yanlarında daha ismini bilmediği kişilerin geldiğini, sahanın her yerine baktıklarını, Şef Murat BAYRAKTAR isimli şahsın "Sistemi durduralım ve sahayı terk edelim" dediğini, kendisinin de sistemi durdurduğunu, arabasına binerek sahayı terk ettiğini, kurucu ofislerine gidip oturduğunu, sonrasında da hiç sahaya çıkmadığını, saat 11.30 civarında yemeğe gittiğini, sonrasında telefon ile oynarken masasının sallandığını fark ettiğini, deprem olduğunu sandığını fakat sonrasında patlama sesine benzer bir ses duyduğunu ve olayı öğrendiğini, Kenan ÖZ isimli şahsı aradığını ama ulaşamadığını, Mehmet KAZAR isimli şahsı aradığını ona da ulaşamadığını, başka da kimseyi aramadığını, Pazartesi izinli olduğunu Pazar günü yarık olmadığını, maden sahası içerisinde bulunan yığın liç bölgesinden yani toprağın kaydığı iş kazasının olduğu yerden Kenan ÖZ'ün sorumlu personel olarak ilk amiri olduğunu, Kaan Murat AKPOLAT'ın da onun üst amiri olduğunu, Murat BAYRAKTAR'ın ise Kırıcı Bölümünün sorumlusu olduğunu beyan etmiştir.

### Saim Serkan KÖSE

14.02.2024 (saat 04:05) tarihli tutanaktaki ifadesinde; Anagold Madencilik A.Ş'de Finans/Maliyet Kontrolleri olarak yaklaşık 7 aydır görev yaptığını, saat 07.30 de mesaiye başladığını, Anagold Yönetimi tarafından yaklaşık iki ay önce başlatılan Müdür baş mühendis şeflerden ve tüm bölümlerin katıldığı normal İSG denetimleri dışında bir denetleme sistemi kurulmuş olduğunu, kendisi de bu kapsamda Anagold Güvenlik Müdürü Hakan Şahin, Mehmet Sarıtaş ile birlikte denetim kapsamında konveyör bantlarını planlı denetlemesi için bölgeye 09.35 sıralarında gittiğini, yığın liç sahasının belirli bir bölümüne kadar çıktıklarını, devamında Şenol Demir tarafından uyarıldıklarını, yığın liç sahası üzerinde çatlak/yarık olduğu söylendiğini, geri

26



döndüklerini, döndükleri esnada da yolun trafiğe kapandığını, daha sonrasında kendi işi olan finans bölümü ofisine geçtiğini, yolun trafiğe kapalı bölgeyi personele bildirme amaçlı Şenol Demir tarafından tüm Anagold personeline 10.50'de e-posta gönderildiğini, durum ile ilgili kimseye bilgi verip vermediği, emniyet tedbiri alıp almadığı ile ilgili olarak kimseye bilgi vermediğini, sorumluluk alanında veya görevi olmayan bir konu olduğunu, olayı görmediğini beyan etmiştir.

### Hatun KAZAR

15.02.2024 (saat 16:30) tarihli tutanaktaki ifadesinde; Öğrenci olduğunu babası Mehmet KAZAR'ın Anagold Madencilik A,Ş isimli firmanın alt taşeronu olan Keklikler isimli firmada yaklaşık 6 yıldır dozer operatörü olarak çalıştığını, annem Lütfiye KAZAR ve kendisini babasını aradıklarında babasının "Bugün bir sıkıntı var, çalışıyor muyuz ben de anlamadım" dediğini, görüntülü görüşme yapmak istediklerinde babasının interneti açtığını konuşalım dediğini sonrasında babasının sesi telaşlı gelmeye başladığını, kendisine seslendiklerini ama bir cevap alamadıklarını, sonrasında hattın tamamen kesildiğini, vardiya amirini aradıklarını ama ulaşamadıklarını, babası ile aynı evde kalan Bayram abiyi aradıklarında bir heyelan yaşandığını söylediğini fakat kendisinin orada olmadığını ve babasını en son konteynıra girerken gördüklerini söylediğini, babasının iş arkadaşı Alparslan Abinin o gün o bölgede çatlakların meydana geldiğini, babasına mühendislerin sahayı boşaltarak dozeri emniyetli bir yere çekmesini ve konteynırda beklemesini söylediklerini anlattığını beyan etmiştir.

### Bülent KARA

15.02.2024 (saat 15:50) tarihli tutanaktaki ifadesinde, Anagold Madencilik A.Ş' nin alt taşeronu olan KARSA firmasında kaynakçı olarak yaklaşık 13 yıldır görev yaptığını, olayın olduğu gün gece vardiyasında çalıştığı için evde olduğunu, kardeşi olan ve şu an da toprağın altında kalan Hüseyin KARA'nın yığın liç alanında çalıştığını, kardeşinin saat 14:00 sıralarında İsa TAŞDELEN, İshak DEMİR ve Soysal DOĞAN isimli şahıslarla beraber olayın gerçekleştiği alana gittiklerini, kardeşi Hüseyin KARA' ya Soysal DOĞAN isimli şahıs "Yolu kapat, Dubaları yola çek ve buradan kimsenin geçmesine izin verme" dediğini, kardeşi hariç diğer üç kişinin yukarı çatlakların olduğu alana doğru geçiş yaptıklarını, kardeşinin onları aşağıda beklediğini, sonrasında saat 14.28 sıralarında olay gerçekleştiğini, İsa TAŞDELEN ve İshak DEMİR isimli şahısların olayın olduğu esnada yüksekte oldukları için dizlerine kadar toprağa batmalarına rağmen oradan bir şekilde çıkmayı başardıklarını, hatta oraya çıkma sebepleri olan fotoğraflama işlemini gerçekleştiremediklerini, İsa TAŞDELEN'in hastaneye geldiğini, oradan da evlerine geldiğini, İsa TAŞDELEN, Abdurrahman ŞAHİN, Hasan Hüseyin ALMALI ve Muhammet ÇELEGEN ile birlikte aynı evde kaldıklarını, olay sabahında sahada bulunan YESTİ ve MÜREKKEPÇİLER isimli firmaların sahadan çıkarıldıklarını fakat kendilerinin bilgisi olmadığını, herkese mail atılmış olduğunu ancak kendilerine gelen bir mail veya bir mesaj olmadığını, İsa TAŞDELEN'in eve geldiğinde dizlerine kadar çamur olduğunu gördüğünü, İsa TAŞDELEN'in kardeşi Hüseyin KARA'nın yanlarında olduğunu ve kendisinden haber alamadıklarını söylediğini, İsa TAŞDELEN'in eve geldikten yaklaşık 2-3 saat içinde bel ağrısı sıkıntısı ile tekrar hastaneye gittiğini, olayı görmediğini, anlattıklarını İsa TAŞDELEN'ın anlatmış olduğunu, o günden sonra kardeşine hiçbir şekilde ulaşamadığını ifade etmiştir.

27



SWORN
TRANSLATION

### Elif REYHAN

14.02.2024 (saat 06:40) tarihli tutanaktaki ifadesinde; Anagold Madencilik A.Ş'de Oksit Asistan Proses Mühendisi olarak yaklaşık 17 aydır görev yaptığını, saat 07.30 de mesaiye başladığını, saat 8.30'da online yapılan genel saha toplantısında STACKING Süpervizör Kenan Öz Yığın Liç sahasında yarılma/çatlamalar olduğunu söylediğini, bu esnada ADR Ofis konteynırda olduklarını, saat 14.00 sıralarına kadar ofis bölgesinde günlük rutin işlerini yaptığını, devamında saat 14.20 gibi yığın liç sahasına Kaan Murat Akpolat, Adnan Keklik ile aynı araçta saha kontrolü yapmak amaçlı çıktıklarını, saha kontrolü yapmak amaçlı 3 yabancı uyruklu isimlerinin hatırladığı kadarıyla Patrik, Ailen, ile yığın liç sahasına gelmeden trafiğe kapatılan denilen bölgede aynı araçta beklediklerini, az ileride Kenan Öz, Ramazan Çimen, Soysal Doğan'ın da aynı araçta beraber beklediklerini, toplamda 3 araç olduklarını, bu esnada kendisi ve Kaan Murat Akpolat yabancı uyruklu şahısların araçlarına bindiklerini, diğer kalan personellerin de gidecekleri yeri bilmediğini, ancak aşağı ineceklerini söylediklerini, kendileri de üç yabancı uyruklu şahıs ve Kaan Murat Akpolat ile birlikte yığın liçin tepesine çıktıklarını, yığın liçi net görebilmek amaçlı tepesinde bulunan 4B Faz çalışmasının yapıldığı yani Yığın Liç tepesinden de yüksekte bulunan yere çıktıklarını, bu esnada Yığın liçin kaydığını toprağın akıp gittiğini gördüğünü, Soysal Doğan'ın da Yığın Liç tepesine yakın bir yerden kaçtığını gördüğünü ve devamında yanlarına geldiğini, 6 kişi üst tarafa doğru yola çıktıklarını, ayrı bir araç gelerek onları aldığını, durumu kimseye Oksit Asistan Proses Mühendisi olarak haber verip vermediği veya emniyet tedbiri alıp almadığı, bölgedeki toprak ayrılması hakkında daha önceden bilgisi olup olmadığı ile ilgili olarak, olay bölgesine iki gündür çıkmadığını, ne olduğunu görmediğini, konu ile ilgili daha önceden kimsenin bilgi vermediğini, olay günü saat 08.30'da öğrendiğini, konu ile ilgili tedbir amaçlı ekibi tarafından e-posta gönderildiğini ve alanın kapatıldığını, alandan sorumluların Mühendis Şenol Demir, Mühendis Kaan Murat Akpolat, kendisi, Baş Mühendis Murat Bayraktar, Müdür Hüseyin Üstündağ, Direktör Kenan Özdemir, Ülke Müdürü Cengiz Demirci olduğunu ifade etmiştir.

### Caner ERBASAN

14.02.2024 (saat 07:31) tarihli tutanaktaki ifadesinde özetle; Anagold isimli altın madeninde yaklaşık olarak 3 yıldır Biyo-Çeşitlilik Uzmanlığı yaparak geçimini sağladığını, saat 07.30 sıralarında işi icabı maden sahasında bulunan çevre ofisine gittiğini, ofisin yanında bulunan iş güvenliği ofisinde çalışan Gizem GAZCI, kendi ofislerinde çalışan Recep ÇALI'nın yanına gelerek yığın liçi bölgesinde hareketlilik haberi aldığını söylediğini, daha sonra 09.15 sıralarında üretim toplantısına katıldığını, toplantı esnasında oksit bölümünden Elif REYHAN yığın liçi bölgesinde hareketlilik gözlemlediklerini belirttiğini, detaylarını bilmediğini araştırmaya devam ettiklerini söylediğini, daha sonra toplantının sona erdiğini, saat 13.15 sıralarında Tuncay KAYA ile birlikte Sabırlı Köyü deresi ve TSF arasında kalan bölgede bu kaza olayından bağımsız farklı bir çalışma yaptıklarını, saat 14.20 sıralarında tekraren çalışma yaptığı yerden ayrıldığını ve üç katlı ofisler bölgesine geldiğini, daha sonra sera bölgesine gittiğini, sera bölgesinde dururken bir ses olduğunu ve Sabırlı Köyü Deresine doğru baktığında yığın liçi'nin kaydığını gördüğünü, akabinde bölüm müdürü Can Serdar HASTÜRK'ü aradığını ve durumu anlattığını beyan etmiştir.

### Ahmet Oğuz ÖZTÜRK

14.02.2024 (saat 06:50) tarihli tutanaktaki ifadesinde; Anagold isimli altın madeninde yaklaşık olarak bir yıldır sürdürülebilirlik direktörü olarak görev yatığını, sabah saat 09.17 sıralarında Çevre

28



SWORN
TRANSLATION

müdürleri Can Serdar HASTÜRK'ün arayarak yığın içi bölgesinde çatlaklar olduğunu söylediğini ve konu hakkında kısa bir görüşme yaptıklarını, görüşmenin hemen ardından whatsapp üzerinden mesaj atarak konu hakkında fotoğraflar gönderdiğini, konuyu böylece öğrendiğini daha öncesinde böyle bir konudan kesinlikle haberi olmadığını, sorumluluk alanında olmadığından Serdar beye kendisini de bilgi vermesini söylediğini, sonrasında kendi işleri ile ilgilendiğini ve konu hakkında başkaca da bir bilgi almadığını, 14.30 sıralarında ofiste bir toplandıklarını, bir anda bir sarsıntı hissettiklerini ve deprem oluyor diye düşünerek binanın dışına çıktıklarını, kısa süre sonra dışarıda olanlardan bazıları yığın liçi bölgesinde kayma olduğunu söylediğini, aceleyle olayın olduğu yöne doğru gittiğini ve büyük bir göçük olduğunu gördüğünü, sonrasında sorunluluğunda bulunan menfezlerin kapatılması talimatı verdiğini, hemen akabinde kriz masasını kurmak için çalışmalara başladığını, konu ile ilgili mail atılıp atılmadığını veya alanda ve çevresinde bilgilendirme yapılıp yapılmadığı ile ilgili kendisine bilgi ulaşmadığını, borulama birimi sorumluluğu dışında olduğunu ifade etmiştir.

### Recep ÇALI

14.02.2024 (saat 08:16) tarihli tutanaktaki ifadesinde; Anagold isimli altın madeninde yaklaşık olarak 3 yıldır Çevre Mühendisi olarak çalıştığını, saat 07.30 sıralarında maden sahasına geldiğini, saat 08.00'de günlük rutin olarak yapılan toplantıya girdiğini, bu toplantıda kayma veya tehlike arz eden bir durumun varlığı hakkında konuşma olmadığını, Saat 08.50 sıralarında İSG Uzmanı olan Gizem GAZCI'nın gelerek en son yapılan yığında kayma olduğunu alana gideceklerini söylediğini, kendisinin de helmesini istediğini, amirini bilgilendirerek Gizem hanımla birlikte alana gittiklerini, alanda Kaan Murat AKPOLAT, Murat BAYRAKTAR ve İshak ARSLAN olduğunu, alanı gözlemlediklerini ve çatlakları ve oyukları incelediklerini, fotoğraflar çektiklerini, sonrasında amirini aradığını ve konu hakkında bilgi verdiğini, Gizem GAZCI ,Kaan Murat AKPOLAT, Murat BAYRAKTAR ve İshak ARSLAN ile birlikte taşeron çalışanlar ve orada olan tüm yüklenicilere alanın kapatılması gerektiği konusunda bilgi verdiklerini, sonrasında alandan ayrıldıklarını ve ofisler bölümüne indiklerini, burada amirine yüz yüze tekrar konu hakkında detaylı bilgi verdiğini, daha sonra Can Serdar HASTÜRK, Burak ARTAL, Gizem GAZCI, Iain Guille birlikte tekrar alanı kontrol etmek için gittiklerini, bir süre sonra ofislere geldiklerinde yol kapama maili tüm saha ile paylaşıldığını, ofisten sonrasında hiç ayrılmadığını ve kendi işleri ile ilgilendiğini, saat 14.30 sıralarında ofiste bir anda bir sallantı olduğunu deprem olduğunu zannederek dışarı çıktığını ve kısa süre sonra yığın liçi bölgesinde göçük olduğunu öğrendiklerini, gözlem yapmak için yanımda ki arkadaşlar ile maden sera bölgesine giderek Sabırlı Deresi kısmında inceleme yaptıklarını, daha sonra tekrar ofise döndüğünü,

### Can Serdar HASTÜRK

14.02.2024 (saat 04:20) tarihli tutanaktaki ifadesinde; Anagold isimli altın madeninde 2011 yılı haziran ayından beri çevre mühendisi ve 2019 yılı Eylül ayından beride çevre müdürü olarak görev yaptığını, sabah saatlerinde maden sahasında bulunan ofisime geldiğini, 08.00 toplantısından sonra ekip arkadaşlarından Caner ERBASAN liç sahası olanak tabir edilen yerde çatlaklar görüldüğünü söylediğini, Caner'e nereden öğrendiğini sorduğunu, iş güvenliği mühendisi Gizem GAZCI'dan öğrendiğini söylediğini, bunun üzerine ekiplerindeki çevre mühendisi Recep ÇALI'yı alana bakması için yönlendirdiğini, Gizem hanımla birlikte alana giden Recep bey saat 09.15 sıralarında alandan fotoğraflar gönderdiğini, fotoğraflardan olayın boyutunu tam anlayamadığı için olay yerine kendisi gitmeye karar verdiğini, daha sonrasında direktörü Ahmet Oğuz ÖZTÜRK'e haber

29



SWORN
TRANSLATION

verdiğini ve alana kendisinin de gideceğini söylediğini, sonrasında genel müdür Iain Guielle'ın yanına gidip olay ile ilgili haberi olup olmadığını sorduğunu, haberi olmadığını söyleyince kendisine bilgi verdiğini, telefonundaki fotoğrafları gösterdiğini, sonrasında 10.00 toplantısına katıldığını ve Iain Guelle ile birlikte alana gitmeye karar verdiklerini, Genel Müdür Iain Guelle ve İSG Mühendisi Gizem GAZCI ve İş Güvenliği Başmühendisi Burak ARTAL ile birlikte alana gitmek için 10.30 sıralarında yola çıktıklarını, yola çıkarken Oksit Proses Baş Mühendisi Murat BAYRAKTAR'ın da arkadan aracıyla takip ettiğini, ofisler bölümünden çatlakların olduğu yere doğru gittiklerini, alana ulaştıklarında alan süpervizörü Soysal DOĞAN'ın olay yerinde olduğunu, Murat beyin çatlakları gösterdiğini ve bunların sabah vardiyasında fark edildiğini anormal bir durum olarak Jeoteknik ekibine sorulduğunu alanda bir kayma hareketi görüldüğünü bildirdiğini radarı kullanan arkadaşların görüşüne istinaden alanda hareketlenme olduğunu, alanda çalışan arkadaşların çıkartıldığını söylediğini, sonrasında çeşitli noktalardan fotoğraflar çektiklerini ve bir süre sonra alandan ayrılarak tekraren ofisler bölümüne geçtiklerini, fakat Soysal beyin olay yerinde kaldığını, ofisler bölümünde kendi aralarında konu ile ilgili yapabilecekler ve alabilecek önlemler hakkında kısa istişareler yaptıklarını, tasarımcı firmanın Amerika'da olmasından ve saat farkı göz önünde bulundurulduğunda akşam saatlerinde konunun tartışılabileceği düşüncesine vardıklarını, konu ile ilgili aldığı mailler saat 10.50'de kaymanın yaşandığı yığın liçi bölgesine erişim yollarının/kapatıldığına dair Şenol DEMİR isimli mühendisten gelen bir mail olduğunu, 13;38'de Murat BAYRAKTAR ve Ali Rıza KALENDER arasında geçen yazışmaya bilgi kısmına eklendiği için haberdar olduğu bir mail daha gördüğünü, bu mailleri göz önünde bulundurduğunda alandaki çalışmaların durdurulduğunu bildirmelerinden ve alana intikal ettiğinde alan süpervizörü Soysal DOĞAN'dan başkalarının da alanda olmamasından dolayı alan sorumluları ve diğer ilgililerce alanda çalışanlar arasında bir iletişim olduğu kanaatinde olduğunu, saat 14.30 sıralarında ofiste toplantı esnasında bir sarsıntı hissettiklerini, önce deprem olduğunu zannederek binayı boşalttıklarını, dışarı çıktıklarında liç sahası batı kısmında toz bulutu gördüğünü, sabahki gözlemlerine de dayanarak orada bir kayma olduğunu anladığını, kısa süre sonra kriz masası kurulacağından içeri ofise giderek konuya iştirak eden iş arkadaşları ile kriz masasını oluşturmaya başladıklarını ifade etmiştir.

### Burak ARTAL

14.02.2024 (saat 04:56) tarihli tutanaktaki ifadesinde, Anagold Madencilik isimli şirkette İş Güvenliği Baş Mühendisi olarak çalıştığını, saat 7:30 sıralarında mesaiye başladığını, saat 09.13 sıralarında kazanın meydana geldiği alandaki iş güvenliği uzmanı Gizem GAZCI'nın whatsapp üzerinden alanda çatlaklar olduğuna dair mesajlar attığını, saat 09.22 sıralarında ek bir fotoğraf daha attığını, fotoğrafta kazanın meydana geldiği yerde küçük bir kayma olduğu göründüğünü, bunun üzerine Çevre Müdürü Can Serdar HASTÜRK ile iletişime geçtiğini ve durumu anlatarak konuyu Çöpler Anagold Madencilik Genel Müdür Yardımcısı Iain Guille ile tartışmaya karar verdiklerini, saat 10.00 'da yapılacak müdürler toplantısında bu konuyu tartışmaya ve sonrasında sahaya çıkıp denetim yapmaya karar verdiklerini, bu sırada saat 09.28'de Gizem GAZCI'nın attığı mesajı gördüğünü, bu mesajda kazanın olduğu alanda işlerin durduğunu ve personelin sahadan çıkarılmaya başlandığı yazdığını, daha sonra toplantıya katıldıklarını ve toplantı sonrasında sahaya çıkmaya karar verdiklerini ve iki araçla saat 10.26 sıralarında sahaya çıktıklarını, araçların birinde kendisini, Gizem GAZCI, Can Serdar HASTÜRK ve Iain Guille, diğer araçta da Oksit Müdür Vekili Murat BAYRAKDAR bulunduğunu, Murat BAYRAKDAR alanı bildiği için öncülük

30



SWORN
TRANSLATION

ettiğini, kazanın meydana geldiği Yığın liçi sahasına ulaştıklarını ve araçtan indiklerini, araçtan inerken Gizem hanım bana "Burası güvenli değil şefim." dediğini, bunun üzerine ben alan sahibi olan Murat BAYRAKDAR'a güvenli olup olmadığını sorduğumda güvenli bilgisini aldığını, bunun üzerine cevaptan tatmin olmadığı için alanda gördüğüm süpervizör Soysal DOĞAN'ı yanıma çekerek konuştuğunu, kendisine alanın güvenli olup olmadığını sorduğunda tehlikeli bir yerde olduklarını, bunun üzerine genel müdür yardımcısı lain'e burasının güvenli olmadığını bizim ekibin araca döndüğünü İngilizce olarak ilettiğini, kendisinin de hak verdiğini ve denetimi yarıda keserek güvenli alana gitmeleri gerektiğini alan sahibi Murat BAYRAKDAR'a söylediğini, bunun üzerine hep birlikte güvenli alana geçerek denetime uzaktan devam ettiklerini, saat 10.50 sıralarında Oksit Üretim Mühendisi Şenol DEMİR yol kapama bilgisini tüm operasyona mail olarak gönderdiğini, bu mesajın rahatlattığını ve Jeoteknik Ekibin değerlendirmesini beklemek için ofisler bölgesine hareket ettiklerini, bu esnada ofise dönüş yaparken bu kazanın meydana geldiğini, tehlikeli alanda yaya olarak çalışan eşgalini tespit edemediği uzak noktada bulunan bir personel gördüğünü, bunun üzerine arkadan gelen Murat BAYRAKDAR'ı arayarak neden alanda personel olduğunu sorduğunu, alan sorumlusunun kendisi olduğunu ve teknik inceleme için sınırlı personelin alana girişine izin verdiğini söylediğini, bunun da tehlikeli olduğunu kendisine söylediğini, bu konuşmaya Can Serdar HASTÜRK ve Gizem GAZCI'nın da tanık olduklarını, akabinde ofise geçtiklerini, daha sonra öğle yemeğine giderken Murat BAYRAKDAR, Kaan AKPOLAT(Oksit Mühendisi) ve Onur SARITAŞ(İş Güvenliği Mühendisi) a rastladığını, Murat BAYRAKDAR'ın Jeoteknik ekibinden Ali Rıza KALENDER in teknik incelemeyi bitirdiğini, alanda bir kayma olmadığını, bir oturma olduğunu, herhangi bir riskli durum olmadığını ve yığın işine devam edilebileceğini sözlü olarak ilettiğini söylediğini, ancak kendisi şu an yığın işine devam etmeyeceğini alanın dizayn mühendisliğini yapan GRE Firması ile 17.00 de bir toplantı yapacağını ve ondan sonra ertesi gün başlayabileceğini ilettiğini, bu konuşmalar sonrası içi rahatlamış bir şekilde yemeğe geçtiğini, yemekten sonra ofiste bulunduğu esnada 13.03 de Ali Rıza KALENDER'in bir e posta gönderdiğini, e postanın içeriğinde Murat BAYRAKDAR'ın söylediğinin aksine bir kayma olduğu kaymanın devam ettiği, yığın işlemine kesinlikle devam edilmemesi gerektiği bilgisi, radar raporlarıyla birlikte anlatıldığını, bunun üzerine hemen Murat BAYRAKDAR a ulaşmaya çalıştığını ancak telefonu meşgul olduğundan whatsapp üzerinde kendisine mesaj attığını, karşılıklı bu konu ile ilgili yazıştıklarını, bu e postaya cevap vereceğini ilettiğini, bu olayın iyi yönetilmediğini, çelişkili durumlar olduğunu düşünerek konuyu Abdulkadir CANSIZ'a (MADEN OPERASYON DİREKTÖR VEKİLİ) ilettiğini, toplantısı olduğunu saat:15.00 dan sonra toplantı ayarlamasını istediğini, saat:13.28 de saat:15.15 e toplantıyı ayarlayıp Ali Rıza KALENDER, Gizem GAZCI, Murat BAYRAKDAR, Abdulkadir CANSIZ, Kaan AKPOLAT ve Muzaffer BEGEN(Acil Dunun Müdahale Şefi) isimli personelleri toplantıya mail atarak davet ettiğini, daha sonra 13.38 de Murat BAYRAKDAR, Ali Rıza KALENDER'in e postasına cevap verdiğini, bu mail de alanın tamamen erişime kapatıldığı, 4B-3 fazında çalışmanın durdurulduğu, yığın işleminin durdurulduğu ve yığın liçi sulama alanlarının kapatılması için bir yönetim toplantısı yapacağını söylediğini, ayrıca çatlakların onarılmaya başlanması için bir problem olup olmadığını, 4B-3 fazındaki işin ne zaman başlayabileceğini sorduğunu ve radar ölçümlerinin öğlen ve gece vardiyalarında kendi ekibine iletilmesini istediğini, akabinde ofiste bulunduğu esnada 14.28 de bahse konu olay gerçekleştiğini, olaydan hemen sonra maden sahasında Acil Durum Eylem Planı devreye girdiğini, kriz masası kurulduğunu, alan sahibi Murat BAYRAKDAR'ın fenalaşarak revire kaldırıldığını, kriz masasına katılmadığını, kriz masasını

31



SWORN
TRANSLATION

Abdulkadir CANSIZ beyin yönettiğini, olay yerine gidilip gidilmediği ile ilgili olarak kriz masasında görevli olduğu için koordinasyondan sorumlu olduğunu sahaya ekibinden acil durum müdahale şefi Muzaffer BEĞEN, Onur SARITAŞ, Çağdaş BAŞ(İş Güvenliği Mühendisi) ve Gizem GAZCI'yı gönderdiğini, borulama biriminden Murat BAYRAKDAR sorumlu olduğunu, boruluma birimine çıkın yada çıkmayın denip denmediği ile ilgili bilgisi olmadığını, sahadakilere kalın veya kalmayın diyen olup olmadığı ile ilgili olarak sahada çalışanlara kalın veya kalmayın deme yetkisi bulunmadığını, sahaya girişlerin kapatıldığı ve tüm işlerin durdurulduğu e postası alan sorumlusu Murat BAYRAKDAR tarafından gönderildiğini, Elif REYHAN(Oksit Mühendisi), Kaan AKPOLAT ve 3 yabancı misafirin olay yerine gidilmesi yönünde talimatı kimin verdiği ile ilgili olarak bilgisi olmadığını, ancak Kaan Bey ve Elif hanımın emir aldığı amir Murat BAYRAKDAR olduğunu, görevi gereği bir üstüne haber verme yükümlülüğü olup olmadığı ile ilgili olduğunu, gerek izinde olan iş güvenliği müdürü Selçuk ÇİFTLİK beye gerekse operasyon direktör vekili Abdulkadir CANSIZ beye sürekli bilgi verdiğini ifade etmiştir.

### Gizem GAZCI

14.02.2024 (saat 04:56) tarihli tutanaktaki ifadesinde; Anagold Madencilik isimli şirkette Kıdemli İş Güvenliği Mühendisi olarak çalıştığını, saat 07.30 sıralarında mesaiye başladığını, saat:08.53 sıralarında Kenan ÖZ('ün Yığın Süpervizörü) arayarak yığın liçinde çatlaklar olduğunu, sabah gördüklerini, oksit proses mühendislerinin sahada olduklarını, gidip alanı kontrol etmesini istediğini, kendisinin de Burak ARTAL'ın yanına giderek durumu kendisine aktardığını, Burak bey de Çevre Birimine haber vermesini istediğini, Çevre Birimi Mühendisi Recep Çalı'ya durumu aktardığını, Recep Bey de Çevre Müdürü olan Can Serdar HASTÜRK'e bilgi vermiş olduğunu, Can Serdar Bey ofiste yanına gelip alana gittiklerinde dikkatli olmalarını, riskli bir şey varsa alana girmemelerini istediğini, akabinde Recep ÇALI(Çevre Mühendisi) ile birlikte alana gittiklerini, o ara Kenan ÖZ'ün telefonla arayarak nerde olduklarını sorduğunu, "alana doğru geliyoruz" dediklerini, o esnada alana yakın noktada Ramazan ÇİMEN ve Kenan ÖZ ile araba ile karşılaştıklarını, Kenan ÖZ'ün arabadan inip yanına gelerek alan ile ilgili resimleri whatsapp üzerinden gönderdiğini, göndermiş olduğu resimlere Recep bey ile baktıklarını bu esnada Ramazan ÇİMEN araç içinde iken yol üzerindeki çatlakları fark ederek Kenan ÖZ'e gösterdiğini, daha sonra onların araçla yanlarından ayrıldıklarını, kendilerinin de aracı park edip yolda oluşan çatlakları kontrol edip resimlerini çektiklerini, daha sonra aracı güvenli bir yere park edip resimleri Recep ÇALI ve Burak ARTAL'a ilettiğini, o sırada büyük çatlakların olduğu alanın girişini iş makinalarının kapattığını gördüklerini, tam geri dönecekleri esnada Kaan Murat AKPOLAT'ın 09.18 sıralarında arayarak proje departmanın çalıştığı alanda Murat BAYRAKDAR ile birlikte olduklarını oraya gelebileceklerini oradan alanın daha net göründüğünü söylediğini, Recep ÇALI ile geri dönerek Kaan Bey'in bahsettiği yere gittiklerini, orada Kaan Murat AKPOLAT ve Murat BAYRAKDAR ile alandaki çatlakların nerden başlayıp nerden bittiğini ne zaman fark edildiğini, radar raporunda herhangi bir bilgi olup olmadığını onlara bu haberin iletip iletilmediğini sorguladıklarını, Murat BAYRAKDAR bu çatlakların gece vardiyasında kimse olmadığı için gündüz vardiyasının ilk kontrollerinde fark edildiğini, bir önceki günkü radar raporunda da herhangi bir uygunsuzluğun gözükmediğini bildirdiğini, radardan gelen otomatik uyarı mesajının(limitlerin dışında hareketlilik olup olmadığı ile ilgili bilgi) gelmediğini söylediğini, bunun üzerine çatlaklardan dolayı projeye bağlı çalışanların alandan çıkarılması gerektiğinin net bilgi gelene kadar çalışmaların durdurulması gerektiğini konuştuklarını, bu esnada Kaan Murat



SWORN
TRANSLATION

AKPOLAT proje mühendisi İshak ASLAN ile alanı boşaltması için görüştüğünü, akabinde alanda çalışan personellerin çalışmayı bırakıp toparlanmaya başladıklarını, Murat BAYRAKDAR'a yolda gördükleri çatlaklardan bahsettiklerini ve alanın daha geriden kapatılması gerektiğini söylediklerini, kendisinin de alana erişimin iki taraflı kapatılacağını hatta Jeoteknik ekibinden Ali Rıza KALENDER'in alana gelip kontrol yapacağını söylediğini, daha sonra Kaan Murat AKPOLAT'a alana solüsyon verilip verilmediğini veriliyorsa verilmemesi gerektiğini söylediklerini, onun da solüsyonu kapattıklarını, alana solüsyon vermediklerini söylediğini, kendisine alana giden solüsyon hatlarının daha aşağıdan kapatılmasının daha uygun olabileceğini herhangi bir kayma olursa boru hatlarında solüsyon kaçağının sızabileceğini söylediğini, alandan ayrılmadan önce yaptıkları görüşmeleri, alan ile ilgili tespitleri alanda olan sorunları bir üst amiri olan Burak ARTAL'a whatsapp üzerinden bilgi verdiğini, kendisi de günlük olan toplantıdan sonra IAIN GUILLE, Can Serdar HASTÜRK ve Murat BAYRAKDAR ile buluşmaya gideceklerini söylediğini, ardından Recep ÇALI ile birlikte bulundukları yerden bir araca öncülük yapmak için ayrıldıklarını ve ofise dönüş yaptıklarını, ofiste iken her gün saat:10.00 da yapılan müdürler toplantısının bitmesini beklediğini, toplantıdan sonra Burak ARTAL, IAIN GUILLE ve Can Serdar HASTÜRK ile araçla tekrardan alana gidecekleri esnada yolun borulama ofislerinin olduğu yerden kapatıldığını gördüklerini, kapatılan alandan geçtikten sonra içeride Murat BAYRAKDAR'ı beklediklerini, daha sonra onun öncülüğünde olay yerine doğru gittiklerini, olay yerine vardıklarında araçları park edip yürüdükleri esnada Soysal DOĞAN(Borulama Süpervizörü)'ın orada olduğunu geçişleri önlemek için orada beklediğini gördüklerini, hatta iş makinaları çatlakların olduğu alana ait yolu kapattığını, yaya olarak çatlakların olduğu alana yürüdükleri esnada Burak ARTAL'a alana girmenin güvenli olup olmadığını sorduğunu, kendisinin de Murat BAYRAKDAR'a soracağını söylediğini, Murat BAYRAKDAR'a sorduğunda herhangi bir sorunun olmadığını söylediğini, bu esnada alana solüsyon verilmeye devam edildiğini gördüğünü ve Murat BAYRAKDAR'a "alana solüsyon kesildiğini söylemiştiniz ama hala solüsyon veriliyor" diye söylediğini, onun da solüsyonu kapatamayacaklarını kapatırlarsa havuzların taşacağını söylediğini, bu esnada Soysal DOĞAN (Borulama Süpervizörü)'a çatlakların normal olup olmadığını sorduğunu, kendisinin de bunların normal olmadığını şimdiye kadar bu tarz çatlakların olmadığını söylediğini, alana girmenin güvenli olup olmadığını sorduğunda kendisi güvenli olmadığını alana girmemeleri gerektiğini söylediğini, bu konuşmalara Burak ARTAL'ın da sonradan dahil olduğunu, ona da güvenli olmadığını söylediğini, onun da IAIN GUILLE'ye alanın güvenli olmadığını alandan çıkmaları gerektiğini söylediğini, akabinde alandan hemen hep beraber çıktıklarını, Soysal DOĞAN'ın karşılaştıkları yerde beklemeye devam ettiğini, alandan çıktıktan sonra alanı daha iyi gören bölgeye gittiklerini, oraya gittiklerinde Kaan Murat AKPOLAT'ın orada bulunduğunu, kendisine "solüsyonun verilmediğini söylemiştiniz ama halen verildiğini gördüm" dediğini, kendisinin de genel müdür yardımcısı IAIN GUILLE'ye durumu söyleyeceğini, onay verirse solüsyonu kapatacağını söylediğini, Iain'de kapatması gerektiğini kendisine söylediğini, akabinde Kaan Murat AKPOLAT'ın Soysal DOĞAN'ı arayıp "solüsyonu kesebilir miyiz kesemiyorsak basıncını düşürebilir miyiz, başka bir alan açamaz mıyız ?" diyerek telefonu kapattığını, Soysal DOĞAN nasıl bir yanıt verdiğini bilmediğini, daha sonra da Kaan Murat AKPOLAT, IAIN'a çatlakların maksimum 6 cm olduğunu, kaymaların doğrultularını söylediğini, bu bilgileri de Jeoteknik Ekibin aldıklarını söylediğini, müdürler kendi arasında bu konularla ilgili bilgi alış verişi yaptıklarını, alandan uzaklaşırken Yığın Liçine giden hangi yolların kapatıldığına dair mailin tüm

33



SWORN TRANSLATION

departmanlara gittiğini, ayrıca alandan uzaklaşırken Soysal DOĞAN 'ın giriş yerinin en sonuna kadar gittiğini gördüklerini, bunun üzerine Burak ARTAL'ın Murat BAYRAKDAR'ı arayıp personelin orada durmaması gerektiğini söyleyip telefonu kapattığını, daha sonra alandan ayrılıp ofise geçtiklerini, ofiste iken Burak ARTAL tüm bu durumları operasyon direktör vekili Abdulkadir CANSIZ'a ileteceğini söylediğini, daha sonra yemeğe gidip geldiğini, Burak şef de yemekten döndükten sonra kendisini yanına çağırdığını , Murat BAYRAKDAR ile görüştüğünü, Murat BAYRAKDAR'ın Ali Rıza KALENDER ile görüştüğünü maden operasyonlarında da benzer hareketliliğin olduğunu, bunların kayma değil oturma olduğunu Murat BAYRAKDAR'ın söylemiş olduğunu, Burak Şefin de "biz madenden daha iyi bilecek değiliz onların hep yaşadığı durumlarmış" o yüzden de panik yapmalarına gerek bir durum olmadığını söylediğini, her ihtimale karşı da mail istediğini mail gelince ileteceğini söylediğini, "Çok panik yapma, şu an için sorun yokmuş." dediğini, aradan 5-10 dakika geçmeden Murat BAYRAKDAR'ın Ali Rıza KALENDER'e cevaben yazdığı mail geldiğini, mail içeriğinin Burak ARTAL'ın söyledikleri ile uyuşmadığını gördüğünü, bu durumu Burak ARTAL'a söylediğinde onun da Murat BAYRAKDAR ile konuşmasının maille uyuşmadığını söylediğini, "Bunlar bu durumu yönetemeyecekler, ben Abdulkadir CANSIZ ile görüşüp onun liderliğinde olayın netleşmesi için konuşacağım." dediğini, saat:15.15 için mail daveti geldiğini, bu toplantının başlığının da Yığın Liçinde yaşanan olay hakkında olarak belirlendiğini, Burak şefin de 15.15 de ki toplantıya katılmasını söylediğini, katılım sağlayacağını belirtip maili onayladığını, daha sonra ofiste toplantıyı beklediği esnada 14.28 de bahse konu olay gerçekleştiğini, olaydan hemen sonra Maden Sahasında Acil Durum Eylem Planı devreye girdiğini, ofisten çıkıp Şenol DEMİR ile birlikte kırıcı ofisleri oraya gittiklerini, daha sonra kriz masasına sahadan bilgi toplamak için çalışma yaptıklarını, borulama biriminden kimin sorumlu olduğu ile ilgili olarak Borulama biriminin bağlı olduğu kişi Murat BAYRAKDAR olduğunu, borulama birimine çıkın yada çıkmayın denip denmediği ile ilgili olarak bilgisi olmadığını, sahadakilere kalın veya kalmayın denip denmediği ile ilgili olarak sahada çalışanlara kalın veya kalmayın deme yetkisi bulunmadığını, sahaya girişlerin kapatıldığı ve tüm işlerin durdurulduğu, epostası alan sorumlusu Murat BAYRAKDAR tarafından gönderildiğini, üst amirine haber verme yükümlülüğü ile ilgili olarak Burak ARTAL ve izinde olan iş güvenliği müdürü Selçuk ÇİFTLİK beye sürekli bilgi verdiğini, Murat BAYRAKDAR ile Burak ARTAL arasında gerçekleşen konuşmalara şahit olup olmadığı ile ilgili olarak bizzat yanında konuşulduğunu beyan etmiştir.

### Murat GÜRBÜZ

14.02.2024 (saat 21:35) tarihli tutanaktaki ifadesinde, Anagold Madencilik A.Ş'de Hibritçi olarak yaklaşık 6 yıldır görev yaptığını, sabah saat:08:00 sıralarında mesai bitiminde görevi bir sonraki vardiya amiri Soysal DOĞAN ve işçi olarak çalışan İshak DEMİR'e vardiya arkadaşı olan Kenan ÇELENK ile birlikte teslim ettiklerini, görevi teslim ederken herhangi bir olumsuz durum olmadığını, kendisi ve Kenan ÇELENK sahada çalıştıkları esnada sahada bulunan basınç ve akış sayaçlarını saat başı kontrol ettiklerinde herhangi bir olumsuz durum görmediklerini, sahada gezdiklerinde sahada herhangi bir çatlak/yarık görmediklerini beyan etmiştir.

### Kenan ÇELENK

14.02.2024 (saat 21:50) tarihli tutanaktaki ifadesinde Murat Gürbüz ile benzer ifade vermiştir.

34



SWORN
TRANSLATION

### İshak DEMİR

14.02.2024 (saat 22:40) tarihli tutanaktaki ifadesinde; Anagold Madencilik Bünyesinde 13 yıldır işçi olarak çalıştığını, görevinin cevhere solüsyonlu su vermek olduğunu, saat 08:00 da vardiyasını Murat Gürbüz ve Kenan Çelenk isimli şahıslardan teslim aldığını, Saat:08.30-09:00 arasında rutin saha kontrolüne çıktığını, kontrol esnasında yığın liçinin olduğu bölgede çatlaklar olduğunu gördüğünü ve delil olarak fotoğraf çektiğini, amiri olan Soysal DOĞAN isimli şahsı arayarak bilgi verdiğini ve sahaya gelmesini istediğini, akabinde Soysal DOĞAN saat 10:00 civarlarında sahaya geldiğini ve üst amirlerini aradığını, bunun üzerine Kaan AKPOLAT isimli şahıs ta sahaya geldiğini, gerekli kontroller yapıldıktan sonra sahanın giriş ve çıkışını kapatmasını ve her saat başı kontroller yaparak bilgi vermesini istediğini, saat 14.00 sıralarında Soysal DOĞAN, Adnan KEKLİK, Kenan ÖZ .Ramazan ÇİMEN, Kaan AKPOLAT ve Elif REYHAN ile kontrol amaçlı tekrar yığın liçi bölgesine gittiklerini, kontrol esnasında çatlakların daha da aşağıya indiğini gördüğünü, Soysal DOĞAN'ın yığın liçi bölgesinde bulunan siyanür gölünün fotoğraflanmasını yapmasını istediğini, İsa TAŞDELEN isimli şahısla bahse konu havuzun yanına fotoğraf çekmek amacıyla geçiş yaptığını, bölgeye ulaştığında Yığın liçinin akmaya başladığını gördüğünü, İsa TAŞDELEN ile birlikte oldukları bölgede beklediklerini, bulunduğu bölge yerin altına çökmeye başladığını, çökme bittikten sora kendi imkanları ile bölgeden uzaklaştıklarını, bu olaydan Soysal DOĞAN, Adnan KEKLİK, Kenan ÖZ .Ramazan ÇİMEN isimli şahıslardan haber alamadığını, bu olayda herhangi bir yaralanma yaşamadığını, kimseye bilgi verip vermediği ile ilgili olarak amiri Soysal Doğan'a haber verdiğini ve talimat doğrultusunda yolu trafiğe kapattığını ifade etmiştir.

### İsa TAŞDELEN

14.02.2024 (saat 23:40) tarihli tutanaktaki ifadesinde; Anagold Madencilik alt taşeronu olan Karsa Ltd. Şti isimli firmada yaklaşık 12 yıldır işçi olarak çalıştığını, makinelere bakım yaptığını, saat 11.00 de işe başladığını ve İshak DEMİR isimli şahsın yığın liçi bölgesinde çatlamalar olduğunu söylediğini, işe başladığında yolun amiri olan Soysal DOĞAN isimli şahıs tarafından talimat verilerek trafiğe kapattırıldığını, Saat 12.30 sıralarında Abdurrahman ŞAHİN isimli şahısla kontrol amaçlı sahaya çıktıklarını, sabah saat 08:00 sıralarında yapılan kontrollerde yığın liçi bölgesinde çatlak olduğu yapılan kontrollerde fark edilmiş olduğunu, Saat: 13.00 sıralarında bölgeden toprak kayması neticesinde kaybolan konteynırın olduğu yere geldiğini, Saat:14.00 sıralarında Soysal DOĞAN isimli şahıs İshak DEMİR ve kendisini fotoğraflama yapmaları için sahaya çağırdığını, bunun üstüne Soysal DOĞAN, İshak Demir, Kenan ÖZ, Elif REYHAN, Kaan AKPOLAT ve Adnan KEKLİK isimli şahıslar ile Yığın liçi bölgesine çıkış yaptıklarını ve burada çatlakları incelediklerini, yığın liçi bölgesine çıkış yaptıklarında Abdurrahman ŞAHİN, Hüseyin Kara, Fahrettin KEKLİK ve Mehmet KAZAR isimli şahıslar olay sonrası toprak altında kalan konteynerde olduklarını, yığın liçi bölgesine çıktıklarında yolun halen trafiğe kapalı olduğunu, sadece kendilerinin geçiş yaptıklarını, daha Sonra İshak Demir ile siyanür gölünün fotoğraflamasını yapmak üzere bölgeden uzaklaştıklarını, Saat 14:28 sıralarında bir gürültü duyduklarını ve kaymayı hissettiklerini, oldukları bölgenin de çökmeye başladığını, ters istikamete doğru kaçarak uzaklaştıklarını ifade etmiştir.

### Sabri EKİCİ

15.02.2024 (saat 18:30) tarihli tutanaktaki ifadesinde Ekiciler Firmasında dozer operatörü olup olaya şahit olmadığını ifade etmiştir.



SWORN
TRANSLATION

### Alparslan Bazna

15.02.2024 (saat 18:11) tarihli tutanaktaki ifadesinde Sabri Ekici ile benzer ifade vermiştir.

### Selim GÜDER

15.02.2024 (saat 19:05) tarihli tutanaktaki ifadesinde; Anagold madencilik içerisinde bulunan Asilçöplerliler Ltd.Şti. firmasında Loder Operatörü olarak çalıştığını, olayın meydana geldiği tarihte istirahatli gününde olup vardiya saat 16:00 da başlayacağını, bir arkadaşının arayarak madende göçük olduğunu söylediğini, bunun üzerine şuan göçük altında bulunan Şaban YILMAZ, Mehmet KAZAR, Kenan ÖZ isimli arkadaşlarını aradığını ancak hiç birisine ulaşamadığını, Bunun üzerine vardiya servisi ile maden gittiğini, olayın meydana geldiği 13.02.2024 günü Şaban YILMAZ'ın öğleden önce saat 10:58 de 5 adet fotoğraf göndermiş olduğunu ancak whatsapp uygulamasına bakmadığı için fotoğrafları görmediğini, telefon ile aradığını "şuan burada işi durdurdular ve sahayı boşalttılar, çatlaklar oluşmuş " dediğini, öğleden sonra saat 13:00 sıralarında Mehmet KAZAR'ı aradığını ve çalışıp çalışmadıklarını sorduğunu, Mehmet KAZAR'da bana henüz çalışmaya başlamadıklarını söylediğini, kendisinin sahada öncesinde olumsuzluk görmediğini ifade etmiştir.

### Cihad KARADAĞ

16.02.2024 (saat 20:00) tarihli tutanaktaki ifadesinde; Anagold madencilik firması alt taşeronu olan Kar-Sa İnşaat Mak.Ltd.Şti isimli firmada 2016 yılından itibaren makine mühendisi olarak çalıştığını, görevinin Anagold maden sahasında Kar-Sa inşaat çalışanlarını organize etmek, projeleri yürütmek ve planlamak olduğunu, olay günü olan 13.02.2024 günü saat 08:00 dan itibaren sahada bulunduğunu, göçük altında kalan ve firmaları personeli olan Abdurahman ŞAHİN ve Hüseyin KARA isimli şahıslar Anagold madencilik bünyesinde kiralık personel olarak çalıştıklarını, Abdurahman ŞAHİN ve Hüseyin KARA isimli şahısları olay günü olan 13.02.2024 saat: 08:00 da mesaiye başladıkları anda gördüğünü, öğlen saat 12:30 sıralarında kırıcı bölgesinde bulunan ofise geldiğinde Abdurahman ŞAHİN ve Hüseyin KARA isimli şahısların ofiste olmadıklarını, çalışma alanları olan yığın liç bölgesine gittiklerini öğrendiğini, ofiste çalışmalarına devam ettiğini, Saat: 14:28 sıralarında büyük bir gürültü ve titreşim duyduğunu , deprem olduğunu düşünerek dışarı çıktığını, Anagold madencilik bünyesinde çalışan eşi Nuray KARADAG'dan yığınliç bölgesinde çökme olduğu bilgisini aldığını ve derhal personeli olan Abdurahman ŞAHİN isimli şahsı aradığını ancak ulaşamadığını ve yine diğer bir personeli olan İsa TAŞDELEN 'i aradığını ve kendisinin yığın liç bölgesinde toprak kayması olduğunu kendisinin bölgeden kaçmaya çalıştığını beyan ettiğini, hemen aracına binerek olay yerine gitmeye çalıştığını, Şahin Çukuru olarak tabir edilen bölgeye kadar gittiğini, yukarıda İsa TAŞDELEN isimli personelin el salladığını gördüğünü ve İsa TAŞDELEN'in kendi imkanları ile yanına kadar geldiğini ve Abdurahman ŞAHİN ve Hüseyin KARA isimli şahısların toprak altında kaldıklarını söylediğini, bölgenin riskli olmasından dolayı hemen olay yerini terk ettiğini ve ofiste bulunan tüm arkadaşları alarak yemekhane bölgesine geçtiğini, burada olay hakkında bilgi almaya çalıştığını, şirket müdürünün amcası Ömer Faruk KARADAĞ olup Barış KARACA isimli şahsın şantiye müdürü olarak görev yaptığını, 10.02.2024 günü izne ayrıldığını ve olay günü sahada olmadığını, kendisinin şantiye proje müdürü ve mühendisi olarak görev yaptığını, Seyfettin KARADAĞ Teknik ofis mühendisi olarak çalıştığını, formenler Hasan Hüseyin ALMALI, Muhammet ÇELEGEN ve idari işler sorumlusu Süleyman SEZGİN olmak üzere firmada yaklaşık 30 kişi çalıştığını, göçük altında kalan Abdurahman ŞAHİN plastik boru kaynakçısı, Hüseyin KARA



SWORN
TRANSLATION

makine bakımcısı, kurtulan İsa TAŞDELEN makina bakımcısı olarak çalıştıklarını, Toprak altında kalan işçilerimiz olan Abdurahman ŞAHİN ve Hüseyin KARA isimli şahıslar Anagold madencilik bünyesinde kiralık olarak çalıştıklarını, işçileri yönlendirme ve organize etme görevinin Anagold madencilik bünyesinde çalışan süpervizörlere ait olduğunu, kendileri ile sadece vardiya değişimleri, eleman ihtiyacı ve personelle alakalı herhangi bir sorun olması durumunda iletişim kurulduğunu, işçilerin görevleri ile ilgili yetki ve sorumluluk mesai saatleri içerisinde Anagold madenciliğe ait olduğunu, olay günü veya olaydan önce yığın liç bölgesinde meydana gelen çatlak ile ilgili herhangi bir bilgileri olmadığı için personellere de bu konuda herhangi bir bilgilendirme yapamadıklarını, aynı şekilde personeller tarafından da yığın liç bölgesindeki çatlakla ilgili herhangi bir bilgi verilmediğini, olaydan sonra öğrendiği kadarıyla bölgede bulunan Yesti firması saat: 10:00 sıralarında oluşan çatlaklar sebebiyle sahadan uzaklaştırıldığını, Kar-Sa inşaat personellinin yığın liç bölgesinde bulunan konteynerde bekletilmeye devam ettiğini, kurtulan personeli İsa TAŞDELEN ise o esnada fotoğraf çekmek üzere tepeye çıktığını ve göçük altında kalmaktan son anda kurtulduğunu, göçük altında kalan vatandaş/vatandaşların hangi birime bağlı oldukları , neden yığın liç bölgesinde oldukları ve o bölgeye gitme talimatını kimin verdiği ile ilgili olarak Abdurahman ŞAHİN ve Hüseyin KARA isimli şahıslar Anagold madencilik bünyesinde yığın liçi proses borulama ekibinde kiralık olarak çalıştıklarını, her gün olduğu gibi olay günü de yığın liç bölgesinde çalışmakta olduklarını, olayın gerçekleştiği yığın liç bölgesinde rutin görevleri icabı bulunduklarını, yığın liç bölgesinin amiri Soysal DOĞAN isimli şahıs olduğunu, ancak olay günü firma personeli Abdurahman ŞAHİN ve Hüseyin KARA isimli şahıslara yığın liç bölgesinde bulunan konteynerde beklemeleri talimatını kimin verdiğini bilmediğini, olay sonrası 2 personelin ve 34 BRK 204 plakalı şirket aracının göçük altında kaldığını ifade etmiştir.

### Süleyman OĞUZ

16.02.2024 (saat 19:00) tarihli tutanaktaki ifadesinde; Anagold madencilik firması alt taşeronu olan Asil Çöpler isimli firmada müdür olarak çalıştığını, firmada aynı yetkiye sahip iki kişi olup diğerinin amcası Zekeriya OĞUZ olduğunu, şirketin genel olarak iş makinesi ve personel kiralama işi yaptığını, olayda toprak yığınının altında kalan Şaban YILMAZ isimli şahıs 18.11.2023 tarihinden itibaren şirketlerinde çalıştığını, Anagold Madencilik ile yaptıkları anlaşma sonucu işe başlamış olduğu tarihten bu güne kadar Anagold Madenciliğe kiraladıkları ve şirkete ait Loder isimli iş makinesini kullandığını, olay günü olan 13.02.2024 günü saat:14.00 sıralarında İliç İlçe merkezinde bulunduğu esnada maden sahasında göçük olduğu bilgisine ulaştığını, derhal maden sahasına gitmek üzere yola çıktığını ve aynı zamanda şirket çalışanı olan Şaban YILMAZ'a ulaşmaya çalıştığını ancak telefonuna ulaşılamadığını, maden sahasına geldiğimde hemen Şaban YILMAZ hakkında kimsenin bir şey bilmediğini, daha sonra Şaban YILMAZ isimli çalışanın heyelan sınasında toprak altında kalan konteynerin içinde olduğunu öğrendiğini, maden sahasından ayrılarak Sabırlı Köyü mevkiine geçtiğini ve olayın meydana gelen yerdeki çalışmaları izlediğini, şirkette Zekeriya OĞUZ ile birlikte müdür olarak görev yaptığını ancak şirkete dair işlerin büyük bir çoğunluğunu yönettiğini, alt kademede direkt olarak işçilerimiz bulunduğunu, yaklaşık 15 personel bulunmakta olup bu personellerden Şaban YILMAZ ve Selim GÜDER loder operatörü olarak görev yaptıklarını, olayın yaşandığı gün olay mahalinde sadece Şaban YILMAZ isimli çalışanın olduğunu, toprak altında kalan kişilere ilişkin maden sahasında kim sorumlu



olduğu, olay günü her hangi bir uyan bildiriminde bulunup bulunmadığı ile ilgili olarak Şaban Yılmaz'ın faaliyeti ile ilgili sorumluluğu olmayıp olay ile ilgili bilgisi de olmadığını ifade etmiştir.

### Abdullah ÖZBEY

16.02.2024 (saat 19:14) tarihli tutanaktaki ifadesinde; Anagold Madencilik A.Ş'nin yüklenici firması olan Çiftay A.Ş' de 2008 yılından itibaren çalıştığını, İliç'de Eylül 2023'den itibaren proje müdürü olarak çalıştığını, mesaiye saat 08.00 de başladığını, rutin işleri ile ilgilendiğini, maillerini kontrol ettiğini, maden içerisinde bulunan çakmak tepe bölgesindeki ocaklarını gezdiğini, daha sonra ofis bölgesine geldiğini, öğlen yemek yediğini, 13.00'de Anagold idari/merkez ofiste göreve yeni başlayan Mehmet TÜRK'ü ziyarete gittiğini, 13.45'de Çiftay A.Ş'nin ofisler bölgesine geçtiğini, ofiste oturduğu esnada saat 14.30 gibi heyelan oluyor denildiğini, dışarı çıktığını, Sabırlı deresinden Yığın liç sahası göründüğünü, heyelan oluşunu gördüğünü, büyük bir toprak yığını geldiğini gördüğünü, heyelana kapılan konteynırlar, beyaz dacia arazi aracı ve kamyon görüp görmediği ile ilgili olarak görmediğini, arkadaşlara işi durdurmaları ve toplanma alanında sayımın yapılma talimatını verdiğini, gördüğü yerin dışında bir toprak kayması daha olduğunu öğrendiğini, manganez diye adlandıran yere intikal ettiğini, yanında iş güvenliği İlkay Ahmet Evren, Şef Erkan Yağınlıuray ve ismini hatırlayamadığı dört kişi de olduğunu, manganez bölgesine gittiklerinde heyelanın bittiğini gördüklerini, orada bulunan personelin şirkete ait bir kamyonun kaldığını söylediğini, orada bulunan yine şirkete ait 2 Loderin (iş makinası) yolu aktarmaya yani temizlemeye başladığını, o bölgede Anagold bünyesinde bulunan personeller olduğunu, 10-15 dk arasında şirket personel sayımı bittiğini ve Mercedes marka 803 kodlu harfiyat kamyonun göçük altı kaldığını anladıklarını, şoförünün Uğur Yıldız isimli personel olduğunu tespit ettiklerini, kamyonun görevinin yığın liç sahasına girmek olmadığını, asıl görevinin maden içerisinde C2-1315A037 bloğundan yüklediği harfiyat malzemesini maden içerisinde Çöpler döküm alanına taşımak olduğunu, bu yol ana firma olan Anagold tarafından firmalarına bildirilen nakliye yolu olduğunu ancak aracın günlük rutin işlerini ifa etmek üzere bulunduğunu, heyelanın olduğu Liç sahası görev ve sorumluluk alanları olduğunu, Proje Müdürü olarak kendisi, şantiye şefi Uğur Gültekin, hatırladığı kadarı ile Mühendis Cevdet Fat, Formen Hüseyin Aydın isimlerinin şirkette olduklarını, altında İliç Çiftay şirketinde 1170 kişilik personel olduğunu, toprak altında kalan 1 kişi kamyon şoförünün personeli olup kendisinin bahsettiği üzere şirkete ait harfiyat kamyonunu kullandığını, olay bölgesi(yığın liç) şirket görev ve sorumluluk alanı dışında kaldığını, Uğur Yıldız rutin mesaisinde ve görev bölgesinde harfiyat taşımakta olduğunu, yığın liç bölgesinde meydana gelen çatlama ve yarılmalardan haberdar olmadığını, mail, whatsapp, telefon ile arama ve ya şifaen sözlü söyleme bildirimi uyarısı gelmediğini, bu neden ile şirkette çalışan 1170 personele bildirimde bulunamadığını, şoförlerimize iş emri kamyon izleme sistemi üzerinden geldiğini, buradaki iş emrinin Anagoldun iş planına göre geldiğini, şoförler kamyon içerisinden gelen iş emrine uygun sorumluluk alanına gittiklerini, personelin o gün yığın liç bölgesinde olmadığını, yığın liç bölgesinden toprağın kayması sonucu mangenez diye adlandırılan ana iletişim yolunda nakliye yapmakta olduğunu beyan etmiştir.

### Zekariya OĞUZ

16.02.2024 (saat 18:00) tarihli tutanaktaki ifadesinde; Anagold madencilik firması alt taşeronu olan Asil Çöpler isimli firmada müdür olarak çalıştığını, aynı yetkiye sahip iki kişi olup diğerinin yeğeni Süleyman OĞUZ olduğunu, şirket yönetiminin büyük kısmını onun takip ettiğini, şirketin faaliyetleri ile çok fazla ilgilenmediğini, işin genel olarak malzeme ekipman tedarik işlemlerini

38



yaptığını, enkaz altında kalan Şaban YILMAZ isimli şahsın loder iş makinası operatörü olarak çalıştığını, olay saatinde İliç çarşı merkezinde kahvede bulunduğunu, olayın meydana geldiğini İliç Ak Parti İlçe Başkanı Ahmet YILMAZ'dan öğrendiğini, daha öncesinde madende bir kaza oluşabileceği veya çatlak olduğu yönünde bir bilgisi olmadığını, Şaban YILMAZ'ın olay yerinde ne yaptığını dahi bilmediğini, Şaban YILMAZ'ın kullandığı makinayı Anagold madenciliğe kiraya verdiklerini, orada yapılan faaliyetlerden hiçbir bilgileri olmadığını, tüm sorumluluk Anagold firmasında olduğunu beyan etmiştir.

## Aydın KEKLİK

16.02.2024 (saat 19:00) tarihli tutanaktaki ifadesinde; Keklikler Ltd.Şti. firmasının ortağı ve müdürü (yönetici) olduğunu, Anagold Madencilik A.Ş. firmasına makine ve araç kiraladıklarını, vardiya operatörlerinin Anagold A.Ş.'nin saha vardiya amirleri tarafından yapılacak işi yönlendirmesi sonucu verilen işleri yaptıklarını, saha içerisinde sadece makine ve operatör kiraya verdikleri için iş ve işleyişe müdahaleleri olmadığını, Keklikler Ltd. Şti. olarak sahada kendi başlarına herhangi bir karar alarak iş yapma durumları da söz konusu olmadığını, tamamen Anagold A,Ş'nin taleplerine karşı hizmet verdiklerini, olayın meydana geldiği gün olan 13.02.2024 günü İliç ilçesinde bulunduğunu, olayı operatörü olarak çalışan Sabri Ekici'den öğrendiğini, operatörü Mehmet KAZAR'ın enkaz altında kalan konteynerin içinde olduğunu öğrendiğini, Mehmet KAZAR'ın saat 10:24'de Whatsapp uygulamasından 2 adet fotoğraf gönderdiğini, fotoğrafları gördüğünü ancak konuşmadıklarını, konu ile ilgili Anagold A.Ş. firmasının yetkili ve sorumlularının kendisine ulaşmadıklarını, Mehmet KAZAR isimli şahsın neden enkaz altında bulunan konteynerin içerisinde bulunduğunu, oraya gitmesini kim yada kimler söylediğini bilmediğini, ayrıca operatörü olan Mehmet KAZAR'ın o gün kullandığı dozerin toprak kaymasının altında kalmadığını, kaymanın meydana geldiği bölgenin üst tarafında kalan bir bölgede hala durduğunu beyan etmiştir.

## Sami BOZ

18.02.2024 (saat 02:00) tarihli tutanaktaki ifadesinde; Anagold Madencilik A.Ş'nin alt taşeron firması olan Yesti İnşaat A.Ş'de Usta Yardımcısı olarak yaklaşık 8 aydır çalıştığını, 13.02.2024 günü saat 08.00'de maden sahasında mesai başladığını, maden sahasında görevlerinin olayın meydana geldiği yığın liç sahasında mebran uygulaması yapmak olduğunu, mesaiye Yesti firması yaklaşık olarak 10 kişilik ekip olarak başladıklarını, sabah mesai başladıklarında bölgedeki yarılma/çatlamaları görmediğini, aynı gün sahada Yesti firmasından en yetkili kişinin Halis Yusuf Kılıç olduğunu, sahadaki görevinin mebran serilmesine yardım etmek olduğunu, saat 09.00 sıralarında şef Halis Yusuf Kılıç'a bilgi verilmiş olup, kaymanın olabileceği söylendiğinden kendilerini sahadan çıkardığını, Yesti Personeli 15 kişi olarak TSF Şantiye alanına geçtiklerini, TSF şantiyesinde öğlen yemeği için beklediklerini, saat 12.00'dc Anagold yemek hanesinde yedikten sonra tekrardan TSF geçtiklerini beklemeyle başladıklarını, saat 14.30 sıralarında olayın meydana geldiğini, kayan toprağın içinde konteynır, araç veya kimsenin kaldığını görmediğini, kayan toprağın içinde sadece konveyır bandının iş makinesinin olduğunu gördüğünü, olaydan sonra İliç Merkez'de bulunan kamp alanına geldiklerini beyan etmiştir.

## Niyazi YAVAN

26.02.2024 (saat 09:20) tarihli tutanaktaki ifadesinde Sami Boz ile benzer ifade vermiştir.

39



SWORN
TRANSLATION

**İlker KIRLI**

26.02.2024 (saat 09:10) tarihli tutanaktaki ifadesinde Sami Boz ve Niyazi Yavan ile benzer ifade vermiştir.

**Akif SANDAL**

26.02.2024 (saat 09:00) tarihli tutanaktaki ifadesinde özetle; Anagold Madencilik A.Ş'nin alt taşeron firması olan Yesti İnşaat A.Ş'de inşaat mühendisi olarak yaklaşık bir yıldır çalıştığını, sabah saat 08.00'de maden sahasında mesai başladığını, sahada membran uygulaması yaptıklarını, Yesti firması olarak 15 kişilik ekip olarak başladıklarını, bölgedeki yarılma/çatlamaları görmediğini, Yesti firmasından en yetkili Halis Yusuf Kılıç olup sahadaki yetkili kişi olduğunu, yığın liç bölgesindeki çatlama ve yarılmalar ile ilgili bildirim şikâyet gelmediğini, Saat 09.00 sıralarında Anagold personellerinden oluşan tahmini 10-15 kişilik ekip geldiğini, bölgede yığın liç tepesinde ve çevresinde gezindiklerini, daha sonra yığın liç tepesinden seslenerek bölgeden çıkmalarını istediklerini, Yesti Personeli olarak TSF şantiye alanına geçtiklerini, Anagold grubu içinde bulunan Murat Bayrakdar ve İshak Aslan şantiyelerine gelerek bölgeden çıkın, çalışma yapmayın dediğini, bölgede kayma riski var diyerek uyardıklarını, yemek sonrası tekrardan TSF'ye geçtiklerini, saat 14.30 sıralarında olayın meydana geldiğini beyan etmiştir.

**Halis Yusuf KILIÇ**

26.02.2024 (saat 08:45) tarihli tutanaktaki ifadesinde; Anagold Madencilik A.Ş'nin alt taşeron firması olan Yesti İnşaat A.Ş'de inşaat mühendisi olarak yaklaşık 4 yıldır çalıştığını, olay günü saat 08.00'de maden sahasında mesai başladığını, sahada mebran uygulaması yaptıklarını, Yesti firması olarak 15 kişilik ekip olarak başladıklarını, bölgedeki yarılma/çatlamaları görmediğini, Yesti firmasından en yetkili kişi olduğunu, yığın liç bölgesindeki çatlama ve yarılmalar ile ilgili bildirim şikâyet gelmediğini, Saat 09.00 sıralarında Anagold personellerinden oluşan tahmini 10-15 kişilik ekip geldiğini, bölgede yığın liç tepesinde ve çevresinde gezindiklerini, daha sonra yığın liç tepesinden seslenerek bölgeden çıkmalarını istediklerini, Yesti Personeli olarak TSF şantiye alanına geçtiklerini, Anagold grubu içinde bulunan Murat Bayrakdar ve İshak Aslan şantiyelerine gelerek bölgeden çıkın, çalışma yapmayın dediğini, bölgede kayma riski var diyerek uyardıklarını, yemek sonrası tekrardan TSF'ye geçtiklerini, saat 14.30 sıralarında olayın meydana geldiğini beyan etmiştir.

**Yusuf YILDIZ**

26.02.2024 (saat 09:15) tarihli tutanaktaki ifadesinde; Sami Boz, İlker Kırlı ve Niyazi Yavan ile benzer ifade vermiştir.

**Hamit AKDUMAN**

26.02.2024 (saat 09:00) tarihli tutanaktaki ifadesinde; Yusuf Yıldız, Sami Boz, İlker Kırlı ve Niyazi Yavan ile benzer ifade vermiştir.

**Alparslan Recep DÜLGER**

26.02.2024 (saat 08:40) tarihli tutanaktaki ifadesinde; Hamit Akduman, Yusuf Yıldız, Sami Boz, İlker Kırlı ve Niyazi Yavan ile benzer ifade vermiştir.

40



SWORN
TRANSLATION

### Ali ÇÜRÜK

26.02.2024 (saat 09:30) tarihli tutanakta, A. Recep Dülger, Hamit Akduman, Yusuf Yıldız, Sami Boz, İlker Kırlı ve Niyazi Yavan ile benzer ifade vermiştir.

### Naim KARA

26.02.2024 (saat 09:05) tarihli tutanaktaki ifadesinde; Ali Çürük, A. Recep Dülger, Hamit Akduman, Yusuf Yıldız, Sami Boz, İlker Kırlı ve Niyazi Yavan ile benzer ifade vermiştir.

### Batuhan KOÇ

26.02.2024 (saat 09:30) tarihli tutanaktaki ifadesinde, Naim Kara, A. Recep Dülger, Hamit Akduman, Yusuf Yıldız, Sami Boz, İlker Kırlı ve Niyazi Yavan ile benzer ifade vermiştir.

### Aziz ÇELIK

20.02.2024 (saat 10:20) tarihli tutanaktaki ifadesinde, Sabırlı Gold firmasında Dozer Operatörü olarak yaklaşık bir yıldır görev yaptığını, olay sabahı 08.00 sıralarında çalışmaya başladığını, TSF Atık alanı-dolgu yeri faz 5 bölgesinde görev yaptığını, olay saatine kadar dozer ile dolgu ve serme işleriyle uğraştığını, daha sonra kamyonları beklemek için saat 14.20 sıralarında dozeri kenara aldığını, ses duyduğunu ve baktığında toprak kaymasının olduğunu fark ettiğini, telefondan video çekmeye başladığını, toprak kayması olduğu anda herhangi bir kişi, konteynır, tır veya araç görmediğini, yığıntının hemen hemen dereye dolmuş olup sadece Sabırlı deresi tarafını görebildiğini, manganez sahasını gülebileceği bir açı olmadığını, toprağın akıntısının hızı oldukça fazla olduğu için iz emare vs. görmediğini ifade etmiştir.

### Efrail DURSUN

22.02.2024 (saat 16:15) tarihli tutanaktaki ifadesinde; Anagold Madencilik A.Ş. taşeronu olan Nurul Omum Ürünleri A.Ş isimli firmada üç yıldır işçi olarak çalıştığını, sahada geri dönüşüm işi yaptığını, olay günü 8:00 de işe başlayıp 9: 00 a kadar çalıştığını, operatör Hüseyin Erdal Mürekkepçi çatlakların olduğunu söyleyerek alanı acilen boşaltmalarını söylediğini, kendi bölgeleri olan Tesef alanına yani kaldıkları yere geçtiklerini, saat 12.00'ye kadar Tesef alanında kaldıklarını ve sonra yemek yemek için Nural Orman Ürünleri şantiyesine gittiklerini, yemek sonrası iş sahasına geri döndüklerini, bahse konu olayın yaşandığı saatte ofisler bölgesinde bulunan konteynırlarda beklediklerini, kendi firmalarındaki üst amirlerine haber verdiklerini, bölgedeki toprak ayrılması hakkında önceden bilgisi olmadığını beyan etmiştir.

### Samed ÇINAR

22.02.2024 (saat 15:30) tarihli tutanaktaki ifadesinde, Efrail Dursun ile benzer ifade vermiştir.

### Yunus SEZMİŞ

22.02.2024 (saat 14:30) tarihli tutanaktaki ifadesinde, Anagold Madencilik A.Ş'nin alt taşeron firması Mürekkepçilcr A.Ş'de operatör olarak yaklaşık çalıştığını, olay günü işe başladıklarını, görevlerinin olayın meydana geldiği yığın liç sahasına membran sermek olduğunu, Bayram Mutluay ve Bekir Koçman ile beraber yığın liç Sahasında makinaları çalıştırıp ısındırdıkları esnada saat 08.30 gibi bulundukları bölgenin altlarında tahmini 20-30 metre aşağıda 15 kişilik mühendislerden oluşan grubun seslerini duyduklarını, bu gurubun içerisinde Murat Bayrakdar, Kenan Öz, Ramazan Çimen ve Soysal Doğan isimli personeller olduğunu, yanlarında bulunan patronu Hüseyin Erdal Mürrekkepçi "bekleyin ben geliyorum" diyerek aşağıdaki grubun yanına

41



SWORN
TRANSLATION

gittiğini ve 5 dk sonra gelerek "iş durdu bölgeyi boşaltıyoruz" dediğini, aşağıda bulunan kamp alanına ( 5 konteynıra) geçtiklerini, burada saat 11 00'e kadara kaldıktan sonra Anagold'un yemekhanesine yemek yemeye geçtiklerini, çalıştıkları yerin toprak kayması yaşanan yığın liç için en tepesi olduğunu, 13.02.2024 günü sabah 08.00 gibi sabahtan bölgedeki çatlak ve yarılmaları gördüklerini, buradaki çatlak ve yarılmaları daha önce görmediğini, varsa da görmemiş olabileceğini, yığın liç bölgesinin büyük bir alan olup olay olduğunda İliç Merkezde evinde olduğunu,

### Bayram MUTLUAY

22.02.2024 (saat 14:15) tarihli tutanaktaki ifadesinde; Yunus Sezmiş ile benzer ifade vermiş olup çatlakları öncesinde de gördüğünü ifade etmiştir.

### Bekir KOÇMAN

22.02.2024 (saat 14:50) tarihli tutanakta, Yunus Sezmiş ile benzer ifade vermiştir.

### Mehmet ÖZKÖK

22.02.2024 (saat 14:50) tarihli tutanaktaki ifadesinde; Anagold Madencilik A.Ş'nin alt taşeron firması olan Nurul İnşaat A.Ş'de formen olarak çalıştığını, görevinin olayın meydana geldiği yığın liç sahasında membran sermek ve temizlemek olduğunu, Efrail Dursun ve Samet Çınar ile beraber yığın liç sahasında çalışmalara başladıklarını, saat 10.00 sıralarında Mürekkepçiler firmasından Hüseyin Erdal Mürekkepçi ile karşılaştığını, "bölgeyi boşaltın" dediğini, Anagold personellerinden uyarı ve ya bilgi gelmediğini, 10 gibi yığın liç alanını boşaltarak Çakmak Tepe Bölgesinde bulunan atık havuz yanındaki TSF bölgesine gittiklerini, yemekten sonra 13 gibi yine oraya geçtiklerini, yığın liç sahasında çatlak ve yarılma olduğu gün sabahtan gördüğünü, TSF bölgesinden olayın olduğu yerin net şekilde göründüğünü, olayın olduğunda saat 14.30 gibi konteynır ve beyaz aracın toprak kaymasına kapıldığını gördüğünü, yığın liç bölgesinde daha önceden de çatlak ve yarılmalar olduğunu ancak bu denli büyük olmadıklarını, olayın olduğu gün sabahtan yarılmaların sayısının arttığını ve derinliği ile genişliği gözle görülecek derecede büyüdüğünü gördüklerini ifade etmiştir.

### Münevver DOGAN

29.02.2024 (saat 12:00) tarihli tutanaktaki ifadesinde; Anagold Madencilik Bünyesinde 15 aydır Çevre Mühendisi olarak çalıştığını, olay günü 13.02.2024 tarihinde Anagold maden sahasında olmadığını, 15 Şubat itibari ile Maden bölgesinde bulunan ofisler bölgesine geldiğini, saha ile alakalı istenilen veri ve bilgileri oluşturmaya çalıştığını, daha sonra Müdürü olan Can Serdar HASTÜRK ile beraber yığın liç bölgesinde çevresel konuların kontrolünü sağladıklarını, bu süreçte Çevre ve Şehircilik Bakanlığı çalışanları ile beraber toprak ve sudan alınan numunelerin takibini yaptıklarını, belli bir süre bu şekilde devam ettikten sonra esnek çalışma programına geçtiklerini, en son yığın liç bölgesine yaklaşık olarak 1,5-2 ay önce çıkmış olduğunu, o süreçte yapmış olduğu kontrolde yığın liç bölgesinde yağan yağmur ve karın da etkisiyle ufak ufak göllenmeler oluşmuş olduğunu, bu göllenmeler yaban hayatı ve kuşları sahaya çekebileceği için ilgili departmana çözüm bulmaları için bilgi verdiğini, Şubat ayının başlarında sahayı gezen arkadaşlarından Suat ARSLAN isimli şahsın whatsaptan görüntü gönderdiğini, görüntüde yığın liç bölgesinde tazyikli bir şekilde akan solüsyon göründüğünü, bunu Oksit Departmanında bulunan Hüseyin ÜSTÜNDAĞ'a gönderdiğini, bu konu hakkında bilgisi olduğunu en kısa süre içinde

42



SWORN
TRANSLATION

ilgileneceğini belirttiğini, bir gün sonra da Oksit Departmanı kendisine aynı yerin sorunu çözülmüş şekilde fotoğrafını gönderdiğini ifade etmiştir.

**Suat ARSALN**

06.03.2024 tarihli ifadesinde özetle Anagold Şirketinde çevre teknikeri olarak çalıştığını, olay günü maden sahası ve çevresinde ölçüm yaptığını, olayı Can Serdar Hastürk'ün mesajı ile öğrendiğini, olay sabahı müdürleri Can Serday Hastürk'ün bölgeye giriş çıkış yapılmaması uyarısında bulunduğundan alt personel Nural Ticaret ve Çınar Çevre çalışanlarına bilgilendirme yaptıklarını beyan etmiştir.

**Mehmet Alperen TURAK**

29.02.2024 (saat 12:15) tarihli tutanaktaki ifadesinde; Anagold Madencilik A.Ş' de yaklaşık olarak 4 yıldır İnşaat Mühendisi olarak çalıştığını, son beş yıldır Alt Yapı İnşaatları Baş Mühendisi olarak çalıştığını, görevinin maden dışındaki Sabırlı, Yakuplu ve Ardıç Bölgelerinde genişleme faaliyeti kapsamında yollar, enerji hatları ve telekomünikasyon hatları gibi alt yapıların relokasyon ve yeniden yapım işlerinin yürütülmesinden sorumlu olduğunu, olay günü olan 13.02.2024 günü saat:07.30 da maden sahasında olduğunu, saat 10.30 sıralarında müdürü Shaun SWARTZ ve Patrik VALKO isimli şahısların kendisini çağırarak; bilgisayar ortamından bahse konu olan Yığın Liç'teki çatlakların fotoğraflanmış hallerini gösterdiklerini, olay günü saat:10.30 da öğrendiği bu bilgi dışında herhangi bir bilgisi olmadığını, Yığın Liç'te meydana gelen olayda veya oradaki çalışma sahası alanında yetkili olmadığını, sadece bilgi amaçlı gösterildiğini, daha sonra orada bulunan çalışma faaliyetindeki taşeron firmaların oradan çekildiğini söylediklerini, olay esnasında toplantıda olup deprem olduğunu zannettiğini, önceden toprak ayrılması ile ilgili bilgisi olup olmadığı ile ilgili olarak 2019 yılının sonlarından, 2021 yılının Haziran ayına kadar Yığın Liç-Faz 4 B ve Faz 5 inşaatı kapsamında kıdemli inşaat mühendisi olarak görev yaptığını, Yığın Liç bölgesinin alt tabanındaki tabakada Membran (geçirimsiz tabaka) çalışmaları sırasında orada çalışmakta olduğunu, bölgede bulunan taşeron firmalarının koordinasyonunu ve iş planlamasını sağlamakta olduğunu, Yığın Liç üst tarafı olan yığın alanın hiçbir zaman çalışması olmadığını ve çalışma operasyonları hakkında herhangi bir bilgisi veya yetkisi de olmadığını, bildiği kadarıyla Yığın Liç alanı Oksit müdürü Hüseyin ÜSTÜNDAĞ isimli şahıs ve Murat BAYRAKTAR isimli şahıslar bu alanlardan sorumlu kişiler olduklarını, bu zamandan beri Yığın Liç bölgesinde çatlak olduğunu hiç görmediğini, 2022 yılı içerisinde Yığın Liç alanında küçük çaplı bir toprak kayması meydana geldiğini, bunun dışında başka bir çatlak veya 13.02.2024 günü yaşanan olayı tetikleyecek bir durum gözlemlemediğini ifade etmiştir.

**Ali SERT**

29.02.2024 (saat 12:50) tarihli maden mühendisi tutanaktaki ifadesindeki ifadesinde; Anagold Madencilik A.Ş' de yaklaşık olarak 6 yıldır olarak çalışmakta olduğunu, görevinin Teknik Servisler Müdürü olarak üretim tesislerinin bütçe uyumluluk takibi ve analitik laboratuvar kapsamında yapılan analiz takipleri olduğunu, olay günü olan 13.02.2024 günü saat:07.30 da maden sahasında olduğunu, Saat 10.00 sıralarında günlük yapılan toplantıya katılamadığını, bu sırada Sülfit Tesisinde alan kontrolü yapmakta olduğunu, bahse konu olan Yığın Liç alanındaki çatlağı toplantı sonrasında öğrenmiş olduğunu, öğrendiği kadarıyla Yığın Liç alanında çatlakların olduğu ve tehlike oluşturduğu, bundan dolayı bölgeye girişin kapatıldığını, Anagold Madenciliğin ve taşeron firmaların bölgeden tahliye edildiğini öğrendiğini, olay anında ofisler bölgesinde online

43



SWORN
TRANSLATION

bir toplantıda olduğunu, ekibi ile beraber Oksit Operasyonun da dahil edildiği tesis optimizasyon çalışmalarını yürütülmesini ve bahse konu alanda mali ve üretim performansının takibini yaptıklarını, bölgenin fiziki çalışmasına herhangi bir dahli veya yetkisi olmadığını, bu bölgedeki sorumlu müdür ve yetkili kişi şuanda tutuklu olan Hüseyin ÜSTÜNDAĞ olduğunu bildiğini ifade etmiştir.

## Aydın KEKLİK;

16.02.2024 tarihli tutanaktaki ifadesinde Keklikler Ltd. Şti firmasının ortağı ve müdürü (yönetici) olarak görev yaptığını, Anagold Madencilik A.Ş. firmasına makine ve araç kiraladıklarını, vardiya operatörlerinin Anagold A.Ş.'nin saha vardiya amirleri tarafından yapılacak işi yönlendirmesi sonucu verilen işleri yaptıklarını, saha içerisinde sadece makine ve operatör kira verdikleri için iş ve işleyişe dahil olmadıklarını, Keklikler Ltd. Şti. olarak sahada kendi başlarına herhangi bir karar alarak iş yapma durumu söz konusu olmadığını, Anagold A,Ş'nin taleplerine karşı hizmet verdiklerini, 13.02.2024 günü İliç ilçesinde bulunduğunu, operatörü olarak çalışan Sabri Ekici arayarak madende göçük olduğunu söylediğini, hemen maden sahasına gittiğini, enkaz altında bulunan operatörüne bakmak istediğini ancak toprak kayması devam ettiği için gidemediğini, orada bulunan birine nerede olduğunu sorduğunu ve Mehmet KAZAR'ın enkaz altında kalan konteynerin içinde olduğunu öğrendiğini, öğrendikten sonra toprak kaymasının meydana geldiği yerden hiç ayrılmadığını, Mehmet KAZAR'ın saat 10:24'de 2 adet fotoğraf gönderdiğini, ancak konuşmadıklarını, çalışma saatleri içerisinde, Anagold A.Ş.nin çalışma yapılmasını belirttiği ve personelinin çalıştığı o bölgede ve yakınında her zaman hazırda bekleyen bir aracı olduğunu, enkaz altında bulunan Mehmet KAZAR'ın da bunu bildiğini, fotoğrafların toprak kaymasının olduğu yerde oluşan çatlakların fotoğrafları olduğunu sonradan öğrendiğini, Anagold A.Ş. firmasının yetkili ve sorumluları telefon ve/veya Email yolu ile ulaşmadıklarını, herhangi bir olumsuz durum olduğuna dair bilgi vermediklerini, Keklikler Ltd.Şti. olarak Anagold A.Ş. firmasının yukarıda da belirttiği gibi vermiş oldukları işleri yapan bir firma olduklarını, tüm personelinin de olumsuz veya tehlikeli gördüğü bir durum oluşması halinde çalışmayı bırakarak oradan ayrılma hakkına sahip olup bunu bildiklerini, buna rağmen şuan enkaz altında bulunan ve personeli olan Mehmet KAZAR'ın neden enkaz altında bulunan konteynerin içerisinde bulunduğunu, oraya gitmesini kim yada kimler söylediğini bilmediğini, araştırılmasını istediğini, operatörü olan Mehmet KAZAR'ın o gün kullandığı dozerin toprak kaymasının altında kalmadığını, kaymanın meydana geldiği bölgenin üst tarafında kalan bir bölgede hala durduğunu, Keklikler Ldt.Şti firmasının Yöneticisi olarak kendisi ve Oğuz Sami DEMIR'in bulunduğunu, Mehmet KAZAR'ın Anagold A.Ş. firmasının Yığın/Liç sahasında çalışırken sorumluları, vardiya amiri olan Kenan ÖZ, bunun da amiri olan Şenol DEMİR, bunun da amiri Murat BAYRAKTAR isimli şahısları bildiğini, bunlar dışında daha üst düzey bir sorumlu bilmediğini, personelin birisine yada makinasına bir şey olsa yukarıda belirttiği 3 kişi ile iletişime geçtiklerini, sorumluluğu bulunmadığını, olayın meydana geldiği gün herhangi bir uyarı bildiriminde bulunmadığını çünkü hiçbir görüşme ve bilgisi olmadığını, Yığın/Liç bölgesinde risk oluşturacak herhangi bir durum görmediğini, makinelerinde büyük bir arıza tespiti olduğu sahaya yılda bir iki kez gittiğini, olay anında Mehmet KAZAR'ın vardiyası olduğu için dozerin operatörü Mehmet KAZAR olduğunu ifade etmiştir.

44



SWORN
TRANSLATION

### Sabri EKİCİ;

15.02.2024 tarihli tutanaktaki ifadesinde 4,5 yıldır İliç Anagold madeni içerisinde bulunan Keklikler Ltd.Şti. firmasında Dozer Operatörü olarak çalıştığını, olayın meydana geldiği tarihte istirahatli olduğunu, saat 14:31 sıralarında bir operatör arkadaşın araması ile toprak kayması olduğunu öğrendiğini, hemen Anagold firmasına gelerek sahaya gittiğini, gördüklerimden sonra yapabileceği bir şey olmadığını anladığını, bölgede daha öncesinde olumsuz bir durum görmediğini, 4,5 yıldır Keklikler Ltd.Şti. firmasında Anagold Madencilik iş sahasında çalıştığını ve toprak kayması olayına hiç şahit olmadığını ve duymadığını ifade etmiştir.

### İshak ASLAN;

06.03.2024 tarihli tutanaktaki ifadesinde özetle Anagold firması Proje Departmanında 7 yıldır inşaat mühendisi olarak çalıştığını, olay günü saat 9:30 sıralarında harita ekibi ile ölçüm yaptıklarını, Kaan Murat akpolat'ın arayarak riskli olan sahayı boşaltmalarını bildirdiğini, orada çalışan Yesti, Mürekekpçiler, Nural çalışanlarını tahliye ettiklerini, İSG Mühendisi Meryem Koçer ile ofis bölgesine geldiklerini, saat 10:30 da çatlaklar olduğuna dair mail geldiğini beyan etmiştir.

### Fuat YILMAZ;

06.03.2024 tarihli tutanaktaki ifadesinde özetle Anagold Firmasında 2020 yılına kadar vardiya ve delme patlatma mühendisi ve sonrasında maden operasyon şefi olarak 13 yıldır çalıştığını, olay günü saat 9:00'da Çiftay ve Anagold ekipleri ile açık ocaklar bölgesinde saha turuna çıktıklarını, daha sonra ofis alanına geçtiğini, saat 13:00 sularında Mehmet Türk ile görüştüklerini, saat 14:30 da Mehmet Türk ile birlikte toplantıya katıldıklarını saat 12:10 da rutin patlatma yapıldığını ve olay günü de yapılmış olduğunu beyan etmiştir.

### Muhammed Kılıç;

06.03.2024 tarihli tutanaktaki ifadesinde özetle Anagold Firmasında önce vardiya mühendisi 2022 yılında itibaren de delme patlatma mühendisi olarak çalıştığını, olay günü sahada ocak içi toplantısından sonra ofise geçtiğini, açık ocaklarda yapılacak patlatmaların planlama biriminden gelen üretim yapılacak yerlerin delme sıralaması ve patlatma takvimini oluşturduklarını, olay günü 12:10 da patlatma yapıldığını, saat 14:30 toplantısı öncesinde olayı öğrendiğini, Madser isimli firmadan danışmanlık hizmeti alarak patlatma tasarımlarının yapıldığını, saat 10:15 sularında Ş. Demir'den iki yolun kapatıldığı bilgisinin geldiğini beyan etmiştir.

### Fatih Sakarya;

06.03.2024 tarihli tutanaktaki ifadesinde özetle Anagold Firmasında 6 yıldır vardiya mühendisi olarak çalıştığını, son 7 aydır patlatma mühendisi olarak görevini sürdürdüğünü, bağlı olduğu birimin açık ocak patlatmalarından sorumlu olduğunu, olay günü 12:10'da 50 ve 60 Mz olarak tabir edilen Main ocak bölgesinde patlatma yaptıklarını beyan ettiği.

45



SWORN
TRANSLATION

### 3.3. CUMHURİYET BAŞSAVCILIĞI TARAFINDAN ALINAN TANIK İFADE TUTANAKLARINA İLİŞKİN TESPİTLER;

**Gizem GAZCI;**

16.02.2024 tarihli tutanaktaki ifadesinde kollukta verdiği ifadeye ilaveten; 2021 yılından beri Anagold bünyesinde İSG mühendisi olarak çalıştığını aynı zamanda hem olay yeri hem de oksit proses alanında ve tedarik zinciri departmanında kimyasal araçların giriş çıkış ve depolamasına baktığını, olay günü saat 08:50 civarında yığın operasyonu süpervizörü olan Kenan ÖZ'ün "burada çatlaklar var gelin bir bakın iyi olur" dediğini, durumu bir üst amiri olan Burak ARTAL'a bildirdiğini, onun da çevre mühendisi Recep ÇALI'ya durumu bildirmesini söylediğini, akabinde Recep ÇALI ile aynı araçla 09:10 civarlarında liçin en üstünde ilerlerken Kenan ÖZ ve Ramazan ÇİMEN ile karşılaştıklarını, onların da "yolda da çatlaklar var" diyerek uyardıklarını ve onların devam ettiğini, çatlaklara bakarak fotoğraflarını çektiklerini, fotoğrafları amiri Burak ARTAL beye gönderdiğini, aynı zamanda amirine durumun kötü olduğu söylediğini, onun da bu durumu iş yeri sorumlusu İAIN GUILLE'ye bildirdiğini sonradan öğrendiğini, konteynerda kaç kişi olduğuna dair bir bilgisi olmadığını, ancak bir kişinin kapattıkları yolun önünde olduğunu gördüğünü, ancak kim olduğunu bilmediğini, olayı uzaktan ofis bölgesinden toz bulutu olarak gördüğünü, saat 09:00 civarında güvenli bölgede Kaan Murat AKPOLAT ile karşılaştıklarında solüsyonun verilmediğini söylediğini, ancak olay yerine ikinci kez gittiğimde saat 10:30 civarlarında solüsyonun hala verilmekte olduğunu gördüğünü, bu duruma amiri Burak ARTAL'da şahit olduğunu, Burak ARTAL'ın Murat BAYRAKTAR'a solüsyonun neden hala durdurulmadığını sorduğunu, Murat BAYRAKTAR'da durması halinde havuzların taşacağını beyan ettiğini, o sırada IAIN GUİLLE'de yanlarında olduğunu, Burak ARTAL'ın da asıl sorumluya durumun tehlikeli olduğunu ilettiğini, sonrasında bilgisi olmadığını, patlatmanın Çiftay A.Ş tarafından yapıldığını ancak talimatların Anagold A.Ş tarafından verildiğini bildiğini, her gün olduğu gibi saat 12:10'da patlatma yapıldığını, patlatma departmanından kim sorumlu bilmediğini, yığının fazla yapılıp yapılmadığını bilmediğini, öngörüsü de olmadığını, oksit proses alanında emir ve talimat verme yetkisi olmadığını, ancak görüş bildirdiklerini, konteynırda kalan işçilerin Soysal DOGAN'ın yönlendirmesiyle çalıştıklarını, bulunduklarını bildiğini, konteynırı oraya kimin konumlandırdığını bilmediğini, geldiğinden beri orada olduğunu, konteynırın orada bulunmasında bir risk görmediklerini, patlatma alanları değişken olmakla birlikte o gün hangi noktada patlatma yapıldığını bilmediğini, olay anında orada Kenan ÖZ, Ramazan ÇİMEN, Adnan KEKLİK'in orada olduğunu duyduğunu, Kenan ÖZ'ün üst amiri Kaan Murat AKPOLAT ve Murat BAYRAKTAR olduklarını, Ramazan ÇİMEN'in ise Şenol DEMİR, Adnan KEKLİK'in ise Elif REYHAN sorumluluğunda olduklarını, Şenol DEMİR ikinci mühendis olup kırılan malzemenin liç alanında konveyörlere gelmesine kadar sorumlu olduğunu, bu malzeme önce çimento ve suyla karıştırıcıda karıştığını, çimento, su ve gerekli malzemenin karıştırıcıya eklenmesinden ve karıştırılmasından Şenol DEMİR ve Kaan Murat AKPOLAT sorumlu olduklarını, daha önce liç alanında küçük su akıntıları olarak liçi bozan kısımların uyarmaları ile düzeltilmiş olduğunu, onların küçük müdahale ile düzelebilecek bozulmalar olduklarını, bu olaydaki çatlak durumunu Abdulkadir CANSIZ'a iletmek için ofislere indiklerini, bire bir iletişime geçmediğini ama Burak ARTAL'ın iletişime geçtiğini bildiğini, Burak ARTAL'da bana Abdulkadir CANSIZ'a durumu ilettiğini söylediğini, yine de tedirginliği geçmediğini, bu durumu gören Burak ARTAL'ın tedirgin olmamasını durumu Murat BAYRAKTAR ile görüştüğünü, kendisine bu durumun

46



normal olduğu korkacak bir şey olmadığını, bunun bir oturma durumu olduğunu, bu bilgiyi de Jeoteknik ekibinden aldığını söylediğini, ayrıca bir mailde geleceğini söylediğini, olay anından bir saat önce de mail geldiğini, maile baktıklarında olayın hiç öyle olmadığını çok tehlikeli bir hal olduğunu Burak ARTAL ile gördüklerini, bu durumu Burak ARTAL'ın direkt Abdulkadir CANSIZ'a ilettiğini, sonrada 15;15'de bir toplantı organize edildiğini, olay sonrası Şenol DEMİR olay yerine gitmekte olduğunu, olay yerini gördüklerinde iki kişinin çıkmaya çalıştığını ve çıktığını gördüklerini, birisinin Karsa personeli diğerinin de Anagold personeli olduğunu, edindiği bilgileri acil durum ekip şefim Muzaffer BEĞEN ve amiri Burak ARTAL'a aktardığını, kimsenin alana girmemesi yönünde talimat aldığını ve gelenleri de alana sokmadığını ifade etmiştir.

### Burak ARTAL;

16.02.2024 tarihli tutanaktaki ifadesinde kollukta verdiği ifadeye ilaveten; Anagold Madencilik isimli şirkette İş Güvenlik Baş Mühendisi olarak çalıştığını, 8 kişilik iş sağlığı güvenliği personelinin baş mühendisi olduğunu, üstünün iş sağlığı, iş güvenliği müdürü Selçuk ÇİFTLİK olduğunu, olay günü Selçuk ÇİFTLİK izinli olduğu için onun yerine vekil olarak baktığını, saat 09.13 sıralarında kazanın meydana geldiği alandaki iş güvenliği uzmanı Gizem GAZCI whatsapp üzerinden alanda bulunan çatlaklara dair hem fotoğraf hem mesaj attığını, saat 09.22'de yine Gizem GAZCI'nın farklı bir açıdan fotoğraf attığını, bu fotoğrafta yine çatlaklar ve bir kısım kaymanın olduğu fotoğraflar olduğunu, Gizem GAZCI'nın sabah 08.00 sıralarında ismini hatırlamadığı süpervizörün kendisine sahada sıkıntılar olduğunu gidip kontrol edeceğini söylediğini, başka herhangi bir bilgiye sahip olmadığını, bunun üzerine çevre müdürü Can Serdar HASTÜRK'ün yanına gittiğini, durumu kendisine anlatarak birlikte bu durumu Çöpler Anagold Madencilik genel müdür yardımcısı Iain Guille'ye haber vermeye gittiklerini, Iain Guille'ye anlattıklarını, onun da saat 10.00'daki rutin toplantıda görüşelim dediğini, kendisine toplantıdan sonra sahaya çıkıp gidelim dediğini ve onun da uygun olduğunu söylediğini, saat 09.23'de Gizem GAZCI bana mesaj atarak yığınliç sahasında bulunan yaklaşık 30-40 kişinin sahadan çıkartmaya başladıklarını söylediğini, Gizem'le konuşarak boşaltma kararını onayladığını söylediğini, Gizem da bu kararı vermeseydi belkide daha fazla kişinin olay neticesinde kaybolmuş olacağını, iş güvenliği olarak görevlerinin sıkıntı bulunan yerlerde sorumlu kişiye doğru tavsiyeleri vererek, can güvenliği ve çevre sağlığı ile ilgili yükümlülükleri bulunmadığını, uygulayıp uygulamamanın saha sorumlusuna ait olduğunu, resen sahada çalışan kişilere emir verme yetkileri bulunmadığını, Gizem'in bu durumu Kaan AKPOLAT ile görüşerek yaptırdığını söylediğini, Kaan AKPOLAT'ın şirkette Oksit Operasyon Asistan Mühendisi olarak yığınliç sahasında görev yaptığını, Kaan AKPOLAT'ın karar alıp karar verme yetkisinin bir yere kadar olup ancak yine de bunu yığın liç alan sorumlusu Murat BAYRAKDAR'a bilgi vererek yaptığını, onay almadan resen bu işlemleri yapması mümkün olmadığını, alanı 09.28'de boşaltırken Murat BAYRAKDAR'ın bilgisi olduğunu düşündüğünü, ancak böyle bir acil durumda Kaan AKPOLAT'ın da işin ciddiyetine göre karar alabileceğini, saat 10.00'da alınan rutin toplantıda sahaya çıkmaya karar verdiklerini, 2 araç ile saat 10.26 sahaya çıktıklarını, bir araç içerisinde Can Serdar HASTÜRK, Gizem GAZCI, Iain Guille ile olduğunu diğer araçta alan sorumlusu oksit müdür vekili Murat BAYRAKDAR bulunduğunu, öncülük ettiğini, araçtan indiğimizde Gizem GAZCI'nın "burası güvenli değil "dediğini, bunu alan sorumlu Murat BAYRAKDAR'a sorduğunu, güvenli olduğunu söylediğini ancak o sırada Can Serdar HASTÜRK'le göz göze geldiğinde güvenli olmadığını hissettiğini, çünkü alana baktığında sıkıştırılmış toprağın bulunduğu yığın liçin üzerinde parça parça

47



SWORN
TRANSLATION

çatlakların olduğunu gördüğünü, en üst katman olan lift 33'te bulunduklarını, olay yerinde bulunan Soysal DOGAN'a şuan bulundukların yerin güvenli olup olmadığını sorduğunu, onun da burası en riskli yer dediğini, alanın o sırada bomboş olduğunu, Süpervizör Soysal DOGAN'ın da kendileri gibi Murat BAYRAKDAR'a eşlik ederek geldiğini düşündüğünü, oraya gitmelerinin amacının risk değerlendirmesi yapmak olduğunu, ancak bunun da güvenli bir yerde yapılması gerektiğini, bu yüzden lain Guille'e dönerek buranın güvenli olmadığını söylediğini, daha sonra lain Guille'nin talimatı ile olay yerinden ayrıldıklarını, güvenli bir noktaya çıkarak uzaktan incelemelerde bulunduklarını, inceleme de bulunduğumuz sırada saat 10.50'de Murat BAYRAKDAR'ın ekibinde bulunan oksit üretim mühendisi Şenol DEMİR tarafından Anagold'aki bütün operasyon birimlerine e-mail atıldığını, bu e-mail bilgisinin alt taşeronlara ilgili birimler tarafından bilgi verildiğini, bu bilginin alanda çalışmayla yükümlü olan alt taşeronlara verilmesi gerektiğini, her birimin kendine bağlı alt yükleniciye bu bilgiyi aktarmakla sorumlu olduğunu, yığınlıç sahasında toprak kayması neticesinde kaybolan 8 kişinin çalıştığı firmaların (Keklikler, Asil Çöplerliler, Karsa alt yükleniciler) oksit birimine hizmet verdiklerini, Karsa alt yüklenicisini başka bir birime de hizmet verebileceğini, ancak olay günü kaybolan alt yüklenicilere ait çalışan kişilerin de oksite hizmet veren kişiler olduklarını, bu durumda yığınlıç sahasından sorumlu Murat BAYRAKDAR veya ekibinden birisinin bu alt yüklenicilere bilgi vermekle yükümlü olduğunu, Çiftay alt yüklenicinin yığınlıç sahasında o anda herhangi bir işi olmadığını bildiğini, Ciftay'da çalışan Uğur YILDIZ'ın da yığınlıç alanında bulunmadığını, maden sahası içerisinde olduğunu, maden sahası ile yığınlıç sahası arasının ne kadar mesafede olduğunu bilmediğini, 10.50'de atılan e-mailden sonra biraz daha rahatladığını, çünkü alana artık kimsenin giremeyeceğinin belirtilmiş olduğunu, bu durumda teknik inceleme ekibi olarak beklemeye karar verdiklerini, teknik ekibin vereceği bulgularla ile risk değerlendirmesi yapacaklarını, bulundukları alandan ayrılarak ofislere gitmek üzere yola çıktıklarını, yolda iken uzaktan kim olduğunu bilmediği birinin tehlikeli alanda hala dolaştığını gördüğünü, Gizem'in bu kişinin Soysal DOGAN olduğunu bugün söylediğini, Murat BAYRAKDAR'ı araçta iken arayarak "niye alanda hala birileri dolaşıyor tehlikeli alanda "diye sorduğunu, Murat'ın telefonda alan sahibi olup alanda inceleme yapmak için bir kaç kişinin girmesi gerektiğini söylediğini, bunun da güvenli olmadığını kendisine söylediğini, bu konuşmaya araçta bulunan Gizem GAZCI ve Can Serdar HASTÜRK'ün şahit olduklarını, saat 12.00 civarında öğle yemeğine geçerken Murat BAYRAKDAR, Kaan AKPOLAT ve Onur SARITAŞ ile karşılaştığını, Murat Bey şuanda Ali Rıza KALENDER'in (teknik ekibin içerisinde bulunan, jeoteknik mühendisi) teknik incelemeyi bitirdiğini alanda bir kayma olmadığını, bir oturma olduğunu herhangi bir riskli durumun olmadığını, yığın işinin devam edilebileceğini sözlü olarak söylediğini, ancak kendisi şuan yığın işine devam etmeyeceğini alanın dizayn mühendisliğini yapan GRE firması ile 17.00'da bir toplantı yapacağını ve ertesi gün başlayacağını ilettiğini, GRE firması söz konusu yığın liç sahasına dizayn mühendisliğini, denetimini yapan bir firma olduğunu, denetimi Türkiye'de ismini bilmediği bir firmaya yaptırdığını, bu denetimlerin ne kadar sürelerle yapıldığını bilmediğini GRE firması Avustralya'da olduğunu bildiğini, Yığınlıç sahasında eklenen katların GRE firması tarafından belirlenen dizaynın parametrelerine göre yapıldıklarını, bu konu hakkında iş güvenliği baş mühendisi olduğu için kapsamlı bilgiye sahip olmadığını, konuyla ilgili Kaan AKPOLAT ve sahadan sorumlu Murat BAYRAKDAR'ın daha fazla bilgiye sahip olduklarını, çünkü onların alanını ilgilendiren ve sürekli GRE firması ile görüşen kişiler olduklarını, Murat BAYRAKDAR "kayma değil oturma" deyince rahat bir şekilde yemeğe geçtiğini, ofise geçtiği sırada saat 13.03'de kıdemli jeoteknik mühendisi Ali Rıza KALENDER'in

48



SWORN
TRANSLATION

bir e posta gönderdiğini, bu e-posta içeriğinde Murat BAYRAKDAR'ın söylediğinin aksine bir kayma olduğu ve bu kaymanın devam ettiği yığın işlemine kesinlikle devam edilmemesi gerektiği bilgisi radar raporları ile birlikte yer aldığını, radar raporunda sıkıntının olduğu anlaşıldığını, bu durumda hemen Murat beyi aramak istediğini, ancak meşgul olduğu için görüşemediğini, ancak whatsapptan dönüş yaptığını, kendisine Ali Rıza KALENDER'in emailindeki durumu söylediğinde e postaya cevap vereceğini söylediğini, bu durumda iş güvenliği açısından risk gördüğünü ve çelişkiyi operasyon direktör vekili Abdulkadir CANSIZ'a bilgi vermeye karar verdiğini, kendisine ilettiğini, toplantısı olduğunu 15.00 dan sonra toplantı ayarlamasını istediğini, saat 13.28'de dijital ortamda e-posta ile toplantıya katılacak kişilere davet atarak 15.15'de toplantıyı ayarladığını, toplantıya katılacak kişiler Ali Rıza KALENDER, Gizem GAZCI, Murat BAYRAKDAR, Abdulkadir CANSIZ, Kaan AKPOLAT, Muzaffer BEĞEN ve kendisi olup saat 13.38'de Murat BAYRAKDAR'ın , Ali Rıza KALENDER'in attığı e-maile cevap verdiğini, (E-mailde Bulananlar: Murat BAYRAKDAR, Ali Rıza KALENDER, lain, Abdulkadir CANSIZ, Selçuk ÇİFTLİK; Hüseyin ÜSTÜNDAĞ, İzzet TEKİN, Berkay MISIR, Kaan Murat AKPOLAT, Can Serdar HASTÜRK, Shaun SWARTZ Ali SERT, Gizem GAZCI, Şenol DEMİR ve kendisi) bu mailde alanın tamamen erişime kapatıldığı, 4B-3 fazında çalışmanın durdurulduğu, yığın işleminin durdurulduğu ve yığın liçi sulama alanlarının kapatılması için bir yönetim toplantısı yapacağını söylediğini, ayrıca çatlakların onarıma başlanılması için bir problem olup olmadığını 4B-3 fazındaki işin ne zaman başlayabileceğini sorduğunu, radar ölçümlerinin öğlen gece vardiyalarında kendi ekibine iletilmesini istediğini, işçilerin yığınliç sahasında Murat BAYRAKDAR'ın ekibinin 3 vardiya usulüyle çalıştığını bildiğini, E-mail sonrasında ofiste olduğunu, 14.28 sıralarında olay meydana geldiğini, o sırada online bir toplantıda olduğunu, toprak altında kalan kişilerin toprak kayması sırasında hangi alanda nerede bulunduklarını bilmediğini, ancak kapatılan tehlikeli alanda bulunmamaları gerektiğini bildiğini, çünkü iş güvenliği bakımından ve Murat BAYRAKDAR'dan gelen e-mailden alanın kapatıldığını öğrendiklerini, Anagold firması çalışanları dışında alt yüklenicilerin çalışanları bulunduğunu, yığınliç sahası bildiği kadarıyla yıkıldığı sırada 33 liften (basamak) oluştuğunu, fazla yükleme yapılıp yapılmadığını bilmediğini, Ancak sahaya ekibimden acil durum müdahale şefim Muzaffer BEĞEN, Onur SARITAŞ , Çağdaş BAŞ ve Gizem GAZCI görevlendirdiğini, borulama ekibinden Murat BAYRAKDAR nihai sorumlu olup olaydan önce boruluma birimine kimin çık ya da çıkmayın dediği hakkında bilgisi olmadığını, sahada onların neden bulunduğunu bilmediğini, onların sahada kalıp kalmaması yönünde bir yetkileri de olmadığını, ancak bu kişilerin o sahada çalışmaya devam edip etmeyeceği konusunda direktif verebilecek alan sorumlusunun Murat BAYRAKDAR olduğunu, söz konusu konteynerin nasıl konulduğunu, bu konuya kimin karar verdiğini bilmediğini, konteynerin uzun süredir o alanda bulunduğunu, sabah gördüğü çatlaklar neticesinde bu boyutta bir felaketin gerçekleşeceğini kimse bilmediğini, daha önce böyle bir şey yaşamadıklarını, çatlaklardan sabah Gizem GAZCI'nın bilgi vermesi ile haberdar olduğunu, normalde böyle durumlarda kim görür ise anında amirine ve o husustaki ilgili birimlere bilgi vermekle yükümlü olduğunu, genel eğitimlerde tehlike hususu bildirme geçtiğini, bu durumu izinde olan yerine vekil olarak baktığı müdürü Selçuk ÇİFTLİK beye de sürekli whatsapp ile bilgi verdiğini, operasyon direktör vekili Abdulkadir CANSIZ'a da bilgi verdiğini, Elif REYHAN, Kaan AKPOLAT ve üç yabancı uyruklu misafirin mahsur kaldığını kriz masasında öğrendiğini, ilk denetime çıktığında solüsyonun durdurulmadığını ve devam edildiğini gördüğünü, Murat Beye de bu hususu sorduğunu, birden durdurursa havuzların taşacağını bu nedenle kademeli olarak



SWORN
TRANSLATION

durduracaklarını söylediğini, Ali Rıza KALENDER'in mailinde de toprak yığın işleminin devam edilmemesini istediğini, zaten sabahtan 10.30 sıralarında toprak yığın işlemi olmadığını sadece solüsyon olduğunu, borulama işçilerinin orada olup olmadığını bilmediğini, olay yerine yukarıda bahsettiği gibi kimsenin talimatı olmadan denetleme maksadıyla çıktıklarını, Yığınliç alanında giriş çıkışların yasaklandığını bildiğini, Yığınliç sahasına iki giriş noktasının kapatıldığını bildiğini, Yığınliç sahasının ne zamandan beri oluşturulduğunu bilmediğini, Ali Rıza KALENDER'in maden jeoloji biriminde çalışan teknik inceleme yapabilecek kıdemli bir jeoteknik mühendisi olduğunu, bu kişinin amirinin olay gününde İzzet Tekin olduğunu, İzzet Tekin'in asıl biriminin Maden Jeoloji Birimi olup maden müdürü yokken onun yerine vekaleten Aralık ayı sonundan itibaren bakmakta olduğunu, olayın yaşandığı tarihte kendi maden jeoloji biriminde asil görevli olup Mehmet Türk'ün madende maden müdürü olarak çalışmaya 12.02.2024 tarihinde başlamış olduğunu, eğitim ve oryantasyon süreci devam ettiğini, imzaları hala İzzet Tekin'den aldıklarını, müdür vekilliğine İzzet Tekin devam ettiğini, Mehmet Türk'ün oryantasyonu olay tarihinde devam ettiğini ifade etmiştir.

### Can Serdar HASTÜRK:

16.02.2024 tarihli tutanaktaki ifadesinde kollukta verdiği ifadeye ilaveten; Olay tarihinde saat 8.00 gibi toplantı olup aynı bölümde çalışan Caner isimli şahıs yanıma gelerek çatlakların maden alanında olduğunu söylediğini, Gizem hanımdan duyduğunu söylediğini, Gizem hanıma alana bakmaları gerektiğini söylediğini ve aynı departmanda çalışan Recep'ten alana gidip fotoğraflanmasını istediğini, Gizem ile birlikte gittiğini ve fotoğraf attıklarını, fotoğraflardan çatlağı görünce maden alanına gitmeye karar verdiğini, geçmişte de çatlaklar meydana gelmiş olup bunun sorumluluğu alan sorumlularında olduğunu, çatlakları üst amiri olan Ahmet OĞUZ'a bilgi verdiğini, daha sonra şantiye koridorunda Iain'ı gördüğünü ve olayları sorduğunu, kendisine de fotoğrafları gösterdiğini, onun da alana bakmaları gerektiğinde hem fikir olduğunu, maden departmanına bilgi vererek İzzet TEKİN'e saat 09.54'te olay bölgesinde drone ile fotoğraflama işlemi yapılması gerektiğini söylediğini, sonrasında 10.00 toplantısına girdiklerini, toplantıya Gizem ve Burak'ta katıldığını, yukarıda doğru çıkmaya başladıklarını, Murat BAYRAKTAR'ın arkalarında olduğunu, yukarıya doğru çıkarken yolun kapalı olduğunu gördüklerini, Iain yolu açtırması ile devam ettiklerini, tahmini saat aralığı 10.30 gibi olduğunu, alanı kontrol ettiğinde telefonuna gelen görüntülere benzer alanda yarıklıklar gördüğünü, ayrıca alanda yürüdüğü sırada yarıkların yola kadar indiğini gördüğünü, alan süpervizörü Soysal Bey ile görüştüklerini, anormal bir durum olduğunu söylediğini, Kaan AKPOLAT radara bu olağanüstü durum olup olmadığını sorduğunu söylediğini, radarın da herhangi bir sıkıntı olmadığını oturma olduğunu iletmiş olduğunu söylediğini, muhtemelen radardan gelen görüntüye göre de alandan işçiler çıkartılmış olduğunu, yarığın gittiği güzergahtan doğu batı eksenine gitmesi sebebiyle kayma veya ayrılma olacaksa dahi bunun güneye doğru olacağını düşündüğünü, hatta Murat ve İain 'in de duymuış olabileceklerini, alandakilerle analiz yaptıkları sırada toprak parçasının güney yönünde akabileceğini bu şekilde söylediğini, güney taraftaki çalışan işçilerin de çıkarılmış olmasının sevindirdiğini, o konuşma sırasında kimsenin ayrılmanın ne yöne olacağını ve görüşü aksine yorum yapmadığını, sohbet arasında zeminin ıslak olduğundan dolayı kapatılmasını gerektiğini söylediğini, daha sonra Kaan'ın onay verilirse "ben bu alanı kapatırım" dediğini, Iain ne cevap verdiğini aradaki mesafeden dolayı duymadığını, yeni yapılan alan için çalışılan güvenli yerden olay yerine baktığında yarıklar olduğunu gördüğünü ve fotoğrafladığını, kendi aralarında durumun

50



ciddi olabileceğini değerlendirdiklerini, olay yerinden ayrılırken Burak ile Murat arasında Soysal'ın alanda kalıp kalmaması hususunda telefonda konuştuklarını duyduğunu, aşağı indiklerini ve gün içerisinde işlerin başına geçtiklerini, olay yerinde sadece yolu açan esmer tenli işçiyi hatırladığını, konteynır içinde kişileri görmediğini, indikten sonra Murat ile olaya ilişkin istişare yaptıklarını, tasarımcının yurt dışında olduğu saat farkından dolayı akşam vaktinde konuşulmasının gerektiğini konuştuklarını, drone görüntüsünün saat 11.23'te cep telefonuna geldiğini, drone görüntülerinin başka kimlerle paylaşıldığını bilmediğini, görüntünün Alperen'den geldiğini, İain'e ve Ahmet Oğuz ÖZTÜRK'e Whatsapp uygulaması üzerinden gönderdiğini ancak İan'in cevap aldığını diğerinden almadığını, sonra online olarak saat 14.00'de toplantıya katıldıklarını, olay sonrası Ahmet Oğuz ÖZTÜRK yanına gelerek olay yerine gitmelerini teklif ettiğini riskli olduğu için reddettiğini, iş güvenliği koordinesinde kriz yönetimine katıldıklarını, sulamanın durdurulup durdurulmadığını bilmediğini, olay yerinde yığın bildiği kadarıyla olağan olup aşırılık olmadığını, olaydan yaklaşık 1-2 hafta önce Hüseyin ÜSTÜNDAG'a dizayna uygun gidip gitmediğini sorduğunda uygun olduğunu söylediğini, bu sırada yanında Alperen'de olduğunu, Jeoteknik kılavuzuna uygun olarak harfiyen uyulması yönünde Hüseyin'e uyarılarda bulunduğunu, yığının miktarı konusunda tam bir fikir sahibi olmadığını, yığının boyutuyla ilgili sorumlunun Hüseyin ÜSTÜNDAG olduğunu, hiyerarşide vekalet aracılığıyla sorumluluk aynı zamanda Abdulkadir CANSIZ'da olduğunu, telkinleri sonra Hüseyin alanda operasyonlarına devam ettiğini, Berkay MISIR isimli şahsı tanıdığını, Jeoteknik mühendisi olarak bildiğini, görevinin alanları radar üzerinden denetlemek olduğunu, sorumlu olduğu bölgede haftada bir bağlı oldukları birime haftanın özeti şeklinde rapor bildirildiğini, ilişkin bilgilendirme maili de geldiğini, yığın ve konteynırlar arasındaki mesafenin alandakilerin sorumluluğunda olduğunu, konteynırların herhangi bir projeyle oraya konuşlandığını düşünmediğini, tamamen insiyatif alınarak gerçekleşmiş olduğunu, kimin tarafından yerleştirildiğini bilmediğini, tahminince Hüseyin'in yerine görev yapan Kaan TOKER, Koray ŞİMŞEK, İrfan AKIN tarafından yapılmış olabileceğini, tam olarak konteynırların hangi konumda bulunması gerektiğini proje departmanı mı yoksa oksit prosescisinin mi baktığını bilmediğini, heapleach alanının çizimi ve proje yürütümü GRE adlı firma tarafından yürütüldüğünü, bu firmanın INR adlı firmayla çalıştığını bildiğini, her gün 12.00 -12.30 arasında belirli bölgelerde patlatma yapıldığını, olay günü de patlatma olduğunu, yaklaşık 1 km mesafede maden içinde gerçekleşmiş olduğunu, bu patlatmanın yığının kaymasına sebebiyet vereceğini düşünmediğini, teknik ve yeterli bilgisi olmadığını, Neil Bar isminde bir firma veya kişi tanımadığını, denetime geldiğinden de haberim olmadığını, doğu bölgesini radarlarla çekilmediğini bildiğini, hatta bu hususla ilgili Münevver DOGAN'dan Berkay MISIR'ın radar talep ettiğini ama bütçe olarak kabul görmediğini hatta konuyu CEO ile konuştuğunu da duyduğunu, raporlayıp raporlamadığını bilmediğini, sahada şifai olarak söylemiş olabileceğini, çevre müdürü olarak siyanür ile ilgili olarak, sabırlı dere yatağına akan malzemede eskiden sulanmış alanlar olduğunu, yığın o tarafa doğru yıkılınca dere yatağındaki menfezleri kapattıklarını, derelerden örnekler almaya başladıklarını, şu ana kadar olumsuz bir durum olmadığını, büyük ölçekte siyanür olduğunu düşünmediğini, insan sağlığını etkileyecek düzeyde olduğunu düşünmediğini, yığından numuneler alarak ağaç yetiştirerek denetim yaptığını ve gözlemlediğini, bu numuneleri de ilgili Bakanlığına gönderdiğini, ilgili Bakanlıklarla istişare ve irtibat halinde olduklarını, tüm önlemleri almış vaziyette olduklarını, insan sağlığına zararlı herhangi bir durum oluşmayacağı kanaatinde olduğunu ifade etmiştir.

51



SWORN
TRANSLATION

**Kaan Murat AKPOLAT;**

16.02.2024 tarihli tutanaktaki ifadesinde kolluktaki ifadesinde ilaveten; Anagold Madencilik A.Ş'de Asistan Proses Mühendis olarak yaklaşık 17 aydır görev yaptığını, saat 8:00 sıralarında yığın liçi operatörü olan Nazım KÖSE'nin üretim mühendisi Şenol DEMİR'i aradığını, Nazım KÖSE Şenol DEMİR'e yığın liçi serim alanında kırıklar olduğunu söylediğini, sonra Şenol DEMİR ile doğrudan bildirilen kırıkların olduğu sahaya gitmek için yola çıktıklarını, alana vardığımızda günlük yapılan üretim toplantısına Teams programı üzerinden katıldıklarını, bu toplantıda yığın liçi süpervizörü Kenan ÖZ yığın liçinde oluşan kırıklardan oksit baş mühendisi Murat BAYRAKTAR'a bilgi verdi. Murat BAYRAKTAR'ın ise herkese bilgi verip sahaya geleceğini söylediğini, Kenan ÖZ çok heyecanlı bir şekilde toplantıda kırıklardan bahsedince Şenol DEMİR ile şuan da kırıkların olduğu sahada olduklarını buraya gelmeleri gerektiğini söylediklerini, Murat BAYRAKTAR'ın "herkese haber verin ben de haber vereceğim" dediğini, toplantı başladığında alana gelmiş olduklarını, kırıkların olduğu alanda Kenan ÖZ ve Soysal DOGAN'da bulunduğunu, toplantıdan hemen sonra kendi aralarında görev dağılımı yapıldığını, Jeoteknik ekibinden asistan mühendis Berkay MISIR'ı aradığını, üstü olan Ali Rıza KALENDER'i de alarak sahaya gelmesi gerektiğini söylediğini, toplantı bittikten sonra Şenol DEMİR ile kırıkları incelemeye başladıklarını ve yaklaşık 30 kadar proje departmanına bağlı işçilerin membran serme işlemi yaptıklarını, daha sonra kırıkların olduğu yere ISG'den mühendisi Gizem GAZCI çevre departmanından mühendis Recep ÇALI ve Oksit Başmühendisi Murat BAYRAKTAR geldiğini, jeoteknik ekibini beklerken Murat BAYRAKTAR alanı boşaltmalarını ve yolu kapatmalarını söylediğini, yığın liçine giden iki yol olup birinin ocak tarafında diğerinin borulama ekibi ofislerinin bulunduğu yerde olduğunu, yolun borulama ekibi ofislerinin önünden kapatılmasını, gelenlerin borulama ekibinin bulunduğu yere gitmesini söylediğini, ocak tarafındaki yol önüne iş makinası ile malzeme dökülüp daha sonra New Jersey denen dubalar konulduğunu, borulama ekibinin bulunduğu ofisin önüne de sadece New Jersey denilen dubalar konulduğunu, alanda bulunan işçilerin proje departmanı işçileri olduğunu, kendilerine çıkmalarını söylediklerini, onların da malzemeleri olduğunu söylediklerini, işçilerin alanı boşaltmalarının hızlandırılması ve bilgilendirme amacıyla proje departmanında çalışan mühendis İshak DEMİR'i arayarak bilgi verdiğini, İshak DEMİR'in de sahaya geldiğini, Murat BAYRAKTAR saat 10:00'da yapılacak olan müdürler toplantısında bu gördüklerini anlatacağını söyleyerek alandan ayrıldığını, bu sırada alanın boşaltılması ve kapatılma işlemlerini malzemeleri güvenli alana çekme işlemlerini yaptıklarını, alanın boşaltılması, kapatılması, malzemelerin güvenli alana çekilmesi talimatını Murat BAYRAKTAR'ın verdiğini, sonra Şenol DEMİR'in de alandan bilgilendirme maili atmak için ayrıldığını, Şenol DEMİR yol kapama bilgilendirme mailini 10:50'de İş Güvenliği Departmanı, Bakım Departmanı, Oksit Proses Operasyon Departmanı, Sülfit Proses Operasyon Departmanı, Maden Departmanı ve Anagold Firması bünyesinde çalışan tüm çalışanların bulunduğu İliç White isimli ortak mail grubuna yolun ikinci bir bildirime kadar kapatıldığına dair mail gönderdiğini, alanı boşalttıktan sonra jeoteknik departmanından Berkay MISIR ve tanımadığı iki kişi alana geldiklerini, inceleme yaptıklarını, alanın radar haritasını gösterdiklerini, durumu anlattığını, bir hareketin olduğunu ancak asıl departmandan sorumlu Ali Rıza KALENDER'in gelip bakması gerektiğini, Ali Rıza KALENDER'in evde olduğunu ve geleceğini söylediğini, sonra Murat BAYRAKTAR ISG Başmühendisi Burak ARTAL, Çevre Müdürü Can Serdar HASTÜRK, Operasyon Başkan Yardımcısı IAİN GÜİLLE ile birlikte olay yerine gidip keşif yapmış olduklarını, Murat BAYRAKTAR'ın kendisini İngilizce desteği için çağırdığını, burada

52



bulunanlara Berkay'ın anlattıklarını anlattığını ve gönderdiği radar görüntüsünü gösterdiğini, Iain'in görüntüleri mail olarak atmasını söylediğini, ona da saat 10:52'de mail yoluyla gönderdiğini, burada Murat BAYRAKTAR'ın alanın kapatıldığını, ara ara saha denetimi yapılmasını, Ali Rıza KALENDER geldikten sonra beraber sahayı inceleyeceğini söylediğini, Murat BAYRAKTAR lian'a alanda bulunan solüsyonun nasıl yönetileceğini, kesilip kesilemeyeceği ile ilgili oksit departmanı ile bir toplantı yapılacağını karar için lian'a sorulacağını söylediğini, saatini tam hatırlamadığı bir zamanda Ali Rıza KALENDER'in şirkete geldiğini, Murat BAYRAKTAR, Ali Rıza KALENDER, kendisi ve tanımadığı bir kişi alana çıktıklarını, Ali Rıza KALENDER'in alanı incelediğini, alandaki yığın liçi çalışmalarının durması gerektiğini, inşaat işçilerinin çalışabileceğini, alanda oturma hareketi meydana geldiğini, bu yarıkların da çimento ile birlikte iş makineleriyle kapatabileceğini söylediğini, Murat BAYRAKTAR'ın Ali Rıza KALENDER'in söylediklerini yazılı olarak Mail yoluyla göndermesi gerektiğini ve teknik bir bilgilendirme göndermesi gerektiğini yoksa dediklerini yapmayacağını söylediğini, aşağı indiklerini ve solüsyonun nasıl yönetileceğine dair Şenol DEMİR, Asistan Proses Mühendisi Elif REYHAN, ADR Şart süpervizörü Adnan KEKLİK, borulama ekibi süpervizörü Soysal DOGAN ile birlikte toplantı yaptıklarını, toplantıda solüsyonun kesilmesine karar verdiklerini, kesildiği vakitte de nasıl yönetileceğini konuştuklarını, konuştuklarını Murat BAYRAKTAR'a söylediklerini, Murat BAYRAKTAR'ın da lian'a soracağını ve kararı söyleyeceğini söylediğini, lian ile görüştüğünü ve çok kısa bir süre sonra solüsyonu kesin dediğini, solüsyonu kestiklerini, Adnan KEKLİK'in kendi birimine bağlı bir kişiyi arayarak solüsyonu kesmesini söylediğini, Ali Rıza KALENDER'in oluşan yarıklarla alakalı teknik bir mail gönderdiğini ancak içerisinde yukarıda alanda söylediği işçilerin girebileceğine yönelik bir bilgi olmadığını, alanın çimento ile düzeltilebileceğini söylediğini, yığın liçi operasyonunun durmasını bildirdiğini, bu olayın Murat BAYRAKTAR'ın solüsyon kesimi için Iain'dan onay almaya gittiği sırada gerçekleştiğini, maili kendi bilgisayarından Murat BAYRAKTAR'ın söylediklerini yazarak ve Murat BAYRAKTAR'a mail olarak gönderdiğini, yaklaşık 15-20 dakika kadar sonra ismini hatırlamadığı bir kişiden borulardan ses geldiği söylendiğini, Elif REYHAN ve Adnan KEKLİK ile borulama ofisinin oraya doğru yola çıktıklarını, Soysal DOGAN 3 tane yabancının yukarı çıkmak istediğini söylediğini, bu sırada Berkay MISIR ile borulama ofisi önünde karşılaştıklarını, Berkay MISIR'ın "kırıklar artmış bence çıkmayın" dediğini, alanı 3 yabancıya göstermek ve alanda kimsenin kalmadığından emin olmak için yukarı çıktıklarını, bu sırada Kenan ÖZ, Ramazan ÇİMEN, Soysal DOGAN, İshak DEMİR ve bir operatör daha saha denetiminde olduklarını, onlara alanı boşaltmalarını söylediklerini, sadece liç 30'un fotoğraflarını çekerek geri dönmelerini Soysal DOGAN, İshak DEMİR ve yanlarında bulunan operatöre söylediğini, diğerlerinin, geri dönmesi gerektiğini söylediğini, Elif ve 3 yabancı inceleme yapmak için sahada olup en üst liç kotuna çıktıklarını, burada bulundukları sırada toprak kaymaya başladığını, 3 yabancının Patrik, Ailen Morris ve John isimli kişiler olup. Patrick membran inşaatından sorumlu olduğunu, Ailen ve John'un ne iş yaptığını bilmediğini, bu iki şahsın Amerika'daki ofiste Patrik'in Türkiye'de çalıştığını bildiğini, olay günü patlatma yapılıp yapılmadığını bilmediğini, yaklaşık 5 aydır kazanın meydana geldiği yerin yakınlarında patlatma yapıldığını, Yığın liçi gereğinden fazla yapılıp yapılmadığını bilmediğini, yaklaşık 1 hafta önce yurt dışından yığın liçinin dizaynının uyumluluğu hakkında onay mesajı geldiğini, Murat BAYRAKTAR ve Ali Rıza KALENDER'in alandan sorumlu mühendislerin, süpervizörlerin, jeoteknik ekibinin ve borulama operatörünün olay yerine

53



çıkabileceğini söylediklerini, yığın liçinde daha önce yüzey çatlakları görüldüğünü ancak olay günü kadar büyük bir çatlak hiç görülmediğini beyan etmiştir.

## 3.4. CUMHURİYET BAŞSAVCILIĞI TARAFINDAN ALINAN SORUŞTURMA TUTANAKLARINA İLİŞKİN TESPİTLER;

### Iain Ronald GUILLE;

16.02.2024 tarihli tutanaktaki ifadesinde kollukta verdiği ifadeye ilaveten; Maden sahasında yapılan işlemlerin gözlemlenmesi ve raporlama sorumlusu olarak çalıştığını, sorumluluğunun tüm maden sahasına yapılan iş ve işlemleri bir üstüme rapor etmek olduğunu, üstünde Cengiz DEMİRCİ çalıştığını, altında çalışan kişi operasyon direktörü Kenan ÖZDEMİR olup gerçekleşen tüm operasyonların Kenan ÖZDEMİR'e bildirildiğini, Kenan ÖZDEMİR tarafından da kendisine bildirildiğini, ölen kişilerin vardiya olarak bir süpervizörleri olup bunlardan emir ve talimat aldıklarını, oksit proses bölgesinde sorumlu olan Müdür Murat BAYRAKTAR olup altında da süpervizörler bulunduğunu, iş sağlığı güvenliği eğitimlerinin ne sıklıkla verildiğini bilmediğini, bu birimden sorumlu Selçuk ÇİFTLİK olduğunu, söz konusu toprak kaymasının neden olduğuna dair herhangi bir fikri olmadığını, ancak daha önce tansiyon çatlakları dediğimiz doğal çatlaklar olduğunu, bu çatlakların küçük müdahale ile teknik elemanlar tarafından verilen tavsiye ve talimatlar çerçevesinde tamir edilebildiklerini, bu tarz büyük çatlakla ilk defa karşılaştıklarını, söz konusu çatlakların olduğunu saat 09:40 - 09:45 sıralarında ofiste Burak ARTAL ve Can Serdar HASTÜRK'ün bilgi verdiğini, bu kişilerin birisinin İSG olduğunu diğerinin ise çevre mühendisi olduğunu bildiğini, bu bilginin kendisine Murat BAYRAKTAR tarafından gelmesi gerektiğini, Saat 10:00 da yapılan toplantı sonrasında Murat BAYRAKTAR'ın söz konusu bölgeye girişin yasak olduğunu tüm çalışanlara, alt yükleniciler de dahil mail attığını bildiğini, zira Murat BAYRAKTAR'ın öyle bir bilgi verdiğini, geoteknikten sorumlu Tekin ve oksit sorumlusu Murat BAYRAKTAR ile birlikte toplantı yapıldıktan sonra Burak ARTAL, Can Serdar ve Gizem ile birlikte 10:45 - 11:00 saatlerinde sahaya gittiklerini, Muratın'da kendi aracıyla geleceğini, gittiklerinde yolun barikatla kapalı olduğunu gördüklerini, söz konusu barikatı süpervizörlerden birinin koyduğunu düşündüğünü, Murat BAYRAKTAR gelene kadar süpervizörün geçişe izin vermediğini, yolun kapatılması talimatını kimin verdiğini bilmediğini, sahaya çıktığında en başta küçük çatlaklar gördüğünü, en büyük çatlak 6 cm büyüklüğünde olduğunu, iyi görebilmek için daha yüksek bir noktaya çıktıklarını ve burada Murat'a artık istifleme yapılmaması gerektiğini söylediğini ve istifle durdurulduğunu, gittiğinde solüsyon verilmeye devam ettiğini, solüsyonun farklı noktalara aktarılmasını söylediğini ancak o noktada karar verme yetkisinin olmadığını, sadece gözlemleme ve raporlamadan sorumlu olduğunu, herhangi bir talimat verme yetkisi olmadığını, alanda normalde kaç kişinin çalıştığını bilmediğini, olay yerinde çalışan 5 kişinin anagold bünyesinde oksit proses çalışanı olduğunu bildiğini, 2 kişinin Karsa personeli olduğunu ve oksit bölgesinde iş yaptıklarını ancak ne iş yaptıklarını bilmediğini, maden sahasından sorumlu kişinin Mehmet TÜRK olduğunu ancak olaydan 2 gün önce başladığını bildiğini, olay günü saat 13:00 civarında radar sorumlusu Ali Rıza KALENDER tarafından radar sonuçları mail olarak Murat BAYRAKTAR'a atılmış olduğunu, yazılan mail içeriğinde daha fazla yığın yapılmaması ve çatlak olan bölgelerin çimento ile kapatılması gerektiği yazdığını, bu kapatma işleminin madenciliğin daha sağlıklı yapılabilmesi için ve de yağmur sularının çatlaklara dolmasına engel olmak ve stabiliteyi sağlamak için olduğunu, olay günü sahaya çıktığında kendisine Murat

54



BAYRAKTAR veya Kaan Murat AKPOLAT'ın pazartesi günü verilen radar sonuçlarının doğal olduğuna dair bilgi verildiğini, bu çatlakların olduğunu olay gününde saat 11:00'de mail atarak ABD'deki merkeze bildirdiğini, saat farkından dolayı mail attığımda orada saatin gece 02:00 olması nedeniyle herhangi bir dönüş olmadığını, ilk geldiği zamanlarda 2022 yılı Ağustos ayında normalde maksimum 8 metre olması gereken yüksekliğin geçildiği bildirildiğini, kendisi başlamadan önce söz konusu raporlamanın yapılmış olduğunu, buranın olması gereken seviyeye indirilmesi için rapor düzenlendiğini, projeye uygun hale getirilmesini sağladığını, düzenli olarak yığın liç alanında anlaşma yapılan ABD kökenli GRE ve Türk kökenli INR isimli firmalarının yapı denetimi yaptıklarını, bu proje ve dizayn GRE isimli şirket tarafından yapılmış olduğunu, yine aynı şirket tarafından Proje ve devamındaki tüm imalat ve yapım, döküm, liç sahasının düzenlenmesi ile ilgili olarak projeye uygun olup olmadığı konusunda düzenli kontroller yapıldığını, liç altında sıvı birikmesi olup olmadığına dair herhangi bir bilgiye sahip olmadığını, yığın liç alanında ne kadar malzeme döküldüğüne dair günlük raporlama yapıldığını, fakat her gün yığın yapılmadığını, bu bilgiler ve dökümlerin şirketin mail adresinde kayıtlı olduğunu, Burak ARTAL'ın yukarıda değil de aşağıya ofise indiklerinde buranın tehlikeli bir hal aldığını söylediğini ifade etmiştir.

### Ali Rıza KALENDER;

16.02.2024 tarihli tutanaktaki ifadesinde kollukta verdiği ifadeye ilave olarak; Anagold Madencilik A.Ş çalıştığını, 2023 yılı içerisinde firma yetkilisi İzzet, Hüseyin ve Murat BAYRAKDAR'a yığının doğu kısmındaki radar sistemlerindeki eksik nedeniyle mail attığını, buradaki eksikliklerin giderilmesi için bütçe desteği istediğini, ancak olumlu bir dönüş alamadığını, Neil Bar isimli firmanın da raporu doğrultusunda 2024 yılı içerisinde bütçe talebinde bulunarak radarların alınmasını istediklerini, bu süre zarfında firma yetkilileri tarafından olumlu veya olumsuz bir dönüş olmadığını, Neil Bar'ın raporunda izleme sistemlerinin yeterli kapasitede olmadığı, acil alınması yönünde görüş bildirildiğini, ayrıca jeoteknik ekibininde personel eksikliği belirtilerek personel alımının ivedi yapılması raporlandığını, şirket tarafından radar alımı ile ilgili herhangi bir tarih aralığı belirtilmediğini, bu cihazların 2024 yılı başında alınması gerektiğini, raporun açıkça bu hususu belirttiğini, bu raporu sahadaki tüm başmühendislerin de bildiğini, Kenan, Can Serdar, Hüseyin, lain ve İzzet isimli şahısların da bilgisi olduğunu, planlama doğrultusunda firmalardan teklifler aldıklarını, toplamda ürünlerin değeri 3 milyon $ olduğunu, aradan geçen süreye rağmen hiçbir gelişme olmadığını, bu süre zarfında baş mühendis İzzet bey ile şifai olarak istemlerinin devam ettiğini, herhangi bir planlama yapılmadığını, hatta radarın kurulacağı alanda güneş sistemi dahil tüm kazı çalışmalarını yaptıklarını, 12 günlük izin dönüşünde olduğunu, Şubat ayının başından ayın 13'üne kadar olmadığını, olay günü saat 09.30 sıralarında Berkay MISIR'ın arayarak heapleach sahasında çatlak ve yarıkların olduğunu tehlikeli bir durum olabileceğini söylediğini, saat 10.30'da sahaya gittiğini, 11.00 civarında da Berkay, Murat BAYRAKDAR, Fatih ÖZER, Şenol DEMİR ve Kaan AKPOLAT ile heapleache çıktıklarını, acilen solüsyonun kesilmesini, yığınının durdurulmasını alanın da boşaltılmasının gerektiğini söylediğini, bu söyleme Berkay MISIR ve Fatih ÖZER şahit olup Murat BAYRAKDAR'ın beyanı da kısmen doğru olduğunu, açıkça bir sıkıntı yok demediğini, kendisinin soyadını hatırlamadığı Louis isimli şahısla toplantı yapılmasını gerektiğini söylediğini, ofislere geçtiklerinde Berkay ile radar grafiklerine baktıklarını, olağanüstü hareketlilik fark edince Murat BAYRAKDAR'a haber verdiklerini, sonrasında Murat ile birlikte lain'in yanına gittiklerini,



SWORN
TRANSLATION

lain'ın damlama sistemi (solüsyon akışı) durdurulması talimatını verdiğini, hareket hızını tekrar kontrol ettiğimde 200 mm civarına yaklaştığım görünce Murat bey, Hüseyin bey, Abdulkadir bey ve İzzet bey ve yetkili personellere mail attığını, mailden sonra Burak bey arayarak konuyla ilgili olarak bir toplantı talep ettiğini, ardından yemeğe gittiklerini, yemek dönüşü grafikteki artışı görünce Berkay ve Fatih ile beraber araziye geri çıktıklarını, burada Murat BAYRAKDAR'ı görüp görmediğini hatırlamadığını, heapleach sahasına o saatte Soysal DOĞAN'nın izni dahilinde çıktıklarını, dönüşte 3 yabancı, Kaan ve Elif'i gördüklerini, Adnan beyin borulama ekibinin konteynırının köşesinde yayan vaziyette beklediğini, Berkay'a "söyle çıkmasınlar çok tehlikeli" dediğini, buna rağmen ne yaptıklarını bilmediğini, gösterilen raporu çözümlediğini, işinin bu raporu çözümlemek ve ilgili birimlere bildirmek olduğunu, 6 Şubat 18.00 sıralarındaki 90 seviyesine yaklaşan mm'lik ivmelerin rutin sıçrama olduğunu, öncesi ve sonrasına bakılması gerektiğini, eğer ki sıçramayı destekleyen bir hareket yoksa sıçrama sahada kontrol edildikten sonra ciddiye alınmaması gerektiğini, grafikte de ortalaması alındığındaki 6 şubattaki hareketlerin 30-50 arasında seyrettiği açık olduğunu, bu sebeple raporlanmasına gerek olmadığını, 12 Şubat'a kadar grafik ortalamasının 15-20 arasında olduğunu, bu sebeple sakıncalı bir durum olmadığını, eğer ki sıçrama 1-2 saat civarında sürmüş ise bunun sahada kontrol edilmesi gerektiğini, ayrıca hız grafiği ile birlikte olayın tam aydınlatılması için deplasman grafiğinin de incelenmesi gerektiğini, 6 Şubattaki sıçramanın kontrol edilip edilmediğini bilmediğini, Berkay tarafından bununla ilgili bilgi verilmediğini, gösterilen diğer 12-13 Şubat tarihli grafikte 13 Şubat 00.00'da mm'lik hareketinin 70 ve üzerine çıktığı, 02.00 sıralarında 80 mm'ye çıktığı, 02.00'da 110 mm'ye yaklaştığı sabit olduğunu, gece vardiyası ile çalışmadıklarını, sadece mesai saatlerinde çalıştıklarını, bu sebeple gece radarı inceleme ve denetleme yükümlülükleri olmadığını, sadece bir tansiyon çatlağı şüphesi durumunda kendilerine haber verildiğinde radar raporlarını inceleyip ona göre bilgi verdiklerini, gece alan belirleme yükümlülükleri olmadığını, alan belirlemenin şu şekilde olduğunu, titreşimin veya kaymanın boyutu her ne olursa olsun grafikte alan belirlemedi iseler nereden ve ne şiddette titreşim, kayma olduğunu bilemeyeceklerini, alan belirledikten sonra titreşim ve kaymayı matematiksel olarak raporlayabildiklerini, Berkay'ın da gece veya sabah 7.30'da mesaisi başladığında alan belirleyip belirlemediğini bilmediğini, bildiği kadarıyla Murat BAYRAKDAR'ın Berkay'a haber vermesi ile saat 9.15 civarında Berkay'ın radara baktığını, ardından kendisine haber verdiğini, mesai başlar başlamaz durumu kendisini fark etse ve uyarılarda bulunsa dahi mevcut durumun değişmeyeceğini, çünkü radarda gözüken yerin mevcut kaymanın yaşandığı alanın 10/1 oranında olduğunu, radar sistemi heapleachin doğu kısmını görmediğinden tehlikenin büyüklüğünün fark edilemeyeceğini, aynı zamanda güney ve güneybatı kısmındaki proje departmanın sorumluluğunda olan mebranlı malzeme sermeye hazır bölgeyi teslim etmedikleri için heapleach kuzeye yaslanarak doğu ve batıyı patlattığını, bu projelerin GRE firmasının sorumluluğunda olduğunu, ÇED raporlarıyla firma projelerinin denetlenip onaylandığını, ön görülemeyen bu hadisenin 2 saat erken bildirilip bildirilmemesi ile alakası olmadığını, aynı zamanda borulama birliğinin konteynırlarının 5-6 yıldır bulundukları alanda olduklarını, hatta orasının 5-6 yıldır acil durum toplanma yeri olduğunu, bunu İSG departmanının kararlaştırmış olduğunu, Evrim beyin departmanın başında olduğunu, yaklaşık 5-6 yıl boyunca heapleach sahası %20 oranında enine büyüdüğünü, dikine ise muhtemelen %40 civarı büyüdüğünü, bu büyümeye rağmen İSG'nin tekrardan karar alarak konteynırların yerlerini belirlemeleri gerektiğini, bu işlemi GRE projecisi Louis ile birlikte yapmaları gerektiğini, heapleachin hem doğusu hem de batısında (batısı) topuk desteği denilen araziler alanlar

56



SWORN
TRANSLATION

bulunduğunu, GRE'nin burasını güvenli bölge olarak tasarladığını, buraya hiçbir şekilde heyelanın kaymanın toprağın gelemeyeceği belirtildiğini, buna istinaden de o bölgelerde konteynerler bulunmakta olduğunu, ancak dediğim gibi %20'lik büyümeye rağmen konteynır alanları güncellenmediğini, olay günü Murat BAYRAKDAR'ın talimatıyla yollar kapandığını, göçük altında kalan borulama konteynırlarının yolun dış tarafında olup iç kısmında olmadıklarını, konteynırların oraya kadar kaymanın gerçekleşebileceğinin projeciler hariç kimse tarafından bilinemeyeceğini, bununla ilgili de projeciler tarafından herhangi bir bildirim yapılmadığını, GRE tarafından sürekli olarak sahadan numune alınarak büyümenin sağlıklı olup olmadığı denetlenmesi gerektiğini, ayrıca verilen siyanür miktarının da projeciler tarafından denetlenmesi gerektiğini, tahminince olayın güney tarafındaki teslim edilmeyen mebran alanından kaynaklanarak yığının kuzeye doğru baskı yapmasından bu baskı neticesinde kuzeyde bulunan topuk desteğinin güçlü olması nedeniyle doğu ve batı kısımlarından toprak kaydığını, aynı zamanda sürekli siyanür ile yıkanan toprağın zemin mukavemeti iyice azaltılmış olduğunu ve toprağın hareketine sebebiyet verdiğini, videolardan görüldüğü üzere yaklaşık 10 milyon tonluk bir kütle 30 saniye içerisinde akıp gittiğini, sebebinin sıvılaşan toprak olduğunu, bu hususların proje departmanı ile oksit proses tarafından denetlenmesi gerektiğini, iki birim arasında yeterli ve gerekli irtibat sağlanmadığından sıkıntı ortaya çıktığını, jeoteknik ekibi olarak tüm yükümlülükleri yerine getirdiklerini, ihmal olmadığını, milimetrik hareketlilik arttığında doğrudan operasyonel birimlerini bilgilendirdiklerini, yığın yapılmaması, solüsyonun kesilmesi, alanın boşaltılması gerektiğini söylediklerini, ayrıca GRE firmasının radara erişim sağlayabileceğini, aylık olarak firmaya radar çözümlemelerini gönderdiklerini, olağandışı bir durum olsa idi firmayı bilgilendireceklerini, kaldı ki firmanın da kendisi tespit edebileceğini, yapacakları başkaca da bir şey olmadığını, herhangi bir sorumluluğu olmadığını beyan etmiştir.

### Cengiz Yalçın DEMİRCİ:

18.02.2024 tarihli tutanaktaki ifadesinde kollukta verdiği ifadesine ilaveten; Anagold Madencilik A.Ş Yönetim Kurulu Başkanı olarak görev yaptığını, 2022 Eylül ayı itibariyle Anagold Madencilik A.Ş'ye ait firmanın üst mercilerine koordinasyonun bütçe onay hazırlıklarını, ortaklık ve ilişkileri, finansal raporlarını, SSR üst yöneticilerine ve Çalık Holding üst yöneticilerine bildirilmesi ve bunun koordinasyonunun üstlere bildirilmesinden sorumlu olduğunu, 2022 Eylül ayından önce SSR Mining şirketinde dünyada bulunan maden arama ekibinin başında olduğunu, Anagold Madencilik A.Ş'de şirketin direktörleriyle iletişim halinde olup onların da burasının finansal işleyişi hakkında kendisine rapor sunduklarını, teknik konuları ise burada görev yapan Iain'e (Operasyon Başkan Yardımcısı) bildirdiğini, ülke işleyişi, madenin durması ile ilgili teknik bir sıkıntı olduğu durumda Iain bildirdiğini, örneğin madenin durdurulması finansal olarak şirketi ilgilendirdiği için bu durumu kendisine bilgilendirmekle yükümlü olduğunu, her ne kadar Kenan ÖZDEMİR (Operasyonlar Direktörü) Iain'in bir alt konumunda çalışan ise de Iain bu durumu direk kendisine bildirmekle yükümlü olduğunu, SSR Mining şirketinde Bill McNevin'a bağlı olduğunu, SSR Mining'in altında bulunan şirketler ile koordinasyonu sağlamak ve üst amirine sunmakla görevli olduğunu, Anagold Madencilik şirketinin Ülke Müdürü olarak görev yaptığını, Türkiye'de bulunan bütün şirketler için 3 ayda bir düzenli aralıklarla toplantılara geldiğini, burda ki olağanüstü durum nedeniyle inisiyatif kullanarak geldiğini, SSR Mining şirketinde Iain Ronald'ın bir alt birimi olduğunu ancak şirket nezdinde her ikisi de aynı pozisyonda çalıştıklarını, onun teknik konularda sorumlu kendisinin teknik konular dışındaki konulardan sorumlu olduğunu, Anagold



SWORN
TRANSLATION

Madencilik A.Ş'de  Iain'den sonra sorumlusu Kenan ÖZDEMİR olup şuan geçici görevle ABD/Nevada da bulunduğunu, yerine şuan vekaleten Abdulkadir CANSIZ baktığını, bu vekaleten görevlendirme işlemlerinin mail ortamında yapıldığını, vekaleten bakan kişi baktığı kişinin bütün sorumluluklarını aldığını, Türkiye'deki işleyiş ile ilgili bütün operasyon görevlilerinin kendisi ile mail ortamında, video konferans ortamında veya diğer iletişim kanallarıyla görüşme sağladıklarını, gerektiği durumlarda Anagold Altın Madeni A.Ş direktör yöneticileri ile video konferans ile toplantı düzenlediklerini, 13.02.2024 tarihinde Anagold Madencilik A.Ş ile herhangi bir toplantısı olmadığını, olaydan Onur ACAR'ın sabaha karşı tahminen saat 04.30 gibi arayarak haber vermesi neticesinde haberdar olduğunu, bu kişinin kendisine bilgi vermek yükümlülüğü olmadığını, kişisel ilişkisi nedeniyle haber verdiğini, sonra Anagold Madencilik'te bulunan kişilere olay hakkında detaylı bilgi almak için ulaşmaya çalıştığını, olaydan 1 buçuk saat sonra olayın detayı ile ilgili mail geldiğini, Iain ile görüştüğünü, kendisine bütün operasyonu durdurmayı unutmaması gerektiğini söylediğini, o kişi de zaten bütün operasyonu durdurduğunu söylediğini, 24 saat boyunca bütün durumdan haberdar olduğunu, hemen üstü olan Bill Macnevin'i aradığını, olaydan haber olduğunu söylediğini, herhangi bir talimat vermediğini, SSR Mining şirketindeki 5 kişilik üst yönetici kadrosuyla online toplantı yaparak bu konuyla ilgili yapılması gereken hususları görüştüğünü, 16.02.2024 günü Türkiye'ye geldiğini, olaydan 2 saat önce Iain'in mail adresime bilgilendirme amaçlı 3 adet çatlağın olduğu, çatlaklar ile ilgili fotoğraf ve önlem aldıklarına dair mail gönderdiğini, maili saat farkı nedeniyle görmediğini, olaydan sonra direktör arkadaşların uyarması sonucunda olaydan 3 gün sonra maili gördüğünü, böyle durumlarda oradaki sorumlunun bütün üst yöneticilere bilgi amaçlı mailler attığını, bunların rutin bilgilendirme maili olduklarını, Iain'ın herhangi bir talimat almak için bu maili atmadığını, normalde iş sağlığı güvenliği eğitiminde ve prosedürlerde bu hususlar ile ilgili maden sahasının çok tehlikeli sınıf kategorisinde bulunması nedeni ile en alttaki işçinin dahi tehlikeyi fark ettiği zaman durdurma yetkisi bulunduğu belirtildiğini, hatta böylesi tehlikeli durumlarda alt yüklenicilerin bile durdurma yetkisi bulunduğunu, buradaki durumda en yetkili kişi Iain olup durdurma yetkisi bulunduğunu, söz konusu olayda da Iain'ın durdurma kararı verdiğini, ancak neden söz konusu yerde incelemelerin yapıldığını bilmediğini, o kişilerin orada hangi amaçla bulunduklarını bilmediğini, Kenan ÖZDEMIR'e olay zamanı bu olayla ilgili bilgi ve verilip ve verilmediğini bilmediğini, yığınlıç sahasının ilk kuruluşu ile ilgili herhangi bir bilgisi olmadığını, o dönemde SSR Mining şirketinde görevli olmadığını, buranın projelendirilmesini kimin ne şekilde ne zaman yaptığını, nereden olur aldıklarını bilmediğini, daha sonraki yığın liçinin genişletilmiş projeleri ile ilgili yetkisi bulunmadığını, teknik konulardan hiç bir şekilde bilgilendirilmediğini, buranın denetimini, kimin hangi aralıklarla ne şekilde yaptığını bilmediğini, yığınlıç sahasından proses oksit departmanı sorumlu olup başında Hüseyin ÜSTÜNDAG bulunduğunu, Hüseyin ÜSTÜNDAG'ın olayın olduğu tarihte izinli olduğunu bildiğini, o izine çıktığında ona vekaleten bakacak kişinin pozisyonunu bilmediğini, olay olduktan sonra orada Hüseyin ÜSTÜNDAG'ın yerine vekaleten Murat BAYRAKDAR'ın görevlendirildiğini öğrendiğini, Oksit proses departmanının Kenan ÖZDEMIR'e bağlı olduğunu, Kenan'ın yerine o dönemde Abdulkadir CANSIZ 2024 Şubat başından itibaren görevli olduğunu, Abdulkadir CANSIZ'ın vekaleten bakmasına Iain ve Kenan karar verdiklerini, normalde Abdulkadir CANSIZ bakım Müdürü olarak görev yaptığını, Abdulkadir CANSIZ bakım departmanının en yetkili kişisi olup diğer departman bilimlerinin kendi konuları ile ilgili oksit proses birimine bilgi ve teknik anlamda destekler verebildiklerini, alt yüklenicilerinin kimler olduğunu bilmediğini, 9 kişinin hangi amaçla yığın liçinde bulunduğunu

58



bilmediğini, hangi görevde olduklarını bilmediğini, olay öncesinde kimseye herhangi bir talimat vermediğini, haberdar olsa idi kesinlikle durduracağını, olaydan önce sorumlu kişilerin de bu yığın liç sahasındaki işleyişini durdurma kararı verdiklerini, yığın liç sahasında fazla yükleme olup olmadığını, solüsyonun fazla verilip verilmediği konusunu bilmediğini, bu olaya neyin sebebiyet verdiğini bilmediğini, dün itibariyle Çevre Bakanlığı'na. verilen bilgide fazla solüsyon ve su verilmediğini bildirdiklerini, radar sistemindeki uyarı hakkında uyarının ne şekilde olduğunu hangi ivmede olduğunu bilmediğini, bu konu ile ilgili DSİ'ye verilen bilgide radar sisteminde olaydan hemen önce hareketlilik olduğunu öğrendiğini, 2023 yılı Aralık ayında radar sistemine ait cihazların bu yılki bütçeye girdiğini bildiğini, alımı ile ilgili onay alındığını bildiğini, cihazlar yurt dışından alındığı için alım süreci uzamış olabileceğini, alım sürecinin Anagold Madencilik A.Ş'deki iç işleyişe bağlı olan bir durum olduğunu, bununla ilgili bütçeye uygun olup olmadığını onayladığını, işleyiş olarak bütçeyi her bir departmanın (müdürlük) kendisi yaptığını, sonra ilgili direktöre sunulduğunu, bu konuda Iain koordinasyonu sağlayarak 5 kişilik üst yöneticiye sunduğunu, bu üst yöneticilerin onayı ile bütçenin onaydan geçmiş olduğunu, kendisine onaylanmış şekilde geldiğini, sadece bunun takibini yaptığını, ilgili departman biriminin bütçesini aşması durumunda olaya müdahale ettiğini, bildiği kadarıyla radar cihazlarının alımı yapıldığını, normalde belirli aralıklarla rutin patlamalar olduğunu, olayın olduğu gün herhangi bir patlama olup olmadığım bilmediğini, patlama olmuş ise de bunu yığınliç sahasına tehlike arz edip etmediğini bilmediğini, maden sahasında oluşabilecek olumsuz durumlarda alt taşeronlara bu bilgilerin verildiğini yada alt taşeron olumsuz bir durum gördüğü zaman bunu durdurup bildirmekle yükümlü olduğunu, konteynerlerin oraya ne şekilde kimin talimatı ile konulduğunu, konulma prosedürünü bilmediğini, konuyla ilgili herhangi bir yetkisi de bulunmadığını, olay sabahı tespit edilen çatlaklar ile ilgili patlatma birimine bilgi verilip verilmediğini bilmediğini, solüsyon sisteminin durdurulup durdurulmadığım bilmediğini, olay sabahı kimin ne şekilde önlem alıp almadığı hakkında daha sonradan bilgi edindiğini, öncesiyle ilgili herhangi bir bilgiye sahip olmadığını, bu konuda talimat verme yetkisi bulunmadığı için bilgisi de olmadığını, ISG eğitimleri hususunda çok katı bir eğitim verildiğini, her eğitim biriminin farklı farklı özellikleri bulunduğunu, yığın liçine ne kadar toprak dökümü yapılıp yapılmadığını bilmediğini, yığın liçi hakkında herhangi bir teknik bilgiye sahip olmadığını, yığınliç sahasının genişletilmesi hususunda proje bakımından yetkisi olmadığını, ancak yığın liçinin düzeni, dizaynı ve projelendirmesi ile ilgili düzenin şu şeklide olduğunu söyleyebileceğini, maden sahasında yapılan yığın liçlerin dizaynı GRE isimli (ABD/Demmar) firma tarafından projelendirmesinin yapıldığını, projelendirmenin oluru alındıktan sonra oksit birimine verildiğini, oksit birimi projeye uygun bir şekilde yükleme yaptığını, liç bünyede bulunan proje birimiyle birlikte GRE isimli firma bir dizayn projesi hazırladıklarını, denetlenmesinin ne şekilde yapıldığını bilmediğini, olayla ilgili yerin güvenliğinden oksit proses birimi ve İSG birimi sorumlu olduklarını, olayda jeoteknik birimi kayıtlan incelediği için ilgili departmanlara bilgi vermek, gerekli önlemlerin alınması hususunda öneride bulunmak ve durdurmakla yükümlü olduğunu, kayan kütlenin ne kadar miktar olduğunu şuan için bilmediğini, radar sistemindeki tehlike seviyeleri hakkında bir bilgisi bulunmadığını, ancak risk analizleri sonucunda jeoteknik biriminin seviyeye göre ilgili kişilere bunu bildirmekle yükümlü olduğunu, hatta yüksek riskli durumlarda SSR Mining üst yöneticilerine dair bu bilginin verilmesi gerektiğini, olay anında yığınliç sahasına Jonathan Holden (SSR'nın inovasyon departmanı başkan yardımcısı-ABD Demmar) ve Allan Mzuris (inovasyon direktörü ABD/Demmar)'in çıkıp çıkmadıklarını bilmediğini, ancak bu kişilerin Anagold Madencilik A.Ş'ye

59



SWORN
TRANSLATION

belirli aralıklarla tanklara cevher besleme, bunların iyileştirmesi hususunda verimliliği artırması ile ilgili çalışma yaptıklarını, yığınlıç sahası ile alakaları olmadığını, muhtemelen Türkiye'ye geldiklerinde yığınlıç sahasını gezmek için o bölgeye gittiklerini, maden sahası ile sorumlu olan Iain tutuklandığı için şuan bütün kurtarma operasyonunu yönettiğini, konu ile ilgili sadece bilgilendirme amaçlı Iain'den benim bulunduğum mail grubuna bilgi geldiğini ifade etmiştir.

### Soysal DOĞAN:

16.02.2024 tarihli tutanaktaki ifadesinde kolluktaki ifadesine ilaveten; Anagold Madencilik A.Ş'de 19 buçuk yıldır bu iş yerinde (14-15 yıl oksit proses bölümünde borulama süpervizörü) çalıştığını, saat 07.30'da işe başladığını, 08.00'da rutin toplantı olan sahada yapılacak işlerin ve yapılan işlerin toplantısına amirleri Kaan Murat AKPOLAT, Şenol DEMİR ve süpervizör olan Kenan ÖZ, Ramazan ÇİMEN, Mehmet SARITAŞ ile birlikte toplantı yaptıklarını, Kaan Murat AKPOLAT kendisi ve Kenan ÖZ'ün, Şenol DEMİR ise Mehmet SARITAŞ ile Ramazan ÇİMEN'in bir üst amiri olduğunu, bu kişilerin direktifleri doğrultusunda iş ve işlemleri yürüttüklerini, süpervizörler olarak kendi başlarına herhangi bir iş yapma yetkileri bulunmadığını, sorumlu olduğu kişilerin İshak DEMİR, Sıddık KEKLİK, Recep KURT, Gökhan GÜN, Nihat ÇUVAK, Sıddık GÜN, Kenan ÇELENK ve Murat GÜRBÜZ (Anagold çalışanları) olduklarını, bunların dışında Karsan alt taşeron firmasına bağlı İsa TAŞDELEN, Hüseyin KARA, Osman KARA, Abdurrahman ŞAHİN, Ferdi DEMİR'in de sorumluluğunda bulunan işçiler olduklarını, bu işçilerle birlikte gündüz çalışmak şartıyla liç sahasında bulunan toprağın üzerine ADR biriminin gönderdiği solüsyonun borulama sisteminin döşenmesini, arızasını, bakımını ve tamirini yaptığını, ayrıca bunların günlük sayaç değerlerini tespit ederek gün içerisinde solüsyonun az mı çok mu gönderilip gönderilmediğine ait raporları bir üst amirlerine bildirdiklerini, sorumluların silsilesi Hüseyin ÜSTÜNDAG sonra Murat BAYRAKDAR sonra Kaan Murat AKPOLAT sonrasında süpervizörler olarak kendisi, olmadığı zamanlarda da ekip lideri olarak Recep KURT geldiğini, Elif REYHAN ADR bölümünün süpervizörlerin üstündeki mühendis olup borulama sistemindeki üstün Murat Kaan AKPOLAT olduğunu, borulama ekibine ait iş sahasına iş sahasına giderken toplanma merkezi olan yerde 8 adet konteyner bulunduğunu, çeşitli amaçlarla kullandıklarını, yaklaşık bu konteynerleri 7 yıldır kullandıklarını, konteynerlerin yerini o zamanın amirlerinin liç sahasının en tehlikesiz bölgesinde konuşlandırdıklarını düşündüğünü, konteynerlerin liç sahasına en yakın olduğu yerin mesafesinin 500 metre, en uzağım 1000 metre olduğunu, olayın gerçekleştiği toprak yığının geldiği konteynerlerin kendilerine ait konteyner olduğunu, olay günü yığın liç ekip lideri Anagold işçisi Kenan ÖZ'ün arayarak sahada çatlaklar olduğunu ve kendisini almak için geldiğini söylediğini, kendisinin de yığınlıç sahası Süpervizörü olup (kırıcıdan gelen cevherin sahadaki 8 metre yükseklikteki alana seriyor ve serilen bu toprağın riperlemesini yapıyor.) riperleme işleminden sonra kendilerine teslim ettiğini, aynı işlemleri diğer alanlara tekrarladığını, sahaya gittiklerini ve Iain Ronald GUILLE, Kaan Murat AKPOLAT, Murat BAYRAKDAR, Fatih ÖZER, Gizem GAZCI, Burak ARTAL, Can Serdar HASTÜRK, Ali Rıza KALENDER ve ismini bilmediği bir mühendis ile çatlakların bulunduğu yere 09.00 ile 09.30 arasında gittiklerini, gitme amacının çatlaklar ile ilgili bir tehlike olup olmadığının tespiti ve onarımına ilişkin konuşmak olduğunu, gelen kişilerin kendi alanları ile ilgili riskleri paylaştıklarını, taşeron firmaların sahadan çıkarılmasını İSG'den Burak ARTAL Murat BAYRAKDAR'a bildirdiğini ve bu firmaların sahadan çıkarılmasının Murat BAYRAKDAR tarafından sağlandığını, liç sahasının üzerinde yaklaşık 25-26 kişi çalışmakta olduğunu, yığınlıç

60



SWORN
TRANSLATION

sahasından sadece alt taşeronlara ait işçilerin çıkarıldıklarını, toplantı sırasında Ali Rıza KALENDER'den titreşim konusunda bir ölçüm daha istediklerini, ADR bölümünden de solüsyonun kesilmesini istediklerini, solüsyonun o sırada kesilmediğini, toplantı yapıp kendi aralarında bu konuyu istişare ederek solüsyonu kesecekleri söylediklerini, solüsyon saat 13.00 sıralarında Murat Kaan AKPOLAT, ADR birimine bağlı Süpervizör Adnan KEKLİK, ADR mühendisi Elif REYHAN'ın talimatı doğrultusunda ADR bölümünden ilgili kişiye ulaşarak solüsyonun tamamen kesildiğini, kısmi olarak solüsyonun kesilmesinin de söz konusu olmadığını, sistemin izin vermediğini, saat 13.00 sıralarında tamamen kapatıldığını, BLS 2 alanın tamamen solüsyona kapatıldığını, lift 33. katta söz konusu çatlakların bulunduğunu, BLS 2'dekinin lift 33'deki alanı ıslatan sistem olduğunu, saat 09.00 ile 09.30 gibi yaptıkları toplantı sonucunda herkes ayrıldığını, toplantı sırasında liç yığınlıç sahasına gidilen yolların kapatılması konusunda Kaan Murat AKPOLAT'ın kendisine talimat verdiğini, akabinde de kırıcı bölümünde görev yapan mühendis Şenol DEMİR'den bütün operasyon birimlerine yolun kapatılmasına ilişkin mail atıldığını, belirlenen alanlara kendisi ve ekibi gidip dubaları yerleştirdiklerini, daha sonra konteynerlere giderek beklemeye başladıklarını, çatlakların bulunduğu yerde kimse kalmadığını, konteynerlerin bulunduğu yerde İshak DEMİR (Anagold), Fahrettin KEKLİK (Anagold), İsa TAŞDELEN (Karsan), Abdurrahman ŞAHİN (Karsan), Hüseyin KARA (Karsan), loader operatörü Şaban YILMAZ (Asil Çöpler), dozer operatörü Mehmet KAZAR (Keklikler Firması) ve kendisi bulunduklarını, Mehmet KAZAR ve Şaban YILMAZ, Kenan ÖZ'ün çalışanlar, diğerlerinin de borulama ekibindeki işçiler olduklarını, saat 14:00'a kadar orada beklediklerini, isimlerini bilmediği iki yabancı uyruklu mühendis geldiğini, sahaya girişlerin kapalı olduğu kendilerine söylediklerini, bu kişiler İngilizce konuştuğu için Kaan Murat AKPOLAT'ı arayarak yabancı uyruklu kişilerle iletişimi sağladığını, o sırada ölçümden sorumlu jeoloji mühendisi Ali Rıza KALENDER'in geldiğini, yol kapanmasından dolayı yabancılara tercümanlık yaptığını, telefonu geri aldığında Kaan Murat AKPOLAT'ın gelmek üzere olduğunu söylediğini, Kaan Murat AKPOLAT, Adnan KEKLİK, Elif REYHAN aynı araçta geldiklerini ve başka bir araçla da Kenan ÖZ ve Ramazan ÇİMEN'in geldiklerini, o sırada Kaan Murat AKPOLAT'ın yabancıların sahaya gitmesine izin verdiğini, Kaan Murat AKPOLAT'ın kendisine de işçilerle birlikte liç sahasında bulunan lift 29 alanına giderek grupta fotoğraf paylaşmasını istediğini, İshak DEMİR, İsa TAŞDELEN ile birlikte beyaz renkli Transporter ile gittiklerini, Lift 25 de durduklarını, kapatmış oldukları lift 25'in bulunduğu alanda çatlaklar gördüklerini, bu çatlakların 2-3 cm genişliğinde 2 adet olduklarını, o sırada Elif REYHAN ve Kaan Murat AKPOLAT yabancılarla birlikte lifi 33'ün üzerindeki faz 4 alanına incelemeye gittiklerini, Kenan ÖZ, Adnan KEKLİK, Ramazan ÇİMEN'in kendilerinin ilk durdukları lift 25 alanında araç dışında kaldıklarını, kendisinin İshak DEMİR ve İsa TAŞDELEN ile birlikte lift 29 alanına araçla gittiklerini, İshak DEMİR ile İsa TAŞDELEN' e "siz lift 29'a gidin" dediğini, kendinin de lift 33'e çatlaklarda genişleme var mı yok mu diye kontrol için aracı ile gittiğini, aracı sahanın dışında bir yere bıraktığını, lift 33'de bulunan çatlakların fotoğrafları çektiği sırada 10-15'er cm'lik birkaç çatlağı gördüğünü, bu çatlaklıkların saat 09.00 sıralarında baktıkları çatlaklardan biraz daha geniş olduklarını, çatlakların fotoğrafını çektiğini, o sırada Kaan beyin kendisine "arka tarafına bak, çatlaklar daha fazla büyümüş" dediğini ve o sırada toprak ayağının altında oynamaya başlayınca Sabırlı yönüne doğru güvenli olan alana koştuğunu, 30 saniye içerisinde yığın liç için orta kısmı akmaya başladığını, o sırada arkadaşlarına bağırdığını, lift 29'u görmeye çalıştığını ama göremediğini, bulunduğu yerden konteynerlerin bulunduğu alana baktığında konteynerlerin

61



SWORN
TRANSLATION

dereye doğru toprak altında olduğunu gördüğünü, hemen lift 29'da bulunan İsa ile İshak'ı aradığını, batı tarafına kaçtıklarını söylediklerini, lift 25'de bulanan Kenan ÖZ ve Adnan KEKLİK'i aradığını ancak ulaşamadığını, konteyner alanında Abdurrahman ŞAHİN, Fahrettin KEKLİK, Şaban YILMAZ Mehmet KAZAK, Hüseyin KARA bulunmakta olduklarını, manganez sahasında bulunan kamyon işçisini görmediğini, kapatmış oldukları yolun onun geçtiği yoldan farklı bir yol olduğunu, yığınlıç sahası ile manganez sahası arası yaklaşık olarak 150 metre mesafede olduğunu, Kaan Murat AKPOLAT ve yabancılar zaten güvenli olan bölgede oldukları için herhangi bir olumsuz durumla karşılaşmadıklarını, kuşaklama üzerindeki yoldan başka bir yola geçtiklerini, kendisi de o yoldan geçerek kamyonun kaza yaptığı manganez bölgesine geldiğini, insanların orada toplanmış olduklarını, ERT grubunda bulunduğum için gruptaki kişilerin yardım istediklerini ve o bölge hakkında bu kişilere bilgi verdiğini, bu sırada ben Muzaffer BEGEN'i arayarak manganez tarafında olduklarını söylediğini, Muzaffer BEGEN'in de TSF bölgesinde olduğunu söylediğini, kriz masasının olduğu noktaya çağırdıklarını, daha sonrasında TSF'nin bulunduğu alana giderek AFAD çalışanlarından birisi bizden bölgeye nasıl gidecekleri konusunda bilgi istediğini, İSG tarafından yılda bir genel bir eğittin verildiğini, olay günü Gizem GAZCI İSG'den sorumlu olduğunu, tehlike gördükleri zaman mevcut amirlerine fotoğraf çekmek suretiyle bildirmekle sorumlu olduklarını, bunun dışında herhangi bir sorumlulukları olmadığını, Mehmet KAZAN ve Şaban YILMAZ Kenan ÖZ'e bağlı olduğu için Kenan ÖZ'ün onlarla ilgili sorumluluğu bulunduğunu, daha öncesinde de solüsyon akmasına bağlı yarıklar oluştuğunu, ama hemen ilgili gerekli müdahalelerin yapıldığını, tehlike ortadan kalktığını, bu olaya sebebiyet veren ilk dizayn projesinden başlanması gerektiğini, oksit sahasından olay tarihinde Murat BAYRAKDAR, Hüseyin ÜSTÜNDAG'ın yerine vekil olduğu için sorumlu olduğunu, söz konusu çatlakların ilk yapılan toplantı da Ali Rıza KALENDER tarafından geceden olmuş olabileceği söylendiğini, kendisi ölçümcü olduğu için bunu radar sisteminden anlamış olabileceğini, saha sorumlularının olumsuz bir durumda taşeron firmalara bilgi verdiklerini, olay tarihinde saat 12.15'de yaklaşık 1 km uzaklıkta açık maden sahasında patlatma yapıldığını, patlatmadan etkilenerek bu olayın gerçekleşip gerçekleşmediğini bilmediğini, fazla yükleme yapılıp yapılmadığını bilmediğini, verilen talimatlar doğrultusunda işlemlerini yaptıklarını, sahanın genişletilmesiyle ilgili herhangi bir bilgisi olmadığını, bulundukları konteynerlerin olduğu alan en güvenli alan olarak bilindiğini, hatta toplanma alanı konteynerlerin bulunduğu alan olduğunu, sorumluluğu olduğunu düşünmediğini. 14 yıldır borulama sisteminde çalıştığını, toprak altında kalan Adnan KEKLİK ve Fahrettin KEKLİK akrabası olduğunu, toprak kaymasını tahminen 10 km olarak değerlendirdiğini, müvekkili bu olayla ilgili alelacele alınan bilirkişi raporunda solüsyonun fazla verilmiş olabileceği durumu ele alınmışsa da müvekkilinin bu solüsyonun akıtılması veya kesilmesinde bir yetkisi bulunmadığını, sadece akan ADR'den gelen solüsyonun dağıtılmasında görev aldığını, solüsyonu kestirmeye hiçbir şekilde yetkisi bulunmadığını, gerçekleşen olayın da solüsyonun fazla akıtılıp akıtılmadığı sonucu gerçekleştiği de kesin belli olmadığını, bilirkişilerin burada tahmin üzerine rapor tanzim ettiklerini, bir günde detaylı bir rapor düzenlenmesi de beklenemeyeceğini, toprak altında kalan kişilerin de müvekkilin sorumluluğunda olmadıklarını, bir tanesi manganez alanında kamyonda kalan kişi, diğeri üç kişi ise lif 25 alanında bulunan kişiler olduklarını, bunların müvekkilin talimat verdiği kişiler olmadıklarını, müvekkilinin talimatı doğrultusunda orada bulunmadıklarını, konteyner bölgesinde bulunan 5 kişi ise zaten şirketin, acil toplanma alanı olarak belirlenen bölgesinde bulunduklarını, saha kapatma kararı gereği işleminin de o bölgeden sonrası için verildiğini beyan etmiştir.

62



SWORN
TRANSLATION

### Hüseyin ÜSTÜNDAĞ;

16.02.2024 tarihli tutanaktaki ifadesinde Anagold madencilik isimli iş yerinde oksit proses müdürü olarak ortalama 4-5 ay kadardır görev yaptığını, şirketteki görevinin kırma eleme, yığın liçinde cevher serimi (dizayn ve yığm inşaatı benim tarafımdan yapılmamaktadır) ve ADR (altının topraktan ayrıldıktan sonra transfer bölümü) bölümü benim görev alanımda olduğunu, olayın olduğu gün izinli olduğunu, iznin pazartesi günü saat 17:00 itibariyle başlayacağını, şirketin müdürlerinin bulunduğu sabah saat 10:00'da yapılan olağan toplantıda izinli olduğunu iki gün şehir dışında olacağını, vekaletini de Başmühendis Murat BAYRAKTAR'a devrettiğini söylediğini, pazartesi 17:00'den sonra işi bırakarak ikametine gittiğini, daha sonra şirkete gelerek izinli olduğu süreçte yapılacak işleri ve toplantıları bildirir bir raporu hazırladığını, bu raporu pazartesi akşamı Murat BAYRAKTAR'a şirket içi kullandıkları mail yoluyla ilettiğini, Salı günü yolda Murat BAYRAKTAR'ın WhatsApp'dan bir fotoğraf attığını, fotoğrafla yığında bulunan çatlaklar olduğunu, daha sonra telefonla irtibat kurduklarını, yığında çatlaklar olduğunu, üretimi durdurduğunu, alanı kapattığını, jeoteknik ekipten Ali Rıza KALENDER'i çağırdığını söylediğini, yolda Murat BAYRAKTAR ile iletişim kurmaya çalıştığını ancak telefonu çekmediği için iletişim kuramadığını, saat 11:00 civarı Erzincan havalimanına ulaştığını, tekrar Murat BAYRAKTAR ile irtibat kurduğunu, jeoteknik ekipten Ali Rıza KALENDER isimli şahsın geldiğini, çatlakları gördüğünü, korkulacak bir durum olmadığını, küçük çatlakların dozerle riper yöntemiyle kapatabileceğini, riper sistemi sürekli yapılan bir uygulama olduğunu, Burada küçük çatlakların dozerin tırnaklarıyla toprak, üzerinden sıyırma işlemi yapılarak çatlakların doldurulma işlemidir, bu şekilde yığın liçi içerisindeki göllenme engellenmiş olur) büyük çatlakların ise çimento ile doldurulabileceğini söylediğini bildirdiğini, Murat BAYRAKTAR'ın Yesti ve Mürekkepçiler isimli firmaların çalışanlarının yığın içerisinde membran çalışması yaptığını ve bu çalışanları alandan çıkarttığını söylediğini, yaptıklarının doğru olduğunu ancak bu konuda bir power point sunumu hazırlayarak çarşamba günü sabah 10:00 da yapılan şirket müdürlerinin bulunduğu toplantıda bu olayı anlatmasını söylediğini, Murat BAYRAKTAR'ın yapacağını söyleyerek görüşmeyi sonlandırdığını, Murat BAYRAKTAR ile yaptığı görüşmede kendisinin, lain ve Burak ARTAL'ın çatlamaların olduğu yere gidip inceleme yaptıklarını, lain'in hangi önlemler alındığını sorduğunu, Murat'ın ise cevher çıkarımı, sulama (irinasyon) işlemlerinin durdurulduğunu, üretimin durdurulduğunun yani bu bölgede yapılan tüm işlemlerin durdurulduğunu, alana giriş ve çıkışların engellendiğini söylediğini bildirdiğini, 12:00'de uçağa bindiğini, saat 14:00-14:05 civarı uçaktan indiğini, şirketin insan kaynaklan direktörünün ayarladığı saat 14:00'da yapılacak toplantıya telefondan online olarak bağlandığını, toplantıda oluşan yarıklarla alakalı herhangi bir konu konuşulmadığını, sendikal haklarla alakalı bir toplantı olduğunu, saat 14:20'de deprem olduğunu söylediklerini, Murat BAYRAKTAR'ı aradığını, Murat BAYRAKTAR'ın durumun kötü olduğunu, toprak geldiğini, konuşamayacağını söylediğini, Adnan KEKLİK'i aradığını ve ulaşamadığını, Kaan Murat AKPOLAT'ı aradığını, "Burası çok kötü" dediğini, Elif REYHAN'ı aradığını Murat'ı aramasını söylediğini, operasyon direktörü olan ancak şuan Amerika'da bulunan Kenan ÖZDEMİR 'in aradığını, idari işler müdürü Cengiz ŞAHİN'i aradığını, araç ayarlamalarını, Erzincan'a döneceğimi söylediğini, Erzincan'a bilet bulamadığını, 15:45 saatinde bulunan İstanbul-Sivas uçağına binerek madenin bulunduğu yere geldiğini, alanın kapatıldığını söyleyerek alana almadıklarını, AFAD'ın koordinasyon merkezine giderek burada yardımcı olmaya çalıştığını, İçişleri Bakanı madene geldiğinde olay yerine geçildiğini, Murat BAYRAKTAR, Elif

63



SWORN
TRANSLATION

REYHAN, Şenol DEMİR VE Kaan Murat AKPOLAT ile olayın nasıl meydana geldiğini görüştüklerini, kaymanın meydana geldiği yerde bulunan konteynırların borulama ekibinin çalışma yeri olduğunu, ayrıca ISG tarafından belirlenen acil toplanma alanlarından bir nokta olduğunu, olay günü izinli olduğum için çözeltinin yığına verilip verilmediğini, durdurulup durdurulmadığını, durdurulduysa ne zaman durdurulduğunu bilmediğini, bu işlemi yapacak olan kişinin vekaleten bakan Murat BAYRAKTAR olduğunu, saat 11:00'de bütün beslemeleri kestiğini, arkasındanda çözeltinin yığına verilme işleminin durdurulduğunu söylemiş olduğunu, olay günü izinli olduğu için patlatma işleminin yapılıp yapılmadığını bilmediğini, normal zamanlarda her gün 12:00 ile 12:45 arasında patlatmalar yapıldığını ancak bazı zamanlarda bu patlatmaların iptal edildiğini, o gün iptal edilip edilmediğini bilmediğini, maden alanında yapılan yığın liçlerinin dizaynı GRE isimli yurt dışı firması tarafından gönderildiğini, bu dizayna uygun bir şekilde yığın liçlerinin dizaynını oluşturduklarını, firmanın yığın liçlerinin yüksekliği, genişliği, eğimi, toplam yüksekliği yani tüm dizayn projesini gönderdiğini, yığın liçleri bu projeye uygun bir şekilde yapıldığını, yığın liçlerinin Anagold firmasının proje firması tarafından yapıldığını, denetlenmesinin ise Çevre ve Şehircilik Bakanlığı tarafından yapıldığını, bu denetlemenin dönemlerini çevre birimi daha iyi bildiğini, çevre birimi denetimi haber verdiğini, çalıştığı 4-5 aylık dönemde bir kere denetim olduğunu, bu denetimde kazaya sebebiyet veren yer ve olayla alakalı hiç bir inceleme yapılmadığını, toprak kaymasının meydana geldiği yerin güvenliğinden ve çatlakların görülmesi anında bu durumu bildirmek ve güvenlik almaktan kim sorumlu olduğuna ilişkin olarak toprak kaymasının meydana geldiği yerin güvenliğinden ISG, Oksit Proses ve Bakım birimi kendi alanlarıyla ilgili durumlarda görevli olduğunu, bu yığın liçindeki güvenlik komplike bir güvenlik olup yığın liçinde görülecek çatlak durumunda bunun ISG ve Jeoteknik birime haber vermesi gereken birim oksit proses birimi olduğunu, jeoteknik birimi radarların toprak içerisindeki hareketi bildirmekle yükümlü olduğunu, radarda 20 ile 40 arasındaki seviyede şirketin üstünde ki müdüre kadar haber verilmesi gerektiğini, çalışanlara 20 ile 40 arasında ilgi mailinin gelmesi gerektiğini, en üst seviye 50 seviyesi olup 50 seviyesinde alanın tamamen kapatılması gerektiğini, olay günü kendisine bildirim maili gelmediğini, konteynır alanının belirttiği gibi acil toplanma alanı olduğu için kapakları alanın dışarısında kaldığını, borulama işleminden Sosyal DOGAN, Kaan Murat AKPOLAT, Murat BAYRAKTAR ve kendisi sorumlu olduğunu, kamyonların geçtiği yerin kapatma alanlarının dışında olduğunu alanın kapatıldığına dair bilgilendirme mailinin kamyon şoförlerinin çalıştığı Çiftay isimli iş yerine mailin aktarılmış olması gerektiğini, açık işletmeye bu mailde gittiğini, buradan iletilmiş olması da gerektiğini, kamyonların geçtiği yerin ISG tarafından belirlenen toplanma alanlarından birisi olduğunu, daha önce heap liç alanında çatlaklar görmediğini, herhangi bir çatlak tespiti de olmadığını, herhangi bir çatlak olduğuna dair rapor gelmediğini, sadece işe ilk girdiği dönemlerde heap liç alanının çelik hatlarının olduğu yere yakın 1 metre uzunluğunda 2-3 cm genişliğinde çatlaklar olduğunu, bunun da SSR firmasının iç denetiminde ortaya çıktığını, bu çatlakta herhangi bir radar sonucu olmadığını, mıcır ile kapatıldığını ve takibi yapıldığını, herhangi bir olumsuzlukla karşılaşılmadığını, yığın liçinde gerçekleşen bu çatlakların dönem dönem olduklarını, bunların radarla kontrol edilmesi gerektiğini, gerekli müdahale yapıldıktan sonra devam etmediklerini, dünyanın her yerinde olan liçlerde meydana gelebileceğini, olay günü çatlakların fotoğrafları gönderildiğini, jeoteknik ekibinin bu çatlakları yorumlaması gerektiğini, kendilerine büyük bir sıkıntı olmadığının Ali Rıza KALENDER tarafından Murat BAYRAKTAR'a sözlü olarak aktarıldığını, bu durumu Murat BAYRAKTAR'ın söylediğini, her ne kadar bilirkişi heyeti ön

64



SWORN
TRANSLATION

raporunda bu çatlakların kısa zamanda olmayacağını belirtmiş ise de pazartesi günü yapılan kontrollerde Soysal DOGAN ve Şenol DEMİR tarafından bir olumsuzluk bildirilmediğini, Soysal DOGAN ve Şenol DEMİR pazartesi günü olayın meydana geldiği yerde herhangi bir çatlak görmediklerini söylediklerini, çatlak görülse idi bu durumun Murat BAYRAKTAR tarafından raporlanacağını, böyle bir rapor ulaşmadığını, rapor gelmiş olsaydı genel müdür yardımcısına kadar herkese bilgi verileceğini, vekili meydana gelen kazada araştırılması gerekenin toprağın neden kaydığı ve toprak kayan yerde iş makinalarının ve koyteynerda bulunan işçilerin neden orada olduklarını, konteynırda bulunan işçilerin ve bölgede bulunan iş makinalarının sorumluluğunun müvekkile ait olmadığını, toprak kaymasının neyden meydana geldiği tam anlamıyla tespit edilebilmiş olmadığını, bilirkişi heyetinin verdiği ön raporda bu çatlakların kısa sürede değil uzun sürede oluşabileceği belirtilmiş ise de bu bilimsel dayanağı olmayan tahmine dayalı bir bilgi olduğunu, müvekkile olaydan öncede toprakta çatlak olduğuna dair herhangi bir rapor verilmediğini, kusur durumunun tespiti için kapsamlı raporun beklenmesi gerektiğini beyan etmiştir.

### Abdulkadir CANSIZ;

16.02.2024 tarihli tutanaktaki ifadesine ilaveten 2018 yılından itibaren beri Anagold Madencilik A.Ş isimli iş yerinde çalıştığını, 2020 yılı Kasım ayında vekaleten bakım müdürü olarak göreve başladığını, 2021 yılı Şubat ya da Mart aylarında asaleten bakım müdürü olarak göreve başladığını, bu görevi ifa ettiğini, operasyonlar direktörü olan Kenan ÖZDEMİR Amerika'ya geçici olarak gittiğinden işleri 05/02/2024 tarihinden itibaren kendisine vekalet verdiğini, giderken gündelik, rutin toplantı yönetimi gibi işleri kendisinin yapması, saha işlerini de lain'ın yapmasını sözlü olarak söylediğini, bundan sonra Hüseyin ÜSTÜNDAG, Faruk DEĞİRMENCİ, Ali SERT ve kendisinin bulunduğu bir toplantıda gündelik rutin işler ve toplantıları kendisine bıraktığını operasyonlar konusunda bilgi sahibi olmadığı için herkesin kendi sorumluluk alanına dikkat etmesi gerektiğini, ve lain'in sürekli burada olacağını söylediğini, bunu söyleme sebebinin lain'in ara ara izne gidiyor olması olduğunu, bu süreçte izne gitmeyeceğini söylediğini, 05/02/2024 tarihinde akşam mesai saatlerinden sonra Kenan ÖZDEMİR'in arayarak kendisinin Amerika'da olduğunu, yapılacak işlere ilişkin listeyi lain'e verdiğini, haberinin olmasını, listesinin kendisin de de bulunmasını söyleyerek mail attığını, daha sonra insan kaynaklarının Kenan ÖZDEMİR'den yazılı bir kayıt almasını, zaman çizelgesinde onay yetkisi açılacağını söylediğini, bu durumun üzerine Kenan ÖZDEMİR'e insan kaynaklarının mail istediğini mail yoluyla bildirdiğini, Kenan ÖZDEMİR'inde onaylayıcı mail gönderdiğini, bu maili de insan kaynakları işleme almadığını, olay günü saat 08:00'da işe geldiğini, her gün başmühendisler arasında 08:30 ile 09:00 arası bakım departmanın kendi iç toplantısı olduğunu, toplantı halindeyken kazanın meydana geldiği yığın içinin başmühendisi olan ve benim sorumluluğunda olmayan Murat BAYRAKTAR'ın gelerek bir konu hakkında bilgi vereceğini söylediğini, yığın liçinin bir bölümünde çatlaklar olduğunu söylediğini, sorumluluk alanında olmaması sebebiyle saat 10:00'da yapılan kendisinin de bölüm müdürüne vekalet etmesinden dolayı katılacağı toplantıda bu durumu söylemesini, sahada en yetkili kişi olan lain isimli kişiye de bu toplantıda bu durumu söylemesi gerektiğini bildirdiğini, bunu söylemesinin sebebinin bu bölgenin kendisi ile bir bağlantısının olmadığını, elektrik mühendisi olmasından dolayı bu işleri bilmediğini, lain isimli kişinin bu alanda uzunca süreden beri çalıştığını, departmanında çalışan hiç kimsenin kazada meydana gelen bölgede çalışma alanları ve sorumlulukları olmadığını, Murat BAYRAKTAR'dan bölgenin fotoğraflarını paylaşmasını, hatta



SWORN
TRANSLATION

bu fotoğrafları saat 10:00'da yapılacak toplantıda da göstermesini istediğini, saat 10:00'da yapılan toplantıda diğer konular konuşulduktan sonra bu konun gündeme geldiğini, gündeme getirenin Murat BAYRAKTAR olduğunu, Murat BAYRAKTAR'ın lain isimli yöneticiye fotoğrafları televizyona yansıtmayı teklif ettiğini, lain gerek olmadığını söylediğini, Iain toplantıdan sonra bölgeye gidileceğini Murat BAYRAKTAR'a bakarak söylediğini, toplantı bittikten sonra lain'in bir araçla bölgeye gitmek için hareketlendiğini gördüğünü ancak araç içerisinde kimlerin olduğunu bilmediğini, sonradan bölgeye lain ile birlikte Murat BAYRAKTAR, İş güvenliği Başmühendisi Burak ARTAL, çevre departmanından kim olduğunu bilmediği bir kişinin gittiğini duyduğunu, İş güvenliği mühendisi olan ve kazanın meydana geldiği alanın iş güvenliğinden sorumlu Gizem GAZCI'nın da kazanın meydana geldiği yere gittiğini duyduğunu, ancak. Iain ile birlikte gidip gitmediği hususunu bilmediğini, kazanın meydana geldiği yerde Maden Jeoloji biriminden Ali Rıza KALENDER'in de lain ile birlikte olduğunu duyduğunu ancak onun da lain ile birlikte gidip gitmediği hususunu bilmediğini, 11:00 ile 14:00 arasında tam zamanı hatırlayamadığı bir saatte Murat BAYRAKTAR'ın arayarak çatlakların büyüdüğünü söylediğini, hız birimini de söylediğini, uzmanlık alanı olmadığı için tam anlamıyla ne anlama geldiğini anlamadığını, Murat BAYRAKTAR'a ne gibi acil önlemler alındığını sorduğunu, alanın boşaltıldığını, girişlerin kapatıldığını, o bölgeye solüsyon akışının durdurulduğunu söylediğini, bu konuşmadan sonra saat 14:00'de yapılacak insan kaynaklarının talep ettiği ülke müdürü Cengiz DEMIRCİ'nin davetlilerden hepsinin katılmasını istediği toplantıya kadar sorumluluk sahası olmadığı için ve ilgili birimdekiler gerekli çalışmayı yaptıkları için sürece dahil olmadığını, kendi görevine devam ettiğini, kendi birimi ile alakalı toplantılara katıldığını, saat 14:00'daki toplantıya katıldığını, toplantıda kazanın meydana geldiği yerle ilgili hiç bir şey konuşulmadığını, toplantı sırasında toplantıya katılanlardan bir kısmı deprem oluyor dediğini bir sarsıntı olduğunu fark ettiğini ve çalışma yerinin önünde bulunan acil toplanma yerine geçtiğini, acil toplantı yerinde lain'da olduğunu, Mustafa BAKIR isimli Elektrik Enstrüman Başmühendisi "heap liç gitti-devrildi" dediğini, gösterdiği yere baktığında daha önce orada olan bir kütlenin orada olmadığını gördüğünü, Iain'a da gösterdiğini, acil toplanma alanına Burak ARTAL geldiğini, deprem değil heap liç'de kayma meydana geldiğini söylediğini, kriz masası oluşturulduğunu, kriz masasında sülfit operasyon müdürü olan Faruk DEGERMENCİ'yi aradığını, oksit tesisine giderek orayı kontrol etmesini söylediğini, ayrıca teknik hizmetler müdürü Ali SERT'e de kaymanın diğer tarafı olan Sabırlı deresini kontrol etmesini sızıntı veya kaçak olup olmadığını tespit etmesini söylediğini, solüsyon bölümünün sorumlu olduğu çalışma alanı olmadığını, Murat BAYRAKTAR'ın telefonda bana solüsyonu durdurduk dediğini bildiğini, bu alana giden BLS1 ve BLS2 isimli iki farklı boru hattı olduğunu, Murat BAYRAKTAR'ın bu alanın tamamen mi yoksa sadece bir boru hattı ile solüsyon akışının durdurulduğunu söylediğini tam hatırlamadığını, bu durumun oksit otomasyon sistemine bakılarak anlaşılacağını, patlatma işlemleri şirketin maden departmanı ve Çiftay isimli taşeron firmanın sorumluluğunda olduğunu, patlatmaya ilişkin bir işi veya sorumluluğu olmadığını, şirket tarafından yapılan periyodik patlatmalardan önce çalışanlara patlatmanın yapılacağına dair bilgi maili gittiğini, bunun sebebinin patlatmayı kontrol etmek amaçlı değil sesten dolayı endişelenmemek için olduğunu, olay günü maden içerişinde bir patlatma olup olmadığı hakkında herhangi bir bilgisi olmadığını, heap liç sahasında prosses havuzlarından çıkıp heap liç yığınına dışarıdan giden metal borulara sadece bakım ve onarım işlemlerinin sorumlu olduğu departmana ait olduğunu, metal borulardan ayrılan HDPE maddesinden yapılmış borular heap liç borulama ekibinin sorumluluğunda olduğunu, onların sulanacak yere bu boruları



SWORN
TRANSLATION

götürdüklerini, kaza yerinde bulunan borulama işçilerinin de bu heapliç borulama ekibi çalışanları olduğunu, olay günü kazanın meydana geldiği yere hiç gitmediğini, davet de edilmediğini, bu işi lain takip ettiğini, kazanın olduğu yere yalnızca ilgili kişilerin davet edildiğini ve gittiklerini, risk durumunda aksiyon alma ve müdahale eğitimi verilip verilmediği ile ilgili olarak böyle bir eğitiminin bulunmadığını, sebebinin kazanın meydana geldiği yerin işi ile ilgili olması olduğunu, liçin içerisinde çalışan personele risk durumunda hızlı aksiyon alması için bir form doldurulup anlatıldığını bildiğini, ancak içeriği hakkında bilgi sahibi olmadığını, bilirkişi raporunda oluşan kazada asli kusurlu olduğuna ilişkin yapılan tespit ile ilgili olarak bilirkişi raporunda ehil yetkili biri olarak şantiyede ortaya çıkması muhtemel tehlikeli durumların belirlenerek risklere dönüşmesine yol açan faktörleri analiz ettirmediği belirtilmiş ise de böyle bir görevi olmadığını, Kenan ÖZDEMİR'in vekalet ettiği düşünülmüş ise de böyle bir vekalet durumu olmadığını, bu tarih 05/02/2024 olması sebebiyle belirtilen hususları yerine getirme hususunda yetkililik kazanacağı bir zaman olmadığını, yığın liçinin tasarımında, acil durum planlarının hazırlanmasında, ve uygulanmasında, muhtemel risk değerlendirilmelerinde, mühendislik hesaplamalarında, uygulanmasında, test edilmesinde, kontrollerinde ve diğer işlerde herhangi bir katılımı olmadığını, görev alanı olmadığını, görev alanının elektro mekanik arızaların giderilmesi ve bakım işleri olduğunu, kazanın meydana geldiği yerde yukarıda belirttiği gibi oluşacak risklerden korumak için gerekli tedbirleri aldırma gibi bir görevi bulunmadığını, yığın liçi ile ilgili hiç bir görev ve sorumluluğu bulunmadığını, işyeri çalışanlarının sağlıklarını olumsuz yönde etkilememesi hususunda gerekli gözetim ve denetim mekanizması kurdurma gibi bir görev ve sorumluluğu da bulunmadığını, kurulan sistemi uygulatma gibi bir görev ve sorumluluğum da bulunmadığını, yığın içinde oluşan çatlaklar konusunda tedbir alması gereken kişinin İain olduğunu, yığın liçinde hiç bir görev ve sorumluluğu bulunmadığını, uzmanlığı ve yetkinliği olmadığı için istese de burada bir iş vermeyeceklerini, çalıştığı hiçbir dönemde yığın liçi ile alakalı bir görev sorumluluk almadığını, bildiği bir alan olmadığını, fikir beyan etse bile dinlenmeyeceğini, kazanın görev, sorumluluk ve yetki alanı dışında meydana geldiğini, sorumluluğunun oksit ve sülfit tesisindeki elektrik sistemleri, pompalar, borular, tanklar buna benzer sabit ekipmanların bakım ve onarımı olduğunu, bölgesel olarak alan sorumlusu da olmadığını, sadece tamir ve bakımdan sorumlu olduğunu beyan etmiştir.

### Mehmet TÜRK:

16.02.2024 tarihli tutanaktaki ifadesinde Anagold Madencilik A.Ş'de 12.02.2024 tarihinde maden müdürü olarak göreve başladığını, göreve başladığı tarihte bir haftalık oryantasyon eğitimine katıldığını, bu eğitimin 14.02.2024 tarihinde biteceğini, oryantasyon sürecinde iş güvenliği diğer birimlerle tanışma, bu birimlerin kapsamlarının ne olduğu, birimleri ile ilgili ilişkilerinin neler olduğunu, ortamın işleyişi, tanıtımı, adapte olma ile ilgili eğiti verildiğini, normalde bu oryantasyon eğitiminden sonra kendi birimine ait çalışan ekibin hangi alanlarda ne faaliyet gösterdikleri, neler yapabilecekleri, ekipman kapasitesi ne olduğu ve bunların bilgilerini alarak başlayacağını, bu durum oryantasyon eğitiminden bir gün sonra gerçekleşince oryantasyon eğitimi kaldığını, görevlendirildiği sahanın aslında açık maden kazasının yapıldığı bölge olduğunu, yığın liçinin olduğu alanda herhangi bir sorumluluğu bulunmadığını, yığın liçinin bir kısmının aktığı manganez sahasında oryantasyon eğitiminden sonra sorumlu olacağını, manganez sahasının bulunduğu açık maden alanı bildiği kadarıyla cevher çıkartma alanı olmadığını, sadece nakliye işlemlerinin gerçekleştiği yer olduğunu, bu yerde herhangi bir üretim faaliyetinin



SWORN
TRANSLATION

bulunmadığını, bulunduğum yerde maden müdürü kendisi gelmeden önce özgür KAYA asil olarak görevli olduğunu, yaklaşık bir ay önce istifa ettiğini, yerine de jeoloji baş mühendisi İzzet TEKİN'in vekaleten baktığını, olayın olduğu tarihte bilgilendirmeleri İzzet beyden öğrendiğini, henüz mailin şirketle olan iç yazışmalara ilişkin açılmamış olduğunu, oryantasyon eğitimi süreci boyunca İzzet TEKİN'in görevlendirildiği departmanda yetkili olarak devam ettiğini, ekibin İzzet TEKİN ile görüşüp, gerekli işleyişi sağladıklarını, talimat verme durumu bulunmadığını, görevlendirildiği alana ilişkin sahayı dahi bilmediğini, manganez sahasındaki kamyon nakil işlemlerinin nasıl ne şekilde nereden gelip nereye gittiğini bilmediğini, göreve başlamış olduğu durumda tehlike yığın liçinden bildirildiğinde belki manganez sahasıysa ilgili tedbirler alabileceklerini, İzzet TEKİN'e madencilik faaliyetlerinin bu riskten dolayı durdurulması gerektiğine dair yönetimden veya iş güvenliği biriminden talimat veya bir uyarı gelmediğini, Yığın liç alanı ile manganez arasında yaklaşık 100-200 metre mesafe bulunduğunu, Riskin büyüklüğü ile ilgili bir bildiri yapılmadığında bahsi geçen yolun tehdit altında olduğunu birimimden birinin bilmesinin mümkün olmadığını, açık maden ocaklarının kapatılmasıyla ilgili herhangi bir bilgi gelmediğini bildiğini, benim madenle erişimim e posta bulunmadığı için İzzet beye bildirilip, İzzet beyden kendisine bilgi geleceğini, bu şekilde herhangi bir bilgi ne İzzet beye ne de kendisine gelmediğini, riskin kendi alanları ile bir ilgilisi bulunmadığını, Yığın liçi sahasında görevli kişilerin bu konuda riskin büyüklüğü ve açık ocakları tehdit edebileceğini tahmin etmediklerini, alanda meydana gelen toprak kaymasında yolda hareket halinde bulunan ismini bilmediği Çiftay çalışanının henüz toprak altında olduğunu bildiğini. Çiftay adlı yüklenici açık maden sahasına da hizmet veren bir firma olup bu konuda Çiftay alt yükleniciye bilgi verilip verilmediğini bilmediğini, olayın bu kadar kapsamlı ve diğer alanları etkileyeceğinin düşünülmemiş olabileceğini, maden sahasında bulunduğu alanla ilgili yetkilendirilme henüz olay tarihinde gerçekleşmediğini, bu nedenle herhangi bir talimat verme iş yapma izni bulunmadığını, sahayı görmediğini, bilmediğini, olayın olduğu tarihte ekibi ile tanışmak için 14:30 da toplantı planladıklarını, toplantıya başlamadan bu haber gelince hemen toplantıyı iptal ettiklerini ve ilk kez o gün sahaya çıktığını, Maden müdürlüğü biriminin altında maden operasyon birimi, maden planlama ve teknik hizmetler biriminden sorumlu olduğunu, bulunduğu birimde yüklenici firma olarak müteahhit firma Çiftay A.Ş. açık ocak maden üretim faaliyetlerinden sorumlu olduğunu, Çiftay A.Ş.'nin yöneticilerinden proje müdürü soy ismini bilmediğim Abdullah beyi tanımadığını, kendi ekibinden bile bir çok kişinin ismini bilmediğini, sabah toplantısında toplantı da IAİN beyin yurt dışındaki yığın liçine bakan danışman firmaya danışılacağını söylediğini, tespitler yapılarak tekrar görüşelim diyerek toplantıya son verildiğini, Çiftay A.Ş ye bu bildirimin yapılıp yapılmadığını bilmediğini, iş sağlığı güvenliği biriminin bu bildirimi yapması gerektiğini, onların sorumluluğunda olduğunu, tehlikenin bulunduğu yerde durdurma kararı verebileceklerini, uyulmadığında yönetime bildireceğini ancak bildirilme usulünü bilmediğini, hiç bir şekilde ne kendisine ne de birimime açık ocak faaliyetlerinin durdurulması hakkında bir tebliğ yapılmadığını, yapılmış olduğunda alt taşeronlara bildireceğini, ilgili önlemleri kesinlikle alacaklarını, Jeoloji baş mühendisi İzzet beye de açık ocakları durdurulması ile ilgili herhangi bir yerden bilgi gelmediğini bildiğini, maden sahasına bağlı iş sağlığı ve güvenliği uzmanı bir kişinin olduğunu bildiğini, İş güvenliği biriminden de işin durdurulmasıyla ilgili talimat gelmediğini, yığın liçi sahasında gerçekleşen toprak kaymasına neyin ve kimin sebep olduğunu bilmediğini, Radar siste minin bulunduğu departmanın alt birimi olduğunu, radar sisteminin başında Jeoteknik şefi Ali Rıza Kalender bulunduğunu, sistemdeki bilgilerin diğer bilimlere aktarılmasında Ali Rıza Kalender

68



bulunduğunu, kendisine bağlı olarak çalıştığını, radardaki uyarıyı Ali Rıza Kalenderin İzzet Tekin'e bildirdiğini İzzet Tekinin'de yönetime bildirdiğini bildiğini, oryantasyon eğitimimi tamamlamış olduğu durumda Ali Rıza Kalenderin bildirmesi gerektiğini, ancak eğitim sürecinde bulunduğu yetkilendirmesi olmadığı için bu konuda bir bilgi paylaşılmadığını, Ali Rıza Kalenderin söylediği kadarıyla sahada bulunan radarın yığın liç alanının tamamını kapsamadığını, 2 adet yeni radar alınması gerektiğini, bunun da bütçeye konuldu bilgisini verdiğini, radar sistemi ayarlanabilir bir sistem olup hareket hız ve kütleye göre uyarılar gönderdiğini, ayarlanabildiği için hızın şiddetine veya kütlenin büyüklüğüne göre ilgili kişilere mail ya da mesaj gönderdiğini, ancak Anagold madencilik sistemindeki radarın ne şekilde çalıştığını bilmediğini, oryantasyon eğitiminde gösterileceğini, yığın liç alanında yeni faz yapılıp Aralık ayıda teslim edilmesi gerektiğini duyduğunu, ancak bu faaliyet gecikmiş diye duyduğunu, fazla yükleme yapıldığı için olayın gerçekleşmiş olabileceğini, alanda sıvı birikintisi olup olmadığını bilmediğini, bu durum da varsa olayı tetiklemiş ya da sebebiyet vermiş olabileceğini ifade etmiştir.

### Şenol DEMİR;

16.02.2024 tarihli tutanakta, "Ben üzerime atılı suçlama ile ilgili olarak daha önce kollukta ifade verdim. O ifadem doğru olup aynen tekrar etmem gerekirse; ben oksit kırıcı mühendisi olarak yaklaşık 4 yıldır Anagold A.Ş bünyesinde çalışmaktayım. Olay anına ben şahit olmadım. Benim üst amirim Murat BAYRAKTAR'dır. Beni kırıcı bölümünde mühendis olarak görevlendirmiştir. Zaten oksit müdürümüz Hüseyin ÜSTÜNDAG son güncellemeyi bu şekilde yapmıştı. Benim bildiğim kadarıyla konteyner alanında iki Karsa personelinin olduğunu adlarının ise Abdurrahman ŞAHİN ve Hüseyin KARA olduğunu sonradan öğrendim. Ayrıca dozer ve loader operatörlerinin de orada oturduğunu sonradan öğrendim. Dozerci Mehmet KAZAR, Loader operatörü ise Şaban YILMAZdır. Bu çalışanların bildiğim kadarıyla sorumluluğu önce Kaan Murat AKPOLAT, üst amiri ise Murat BAYRAKTAR'dır. Bir de konteynırda Fahrettin KEKLİK isimli şahsın eşyalarım almaya gittiğini öğrendim. Ancak Fahrettin KEKLİK idari işlere bağlı bir çalışandır. Bu kişinin üst amirini bilemiyorum. Ben iki Karsa personelinin 21 Haziran 2022'de göreve başladığını biliyorum. Loder operatörünün 1,5-2 ay önce başladığını, dozer operatörünün ise geldiğimden beri yani 4 yıldır orada olduğunu biliyorum. Ramazan ÇİMEN benim sorumluluğumdadır. Kendisi kırıcı süpervizörü vardiya sorumlusu olarak çalışmaktaydı. Onun olay anında neden orada olduğunu, kimin gönderdiğini bilmiyorum. Düşündüğüm kadarıyla hipliç süpervizörü Kenan ÖZ ile birlikte kendi kararıyla gitmiştir. İş sağlığı güvenliği eğitimleri yılda bir kez kesinlikle verilmektedir. Bizim bölüme Gizem GAZCI hanım bakmaktaydı. Bildiğim kadarıyla Adnan KEKLİK ADR süpervizörüydü. Hipliç alanından bağımsız görev yapıyordu. Adnan KEKLİK'in de Elif REYHAN ve Kaan Murat AKPOLAT ile birlikte çıktığını duydum. Benim hipliç alanında bir sorumluluğum yoktur. Bu alanın sorumluları Soysal DOGAN (borulama süpervizör), Kenan ÖZ (yığın yapma süpervizör) Kaan Murat AKPOLAT (asistan mühendis) Murat BAYRAKTAR (başmühendis) Hüseyin ÜSTÜNDAG (Oksit Müdürü) şeklinde sorumlulukları vardır. Bize olay günü çatlaklar ile alakalı olarak sabah saat 08:15 civarında fotoğraflar geldi. Bu fotoğraflar tüm mühendis arkadaşlara geldi, Yanımda hipliçden sorumlu Kaan Murat AKPOLAT olduğu halde saat 08:30 a doğru çatlakların olduğu yere gittik. Ben gittiğimde hipliç süpervizör Kenan ÖZ, borulama süpervizör Soysal DOGAN, dozer ve loader operatörü, steaking operatörü Nazım KÖSE ve mürekkepçiler firmasından Hüseyin MÜREKKEPÇI vardı. İlerleyen süreçte de Mutat BAYRAKTAR, Berkay MISIR ve kendi ekibinden isimlerini bilmediğim iki kişi daha olay yerine

69



geldi. Ben sahadan ayrılırken incelemelere devam ediyordu. Dönüş esnasında İSG Gizem GAZCI ve Recep ÇALI ile karşılaştım. Araç ile olay yerine gidiyorlardı. Sonrasında proje biriminden İsak ARSLAN'la da yolda karşılaştım. O da çatlakların olduğu bölgeye gidiyordu. Ben geri dönerek kırıcıya gittim. Kırıcıda rutin denetim için GÜVENLİK MÜDÜRÜ Hakan ŞAHİN ve finans departmanından Serkan KÖSE ve kırıcı süpervizörü Mehmet SARITAŞ ile birlikte yığın liçi alanına denetim aksiyonlarını kontrol etmek için tekrar çıktık. Benim çıkma sebebim Kaan Murat AKPOLAT'ın yoğun olmasından kaynaklıydı. Biz bu alanı denetim için saat 9:30 sıralarında kontrol etmek üzere giderken Kaan be yalanın kapandığını ve boşaltıldığım söyledi. Bana da kendisinin saha da olacağını benim kapatıldığıma dair ofisimden mail atmamı söyledi. İş güvenliği ile alakalı bütün birimler benim mailimde kayıtlıdır. Hepsine de saat 10:40 - 10:50 gibi mail attım. Bilgilendirme yaptım. Normalde bu bilgilendirme benim görevimde değildir. Kaan Murat AKPOLAT'ın görevidir. Ben oradayken solüsyon verilmekteydi. Solüsyonla ADR birimi ilgilenir. Bu birimin başındaki kişi Elif REYHAN'dır. Elif REYHAN m üstü Murat BAYRAKTAR'dır. Kazadan önce de solüsyon verildiğinin durdurulduğunu duydum. Ben yığılan cevherin baskı yaparak zayıf noktadan patlattığı için kaydığını tahmin ediyorum. Bildiğim kadarıyla 25 - 30 kişilik ekip faz genişletme olarak çalışıyordu. Onların acilen çıkarıldığını biliyorum. Radar sistemi ile ilgili olarak herhangi bir bilgim yoktur. Bu birimden bana hiç bir bilgi gelmedi. Radar birimi ile alakalı jeoteknik mühendisleri Ali Rıza KALENDER ve ekibi sorumludur. Ali Rıza KALENDER'den kimin sorumlu olduğunu bilmiyorum. Bizim kırıcıdan çıkan ve hazır hale gelen malzeme günlük olarak kantarda tartılarak liç alanına gider ve günlük olarak raporlanır. Günde 7 - 8 bin ton ortalama malzeme kırılıp liç alanına gönderilmektedir. Ben toprağın alt kısmında sıvı birikintisi olduğuna dair bir bilgi almadım. Böyle bir gözlemde de bulunmadım. Ben aglomeratör isimli karıştırıcı alete standartlara uygun olarak tonda 12 kg çimento 2 kg kireç 25– 35 m3 arasında suyun makineden otomatik sistem olarak koyulduğunu biliyorum. Ben oluşan çatlakların çimento veya diğer malzemenin eksik ya da fazlalığından oluşmadığını düşünüyorum. Üzerime atılı suçlamaları kabul etmiyorum." Demiştir.

**Murat BAYRAKTAR;**

16.02.2024 tarihli tutanakta; şüpheli beyanında: "Ben halen yukarıda belirtmiş olduğum adreste ikamet ederim. Kollukta vermiş olduğum ifademi aynen tekrar ederim. Bizim günlük rutin toplantılarımız olmaktadır. Ben toplantıdayken sabah saat 8.30 sıralarında Kenen ÖZBEY tarafından teams uygulaması üzerinden heapleachte çatlaklar olduğu bana söylendi ben de toplantıdan ayrılarak çatlakları görmeye heapleacehe alanına tek başıma gittim. 08.45 sıralarında yerine baktığım esas oksit prosesten sorumlu Hüseyin ÜSTÜNDAG'a bilgi verdim. İlerleyen aşamalarda, aşağıda detaylı şekilde anlatacağım zamanlarda da bilgi vermeye devam ettim. Hatta kendisi benim gayretimi özverimi görerek alanı boşaltmam, üretimi durdurmamı, yolları kapatmamı tebrik ederek sunum hazırlamamı söyledi. 14 şubat sabahında da sunum yaparak örnek bir çalışmayı müdürle paylaşmamı söyledi. Alanda süpervizörlerimiz Kaan, Ramazan, Kenan ve ben vardım. Alanda öncelikle incelemeye başladık. Bu sırada Berkay MISIR'ı arayarak alanda çatlaklar olduğunu söyledik ve radar sisteminden incelenmesini istedik. Radar tarafından kontrol edildiğinde 70 mm'lik hız ve deplasman hareketinin olduğu söylendi. Normal şartlarda değer 20 – 50 oranında gözlemlendiğinde uyarılmamız gerekiyor. Çatlağın Pazartesi günü ivmelenmeye başladığı Berkay ve Ali Rıza'nın yanına yanıma Kaan'ı alarak gittiğimde saat 11.00 sıralarında tarafıma söylendi. Değer oranın ise 70 oranında olduğunu gördüm. Daha sonra neden

70



SWORN
TRANSLATION

bilgilendirmediğimizi sorduk. Doğu bölgesinin çizimlenmesi ve değerlendirilmesinin sms sistemine dahil olmadığı ve doğu bölgesinde herhangi bir ölçüm alınamadığı tarafıma söylendi. Saat 09.30'a dönersek; olay yerine gittiğimde yolların kapatılmasının talimatını verdim. Ben daha sonra 10.00'daki toplantıya katıldım. Toplantıda Ben, lain, Abdulkadir, Can Serdar, Burak ve İzzette vardı. Sunumu Abdulkadir bey yapıyordu. Toplantı sırasında lain fotoğrafların yayınlanmasını istemediğini Can Serdar bana toplantı salonu dışında söyledi. Heapleach bölgesinde çatlaklıklar olduğu söylendi. Toplantı sonrasında Can Serdar, ben, Burak, Iaian, ve Kaan ile birlikte yukarıya çıktık ve alana bakıldı. Oksit birimindeki yığın ve kırıcı operasyonun çalışmayacağını ve operasyonların durdurulduğunu söyledim ve bunun üzerine Can Serdarın olduğu ekip olay yerinden ayrıldı. Alana daha sonra Berkay ve Ali Rıza'da gelerek inceleme yaptı. Bu çatlakların yüzeysel olduğu ve herhangi bir problem olmayacağı, çimento ile kapanabileceğini ve madem tarafında bu tür çatlakların olağan olduğu Ali Rıza tarafından bana söylendi. Bu olaya Kaan Murat AKPOLAT'a şahittir. Berkayın bana söyleneni duyup duymadığını bilmiyorum. Ben de Ali Rıza tarafından bu olayın mail olarak tarafıma atılmasını istedim. Ali Rıza bey de maili bana atacağım söyledi. Saat 13.00 sıralarında tarafıma mail attı. Mail içeriğinde yapılan saha denetiminde heapleach alanında ani yükselme olduğunu, titreşimlerin arttığını söyledi. Çatlakların dozer iş makinesi ile doldurulması gerektiğini söyledi. Ben de onun talimatına istinaden kendisine geri dönüş yaparak sorular dile getirdim ancak geri dönüş olmadı. Maile dönüş olmayınca Ali Rıza'yı telefonla saat 13.30 sıralarında arayarak, durumun ne olduğunu sordum ve değerlerin yükselişte olduğunu ve yemeğe gittiğini söyledi. Daha sonra ben kendisini tekrar arayarak 13.45 civarında durumu sorduğumda değerlerin daha da yükseldiğini, 400 mm/g seviyesine çıktığını söyledi. Ben de acil durum olduğunu öğrendiğimden Ali Rıza ile birlikte lain'e durumu anlattık. Değerlerin yükseldiği iletildi ancak bana bana herhangi bir talimat verilmedi. Benim de saat 14.00'da zorunlu katılmam gereken toplantı vardı. Bu toplantıya zorunlu katılımcı olduğumu Dilara ÇOR'dan öğrendim. Ben de katıldım. Daha sonra Ali Rıza, Berkay araçlarıyla heapleachin güney bölgesinde 32 - 33 liftler arasındaki rampaya araçlarını bırakarak heapleache yürüdüler. Ben o sırada aracımda teams uygulamasından toplantıdayım. Yaklaşık 10 dakika boyunca heapleach arazisindeydim. Buradayken ne Adnan'ı ne Kaan'ı ne Elifi ne de 3 yabancı şahsı görmedim. Alanda Soysal dahil hiçbir kimseyi görmedim. Bunun üzerine ofisime geri dönerek toplantıya devam ettim. Alanda bulunan Adnan, Ramazan ve Kenan bilgim dışında araziye girmişlerdir. Kaan ve Elif'ten duyduğum kadarıyla Adnan kendilerinin arkasında tek başına araçla heapleach bölgesine girmiş. Hatta 3 yabancı (Jonathan, Alan ve Patrick) Soysal'ın kontrol ettiği borulama ofisler bölgesindeki yoldan geçmek istemişler ancak Soysal beni altım ancak kendisinin üstü olan Kaan'ı arayarak bilgi ve imiş. Bunun üze tine Kaan Elifi de alarak kapıya gitmiş ardından da Adnan arkalarından gitmiş. Bu şahısların içeriye girmesinde hiçbir bilgim ve dahilim yoktur. Ben 13 yıldır firmada çalışmaktayım. Son 2 yıldır oksit ADR operasyon şefiydim. Son yıl ise oksit operasyonları baş mühendisi olarak görev yapmaktayım. Olaydan 1 gün önce Hüseyin ÜSTÜNDAG'ın geçici vekaleti olarak heapdeach alanından sorumlu kişiydim. Olayın olduğu gün tehlikeyi fark ederek saat 09.30 sıralarında jeotekniğe ben haber verdim. Acil radar çözümlemesi istedim. Hatta bununla yetinmeyerek şifai şekilde bana bir sıkıntı olmadığını söylemelerine rağmen ben bu durumun yazılı olarak incelenmesini istedim. Burak ARTAL'ın beyanı okundu, söyleyecekleri soruldu: Şahsın beyanına kısmen katılıyorum. Görüşmeler ve konuşmalar yapılmıştır ancak ben bu alanın sorumlusuyum her şey kontrolüm altında şeklinde bir şey ima etmedim. Elimden geldiği kadarıyla tüm yetkimi kullanarak alanı boşalttım. 15.15'de belirtilen toplantıyı saat olarak ben talep



SWORN
TRANSLATION

etmedim. Ben acil toplantı istemiştim. Yığın altında kalan konteynır yaklaşık 6 senedir mevcut yerdeydi. Toplanma alanları İSG tarafından belirlenmektedir. Borulama ekiplerinin bulunduğu konteynırlar da acil durum toplanma alanları olarak 2022 yılından beri orada konumlandırılmıştır. ISG ekipleri riskler karşısında revize ederek yerleri değiştirmektedir. Bu sebeple oksit processor müdür vekili olarak söyleyebileceğim tek şey heapleach alanın konteynır alanlarının bulunduğu yere ISG'nin acil toplanma, güvenli bölge alanı belirtmesi sebebiyle yığılma ihtimali öngörülemedi. Dediğim gibi orası zaten güvenli bölge olarak belirtilmişti. Hatırladığım kadarıyla oranın güvenli ve toplanma bölgesi kararı Selçuk ÇİFTLİK zamanında alınmıştır. 2023 yılı Kasım Aralık ayı içerisinde Nail Bar şirketi tarafından Doğu bölgesinde ki radar sistemdeki eksiklikler nedeniyle bir sunum gerçekleşti. Bu sunumda, Ali Rıza, Berkay, İzzet, Kenan, lain, Özgür KAYA, Ali SERT ve Faruk'ta vardı. Toplantı sonunda doğu bölgesi için hatırladığım kadarıyla bir radar konumlandırılmasının zorunlu olduğu belirtilmişti. Hatta bu radarın maliyetinin 45.000 Euro olduğu konuşuldu. Sonrasında radarın neden alınmadığını bilmiyorum. Bütçe vs işlemlerine takılıp takılmadığını bilmiyorum. Bu proje ile ilgili maden müdürü İzzet veya Özgür beydir. Aynı zamanda heapleach güney ve güney batısında proje departmanı, maden departmanı ve Çiftay'ın ortak çalışmasıyla patlatmalar yapılmaktadır. Ben bu patlatmaların yüzde 70 oranında heapleachin oynamasına sebebiyet verdiğini düşünüyorum. Maden sahasındaki her gün yapılan rutin patlatmanın da yüzde 10 civarında etkilemiş olabileceğini düşünüyorum. Bizim birimimizde kullanılan tarp adında bir rapor sistemi vardır. Buna göre 0-20 arası olağan, 20-50 arası üst amiri bildirme, 50-75 arası baş mühendise bildirme ve 75 üstü müdür ve operasyon şefine bildirme şeklinde yükümlülük vardır. Olay günü tarafıma jeoteknik ekiplerince herhangi bir radar bildirimi yapılmamıştır. Bu sebeple erken vakitte ben herhangi bir bildirimde bulunamadım. Bana gösterdiğini grafikteki 6 Şubat saat 18.00 sıralarında 90 mm yakın olan hareketin dökümü tarafımıza yollanmadı. 13.02.2024 saat 13.00'te Ali Rıza tarafından kaymanın 200 mm yaklaştığı yönünde bilgilendirme yapıldı. Zamanında bildirim yapılsaydı komple kapanma söz konusu olabilir belkide can kaybı yaşanmazdı. Geç bilgilendirildiğimiz için yine görevim olan kendi alanımı boşaltma işlemini yaptım. Heapleach alanı yaklaşık olarak 61 milyon ton büyüklüğündedir. Kayan kütle 10 milyon metre küp civarında olduğu düşünülmektedir. Biz heapleach alanına yığını dizayn sisteminin dışına çıkmadan yaptık. Herhangi bir aşım söz konusu değildir. Bizler uygulayıcıyız. Proje işlerine proje departmanı ve bakanlığın ilgili birimleri yapmaktadır. GRE adlı yurt dışı merkezli firma ülkede bulunan INR. adlı firma vasıtasıyla çizimlerini yapıp projelerini hazırlayıp bakanlığa sunmakta ardından bakanlığının kontrolü ile proje aktif edilmektedir. Bu projeyi denetleyen GRE firmasının Louis Inturg... ismindeki şahıstır. Aynı zamanda SSR kıdemli metalurjist James Harold ayda 2 kere toplantı düzenledi. İlgili yorum ve görüşlerini tarafımıza bildirmektedir. Yaklaşık olarak 1 ve ya 2 önce denetimi yapıp gitmiştir. Bu proje yaklaşık olarak 2010 yılından beri aktiftir. Faz 1 aşamasından Faz4 aşamasına gelmiştir. Yaklaşık 3 yıldır Faz4 aşamasındadır. 21 Aralıkta 4b1-3 alanının proje departmanı tarafından oksit operasyonlarına devir edilmesi gerekmekteydi ancak devir tarihi 29 şubata ertelendi. Bu şu yüzden önemlidir, devir edilecek olan alan bir nevi heapleach güney ve güneybatı alanında yastıklama, dolgu görevi görecekti. Alanın büyümesine rağmen konteynırların aynı yerde durması alanın yukarıya doğru büyümesinden dolayıdır. Hatta bizim heapleach alanında yığın operasyon konteynırlarımız vardır. Bu koteynırlarda Kenan Özbey Nazım Köse, Keklikler A.Ş ve Asilçöpler A.Ş çalışanları bulunmaktaydı. Olay günü ben bu arkadaşlara alanı terk etmelerini Kaan vasıtasıyla söyledim. Kolluğun almış olduğu ifadenin 3. Sayfasındaki 3. Soruyu ben tüm maden sahası olarak

72



SWORN
TRANSLATION

algılamıştım. O yüzden ISG departmanın görevi olduğunu söylemiştim. Elimden geleni görev ve yetkilerim dahilinde her şeyi yaptım. Yaklaşık 30 kişiyi alandan ayırdım. Üzerime atılı suçlamaları kabul etmiyorum. Söyleyeceklerim bundan ibarettir." Demiştir. Vekili "Müvekkilimin beyanlarına aynen katılıyorum. Kendisini heapleach sahasındaki çatlakları öğrenir öğrenmez faaliyeti durdurmuştur. Gerekli yollan kapatmıştır, alan solüsyonu kesmiştir. Taşeron çalışanları dahil bütün çalışanları bölgeden tahliye ettirmiştir. Buna ilişkin acil durum eylem planını uygulamıştı. Müvekkil görevi gereği üzerine düşen bütün sorumluluktan eksiksiz bir şekilde yerine getirmiştir. Dosya arasında mevcut müvekkilin asli kusurlu olduğunu gösterir bilirkişi raporunda müvekkilimin ifadesi dahil bulunmamaktadır. Bu husus bile bilirkişi raporun eksik ve hatalı olduğunu açıkça göstermektedir. Bu nedenle bilirkişi raporundaki asli kusura kesinlikle katılmıyoruz. Ayrıca heapleach sahasının projesi danışman şirketler tarafından denetlenmektedir. Müvekkilimin burada sadece uygulayıcı konumundadır. Uygulama sonrasında danışman şirketler yeniden uygulamayı denetleyerek onay vermiştir. Dizayn ve projeye aykırı herhangi bir çalışma yapılmamıştır. Toprak altında kalan kayıp şahıslar tahliye sonrasında müvekkilimin bilgisi ve rızası olmadan yeniden alana girmişlerdir. Bu durumdan müvekkilimin bilgisi olsaydı kesinlikle böyle bir şeye müsaade etmezdi. Aynı zamanda müvekkilim hem işinin ehli gerek halinde tüm yardım yapmayı hazır hem de 11 aylık ve 7 yaşında 2 çocuğu olan bir şahıstır. En sert şekli ile ev hapsi dahil veya maden alanından çıkmama şeklinde koruma tedbirleri dahil hepsini uygulanmasını ile dosyadaki maddi gerçekliğin doğru bir şekilde ortaya çıkacağı kanaatindeyiz. Bu yönde talepte bulunulmasını talep ederiz. Bu nedenle kusuru bulunmadığı kanaatindeyiz. Öncelikle salı verilmesini aksi kanaat halinde adli kontrol hükümlerinin uygulanmasını talep ediyoruz." Demiştir.

### İzzet TEKİN:

02.03.2024 tarihli ifadesinde Anagold Madencilik A.Ş'de Jeoloji başmühendisi olarak 2022 Mayıs ayından beri çalışmakta olduğunu, 12.02.2024 tarihine kadar maden sahası bölümünde çalışmakta olduğunu, 12.02.2024 tarihinden sonra ise yeni oluşturulan Jeoloji bölümünde çalıştığını, sahada cevher kontrolü yapmak, geliştirme sondajlarını kontrol etme görevi olduğunu, Jeoloji bölümü müdürü olan Doğukan AŞKIN'ın jeoloji bölümünün amiri olduğunu, ona bağlı olduğunu, kendisine bağlı çalışan 2 jeoloji mühendisi ve 19 işçi olduğunu, toprak altında kalan işçilerin alt biriminde olmadığını, yığınlıç alanıyla alakalı herhangi bir bilgiye sahip olmadığını, çalıştığı alanın dışında bir alan olduğunu, olay gününe kadar yığın liç çatlaklarıyla alakalı veya başka bir olayla alakalı herhangi bir bilgi almadığını, olay gününde radarı takip eden jeoloji mühendisi Berkay MISIR'ın  saat 08.15 sıralarında haber verdiğini, yığın liç alanındaki çalışmanın ve sulamamanın durdurulmasını tavsiye ettiklerini, maden sahasına yönelik herhangi bir tavsiye gelmediğini,  radar sisteminin maden kısmının bir kısmı ile liç sahasının bir kısmını yani batı kısmını izleyebildiğini, sorumlu olduğu maden sahası bölümünü MAPEG'in  denetlediğini bildiğini, bu konuda da bilgisi olmamakla birlikte maden ve arazi hakları departmanının bilgisi olabileceğini düşündüğünü, liç sahasından oksit operasyon birimi sorumlu olduğunu, yöneticisinin Hüseyin ÜSTÜNDAG olduğunu, toprak altında kalan Uğur YILDIZ (kamyon şoförü), Adnan KEKLİK (oksit operasyon süpervizörü) ve Kenan ÖZ'ün (oksit operasyon süpervizörü) görevlerini bilmediğini, olay anında başka bir konu ile ilgili maden bölümündeki kendi ofisinde online toplantı halindeyken olayın vuku bulması halinde bir titreşim halinde hissetmesi  üzerine dışarı çıktığını, diğer çalışanlardan yığınliç alanında bir kayma olduğunu duyduğunu, diğer arkadaşlarla araçlara

73



SWORN
TRANSLATION

binip bölgeye gittiklerini, böyle bir acil durumda özel bir görevi olmadığını, yığınlıç alanındaki toprak kaymasının fazla solüsyon verilmesi ile alakalı olabileceği duyduğunu, günlük, malzeme döküm miktarı ve liç alanının kaç basamaktan oluştuğuna dair, ne kadar bir alanı kapladığına dair, denetim yapan özel firmalara dair bir bilgisi olmadığını, teknik konuları ancak birim yetkililerinin bildiğini, maden bölgesinde çalışmayı etkileyecek şekilde bir titreşim veya başkaca bir durum söz konusu olduğunda jeoteknik ekibi tarafından da bu hususun teyidi halinde ve gözle görülebilir bir sorun durumunda maden bölümündeki çalışmanın durdurulması gerektiği genel olarak jeoteknik ekibi tarafından kendilerine bildirildiğini, 2022-2023 yıllarında bölümü adına radar ve robotik izleme cihazlarının alımı gerektiği hususunda bütçeye alınması hususunda tavsiyede bulunduğunu, radar cihazlarının alımı ile 2023 Aralık ayında sözlü olarak onay aldığını, ancak 2024 yılı bütçesi içerisinde Nisan ayında alınabileceği bilgisini aldıklarını, radar hareketini ilk defa olay günü öğrendiğini, maden sahasındaki taşeron şirketlere bildirim gitmediğini bildiğini, yığınlıç alanındaki taşeron şirketine bildirim gitmiş olabileceğini, maden alanında herhangi bir sorun halinde taşeronlara bildirim jeoteknik ekibi tarafından veya maden operasyon şefi Fuat YILMAZ tarafından birebir yapılması gerektiğini, olay gününde saat 12.15 civarında her zamanki gibi patlatmanın yapıldığını bununda yığınlıç alanına mesafesinin 1.5 km'den fazla olduğunu bildiğini, patlatmanın liç yığını etkileyip etkilemeyeceği hususunu maden uzmanı olmadığı için tam bilemediğini, ancak patlatma saati ile yığın liçin akış saati arasında zaman farklı olduğunu ve patlatmanın yapıldığı yerin uzaklığı değerlendirildiğinde herhangi bir etkisinin olmayacağını düşündüğünü, konteynerlerin oraya ne zaman, ne için ve kimin talimatı ile konulduğunu bölgeye hiç gitmediği için bilmediğini, yukarıda değindiği duyduğu tavsiyelerden başka çatlaklar üzerine bir önlem alınıp alınmadığını bilmediğini, çatlaklar olduğuna dair bir mail gelmediğini, dolayısıyla kimseye haber vermediğini, her yıl yılda 16 saat iş sağlığı eğitimi zorunlu olmakla birlikte biz jeoloji bölümü olarak haftada maksimum yarım saat olacak şekilde eğitim aldıklarını, olay olduğu tarihte jeoloji bölümünde çalıştığı için ancak oryantasyon sürecinde olan Mehmet TÜRK Beye de önemli durumlarda bilgi verme yükümlülüğü olduğunu, fakat maden bölümüyle alakalı herhangi bir sorun olduğuna dair kendisine bir durdurma bildirimi gelmediği için maden müdürüne böyle bir bilgi aktarımında bulunamadığını, ancak tüm sahadan sorumlu olan operasyon direktörü Kenan ÖZDEMİR maden çalışmasını durdurmaya yetkili olduğunu ifade etmiştir.

**Kaan Murat AKPOLAT;**

02.03.2024 tarihli tutanakta; 02.03.2024 tarihli tutanakta, " Ben Anagold Madencilik A.Ş'de asistan proses mühendisi olarak 17 aydır görev yapmaktayım. Elif REYHAN (asistan proses mühendisi), Şenol DEMİR (üretim mühendisi) ve ben üçümüz de yığın liç alanına günlük gideriz ve gerekli kontrolleri yaparız. Benim üst amirim baş mühendis Murat BAYRAKDAR'dır. Kenan ÖZ (yığından sorumlu süpervizör) ve Soysal DOĞAN (borulama birimi) bana listede bağlı görünürler. Ben Murat BAYRAKDAR'dan aldığım talimatları onları iletebilirim. Onlarda bunu yerine getirirler. Yığın liçin başlayış tarihini tam olarak bilmemekle birlikte 10 yıldır yapıldığı hakkında bir duyum almıştım. ABD firması olan GRE firması tarafından bir dizayn projesi hazırlanır. Bu hazırlanan proje Türkiye'de onaylanır. Bu onay işleminden sonra Anagold A.Ş'nin proje departmanına gelir ve bu departmandaki haritacılar tarafından liç alanının sınır bölgeleri belirlenir. Bu sınırlara göre kırıcı biriminde malzeme geçirilerek aglomeratör cihazından gerekli karışım ve işleminden sonra bant sistemi ile liç alanına malzeme yığılmaya başlanır. Malzeme yığıldıkça yayılma işlemi dozerler ve iş makineleri vasıtasıyla yapılır. Sonra boru döşeme işlemi



SWORN
TRANSLATION

yapılır ve borulara solüsyon verilir. Ben işlemlerin bu şekilde yapıldığını biliyorum. 2-3 aylık ara dönemlerde çok küçük boyutta çatlakların görüldüğü ve denetçi firma olan GRE firmasına bunların fotoğraflarının gönderildiği, firma tarafından da çatlakların kendi malzemesi ile harmanlanarak çatlakların kapatılması hususunda tavsiye almıyordu. Bu kapatılan çatlaklar doğal çatlaklardır. Daha önce böyle büyük bir çatlaklar görülmedi. GRE firması yaklaşık 3 ayda bir denetlemeye gelmektedir. Ben bakanlık tarafından denetim görmedim. Belki müdürlerimiz tarafından bu denetim gözlenmiştir. Liç sahasından oksit proses birimi, çevre departmanı, iş sağlığı birimi, jeoteknik birimi ve proje departmanı sorumludur. Oksit proses biriminin yöneticisi Hüseyin ÜSTÜNDAG, çevre departmanı yöneticisi Can Serdar HASTÜRK, iş sağlığı birimi yöneticisi Selçuk ÇİFTLİK, jeoteknik birimi yöneticisini Ali Rıza KALENDER olarak bilirim. Toprak altında kalan 9 işçinin yetisi alanlarını biliyorum. Uğur YILDIZ (maden bölümünde şoför), Kenan ÖZ (yığın süpervizörü), Ramazan ÇİMEN (kırıcı süpervizörü), Adnan KEKLİK (ADR, ŞART Süpervizörü) olduğunu, Mehmet KAZAR, Hüseyin KARA, Abdurrahman ŞAHİN ve Şaban YILMAZ'ın taşeron işçisi olduğu ve dozere/loader şoförü olabileceklerini düşünüyorum. Fahrettin KEKLİK ise idari işler personeli olup idari işler biriminin amirinin Cengiz ŞAHİN olduğunu biliyorum. Olayın meydana geldi saat 08.00 sıralarında yığınliçi operatörü olan Nazmı KÖSE, üretim mühendisi Şenol DEMİR'i aradı. Şenol DEMİR ile ben aynı odayı paylaşırın. Nazmı KÖSE, Şenol DEMİR'e yığınliçi serim alanında kırıkları olduğunu söyledi. Daha sonra ben ve Şenol DEMİR doğrudan bize bildirilen kırıkların olduğu sahaya gitmek için yola çıktık. Nazım KÖSE Şenol DEMİR'i daha tecrübeli olduğunu gördüğü için onu aramış olabilir. Zaten bir kişiye haber verildiğinde yeterli oluyor. Sahaya çıktıktan sonra zaten bizde üst amirimiz olan Murat BAYRAKDAR'a çatlaklar ile ilgili bilgiyi vermiştik. Alana vardığımız zaman günlük yapılan üretim toplantısına Team's programı üzerinden katıldık. Hatırladığım kadarıyla arabayı ben kullanıyordum. Benim telefonumdan mı yoksa Şenol DEMİR oturumu üzerinden toplantıya katıldığımı hatırlamıyorum. Bu toplantı da Yığın liçin süpervizörü Kenan ÖZ, yığın liçin de oluşan kırıklardan oksit baş mühendisi Murat BAYRAKDAR'a bilgi verdi. Çünkü Kenan ÖZ'ünde yığın liç alanını kontrol görevi vardır. Biz zaten çıktığımızda kendisi oradaydı. Murat BAYRAKDAR ise herkese bilgi vererek sahaya geleceğini söyledi. Şenol DEMİR ve ben şu an da sahada olduğumuzu buraya gelmeleri gerektiğini Murat BAYRAKDAR'a söyledik. Soysal DOGAN'a o sırada orada bulunmaktaydı. Toplantıdan hemen sonra kendi aramızda görev dağılımı yapıldı. Ben jeoteknik bölümünden asistan mühendis Berkay MISIR'ı aradım. Üstü olan Ali Rıza KALENDER'i de alarak sahaya gelmesi gerektiğini söyledim. Bu talimatı Murat BAYRAKDAR'ın talimatı olarak verdim. Toplantı bittikten sonra ben ve Şenol DEMİR arabadan inerek kırıkları incelemeye başladık. Yaklaşık 30 kadar proje departmanına bağlı işçiler mebran serme işleri yapıyorlardı. Daha sonra kırıkların olduğu yere İSG'den mühendis Gizem GAZCI, Çevre departmanından mühendis Recep ÇALI, oksit baş mühendisi Murat BAYRAKDAR geldi. Biz jeoteknik ekibini beklerken Murat BAYRAKDAR alanı boşaltmamızı ve yolu kapatmamızı söyledi. Yığın liçine giden iki yol vardır. Biri ocak tarafından diğeri borulama ofislerinin olduğu yerdedir. Yolu borulama ekibi ofislerinin önünden kapatılmasını, gelenlerini borulama ekibinin bulunduğu yere gitmesini Murat BAYRAKDAR söyledi. Ocak tarafındaki yol üzerine iş makinesi malzeme götürüp daha sonra newjerse denilen dubalar konuldu. Borulama ekibinin bulunduğu ofisin önüne de dubalar konuldu. Alanda bulunan işçiler proje departmanı işçileriydi. Kendilerine çıkmalarını söyledik. İşçiler malzemelerin olduğunu söylediler. Ben boşaltmanın hızlandırılması ve bilgilendirme amacıyla proje departmanında çalışan mühendis İshak ASLAN'ı arayarak bilgi

75



SWORN
TRANSLATION

verdim. İshak ASLAN'da sahaya geldi. Murat BAYRAKDAR saat 10.00'da yapılacak olan müdürler toplantısında bu gördüklerini anlatacağını söyleyerek alandan ayrıldı. Bizde bu sırada alanın boşaltılmasını ve kapatılma işlemlerini, malzemeleri güvenli alana çekme işlemlerini yapıyorduk. Alanla ilgili tüm talimatları bize Murat BAYRAKDAR verdi. Daha sonra Şenol DEMİR'de alandan mail atmak için ayrıldı. Şenol DEMİR yol kapama bilgilendirme mailini 10.50'de iş güvenliği departmanı, bakım departmanı, oksit proses operasyon departmanı, sülfit proses operasyon departmanı, maden departmanı ve Anagold bünyesinde çalışanların bulunduğu İliç White isimli ortak mail grubuna yolun ikinci bir bildirime kadar kapatıldığına dair mail gönderdi. Bildiğim kadarıyla bu İliç White'ye gelen mail bildirimden taşeron yetkililerin bilgisi yoktur. Biz alanı boşalttıktan sonra jeoteknik departmanından Berkay MISIR ve tanımadığım iki kişi alana geldiler ve İnceleme yaptılar. Radar haritasını bana Berkay MISIR gösterdi ve durumu bana anlattı. Bir hareketin olduğunu ancak asıl departmandan sorumlu Ali Rıza KALENDİR'in gelip bakması gerektiğini, Ali Rıza KALENDER'in geleceğini söyledi. Bana radar haritasının fotoğrafını gösterdi. Daha sonra Murat BAYRAKDAR İSG baş mühendisi Burak ARTAL, çevre mühendisi Can Serdar HASTÜRK, operasyon başkan yardımcısı Iain Guille ile birlikte olay yerine gidip keşif yapmakta iken Murat BAYRAKDAR'ın beni çağırması üzerine bu keşfe daha sonra katıldım. Burada bulunanlara Berkay MISIR'ın bana anlattıklarını anlattım ve gönderdiği radar görüntüsünü gösterdim. Berkay MISIR bana tam bir anlam veremediğini, olayın önemi ile alakalı Ali Rıza KALENDERİ işaret etti. Iain görüntüleri mail olarak atmamı istedi. Saat 10.52'de mail yoluyla görüntüleri gönderdim. Alanda iken Murat BAYRAKDAR alanın kapatıldığını, ara ara saha denetimi yapılmasını Ali Rıza KALENDER geldikten sonra beraber sahayı inceleyeceğini söyledi. Murat BAYRAKDAR Iain'e alanda bulunan solüsyonun nasıl yönetileceğini kesilip kesilemeyeceği ile ilgili oksit departmanı ile bir toplantı yapılacağını, karar için Iain'e sorulacağını söyledi. Saatini tam hatırlayamadığım bir zamanda ancak saat 12.00 civarı olabilir, Ali Rıza KALENDER şirkete geldi. Murat BAYRAKDAR, Ali Rıza KALENDER, ben ve tanımadığım bir kişi alana çıktık. Ali Rıza KALENDER, alanı inceledi. Alanda yığın liçi çalışmalarının durması gerektiğini, inşaat işçilerinin çalışabileceğini, alanda oturma hareketi meydana geldiğini, bu yarıkların da çimento ile birlikte iş makineleriyle kapatılabileceğini söyledi. Ali Rıza KALENDER böyle bir tavsiye de bulunabilir ancak biz liç alanındaki talimatları Murat BAYRAKDAR'dan alırız ve ona göre iş durdurması veya başka bir iş yaptırabiliriz. Murat BAYRAKDAR Ali Rıza KALENDER'in yazılı olarak mail olarak gönderilmesini ve teknik bir bilgilendirme göndermesi gerektiğini yoksa dediklerini yapmayacağını söyledi. Biz aşağı indik ve solüsyonun nasıl yönetileceğine dair toplantı yapmaya saat 13.20 civarında başladık. Bu toplantıda ben Şenol DEMİR, asistan proses mühendisi Elif REYHAN, ADR süpervizörü Adnan KEKLİK, borulama süpervizörü Sosyal DOGAN vardı. Biz bu toplantıda solüsyonun kesilmesi halinde nasıl yönetilebileceğini aktardık. Bu konuştuklarımızı Murat BAYRAKDAR'a söyledik. Murat BAYRAKDAR bunu Iain'e soracağım ve kararı bize söyleyeceğini söyledi. Çok kısa süre sonra bize döndü ve solüsyonu kes dedi bizde solüsyonu kestik. Adnan KEKLİK kendi birimine bağlı bir kişiyi arayarak solüsyonu kesmesi gerektiğini söyledi. Ali Rıza KALENDER oluşan yatıklarla ilgili bir mail gönderdi ancak yukarıda alanda söylediği işçilerin girebileceğine yönelik bir bilgi yoktu. Alanın çimento ile düzeltilebileceğini söyledi. Yığınliçi operasyonunun durmasını bildirdi. Bu olay Murat BAYRAKDAR'ın solüsyon kesimi için Iain'den onay almaya gittiği sırada gerçekleşti. Maili kendi bilgisayarından Murat BAYRAKDAR'ın söyledikleri yazarak ve Murat BAYRAKDAR'a mail olarak gönderdim. 15-20 dk sonra ismini hatırlamadığım bir kişiden

76



borulardan ses geldiği söylendi. Ben Elif REYHAN ve Adnan KEKLİK borulama ofisinin oraya doğru yola çıktık. Borulardaki solüsyon akışından Adnan KEKLİK sorumlu olduğu için ben ve Elif REYHAN'da liç sahasında kontrol görevimiz olduğu için beraber gitme kararını aldık. Adnan KEKLİK in kendi görevi olduğu yönünde bir değerlendirme yaptığını düşünüyorum. Zira Murat BAYRAKDAR bana böyle bir talimat vermedi. Bu sırada Berkay MISIR ile karşılaştık. Berkay MISIR bize kırıklar artmış bence çıkmayın dedi. Biz alam biri inşaat müdürü (farklı firma, ismini Patrik olarak biliyorum) ve tanımadığım diğer iki yabancıya bu kişilerin inşaat işinden anladıkları ve inşaatın durumuna bakacaklarını söylediler. Bende bu alanda yetkili olduğum için beraber çıkmıştım. Bu sırada Murat BAYRAKDAR'ın talimatı ile olduğunu bildiğim Kenan ÖZ, Ramazan ÇİMEN, Soysal DOGAN, İshak DEMİR ve bir operatör daha denetimdeydi. Biz onlara alam boşaltmaların söyledik. Böyle söyledikten 5-10 dk sonra kayma meydana geldi. Murat BAYRAKDAR bana alandan çatlak fotoğraflarım göndermemi istedi. Ben sadece Soysal DOGAN ve İshak DEMİR'e liç 30'da fotoğraf çekmelerini söyledim. Ben Elif REYHAN ve üç yabancı inceleme yapmak için en üst liç kotuna çıktık. Burada bulunduğumuz sırada toprak kaymaya başladı. Olay bu şekilde meydana geldi. Benim zamanımda fazla yükleme olmadı. Sadece su birikintisi ara ara oldu ama küçük işlemler ile giderildi. Şu sıralar günde yaklaşık 7-8 ton malzemenin yığıldığını biliyorum. Zaten bu mail yoluyla bildirilmektedir. GRE ve İNR firmaları yaklaşık 3 ayda bir normal denetim, 1 ay da birde üstten drone uçurarak denetim yapabiliyorlardı. Yığın liçin hangi anda kapatılacağı tetikleyici aksiyon planında yazıyor. Ben tarafıma böyle bir talimatın Murat BAYRAKDAR tarafından verileceğini biliyorum. Radar sistemleri ile ilgili herhangi bir bilgim yoktur. Radar sistemleri ile ilgili jeoteknik birimi Berkay MISIR ve Ali Rıza KALENDER olduğunu biliyorum. Borulama işçilerini durdurma Murat BAYRAKDAR'ın yetkisindedir. İnşaat işi durdurulmuştu ama borulama işçileri kontrol için orada kalabilir şekilde Murat BAYRAKDAR tarafından talimat verildiğini biliyorum. Ben alt taşeron yetkililerine hangi birim tarafından bilgi verileceğini bilmiyorum. Olay günü yakın bölgeden bir patlama yapılmadığını duydum. Konteynerlerin orada bulunmasına dair kim bilgi veriyor bilmiyorum. Solüsyon saat 13.58'de kesildiğine dair mesaj gelmişti. İş sağlığı ve güvenliği eğitimleri ara ara 3 ay da bir 6 ayda bir yapılıyor. Yılda bir de genel eğitim var. Ben Kenan ÖZ ve Ramazan ÇİMEN'in liç alanında Murat BAYRAKDAR'ın alanı kontrol edin genel talimatı ile orada kontrol amacıyla bulunduklarını düşünüyorum. Fahrettin KEKLİK'in idari işler birimine bağlı olduğunu bu biriminde amirinin Cengiz ŞAHİN olduğunu biliyorum. Ekleyeceğim başka bir husus yoktur." Demiştir. Müdafii Av. Cem AKTOLGALI "Müvekkilin beyanlarına katılıyoruz. Müvekkil oradaki çatlakların anlam ve önemini bilebilecek bir düzeyde değildir. Ayrıca radarı yorumlama gibi bir yetkinliği de yoktur. Bu durumlar için şirkette jeoteknik birimi mevcut olup, bu birim sadece radardan sorumlu değildir. Alanları gözlemlemek ve bu tarz tehlikeleri bildirmekle sorumludur. Ayrıca dosyaya sunmuş olduğumuz tetikleyici aksiyon planında da jeoteknik biriminin bu görevi yazılıdır. Müvekkil oraya görevi olmayan birini götürmemiştir. Ayrıca olay sırasında da kendisine de ordadır. Jeoteknik biriminden aldığı sözlü ve yazılı bilgi uyarınca bunu yaptığı açıktır. Söyleyeceklerimiz bunlardan ibarettir." Demiştir.



77

## 4. İLGİLİ MEVZUATLARIN İNCELENMESİ

### 4.1. 15.06.1985 TARİH 18785 SAYILI MADEN KANUNU, MADENCİLİK FAALİYETLERİ UYGULAMA YÖNETMELİĞİ KAPSAMINDAKİ YÜKÜMLÜLÜKLER

*-3213 Sayılı Maden Kanunun, Amaç başlığı altında; "Madde 1 – Bu Kanun madenlerin milli menfaatlere uygun olarak aranması, işletilmesi, üzerinde hak sahibi olunması ve terk edilmesi ile ilgili esas ve usulleri düzenler."*

*-3213 Sayılı Maden Kanunun, İşletme faaliyeti başlığı altında; Madde 29 – (Değişik: 4/2/2015 – 6592/14 md.) İşletme faaliyeti, projesine ve bu Kanunun ilgili hükümlerine göre yürütülür. İşletme projesine aykırı faaliyette bulunulduğunun tespit edilmesi hâlinde, projeye uygun faaliyette bulunulması için ruhsat sahibine altı aya kadar süre verilir. Bu süre sonunda projeye uygun faaliyette bulunulmaması hâlinde 50.000 TL idari para cezası verilerek üretim faaliyeti durdurulur. Ancak, projeye aykırı faaliyetlerin işletme açısından tehlikeli olduğunun tespit edilmesi hâlinde tehlikeli durum giderilinceye kadar üretim faaliyetleri doğrudan durdurulur. İşletme projeleri ve değişikliklerinin uygulamaya konulmadan önce Genel Müdürlüğe sunulması zorunludur. Aksi takdirde üretim faaliyeti durdurulur. İşletme projeleri ve değişiklikleri ile ilgili dokümanlar ve işletmelerin faaliyetlerinin durdurulmasına dair işlemler Çalışma ve Sosyal Güvenlik Bakanlığı ile Bakanlık tarafından karşılıklı olarak elektronik ortamda erişime açılır. Yetkilendirilmiş tüzel kişiler tarafından hazırlanan rapor, proje ve tüm teknik belgeler ruhsat sahibi tarafından Genel Müdürlüğe verilir. Ruhsat sahibi, her yıl nisan ayı sonuna kadar bir önceki yıl içinde gerçekleştirdiği işletme faaliyeti ile ilgili teknik belgeleri, işletme faaliyet raporunu ve işletme sahasında arama yapmış ise arama ile ilgili bilgileri Genel Müdürlüğe vermekle yükümlüdür. Yükümlülüğün yerine getirilmemesi hâlinde 30.000 TL idari para cezası uygulanır. Yükümlülük yerine getirilinceye kadar üretim faaliyeti durdurulur."*

-21 Eylül 2017 tarihli ve 30187 sayılı Resmî Gazetede yayımlanan Maden Yönetmeliğinin Daimî nezaretçinin görev, yetki ve sorumlulukları başlıklı 125. Maddesinde "(1) Daimî nezaretçinin görev, yetki ve sorumlulukları: a) Daimî nezaretçi, nezaret görevini Kanun ve bu Yönetmelik kapsamında yürütür. b) Ruhsat alanı içerisinde maden işletme faaliyetlerini işletme projesine uygun olarak planlar, koordine eder ve yürütülmesini sağlar. İşletme projesine aykırı olan tehlikeli bir durumun varlığı söz konusu olduğu zaman, gerekli önlemlerin alınmasını önerir ve önlem alınmasına nezaret eder. c) Daimî nezaretçi iş sağlığı ve güvenliği ile ilgili alınan tedbirlerin uygunluğunu denetler. ç) Ruhsat alanı içerisinde hazırlık, üretim ve tüm işletme faaliyetlerinin işletme projesine uygun yürütülmesini sağlar. d) Daimî nezaretçi ataması yapılan her saha için ayrı ayrı daimi nezaretçi defteri tutulması, bir sahada birden fazla daimi nezaretçi ataması yapılması halinde her nezaretçi için ayrı ayrı defter tutulması zorunludur. e) Daimî nezaretçi, görevi ile ilgili inceleme yapmak ve gerekli her türlü bilgiyi alma ve Kanun kapsamında gerekli önlemlerin yerine getirilmesini sağlama yetkisine sahiptir. Bu yetkinin kullandırılmaması, önlemlerin yerine getirilmemesi durumunda doğacak her türlü sorumluluk daimî nezaretçinin atanmasını talep edenlere aittir. f) Daimi nezaretçi, atandığı ve sorumlu olduğu işletmenin faaliyetlerinin projeye uygunluğunu işletme faaliyetinde bulunulan her gün inceleyerek tespitlerini ve önerilerini daimî nezaretçi defterine en az haftada bir kaydetmek zorundadır. Bu süre içerisinde işletmede yeni bir durumun ortaya çıkması halinde bu husus aynı gün deftere kaydedilir. Aksi

78



SWORN
TRANSLATION

takdirde daimî nezaretçi Genel Müdürlükçe uyarılır. İkinci kez aynı ruhsat ile ilgili olarak bu yükümlülüklerin yerine getirilmemesi durumunda daimî nezaretçinin Kanun gereğince yapacağı beyanlar bir yıl süre ile geçersiz sayılır. Fiilin her tekrarında hak mahrumiyeti uygulamasına devam edilir. Uygulanan uyarı ve hak mahrumiyeti Maden Mühendisleri Odasına bildirilir. g) Daimi nezaretçi defterinin; daimi nezaretçi ile ruhsat sahibi/hammadde üretim izin sahibi/rödövansçı/faaliyeti gerçekleştiren ile birlikte imzalanması zorunludur. Daimî nezaretçi defterinin muhafazası daimi nezaretçiyi istihdam edenin sorumluluğundadır.

### 4.2. 09.08.1983 TARİH 2872 SAYILI ÇEVRE KANUNU, 29.07.2022 TARİH VE R.G - 31907 SAYILI ÇEVRESEL ETKİ DEĞERLENDİRME YÖNETMELİĞİ, 15.07.2015 TARİH VE R.G - 29417 SAYILI MADEN ATIKLARI YÖNETMELİĞİ, 23.01.2010 TARİH VE R.G - 27471 SAYILI MADENCİLİK FAALİYETLERİ İLE BOZULAN ARAZİLERİN DOĞAYA YENİDEN KAZANDIRILMASI YÖNETMELİĞİ KAPSAMINDAKİ YÜKÜMLÜLÜKLER

#### 4.2.1. 2872 Sayılı Çevre Kanunun Soruşturmaya Esas Olayla İlişkili Uygulama Maddeleri;

..., *İlkeler Başlığı altında yer alan "Madde 3 –(Değişik: 26/4/2006-5491/3 md.) Çevrenin korunmasına, iyileştirilmesine ve kirliliğinin önlenmesine ilişkin genel ilkeler şunlardır: a) Başta idare, meslek odaları, birlikler ve sivil toplum kuruluşları olmak üzere herkes, çevrenin korunması ve kirliliğin önlenmesi ile görevli olup bu konuda alınacak tedbirlere ve belirlenen esaslara uymakla yükümlüdürler. "...", f) Her türlü faaliyet sırasında doğal kaynakların ve enerjinin verimli bir şekilde kullanılması amacıyla atık oluşumunu kaynağında azaltan ve atıkların geri kazanılmasını sağlayan çevre ile uyumlu teknolojilerin kullanılması esastır. g) Kirlenme ve bozulmanın önlenmesi, sınırlandırılması, giderilmesi ve çevrenin iyileştirilmesi için yapılan harcamalar kirleten veya bozulmaya neden olan tarafından karşılanır. Kirletenin kirlenmeyi veya bozulmayı durdurmak, gidermek veya azaltmak için gerekli önlemleri almaması veya bu önlemlerin yetkili makamlarca doğrudan alınması nedeniyle kamu kurum ve kuruluşlarınca yapılan gerekli harcamalar 6183 sayılı Amme Alacaklarının Tahsil Usulü Hakkında Kanun hükümlerine göre kirletenden tahsil edilir.", "...",*

*Kirletme yasağı başlığı altında yer alan; "Madde 8 – Her türlü atık ve artığı, çevreye zarar verecek şekilde, ilgili yönetmeliklerde belirlenen standartlara ve yöntemlere aykırı olarak doğrudan ve dolaylı biçimde alıcı ortama vermek, depolamak, taşımak, uzaklaştırmak ve benzeri faaliyetlerde bulunmak yasaktır. Kirlenme ihtimalinin bulunduğu durumlarda ilgililer kirlenmeyi önlemekle; kirlenmenin meydana geldiği hallerde kirleten, kirlenmeyi durdurmak, kirlenmenin etkilerini gidermek veya azaltmak için gerekli tedbirleri almakla yükümlüdürler.", "...",*

*Çevresel Etki Değerlendirilmesi başlığı altında yer alan; "Madde 10 – (Değişik: 26/4/2006-5491/7 md.) Gerçekleştirmeyi plânladıkları faaliyetleri sonucu çevre sorunlarına yol açabilecek kurum, kuruluş ve işletmeler, Çevresel Etki Değerlendirmesi Raporu veya proje tanıtım dosyası hazırlamakla yükümlüdürler. Çevresel Etki Değerlendirmesi Olumlu Kararı veya Çevresel Etki Değerlendirmesi Gerekli Değildir Kararı alınmadıkça bu projelerle ilgili onay, izin, teşvik, yapı ve kullanım ruhsatı verilemez; proje için yatırıma başlanamaz ve ihale edilemez. (İptal üçüncü fıkra: Anayasa Mahkemesi'nin 15/1/2009 tarihli ve E.:2006/99, K.:2009/9 sayılı Kararı ile.) Çevresel Etki Değerlendirmesine tâbi projeler ve Stratejik Çevresel Değerlendirmeye tâbi plân ve programlar ve konuya ilişkin usûl ve esaslar Bakanlıkça çıkarılacak yönetmeliklerle belirlenir.", "...", İzin alma, arıtma ve bertaraf etme yükümlülüğü başlığı altında yer alan; "Madde 11 – (Değişik: 26/4/2006-5491/8 md.) Üretim, tüketim ve hizmet faaliyetleri sonucunda oluşan atıklarını alıcı ortamlara doğrudan veya dolaylı vermeleri uygun görülmeyen tesis ve işletmeler ile yerleşim birimleri atıklarını yönetmeliklerde belirlenen standart ve yöntemlere uygun olarak*

79



SWORN
TRANSLATION

*arıtmak ve bertaraf etmekle veya ettirmekle ve öngörülen izinleri almakla yükümlüdürler. Birinci fıkrada belirtilen yükümlülüğü bulunan tesis ve işletmeler ile yerleşim birimlerine; 1) Yapı ruhsatı aşamasında bu yükümlülüğünü yerine getireceğini gösterir proje ve belgeleri ilgili kuruma sunmadıkça yapı ruhsatı verilmez. "...", Bu Kanunun uygulanmasını sağlamak üzere alınması gereken izinler ve bu izinlerin tâbi olacağı usûl ve esaslar Bakanlıkça çıkarılacak yönetmeliklerle belirlenir. Faaliyetleri nedeniyle çevreye olumsuz etkileri olabilecek kurum, kuruluş ve işletmeler tarafından, faaliyetlerine ilişkin olası bir kaza durumunda, kazanın çevreye olumsuz etkilerini kontrol altına almak ve azaltmak üzere uygulanacak acil durum plânları hazırlanması zorunludur. Buna ilişkin usûl ve esaslar Bakanlıkça çıkarılacak yönetmelikle düzenlenir.", "...",*

***Denetim, bilgi verme ve bildirim*** *yükümlülüğü başlığı altında yer alan; "Madde 12 – (Değişik: 26/4/2006-5491/9 md.) Bu Kanun hükümlerine uyulup uyulmadığını denetleme yetkisi Bakanlığa aittir. Gerektiğinde bu yetki, Bakanlıkça; il özel idarelerine, çevre denetim birimlerini kuran belediye başkanlıklarına, Denizcilik Müsteşarlığına, Türkiye Çevre Ajansına, Emniyet Genel Müdürlüğüne, Jandarma Genel Komutanlığına ve Sahil Güvenlik Komutanlığına (...) devredilir. Denetimler, Bakanlığın belirlediği denetim usûl ve esasları çerçevesinde yapılır.", "...",*

***Tehlikeli kimyasallar ve atıklar*** *başlığı altında yer alan; "Madde 13 – (Değişik: 26/4/2006- 491/10 md.) Tehlikeli kimyasalların belirlenmesi, üretimi, ithalatı, atık konumuna gelinceye kadar geçen süreçte kullanım alanları ve miktarları, etiketlenmesi, ambalajlanması, sınıflandırılması, depolanması, risk değerlendirilmesi, taşınması ile ihracatına ilişkin usûl ve esaslar ilgili kurum ve kuruluşların görüşleri alınarak Bakanlıkça çıkarılacak yönetmelikle belirlenir. Tehlikeli kimyasalların üretimi, satışı, depolanması, kullanılması ve taşınması faaliyetleri ile (...)17 atıkların toplanması, taşınması, geçici ve ara depolanması, geri kazanımı, yeniden kullanılması ve bertarafı faaliyetlerinde bulunanlar ile atık yönetim sorumlusu firmalar, bu Kanun ile getirilen yükümlülükler açısından müteselsilen sorumludurlar. Sorumlular bu Kanunda belirtilen mesleki faaliyetleri nedeniyle oluşacak bir kaza dolayısıyla üçüncü şahıslara verebilecekleri zararlara karşı tehlikeli kimyasal ve tehlikeli atık malî sorumluluk sigortası yaptırmak zorunda olup, faaliyetlerine başlamadan önce Bakanlıktan gerekli izni alırlar. Sigorta yaptırma zorunluluğuna uymayan kurum, kuruluş ve işletmelere bu faaliyetler için izin verilmez.", "...",*

***Çevre Kanunun Ek Madde 1*** *– (Ek: 26/4/2006-5491/23 md.) başlığı altındaki; "...", b) Taşocağı ve madencilik faaliyetleri, malzeme ve toprak temini için arazide yapılan kazılar, dökümler ve doğaya bırakılan atıklarla bozulan doğal yapının yeniden kazanılmasına ilişkin usûl ve esaslar ilgili kuruluşların görüşleri alınarak Bakanlıkça çıkarılacak yönetmelikle belirlenir."*

**4.2.2. 9/8/1983 tarihli ve 2872 sayılı Çevre Kanunu'nun 10 uncu maddesine dayanılarak hazırlanan 29.07.2022 tarih ve R.G- 31907 Sayılı Çevresel Etki Değerlendirme Yönetmeliğinin Olaya İlişkin Maddeleri;**

***Yetki Başlığı Altında;*** *"MADDE 5- (1) Bu Yönetmeliğe tabi projeler hakkında "ÇED Olumlu", "ÇED Olumsuz", "ÇED Gereklidir" veya "ÇED Gerekli Değildir" kararlarını verme yetkisi Bakanlığa aittir. Ancak Bakanlık gerekli gördüğü durumlarda "ÇED Gereklidir" veya "ÇED Gerekli Değildir" kararının verilmesi konusundaki yetkisini, sınırlarını belirleyerek il müdürlüğüne devredebilir."*

***Çevresel etki değerlendirmesi başvuru dosyası, çevresel etki değerlendirmesi raporu veya proje tanıtım dosyası hazırlama yükümlülüğü*** *başlığı altında; "MADDE 6- (1) Bu Yönetmelik kapsamındaki bir projeyi gerçekleştirmeyi planlayan gerçek veya tüzel kişiler; Çevresel Etki Değerlendirmesine tabi projeleri için; ÇED Başvuru Dosyasını ve ÇED Raporunu, Çevresel Etkileri Ön İnceleme ve Değerlendirmeye Tabi Projeleri için de Proje Tanıtım Dosyasını, Bakanlıkça yeterlik verilmiş kurum/kuruluşlara hazırlatmak, ilgili makama sunulmasını sağlamak ve proje kapsamında verdikleri taahhütlere uymakla yükümlüdürler."*

***Yatırımın izlenmesi ve denetimi*** *başlığı altında; "..., MADDE 18- (1) Bakanlık, "ÇED Olumlu" kararı veya "ÇED Gerekli Değildir" kararı verilen projelerle ilgili olarak, "ÇED Olumlu"*



SWORN
TRANSLATION

*kararına esas nihai ÇED raporunda veya "ÇED Gerekli Değildir" kararına esas proje tanıtım dosyasında taahhüt edilen hususların yerine getirilip getirilmediğini izler, kontrol eder ve denetler. Bakanlık, proje ilerleme raporlarında belirtilen iş ve işlemlerin doğruluğunu kontrol eder.",*

**Kapasite artışları** *başlığı altında; "..., MADDE 20- (1) "ÇED Olumlu" veya "ÇED Gerekli Değildir" kararı bulunan ve eşik değeri olan projelerde yapılacak kapasite artışı ve/veya alan genişletilmesinin planlanması durumunda, her bir kapasite artışı miktarının mevcut proje kapasitesi ile toplanması ve bu toplamın; a) Ek-1'deki listede yer alan eşik değer ve üzerinde kalması durumunda, 8 inci madde kapsamında başvuru yapılması gerekmektedir. b) Ek-2'deki listede yer alan eşik değer ve üzerinde kalması durumunda, 16 ncı madde kapsamında başvuru yapılması gerekmektedir. (2) "ÇED Olumlu" veya "ÇED Gerekli Değildir" kararı bulunan projelerde kapasite artışı ve/veya genişletilmesinin planlanması halinde, planlanan projenin etkileri, mevcut karara esas çevresel etkiler ile birlikte kümülatif olarak değerlendirilir." "..."*

**Ek-3, Çevresel Etki Değerlendirmesi Genel Formatı, Bölüm III: Projenin İnşaat ve İşletme Aşamasında Çevresel Etkileri ve Alınacak Önlemler** *başlığı altında; "Projenin; a) Çevreyi etkileyebilecek olası sorunların belirlenmesi, kirleticilerin miktarı, alıcı ortamla etkileşimi, kümülatif etkilerin belirlenmesi. b) Projenin iklim üzerindeki etkisi (sera gazı emisyonlarının niteliği ve büyüklüğü) ve projenin iklim değişikliğinden nasıl etkileneceği, c) İklim değişikliğine bağlı projeyle ilgili afet veya kaza riski, ç) Projenin çevreye olabilecek olumsuz etkilerinin azaltılması için alınacak önlemler.(...)" in alınması gerekliliği.*

### 4.2.3. 15.07.2015 tarih ve R.G - 29417 Sayılı Maden Atıkları Yönetmeliğinin Olaya İlişkin Maddeleri;

**İkinci Bölüm, Genel Hükümler, Görev, Yetki ve Yükümlülükler, Genel hükümler;** *başlığı altında "MADDE 5 – (1) Maden atıklarının geçici depolanması, taşınması ve işlenmesi sırasında su, hava, toprak, bitki, hayvan ve insanlar için risk yaratmayacak, gürültü, titreşim ve koku yoluyla rahatsızlığa neden olmayacak, doğal çevrenin olumsuz etkilenmesini önleyecek ve böylece çevre ve insan sağlığına zarar vermeyecek yöntem ve işlemlerin kullanılması esastır." (...), (3) Maden atıklarının sürdürülebilir çevre ve insan sağlığı ile sürdürülebilir kalkınma prensipleri göz önünde bulundurularak yönetilmesinde mevcut en iyi teknik ve teknolojilerin seçilmesi ve uygulanması esastır.*

**Bakanlığın görev ve yetkileri, MADDE 6 – (1) Bakanlık;** *başlığı altında "..., ç) Maden atık bertaraf tesisleri için hazırlanan atık yönetim planını değerlendirmekle, görevli ve yetkilidir."*

**İşletmecinin görev ve yükümlülükleri** *başlığı altında; e) Bakanlıkça uygun görülen uygulama projesine göre yapılacak olan maden atıklarının depolandığı tesise ait inşaat denetimini ve inşaat denetimine ait raporlama işlerini Bakanlıkça belirlenen usul ve esaslara göre yaptırmakla, (...), g) Kategori A maden atığı bertaraf tesisi için finansal garantiyi yaptırmakla sorumlu olduğu,*

**Maden Atıkları Yönetmeliğinin** *Ek 5 te yer alan parametrelerden pasa yığınları söz konusu olduğunda, risk değerlendirmesinde -Tesisin boyutu ve özellikleri, – Tesisteki atığın miktarı ve niteliği, – Yığının şev açısı, – Yığın içinde dahili yer altı suyu oluşma potansiyeli, – Zeminin duraylılığı, – Topoğrafya, – Su yollarına, yapı ve binalara yakınlık gibi faktörlerin göz önünde bulundurulması gerektiğinin belirtildiği, •Malzeme yığınının stabilitesine yönelik olası bir kayma/heyelan türü bir yapısal bozulma sonucunda herhangi bir kalıcı veya uzun süreli çevresel etki olasılığı söz konusu ise •Topoğrafik kısıtlamalara bağlı olarak, tesisin tasarımı potansiyel yıkılma türü bozulmalara karşı yeterli değilse tesisin Kategori A olarak sınıflandırılması gerekliliği belirtilmektedir.*

**Maden atıklarının depolandığı tesislerin geçirimsizlik sistemi** *başlığı altında; "MADDE 11 – (1) Maden atıklarının depolandığı tesislerin kurulacağı alanın jeolojik, hidrojeolojik, jeokimyasal, hidrokimyasal ve mühendislik jeolojisi çalışmasının yapılarak, tesisin kurulacağı alandaki kayaçların geçirimlilik ve iletimlilik özellikleri belirlenir. (2) Maden atıklarının depolandığı*

81



*tesislerin tabanı ve yan yüzeylerinde sızıntı suyunun yer altı suyuna karışmasını önleyecek şekilde bir geçirimsizlik tabakası olması gereklidir. Bu tabaka doğal olarak bulunmuyorsa yapay yollarla oluşturulur. Doğal olarak bulunacak tabakanın kille aynı fiziksel, kimyasal, mekanik ve hidrolik özellikleri taşıması gereklidir. (3) Geçirimsizlik teşkilinde kullanılacak kil grubu mineraller, öncelikli olarak maden ruhsat alanında yapılan sondajlar/kazılarla aranır. 4) Tehlikeli maden atıklarının depolanacağı tesislerin tabanında ve yan yüzeylerinde oluşturulan geçirimsizlik tabakası teşkilinde, en az iki tabaka olarak sıkıştırılmış ve uygun koşullarda nemlendirilmiş minimum 50 cm kalınlığında ve geçirimliliği en fazla $10^{-9}$ m/sn olan kil grubu mineral serilir ve bu tabaka HDPE (yüksek yoğunluklu polietilen) jeomembran kullanılarak güçlendirilir. Jeomembranın korunması amacıyla üstüne uygun doğal malzeme ya da jeotekstil serilir. Yan yüzeylerde, topoğrafik koşullar nedeniyle şev eğiminin düşürülmesinin teknik olarak zor olması ve dik şev eğimlerinde de stabilitenin sağlanmasının mümkün olması durumunda, kil yerine jeosentetik kil tabakası HDPE jeomembran ile birlikte uygulanır. (5) Tehlikesiz maden atıklarının depolanacağı tesislerde, eğer ruhsat sahasında geçirimsizlik sistemi teşkili için gerekli olan kil grubu mineral bulunuyorsa, kil tabakası uygun nemlendirme ve en az iki tabaka olarak sıkıştırma ile toplam 50 cm kalınlığında ve geçirimliliği en fazla $10^{-9}$ m/sn olacak şekilde tabana serilir. Eğer ruhsat sahasında geçirimsizlik sistemi teşkili için gerekli olan kil grubu mineral bulunmuyor ve tesis dışından getirilmeyecekse, bu sistem jeosentetik malzemelerle oluşturulur, bu durumda tesisin tabanında yapılan kazı sonrası tabanda bulunan tampon tabakası üzerine jeosentetik kil tabakası ve HDPE jeomembran birlikte uygulanır. Yan yüzeylerde ise, kil tabakası veya jeosentetik kil tabakası ve HDPE jeomembran birlikte uygulanır. (6) Jeosentetik geçirimsizlik malzemelerinin kullanıldığı tehlikeli ve tehlikesiz maden atık depolama tesislerinde, yan yüzeylerde malzemelerin yüzeyde akmadan durması için pürüzlü jeomembran ve palyeli sistem uygulanır. (7) Maden atıklarının depolandığı tesislerin tabanında yer altı suyu bulunması ya da yer altı suyunun yükselerek tabanda teşkil edilecek geçirimsizlik sistemine zarar verme olasılığı bulunması durumunda, tabanda yer altı suyunu drene edecek bir sistem oluşturulur. Bu sistemde doğal ya da jeosentetik malzemeler kullanılır. (8) Sızıntı sularının toprak ve yer altı suları için oluşturacağı potansiyel risklerin engellenmesi ve kapatma sonrası maden atıklarının depolandığı tesisin duraylılığının uzun vadede sağlanması için, geçirimsizlik sistemine ilave olarak depo tabanında sızıntı suyu drenaj, toplama ve gerekirse arıtma sistemi inşa edilir. Drenaj sistemi teşkilinde, atığın tane boyutu ve kil içeriği gibi özellikleri dikkate alınarak sızıntıyı toplamaya uygun doğal ya da jeosentetik malzemeler seçilir. (9) Yağmur sularının maden atıklarının depolandığı tesislere girişini ve dolayısıyla oluşturacağı hidrolik yükü önlemek amacıyla gerekli yağış hesabı yapılarak kuşaklama kanalları inşa edilir ve depolama tesisinde gerekli hava payı bırakılır. (10) Toplanan sızıntı sularının alıcı ortama deşarj edilmesi durumunda 31/12/2004 tarihli ve 25687 sayılı Resmî Gazete'de yayımlanan Su Kirliliğinin Kontrolü Yönetmeliği ve 30/11/2012 tarihli ve 28483 sayılı Resmî Gazete'de yayımlanan Yüzeysel Su Kalitesi Yönetimi Yönetmeliği hükümleri uygulanır. (11) Geçirimsizlik teşkilinde kullanılacak HDPE jeomembranın kalınlığı en az 2 mm, yoğunluğu en az 941 – 965 kg/m3 olmalıdır. Ayrıca, geçirimsizlik malzemeleri teknik özellikleri bakımından ulusal ya da uluslararası standartlara uygun olmalıdır. (12) Yığın liçi tesislerinin taban teşkilinde en az bu maddenin dördüncü fıkrasında yer alan kalınlık ve geçirimlilik hükümleri uygulanmak zorundadır. (13) Atık çöktürme havuzlarında bu madde hükümleri uygulanmamakla birlikte, atıkla temas edecek tüm yüzeylere özel sızdırmaz beton kaplanır. (14) Pasa depolama alanları için bu madde hükümleri uygulanmamakla birlikte, uygun yükseklikte ve şev eğiminde stabilite önlemleri alınır. Ayrıca, sülfür içeren ve asit kaya drenajı potansiyeli bulunan pasalar hava ve su ile teması kesecek şekilde, nötrleştirme kapasitesi bulunan pasalarla tamponlanarak ya da sızıntı suyunun toplanarak arıtılması için gerekli tekniklerle, uygun şev eğimi ve palyeli sistemlerle depolanır ve depolama sonrası rehabilite edilir. Bu sahaların yüzeysel/yer üstü ve yer altı suyuna etkileri gözlem noktaları ve gözlem kuyularından alınacak su numuneleri ile izlenir." (...).*

***Dördüncü Bölüm, Acil Eylem Planı Atık Yönetimi Planı, Çevre İzni/Lisansı Acil eylem planı*** *başlığı altında; MADDE 13 – (1) Acil Eylem Planı Atık Yönetim Planı içinde yer alır. (2) Dahili*

82



SWORN
TRANSLATION

*Acil Eylem Planı yalnızca tesis içinde acil durum oluşturabilecek riskleri kapsayacak şekilde Ek-2'de belirtilen kriterlere uygun olarak hazırlanır. (3) Kategori A tesisler için, Büyük Endüstriyel Kazaların Önlenmesi ve Etkilerinin Azaltılması Hakkında Yönetmelik hükümleri doğrultusunda gerekli bildirimler işletmeci tarafından yapılır. (4) İşletmeci, Dahili Acil Eylem Planının etkinliğini yılda en az bir kez kontrol etmek zorundadır. (5) İşletmeci, Dahili Acil Eylem Planının genel kontrolünden sorumlu olan ve tüm nihai kararları alacak bir yetkili personel görevlendirmek zorundadır.*

*Dördüncü Bölüm, Ön İnceleme ve Değerlendirme Yöntemi, Çevresel etkileri ön inceleme ve değerlendirmeye tabi projeler başlığı altında, "MADDE 13- (1) Bu Yönetmeliğin; a) Ek-2'deki listede yer alan projeler, b) Kapsam dışı değerlendirilen veya kanunen muafiyeti bulunan projelere ilişkin kapasite artırımı ve/veya genişletilmesinin planlanması halinde, mevcut proje kapasitesi ve kapasite artışları toplamı ile birlikte projenin yeni kapasitesi Ek-2'deki listede belirtilen projeler için proje tanıtım dosyası hazırlanması zorunludur."*

*Yönetmeliğin EK-2. Maddesinde Yeralan, Dahili Acil Eylem Planı başlığı altında; 1) İşletmeci, tesisin faaliyetleri sırasında ortaya çıkabilecek büyük kazalara karşı önleme politikası belirler. Bu politika, kaza riskinin kontrol edilmesine ilişkin hedefleri ve ilkeleri içermelidir. 2) İşletmeci, büyük kazaları önleme politikasına uygun bir güvenlik yönetimi sistemi oluşturmak zorundadır. Güvenlik yönetimi sistemi; acil eylem planı organizasyon yapısı, sorumluluklar, uygulamalar, süreçler ve kaynaklar gibi bölümleri içermelidir. 3) İşletmeci tarafından Dahili Acil Eylem Planının yönetiminden sorumlu yönetici ve kilit personel belirlenmeli, bu personelin görev ve sorumlulukları açık olarak tanımlanmalıdır. 4) Planda, acil durumlarda kullanılacak olan araç-gereç, giysi, ekipman ve kaynaklar tanımlanmalı ve bunların yerleri şematik olarak gösterilmelidir. 5) Tesiste acil durumlarda görevli personele acil durumlarda yapması gereken işlerle ilgili eğitimler verilmeli ve eğitim sertifikaları Acil Eylem Planı ekinde yer almalıdır. 6) Tesisin faaliyetlerinden kaynaklanabilecek, tesisi ve yakın çevresini etkileyebilecek olası kazalar ve kazalar nedeniyle kısa ve uzun dönemde çevre ve insan sağlığı üzerindeki olumsuz etkiler ve rehabilitasyon/restorasyon dahil olmak üzere olunacak önlemler tanımlanmalıdır. 7) İşletme sırasında ortaya çıkabilecek her türlü arıza, kesinti vb. durumlarda işletmenin güvenli bir şekilde faaliyetinin sürdürülmesi amacıyla yapılacak çalışmalar tanımlanmalıdır.*

### 4.2.4. Atıkların Düzenli Depolanmasına Dair Yönetmeliğinin Olaya İlişkin Maddeleri;

*Yönetmeliğin, Amaç bölüm başlığı altında; "MADDE 1 – (1) Bu Yönetmeliğin amacı; atıkların düzenli depolama yöntemi ile bertarafı sürecinde; a) Oluşabilecek sızıntı sularının ve depo gazlarının toprak, hava, yeraltı suları ve yüzeysel suların üzerindeki olumsuz etkilerinin asgari düzeye indirilerek çevre kirliliğinin önlenmesine, b) Atıkların türüne göre uygun depo tabanı teknik tasarımlarının yapılması ve düzenli depolama tesislerinin inşa edilmesine, c) Düzenli depolama tesislerine atık kabulü işlemlerine, ç) Düzenli depolama tesislerinin işletilmesi, kapatılması ile kapatma sonrası kontrol ve bakım süreçlerine, d) İşletme, kapatma ve kapatma sonrası bakım süreçlerinde sera etkisi de dâhil olmak üzere çevre ve insan sağlığı açısından risk teşkil edebilecek olumsuzlukların önlenmesine, e) Mevcut düzenli depolama tesislerinin ıslahı, kapatılması ve kapatma sonrası bakım süreçlerine ilişkin teknik ve idari hususlar ile uyulması gereken genel kuralları belirlemektir."*

*Kapsam bölüm başlığı altında; "MADDE 2 – (1) Bu Yönetmelik, düzenli depolama tesislerine ilişkin teknik esaslar ile atıkların düzenli depolama tesislerine kabulü ve atıkların düzenli depolanmasına ilişkin usul ve esaslar ile alınacak önlemleri, yapılacak denetimleri ve tabi olunacak sorumlulukları kapsar."*

*Depo tabanının teşkili, bölüm başlığı altında, MADDE 16 – (1) (Değişik:RG-26/12/2019-30990) Düzenli depolama tesisinin tabanı ve yan yüzeylerinde, sızıntı suyunun yeraltı suyuna karışmasını önleyecek şekilde bir geçirimsizlik tabakası teşkil edilir. Geçirimsizlik tabakasının fiziksel, kimyasal, mekanik ve hidrolik özellikleri depolama tesisinin toprak ve yeraltı suları için*



SWORN
TRANSLATION

oluşturacağı potansiyel riskleri önleyecek nitelikte olmak zorundadır. Geçirimsizlik malzemeleri teknik özellik bakımından Türk Standartları Enstitüsü standartlarına uygun olmalıdır. (2) (Değişik:RG-26/12/2019-30990) Düzenli depolama tesisi sınıflarına göre depo tabanının asgari aşağıda belirtilen geçirgenlik ve kalınlık özelliklerine sahip olması gerekir: a) I. sınıf düzenli depolama tesisi: $K \leq 1,0 \times 10^{-9}$ m/sn ve en az 5 m kalınlığa sahip kil veya kil grubu geçirimsiz tabaka, b) II. sınıf düzenli depolama tesisi: $K \leq 1,0 \times 10^{-9}$ m/sn ve en az 1 m kalınlığa sahip kil veya kil grubu geçirimsiz tabaka, c) III. sınıf düzenli depolama tesisi: $K \leq 1,0 \times 10^{-7}$ m/sn ve en az 1 m kalınlığa sahip kil veya kil grubu geçirimsiz tabaka. (3) (Değişik:RG-26/12/2019-30990) Jeolojik geçirimsizlik tabakasının ikinci fıkrada verilen koşulları doğal olarak sağlayamaması halinde, geçirimsizlik tabakası: a) I. sınıf düzenli depolama tesisi: $K \leq 1,0 \times 10^{-9}$ m/sn geçirgenlik ve sıkıştırılmış en az dört tabaka halinde ve toplamda en az 1 m kalınlığa sahip kil veya kil grubu minerallerden, b) II. sınıf düzenli depolama tesisi: $K \leq 1,0 \times 10^{-9}$ m/sn geçirgenlik ve sıkıştırılmış en az iki tabaka halinde ve toplamda en az 50 cm kalınlığa sahip kil veya kil grubu minerallerden, c) III. sınıf düzenli depolama tesisi: $K \leq 1,0 \times 10^{-7}$ m/sn geçirgenlik ve sıkıştırılmış en az iki tabaka halinde ve toplamda en az 50 cm kalınlığa sahip kil veya kil grubu minerallerden oluşturulur, tabakanın her yerinde homojen olarak geçirgenlik değerleri sağlanır ve I. ve II. sınıf düzenli depolama tesislerinde jeomembran kullanılarak güçlendirilir." "...". MADDE 16 – (4) Sızıntı sularının toprak ve yeraltı suları için oluşturacağı potansiyel risklerin engellenmesi için düzenli depolama tesislerinde doğal geçirimsizlik tabakasına ilave olarak aşağıda verilen teknik özelliklerde sızıntı suyu toplama ve drenaj sistemi inşa edilir. "...", "ç) Drenaj katmanının içinde drenaj boruları bulunur. Boru çapı, yapılacak kontrol ve temizlemelere imkân verebilecek genişlikte olur. Depo tabanında sızıntı suyuna dayanıklı bir malzemeden imal edilmiş yeterli sayıda drenaj borusu, ana toplayıcılar ve bacalar bulunur. Sızıntı suyu toplama ve drenaj sistemi sızıntı suyu toplama havuzu ile son bulur. Sızıntı suyu toplama havuzu tesisin kurulacağı yerin meteorolojik koşulları ve depolanacak atıkların su içeriği göz önünde bulundurularak herhangi bir olumsuzluğa mahal vermeyecek şekilde tasarlanır ve inşa edilir. d) Depo tabanının boyuna eğimi % 3'den az olamaz."

**4.2.5. 23.01.2010 tarih ve R.G - 27471 Sayılı Madencilik Faaliyetleri İle Bozulan Arazilerin Doğaya Yeniden Kazandırılması Yönetmeliğinin Olaya İlişkin Maddeleri;**

(...). Doğaya yeniden kazandırma yükümlülüğü başlığı altında: MADDE 5 – (1) İşletmeci tarafından çalışmalara başlanmadan önce, bozulacak doğal yapının yeniden düzenlenmesi, doğal dengenin kurulması, alanın yeniden insanların ya da diğer canlıların güvenle yararlanabileceği hâle getirilmesini sağlayacak biçimde doğaya yeniden kazandırma çalışması, söz konusu madencilik faaliyetine ilişkin ÇED sürecinde bir bütün olarak değerlendirilir ve sonuçlandırılır. (2) Bir faaliyet sırasında doğaya yeniden kazandırma çalışması yapılacak alanın kullanım öncesi dönemde çoraklık ve verimsizlik gibi olumsuz nitelikler taşıyor olması, alanda doğaya yeniden kazandırma çalışması yapılmaması için gerekçe olarak gösterilemez. (...).

**4.3. ANAGOLD MADENCİLİK SANAYİ VE TİCARET ANONİM ŞİRKETİ TARAFINDAN YÜRÜTÜLEN MADEN İŞLETME FAALİYETLERİ VE İŞLETME FAZLARININ ÇEVRE, ŞEHİRCİLİK VE İKLİM DEĞİŞİKLİĞİ BAKANLIĞI (ÇŞİB) TARAFINDAN ÇEVRE KANUNU UYGULAMA MEVZUATLARI KAPSAMINDAKİ İZLEME VE DENETİMLERİNİN İNCELENMESİ**

ÇŞİB'nın 24.12.2014 tarih ve 58003700/220.01/20461 sayılı ve "Çöpler Kompleks Madeni Kapasite Artışı "Projesi ÇED Olumlu Karar Konulu Yazısında;
Erzincan İli, İliç İlçesi, Çöpler Köyü Mevkii'nde, Anagold Madencilik Sanayi ve Ticaret A.Ş.



tarafından yapılması planlanan Çöpler Kompleks Madeni Kapasite Artışı projesi ile ilgili olarak Bakanlıklarına Çevrim içi ÇED süreci Yönetim Sisteminden sunulan ÇED Raporunun, inceleme Değerlendirme Komisyonu tarafından incelenerek değerlendirildiği, Çöpler Kompleks Madeni Kapasite Artışı hakkında ÇED Yönetmeliğinin Geçici 1. Maddesi kapsamında 14. maddesi gereğince Bakanlığımıuzca "Çevresel Etki Değerlendirmesi Olumlu" Kararı verilmiş olduğunun, Erzincan Valiliği (Çevre ve Şehircilik İl Müdürlüğü) tarafından kararın halka duyurulması gerektiği, Söz konusu projeye ait Nihai ÇED Raporu ve eklerinde belirtilen hususlar ile 2872 sayılı Çevre Kanununa istinaden yürürlüğe giren yönetmeliklerin ilgili hükümlerine uyulması, mer'i mevzuat uyarınca ilgili kurum/kuruluşlardan gerekli izinlerin alınması ve ÇED Yönetmeliğinin 18. maddesi gereğince yatırımın başlangıç, inşaat dönemine ilişkin izleme raporlarının Bakanlıklarına projede yapılacak Yönetmeliğe tabi değişikliklerin de Bakanlıklarına veya Erzincan Valiliği (Çevre ve Şehircilik İl Müdürlüğü) 'ne iletilmesi gerektiği belirtilmiştir. Kaymaya neden olan Faz 4 ün kapsadığı alan ile Faz 1, 2. 3 yığın liç (Heapleach) alanlarına bu yazı ekindeki 24.12.2014 tarih ve 3723 Sayılı ÇED Olumlu Kararının verildiği tespit edilmiştir

**2016 yılında Global Resource Engineering Ltd. Tarafından Anagold İçin Hazırlanan "Stability Report, Phase 4 Leach Pad Expansion Çöpler Gold Mine" Atık Depolama Tesisi Tasarımı ve Stabilite Raporunun öneriler bölümünde:**

- Anagold, risk değerlendirmeli toleranslarını gözden geçirmeli ve payandalar için sunulan GRE'nin minimum değerlerinin risk profillerini karşılayıp karşılamadığına karar vermesi geerktiği, Anagold, atık kaya nakliyesini değerlendirmeli ve 4. Aşama Doğu ve Batı payandalarına ilave malzeme yerleştirmenin nakliye maliyetinde tasarruf sağlayıp sağlamayacağının belirlemesi, Anagold'un ayrıca, HLF stabilitesini GRE tarafından tavsiye edilen minimum değerlerin üzerine çıkarma avantajına sahip olacak şekilde payandalara yönelik başa baş nakliye maliyetini de dikkate alması gerektiği. Devam eden doğrulama için cevherin mukavemet ve geçirgenlik açısından rutin numune alınmasının ve test edilmesinin gerektiği, Yığındaki kurulu dikey boru piyezometreleri aracılığıyla HLF içindeki serbest yüzeyin doğrulanması ve rutin olarak izlenmesi, GRE'nin tasarımı 1 metreyi varsaydığı, Herhangi bir tutarsızlık kaydedilmeli ve daha ayrıntılı olarak değerlendirilmesi gerektiği, HLF ve payanda performansını sürekli olarak izlemek için Aşama 4'te şev stabilitesi enstrümantasyonunun kurulumu, Yığın hareketini ölçmek için Aşama 1'den 3'e kadar kurulu stabilite enstrümantasyonunun sürekli izlenmesi önerilmiştir.

**ÇŞİB'nın 08.05.2018 tarih ve 79380874-145.09-E.78574 sayılı Yazısında;**
Anagold Madencilik Atık Barajı-1 ve Yığın Liçi Faz 1,2,3 maden atık bertaraf tesisi onayı konulu yazıda, Çöpler atık barajının ve yığın liçi Faz 1-2-3 anlarının Bakanlık teknik personelince yerinde incelendiği ve neticesinde yazı ekinde koordinatları verilen tesisin uygulama projesine uygun olarak inşaa edildiğinin anlaşıldığı belirtilmiştir.

**ÇŞİB'nin 29112018 Tarih ve 79380874-145.09-E.212415 sayılı ve Anagold Yığın Liçi 4. Faz Uygulama Projesi Onayı konulu yazısında;**
17.09.2018 tarihli ve E.160480 sayılı yazı İle Anagold Mad. San. ve Tic. A.Ş.'ye ait yığın liçi 4. faz inşaatına Bakanlıklarınca onaylanan uygulama projesi, hizmet sözleşmesi ve meri mevzuata uygun olarak başlanmasının uygun görüldüğü, Bakanlıkça onaylanan projenin inşaat denetimi ve kontrollüğünün Ore Mineral Sondaj İnşaat Müh. San Tic. Ltd. Şti ile imzalanan sözleşmeye göre



SWORN
TRANSLATION

adı geçen firma tarafından yapılmasının ve "...7..aylık denetim raporlarının Bakanlığa bildirilmesi gerektiği belirtilmiştir.

**ÇŞİB'nin 11.03.2019 Tarih ve 79380874-145.09-E.56883 sayılı ve Anagold Madencilik Maden Atık Depolama Tesisi Onay Belgesi (Çöpler Atık Barajı Faz 1 ve Yığın Liçi Faz 4) konulu yazısında;**
Özet ile Yatırımcı Anagold tarafından Ore Mineral Sondaj İnş. Ltd Şti'ne yaptırılan Çöpler Faz-4 Yığın Liçi Genişletme Projesi, Su Yapıları Denetim Hizmetleri Faaliyet Raporları ve Proje Sonu Nihai Raporunun sunulduğu, Faz 4 projesine uygun olduğu, Atık Barajının İnşaatında her kademe inşaatlarında Bakanlıklarından maden atığı depolama tesisi onay belgesinin alınması gerektiği belirtilmiştir.

**18.02.2019 Tarihli Yatırımcı Anagold tarafından Ore Mineral Sondaj İnş. Ltd Şti'ne yaptırılan Çöpler Faz-4 Yığın Liçi Genişletme Projesi, Su Yapıları Denetim Hizmetleri Faaliyet Raporları ve Proje Sonu Nihai Raporunda (003);**

Özet ile Yatırımcı Anagold Madencilik San. ve Tic. A.Ş. ile 02/05/2018 tarihinde imzalanmış olan ANO-1734 No.lu sözleşme uyarınca, Erzincan İli, İliç ilçesi, Çöpler Köyü sınırlarındaki Çöpler Faz-4 Yığın Liçi Genişleme projesi kapsamında inşa edilmekte olan Liç Sahası inşaatının Çevre Bakanlığı Mevzuatı gereği yapılması gereken denetim hizmetleri, Devlet Su İşleri Genel Müdürlüğü tarafından 067 No.lu Su Yapıları Yetkili Denetim Firması izin belgesi ile yetkilendirilmiş olan "Ore Mineral Sondaj İnşaat Mühendislik Sanayi Ticaret Limited Şirketi" tarafından yürütüldüğü, Uygulama Projesi Raporu'na göre; Çöpler Yığın Liçi Tesisi, yapılan analizler doğrultusunda II. Sınıf Tehlikesiz Atık depolanağı, Atıkların Düzenli Depolanmasına Dair Yönetmeliğe (ADDDY) göre II. Sınıf Düzenli Depolama Tesisi şartlarını sağlayacak şekilde tasarlandığı ve tasarımına uygun olarak inşa edildiği, sonuç olarak İşbu raporun, Faz-4 Yığın Liçi Genişletme inşaatında imalatı tamamlanan Stage 3A ve Stage 3B alanının denetim raporlarına yönelik olarak (üç) nüsha halinde hazırlandığı belirtilmektedir.

**Yatırımcı Anagold Tarafından GRE Engineering Ltd' ye 01.08.2016 Tarihinde "Stability Report, Phase 4 Leach Pad Expansion Çöpler Gold Mine" raporunun hazırlatıldığı,**
Raporda özet ile yapılan stabilite ve teknik sonuçları ve önerileri kapsamaktadır. Rapor sonucundaki öneriler; Yapılan analizlerin sonuçlarına dayanarak GRE şu hususları önermektedir; -Anagold, risk değerlendirmeli toleranslarını gözden geçirmeli ve payandalar için sunulan GRE'nin minimum değerlerinin risk profillerini karşılayıp karşılamadığına karar vermesi gerektiği. -Anagold, atık/dolgu kaya nakliyesini değerlendirmeli ve 4. Aşama Doğu ve Batı payandalarına ilave malzeme yerleştirmenin nakliye maliyetinde tasarruf sağlayıp sağlamayacağını belirlemesi gerektiği, Anagold ayrıca, HLF (yığın liç tesisisnin) stabilitesini GRE tarafından önerilen minimum değerlerin üzerine çıkarma avantajına sahip olacak şekilde payandalara yönelik başabaş nakliye maliyetini de dikkate alması gerektiği, -Devam eden doğrulama için cevherden rutin numune alınması ve mukavemet ve geçirgenlik açısından test edilmesi gerektiği. -Yığında kurulu dikey boru piyezometreleri aracılığıyla HLF içindeki serbest yüzeyin doğrulanması ve rutin olarak izlenmesinin yapılması, GRE'nin tasarımı 1 metreyi varsaydığı, -Herhangi bir tutarsızlık kaydedilmeli ve daha ayrıntılı olarak değerlendirilmesi gerektiği, HLF ve payanda performansını sürekli olarak izlemek için Aşama 4'te şev stabilitesi



SWORN
TRANSLATION

enstrümantasyonunun kurulumunun sağlanması, Yığın hareketini ölçmek için Aşama 1'den 3'e kadar kurulu stabilite enstrümantasyonunun (ölçüm yapılarak kontrolünün sağlanması) sürekli izlenmesi önerilmiştir.

**Yatırımcı Anagold Tarafından GRE Engineering Ltd' ye 27.03.2020 Tarihinde Detail Design Report Phase 4b Leach Pad Expansion Report" raporunun hazırlatıldığı, Raporda özet ile**
• Yığındaki serbest sıvı seviyesinin yastık astarının 1 metre üzerinde olduğu varsayımı sadece stabilite analizi için değil aynı zamanda işletme için de bir gereklilik olduğunu, Yığınların düzenli sulanması için uygun sulamanın sürdürülmesi ve sıvı seviyelerinin izlenmesinin önerildiği, yeraltı su seviyesinin ve aşırı boşluk suyu basıncı gelişeceği, Yığın ucuna yerleştirilen yanal piyezometre borularından alınan okumalar sürekli olarak izlenmesi ve kaydedilmesi, • Burada sunulan MDE analizi, payandanın yanı sıra yeniden sınıflandırma ve istiflemeyi içerebilecek nihai kapatma koşullarını içermediği, Kapatma koşulu sağlandıktan sonra kapatma koşulunun stabilitesi bağımsız olarak ele alınması gerekliliği önerilmiştir.

**Yatırımcı Anagold Tarafından INR Mühendislik Müşavirlik A.Ş. ye 27.04.2020 Tarihinde Yaptırılan "Çöpler Altın Madeni Faz-4b Yığın Liç Genişleme Proje (Tasarım) Raporu"**
INR Mühendislik Müşavirlik A.Ş.tarafından hazırlanan Tasarım Raporunda özet ile: Anagold Madenciliğin, Erzincan İli, İliç İlçesi, Çöpler köyü mevkiinde açık ocak yöntemi ile altın madeni işletmekte olduğu, Sahadaki cevherin özelliklerine göre, altın üretimi yığın liç yöntemi kullanılarak gerçekleştirildiği, mevcut durumda yaklaşık 34 milyon ton kapasiteye sahip, 3 fazdan oluşan yığın liç tesisinin yer aldığını, Mevcut liç yığının alt kaplama sisteminden maksimum yüksekliği 100 metre olduğunu, Mevcut sistemde liç işleminin 5 hücrede gerçekleşmekte olduğu, Faz-4 genişlemesiyle birlikte 6 ve 7 nolu hücreler oluşturularak ve liç kapasitesinin 58 milyon tona çıkarılacağı, Mevcut sistemde Faz-1 liç yığının topuğunda proses ve taşkın havuzlarından oluşan toplama havuzları 2012 yılında inşa edildiği, Anagold, proses ihtiyaçlarını karşılamak adına taşkın havuzunu ikincil proses havuzuna dönüştüreceği, yeni taşkın havuzunu 2014 yılında hizmete aldığını, Faz-4'e ait projelerin 29.11.2018 tarihinde Çevre ve Şehircilik Bakanlığı tarafından onaylandığını, Artan madencilik faaliyetleri ile Anagold Madencilik (Anagold) kapasite artırımına karar verildiği ve Faz4-B genişlemesine ihtiyaç duyulduğu, Bu kapsamda projeler alanında Uzman Amerikan kökenli tasarım firması (GRE,Global Resources Engineering) ve INR Mühendislik (INR) tarafından ortak olarak hazırlandığını, INR, GRE tarafından yapılan tasarımın gözden geçirerek yönetmelik ve mühendislik esaslarına uygunluğunu kontrol ederek Bakanlığa sunumunu gerçekleştirildiğini, Faz4b genişlemesi ile iki aşamada yapılacağı, Aşama-1'de Faz-4 güneye doğru yamaç boyunca genişleme yapılacağı, Aşama-2'de ise Faz-4 batıda bulunan mevcut pasa sahasına doğru genişleyeceğini, Bu raporun Faz-4 YLT genişlemesi ile ilgili detay mühendislik çalışmalarını içerdiğini, Tasarım çalışmaları ve mühendislik analizlerinin raporun temelini oluşturduğunu, Yapılan çalışmalara ait ana başlıkların maddeler halinde verildiği, Bu maddelerin, -Proje ile ilgili mevcut verilerin değerlendirilmesini, -Mevcut YLT depolanan liç malzemeleri üzerinde jeoteknik çalışmaların gerçekleştirilmesini, -Saha ziyaretleri yapılarak proje kriterleri ve genel ihtiyaçların belirlenmesini, -Geoteknik araştırmaların ve kil sahasının tespit edilmesini, Kaplama sisteminde kullanılan membran GCL üzerinde jeoteknik çalışmaların gerçekleştirilmesini, -Tasarım kriterleri ve tasarım esaslarının belirlenmesini, Saha ile ilgili jeolojik, topografik, sismik, iklimsel ve jeoteknik koşulların değerlendirilmesini, İklimsel verilerin işlenmesini, Soyutlandırma, genel yerleşim ve saha düzenleme çalışmalarının gerçekleştirilmesini,

87



SWORN
TRANSLATION

Detay tasarım unsurları olan, hücre bölümlemeleri, sedde, kaplama sistemleri ve drenaj ağlarının geliştirilmesini, -Maksimum cevher yığın konfigürasyonu, depolama planının hazırlanmasını, -Faz4-B yığın geometrisine göre stabilite analizlerinin gerçekleştirilmesini, Metrajların belirlenmesini, Teknik Şartname Proje çizimlerinin yapılmasını kapsadığı, Yetki ve Görevlendirme başlığı altında; Çöpler Altın Madeni Faz-4B Yığın Liç Genişleme Projesi Mühendislik Hizmetleri işinin Anagold ile INR arasında imzalanan sözleşme ile INR'ye verildiğini, Bu raporun anılan sözleşme kapsamında hazırlandığını, Çöpler Faz-4B Yığın Liç Tesisi genişlemesi işi tasarımı işveren tarafından görevlendirilen tasarım ekibi tarafından yapıldığını, Tasarım ekibinin INR, GRE ve Hidrodizayn (SYDF)'dan oluştuğunu, Sahada düşük tenörlü altın madenlerinde cevherin kayaçtan ayrılmasını sağlamak amacıyla uygulanması tercih edilen yöntem yığın liç metodu olduğu, Bu yöntem ile kırıcılar ile tane boyu düşürülen cevher liç geçirimsizliği sağlanmış sahasına tabakalar halinde serildiği, Yığına gönderilen malzemenin çözelti ile homojen bir şekilde temas edebilmesi için gerekli olduğu durumlarda cevhere aglomerasyon yöntemi ile homojen bir yapı kazandırılmakta olduğu, Bu aşama, liç malzemesinin jeoteknik özellikleri yığın stabilitesi açısından oldukça önemli olduğunu, Yığın tamamlandıktan sonra çözücü (solüsyon), pompalar yardımıyla yığının üst kısmına sulama veya yağmurlama biçiminde verildiğini, yüksüz (mineral içermeyen - barren) ve yüklü (mineral içeren - pregnant) çözeltiler drenaj yoluyla toplandığı, Yüklü çözelti içindeki metal alındığı, Yüksüz çözelti ise pompalar yardımıyla yığının üzerine tekrar basıldığı, Serilen tabaka için besleme tamamlandıktan sonra ikinci aşama tabakanın serildiği ve çözelti ile besleme tekrarlandığı, Geometrik olarak temelde 3 çeşit yığın liç tesisi tipi bulunduğunu, -Ped tipi yığın liç tesisi "bu tipte cevher geçirimsizliği sağlanmış, görece yatay geniş bir ped üzerine istiflenmenin yapıldığı, Bu nedenle, geniş ve düz alana gerek duyulduğu, Borularla toplanan çözeltilerin havuzlara aktarıldığını, İşletme tamamlandığında yerinde kapatıldığını", -Vadi tipi yığın Liç tesisi "Topografyanın düz olmadığı yerlerde, vadi içlerinde baraj benzeri yapılan liç tesisleri olduğu, Eğimli topografyadan dolayı stabilitenin sağlanabilmesi için vadi sonunda sedde yapılması gerekebileceği, bu tipte yüklü çözelti havuzu yapılmadan, sedde içinde biriken çözeltinin alınması mümkün olduğunun, İşletme sonunda atık depolama tesisleri gibi kapatıldığını, Aç-kapa yığın liç tesisi, daha küçük ped tipi yığın liç tesisinde işlenen cevher metali alındıktan sonra yıkandığını, Ardından bu yığın ped yüzeyinden kaldırılarak yapılacak kuru tip atık depolama tesisine istiflendiği, Ped bir sonraki işletmeye alındığı, Bu tipte ilk yatırımın maliyetinin düşük olduğu", Çöpler YLT ped tipi bir tesis Olduğunu, Olabildiğince düz ve kazı/dolgu işleriyle düzenlenecek alanda taban geçirimsizliği sağlandıktan sonra yığın tabakalar halinde istiflenmenin yapıldığını, Çöpler mevcut yığın liç tesisi, Çöpler Deresi doğal drenaj havzası üzerine Kuzey-kuzeybatı yönelimli olarak kurulu olduğu, Faz-4 genişlemesinin güney yönünde yaklaşık %20-%55 doğal eğimlere sahip yamaca ve güneybatı pasa döküm sahası üzerine doğru gerçekleştirileceği, Sonuçlar bölümünde; Proje sahasının, Erzincan ilinin 120 km batısında, İliç ilçesinin 900 m güneybatısında Çöpler köyü civarında bulunduğunu, Proje için seçilen altın üretim yönteminin yığın liç olduğu, Bu yöntemde; açık ocaktan çıkacak cevherin boyutlandırılması sonrası, geçirimsizliği sağlanmış bir alanda yığınlar halinde istiflenmesinin söz konusu olduğu, İstiflenen cevherin bünyesindeki altın, hazırlanan çözeltinin yığın üzerine homojen bir şekilde bırakılması ile alındığını, Süzülerek yığın tabanına inen altınlı çözeltinin; tabanda tahsis edilen drenaj sistemi ile toplandığı, ardından ham altın olarak çözeltiden ayrıldığı, Kalan çözeltinin sisteme geri beslenerek prosesin tekrarlandığını, Proje sahasında hali hazırda 1-2-3 ve 4a fazlarından oluşan yığın liç tesisinin yer aldığını, Madenin

88



SWORN
TRANSLATION

ihtiyaçları doğrultusunda 4. faz yığın alanının tasarlandığını ve projelerinin ÇŞB tarafından onaylandığını, 4. fazda toplam 58 milyon ton cevherin depolandığını, Yeni yapılacak Faz 4B ile liç kapasitesi 64 milyon tona çıkacağını, Liç tabanında Munzur kireçtaşlarının temel kayasını oluşturduğunu, Bu kesimlerde yapılacak kazılarda patlatma ihtiyacı doğacağı, Nihai yığın yüksekliğinin 1414 m seviyesinde olacağı, 8 metre yüksekliğinde 35 tabaka serim gerçekleştirileceği, Genel yığın açısının 2.5Y 1D olarak belirlendiğini, Yığın tabanının oturduğu alanın güneydoğu kesiminde pasa dolgusu yer aldığını, Taban düzenlemesinde bu malzemenin sıyrılacağı, Saha fizibilite ve uygulama projesi çalışmaları kapsamında jeolojik jeoteknik araştırmaların yapıldığını, Yapılan araştırmalarda, sondaj ve arazi deneyleri gerçekleştirildiği, elde edilen veriler bu çalışma için temel teşkil ettiğini, Sahada yapılan maden araştırma ve jeoteknik çalışmalar neticesinde sahadaki hakim jeolojik birimlerin kireçtaşları olduğu, Kireçtaşı, çoğunlukla zayıf kaya kalitesine sahip olduğu, Sahada yapılan sondajlarda yeraltısuyu gözleminin yapılmadığını, Proje sahası Türkiye Deprem Araştırma Dairesi Depremsellik haritasına göre 2. Derece deprem bölgesinde yer aldığı, Saha için işletme aşaması için (OBE) yatay deprem ivme katsayısı 0,15 g, uzun dönem duraylılık için ise 0,27 g (MDE) önerildiği, Stabilite analizlerinde sınır güvenlik katsayıları işletme aşaması için Statik ve Sismik koşullar için sırasıyla 1.5 ve 1,2 olarak seçildiğini, Sınır güvenlik katsayıları işletme sonu için ise sismik ve statik koşullar için sırasıyla 1.5 ve 1.0 olarak düşünüldüğünü, Taşkın kanallarında hava payının 0.26 m olarak hesaplandığı, Proje için tasarlanan yapıların yüzeysel sular ile temasa geçmesini engellemek için 1 adet kuşaklama kanalının daha önce projelendirilerek inşa edildiğini, Böylece saha genel su yönetim planına uygun bir şekilde diğer kanallar ile bağlantısının sağlandığını ve sabırlı deresine deşarj edildiğini, YLT için en kritik sistemlerden biri olan kaplama sistemi geomembran, GCL veya kil tabakalarından oluştuğunu, 50 cm kalınlığında kil ve geomembran serilerek kaplama sistemi oluşturulacağını, Kaplama sisteminin üzerinde üretimin en önemli unsuru olan üst drenaj ve toplama sistemi tasarlandığını, Bu sistem de üçüncül, ikincil ve ana toplama boruları ve minimum 0.60 m kalınlığında bu boruları koruyan ve filtre görevi göre filtre tabakası yığın liç işlemi başlamadan önce tabana serileceğini, Çözelti toplama havuzları (proses havuzları) daha önceki aşamalarda projelendirilerek inşa edildiği, Tesisin olası taşkınları karşılayabilmesi daha önceki yıllarda taşkın havuzunun tasarlandığı ve inşa edildiği, Tesiste üretimin tamamlanması ardından; gerekli geometrik düzenlemeler sonrasında Maden Atıkları Yönetmeliğine uygun olarak kapatılacağı, Kapama aşamasında tesisin uzun dönem duraylılığı dikkate alınarak mühendislik hesaplarının tekrar gözden geçirilmesi gerektiği, Proje dahilin de planlanan yapılar için güvenli şev açıları stabilite analizleri neticesinde belirlendiğini, Yapılan analizlerde işletme aşaması için aranan güvenlik katsayıları sağlandığı, Saha için hidrolik analizlerin yapıldığı ve kanal boyutlandırmalarının 100 ve 500 yıllık taşkın debileri esas alınarak gerçekleştirildiği, Raaporun Öneriler; Çöpler altın madeni hali bölümünde ise hazırda 1-2-3 ve 4a fazlarından oluşan bir yığın liç tesisine sahip bir işletme olduğu, Faz-4b liç genişlemesi ile kapasite artışı gerçekleşeceği, Faz-4(a ve b) yığın geometrik alternatiflerinin, işletmedeki mevcut altyapı, topografik koşullar ve diğer tesisler ile entegrasyon kısıtlamaları nedeniyle kısıtlı olduğu, Bu nedenle yığın geometrisi, projelendirilen destek yapıları ile işletme aşaması için (kısa dönem) duraylı ancak uzun dönem (kapama sonrası) için yeniden gözden geçirilmesi gereken bir konu olduğu, İşletmenin tamamlanması ardından uzun dönemde duraylı kapama projelerinin hazırlanması önerildiği, Kısıtlamalar başlığı altında; Sismik risk analizi verileri USGS ve B.Ü. Kandilli Rasathanesi ve bölge için yapılmış bilimsel çalışmalardan alındığı, Fay atımı sebepli yüzey veya temel

89



deplasmanlarının belirlenmesi veya sahayı ilgilendiren ölçekte bu rapor kapsamında tartışılmamış olası mevcut yeni aktif fayların belirlenmesi ve karakterize edilmesi ayrıntılı arazi çalışması gerektirdiği ve bu çalışma kapsamına dahil edilmediği, Hidrolojik veriler sahaya en yakın gözlem istasyonlarından, sahada kurulu istasyonlardan ve daha önceki çalışmalardan temin edildiği, Hesaplamalarda girdi olarak kullanılan veriler gerçek akım değerlerinden farklılık gösterebileceği, Raporda sunulan jeolojik bilgiler kavramsal tasarım aşamasında yapılan jeoteknik araştırmaya ve genel literatür verilerine dayandığını, Sahada yapılan sondajlar, arazi deneyleri, loğlama ve laboratuvar deneyleri İşveren tarafından yetkilendirilmiş 3. şahıs ve/veya firmalar tarafından gerçekleştirildiğini, Rapor kapsamında sunulan jeolojik sınırlar ve jeolojik ilişkiler, jeomekanik parametreler ve kinematik analizler, jeolojik-jeoteknik araştırmalara bağlı mühendislik yorumları elde edilen bu sınırlı verilere dayandığı tasarım raporunda belirtilmektedir.

**Anagold Madencilik tarafından Hidrodizayn Mühendislik ve Müşavirlik İnş. A.Ş.'ne yaptırılan Çöpler Yığın Liç Tesisi Genişleme Projesi Faz-4b Su Yapıları Denetim Hizmetleri Denetim Raporu No:8 - 01/1/12/2020- 31/12/2020;**
Bu raporda, Yığın Liç Tesisi (YLT) Genişleme Projesi Faz-4B kapsamında yapılmış olan inşaat ve imalat işlerinin ana iş kalemlerinin 31/12/2020 tarihi itibarıyla fiziki gerçekleşme oranları, proje genelindeki ağırlıklarının değerlendirilerek, YLT inşaatında 01/12/2020 - 31/12/2020 tarihleri arasında yapılan denetimler ve Yatırımcı'nın ölçme grubu tarafından tedarik edilen metrajlar ışığında, Aylık Denetim Raporunu kapsamaktadır.

**ÇŞİB'nin 07.10.2021 Tarih ve E-20289998-220.01-1917939 sayılı ve 847, 49729 ve 20067313 Ruhsat Nolu Çöpler Kompleks Madeni 2. Kapasite Artışı ve Flotasyon Tesisi Projesi ÇED Olumlu Kararı konulu yazısında;**
Erzincan İli, İliç İlçesi, Çöpler Mevkii'nde, Anagold Madencilik San. ve Tic. A.Ş. tarafından yapılması planlanan 847, 49729 ve 20067313 Ruhsat Nolu Çöpler Kompleks Madeni 2. Kapasite Artışı ve Flotasyon Tesisi projesi ile ilgili olarak Bakanlığımıza Çevrimiçi ÇED süreci Yönetim Sisteminden sunulan ÇED Raporunun, İnceleme Değerlendirme Komisyonu tarafından incelenerek değerlendirildiği, 847, 49729 ve 20067313 Ruhsat Nolu Çöpler Kompleks Madeni 2. Kapasite Artışı ve Flotasyon Tesisi hakkında ÇED Yönetmeliğinin 14.maddesi gereğince Bakanlıklarınca "Çevresel Etki Değerlendirmesi Olumlu" Kararı verildiği, Söz konusu projeye ait Nihai ÇED Raporu ve eklerinde belirtilen hususlar ile 2872 sayılı Çevre Kanununa istinaden yürürlüğe giren yönetmeliklerin ilgili hükümlerine uyulması, mer'i mevzuat uyarınca ilgili kurum/kuruluşlardan gerekli izinlerin alınması, projede yapılacak Yönetmeliğe tabi değişikliklerin de Bakanlıklarına veya Erzincan Valiliği (Çevre ve Şehircilik İl Müdürlüğü) 'ne iletilmesi gerektiği, bahse konu proje ile ilgili olarak proje sahibi tarafından, 25.11.2014 tarih ve 29186 sayılı Resmi Gazete'de yayımlanan ÇED Yönetmeliği (Değişik:RG-08/07/2019-30825)"nin 18.Maddesi 5.bendinde yer alan hüküm kapsamında, ÇED Olumlu Karar tarihinden itibaren 3 (üç) aylık periyotlarda yatırımın; başlangıç, inşaat ve işletme sonrasına ilişkin kaydedilen gelişmeleri içeren Proje İlerleme Raporu'nun Bakanlıklarına sunulması gerektiği belirtilmiştir.
07.10.2021 tarih ve 6421 Karar Sayı ile ÇED Olumlu Belgesi Verilmiştir. Erzincan ili iliç ilçesi çöpler mevkiinde Anagold Madencilik San. Ve Tic. A.Ş. tarafından yapılması planlanan 847, 49729 ve 20067313 ruhsat nolu çöpler kompleks madeni 2. Kapasite artışı ve flotasyon tesisi kapasite ve projesi konum bilgileri aşağıda verilmiştir.



SWORN
TRANSLATION

Proje Alanı ve Kapasite Bilgileri

| Üniteler | Mevcut | 2. Kapasite Artışı İle Planlanan | Nihai Durum |
|---|---|---|---|
| Oksitli cevher üretimi (Milyon ton) | 77,4 | 7,9 | 85,3 |
| Sülfidli cevher üretimi (Milyon ton) | 31,7 | 31,13 | 31,13 |
| Pasa (Milyon ton) | 273 | 147 | 420 |
| Sülfidli cevher zenginleştirme tesisi (ton/gün) | 6000 | 3000 | 9000 |
| Flotasyon tesisi (ton/saat) | - | 150 | 150 |
| Mobil kırıcılar (ton/saat) | 1 adet 400 ton saat | 1 adet 160 ton saat 2 adet 200 ton saat | 4 adet mobil kırıcı |
| YLS kapasitesi (Milyon ton) | 58 | 27,3 | 85,3 |
| ADT-1 kapasitesi (Milyon ton) | 36,7 | 15,7 | 52,4 |
| ADT-2 kapasitesi (Milyon ton) – kavramsal | 21,0 planlanmış | 13,7 | 13,7 |
| Kül sahası | - | sicil 76817 için 300.000 ton yıl sicil 76818 için 650.000 ton yıl | |
| Çalışma alanı büyüklüğü (ha) | 1.696 | 60,52 | 1.746,52 |



07.10.2021 tarih ve 6421 Karar Sayı ile ÇED Olumlu kararı verilen projenin kapasite ve konum bilgileri



91

SWORN
TRANSLATION

**Yatırımcı Anagold Tarafından Ore Mineral Sondaj İnş. Ltd Şti'ne Yaptırılan 07.07.2022 Tarihli "Çöpler Altın Madeni Yığın Liçi Sahası Faz 4a Doğu Alanı Rehabilitasyon Çalışmaları" Raporunda;**



Yatırımcı ANAGOLD Madencilik San. ve Tic.A.Ş. ile 30.06.2021 tarihinde imzalanan ANO-3025 numaralı sözleşme uyarınca, Erzincan ili, İliç ilçesi, Çöpler Köyü sınırlarındaki Çöpler Sülfit Projesi kapsamında inşa edilmekte olan Atık Depolama Tesisi (ADT) Faz-4 ve Yığın Liçi Tesisi (YLT) Genişleme Projesi Faz-5 inşaatlarının T.C. Çevre, Şehircilik ve İklim Değişikliği Bakanlığı Mevzuatı gereği yapılması gereken denetim hizmetleri, D.S.İ. Genel Müdürlüğü tarafından 067 Numaralı Su Yapıları Yetkili Denetim Firması izin belgesi ile yetkilendirilmiş olan "ORE Mineral Son.İnş.Müh.San.Tic.Ltd.Şti." tarafından yürütüldüğü, T.C. Çevre, Şehircilik Ve İklim Değişikliği Bakanlığı 28.06.2022 tarihinde, ANAGOLD Çöpler Altın Madeni Yığın Liçi Tesisinde 21.06.2022 gününü 22.06.2022 gününe bağlayan gece yarısı, Yığın Liçi Tesisi doğu alanında başlayan siyanürlü solüsyon kaçağı sebebiyle, ANAGOLD Çöpler Altın Madeni tüm çalışma faaliyetlerini, rehabilitasyon çalışmaları Bakanlık tarafından onaylanıncaya kadar durdurulduğu, T.C. Çevre, Şehircilik Ve İklim Değişikliği Bakanlığı, Çevre Yönetimi Genel Müdürlüğü'nün, 01.07.2022 tarihli ve E-79380874-145.09-4039595 sayılı yazısında, Yığın Liçi Sahasının doğu alanında meydana gelen siyanürlü solüsyon kaçağı sebebiyle yapılan rehabilitasyon çalışmalarını içeren raporun, S.Y.D.F. ORE Mineral Sondaj İnşaat Mühendislik San.Tic.Ltd.Şti. tarafından hazırlanmasının istendiği, Yığı Liçi Sahası Faz 4A doğu alanında siyanürlü solüsyon taşıyan basınçlı boruda meydana gelen kaçağın sebebinin, 06.07.2022 tarihinde T.C. Çevre, Şehircilik Ve İklim Değişikliği Bakanlığı heyeti ve T.C. Erzincan Valiliği Çevre, Şehircilik Ve İklim Değişikliği İl Müdürlüğü heyeti ile birlikte yapılan arazi incelemesinde, Yatırımcı ANAGOLD firması tarafından vananın takılı olduğu HDPE T parçasının yarılması sonucu olduğunun belirtildiği, Bu nedenle siyanürlü solüsyon taşıyan basınçlı boruda meydana gelen patlamaya, Yığın Liçi Sahası batı alanındaki Faz-4B Aşama-1 ve Aşama-2'ce meydana gelen kaymaya sebep olmamadığı, Yığın Liçi Sahasında yapılan geomembran döşenecek yüzeylerin kontrolları, geosentetik kil astar, geomembran ve geokompozit imalatlarına ait tüm kalite güvence işleri Yatırımcı Müşaviri GOLDER Associates Inc. Ltd. Şti. tarafından yapılmakta olduğunu, S.Y.D.F. ORE Mineral,

92



SWORN
TRANSLATION

28.06.2022 günü saat 16:24'de Yatırımcı ANAGOLD tarafından aranarak, siyanürlü solüsyon kaçağının olduğu Yığın Liçi Tesisi doğu tarafına çağırıldığını, ANAGOLD yetkilisi Bakanlık ile yapılan görüşme sonucunda, S.Y.D.F. ORE Mineral'in ANAGOLD'un doğu ve batı alanlarında yapacağı rehabilitasyon çalışmalarını izlemesi ve çalışmalarla ilgili olarak Bakanlığa sunulmak üzere rapor hazırlaması istendiğinin belirtildiği, Patlayan borudan çıkan siyanürlü solüsyon, Fotoğraf 3'de yeşil ile gösterilen şev yüzeylerinden akarak, doğu alanı ulaşım yoluna inmiş ve kırmızı ile gösterilen eğimli yoldan da aşağıya doğru akarak, maden sahası dışına çıktığı, (Fotoğraf 3, Anagold firmasından alındığı).



Fotoğraf 3 Siyanürlü Solüsyon Kaçağının İnindiği Yol



Fotoğraf 32 Havuzun Doğu Alanındaki Konumu

Sonuç olarak; T.C. Çevre, Şehircilik Ve İklim Değişikliği Bakanlığı tarafından 28.06.2022 tarihinde, Anagold Çöpler Altın Madeni Yığın Liçi Tesisinde 21.06.2022 gününü 22.06.2022 gününe bağlayan gece yarısı, yığın liçi tesisi doğu tarafında başlayan siyanürlü solüsyon kaçağı sebebiyle, Anagold Çöpler Altın Madeni tüm çalışma faaliyetlerini, rehabilitasyon imalatlarının

93



SWORN
TRANSLATION

Bakanlık tarafından onaylanmasına kadar durdurulduğu, Bu kapsamda yapılan rehabilitasyon çalışmalarına 29.06.2022 günü başlandığı ve 07.07.2022 taihinde tamamlandığı, Rehabilitasyon çalışmalarının, Yatırımcı Anagold tarafından tasarlanmış ve inşaat bölümü tarafından organize edildiğini, S.Y.D.F. ORE Mineral, arazide yapılan çalışmaları takip ettiğini, Rehabilitasyon kapsamında yapılan çalışmalarda S.Y.D.F. ORE Mineral' çalışmaları takip ve izleme faaliyetinde bulunduğunu, Bu kapsamda çalışan firmaları; 1) ÇİFTAY firması, kaba inşaat (kazı, dolgu, toprak) işlerini yaptığı, 2) YESTİ firması, ince inşaat (hasarlı geomembran ve geotekstil kil astar işleri, yeni geotekstil kil astarın yerine yerleştirilmesi, yeni geomembranın yerine yerleştirilmesi, yeni geomembranın kaynaklarının yapılması, eski geomembran üzerinde yama yapılması, yapılan tüm kaynak ve yamaların testlerinin yapılması) işlerini yaptığı, 3) NURAL firması, kaba inşaat işlerinin makina ile yapılan kısımları dışındaki inşaat (kürek ile hassas kazı yapılması, hasarlı malzemelerin sökülmesi ve araçlara yüklenmesi) işlerini yaptığı, 4) GOLDER firması, Yatırımcı Müşaviri ve kalite kontrol firması olarak, her türlü inşaat imalat işlerine onay verilmesi (toprak işleri malzeme onay, dolgu sıkışma ve, geosentetik kil astar öncesi yüzey kabul, geosentetik kil astar ve geomembran, ve deneme ve onay testlerinin yapılması) işlerini denetlediği, 5) SENSOR firması rehabilitasyon kapsamında, geomebran kaynak ve yama işlerine ait MIT testi ile kontrol işlerini yaptığı, Rehabilitasyon işlemlerinde; 1) Toplam 148,80 metrelik şedde rehabilitasyonu yapıldığı, 2) Gelecekte olası kaçaklara karşı yol güzergahı değiştirilmiş ve kaçağın maden sahası dışına çıkmasının engellendiği, 3) Yüzey suları toplama havuzu, olası siyanürlü solüsyon kaçağı için de görev yapabileceği, Alt kotlarda inşatı yapılan bu havuz ile ilgili bilgiler geçmiş bölümlerde verildiği, 4) Yığın Liçi üzerinde bulunan solüsyon hatlarında sensörlü kesici vanalar monte edildiği, İşbu rapor, 29.06.2022 tarihinde başlayıp 07.07.2022 tarihinde biten, Yığın Liçi Tesisi Doğu Tarafı Rehabilitasyon çalışmalarına ait yapılan işleri kapsadığı, Rapor ve eklerinin yatırımcı ANAGOLD firmasından ve GOLDER firmasından tedarik edilen belgeleri kapsamakta olduğu belirtilmektedir.

**Yatırımcı Anagold Tarafından Ore Mineral Sondaj İnş. Ltd Şti'ne Yaptırılan 02.08.2022 Tarihli "Çöpler YLT Faz-4B Aşama-1 ve Aşama-2 Batı Alanı Rehabilitasyon Çalışmaları" Raporunda;**
07.07.2022 Tarihli "Çöpler Altın Madeni Yığın Liçi Sahası Faz 4a Doğu Alanı Rehabilitasyon Çalışmaları" ile bağlantılı olarak Yığın liçi sahası batı alanında, siyanürlü solüsyon yüklü cevherli malzemenin yenilmesi sonucunda, siyanürlü solüsyon yüklü toplayıcı boruların, geomembran ve geosentetik kil astarların parçalandığı tespit edildiği, Bu nedenle yenilmenin olduğu en üst noktadan başlayarak, siyanürlü solüsyon yüklü cevherli malzeme yığın liçi sahasında başka bölgelere taşındığı, Bu taşıma işlemi, parçalanan geomembran, geosentetik kil astar ve toplayıcı boruların yenilenmesi amacıyla yapıldığı, Yığın liçi sahasında meydana gelen, rehabilitasyon çalışmalarının başlamasına sebep olan yenilmenin 27.03.2022 tarihinde meydana geldiği, Fotoğraf 3'de yenilme sonrası durumun görüldüğü.

94





Fotoğraf 3 Yığın Liçi Sahası Faz-4B Aşama-1 Yenilme Bölgesi (28.03.2022)

Sonuç olarak; T.C. Çevre, Şehircilik Ve İklim Değişikliği Bakanlığı tarafından 28.06.2022 tarihinde, Anagold Çöpler Altın Madeni Yığın Liçi Tesisinde 21.06.2022 gününü 22.06.2022 gününe bağlayan gece yarısı, Yığın Liçi Tesisi Doğu Alanı Faz-4A'da başlayan solüsyon döküntüsü sebebiyle, Anagold Çöpler Altın Madeni tüm çalışma faaliyetlerini, rehabilitasyon çalışmalarının Bakanlık onaylayıncaya kadar durdurulduğu, Bu kapsamda yapılan, Yığın Liçi Tesisi Batı Alanı Faz-4B Aşama-2 rehabilitasyon çalışmalarına 29.06.2022 günü başlandığı ve 02.08.2022 tarihinde tamamlandığı, Rehabilitasyon çalışmaları, Yatırımcı Anagold inşaat bölümü tarafından tasarlandığı ve organize edildiği, Rehabilitasyon kapsamında yapılan çalışmalarda, S.Y.D.F. ORE Mineral firması çalışmaları kontrol ve takip ettiği, Ayrıca, yapılan çalışmalar hakkında rapor hazırladığı, bu kapsamda çalışan firmaların; 1) ÇİFTAY firması, kaba inşaat (kazı, dolgu, toprak) işlerini yapmaktadır. 2) MÜREKKEPÇİLER firması, tırnaksız ekskavatör kovasıyla kaba inşaat (kazı) işlerini yaptığı, 3) YESTİ firması, ince inşaat (hasarlı geomembran ve geotekstil kil astar işleri, yeni geotekstil kil astarın yerine yerleştirilmesi, yeni geomembranın yerine yerleştirilmesi, yeni geomembranın kaynaklarının yapılması, eski geomembran üzerinde yama yapılması, yapılan tüm kaynak ve yamaların testlerinin yapılması) işlerini yaptığı, 4) NURAL firması, kaba inşaat işlerinin makina ile yapılan kısımları dışındaki inşaat (kürek ile hassas kazı yapılması, hasarlı malzemelerin sökülmesi ve araçlara yüklenmesi) işlerini yaptığı, 5) GOLDER firması, Yatırımcı Müşaviri ve kalite kontrol firması olarak, her türlü inşaat imalat işlerine onay verilmesi (toprak işleri malzeme onay, dolgu sıkışma ve, geosentetik kil astar öncesi yüzey kabul, geosentetik kil astar ve geomembran, ve deneme ve onay testlerinin yapılması) işlerini denetlediği, 6) SENSOR firması rehabilitasyon kapsamında, geomembran kaynak ve yama işlerine ait MIT testi ile kontrol işlerini yaptığı, Rehabilitasyon işlemlerinde; Yığın Liçi Sahası Faz-4B Aşama-1'de kayan cevherli malzemenin Yığın Liçi Sahasında başka bölgelere taşındığı, Yığın Liçi Sahası Faz-4B Aşama-1'de meydana gelen yenilme sebebiyle, Faz-4B Aşama-2'de +1.289,50, 1.305,50 ve 1.332,50 kotları arasında kalan bölgedeki hasar gören geotekstil kil astar ve geomembranların yeni malzemelerle değiştirildiği, +1.305,50 kotunda bulunan kilitleme kanalı dolgusu, uygun dolgu malzemesi ile kademeli olarak dolgu yapılıp sıkıştırıldığı, Çöpler Altın Madeni Yığın Liçi Sahası Faz-4B Aşama-1 ve Aşama-2 Batı Alanı Rehabilitasyon Çalışmaları kapsamında kalite güvence raporlarının Bölüm 6'da verildiği, Çöpler Altın Madeni Yığın Liçi Sahası Faz-4B Aşama-1 ve Aşama-2'de yapılan Batı Alanı Rehabilitasyon Çalışmaları 02.08.2022

95



SWORN
TRANSLATION

tarihinde tamamlamış ve alan kullanıma hazır hale getirildiği, İşbu raporun, 29.06.2022 tarihinde başlayıp 02.08.2022 tarihinde biten, Yığın Liçi Tesisi Batı Alanı Faz-4B Aşama-1 ve Aşama-2 rehabilitasyon çalışmalarına ait yapılan işleri kapsadığı belirtilmiştir.

**Muğla Sıtkı Koçman Üniversitesi, Mühendislik Fakültesi, İnşaat-Maden Mühendisliği Bölümü Öğretim Personelleri tarafından 23.08.2022 Tarihinde, Anagold Madencilik San. Ve Tic. A.Ş.'ye Ait Çöpler Altın Madeni Yığın Liç Sahası Faz 4 Kısmı Rehabilitasyon Çalışmaları Değerlendirme Raporunda özet ile;**

INR tarafından hazırlanan tasarım raporunda (5.6 Cevher Yığını kısmında), bahse konu yığın liç bölgesinde dolgu şev eğimlerinin en fazla 2.5D/1Y olacak şekilde uygulanması gerektiği belirtilmiş ve stabilite analizleri bu kritere göre yapılmıştır. SYDF temsilcisi ORE Mineral tarafından hazırlanan raporun incelenmesi ve teknik gezide yapılan görüşmeler neticesinde, Faz-4 batı bölgesinde meydana gelen şev kaymasının dolgunun tasarım kriterlerinde belirtilen eğimlere uyulmayarak daha dik olarak inşa edilmesi nedeniyle gerçekleştiği anlaşılmaktadır. Şevde gerçekleşen yenilmeden sonra yatırımcı ANAGOLD yığın liç sahasında bulunan diğer bölgeleri de denetleyerek GRE firmasına stabilite analizlerini yaptırmış (EKZ) ve bu doğrultuda şevlerde kazı yaparak tasarıma uygun hale getirmiştir. Faz-4 batı bölgede kayma meydana gelen şevde ise geomembran üstündeki kayan kütlenin hepsini kaldırarak şev stabilite oranını çözmüştür (Şekil 41). Tasarım raporlarında yapılan stabilite analizleri ve 16-17 Ağustos 2022 tarihinde sahada yapılan incelemeler birlikte değerlendirildiğinde, Faz-4 batı yığın liçinde rehabilitasyonu yapılmakta olan diğer şevlerin de eğim ve yüksekliklerinin mevcut durum ve şartlar altında stabilite açısından herhangi bir sorun teşkil etmeyeceği, SYDF temsilcisi ORE Mineral tarafından rehabilitasyon çalışmalarının detaylı olarak izlendiği ve iyileştirme işlerinin tüm aşamalarının değerlendirildiği rapor, yatırımcı müşaviri GOLDER'ın yığın liçi sahasında rehabilitasyon çalışmaları sırasında takibini yaptığı tüm geomembran ve GCL imalatlarına ait test ve kalite dokümanları ile INR tarafından Faz-4B için hazırlanan tüm tasarım dokümanları ve teknik şartnamenin incelendiği, iyileştirme çalışmaları yerinde kontrol edildiği, 16-17 Agustos 2022 tarihinde yerinde yapılan incelemelerde sedde imalatının tasarıma uygun olarak inşa edildiği ve geomembran imalat ve kontrol testlerinin teknik şartnamelere uygun olarak yapıldığı, kanaati belirtilmiştir..

**ÇŞİB'nın 11.03.2024 tarih ve E-74694234-622.03-8961893 sayılı Yazısında;**

Maden Atık Yönetim Planı ve Maden Atık Bertaraf Tesisi, Yığın Liç Faz 4 Uygulama Projesi, Yığın Liçi Faz 4 Maden Atık Depolama Tesisi, Yığın Liçi Faz 4B Uygulama Projesi, Yığın Liçi Faz 4B/1.Kısım Maden Atık Depolama Tesisi, Yığın Liçi Faz 4B/2.Kısım Maden Atık Depolama Tesisi, Yığın Liçi Faz 4B/3.Kısım Maden Atık Depolama Tesisi, Yığın Liçi Faz 4B/4.Kısım Maden Atık Depolama Tesisi onaylarına ilişkin yazılar ve Faz 4B Su Yapıları Denetim Firması Nihai Denetim Raporunun onaylandığı belirtilmektedir.



SWORN
TRANSLATION

## 5. MADEN İŞ KAZASI OLAYININ TEKNİK DEĞERLENDİRMESİ

T.C. İliç Cumhuriyet Başsavcılığının, Bilirkişi Heyetimize tevdi edilen görev kapsamında 16.03.2024 tarihinde kaza olayının gerçekleştiği mahal Savcılık ve Bilirkişi Heyetleri ile birlikte keşfi yapılmıştır.

-Maden Kazası Olayının gerçekleşmesinde Etkin Olan Nedenlerin İnşaat (Geoteknik) Mühendisliği, Maden İşletmesi ve Planlaması, Jeoloji, Çevre Kanunu (ÇED Raporları), İş Sağlığı ve Güvenliği Kanunları kapsamında değerlendirilmesi,

-Olayın gerçekleşmesinde kurum, tüzel kişi ve şahıslardan Kusurlu Olanlar var ise asli ve tali kusur oranların belirlenmesine ilişkin iş bu rapor hazırlanmıştır.

Kaza olayının incelenmesi, soruşturma dosyası kapsamında sunulan bilgi ve belgelerin değerlendirmesini, Cumhuriyet Başsavcılığı'nca alınan soruşturma tutanakları, kolluk kuvvetleri tarafından alınan ifadeler ve hazırladıkları raporlar, çekilen fotoğraflar ve kayıt edilen videolar, Çeşitli firmaların hazırladıkları tasarım amaçlı teknik raporları, geoteknik ve mekanik dayanım parametrelerinin tespitine yönelik yapılan deney sonuçları, maden faaliyetinin izlenmesine yönelik, radar ölçümleri, manyetik ölçümler, drone görüntüleri, solisyon ölçümleri, patlatma-tireşim ölçümleri, ÇED kapsamında su ve toprak numunelerinden alınan zehirli madde ölçümleri, dosya kapsamında hazırlanmış bilirkişi raporları, tehlike ve riske yönelik hazırlanmış teknik raporlardan yararlanılarak, kaza olayının aydınlatılmasına yardım edecek Çevre Kanunu ve ÇED Yönetmeliği, Maden ve İSG Kanunu Uygulama Yönetmelikleri dikkate alınarak teknik değerlendirmeler yapılmıştır. Detaylar alt bölümlerde verilmiştir.

## 5.1. MADEN KAZASI OLAYININ MADEN MEVZUATI, MADEN İŞLETME PROJESİ, MAPEG TEKNİK RAPORLARI KAPSAMINDA DEĞERLENDİRİLMESİ

**Maden ve Petrol Genel Müdürlüğünün (Ruhsat Denetleme Daire Başkanlığı) 2004-2024 tarihleri arasında yapmış olduğu Mahallinde Tetkik ve Değerlendirme Raporları;**

-Ruhsat Sahası Hakkında; Ruhsat Sicil Numarası; RS:847, Ruhsat Erişim Numarası;1027313 olan Erzincan ili, İliç İlçesi sınırları içinde IV Grup Maden Sahası için ilk müracaat 06.11.1986 tarihinde yapıldığı, 06.11.1986 tarihinde Ruhsatın yürürlüğe girdiği, Maden cinsinin Altın+Gümüş, Altın+Gümüş+Bakır+Civa, Manganez olduğu, Manganez madeninin işletme izin tarihinin 06.11.1986'dan bu yana yürülükte olduğu, Altın+Gümüş+Bakır+Civa madeninin işletme izin tarihinin ise 03.11.2004'ten bu yana yürülükte olduğu belirtilmekte olup, Ruhsat sahibi ANAGOLD MADENCİLİK SANAYİ VE TİCARET ANONİM ŞİRKETİ'dir.



97

SWORN
TRANSLATION

| Mahallinde Tetkik ve Değerlendirme Rapor Tarihi | Faaliyetler projesine uygun yürütülüyor mu? | FAALİYETLERİN PROJESİNE UYGUN YÜRÜTÜLMEDİĞİNE DAİR TESPİTLER<br>1. (VARSA) GENEL HUSUSLAR, DİĞER TESPİTLER, ÖNERİLER, SONUÇ (AÇIKLAMA) |
|---|---|---|
| 22.02.2024 | Hayır | **Faaliyetlerin projesine uygun yürütülmediğine dair tespitler:** Batı açık işletme ocağında ve Mermer ile Ana açık işletme ocakları arasında bulunan 39.29 hektarlık alanda tespit edilen tehlikeli durumlar sebebi ile Maden Kanunu'nun 29. Maddesinin 1. Fıkrası gereği üretim faaliyetlerinin durdurulmuş olduğu, Genel Müdürlüğümüzün 14.02.2024 tarihli ve 2024077289 sayılı yazısı ile sahadaki üretime yönelik faaliyetler durdurulmuştur.<br>**1. (Varsa) Genel Hususlar, Diğer Tespitler, öneriler, Sonuç (Açıklama):** Tetkik tarihinde yapılan incelemede sahada faaliyet olmayan Y:457978 X:4363438 temsili koordinatlarında, kademeli Batı açık ocağı, Y:458893 X:4363951 temsili koordinatlarında 40 kademeli ana açık ocak Y:459538, X:4364137 temsili koordinatlarında 28 kademeli Mermer açık ocağı, Y:460139 X:4364382 temsili koordinatlarında 26 kademeli Manganez açık ocakları görülmüştür. Sahada tetkik tarihi itibarıyle açık ocaklarda faaliyetler durdurulmuştur. *13.02.2024 tarihinde saat 14:28 sularında Y:460636-X:4364323 temsili koordinatlarında bulunan kademeli yaklaşık 270 metre yüksekliğinde bulunan lliç yığının kayması sonucu kayma meydana gelmiştir.* Kayma sonucu malzemenin bir kısmının Y:459975 X:4364350 koordinatında 26 kademeli Manganez açık ocağının içerisine bir kısmının ise yığının doğu kısmında bulunan Sabırlı deresine doğru akmış olduğunun tespit edildiği, Mülkiyetin özel mülkiyet, hazine, mera ve orman arazisi olduğu beyan edildiği, Çalışmalarda Maden Kanunu ve Yönetmeliği esaslarına göre çalışılması hususunda bilgilendirme yapılmıştır. Maden sahasında yapılan denetim sonucunda tespit edilen hususlar, mahallinde tetkik tarihi itibariyle sahadaki mevcut durumu yansıtmaktadır. İş bu maden sahasındaki çalışma ortamının, sürekli değişen ve dinamik bir yapıya sahip olması nedeniyle ruhsat sahasındaki madencilik faaliyetlerinin maden mevzuatına uygunluğunun ve bunun sürekliliğinin sağlanması ruhsat sahibinin / rödovansçının / işletmecinin yükümlülüğünde olduğu, Bu yükümlülüğün yerine getirilmemesinden dolayı meydana gelebilecek tüm olumsuzluklardan ruhsat sahibi / rödovansçı / iş etmeci sorumlu olduğunun beyan edilmiştir. |
| 04.09.2023 | Hayır | **Faaliyetlerin projesine uygun yürütülmediğine dair tespitler:** 22.09.2022 tarih ve 2022339558 sayılı yazıda belirtilen hususlar devam ettiğinden, Y:457978 X:4363438 temsili koordinatlarındaki 11 kademe Batı açık ocağında faaliyet durdurmanın devamı, Y:458893 X:-4363951 temsili koordinatlarında, Ana açık ocak ve Y:459538 X:4364137 temsili koordinatlarındaki Mermer açık ocağın kesiminde heyelanlı bölgede tehlikeli durumlar devam ettiğinden 39.29 ha alanda kısmi faaliyet durdurmanın devamının yapılması gerektiği heyet tarafından beyan edildiği.<br>**1. (Varsa) Genel Hususlar, Diğer Tespitler, öneriler, Sonuç (Açıklama):** Tetkik tarihinde yapılan incelemede sahada faaliyet olmayan Y:457978 X:4363438 temsili koordinatlarınca 11 kademeli Batı açık ocağı, faaliyetleri devam eden Y:458893 X:4363951 temsili koordinatlarında 40 kademeli Ana açık ocak, faaliyete olmayan Y:459538 X:4364137 temsili koordinatlarında 28 kademeli Mermer açık ocağı, faaliyet olmayan Y:460139 X:4364382 temsili koordinatlarında 26 kademeli Manganez açık ocakları görüldüğü, Mermer açık ocak ile Ana açık ocak arasında kalan bölgede, kaymayı önlemeye yönelik yük almak amacıyla üst kotlarda dekapaj faaliyetlerinin devam ettiği görüldüğü, Ayrıca kısmı faaliyet durdurma bulunan alanda ve bütün ocaklar genelinde radar cihazıyla ve saha kontrolleriyle Jeoteknik Birim tarafından kayma/deformasyon takibi yapıldığının görüldüğü beyan edilmiştir. |
| 22.09.2022 | Hayır | **Faaliyetlerin projesine uygun yürütülmediğine dair tespitler:** Açıklamalar kısmında belirtildiği,<br>**1. (Varsa) Genel Hususlar, Diğer Tespitler, öneriler, Sonuç (Açıklama):** Tetkik tarihinde yapılan incelemede sahada faaliyet olmayan Y:458034 X:4363463 temsili koordinatlarında, 11 kademeli Batı Açık ocağı, Y2:458738 X2:4363913 temsili koordinatlarında, 43 kademeli Ana Açık ocak, Y3:459457 X3:4364222 temsili koordinatlarında, 28 kademeli Mermer Açık ocağı, Y4:459975 X3:4364350 temsili koordinatlarında, 26 kademeli Manganez Açık ocakları görüldüğü, Batı ocağında; bir önceki heyet tespitleri sonrasında faaliyette bulunulmadığı, tehlikeli durumların devam etmesinden dolayı faaliyet durdurmasının devam etmesi gerektiği, Mermer ocağı ile ana ocak kesişiminde bulunan ve aşağıda koordinatları verilen alanda: bir önceki heyet tespitleri sonrasında faaliyette bulunulmadığı, tehlikeli durumların devam etmesinden dolayı faaliyet durdurmasının devam etmesi gerektiği, kısmi faaliyet durdurmanın devam edeceği alan koordinatlarının aşağıda belirtildiği beyan edilmiştir<br><br>Kısmi Faaliyet Durdurmanın Devam Edeceği Alan Koordinatları (Pafta: 141 Al-Alan:39.29 ha)<br><br>| Y1 | X1 | Y2 | X2 | Y3 | X3 | Y4 | X4 | Y5 | X5 |<br>| 459494 | 4364312 | 459787 | 4363896 | 459541 | 4363472 | 459229 | 4363462 | 459048 | 4364017 | |

98



SWORN
TRANSLATION

Ana ocakta, bir önceki heyet tespitlerinden sonra faaliyette bulunulmadığı, mevcut haliyle işletme projesine uygun olduğu ancak ocak derinleştirmesine yönelik şev kesme çalışmaları yapılacağından ocak tabanında üretim faaliyetinde bulunulmadan üst kotlardan alt kotlara gidilecek şekilde üretim ve üretime hazırlık faaliyetinde bulunulması hususlarında uyarı yapılması gerektiği, Mangan ocakta, bir önceki heyet tespitlerinden sonra faaliyette bulunulmadığı, mevcut haliyle işletme projesine uygun olduğu heyetçe tespit edildiği, Ayrıca, 20/09/2022 tarih ve 2022335943 sayılı heyet isteğinde değerlendirilmesi talep edilen 20/09/2022 tarih ve 2022335654 sayılı dilekçe ile ekinde mevcut olan Çevre, Şehircilik Ve İklim Değişikliği Bakanlığı tarafından verilen Geçici Faaliyet Belgesine istinaden sahada yapılan incelemelerde; 07/07/2022 tarih ve E.4092374 sayılı yazı ile Çevre İzin ve Lisansın iptal edildiği, buna istinaden 20/09/2022 tarih ve E.2538 sayılı yazısı ile 'Geçici Faaliyet Belgesi' verildiği ve faaliyette bulunulmasında herhangi bir sakınca olmadığı belirtildiğinden mevcut durumda 3213 sayılı Maden Kanunu ve Maden Yönetmeliğinin ilgili maddeleri gereği yukarıda koordinattan belirtilen ocaklarda maden işletme faaliyetinde bulunulmasında herhangi bir sakınca bulunmadığı heyetçe tespit edildiği beyan edilmiştir.



| | | **Faaliyetlerin projesine uygun yürütülmediğine dair tespitler:** Y:458034 X:4363463 temsili koordinatlarında bulunan Batı Ocakta M.K. 29/1 maddesi kapsamında üretim faaliyetlerinin cırdurulmasına sebep olan tehlikeli durumların halen devam ettiği tespit edildiğinden *M.K. 29/1 maddesi kapsamında üretim faaliyetlerinin durdurulmasına devam edilmesi gerektiği,* Y:459417, X:4364222 temsili koordinattı mermer ocağı ile Y:458738 X:4363913 temsili koordinattı ana ocak kesiminde bulunan heyelanlı bölgede M.K. 29/1 maddesi kapsamında üretim faaliyetlerinin durdurulmasına sebep olan tehlikeli durumların halen devam ettiği tespit edildiğinden M.K. 29/1 maddesi kapsamında üretim faaliyetlerinin durdurulmasına devam edilmesi gerektiği hususlarının tespit edildiği,
| 07.07.2022 | Hayır | 1. (Varsa) Genel Hususlar, Diğer Tespitler, öneriler, Sonuç (Açıklama): Tetkik tarihinde yapılan incelemede Y1:458034 X1:4363463 temsili koordinatlarında 11 kademeli Batı Açık ocak görülmüş olup, tetkik gününde faaliyet olmadığı, Tetkik tarihinde yapılan İncelemede Y2:458738 X2:4363913 temsili koordinatlarında 43 kademeli Ana Açık ocağın görüldüğü, tetkik gününde faaliyetin görülmediği, Tetkik tarihinde yapılan İncelemede Y3:459457 X3:4364222 temsili koordinatlarında 28 kademeli Mermer Açık ocak görülmüş olup, tetkik gününde faaliyet olmadığı, Tetkik tarihinde yapılan İncelemede Y4:459975 X3:4364350 temsili koordinatlarında 26 kademeli Manganez Açık ocak görülmüş olduğu, *tetkik gününde ruhsat sahasındaki tüm faaliyetler Çevre Bakanlığı tarafından durdurulduğundan, faaliyetin bulunmadığı, 21.06.2022 tarihinde gerçekleşen liç sahasına ait siyanür içerikli solüsyon taşıyan boru hatlarında arıza ile ilgili yapılan inceleme sonucunda; Ruhsat sahasında 21.06.2022 tarihinde saat 01.50 civarında liç sahasına siyanür içerikli solüsyon taşıyan boru hattında basınç düşüklüğünün fark edilmesi ile borularda kaçak olduğu anlaşılmış ve liç sahası genelinde kaçak tespiti için arama yapılmış, saat 05.20 gibi kaçağın liç sahası içerisinde temsili Y:460635 x:4363878 koordinatlarında bulunan solüsyon ana boru (10 inç) hattı ile yan hattın (4 inç) bağlantı noktasında kopmadan kaynaklandığı tespit edilmiş olup, ana solüsyon hattı tamamen durdurulduğu, Şirket yetkilisinin beyanında kaçak tespiti için geçen 3.30 saatlik zamanda 210 metreküp solüsyonun (siyanür içeriği 415 ppm olan) dışa aktığı, bunun 190 metreküpünün liç alanı içerisinde membranlı alanda kaldığı, 20 metreküpünün ise membransız alana aktığının belirtildiği,* Membransız alanda solüsyonun bulaştığı toprağın iş makinalarıyla alınarak liç alanına taşındığı, makina ile ulaşılamayan alanların ise Hipoklorik asit ile yıkandığı, liç alanı yakınında bulunan sabırlı deresine solüsyonun ulaşmadığının heyete beyan edildiği belirtilmektedir. |





SWORN
TRANSLATION



| | | |
|---|---|---|
| | | **Faaliyetlerin projesine uygun yürütülmediğine dair tespitler:** Y:457897, X:4363326 temsili koordinatlarında M.K. 29/1 maddesi kapsamında üretim faaliyetlerinin durdurulmasına sebep olan tehlikeli durumların halen devam ettiği tespit edildiğinden M.K. 29/1 maddesi kapsamında üretim faaliyetlerinin durdurulmasına devam edilmesi gerektiği, Y:459417,X:4364222 temsili koordinatlı mermer ocağı ile Y:458738, X:4363913 temsili koordinatlı ana ocak kesişiminde bulunan heyelanlı bölgede M.K. 29/1 maddesi kapsamında üretim faaliyetlerinin durdurulmasına sebep olan tehlikeli durumların halen devam ettiği tespit edildiğinden M.K. 29/1 maddesi kapsamında üretim faaliyetlerinin durdurulmasına devam edilmesi gerektiği hususları tespit edilmiştir.<br><br>**I. (Varsa) Genel Hususlar, Diğer Tespitler, öneriler, Sonuç (Açıklama):** Y:457897, X:4363326 temsili koordinatlarında bulunan 11 kademeli Batı Ocak'ta son heyet tetkik tarihinden bu yana faaliyet olmadığı tespit edilmiştir. Y:459417, X:4364222 temsili koordinatlarında bulunan 25 kademeli Mermer ocağında üretim faaliyetleri ve heyelan yükü azaltma/kademelendirme çalışmalarının devam ettiği görülmüştür. Y:459975, X:4364350 temsili koordinatlarında bulunan 27 kademeli Mangan ocağında son heyet tetkik tarihinden bu yana faaliyet olmadığı tespit edilmiştir. Y:458738, X:4363913 temsili koordinatlarında bulunan 37 kademeli Ana ocakta heyelan yükü azaltma/kademelendirme çalışmalarının devam ettiği görülmüştür. Y:457897,X:4363326 temsili koordinatlarında bulunan Batı Ocak'ta M.K. 29/1 maddesi kapsamında üretim faaliyetlerinin durdurulmasına sebep olan tehlikeli durumların halen devam ettiği tespit edildiğinden M.K. 29/1 maddesi kapsamında üretim faaliyetlerinin durdurulmasına devam edilmesi gerektiği, Y:459417,X:4364222 temsili koordinatlı mermer ocağı ile Y:458738,X:4363913 temsili koordinatlı ana ocak kesişiminde bulunan heyelanlı bölgede M.K. 29/1 maddesi kapsamında üretim faaliyetlerinin durdurulmasına sebep olan tehlikeli durumların halen devam ettiği tespit edildiğinden M.K. 29/1 maddesi kapsamında üretim faaliyetlerinin durdurulmasına devam edilmesi gerektiği hususlarının tespit edildiği, |
| 20.01.2022 | Hayır | |



100



SWORN TRANSLATION

| 16.09.2020 | Hayır | **Faaliyetlerin projesine uygun yürütülmediğine dair tespitler:** Ana ocakta basamak geometrisi bozulmuş durumda, Sahada ana ocakta basamak geometrisinin tamamen bozulduğu ve kaymaların oluştuğu, Ana ocağın NE'sunda bulunan mermer ocak ve Mangan ocağın etkilenmesinin söz konusu olduğu, Ana ocaktaki bu kaymalar ile İlgili olarak üniversitelerden alınacak bir jeoteknik rapor doğrultusunda kayma yüzeyinin tespiti, yeraltı su seviyesinin tespiti yapılıp konuyla İlgili şev stabilitesi sağlanıp basamaklar projesine uygun hale getirilinceye kadar aşağıdaki koordinatlarda herhangi bir madencilik faaliyetinde bulunulmaması heyetin görüşü olarak belirtildiği, Pafta: J41a1 Alan: 207,41 ha |

|  | | Nokta 1 | Nokta 2 | Nokta 3 | Nokta 4 | Nokta 5 | Nokta 6 |
|---|---|---|---|---|---|---|---|
| Sağa (X) | | 458171 | 458517 | 459073 | 459810 | 460166 | 459669 |
| Sola (Y) | | 4362944 | 4364121 | 4364359 | 4364623 | 4364157 | 4363148 |

**1. (Varsa) Genel Hususlar, Diğer Tespitler, öneriler, Sonuç (Açıklama):** Tetkik tarihinde sadece Mangan ocakta faaliyetlerin yürütüldüğü, -Sahada yapılan incelemeler neticesinde; Ana ocakta kaymalardan dolayı basamak geometrisinin tamamen bozulduğu, beyanlara göre Jeoradar İle yapılan ölçümler neticesinde kaymanın 10 mm/gün olduğunun görüldüğü, Sülfürlü bu ocağın NE bulunan Mermer ve Mangan ocağın bu kaymalardan etkilenip etkilenmeyeceği, kayma yüzeyinin tespiti, yeraltı su seviyesinin tespiti, şev durayılılığının yeniden değerlendirilerek yapılması gerekiyor ise projede değişikliğe gidilmesi, bütün bunlarla İlgili olarak üniversitelerden ve/veya akredite bir kuruluş tarafından Jeoteknik rapor alınması, bozulan bu şevlerin projesine uygun hale getirilinceye kadar yukarıda belirtmiş olduğumuz koordinatlar dahilinde herhangi bir üretim faaliyetinin yürütülmemesi gerektiği, -- Ruhsat sahibi tarafından 18.03.2020 tarih ve 15897 sayılı dilekçe ekinde verilen koordinatlar dahilinde Mera Vasıf değişikliğinin heyetçe uygun bulunduğu, -Ayrıca Y: 457913 X: 4363514 temsili koordinatında bulunan Batı ocakta basamaklarda bozulmaların meydana geldiği, bu ocakta çalışmaya başlanılmadan önce basamaWann düzenlenmesi gerektiği, -Üretim faaliyetlerinin durdurulmasına sebep konu İle İlgili yapılacak çalışmaların sahada uygulandıktan sonra Genel Müdürlüklerinin mahallinde tetkik heyeti tarafından yerinde tespiti yapılıp onaylandıktan sonra üretim çalışmalarına başlanması, heyetin kanaati olarak belirtilmiştir.



| 31.10.2019 | Evet | **Faaliyetlerin projesine uygun yürütülmediğine dair tespitler:** 2013: 8.483.256 ton, 2014: 8.856.076 ton, 2015: 7.840.357 ton, 2016: 6.806.407 ton, 2017: 8.180.217 ton, 2018: 4.239.050 ton, 2019 yılı tetkik tarihi itibariyle 3.037.246.817 ton zenginleştirme tesisine tüvenan cevher sevciyatının yapıldığı tespit edilmiştir. **1. (Varsa) Genel Hususlar, Diğer Tespitler, öneriler, Sonuç (Açıklama):** Tetkik tarihinde yukarıda koordinatları belirtilen birbiriyle bağlantılı ve birbirinin devamı şeklinde olan büyük çaplı ocakta yüklenici firma Çiftay A.Ş. tarafından faaliyetlerin devam ettiği, önceki heyetlerce de tespit edilen mermer ocağı tarafında bulunan heyelandan alan İçin tampon bölge bırakıldığı ve herhangi bir faaliyetinin olmadığı, manganez İşletme İznine yönelik olarak uzun dönemden bu yana faaliyette bulunulmadığı, *Y:459395 X:4364734 temsili koordinatında mevcut ocaktaki mm boyutuna kadar olan kayma hareketlerinin anlık İzlendiği jeoradar sisteminin kurulduğu,* Sahada üretilen oksitli ve sülfürlü tüvenan cevherin ruhsat sahibine ait zenginleştirme tesisine beslendiği, 16. madde kapsamında üretimine izin verilen kalkerin ise ocak içi yollarda ve tesise yönelik olan faaliyetler için kullanıldığı tespit edilmiştir. |

101

SWORN
TRANSLATION

| 03.07.2018 | Evet | 1. (Varsa) Genel Hususlar, Diğer Tespitler, öneriler, Sonuç (Açıklama): Tetkik tarihinde sahada, Y:459589-X:4364034 (mermer ocağı), Y:459975-X:4364402 (mangan ocağı), Y:458738-X:4363913 (ana ocak) ve Y:457913-X:4363514 (batı ocağı) koordinatları civarında birbirine mücavir olarak açılmış dört ocakta, *ruhsat sahibi firma ve yüklenici firma Çiftay A.Ş. tarafından kompleks cevher (Au+Ag+Cu+Mn+Hg) üretim faaliyeti sürdürülmektedir. Ruhsat alanındaki manganez üretim faaliyetlerine uzun zaman önce son verildiği,* Cıva üretiminin de yapılmamakta olduğu, Sahada çalışan sayısı değişmekle birlikte yaklaşık olarak 1000 personelin görev yapmakta olduğu, 8.500.000 ton civarında tüvanan kompleks cevher stoğu mevcuttur. Ayrıca, 16. madde kapsamında kil ve kalker üretimi de gerçekleştirilmekte olup, tamamı zenginleştirme işlemlerinde ve ocak yolu düzenlemelerinde kullanılmakta olup, piyasa satışı bulunmamaktadır. Sahada mevcut ocaklarda güvenli çalışmanın sağlanabilmesi için sahada radar izleme cihazı yerleştirilerek erken uyarı sisteminin kurulmuş olduğu, Söz konusu radar cihazı ile ocaklardaki deformasyonlar anlık olarak takip edilmekte ve deformasyon hızının kritik seviyeye ulaşması durumunda, otomatik uyarı sistemi ile tehlike görülen alanların boşaltılacağı, Tetkik tarihine kadar sahada mevcut ocaklarda acil bir tahliye durumuna ihtiyaç olmadığının beyan edildiği. Tetkik tarihinde yapılan incelemede; sahada 2006 yılında mermer ve mangan ocaktan arasında meydana gelen yaklaşık Y:459600-X:4363800 koordinattan arasındaki bölgesel/kısmi kayma hareketinin/heyelanın olduğu bölgede herhangi bir faaliyetin olmadığı, kayma düzleminin alt kotlarına dört kademe kadar topuk yapılarak güçlendirildiği ve bu bölüme olan girişlerin kapatıldığı görülmüştür. Heyete katılan ruhsat yetkilisince, bu alanda üretim faaliyetinin düşünülmediği belirtilmiştir. Tetkik tarihinde sahadaki yığın liç alanı, mevcut oksitli cevheri işleyen tesis ve yapımı devam eden sülfitli cevheri işleme tesisleri gezilmiş ve bilgiler alınmıştır. Yapımı devam eden ve yaklaşık maliyetinin 750 milyon dolara ulaşacağı belirtilen sülfitli cevheri işleme tesisinin önümüzdeki birkaç ay içerisinde tamamlanacağı ve bu güne kadar ocaktan üretilen ve stokta tutulan sülfitli cevherin bu tesiste yaz aylarından itibaren deneme üretiminin ardından zenginleştirileceği beyan edilmiştir. Bu sahadan oksitli cevher için yaklaşık 43.000.000 ton görünür rezerv ve ortalama 1,13 gr/ton Au cevherleşmesi projesinde belirtilmiştir. Ayrıca sülfitli cevher için de 190 Mton kadar rezerv ve ortalama 1,33 gr/ton Au tenörü belirtilmektedir. Bu sahada günümüze kadar olan sürede 128.000 metrenin üzerinde toplamda 1200 kadar RC sondaj yapıldığının beyan edildiği. |
| 06.06.2017 | Evet | 1. (Varsa) Genel Hususlar, Diğer Tespitler, öneriler, Sonuç (Açıklama): 7- TETKİKE İLİŞKİN TESPİTLER İLE TEKNİK VE MALİ KONULARA İLİŞKİN GÖRÜŞLER Sic.847 sayılı ruhsat sahasının Makamın 03/05/2017 tarih ve 802839 sayılı oluru 3213 sayılı Maden Kanununun ilgili maddeleri gereği gerçekleştirilen mahallinde tetkikinde aşağıdaki hususlar tespit edilmiştir. — Tetkik tarihinde sahada, Y:459589-X:4364034 (mermer ocağı), Y:459975-X:4364402 (Mangan ocağı), Y:458738-X:4363913 (ana ocak) ve Y:457913-X:4363514 (Batı ocağı) koordinatları civarında birbirine mücavir olarak açılmış dört ocakta, ruhsat sahibi firma ve yüklenici firma Çiftay A.Ş. tarafından kompleks cevher (Au+Ag+Cu+Mn+Hg) üretim faaliyeti sürdürülmektedir. Ruhsat alanındaki manganez üretim faaliyetlerine uzun zaman önce son verilmiştir. 2016 yılı 29. madde formu ekinde verilen imalat haritası 2017 yılı faaliyetleri dışında uygundur. 8.000.000 ton civarında tüvanan kompleks cevher stoğu mevcuttur. Ayrıca, 16. madde kapsamında kil ve kalker üretimi de gerçekleştirilmektedir (Tamamı zenginleştirme işlemlerinde ve ocak yolu düzenlemelerinde kullanılmakta olup, piyasa satışı bulunmamaktadır.) — Sahada mevcut ocak dizaynları, 2004 yılı Aralık ayında Sial Mühendislik-Müşavirlik, 2012 yılı Nisan ayında Bati Engineering ve 2014 yılı Nisan ayında Golder Associates Firmaları tarafından yapılan jeoteknik çalışmalar sonucunda oluşturulduğu, Yapılan çalışmalar sonucunda; maksimum 15 metre basamak yüksekliğine, 75° basamak şev açısına ve 52,50° genel şev açısına sahip ocak dizaynı oluşturulmuş olup, tetkik tarihinde yapılan incelemede, basamak şev açılarının 74-75° civarında, basamak yüksekliklerinin 15 metre civarında olduğu görülmüştür. Cevher üretimi 5 metrelik dilimler halinde kademeler oluşturularak yürütülmekte ve sonucunda 15 metrelik nihai kademeler oluşturulmakta olduğu, Halihazırda, mevcut ocak dizaynlarının değerlendirilmesi ve Sülfür Projesi (Sülfürlü cevherin üretimi ve zenginleştirilmesi) kapsamında Golder Firması ve Hacettepe/Ortadoğu Teknik Üniversiteleri tarafından kollektif çalışmanın devam ettirildiği ve yakın zamanda bir ortak raporun hazırlanacağı beyan edilmiştir. Ocak dizaynı ile ilgili projelerin Genel Müdürlüğümüze de verilmesi hususunda ruhsat yetkilileri uyarılmıştır. Sahada mevcut ocaklarda güvenli çalışmanın sağlanabilmesi için sahada Y:459918-X:4363906 koordinatları civarında radar izleme cihazı yerleştirilerek erken uyarı sistemi kurulmuştur. Söz konusu radar cihazı ile ocaklardaki deformasyonlar anlık olarak takip edilmekte ve deformasyon hızının kritik seviyeye ulaşması durumunda, otomatik uyarı sistemi ile tehlike görülen alanlar boşaltılmaktadır. Tetkik tarihine kadar sahada mevcut ocaklarda acil bir tahliye durumuna ihtiyaç olmadığı beyan edilmiştir. -Makamın 14/01/2015 tarih ve 212 sayılı oluru ile görevlendirilen heyet raporunda, Y:459486-X:4363909 koordinatı civarında açılan ocakta heyelan olduğu belirtilmiş ve bu tespit doğrultusunda 29. maddenin 1. fıkrası kapsamında ruhsat sahibine uyarı yazısı yazılmıştır. Tetkik tarihinde yapılan incelemede, heyet raporunda belirtilen alanda üretim faaliyetlerinin devam ettirilerek bu bölgenin aşıldığı görülmüştür. Tetkik tarihinde yapılan incelemede; mermer zonu olarak adlandırılan ocağın Y:459682-X:4363953 ve Y:459257-X:4363721 koordinatları arasında bölgesel/kısmi kayma hareketinin başlamış olduğu (bir önceki heyet tarafından tespit edilen alandan farklı bir bölgede), kayma hareketinin başlaması nedeni ile +1200 kodu üzerinde 5 kademede dekapaj yapılarak yük azaltma çalışması yapıldığı, +1200 kodu civarında çeşitli noktalarda deformasyon izleme istasyonları oluşturulduğu, daha üst kotlarda kayma/akma belirtisinin bulunmadığı, ocak tabanında yaklaşık 40 metre topuk bırakılarak üretim faaliyetlerinin sürdürüldüğü görülmüştür. Heyete iştirak eden ruhsat yetkilisince, kayma bölgesinin jeoteknik incelenmesi sonucunda, kayma hareketinin |



SWORN
TRANSLATION

| | | |
|---|---|---|
| | | formasyon özellikleri nedeni ile daha çok yerinde yayılma niteliğinde olduğunun tespit edildiği, kayma hareketinin üst kotlarında yük azaltma çalışmalarının yapıldığı, söz konusu akma/kayma bölgesinin radar ile ve ayrıca birçok noktada deformasyon izleme istasyonları oluşturularak 24 saat izlendiği ve yapılan değerlendirmeler sonucunda olumsuz bir ivmes tespit edilmediği, ocak tabanında 5 metrelik bir dilimde daha üretim çalışması yapılacağı ve bölgenin kısa bir sonra iç döküm alanı olarak kullanılacağı belirtilmiştir. Söz konusu kayma/akma bölgesindeki üretim faaliyetlerinin tetkik tarihinde sürdürülüyor olması ve ocak ilerleme yönünün bu bölgeye doğru olması nedeni ile bu bölgede gerekli güvenlik tedbirlerinin alınması hususunda ruhsat sahibi firmanın yazılı olarak uyarılması gerektiği, — Maden Kanununun 7. maddesi kapsamındaki izinler ile ilgili detaylar ilgili bölümde verilmiş olup, mevcut üretim alanları işletme izni ve 7. madde izin alanları dahilinde kalmaktadır. l —Teknik ve daimi nezaretçi atama listesi rapor ekinde olup, en son 17/02/2016 tarihinde Karabey TURAN daimi nezaretçi olarak atanmış olduğu; Noter onaylı nezaretçi defteri düzenli ve uygun olarak tutulmuş olduğu, Faaliyetler nezaretçi atama dönemi içerisinde gerçekleştirilmiş olduğu — Arzu KEKLİK tarafından 11/03/2017 tarihli ÇİMER başvurusunda, köylerine 500 metre mesafede siyanür kullanıldığı, patlatma yapıldığı, toz bulutlarının her yanı sardığı, sağlıklarının bozulduğu, maden ocağı ve İbrahim ÇEÇEN barajı yüzünden köşeye sıkışıldığı, köylünün bir kısmına yeniden yardım parası adı altında paralar verilip susturulduğu, tel örgüler ile aralarında 0 metre bile kalmadığı, her geçen gün kanserden birilerinin öldüğünün belirtildiği, Arzu KEKLİK ile 0539 694 2857 nolu telefon ile irtibat kurulmuş, maden ocağı mücavirinde ikamet edilmediği, İliç ilçe merkezinde ikamet edildiği, bölgede ölümlerin çoğaldığı yönünde duyumlar alındığı bu nedenle şikayette bulunulduğu, heyete iştirak edilmeyeceğinin beyan edilmiş olduğu, Patlatma şikayeti ile ilerleyen bölümlerde açıklama yapılmış olup, diğer şikayetlerin madencilik faaliyetlerinin çevre üzerindeki olumsuz etkileri ile ilgili olması nedeni ile ÇED kapsamında değerlendirilmesinin gerektiği, —Eşref DEMİR tarafından BİMER'e yapılan 04/1/2016 tarihli şikayet dilekçesinde, Anagold firması tarafından köy mücavir alanı içerisinde madencilik faaliyete başlandığı, hayvan otlatılacak mera alanlarının yok denecek kadar uzaldığı, oluşan yoğun tozlanma nedeni ile ot veriminin düştüğü, hayvanların toza bağlı hastalıklara yakalandığı, kullanılan kimyasalların hayvan hastalıklarına yol açtığı, maden aramaları sırasında patlayıcı madde kullanıldığı, oluşan yoğun gürültü nedeni ile hayvanların ciddi travmalar geçirdiği, yasal izinlerin alınmadığının haricen öğrenildiği, yapılan çalışmalar sırasında insan sağlığını etkileyici sonuçlar ortaya çıktığı belirtilerek, şüpheli şirket hakkında gerekli soruşturmanın yapılarak şüphelilerin cezalandırılması için kamu davası açılması talep edildiği, Tetkik tarihinde heyete şikayetçi Eşref DEMİR tarafından da iştirak edilmiş ve tutanakla "Ruhsat sahası ile ilgili yapılan şikayetin daha çok ruhsata ait izinler ile ilgili olduğu, İliç alanı ve mücavirinin Sabırlı Köyü Tüzel Kişiliğine ait olduğu, ancak söz konusu alanın Çöpler Köyü adına gösterildiği ve bu şekilde izin alındığı, konunun yargıya taşındığı ve mahkeme aşamasının devam ettiği, dilekçede çevre ile ilgili yapılan şikayetlerin devam ettiği beyan edilmiştir. S.847 sayılı ruhsat sahasına ait işlem dosyasının incelenmesinde, ruhsat alanı dahilinde kullanılan alanlar ile ilgili mülkiyet izinlerinin (ve 7. madde kapsamındaki diğer izinlerin) tamamının alındığı tespit edilmiş olup, mera tahsis değişikliği yapılmış olan İliç alanının Sabırlı Köyü sınırları dahilinde kaldığı da ilgili şikayetin ilgili kurumlarca değerlendirilmesi gerekmektedir. Ruhsat sahasında patlatma şikayeti ile ilgili yapılan incelemede, patlatmalarda delikler arasında gecikmeli kapsüllerin kullanıldığı ve 102 mm çaplı delgilerin delindiği ve üretim kademelerinde delik derinliğinin 5,6 metre civarında olduğu, dolayısıyla delgi başına (anlık gecikme başına) maksimum 24-25 kg civarında patlayıcı madde kullanıldığı, 15 metrelik delgilerde ise maksimum 80 kg civarında patlayıcı madde kullanılabileceği tespit edilmiş olup, söz konusu patlayıcı madde miktarlarının uygun olduğu görülmüştür. Yapılan diğer şikayetler (tozlanma, hayvan hastalıkları, mera alanlarının azalması vs.) ile ilgili değerlendirmenin ÇED kapsamında ilgili kurumlarca yapılması gerekmektedir. 11. madde kapsamında, 14/01/2015/212 sayılı olurla görevlendirilen heyetçe 606881 no'ya kadar incelenmiş olduğu, 2015, 2016 yıllarına ait ibraz edilen sevk fişleri ile satış faturaları üzerinden yapılan incelemede, sevk fişleri ocak ile tesis yanında bulunan oksit stok alanı ve sülfür stok alanına günlük yapılan sefer sayısı, aracın aldığı tonaj miktarı baz alınarak toplamı üzerinden günlük tek sevk fişi kesilmiş olduğu, ayrıca stok alanından zenginleştirme tesisine (yığın linç) sevkiyatı yapılmış olduğu ekinde günlük artımı gösterir kantar fişi listesi mevcut olduğu, tesis sonrası dore-külçe sevkiyatlarında sevk fişi kullanılmış olduğu, -2015 yılına ait ibraz edilen satış faturalarına göre, 243.747 onsdore altın 39.084 ons Gümüş, 110.904,05 kg Bakır, 47.325 ton kalker, 73.912 ton kil satışı ile 654.222.853.37 TL gelir elde edilmiş olup, resmi muhasebe kayıtlarından, tesise ait maliyet hesaplamalarından düşülerek, ortalama ocak başı satış fiyatlarının uygun olduğu tespiti yapılmıştır. -2016 yılına ait ibraz edilen satış faturalarına göre, 151.167 ons dore altın, 30.416 ons Gümüş, 1.197.548 kg Bakır, 1.165.491 ton kalker satışı ile 450.455.091.94 TL gelir elde edilmiş olup, resmi muhasebe kayıtlarından, tesise ait maliyet hesaplamalarından 213.669.938 TL maliyet gideri düşülerek ortalama ocak başı satış fiyatlarının uygun olduğu tespiti yapıldığı, -2017 yılı tetkik tarihine kadar Genel Müdürlüğümüze ait sevk fişleri ile oksit stok sahasına 1.728.800 ton, sülfür stok sahasına 185.726 ton, zenginleştirme tesisine (yığın liç) 1.703.178 ton, kırma-eleme tesisine 59.287,50 ton kalker sevkiyatının yapıldığı, İşletme ruhsat harçlarının, ruhsat bedellerinin ve çevre ile uyum teminatlarının Ödendiği MBYBS sistem kayıtlarından görüldüğü beyan edilmiştir. |
| 26.02.2015 | Evet | **Faaliyetlerin projesine uygun yürütülmediğine dair tespitler:** a) Genel Bilgi (İlk müracaatından başlanarak, ruhsat aşamaları, devir durumu son durumu): S 847 sayılı ruhsatın hukuku 6309 sayılı Kanun döneminden gelmektedir. IR.257 (S 847) sayılı ruhsat için Ünimangan Manganez San. A.Ş. tarafından Genel Müdürlüklerine tevdi edilen 10/02/1986 tarih 7179 sayılı dilekçe ekindeki manganez işletme projesi ile ruhsatın 3213 sayılı Maden Kanununa uyumlu talep edildiği, Talep uygun bulunarak sahaya 06/11/1986 tarihinden geçerli 40 yıl süreli işletme ruhsatı ve manganez işletme izni düzenlendiği, S:847 sayılı ruhsat 23/10/2000 tarihinde Çukurderes Mad. San. ve Tic. Ltd. |

103

*Şti'ne devredildiği*, Genel Müdürlüklerine tevdi edilen 13/01/2004 tarih 79911 sayılı dilekçe ekindeki altın + bakır işletme projesi ile ikinci maden işletme izni talep edildiği, *Talebin uygun bulunarak 04/11/2004 tarihinde ikinci maden altın + bakır izni düzenlendiği, 18/08/2009 tarihinde unvan değişikliği yapılarak Çukurdere Mad. San. ve Tic. A.Ş. olduğu, Gümüş cevherinin tespit edilmesi sonucu hazırlanan işletme projesi 22/12/2006 tarihinde Genel Müdürlüğümüze tevdi edilmiş, saha mahallinde yapılan inceleme neticesinde ve alınan Makam Oluru sonrası 18/03/2011 tarihinde gümüş işletme izni düzenlendiği, 04/11/2010 tarih 145086 sayılı dilekçe ile unvan değişikliği yapılarak Anagold Mad. San. ve Tic. A.Ş. ünvanını aldığı*, 847 sayılı ruhsatın hukuku devam etmekte olup, söz konusu ruhsatın devredilmemiş olduğu, S:847 sayılı ruhsat için ruhsat sahibi şirket tarafından Genel Müdürlüklerine tevdi edilen 11/06/2014 tarih 102850 sayılı dilekçe ile izin alanı genişletilmesi talep edilmiş ve Makamın 19.06.2014 tarih ve 3190 sayılı olurları gereği *3213 Sayılı Maden kanununun 7.11.29.24/4-12 maddeleri gereği görevlendirilen heyet tespitleri ile 941.42ha. İşletme izni düzenlemesi uygun bulunmuş* ve 05.09.2014 tarih ve 6284 sayılı olur ile kabul edilmiştir. Ruhsat sahibi firma tarafından verilen 03.12.2014 tarih ve 148912 sayılı ve 16.12.2014 tarih ve 151881 sayılı dilekçeleri ile 3213 sayılı Maden Kanunu'nun 7.11.,24/4-12.,29.,31.,46. (Kamulaştırma ve Kamu Yararı) maddeleri ile 4342 sayılı Mera Kanununun 14. maddesi gereği tetkiki için heyetlerinin görevlendirildiği, e) Üretim Varsa Kimin Tarafından Yapıldığı? **Sahada taşeron firma Çiftay İns. Taah. ve Tic. A.S. tarafından üretim faaliyeti** yapıldığı beyan edildiği, f) Faaliyetler Ruhsat Sahibi Beyanına Uygun Olarak Yürütülüyor mu? Evet

1. **(Varsa) Genel Hususlar, Diğer Tespitler, öneriler, Sonuç (Açıklama): 7- TETKİKE İLİŞKİN TESPİTLER İLE TEKNİK VE MALİ KONULARA İLİŞKİN GÖRÜŞLER** (Görevlendirme konusu ve eklenmesi gereken diğer hususlarla ilgili; tespit ile teknik ve mali konulara ilişkin görüşler paragraflar halinde açıklanacaktır) : .... - Tetkik tarihi itibariyle S:847 sayılı ruhsat sahasında üretim faaliyetlerinin sürdürüldüğü, işletme izin alanında Y:457996 - X:4363492 Batı Ocağı, Y:458261 - X:4363890 Ana Ocağı, Y:459545 - X:4364005 Kireçtaşı Ocağı, Y:460156 - X:4364621 Mangan Ocağı temsili koordinatlarında dört ocak açıldığı, açılan ocaklarda taşeron firma Çiftay İnş. Taah. ve Tic. A.Ş. tarafından üretim yapıldığı gözlenmiştir - İşletme izin alanında açılan ocaklarda kademeli üretim yapıldığı, kademe yüksekliklerinin 10 metre civarında olduğu, tetkik tarihi itibariyle mevcut durumun can ve mal güvenliği açısından tehlike arz etmediği ancak, Y:459486 X:4363909 temsili koordinatta bulunan ocakta heyelan oluştuğu, bu nedenle söz konusu alanda zemin etüdü yaptırılarak heyelanın oluşumunu engelleyici tedbirler alınması, şev açısı şev yüksekliği ve basamak genişliğinin yapılan etüt neticesine göre basamakların uygun hale getirilmesi için uyarılması söz konusu alanda gerekli emniyet tedbirleri alınana kadar heyelan alanına girilmemesi hususunda uyarı levhası konulması gerekliliği, -Diğer Tespitler Kapsamında: Ruhsat sahibi tarafından 29.12.2014 tarih ve 155413 sayılı dilekçeleri ile işletme izin alanı içerisinde bulunan ve pasa döküm alanı yapılacak alanlar ile kuşaklama kanalı yapılacak alanların mera alanları içerisinde kaldığı ve bunu üzerinden mera tahsis değişikliği talep edildiği, 4342 Sayılı Mera Kanununun 14. maddesi gereği yapılan tetkik sonucu ve 26.01.2011 tarih ve 481 sayılı komisyon raporundaki kriterlere aksi bir durum bulunmadığı tespit edildiğinden 107 ada 103 ve 108 nolu parseller ile 106 ada 40 nolu parsel ve 108 ada 67 nolu parsel içerisinde bulunan alanların Mera tahsis değişikliği talepleri aşağıda verilen koordinatlar dahilinde yapılması heyetlerince uygun bulunduğu, Mera Tahsis Değişiklik talebi uygun bulunan pasa alanları Poligon 1, 2, 3 olarak tanımlandığı, Mera Tahsis Değişiklik talebi uygun bulunan Kuşaklama Kanalı alanı poligon-1 (P-1) ve poligon- 2 (P-2) olarak tanımlandığı beyan edilmiştir.



104



SWORN
TRANSLATION

| 27.06.2014 | Evet | 1. (Varsa) Genel Hususlar, Diğer Tespitler, öneriler, Sonuç (Açıklama):- Saha mahallinde yapılan incelemede, mevcut işletme izin alanında 4 ayrı alanda ocak açıldığı, açılan ocaklarda tüvenan altın – bakır = gümüş cevher üretiminin yapıldığı ayrıca ruhsat sahasında oksitli cevherin zenginleştirilmesi amacıyla kurulu tesisin mevcut olduğu, işletilmesine karar verilen sülfitli cevher için yeni zenginleştirme tesisi ve atık barajlarına ihtiyaç olduğu, ruhsat sahasında düzgün tesis kurulmasına müsait topografyanın bulunmadığı ayrıca mevcut işletme izin alanı içerisinde uygun alanlara pasa dökümü yapıldığı heyetimizce görülmüş olup, tesis, altyapı tesisi ve atık barajlarının işletme izin alanına dahil edilmesi talebinin ve bu talep için Genel Müdürlüğümüze tevdi edilen dilekçe eklerinin uygun olduğu tespit edilmiştir  Talep edilen ve heyetimizce uygun bulunan işletme izin alan koordinatlarının |

|  | 1. Nokta | 2. Nokta | 3. Nokta |
|---|---|---|---|
| Y | 457280 | 462600 | 457620 |
| X | 4366400 | 4363600 | 4362680 |



| 02.01.2014 | Evet | Faaliyetlerin projesine uygun yürütülmediğine dair tespitler: c) Üretimin Kimin Tarafından Yapıldığı Taşeron firma Çiftay İnş. Taah. ve Tic. AŞ tarafından yapılmakta olduğu, <br>1.(Varsa) Genel Hususlar, Diğer Tespitler, öneriler, Sonuç (Açıklama): İzin Genişletme: > Ruhsat sahibi tarafından Genel Müdürlüklerine verilen 04/07/2013 tarih ve 112166 sayılı dilekçede, sahada yapılmış olan rezerv arttırmaya ve aramaya yönelik çalışmalar sonucunda sahanın mevcut işletme izin alanı dışında kalan bölgelerde de altın+gümüş+bakır cevheri gözlenmesinden ve üretim planı yapılmasından dolayı işletme izin alanının genişletilmesi talep edildiği, > Sahadan işletme izin alanı genişletme talep edilen alanlarda daha önce açılmış karotlu sondaj lokasyonlarını temsil edecek şekilde muhafaza edilen karot sandıklarından 3 adet numune alınmış olup, alınan numunelerin akredite belge sahibi Acme laboratuvarında analizleri yaptırıldığı, Yaptırılan analizi sonucunda izin genişletme talep edilen alanda altın+gümüş+bakır cevherleşmesinin bulunduğunun tespit edildiği, Sondaj lokasyonlarını gösterir haritalar ve numune analiz sonuçlarına ait rapor ekinde olduğu, > İzin genişletme talep edilen alanda altın+gümüş+bakır cevherleşmesi bulunduğu tespit edildiğinden aşağıda pafta ve koordinatları belirtilen alan dahilinde işletme izin alanının genişletilmesinin heyetlerince uygun bulunduğu, Heyetlerince uygun bulunan genişletilmiş altın+gümüş+bakır işletme izin alanının aşağıda harita sınırlarının gösterildiği beyan edilmiştir. |

SWORN
TRANSLATION

| | | |
|---|---|---|
| | |  |
| ...../05/2012 | Evet | **Faaliyetlerin projesine uygun yürütülmediğine dair tespitler: ş)** *Pasa ve Bakiye Hakkında Bilgi:* Genel Müdürlüklerince uygun bulunan 2. Maden Au+Ag+Cu işletme projesinde, pasa malzemesi (y:460200,x:4363800, y:459800,x:44364600) iki değişik alanda depolanacağı, bu sahalardan biri madenin güneydoğusunda diğeri güneybatısında yer aldığı, güneybatıdaki sahada ana zondan çıkartılan paşanın depolanacağı, pasanın bir kısmı ise atık depolama tesisi, yığın liç Ünitesinde kullanılacağı, belirtilmiş olduğu, 16. madde kapsamında üretimin zaruri neticesinde çıkan kil ve kalker için izin alınmış olup çıkan malzeme yığın liç alanında kullanılmakta olduğu, <br><br>**I. (Varsa) Genel Hususlar, Diğer Tespitler, öneriler, Sonuç (Açıklama):** 6- TETKİKE İLİŞKİN TESPİTLER İLE TEKNİK VE MALİ KONULARA İLİŞKİN GÖRÜŞLER (Görevlendirme konusu ve eklenmesi gereken diğer hususlarla ilgili, tespit ile teknik ve mali konuları ilişkin görüşler paragraflar halinde açıklanacaktır): İR:257-Ş;847 sayılı maden ruhsat sahasında 3213 sayılı Maden Kanununun 2., 16. ve 36. maddeleri kapsamında yapılan inceleme ve gözlemlerde yukarıda belirtilen hususlara ilaveten aşağıda belirtilen hususlar tespit edildiği, ♦Tetkik tarihi itibarı ile müteahhit firma (Çiftaylar) tarafından sahada işletme izin alanı içerisinde açılmış olan Y:460203-4364044 temsili koordinatlarındaki ocakta tamamen altın gümüş Üretimine yönelik üretim faaliyetlerine devam edilmekte olduğu ♦Sahada yapılan çok sayıda sondajlara ait verilerin birbirleri ile korelasyonu yapılması sonucu altın-gümüş mineralizasyon tespiti yapılarak cevherin jeolojik yapısı/modeli ortaya konulmakta olduğu, Açık işletme yöntemi ile ocak açılmış olduğu, Açık ocak planı kapsamında yapılan basamaklandırma ile mineralizasyon zonuna inildiği ve altın gümüş üretimine geçilmiş olduğu, Tetkik tarihi itibarı ile cevher mineralizasyonunda üretim faaliyetlerine devam edilmekte olduğu, Ayrıca kaldırılmaya başlanan Çöpler Köyü etrafında sondaj çalışmaları yapılarak Au-Ag tenörleri ortaya çıkarma çalışmalarına devam edilmekte olduğu, Çöpler köyünün kaldırıldığı yapılan yeni yerleşim alanına taşındığı 2012 yılı planlarında Çöpler köyünün güneyinde Au-Ag üretimine başlanacağının heyetlerine beyan edildiği, ♦Daha önce 16. madde kapsamında kil-kalker ve civa üretimine izin verilen 65,05 ha alan dışında Au+Ag üretim faaliyetleri başlayacağından bu çalışılacak alanları kapsayacak şekilde 16. madde izin alanının genişletilmesi talep edildiği, ♦Yeni çalışılacak alanda (sondaj yapılmış) üst seviyelerde kil ve kalker Üretim yapılan mangan zonunda yüzey genelde mermer ile kaplı olduğu, mineralizasyon diyorit intrüzif kolları, mermer ve diyoritler arasındaki kontaklar ile alakalı olduğu, dissemine mineralizasyonu ise kontak zonunun dışında oluştuğu, sahada mineralizasyonun geliştiği kireçtaşlarında cevher üretimi esnasında üretimi yapılmadan/yerinde patlatma yapılarak yerinden sökülecek olan alanın kayaç sökülmeden kaldırılacak alanı temsil edecek şekilde numunelendirilerek yapılan analiz sonucu ekonomik orada altın gümüş içermeyen/cevher içermeyen kireçtaşları alınması sonucu yaklaşık Y:459925-X:4364561 koordinatlarındaki kil depolama alanının kuzeydoğusu ve yakındaki kireçtaşı paşası depolama alanına dökülmektedir. Boyutlandırılabilecek özellikteki kalker mobil kırıcılar vasıtası ile kırılarak boyutlandırıldığı, boyutlandırılan kalker yığın liç alanında kullanılmakta olduğu, Ayrıca ocak içerisinde değişik seviyelerde kireçtaşları çatlaklarına/mineralizasyon alanında kil oluşumlarının gözlemlenmiş olduğu, ♦Yığın liç alanına önce yaklaşık 30 cm kalınlığında olan testleri yapılmış olan sıkıştırılabilir/sızdırmaz özellikte kil serildiği, sıkıştırma işleminin yapıldığı, üzerine bentonit emdirilmiş jeotekstil (kil ile eşdeğer geçirimsizlikte) bu seviyenin üzerine de polietilen/geomembran serildiği, üzerine çözeltiyi toplayacak/tesise drene edecek şekilde ve özellikle borular yerleştirildiği, üzerine filtre amaçlı olarak +12 mm -35 mm boyutlarda (boyutlandırılmış kalker) serilerek liç alanının hazırlandığının beyan edilmiş olduğu, 3 fazdan (birbirine mücavir 3 ayrı alan) oluşan liç alanının yaklaşık 50 ha.(500.000 m2) alanı kapsadığı, 500.000 m2 x0,3=150.000 m3 kil ve 500.000 m2x 1 m= 500.000 m3 kalkere ihtiyaç duyulduğu, 3 ayrı alandan 1. alanın tamamlandığı 2. ve 3. alanın yapımına başlandığı, 2. Ve 3. alan için 500.000 m3 x2/3=333.333,33 m3 x2,7 ton/m3 = yaklaşık 900.000 ton kalker ihtiyacı olduğu beyan edilmiştir. Hazırlanan üç alanı üzerine ocaktan üretilerek ocak yakınında kurulu kırıcı Ünitelerine ((ilk kırıcı döner kırıcı, ikincisi konik kırıcı, üçüncüsü konik kırıcı yakın zamanda kurulduğu, 2010 yılında cevherin tovanan olarak yağın liçimin yapıldığı, ancak siyanürlü solüsyon cevher içeren parçanın içerisindeki altını, gümüşü çözeltiye almadığı, ancak cevher içeren parçanın yüzeyindeki altını ve gümüşü çözeltiye aldığı, yani boyut küçüldükçe cevher kazanımı artıyor. Buradan bantlar vasıtası ile liç alanına serilerek aktarılmaktadır. Hazırlanan liç alanında yaklaşık 8 metre kalınlığında cevher serilerek katlar oluşturulmakta olduğu, Liç alanı |

SWORN TRANSLATION

oluşturma işlemi en alt kottan itibaren yapılmakta olduğu, **Toplam 13 kat (her bir kat 8 metre) oluşturulacağı beyan edildiği.** Serilen cevher üzerine solüsyona *(1 ton suya 350 gr siyanür, ph 10.5 üzerine çıkarmak için kireç ilave edilmekte)* uygulayarak, enine boyuna kauçuk borular döşenerek damlama sistemi ile cevher üzerinde *(cevher üzerinde 20 cm x 20 cm boyutlarında karelaj oluşturulup, bütün karelajlara ait kenar köşelerdeki deliklerden akan solüsyon ile cevher üçe tabi tutulmakta)* böylelikle bütün cevher yüzeyi bu solüsyona tabi tutularak tabanda bulunan borular vasıtası ile altın gümüş içeren çözelti tesise alınmakta olduğunu, **Her bir kattaki cevhere bu solüsyon 45 gün uygulanmakta olduğu, Uygulanma sonrası yeni bir kat öncekinin üzerine yine serilmekte, bir alttaki kat üst kattan dolayı tekrar üçe tabi tutulmaktadır. Her bir liç alanından tesise gelen çözeltinin altın -gümüş içeriği sürekli kontrol edilmekte buna göre kat planları yapılmakta olduğu, Yaklaşık süreli üçe tabi tutulan yığın cevher 30 ay sonra değerli minerallerinin büyük kısmının çözeltiye alındığı beyan edildiği.** Bu itibar ile faaliyet olan mangan zonu ve yakın zamanda faaliyette bulunulacak olan mermer kontak zonunda altın ve gümüşe yönelik olarak yapılan üretim faaliyetin sonucu kalker ve kil ortaya çıkmaktadır. *Tesiste yapılan incelemede, sahada liç alanından alınan altın ve gümüş ihtiva eden çözeltideki Au+Ag önce karbondan geçirilerek Au+Ag aktif karbon üzerine alınıyor, tanklarda solüsyon siyanür miktarı ve ph ayarlandıktan sonra kapalı devre yeniden liç alanına gönderiliyor, sonra altın sıyırma koluna getirilen Au+Ag içeren karbon, yüksek sıcaklık, yüksek çözünürlükteki siyanür ve 3 bar basınç altında geçirilerek metaller (Au+Ag) alınıyor, karbonun aktifleştirilip yeniden kullanılması için asit yıkamaya tabi tutularak kapalı devre kullanılıyor (altın tutma kapasitesinin arttırılması için seyreltilmiş nitrik asit ile muameleye tabi tutuluyor ve bu işlem ile karbon üzerindeki yağ, kireç vb. uzaklaşıyor), tetkik tarihine kullanılmayan ancak kullanılması ileride kullanılması planlanan (ekonomik bakır mevcudiyetinde) bakır sıyırma ünitesinin de mevcut olduğunun görüldüğü, siyanürlü ortamdaki Au(CN) iyonik halde bulunan Au+Ag, metalik durumu indirgenerek katı halde paslanmaz çelikte yapılmış olan katotta toplanmakta olduğu, alınan altın keki filtre edilerek susuzlaştırılıyor, tüvenan cevher içerisindeki Hg bu işlemler esnasında Au+Ag ile aynı kimyasal özelliği göstererek potaya kadar gelebildiği, filtre işlemi sonrasında Hg uzaklaştırma için fırına veriliyor, burada Hg 425 derece buharlaşıyor, altın ise yaklaşık 1250 derecede, yaklaşık 520 derece oksijensiz ortamda sıcaklığa tabi tutulan altın kekinde Hg buharlaşarak vakumla borulara alınıyor eşanjöre gelen eşanjörde ani soğutmaya tabi tutularak yoğunlaşıyor, boru ile biriktirme tanklarına geliyor, eğer buhar burayı geçerse ikinci bir eşanjörde aynı muameleye tabi tutuluyor buradan da borular ile civa toplama tankına alınıyor, buradan da geçerse 2 ayrı baca gazı arıtma ünitesine tutuluyor. Bu güne kadar baca deşarjında herhangi bir Hg bulgusuna rastlanılmadığı beyan edilmiş olduğu, Hg uzaklaştırma sonrası altın keki potaya ilave edilen silika, boraks, soda ile 1300 derece sıcaklığa tabi tutuluyor. Magma durumuna geçen eriyik aniden dökülmesi sonucu altın ile cüruf arasındaki ergime derecesi farklılığı nedeni ile altın ilk once en alta soğuyarak katılaşıyor. Cüruf ise belirli bir süre eriyik halini koruyarak katılaşıyor. Genel Müdürlüğümüze tevdii edilen 01/07/2011 tarih ve 114358 sayılı dilekçe ile talep edilen civatın değerlendirilmesinin ekonomikliğinin olmadığı, yıllık belirtilen prosesten damıtılarak 2010 yılında 90 kg., 2011 yılında ise 152 kg. civanın elde edildiği, satılmasının planlandığı, Hg olumsuz çevresel etkisinden dolayı Hg ayırma ünitesinin kurulduğu, ayrıca bu hususun ÇED mevzuatında yer aldığı beyan edilmiştir. Civanın Maden Kanununun 16. maddesi kapsamında değerlendirilmesinin sakıncasının olmadığının heyetleri görüşü olduğunu beyan ederek, Heyetlerince uygun bulunan önceki 65,05 ha. alana ilave 6. madde gereği kil+kalker+Hg izin alanı koordinatları 104,20 ha. olup aşağıda gösterilmiştir.*

|  | 1. Nokta | 2. Nokta | 3. Nokta | 4. Nokta | 5. Nokta | 6. Nokta | 7. Nokta | 8. Nokta | 9. Nokta | 10. Nokta |
|---|---|---|---|---|---|---|---|---|---|---|
| Sağa Y | 458473 | 459088 | 459649 | 459540 | 459550 | 459434 | 459218 | 458911 | 458639 | 458453 |
| Yukarı X | 4364185 | 4364206 | 4364475 | 4363700 | 4363500 | 4363309 | 4363257 | 4363201 | 4363308 | 4363671 |





SWORN TRANSLATION

| 13.07.2011 | Evet | 1. (Varsa) Genel Hususlar, Diğer Tespitler, öneriler, Sonuç (Açıklama):<br>7- TETKİKE İLİŞKİN TESPİTLER İLE TEKNİK VE MALİKONULARA İLİŞKİN GÖRÜŞLER  IR:257-S 847 sayılı maden ruhsat sahasında 3213 sayılı Maden Kanununun 2 ,7 , 11 , 24/3, 24/4, 24/12, 29 ve 32 maddeleri kapsamında yapılan inceleme ve gözlemlerde yukarıda (raporda) belirtilen hususlara ilaveten aşağıda belirtilen hususların tespit edildiği, Tetkik tarihi itibarı ile müteahhit firma tarafından sahada işletme izin alanı içerisinde mangan zonunda açılmış olan Y-460203, X-4364044 koordinatlarındaki ocakta tamamen altın gümüş üretimine yönelik üretim faaliyetlerine devam edilmekte olduğu, Sahada yapılan çok sayıda sondajlar ait verilerin birbirleri ile korelasyonu yapılması sonucu, *Altın-Gümüş mineralizasyonu yapılarak cevherin jeolojik yapısı/modeli ortaya konulmuş olduğu, Mangan zonu (mermer kontak zonu ve ana zonda herhangi bir faaliyet olmadığı) kuzey güney yönünde yaklaşık 450 metre, doğu batı yönünde 709 metre genişliğinde, mangan zonu mineralizasyonu yüzey altında/Örtülü meydana geldi, mineralizasyonun yaklaşık yüzeyden 300 metre derinlikte olduğu ortaya konulmuş olup bu zonda topografyanın durumu, mineralizasyonun jeolojik konumu, ekonomik işletmecilik, iş güvenliği, ekonomik yeterlilik gibi hususlar dikkate alınarak mineralizasyonun en alt kotu dikkate alınarak cevherin ekonomik üretiminin yapılabilmesi için açık işletme ocak dizaynı yapılmış olduğu,* Bu işlem yapıldıktan sonra belirtilen koordinatlardaki ocakta üst kotlardan itibaren (cevher içermeyen seviyelerde) açık ocak planı uygulanmakta olduğu, Açık ocak planı kapsamında yapılan basamaklandırma ile mineralizasyon zonuna inildiği ve altın-gümüş üretimine geçilmiş olduğu, Tetkik tarihi itibarı ile cevher mineralizasyonunda üretim faaliyetlerine devam edildiği, Üretim yapılan mangan zonunda yüzey genelde mermer ile kaplı olduğu, mineralizasyon diyorit intrüzif kolları, mermer ve diyoritler arasındaki kontaklar ile alakalı olduğu, dissemine mineralizasyonu ise kontak zonunun dışında oluştuğu, sahada mineralizasyonun geliştiği kireçtaşlarında cevher üretimi esnasında üretimi yapılmadan/yerinde patlatma yapılarak yerinden sökülecek olan alanın kayaç sökülmeden kaldırılacak alanı temsil edecek şekilde numunelendirilerek yapılan analiz sonucu *ekonomik oranda altın - gümüş içermeyen/cevher içermeyen kireçtaşlarının alınması sonucu yaklaşık Y:459925-X:4364561 koordinatlarındaki kil depolama alanının kuzeydoğusu ve yakındaki kireçtaşı pasası depolama alanına dökülmekte olduğu, Boyutlandırılabilecek özellikteki kalker mobil kırıcılar vasıtası ile kırılarak boyutlandırıldığı, boyutlandırılan kalker yığın liç alanında kullanılmakta olduğu,* Ayrıca ocak içerisinde değişik seviyelerde kireçtaşları çatlaklarında/mineralizasyon alanında kil oluşumları gözlemlendiği, Kil oluşumlarının olduğu alanlarda, kaldırılmadan önce yerinde yapılan numunelendirme sonucu ekonomiklik arz etmeyen/cevher içermeyen kil seviyelerinin de mevcut olduğu gözlemlendiği, Bu seviyelerde yapılan yerinde örnekleme ile cevher içerip içermediği tespiti yapılmakta ayrıca teknolojik testleri (sıkıştırılabilirlik, sızdırmazlık, vb) yapılmakta olduğu, Cevher içermeyen, sıkıştırılabilir geçirimsiz kil yığın liç alanlarının tabanında sızdırmaz malzeme olarak kullanılmasının planlanmakta olduğu, Mangan zonunda ki ocak tabanında yaklaşık 20 m x 30 metre boyutlarında ocak tabanında gri tonlarda kil (yapılan testler sonucu cevhersiz ve geçirimsiz olduğunun belirlendiği beyan edilen) oluşumu gözlemlenmiş olduğu, Yığın liç alanına önce yaklaşık 30 cm kalınlığında olan testleri yapılmış olan sıkıştırılabilir/sızdırmaz özellikte kil serildiği, sıkıştırma işleminin yapıldığı, üzerine bentonit emdirilmiş jeotekstil (kil ile eşdeğer geçirimsizlikte) bu seviyenin üzerine de polietilen/geomembran serildiği, Üzerine çözeltiyi toplayacak/tesise drene edecek şekilde ve özellikte borular yerleştirildiği, üzerine filtre amaçlı olarak +12 mm -35 mm boyutlarda (boyutlandırılmış kalker) serilerek liç alanının hazırlandığı beyan edildiği, Hazırlanan liç alanı üzerine ocaktan üretilerek ocak yakınında kurulu kırıcı ünitelerine (ilk kırıcı döner kırıcı, İkincisi konik kırıcı, üçüncüsü konik kırıcı, yakın zamanda kurulduğu, 2010 yılında cevherin tüvenan olarak yığın liçinini yapıldığı, ancak siyanürlü solüsyon cevher içeren parçanın içerisindeki altın, gümüşü çözeltiye almadığı, ancak cevher içeren parçanın |

Case No. 1:24-CV-00739-DDD-TPO   Document 60-10   filed 12/17/24   pg 378 of 531   USDC Colorado

SWORN
TRANSLATION

yüzeyindeki altın ve gümüşü çözeltiye aldığı, yani boyut küçüldükçe cevher kazanım kazanım artıyor) kamyonlar ile nakil edilmekte olduğu, Buradan bantlar vasıtası ile liç alanına verilerek aktarılmakta olduğu, Hazırlanan liç alanında yaklaşık 8 metre kalınlığında cevher serilerek katlar oluşturulmakta olduğu, Liç alanı oluşturma işlemi en alt kattan itibaren yapılmakta olduğu, Toplam 13 kat (her bir kat 8 metre) oluşturulacağı beyan edildiği, Serilen cevher üzerine solüsyona (1 ton suya 350 gr siyanür, ph 10,5 üzerine çıkarmak için kireç ilave edilmekte) uygulayarak, enine boyuna küçük borular döşenerek dam ama sistemi ile cevher üzerinde (cevher üzerinde 20 cm x 20 cm boyutlarında karelaj oluşturulup, bütün karelajalara ait kenar köşelerdeki deliklerden akan solüsyon ile cevher liçe tabi tutulmakta), böylelikle bütün cevher yüzeyi bu solüsyona tabi tutularak tabanda bulunan borular vasıtası ile altın-gümüş içeren çözelti tesise alınmakta olduğu, Her bir kattaki cevhere bu solüsyon 45 gün uygulanmakta olduğu, Uygulanma sonrası yeni bir kat öncekinin üzerine yine serilmekte, bir alttaki kat üst kattan dolayı tekrar liçe tabi tutulmakta olduğu, Her bir liç alanından tesise gelen çözeltinin altın-gümüş içeriği sürekli kontrol edilmekte buna göre kat planları yapılmakta olduğu, Yaklaşık süreli liçe tabi tutulan yığın cevher 30 ay (2,5 yıl) sonra değerli minerallerinin büyük kısmının çözeltiye alındığı beyan edilmiş olduğu, Bu itibar ile faaliyet olan mangan zonu ve yakın zamanda faaliyette bulunulacak olan mermer kontak zonunda altın ve gümüşe yönelik olarak yapılan üretim faaliyeti sonucu kalker ve kil ortaya çıkmaktadır/çıkacaktır. Söz konusu ruhsat sahibi şirket tarafından Maden Kanununun 16. Maddesi kapsamında Genel Müdürlüklerine tevdi edilen 24/06/2011-112537 sayılı dilekçede kalkeri, 29/06/2011- 113730 sayılı dilekçede kili kendi proseslerinde kullanılmak üzere izin istendiğini, Mangan ve mermer kontuk zonunu içerisine alacak şekilde Maden Kanununun 16. maddesi kapsamında talep edilen kalker ve kil izninin verilmesi heyetlerin görüşü olarak belirtildiği, Heyetlerince uygun bulunan 16. madde kalker-kil izin koordinatlarının aşağıda verildiği, Tesiste yapılan incelemede, sahada liç alanından alınan altın ve gümüş ihtiva eden çözeltideki Au+Ag önce karbondan geçirilerek Au+Ag aktif karbon üzerine alınıyor, tanklarda solüsyon siyanür miktarı ve ph ayarlandıktan sonra kapalı devre yeniden liç alanına gönderildiği, sonra altın sıyırma kolonuna getirilen Au+Ag içeren karbon, yüksek sıcaklık, yüksek çözünürlükteki siyanür ve 3 bar basınç altında geçirilerek metaller (Au+Ag,) alınıyor, karbonun aktifleştirilip yeniden kullanılması için asit yıkamaya tabi tutularak kapalı devre kullanılıyor (altın tutma kapasitesinin arttırılması için seyreltilmiş nitrik asit ile muameleye tabi tutuluyor ve bu işlem ile karbon üzerindeki yağ, kireç vb. uzaklaşıyor), tetkik tarihine kullanılmayan ancak kullanılması ileride kullanılması planlanan (ekonomik bakır mevcudiyetinde) bakır sıyırma ünitesinin de mevcut olduğu görülmüş olduğu, siyanürlü ortamdaki Au(CN) iyonik halde bulunan Au+Ag, metalik duruma indirgenerek katı halde paslanmaz çelikte yapılmış olan katotta toplanmakta olduğu, alınan altın keki filtre edilerek susuzlaştırılıyor, tüvenan cevher içerisindeki Hg bu işlemler esnasında Au+Ag' ile aynı kimyasal özelliği göstererek potaya kadar gelebildiği, filtre işlemi sonrasında Hg uzaklaştırma için fırına veriliyor, burada Hg 425 derece buharlaşıyor, altın ise yaklaşık 1250 derecede, yaklaşık 520 derece oksijensiz ortamda sıcaklığa tabi tutulan altın kekinde Hg buharlaşarak vakumlu borulara alınıyor eşanjöre gelen buhar eşanjörde ani soğutmaya tabi tutularak yoğunlaşıyor, boru ile biriktirme tanklarına geliyor, eğer buhar burayı geçerse, ikinci bir eşanjörde aynı muameleye tabi tutuluyor buradan da borular ile civa toplama tankına alındığı, buradan da geçerse 2 ayrı baca gazı arıtma ünitesine tutulduğu, Bu güne kadar baca deşarjında herhangi bir Hg bulgusuna rastlanılmadığının beyan edildiği, Hg uzaklaştırma sonrası altın keki potaya ilave edilen silika, boraks, soda ile 1300 derece sıcaklığa tabi tutuluyor. Magma durumuna geçen erivik uniden dökülmesi sonucu altın ile curuf arasındaki ergime derecesi farklılığı nedeni ile altın ilk önce en altta soğuyarak katılaşıyor, curuf ise belirli bir süre erivik halini koruyarak katılaşıyor. Genel Müdürlüklerine tevdii edilen 01/07/2011 tarih ve 114358 sayılı dilekçe ile talep edilen civanın değerlendirilmesinin ekonomikliğinin olmadığı, yıllık belirtilen prosesten damıtılarak 15l -200 kg civanın satılmasının planlandığı, Hg olumsuz çevresel etkisinden dolayı Hg ayırma ünitesinin kurulduğu, ayrıca bu hususun ÇED mevzuatında yer aldığının beyan edilmiş olduğu, Civanın Maden Kanununun 16. maddesi kapsamında değerlendirilmesinin sakınca olmadığı heyetin görüşü olarak belirtildiği, Elektroliz sonrası, döküm öncesi en son yapılan analiz sonuçlarının bir suretinin heyetlerine ibraz edildiği ve rapor ekinde verildiği, Maden Kanununun 7. maddesi kapsamında yapılan tespitlerinde, raporlarının 6. Bölümünde belirtildiği, Maden Kanununun 11. maddesi kapsamında yapılan incelemelerde; Ruhsat sahasından yapılan faaliyetlerin projesine uygun olarak devam ettiği, sevkiyatlarda Genel Müdürlüklerinden alınan sevk fişlerinin kullanıldığı, sevk fişlerine kantar fişlerinin eklendiği, satış bilgi ve faaliyet bilgi formlarının zamanında verildiği, Genel Müdürlüklerine tevdi edilen 29. madde vesaikleri ile kesilen sevk fişi ve faturaların uyumlu olduğu ve oluşan devlet haklarının ödendiği tespit edilmiş olduğu beyan edilmiştir.

16. madde kapsamında kalker-kil izni verilmesi uygun bulunan alan koordinatları ve harita gösterimi ise aşağıda verilmiştir.

|   | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| Y | 459660 | 460150 | 460430 | 459880 | 459650 | 459550 | 459540 |
| X | 4364560 | 4364730 | 4354260 | 4388640 | 4363500 | 4363500 | 4363700 |

SWORN
TRANSLATION

| 08.09.2010 | Evet | |

1. (Varsa) Genel Hususlar, Diğer Tespitler, öneriler, Sonuç (Açıklama):
Numune alınan yerlerde yapılan sondaj stamplan, şirketin kendi laboratuvarlarında yapmış olduğu analiz sonuçları heyete elden takdim edilmiş, incelendiğinde altın varlığının mevcut olduğu görüldüğü, Bu nedenle, aşağıda koordinatları verilen alan için Altın (Au), Bakır (Cu) işletme izni genişletmesi heyetçe uygun bulunduğu, Sınırlar ise aşağıda verilmiştir.

Genişletilmiş Altın (Au), Bakır(Cu) koordinatları 245hk.

| no | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| y | 458400 | 459081 | 459464 | 459608 | 459925 | 460233 | 460369 | 460386 | 459894 |
| x | 4364200 | 4364225 | 4364413 | 4364474 | 4364679 | 4364637 | 4364397 | 4364120 | 4363561 |
| no | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| y | 459783 | 459600 | 458593 | 458364 | 457770 | 457750 | 457788 | 458079 | 458400 |
| x | 4363512 | 4363100 | 4363100 | 4363038 | 4363302 | 4363415 | 4363569 | 4363674 | 4363745 |

110

SWORN
TRANSLATION

| | | 16.maddeGereğ talep edilen izin koordinatları (9.23HK.) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | no | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| | | y | 459866 | 459893 | 459914 | 459946 | 460061 | 460163 | 460240 | 460398 | 460481 |
| | | x | 4364153 | 4364171 | 4364175 | 4364105 | 4364283 | 4364271 | 4364287 | 4364248 | 4364219 |
| | | no | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| | | y | 460436 | 460357 | 460339 | 460292 | 460241 | 460151 | 459987 | 459968 | 459905 |
| | | x | 4364192 | 4364147 | 4364138 | 4364123 | 4364070 | 4364031 | 4364049 | 4364066 | 4364059 |
| | | no | 19 | 20 | 21 | 22 | 23 | | | | |
| | | y | 459867 | 459859 | 459865 | 459842 | 459840 | | | | |
| | | x | 4364058 | 4364071 | 4364071 | 4364091 | 4364095 | | | | |

| Date | | Description |
|---|---|---|
| 19.01.2009 | Evet | **1. (Varsa) Genel Hususlar, Diğer Tespitler, öneriler, Sonuç (Açıklama):** Çöpler pasa sahası, ana ocak sahası, ana ocak yakınında kalan saha, ana ocak ile çöpler pasa sahası içerisine kalan sahası için kamulaştırılması zaruri olan özel mülkiyete ait arazilerin parsel numaraları, alanları ve kullanım yerleri aşağıdaki tabloda verildiği belirtilmiştir. (Kamulaştırılması istenilen parsel alanları liste halinde rapor ekinde verilmiştir.)<br><br>Ada No — Parsel No — Kullanım amacı — Alanı<br>109 — 39, 40, 47,48 — çöpler pasa sahası, ana ocak sahası, ana ocak yakınında kalan saha, ana ocak ile çöpler — 2.949,89 m2<br>110 — 11, 13 — pasa sahası içerisine kala saha<br>Ancak bu alanlar heyelan olan lech alanı kapsamı dışında mangan ocağının batısında yer almaktadır. |
| 28.11.2006 | | **Faaliyetlerin projesine uygun yürütülmediğine dair tespitler:** Açık işletmeye yönelik proje çalışmalarının devam ettiği beyan edilmiştir.<br>**1.(Varsa) Genel Hususlar, Diğer Tespitler, öneriler, Sonuç (Açıklama):** İR.257 sayılı sahada Maden Kanununun 11., 29. ve 37. maddeleri kapsamında yapılan incelemelerde; - 11. Madde kapsamında, sevk fişi alınmadığı, üretim ve sevkiyat yapılmadığı, tahakkuk eden Devlet Haklarının yatırıldığı, - 29. Madde kapsamında imalat haritasının uygun olduğu, - 37. Madde kapsamında, talep dilekçesinde belirtildiği üzere, gümüşe yönelik rezerv geliştirme çalışmalarının, ayrıca kapalı işletme yöntemi rantabl görülmediğinden kapalı işletme yönteminde kuyudaki su problemi aşılamadığından açık işletmeye yönelik proje çalışmalarının devam ettiği tespit edilmiştir. |



111

## 5.2. MADEN İŞ KAZASI OLAYININ MEYDANA GELDİĞİ YIĞIN LİÇ SAHASI VE YAKIN ÇEVRESİNİN GENEL JEOLOJİSİ, YAPISAL VE JEOMORFOLOJİK ÖZELLİKLERİNİN 2 VE 3 BOYUTLU MODELLENMESİ VE TEKNİK ANALİZİ

### 5.2.1. Şev Duraylılığı Bozularak Kaymaya Maruz Kalan Yığın Liç Sahasının Coğrafi Konumu

Yığın liç sahası coğrafi konumu, Doğu Anadolu Bölgesinin batı kesminde, Erzincan ili, İliç ilçe merkezi meskun alanının yaklaşık 4 km güneybatısında, Çöpler ve Sabırlı Köylerinin sınırları içerisinde yer almaktadır. 1/25000 ölçekli J41a1 nolu memleket haritasında bu saha doğudan Sabırlı Deresi ile güneyden sığıryatağı sırtı ile batı ve kuzeybatı istikametinde ise Ana ocak ve Eski Mangan Açık İşletme ocağı ile sınırlandırılmıştır.



*Şekil 1.Maden Kazası olayının gerçekleştiği Maden İşletmesinin yerbulduru haritası (Googlemap ve HGM-J41a1, 1/25000 ölçekli, memleket haritasındaki konumu).*



112

### 5.2.2. Maden Sahasının Jeolojik Özellikleri

Çöpler porfiri-epitermal altın cevherleşmesi Alp-Himalaya orojenik kuşağında "Tetis Avrasya Orojenik Kuşağı" (Jankovic, 1986; Jingwen vd., 2014) içerisinde yer alan, açılmalı/genişlemeli tektonik bir fazla bağlantılı magmatizmayla doğrudan ilişkili bir yatak olduğu, İnceleme alanının temelini Keban Metamorfitlerine ait bölgesel metamorfizma ürünü Permo-Triyas yaşlı metasedimanter kayaçların oluşturduğu (Özgül vd., 1981; Özgül ve Turşucu, 1984), stratigrafik olarak alt seviyeleri oluşturan metasedimanter istif ofiyoliterin Geç Kretase'de Torosların kuzey kenarına doğru yerleşimiyle ilişkili olarak düşük-dereceli metamorfizmaya (alt yeşilşist fasiyesi) uğramış olduğu, Metasedimanter kayaçların başlıca fillitlerle temsil edilmekte olduğu, düşük sıcaklık yeşil şist fasiyesinde metamorfizmasını temsil eden klorit + kuvars + serizit/mika + epidot mineral birlikteliğiyle karakteristik olduğu, Metamorfik temel, Geç Triyas-Kretase yaşlı allokton karbonat platformu Munzur Kireçtaşı (Özgül vd., 1981) tarafından tektonik bir sınır boyunca üzerlendiği, Munzur kireçtaşları kalınlığının 1200 m'ye ulaşan masif ve tabakalı çoğunlukla kristalize kireçtaşlarından (intrabiyomikrit) oluştuğu, Granitoyid sokulumlarının çevresinde kontakt metamorfizma etkisiyle granoblastik dokulu mermerlere dönüştüğü, Plütonik-mermer sınırlarında epidot granat, skapolit, klorit ve tremolit/aktinolit minerallerinin geliştiği küçük çaplı yersel skarn oluşumları ile kahverengi renkli biyotitçe-zengin ve soluk yeşil renkli diopsitçe-zengin hornfeslerin geliştiği, bölgede çalışma yapmış araştırmacılar (İmer vd., 2013, 2016; Canbaz ve Gökçe, 2014) tarafından belirtilmiştir. Orta Eosen magmatik kayaçların (porfirik granitoyidler) meta-sedimanter temel ve kireçtaşları içerisine sokulumunun birkaç yüz metreden birkaç kilometreye kadar ulaştığı, ayrıca erken evre porfiri cevherleşmenin başlıca ana zonda açığa çıkan granodiyorit porfirinin içerisinde gelişmiş olup, 300 × 500 m'lik bir alanca yüzeylenmekte olduğu, bölgenin aynı zamanda porfiri sistemi etkileyen küçük çaplı epitermal mineralizasyon içerdiği de İmer vd. (2016) tarafından belirtilmiştir (şekil 2, 3).



*Şekil 2. Maden İşletme sahasında gözlenen kaya birimleri (tektono-stratigrafik harita İmer vd., 2016'dan alınmıştır) ve faz olarak belirtilen yığın liç alanının konumu (ED50-UTM6D-CM37).*





*Şekil 3.Bölgenin genel tektono-stratigrafik dikme kesiti (Bilgiç, 2001'den alınmıştır)*

Bozkaya ve diğ. (2018), tarafından bölgede yapılan araştırmalarda; Çöpler altın yatağı ve çevresinde geniş alanlara yayılmış büyük ölçekli ve yaygın arjilik alterasyonun geliştiğinin belirlendiği, arjilik alterasyon zonları genellikle granodiyorit porfiri çerisinde Munzur kireçtaşı bindirme sınırına yakın kesimlerde konumlandığı, Arjilik alterasyonun bol kil ve silis içeriği nedeniyle açık renkli (beyaz, açık krem) görünüm sergilemekte olduğu (Arjilik zona ait örnekler fillik zona yakın iç kesimlerde "ileri arjilik zon" kuvars + I-S (illit-simektit), kuvars + krandallit + jarosit ve kristobalit, dış kesimlerde "arjilik zon" ise kuvars + simektit + kaolinit birliktelikleri sergilemektedir), demiroksit-hidroksit (limonit) bozuşmaları nedeniyle yer yer sarımsı-turuncu-bordo/kahverengi zonlarında eşlik ettiği, Kilce-zengin alterasyon zonları onlarca metre yayılım sunan geniş ölçekli yayılımların yanısıra bozuşmuş granodiyorit porfir kütlesi içerisinde iç kesimleri silis ve kil minerallerince zengin beyaz, çeperleri sarımsı turuncu renkli limonitçe zengin 50-100 cm kalınlığa sahip damar dolguları biçiminde de gözlendiğini belirtmişlerdir.

### 5.2.3. Yığın Liç Sahasının Maden Sahasındaki Konumu ve Jeolojisi

13.02.2024 (Salı, zaman 14:28) tarihinde şev stabilitesi bozularak yenilen yığın liç sahası (Faz 1,2,3 ve 4 nolu bölgeler), Anagold A.Ş 'nin uhdesinde olan R.S:847 nolu Çöpler maden işletme sahasının doğu kesiminde yer almaktadır. Yığın liçin taban kayasını Alt Triyas-Kretase yaşlı mermer ve kireçtaşlarından oluşan Munzur kireçtaşları oluşturmaktadır. Bu istif Keban Metamorfiklerini tektonik bir dokanakla üzerlemektedir. Allokton Munzur Kireçtaşlarının bölgeye yerleşmesi sonrası çöpler bölgesinde birimin aşınması sonucu maden sahasının bulunduğu bölge Çöpler penceresi olarak tanımlanmaktadır. Kireçtaşı kaya birimleri masif görünümlü yer yer kalın tabakalı bol kırıklı ve çatlaklı bir yapıya sahiptir. Arazide yapılan gözlemlerden bu birim içinde karstik boşlukların yaygın olarak gözlendiği, birim içerisinde, dar vadi ve dere yataklarının geliştiği bölgelerde dik yamaçların oluştuğu da gözlenmiştir.

114

SWORN
TRANSLATION

### 5.2.4. Yığın Liç Sahasının ve Malzemesinin Özellikleri

MAPEG tarafından maden kanunu kapsamında maden işletme sahasının kontrol ve denetimine ilişkin yapılan inceleme ve tetkik raporlarında tespit ve işletmeci beyanları kapsamında yığın liç tesisi ve malzeme özelliklerinin değerlendirmesi yapılarak aşağıda verilmiştir. Açık ocak planı kapsamında yapılan basamaklandırma ile mineralizasyon zonuna inildiği ve altın-gümüş üretimine geçilerek, mineralizasyon diyorit intrüzif kolları, mermer ve diyoritler arasındaki kontak bölgede cevherleşmenin geliştiği, dissemine mineralizasyonun ise kontak zonunun dışında oluştuğu, bu bölgelerden boyutlandırılabilecek özellikteki kalkeri mobil kırıcılar vasıtası ile kırılarak boyutlandırılan kalker yığın liç alanında kullanılmaktadır. Ocak içerisinde değişik seviyelerde kireçtaşlarının çatlaklarındaki mineralizasyon alanında kil oluşumları gelişmektedir. Cevher içermeyen, sıkıştırılabilir geçirgensiz kil yığın liç alanlarının tabanında sızdırmaz malzeme olarak kullanılmaktadır. Mangan zonundaki ocak tabanında yaklaşık 20 m x 30 metre boyutlarında ocak tabanında gri tonlarda kil (yapılan testler sonucu cevhersiz ve geçirimsiz olması nedeniyle buralardan alınan kil malzemesi). Yığın liç alanına önce yaklaşık 30 cm kalınlığında sıkıştırılabilir/sızdırmaz özellik kazandırılmak amacı ile tesviyesi yapılmış yüzey üzerine serilen kil tabakasının sıkıştırılmasını müteakip üzerine bentonit emdirilmiş jeotekstil (kil ile eşdeğer geçirimsizlikte) bu seviyenin üzerine de polietilen/geomembran serilmektedir. Üzerine çözeltiyi toplayacak tesise drene edecek şekilde ve özelikte borular yerleştirilerek, üzerine filtre amaçlı olarak +12 mm -35 mm boyutlarında (boyutlandırılmış) kalker serilerek liç alanı hazırlanmaktadır. Hazırlanan liç alanı üzerine ocaktan üretilerek ocak yakınında kurulu kırıcı ünitelerde hazırlanan cevher tüvenan olarak serilerek yığın liçi oluşturulmaktadır. Siyanürlü solüsyon, cevher içeren parçanın içerisindeki altın ve gümüşü çözeltiye almamakta, sadece agreganın/parçanın yüzeyindeki altın ve gümüş çözeltiye almaktadır. Yığın liç içerisindeki parça boyutu küçüldükçe cevher kazanımı artmaktadır. Kamyonlar ile nakil edilen malzeme bantlar vasıtası ile liç alanına serilerek aktarılmakta, liç alanında yaklaşık 8 metre kalınlığında cevher serilerek katlar oluşturulmaktadır. Liç alanı oluşturma işlemi en alt kottan itibaren yapılmakta, toplam 13 kat (her bir kat 8 metre) oluşturularak, serilen cevher üzerine solüsyon (1 ton suya 350 gr siyanür, ph 10,5 üzerine çıkarmak için kireç ilave edilmekte) uygulanmaktadır. Enine boyuna kauçuk borular döşenerek damlama sistemi ile cevher yüzeyi (cevher üzerinde 20 cm x 20 cm boyutlarında karelaj oluşturulup, bütün karelajalara ait kenar köşelerdeki deliklerden akan solüsyon ile cevher liçe tabi tutulmakta), bu solüsyona tabi tutulmaktadır. Yığın liç tabanına süzülen solüsyon yığın içinden Au+Ag+Hg gibi metalleri çözerek bünyesine aldıktan sonra yığının tabanın bulunan borular vasıtası ile çözelti tesise alınmaktadır. Her bir kattaki cevhere bu solüsyon 45 gün uygulanmakta olup, uygulanma sonrası yeni bir kat öncekinin üzerine yine serilmekte, bir alttaki kat üst kattan dolayı tekrar liçe tabi tutulmakta ve herbir liç alanından tesise gelen çözeltinin altın-gümüş içeriği sürekli kontrol edilerek kat planları yapılmaktadır. Liçe tabi tutulan yığın cevherinin 30 ay (2,5 yıl) sonra değerli minerallerinin büyük kısmının çözeltiye alındığı kabul edilmektedir.

### 75.2.5. Yığın Liç Tesisi (YLT) Faz Yüzeylerinin Topografik Ve Jeomorfolojik Analizi

Savcılık soruşturma dosyası kapsamında Yığın Liç Tesisinde (YLT) meydana gelen kaymanın bulunduğu alanların farklı dönemlerde alınmış sayısal yükseklik ve yüzey modellerinin analizi ile YLT fazlarını kapsayan 3 Jeolojik hat ve 1 topografik profil üzerinden değerlendirilmiştir. Sözel ve sayısal) verilerin tasniflenmesi, düzenlemesi ve analizlerinde CBS ve UA tekniklerini içeren QGIS, Global Mapper yazılımları ile Slide (Rocscience), MS Office (Excel), Notepad vb. yazılımlar kullanılmıştır.



SWORN
TRANSLATION



*Şekil 4.A-B Hattına ait Jeolojik Profil*



*Şekil 5.C-D Hattına ait Jeolojik Profil*



*Şekil 6.E-F Hattına ait Jeolojik Profil*

116



SWORN
TRANSLATION



*Şekil 7. G-H Hattına ait Topografik Profil*

Jeolojik profiller üzerinde yapılan analizlerde kaymaya uğrayan YLT'nin kayma sonrası oluşan (AB-CD-EF kesitlerindeki kırmızı renkli hat ile gösterilen) üst topografik yüzeyinin maden işletme dönem öncesi (AB-CD-EF kesitlerindeki siyah renkli hat ile gösterilen) topografya yüzeyi ile paralellik gösterdiği, Kaymanın güney-kuzey istikametinde Faz-4'ün üst kotlarından (Faz-4B bölgesinden) başladığı, Faz4 ve Faz3'ün birleşim hattından sonra kayma olayının yön değiştirerek yaklaşık K45D istikametinde Faz3 ve Faz4 altında yer alan eski kuru dere yatağına paralel olarak hareket ettiği, için çok küçük bir bölümünün ise Mangan Açık işletme Ocağı içerisine ilerlediği, eski kuru dere yatağının Sabırlı deresine bağlandığı bölgede kaymanın tekrar yön değiştirerek sabırlı mecra hattı boyunca tekrar güney-kuzey istikametinde aktığı tespit edilmiştir.

YLT kayma olayının Faz4B'nin üst kotlarında başladığı, doğal topografya üzerine yerleştirilen mebran boyunca yaklaşık 350-400 metre ilerledikten sonra kayma yüzeyi doğal topografik yüzeyden değil, 30.12.2023 tarihli topografik yüzeyin ortalama 50-55 metre alt kotlarından YLT içerisinde hareketini sürdürerek, doğu bölgesindeki toplanma alanında yer alan konteynırların yaklaşık 200 metre K35B istikametinde 1195 kotun bulunduğu alandaki YLT şev yüzeyini patlatarak hızlı akma tarzındaki bir hareket ile yenilen malzeme sabırlı deresine yönelerek akışını sürdürmüştür.

Meydana gelen Maden İş kazasında, olayın hızlı ve anlık geliştiği, kayma olayının başlaması sonrasında, kayma hareketinin jeomorfolojik ve topografik unsurların etkisi altında kaldığı, YLT kaymasının nedenleri arasında yığın İç tasarım/dizayn projesinin yeterli güvenlik kriterini barındırmadığı ve proje tasarımında jeomorfolojik ve topografik etkilerin (kuru dere yatakları, vadi ve yamaç yüzeylerinin eğimleri, vadi tipleri, yamaç yönelimi vb.) şev duraylılığını sağlayacak ölçülerde yeterince dikkate alınmadığı,

Bu nedenlerle; "Maden Atıkları Yönetmeliğinin Ek 5 te yer alan parametrelerden pasa yığınları söz konusu olduğunda, risk değerlendirmesinde -Tesisin boyutu ve özellikleri, – Tesisteki atığın miktarı ve niteliği, – Yığının şev açısı, – Yığın içinde dahili yer altı suyu oluşma potansiyeli, – Zeminin duraylılığı, – Topoğrafya, – Su yollarına, yapı ve binalara yakınlık gibi faktörlerin göz önünde bulundurulması gerektiği,, •Malzeme yığınının stabilitesine yönelik olası bir kayma/heyelan türü bir yapısal bozulma sonucunda herhangi bir kalıcı veya uzun süreli çevresel etki olasılığı söz konusu ise •Topoğrafik kısıtlamalara bağlı olarak, tesisin tasarımı potansiyel yıkılma türü bozulmalara karşı yeterli değilse tesisin Kategori A olarak sınıflandırılması gerekliliklerinin" yerine getirilmediği kanaatine varılmıştır.

117





SWORN
TRANSLATION

### 5.3. LİÇ SAHASINDA, ŞEV DURAYSIZLIĞINA NEDEN OLAN ETKENLER İLE YENİLMENİN ÖNCESİ, ANI VE SONRASI KULLANILAN ERKEN İKAZ SİSTEMLERİNİN (RADAR, İNSAR, PRİZMA, PİEZOMETRE, TİLTMETRE, MANYETİK YÖNTEM VB.) İNCELENMESİ, MADEN İŞLETME SÜRESİ VE SONRASINDA İZİN VERİLEBİLİR DÜŞEY VE YATAY YÖNDEKİ YER DEĞİŞTİRMELERİN GEOTEKNİK DEĞERLENDİRMESİ VE ANALİZİ

#### 5.3.1. YIĞIN LİÇ SAHASININ GEOTEKNİK DEĞERLENDİRMESİ

Yapılan incelemelerde aşağıdaki sorulara cevaplar aranmış ve detaylar tablonun alt kısmında açıklanmıştır:

| Sorular | Özet olarak cevaplar (detayları tablonun aşağı kısmında görülebilir) |
|---|---|
| Yığın liç sahasındaki kayma olayı deprem veya aşırı yağış gibi bir doğa olayı nedeniyle tetiklenmiş olabilir mi? | Hayır. |
| Yığın liç sahasındaki malzeme, daha önce her faz için örnekler alınarak, zemin mekaniği laboratuvarına gönderilerek deneyleri yapılmış olan malzemeler ile aynı/benzer malzeme midir? | Esas itibariyle Evet. Malzemeler arasında belirgin bir fark görülmemiştir.<br><br>Yığın liç sahasına gönderilen ve serilen malzemenin, zaman içinde siyanürlü solüsyon ile sulama nedeniyle veya üzerine yığılan diğer fazlardaki malzemelerin oluşturduğu ilave düşey basınçlar nedeniyle bir gradasyon değişimine uğrayıp uğramadığı konusunda kesin bir yargıya varılamamakla birlikte, siyanürlü solüsyon uygulanması sonrası yığın liç sahasındaki malzemenin ince dane yüzdesinde ufak bir artış söz konusu olabilir. |
| Yığın liç alanına serilen malzemenin üzerinden siyanürlü çözelti verildiğinde bu işlemler süresince ve sonrasında zemin özelliklerinde zaman içinde bir değişiklik beklenmekte midir? Bunun kayma olayına bir etkisi olmuş olabilir mi? | Bu konuda kesin bir yargıya varılamamakla birlikte, siyanürlü solüsyon uygulanması sonrası yığın liç sahasındaki malzemenin ince dane yüzdesinde ufak bir artış, ve buna bağlı olarak kayma dayanımında ufak bir azalma söz konusu olabilir. |
| Her fazda benzer malzeme mi yığılmış/serilmiştir? Yığın liç sahasındaki malzeme değişkenlik içermekte midir? Değişkenlik içermekte ise bu | Hayır, her fazda benzer malzeme serilmemiştir. Yığın liç alanındaki malzeme bir miktar değişkenlik içermektedir. Bu durumun şev stabilitesi analizlerinde göz önüne alınması gereklidir. |

SWORN
TRANSLATION

| | |
|---|---|
| durum şev stabilitesinde etkili olabilir mi? | Yığın liç alanındaki malzemenin çoğunluğu "siltli kum, SM", ikincil çoğunlukta da "siltli çakıl, GM" olup, ortalama ince dane yüzdesi %22 (%16-28% aralığında), ortalama plastisite indisi %9 (maksimum %21)'dir. Firmanın belirttiğine göre, yığın liç alanındaki toplam cevher miktarı yaklaşık 60 milyon ton olup bunun yaklaşık %21'inin "kil tesisinde işlenerek Yığın Liçi sahasına istiflenen killi cevher" olduğu belirtilmiştir. |
| Yığın liç sahasına serilen malzemenin arazideki sıkılık durumu nedir? Laboratuvar üç eksenli basınç kayma mukavemeti deneylerinde kullanılan numune sıkılık durumu ile benzer midir? Farklılık var ise bu durumun şev stabilitesinde etkisi olabilir mi? | Yığın liçi sahasında, arazide-yerinde sıkılık durumu ile laboratuvarda kayma dayanımının belirlendiği sıkılık durumu birbirinden, malzemenin kayma dayanımını belirgin bir seviyede etkileyecek mertebede farklı değildir; en farklı durum için, laboratuvardaki sıkılık durumunda ölçülen kayma dayanımının, örneğin, içsel sürtünme açısı değerinin arazide 1 derece kadar daha düşük olabileceği düşünülebilir. Şev stabilitesi güvenlik sayısı hesaplanmasında bu durum göz önüne alınmalıdır. |
| Yığın liç malzemesinin kayma mukavemeti parametreleri doğru belirlenmiş midir? Bunun şev stabilitesi analiz sonuçlarına etkisi olabilir mi? | Doğru belirlenmemiştir. Ancak kayma yüzeyi çoğunlukla tabandaki geosentetik-zemin, geosentetik-geosentetik arayüzlerinden, veya geosentetik kil örtü içinden geçmektedir. Bu nedenle yığın liç dayanım parametrelerinin çok ciddi bir etkisi olmamaktadır; ancak yine de yığın liç dayanım parametrelerinin daha düşük değerler alınması gerekirdi. |
| Şev stabilitesine destek olması amacıyla yığın liç sahasının doğu ve batı taraflarında topuk kaya dolgusu (buttress) yapılmıştır. Bu malzemenin dayanım parametreleri doğru seçilmiş midir? | Yaklaşık olarak doğru seçilmiştir, ancak bir miktar daha düşük parametreler kullanılması daha doğru bir mühendislik yaklaşımı olurdu. |
| Yığın liç sahasında kullanılan geosentetik ürünler (geomembran, geosentetik kil örtü, geotekstil) malzemeler ile bu geosentetik malzemelerin altında-üzerinde bulunacak olan yığın liç veya zemin malzemeleri arasındaki arayüz kayma mukavemetini belirlemek için deneyler yapılmış mıdır? Deney sonuçlarına göre | Evet, geosentetik-zemin arayüz deneyleri yapılmıştır. Analizlerde doğru parametreler kullanılmamıştır. Deney verilerinde çok ciddi mertebede değişkenlik vardır. Bu da geosentetik-geosentetik ve geosentetik-zemin arayüzlerinin kayma mukavemetlerinin çok faktörden etkilenmesindendir. |

119



SWORN
TRANSLATION

| | |
|---|---|
| analizlerde doğru parametreler kullanılmış mıdır? | |
| Hem kaya-zemin malzemelerde hem de geosentetik-zemin arayüz kayma mukavemetinde yüksek normal basınçlar altında yenilme zarfının doğrusal olmayabildiği bilinmektedir. Bu kayma olayında doğrusal olmayan kayma mukavemeti zarfının bir etkisi olmuş olabilir mi? | Yenilme zarflarının 1800 kPa gibi yüksek düşey basınçlar altında doğrusal olmaması durumu incelenmiştir, ancak şev stabilite analizlerini ciddi bir seviyede etkileyecek kadar bir etkisi olmayacağı değerlendirilmiştir. |
| Radar ölçümleri ile belirlenen zemin hareketi ölçümlerine göre, uyarı verme ve gerekli önlemleri alma açısından bir kusur var mıdır? Hangi zemin hareket hızı değerinden sonra hangi seviye uyarı-alarm verilmesi gerektiği, bu değerler doğru tanımlanmış mıdır? Ne zaman uyarı-alarm verilmesi gerekirdi? | Kusur vardır. Limit değerlerin doğru seçilmediği ve gereken uyarıların verilmediği ve acil eylem planının yürütülmesinde kusurlar olduğu anlaşılmaktadır. |
| Siyanürlü solüsyonun yol açabileceği daha yüksek bir su seviyesi olması muhtemel midir, böyle bir durum şev stabilitesi analizlerinde göz önüne alınmış mıdır? | Alınmamıştır. Mevcutta tabanda 1 m yükselen suyun, daha fazla yükselmesi ihtimali göz önünde bulundurularak farklı su durumu için de şev stabilite analizlerinin yapılması yerinde olurdu. |
| Tasarımda, şev stabilitesi analizlerinde 2-boyutlu analizlerde yeterli sayıda kritik kesit kullanılmış mıdır? | Hayıt. Kullanılan kesitler yetersizdir. |
| Şev stabilitesi analizlerinde sağlanması gereken minimum güvenlik sayısı değeri doğru seçilmiş midir? | Hayır. Güvenlik sayısı için 1.0-1.3 değerleri GRE firması tarafından yeterli bulunmuş olmakla birlikte, bu değerler yetersizdir. |
| 3-boyutlu şev stabilitesi analizleri yapılmış mıdır? | Evet. Ancak kullanılan dayanım parametreleri doğru değildir. |



SWORN
TRANSLATION

## YIĞIN LİÇ MALZEMESİNİN ÖZELLİKLERİ

Yığın liç sahasındaki malzemenin tanımlanması amacıyla Erzincan İliç'te Anagold Çöpler maden sahasında, 16 Mart 2024 tarihinde bilirkişi heyeti keşif çalışması esnasında, yığın liçi sahasından numuneler alınmıştır.

Yığın liç alanında 3 farklı lokasyonda (Lokasyon 1, 2, 3)  5 adet malzeme örneği alınmıştır (örnek 1, 2, 3A, 3B ve 3C). Yığın liç sahası ve çevresinde kayma hareketlerinin devam etmesi ihtimali ve güvenlik göz önüne alınarak sınırlı sayıda lokasyondan numune alınabilmiştir. Numune lokasyonları ve alındıkları yerlerden fotoğraflar Şekil 1-Şekil 9'da sunulmaktadır. Numune 1 ve Numune 2 yığın liç alanında, kaymamış/stabil bölgelerdeki yığın liç basamaklarından; Numune 3A, 3B ve 3C ise Sabırlı deresine kaymış-akmış olan malzemeden, bir diğer deyişle, kayma nedeniyle karışmış ve örselenmiş malzemeden alınmıştır.

### Numune Lokasyonu-1

Koordinatı
X: 460 291.86m
Y: 4 363 769.49m
Z: 1 280.04m




*Şekil 1. Numune Lokasyonu-1 (görseller ve koordinatlar firma tarafından sağlanmıştır)*



121

## Numune Lokasyonu-2

Koordinat:
X: 460 577.06m
Y: 4 363 627.14m
Z: 1 362.24m





*Şekil 2. Numune Lokasyonu-2 (görseller ve koordinatlar firma tarafından sağlanmıştır)*



*Şekil 3. 2 no'lu numunenin alındığı nokta (Faz 4B malzemesi). Fotoğraf 16 Mart 2024'te Nejan Huvaj tarafından çekilmiştir. Fotoğraf, heyelan aynasını (kayma yüzeyinin üst kısmını) gösterdiği bakımından da önemlidir. Numune, kayma yüzeyinin gerisinden, stabil kısımdan alınmıştır.*



122

SWORN
TRANSLATION



*Şekil 4-2 no'lu numunenin alındığı nokta (Faz 4B malzemesi). Fotoğraf 16 Mart 2024'te Nejan Huvaj tarafından çekilmiştir. Heyelan aynası (kayma yüzeyi) fotoğrafta görülmektedir.*



*Şekil 5-2 no'lu numunenin alındığı nokta (Faz 4B malzemesi). Fotoğraf 16 Mart 2024'te Nejan Huvaj tarafından çekilmiştir.*



SWORN
TRANSLATION

## Numune Lokasyonu-3

Koordinat:
X: 461 024.85m
Y: 4 364 801.03m
Z: 1 086.29m





*Şekil 6. Numune Lokasyonu-3 (görseller ve koordinatlar firma tarafından sağlanmıştır)*



*Şekil 7. 4 no'lu numune lokasyonu. Sabırlı deresine kaymış-akmış olan, karışık yığın liç malzemesi. Fotoğraf 16 Mart 2024'te Nejan Huvaj tarafından çekilmiştir.*



124

SWORN
TRANSLATION



*Şekil 8. 3A, 3B ve 3C numaralı numunelerin alındığı 3 no'lu lokasyon (heyelan sonrası Sabırlı dere yatağına akmış olan malzeme). Fotoğraf 16 Mart 2024'te Nejan Huvaj tarafından çekilmiştir.*



| Numune 1 | Numune 2 |
| Numune 3B | Numune 3C |

*Şekil 9. Numunelerin alındığı noktalarda yakından görüntüleri. Fotoğraflar 16 Mart 2024'te Nejan Huvaj tarafından çekilmiştir.*



SWORN
TRANSLATION

Alınan malzeme örnekleri ODTÜ İnşaat Mühendisliği Bölümü'nde Doç. Dr. Nejan HUVAJ tarafından 18 Mart 2024 tarihinde, Erzincan Merkez İlçe Jandarma Komutanlığı jandarma görevlilerinden, iki mavi renkli termos kap içerisinde, ağzı bantlanmış 6 torba şeklinde teslim alınmıştır (2 no'lu numuneden 2 torba örnek alınmıştır). 1, 2, 3A, 3B ve 3C olarak isimlendirilen toplam 5 numune deneylere tabi tutulmuştur. Tüm deneyler ODTÜ İnşaat Mühendisliği Bölümü Zemin Mekaniği Laboratuvarı'nda Doç. Dr. Nejan HUVAJ ve Araş. Gör. Mert ERBAŞ tarafından yapılmıştır.

18 Mart 2024 tarihinde teslim alınan zemin numuneleri, siyanürlü solüsyon içermesi olasılığı nedeniyle, gerekli iş sağlığı ve güvenliği kurallarına göre kişisel koruyucu malzemeler kullanılarak açılmış, torbalarından çıkartılmış, çeyrekleme yöntemiyle numuneyi temsil edecek şekilde yapılması planlanan deneyler için kısımlara ayrılmış (Şekil 10) ve şu deneyler yapılmıştır: doğal su muhtevası, elek analizi (kuru yöntem ile), elek analizi (yıkamalı yöntem ile), hidrometre deneyi, Atterberg limitleri, özgür ağırlık (spesifik gravite).





Şekil 10    laboratuvara getirilen numune torbalarının açılması ve 2 numaralı numunenin görülmesi.

İki farklı yöntem ile elek analizi yapılmasının sebebi şudur: ince daneli ve iri daneli zeminler içeren (karışık zeminlerde, ince dane yüzdesinin doğru belirlenmesi için, iri danelerin üzerine yapışmış olan ince danelerin su ile yıkanarak ayrıştırılması ve bu nedenle yıkamalı elek deneyi yapılması gereklidir (Şekil 11). Doğal su muhtevası belirlenmesinde dane boyu düşünülerek temsili olması açısından 2,1 kg ila 2,9 kg arasında kuru numune ağırlığı kullanılmıştır. Yıkamalı elek deneyinde No.200 elekten geçen daneler (0.074 mm'den küçük daneler) toplanmış ve kurutulduktan sonra bu kısımda

126



SWORN
TRANSLATION

hidrometre deneyi yapılmıştır. Özgül ağırlık deneyi, yıkamalı elek deneyinden elde edilen No.200 elekten geçen daneler (0.074 mm'den küçük daneler) kısmında yapılmıştır. Atterberg limitleri deneyi iki farklı şekilde numune hazırlanarak yapılmıştı: (1) Kuru elek deneyinden elde edilen No.40 elekten geçen (0.420 mm'den küçük) daneler kısmında yapılmıştır. (2) Yıkamalı elek deneyinden elde edilen No.200 elekten geçen (0.074 mm'den küçük) daneler kısmında yapılmıştır. Her iki türlü hazırlanan Atterberg limit deneylerinde, Casagrande kabı yöntemi kullanılmış, "ıslaktan kuruya" doğru, "çok nokta yöntemi" ile yapılmıştır. Sonuçlar "tek nokta yöntemi" ile de teyit edilmiştir. 18 Mart 2024 – 11 Nisan 2024 tarihlerinde yapılmış olan tüm deneylerin sonuçları aşağıda sunulmaktadır.




Numune 3C                                              Numune 3B

*Şekil 11. Yıkamalı elek analizinde, numunelerin No.200 elekten yıkanması ve fırında kurutulması sonrasında, No.200 elek üzerinde kalan (0.074 mm'den büyük) danelerin görüntüsü*

Elek analizi ve hidrometre deneylerinden elde edilen dane boyu dağılımı, gradasyon eğrileri Şekil 12-Şekil 13'te gösterilmiştir. Elek analizi sonuçları ve Birleştirilmiş Zemin Sınıflandırma Sistemi (Unified Soil Classification System, USCS)'ne göre zemin sınıflandırmaları Tablo 1'de, Atterberg limit deneylerinin sonuçları ise Tablo 2'de sunulmaktadır.



*Şekil 12. Elek analizi (kuru yöntem) sonucu elde edilen dane boyu dağılımı, gradasyon eğrileri*





*Şekil 13. Elek analizi (yıkamalı yöntem) ve hidrometre deneyleri sonucu elde edilen dane boyu dağılımı, gradasyon eğrileri*

*Tablo 1. 16 Mart 2024'te alınan numunelerde yapılan elek analizi deneylerinin sonuçları ve zemin sınıflandırması*

| Numune numarası: | 1 | 2 | 3A | 3B | 3C |
|---|---|---|---|---|---|
| Doğal su muhtevası (%) | 8.0 | 12.4 | 12.0 | 13.0 | 13.0 |
| 0.074 mm'den küçük danelerin özgül ağırlığı, Gs | 2.748 | 2.804 | 2.725 | 2.781 | 2.780 |
| **ELEK ANALİZİ (KURU YÖNTEM İLE)** | | | | | |
| Çakıl yüzdesi, % (4.76 mm'den büyük dane yüzdesi) | 60.4 | 48.2 | 44.8 | 51.9 | 51.6 |
| Kum yüzdesi, % (0.074 mm ile 4.76 mm arasında kalan dane yüzdesi) | 36.3 | 45.9 | 45.8 | 44.6 | 42.3 |
| İnce dane yüzdesi, % (0.074 mm'den küçük dane yüzdesi) | 3.3 | 5.9 | 9.5 | 3.6 | 6.1 |



128

SWORN
TRANSLATION

| Birleşik Zemin Sınıflandırma Sistemi, USCS'ye göre zemin sınıflandırma ismi | GW (iyi derecelenmiş çakıl) | GW-GM (iyi derecelenmiş çakıl-siltli çakıl) | SP-SM (kötü derecelenmiş kum-siltli kum) | SW (iyi derecelenmiş kum) | GW-GC (iyi derecelenmiş çakıl-killi çakıl) |
|---|---|---|---|---|---|
| **ELEK ANALİZİ (YIKAMALI YÖNTEM İLE)** | | | | | |
| Çakıl yüzdesi, % | 55.6 | 44.6 | 41.1 | 38 | 42.5 |
| Kum yüzdesi, % | 29.8 | 35.9 | 44.5 | 40.1 | 35 |
| İnce dane yüzdesi, % | 14.5 | 19.5 | 14.4 | 21.9 | 22.5 |
| Bütün numunede kil yüzdesi, %, CF (0.002 mm'den küçük dane yüzdesi): | 4.0 | 5.5 | 3.0 | 6.6 | 7.3 |
| USCS zemin sınıflandırma ismi | **GM** (Siltli çakıl) | **GM** (siltli çakıl) | **SM** (siltli kum) | **SM** (siltli kum) | **GC** (killi çakıl) |

*Tablo 2  16 Mart 2024'te alınan numunelerde yapılan Atterberg limitleri deneylerinin sonuçları*

| Numune numarası: | 1 | 2 | 3A | 3B | 3C |
|---|---|---|---|---|---|
| **Atterberg Limitleri:** Kuru elekten, No.40 elek altı (0.425 mm'den küçük) daneler üzerinde yapılmıştır, Casagrande çok-noktalı yöntem (ıslaktan kuruya doğru) | | | | | |
| Likit Limit, LL (%): | 30 | 30 | 21 | 32 | 30 |
| Plastik Limit, PL (%): | 24 | 24 | 21 | 24 | 22 |
| Plastisite İndisi, PI (%): | 6 | 6 | 0 | 8 | 8 |
| İnce dane kısmının USCS sınıflandırmasına göre ismi: | ML (düşük plastisiteli silt) | ML (düşük plastisiteli silt) | N.P. (Non-plastik) (ML) | ML (düşük plastisiteli silt) | CL (düşük plastisiteli kil) |
| **Atterberg Limitleri:** Yıkamalı elekten, No.200 elek altı (0.074 mm'den küçük) daneler üzerinde yapılmıştır, Casagrande çok-noktalı yöntem (ıslaktan kuruya doğru) | | | | | |
| Likit Limit, LL (%): | 45 | 40 | 36 | 47.5 | 44 |
| Plastik Limit, PL (%): | 30 | 26 | 36 | 29.4 | 26 |
| Plastisite İndisi, PI (%): | 15 | 14 | 0 | 18.1 | 18 |
| İnce dane kısmının USCS sınıflandırmasına göre ismi: | ML | ML | N.P. (Non-plastik) (ML) | ML | CL |
| Aktivite: Plastisite indisi / Kil yüzdesi, (PI/CF): | 6/4 = 1.5 Veya 15/4=3.7 | 6/5.5 = 1.1 Veya 14/5.5=2.5 | 0.0 | 8/6.6 = 1.2 Veya 18.1/6.6 = 2.7 | 8/7.3 = 1.1 Veya 18/7.3 = 2.5 |



129

SWORN
TRANSLATION

16.03.2024 tarihinde sahadan alınan numunelerden yalnızca 1 ve 2 numaralı numuneler yığın liç alanında, basamaklarda bulunan orjinal malzemeler olup, 3A, 3B ve 3C no'lu numuneler ise 13 Şubat 2024 tarihinde oluşan heyelan ile Sabırlı Deresi'ne akmış ve yığın liçinin farklı kısımlarından gelip birbiri ile karışmış olan malzemelerdir. Dolayısıyla 3A, 3B ve 3C numaralı örnekler, yığın liçinde (yerindeki) malzemenin gradasyon özelliklerini temsil etmeyecektir. Örneğin, akarken farklı seviyelerdeki malzemeler karışmış olabileceğinden, o numunelerde "numunenin içindeki ince dane yüzdesi" yığın liçindeki ince dane yüzdesini temsil etmez. Bu nedenle **Numune-1 ve Numune-2 no'lu numunelerin özelliklerine vurgu yapılacaktır.**

Ulusal ve uluslararası standartlarda da belirtildiği üzere, yıkamalı yöntem ile elek analizi ince-iri daneli karışık zeminlerin gradasyonunu ve ince dane yüzdesini (kuru elek yöntemine göre) daha doğru şekilde yansıtmaktadır. Yıkamalı elek analizi sonuçlarına göre Numune-1'de %14.5, Numune-2'de ise %19.5 ince dane yüzdesi bulunmaktadır; her iki numune de "siltli çakıl" (GM) olarak sınıflandırılmaktadır. Numune-3C'de ince dane yüzdesi %22.5 olup, zemin sınıflandırması "killi çakıl"dır; ancak belirtildiği gibi bu numunenin yığın liç sahasında heyelan öncesi basamaklarda yer alan malzemeyi temsil ettiği söylenemez; akmış-karışmış malzemedir.

Bütün numunede toplam kuru ağırlığa oranla, kil-dane boyu yüzdesi, bir diğer deyişle 0.002 mm'den küçük dane yüzdesi (clay-size fraction, CF), Numune 1 için 4% ve Numune 2 için 5.5%'dir.

Numune 1 ve Numune 2 için, ASTM yöntemine göre (numunenin 0.425 mm'den küçük dane boyu olan kısmında yapılan Atterberg limitleri deneylerinde) likit limit değerleri 30% ve plastisite indisi değerleri 6% olarak elde edilmiştir; numunenin 0.074 mm'den küçük dane boyu olan kısmında yapılan Atterberg limitleri deneylerinde ise likit limit ve plastisite indisi değerleri Numune 1 için LL=45%, PI=15%, Numune 2 için LL=40%, PI=14% olarak elde edilmiş ve her iki numunenin ince dane kısmı "düşük plastisiteli silt, ML" olarak sınıflandırılmıştır.

Diğer yandan, numunelerin ince dane kısmının mineralojisi hakkında fikir vermek üzere, aktivite değerleri (plastisite indisi / bütün numunedeki kil yüzdesi) hesaplanmıştır. Literatürde aktivite değeri 1.25'ten büyük ise "aktif kil", 0.75-1.25 aralığında ise "normal aktiflikte kil" olarak sınıflandırılmaktadır (Skempton, 1953); örnek olarak kalsiyum Ca-montmorillonit mineralinin aktivite değeri 1.5, sodyum Na-montmorillonit'inki ise 3'ten büyüktür. Numune-1 için aktivite değeri 1.5 veya 3.7 olmaktadır (Plastisite indisi 0.425 mm'den küçük daneler kısmından elde edilirse PI=%6 olup buna göre aktivite 1.5'dur. Plastisite indisi 0.074 mm'den küçük daneler kısmından elde edilirse PI=%15 olup aktivite 3.7 olmaktadır. Bu durumda Numune-1'in "aktif kil" içerdiği sonucuna varılabilir.

Yığın liç sahasına serilecek olan malzemelerden örnekler, bir süredir, Firma tarafından alınarak Ankara'da Toker Sondaj A.Ş. zemin mekaniği laboratuvarlarına gönderilmiş ve bazı deneyler yaptırılmıştır. Gönderilen malzemeler genelde "heap leach", "aglomeratör" veya "kırıcı" şeklinde isimlendirilmiştir; az sayıda numunede "Lift 32 Cell 08" vb. lift numaraları belirtilmiştir. 2022 Aralık ile 2024 Ocak ayları arasında Toker Sondaj A.Ş. tarafından yapılmış olan deneylerin verileri incelenmiştir.

Burada aklıa gelen bir soru, 16.03.2024 tarihinde yığın liç sahasından alınan **Numune-1 ve Numune-2**, firma tarafından Toker Sondaj A.Ş.'ye yaptırılan deneyler ile benzer sonuçlar mı

130



TRANSLATION

vermektedir? Bir diğer deyişle, yığın liç alanındaki malzeme özellikleri, yığın liç alanına yerleştirme öncesi ve siyanürlü solüsyon ile sulama sonrası ve aynı zamanda malzeme üzerine ilave düşey basınçlar gelmesi sonrası ne kadar değişmektedir? Veya, yığın liç alanına serilecek olan malzeme genel olarak ne kadar değişkendir; malzeme özelliklerinde ne kadar farklılık-değişkenlik bulunmaktadır?

Toker Sondaj A.Ş. tarafından yapılmış olan deneyler ile 16 Mart 2024'te yığın liçi sahasından bilirkişi heyetimiz tarafından alınan örneklerin benzer olup olmadıkları incelenmiştir.

Aralık 2022-Ocak 2024 arasında Toker Sondaj A.Ş. tarafından "heap leach" ve "aglomeratör" malzemede kuru eleme yöntemi ile yapılan elek analizi sonuçları ile 16.03.2024 tarihinde bilirkişi heyetince sahadan alınan numunelerde ODTÜ'de aynı yöntem ile yapılan deneyin sonuçları kıyaslanmıştır. 16.03.2024 tarihinde sahadan alınan numunelerde yalnızca 1 ve 2 numaralı numuneler yığın liç alanında basamaklarda bulunan orjinal malzemeler olduğundan kıyaslamada yalnızca 1 ve 2 no'lu numuneler göz önüne alınmıştır.



Şekil 14 Elek analizi (kuru yöntem) sonucu elde edilen dane boyu dağılımı, gradasyon eğrilerinin kıyaslanması. Gri renkli eğriler Toker Sondaj A.Ş.'nin 8 farklı "heap leach" ve "aglomeratör" isimli malzemede yaptığı elek analizi deney sonuçlarıdır.



131

SWORN
TRANSLATION

Aralık 2022-Ocak 2024 arasında Toker A.Ş. lab. tarafından "heap leach" ve "aglomeratör" malzemede kuru eleme yöntemi ile yapılan elek analizi sonuçlarında 8 farklı numunenin ince dane yüzdesi 0.5-1.2% aralığında iken (Şekil 14), 16.03.2024 tarihinde bilirkişi heyetince sahadan alınan numunelerde ODTÜ'de aynı yöntem ile yapılan deneyin sonuçları, Numune 1 ve 2 için, sırasıyla, 3.3% ve 5.9%'dur. Ayrıca, Hazen (1892) ampirik denklemine göre, granüler malzemelerde suya doygun durumdaki hidrolik iletkenliği (su geçirgenliğini) kontrol ettiği bilinen, efektif dane boyu, $D_{10}$ (malzemenin %10'unun daha küçük olduğu dane boyu) Toker A.Ş. lab. tarafından "heap leach" ve "aglomeratör" 8 farklı malzemede kuru eleme yöntemi ile yapılan elek analizine göre $D_{10}$ = 0.51-0.83 mm olup, Numune 1 ve Numune 2 için $D_{10}$ değerleri 0.30 mm ve 0.15 mm'dir. İnce ve iri daneler içeren (karışık) zeminlerde kuru yöntem ile yapılan elek analizi zeminin gradasyon eğrisini ve ince dane yüzdesini doğru belirlemez. Bu nedenle, yıkamalı yöntem ile elek analizi yapılmalıdır. Yine de, kuru yöntem ile yapılmış olsa bile, ince dane yüzdesinin küçük bir miktar arttığı söylenebilir; ve zeminin ince dane yüzdesinin artması, zeminin suya doygun durumdaki hidrolik iletkenliğini (su geçirgenliğini) bir miktar azaltabilir. Yığın liç sahasında taban kesimdeki malzemenin suya doygun olması beklenir; diğer yandan, yığın liç sahasına serilmiş olan malzemenin büyük çoğunluğunun, 45-60 gün süren solüsyon damlatma döngüsü dışındaki zamanlarda (cevhere, doygunluğa erişene kadar solüsyon verme işlemine devam edildiği firma tarafından belirtilmiştir), "suya doygun-olmayan durumda" (bir diğer deyişle, "yarı-doygun" durumda) olması beklenmektedir. Aynı malzeme için, suya doygun durumdaki hidrolik iletkenlik (permeabilite) suya-doygun-olmayan duruma kıyasla daha yüksektir.

Toker Sondaj A.Ş. laboratuvarına gönderilen numunelerin "heap leach" ve "aglomeratör" olarak isimlendirildikleri ve yığın liçine serilmeden önce laboratuvara gönderildikleri; ODTÜ'de deney yapılan numunelerin ise yığın liç sahasında basamaklarda yer alan ve siyanür solüsyonu uygulanmış ve üzerine serilen lift'lerden dolayı ilave düşey basınçlara maruz kalmış malzemeler olduğu göz önüne tutulmalıdır.

Yığın liç sahasına gönderilen ve serilen malzemenin, zaman içinde siyanürlü solüsyon ile sulama nedeniyle veya üzerine yığılan diğer fazlardaki malzemelerin oluşturduğu ilave düşey basınçlar nedeniyle bir gradasyon değişimine uğrayıp uğramadığı; ince dane yüzdesinin artıp artmadığı ile ilgili basit bir literatür taraması yapılmış ancak konuya ilgili bir bilgiye rastlanmamıştır. Ancak böyle bir olasılık söz konusu olabilir.

Yığın liç sahasından yalnızca iki noktadan alınan numuneler (Numune 1 ve Numune 2) basamaklardaki malzemeyi temsil etmektedir, ve yalnızca iki numunede yapılan deneyler üzerinden kesin bir yargıya varmak doğru olmayacaktır. Sahada farklı fazlarda serilen, ve farklı kotlarda yer alan numunelerin gradasyon özelliklerinde birbirinden farklılıklar da söz konusu olabilecektir. Diğer yandan, elek analizi deneyinde "kuru elek" yönteminde, aynı numune iki farklı laboratuvara gönderilseydi bile, (örneğin Toker Sondaj A.Ş. laboratuvarı ve ODTÜ Zemin Mekaniği laboratuvarı) aynı numunede iki farklı laboratuvarın yaptığı deney sonuçları arasında da ufak farklılıklar olabileceği uluslararası literatürde bilinen bir durumdur.

Aralık 2022-Ocak 2024 arasında Toker A.Ş. lab. tarafından "heap leach" ve "aglomeratör" malzemede yıkamalı yöntem ile yapılan elek analizi sonuçlarına göre gradasyon eğrileri ve heyelan sonrası alınan örneklerin gradasyon eğrileri Şekil 15'te ve Tablo 3'te sunulmaktadır. 16 Mart 2024'te

132



SWORN
TRANSLATION

alınan Numune-1 ve Numune-2'nin Toker A.Ş. Lab. gradasyon eğrileri aralığında-bandında olduğu; bir diğer deyişle, farklı gradasyona sahip malzemeler olmadığı görülmektedir.



*Şekil 15. Aralık 2022-Ocak 2024 arasında Toker A.Ş. lab. tarafından "heap leach" ve "aglomeratör" malzemede yıkamalı yöntem ile yapılan elek analizi sonuçları. 16 Mart 2024'te alınan Numune-1 ve Numune-2'nin Toker A.Ş. Lab. gradasyon eğrileri bandında olduğu, bir diğer deyişle farklı gradasyona sahip malzemeler olmadığı görülmektedir.*

*Tablo 3. Aralık 2022-Ocak 2024 arasında TOKER lab tarafından "heap leach" ve "aglomeratör" malzemede yapılan yıkamalı yöntem elek analizi ve Birleşik Zemin Sınıflandırma Sistemi (USCS)'ye göre, 24 farklı numunenin sınıflandırmaları*

| Numune sınıflandırması | İnce dane yüzdesi (% ≤ 0.074 mm) | Likit limit, LL (%) | Plastisite indisi, PI (%) |
|---|---|---|---|
| GM (siltli çakıl) | 9 numunede ortalama %21 (16-24% aralığında) | 9 numunede ortalama %35 (30-41% aralığında) | 9 numunede ortalama 7.5% (4.5-11.7% aralığında) |
| SM (siltli kum) | 11 numunede ortalama %21 (17-25% aralığında) | 11 numunede ortalama %36 (28-48% aralığında) | 11 numunede ortalama 8% (4-18% aralığında) |
| GC (killi çakıl) | 24% ve 23.5% | 37.1% ve 37.3% | 16.4% ve 13.2% |
| SC (killi kum) | 28.2% ve 24.5% | 48.8% ve 40.2% | 21.4% ve 15.9% |

Toker A.Ş. lab. Aralık 2022-Ocak 2024 deneylerine göre:

133



SWORN
TRANSLATION

24 numuneden 11'i (yaklaşık %46'sı) "siltli kum, SM"; 9'u (yaklaşık %37'si) "siltli çakıl, GM"; 2'si (yaklaşık %8'i) "killi çakıl, GC"; 2'si de (yaklaşık %8'i) "killi kum, SC" olarak sınıflandırılmıştır.

24 numune içinde, ortalama ince dane yüzdesi: %21.7 (min=16.2%, max=28.2%)

24 numune içinde, ortalama likit limit: %36.6 (min=28%, max=48.8%)

24 numune içinde, ortalama plastisite indisi: %9.3 (min=3.8%, max=21.4%)

Olarak belirlenmiştir. Şekil 16'da Toker A.Ş. Lab.'da 24 numunede yapılan yıkamalı elek deneyinden elde edilen ince dane yüzdesi ortalama değerleri ve varyasyonu-değişkenliği; Şekil 17'de ise 24 numune için likit limit ve plastisite indisi değerleri görülebilmektedir.



*Şekil 16. Aralık 2022-Ocak 2024 arasında TOKER lab tarafından "heap leach" ve "aglomeratör" malzemede yapılan yıkamalı yöntem elek analizine göre 24 farklı numunenin ince dane yüzdesi ve doğal su muhtevaları (16 Mart 2024'te alınan Numune-1 ve Numune-2'nin doğal su muhtevaları %8 ve %12.4 olup bu değerler, Toker A.Ş. Lab.'da 24 numuneden elde edilen ortalama değer ve aralık-bandı içindedir.*



*Şekil 17. Aralık 2022-Ocak 2024 arasında TOKER lab tarafından "heap leach" ve "aglomeratör" malzemede yapılan deneylere göre likit limit ve plastisite indisi değerleri*



SWORN
TRANSLATION

16 Mart 2024'te bilirkişi heyetince alınan numunelerden Numune-1 ve Numune-2'nin ince dane yüzdeleri (sırasıyla %14.5 ve %19.5); likit limit değerleri %30 (0.425 mm'den küçük daneler için) ve %45 ile %40 (0.074 mm'den küçük daneler için); plastisite indisi değerleri %6 (0.425 mm'den küçük daneler için) ve %15 ile %14 (0.074 mm'den küçük daneler için) Toker A.Ş. lab.'da elde edilen değer aralıklarındadır. Bu sonuçlar değerlendirildiğinde, **yığın liç sahasında basamaklarda yer alan ve siyanür solüsyonu uygulanmış ve üzerine serilen lift'lerden dolayı ilave düşey basınçlara maruz kalmış malzemelerin (Numune-1 ve Numune-2) yığın liç alanına serilmeden önceki malzemeden, gradasyon ve plastisite özellikleri açısından, belirgin bir farklılık göstermediği anlaşılmaktadır, ancak solüsyon uygulanması sonrası ince dane yüzdesinde küçük bir artış söz konusu olabilir.**

**Özetle, Toker A.Ş. lab. deneylerine göre yığın liç alanındaki numunelerin çoğunluğunun "siltli kum, SM", ikinci çoğunlukta da "siltli çakıl, GM" olduğu, ortalama ince dane yüzdesi %22 ve max. %28 olup değişkenlik gösterdiği (%16-28% aralığında olduğu), ortalama plastisite indisi %9 olmakla birlikte, bu değerin değişkenlik gösterdiği ve max. %21 olduğu anlaşılmaktadır.**

Yığın liçindeki malzemeler (SM, GM, SC, GC) Birleştirilmiş Zemin Sınıflandırma Sistemi (USCS)'ne göre "iri daneli zemin" olarak sınıflandırılmakla birlikte ortalama %22 (ve max. %28'e kadar) ince dane yüzdesi içermektedir. Bu tür zeminlerde ince daneli kısmın plastisitesi ve mineralojik özelliklerine bağlı olarak, kimi zaman ince daneli kısım malzemenin kaymaya karşı dayanımını-mukavemetini ve drenajlı-drenajsız davranışını kontrol edebilmektedir (Park ve Santamarina 2017, Ekici 2022). Revize Zemin Sınıflandırma Sistemi (Revised Soil Classification System, RSCS) Park ve Santamarina (2017) tarafından geliştirilen ve özellikle, yığın liçindeki gibi, "iri daneli ve ince daneli (karışım)" malzemeler için; Birleştirilmiş Sınıflandırma Sistemine (USCS) kıyasla, malzemenin davranışını (mekanik özellikler-mukavemet ve su akışı açısından ayrı ayrı olarak) dikkate almayı vurgulayan bir zemin sınıflandırma sistemidir. Bu sınıflandırma sisteminde kullanılan bazı parametreler (örneğin, numunedeki iri danelerin şekli/köşelilik derecesi gibi), yığın liçindeki numuneler için kesin değer olarak bilinmemekle birlikte, bunların tahminine yönelik Park ve Santamarina (2017)'nin önerdiği ampirik ilişkiler kullanılabilmektedir. 16 Mart 2024'te yığın liç alanından alınan Numune-1 ve Numune-2, Revize Zemin Sınıflandırma Sistemi (RSCS)'ne göre "geçiş karışımı malzemesi (transitional mixture)" olarak sınıflandırılmaktadır. Bu malzemeler kum, çakıl gibi "iri-daneli zemin davranışı" ile silt, kil gibi "ince-daneli zemin davranışı" arasında bir davranış gösteren, geçiş karışım malzemeleridir. Örneğin, RSCS'ne göre Numune-1, GF(F) olarak sınıflandırılmaktadır; ve mekanik davranışı iri daneler ve ince daneler birlikte kontrol ederken, su akışı davranışını yalnızca ince daneler kontrol eder. Bu durum, yığın liç malzemesinin kayma dayanımını değerlendirirken göz önüne alınmalıdır.

Diğer yandan, firmanın belirttiğine göre, yığın liç alanına serilen toplam cevher miktarı yaklaşık 60 milyon ton olup, bunun yaklaşık %21'inin "kil tesisinde işlenerek Yığın Liçi sahasına istiflenen killi cevher" olduğu belirtilmiştir. Bir diğer deyişle, yığın liç alanına serilmiş malzemeler içinde daha çok "killi malzeme" bulunan zonlar olma ihtimali %20 mertebelerinde düşünülebilir.

**İncelenmesi gereken diğer bir husus, yığın liçindeki malzemenin basamaklarda yerindeki sıkılığı ve Toker A.Ş. Laboratuvarda yapılan kayma dayanımı deneylerinin hangi sıkılıkta hazırlanan numunelerde yapıldığı konusudur.** Zemin mekaniği prensiplerinden bilindiği üzere,

135



SWORN
TRANSLATION

granüler zeminler (kumlu, çakıllı zeminler) sıkılık durumlarına göre farklı kayma mukavemetine sahip olabilir. Örneğin, danelerin arasında daha çok boşluk bulunan, gevşek durumdaki bir kum, aynı kumun, sıkı durumdaki haline göre daha düşük bir kayma mukavemetine (içsel sürtünme açısı, ⌴) sahiptir. Yığın liç sahasına serilen malzemenin arazideki sıkılık durumu ve bunun alanda ne kadar değişken olduğunu incelemek amacıyla Toker Sondaj A.Ş. tarafından 06.08.2018-07.08.2018 tarihlerinde Erzincan İliç yığın liç sahasında, nükleer yoğunluk ölçer cihazı ile, yapılan ölçümler incelenmiştir (Tablo 4). Ölçümler, yığın liçinin farklı fazlarında, çekirge konveyör vb sistemler ile serilen (sıkıştırılmayan) yığın malzemesi üzerinde yapılmıştır ve ölçüldüğü noktada, yüzeyden 0.3 m derinliğe kadar olan zeminin sıkılık durumunu temsil etmektedir.

*Tablo 4. Yığın liç malzemesinde yerinde sıkılık ölçümleri (Toker Sondaj A.Ş. tarafından 06.08.2018-07.08.2018 tarihlerinde ölçülmüştür. Ölçülen değerler, ölçüldüğü noktada, yüzeyden 0.3 m derinliğe kadar olan zemini temsil etmektedir)*

| Ölçüm yapılan noktanın yığın liçindeki basamağı (lift) | Ortalama doğal birim hacim ağırlığı * (kg/cm³) | Doğal birim hacim ağırlığı Std. sapma * (kg/cm³) | Ortalama kuru birim hacim ağırlığı *(kg/cm³) | Ortalama kuru birim hacim ağırlığı (kN/m³) | Ortalama su muhtevası * (%) | Su muhtevası Std. sapma (%) * |
|---|---|---|---|---|---|---|
| Lift 9 (C6) | 1518.4 | 78 | 1379.8 | 13.5 | 9.9 | 1.5 |
| Lift 9 (C4) | 1883.0 | 84 | 1635.4 | 16.0 | 15.3 | 2.5 |
| Lift 22 | 1617.1 | 97 | 1572.4 | 15.4 | 2.9 | 1 |
| Lift 23 | 1855.8 | 136 | 1785.3 | 17.5 | 3.9 | 1.2 |
| Lift 24 | 1954.9 | 91.5 | 1852.9 | 18.2 | 5.5 | 1.2 |
| Lift 25 (C3) | 1891.9 | 59 | 1739.5 | 17.1 | 8.7 | 0.6 |
| Lift 25 (C5) | 1948.2 | 88 | 1740.7 | 17.1 | 11.9 | 1.6 |
| Lift 25 (C6) | 1955.6 | 59 | 1773.5 | 17.4 | 10.3 | 1 |
| Lift 25 (C8) | 1711.3 | 96 | 1593.1 | 15.6 | 7.5 | 1.6 |
| Ortalama | 1815.1 | 87.6 | 1674.7 | 16.4 | 8.4 | 1.4 |

* her bir değer, aynı alanda aynı seviyede (kotta) ölçülmüş olan 6 ila 13 deneyden elde edilen verinin ortalamasıdır

Arazide, yerinde ölçülen en küçük kuru birim hacim ağırlık 13.5 kN/m³, ortalama değer 16.4 kN/m³ ve en yüksek değer 18.2 kN/m³'tür. Yerinde ölçülen kuru birim hacim ağırlık değerleri, bu malzemenin bir efor uygulanarak iyice sıkıştırılmış durumuna kıyasla "ne derece sıkı" bir durumu ifade etmektedir?; bunun anlaşılması için, ya "göreli sıkılık" (relative density, Dr), veya bunun elde edilemediği durumda, örneğin karayolu yapımında olduğu gibi sıkıştırma işlemlerinde sıkça kullanılan "% Proktor sıkılık oranı" kullanılabilir (% Proktor sıkılık oranı=numunenin kuru birim hacim ağırlığı / o malzeme için Proktor deneyinde elde edilen en yüksek kuru birim hacim ağırlık). **Arazide yapılan yerinde sıkılık ölçümleri ortalama olarak %83 Proktor sıkılık oranına (en düşük olduğu durumda %68 Proktor sıkılık oranına) denk gelmektedir.**



SWORN
TRANSLATION

Toker A.Ş. laboratuvarına Anagold firması tarafından gönderilen malzemelerde, Aralık 2022-Ocak 2024 tarih aralığında, kayma dayanımının belirlenmesi için konsolidasyonlu drenajsız (CU) üç eksenli basınç (triaxial) deneyleri yapılmıştır. Numuneler çoğunlukla siltli kum, SM, ikincil çoğunlukla siltli çakıl, GM, ve az sayıda killi kum, SC, ve killi çakıl, GC'dir; ince dane yüzdeleri %17-%25 aralığında, plastisite indisi değerleri, %5-%18 aralığındadır. Deneylerde kullanılan hücre basınçları 300, 600 ve 900 kPa'dır. Tasarım firması GRE tarafından belirtilen belli bir hedef sıkılık seviyesinde sıkıştırılarak hazırlanan numunelerin, deney başlangıcında, ilk hazırlandığı ortalama kuru birim hacim ağırlık 16.5 kN/m³ ve hazırlandığı su muhtevası değeri ortalama 13.6%'dır. Numuneler üç eksenli basınç deneyinde hücre basıncı altında konsolide edildikten sonra ise ortalama kuru birim hacim ağırlıkları 18.5 kN/m³'tür. **Numunelerin Toker A.Ş. lab'da yapılan üç eksenli basınç deneylerinde, deney başlangıcında ilk hazırlandığı sıkılık durumu ortalama %84 Proktor sıkılık oranına (farklı deneylerdeki numuneler için %80-%86 aralığında Proktor sıkılık oranına) denk gelmektedir.** Numuneler üç eksenli basınç deneyinde, belli bir hücre basıncı altında konsolide edildikten sonra bu % Proktor sıkılık oranı değerleri küçük bir miktar daha artar. Benzer şekilde, yığın liç sahasına yeni serilen malzeme, üzerine gelen ilave basamaklar/düşey basınçlar nedeniyle zaman içerisinde bir miktar daha sıkışır ve % Proktor sıkılık oranı küçük bir miktar artabilir. **Özetle, yığın liçi sahasında, arazide-yerinde sıkılık durumu ile laboratuvarda kayma dayanımının belirlendiği sıkılık durumu birbirinden, malzemenin kayma dayanımını belirgin bir seviyede etkileyecek mertebede farklı değildir, en farklı durum için, laboratuvardaki sıkılık durumunda ölçülen kayma dayanımının, örneğin, içsel sürtünme açısı değerinin arazide 1 derece kadar daha düşük olabileceği düşünülebilir.** Örneğin, Amerika'da kullanılan NAVFAC "Soil Mechanics DESIGN MANUAL 7.01 (1986)"ya göre kötü derecelenmiş çakıl, GP, malzeme için göreli sıkılık (relative density, Dr) %75'ten %50'ye azaldığında içsel sürtünme açısı 38 dereceden 35 dereceye; siltli kum-kötü derecelenmiş kum, SM-SP, malzeme için de 35-37 derecelerden 32-34 derecelere (3 derece kadar) azalmaktadır.

Toker A.Ş. laboratuvarında GRE firması tarafından belirtilen sıkılıkta hazırlanan numunelerde, Aralık 2022-Ocak 2024 tarih aralığında yapılan konsolidasyonlu drenajlı (CU) üç eksenli basınç deneyleri sonuçlarına göre 13 numunede elde edilen drenajlı kohezyon değeri (c') ve içsel sürtünme açısı (ϕ') değer ikilileri Şekil 18'de, doğrusal yenilme zarfları ise Şekil 19'da sunulmaktadır. **Kohezyon değerleri (c') 0-12 kPa arasında değişmekte olup, en düşük içsel sürtünme açısı (ϕ') değeri 27 derece, en yüksek değer 38 derecedir. Yenilme zarfları incelendiğinde, ortalama doğrusal yenilme zarfı için, kayma dayanımı parametreleri c'=4.7 kPa ϕ'=32.8 derecedir. En düşük yenilme zarfı için, kayma dayanımı parametreleri c'=4.4 kPa ϕ'=27.2 derecedir.**

Tasarım firması tarafından şev stabilitesi analizlerinde yığın liçi malzemesi için **kullanılan değerler c'=0 kPa ϕ'=37 derecedir.** Tasarımda şev stabilitesi analizlerinde kullanılan bu yenilme zarfı, Şekil 19'da görüleceği üzere yığın liçi malzemesinde yapılan tüm laboratuvar kayma dayanımı deneylerinden elde edilen değerler arasında üst sınıra yakın bir yenilme zarfıdır.

SWORN
TRANSLATION



● C kolonu, GM, İnce %24, PI=4.5%   ● K kolonu, GM, İnce 23.8% PI=8.7%   ● F kolonu, SM, ince 20.6% PI=N.P.
● I kolonu, SM, ince 24.2% PI=18.3%   ● J kolonu, SC, ince 24.5% PI=15.9%   ● L kolonu, SM, İnce 24.4% PI=9.6%
● M kolonu, GM, İnce 23.5% PI=13.2%   ● U kolonu, GM, İnce 17.2% PI=8.6%   ●V kolonu, SM, İnce 21.7% PI=6.7%
● W kolonu, GM, İnce 22.5% PI=11.7%   ● X kolonu, GM, İnce 22% PI=6.1%   ● Y kolonu, SM, İnce 18.9% PI=5%
● Z kolonu, GM, İnce 20.8% PI=6.2%

*Şekil 18. Aralık 2022-Ocak 2024 tarih aralığında, Toker A.Ş. laboratuvarında yapılan 13 adet konsolidasyonlu drenajsız (CU) üç eksenli basınç deneyinden elde edilen drenajlı kayma dayanımı parametreleri ikilileri*



*Şekil 19. Aralık 2022-Ocak 2024 tarih aralığında, Toker A.Ş. laboratuvarında yapılan 13 adet konsolidasyonlu drenajsız (CU) üç eksenli basınç deneyinden elde edilen drenajlı kayma dayanımı yenilme zarfları*

138



Şekil 20'de yığın liç alanının doğu ve batı kenarlarında topuk dolgularında/kaya dolguda **kullanılan malzemeler** için kayma dayanımı yenilme zarfı incelenmiştir. Alanda doğu topuk dolgusu (toe buttress) gibi granüler dolgular bulunmakta olup, şev stabilitesi analizlerinde kimi raporlarda topuk dolgu malzemesi için Leps (1970)'in kaya dolgu malzemeler için önerdiği yenilme zarfı parametreleri (doğrusal kabul edilmesi durumunda c=48.7 kPa $\phi$=37.8 derece); kimi raporlarda ise c=0 $\phi$=35 derece doğrusal yenilme zarfı kullanılmıştır. Şekil 20'den de anlaşılacağı üzere, **topuk dolgularında kullanılan kaya dolgu malzeme de belli bir değişkenlik içermektedir.**



*Şekil 20. Yığın liç alanının doğu ve batı kenarlarında topuk dolgularında/kaya dolguda kullanılan malzemeler için kayma dayanımı yenilme zarfı*

Geosentetik malzemeler için kayma dayanımı değerlendirmesi şev stabilitesi değerlendirmesi bölümünde sunulmaktadır.

## ŞEV STABİLİTESİ ANALİZLERİ

"2020.04.27-INR-Yığın Liç Faz 4B Genişleme Proje Raporu" dosya isimli raporda, "Projeler ... GRE ve INR tarafından ortak olarak hazırlanmıştır. INR, GRE tarafından yapılan tasarımı gözden geçirerek yönetmelik ve mühendislik esaslarına uygunluğunu kontrol ederek Bakanlığa sunumunu gerçekleştirmiştir." Denilmektedir. Ayrıca, "Çöpler Altın Madeni Faz-4B Yığın Liç Genişleme Projesi Mühendislik Hizmetleri işi Anagold ile INR arasında imzalanan sözleşme ile INR'ye verilmiştir. ... Çöpler Faz-4B Yığın Liç Tesisi genişlemesi işi tasarımı işveren tarafından görevlendirilen tasarım ekibi tarafından yapılmıştır. Tasarım ekibi, INR, GRE ve Hidrodizayn (SYDF)'dan oluşmaktadır." Denilmektedir. Kayma mekanizması ve kayma yüzeyi ile ilgili önemli bilgiler sunacağından, proje sahasının geçmişten günümüze gelişim süreci ve kayma anındaki ve sonrasındaki hava fotoğrafları ve videolar incelenmiştir, aşağıdaki şekillerde bazı görseller sunulmaktadır.

139



SWORN
TRANSLATION



*Şekil 31. Sabırlı Deresi, güneye doğru bakış (Google Earth, 2006). Henüz maden sahası bulunmamaktadır. Sabırlı Deresi'ne batıdan gelen bir dere yatağı/vadi görülmektedir.*



*Şekil 32. Sabırlı Deresi, güneye doğru bakış (Google Earth, 2012). Maden sahası operasyondadır. Sabırlı Deresi'ne batıdan gelen dere yatağı/vadi dolgu malzemesi ile doldurulmuştur.*



140

SWORN
TRANSLATION



*Şekil 24. Sabırlı Deresi, güneye doğru bakış (Google Earth, 2013). Maden sahası opera... şehir. Yağn üç sahasında, güneye doğru, tepenin yüksek kotlarında traşlama yapılmaktadır.*



*Şe... Yaban... güneye doğru bakış (Google Earth, 2023). Maden sahası opera... kbr. ... üst kotuna doğru bir topuk destek ... imal edilağı... yapılmaktadır.*

141



SWORN
TRANSLATION



Şekil 25

SWORN
TRANSLATION



*Şekil 26. ... sonrası konumu (görünü)*

SWORN
TRANSLATION







SWORN
TRANSLATION



SWORN
TRANSLATION







SWORN
TRANSLAT.ON







SWORN
TRANSLATION



SWORN
TRANSLATION





*Şek.* ... yüzeyleri



SWORN
TRANSLATION



Şekil ... görülen bir noktadan

SWORN
TRANSLATION



*Şekil 3. Kayının antını gelişimi ve kaynar yüzeyi*



*Şekil 4. Kayının antını gelişimi ve kaynar yüzeyi*



SWORN
TRANSLATION



Şekil ... *yatırım altınını geliştirici ve koruyucu işlemlerin yol üstünden, yol ...esi içerisinden çıkışı (http://... ... ... ... ... ...Unit* ... )*

SWORN
TRANSLATION



SWORN
TRANSLATION





SWORN
TRANSLATION





Se... ...ana ...... ve ...czetilmes... uğ...uund... ...yol ..t...ıl üzerinden çıkışı
Yak... ...... ...fillm dilmesini... ...taraf...n...7 M...

Ö... ...fak ...om ...y... ...ın... ...l... ...ve ...... ...ta... ...oh...... ...lik ...ECU 03 27-INR-
Yiğit ...... ...en ...e Genisleme Prolic Resmi O...du. "Pro...ler ..., GRE ve INR tarafından ortak olarak
hazırl... ...en... IGR. GRE ...tihob... ...op...o... ...arer, yüzden ...geçened... yönetmelik ve mühendislik
esasl... ...... uygunluğunu içeren ...oroel. Bakanlığa ...o...........um gerçekleştirilmiş... Denilmektedir.
Ayr... ...... ...tar... M...del ...ca-III. Yiğit ...... ...deme Projesi Mühendislik Hizmetleri işi

157



Anagold ile INR arasında imzalanan sözleşme ile INR'ye verilmiştir. ... Çöpler Faz-4B Yığın Liç Tesisi genişletmesi işi tasarımı işveren tarafından görevlendirilen tasarım ekibi tarafından yapılmıştır. Tasarım ekibi, INR, GRE ve Hidrodizayn (SYDF)'dan oluşmaktadır."

Sahadaki yer stabilitesi değerlendirmelerinde geosentetiklerin kendi içlerindeki dayanımları ve **geosentetik-geosentetik, ve geosentetik-zemin arayüz kayma dayanımlarının doğru değerlendirilmesi çok önemlidir.**

Özellikle geosentetik kil örtü (geosynthetic clay liner, GCL), yapısı gereği iki geotekstil katmanı arasında bulunan bentonit kil mineralinin hidratasyon/ıslanma/satüre olması sonrası oldukça **düşük** kayma dayanımına sahip olması sebebiyle (Ross ve Fox, 2015) şev stabilitesi analizlerinde özellikle dikkatle ele alınmalıdır.

Genellikle GCL'in kendi içerisinde pik kayma dayanımı geomembran GM-GCL arayüz kayma dayanımından daha yüksektir (Ross ve Fox 2015), ancak yüksek normal gerilmeler altında GCL'nin kendi içerisinden kayma da gözlenebilmektedir. GM-GCL veya geosentetikler ile **temasta oldukları zemin arasındaki arayüz kayma dayanımını** etkileyen çok sayıda **faktör bulunmaktadır.** GM-GCL arayüz kayma dayanımını etkileyen faktörlerden bazıları, geosentetiklerin üzerindeki düşey gerilme seviyesi, geosentetiklerin (özellikle GCL'nin) kuru, nemli veya satüre durumda olması veya hidrate edilip edilmemiş olması (kuru durumda **kayma dayanımı daha yüksektir**), hidrasyon süresi, hidrasyon sıvısının kimyasal özelliği (örneğin saf su, musluk suyu, atık çöp depo sahası sızıntı suyu, siyanürlü solüsyon vb), geosentetik malzemelerin türü (örgülü veya örgüsüz geotekstil, pürüzlü veya pürüzsüz geomembran vb) ve kesme hızıdır (kayma gerilmesi uygulanma hızı, hızlı kesme, yavaş kesme vb). Ayrıca, geosentetikler (zeminler gibi) **maruz kaldıkları kayma deformasyonlarının az veya çok olmasına, mertebesine göre de farklı kayma dayanımlarına sahip olurlar. Bir diğer deyişle, kayma deformasyonu miktarı da, kayma dayanımını etkileyen bir diğer faktördür.**

Ross ve Fox (2015) GM-GCL arayüz kayma dayanımı için, kayma gerilmesi hızına bağlı olarak c=5-11 kPa ve φ=15-16 derece değerlerini vermiş; kayma gerilmesi uygulanma hızının artması ile pik dayanım sonrası düşen-azalan dayanımın, pik dayanımın %35-%55'i mertebesinde olabileceğini ortaya koymuştur. Fox vd. (2015) yaptıkları deneysel çalışmada GCL içerisinden kayma dayanımı için rezidüel dayanım olarak: c= 1 kPa φ= 5 derece rapor etmiş, kesme hızına ve düşey basınç seviyesine bağlı olarak mukavemetin değişebildiğini ortaya koymuştur. Ayrıca, bu değerlerin literatürde hidrate edilmiş GCL içerisinden kayma durumu, rezidüel dayanım değerleri olarak, sıfır kohezyon ve düşük içsel sürtünme açısı değerlerinin literatürle uyumlu olduğunu belirtmiştir. Hızlı kesme durumunda ise rezidüel dayanım olarak c= 10-50 kPa ve içsel sürtünme açısı 3-6 derece değerleri belirtilmiştir.

Koerner (2012) arayüz kayma mukavemeti için E, "efficiency" tanımını yapmakta (E değeri 0-100% arasında bir sayıdır), bu tanıma göre, geosentetik ile geosentetiğin temasta olduğu zemin **arayüz kayma dayanımı,** zeminin kendi kayma dayanımından büyük olamaz. Arayüz kayma dayanımı en yüksek olarak, temasta olduğu zeminin kayma dayanımına sahip olabilir (bir diğer deyişle, E değeri en fazla %100 olabilir, genellikle farklı geosentetik arayüzler için %70-98 mertebesindedir).





Sahada geçirimsizlik amacıyla hazırlanan tabakalarda, en altta kimi yerde sıkıştırılmış kil tabakası bulunmaktadır. Geosentetiklerin arayüz kayma dayanımı değerlendirilirken, temasta oldukları kilin kayma dayanımından daha yüksek bir dayanıma sahip olmayacağı göz önünde bulundurulmalıdır. Bu durumda, temasta oldukları tabandaki sıkıştırılmış kil tabakasının pik ve/veya rezidüel dayanımı da önemli olmaktadır. Yığın liç sahası altına serilmiş ve sıkıştırılmış olan kil tabakasının (istenen geçirimsizlik kriterlerini sağlayacak şekilde) yüksek plastisiteli kil (CH) olduğu raporlarda yer almaktadır.

Örneğin, "2019.11.06-GRE-Phase 4B Stability Report" dosya isimli "STABILITY ANALYSIS REPORT, PHASE 4B: STAGE 1 AND STAGE 2, Çöpler Phase 4B HLP Expansion, Erzincan Province, Turkey, November 6, 2019, Project No. 19-1210, Revision C" başlıklı raporda "Yamaç eğimleri 3Y:1D'den daha yüksek açıda olan yerlerde GCL (geosentetik kil örtü), 3Y:1D olan yerler ve daha az açıda olan yerlerde kil serileceği" belirtilmiştir. "2018.10.10-INR-Yığın Liç Faz 4 Genişleme Proje Raporu" dosya isimli raporda "Liç tabanında çift taraflı pürüzlü, 2 mm kalınlığında HDPE geomembrane, altında GCL ve bunun da altında 0.5 m kalınlıkta kil yer almaktadır." Denilmektedir. "2020.04.27-INR-Yığın Liç Faz 4B Genişleme Proje Raporu" dosya isimli raporda "Tabanda 2 mm HDPE membran ve altında GCL ya da kilden oluşan kompozit bir kaplama sistemi planlanmıştır" denilmektedir. "2016.08.01-GRE-Phase 4 Stability Report" dosya isimli raporda sunulan büyük direkt kesme geosentetik-zemin arayüz kayma dayanımı deneylerinde kullanılan kil, "açık kahverenkli kumlu yüksek plastisiteli kil, CH" (light brown sandy fat clay, CH) olarak tanımlanmıştır; likit limit LL=51%, ve plastisite indisi PI=31%'dir.

**"2007.11.01-Tetratech-Heap Leach Pad Facility Final Design Report" dosya isimli raporda:**

Vector Engineering (California) firması tarafından 24 Şubat 2007'de yapılan büyük boyutlu direkt kesme deneyleri sunulmuştur. 1.5 mm kalınlığında iki yüzü pürüzlü yüzeyli LLDPE geomembran ile sahada tabana serilecek olan kil "underlying clay soil liner (CH, sandy fat clay, liquid limit LL=74%, plasticity index PI=45%)" ve bunların üzerinde yer alacak olan cevher (GP) malzemelerin arayüz dayanım deneyleri 193, 393 ve 787 kPa düşey basınçlar altında (kuru durumda "dry or unflooded") yapılmıştır. Kil ve geomembrane arasında en çok deplasman gözlendiği belirtilmiştir. Yapılan şev stabilitesi analizlerinde pürüzsüz yüzeyli LLDPE geomembran ile kil (CH) tabakası arayüzü için c=0 φ=15 derece kullanılmıştır. İki-yüzeyi pürüzlü LLDPE geomembran ile geosentetik kil örtü (GCL) arayüzü için yapılan literatür taramasına göre (Zornberg et al. 2005, CETCO 2002, Triplett and Fox 2001) c=0 φ=23 derece kullanılmıştır.

"2007.11.01-Tetratech-Heap Leach Pad Facility Final Design Report" dosya isimli raporda, şev stabilitesi analizlerinde kullanılan dayanım parametreleri aşağıdaki tabloda görülebilir:

SWORN
TRANSLATION

Table 5.2:    Material Properties in Stability Analyses

| Material | Moist Unit Weight (kN/m³) | Effective Cohesion (kN/m²) | Effective Friction Angle (degrees) |
|---|---|---|---|
| Heap Ore | 18.1 | 0 | 40 |
| Smooth Geomembrane/Soil Liner Interface | 17.8 | 0 | 15 |
| Double-Side Textured Geomembrane/GCL Interface | 17.8 | 0 | 23 |
| Site Grading Rockfill | 22.0 | Non-Linear Shear Strength Envelope (Table 5.1) | |
| Slope Debris (Gravelly Clay) Foundation | 19.0 | 0 | 35 |
| Conglomerate Foundation | 23.0 | 600 | 30 |

"2007.11.01-Tetratech-Heap Leach Pad Facility Final Design Report" dosya isimli raporda:

yapılan analizlerde ve sunulan kesitlerde, Sabırlı deresine doğru giden eski dere yatağı-vadinin doldurulmuş hali, ve tabanda yer alan geosentetikler ile ilgili bilgi bulunmaktadır, bunlar Şubat 2024 heyelanının kayma yüzeyinin alt kısmı bu yüzeyden, yol kotundan çıktığı için önem arz etmektedir, aşağıdaki şekillerde görülebilir



2007.11.01 Tetratech Heap Leach Pad Facility Final Design Report" dosya isimli rapordan alınmıştır.



SWORN
TRANSLATION



2007.11.01-Tetratech-Heap Leach Pad Facility Final Design Report" dosya isimli rapordan alınmıştır.



2007.11.01-Tetratech-Heap Leach Pad Facility Final Design Report" dosya isimli rapordan alınmıştır.

161



SWORN
TRANSLATION

"2016.08.01-GRE-Phase 4 Stability Report" dosya isimli raporda:

**17 Aralık 2015 tarihli GRE firması memorandum mektubunda, GRE, Anagold'a şev stabilitesi ile ilgili çekincelerini iletmiştir. Laboratuvar geosentetik arayüz deney sonuçlarındaki tutarsızlıklar** (pürüzsüz geomembran ile geosentetik kil örtü (GCL) arayüz dayanımının pürüzlü geomembran arayüzünden daha yüksek olması çıkması, laboratuvar deneylerindeki **düşey gerilmelerin** istenen kadar yüksek olmayışı, yüksek normal basınçlar altında geomembran-GCL arayüz dayanımının uzalmaması v.b. 1 Nisan 2016 tarihinde Alacer firmasının GRE'ye gönderdiği mektupta. Golder firmasına Aralık 2015'te ve SRK Consulting firmasına Ocak 2016'ta yaptırılan bağımsız stabilite durum değerlendirmesi çalışmaları ile ilgili bilgi vermiştir. **Golder ve SRK firmalarının şev stabilitesi çalışmaları, GRE firmasının şev stabilitesi analizlerinde kullandığı su** seviyesini (Phreatic line) de sorgulamıştır. Golder ve SRK **stabilite çalışmaları, geomembran-GCL** arayüz makavemeti üzerine fokuslanmış ve **pürüzsüz ve pürüzlü geomembran için 20 cm (8 inch) deformasyonlarda** rezidüel (kalıntı) dayanımını **önermiştir.**

Golder, 2007-2015 arasında Çöpler sahası için geomembran-GCL arayüz dayanımı için yapılmış olan büyük direkt kesme deneyi sonuçlarını derlemiştir. SRK geomembran-GCL arayüz dayanımı ile ilgili literatür taraması yapmış ve 14 makaleyi derlemiştir. Bu literatür taramasına dayanarak, SRK, geomembran-GCL arayüz kayma dayanımının, 700 kPa düşey basınçlardan yüksek basınçlarda geomembran-GCL arayüzü yerine, GCL içindeki bentonite tarafından kontrol edildiğini belirtmiştir.

GRE firması, GLA firmasına Mart-Mayıs 2016'da büyük boyutlu direkt kesme deneyleri yaptırmıştır, ve elde ettikleri sonuçları Golder ve SRK'nın önerdiği kayma dayanımı değerleri ile birlikte grafik haline getirmişlerdir (aşağıdaki şekil ve tablolar GRE firmasının memorandum dokümanından alınmıştır) Ayrıca, yığın içi alanda taban geçirimsizliği sağlamak için geçmişten beri, **farklı kotlarda serilmiş olan farklı tür ve özelliklerdeki** geosentetikler aşağıdaki Şekil'deki **çizimde görülebilir.** Anlaşılacağı üzere, alanda çok sayıda, farklı türde geosentetik-geosentetik ve **geosentetik-zemin arayüz dayanımları** mevcuttur ve bunlar şev stabilitesi hesaplarında **etkin olacaktır.**





Figure 2: Large Strain (6") Smooth Geomembrane/GCL Residual
Shear Strength Envelope Comparison



Figure 3: Large Strain (6") Textured Geomembrane/GCLResidual
Shear Strength Envelope Comparison

17 Aralık 2015 tarihli GRE firması memorandum mektubundan alınmıştır



163

SWORN
TRANSLATION

Aşağıdaki tablolar 17 Aralık 2015 tarihli GRE firması memorandum mektubundan alınmıştır.

## Table 4: Laboratory Testing Residual Smooth Geomembrane/GCL Strength Envelopes

| Test Date | Peak Friction Angle (degrees) | Residual Friction Angle[1] (degrees) |
|-----------|-------------------------------|--------------------------------------|
| 8/12/2014 | 16 | 14 |
| *2/18/2016 | 17 | 12 |
| 2/18/2016 | 14 | 13 |
| +3/29/2016 | 15 | 12 |

[1] Calculated at 3-inch strain

*GCL installed with woven side against the GM

+test completed to 270 pounds per square inch (psi) normal load (~105 meters of ore), all other tests listed were completed at 115 psi (~45 meters of ore)

## Table 5: Laboratory Testing Residual Textured Geomembrane/GCL Strength Envelopes

| Test Date | Peak Friction Angle (degrees) | Residual Friction Angle[1] (degrees) |
|-----------|-------------------------------|--------------------------------------|
| +5/2/2016 | 11 | 9 |
| 2/4/2015 | 25 | 10 |

[1] Calculated at 3-inch strain

*+test completed to 270 pounds per square inch (psi) normal load (~105 meters of ore), all other tests listed were completed at 115 psi (~45 meters of ore)



164

SWORN
TRANSLATION



Şekil. Alanda farklı kotlardaki taban seviyelerinde serilmiş olan farklı tür ve özellikte geosentetikler

"2016.08.01-GRE-Phase 4 Stability Report" dosya isimli raporda,

Geosentetikler için 7.5 cm (3 inch) deplasmandaki rezidüel (kalıntı) kayma dayanımı kullanılarak **şev stabilitesi güvenlik sayısının minimum 1.0-1.3 olduğu durumu GRE firmasının "kabul edilebilir şev güvenlik sayısı"** (minimum FOS of 1.0 to 1.3) olarak kullandığı belirtilmektedir. Pik kayma dayanımı parametreleri kullanılarak elde edilen minimum güvenlik sayısı 1.3 ila 1.5 olduğu durum "Kabul edilebilir güvenlik sayısı" olarak tanımlanmıştır.

**Ayrıca, pik veya rezidüel farketmeksizin, geomembran-GCL arayüzü ve GCL iç-mukavemetinin sistemdeki en düşük dayanımlar olduğu belirtilmektedir.** Rezidüel dayanım kullanılması durumunda, sağlanması gerekecek minimum güvenlik sayısı değerinin neden **düşük alındığı** ile ilgili olarak, şu ifade yer almaktadır: (a) sistemde (yığın liçi sahasında ve tabanında) hiçbir zaman, geniş alanlarda tamamiyle rezidüel dayanımı mobilize edecek kadar yüksek miktarda deformasyonlar oluşmamalıdır ("the system should never achieve the strain required to fully mobilize residual strengths over large areas"), (b) 3-boyutlu etkilerin şev stabilitesi güvenlik sayısına katkıları. Ancak, literatürde, çok küçük miktarda zemin kayma deplasmanlarının bile yatay, veya yataya yakın tabakalar olarak yer alan killi birimlerde rezidüel kayma mukavemetine ulaşılması için yeterli olduğu bilinmektedir (Mesri ve Shahien, 2003; Huvaj-Sarıhan (2009). İşletme süresince birbiri üzerine basamaklar halinde yığılarak yükseltilen yığın liçi sahasında, radar ölçümleri ile gözlendiği gibi düşey-yatay zemin hareketleri yaşanmaktadır. **Bu hareketler tabanda serili olan kil ve/veya geosentetiklerin de işletme sırasında, belli bir miktar deformasyona maruz kalacağına ve rezidüel (kalıntı) kayma mukavemeti değerlerine ulaşacaklarına işaret etmektedir. Bu durumda, yığın liç sahasında kil içeren birimlerin (tabana serilmiş sıkıştırılmış kil tabakası, cevher içindeki killi zonlar, tabanda bentonit içeren geosentetik kil örtü, geosentetik-zemin arayüzleri vb) residüel dayanımlarında olması göz önüne alınmalıdır.**

Diğer yandan, çok sayıda farklı geosentetik ve zemin arayüzleri yer alan **yığın liç sahası tabanında, kayma yüzeyi, kayma mukavemeti en düşük olan malzemeden geçecektir.** Bir diğer deyişle, örneğin, şayet, geomembran-GCL pik veya rezidüel arayüz dayanımı, bunların altında serili olan sıkıştırılmış kil tabakasının rezidüel dayanımından yüksek ise, kayma yüzeyi, daha az dayanıma sahip olan alttaki kil tabakasından geçecektir. Alandaki toplam yığın liç malzemesinin yaklaşık %21'inin "kil tesisinde işlenerek Yığın Liçi sahasına istiflenen killi cevher" olduğu firma tarafından belirtilmiştir. Alanda tabana serilip sıkıştırılan kil malzemenin "açık kahverenkli kumlu yüksek plastisiteli kil, CH" (light brown sandy fat clay, CH) likit limit LL=51%, ve plastisite indisi PI=31% olduğu. Bir başka raporda da "underlying clay soil liner (CH, sandy fat clay, liquid limit LL=74%, plasticity index PI=45%)" olduğu bahsedilmektedir. Mesri ve Shahien (2003)'e göre, (Mesri ve Shahien (2003)'e göre, doğrusal olmayan yenilme zarfına sahip olmakla birlikte, pratiklik açısından burada doğrusal yenilme zarfı parametreleri verilmiştir).

Plastisite indisi, PI=25% olan bir kilin ortalama drenajlı rezidüel kayma dayanımı parametreleri c'=0 kPa ve $\phi$=17.3 derece (Mesri ve Shahien, 2003).

PI=45% olan bir kilin ortalama drenajlı rezidüel kayma dayanımı parametreleri c'=0 kPa ve $\phi$=10.7 derecedir (Mesri ve Shahien, 2003).

166



SWORN TRANSLATION

**Bu** durumda, geosentetik-geosentetik, veya geosentetik-kil arayüz kayma dayanımları **bu gibi kayma** dayanımı parametrelerinden yüksek ise, düşük olan kayma dayanımı parametreleri, **yani kilin rezidüel kayma** duyanımı parametreleri kullanılmalıdır. **Bunun göz ardı edilmiş olması** tasarımdan sorumlu GRE firması açısından bir kusur olarak görülmektedir.

**"2016.08.01-GRE-Phase 4 Stability Report"** dosya isimli raporda,

GRE firması, şev stabilitesi açısından 7 kritik kesiti göstermiştir. Bunların 5'i Golder (2015) ve SRK (2016) değerlendirme raporunun belirttiği 5 kesit olup, GRE firması 2 kesit daha eklemiştir. **GRE firması,** yaptığı **şev stabilitesi analizlerinde, malzemelerin pik kayma dayanımlarını kullanarak statik** durum **için güvenlik sayısını "sahaya özgü koşullara bağlı olarak minimum 1.3-1.5", rezidüel (kalıntı) kayma dayanımlarını kullanarak ise, kabul edilebilir minimum güvenlik sayısını** "sahaya özgü koşullara bağlı olarak 1.0 ila 1.3" olarak kabul ettiğini **belirtmiştir.** 1.0 mertebesinde güvenlik sayısı değeri, yığın liç sahası gibi uzun süre (yıllarca) operasyonu devam eden edecek olan; sahada yığının devamlı yükseltilmesi nedeniyle topoğrafyanın ve malzeme özelliklerinin değişken olduğu, firmanın ifadesiyle "damlama yöntemiyle sürekli bir şekilde siyanür içeren solüsyonla beslenen, yine dönem dönem yağmur ve kar sularıyla içerisindeki sıvı miktarının **arttığı** bir yapıda". Böylesi bir alandaki şev stabilitesi için, **rezidüel kayma dayanımı parametreleri kullanarak, elde edilecek 1.0-1.3 değer aralığı "kabul edilebilir minimum güvenlik sayısı" değeri değildir;** ve ulusal-uluslararası bir dayanağı yoktur. Bu nedenle, **tasarımdan sorumlu GRE** firması alanda "sağlanması gereken minimum güvenlik sayısını" doğru belirlemediği **için kusurludur.**



Figure 5: HLF Stability, Critical Sections

**Belirlenen kritik kesitler** arasında, yığın liç alanının batı tarafında ilave yapılan **topuk destek dolgusunu** içeren, ve Şubat 2024'te manganez ocağına doğru oluşan kaymanın oluştuğu **aksın bulunmaması,** böyle bir kesitin kritik görülmeyip revize malzeme parametreleri **ile şev stabilitesi** hesaplarında ele alınmaması GRE firmasının bir mühendislik-tasarım **kusurudur.**



GRE firması, kendisinin vereceği kayma dayanımı parametrelerini kullanarak, 3-boyutlu şev stabilitesi analizleri yapılması işini Anddes firmasına vermiş ve 3 kesit için 3-boyutlu şev stabilitesi analizleri de yaptırmıştır.

**"2018.10.10-INR-Yığın Liç Faz 4 Genişleme Proje Raporu" isimli dosyada:**

geçmişte yapılmış geosentetik arayüz dayanım deneyleri derlenmiştir.

"Liç tabanında çift tarafı pürüzlü, 2 mm kalınlığında HDPE geomembrane, altında GCL ve bunun da altında 0.5 m kalınlıkta kil yer almaktadır.

Alt Kaplama 2: 2014 yılında pasadan alınan malzeme (killi kum, SC, LL=44%, PI=23%, ince dane yüzdesi 47.6%) 2 farklı bentonit malzemesi ile %5 oranında karıştırılması sonucu elde edile malzemenin geçirimliliği incelenmiştir.

2009 yılında, çift tarafı pürüzlü, 1.5 mm kalınlıkta Solmax LLDPE GM ile NAUE Bentofix NSP 3300 GCL arayüzü büyük ölçekli direk kesme deneyi gerçekleştirilmiştir.

2009 yılında, çift tarafı pürüzlü, 1.5 mm kalınlıkta Agru LLDPE GM ile CETCO Bentomat ST GCL ile arayüzü büyük ölçekli direk kesme deneyi

2011 yılında çift tarafı pürüzlü, 1.5 mm kalınlıkta Solmax LLDPE GM ile Geomas Bentoshield 5000 GCL ile arayüzü

2014 yılında aşağıdan yukarı doğru, kumlu silt (ML) toprak kaplama, Geomass Bentoshield 3500 GCL ve GSE 1.5 mm kaygan yüzeyli LLDPE GM istifi

2014 yılında aşağıdan yukarı doğru, killi kum (SC) toprak kaplama, Geomas Benthohield Smax 3500 R GCL ve GSE çift tarafı pürüzlü 1.5 mm kalınlıkta LLDPE GM istifi

2014 yılında Atarfill LTMT çift tarafı pürüzlü, 1.5 mm kalınlıkta LLDPE GM, altında Geomas GCL ve üzerinde üst kaplamayı temsil eden kırmataş istifi

2015 yılında çift tarafı pürüzlü 1.5 mm kalınlıkta LLDPE GM, altında Geomas GCL ve üzerinde üst kaplamayı temsil eden kırmataş istifi

2015 yılında çift tarafı pürüzlü 1.5 mm kalınlıkta LLDPE GM, altında Eurobent 3500/240 combo GCL ve üzerinde üst kaplamayı temsil eden kırmataş istifi"

Aşağıdaki tablolar "2018.10.10-INR-Yığın Liç Faz 4 Genişleme Proje Raporu" isimli dosyadan alınmıştır.



168

SWORN
TRANSLATION

Tablo 3.10 Kompozit kaplama sistemi laboratuvar test sonuçları

| Örnemenbrse | GCL | Pik Makaslama Dayanımı Efektif (kPa) | İmtiliç Derlenmi Açısı (ceclera) | Residual Makaslama Dayanımı Efektif Adezyon (ceclera) | Efektif İçİçtenme Açısı Derecel |
|---|---|---|---|---|---|
| GSE 1.5 mm çift taraf pürüzlü LLDPE | Kerolu KB-Blat Kaplama | 16.2 | 18 | 55.5 | 6 |
| Intimax 1.5 mm çift taraf pürüzlü LLDPE | Naue Bentofix NSP 3500 | 72.9 | 9 | 49.2 | 6 |
| Agru 1.5mm çift taraf pürüzlü LLDPE | Cetco Bentomat ST | 47.4 | 18 | 76.6 | 5 |
| Solmax 1.5 mm çift taraf pürüzlü LLDPE | Solmax Bentoliner 5000 | 86.7 | 12 | 23.7 | 6 |
| GSE 1.5 mm pürüzsüz LLDPE | Geomas Bentoshield 3500 | 8 | 16 | 0 | 14 |
| GSE 1.5 mm çift taraf pürüzlü LLDPE (kompozit pürüzlülükt) | Geomas Bentoshield Smax R 3500 (güçlendirilmiş) | 30.6 | 32 | 64.6 | 7 |

| Agru 1.5 mm çift taraf pürüzlü LLDPE | Geomas Bentoshield Smax R 3500 (güçlendirilmiş) | 8.1 | 29 | 101.0 | 9 |
| GSE 1.5 mm çift taraf pürüzlü LLDPE (0.7 mm asperitali) | Geomas Bentoshield Smax R 3500 (güçlendirilmiş) | 51.6 | 25 | 71.3 | 10 |
| GSE 1.5 mm çift taraf pürüzlü LLDPE (0.7 mm asperitali) | Eurobent 3500/240 combo (güçlendirilmiş) | 22.0 | 25 | 54.1 | 8 |

15 Temmuz 2017'de yürürlüğe giren "Maden Atıkları Yönetmeliği"ne göre Faz-4 liç tabanı 2 mm HDPE GM ve altında GCL (3Y:1D ve daha düşük eğimlerde GCL, altında 0.5 m kil önerilmiştir. Faz-1 ve 2'de 1.5 mm pürüzsüz LLDPE GM, Faz-3'te 1.5 mm çift tarafı pürüzlü LLDPE GM, Faz-4'te Maden Atıkları yönetmeliğine uyacak şekilde 2-mm HDPE GM kullanılmasına karar verilmiştir.

**Yığın** liç yapısının herhangi bir destek yapısı olmadan stabil olmayacağı nedeniyle, **yığın liçin kritik noktalarında 2 adet destek dolgu yapısı tasarlandığı "2018.10.10-INR-Yığın Liç Faz 4 Genişleme Proje Raporu"** isimli raporda belirtilmiştir. Aşağıdaki tablo aynı rapordan **alınmış olup** tasarımcı firmanın bazı şev stabilitesi analizlerinde kullandığı kayma dayanımı **parametreleridir.**

Stabilite analizlerinde kullanılan malzeme parametreleri ise aşağıdaki tabloda verilmiştir.

Tablo 5.4 Malzeme Parametreleri

| Birimler | Birim Hacim Ağırlık (kN/m³) | Kohezyon (kPa) | İçsel Sürtünme Açısı (Derece) |
|---|---|---|---|
| Ana Kaya | 25 | | Kritik Değil |
| Düzenleme Dolgusu | 22 | | Kritik Değil |
| Cevher | 18.1 | 0 | 37 |
| GCL /Geomembran Arayüz | 17.9 | | Değişken |
| Pasif Topuk Dolgusu | 20 | 0 | 35 |



Aşağıdaki görsel ve tablolar "2018.10.10-INR-Yığın Liç Faz 4 Genişleme Proje Raporu" isimli dosyadan alınmıştır.



Şekil 6.3 Kritik Kesitler

Yapılan 2 boyutlu limit denge analiz sonuçları aşağıda tabloda verilmiştir.

Tablo 6.5 2B Stabilite Analiz Sonuçları

| Kesit | Statik Pik Dayanım | Statik Rezidüel Dayanım | Pseudo Statik OBE (0.15g) | Sismik Yük Altında Deplasmanlar (cm) OBE (0.15g) | MDE (0.24g) |
|---|---|---|---|---|---|
| 1 | 1,51 | 1,48 | 0,96 | 2 | 10 |
| 2 | 1,51 | 1,39 | 0,94 | 2 | 13 |
| H | 1,51 | 1,22 | 0,86 | 7 | 32 |
| K | 1,66 | 1,29 | 0,88 | 3 | 20 |
| L | 1,51 | 1,15 | 0,75 | 7 | 32 |
| N | 1,49 | 1,23 | 0,74 | 12 | 52 |
| A | 1,69 | 1,33 | 0,78 | 10 | 45 |



170

SWORN
TRANSLATION

Buna göre H, L ve N kesitleri üzerinde 3 boyutlu stabilite analizleri yapılmış **ve** sonuçları aşağıdaki tabloda verilmiştir.

Tablo 6.6 3B Stabilite Analiz Sonuçları

| Kesit | Yüzey Dayanım Koşulu | Statik Durum | Güvenlik Katsayıları Pseudo Statik Durum a Dönem (OBE) | Uzun Dönem (MDE) |
|---|---|---|---|---|
| 1 | Pik | 1.91 | 1.32 | 1.04 |
| 1 | Residüel | 1.44 | 0.98 | 0.73 |
| 2 | Pik | 2.21 | 1.34 | 1.01 |
| 2 | Residüel | 1.96 | 1.14 | 0.86 |
| 3 | Pik | 2.08 | 1.66 | 1.23 |
| 3 | Residüel | 1.47 | 0.98 | 0.79 |
| 4 | Pik | 2.31 | 1.44 | 1.12 |
| 4 | Residüel | 1.45 | 0.95 | 0.75 |
| 5 | Pik | 1.86 | 1.29 | 1.02 |
| 5 | Residüel | 1.58 | 1.06 | 0.82 |

Bu değerler dikkate alınarak H, L ve N kesitlerinde topuk seddesi optimize **edilerek** analizler tekrarlanmıştır. Revize edilmiş topuk seddeleri ile tekrarlanan analiz sonuçları aşağıdaki tabloda verilmiştir.

Tablo 6.7 3B Residüel Dayanım Statik Durum Analiz Sonuçları

| Kesit | 2B Analiz Statik GK | 3B Analiz | Statik GK |
|---|---|---|---|
| H | 1.07 | | 1.36 |
| L | 1.10 | | |
| N | 1.11 | | 1.38 |

"2018.10.10-INR-Yığın İç Faz 4 Genişleme Proje Raporu" isimli rapordan alınmış olan yukarıdaki tablolarda görüleceği üzere, L kesitinde, rezidüel dayanım **parametreleri kullanıldığında**, statik durum için 1.15 güvenlik sayısı değeri (H kesitinde 1.22 ve N **kesitinde 1.23 değerleri**) GRE ve INR firmaları tarafından elde edilmiştir. 3-boyutlu analizlerde ise **1.09** mertebesinde oldukça düşük güvenlik sayısı değerleri elde edilmiştir. Bu değerler **sağlanması** gereken minimum güvenlik sayısının altındadır, ve kabul edilemez. Tasarım firması **GRE ve** INR'nin burada kusuru olduğu düşünülmektedir.

Aynı raporda aşağıdaki ifadeden de görüleceği gibi malzeme dayanım özelliklerinin **yığın** stabilitesinde oldukça hassas bir rol oynadığı belirtilmektedir.



TRANSLATION

Yapılan stabilite analizleri, yığının genel olarak statik durumda veya kısa dönem için kabul edilen sismik yükler altında stabil olduğunu ancak uzun dönem sismik yükler altında stabilite problemi oluşacağını göstermektedir. Ayrıca malzeme dayanım durumuda yığının stabilitesinde oldukça hassas bir rol oynamaktadır. Yığın liç tesisi 4 fazdan oluşmaktadır. Bu fazların 3 tanesi hali hazırda sahada inşa edilmiş ve üretim halindedir. Bu nedenle Faz-4 yığın stabilitesinin uzun dönem (kapama sonrası) de duraylı bir geometriye kavuşturulması için, işletme aşamasında alansal nedenlerden dolayı çok fazla alternatif bulunmamaktadır. Yığın stabilite durumunun madenin işletildiği dönemde belirli periyotlar ile tekrardan gözden geçirilmesi (malzeme parametrelerinin tayin edilmesi, yığın geometrisinin kontrol edilmesi, fratik hattın sürekli gözlenmesi) gerekmektedir. Yapılan periyodik ölçüm, test ve gözlemlere göre stabilite analizleri tekrarlanmalı ve riskli görülen kesimlerde stabiliteyi arttıracak düzenlemelere gidilmelidir.

**Bu** bilirkişi heyet raporu kapsamında, geosentetik-geosentetik ve geosentetik-zemin **arayüzleri ile** ilgili değerlendirmeler ve şev stabilitesi analizleri yapılmıştır.

**"2020.04.27-INR-Yığın Liç Faz 4B Genişleme Proje Raporu"nda,**

farklı geosentetikler, cevher ve sıkıştırılmış taban kili arayüz kayma dayanımı deneylerinin sonuçları sunulmuştur.





SWORN
TRANSLATION



Örnek olarak, enkarındaki Şekil'de ... membran-zemin arayüzünde ve zeminin kendi içinde oluşturu... ... ... occurred GM-drainfill interface and internally within soil", G... .. February .020\.

GCL arayüz k... ... ... ... ... numaları kuru durumda, bazıları nemli, **bazıları belli bir süre hidrasyon yapıldıktan sonra**, vb farklı koşullarda test edilmiştir.

Aşağıdaki tablo... ... yenilme zarfı grafiğinde bu bilirkişi heyet raporu çalışmaları **kapsamında derlenen farklı** geosentetik arayüz davranını laboratuvar deney verileri **sunulmaktadır.**





SWORN
TRANSLATION

174

SWORN
TRANSLATION





175

SWORN
TRANSLATION

Yukarıdaki şekilden ve önceki kısımda zemin malzemelerin dayanımı irdelenmesinden de anlaşıldığı üzere, zemin ve geosentetik malzemelerin kayma dayanımları çok sayıda faktörden etkilenmektedir, ve alanda değişkenlik içermektedir. Bu durumda, kayma dayanımı parametreleri için, tasarım yapılırken malzeme özelliklerindeki bu değişkenliğin, varyasyonun göz önüne alınması, bir şartname kapsamında zorunluluk olmamakla birlikte, mühendislik muhakemesi/sorumluluğu ve güvenli tasarım gereği, söz konusu olmalıdır. Bu, ya Eurocode vb. tasarım şartnamelerinde önerildiği gibi, bir zemin parametresi için "ortalama değer eksi 1 standard sapma" değerinin de kullanılarak analizlerin yapılması; veya en kötü zemin parametresi kullanılarak da güvenlik durumunun kontrol edilmesi; veya malzeme özellikleri için bir istatistiksel dağılım kullanılarak olasılıksal şev stabilitesi analizi yapılması vb şekilde düşünülebilir. Ayrıca, **yığın liç alanı tabanındaki su seviyesinde olası yükselme de GRE tasarımlarında göz önüne alınmamış, tüm analizlerde tek bir su seviyesi kullanılmıştır.** Bu da tasarımcı GRE nazarında bir kusurdur.

**Tasarımı yapan GRE firmasının raporlarında yığın liçindeki malzemenin kayma mukavemeti, ve farklı tür geosentetikler ile farklı tür zeminler arasındaki arayüz kayma mukavemeti için (zaman içinde revizyon raporlarında farklı değerler kullanılmakla birlikte) yalnızca bir değer belirlenmiş ve analizlerde bu değerler kullanılmıştır; malzemenin değişken olabileceği şev stabilitesi göz önüne alınmamıştır. Bu GRE'nin bir tasarım mühendislik kusuru olarak değerlendirilmektedir.**

**"2018.10.10-INR-Yığın Liç Faz 4 Genişleme Proje Raporu" isimli dosyada:**

yer alan GRE 27 Haziran 2018 Teknik Memorandum notu: "Konu: Çöpler HLF Faz 4 Stabilite Revizyonu" (Hazırlayanlar: Luis Quirindongo ve Vinh Luu Le, Gözden Geçiren: Kevin Gunesch), yığın liçinin doğu ve batı taraflarındaki şev stabilitesini sağlayabilmek adına yapılacak olan ilave topuk dolgu (toe buttress)'ın geometrisi ve optimizasyonu üzerine analizler içermektedir.



Şekil 1 - L Kesiti'nin Plan Görünümü

176



SWORN
TRANSLATION

**Şekil 2 - L Kesiti'nin Mevcut Durumuna İlişkin Analiz Edilmiş Geometri**



**Şekil 3 - L Kesiti'nin En Son Faz 4 Durumuna İlişkin Analiz Edilmiş Geometri**





177

SWORN
TRANSLATION

**Şekil C-2 – Statik Son Faz 4 Durumu; Son Tasarlanan Payanda; Derin Kayma Yüzeyi**



GRE 27 Haziran 2018 Teknik Memorandum notundan alınan yukarıdaki kesit için, bu bilirkişi heyet raporu çalışmaları kapsamında yapılmış olan şev stabilitesi analizi aşağıda sunulmaktadır.





SWORN
TRANSLATION



| Kayma dayanımı parametreleri | | Su seviyesi | | Elde edilen güvenlik sayısı, F.S. değeri |
|---|---|---|---|---|
| Cevher: c=5 kPa φ =27 derece<br>Topuk destek (buttress): c=0.1 φ =35 derece | LLDPE/GCL arayüz c=1 kPa φ =13 derece | Tabanda 1 m yüksekliğinde su seviyesi | | Statik durum FS=1.032 |
| Cevher: c=5 kPa φ =27 derece<br>Topuk destek (buttress): c=0.1 φ =35 derece | LLDPE/GCL arayüz c=1 kPa φ =13 derece | Tabanda 2 m yüksekliğinde su seviyesi | | Statik durum FS=1.024 |
| Cevher: c=5 kPa φ =27 derece<br>Topuk destek (buttress): c=0.15 kPa φ=28.3 derece | LLDPE/GCL arayüz c=1 kPa φ =17 derece | Tabanda 1 m yüksekliğinde su seviyesi | | Statik durum FS=1.23 |
| Cevher: c=5 kPa φ =27 derece<br>Topuk destek (buttress): c=0.15 kPa φ=28.3 derece | LLDPE/GCL arayüz c=1 kPa φ =13 derece | Tabanda 1 m yüksekliğinde su seviyesi | | Statik durum FS=0.996 |

Sadece geosentetik arayüzünün içsel sürtünme açısını 4 derece artırınca şev stabilitesi güvenlik sayısı 1.0 mertebesinden 1.23 değerine çıkmaktadır. **Bu durum, yığın liçi alanında şev stabilitesi analizlerinde geosentetik arayüz kayma dayanımının doğru belirlenmesinin kritik öneme sahip**



SWORN
TRANSLATION

olduğunu göstermekte ve bu parametrelerin doğru belirlenememe ihtimali durumunda, güvenli tarafta kalacak şekilde tasarım yapılmasının önemine işaret etmektedir.



Şekil 6-3 YLT Faz 4B Genişleme Planı ve Kesitleri



180

SWORN
TRANSLATION



Şekil 6-4 Kesit-A Görünümü



Şekil 6-5 Kesit-B Görünümü



Şekil 6-6 Kesit-C Görünümü

Yukarıdaki şekiller "2018.10.10-INR-Yığın Liç Faz 4 Genişleme Proje Raporu" isimli rapordan alınmıştır



181

Aşağıdaki tablo "2018.10.10-INR-Yığın Liç Faz 4 Genişleme Proje Raporu" isimli rapordan alınmıştır

Table 6-2 Malzemelere ait pik dayanım parametreleri

| Malzeme | B.H.A kN/m³ | Model | Kohezyon kPa | İçsel sürtünme açısı | Referans |
|---|---|---|---|---|---|
| Cevher | 18.1 | Mohr-Coulumb | 0 | 37° | Ref-1 |
| Pasa Dolgu – sıkıştırılmış | 20.0 | S/N Fonksiyonu Leps-Ortalama | Değ. | Değ. | Ref-2 |
| Ana kaya | – | Sonsuz Dayanım | – | – | Ref-5 |
| Bir önceki faza ait (Faz4a) GCL-GM ara yüzü | 17.8 | Mohr-Coulumb | 82 | 18° | Ref-3 Table 6-3 |
| GT-GM Ara yüzü | 18.0 | Mohr-Coulumb | 55 | 23° | Ref-6 |
| Kil-GM Ara yüzü | 18.0 | Mohr-Coulumb | 51 | 16° | Ref-4 Table 6-4 |

Malzeme dayınım parametrelerine ait referans dokumanlar aşağıda listelenmiştir.

- Referans-1: GRE, Çöpler Phase-4 Leach Pad Expansion, 3 March, 2015
- Referans-2: Leps, T. (1970). "Review of the shearing strength of rockfill", 96(No. SM4, Proc. Paper 7394, July 1970, 1159-1170). J. of Soil Mech. and Found. Div., ASCE.
- Referans-3: 2016 yılında stabilite analizleri için yapılan raporun eklerinden faydalanılmıştır. (Global Resource Engineering, Çöpler Phase 4 Leach Pad Expansion, August 1, 2016)
- Referans-4: Faz4b aşaması için yapılan direk kesme deneyi analizleri (ekte sunulmuştur.19 Eylül 2019)
- B.H.A: Birim Hacim Ağırlığı
- S / N: Shear / Normal Function , Kayma ve normal gerilme fonksiyonu
- Referans-5: Ana kayadan geçecek kayma yüzeyleri/daireleri kritik olarak değerlendirilmemektedir. Bu kapsamda ana kayaya maksimum dayanım girilmiştir.
- Referans-6: 28 Şubat 2020 tarihinde Golder Associates Inc. Denver Labaratuarında gerçekleştirilen direk kesme deneyi sonuçları

"2020.04.27-INR-Yığın Liç Faz 4B Genişleme Proje Raporu"nda,

direkt kesme deneylerinde "Kil ile yapılan ara yüz testlerinde yenilme GM-Kil arasında oluşmuştur" ve "GCL-Kil ara yüzü için yapılan üç testte de GM-çakıl ara yüzeyi birincil kayma düzlemi olsa da, en yüksek iki yüklemede kayma yüzeyi kil içerisinde gerçekleşmiştir." Denilmektedir. Bu da, geosentetik-zemin arayüz kayma dayanımı kadar, kilin kendi kayma dayanımının da önemli bir faktör olduğuna işaret etmektedir.

182



SWORN
TRANSLATION

Tüm arayüz çeşitleri için pik kayma dayanımlarına karşı normal yükleme grafikleri çizilerek Mohr-Coulomb parametrelerinin elde edilmesine yönelik doğrular oluşturulmuştur. Oluşturulan doğrunun y eksenini kestiği nokta kohezyonu doğrunun açısı ise içsel sürtünme açısını vermektedir. Ara yüzlere ait Mohr-Coulomb pik parametreleri aşağıda sunulmuştur. Kil kaplama ve tek GT/GM ara yüz parametreleri statik stabilite analizlerinde kullanılmıştır.

Tablo 6-4 Pik Mohr-Coulomb parametreleri

| Ara yüz | Kohezyon C, kPa | Sürtünme Açısı (Derece) |
|---|---|---|
| Kil kaplama | 51 | 16 |
| GCL/Kil (Ort.) | 84 | 20 |
| Çift GT/GM | 45 | 25 |
| Tek GT/GM | 55 | 23 |
| GCL/Kaya | 25 | 32 |

Figure 1: Section A – Static Stability Output



Yukarıdaki tablo ve şekil "2020.04.27-INR-Yığın Liç Faz 4B Genişleme Proje Raporu"ndan alınmıştır.



183

SWORN
TRANSLATION

Figure 7: Section C – Static Stability Output



Ayrıca 3-boyutlu şev stabilitesi analizlerinin Soil Vision yazılımı ile GRE firması tarafından yapıldığı belirtilmektedir, "2020.04.27-INR-Yığın Liç Faz 4B Genişleme Proje Raporu"ndan alınan 3-boyutlu şev stabilitesi analizlerinden görüntüler aşağıda sunulmaktadır. **3-boyutlu analizlerde güvenlik sayısı 1'den büyük görünmekle birlikte, kullanılan kayma dayanımı parametrelerinin doğru olmaması nedeniyle gerçeği yansıtmamaktadır.**

Figure 8: Section A – 3D Stability Output OBE



184



SWORN
TRANSLATION

Figure 22: Section C – Cross-Section



Bu bilirkişi heyeti çalışmaları kapsamında, aşağıda plan görüntüsü verilen Y-T kesitinde 2-boyutlu şev stabilitesi analizleri yapılmıştır.



185



SWORN
TRANSLATION



| Material Name | Color | Unit Weight (kN/m3) | Strength Type | Cohesion (kPa) | Phi (deg) | Water Surface |
|---|---|---|---|---|---|---|
| HEAPLEACH | | 18.1 | Mohr-Coulomb | 5 | 27 | Piezometric Line 1 |
| Topuk Kaya dolgu (Toe Buttress) | | 22 | Mohr-Coulomb | 0 | 35 | Piezometric Line 1 |
| ANA KAYA | | 22 | Mohr-Coulomb | 100 | 35 | Piezometric Line 1 |
| GCL | | 18 | Mohr-Coulomb | 1 | 13 | Piezometric Line 1 |

Bu bilirkişi heyet raporu çalışmaları kapsamında Y-T kesitinde yapılan şev stabilitesi analizleri:

| Kayma dayanımı parametreleri | | Su seviyesi | Güvenlik Sayısı, F.S. |
|---|---|---|---|
| Cevher: c=5 kPa $\phi$ =27 derece<br>Topuk destek (buttress): c=0 $\phi$ =35 derece | LLDPE/GCL arayüz<br>c=1 kPa $\phi$ =13 derece | Tabanda 1 m yüksekliğinde su seviyesi | Statik durum<br>**FS=0.938** |
| Cevher: c=5 kPa $\phi$ =27 derece<br>Topuk destek (buttress): c=0 $\phi$ =35 derece | LLDPE/GCL arayüz<br>c=1 kPa $\phi$ =15.5 derece | Tabanda 1 m yüksekliğinde su seviyesi | Statik durum<br>**FS=1.11** |
| Cevher: c=5 kPa $\phi$ =27 derece<br>Topuk destek (buttress): c=0 $\phi$ =35 derece | LLDPE/GCL arayüz<br>c=1 kPa $\phi$ =14 derece | Tabanda 1 m yüksekliğinde su seviyesi | FS=1.006 |
| Cevher: c=5 kPa $\phi$ =27 derece<br>Topuk destek (buttress): c=0 $\phi$ =28.3 derece | LLDPE/GCL arayüz<br>c=1 kPa $\phi$ =17 derece | Tabanda 1 m yüksekliğinde su seviyesi | Statik durum<br>FS=1.214 |
| Aşağıdaki görselde verilen A-Kesiti için<br>Cevher: c=5 kPa $\phi$ =27 derece<br>Topuk destek (buttress): c=0<br>Fi=35 derece | LLDPE/GCL arayüz<br>c=1 kPa $\phi$ =13 derece | Tabanda 1 m yüksekliğinde su seviyesi | 1.134 |

186



SWORN
TRANSLATION

| Aşağıdaki görselde verilen A-Kesiti için  Cevher: c=5 kPa φ=27 derece  Topuk destek (buttress): c=0  Fi=28,3 derece | LLDPE/GCL arayüz  c=1 kPa φ=13 derece | Tabanda 1 m yüksekliğinde su seviyesi | 1.088 |
|---|---|---|---|





187

SWORN
TRANSLATION



Güvenlik açısından akla gelen bir diğer soru, yığın liç sahası yakınında yapılan patlatmalar yığın liçinde serilmiş malzemede ve/veya farklı geosentetikler ile altındaki üstündeki farklı zeminler ile oluşan arayüz kayma **mukavemetlerinde ne tür bir etkiye yol açar?**

Patlatma-kaynaklı titreşimlerin hem yığın liçindeki malzemenin kayma dayanımını ve/veya geosentetikler ile zemin arayüz mukavemetlerini azaltması, oluşturacağı ivme/titreşim etkisiyle stabiliteyi etkilemesi ve zeminde oturma ve çatlaklara yol açması, mevcut çatlakları genişletmesi muhtemeldir.

Bir maden sahasının patlatma-kaynaklı titreşimler için dinamik şev stabilitesi analizi yapılmasında patlatma olayının ivme-zaman veya yer sarsıntısı parçacık hızı-zaman grafiği gerekmektedir. Bazzi vd. (2020) patlatma kaynaklı maden şev stabilitesi üzerine yaptıkları sayısal modelleme çalışmasında, malzeme dayanımı içsel sürtünme açısının örnek olarak 30 dereceden 26 dereceye düşmesiyle şev yüzeyindeki referans noktalarda ani ve ciddi mertebede hareket oluştuğunu, ancak 27 dereceye düşmesi durumunda ciddi mertebede bir zemin yüzey hareketi oluşmadığını belirtmiş; ani zemin hareketlerinin oluşacağı kritik bir içsel sürtünme açısı değeri olduğunu ortaya koymuştur.

Ross ve Fox (2015) HDPE pürüzlü geomembran ile hidrate edilmiş örgüsüz (keçe tipi) geosentetik kil örtü arasındaki kayma dayanımını (yaklaşık 2000 kPa düşey gerilmeler altında) monotonik bir dinamik yükleme türü olan, tek yönlü kesme yüklemesi koşulunda dinamik durumda incelemiş ve patlatmaların kayma dayanımına etkisi olabileceğini ortaya koymuştur. Patlatmaların alanda yarattığı ivme, parçacık hızı ve tekrar sıklığı-aralığı gibi faktörlere bağlı olarak kayma dayanımını azaltabildiği belirtilmiştir.

188



SWORN
TRANSLATION

## RADAR VERİLERİ İLE İLGİLİ EK DEĞERLENDİRME:

### 13 Şubat 2024 saat 10:00 itibariyle sahadaki personelin alandan uzaklaştırılmamış olması bir kusur olarak görünmektedir:

Radar verilerinde 12 Şubat 2024 saat 12:17 ile 13 Şubat 2024 saat 12:17 arasında ölçülen hareketlerde görüleceği üzere, 13 Şubat 2024 sabah saatlerinde (örneğin mesainin başladığı 13 Şubat 2024 sabah 08:00 itibariyle) "1 günde 20 mm" hareket limitinin aşıldığının (Şekil 1) radar verilerinden sorumlu-karar verici ilgililer tarafından anlaşılmış olması gerekirdi.



*Şekil 1. 12 Şubat 2024 saat 12:17 ile 13 Şubat 2024 saat 12:17 arasında ölçülen zemin hareket miktarları grafiği ("1-day Displacement Graph.bmp" isimli dosya)*

Diğer yandan, "1 günde 20 mm" hareket limiti "0.83 mm/saat" hareket hızı anlamına gelmektedir. Ölçülen hareketin hızının 12 Şubat 2024 16:00-22:00 saatleri arasında 11 mm/6 saat (1.83 mm/saat) olduğu, ve hareketin 13 Şubat 2024 günü içinde sabah saatlerinden itibaren hızlandığı, ölçümlerden anlaşılmaktadır. Örneğin, 13 Şubat 2024 saat 01:00-06:00 arasında hareket hızı 15 mm/5 saat (3 mm/saat), saat 08:00-10:00 arasında ise 8 mm/2 saat (4 mm/saat) olarak ölçülmüştür. "Deplasman-zaman" şeklinde zemin hareket grafiklerinde, bu tür artan zemin hareket hızı değerlerinin (bir diğer deyişle grafiğin asimptotik olarak yukarı sonsuz yöne devam etmesinin) zeminin/şevin "göçme durumu"na doğru gittiğini işaret ettiği bilinmektedir. **13 Şubat 2024 tarihinde saat 08:00 veya saat 10:00'dan itibaren bu değerlendirmenin yapılarak sahadaki personelin alandan uzaklaştırılması gerekirdi.**

**Hareketin ölçüldüğü noktadan ne kadar uzaktaki bir alanda göçme (heyelan) yaşanacağı, heyelanın tetiklendiği noktadan ne kadar ileri bir alana kadar akacağı öngörülemeyebilirdi.** Örneğin, bu heyelanın Sabırlı Deresine akacak kadar büyük bir kütleyi harekete geçireceği, mobilize edeceği bu kütlenin nereye kadar akacağı öngörülemeyebilirdi. Ancak, yine de, radar verilerinden hareket eden alanın genişliğinin görülebildiği anlaşılmaktadır (Şekil 2). Şayet Şekil 1 ve Şekil 2'deki

189



SWORN
TRANSLATION

görüntüler heyelan olayından önce ilgili-yetkili kişilerin izlemesine açık ise, hareketlerin oluştuğu alanın sınırları da anlaşılabilmeliydi, ve tedbiren, Şekil 2'deki alandan daha geniş bir alandaki personelin alandan uzaklaştırılması güvenli-doğru bir uygulama olurdu.



*Şekil 2. Zemin hareketlerinin gözlendiği alanlar "1-Day Displacement Map.bmp" isimli dosya*

Şekil 3'deki 1-günlük hareket hızı grafiğinde hız değerlerinin nasıl hesaplandığı bilinmemekle birlikte, **Şekil 3'teki hareket hızı grafiğinin, Şekil 1'dekine kıyasla tehlikeyi net bir şekilde işaret etmeyen bir grafik olduğu anlaşılmaktadır** (Şekil 3'teki hız değerleri zaman içinde zikzaklı bir şekilde (sinyal gürültüsü benzeri bir görünümle) artmakta ve azalmakta olduğundan).



*Şekil 3. 1-günlük hareket hızı grafiği, "1-Day Velocity Graph.bmp" isimli dosya*

190



## 13 Şubat 2024 öncesindeki son 7 günlük hareket verilerinden 11-12 Şubat 2024 tarihlerinde hareketin hızlandığının göz önüne alınmamış olması bir kusur olarak görünmektedir

Son 7 günlük radar verilerinde 6 Şubat 2024 saat 12:23 ile 13 Şubat 2024 saat 12:21 arasında ölçülen hareketlerde görüleceği üzere, 9 Şubat 2024'ten sonra, 10, 11 ve 12 Şubat 2024 tarihlerinde artan hareket hızları ölçülmüştür (Şekil 4). Şekil 5'teki görüntüler bu hareketin yoğun olarak gözlendiği alanları göstermektedir.



*Şekil 4. 6 Şubat 2024 saat 12:23 ile 13 Şubat 2024 saat 12:21 arasında ölçülen zemin hareket miktarları grafiği ("7-day Displacement Graph.bmp" isimli dosya)*

Şayet Şekil 4 ve Şekil 5'deki görüntüler heyelan olayından önce ilgili kişilerin izlemesine açık ise, hareketlerin oluştuğu alanın sınırları da anlaşılabilmeliydi. 11 ve 12 Şubat 2024 tarihlerindeki ölçümlerden, 12 Şubat'ta, henüz daha 1 gün dolmadan hareketin hızının 2 kat hızlandığı, 12 Şubat gün içinde ise hareket hızının artarak devam ettiği gözlenebilmektedir. Tedbiren, Şekil 5'teki alandan daha geniş bir alandaki personelin uzaklaştırılması güvenli-doğru bir uygulama olurdu.



SWORN
TRANSLATION



*Şekil ........ cumletherum gözlendiği alanlar "7-Day Displacement Map.bmp" isimli dosya
(şekli ... .. ..... Al gri renkli alan radar tarafından gözlenememektedir, bu nedenle o alanda
hareket ......... gözünmedigi bilinmemektedir. Gri alanda bulunan prizmalar PL10, PL20, PL21,
PL22'nin zemin hareketi ölçüm verileri temin edilememiştir)*

Şekil 6'daki 7-günlük hareket hızı grafiğinde hız değerlerinin nasıl hesaplandığı bilinmemekle
birlikte, Şekil 6'daki hareket hızı grafiğinin, Şekil 4'tekine kıyasla tehlikeyi net bir şekilde işaret
etmeyen bir grafik olduğu anlaşılmaktadır (Şekil 6'daki hız değerleri zaman içinde artmakta ve
azalmakta olduğundan)



*Şekil 6 7-günlük hareket hızı grafiği, "7-Day Velocity Graph.bmp" isimli dosya*

192



Şekil 7'de Ali Rıza Kalender'in gönderdiği email'deki fotoğraflar ve Şekil 8'de Iain Guille'nin gönderdiği email'de fotoğraflar, sahada gözlenen gerilme çatlaklarının, yarıkların/ayrılmaların ciddi seviyede olduğunu açıkça ortaya koymaktadır. Şekil 9'da bu çatlakların gözlendiği alan gösterilmiştir. Şekil 10'da çatlakların ilave fotoğrafları görülmektedir.

Çatlakların oluştuğu alanda, bu gerilme çatlaklarının, henüz daha az genişlikte çatlaklar iken, ilk tespit edildiği, gözlendiği andan itibaren harita üzerinde işaretlenmemiş olması, ve zaman içinde bu çatlakların genişleyip genişlemediği, veya farklı alanlarda da gözlenip gözlenmediğinin takip edilmemiş olması bir kusur olarak görünmektedir.





*Şekil 7 ... Kalender'in gönderdiği email'deki fotoğraflar*

193



SWORN
TRANSLATION





*...... nille'nin gönderdiği email'deki fotoğraflar*

194



SWORN
TRANSLATION

 

*Şekil ... alandaki çatlakları gösteren diğer fotoğraflar*



SWORN
TRANSLATION



*Şe... ...fotoğraflardaki çatlakların gözlendiği alan*

SWORN
TRANSLATION

Şekil 11'deki doğu kısmıtaki PL numaralı prizmaların ölçümleri temin edilememiştir. Bu alanda yüzeydeki zemin hareketini gösterecek olan prizmalardan ölçüm alınmadı veya alındı ancak karar-almaya yönelik değerlendirilmedi ise, bu da önemli bir eksikliktir.



Şekil 11. Alandaki prizmaların lokasyonları



197

SWORN
TRANSLATION

**KAYNAKLAR:**

Bazzi, H., Nojeresll, H., and Farhadian, H. (2020) Modelling the effect of blast-induced vibrations on the stability of a faulted mine slope. Journal of the Southern African Institute of Mining and Metallurgy, vol. 120, no. 10, pp. 591-598.

CETCO Lining Company (2002) Bentomat Direct Shear Testing Summary, Laboratory Data Reports

Ekici, A. (2022). Geotechnical properties of coarse-fine mixtures and their interaction with geogrids through large direct shear testing, Doktora tezi, ODTÜ İnşaat Mühendisliği Bölümü. https://open.metu.edu.tr/handle/11511/98202

Fox, P. J., Sura, J. M., & Nye, C. J. (2015). Dynamic shear strength of a needle-punched GCL for monotonic loading. Journal of Geotechnical and Geoenvironmental Engineering, 141(7), 04015025.

Haselsteiner, R., Parrak, R., & Ersoy, B. (2017). Aspects concerning the shear strength of rockfill material in rockfill dam engineering. geotechnik, 40(3), 193-203.

Hazen, A. (1892). Physical Properties of Sands and Gravels With Reference to Their Use Infiltration, Massachusetts State Board of Health, Boston, Mass

Huvaj-Sarihan, N. (2009) Movement of Reactivated Landslides, Ph.D. Thesis, University of Illinois at Urbana-Champaign USA.

Koerner, R. M. (2012) Designing with geosynthetics-Vol. 1 (Vol. 1, Vol. 2), Xlibris Corporation.

Leps, T. (1970) "Review of the shearing strength of rockfill" 96 (No. SM4, Proc. Paper 7394, 11591170, J. of Soil Mech. And Found. Div. ASCE

Li, X., Li, Q., Hu, Y, Chen, Q., Peng, J., Xie, Y., & Wang, J. (2022). Study on three-dimensional dynamic stability of open-pit high slope under blasting vibration. Lithosphere, 2021(Special 4), 6426550

Mesri, G., & Shahien, M. (2003). Residual shear strength mobilized in first-time slope failures. Journal of geotechnical and geoenvironmental engineering, 129(1), 12-31.

Ovalle, C., Linero, S., Dano, C., Bard, E., Hicher, P. Y., & Osses, R. (2020). Data compilation from large drained compression triaxial tests on coarse crushable rockfill materials. Journal of Geotechnical and Geoenvironmental Engineering, 146(9), 06020013.

Park, J. & Santamarina, J. C. (2017). Revised soil classification system for coarse-fine mixtures. Journal of Geotechnical and Geoenvironmental Engineering, 143(8), 04017039.

Ross, J. D. & Fox, P. J. (2015). Dynamic shear strength of GMX/GCL composite liner for monotonic loading. Journal of Geotechnical and Geoenvironmental Engineering, 141(7), 04015026.

Skempton, A.W. (1953) The Colloidal "Activity" of Clays, Proc. III Int. Conf. on Soil Mechanics and Foundation Engineering, 1, 57-61, https://www.issmge.org/publications/online-library

Terzaghi, Peck, Mesri (1996) Soil Mechanics in Engineering Practice (kitap)

Triplett, E.J. and Fox, P.J. (2001) Shear Strength of HDPE Geomembrane/Geosynthetic Clay Liner Interfaces, Journal of Geotechnical and Geoenvironmental Engineering, ASCE, June, pp.543-552

Zornberg, J., McCartney, J.S. and Swan, R. H. (2005) Analysis of a Large Database of GCL Internal Shear Strength Results, Journal of Geotechnical and Geoenvironmental Engineering, ASCE, March, pp.367-580



198

SWORN
TRANSLATION

## *Membran Üzerinde Şev Kaymaları*

15 dönümlük 30 metre yükseklikte Kettleman tehlikeli atık depolama sahasında membran sistemi üzerindeki şev kaymalarında 12 metreye kadar yanal yer değiştirmelerin ve 4.5 metreye kadar dikey oturmaların ölçüldüğü bildirilmiştir (Mitchell, J. K., Seed, R., Seed, H. B, 1990)

Gerçekleştirilen direk kesme ve çekme testlerinde bazı geosentetikler ve sıkıştırılmış doygun kil tabakası arasındaki arayüz açısının 8 dereceye kadar düşebildiği anlaşılmıştır. En kritik arayüz durumu HDPE ile geotekstil, HDPE ile geonet, ve HDPE ile sıkıştırılmış kil arasında görülmüştür.

Breitenbach, A.J., Katı atık depolama sahaları, yığın liçi alanları ve atık kapama projelerindeki geçmişteki şev kaymalarında geçirimsizlik tabakasının (astarın) neden olduğu kaymaların genellikle düzlemsel geomembran tabakası ile zayıf altta veya üstte yer alan zayıf malzemelerin arayüzünde meydana geldiğini göstermiştir. Geomembran yüzeyinin genel olarak daha düşük sürtünme mukavemeti özelliklerine sahip olduğu ve üzerini kaplayan dolgu ve alttaki temel malzemeleri nedeniyle membran sisteminin stabilite sorunları çıkmaması için özel tasarımlara ve işletme koşullarına ihtiyaç duyulduğu bildirilmektedir.

Vaid Vu Rinne (1995) birçok olayda deplasman ile mobilize olan membran ile zemin arasındaki arayüz sürtünme açısının zemin sürtünme açısından küçük olduğuna ve tasarımda potansiyel kayma yüzeyinin belirleyici faktörlerden biri olabileceğine dikkat çekmişlerdir.

Negussby v.d. (1988) HDPE geomembran ile köşeli ve yuvarlak kum, çakıl ve jeotekstil arasındaki arayüz sürtünmesini halka kesme aparatında incelemişler, Kompozit arayüzlerde kaymanın, ince taneli bir arayüzde kaba taneli bir geomembran arayüzünden daha kolay meydana geldiğini, jeotekstil ve geomembran arasındaki arayüz sürtünme açılarının hiçbir ayrım olmaksızın çok düşük olduğunu bildirmişlerdir.

Toulegilon v.d. (2020) Doğal zeminlerde liç etkisinin toprağın mekanik parametrelerinde değişiklikler şeklinde kendini gösterdiğini, sızıntı nedeniyle zeminlerde meydana gelen mukavemet azalmasının sonuçlarından birinin de kayma şeklinde ortaya çıkan şev dengesizliği olduğunu bildirmişlerdir. İran'ın kuzeyindeki bir kil şevinin stabilitesi üzerinde yıkamanın etkisini araştırmak amacıyla bir dizi kimyasal, fiziksel ve mekanik testler gerçekleştirildiğini, sonuçlar, liç etkisi ile zeminden çözünebilir tuzların uzaklaştırıldığını, gözenekli ve dengesiz bir yapı bıraktığını, süzme, drenajlı ve drenajsız durumda deformasyon ve kesme mukavemeti parametreleri dahil olmak üzere ana toprağın mekanik özelliklerinin azalmasına neden olduğunu bildirmişlerdir.

İsmael ve Mollah (1998) Kuveyt'teki çimentolu kum depositlerinin özellikleri üzerinde liç işleminin etkisini incelemişler, farklı çimentolaşma seviyelerine sahip iki bölgeden alınan numuneler üzerinde laboratuvar deneyleri yapmışlardır. Sonuçlar liç etkisi ile sıkıştırılabilirliğin arttığını ve sızıntıdan dolayı efektif kayma mukavemeti parametreleri olan c' ve φ'de azalma olduğunu gösterdiğini, bu etkinin, zayıf çimentolu kumlarda, orta ila kuvvetli çimentolu kumlara kıyasla daha belirgin olduğunu ifade etmişlerdir.

Thiel ve Smith (2004) bakır ve altın yığın liçinde tasarım problemlerini incelediği makalelerinde, derin dolgularda kayma mukavemeti deneylerinin daha büyük gerilme aralıklarında uygulanması gerektiğini, zira, tipik olarak, kayma mukavemeti zarfının büyük gerilme aralıklarında artık doğrusal

199



SWORN
TRANSLATION

olmayıp, normal gerilmeler arttıkça kayma mukavemetinin azalacak şekilde kavisli bir eğri haline geleceğini, normal deneysel sınırlar için bulunan mukavemet zarfının ileri doğru uzatarak (ekstrapole ederek) kayma mukavemetinin belirlenmesinin konservatif olamayacağını, güvenli tarafta kalamayacağını belirtmişlerdir. Yazarlar., bu prensiplerin hem cevher malzemesinin iç mukavemeti hem de cevher ile membran arasındaki ara yüzey için geçerli olacağını vurgulamışlardır..

*References*

Vaid ve Rinne, "Geomembrane Coefficients Of Interface Friction ", Geosynthetics International · January 1995

Negussby, D; Wijewickreme W.K.D; Vaid, P. Y.," ve Vaid, Geomembrane interface friction" Canadian Geotechnical Journal, 2011

Toulegilan; M.M. Chenari, R.J. Neshaei, A.L; Forghani, A." Changes in stability conditions of clay slopes due to leaching, a case study", SN Applied Sciences ,2,2030;2020

Nabil F. Ismael, Member, ASCE, and M. A. Mollah  Leaching Effects on Properties of Cemented Sands in Kuwait Journal of Geotechnical and Geoenvironmental Engineering, Volume 124, Issue 10

Thiel, R. and Smith.M.E., State of the practice review of heap leach pad design issues, Geotextiles and Geomembranes, Volume 22, Issue 6, December 2004, Pages 555-568)

(Mitchell, J.K., Seed, R.  , and Seed, H.B  , . Kettleman Hills Waste Landfill Slope Failure. I: Liner-System Properties Journal of Geotechnical Engineering, Volume 116, Issue 4, 1990)

By   Breitenbach, A.J., P.E., SME Member,  Vector Colorado c Heap Leach Pad Design And Construction Practices In The 21st Century.

Vaid, P. T., Geomembrane Coefficients of Interface Friction ,Geosynthetics International · January 1995



SWORN
TRANSLATION

TABLE 2. interface friction angles

| Interface | Normal stress, kPa | Peak friction angle, deg | Residual friction angle, deg |
|---|---|---|---|
| Single stage | | | |
| Sand – geomembrane (80 mil) – gravel (dry) | 50 | 24.9 | 18.5 |
| | 100 | 24.3 | 18.5 |
| | 250 | 28.4 | 22.0 |
| | 400 | 27.2 | 18.7 |
| Multistage | | | |
| Sand – geomembrane (40 mil) – gravel (dry) | 50 | 22.0 | 19.0 |
| | 100 | — | 17.0 |
| | 250 | — | 16.5 |
| | 400 | — | 16.7 |
| | 800 | — | 16.5 |
| Geomembrane (60 mil) – geotextile (Texel 7612) (dry) | | — | 6.5 |
| Geomembrane (60 mil) – geotextile (Texel 7612) (saturated) | | — | 6.5 |
| Geomembrane (60 mil) – Ottawa sand (ASTM-C-109) | | 17.6 ($\sigma$ = 50 kPa) | 15.0 |

Note: 40 mil geomembrane is equivalent to approximately 1.02 mm thickness; 60 mil to approximately

*Interface friction angles (Geomembrane interface friction, Negussey, Wijewickre, Vaid, 1988)*

Bu bilgiler muvacehesinde, şekil 1'de gösterilen kaymanın müşahede edildiğ, 3-3 kesiti üzerinde yapılan statik stabilite analizleri sonucu şekil 2'de verilmektedir..

Yığın içinin kayma mukavemet asıcı TOKER Ltd. deneylerinde elde edilen sonuçlar incelenerek temsil edici değer olarak 27 derece, kohezyon 5 kPa alınmıştır. Boşluk su basıncı parametresi, ru=0.05 kabul edilmiştir.

Statik durum için yapılan geri-analizlerde zemin blokunun membran üzerinde kaymaya karşı güvenlik sayısın 1'e yakın olduğu müşahede edilmektedir

Sıkıştırılmadan istiflenmiş zemin yığınlarından geçen liç etkisi ile zeminin mukavemet parametrelerinde azalma olduğu, bunun geomembran-zemin arasındaki arayüz mukavemet açısını düşürdüğü, zaman içinde bu değerlerin kalıntı mukavemet değerlerinde yaklaştığı anlaşılmaktadır. Ayrıca, laboratuvar koşullarında yapılan mukavemet deneylerinden elde edilen mukavemet parametrelerinin 80 metreye varan yükseklikteki zemin kütlesinin altında yaklaşık 1400 kPa basınç altında mobilize olacak mukavemet parametrelerini tam olarak yansımayabileceği de ihtimal dahilindedir.

Şekil 3'de ise, çevrede yapılan ocak patlatmalarında intikal edebilecek veya mikrotremor kaynaklı çok küçük bir sismik etki (0,005 g veya 5 gal ) altında kaymaya karşı güvenliğin daha da azaldığı görülmektedir.



SWORN
TRANSLATION

Kayma öncesi güvenlik sayısı 1 civarında olan şevin, ocak patlatmaları etkisi ile zamanla küçük deformasyonlar yapabileceği, bu hareketlerin birikmesi ile çatlakları oluşması ve nihayet kaymanın oluşabileceği söylenebilir.

Sonuç olarak yukarıda işaret edildiği veçhile, sıkıştırılmadan istiflenmiş zemin yığınlarından geçen liç etkisi ile zeminin mukavemet parametrelerinde azalma olduğu, bunun geomambran-zemin arasındaki arayüz mukavemet açısını düşürdüğü, zaman içinde, yapılan ocak patlatmalarının da etkisi ile bu değerlerin kalıntı mukavemet değerlerinde yaklaşarak kaymanın vuku bulduğu kanaati oluşmuştur.



*Şekil 1. 30.12.2023 tarihli sayısal yüzey modeli üzerinden alınan ve duraylılık anlizlerinde kullanılan kesit hatlarının konumu.*



202

SWORN
TRANSLATION



Şekil 2. Statik durum



Şekil 3. Sismik durum şev analizi sonucu



SWORN
TRANSLATION

## 5.3.2. İŞLETME SÜRECİNDEKİ ŞEV STABİLİYESİNE OLUMSUZ ETKİLER

### 5.3.2.1. Patlatmalar

Patlatma ile çevreye verilen olumsuzlukların en önemlisi yer sarsıntısıdır. Patlatma kaynaklı yer sarsıntıları yapılar üzerinde depremler ile benzer etkiler yaparlar. Patlatmanın kaçınılmaz olduğu taş ocakçılığı, madencilik, inşaat altyapı kazıları, kuyu -tünel, boru hattı, baraj gibi çeşitli sektörlerde: yersarsıntısından kaynaklanan çevre problemleri sıkça karşılaşılmakta ve tartışılmaktadır. Özellikle stabilite açısından hassas mühendislik yapılarında patlatma kaynaklı yersarsıntısı hasarları sıklıkla görülmektedir. Bu kapsamda işletme sahasında yapılan patlatmalı kazı çalışmaları incelenmiş ve patlatma kaynaklı yer sarsıntılarının Yığın liçinde oluşturabileceği hasarlar belirlenmiştir.

Kaymanın gerçekleştiği yığın liçi çevresinde yakın mesafede yapılan patlamalar incelendiğinde, yığın liçi faz-5 inşası sırasında yapılan patlamaların yığın liçine oldukça yakın mesafelerde yapıldığı tespit edilmiştir. **Yerinde yapılan gözlemler ve firma raporları doğrultusunda Faz-5 inşasının yapıldığı zemin formasyonunun Munzur kireçtaşı olduğu ve bu formasyonun oldukça dayanıklı kireçtaşlarında oluştuğu belirlenmiştir. Bu nedenle bu zeminde yapılacak kazı çalışmalarının patlatma ile yapılması bir mühendislik gerekliliğidir (Fugro sial.2014; Gokceoglu vd.,2016; Ozer vd., 2008).** Firmanın açık işletme üretiminde uyguladığı patlatma paterni Tablo 1 de verilmiştir. Firmadan alınan veriler doğrultusunda Faz-5 inşası sırasında yapılan tüm patlatmaların (Kasım 2023 tarihinden itibaren) basamak parametreleri ve yığın liçine olan mesafeleri ise Tablo 2 de özetlenmiştir. Ayrıca bazı atımların yığın liçine olan mesafeleri Şekil 1 de gösterilmiştir. Ayrıca firmanın açık işletme üretiminde uyguladığı basamak patlatma paterni Şekil 2 de verilmektedir.

*Tablo 1. Firmanın Açık İşletme Üretiminde Uyguladığı Basamak Patlatma Paterni*

| Patlatma parametreleri | Rutin Patlatmalar için Kullanılan Parametreler | Kontrollü Patlatmalar İçin Kullanılan Parametreler |
|---|---|---|
| Basamak Yüksekliği (m) | 5 | 5 |
| Alt Delgi (m) | 0,5-0,7 | 0,5-0,7 |
| Yük Mesafesi (m) | 3-3,25 | 2-2,5 |
| Delikler Arası Mesafe (m) | 3-3,75 | 2,5-3 |
| Delik Çapı (m) | 0,102 | 0,102 |
| Sıkılama Mesafesi (m) | 2,44-2,69 | 3-3,25 |
| **Delik Başına Patlayıcı Miktarı (kg)** | **20** | **12,4** |
| **Emniyet Mesafesi (m)** | **500** | **300** |
| Delikler Arası Geciktme Kapsül (msn) | 17/500 | 17/500 |
| Sıralar Arası Geciktme Kapsül (msn) | 42 | 42 |



SWORN
TRANSLATION



*Şekil 1. Her 3 insan yerleşimli bazı çalışmaların yığın* liçine olan **mesafeleri**



SWORN
TRANSLATION

Tablo 2. Yığın liçi Faz5 inşaatı kapsamında yapılan patlatmalı kazı çalışmaları (Kasım 2023 tarihinden itibaren)

| No | Adı | Tarih | Koordinat | | | Delik. Boyu (m) | Max..Patlayıcı Miktarı (kg) | Top. Patlayıcı Miktarı (kg) | Delik Sayı | Yığın Liçi Mesafe (m) |
| | | | Y | X | Z | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Faz5-33 | 03.11.2023 | 460252,48 | 4363682,08 | 1.308,31 | 18,52 | 95,65 | 20223 | 281 | 100 |
| 2 | Faz5-34 | 10.11.2023 | 460045,69 | 4363681,76 | 1.307,73 | 15,49 | 74,67 | 8003 | 329 | 100 |
| 3 | Faz5-36 | 24.11.2023 | 460060,41 | 4363673,93 | 1.307,99 | 16,54 | 81,48 | 12095 | 213 | 100 |
| 4 | Faz5-37 | 01.12.2023 | 460080,65 | 4363649,30 | 1.307,93 | 8,43 | 35,30 | 6573 | 283 | 100 |
| 5 | Faz5-38 | 01.12.2023 | 460110,98 | 4363657,39 | 1.306,97 | 7,47 | 29,03 | 2050 | 106 | 100 |
| 6 | Faz5-39 | 29.12.2023 | 460164,77 | 4363649,89 | 1.306,47 | 6,97 | 27,40 | 4983 | 261 | 100 |
| 7 | Faz5-41 | 29.12.2023 | 460182,96 | 4363658,35 | 1.306,86 | 7,36 | 28,36 | 2507 | 139 | 100 |
| 8 | Faz5-42 | 02.01.2024 | 460062,63 | 4363713,92 | 1.301,08 | 10,04 | 44,15 | 8518 | 299 | 123 |
| 9 | Faz5-43 | 05.01.2024 | 460213,14 | 4363663,61 | 1.307,20 | 7,70 | 30,58 | 5720 | 294 | 59 |
| 10 | Faz5-44 | 05.01.2024 | 460255,27 | 4363674,35 | 1.309,99 | 10,49 | 47,05 | 8493 | 330 | 59 |
| 11 | Faz5-45 | 12.01.2024 | 460093,11 | 4363721,01 | 1.300,24 | 9,62 | 43,02 | 9643 | 346 | 217 |
| 12 | Faz5-46 | 08.01.2024 | 460252,67 | 4363683,56 | 1.308,10 | 8,60 | 34,78 | 3382 | 157 | 96 |
| 13 | Faz5-47 | 12.01.2024 | 460127,26 | 4363691,68 | 1.300,57 | 9,54 | 40,91 | 4078 | 190 | 217 |
| 14 | Faz5-48 | 14.01.2024 | 460246,90 | 4363722,35 | 1.299,77 | 10,47 | 45,28 | 2277 | 139 | 101 |
| 15 | Faz5-49 | 14.01.2024 | 460225,28 | 4363703,10 | 1.300,59 | 11,11 | 49,48 | 3355 | 148 | 101 |
| 16 | Faz5-50 | 16.01.2024 | 460121,32 | 4363692,24 | 1.300,91 | 9,77 | 40,77 | 2525 | 105 | 76 |
| 17 | Faz5-51 | 16.01.2024 | 460228,73 | 4363703,56 | 1.300,86 | 11,38 | 51,21 | 9346 | 217 | 76 |
| 18 | Faz5-52 | 19.01.2024 | 460211,39 | 4363691,65 | 1.300,66 | 11,01 | 47,52 | 6743 | 200 | 143 |
| 19 | Faz5-53 | 24.01.2024 | 460260,75 | 4363674,47 | 1.300,56 | 10,63 | 46,36 | 7727 | 266 | 64 |
| 20 | Faz5-54 | 30.01.2024 | 460236,15 | 4363660,08 | 1.299,97 | 9,87 | 43,01 | 5637 | 117 | 147 |
| 21 | Faz5-55 | 30.01.2024 | 460131,04 | 4363657,69 | 1.300,10 | 9,12 | 41,62 | 3166 | 148 | 147 |
| 22 | Faz5-56 | 30.01.2024 | 460131,90 | 4363700,68 | 1.299,87 | 9,53 | 12,16 | 4049 | 192 | 147 |
| 23 | Faz5-57 | 06.02.2024 | 460111,57 | 4363717,50 | 1.299,37 | 5,24 | 12,80 | 166 | 40 | 172 |
| | | Ortalama Değerler | | | | 10,24 | 45,15 | 5112 | 209 | 115 |



SWORN
TRANSLATION

Tablo 1 ve Tablo 2 deki basamak patlatma paternleri incelendiğinde, firmanın kontrollü patlatmalar için uyguladığı Maksimum patlatıcı miktarının 12,4 kg, rutin patlatmalar için ise 20 kg olduğu görülmektedir. Ancak Faz 5 inşaatında yapılan patlatmalarda tüm atımlarda uygulanan maksimum patlayıcı miktarı değerleri bu değerlerin oldukça üzerindedir. Bazı atımlarda 8 kat daha fazla kullanılan maksimum patlayıcı miktarı, patlatma kaynaklı yersarsıntısı oluşumunda oldukça etken bir parametredir. Ayrıca açık işletme firma paterninde emniyet mesafeleri rutin ve kontrollü patlatmalarda sırasıyla 500 m ve 300 m olarak uygulanmaktadır. Ancak Tablo 2 den de görüldüğü gibi Faz 5 inşaatı patlatmaları yığın liçine ortalama 115 m mesafededir. Bu mesafe patlatma yersarsıntılarının oldukça etkin olduğu değerlerdir ve bu nedenle burada yapılan patlatmaların kontrollü olarak oldukça hassas şekilde yapılması gerekir. Bu durum patlatma kaynaklı yersarsıntılarının yığın liçine zarar verme riskini artırmaktadır.

Çeşitli araştırmacılar tarafından geliştirilen patlatma kaynaklı hasar kriterlerinde yapı hasarı riskinin belirlenebilmesi amacıyla yersarsıntısı parçacık hızı ve frekans parametreleri kullanılmaktadır. Ayrıca Ülkemiz Çevresel Gürültü Kontrol Yönetmeliği (Resmi Gazete Tarih: 30.11.2022 Sayı: 32029)'ne göre de patlatma kaynaklı yapı hasarlarında bu parametreler kullanılmaktadır. Bu yönetmelikte verilen "Maden ve taş ocakları ile benzeri alanlarda patlatma nedeniyle oluşacak zemin titreşimlerinin sınır değerleri" Tablo 3'de yer almaktadır.

*Tablo 3. Maden ve taş ocakları ile benzeri alanlarda patlatma nedeniyle oluşacak titreşimlerin en yakın yapıda yaratacağı zemin titreşimlerinin izin verilen en yüksek değerleri*

| Yapı Tipi | | Binaların Temelinde En Yüksek Titreşim Hızı, (mm/s) (frekansa göre, f=Hz) | | | Tüm frekanslar için en üst katın döşemesinde (2) |
|---|---|---|---|---|---|
| | | f= 1-10 | f=10-50 | f=50-100[1] | |
| 1 | Endüstriyel binalar | 20 | 40 | 50 | 40 |
| 2 | Evler, tuğla ve beton gibi dayanıklı yapılar | 5 | 15 | 20 | 15 |
| 3 | Titreşime duyarlı olup 1. ve 2. maddenin dışında kalan binalar, tarihi ve doğal yapılar (3) | 2 | 8 | 10 | 8 |

[1] 100 devir/sn büyük frekanslar için, büyük titreşim düzeyine izin verilebilir.

[2] Birden fazla katlı binalar için, ölçümlerin hem binaların temelinde hem de en üst katın döşemesinde alınması gerekir.

[3] Tarihi ve doğal yapılar için belirlenen bu sınır değerler, yerinde yapılacak hassas, kapsamlı titreşim ölçümleri ve bilimsel çalışmalar ile kısıtlanabilir.



SWORN
TRANSLATION

Faz 5 inşaatı sırasında yapılan ve Tablo 2 de patlatma patern bilgileri verilen Toplam 23 atımın, hemen yanında bulunan yığın liçine zarar verme potansiyelini belirlemek için atımlar sonrası oluşan yersarsıntısı parçacık hızı ve frekans değerlerinin belirlenmesi gerekmektedir. Bu değerlerin belirlenmesinde iki temel metot uygulanır. Bunlardan birincisi doğrudan bu parametrelerin titreşim ölçer cihazlarıyla ölçülmesi, ikincisi ise bölge için geliştirilen ampirik formüller kullanılarak bu değerlerin tahmin edilmesidir. Patlatmalı kazı çalışmaları sırasında yığın liçi yakınında titreşim ölçer cihazı kullanılarak herhangi bir ölçüm yapılmamıştır. Bu durum yasal zorunluluk olmamakla birlikte kontrollü patlatma ilkelerine uymamaktadır. Ayrıca bölgede bir titreşim ölçer cihazı bulunmaktadır ancak konum itibarıyla yığın liçine oldukça uzak mesafede olduğundan (~2km) atım kayıtları alınamamıştır. Doğrudan ölçüm sonuçlarının olmaması sebebiyle 2. Metot bu değerlerin belirlenmesi için kullanılmıştır. Tahminde kullanılacak ampirik formüller bölgede yapılan bilimsel bir çalışmadan ve benzer formasyonda (kireçtaşı) yapılan başka bir çalışmadan alınmıştır (Taşdemir,2013, Adıguzel,2006). Bu ampirik formüller ile patlatma sırasında kullanılan patlayıcı madde miktarı ve patlatmanın mesafe değerleri kullanılarak patlatma sonucu oluşabilecek yersarsıntısı değerleri tahmin edilir (Eşitlik 1,2). Ayrıca bölgede yapılan patlatmalardaki baskın frekans değeri de tüm atımların frekans değerleri ile belirlenir.

PPV = 578.02 x SD-1.46    Benzer formasyonda yapılan bir çalışma (1)

PPV = 136.36 x SD-1.132    Bölgede yapılan bir çalışma    (2)

Burada;

PPV=maksimum parçacık hızı(mm/sn)

SD=Ölçekli mesafe: patlatma mesafesinin(R) patlayıcı miktarına(W) oranı :R/W0,5

Eşitlik 1 ve 2 de verilen ampirik formüllerin doğruluğunun belirlenmesi amacıyla sahada yapılan patlatma titreşim ölçer sonucu bu denklemlerle tahmin edilmiş ve gerçek ölçüm sonucuyla karşılaştırılmıştır (Tablo 4).

Tablo 4. Tahmin formülleri gerçek ölçüm sonucu karşılaştırılması

| Tahmin Formülü | 11.02.2024 tarihli atımın PPV tahmini (mm/sn) | 11.02.2024 tarihli atımın ölçülen PPV değeri (mm/sn) | Sapma |
|---|---|---|---|
| PPV=136.36 x SD-1.132 | 0,17 | 0,24 | 0,07 |
| PPV= 578.02*SD-1.46 | 0,11 | | 0,13 |

PPV: peak particular velocity(en yüksek titreşim hızı)

SD: Ölçekli mesafe (R/W^0,5), R:mesafe, W: patlayıcı şarj

Tablo 4 den görüldüğü gibi eşitlik 1 ve 2 de verilen tahmin formülleri gerçek ölçüm sonuçlarını çok küçük bir sapma değeri ile tahmin etmektedir. Bu durum ampirik formüllerin PPV tahmininde

SWORN
TRANSLATION

kullanılabileceğini göstermektedir. Tablo 2 de verilen 23 atımın maksimum patlayıcı miktarları ve yığın içine olan mesafeleri eşitlik 1 ve 2 de kullanılarak bu atımların oluşturacağı maksimum parçacık hızı değerleri tahmin edilmiştir. Bölgede bulunan titreşim ölçer cihazı ile alınan bir atım kaydına ait frekans değeri (6.2Hz) (Şekil 2), bölgede yapılan bilimsel bir çalışmadaki patlatma kaynaklı frekans değerleri ile oldukça uyumludur. Bu nedenle baskın frekans değeri olarak bu değer kabul edilmiş ve Ülkemiz hasar normundaki 1-10 Hz frekans aralığı değerlendirmeye alınmıştır. Buna göre Faz 5 İnşaatında yapılan patlatmalı kazı çalışmaları sonucu oluşan zemin titreşimlerinin Çevresel Gürültü Kontrol Yönetmeliği'ne göre değerlendirilmesi Şekil 3 de verilmiştir.



Şekil 2. 11.02.2024 tarihinde magnezit açık işletme sahasında yapılan patlatmanın titreşim ölçer kaydı (Patlama ile alanı Yığın içine ~2km)



SWORN
TRANSLATION



Şekil 3. Faz 5 İnşaatında Yapılan Patlatmalı Kazı Çalışmaları Sonucu Oluşan Zemin Titreşimlerinin Çevresel Gürültü Kontrol Yönetmeliği'ne Göre Değerlendirilmesi a) 1-10 Hz frekans değerindeki hasar limitlerine göre b) Tüm frekans değerlerindeki hasar normu

Şekil 3' den de görüldüğü gibi Faz 5 inşaatında yapılan patlatmaların tahmin edilen zemin titreşim hızları, "Çevresel Gürültü Kontrol Yönetmeliği-Titreşime duyarlı olup 1. ve 2. maddenin dışında kalan binalar, tarihi ve doğal yapılar" için belirlenen sınır değerden (2mm/s) oldukça yüksektir. Hatta birçok atımın zemin titreşim değerleri, evler için belirlenen sınır değerlerinden de (5mm/s)

SWORN
TRANSLATION

yüksek olduğu görülmektedir. Bazı atımların ise endüstriyel binalara hasar riski bulunmaktadır. Bu durum bu atımların yığın liçine olası zararlarını göstermektedir. Yığın liçine yakın mesafelerde ve yüksek miktarda patlayıcı kullanılarak yapılan bu tekrarlı patlatma işlemlerinin zamanla liçin içerisindeki içsel çatlakları artırarak yapının stabilitesinin bozulmasına neden olması kaçınılmazdır.

Yapılan hasar değerlendirmelerinde gecikmeli kapsül kullanılması sebebiyle delik başına en yüksek patlayıcı madde miktarı dikkate alınmıştır. Ancak yapılan patlatmaların birçoğunda Tablo 2 den görüldüğü gibi fazla sayıda delik bulunmakta ve buda toplam patlayıcı madde miktarını artırmaktadır (ortalama patlayıcı madde miktarı =6112kg). Delikler gecikmeli olarak tek tek patlatılsa da, patlatma sonucu oluşan titreşim dalgaları belli gecikme değerlerinde üstüste binerek süperpose etkisi yapmakta ve bu durum titreşim hızlarını artırarak yapılara daha çok zarar vermektedir. Bu durumun da yığın liçi patlatma hasarında göz önünde bulundurulması gerekmektedir.

Not: 5.3.2.1. bölümü ile ilgili kaynaklar birlikte değerlendirme yapıldığından Bölüm 5.3.4.1'de verilmiştir.

## 5.3.2.2. Su Dengesi

İliç Altın Madeni yığın liçi sahasında meydana gelen toprak kaymasının muhtemel nedenlerinden biri de yığın malzemesi içinde bulunan su miktarıdır. Yığına giren toplam su (yüksüz liç çözeltisi + yağış + yığın malzemesinin bünye nemi) ile yığından çıkan toplam su (yığından alınan yüklü çözelti + buharlaşma) arasındaki fark yığın malzemesinde içinde tutulan su miktarına eşittir. Yığın malzemesinin içindeki su, gözeneklerde birikerek, gözenek basıncı oluştururlar. Bu basıncın belli bir değerin üzerinde olması, İliç yığın liçi sahasındaki malzeme gibi ince boyutlu gevşek toprak yığınlarının kaymasına neden olabilmektedir [1]. Dolayısıyla, İliç Altın Madeni Yığın Liçi Projesinin tasarım ve uygulamasında bu hususun da dikkate alınması gerekirdi. İliç Altın Madeni Yığın Liçi için hazırlanmış olan projelerin hiçbirinde bu husus irdelenmemiş, olası riskler ve önlemler belirlenmemiştir. Bu çalışmalarda, liç yığınlarındaki su dengesi, aşırı yağış durumunda oluşabilecek taşkının önüleceği, proses suyu ve fırtına suyu havuzlarının kapasitelerinin yeterliliği açısından projelendirilmiştir. Bununla birlikte, projelerde liç yığınlarına beslenecek su ve yığınlardan toplanacak su miktarları için tasarım değerleri öngörülmüştür. Uygulamada bu değerlere uyulup uyulmadığını belirlemek amacıyla, tasarım değerleri ve gerçekleşen değerler, aşağıdaki çizelgede karşılaştırmalı olarak verilmiştir.

Çizelgeden de görüleceği gibi, yığına beslenen ve yığından geri dönen çözelti miktarlarının tasarım değerleri ile gerçekleşen değerler birbirinden sürekli farklı olmuştur. Mayıs 2018-Mayıs 2022 ayları arasında bir kaç ay hariç (Eylül, Ekim, Kasım 2018; Nisan, Haziran, Temmuz Ağustos 2019), "Yığına Beslenen Çözelti (Tasarım)-Yığına Beslenen Çözelti (Gerçekleşen), m3/ay" değeri sürekli negatif değerde olmuştur, yani yığına tasarım değerinden daha fazla çözelti beslenmiştir. Bu tarihler arasında, yığına tasarım değerinden toplamda 1.407.220 m3 daha fazla çözelti beslenmiştir. Haziran 2022-Şubat 2024 arasında ise, tersine bir durum yaşanmıştır. Yığına Beslenen Çözelti (Gerçekleşen) miktarı, Yığına Beslenen Çözelti (Tasarım) miktarından sürekli daha az olmuştur. Bu tarihler arasında, yığına, tasarım değerinden toplamda 1.953.382 m3 daha az çözelti beslenmiştir. Benzer bir durum, yığından geri dönen çözeltilerin miktarında da görülmektedir.

[1] Smith, E. S., 1973, The Role of Water in the Failure of Tailings Dams.
http://www.imwa.de/docs/imds_1979/IMDS1979_Smith_627.pdf



SWORN
TRANSLATION

Uygulamada yığınları tasarım değerlerinden daha fazla çözelti beslenmesi, yığınların stabilitesi yönünden sorumludur. Ancak, Mayıs 2018-Mayıs 2022 arasında gerçekleşen bu durumun 13 Şubat 2024'te gerçekleşen toprak kayması üzerindeki etkisini belirleyebilmek mümkün değildir.

Tasarım raporlarındaki değerler ve değerlendirmeler, sahada fiili olarak yığınlara uygulanan çözelti miktarları, liç yığınlarının kaymasına neden olabilecek yığın içindeki su dengesinin gerekli ve yeterli bir biçimde değerlendirilmediğini/dikkate alınmadığın göstermektedir. Bu aşamada, İliç Altın Madeninde meydana gelen kaymanın, elçe yeterli veri olmadığı için, bu olgudan etkilenip etkilenmediğini belirleyebilmek mümkün değildir. Ancak, proje tasarım raporlarında, bu konunun ele alınmamış olması, olası risklerin ve risk yönetiminin belirlenmemiş olması önemli bir eksikliktir. Bu hususta proje firması GRE şirketi sorumludur. Ayrıca, yukarıda açıklandığı gibi, uygulamada zaman zaman, proje raporlarında belirtilen miktarlardan fazla miktarlarda yığınlara çözelti beslenmiş ve yığın içindeki suyun izlenmesi Neil Barr tarafından hazırlanan geoteknik raporunda da belirtildiği gibi gerektiği biçimde yapılmamıştır. Bu durum uzun bir döneme yayıldığı için (Mayıs 2018-kaza tarihi) bu süre içinde konu ile ilgili Oksit Operasyon Departmanı sorumlu konumda olan personelin sorumluluğu oranında kusurlu olduğu düşünülmektedir.

Aşağıda verilen çizelgeye ilişkin dipnotlar:

(*)INR Mühendislik Müşavirlik A. Ş. Tarafından hazırlanmış olan INR-018-004-Rep-001 nolu *Çöpler Altın Madeni Faz-4 Yığın Liç Genişleme Proje Raporu* ve INR-021-010-TEM-002-Rev B nolu "*Evaluation Storage Requirements of Çöpler Heap Leach Facility*" raporları ve Global Resource Engineering (GRE), Ltd. tarafından hazırlanmış olan Project No. 19-1210 Revision – 2 *Detail Design Report Phase 4b Leach Pad ExpansionÇopler Gold Mine Erzincan Province, Turkey, March 2, 2020* raporlarında tasarım değerleri olarak liç yığınlarına 1.200 m³/h (9,78 l/h/m² ) çözelti yüksüz çözelti besleneceği öngörülmüştür. Aylık değerler, projelerde olduğu gibi, 1.200 m³/h esas alınarak hesaplanmıştır.

(**) Veriler, Anagold tarafından dava dosyasına konulmuş olan *Yığın Liç Sahasına Beslenen ve Geri Dönen Liç miktarları.xlsx* dosyasından alınmıştır.

(***) Yığından Geri Dönen Çözelti Değerleri, Global Resource Engineering (GRE), Ltd. tarafından hazırlanmış olan Project No. 19-1210 Revision – 2 *Detail Design Report Phase 4b Leach Pad ExpansionÇopler Gold Mine Erzincan Province, Turkey, March 2, 2020* raporlarında verilen 25.637 m³/gün ortalama geri dönen çözelti esas alınarak hesaplanmıştır.

(****)INR Mühendislik Müşavirlik A. Ş. Tarafından hazırlanmış olan INR-018-004-Rep-001 nolu *Çöpler Altın Madeni Faz-4 yığın Liç Genişleme Proje Raporu* ve INR-021-010-TEM-002-Rev B nolu "*Evaluation of Storage Requirements of Çöpler Heap Leach Facility*" raporundan alınmıştır.



SWORN TRANSLATION

| Tarih | Yığına Beslenen Çözelti, m³/ay, Tasarım Değeri (*) | Yığına Beslenen Çözelti, m³/ay, Gerçekleşen (*) | Yığına Beslenen Çözelti (Tasarım)-Yığına Beslenen Çözelti (Gerçekleşen), m³/ay | Yığından Geri Dönen Çözelti, m³/ay, Gerçekleşen (***) | Yığından Geri Dönen Çözelti, m³/ay, Tasarım Değeri (****) | Yığından Geri Dönen Çözelti Tasarım Değeri(****)-Yığından Geri Dönen Çözelti, Gerçekleşen, m³/ay | Yığından Geri Dönen Çözelti, m³/ay, Tasarım Değeri(*****) | Yığından Geri Dönen Çözelti Tasarım Değeri(*****)-Yığından Geri Dönen Çözelti Gerçekleşen, m³/ay |
|---|---|---|---|---|---|---|---|---|
| Mayıs 2018 | 892.800 | 915.598 | -22.798 | 833.887 | 794.747 | -39.140 | Veri yok | Veri yok |
| Haziran 2018 | 864.000 | 887.504 | -23.504 | 820.042 | 769.110 | -50.932 | Veri yok | Veri yok |
| Temmuz 2018 | 892.800 | 900.720 | -7.920 | 836.704 | 794.747 | -41.957 | Veri yok | Veri yok |
| Ağustos 2018 | 892.800 | 895.868 | -7.068 | 831.094 | 794.747 | -36.347 | Veri yok | Veri yok |
| Eylül 2018 | 864.000 | 781.853 | 82.147 | 679.579 | 769.110 | 89.531 | Veri yok | Veri yok |
| Ekim 2018 | 892.800 | 883.550 | 9.250 | 833.593 | 794.747 | -38.846 | Veri yok | Veri yok |
| Kasım 2018 | 864.000 | 835.292 | 28.708 | 812.128 | 769.110 | -43.018 | Veri yok | Veri yok |
| Aralık 2018 | 892.800 | 895.352 | -2.552 | 845.393 | 794.747 | -50.646 | Veri yok | Veri yok |
| Ocak 2019 | 892.800 | 919.187 | -26.387 | 840.135 | 794.747 | -45.388 | Veri yok | Veri yok |
| Şubat 2019 | 806.400 | 831.677 | -25.277 | 780.632 | 717.836 | -62.796 | Veri yok | Veri yok |
| Mart 2019 | 892.800 | 894.890 | -2.090 | 841.326 | 794.747 | -46.579 | Veri yok | Veri yok |
| Nisan 2019 | 864.000 | 845.783 | 18.217 | 824.642 | 769.110 | -55.532 | Veri yok | Veri yok |
| Mayıs 2019 | 892.800 | 893.910 | -1.110 | 877.644 | 794.747 | -82.897 | Veri yok | Veri yok |
| Haziran 2019 | 864.000 | 861.354 | 2.646 | 844.978 | 769.110 | -75.868 | Veri yok | Veri yok |
| Temmuz 2019 | 892.800 | 892.259 | .541 | 847.523 | 794.747 | -52.776 | Veri yok | Veri yok |
| Ağustos 2019 | 892.800 | 864.934 | 27.866 | 836.749 | 794.747 | -42.002 | Veri yok | Veri yok |
| Eylül 2019 | 864.000 | 865.700 | -1.700 | 783.072 | 769.110 | -13.962 | Veri yok | Veri yok |
| Ekim 2019 | 892.800 | 900.295 | -7.495 | 800.780 | 794.747 | -6.033 | Veri yok | Veri yok |
| Kasım 2019 | 864.000 | 870.177 | -6.177 | 1.005.217 | 769.110 | -236.107 | Veri yok | Veri yok |
| Aralık 2019 | 892.800 | 936.474 | -43.674 | 1.084.039 | 794.747 | -289.292 | Veri yok | Veri yok |
| Ocak 2020 | 892.800 | 969.651 | -76.851 | 951.608 | 794.747 | -156.861 | Veri yok | Veri yok |
| Şubat 2020 | 806.400 | 930.776 | -124.376 | 773.690 | 743.413 | -29.213 | Veri yok | Veri yok |
| Mart 2020 | 892.800 | 893.513 | -713 | 800.960 | 794.747 | -96.611 | Veri yok | Veri yok |
| Nisan 2020 | 864.000 | 899.625 | -35.625 | 868.101 | 769.110 | -98.911 | Veri yok | Veri yok |
| Mayıs 2020 | 892.800 | 957.957 | -65.157 | 897.316 | 794.747 | -102.569 | Veri yok | Veri yok |
| Haziran 2020 | 864.000 | 910.576 | -46.576 | 868.351 | 769.110 | -99.241 | Veri yok | Veri yok |
| Temmuz 2020 | 892.800 | 929.146 | -36.346 | 905.731 | 794.747 | -112.961 | Veri yok | Veri yok |
| Ağustos 2020 | 892.800 | 947.807 | -55.007 | 909.825 | 794.747 | -115.012 | Veri yok | Veri yok |
| Eylül 2020 | 864.000 | 913.863 | -49.863 | 863.530 | 769.110 | -94.420 | Veri yok | Veri yok |
| Ekim 2020 | 892.800 | 954.707 | -61.907 | 940.701 | 794.747 | -102.911 | Veri yok | Veri yok |
| Kasım 2020 | 864.000 | 914.667 | -50.667 | 870.141 | 769.110 | -100.931 | Veri yok | Veri yok |
| Aralık 2020 | 892.800 | 905.549 | -12.749 | 913.113 | 794.747 | -118.011 | Veri yok | Veri yok |
| Ocak 2021 | 892.800 | 894.340 | -1.540 | 862.237 | 794.747 | -107.378 | Veri yok | Veri yok |
| Şubat 2021 | 806.400 | 895.625 | -89.225 | 817.360 | 717.836 | -99.524 | Veri yok | Veri yok |
| Mart 2021 | 892.800 | 982.044 | -89.244 | 900.131 | 794.747 | -105.384 | Veri yok | Veri yok |



| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Nisan 2021 | 864.000 | 941.563 | -77.563 | 815.610 | 769.110 | -46.500 | Veri yok | Veri yok |
| Mayıs 2021 | 892.800 | 954.929 | -62.129 | 893.664 | 794.747 | -98.917 | Veri yok | Veri yok |
| Haziran 2021 | 864.000 | 912.432 | -48.432 | 865.352 | 769.110 | -96.242 | Veri yok | Veri yok |
| Temmuz 2021 | 892.800 | 940.449 | -47.649 | 798.158 | 794.747 | -3.411 | Veri yok | Veri yok |
| Ağustos 2021 | 892.800 | 946.969 | -54.169 | 880.027 | 794.747 | -85.280 | Veri yok | Veri yok |
| Eylül 2021 | 864.000 | 915.584 | -51.584 | 867.164 | 769.110 | -98.054 | Veri yok | Veri yok |
| Ekim 2021 | 892.800 | 941.351 | -48.551 | 891.868 | 794.747 | -97.121 | Veri yok | Veri yok |
| Kasım 2021 | 864.000 | 885.923 | -21.923 | 867.155 | 769.110 | -98.045 | 877.831 | 10.676 |
| Aralık 2021 | 892.800 | 862.915 | 29.886 | 814.464 | 794.747 | -19.717 | 900.825 | 86.361 |
| Ocak 2022 | 892.800 | 836.948 | 55.852 | 758.883 | 794.747 | 35.864 | 907.167 | 148.284 |
| Şubat 2022 | 806.400 | 768.637 | 37.764 | 702.805 | 717.836 | 15.031 | 835.049 | 132.244 |
| Mart 2022 | 892.800 | 945.359 | -52.559 | 840.442 | 794.747 | -45.695 | 930.957 | 90.515 |
| Nisan 2022 | 864.000 | 877.295 | -13.295 | 785.320 | 769.110 | -16.210 | 897.242 | 111.922 |
| Mayıs 2022 | 892.800 | 919.000 | -26.200 | 805.405 | 794.747 | -10.658 | 909.494 | 104.090 |
| **ARA TOPLAM** (Mayıs 2018-Mayıs 2022) | 42.940.800 | 44.348.020 | -1.407.220 | 41.684.265 | 38.250.404 | -3.433.861 | 6.258.565 | 684.091 |
| Haziran 2022 | 864.000 | 861.639 | 2.361 | 780.625 | 769.110 | -11.515 | 843.084 | 62.459 |
| Temmuz 2022 | 892.800 | 871.513 | 21.288 | 800.189 | 794.747 | -5.442 | 853.013 | 52.824 |
| **Ağustos 2022** | **892.800** | **839.865** | **52.935** | **602.598** | **794.747** | **192.149** | **848.500** | 245.902 |
| **Eylül 2022** | **864.000** | **719.756** | **144.245** | **222.585** | **769.110** | **546.525** | **836.505** | 613.920 |
| Ekim 2022 | 892.800 | 817.656 | 75.145 | 802.061 | 794.747 | -3.314 | 893.893 | 91.832 |
| Kasım 2022 | 864.000 | 767.379 | 96.621 | 741.084 | 769.110 | 28.026 | 871.223 | 130.139 |
| Aralık 2022 | 892.800 | 750.074 | 142.726 | 718.072 | 794.747 | 76.675 | 895.664 | 177.592 |
| Ocak 2023 | 892.800 | 766.513 | 126.187 | 734.822 | 794.747 | 59.925 | 897.222 | 162.400 |
| Şubat 2023 | 806.400 | 709.095 | 97.305 | 654.256 | 717.836 | 63.580 | 834.634 | 170.378 |
| Mart 2023 | 892.800 | 806.296 | 86.504 | 721.082 | 794.747 | 73.665 | 919.538 | 198.456 |
| Nisan 2023 | 864.000 | 773.004 | 90.996 | 731.380 | 769.110 | 37.727 | 867.835 | 138.455 |
| Mayıs 2023 | 892.800 | 802.414 | 90.386 | 781.180 | 794.747 | 13.838 | 890.611 | 148.442 |
| değerleri | 864.000 | 772.605 | 91.395 | 728.141 | 769.110 | 40.979 | 834.282 | 106.031 |
| Temmuz 2023 | 892.800 | 790.386 | 102.414 | 751.361 | 794.747 | 43.386 | 845.167 | 94.326 |
| Ağustos 2023 | 892.800 | 805.247 | 87.519 | 772.707 | 794.747 | 22.040 | 847.323 | 64.326 |
| Eylül 2023 | 864.000 | 768.311 | 95.754 | 750.933 | 769.110 | 18.177 | 831.369 | 80.226 |
| Ekim 2023 | 892.800 | 788.482 | 104.318 | 801.928 | 794.747 | -7.181 | 890.412 | 94.483 |
| Kasım 2023 | 864.000 | 753.487 | 110.513 | 704.963 | 769.110 | -21.853 | 877.228 | 80.265 |
| Aralık 2023 | 892.800 | 755.210 | 114.590 | 778.762 | 754.747 | -6.885 | 867.339 | 119.817 |
| Ocak 2024 | 892.800 | 779.602 | 113.198 | 887.404 | 794.747 | -92.543 | 877.844 | 11 |
| Şubat 2024 | 874.845 | 817.507 | 86.091 | 867.091 | 813.379 | 833.310 | 894.674 | 1.995 |
| **ARA TOPLAM** (Haziran 2022-Şubat 2022) | 17.942.400 | 15.989.070 | 1.953.382 | 14.841.291 | 15.971.851 | 1.127.760 | 17.780.953 | 2.936.042 |

SWORN TRANSLATION



SWORN
TRANSLATION

### 5.3.3. İZLEME (MONİTORİNG) VE ERKEN UYARI SİSTEMLERİ (EARLY WARNING) SİSTEMLERİ DEĞERLENDİRMESİ

Açık maden işletmeciliğinde 2007 Kosta Rika Bella Vista, 2011 Avusturalya Pajingo, 2012 Alaska Fort Knoks, 2014 Cerro Verde, Peru maden işletmelerinde meydaba gelemiş olan liç yığınının duyarlılığını yitirmesi sonucu oluaşan heyelanlar liç tesislerinde meydana gelmiş olan kayma/akma olaylarına birkaç örnek olup liç işlemi sırasında heyelanlar meydana geldiği/gelebileceği bilinen ve önzelem alınması gereken bir durumdur. Ayrıca yapılan heyelan araştırmaları da doğal koşullar kaynaklı olmayan/insan yapısı heyelanlarda artış olduğunu göstermektedir. Olası heyelan durumunda erken önlem alınabilmesi açısından izleme ve uyarı sistemlerinun önemi büyüktür. Heyelan riskini azaltmak ve yığın liç alanlarının stabilitesini sağlamak için çeşitli teknolojik ve yönetimsel bileşenleri olan bir izleme sistemi kurulması şarttır. Bu kapsamda liç yığınları olası risklere karşı genel olarak aşağıdaki başlıklarda belirtilen yöntemlerle izlenip takip edilmektedir.

- Topografik izleme:
  Yığının yüzeyindeki hareketleri sürekli izlemek için hassas GPS sensörleri ile yığının herhangi bir yerinde meydana gelen milimetrik hareketler algılanabilmektedir.
  Düzenli aralıklarla yığının 3D (üç boyutlu) topografik haritalarının oluşturulması potansiyel heyelan bölgelerinin belirlenmesine etkili olmaktadır.
- Jeoteknik izleme:
  Yığın içi hareketleri, kayma yüzylerini belirlemek/takip etmek için inklonometreler, yığın içi su basıncının takibi için piyezometreler, yığın içi gerilme ve deformasyonları takip için deformasyon ölçerler (deformasyon ölçerler) yerleştirlmektedir.
- Uzaktan izleme:
  LIDAR (Light Detection and Ranging) ile yığın yüzeyi değişiklikleri izlenir. Radar verileri ile
- Veri Toplama/Analiz Sistemi:
  Verilerin toplanacağı ve gerçek zamanlı izleneceği ve belirlenen risk durumlarında uyarı verecek bir enstrümantasyon sistemi kurulur.

Çöpler maden işletmesinde yığın liç deformasyonları radar ve prizma verileri ile izlenmektedir. Ancak bir önceki bölümde de belirtildiği üzere boşluk suyu basınçlarının takibi yapılmamaktadır. Ölçüm aletleri ezberiace yerleştirilmemeiş ve merkezi bir veri toplama/analiz ünitesi yapılmamıştır.

### 5.3.3.1.Radar izleme

Firma Açık Ocak operasyonlarını yakın İzleme amacıyla Mermer kuzey genişletme ocağı kuzey tepesine yerleştirilen RADAR cihazı (IDS Georadar) ile Açık Ocak, Yığın Liçi (Heap Leach) batı yüzeyi ve döküm sahalarının büyük bir kısmını tarayabilmekte ve mobil iletişim yoluyla veri aktarımını sağlamaktadır (Şekil 4) (Çöpler,TARP, 2022) Radar cihazının maksimum ölçülebilir hareket hızının 12/7 mm saat olması ve 4 dakika gecikmeli izleme nedeniyle kaya düşmelerinin önceden tespit imkanlı değildir. Buna karşın hareket hızının saatte 13 cm'den daha düşük olduğu kayma akma ve dökülme gibi duraysızlık durumlarında tedbir alınmasına olanak vermektedir



SWORN
TRANSLATION



*Şekil 4: RADAR Deplasman Haritası Plan Görünümü*

Firma radarda tespit edilen hareketli alanlar ile birlikte yol güzergahları ve yağışlı dönemlerde deformasyonların arttığı alanları belirleyip, 12 ayrı TARP Tetikleyici Eylem Müdahale Planı Zonu belirlemiştir (Şekil 5 - 6).



*Şekil 5: RADAR Alarm Tarama Alanları Perspektif Görünüm*



Sayfa 216 /

SWORN
TRANSLATION



*Şekil 6. RADAR Alıcı Tarama Alanları Panoramik Görüntü*

Bu bölgelerdeki kritik alarm seviyeleri RADAR tarama sürecinde lokal yenilmelerin meydana geldiği alanlardaki litolojik ve jeoteknik birimlerin yenilme hız değerleri dikkate alınarak belirlenmiştir. Buna göre yığın liçi için TARP planına göre deplasman kritik seviye değerleri ve bu değerleri aşılması durumunda yapılacak işlemler Tablo 5 de verilmiştir (Çöpler TARP, 2022). Uyarı verildikten sonra Yığın liçi Zonu için Butress yolu araç ve çalışan girişlerinin engellenmesi için çift taraflı ulaşıma kapatılacaktır 2 saat boyunca zon takip edilip yol kapalı tutulacaktır. 2 saat sonrası uyarı gelmediği takdirde yol kontrol edilip malzeme dökülme ve akmalarının yol üzerinde çatlakların ve solüsyon akmalarının olmadığına emin olunduktan sonra trafiğe açılacaktır. RADAR deformasyon analizlerinde kritik seviye değerleri için literatürde uluslararası bir kabul bulunmamaktadır Belirlenen kritik seviyeler için mevcut saha tarama verileri ile farklı litolojik birimlerden elde edilen yenilme hızı değerleri kullanılmıştır Kritik seviyedeki hareketlerin 2 saat sonra yenilmeye neden olacağı senaryo baz alınmıştır. Tetikleyici Eylem Müdahale Planında Oksit proses operasyonları ekibi, radar tarafından olağan bir hareket izlendiğinde SMS mesajları almaktadır. Tetikleme limiti maden birimi tarafından belirlenir ve limitler her Pazartesi paylaşılan haftalık radar raporu aracılığıyla paylaşılır. Haftalık radar raporu, hafta içinde gerçekleşen hareketin kısa bir özetini sunar. Kayma öncesi son haftaya ait yığın liçi deplasman grafiği Şekil 7 de ve Yığın liçi radar ölçümlerinde kullanılan referans alanlar ise Şekil 8'de verilmiştir.

*Tablo 5. Yığın liçi için Tetikleyici Eylem Müdahale Planı (TARP)'na göre deplasman kritik seviye değerleri ve bu değerleri aşılması durumunda yapılacak işlemler (Çöpler TARP, 2022)*

| Seviye | Operasyon Müdahale Planı | | Acil Durum Müdahale Planı | |
| --- | --- | --- | --- | --- |
| | Yeşil: Normal İşlemler | Sarı: Uyarı | Turuncu: Yüksek Risk | Kırmızı: Bütünlük Kaybı |
| Tetikleyiciler. Görsel İncelemeler. Etut | • Hareket veya anormal durum gözlenmez | • <10 mm/gün hafif hareket <br> • Radar kullanılarak YL'nin sürekli izlenmesi | • Orta derecede hareket, hareket hızı 10-20 mm/gün arasında <br> • Radar kullanılarak YL'nin sürekli izlenmesi. | • >20mm/gün Anlık hareket hızı <br> • Radar kullanılarak YL'nin sürekli izlenmesi. |
| Anagold çalışanı | – | Fark edilebilir Liç hareketi yok | • Yakın hareket alanında olmadığından emin olun <br> • Derhal güvenliğe ya da amirinize haber verin. | |



SWORN
TRANSLATION

| Güvenlik | YOK | Derhal vardiya amirine haber verin | |
|---|---|---|---|
| YL Operatörü | YOK | Derhal vardiya amirine haber verin. | İstifleme işlemini durdurmak için derhal YL istifleme operatörüyle iletişime geçin. |
| Amir / Bölge Mühendisi | YOK | • Gerekli barikatlama derecesi hakkında yönlendirme için Geoteknik Mühendisini bilgilendirin<br>• Geoteknik Mühendisi bir HL arızası olup olmadığına karar verecektir<br>• Geoteknik Ekibi tarafından yönlendirildiği şekilde alanı barikatlayın<br>• Bunun küçük bir HL arızası olup olmadığını belirleyin.<br>• Geoteknik Mühendisi ile birlikte, istiflemeyi durdurarak ve/veya sulamayı azaltarak daha fazla hareket riskini azaltma ihtiyacını değerlendirin, yetkisiz personelin erişimini önlemek için alanı emniyete alın.<br>• Olay Raporlama süreçlerini gerektiği gibi koordine edin. | |
| Geoteknik Mühendisi | YOK | • Kirişin içinde veya dışında potansiyel arızayı değerlendirin<br>• Amir ve/veya Bölge Mühendisine barikat kurma da dahil olmak üzere alanın güvenliğini sağlama konusunda talimat verin<br>• Hareket ve düzeltici eylemler için ek izleme de dahil olmak üzere sonraki adımlara ilişkin talimatlar sağlayın | |



Şekil 7. Kayma öncesi son haftaya ait yığın liçi deplasman grafiği



Sayfa **218** /

SWORN
TRANSLATION



*Şekil 8. Yığın İçi Radar ölçümlerinde kullanılan referans alanlar*

Şekil 7 den de görüldüğü gibi turuncu uyarı **için 10 mm/gün sınırı 08.02.2024 tarihinde aşılmıştır.** Ancak şüpheli ifadelerinden görüleceği üzere **herhangibir güvenlik önlemi alınmamıştır.**

Yığın İçi referans alanlarına göre yapılan ve son 6 aya ait radar deplasman ölçümleri Şekil 9 ve Şekil 10' da verilmiştir. Bu ölçümler 13.08.2023 tarihinden itibaren kayma olana kadar olan tarih aralığını kapsamaktadır. Deplasman miktarları kümülatif olarak verilmiş ve Faz 5 inşaatı sırasında yapılan patlatmalar bu grafikler üzerinde gösterilmiştir.



Sayfa **219** /

SWORN
TRANSLATION



*Şekil 9. Referans Noktası S1 e göre yapılan deplasman ölçümleri (son 6 aylık)*



*Şekil 10. Referans Noktası FY ye göre yapılan deplasman ölçümleri (son 6 aylık)*

Şekil 9 ve Şekil 10 'da görüldüğü gibi radar deplasman miktarları ile faz 5 inşaatı patlatma işlemleri arasında doğrudan bir ilişki bulunmaktadır. Özellikle Ocak ayından itibaren deplasman hareketlerinin arttığı her iki referans noktasında da görülmektedir. Buna göre deplasmanların tarih aralığına göre değerleri Tablo 6 de verilmiştir.

Sayfa **220** /



SWORN
TRANSLATION

*Tablo 6. Deplasmanların Tarih Aralığına Göre Dağılımı*

| Tarih Aralığı | Gün Sayısı | Toplam Deplasman (mm) | Hız (mm/gün) | Faz 5 İnşaatı Kapsamında Yapılan Patlatma Sayısı |
|---|---|---|---|---|
| 13.08.2023-02.11.2023 | 82 | 28,36 | 0,345854 | - |
| 03.11.2023-01.01.2024 | 60 | 32,5 | 0,541667 | 8 |
| 02.01.2024-13.02.2024 | 43 | 192,8 | 4,483721 | 15 |

Faz 5 inşaatı sırasında yapılan patlatmalar incelendiğinde toplam 23 atımın 18 inin Ocak 2024 tarihinden kayma gerçekleşme tarihine kadar yapıldığı görülmektedir. Yapılan patlatmalar içerisinde en yüksek titreşim hızını veren patlatmalar 9 (05.01.2024), 10 (05.01.2024) ve 19 (24.01.2024) numaralı atımlardır ve bunları takiben yığın liçinin deplasman değerleri artmaya başlamıştır. Bu durum Şekil 11'de verilen son 2 aya ait deplasman hız grafiğinde de görülebilir.



*Şekil 11. Deplasman Hız Değişimi (son 2 aya ait)*

Şekil 11 den de görüldüğü gibi patlatma 9 ve 10'un yapıldığı 05.01.2024 tarihinden sonra deplasman hızı ~25 mm/gün olarak ölçülmüştür. Bu değer Tablo 5 de görüldüğü gibi kırmızı uyarı işlemlerini gerektirmektedir.

Kaynaklar:

•*Fugro Sial, Çöpler Altın Madeni Projesi 4. Aşama Yığın Liç Sahası Şev Stabilitesi Raporu, Eylül 2014*

•*C. Gokceoglu, A. Turer, H.A. Nefeslioglu, D. Turer, C. Meral, Safety assessment of limestone-based engineering structures to be partially flooded by dam water: A case study from northeastern Turkey. Engineering Geology 209 (2016) 44–55*



SWORN
TRANSLATION

- U. Ozer, A. Kahriman, M. Aksoy, D. Adiguzel, A. Karadogan, *The analysis of ground vibrations induced by bench blasting at Akyol quarry and practical blasting charts*, Environ Geol (2008) 54:737–743
- S. Taşdemir, *Erzincan-İliç-Çöpler Maden Sahasında Yapılan Basamak Patlatmalarının Çevresel Etkilerinin İncelenmesi*, Dokuz Eylül Üniversitesi Fen Bilimleri Enstitüsü, Yüksek Lisans Tezi
- Şubat, 2013
- D. Adıgüzel, *Çatalca Yöresi Akyol Taşocağında Patlatmadan Kaynaklanan Titreşim Etkilerinin Araştırılması*, İstanbul Üniversitesi Fen Bilimleri Enstitüsü, Yüksek Lisans Tezi, Haziran, 2006
- Çöpler TARP Anagold, *Heap Leach Structural Integrity Trigger Action Response Plan (TARP)*, Eylül 2022

## 5.4. İŞ SAĞLIĞI VE GÜVENLİĞİ KAPSAMINDA OLAYIN DEĞERLENDİRİLMESİ

Yukarıda proje ve izleme alt başlıklarının irdelendiği bölümlerde de değinildiği gibi liç tesisinin tasarım parametreleri zaman içinde değiştiğinden (yükleme, su besleme, yağış vb.) stabilitesinin sürekli izlenmesi ve bu hususta gerekli uyarı istemlerinin kurulması çok önemlidir. Yine daha önce değinildiği gibi izleme sistemlerinin tasarlanması projecinin, kurulması ve işleyişinin sağlanması proje departmanının sorumluluğundadır. İş sağlığı ve güvenliği mevzuatı yönünden her iş veren çalışanlarının her koşulda sağlık ve güvenliğini sağlamakla yükümlüdür[2]. Bu kapsamda risk değerlendirmesi yapmak/yaptırmakla ve yenilenemekle de yükümlü kılınmıştır[3].

---

[2] 6331 sayılı İş Sağlığı ve Güvenliği Kanunu:
İşverenin genel yükümlülüğü başlıklı Madde 4. (1)'de ; "İşveren, çalışanların işle ilgili sağlık ve güvenliğin sağlamakla yükümlü olup bu çerçevede:
a) Mesleki risklerin önlenmesi, eğitim ve bilgi verilmesi dahil her türlü tedbirin alınması, organizasyonun yapılması, gerekli araç ve gereçlerin sağlanması, sağlık ve güvenlik tedbirlerinin değişen şartlara uygun hale getirilmesi ve mevcut durumun iyileştirilmesi için çalışma yapar...

Maden İşyerlerinde İş Sağlığı ve Güvenliği Yönetmeliğinin
İşverenin genel yükümlülükleri başlıklı 5. Maddesinde
" (1) İşveren aşağıdaki hususları yerine getirmekle yükümlüdür:
a) Çalışanların sağlık ve güvenliklerini sağlamak amacıyla;
1) İşyerleri, çalışanların sağlık ve güvenliklerini tehlikeye atmayacak şekilde tasarlanır, inşa edilir, teçhiz edilir, hizmete alınır, işletilir ve bakımı yapılır.
2) İşyerinde yapılacak her türlü çalışma, yetkili kişinin nezaretinde ve sorumluluğu altında yapılır.
4) Tüm güvenlik talimatları çalışanların anlayacağı şekilde hazırlanır.
5) 18/6/2013 tarihli ve 28681 sayılı Resmî Gazete'de yayımlanan İşyerlerinde Acil Durumlar Hakkında Yönetmeliğe uygun olarak yeterli ilk yardım donanımı sağlanır ve (Değişik ibare:RG-24/3/2016-29663) en geç 6 ayda bir olmak üzere düzenli olarak gerekli tatbikatlar yapılır.

[3] 6331 sayılı Yasa madde 4.1 c.
c) Risk değerlendirmesi yapar veya yaptırır "
Risklerden korunma İlkeleri başlıklı Madde 5-(1)'de ; "işverenin yükümlülüklerinin yerine getirilmesinde aşağıdaki ilkeler göz önünde bulundurulur:
Risklerden kaçınmak.
Kaçınılması mümkün olmayan riskleri analiz etmek.
Risklerle kaynağında mücadele etmek.
Teknik çalışanlara uyum sağlamak.
Tehlikeli olanı, tehlikesiz veya daha az tehlikeli olanla değiştirmek.
Çalışanlara uygun talimatlar vermek"



SWORN
TRANSLATION

Dosya kapsamında yukarıda heyetimize teslim edilen evraklar içinde risk değerlendirme raporu bulunmamakla birlikte 15.03.2024 tarihli bilirkişi heyeti nihai raporunda Anagol Madencilik tarafından hazırlanan risk analiz raporu bulunduğu belirtilmiş olup 42 maddesine atıf yapılarak yığın operasyonlarında gerçekleşen toprak kayması sonucu çevresel döküntü tehlikesi karşı yığınım projeye uygunluğunun kontrolü edilememesi, yığın hareketliliğini ölçecek cihazların bulunmaması, dizaynın alana uygun yapılmaması, şev stabilitesinin düşük olması, şev hareketliliğinde tetikleyici eylem planının olmaması, aşırı yağış, BLS hatlarında kaçaklar, deprem, yığın kil taş oranının yığın içi şev istiflemesinde belirtilen standartlardan farklı olması verilmiş ve önlem olarak radar, prizma takip sistemleri, tetikleyici eylem planı bulunmakta olup eğitim sonrası sınav yapıldığı, HL sahasında topoğraf tarafından ölçüm alındığı, hip liç OWS dokümanı hazırlandığı, OMS eğitimleri verildiği, liçin prizma ile izlendiği, boru hatlarına destekler konarak basınçların değişmlerinin kontrol altında tutulduğu, hat bağlantı ve kaynaklarının kontrol edildiği, radar raporları değerlendirme eğitimlerinin tamamlandığı, raporun her hafta maden jeolojji birimi tarafından paylaşıldığı, radar genel ve lokal tarama için kritik seviyelerin güncellenmesi ve SMD sistemi üzerinden bilgi geldiği, solüsyon hatları ve akışları DCS sistemi ile kontrol edildiği, basınç değeri değişikliklerinde solüsyon (BLS)pompalarının otomatik durduğu, doğu batı bölgelerinde topuk desteği yapıldığı, statik stabilite analizleri yapıldığı belietilmiştir.

Ancak risk değerlendirme raporu hazırlanmış olmakla birlikte riskler kesinlikle doğru/yeterli analiz edilmemiştir. Önceki bölümlerde de bahsedildiği üzere tasarım parametrelerini kontrol edecek bir sistem geliştirilmemiştir. Yine daha önce de bahsedildiği üzere ilgili tasarımı yapmak ve sistemi kurmak projel ce proje departmanı sorumluluğundadır.

Ancak işverlerinde acil durumlar hakkında yönetmelik kapsamında işverenler acil eylem planı hazırlamakal yükümlüdür. Bize teslim edilen belgeler içinde acil eylem planı olmamakla birlikte

---

*Risk değerlendirmesi, kontrol ölçüm ve araştırma başlıklı ;*
*Madde 10.1 ile "İşveren, iş sağlığı ve güvenliği yönünden risk değerlendirmesi yapmak veya yaptırmakla yükümlüdür"*

*² İşverenin yükümlülükleri*
*MADDE 5 - (1) İşverenin acil durumlara ilişkin yükümlülükleri aşağıda belirtilmiştir;*
*a) Çalışma ortamı, kullanılan maddeler, iş ekipmanı ile çevre şartlarını dikkate alarak meydana gelebilecek ve çalışanlar ile çalışma çevresini etkileyecek acil durumları önceden değerlendirerek muhtemel acil durumları belirler.*
*b) Acil durumların olumsuz etkilerini önleyici ve sınırlandırıcı tedbirleri alır.*
*c) Acil durumların olumsuz etkilerinden korunmak üzere gerekli ölçüm ve değerlendirmeleri yapar.*
*ç) Acil durum planlarını hazırlar ve tatbikatların yapılmasını sağlar....*
*g) (Değişik:RG-1 10/2023-31615) Varsa alt işveren ve geçici iş ilişkisi kurulan işverenin çalışanları, müşteri ve ziyaretçiler ile işyerinde toplantı, seminer, konferans ve eğitim gibi toplu halde gerçekleştirilen faaliyetler için bulunan katılımcılar ve diğer kişilerin acil durumlar, tahliye planı, kaçış yolları, toplanma yerleri ve acil durum ekipleri hakkında bilgilendirilmesini sağlar.*
*Acil durum planı*
*MADDE 7 - (1) Acil durum planı, tüm işyerleri için tasarım veya kuruluş aşamasından başlamak üzere acil durumların belirlenmesi, bunların olumsuz etkilerini önleyici ve sınırlandırıcı tedbirlerin alınması, görevlendirilecek kişilerin belirlenmesi, acil durum müdahale ve tahliye yöntemlerinin oluşturulması, dokümantasyon, tatbikat ve acil durum planının yenilenmesi aşamaları izlenerek hazırlanır ....*



SWORN
TRANSLATION

kaza sonrası alınan ifadelerden acil eylem palnının devreye alındığı anlaşılmaktadır. Ancak ilgili durum kaza sonrası için geçerli olmuştur. Oysa liç sahalarında heyelanlar geçmişte sıkça yaşanmış olup olası tehlikeli bir durum olduğu bilinmektedir ve bu duruma karşı doğru bir planlama yapılmamıştır. Özellikle alt işverenlerle ilişki, iletişim düzensiz ve yetersizdir.[5]

Kazada ölen beş işçi konteyner içinde toprak altında kalmıştır. İfadelerden de anlaşıldığı üzere konyeynırın bulunduğu alan aynı zamanda toplanma alanıdır. Ancak aşağıdaki şekilde de görüleceği üzere konteynırın bulunduğu yer kayma ihtimaline karşı topuk desteğinin yapıldığı yere çok yakın olup liç yığını hemen altındadır. Bu durumda toplanma yeri olarak da belirlenemiş olan konyeynırın bulunduğu alan toprak altında kalması kuvvetle bir yer olup yeri doğru konumlandırılmamıştır.

Olay günü SMS ve mail iletişimi de yetersiz kalmış olup bazı birimler haberdar edilememiştir. Olası heyelen durumunda acil eylem planı kapsamında hızlı ve tüm çalışanlarla iletişimi sağlayan bir haberleşme sistemi kurulmamıştır. Nitekim müteveffa kamyon şoförü Uğur Yıldız çalışmaya devam etmiştir. Neil Barr tarafından firma için hazırlanan geoteknik raporda da SMS ve e-mail haberleşmesindeki aksamalara karşı görsel/işitsel uyraı sistemlerinin gerekliğinden bahsedilmektedir.

Bu kapsamda heyelan riskine karşı kapsamlı bir acil eylem planı hazırlanmamış /yetersiz hazırlanmış olması sabah erken saatlerden uyarı veren ve öğlen 14:30 sularında gerçekleşen kazada ciddi şekilde etkili olmuştur.

Acil toplanma yeri de olan konteynır alanının yanlış konumlandırılmış olmasında proje departmanı ile İSG departmanının birlikte ve acil eylem planının doğru hazırlanmması konusunda İSG departmanının kusurlu oldukları kanaatine varılmıştır.

---

*MADDE 9 – (1) İşveren, belirlediği mümkün ve muhtemel acil durumların oluşturabileceği zararları önlemek ve daha büyük etkilerini sınırlandırmak üzere gerekli tedbirleri alır.*
*(2) Acil durumların olumsuz etkilerinden korunmak üzere tedbirler belirlenirken gerekli olduğu durumda ölçüm ve değerlendirmeler yapılır.*
*3) Alınacak tedbirler, risklerden korunma ilkelerine uygun olur ve toplu korumayı esas alır.*

[5] *MADDE 12 – (1) Bir çalışma alanını birden fazla işverenin paylaşması durumunda, yürütülen işler için diğer işverenlerin yürüttüğü işler de göz önünde bulundurularak acil durum planı işverenlerce ortaklaşa hazırlanır.*
*MADEN İŞYERLERİNDE İŞ SAĞLIĞI VE GÜVENLİĞİ YÖNETMELİĞİ, madde 5;*
*(4) Bir işyerinde birden çok işverene ait çalışanların bulunması(2) İşveren,*
*a) Kanunun 6, 10, 14 ve 16 ncı maddelerinde belirtilen hükümler doğrultusunda sağlık ve güvenlik dokümanı hazırlanmasını ve güncellenmesini sağlar.*
*b) Sağlık ve güvenlik dokümanında özellikle aşağıdaki hususların yer almasını sağlar:*
*1) Çalışanların işyerinde maruz kalabilecekleri psikososyal riskler dahil olmak üzere risklerin belirlenmesi ve değerlendirilmesi.*
*2) Bu Yönetmelik hükümlerini yerine getirmek için alınacak durumunda, her işveren kendi kontrolü altındaki işlerden sorumludur. Ancak işyerinin tamamından sorumlu olan işveren, çalışanların sağlık ve güvenliğinin korunması ile ilgili tedbirlerin uygulanmasını koordine eder. Kendisine ait sağlık ve güvenlik dokümanında koordinasyonun amacını ve bu koordinasyonu sağlamak için alınacak tedbirler ile uygulanacak yöntemleri belirtir. Bu koordinasyon her bir işverenin Kanunda belirtilen sorumluluğunu etkilemez.*

SWORN
TRANSLATION



*Şekil 1. konumunu gösteren Kırmızı renkli hat, kayma sonucu etkilenen yaklaşık 96,8 ha'lık alanı gösterecektir.*

SWORN
TRANSLATION

## 5.5. OLAY SONRASI SİYANÜRLÜ LİÇ MALZEMESİNİN ARAZİYE YAYILIMININ ÇEVRESEL ETKİ DEĞERLENDİRME KAPSAMINDA İNCELENMESİ

**Olay :** 13.02.2024 tarihinde Erzincan İli İliç ilçesi sınırları Anagold Madencilik San. ve Tic. A.Ş. firmasının Çöpler Kompleks Maden Sahasında yürüttüğü madencilik faaliyetleri içerisinde yer alan Yığın Liçi (Heap Leach) sahasında meydana gelen kayma sonucu siyanürlü toprak malzemenin akması olayı.

**Olay hakkında Cumhuriyet Başsavcılığı (CBS) tarafından bilirkişiden cevaplandırılması istenen soru :**

Meydana gelen yığın kayma olayının çevre **kirliliğine sebep olup olmadığı.**

İncelenen belgeler :

1- CBS soruşturması kapsamında tarafımıza verilen tüm analiz raporları (3. Maddedeki dosyalar içinde)

2- 15.03.2024 tarihli Bilirkişi raporu (Kimya ve çevre bilirkişi açısından değerlendirme notları)

3- CBS tarafından gönderilen dosyalar (CBS'ndan geldiği isimlerle):
   a. İLİÇ CBS Soruşturma No:2024/88 (2484 sayfa)
   b. İLİÇ CBS Soruşturma No:2024/88 (Ek) (1152 sayfa)
   c. İLİÇ CBS Soruşturma No:2024/88 Ek-2 (2840 sayfa)
   d. İLİÇ CBS Soruşturma No:2024/88 Ek-3 (583 sayfa)
   e. Anagold Teknik Rapor 2024.04.05 (46 sayfa)
   f. Ek-5 (1399 sayfa)
   g. Tahkikata ek yeni gelen evraklar (59 sayfa)

4- İlgili mevzuat

İnceleme konuları :

1- Yüzeysel su kaynaklarında herhangi bir kirlilik meydana gelip gelmediği
2- Yeraltı sularında herhangi bir kirlilik meydana gelip gelmediği
3- Saha ve yakın çevresinden alınan toprak numunelerinde herhangi bir kirlilik meydana gelip gelmediği
4- Saha ve yakın çevresinde hava ortam numunelerinde herhangi bir kirlilik olup olmadığı

İNCELEME SONUÇLARI :

## 5.5.1. HEYELAN SONRASI BAKANLIK TARAFINDAN YAPILAN ÇALIŞMALARIN DEĞERLENDİRİLMESİ



Sayfa **226** /



SWORN TRANSLATION

### 5.5.1.1. Heyelan Sonrası Alınan Tedbirler Kapsamında Bakanlık Denetiminde Yapılan İşlemler

2024-88 Soruşturma Ek-2 başlıklı dosya içerisinde (Ek-14 olarak verilmiş sayfalar, pdf sayfa 1166-1276), heyelan sonrası kayan toprak malzemenin (atıkların) bulundukları yerinden alınarak geçici ve kalıcı alanlara taşınması hakkında, Bakanlık tarafından yetkilendirilmiş Ore Mineral Sondaj İnş. Müh. San. Tic. Ltd. Şti. nin 05.03.2024 tarih ve ORE-057-2024 sayılı yazısında, "yığın liç tesisinin doğu ve batı taraflarına dökülen malzemenin döküldüğü yerlerden kaldırılması ve tespit edilen depolama alanlarına güvenli bir şekilde taşınıp depolanması işlerinin takibi için firmalarının yetkilendirildiği" belirtilerek, "bu kapsamda 20.02.2024-04.03.2024 tarihleri arasında yapılan 15 günlük takip faaliyet raporlarının ekte sunulduğu"nun ifade edildiği, yazı ekinde yer alan raporların "Anagold Madencilik Çöpler Kompleks Maden İşletmesi, Heyelan Sonrası Geçici Atık Depolama- Atık Transferi Saha Çalışmaları Su yapıları Denetim Firması Günlük Takip Raporu" başlığı ile verildiği görülmüştür.

Raporların ön sayfasında yer verilmiş bilgilerden "iki taraflı meydana gelen olayda 6 milyon m3 malzemenin kaydığı, sahada yapılan çalışmalar sonucu 2 adet geçici 1 adet de kalıcı depolama alanının tespit edildiği, tespiti yapılan alanlara ait bilgilerin :

- Geçici depolama alanı-1 (Eski mermer ocağı) – yaklaşık 1.950.000 m3 kapasite
- Geçici depolama alanı-2 (Kilise altı bölge) – yaklaşık 7.000.000 m3 kapasite
- Kalıcı depolama alanı (Manganez ocağı) – yaklaşık 45.000.000 m3 kapasite

şeklinde verildiği, bu alanlarda zeminin kil tabaka ile geçirimsiz hale getirilmesi sonrasında heyelana uğrayan malzemenin güvenli şekilde taşınarak depolama uygulamasının yapılacağı, uygulamanın sağlıklı bir şekilde yapıldığının denetimi için de Ore Mineral Sondaj İnş. Müh. San. Tic. Ltd. Şti.nin yetkilendirildiği" anlaşılmıştır.

### 5.5.1.2. Çevre Referans Laboratuvarı Tarafından Yapılan Analizler

Erzincan Valiliği ÇŞİD İl Müdürlüğü'nün bila tarihli 8910306 sayılı yazısında, özet olarak, "soruşturma kapsamında olay yerinde çevre kirliliği bakımından konu ile ilgili yapılan inceleme sonuçlarının ivedi olarak talep edildiği, yapılan inceleme neticesinde işletme adına düzenlenmiş çevre izin ve lisans belgesinin Bakanlık tarafından iptal edildiği, heyelan nedeniyle çevre kirliliği oluşup oluşmadığının tespiti ve takibi amacıyla, ilk olarak çevreyi korumaya yönelik olmak üzere Sabırlı deresi üzerinde bulunan 2 menfezin kapatıldığı, alanda toprak kayması riski bulunması nedeniyle kayan malzemenin önüne set yapılarak toprak ve su akışının durdurulduğu, sızdırmazlığı sağlanan membranlı havuzlar yapılarak toplanan atık suların pompa ve vidanjör yardımı ile tesis sahası içerisinde bulunan atık barajına yönlendirildiği, ayrıca sahadan toprak numunesi, yüzeysel ve yeraltı suyu izleme gözlem kuyularından (Aşağıdaki resimde görülen noktalardan, **Resim 1**) günlük su numunesinin alınarak analize gönderildiği, analizlerin alanda görevli Bakanlık Mobil Su ve Atıksu Analiz Laboratuvarı, Bakanlık Çevre ve Referans laboratuvarı ve yetkili laboratuvarlarda günlük yapılarak karşılaştırıldığı (yazı ekinde Ek-4 olarak verildiği, işbu rapora olduğu gibi alınmayan ekindeki tablolar **(ilgili tablolara dair değerlendirmeler aşağıdaki bölümlerde yapılmıştır)**, bölgenin hava kalitesinin de Bakanlık Mobil Hava Kalitesi İzleme Aracı ve bölgede bulunan 2 adet Hava Kalitesi İzleme İstasyonu ile sürekli (24 saat) takip edildiği, alınan numunelerde ve bölgenin hava kalitesinde şu ana kadar (numunelerin alındığı tarihlerde) bir

SWORN
TRANSLATION

olumsuzluk ile karşılaşılmadığı, çevresel izleme çalışmaları kapsamında numune örnekleme ve hava kalitesi izleme sürecinin devam etmekte olduğu (yazı ekinde Ek-5 olarak verilmiş), akan toprağın güvenli alana alınarak çevre kirliliğinin önlenmesine yönelik Bakanlık tarafından Geçici ve Kalıcı Atık Depolama Alanlarının belirlenmiş olduğu, bu amaçla bir firmanın görevlendirildiği, akademik danışmanlık için de görevlendirmenin yapıldığı" bilgilerine yer verildiği görülmüştür.

Yazı ekinde, numune alma noktaları (Resim 1.1 ve Tablo 1.1) ve analiz sonuçlarının verildiği görülmüş, analiz sonuçları hakkında değerlendirme aşağıdaki bölümlerde yapılmıştır.



*Resim 1.1 : Yüzeysel ve yeraltı suyu izleme gözlem kuyularının yerini gösteren harita*

*Tablo 1.1 : Yüzeysel ve yeraltı suyu izleme gözlem kuyularına ait açıklama ve koordinatlar*





SWORN
TRANSLATION

### 5.5.2. OLAY SONRASI HAZIRLANAN **BİLİRKİŞİ RAPORUNUN İNCELENMESİ**

Olay sonrası [illegible] kapsamında 15.03.2024 tarihli 10 farklı uzmanlık alanından Bilirkişi tarafından [illegible] Bilirkişi raporunda (121 sayfa), çevre kirlenmesi konusu ile ilgili inceleme ve değerlendirme yaptıkları görülen Kimya Bilirkişisi ve Çevre Bilirkişisinin, yukarıda belirtilen [illegible] sonuçların aşağıdaki gibi olduğu görülmüştür.

Kimya Bilirkişisinin değerlendirme kısmında verdiği bilgilerde, ANKALAB-FEPAS-ARTEK çevre laboratuvarları tarafından maden sahası çevresinde 26.02.2024 tarihli alınmış 9 adet su numunesinde yapılan analiz sonuçlarından siyanür için yöntem algılama sınırının (tayin limiti) altında değerler bulunduğu dolayısıyla, kaymadan dolayı meydana gelen deşarjdan dolayı, deşarj limit değerlerinin [illegible] sonucuna varıldığı şeklinde görüş bildirilmiştir. Benzer şekilde ağır metaller için [illegible] ölçüm sonuçlarının da, sınır değerleri aşmadıklarının tespit edildiği şeklinde bilgi verildiği [illegible] (Test Aynı analiz sonuçlarının işbu rapor kapsamında değerlendirme sonuçları aşağıdan [illegible] verilmiştir)

Kimya bilirkişisi tarafından genel değerlendirme başlıklı bölümde "*Çöpler maden işletmesinde 13.02.2024 [illegible] maden [illegible] Heap Leach sahasının kayması olayının ardından 40 gün boyunca Karaca [illegible] örnekleme programı çerçevesinde farklı koordinatlardan farklı tarihlerde akreedite [illegible] elemanları tarafından alınacak yeraltı ve yüzeysel su, atık, toprak ve hava numuneleri [illegible] akredite laboratuvar tarafından yapılacak siyanür ve ağır metal analizleri sonuçlarına göre [illegible] [illegible] Kontrolü Yönetmeliği (değişik tablo 1: RG-13/02/2008-26786) Tablo 1 [illegible] [illegible] Maaran Sınıflarına Göre Kalite Kriterleri, Toprak Kirliliğinin Kontrolü ve [illegible] Kirlenmiş Sahalara Dair Yönetmeliğe göre suyun hangi sınıfta olduğu, [illegible] [illegible] [illegible] [illegible] madığı, toprakta kirlilik olup olmadığının araştırılması gerekmektedir. Testi [illegible] öncesi ve Heap Leach sahasının kayması olayının öncesindeki kalite sınıfı [illegible] [illegible] olup olmadığına bakılarak kirlenme olup olmadığına karar verilebilir.*" denildiği görünmüş, dolayısıyla kimya mühendisliği bilirkişisinin, olaydan sonra alınmış 26.02.2024 tarihli numunelerle, kirlenme olup olmadığı hakkında karar verilemeyeceği, halen devam [illegible] olan numune işlemlerinin tamamlanmasından sonra karar verilmesinin uygun olacağı [illegible] bir değerlendirme yaptığı anlaşılmaktadır.

Kimya bilirkişisinin toprak analiz sonuçları ile ilgili yaptığı değerlendirme kısmında da, "*3 adet toprak numunesinin [illegible] laboratuvarlar tarafından tarafından yapılmış analiz sonuçlarının önemli bir kısmının özal [illegible] sınır değerlerinin altında ölçülmüş olduğu, 1 adet toprak numunesinde kobalt ile 2 adet toprak numunesinde arsenik konsantrasyonlarının jenerik kirletici sınır değerlerini aşıyor görünümü ancak bu maddelerin de toprağın yutulması ve deri teması [illegible] toprağı [illegible] [illegible] soluaması durumu için sınır değerlerin daha yüksek olmasından dolayı [illegible] [illegible] şeklinde değerlendirmede bulunulduğu, referans kabul edilen numune [illegible] [illegible] için kıyaslama yapılamadığı, toprak ağır metal konsantrasyonunun [illegible] [illegible] yakın değerler olması sebebiyle, arsenik ve kobalt kirleticileri için [illegible] [illegible] [illegible] [illegible] kaymadan kaynaklı bir kirlilik olmadığının düşünüldüğü*" şeklinde itibaren [illegible] [illegible] görünmektedir.

Kimya bilirkişisinin [illegible] oluşabileceği riskler" başlıklı bölümde literatürden derlenmiş bilgilere yer verildiği ancak bu bilgilerin hangi kaynak veya kaynaklardan alındığına dair bir bilgiye yer verilmediği anlaşılmıştır.

SWORN
TRANSLATION

Aynı Bilirkişi Raporunda Çevre Bilirkişisi yapılan değerlendirmede, özet olarak, olayın ilk safhalarında resmi kurumların yaptıklarından bahisle, maden ocağının lisans belgesinin iptal edildiği, savcılık tarafından soruşturma kapsamında cevaplandırılması istenilen 7 soruya yer verildiği, raporun devamında "genel çerçeve, mevcut durumun tespit ve gözlemler, kazanın oluşumunda çevresel etkilerin varlığı, kazanın çevresel açısından değerlendirilme kategorisi" başlıkları altında açıklamaların yer verildiği, devam eden kısımlarda firma için hazırlanmış 2021 tarihli ÇED Raporundan bahisle, rapor içerisinde risk konuları ile ilgili verilmiş bilgilere yer verildiği, Nihai ÇED Raporunda "yığın liç sahasına kayma" ve "yığın liç sahasında yıkılma" konu başlıklarında değerlendirme yapılmış olsa da kayma/yıkılma olmasına ihtimal verilmediğinin rapordan anlaşıldığının ifade edildiği, olayın çevre ve yasal mevzuatlar yönünden değerlendirildiği sonraki bölümde hava kalitesi, suyun ve toprağın kirletilmesi ile ilgili yönetmelik maddelerinden bahsedildiği, görülmüştür.

Yapılan değerlendirmede, herhangi bir kirlenme olup olmadığına dair kanaat bildiren bir ifadeye rastlanmamış olup, çevre bilirkişisinin değerlendirmelerinin ilgili mevzuata uyum ve ÇED Raporundan faydalanarak savcılık sorularını cevaplandırmak şeklinde olduğu, kirlenme olup olmadığı hakkında değerlendirmenin Kimya Bilirkişisi tarafından yapıldığı için ayrıca Çevre Bilirkişisi raci kılma yapılmasının kabulünün gerektiği anlaşılmıştır.

### 5.5.3. BAKANLIK (ÇŞİDB) REFERANS LABORATUVAR ANALİZ SONUÇLARININ DEĞERLENDİRİLMESİ

*5.5.3.1 Hava Kalitesi Ölçüm Sonuçlarının İncelenmesi Ve Değerlendirilmesi Yararlanılan Belge : 3.c*

İliç CBS'nin 08.03.2024 tarihli ve 43846157/(2024/88)/890 sayılı yazısına cevap olarak ÇEVRE, ŞEHİRCİLİK VE İKLİM DEĞİŞİKLİĞİ BAKANLIĞI Çevresel Etki Değerlendirmesi, İzin ve Denetim Genel Müdürlüğü tarafından gönderilen bila tarihli E-77551409-641.99-9047406 sayılı yazıda *"meydana gelen toprak kayması ile ilgili, Hava Kalitesi ölçüm sonuçları, Genel Müdürlüğümüzün laboratuvarında yapılan ve akredite laboratuvarlarda yaptırılan hava, su ile toprak numunelerinin analiz sonuçları ekte gönderilmektedir"* denildiği, hava kalitesi ölçüm sonuçlarının Ek-3'de 20 sayfa olarak verilmiş olduğu görülmüş, yazı ekinde yer alan Bilgi Notu başlıklı sayfada (pdf sayfa 2372) "ölçümlerin 23.02.2024 tarihinden itibaren olmak üzere Bakanlığa bağlı Sabit Hava Kalitesi Ölçüm Aracı kullanılarak yapıldığı, ölçülen parametrelerin Partikül madde (PM10 ve PM2.5), Kükürtdioksit (SO2), Karbon monoksit (CO), Azot oksitler (NOx, TSyon (O3) olduğu ayrıca 4 noktada Kurşun (Pb), Nikel (Ni), Kadmiyum (Cd) ve Arsenik (As) parametrelerinin tespiti amacıyla örnekleme yapıldığı, filtre örneklerinin Bakanlık Çevre Referans laboratuvarında analiz edildiği, 42 numune analizinin tamamlandığı, 64 adet numunenin ise analiz işlemlerinin devam etmekte olduğu" bilgilerine yer verildiği görülmüştür.

Ek-3 dosyada (pdf sayfa 2355-2375) 20 sayfa halinde verilmiş hava kalitesi ölçüm sonuçlarının R.G'nin 08.06.2008 tarih ve 26898 sayılı nüshasında yayımlanan Hava Kalitesi Değerlendirme ve Yönetimi Yönetmeliği ile ilgili parametreler için aşağıda verilmiş sınır değerler ;



SWORN
TRANSLATION

*Tablo 3.1. HKDYY sınır değerleri*

| Parametre | PM10 | PM2,5 | SO2 | CO | NOx | O3 |
|---|---|---|---|---|---|---|
| Saatlik limit değer, µg/m3 | 50 | - | 350 | 10.000 | 200 | 120 |

dikkate alınarak değerlendirme yapıldığında ;

-Ölçülmüş PM10 değerlerinin maksimum 143,8 mg/m3 ölçülmüş olduğu, ancak yönetmelik Ek-1 de sınır değerin 1 yılda 35 defadan fazla aşılmaz ifadesine göre değerlendirme yapıldığında, 20 günlük sürede bu sayının aşılmış olduğunun görüldüğü, diğer parametrelerin tüm ölçümlerde sınır değerlerin altında kaldığı görülmüştür.

-Anagold madencilik için hazırlanmış Mart-2021 tarihli "847, 49729 ve 20067313 Ruhsat Nolu Çöpler Kompleks Madeni 2. Kapasite Artışı ve Flotasyon Tesisi Projesi" isimli Nihai ÇED Raporunda sayfa II-196 (pdf sayfa 350) da "Tablo II.67 Arka Plan Hava Kalitesi Ölçüm Sonuçları (PM10 ve Çöken toz)" değerlerinin verilmiş olduğu (ölçümler 13.09.2018-10.10.2018 ve 08.11.2018 tarihlerinde anlık olarak yapılmış), bu tablodan, toplam 14 noktada yapılmış ölçüm sonuçları içerisinde PM10 için en düşük 0,499 mg/Nm3 (499 µg/m3) , en yüksek 1,041 mg/Nm3 (1041 µg/m3) değerlerinin ölçülmüş olduğu görülmüş, bu değerlerin, Sanayi Kaynaklı Hava Kirliliğinin Kontrolü Yönetmeliğinde Ek-1 b.2.2 de yer alan 3 mg/Nm3 sınır değer ile karşılaştırılarak sınır değerin aşılmadığı belirtilmiştir. Oysa, 3 mg/Nm3 sınır değeri için yönetmelikte *"... kaynağından 1 metre uzaklıkta toz konsantrasyonu saatlik ortalama değeri (PM 10) en fazla 3 mg/m3 değerini aşmamalıdır"* ifadesi yer almakta olup, proje alanı ve çevresinde yapılmış ölçüm sonuçlarının (ÇED Raporunda yer alan bu ifadenin doğru yazılmış olduğu kabul edilecek olursa) 3 mg/Nm3 sınır değer ile kıyaslanmasının yanlış bir değerlendirme olduğu, yukarıda Tablo 3.1 de verilen ortam hava kalitesi değerleri ile karşılaştırma yapılmasının gerektiği anlaşılmaktadır. Bu limitler üzerinde değerlendirme yapılmış olsaydı, ortam PM10 sınır değerlerinin aşılmış olduğu görülecekti. Dolayısıyla, 23.02.2024-13.03.2024 tarihleri arasında mobil cihaz ile yapılan analiz sonuçları ile tesisin önceki durumu karşılaştırıldığında, PM10 parametresi açısından, hem tesisin önceki durumunda, hem de ölçüm yapılan tarihler itibariyle, sınır değerlerin aşıldığı, diğer parametreler açısından sınır değerlerin altında kalınmış olduğu anlaşılmıştır.

-Belge 3 c' de pdf sayfa 2355-2375 arasında verilmiş Mobil Hava Kalitesi Ölçüm Sonuçları tablosuna bakıldığında, dava konusu olay içerisinde adı geçen siyanür parametresini ifade eden bir parametreye ait (HCN) ölçüm yapılmadığı görülmüştür. Proses ve literatür bilgilerinden, Liç prosesinde kullanılan siyanürün, işletme şartlarında uçucu hale geçmemesi için toprak ortamının pH'ı 10'un üzerinde tutulmakta olduğu, ortamdan ayrılan malzemede pH düştükçe siyanürün de HCN formunda çevre ortamından uzaklaştığı bilinmektedir. Dolayısıyla, heyelan sonucu akan malzeme içindeki siyanürün hava ortamına karışıp karışmadığının anlaşılabilmesi için, olay sonrasında takip eden birkaç gün içerisinde hava ortamında HCN ölçümünün yapılması gerekmektedir. Mobil hava kalitesi ölçümlerinin 21.02.2024 tarihinde başlamış olması, olayın üzerinden 10 gün geçtiği, dolayısıyla hava ortamına karışan HCN olup olmadığına dair doğru bir veri alabilme imkanının ortadan kalkmış olduğu sonucuna gelmektedir. Hava Kalitesi Değerlendirme ve Yönetimi Yönetmeliği nin Siyanür kelimesi ile tarama yapıldığında herhangi bir ifadeye rastlanmıyor olması da normal şartlar altında ortam ile karşılaşılmaması gerektiğini, ani maruziyet durumları (işyeri ortamı vb.) için bu konuda farklı yönetmeliklere **(KİMYASAL MADDELERLE**

Sayfa **231 /**



SWORN
TRANSLATION

ÇALIŞMALARDA SAĞLIK VE **GÜVENLİK ÖNLEMLERİ HAKKINDA YÖNETMELİĞİ** bulunması gerektiğini göstermektedir. Herhangi bir ölçüm sonucu olmadığı için, sözü edilen yönetmelikten konu ile ilgili herhangi bir maruziyet sınır değerini vermenin de bir anlamı bulunmamaktadır.

-Hava numunelerinde ağır metal ölçüm sonuçlarının değerlendirilmesi

Ek-2 pdf sayfa 2641-2786 arasında verilmiş hava kalitesi izleme raporlarının yer aldığı, ölçümlerin 21.02.2024 tarihinden itibaren başlatıldığı, 20 gramlık filtre kağıtları üzerine alınmış toz örneklerinde ağır metal ölçümlerinin yapıldığı, ölçüm sonuçlarının **µg/filtre** şeklinde verilmiş olduğu (NOT: filtre ağırlığı 20 gram olarak verildiği için tablodaki değerin 20 grama bölünerek µg/gram birimine geçilebileceği, buradan da kütlesel olarak ppm cinsinden bir değer verilebileceği anlaşılmakta olmakla hava kirleticiler için genellikle konsantrasyon birimi (µg/Nm3) kullanılmakta, ancak bu raporlarda ne kadarda hava çekilerek ölçüm yapıldığına dair bir bilgi olmadığından konsantrasyon birimine geçilememektedir.)

Kaldı ki, ölçümleri yapan birimin bağlı olduğu Bakanlık tarafından, R.G.'nin 6/6/2008 tarih ve 26898 sayılı nüshasında yayınlanan Hava Kalitesi Değerlendirme ve Yönetimi Yönetmeliği'nde yer almayan bir birim kullanılarak hava kalitesi izleme sonuçlarının verilmiş olmasının gerekçesi anlaşılamamıştır. Yönetmeliğin ekler kısmında Ek-1'de Tanımlar kısmında konsantrasyon değerlerinin hangi birimlerle ifade edilmesi gerektiği (*arsenik, kadmiyum, nikel, cıva ve benzo(a)piren* için) görülmektedir.

Sonuç olarak filtre kağıtları üzerinde tutulmuş toz numuneleri üzerinde yapılan analizler sonucu bulunmuş ağır metal değerlerinin kıyaslanabileceği bir birim kullanılmadığından, heyelanın hava ortamında ağır metal açısından bir kirlenmeye sebep olup olmadığı hakkında değerlendirme yapılabilmesi de mümkün değildir. Olayın üzerinden de uzun zaman geçmiş olması sebebiyle, ölçümlerin tekrarlanabilirliği de söz konusu olamayacaktır.

Heyetimizce, hava kalitesi ile ilgili ölçüm raporlarında, HCN ile ilgili sonuçlara rastlanmamıştır.

### 5.5.3.2. 5n. Toprak Analiz Çalışmalarının **İncelenmesi ve Değerlendirilmesi**

ERZURUM İL İL LABORATUVAR, ÖLÇÜM VE İZLEME DAİRESİ ÇALIŞMALARINA İLİŞKİN BİLGİ SAĞLI; vde

(Belge bc, pdf sayfa 2378). Özet olarak, "bakanlık tarafından olayın ilk gününden itibaren bölgenin hava kalitesi ve su kirlenmesi önemli olarak takip edildiği, her gün 5'i gözlem kuyusu, 6'sı yüzey ve sızıntı suyu olmak üzere toplam 11 ayrı noktadan, haftalık olarak ise maden sahası atık depolama alanından 5 gözlem kuyusunda su örneklerinin alındığı, ayrıca maden atığının kaza sonucu gelmiş olduğu sahadan itibaren hem atıktan hem de temiz alandan alınmış olan 6 adet maden atığı ile kirlenmesinin olmadığı olarak kalmayan 1'i maden üretim alanından olmak üzere 7 ayrı noktadan alınan toprak numuneleri mobil atık, atık mobil su ve atıksu analiz laboratuvarında yerinde ve detaylı olarak ise bakanlık Çevre Referans Laboratuvarı'nda analiz edildiği, olay tarihinden itibaren 42 adet atık/toprak numunesinde (katı ve orjinal formda) toplamda 1.176 parametrenin çalışıldığı, günlük düzenli olarak alınmak toplam 256 adet su numunesinde 7986 fiziksel ve kimyasal parametresinin analizinin yapıldığı, analiz ve raporlama çalışmalarının devam etmekte olduğu (doğrudan evet olabilecek olgu 29.03.2024 tarihi itibariyle), ayrıca tüm numunelerin eş zamanlı



SWORN
TRANSLATION

olarak akredite Çson Çevre Analiz Laboratuvarı ile Segal Çevre Analiz Laboratuvarına da gönderildiği, adı geçen bu laboratuvarlara ait sonuçların yer aldığı veri tablolarının CD kaydı içerisinde yer aldığı bilgilerine yer verildiği görülmüş, yazı ekinde yer alan analiz raporları ayrı ayrı incelenmiş elde edilen sonuçlar aşağıda verilmiştir.

**5.5.3.2.1. Su numunelerinin analiz sonuçlarının değerlendirilmesi**

(Belge 3.c (Ek-2). pdf sayfa 2576- 2822)

**Değerlendirme için ilgili Yönetmelik ve Eki : Yerüstü Su Kalitesi Yönetmeliği EK-5**

(Değişik:RG10/8/2016-29797) Tablo 4:Yerüstü Su Kaynakları için Belirli Kirleticiler ve Çevresel Kalite Standartları

Raporların tarihi : .03.2024

*Tablo 3.2: ÇŞİDB Çevre Referans Laboratuvarı Analiz Sonuçlarının Değerlendirilmesi*

| Numunenin alındığı nokta | Rapor no | Sınır değerlerin geçilip geçilmediği* | Örnek parametreler |
|---|---|---|---|
| ALAO toplama noktası IIV | 24-SU-2033-M4 | YO-ÇKS değerlerini aşanlar | Antimon, Arsenik, Bakır, Gümüş, Nikel, Kobalt, Demir, Vanadyum |
| | | MAK-ÇKS değerlerini aşanlar | Civa, Arsenik, Bakır, Çinko, Nikel, Gümüş, Kobalt, Demir |
| Sazlı Dere (W SU-30) | 24-SU-2033-M4 | YO-ÇKS değerlerini aşanlar | Krom, Bakır, Kurşun, Çinko, Alüminyum |
| | | MAK-ÇKS değerlerini aşanlar | Civa, Alüminyum, Demir |
| Çöpler Deresi (WSU-36) | 24-SU-2034-M4 | YO-ÇKS değerlerini aşanlar | Krom, Bakır, Kurşun, Çinko, Alüminyum |
| | | MAK-ÇKS değerlerini aşanlar | Civa, Alüminyum |
| Sabırlı Deresi Memba WSU-30 | 24-SU-2035-M4 | YO-ÇKS değerlerini aşanlar | Krom, Bakır, Kurşun, Çinko, Alüminyum, Kobalt, Vanadyum |
| | | MAK-ÇKS değerlerini aşanlar | Civa, Kobalt |
| Çöpler Deresi (NW-40) | 24-SU-6036-M4 | YO-ÇKS değerlerini aşanlar | Kadmiyum, Bakır, Kurşun, Demir, Alüminyum, Arsenik, Kobalt, Vanadyum, Krom |
| | | MAK-ÇKS değerlerini aşanlar | Bakır, Demir, Alüminyum, Arsenik, Civa |
| Menova Deresi Bağ sonrası (SW-70) | 24-SU-6037-M4 | YO-ÇKS değerlerini aşanlar | Kadmiyum, Bakır, Krom, Kurşun, Alüminyum, Kobalt, Demir |
| | | MAK-ÇKS değerlerini aşanlar | Civa, Alüminyum, Kobalt, Demir, |
| Bahçe sonrası (AO-80) | 24-SU-6038-M4 | YO-ÇKS değerlerini aşanlar | Kadmiyum (Sınıf I), Krom, Bakır, Kurşun, Antimon, Alüminyum, Kobalt |
| | | MAK-ÇKS değerlerini aşanlar | Civa, Alüminyum |



Sayfa **233** /

SWORN
TRANSLATION

| Manba (SW-01) | 31-SU-0079-M4 | YO-ÇKS değerlerini aşanlar | Kadmiyum (Sınıf 1), Krom, Bakır, Kurşun, Antimon, Alüminyum, Kobalt, Demir, Vanadyum |
| | | MAK-ÇKS değerlerini aşanlar | Civa, Alüminyum. |
| Sabırlı Deresi Gözlem Kuyusu (WM-39) | 34-SU-0046-M4 | YO-ÇKS değerlerini aşanlar | Kadmiyum (Sınıf I), Krom, Bakır, Kurşun, Antimon, Çinko, Alüminyum, Kobalt, Vanadyum |
| | | MAK-ÇKS değerlerini aşanlar | Civa, Bakır |

\* YO-ÇKS – Yıllık ortalama çevresel kalite standardı

MAK-ÇKS – Maksimum izin verilebilir çevresel kalite standardı

Yukarıda bir kısmı verilmiş numune alma noktalarından alınan su örneklerinde yapılmış analiz sonuç raporlarında YO-ÇKS ve MAK-ÇKS kalite standart değerlerini geçen ağır metaller örnek parametreler sütununda verilmiş olup, burada verilmeyen (Ek-2 de pdf olarak verilmiş diğer yaklaşık 400 sayfalık yer alan analiz raporlarında da, benzer ağır metallerin YO-ÇKS ve MAK-ÇKS kalite standart değerlerini aşmış oldukları, özellikle Civa parametresinin hemen hemen tüm su numunelerinde (Ek-2 raporunda yapılan taramada 61 yerde geçtiği tespit edilmiş) kalite değeri olan 0.07 µg/L değerinin üzerinde ölçülmüş olduğu, görülmüştür. Su numunelerinin sadece civa parametresi açısından değerlendirilmesi halinde dahi, su kaynaklarında bir kirlenme olduğunun söylenebileceği anlaşılmaktadır. (NOT : Civa maddesinin işletmede hangi proseste kullanıldığı ile ilgili olarak 2021 tarihli ÇED Raporu incelendiğinde, raporda sayfa I-54'de "Altın Elektrokazanımı" başlıklı bölüm içerisinde, sayfa I-66-67'de "Rafinasyon Ünitesi" başlıklı bölüm içerisinde geçtiği görülmüştür.)

Belge 3.3 da (HTC EBS Soruşturma No:2024/88) pdf sayfa 1220 -1259 arasında yer alan tabloda, Çevre Referans Laboratuvarı tarafından yapılmış su analiz sonuçlarının toplu halde verildiği, 14.02.2024- 26.02.2024 tarihleri arasında alınmış numunelere ait sonuçların verildiği (bu aralıkta bazı noktalarda numune alınmadığı için sonuçların da olmadığı görülmüştür), numune alma noktalarının :

Memba (SW-01), Baraj Mansap (SW-02), Çöpler Deresi (SW-04), Menfez Giriş Önü (SW-06), Menfez Çıkış (SW-06 b), Menfez Baraj Bağlantısı (SW-08), Sabırlı Deresi Gözlem Kuyusu (WM-08), Çöpler Deresi Gözlem Kuyusu (WM-36), Sabırlı Deresi Gözlem Kuyusu (WM-39), Tesis Atıklar Gözlem Kuyusu (WM- 48), Bent Öncesi Birikinti suyu (SW-10), BAĞISTAS-1 Barajı Baraj Gövdesi (SW-08B), Sabırlı Deresi Menfez Altı (MW-26), Çöpler Deresi Gözlem Kuyusu (WM-57), BAĞISTAS-1 Barajı Kapak Kısmı (BKK), Baraj Altı Kuyusu (BAK) şeklinde isimlendirildikleri, açıklama kısmında ;

SW kodlu numuneler yüzey suyu veya sızıntı suyu

WM kodlu numuneler sahada bulunan kuyu suyu

SW-01, SW-02, SW-08, SW-08B Fırat Nehri Üzerinden Alınan Numuneler

SW-10, SW-14 buraya karışan sızıntı suları

bilgisinin verildiği, nihai ölüm sonuçlarının değerlendirilmesinde "SKKY Tablo 7.1 Maden Sanayii" tablosunda verilmiş değerler ile "YSKY Tablo 2 Su Kalite Sınıfları", "YSKY Tablo 4: Çevresel Kalite Standartları" nın dikkate alındığı görülmüştür.

Sayfa **234** /



SWORN
TRANSLATION

Tablolar Arsenik, Civa, Kadmiyum, Kobalt, Krom, Demir, Kurşun, Çinko parametrelerinin 1 veya 1 den fazla numunede kalite standartlarının üzerinde oldukları görülmüştür. Analizlerin, alıcı ortamlardan alınan numuneler üzerinde yapılmış olmalarından dolayı, sonuçların tabloda verilmiş SKKY limitleri (deşarj limitleri olarak verildikleri için) ile karşılaştırılmaları doğru olmayıp, YSKY ÇKS değerleri ile karşılaştırılarak değerlendirme yapılması gerekmektedir.

Söz konusu numunelerde, hangi parametrelerin aşıldığı ile ilgili olarak, yukarıda Tablo 3.2 ve devamındaki kısımda daha detaylı değerlendirme yapılmış olup, alıcı ortam numunelerinde benzer parametreler için ölçümde bulunmuş değerlerin YO-ÇKS ve MAK-ÇKS kalite standartlarını aştıkları, 3.a nolu kaynakta pdf sayfa 1220 den başlayan sayfalarda toplu halde verilmiş tablodan da anlaşılmıştır.

Mart-2021 tarihli 847_40729 ve 20067313 Ruhsat Nolu Çöpler Kompleks Madeni 2. Kapasite Artışı ve Flotasyon Tesisi Projesi Nihai ÇED Raporu"nda, sayfa II.128 (pdf sayfa 237) Tablo II.31'de İzleme&Örnekleme İstasyonlarında yıllara göre verilmiş pH değerlerine bakıldığında ortalama en düşük pH'ın 7.3, en yüksek pH'ın 8 olduğu görülmekte, ancak 3.a nolu kaynakta pdf sayfa 1220-1259 arasında verilmiş su analiz sonuçlarına bakıldığında pH değerlerinin daha yüksek olduğu, aynı şekilde Sink miktar değerlerinde de 2021 yılına göre artış olduğu görülmektedir.

2021 tarihli ÇED Raporunda sayfa II-98 de yer alan Tablo II.25'de, Civa için MAK-ÇKS değeri verildiği, SW-04 ve SW-06 nolu noktalarda MAK-ÇKS değerlerinin aşıldığı, ayrıca, aynı tabloda Nikel için tüm numunelerde hem YO-ÇKS hem de MAK-ÇKS değerlerinin aşıldığı, Kurşun ve Kadmiyum için ilk SW-03 ve SW-04 her iki standart değerin aşılmış olduğu, Kurşun için SW-06 da MAK-ÇKS nın aşılmış olduğu, Kadmiyum için SW-05 de YO-ÇKS, SW-06 da her iki sınır değerin de aşılmış olduğu bilgisine yer verildiği görülmüştür.

Aynı ÇED Raporunda sayfa II-95'de "*Anagold su kalitesi veri tabanında yer alan tüm ölçümlerin ortalama değerleri, YSKY EK-5 Tablo 5 kriterleriyle karşılaştırıldığında (Tablo II.24) tüm istasyonların alüminyum, bakır, demir, kobalt ve titanyum konsantrasyonları, yıllık ortalama ve maksimum limit değerlerinin üzerindedir.*" ifadesinin yer aldığı, buna göre 2021 yılı itibariyle su kalitelerinde sınır değerlerin üzerinde ölçümlerin olduğu anlaşılmaktadır. Ancak, sözü edilen tabloda (Table II.24) yeşil renk ile işaretli maddelerden örneğin Civa konsantrasyonunun, 2021 yılı itibariyle MAK-ÇKS değerinin altında oldukları görülmesine karşılık, dava konusu olay sonrası yapılan ölçümlerde (Örneğin SW-01, SW-02, SW-03 ve SW-05) sınır değerlerin aşılmış oldukları, Kadmiyum için de benzer durumun söz konusu olduğu (SW-01, SW-02 ve SW-05 de YO-ÇKS için) görülmüştür.

### 5.5.3.2.1. Toprak analiz sonuçlarının değerlendirilmesi

(Belge 3.a pdf sayfa 2784-2804, analiz raporlar.)

**Değerlendirmede ilgili Yönetmelik ve Eki :** Toprak Kirliliğinin Kontrolü ve Noktasal Kaynaklı Kirlenmiş Sahalara Dair Yönetmelik Ek-1 Jenerik Kirleticiler

Numunenin alınma tarihi : 13.02.2024

Belge 3.a da pdf sayfa 1260 da toprak analiz sonuçlarının toplu halde verilmiş olduğu, tabloda, jenerik değerleri geçen parametrelerin olduğu, buna göre, 1 veya 1 den fazla numunede sınır değerleri geçen ortamların pH, Toplam Siyanür (TCN), Kükürt, Gümüş, Antimon, Arsenik,





SWORN
TRANSLATION

Bakır, Baryum, Çinko, Çinko, Kadmiyum, Kobalt, Kurşun, Molibden, Nikel, Selenyum, Talyum, Titanyum, Vanadyum olduğu görülmüş, belirtilen bu parametrelerin çoğunun, Jenerik Kirleticiler tablosundaki "Kirleticilerin yeraltı suyuna taşınması ve yeraltı suyunun içilmesi" kriterinin üzerinde oldukları anlaşılmıştır. Numune alınan noktaların 1- Afat Toplanma noktası Altı (T1, T2, T3), 2- Radar Düzenleme Noktası Altı (R1, R2, R3) oldukları, T ve R noktaları için referans noktalar ile sağlıkta alınmış şahit numune ve ana ocak referans noktalarına ait pH ve iletkenlik parametreleri, iletkenlik sonuçlarının verildiği (tuzluluk için ölçüm yapılmadığı için hepsinde 0,00 verildiği), ağır metallere ait sonuçların ise verilmediği görülmüştür.

Belge 3.a'da pdf sayfa 1260 daki tablonun devamı olan sayfa 1261 deki tablodan, Sabırlı deresi (SD-01, 02-03) numunelerinin alınmış olduğu anlaşılmış, ancak bu numunelerde sadece pH ve iletkenlik ölçümlerinin yapıldığı, tuzluluk parametresi için 0,00 yazılı olduğu görülmüştür.

### 5.5.3.2.3. Toprak eluat test sonuçlarının **değerlendirilmesi**

Toprak örneklerinin eluat test sonuçlarının da, 3.c nolu kaynakta pdf sayfa 2805-2822 de verildiği, analiz sonuçlarının "Atıkların Düzenli Depolanmasına Dair Yönetmelik" kapsamında 3 kritere göre değerlendirildiği, numuneye ait raporlardaki ölçüm sonuçlarının 3.a nolu kaynakta (pdf sayfa 1262-1267 sonuçların görülebilmesi için %600 büyütülmesi gereken sayfalar) toplu halde bir tabloda verildiği, noktaların 3 tanesinin Afat Toplanma Noktası Altı (T1, T2, T3), diğerlerinin Radar Düzenleme Noktası Altı (R1, R2, R3) oldukları, tablodan, Arsenik, Civa ve Nikel parametrelerinin kırmızı renk ile işaretlendikleri, analiz sonuçlarına bakıldığında, yönetmelik 2-B ve 3-e kriterdeki mevsuda değerlere sahip oldukları, analiz sonuçlarının 2-C kriterlerinin altında olmakla, 2-B limitlerine göre değerlendirilmesi gerektiği, buna göre toprak örneklerinin tehlikesiz atıklar sınıfına girdiklerinin söylenebileceği anlaşılmıştır.

Tablonun alt tarafında bir açıklamada da "*1) Eluat (suyla 10 kat seyreltilmiş numune) değerleri ile orijinal eluat (maSH ile ekstraksiyona gidilmiş) elde edilen sonuçlar uyumludur*" ifadesinin yer aldığı görülmüştür.

### 5.5.4.BALIK NUMUNELERİNDE YAPILAN ANALİZLER HAKKINDA DEĞERLENDİRME

İnceleme Belge No: 3.c (2024-88 Soruşturma Ek-2 (pdf sayfa 1303-1310))

Tarım ve Orman Bakanlığı Düzağ Veteriner Kontrol Enstitüsü Müdürlüğü tarafından İliç Hazırlık Bürosunun 05.03.2024 tarih ve 43846157/(2024/88)/805 sayılı yazısına cevaben yazılmış bila tarihli 13715047 nolu yazıda, İliç İlçe Tarım ve Orman Müdürlüğü tarafından gönderilen balık numunelerinde bazı analizlerin yapılarak analiz raporlarının yazının ekinde sunulduğunun belirtildiği görülmüştür.

Eklerde ver alan bir analiz raporunda (protokol numarası : BVE/2024/380 / MERT ŞAHİN, numunenin DÜZAĞ VETERİNER KONTROL ENSTİTÜSÜ MÜDÜRLÜĞÜ tarafından TARIM VE ORMAN BAKANLIĞI, İZMİR BORNOVA VETERİNER KONTROL ENSTİTÜSÜ MÜDÜRLÜĞÜ"ne gönderildiği, analizlerin burada yapıldığı, numune alma tarihinin 06.03.2024 olduğu, açıklamalar kısmında "İlçemiz Bağıştaş Hes-1 barajı yakınında bulunan bulutal hattının yakınlarında sazan türü balıklarda ani ölümlere rastlanılmaktadır. Yüzel laboratuvarlarımız kullanılmaktadır." ifadesinin yer aldığı, Viroloji Bölümü tarafından Balık

SWORN
TRANSLATION

(sazan) numunelerinde 2 farklı hastalık türü (KOİ HERPES VİRUS HASTALIĞI, SAZANLARIN BAHAR VİREMİSİ) için yapılmış 19.03.2024 tarihli analiz sonuçlarının "Negatif" olarak belirtildiği görülmüştür.

Protokol numarası ELZ/2024/152 / MERT ŞAHİN olan 3 sayfalık analiz raporunun ELAZIĞ VETERİNER KONTROL ENSTİTÜSÜ MÜDÜRLÜĞÜ tarafından hazırlandığı, numunenin alındığı tarih 03.03.2024, açıklama kısmında yukarıdaki raporda yazılı açıklamanın yer aldığı, Balık (sazan) numunelerinde yapılan analizler hakkında sonuçlar kısmında hastalık türleri için ayrı ayrı olmak üzere;

KOİ HERPES VİRUS HASTALIĞI için Reddedildi, (Analiz Metodu : Nested-PCR)

BALIKLARIN VİBRİOZİSİ için Pozitif, (Analiz Metodu : Konvansiyonel kültürel metod) Açıklama kısmında "Hastalık teşhisi için gönderilen 5 adet balıkların nekropsileri yapıldıktan sonra iç organlarından Kanlı Agar, TSA, TCBS'ye yapılan ekimler neticesinde bakteri üremesi gözlendi. Bakteri izolasyonu yapılarak Vitek 2 compact cihazı ile bakteri Aeromonas sobria olarak identifiye edildi" ifadesinin yer aldığı,

- PARAZİTOLOJİK TARAMA için Pozitif, (Analiz Metodu : Makroskobik Muayene (Taranma Metot Birliği) Açıklama kısmında "Gelen 5 adet balık numunesi balık (numuneleri yönünden) taranmış olup Monogenea paraziti tespit edilmiştir" ifadesinin yer aldığı,

- KOİ HERPES VİRUS HASTALIĞI için Negatif, (Analiz Metodu : Real Time PCR)

- ZEHİRLİ MADDE (PESTİSİT) için Negatif, (Analiz Metodu : GC-MS) açıklama kısmında "RAPOR EKİNDE BELİRTİLEN PESTİSİTLER TESPİT EDİLEBİLİR DÜZEYDE BULUNAMADI" bilgisinin verildiği,

SAZANLARIN BAHAR VİREMİSİ için Negatif, (Analiz Metodu : Hücre kültürüne etken identifikasyonu)

- Açıklama kısmında "Viral Balık Hastalıkları yönünden referans olan İzmir Bornova Veteriner Kontrol Enstitüsü Viroloji Laboratuvarının analiz sonucu ektedir" ifadesinin yer aldığı

görülmüş, 2 sayfalık Toksikoloji Laboratuvarı sonuçları tablosunda tüm aranan parametreler için "Tespit edilebilir düzeyde bulunamadı" ifadesinin, **Karar** kısmında "Gönderilen Balık numunesinde toksikolojik olarak yukarıdaki tabloda belirtilen PESTİSİTLER TESPİT EDİLEBİLİR DÜZEYDE BULUNAMADI" ifadesine yer aldığı görülmüştür.

Yukarıdaki sonuçlardan, balıklarda kimyasal bir zehirlenmenin etkisinin görülmediği, biyolojik bir kirlenme olduğu yönünde tespitler yapıldığı anlaşılmıştır.

**3.e mülü kayıtta pdf sayfa 2323-2337 da yer alan Balık Ölümleri hakkındaki diğer raporun incelenmesi;**

ERZİNCAN VALİLİĞİ İl Tarım ve Orman Müdürlüğü'nün, Tarım ve Orman Bakanlığı Hukuk Hizmetleri Genel Müdürlüğü'ne gönderdiği 20.03.2024 tarih ve E-81297481-140.99-13683117 sayılı yazıda balık ölümleri hakkında ;

"Ancak toplanan (resmi) bilgi ve belgelerden farklı olarak toprak kayması olayı ile ilgisi olup olmadığı bilinmeyen, en yakın kara sınırı toprak kaymasının meydana geldiği yere yaklaşık 2 km uzaklıkta bulunan (Erzincan) Bağıştaş-1 HES Baraj Gölü' nde, farklı gün ve farklı lokasyonlarda balık ölümlerinin meydana gelmesinden dolayı, İl ve İlçe Müdürlüklerimiz ile Elazığ Su Ürünleri

Sayfa **237 /**



SWORN
TRANSLATION

Araştırma Enstitüsü Müdürlüğünce saha kontrolleri yapılmış, toplu balık ölümlerinin olmadığı, tek bir balık türünde ölümlerin gerçekleştiği ve daha önceki yıllarda da yaşandığı belirtilen bu ölümlerin mevsimsel geçiş dönemlerinden ve balık hastalıklarından kaynaklanabileceği öngörülmüş, balık ölümlerine ilişkin kesin teşhis ve tanının saptanabilmesi için sahadan balık ve su numunesi alınarak analiz yaptırılmak üzere ilgili Laboratuvar ve Enstitü Müdürlüklerine gönderilmiş, analiz sonuçlarının bir kısmı İl Müdürlüğümüze ulaşmışken bir kısmı ise henüz ulaşmamıştır. İkinci konu balık ölümlerine ilişkin elimizdeki tüm çalışmalar, bilgi ve belgeler yazımız ekinde paylaşılmaktadır."

şeklinde ifadelere yer verilmiş olduğu, İl Tarım ve Orman Müdürlüğünce hazırlanan raporların ek olarak verildiği. Raporlar içerisinde balık ölümleri hakkında raporların yanısıra, Bağıştaş – I Baraj Gölü'nden alınmış su numunelerine ait analiz sonuçlarının da verildiği, ayrıca Elazığ Su Ürünleri Araştırma Enstitüsünün raporlarına da yer verildiği görülmüştür.

Balık ölümünü değerlendirme formunda (Ek-1 olarak verilmiş) ölüm sebebi olarak "hastalıklardan" olduğu, "belirli kirletici bulunmadığı" notunun yer aldığı, ölçüm tarihinin 05.03.2024, saatin 8.45, Çözünmüş Oksijenin 11,2 mg/L, İletkenliğin 540 µS/cm, su sıcaklığının 8,1 °C "kaya kesitlerde olmak üzere baraj sahası genelinde ölümlere rastlanılmış" olduğu bilgisinin yer aldığı görülmüştür.

Genel Müdürlük Makamına sunulan Bilgi Notu'nda da, "ölümlerin 27.02.2024 – 05.03.2024 tarihleri arasında meydana gelen 8 günde 109 civarında balık ölümünün olduğu, ölümün toplu halde olmadığı yetişkin ve ileri yaştaki yetişkin (2-7 kg arasında) pullu ve aynalı sazan ölüsünün barajın farklı noktalarında yüzeye çıktığı bilgisinin edinildiği, inceleme günü suyun renginde ve kokusunda anormallik gözlenmediği, balık ölümlerinin azalarak devam ettiği, ölümlere neden olacak bir etkenin kesin olarak tespit edilemediği, su ve balık numunelerinin ilgili laboratuvarlara gönderildiği" bilgisine yer verildiği görülmüştür.

Erzincan Gıda Kontrol Laboratuvar Müdürlüğü'nün 08.03.2024 Rapor Tarihli Muayene ve Analiz Raporunda; alınmış (Bağıştaş-I) alınmış su numunesinde amonyum, nitrit, nitrat, çözünmüş oksijen, elektrik iletkenlik, fekal koliform, pH, toplam askıda katı madde parametrelerinin analizlerinin yapıldığı, ancak sonuçları hakkında herhangi bir değerlendirme yapılmadığı görülmüştür.

*Bakılmış olan Kimyasal ve biyolojik parametreler ve bu parametrelere ait analiz sonuçlarından su ortamında herhangi bir kimyasal madde kirlenmesi (özellikle siyanür, arsenik ve diğer ağır metaller açısından) olup olmadığına dair bir sonucun çıkarılmasının mümkün olmadığı anlaşılmıştır.*

- Kimyasal madde ölçümlerinin de istendiği **analiz raporlarının incelenmesi : (3.c nolu kaynakta (alt-ayrıntı 2327)**

İliç Kaymakamlığı İlçe Tarım ve Orman Müdürlüğünün, Elazığ Veteriner Kontrol Enstitüsü Müdürlüğü'ne hitaben yazdığı 05.03.2024 tarih ve E-44473183-325.01-13498182 sayılı yazısında (Ek-2 ünvanlı ndf) sayfa 2327) :

"sebebi tespit edilemeyen sebebi ölümlerinin kesin tanı ve teşhisi için 05.03.2024 tarihinde alınan numunelerde (16 adet balık, 4 litre su) "Patojen (Bakteri, Virüs, Parazit vb.) Çözünmüş Oksijen (DO = mg/lt), Kirlilik Ağır Metal, Siyanotoksin, Fenol, Sodyum Siyanür (NaCN), Hidrojen



SWORN
TRANSLATION

Siyanür (HCN), Siyanojen Klorür (CNCl)" analizlerinin yapılarak balık ölümlerine sebep olan unsur/unsurların tespitinin istendiği görülmüştür.

Elazığ Su Ürünleri Araştırma Enstitüsü Müdürlüğü'nün Erzincan Valiliği İl Tarım ve Orman Müdürlüğüne gönderdiği 05.03.2024 tarih ve E-16933810-145-13442160 sayılı yazıda (Ek-2 dosyalı pdf sayfa 2329);

"27.02.2024 tarihinde ihbar üzerine İliç İlçesi Bağıştaş HES-1 Baraj Gölünde balık ölümlerinin araştırılması için su (4 istasyon) ve balık numureleri (3 adet) alındığı (rapor ekinde Ek-2 olarak verilmiş), mahalinde doğrultusunda yapılan su analizleri (rapor ekinde Ek-1 olarak verilmiş) neticesinde canlı balıklar için öldürücü etkiye sahip herhangi bir değere rastlanmadığı, ayrıca enstitüde altın, siyanür vb analizlerin yapılmadığı, balıkların dış muayenesinde herhangi bir hastalık, enfeksiyon ve enfestasyon belirtisine rastlanmamakla beraber ayrıntılı analizler için daha fazla numuneye ihtiyaç duyulduğu, yeterli sayıda numunenin hastalık tespiti için Elazığ Veteriner Kontrol Enstitüsü Müdürlüğüne gönderilmesinin uygun olacağı" bilgilerine yer verildiği görülmüş, ancak bir önceki yazıdan (pdf sayfa 2339), yeterli sayıda numune gönderildiği anlaşılmıştır. Yazı ekinde verilmiş Elazığ Su Ürünleri Araştırma Enstitüsü Müdürlüğü'nün yapığı su analiz raporu incelendiğinde, 4 ayrı noktada (Baraj gövdesi, Dostal, Çöpler Köyü, Mevcut mendi noktalar) yapılmış analiz parametrelerinin bilinen klasik su kalitesi parametreleri olduğu, bu parametrelerden hareketle kimyasal kirlenme olup olmadığına dair bir değerlendirme yapılabilmesinin mümkün olmadığı anlaşılmıştır.

Rapor hakkında bir uzman raporu, kullanılan analiz metodları ve analiz sonuçlarının ifade ediliş şekli açısından değerlendirildiğinde, analiz metodlarının standart metodlar olarak ifade edilmemiş oldukları (başka bir ifadeyle, ölçümlerin standart metodlara göre yapılmadığı), ayrıca pH, iletkenlik ve askıda katı parametreleri için gravimetrik analiz metodunun (tartım esasına dayalı bir metod) yazılmış olmasının hatalı bir ifade olduğu (buna rağmen sonuçların mertebe olarak normal bir su kalite değerlerini gösterdiği), bazı analiz sonuçlarının da anlamlı rakamlarla ifade edilmemiş oldukları (örneğin klorür veya sülfat için analiz hatasının %1 olduğu kabul edilecek olsa, virgülden sonra o rakamla verilmiş olmasının bir anlamının olmadığı), ancak sonuçlarının analitik kontrollerle elde edilmiş olması halinde de, numunelerin normal bir baraj suyu kalitesi gösterdiği anlaşılmıştır.

### 5.5.4. ANKALAB-FUTAS-ARTEK ÇEVRE LABORATUVARLARININ ANALİZ SONUÇLARININ DEĞERLENDİRİLMESİ

NOT (yukarıdaki tablolarda verilen analizlerin ANKALAB ve ARTEK işbirliği ile yapılmış olduğu, ARTEK-ALAN numune alma ve pH ölçümleri yaptığı, diğer tüm parametrelerin ARTEK tarafından yapılmış olduğu görülmüştür.

Değerlendirme

Toplam Siyanür parametresi için YSKY'de YO-ÇKS için 1,2 µg/L ve MAK-ÇKS için 6 µg/L değerlerinin verilmiş olup, aşağıdaki tablolarda verilmiş <0,02 mg/L (20 µg/L) değeri ile kıyaslandığında, verilmiş tayin limitlerinin, kalite standartlarının üzerinde olduğu, dolayısıyla numunelerdeki toplam siyanürün 20 µg/L nin altında olduğu anlaşılmakta, ancak, 1,2 µg/L veya 6 µg/L değerlerinin de altında olup olmadığı anlaşılmamaktadır.



SWORN
TRANSLATION

Diğer parametreler için de kıyaslama yapıldığında, tümünün çevresel kalite standartlarının üzerinde oldukları görülmüştür.

Toprak numuneleri için analiz sonuçları incelendiğinde, bazı parametrelerde SF-10, bazı parametrelerde ise SF-1 kabulüne göre sınır değerlerin aşılmış oldukları görülmüştür.



Sayfa **240** /

5.5.4.1.Su numune sonuçları : (Numunelerin alındığı tarih : 14.02.2024)

| PARAMETRE | BİRİM | 240215132943709 (5 numaralı) | 240215132943975 (8 numaralı) | 240215132943820 (9 numaralı) | YSKY* Tablo 4: Çevresel Kalite Standartları | | KULLANILAN METOT |
|---|---|---|---|---|---|---|---|
| | | | | | YO-ÇKS (mg/L) | MAK-ÇKS (mg/L) | |
| Serbest siyanür | mg/L | <0,02 | <0,02 | <0,02 | 0,0012 | 0,006 | SM 4500 CN⁻ E |
| Toplam Siyanür | mg/L | <0,02 | <0,02 | <0,02 | - | - | SM 4500 CN⁻ E SM 4500 CN⁻ C |
| Zayıf asitte Çözünebilen Siyanür (Wad Siyanür) | mg/L | <0,02 | <0,02 | <0,02 | - | - | SM 4500 CN-C,E,I |
| *Arsenik | mg/L | 0,017 | 0,019 | 0,296 | 0,053 | 0,053 | EPA 200.7 |
| *Bakır | mg/L | 0,021 | 0,016 | 0,109 | 0,0016 | 0,0031 | EPA 200.7 |
| *Çinko | mg/L | 0,036 | 0,026 | 0,019 | 0,0059 | 0,231 | EPA 200.7 |
| *Kadmiyum[1] | mg/L | <0,0005 | <0,0005 [2] | <0,0005 [3] | <0,00008 (Sınıf 1) | <0,00045 (Sınıf 1) | EPA 200.7 |
| *Krom Tayini | mg/L | 0,011 | 0,011 | 0,011 | 0,0016 | 0,142 | EPA 200.7 |
| *Kurşun | mg/L | 0,031 | 0,024 | 0,014 | 0,0012 | 0,014 | EPA 200.7 |
| *Nikel | mg/L | 0,027 | 0,019 | 0,021 | 0,004 | 0,034 | EPA 200.7 |

[1] ANKALAB raporlarında bu parametrenin Kadmiyum şeklinde yazılmış olduğu, işbildiği yapılan ARTPE Ltd. raporlarında Kadmiyum İfadesinin kullanıldığı görülmüştür. İşbu raporlarda Kadmiyum ifadesi kullanılmıştır.

[2] ANKALAB raporlarında 0,005 yazılmış değer. ARTLK değerlendirilmesinde 0,0005 yazılmış olduğunu YSKY karşılaştırmasında yapılan olduğu. ANKALAB raporlarında yazılan 0,005 değeri dikkate alınmıştır.

SWORN
TRANSLATION



5.5.4.2.Toprak numune sonuçları : (Numunelerin alındığı tarih : 14.02.2024)

| PARAMETRE | BİRİM | 240215133016043 (1 Numaralı Toprak) | 240215133016152 (2 Numaralı Toprak) | 240215133016262 (3 Numaralı Toprak) | 240215133016371 (4 Numaralı Toprak) | 240215133016484 (6 Numaralı Toprak) | 240215133016594 (7 Numaralı Toprak) | Ek-I deki Jenerik kirletici değeri* A-B | KULLANILAN METOT |
|---|---|---|---|---|---|---|---|---|---|
| Toplam Siyanür | mg/Kg | 7,88 | 0,72 | 15,94 | <0,5 | 15,75 | <0,5 | 5 – 0,5 ** | ISO 11262 |
| Arsenik | mg/Kg | 175,5 | 20,1 | 904,1 | 20,05 | 351,3 | 77,57 | 3 - 0,3 | EPA 3051A/EPA 200.7 |
| Bakır | mg/Kg | 412 | 45,64 | 902 | 37,41 | 813,8 | 86,67 | 514 - 51 | EPA 3051A/EPA 200.7 |
| Çinko | mg/Kg | 377,7 | 75,95 | 769,6 | 58,14 | 484,9 | 103,1 | 6811 - 681 | EPA 3051A/EPA 200.7 |
| Kadmiyum | mg/Kg | 2,498 | 0,36 | 4,096 | <0,2 | 2,394 | 0,268 | 27 - 3 | EPA 3051A/EPA 200.7 |
| Toplam Krom | mg/Kg | 8,384 | 163,9 | 33,03 | 40,31 | 9,4 | 16,5 | 900000 - 1 | EPA 3051A/EPA 200.7 |
| Kurşun | mg/Kg | 149,5 | 31,28 | 75,44 | 21,56 | 78,43 | 49,61 | 135 - 14 | EPA 3051A/EPA 200.7 |
| Nikel | mg/Kg | 16,41 | 362,6 | 22,46 | 84,78 | 11,74 | 16,5 | 13 - 1 | EPA 3051A/EPA 200.7 |
| Kobalt | mg/Kg | 5,091 | 21,3 | 10,72 | 7,232 | 5,732 | 2,16 | 5 – 0,5 | EPA 3051A/EPA 200.7 |
| Civa | mg/Kg | 0,764 | <0,5 | 2,636 | <0,5 | 0,811 | <0,5 | 3 – 0,6 | EPA 3051A/EPA 200.7 |
| pH | | 10,04 | 7,63 | 9,77 | 9,37 | 8,07 | 9,27 | - | |

* A : Kirleticilerin yeraltı suyuna taşınması ve yeraltı suyunu kirletici (mg/kg kuru madde)
SF×10 B : Kirleticilerin yeraltı suyuna taşınması ve yeraltı suyunu kirletici (kuru madde toprak) SF=1

Maling olan mesafenin 2m'den az olması, akiferin çözünür suya karışması fazla olması kayma faktörü SF "1" ; diğer durumlarda SF "10" olarak kabul edilmiştir.

* Siyanür için verilmiş değerdir.



*5.5.4.3.Su numune sonuçları : (Numunelerin alındığı tarih : 26.02.2024)*

| Parametre | Biri m | 240227133 445 797 (4 numaralı) | 240227133 445 359 (5 numaralı) | 2402271 334 45469 (6 numaralı) | 2402271 334 45906 (7 numaralı) | 240227133 446 015 (8 numaralı) | 2402271 334 45578 (9 numaralı) | 24022713344 56 87 (10 numaralı) | 24022713344 51 40 (11 numaralı) | 240227133 445 250 (12 numaralı) | YSKY* Tablo 4: Çevresel Kalite Standartları YQ-ÇKS (mg/L) | MAK-ÇKS (mg/L) | KULLANILAN METOT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Serbest siyanür | mg/L | <0,02 | <0,02 | <0,02 | <0,02 | <0,02 | <0,02 | <0,02 | <0,02 | <0,02 | 0,0012 | 0,006 | SM 4500 CN⁻ E |
| Toplam Siyanür | mg/L | <0,02 | <0,02 | <0,02 | <0,02 | <0,02 | <0,02 | <0,02 | <0,02 | <0,02 | - | - | SM 4500 CN⁻ E SM 4500 CN⁻ C |
| Zayıf asitte Çözünebilen Siyanür (Wad Siyanür) | mg/L | <0,005 | <0,005 | <0,005 | <0,005 | <0,005 | <0,005 | <0,005 | <0,005 | <0,005 | - | - | SM 4500 CN-C,E,I |
| *Arsenik | mg/L | 0,004 | <0,004 | 0,016 | 0,004 | 0,004 | 0,195 | 0,011 | 0,018 | 0,014 | 0,053 | 0,053 | TS EN ISO 15587-1,2 TS EN ISO 17294-1,2 |
| *Bakır | mg/L | 0,030 | 0,021 | 0,026 | 0,027 | 0,021 | 0,069 | 0,020 | 0,018 | 0,039 | 0,0016 | 0,0031 | TS EN ISO 15587-1,2 TS EN ISO 17294-1,2 |
| *Çinko | mg/L | 0,038 | 0,094 | 0,040 | 0,040 | 0,031 | 0,096 | 0,015 | 0,033 | 0,018 | 0,0059 | 0,231 | TS EN ISO 15587-1,2 TS EN ISO 17294-1,2 |
| *Kadmiyum | mg/L | <0,0002 | <0,0002 | <0,0002 | <0,0002 | <0,0002 | <0,0002 | <0,0002 | <0,0002 | <0,0002 | <0,00008 (Sınıf 1) | <0,00045 (Sınıf 1) | TS EN ISO 15587-1,2 TS EN ISO 17294-1,2 |
| *Krom Tayini | mg/L | 0,012 | 0,014 | 0,014 | 0,016 | 0,013 | 0,016 | 0,015 | 0,017 | 0,015 | 0,0016 | 0,142 | TS EN ISO 15587-1,2 TS EN ISO 17294-1,2 |
| *Kurşun | mg/L | 0,0012 | <0,001 | 0,008 | 0,0021 | 0,0011 | 0,080 | 0,0001 | 0,0016 | <0,0014 | 0,012 | 0,14 | TS EN ISO 15587-1,2 TS EN ISO 17294-1,2 |
| *Nikel | mg/L | 0,018 | 0,059 | 0,012 | 0,019 | 0,015 | 0,030 | 0,008 | 0,008 | 0,014 | 0,004 | 0,051 | TS EN ISO 15587-1,2 TS EN ISO 17294-1,2 |



SWORN TRANSLATION

### 5.5.4.4.Toprak numune sonuçları : (Numunelerin alındığı tarih : 26.02.2024)

| PARAMETRE | BİRİM | 240227133557154 (1 Numaralı Toprak) | 240227133557260 (2 Numaralı Toprak) | 240227133557369 (3 Numaralı Toprak) | Ek-1 deki Jenerik kirletici değeri* A – B | KULLANILAN METOT |
|---|---|---|---|---|---|---|
| Toplam Siyanür | mg/Kg | <0,5 | <0,5 | <0,5 | 5 – 0,5 ** | ISO 11262 |
| Arsenik | mg/Kg | 20,88 | 18,28 | 142,3 | 3 - 0,3 | EPA 3051A/EPA 200.7 |
| Bakır | mg/Kg | 59,27 | 24,51 | 90 | 514 - 51 | EPA 3051A/EPA 200.7 |
| Çinko | mg/Kg | 200,2 | 53,83 | 44,46 | 6811 - 681 | EPA 3051A/EPA 200.7 |
| Kadmiyum | mg/Kg | 1,737 | 0,651 | 1,074 | 27 - 3 | EPA 3051A/EPA 200.7 |
| Toplam Krom | mg/Kg | 120,9 | 63,92 | 6,196 | 900000 - 1 | EPA 3051A/EPA 200.7 |
| Kurşun | mg/Kg | 67,94 | 12,49 | 34,51 | 135 - 14 | EPA 3051A/EPA 200.7 |
| Nikel | mg/Kg | 162,3 | 92,83 | 10,81 | 13 - 1 | EPA 3051A/EPA 200.7 |
| Kobalt | mg/Kg | 20,31 | 11,03 | 43,1 | 5 – 0,5 | EPA 3051A/EPA 200.7 |
| Cıva | mg/Kg | <0,5 | <0,5 | <0,5 | 7 - 0,5 | EPA 3051A/EPA 200.7 |
| pH | - | 7,56 | 7,58 | 7,33 | | |

* A : Kirleticilerin yeraltı suyuna taşınması ve yeraltı suyunun içilmesi (mg/kg fire kuru toprak) SF=10 B : Kirleticilerin yeraltı suyuna taşınması ve yeraltı suyunun içilmesi ( mg/kg fire kuru toprak) SF=1

Akifere olan mesafenin 3m den az olması, akiferin yutulduğuna k......... ya da kalitik kıymağı ........ ....... p,ayrısıma faktörü SF "1" diğe ......... SF "1" ....................

** Siyanür için verilmiş değerdir.

SWORN
TRANSLATION



SWORN
TRANSLATION

### 5.5.5. FEBAS ÇEVRE LABORATUVARI ANALİZ SONUÇLARI

Belge No : 3.a (pdf sayfa 1188-1212)

İLIÇ Kaymakamlığı İlçe Jandarma Komutanlığının 14 Şubat 2024 tarihli yazısından FEBAS Çevre Lab Analiz San ve Tic. Ltd. Şti. isimli firmaya su ve toprak analiz talebinde bulunulduğu, AFAD elemanları tarafından alındığı belirtilen 6 adet toprak, 3 adet su numunesinde aşağıdaki tabloda belirtilen analizlerin yapılmasının istendiği görülmüş, 14.02.2024 tarihli numune alma tutanağından, numune alınan yerlere ait açıklamaların ;

Toprak numuneleri

1- Kontamine topraktan alınan numune (39.431208 – 38.547548 koordinatlarından saat 10.30 de alınan numune)

2- 1 nolu numunenin yaklaşık 30 metre yakınındaki kontamine olmayan topraktan alınan numune

3- Kontamine topraktan alınan numune (39.431981 – 38.547382 koordinatlarından saat 11.06 da alınan numune)

4- 3 nolu numunenin yaklaşık 30 metre yakınındaki kontamine olmayan topraktan alınan numune.

Su numunesi

5- Su birikintisinden alınan su numunesi (39.443211 – 38.538665 koordinatlarından saat 12.11 de alınan numune)

Toprak numunesi

6- Kontamine topraktan alınan numune (39.428320 – 38.538206 koordinatlarından saat 12.11 de alınan numune)

7- 6 nolu numunenin yaklaşık 30 metre yakınındaki kontamine olmayan topraktan alınan numune

Su numunesi

8- Fırat nehrinden alınan su numunesi (39.450985 – 38.535057 koordinatlarından saat 12.30 da alınan numune)

9- 8 nolu numunenin yaklaşık 30 metre yakınındaki maden sahasından akan dere yatağından alınan su numunesi

Değerlendirme

Yukarıda bölümde verilmiş (ANKA vd laboratuvarların analiz sonuçları) su analiz sonuçları içerisinde serbest siyanür için tayin limiti <0,02 mg/L şeklinde verilmiş, ancak FEBAS laboratuvar analiz sonuçlarında tayin limiti <0,005 mg/L şeklinde verildiği görülmüştür. Oysa, her iki tablodan da görüleceği üzere, analiz yöntemleri aynı olmasına rağmen, tayin limitlerinin birinde 20 µg/L, diğerinde 5 µg/L verilmiş olmasının gerekçesine ulaşılamamıştır.

Su analiz sonuçlarının çevresel kalite standartları ile kıyaslanmasında, çoğu parametrede değerlerin altında çıktıkları görülmüştür.



Sayfa **20** /

### 5.5.6.1 Su analiz sonuçları (Numune alma tarihi : 14.02.2024)

| PARAMETRE | BİRİM | Numune No : N-0402/24 (5 nolu nokta) | Numune No : N-0403/24 Su (8 nolu nokta) | Numune No : N-0404/24 Su (9 nolu nokta) | YSKY* Tablo 4: Çevresel Kalite Standartları | | KULLANILAN METOT |
|---|---|---|---|---|---|---|---|
| | | | | | YO-ÇKS (mg/L) | MAK-ÇKS (mg/L) | |
| Toplam Siyanür | mg/L | <0,005 | <0,005 | <0,005 | 0,0012 | 0,006 | SM 4500 CN-C SM 4500 CN-E |
| Serbest siyanür | mg/L | <0,005 | <0,005 | <0,005 | - | - | SM 4500 CN-E |
| Zayıf asitte Çözünebilen Siyanür | mg/L | <0,005 | <0,005 | <0,005 | - | - | SM 4500 CN-C SM 4500 CN-I |
| Arsenik | mg/L | <0,001 | <0,001 | 0,112 | 0,053 | 0,053 | |
| Bakır | mg/L | 0,006 | 0,006 | 0,015 | 0,0016 | 0,0031 | |
| Çinko | mg/L | 0,012 | 0,012 | 0,007 | 0,0059 | 0,231 | |
| Kadmiyum | mg/L | <0,0002 | <0,0002 | <0,0002 | <0,00008 (Sınıf 1) | <0,00045 (Sınıf 1) | TS EN ISO 15587 1,2 TS EN ISO 17294-1,2 |
| Toplam Krom | mg/L | 0,022 | 0,015 | 0,013 | 0,0016 | 0,142 | |
| Kurşun | mg/L | <0,001 | <0,001 | <0,001 | 0,0012 | 0,014 | |
| Nikel | mg/L | <0,002 | <0,002 | <0,002 | 0,004 | 0,034 | |

* YERÜSTÜ SU KALİTESİ YÖNETMELİĞİ (Değişik:RG-03/2016-29979)

SWORN TRANSLATION



## 5.5.6.2 Toprak analiz sonuçları (Numune alma tarihi : 14.02.2024)

| PARAMETRE | BIRIM | Kontamine toprak Numune No : N-0405/24- Toprak (1 nolu nokta) | Referans toprak Numune No : N-0406/24- Toprak (2 nolu nokta) | Kontamine toprak Numune No : N-0407/24- Toprak (3 nolu nokta) | Referans toprak Numune No : N-0408/24- Toprak (4 nolu nokta) | Kontamine toprak Numune No : N-0409/24- Toprak (6 nolu nokta) | Referans toprak Numune No : N-0410/24- Toprak (7 nolu nokta) | Ek-1 deki Jenerik kirletici değeri ** A-B | KULLANILAN METOT |
|---|---|---|---|---|---|---|---|---|---|
| pH | - | 8,57 | 8,38 | 9,02 | 7,67 | 8,76 | 8,35 | - | TS ISO 10390 |
| Arsenik | mg/kg | 124 | 11,8 | 657 | 30,8 | 237 | 110 | 3 - 0,3 | |
| Kadmiyum | mg/kg | 2,86 | 0,528 | 2,63 | 0,487 | 4,10 | 1,0 | 27 - 3 | |
| Kobalt | mg/kg | 3,31 | 17,1 | 7,12 | 6,39 | 5,68 | 1,26 | 5 – 0,5 | |
| Toplam Krom | mg/kg | 4,15 | 63,4 | 11,1 | 33,5 | 12,2 | 4,08 | 900000 - 1 | |
| Bakır | mg/kg | 244 | 27,2 | 495 | 39,6 | 563 | 51,8 | 514 - 51 | |
| Civa | mg/kg | <0,1 | <0,1 | 0,582 | < 0,1 | 0,392 | < 0,1 | 3 – 0,6 | EPA 3051 A EPA 6020 B |
| Kurşun | mg/kg | 49,2 | 32,1 | 53,2 | 14,6 | 113 | 79 | 135 - 14 | |
| Cinko | mg/kg | 287 | 38,4 | 489 | 36,7 | 280 | 68 | 6811 - 681 | |
| Nikel | mg/kg | 14,1 | 7,37 | 18 | 72,7 | 16,5 | 10,7 | 12 - 1 | |
| *Toplam Siyanür | mg/kg | 4,95 | <0,4 | 17,32 | <0,4 | 20,18 | <0,4 | 5 – 0,5 *** | EPA 9013 A, EPA 9010 C, EPA 9014 |

\* İşbirliği kapsamında ALKA Lab tarafından yapılan analiz

\*\* A : Kirleticilerin yeraltı suyuna taşınması ve yeraltı suyunun içilmesi
(mg/kg fırın kuru toprak) SF=10 B : Kirleticilerin yeraltı suyuna
taşıtması ve yeraltı suyunun içilmesi (mg/kg fırın kuru toprak) SF=1

Akifere olan mesafenin 3m'den az olması, akiferin çatlaklı veya karstik olması ya da kirlilik kaynağı alanının 10 hektar veya daha büyük olması koşullarından herhangi birinin geçerli olması halinde seyrelme faktörü SF "1" ; diğer durumlarda SF "10" olarak kabul edilmelidir.

\*\*\* Siyanür için verilmiş değerler.

SWORN
TRANSLATION

**6.** MADEN İŞ KAZASI OLAYININ İZİN BELGELERİ, OLAY YÖNETİMİ VE KUSURLULAR KAPSAMINDA DEĞERLENDİRİLMESİ

Erzincan İli İliç ilçesinde faaliyet gösteren Anagold Madencilik San. ve Tic. A.Ş. firmasının Çöpler Kompleks Maden Sahasında yürüttüğü madencilik faaliyetleri içerisinde yer alan Yığın Liçi (Heap Leach) sahasında meydana gelen kayma sonucu siyanürlü toprak malzemenin alıcı ortamlarda (su, toprak ve hava) çevre kirlenmesine sebep olup olmadığı hakkında, özel ve resmi kurumlar tarafından yapılmış analiz sonuçlarının incelenmesi ve değerlendirilmesi neticesinde ;

- Yüzeysel su kaynaklarında, YO-ÇKS ve MAK-ÇKS değerlerinin bazı parametrelerde aşılmayoluduğu,

- Yeraltı sularında, YO-ÇKS ve MAK-ÇKS değerlerinin bazı parametrelerde aşılmış olduğu,

- Saha ve yakın çevresinden alınan toprak numunelerinde, jenerik kirletici değerlerin bazı parametrelerde aşıldığı,

- Saha ve yakın çevresinde hava ortam numunelerinde, PM10 parametresi açısından sınır değerlerin aşılmış olduğu, diğer parametreler açısından bir sorun olmadığı, filtrede ölçüldüğü belirtilen ağır metal konsantrasyonları için kullanılan birim (µg/filtre) farklılığından dolayı, ilgili yönetmelikler kapsamında bir değerlendirme yapılabilmesinin mümkün olmadığı,

- Alıcı ortamlarda, ilgili yönetmeliklerdeki sınır değerlerin bazı parametreler açısından aşılmış olması sebebiyle, çevre kirlenmesinin meydana geldiği,

kanaatine varılmıştır.

## 6.1. İZİN BELGELERİNİN DEĞERLENDİRİLMESİ

- Bölüm 5.5 da detaylı olarak verildiği üzere 2021 ÇED Raporunda alıcı ortamlarda bazı kirletici parametrelerin sınır değerlerinin üzerinde olmasına rağmen ÇED izni verildiği görülmektedir. Raporda özellikle civa parametresinin alıcı ortamlarda yüksek olması faaliyetin kapasitesinin yüksek olduğunu gösterir niteliktedir. Buna rağmen kapasite artışına gidilmiştir.

- ÇŞİB'nın 07.10.2021 tarih ve E-20289998-220.01-1917939 sayılı ve 847, 49729 ve 20067313 Ruhsat Nolu Çöpler Kompleks Madeni 2. Kapasite Artışı ve Flotasyon Tesisi Projesi ÇED Olumlu Kararı konulu yazısında; Erzincan İli, İliç İlçesi, Çöpler Mevkii'nde, Anagold Madencilik San. ve Tic. A.Ş. tarafından yapılması planlanan Çöpler Kompleks Madeni 2. Kapasite Artışı ve Flotasyon Tesisi projesi ile ilgili olarak Bakanlıklarına Çevrimiçi ÇED süreci Yönetim Sisteminden sunulan ÇED Raporunun, İnceleme Değerlendirme Komisyonu tarafından incelenerek değerlendirildiği, 2. Kapasite Artışı ve Flotasyon Tesisi hakkında ÇED Yönetmeliğinin 14.maddesi gereğince Bakanlığımızca "Çevresel Etki Değerlendirmesi Olumlu" Kararı verildiği, Ayrıca ÇŞİB'nın 11.03.2024 tarih ve E-72904274-622.03-8961893 sayılı Yazısı ile Maden Atık Yönetim Planı ve Maden Atık Bertaraf Tesisi, Yığın Liç Faz 4 Uygulama Projesi, Yığın Liçi Faz 4 Maden Atık Depolama Tesisi, Yığın Liç Faz 4B Uygulama Projesinin, Faz 4B/1.,2.,3. ve 4. Kısımlarının Atık Depolama tasarımları, Faz 4B Su Yapıları Denetim Firmasınca hazırlanan Nihai Denetim Raporunun onaylandığı ilgili dosya kapsamından anlaşılmaktadır.



SWORN
TRA...TION

## 6.2. OLAYIN YÖNETİMİ

Olay günü olayın gelişimi kısaca aşağıda özetlenmiştir.

Sabah mesai başlangıcında çatlakların işçiler ve süpervizörler tarafından fark edilmesi, whatsapp grubunda paylaşılması sonrası oksit baş mühendisi Murat Bayraktar ve üretim mühendisleri Kaan Murat Akpolat ve Şenol Demir konuyu saha toplantısında görüşürler. İSG Uzmanı Gizem Gazcı ve Çevre biriminde çalışan mühendis Recep Çalı'da sahaya gelirler. Radar verilerini takip/izleme ve değerlendirmekten sorumlu kıdemli geoteknik mühendisi Ali Rıza Kalender'e ve asistan mühendisi Berkay M... haber verilir. Murat Bayraktar Şenol Demir ve Kaan Murat Akpolat'a sahayı boşaltmaları ve yolu kapatmaları talimatı verir. Şenol Demir İş Güvenliği Departmanı, Bakım Departmanı, Oksit Proses Operasyon Departmanı, Sülfit Proses Operasyon Departmanı, Maden Departmanı ve Arugai firması bünyesinde çalışan tüm çalışanların bulunduğu İliç White isimli ortak mail grubuna yalnızca ikinci bir bildirime kadar kapatıldığına dair mail gönderir. K.M.Akpolat proje bölümünden Kıdemli Proje Mühendisi İshak Demir'e haber verir ve o da sahaya gelir. Saat 10:00 toplantısından sonra Murat BAYRAKTAR, İSG Başmühendisi Burak ARTAL, Çevre Müdürü Can Serdar HASTÜRK, Operasyon Başkan Yardımcısı IAIN GÜİLLE sahaya gelirler. A.R.Kalender öncesinde çatlakların oturma çatlağı olup çimento şerbeti ile doldurulması gerektiğini belirtir. Şenol DEMİR, Asistan Proses Mühendisi Elif REYHAN, ADR Şart süpervizörü Adnan KEKLİK, bunlara ... süpervizörü Soysal DOGAN, K.M. Akpolat yaptıkları toplantıda solüsyonun kesilmesine karar verirler ve Murat BAYRAKTAR'a iletirler; Operasyon Başkan Yardımcısı Ian B. Laulle ya ile de haber verilerek solüsyon kesilir (saat 13:00 suları). Solüsyon kesileceği bilgisini Adnan Keklik iletir. Bu sırada Ali Rıza Kalender'den işin durması gerektiğine ilişkin mail gelir. K.M.Akpolat, E.Reyhan, Patrick Valko, Alien ve Johnatan sahaya gözlem amaçlı gelirler. Kenan Öz, Ramazan ÇİMEN, Soysal DOGAN, İshak DEMİR ve İsa Taşdelen saha denetimi yapmaktadır. K.M. Akpolat, Soysal DOGAN, İshak DEMİR ve İsa Taşdelen'e fotoğraf çekimi görevi verir. Kaan Murat Akpolat'ın fotoğraf çekimi için görevlendirmesi ile Soysal Doğan lift 33'e, Taşdelen ile İsa Demir ise lift 29'a giderler. Adanan Keklik, Kenan Öz ve Ramazan Çimen ise 29'da kalırlar, K.M.Akpolat, E.Reyhan, P.Valko ve diğer iki yabancı üst kotlara giderler. Bu sırada heyelan gerçekleşir Soysal Doğan koşarak heyelan alanı dışına çıkar diğer iki süpervizör Ian Taşdelen ve İsa Demir ise bir müktar toprak içinde kalsalar da kendi imkanları ile kurtulur. Kenan Öz, Ramazan Çimen ve Adnan Keklik'in bulundukları alanda heyelan alanı içinde kalır ve kurtarılamazlar. Bahattin Keklik, Hüseyin Kara, Şaban Yılmaz, Mehmet Kazar ve Abdurrahman Şahin ise olay boşalmakla birlikte konteynır içinde olduklarında konteynır ile birlikte heyelan alanı içinde kalır. ... gür Yıldız ise açık ocak madenciliği kapsamında kamyonla ilerlediği mevki... ocak sırasında heyelan bölgesi içinde kalır.

## 6.3. OLAYDA KUSURLU OLANLAR VE GEREKÇELİ KUSUR DEĞERLENDİRMESİ

Yukarıda ilgili bölümlerde yapılan inceleme, tespit ve değerlendirme sonucu faz 1,2,3 inşaatı sonrası çok daha elverişsiz koşullardaki topgrafya üzerinde kapasite artışına gidilmiş olması, ilgili koşullar kapsamında tasarımın projenin eksik ve yetersiz olması, proje denetiminde bu durumun göz ... olması, ... aşamasında stabilte takibinin son derece yetersiz/ihmalkar yapılması ve son olarak olay günü sabah erken saatlerde uyarı veren heyelan olayının gerçekleşme saatine (13:00) kadar iyi yönetilmemiş olması olayın asli sebepleri olarak değerlendirilmiştir.



SWORN
TRANSLATION

Olayda en etkin husus proje yönetiminin son derece yetersiz olması ve olay günü uyarı vermiş olan heyelan boyutunun doğru tahmin edecek ve yönetecek mekanizmanın kurulmamış olmasıdır.

Meydana gelen olayda aşağıda kusur atfedilen kişiler kusur gerekçeleri ile aşağıda tek tek verilmiştir.

**John HARMSE (SSR, Global Projeler Başkan Yardımcısı) :**

Görev tanımı içerisinde "SSR bünyesinde, şirketin global projelerinin hayata geçirme sürecinde liderlik etmek, proje ekibini yönetmek..., Projeleri, proje kontrol standartları ve prosedürleri ve ilerleme ölçümü, tahmin ve raporlama standartları ve prosedürleri dahil olmak üzere proje kontrolleri ve proje yönetimi standartları çerçevesi geliştirmek ve uygulamak.... Proje sürecinde ilgili taraflarla etkili iletişim kurmak, paydaşlar arasında uyum ve iş birliğini teşvik etmek., Proje ilerlemesini düzenli olarak raporlamak, finansal ilerlemesini incelemek, performansı değerlendirmek ve yönetimle paylaşmak. Proje güvenliğini, çevreyi ve riskleri şirket politikalarına göre yönetmek..." bulunmakta olup proje yönetimi doğrudan görevi olup proje kapsamında proje yöneticisi olmaması, yetki devirlerinin belirlenmemiş olması, proje risklerinin belirlenmemiş olması gereğince projenin doğru yönetilmemiş olmasından **ASLİ KUSURLU.**

**Cengiz Yalçın DEMİRCİ (Anagold Ülke Müdürü, Anagold YK Bşk.):**

İfadesinde teknik konulardan sorumlu olmayıp idari konulardan sorumlu olduğunu belirtmektedir. Ancak organizasyon şeması ve görev tanımı incelendiğinde SSR Mining Şirketi bünyesindeki Operasyonlar ve Sürdürülebilirlik Başkan Yardımcısı Bill Mc Nevin'a na bağlı çalıştığı ve raporlama yaptığı görev tanımı içinde "Şirket ortakları arasındaki iletişim ve koordinasyonun sağlanması, şirket ortaklarının şirketin üst düzey işleyişi ile ilgili bilgilendirmelerin yapılması ve işbirliğinin sağlık edilmesi... Şirket direktörlerinden aldığı üst düzey bilgilerin ortak şirket yetkilileri ile paylaşılması, alınan kararların yine şirket direktörlerine aktarılması,..." bulunduğu görülmekte olup Olay günü olayın durum kendisine bildirilmiş olmasına rağmen ciddi bir iletişim ve yönetim mekanizmasının kurulmamış olması gereğince olayı yönetememiştir. Ayrıca risk durumu yönetmeye çalıştığını ifadesinde de belirtmiştir. Durumu üst amiri Bill Mc Nevin'a iletmişse ve çeşitli kişilerle görüşmüşse de geç kalınmış, aksiyon alınamamıştır. Görev tanımında bulunan iletişim ve koordinasyon konusunda yeterli mekanizmanın kurulmamış olmasından kaynaklı **ASLİ KUSURLU** addedilmiştir.

**Iain Ronald GULE (Anagold, Operasyon Başkan Yardımcısı):**

Ülke Müdürü Cengiz Yalçın Demirci ve bağlı çalışmakta olup teknik konularda ise Üst Düzey Başkan Yardımcısı Bill Mc Nevin'a rapor vermektedir. Olay günü de Bill Mc Nevin'a bilgi vermiştir. Görev tanımı içinde "Maden operasyonu üretim stratejilerin belirlenmesi, Genişleme projelerinin akışı ve tasarı... Şirketin büyüme ve gelişme hedefleri doğrultusunda, maden sahasının geliştirilmesi ve işletmeye alınması için projelerin hazırlanması, bütçelenmesi ve yönetilmesi, Kendisine rapor eden ekibin performansının düzenli olarak değerlendirilmesi ve gerektiğinde yönlendirilmesi, eğitilmesi, Operasyonların etkinliği, verimliliği ve sürdürülebilirliği için gerekli önlemlerin alınması ve iyileştirme stratejilerinin belirlenmesi, aylık risk, bütçe ve yönetim toplantılarının yönetilmesi ve bu toplantıların yönetilmesi.." yer almakta olup doğrudan proje takibinden,

yönetiminden. İlerleden, operasyon etkinliğinden ve önlem almaktan sorumludur. Olay günü de kendisine bilgi verilmiş olmasına rağmen İSG müdürlüğü de görev alanı kapsamında olmakla daha önce de bahsedildiği gibi doğru işleyen bir risk planlaması yapılarak acil yönetim planı oluşturulması olduğundan olayı yönetememiştir. **ASLİ KUSURLU** addedilmiştir.

<u>Shaun SCHWARTZ</u> (Anagold, **Sürdürülebilir Yatırım Projeleri Müdürü**) :

SSR Mining Şirketi bünyesindeki Global Projeler Başkan Yardımcısı bağlı çalışmakta olup görev tanımı içinde "Proje geliştirme süreçlerine liderlik edilmesi, etkili denetimi ve idaresinin sağlanması, Projelerin etkin yönetilmesi, idaresi, yönlendirilmesi ve izlenmesi, Yatırım projelerinin geliştirme hedefine ulaşırken güvenli ve verimli şekilde tüm çalışmaların sürdürülmesi ve kilit paydaş beklentilerinin karşılanması. …Proje performansını sürdürmek için kaynakların belirlenmesi ve ekip seçiminin sağlanması, <u>operasyon ve alt yüklenici yönetimi</u>,… Şirket standartlarına, yönetimine ve temel değerlerine uyulmasının ve denetim yapılmasının sağlanması, Proje geliştirme <u>hedeflerine</u> (maliyet programı, kalite ve <u>güvenlik</u>) ulaşırken tüm proje ekibine <u>liderlik edilmesi, yönetilmesi ve izlenmesi</u>,… Proje geliştirme performansı, ilerlemesi, maliyet ile <u>Sağlık, Emniyet ve Çevre performansının sağlanması</u>, …" olup proje çalışmaları bakımından sorumludur. Bu kapsamda yukarıda ilgili bölümlerde <u>kontrol edilmesi ve raporlanması</u>, açıklanması üzere proje tasarım kriterlerinin takip edilmesi, izlenmesi, değerlendirilmesi konusunda yetersiz kaldığı, olası heyelen senaryoları değerlendirmediği ve ayrıca Faz 4 olarak genişletilmesine gidilmesine rağmen konteynırın iç alanı hemen altında topuk bölgesinin korunmamasından dolayı sırasında sorumlu olduğu gereğince **ASLİ KUSURLU** olduğu kanaatine varılmıştır.

<u>Luis DEHRINDONGH ve Vinh LUU LE</u> (**GRE Tasarım Mühendisleri**), Kevin GUNESCH (**GRE Kontrol Mühendisi**):

"2018.10.10 ISR Yıgın Liç Faz 4 Genişleme Proje Raporu" isimli dosyada yer alan GRE 27 Haziran 2018 tarihli Memorandum notu: "Konu: Çöpler HLF Faz 4 Stabilite Revizyonu"nda yeraldığı üzere yalnızca genel stabilitesindeki etkiler tatışmasında detaylı şekilde verildiği üzere tasarım revizlikdokleri kaynaklı hazırlayanlar ve denetleyenler olarak **ASLİ KUSURLU** addedilmişlerdir.

<u>Ali İhsan KALENDER</u> (Anagold, **Kıdemli Geoteknik Mühendisi**):

Maden Operasyon Direktörü altında yer alan Jeoteknik Biriminde kıdemli mühendis olarak çalışmaktadır. Operasyon alanları öncelikli olmak üzere tüm sahanın jeoteknik açıdan takibi ve izlenmesi, izleme cihazlarının konumlandırılacağı gerekli alanların tespit edilmesi, bu alanlara cihazların yerleştirilmesi, cihazların bakım ve onarımı, <u>Sahadaki jeoteknik risklerin ve bu risklerle ilgili alınması gereken önlemlerin belirlenmesi, bu önlemlerle ilgili yapılacak olan çalışmaların takibi ve kontrolü, Sahaya ait jeoteknik verilerin toplanması, analizi, kayıt altına alınması ve depolanması, Zemin deformasyonlarının tespit edilmesi ve operasyon birimlerine bilgi vererek gerekli önlemlerin alınmasının sağlanması, Erken uyarı sistemlerinin etkin olarak kullanılması, Tehlike ve Müdahale Yönelik Planı (TARP) dahilinde herhangi bir tehlikeye sebebiyet verecek durum halinde gerekli kişilerin bilgilendirilmesi ve gereken aksiyonların zamanında alınmasının sağlanması, ilgili raporların hazırlanması ve dağıtılması, Zemin Kontrolü Yönetim</u>



SWORN
TRANSLATION

Planının oygulanması, yönetimi ve güncellenmesi, Bölüm içi ve bölüm dışı alınacak eğitim ve danışmanlık hizmetlerinin planlanmasından" sorumludur. Meydana gelen olayda Ali Rıza Kalender öncesinde olanla birlikte olay günü radar verilerine ulaşmış, sahayı görmüş olup kıdemli jeoteknik mühendisi olarak heyelanın boyutunu/mekanizmasını tahmin edememiştir. Ayrıca sabah saatlerinde ölçüm TARP raporunda izin verilen değerlerin üzerine çıkmış olmasına rağmen yıkma çalışı olabileceği yönünde yanlış/eksik bilgilendirmede/değerlendirmede bulunmuştur, ayrıca jeoteknik açıdan kontrolü de sorumluluğu içindedir. Radar verileri ilgili olması gereken sorumlu yeterince değerlendirilmemiş olması olaya sebebiyet vermiştir. Ayrıca bu tip durumların bilgilendirme ve gerekli aksiyonların zamanında alınmasından da sorumludur. Ali Rıza Kalender **ASLİ KUSURLU** addedilmiştir.

Fuat YILMAZ (Anagold, Maden Operasyon Şefi):

Maden Operasyon Departmanında Maden Başmühendisine/Maden Müdürüne bağlı çalışmakta olup görev alanı içinde "Açık maden ocakları ve Çiftay A.Ş.'ye ait açık ocak faaliyetlerinin takip edilmesi, Maden vardiya mühendisleri ve delme patlatma mühendisinden rapor alınarak günlük madencilik faaliyetlerinin değerlendirilmesi, Çiftay A.Ş. tarafından fiziki olarak yapılan açık ocak delme patlatma kazı faaliyetlerinin maden vardiya mühendisleri ile gözlenmesi, ... açık ocak maden üretim metotlarının geliştirmesi, güvenli ve efektif bir şekilde tamamlanbilmesi amacı ile çalışanların yönlenmesi" yer almaktadır. Faz 5 inşaatı sırasında patlatmaların izin verilir değerler üzerine yapılması ve ocak içi stabilitesinin bozulması kaynaklı **ASLİ KUSURLU** addedilmiştir.

Muhammed KILIÇ (Anagold, Delme Patlatma Mühendisi):

Maden Operasyon Departmanında Maden Operasyon Şefine bağlı çalışmakta olup görev alanı içinde "Çiftay A.Ş.'ye ait olan maden açık ocaklarında yapılan delme ve patlatma faaliyetlerinin takibi, açık ocak delme ve patlatma faaliyetlerinin geliştirlmesi, güvenli ve efektif bir şekilde tamamlatabilmesi amacı ile çalışmaların yapılması, açık ocak patlatma paternlerinin dizaynı ve kontrolünün yapılması, açık ocak patlatma sırasındaki saha faaliyetlerinin kontrol ve takip edilmesi" yer almaktadır. Faz 5 inşaatı sırasında patlatmaların izin verilir değerler üzerine yapılması ve ocak içi stabilitesinin bozulması kaynaklı **ASLİ KUSURLU** addedilmiştir.

Ömer ARDIÇ (INR, Proje Koordinatörü):

Lisans sözleşmesi servis ortasında eskili olan "2018.10.10-INR-Yığın Liç Faz 4 Genişleme Proje Raporu" ve "2020.01.21-INR-Yığın Liç Faz 4B Genişleme Proje Raporu" daki proje hatalarından sorumlu proje koordinatörü olması gereğince, **ASLİ KUSURLU** addedilmiştir.

Selçuk ÇİFTLİ (İş Sağlığı ve İG Müdürü):

Operasyon müdürü yardımcısı ve İK müdürüne bağlı çalışmakta olup görev kapsamında "İş Sağlığı ve Güvenliği politikalarının oluşturması, Şirket tarafından belirlenen İş Sağlığı ve Güvenliği hedeflerine uygunluğun izlenmesi ve raporlanmasının sağlanması, İşyerinde yapılacak rutin ve rutin dışı tüm risk analizlerine İş Sağlığı ve Güvenliği birimi tarafından rehberlik edilmesi, İşyeri ve yapılan işlerin güvenliği için risk değerlendirmesi çalışmalarına İş Sağlığı ve Güvenliği biriminden katılım sağlanması, Risk değerlendirmesi sonucunda alınması gereken önlemler konusunda önerilerde bulunulması ve takibinin yapılmasının sağlanması, Çalışma ortamının periyodik olarak denetlenme



SWORN
TRANSLATION

planlamasının sağlanması, uygunsuzlukların giderilmesi için önerilerde bulunulması ve takibi, Uygunsuzlukların raporlanması, takibinin yapılması ve ilgililerin bilgilendirilmesi, 02.03.2019 tarih 30702 sayılı Resmi Gazetede yayınlanan "Büyük Endüstriyel Kazaların Önlenmesi ve Etkilerinin Azaltılması Hakkında Yönetmelik" Genel yükümlülükler, Güvenlik Raporu İle İlgili Hususlar, Acil Durum Planları, Çeşitli ve Son Hükümler başlıklarında belirlenen gerekliliklerin karşılanmasını sağlaması için önerilerde bulunulmasından" sorumludur. Proje departmanı ile işbirliği içinde 27.03.2022 tarihinde bir heyelan yaşanmış olduğu durumda ve yığın liçlerinde olası heyelen durumunun ciddi tehlike olduğu bilinir olmasına rağmen yeterli bir risk değerlendirmesi hazırlanmamış ve alınacak tedbirler belirlenmemiş TARP raporlarında sadece belirli deformasyon seviyeleri için uyarı kriterleri belirlenmiş ve eylem olarak "üst amire" bilgi verilmesi tanımlanmıştır. Olay günü de bu doğrultuda oksit birimi çalışanları ve diğer olay müdahilleri üst amirlerine haber vermekte ve kendi imkanları ile olayı yönetmeye çalışmışlardır. Olası heyelan durumunda ilgili günlük bazında acil önlem olarak alınacak tedbirler (yolların kapatılması ve sahanın tamamen boşalması, tüm çalışanlara haber verilmesinin sağlanması gibi) belirlenmemiştir. Bu kapsamda olası heyelan durumu için gerekli/yeterli acil önlem planı hazırlanmasını sağlamayan İSG müdürü ASLİ KUSURLU addedilmiştir.

**Bilfail NEVIN (SSR Üst Düzey Başkan Yardımcısı/Operasyonlar ve Sürdürülebilirlik):**

Görev tanımı içinde "Sürekli Çevre, Sağlık, Güvenlik ve Sürdürülebilirlik politikası ve standartlarının sürdürülmesi ve her bir iş birimi tarafından uygulanmasını sağlamak, Şirketin maden sahalarının her birinde operasyon ekiplerini ve yerel paydaş ilişkilerini geliştirmek.. " yer almaktadır. Operasyon Başkan Yardımcısı I.R.Guille teknik konularda kendisine bağlı çalışmaktadır. Maden alanında projenin doğru yönetileceği her birimin görev tanımının yetki/sorumluluğunun net olacağı mekanizmanın kurulmasını sağlamamış olmaktan kusurlu olarak TALİ KUSURLU addedilmiştir. Olay günü de I.R.Guiile ve C.Y.Demirci tarafından bilgisi olmasına rağmen geç kalınmıştır.

**Patrick ŢALKO (WSP Proje Kalite Güvence Müdürü):**

Proje Müdürü Trino Schwarz a bağlı çalışmakta olup ifadesinde İliç Çöpler Madeninde Anagold tarafından kurulan atık depolama tesisi genişletilmesi, Yığın Liç genişletilmesi, Yakuplu yolu inşaatı, zemin gemisle kalite güvence kontrollerini yapmakla görevli olduğunu, bölgenin boşaltılması veya operasyonu durdurma gibi görev ve yetkisi olmadığını ifade etmekle birlite sahanın riskli olduğunu öğrenmesi üzerine sahanın boşaltılması için ve bölgede bulunan Nural, Yesu taşıyıcılığı gibi yükleniçi şirketlere Anagold personelinin sahadan ayrılması için bilgilendirilmiş apayrı konuda tavsiyede bulunduğunu ifadesinde beyan etmektedir. Görüldüğü üzere verilen tavsiye ile dokümantasyonla olup acil eylem/durum planı bulunmamaktadır. Çalışmakta olduğu konu Yığın Liç Tesisinin kapasitesini inşaatı yapılan Genişleme Projesi Faz-5 Tesisinin Çevre Bakanlığından ruhsatını gereği, denetim hizmetlerini yapmak üzere, DSİ tarafından 067 numaralı izin belgesi ile sorumlutulması bu kapsamda Faz 5 Liç inşaatı sırasında yapılan patlatmalı kazı işlemlerinin yürütülmesinin denetlenmesi, bu etkilerin kontrol altında tutulması ve patlatma kaynaklı oluşan çevresel etkilerin sağlık açıdan olabilecek olası etkileri tespit edilmesi hususunda yeterli ileri tahmini yapılmadığından geç dönem ilime proje müdürü **M.Yusuf ÇELEN (WSP Proje Müdürü)** ile birlikte TALİ KUSURLU addedilmiştir. Aynı gerekçelerle faz 5 inşaatında gerekli denetimlerin



SWORN
TRANSLATION

yapılmasında yetersiz kalan Kalite Güvence **Mühendisleri Alkın YEŞİLTEPE, Emrah Ergon** Ahmet Furkan ELÇİ, Hasan Aydın, **Sertan Aydın TALİ KUSURLU** bulunmuştur.

Karahov Turan (Anagold, Proje Başmühendisi):

Sürdürülebilir Yönetim Projeleri Müdürüne bağlı çalışmakta olup görev tanımı içinde " Atık Depolama Tesisi ve Yığın Liç Sahası inşaat projelerinin (zemin hazırlığı, astarlama, dolgu yerleştirme ve sıkıştırma, drenaj sistemleri) yönetimi ve inşası tamamlanmış projelerin operasyon departmanlarına tesliminin sağlanması, İnşaat projelerinin, Sağlık, Güvenlik ve Çevre ile ilişkili risklerinin belirlenmesi ve riski azaltmak için yeterli kontrollerin yapılmasının sağlanması, Proje geliştirme hedeflerine (maliyet programı, kalite ve güvenlik) ulaşmak için proje ekibine liderlik edilmesi, yönetilmesi ve planması, Şirket standartlarına, politikalarına, prosedürlerine ve temel değerlerine uygulandığından devam yapılmasının sağlanması, Proje geliştirme faaliyetlerinin etkili iletişim ve koordinasyon sağlanması, Proje geliştirme performansı, ilerlemesi, maliyet ile Sağlık, Emniyet ve Çevre performansının sağlanması, kontrol edilmesi ve raporlanması,…" yer almaktadır. Görev kapsamında proje inşa edilmesinde yetersiz kaldığı/konteynırın riskli alanda konumlandırılması ile ilişkili olarak **TALİ KUSURLU** addedilmiştir.

İshak ASLAN (Anagold, Kıdemli Proje **İnşaat Mühendisi**) :

Proje biriminde mesul saha mühendisine bağlı çalışmakta olup görev tanımı içinde Yığın Liç Sahası inşaa projelerinin (zemin hazırlığı, astarlama, dolgu yerleştirme ve sıkıştırma, drenaj sistemleri) takibi, Mevcut alt yüklenicilerin talimatlara, tasarıma ve iş programına göre koordinasyonunun yapılması ve saha denetim yükümlendirme yapılması, Mevcut alt yüklenicilerin iş güvenliği ile ilgili uyumu çalışmalarının gözlemlenmesi ve üst amire bilgilendirme yapılması, …Dizayn ve kriterlerine göre alt yüklenici tarafından yapılan imalatın kontrolü ve üst amire bilgilendirme yapılması … " yer almaktadır. Projenin özellikle faz 5 sırasında yeterince izlenmemesi ve olay günü ev sahibi görevi dışında acil Valko talimatı ile sahayı boşaltmış olsa da heyelan boyutunun tahmin edilmemesi ve diğer alt yüklenicilerin yeterince bilgilendirmemesi gereğince **TALİ KUSURLU** addedilmiştir.

İzzet TEKİN (Anagold, Maden Jeoloji **Başmühendisi**) :

Maden Jeoloji Departmanında inşaat müdürüne bağlı çalışmakta olup görev tanımında "Maden Jeolojisi son veriler ile Simülasyon operasyon prosedürlerinin hazırlanması ve güncellenmesinin sağlanması ve yapılan çalışmaların uygulanmasının kontrolü,…" bulunmaktadır. Maden Müdürü Özcan İzge görevinin yerine bir gün önce Mehmet Türk'ün gelmesine kadar maden müdürlüğüne vekalet etmemiştir. Dolayısı ile vekalet kapsamında olayda yeterli önlemin alınmamasında olduğu ve üzerinde kadar verileri takip/izleme/değerlendirme sürecindeki eksiklik olması nedeniyle kusurlu bulunan **TALİ KUSURLU** addedilmiştir.

Berkay MISIR (Anagold, Asistan Geoteknik **Mühendisi**):

Operasyon Departmanı bünyesinde yer alan Jeoteknik Biriminde Ali Rıza Kalender'in asistan mühendisi olarak çalışmaktadır. Görev tanımı kapsamında "Operasyon alanları öncelikli olmak üzere tüm sahanın jeoteknik açıdan riski ve izlenmesinden sorumlu Kıdemli Jeoteknik Mühendisinin asiste edilmesi, Kıdemli Jeoteknik Mühendisi tarafından verilen görevlerin yerine getirilmesi, Sahaya ait

SWORN
TRANSLATION

jeoteknik verilerin toplanması, analizi, kayıt altına alınması ve depolanması hususunda Kıdemli Jeoteknik Mühendisine yol gösterilmesi ile gerekli dokümantasyon işlemlerinin yerine getirilmesi, Jeoteknik raporların hazırlanması ve dağıtılmasından sorumlu Kıdemli Jeoteknik Mühendisinin asiste edilmesi, Jeoteknik verilerin ve raporların düzenlenmesi ve saklanmasından sorumlu Kıdemli Jeoteknik Mühendisinin asiste edilmesi, Zemin Kontrolü Yönetim Planının uygulanması, yönetimi ve güncellenmesinden sorumlu Kıdemli Jeoteknik Mühendisinin asiste edilmesi" bulunmaktadır. Görev alanı göz önüne alındığında veri toplama, izleme ve kıdemeli geoteknik mühemdisine asisanlık yapması sağlığı anlaşılmaktadır. Olay günü öncesinde A.R.Kalender izinli olduğu süreçte yerine vekalet etmiş ve bu süreçte radar verileri uyarı vermiş olmakla birlikte yeterinde değerlendirilmediği için adı olan gerekçelerle **TALİ KUSURLU** addedilmiştir.

Ahmet YURDAŞAN (Ore Mineral Denetim Sorumlusu), Hayriye ÖNTÜRK GÜRSOY (Ore Mineral, Denetçi Mühendis), Talat Bülbül (Ore Mineral, Kontrol Mühendisi), Dindar Tosun (Ore Mineral, Kontrol Mühendisi):

Ore Mineral Sondaj İnşaat Mühendislik San. Tic. Ltd. Şti. Yığın Liçi Tesisi kapsamında inşaatı yapılan Genişleme Projesi Faz-5 Tesisinin Çevre Bakanlığı mevzuatı gereği denetim hizmetlerini yapmak üzere, DSİ tarafından 067 numaralı izin belgesi ile yetkilendirilmiştir. Bu kapsamda Faz 5 Liç inşaası esnasında sondan patlatmalı kazı işleminin çevresel etkilerin izlenmesi, bu etkilerin kontrol altında tutulması ve patlatma kaynaklı oluşan yersarsıntılarının yığın liçine olabilecek olası etkileri tespit edilmesi hususunda yeterli denetimlerin yapılmaması gereğince yukarıda adı verilen denetçi personel olan Talat Bülbül, Dindar Tosun, Hayriye Öntürk Ahmet Yurdaşan **TALİ KUSURLU** addedilmiştir. Ayrıca, yukarıda detaylı anlatrıldığı üzere tasarım hataları içeren "2018.10.10-Fz5-Yığın Liçi Faz-4 Genişleme Proje Raporu" nun kontrolünü üstlenen Ore Mineral Firması Denetçi mühendisi olarak Hayriye Öntürk ve Denetim Sorumlusu olarak ayrıca Ahmet Yurdaşan kaydedilmiştir.

Ramazan KARAKAPLAN (Çiftay, Proje Müdürü), Ahmet MUMYAKMAZ (Çiftay, Proje Müdür Yardımcısı), Yusuf YAZICI (Çiftay, Şantiye Şefi):

Çiftay Madencilik A.Ş. Yığın Liçi Tesisi kapsamında inşaatı yapılan Genişleme Projesi Faz-5 Tesisinin Kazı İnşaat İşleri yüklenicisidir. Bu kapsamda Faz 5 Liç inşaatı sırasında yapılan patlatmalı kazı kontrol ve kontrol kontrollü basamak patlatması tekniklerine uygun işlem yapmaması, Patlatmaların çevresel etkilerin izlenmemesi ve patlatma kaynaklı oluşan yersarsıntılarının yığın liçine olabilecek olası etkileri konusunda yeterli önlemlerin alınmaması gereğince yukarıda adı verilen firma çalışanları **TALİ KUSURLU** addedilmiştir.

Burak ARTAL (Anagold, İSG Başmühendisi); Gizem Gazcı (Anagold, Kıdemli İSG Mühendisi):

Burak Artal İSG mühendisi, Gizem Gazcı ise İSG Başmühendisine bağlı çalışmak olup görev tanımları kapsamında İSG sisteminin yönetilmesi, denetlenmesi, İSG birimine rejberlik edilmesi, risk değerlendirmesinin kabul esasının sağlanması ve önerilerde bulunulması vb. işleyişle ilgili huşular mevcut olup İSG uzmanları olarak İSG Uzmanlarının görev ve sorumlulukları yönetmeliği çerçevesinde sorumluluklarını yerine getirdikleri ve kusurları olmadığı kanaatine varılmıştır.



SWORN
TRANSLATION

<u>Kenan ÖZDEMİR (Anagold, Operasyon Direktörü), Abdülkadir CANSIZ (Anagold, Bakım Müdürü):</u>

Operasyon Direktörü olarak tüm operasyonel departmanların yönetiminden sorumludur. Departmanların çeşitli faaliyetlerinin koordinasyonu, <u>her bölümün performansının izlenerek</u> iyileştirilmesi, tüm operasyonların entegre bir şekilde yürütülmesinin sağlanmasından yükümlüdür. Görev alanı kapsamında "Günlük operasyonların denetlenmesi ve yönetilmesi, Maden sahasındaki operasyon stratejilerin belirlenmesi ve uygulanması, <u>Operasyon faaliyetlerinin tamamının kontrol ve gözetimi ile risklerin belirlenmesinin sağlanması,</u> Tüm operasyonel bölümler için operasyon planlarının hazırlanması ve uygulanmasının kontrol edilmesi,…. <u>Maden sahasında</u> güvenli bir çevre ve çalışma ortamının sağlanması için uygun politika ve prosedürlerin oluşturulması, uygulanması ve kontrolü …, Potansiyel risklerin belirlenmesi, analiz edilmesi ve uygun risk yönetim stratejilerinin geliştirilmesi, Riskleri minimize etmek ve iş sürekliliğini sağlamak için önlemlerin uygulanması …" yer almaktadır. Risklerin belirlenmesi, güvenlik ve çevre yönetimi politika ve prosedürlerinin oluşturulması, kontrollü görev kapsamında olup liç sahasında üretim sırasında meydana gelen … riski belirlenmemiş, liçe beslenen/çıkan su etkisinin takip edilmesi ile ilgili durum incelenmemiş. Olay öncesinde izinli olup yerine üretim tesisileri ekibinin sorumlusu … sorumlu Bakım Müdürü Abdülkadir Cansız vekalet etmektedir. Her … için vekalet ettiği saha ile ilgili konuların İ.R.Guille sorumluluğunda olduğu belirtilmiş, çatlaklarla ilgili kendisine amir olarak bilgi verilmiştir. Kenan Özdemir'in olay anında olmaması, vekaletini buna … verilmiş olması, ayrıca Kenan Özdemir'e doğrudan bağlı çalışan … Maden Hüseyin Üstündağ'ın da izinli olması olay yönetilmemesinde etkili olmasından Amled gözetişimle Kenan Özdemir **ASLİ KUSURLU** addedilmiştir. Abdülkadir Cansız operasyon direktörüne vekalet etmekle çatlakların durumu kendisine bildirildiğinde görev ve sorumluluk alanı olmadığı gerekçesi ile olay yönetmine müdahil olmamış olmakla yönetim yükümlülüğünü … olmakla olayda **TALİ KUSURLU** addedilmiştir.

<u>Murat BAYRAKTAR (Anagold, Oksit Proses Baş Mühendisi):</u>

Olay günü klasik liç sorumlusu kişidir. Görev alanında "Oksit proses tesisinin üretime geçmesi ve üretim yapılmasının sağlanması, Oksit operasyonu kapsamında kırma, eleme, peletleme (aglomerasyon), cevherin liçlenmeyi hazırlanması, cevherin yığına taşınması, borulama, liçleme, altın kazanım (ADR) tesisi ve siyanür geri kazanım ve bakır üretim (SART) tesisi operasyonlarının koordinasyonu, Oksit Proses Müdüründen aldığı talimatların yerine getirilmesi, Oksit operasyon planlarının oluşturulmasında Oksit Proses Müdürüne destek sağlanması, Günlük oksit operasyon toplantılarına … katılması, Oksit operasyonu için gerekli politika ve prosedürlerin oluşturulmasında Oksit Operasyon Müdürüne destek sağlanması, Oksit operasyonunun kaynak ihtiyaçlarının karşılanmasında Oksit Operasyon Müdürüne destek sağlanması, Oksit operasyon departmanı personelinin … ile Oksit gelişimlerin için departman eğitimlerinin sağlanmasından sorumludur" Olay sahada meydana gelmesi öğrenmesi sonrası alanın boşaltılması ve yolların kapatılması talimatını kıymetli Sıcak … mühendisleri K. M. Akpolat ve Ş. Demir'i bu konuda görevlendirmiştir. Yolun kapatılması ilgili bilgilendirme maili atılmıştır. Ancak daha önce de belirtildiği üzere hayata geçirilmiş bir acil durum prosedürü bulunmadığından saha tam boşaltılmamış olmakla ve üretim mühendisleri ve süpevizörler ile sürekli sahada durumu izlemiş … düşüşü. Sorumluluğu kapsamında üst amirlerine bilgi vermiştir.



SWORN
TRANSLATION

Solüsyonun sahaya uygulamanın durdurulması düşünülmüşse de havuzların taşacağı gerekçesi ile solüsyonun durdurulması ancak saat 13:00 sularında sağlanmıştır. Elde veri olmamakla birlikte büyük boşutta çatlakları olmasına rağmen solüsyonun verilmeye devam edilmiş olmasının heyelan sürecini tetiklediği/hızlandırdığı düşünülmektedir. Sahayı boşaltma talimatı vermiş olup kompleyninta olan laç kişinin oraya gitmesi hususunda herhangi bir talimat vermemiştir. Daha önce de ısssanıldığı gibi laç idolın güvenli alan olduğu gerekçesi ile ölmeden önceki telefon görüşmesinde de solümaanı üzere burada tekrar işe başlama talimatını beklemektedirler. Murat Bayraktar süreç önceyi oldukça iyi yönetmiş olmakla birlikte solüsyonun kesilmesinde erken karar vermediği için **TALİ KUSURLU** bulunmuştur.

**Erdi SEYHAN, Aykut AYDERMAN, Funda ARDIÇ (INR, Tasarım Mühendisleri):**

Liç modelümü 'kayınıcəsinor etkili olan "2018.10.10-INR-Yığın Liç Faz 4 Genişleme Proje Raporu" ve "2020.04.27-INR-Yığın Liç Faz 4B Genişleme Proje Raporu"nun tasarım mühendisleri olarak yapılan eksik hatalı tasarımları nedeniyle **TALİ KUSURLU** addedilmiştir.

**Bürgehan AKARSU (Hidro Dizayn, Denetçi Mühendis), Osman BAYRAK (Hidro Dizayn, Denetim Sorumlusu):**

"2020.04.27-INR-Yığın Liç Faz 4B Genişleme Proje Raporu" nda yukarıda detaylı anlatılan tasarım hatalarının kompoleriaesi eksiklik/hatası nedeniyle/gereğince Osman BAYRAK ve Bürgehan AKARSU **TALİ KUSURLU** addedilmiştir.

**Kaan Anıcan AKPOLAT (Anagold, Asistan Oksit Proses Mühendisi):**

Oksit Müdürlüğü bağlı VC. Depolama ve borulama işleri kapsamında çalışmakta olup Oksit operasyonu kapsamında Oksit Proses Departmanındaki yöneticilerinin talimatları doğrultusunda cevherin yığın liç sahasına yığın taşınması, borulama ve liçleme operasyonlarının günlük olarak yürütülmesi görevini alınıştır. Yığın liç alanında Operasyon Direktörü tarafından belirlenen hedeflere ulaşılması için gerekli günlük operasyonların takip edilmesi, Departmanın günlük toplantısına katılım ve Oksit Proses Departmanındaki yöneticilerin asiste edilmesi, Haftalık olarak bakım toplantılarına katılım ve yapılacak bakım işlemlerinin takip edilmesi, Departman yürütümünün takip valdığı dökümanların hazırlanması, düzenlenmesi ve saklanması konularında Oksit Proses Departmanındaki yöneticilerin asiste edilmesinden sorumludur. Görev alanı kapsamında navi amamvesi ve amirlerine haber vermiş ve amirlerinden gelen görevleri yerine getirmişini olayai kusursuz addedilmiştir.

**Semd DEMİREL, Kıdemli Oksit Proses Mühendisi:**

Oksit Müdürlüğe bağlı VC. ve Staik çalışmakta olup Oksit operasyonu kapsamında, Oksit Proses Başmühendisinin direktifleri doğrultusunda stok sahalarında stoklanan oksitli cevherin tonaj ve tenor ... değerlendirerek Kırıcı ünitelerine gönderilmesi ve boyutlandırılması, Kırma, eleme ve ... operasyonların takip edilmesi, Kırıcı alanında Operasyon Direktörü tarafından belirlenen hedefler doğrultusunda gerekli günlük operasyonların takip edilmesi, Departmanın günlük toplantısına katılım ve Oksit Proses Başmühendisinin asiste edilmesi, Haftalık olarak bakım toplantılarına katılım ve yapılacak bakım işlemlerinin takip edilmesi, Departman yürütümünün takip ettiği dökümanların hazırlanması, düzenlenmesi ve saklanması



SWORN
TRANSLATION

konusunda Oksit Proses başmühendisinin asiste edilmesinden sorumludur. Görev alanı kapsamında olayı öğrenmesi ile amirlerine haber vermiş ve amirlerinden gelen görevleri yerine getirmiştir. Soysal Doğan'dan fotoğraf talep etmesi ile S.Doğan bulunduğu yerden ayrılarak kazadan kurtulmuştur. Olayda kusursuz addedilmiştir.

### Mehmet TÜRK (Anagold, Kaynak Geliştirme Direktörü/Maden Operasyon Müdürü):

Operasyon direktörüne bağlı çalışmakta olup olayda doğrudan etkisi olan radar veri takibinden sorumlu olarak, görev tanımında "Maden Jeoteknik Birimi kapsamında; radar takip ve uyarı sistemlerinin operasyon kontrolü, açık ocak, pasa dökümü, cevher stok sahaları ve yığın liç şev stabilitesinin kısım dışı saha dizaynlarının jeoteknik açıdan kontrolü, denetimi ve yönetilmesi,..." yer almaktadır ancak bir yılı önce göreve başlamış olmakla henüz oryantasyon ve personel ile tanışma aşamasında olduğundan kusursuz addedilmiştir.

### Hüseyin ÜSTÜNDAĞ (Anagold, Proses Oksit Müdürü):

Olay anında yürütmesi yapıldığı proses alanında müdür olarak görev yapmaktadır ve izne ayrılmıştır. Görev tanımı "Oksit proses tesisinin üretime geçmesi ve üretim yapılmasının sağlanması. Oksit operasyonu kapsamında kırma, eleme, peletleme (aglomerasyon), cevherin liçlenmeye hazırlanması, cevherin yığına taşınması, borulama, liçleme, altın kazanım (ADR) tesisi ve reaktifli çöktürme ve filtre üretim (SART) tesisi operasyonlarının kontrolü, Oksit proses müdürlüğü operasyon üretim personelinin üretim hedeflerine ulaşmak için koordine edilmesi, Oksit operasyonu iyileştirme projelerinin yürütülmesi, Şirketin vizyonu, misyonu doğrultusunda şirket hedefleri kapsamında sorumlu olduğu süreçlerdeki performans göstergelerin, hedeflerin belirlenmesi takip edilmesi ve raporlanması, Oksit operasyonu için gerekli politika ve prosedürlerin oluşturulması, Oksit operasyonu kaynak ihtiyaçlarının belirlenmesi, Oksit operasyon departmanı çalışanlarının süreçle ilgili yetki alanları için departman eğitimlerinin sağlanması, Oksit operasyon departmanı için bütçenin hazırlanması, Operasyon Direktörünün onayına sunulması ve onaylanan bütçenin gerçekleşmesidir". Olay günü izinli olduğu ve görev kapsamı gereği olay ile doğrudan ilişkili olmadığı gerekçesi ile kusursuz olduğu görüş ve kanaatine varılmıştır.

### Soysal DOĞAN (Anagold, kıdemli borulama süpervizörü, işçi):

Şirketin kıdemli borulama süpervizörü olarak çalıştığı, solüsyonun fazla verilmiş olabileceği durumu algılayamayacağı, ve solüsyonun akıtılması veya kesilmesinde bir yetkisi bulunmadığı, sadece statik olarak gelen solüsyonun dağıtılmasında görev aldığı, solüsyonu kestirmeye hiçbir şekilde yetkisi bulunmadığı, Oksit Proses Başmühendisine asiste edilmesinden sorumlu olduğu, Görev alanı kapsamında olayı öğrenmesi ile amirlerine haber verdiği ve amirlerinden gelen görevleri yerine getirdiği, olay mahallinde bulunduğu, olay anında kendisinden fotoğraf talep edilmesi ile bulunduğu yerden ayrılarak kazadan kurtulduğu anlaşılmakta olup, Olayda kusursuz addedilmiştir.



SWORN
TRANSLATION




ORGANİZASYON ŞEMASI



SWORN
TRANSLATION

## 7. SONUÇ

Bilirkişi heyetimiz yukarıdaki değerlendirmelerin ışığında;

-Olayın, yürürlükte olan 5510 sayılı SGK Kanunu 13/a-b maddesi gereğince bir **"İŞ KAZASI"** olduğu,

-Olayın meydana gelmesinde;
- Proje yönetim mekanizmasının doğru/işler şekilde kurulmamış olmamasının;
- Faz-II olarak kapasite artışına gidilmiş olmasının ve hazırlanan projelerdeki tasarım eksiklik/hatalarının bulunmasının,
- İşletme aşamasında proje tasarım kriterlerinin yetersiz takip edilmesinin,
- Faz 2 inşaat sırasında, yığın liçine yakın mesafelerde ve yüksek miktarda patlayıcı kullanılarak yapılan patlatmaların yığın liçine olası hasar risklerinin belirlenmemesinin,
- Uyarı sistemlerinin yetersiz olmasının,
- Çatlakların uyarı vermesi sonrası olayın etkin şekilde yönetilmesini sağlayacak sistemin bulunmamasının etkili olduğu,

- Olayın çevre kirliğine sebep olduğu,

- Tasarım ve projelendirme aşamasında yığın liçin duraylılık analizinde hazırlanan raporlarda meri mevzuatlarının gerekliliklerini sağlayacak veri setlerinin kullanılmadığı, Maden ve Çevre Kanunu kapsamındaki yükümlülüklerin yerine getirilmediği,

| S.N | KUSUR TANIMI | ADI SOYADI | GÖREVİ |
|---|---|---|---|
| 1 | ASLEN KUSURLU | John HARMSE | SSR, Global Projeler Başkan Yardımcısı |
| 2 | ASLI KUSURLU | Cengiz Yalçın DEMİRCİ | Anagold Ülke Müdürü, Anagold YK Bşk. |
| 3 | ASLI KUSURLU | Jean Ronald GUILLE | Anagold, Operasyon Başkan Yardımcısı |
| 4 | ASLI KUSURLU | Shaun SCHWARTZ | Anagold, Sürdürülebilir Yatırım Projeleri Müdürü |
| 5 | ASLI KUSURLU | Ali Rıza KALENDER | Anagold, Kıdemli Geoteknik Mühendisi |
| 6 | ASLI KUSURLU | Uğur YILMAZ | Anagold, Maden Operasyon Şefi |
| 7 | ASLI KUSURLU | Selçuk ÇİFTLİK | Anagold, İSG Müdürü |
| 8 | ASLI KUSURLU | Ömer ARDIÇ | INR, Proje Koordinatörü |
| 9 | ASLI KUSURLU | Sezan ÖZDEMİR | Anagold, Operasyon Direktörü |
| 10 | ASLI KUSURLU | Luis QUIBENDONGO | GRE, Tasarım Mühendisi |
| 11 | ASLI KUSURLU | Vinh LUU LE | GRE, Tasarım Mühendisi |
| 12 | ASLI KUSURLU | Kevin GUNESH | GRE, Kontrol Mühendisi |
| 13 | ASLI KUSURLU | Muhammed KILIÇ | Anagold, Delme Patlatma Mühendisi |



SWORN
TRANSLATION

| S.N | KUSUR TANIMI | ADI SOYADI | GÖREVİ |
|---|---|---|---|
| 1 | TALİ KUSURLU | Bill MCNEVIN | SSR, Üst Düzey Başkan Yardımcısı/Operasyonlar ve Sürdürülebilirlik |
| 2 | TALİ KUSURLU | Karabey TURAN | Anagold, Proje Başmühendisi |
| 3 | TALİ KUSURLU | İdrak ASLAN | Anagold, Kıdemli Proje İnşaat Mühendisi |
| 4 | TALİ KUSURLU | Patrick VALKO | WSP Proje Kalite Güvence Müdürü |
| 5 | TALİ KUSURLU | M. Yusuf ÇELEN | (WSP Proje Müdürü) |
| 6 | TALİ KUSURLU | Allan YEŞİLTEPE | Kalite Güvence Mühendisi WSP |
| 7 | TALİ KUSURLU | Emrah Ergon | Kalite Güvence Mühendisi WSP |
| 8 | TALİ KUSURLU | Ahmet Furkan ELÇİ | Kalite Güvence Mühendisi WSP |
| 9 | TALİ KUSURLU | Hasan Aydın | Kalite Güvence Mühendisi WSP |
| 10 | TALİ KUSURLU | Sertan Aydın | Kalite Güvence Mühendisi WSP |
| 11 | TALİ KUSURLU | İzzet TEKİN | Anagold, Maden Jeoloji Başmühendisi |
| 12 | TALİ KUSURLU | Berkay MISIR | Anagold, Asistan Geoteknik Mühendisi |
| 13 | TALİ KUSURLU | Ahmet YURDAŞAN | Ore Mineral Denetim Sorumlusu |
| 14 | TALİ KUSURLU | Havvıye ÖNTÜRK GÜRSOY | Ore Mineral, Denetçi Mühendis |
| 15 | TALİ KUSURLU | Taan BÜLBÜL | Ore Mineral, Kontrol Mühendisi |
| 16 | TALİ KUSURLU | Hıdar TOSUN | Ore Mineral, Kontrol Mühendisi |
| 17 | TALİ KUSURLU | Ramazan KARAKAPLAN | Çiftay, Proje Müdürü |
| 18 | TALİ KUSURLU | Ahmet MUMYAKMAZ | Çiftay, Proje Müdür Yardımcısı |
| 19 | TALİ KUSURLU | Yusuf YAZICI | Çiftay, Şantiye Şefi |
| 20 | TALİ KUSURLU | Andülkadir CANSIZ | Anagold, Bakım Müdürü |
| 21 | TALİ KUSURLU | Murat BAYRAKTAR | Anagold, Oksit Proses Baş Mühendisi |
| 22 | TALİ KUSURLU | Serdi SEYHAN | INR, Tasarım Mühendisi |
| 23 | TALİ KUSURLU | Aykın AYDURMAN | INR, Tasarım Mühendisi |
| 24 | TALİ KUSURLU | Hasan ARDIÇ | INR, Tasarım Mühendisi |
| 25 | TALİ KUSURLU | Osman BAYRAK | Hidro Dizayn, Denetim Sorumlusu |
| 26 | TALİ KUSURLU | Gürgen AKARSU | Hidro Dizayn, Denetçi Mühendis |

-Dokuz kişinin hayatını kaybettiği olayda **yukarıda isimleri verilen 13 şahsın, ASLİ KUSURLU** olduğu

-Dokuz kişinin hayatını kaybettiği olayda **yukarıda isimleri verilen 26 şahsın, TALİ KUSURLU** olduğu

-Ayrıca 07.10.2021 tarih ve 6421 kayıt sıra numaralı Çevresel Etki Değerlendirme (ÇED) Olumlu Kararı veren yetkililerin **ASLİ KUSURLU olduğu,**



SWORN
TRANSLATION

- Kazada kaçınılmazlık unsuru bulunmadığı,

Ortak kanaatine varılmıştır. Yüce Cumhuriyet Başsavcılığının takdirlerine saygı ile sunulur 23.05.2023.

## BİLİRKİŞİ KURULU

**Prof. Dr. Mehmet Yener ÖZKAN**
İnşaat Yüksek Mühendisi
(ODTÜ)

**Prof. Dr. Haluk AKGÜN**
Jeoloji Yüksek Mühendisi
(ODTÜ)

**Prof. Dr.** Ahmet ERDAL OSMANLIOĞLU
Maden Yüksek Mühendisi
İÜ Cerrahpaşa

Serhat GÜNGÖR
Makine Mühendisi
(ODTÜ)

**Doç. Dr. Nejan HUVAJ SARIHAN**
İnşaat Yüksek Mühendisi
(ODTÜ)

**Prof. Dr. Ali İhsan AROL**
Maden Yüksek Mühendisi
(ODTÜ)

**Mert ERBAŞ**
İnşaat Yüksek Mühendisi
(ODTÜ)

**Mustafa Kemal TÜFEKCİ**
Jeoloji Yüksek Mühendisi
(AFAD)

**E.Ö. Gör. Saadet Gülru YILDIZ**
İnşaat Yüksek Mühendisi
(ODTÜ)

**Prof. Dr. İsmail TORÖZ**
Çevre Yüksek Mühendisi
(İTÜ)

**Doç. Dr. Deniz ADIGÜZEL**
Maden Yüksek Mühendisi
(İÜ Cerrahpaşa)

