# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Consolidated Civil Action No. 1:24-cv-00739-DDD-SBP

KARAM AKHRAS, Individually and on
behalf of all others similarly situated,

        Plaintiff,

    v.

SSR MINING INC.,
RODNEY P. ANTAL, and
ALISON WHITE,

        Defendants.

---

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

---

**TABLE OF CONTENTS**

Page

I.    NATURE OF THE ACTION AND OVERVIEW ....................................................... 1

II.   JURISDICTION AND VENUE................................................................................... 4

III.  PARTIES .................................................................................................................. 5

IV.   SUBSTANTIVE ALLEGATIONS............................................................................... 7

    A.    Background................................................................................................... 7

        1.    SSR Mining and the Çöpler Mine  ..................................................... 7

        2.    The Gold Mining Process At Çöpler ................................................. 8

        3.    Defendants Claimed To Prioritize Mine Safety............................. 11

    B.    Operations At The Çöpler Mine Were Repeatedly Suspended
        Due To Non-Compliance ........................................................................... 12

    C.    During the Class Period, Defendants Misleadingly Claimed
        That SSR Mining Had "Effective" Safety Systems, Including
        "Appropriate" Equipment To Identify And Mitigate Risks In
        Mine Operations ....................................................................................... 14

    D.    The Truth About Çöpler's Monitoring System Deficiencies
        Is Revealed When A "Large Slip" Leads To The Death Of
        Several Miners And SSR Mining Employees Are Criminally
        Charged .................................................................................................... 15

    E.    SSR Mining Incurred At Least $250 Million In Remediation Costs
        And $114 Million In Impairment Charges Due To The Indefinite
        Suspension of Çöpler Operations ........................................................... 26

    F.    SSR Mining Was At Fault For Failing To Timely Evacuate Miners
        After Data Suggested An Impending Landslide ...................................... 30

V.    MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING
    THE CLASS PERIOD........................................................................................... 36

A.    Statements Regarding SSR Mining's Equipment To Ensure
Employee Safety.................................................................................. 36

B.    Statements Regarding Risks To The Company's Permits ....................... 40

C.    Statements Of Risks Purportedly Outside The Company's
Control ................................................................................................. 43

VI.    CLASS ACTION ALLEGATIONS ........................................................... 46

VII.    UNDISCLOSED ADVERSE FACTS........................................................ 48

VIII.    LOSS CAUSATION ................................................................................ 49

IX.    ADDITIONAL SCIENTER ALLEGATIONS .............................................. 51

A.    SSR Mining Did Not Have Required Monitoring Systems To
Mitigate The Known Risks of Landslides In Open
Pit Mining ............................................................................................. 51

B.    Çöpler Was A Core Asset For The Company .......................................... 57

X.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-
THE-MARKET DOCTRINE) .................................................................... 58

XI.    NO SAFE HARBOR ............................................................................... 60

XII.    CLAIMS FOR RELIEF ............................................................................ 61

XIII.    PRAYER FOR RELIEF........................................................................... 66

XIV.    JURY TRIAL DEMANDED...................................................................... 66

Lead Plaintiff RAD Investment LLC ("Plaintiff") individually and on behalf of all others similarly situated, by and through its attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by SSR Mining Inc. ("SSR Mining" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by SSR Mining; and (c) review of other publicly available information concerning SSR Mining.

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired SSR Mining securities between February 23, 2022 and February 27, 2024, inclusive (the "Class Period") and were damaged thereby (the "Class"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2. SSR Mining is a precious metals mining company with assets located in the U.S., Canada, Turkey, and Argentina. More than 40% of its revenue is derived from Çöpler, a gold mine located in Turkey near the Euphrates River. Gold is extracted at Çöpler using open pit mining, which involves a heap leach pad where pulverized ore is leached with a cyanide solution to dissolve valuable minerals for further processing. The heap contains 13 layers of ore, where each layer is 8 meters thick, and it takes more than 2 years to extract the majority of the valuable minerals from the heap. The leaching makes

1

the heap susceptible to landslides as the solution erodes the stability of the heap slope. To mitigate the risk of loss from a landslide, SSR Mining must implement a range of monitoring systems that track the movement of the heap to enable the Company to take prompt precautions.

3.      Unbeknownst to investors, the Company lacked these essential systems at Çöpler. In early 2024, a large crack formed on the heap leach pad.  The displacement was at a rate of 25 mm per day after January 5, 2024. The velocity of this movement warranted "red" warning action because there was a loss of integrity of the heap leach. However, the area was not evacuated.

4.      The truth began to emerge on February 13, 2024, before the market opened, when SSR Mining announced that operations were suspended at the Çöpler mine due to a "large slip on the heap leach pad." At least nine miners were missing, and the Turkish Interior Department launched an investigation into the incident. Media articles reported that the landslide was "a disaster that (was) coming" because "***safety risks were frequently ignored*** and inspections not adequately carried out."[1] On this news, the Company's share price fell $5.22, or 53.7%, to close at $4.50 per share on February 13, 2024, on unusually heavy trading volume.

5.      Then, on February 16, 2024, after the market closed, the Company announced that 8 of its employees were detained in connection with the government's investigation. Over the President's Day weekend, SSR Mining announced that its

---

[1]      Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

environmental permit had been revoked, so Çöpler mine operations were suspended. Analysts braced investors for the possibility that operations would never resume. On this news, the Company's stock fell $0.29, or 5.91%, to close at $4.62 per share on February 20, 2024, on unusually heavy trading volume.

6.    On February 27, 2024, after the market closed, SSR Mining retracted its long-term guidance due to the uncertainty at Çöpler. The Company expected to record a liability during first quarter 2024 to reflect remediation costs and an impairment to inventory and certain assets. Six employees were criminally charged for their actions on the day of the incident. On this news, the Company's stock price fell $0.37, or 7.94%, to close at $4.29 per share on February 28, 2024, on unusually heavy trading volume.

7.    Months later, the Company announced that Çöpler's heap leach pad would be permanently closed and recorded a $114.2 million impairment charge. The remediation work was expected to cost between $250 to $300 million.

8.    In connection with the Turkish prosecutors' investigation, an expert committee report was commissioned to analyze witness accounts, available data, and applicable requirements to assess the causes of the landslide. That report found at fault SSR Mining's country manager for Turkey, SSR Mining's Vice President of Global Projects, and 12 other individuals. Necessary alerts were not given even after radar measurements had detected significant ground motion at the heap and the crack was visible. Moreover, SSR Mining did not monitor the tension in pore water, adequately place monitoring instruments, or centralize data collection and analysis to effectively manage

3

the information available. These failures were directly related to the devastating impact of the landslide, which led to the deaths of nine miners.

9.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that the heap leach pad at the Çöpler mine was significantly higher than industry norms; (2) that, as a result, the heap slope was unstable; (3) SSR Mining lacked key systems at the Çöpler mine to monitor the movement and displacement of heap; (4) that the foregoing were foreseeable factors within the Company's control that contributed to a significant risk of landslides at the Çöpler mine; (5) that, as a result, the Company was ill-equipped to respond to emergencies such as landslides at the heap leach pad; (6) that, as a result of the foregoing, there was a significant risk that Çöpler's permits could be suspended; and (7) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

10.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

11.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

4

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

14. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

15. Plaintiff, as set forth in the previously filed certification (ECF No. 18-3), incorporated by reference herein, purchased SSR Mining securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16. Defendant SSR Mining is incorporated under the laws of British Columbia, Canada with its principal executive offices located at 6900 E. Layton Ave., Suite 1300, Denver, Colorado 80237. SSR Mining's common shares trade on the NASDAQ and

5

Toronto stock exchanges under the symbol "SSRM," and under the Australian stock exchange under the symbol "SSR."[2]

17.    Defendant Rodney P. Antal ("Antal") has been the President and Chief Executive Officer ("CEO") of the Company since September 2020. Prior to that, he had been the President and CEO of Alacer Gold Corp. ("Alacer") since August 2013. He has over 25 years of global mining experience in various mineral and metal businesses, including at various mine operating sites. He has nearly 15 years of experience from various senior management positions at Rio Tinto Group, the world's second largest metals and mining corporation.

18.    Defendant Alison White ("White") was the Chief Financial Officer and Executive Vice President of the Company from March 2021 to March 2024.

19.    Defendants Antal and White (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts

---

[2]    Effective January 1, 2022, SSR Mining became a large accelerated filer under the SEC and transitioned to U.S. GAAP reporting.

specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

20.    Non-party Cengiz Yalçin Demirci ("Demirci") was the Company's Senior Vice President of Operations since 2017 and the Country Manager for operations in Turkey since September 2022. He was responsible for coordinating the companies under SSR Mining and presenting the incoming financial reports to Bill Macnevin, Executive Vice President of Operations and Sustainability. Demirci spent most of the year in Denver, Colorado but regularly traveled to Turkey. Anagold's Vice President of Operations, Iain Ronald Guille reported to Messrs. Demirci and Macnevin.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background

#### 1.    SSR Mining and the Çöpler Mine

21.    SSR Mining is a precious metals mining company. It has four operating mine sites: (i) Çöpler in the İliç District of Erzincan Province, Turkey; (ii) Marigold in Nevada, United States; (iii) Seabee in Saskatchewan, Canada; and (iv) Puna in Jujuy Province, Argentina. For fiscal year 2021, 41% of revenue was derived from Çöpler, 29% from Marigold, 15% from Seabee, and 15% from Puna. In May 2023, SSR Mining acquired a 10% interest, which may be increased to 40%, and immediate operational control of the Hod Maden project in northeastern Turkey, which is being explored for gold-copper deposits and developed for mining operations.

7

22.    SSR Mining's flagship asset is the Çöpler gold mine, which is in the northern margin of a collision zone that lies between the Pontide Belt / North Anatolian Fault, the Arabian Plate, and the East Anatolian Fault. The Çöpler mine is wholly owned by Anagold Madencilik Sanayi ve Ticaret Anonim Şirketi ("Anagold"). Anagold holds the exclusive right to engage in mining activities within the Çöpler project area and has licenses covering a combined area of approximately 16,600 hectares. SSR Mining controls 80% of Anagold, and the remaining interest is held by Lidya Madencilik Sanayi ve Ticaret A.Ş. ("Lidya") and a bank wholly owned by Çalik Holdings A.Ş. SSR Mining provides management, technical, mine planning, engineering, and grade control functions for the Çöpler mining operation. The mining is carried out by a mining contractor that provides operators, line supervisors, equipment, and ancillary facilities.

23.    The Company acquired its interest in the Çöpler mine through the Company's merger-of-equals with Alacer in September 2020. The Company conducted exploratory drilling and completed an order of magnitude study to leverage the copper-driven mineral value that the mine plan did not already exploit. The mine contains oxide and sulfide ores, which are mined concurrently and processed using heap leach and pressure oxidation processing, respectively, to produce gold bullion.

### 2.    The Gold Mining Process At Çöpler

24.    Gold mining has roughly four steps: prospecting, mining, extracting, and refining. Çöpler's mining and processing operations involve open pit mining, multiple waste rock dumps to accommodate mined materials, processing ores on heap leach

pads, and processing of sulfide ores. The Çöpler mine obtained its operating license in 2004, and it began open pit and heap leach operations in 2010.

25.    Prospecting is the process of searching for precious metal deposits. In 1998, Alacer's predecessor entity identified gold-copper prospects in east central Turkey and applied for exploration licenses for these prospects, including in the Çöpler basin.

26.    Mining obtains the precious metals from the deposits. There are many techniques depending on the concentration and type of deposit. At Çöpler, SSR Mining employs open-pit mining, which is used to extract minerals from an open pit when the mineral or ore deposits are found relatively close to the surface of the Earth. Miners drill a pattern of holes and fill them with explosives to break up the ground to load the metal-bearing rock into haul trucks. The walls of the open pits are angled and include steps to prevent avalanches.

27.    To extract the gold from the metal-bearing rock, SSR Mining uses leaching at a heap leach pad. The design permits the heap to contain 13 layers of ore where each layer is 8 meters thick, and a cyanide solution is applied to the ore. The solution dissolves gold and filters to the base, where it is transported by pipes to a facility. The solution is applied to each layer for 45 days before a new layer is laid on top.  Generally, the majority of the valuable minerals in the ore are dissolved into the solution after 2 and a half years. The heap leach area is overseen by the Oxide Process Unit, which is led by Kenan Özdemir, the site operations director.

28.    The extracted gold is then molded into doré, which are shipped to refineries. Çöpler produces gold doré, which is unrefined gold bullion bars containing at least 90% gold, that is delivered to the Istanbul Gold Refinery.

29.    On December 24, 2021, SSR Mining announced the commencement of commissioning and ramp-up activities at Çöpler's sulfide plant flotation circuit after it stated that it had received the required permits and approvals. This circuit was expected to "increase the gold and sulfide sulfur grades processed through the autoclaves, reduce reagent use, and increase total sulfide plant throughput and gold production."

30.    The figure below illustrates the Çöpler operations and its proximity to the Karasu River, which flows into the Euphrates River:[3]

---

[3]    The image was provided in the Company's Technical Report for Çöpler dated February 13, 2024. "TSF" means Tailings Storage Facility.

10

Figure 3-3:    Çöpler Operations and Surrounding Population Centers



### 3.    Defendants Claimed To Prioritize Mine Safety

31.    After the merger with Alacer in September 2020, SSR Mining updated its Environment, Social, and Governance policies. During the third quarter 2021 earnings call, the Company's Chief Operating Officer Stewart J. Beckman stated that after the merger with Alacer, "we focused our immediate efforts on updating our ESG policies in building out our integrated ESG management and information systems, in line with contemporary industry best practice." As a result, recordable injury frequency rates improved by about 60% over the 2020 figures.

32.    On November 3, 2021, during the third quarter 2021 earnings call, Antal claimed that "ESG is and has long been a core value and focus for SSR Mining as it firmly

11

underpins the success of our business." He continued that the Company saw "positive health and safety trends at our operations, reflecting the efforts we have applied to improving the well-being of our employees, contractors, and communities."

**B.    Operations At The Çöpler Mine Were Repeatedly Suspended Due To Non-Compliance**

33.    In September 2020, the General Directorate of Mining and Petroleum ("General Directorate") inspected the Çöpler mine and concluded that activities were not being conducted in accordance with the project design and permit. Specifically, there was slippage in the quarries at 10 mm per day because the step geometry had deteriorated, and the committee determined that mining should be halted "until the determination of the slip surface in line with a geotechnical report . . . , the determination of the groundwater level and the related slope stability is ensured and the steps are made in accordance with the project."[4] The committee found that the production activities could resume only after the on-site inspection and approval of the General Directorate. In January 2022, the General Directorate determined that the "dangerous conditions that caused the suspension of production activities . . . are still continuing."

34.    On June 21, 2022, a pipe to the heap leach pad in Çöpler leaked cyanide. Initially, media reported that the mine's operations were suspended. The Turkish Ministry of Environment posted on Twitter, translated to English: "WE STOP the operation of the gold mine in Ilic, Erzincan, which caused environmental pollution due to the failure of the

---

[4]    The summary of these reports is based on the characterization in the Expert Committee Report dated March 16, 2024 commissioned by Erinzcan's Chief Public Prosecutor.

12

pipelines! The facility will NOT be allowed to operate until it is determined by the inspection teams of our Ministry that additional environmental improvements works have been completed." Similarly, on June 27, 2022, *Bloomberg* reported that the mine was halted. However, the Company stated that it had not received any formal communications and that Çöpler was still operating.

35.    The Ministry of Environment visited the Çöpler operations and provided initial guidance on expected improvement initiatives on June 28, 2022. The mine's operations were temporarily suspended while these initiatives were implemented. Canaccord noted that the site visited was prompted by "frustration among local residents" after the "leak was widely publicized on mainstream and social media in Turkey." 210 cubic meters of solution (with a cyanide content of 415 parts per million) flowed over more than 3 hours.

36.    The mine resumed operations three months later, on September 22, 2022, after the Company completed the improvement initiatives and received regulatory approvals. While operations had been suspended, the Company accelerated and completed planned maintenance in the sulfide plant, which had previously been scheduled for the fourth quarter of 2022. However, due to hazardous conditions at the marble quarry and main quarry, the General Directorate ordered a partial suspension in those areas, and the suspension continued as of September 2023. In connection with the incident, the Company was fined 16.4 million liras (roughly $1 million).

13

C. **During the Class Period, Defendants Misleadingly Claimed That SSR Mining Had "Effective" Safety Systems, Including "Appropriate" Equipment To Identify And Mitigate Risks In Mine Operations**

37.    On February 23, 2022, Defendants filed SSR Mining's fiscal 2021 annual report, which claimed "[t]he Company's safety framework emphasizes effective risk-centered management systems . . . to identify and assess job-related risks."

38.    On February 28, 2022, BMO Capital Markets highlighted that one of the "key points" of the Company's presentation of fiscal 2021 performance was its commitment to sustainable practices, including the "health & safety of its workforce."

39.    On April 14, 2023, SSR Mining published its 2022 Environment, Social, and Governance and Sustainability Report, which claimed to prioritize health and safety of miners using "appropriate equipment" and "effective communication."

40.    Defendants' statements were materially misleading and failed to disclose to investors: (1) that the heap leach pad at the Çöpler mine was significantly higher than industry norms; (2) that, as a result, the heap slope was unstable; (3) SSR Mining lacked key systems at the Çöpler mine to monitor the movement and displacement of heap; (4) that the foregoing were foreseeable factors within the Company's control that contributed to a significant risk of landslides at the Çöpler mine; (5) that, as a result, the Company was ill-equipped to respond to emergencies such as landslides at the heap leach pad; (6) that, as a result of the foregoing, there was a significant risk that Çöpler's permits could be suspended; and (7) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

14

**D.      The Truth About Çöpler's Monitoring System Deficiencies Is Revealed When A "Large Slip" Leads To The Death Of Several Miners And SSR Mining Employees Are Criminally Charged**

41.      On February 13, 2024, at approximately 8:49 a.m. EST, the Company announced that operations were suspended at the Çöpler mine due to a landslide. In a press release that was concurrently filed as an exhibit to a Form 8-K filed with the SEC, the Company stated:[5]

> SSR Mining Inc. (Nasdaq/TSX: SSRM; ASX: SSR) ("SSR Mining" or the "Company") announces a suspension of operations at the Çöpler mine as a result of a large slip on the heap leach pad. This event occurred in the morning of February 13, 2024 at approximately 6:30 am EST, and all operations at Çöpler have been suspended as a result.

42.      The same day, *Reuters* reported that at least nine miners were missing in the landslide and that the Turkish Interior Department had launched an investigation. In an article entitled "SSR Mining halts gold production in Turkey after landslide, shares tank," *Reuters* reported:

> Interior Minister Ali Yerlikaya said 400 search and rescue workers were looking for the missing miners.
>
> "In order to closely coordinate the rescue work, I will interrupt my international program with our president and move to the region as of tonight," Energy Minister Alparslan Bayraktar said in a posting on X, formerly Twitter.
>
> The government said it has launched an investigation into the incident.

43.      On February 13, 2024, at approximately 12:03 p.m. EST, *PBS* reported that the mine's operations had a track record of ignoring safety risks. In an article entitled

---

[5]      The time in Turkey is 8 hours ahead of Eastern Standard Time, so the landslide occurred at approximately 2:30 p.m. local time.

"Workers at gold mine in Turkey missing, assumed trapped underground after landslide,"

*PBS* reported:

> Turkey has a poor mine safety record. In 2022, an explosion at the Amasra coal mine on the Black Sea coast killed 41 workers. The country's worst mining disaster took place in 2014 at a coal mine in Soma, western Turkey, where saw 301 people were killed.
>
> ***In the wake of those incidents, engineers warned that safety risks were frequently ignored and inspections not adequately carried out.***
>
> ***"The disaster that took place in Erzincan Ilic Copler gold mine is a disaster that (was) coming***," the Union of Chambers of Turkish Engineers and Architects said in a statement issued on social media.
>
> The union added that it had filed two lawsuits against the mine's operation. "We said that Ilic Copler gold mine should be closed and rehabilitation works should be started."

44.    On this news, SSR Mining's share price fell $5.22, or 53.7% per share, to close at $4.50 per share on February 13, 2024, on unusually high trading volume.

45.    The incident was widely expected to have long-term implications. CIBC Capital Markets stated that SSR Mining's "longer-term prospects to 2027 could also be at risk as these were highly dependent on growth assets in Türkiye." Moreover, CIBC Capital Markets was "no longer expecting any contribution from Copler in 2024," which would present "a decrease from +700koz production for the company in 2023, down to 360koz at the mid-point of guidance for 2024." Scotiabank also posited that the suspension "could have negative implications on the cost and timeline of the planned grind-leach expansion for the Çakmaktepe extension[.]"

46.    Both CIBC Capital Markets and Scotiabank also questioned the Company's "social license to operate in the country," suggesting that the reputational harm was

irreparable following the Company's 2022 cyanide spill and the latest incident. TD Cowen's February 14, 2024 research note similarly recognized that "there is a possibility that SSR's social license in Turkey, as well as management credibility, could be negatively impacted."

47.    On Friday, February 16, 2024, after the market closed, the Company announced that 8 of its employees had been detained as part of the ongoing investigation. In a news release, SSR Mining stated, in relevant part:

> Search and rescue operations to locate nine missing workers following the February 13, 2024 incident at the Çöpler Mine continue and all operations remain suspended. All available resources have been deployed to assist in the operation, with emergency crews and first responders working around-the-clock, utilizing advanced search techniques supported by aerial drones. Our thoughts continue to be with the families of the missing workers and the Çöpler community during this incredibly difficult time. We will continue to support the authorities on the ground in Türkiye in their search and rescue efforts.
>
> ***Eight Çöpler Mine employees have been detained while the local authorities conduct their investigation. SSR Mining is providing its full cooperation to the regulators on site and providing support to the individuals and their families.***
>
> SSR Mining will provide a further update on the incident as it becomes aware of more information or during the Company's full-year 2023 financial results, currently scheduled for Wednesday, February 21, 2024.

48.    Media reported that Demirci was among those detained. Known as the "Turkey Country Manager," Demirci was released six hours later under judicial control conditions.

49.    On Sunday, February 18, 2024, SSR Mining announced that its environmental permit had been revoked by the Turkish Ministry of Environment,

17

Urbanization, and Climate Change and that the Çöpler mine operations would remain suspended until further notice. In a news release, the Company stated, in relevant part:

> SSR Mining has also been notified that the Çöpler environmental permit has been revoked, and the operation will remain suspended until further notice. Planning for near-term remediation efforts has begun at the direction of Ministry Officials, with an initial focus on removing heap leach material from the Sabirli valley and relocating it to a permanent storage location. SSR Mining is also deploying third party contractor resources to support the recovery and remediation efforts.

50.    On Monday, February 19, 2024, President's Day, Scotiabank issued a report stating that, though the permit cancellation was negative news, "we expect a negative reaction to be muted at market open on Tuesday as we believe investors have already priced the Çöpler asset out of the stock entirely." That report also reproduced "near-real time satellite imagery of the mine site show[ing] that the majority of this material has slid to the east of the pad between the leach pad and the TSF":

18

**Exhibit 1 - Near Real-time Satelite Image of Çöpler Site Highlighting Landslide**



Source: © Capella Space Corp, All Rights Reserved.

51.    On Tuesday, February 20, 2024, at approximately 12:25 a.m. EST, SSR Mining postponed the release of its full year 2023 financial results until February 27, 2024. The Company also stated that search and rescue activities had been temporarily suspended to "focus on stabilization of the heap leach area."

52.    On February 20, 2024, RBC Capital Markets "further reduced [its] NAV8% estimate for SSRM by 51% to $3.70/sh, now assuming zero value/production for Copler/Hod Maden in Turkey," citing the permit revocation and employee charges, which

19

"signal[led] in our view that valuation risks have increased again as the situation evolves." These actions by the Turkish government indicated "the seriousness of the disaster on the ground . . . and the seriousness with which the Turkish government is treating the disaster, as well as its willingness to take apparent control of the site and assume responsibility for the remediation and monitoring efforts." The report doubted whether the mine would ever resume operations, comparing the incident to a 2011 Collolar coal mine disaster, which was shutdown permanently, and other similar mine incidents. Therefore, the report posited it was "prudent to assume that at a minimum, investors will have little visibility into realizing any value for SSRM's Turkish assets for an extended period (if ever), with significant risk of costs, fines, legal and environmental liabilities beyond the $200m we currently model through 2026." Multiple analysts removed the Çöpler mine from its valuation of the company given the uncertainty.

53.     On the news disseminated between February 16 and February 20, SSR Mining's share price fell $0.29, or 5.91%, to close at $4.62 per share on Tuesday, February 20, 2024, on unusually heavy trading volume.

54.     On February 21, 2024, an article reported that scientists had determined that Çöpler's heap leach pad was 70% taller than the maximum standard.[6] Specifically, the article stated:

> A delegation of scientists from Trabzon Karadeniz Technical University (KTÜ) Landslide Application and Research Center has determined that that **heap leach that caused landslide in the Çöpler Gold Mine in Turkey's eastern Erzincan province was above the "controllable level."**

---

[6]     https://www.duvarenglish.com/scientists-determine-heap-leach-caused-landslide-in-turkish-mine-70-pct-higher-than-maximum-news-63875

Hakan Ersoy, member of the board of directors of the research center, underscored, "*We have determined that the heap leach, which is a maximum of 150 meters in the world standards, reached 257 meters here which is an unbelievable figure*."

Ersoy stated that they had not come across such practice in the world, and added "The excessive water content in an uncontrollable heap leach and its accumulation at a point very close to the explosions in the production area brought the disaster."

The leach heap is the accumulation of the material used during material beneficiation. The Çöpler Gold Mine used cyanide-containing solution for the extraction of gold; hence, the leach heap that caused landslide contained cyanide.

Many experts warned that the landslide could have led the cyanide exposure to local water sources as the mine was very close to Euphrates River and had river branches connected with the Euphrates in the mining site.

"The notion that a material stacked merely in piles reaches a height of 257 meters startled us, especially considering that buildings constructed from iron and concrete typically cannot exceed 200 meters in height nowadays. There is also a valley height of 100 meters, so a 350-metre pyramid was formed. These factors represent the primary drivers behind the (land) movement's acceleration and the exacerbation of the disaster," Ersoy stated.

The KTÜ professor also stated that the same landslide could have been triggered by an earthquake as the the contemporary fault map of the General Directorate of Mineral Research and Exploration (MTA) indicated that a fault line passes within 300-400 meters of the mine site.

"The heap is also so close to the quarry site that the it was subjected to repetitive loads due to the explosions during the extraction," he added.

Ersoy also underscored that they saw in the footage that the material flowed like a liquid during the landslide and said, "We think that the water content in the heap leach is higher than standards which also contributed to the disaster."

55.    On February 27, 2024, after the market closed, SSR Mining retracted its

previously issued 2024 and long-term guidance for the Çöpler mine due to the indefinite

21

suspension of operations. In a press release announcing fourth quarter and full year 2023

financial results, the Company stated, in relevant part:

> SSR Mining Inc. (Nasdaq/TSX: SSRM, ASX: SSR) ("SSR Mining" or the "Company") reports consolidated financial results for the fourth quarter and full-year ended December 31, 2023. Subsequent to year-end 2023, on February 13, 2024, operations at Çöpler were suspended as a result of a significant slip on the heap leach pad (the "Çöpler Incident"). Nine individuals remain unaccounted for as a result. ***The Company is not, at this time, able to estimate or predict when it will resume operations at Çöpler.*** The Company is assessing the potential impacts on the business, cash flows, results of operations and financial condition.

> Rod Antal, Executive Chairman of SSR Mining, said, "Right now, our attention is focused at Çöpler. The events of February 13, 2024 were tragic and overshadow today's results. We are heartbroken and sympathize with what we know is an extraordinarily stressful time for the families, friends and colleagues of the nine missing personnel.

> We would like to recognize the overwhelming support by a number of government agencies who are providing significant resources at Çöpler. Our teams are supporting the various government agencies to ensure that areas impacted are safe to continue the recovery and containment work. Finally, initial discussions and technical support is progressing to agree on the ultimate permanent storage location for the heap leach material that has been displaced from the heap leach pad.

> ***Due to the evolving situation at our Çöpler mine, we are retracting our previously issued 2024 and long-term guidance forecasts for Çöpler and Türkiye. We are also suspending our quarterly dividend payments and the automatic share purchase plan ("ASPP").*** While we continue to assess the impact of the Çöpler Incident, with a year-end 2023 cash balance of nearly $500 million and our operations at Marigold, Seabee and Puna continuing to generate cash flow, we do not, at this time, anticipate any near-term liquidity concerns. This is a challenging time, and we continue to offer our support to all individuals impacted by the events of February 13, 2024."

56.    The same February 27, 2024 press release noted that SSR Mining would

record a liability during first quarter 2024 to reflect remediation costs and may report

additional impairments for the Çöpler mine. Specifically, the press release stated:

**Çöpler Incident**: On February 13, 2024, the Company suspended operations at Çöpler as a result of a significant slip on the heap leach pad. At this time, nine personnel remain unaccounted for. The Turkish government is conducting environmental monitoring of surface water, groundwater, soil and air quality in the region with respect to potential contamination. Public comments from the Turkish government indicate that, to date, the testing results have been negative with respect to potential contamination in the locations being monitored. Containment and remediation efforts are ongoing, which are being directed by the Turkish government and supported by the Company, with an initial focus on removing heap leach material from the Sabırlı Valley and relocating it to a permanent storage location. ***The Company is in the process of evaluating the estimated remediation costs and anticipates recording a remediation liability during the first quarter of 2024. We also anticipate recording an impairment of inventory and specific assets directly impacted by the Çöpler Incident and will evaluate the Çöpler long-lived asset group for additional impairment during the first quarter of 2024.*** As of December 31, 2023, the Çöpler leach pad inventory of $73.3 million represents 19% and 10% of Çöpler's total inventory and of the Company's total inventory, respectively. As of December 31, 2023, the Çöpler mineral, properties, plant and equipment ("MPP&E") related to the leach pad of $33.1 million represents 1.0% and 0.8% of Çöpler's total MPP&E and of the Company's total MPP&E, respectively.

57.    On February 27, 2024, after the market closed, the Company filed its fiscal 2023 annual report on Form 10-K (the "2023 10-K"), which stated that "the regulatory authorities have charged six employees with criminal charges directly related to actions on the day of the Çöpler Incident." Moreover, SSR Mining was fully cooperating with legal and regulatory authorities who had requested documents and begun interviews of personnel.

58.    The 2023 10-K also listed a series of "Risks Related to the Çöpler Incident," including:

**Potential losses and liability resulting from the Çöpler Incident could have a material adverse effect on our financial condition, liquidity, cash flows and results of operations.** . . .

23

**Investigations are being conducted and the remediation is being directed by the Türkiye Government.** . . . As a result of the investigations, the Company may face, among other things, criminal and/or civil sanction, which may include significant fines, orders for remediation and restitution and loss of permits and/or the ability to operate Çöpler. Although we are cooperating and providing support as requested, the Türkiye government has assumed control and direction of the remediation efforts. As a result, we are not directly involved in assessing the scope of the remediation effort that may be required and the associated costs at this time. . . .

**The Company's production, development plans and cost estimates for Çöpler may not be achieved.** . . . As a result of the Çöpler Incident, the Company may not be able to achieve these estimates during the time frame it has set out, if at all, as the operating and economic assumptions, along with the mineral reserves, mineral resources, cost estimates and other findings contained in such TRS, may no longer be accurate. . . . The Company cannot estimate at this time when Çöpler will resume operations, which may have a material adverse impact on the Company's future cash flows, profitability, results of operations and financial condition.

59.    On February 27, 2024, after the market closed, the Company held a conference call to discuss the fourth quarter and full year 2024 financial results. During the call, Antal stated that SSR Mining would not make further comments pending the Turkish government's investigation and provided an overview of the Company's efforts following the incident:

The immediate focus was on the search and rescue efforts. This was initially suspended due to the instability of the heap leach pad, but efforts to locate the personnel have since resumed. Our priority is to safely recover and return our people to their families.

In addition, efforts have been focused on 3 other areas. First, to agree on and initiate a plan to stabilize the heap leach pad allowing work to safely continue on the recovery of our missing people. Initial work began on February 23 to stabilized portion of the heap leach pad, and extensive monitoring is taking place using drones and radar. The work to determine the final overall plan and approach to stabilize the pad, including the use of remote equipment, is continuing to advance.

24

Second priority has been on the containment of the Sabirli Creek area. In this regard, a containment pond was immediately constructed and the installation of a concrete curtain at the bottom of the valley is underway. Order diversion systems at the top of the Sabirli valley are also underway. The Turkish government is conducting environmental monitoring of surface water, ground water, soil and air quality in the region. Couple of comments from the Turkish government today indicate that test results have been negative with respect to potential contamination in the locations being monitored. These results are preliminary and additional testing will continue.

Finally, and number 3 is the ongoing discussion with the various government ministries to determine the permanent storage location for the heap leach material.

\*        \*        \*

Investigations led by the Turkish government are underway to determine the cause of factors leading to the slip. We expect this to take some time to complete and until then, have no further comments to make. As we look ahead, we continue to work closely with government officials and regulators, and we'll update the market as facts present themselves moving forward.

60.    In its research note on February 28, 2024, BofA Securities pointed out that "[a]t the Hod Madan project in Türkiye, SSRM halted development activity, and sees a risk that permits may be revoked." This highlighted that the incident at the Çöpler mine had a ripple effect on the Company's operations within the country. Canaccord stated that "[a]pproximately one-third of the material (18-20Mt) stacked on the Çöpler oxide heap leach slipped off the pad . . . [into areas] within the boundaries of Çöpler's Environmental Impact Assessment," meaning the incident was within the Company's area of control.

61.    On this news, the Company's share price fell $0.37, or 7.94%, to close at $4.29 per share on February 28, 2024, on unusually heavy trading volume.

62.    On March 8, 2024, SSR Mining announced that White was "leaving the Company to pursue other opportunities." The Company's Executive Vice President, Chief Legal and Administrative Officer, Michael J. Sparks, succeeded White as CFO.

**E.    SSR Mining Incurred At Least $250 Million In Remediation Costs And $114 Million In Impairment Charges Due To The Indefinite Suspension of Çöpler Operations**

63.    On May 8, 2024, SSR Mining announced its first quarter 2024 financial results, which included a $114.2 million impairment charge because the heap leach pad would be permanently closed as a result of the Çöpler incident. In a press release, the Company stated:

> As a result of the Çöpler Incident, the Company plans to permanently close the heap leach pad; therefore, the Company fully impaired the heap leach pad inventory and related heap leach pad processing facilities. Accordingly, during the three months ended March 31, 2024, the Company recorded non-cash impairment charges of $76.0 million related to Inventories and $38.2 million related to Mineral properties, plant and equipment, net, for a total non-cash impairment charge of $114.2 million.

64.    Moreover, the Company had developed a remediation plan, which would be submitted for government approval, to design and construct a permanent storage facility for approximately 18 to 20 million tonnes of displaced heap leach material. The remediation was estimated to cost between $250 to $300 million, and the Company had already incurred $22.5 million in remediation expenses. Specifically, the May 8, 2024 press release stated, in relevant part:

> **<u>Çöpler Update</u>**
>
> Our primary focus at Çöpler continues to be the return of our missing colleagues to their families. Following the recovery of four of our missing colleagues, recovery efforts for the five remaining individuals continue. To-date over 6.7 million tonnes of heap leach material has been relocated as

26

part of the ongoing recovery, containment and remediation activity, including 4.2 million tonnes from the Sabırlı Valley.

SSR Mining currently expects the completion of the removal of all displaced heap leach material resulting from the Çöpler Incident out of the Sabırlı Valley and into temporary storage locations in the third quarter of 2024. Concurrently, containment efforts have been completed alongside the removal of the displaced material with the installation of a grout curtain, coffer dam and buttress as well as the ongoing installation of pumping systems and diversion channels in the Sabırlı Valley.

In parallel with the recovery and containment work, the Company is progressing a remediation plan following comprehensive consultation and evaluations with various Turkish government agencies, ministries, independent experts and external consultants. ***The remediation plan will be submitted for government approval in the second quarter of 2024 and will include, among other things, the construction of a permanent storage facility for the displaced heap leach material. The design of the storage facility is capable of containing the approximately 18 to 20 million tonnes of displaced material in an area referred to as the East Storage Facility (see Figure 1).***

***The remediation work is expected to cost between $250 to $300 million on a 100% basis, in addition to the approximately $22.5 million incurred as of March 31, 2024. The remediation efforts are expected to be implemented over a period of 24 to 36 months.*** With a total cash position of $467 million at the end of the first quarter 2024, ongoing cash flow from three operations, and access to an additional $400 million revolving credit facility, the Company remains well positioned to fund these remediation commitments.

65.     According to the May 8, 2024 press release, the heap leach pad would be permanently closed, and Defendants could not estimate when operations at the Çöpler mine would resume:

As part of the remediation plan, the heap leach pad will be permanently closed and no further heap leach processing will take place at Çöpler. In order to restart the operations, the Company will require the necessary operating permits and approvals. Once all necessary regulatory approvals, including the Environmental Impact Assessment (EIA) and operating permits, are reinstated, it is anticipated that initial ore processing at Çöpler will occur exclusively through the sulfide plant, which will process stockpiled

27

material while Çöpler's mining team remains focused on completing the recovery and remediation work. As of the end of 2023, sulfide stockpiles totaled 10.8 million tonnes of ore at a grade of 2.0 grams per tonne gold, or approximately 706,000 contained ounces. ***At this time, the Company is not able to estimate when and under what conditions operations will resume at Çöpler.***

66.     The May 8, 2024 press release also contained the following image showing the Çöpler site, displaced heap leach material, and proposed remediation infrastructure:



**Figure 1.** Location of containment and proposed remediation infrastructure overlain on an aerial view of the Çöpler site as of May 1, 2024.

67.     Also on May 8, 2024, the Company held a conference call to discuss first quarter 2024 financial results. During the call, Antal stated that "first quarter financial results were significantly impacted by the Çöpler Incident" due to "charges totaling $288 million, including costs incurred to date, plus future remediation costs, and legal contingencies." As to the environmental permits that had been revoked, Antal stated that efforts had been focused on recovery of missing workers and remediation efforts, so "it's

28

a little bit early to say exactly what pathway we need and how long it's going to take" to

obtain permits.

68.    Analysts like Scotiabank commented that these remediation costs

"significantly exceeded our estimate of ~$120M, carrying a protracted timeline with a

permanent closure of the heap leach circuit which was a key source of near-term low-

cost gold production."

69.    On May 24, 2024, SSR Mining announced that it had received a copy of the

Expert Committee Report dated March 16, 2024 commissioned by Erinzcan's Chief

Public Prosecutor (the "Expert Committee Report") but had "only completed a preliminary

review." In the same press release, however, the Company attempted to defend the safety

of the mine's construction, stating in relevant part:

> The Company notes that the Çöpler heap leach pad was designed, and has
> been reviewed over the years, by multiple reputable, third-party engineering
> firms and based on the Company's preliminary, initial review and
> assessment of the incident, the Company has not identified any material
> non-conformance with the construction or operation of the heap leach pad
> relative to the third-party engineered design parameters. The Company will
> continue to evaluate the Report in conjunction with its assessment of the
> Çöpler Incident.

70.    On July 31, 2024, after the market closed, SSR Mining announced its

second quarter 2024 financial results in a press release, including that the Company had

spent $55 million on remediation activities during the quarter. In relevant part, the press

release stated:

> Over 13 million tonnes of displaced heap leach material at Çöpler have
> been moved since the Incident, including more than 9 million tonnes from
> the Sabırlı Valley. As previously guided, all displaced material is expected
> to be removed from the Sabırlı Valley into temporary storage areas by the
> end of the third quarter of 2024. From the start of the second quarter of 2024

29

onwards, estimates for the cost of site remediation are between $250 to $300 million, including legal contingencies, material movement and construction costs. ***In the second quarter, $55 million was spent on remediation activities at Çöpler.*** With total cash of $358 million at the end of the second quarter, total available liquidity in excess of $850 million, and ongoing free cash flow generation from Marigold, Seabee and Puna, SSR Mining's balance sheet remains strong.

\*　　　\*　　　\*

At this time, the Company is not able to estimate when and under what conditions operations will resume at Çöpler.

**F.      SSR Mining Was At Fault For Failing To Timely Evacuate Miners After Data Suggested An Impending Landslide**

71.     The 262-page Expert Committee Report found at fault Demirci and SSR Mining's Vice President of Global Projects, John Harmse, among others. According to media reports, the "primary responsible party was identified as Canada-based SSR Mining's Vice President of Global Projects, John Harmse," and Demirci and 12 other individuals were found "primary negligent parties."[7] The article described the Expert Committee Report, in relevant part:

The report summarised the multiple errors that have led to the disaster. Failure to properly establish the project management mechanism, the capacity increase, the design errors in the prepared projects, the insufficient monitoring during the operation phase, the inadequate warning systems, and the lack of an effective management system to act upon the warning signs of cracks were all influential factors in the occurrence of the incident.

72.     The Expert Committee Report concluded that the landslide could *not* have been triggered by a natural disaster, such as an earthquake or excessive rain, and that necessary alerts were not given after radar measurements detected significant ground

---

[7]      https://www.duvarenglish.com/turkish-court-arrests-four-regarding-ilic-gold-mine-disaster-following-new-expert-report-news-64405

30

motion at the heap. Radar measurements between February 12 and February 13, 2024 showed that ground movement exceeded the 20 mm per day limit (or 0.83 mm per hour). The radar measurements showed that the velocity was 1.83 mm per hour, so the "assessment should have been made as of 08:00 a.m. or 10:00 a.m. on February 13, 2024" to evacuate the area. In fact, the velocity data over the 7-day period preceding the incident shows increasing velocities, which underscores that the area should have been evacuated long before the incident:



*Figure 4. Graph for displacement figures measured between 12:23 p.m. on February 06, 2024 and 12:21 p.m. on February 13, 2024 (file titled "7-day Displacement Graph.bmp")*

73.     No later than February 11, 2024, Anagold was aware of a crack at the heap leach pad at the Çöpler mine. According to an employee of Anagold, the "occupational safety expert came to workers after the disaster and told them that they had known about the crack that caused [the] landslide for two days."[8] The miner recounted that "Workers

---

8     https://www.duvarenglish.com/miner-says-company-aware-of-landslide-risk-two-days-before-turkeys-mining-disaster-news-6384.

saw the crack and warned (the company) about it, yet they did not take it into consideration. The company told us that they evacuated the site. If it was evacuated, why did these people stay under the ground? If we had not realized, we could have died too."

74.     These media reports that the Company was aware of a crack were corroborated by the Erinzcan Public Prosecutor's Office. A preliminary expert report commissioned by the Prosecutor's Office found that the deputy plant manager, oxide process manager, and chief engineer of the oxide plant "reportedly ignored the cracks that had formed in the heap leach field, which posed a significant risk, and failed to evacuate the area even though they were aware of the hazards."[9] Moreover, "[e]xperts said that disaster was expected at the mine, as previous accidents and irregularities in documentation signaled a lack of control on the operating company Anagold and the Environment Ministry's part."[10]

75.     Images of the crack were circulated among employees via WhatsApp group and e-mails. The following are several images of the crack, as reproduced within the Expert Committee Report that concluded the landslide was caused in part by "the failure to follow whether these cracks got wider over time or if there also observed in different areas."

---

[9]     https://www.turkishminute.com/2024/02/17/6-arrest-over-landslide-gold-mine-search-for-trapped-miners-continues/

[10]     https://www.duvarenglish.com/turkish-mining-authority-removed-active-fault-under-collapsed-copler-gold-mine-from-map-chp-reveals-news-63888





*Figure 7. Photos in e-mail sent by Ali Rıza Kalender*





*Figure 8. Photos in e-mail sent by Iain Guille*



*Figure 9. Other photos showing the cracks in the area*

76.    A daily production meeting was held on-site at the Çöpler mine every morning, and at the February 13, 2024 meeting held at 8:30 a.m. Istanbul time, the senior heap leach supervisor reported the cracks in the heap leach area and that there was a risk of a slide. At 11:30 a.m., Iain Ronald Guille, Anagold's Occupational Health and Safety assistant executive manager, notified Demirci, Mr. MacNevin, and Patrick James (Senior Vice President of Environment, Health, Safety and Sustainability) to notify them of the crack. By 1:30 p.m., Geotechnical Engineer Ali Riza found that the heap leach movement had accelerated to 90 mm, from the usual movement of 20 mm, and that the crack can be covered with cement but no heap should be made until the area is repaired. An hour later, the heap slipped and trapped 9 workers.

77.     None of the witnesses interviewed by the Prosecutor's Officer recalled a negative radar report before the incident occurred, according to the Expert Committee Report.

## V.    MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A.    Statements Regarding SSR Mining's Equipment To Ensure Employee Safety

78.     On February 23, 2022, SSR Mining filed its annual report on Form 10-K for the period ended December 31, 2021 (the "2021 10-K"), which claimed the Company had "established systems" to identify and respond to mining risks. Specifically, it stated:

*Health and Safety*

The Company is committed to the health and safety of its employees and does so **by creating and maintaining a safe working environment, equipment, work processes, effective safety and health management systems, and by complying with all applicable health and safety laws and regulations.** The Company acknowledges that there are inherent risks associated with the Company's business and, through proactive risk management, continuously strives to maximize the safety of its operations and minimize and control health and safety risks.

**The Company's safety framework emphasizes effective risk-centered management systems**, positive and effective work cultures and proactive leadership to drive culture enhancement. The Company focuses on balancing the human and technical aspects of safety: blending leadership behaviors with traditional management activities to create a safe, productive culture. The Company ensures that its workers understand their individual roles and contributions to safe production and a safe workplace. In this way, the Company's employees maintain safety awareness, recognize hazards and analyze risk in their daily activities. **The technical aspects of safety are addressed through established systems, policies and procedures that enable the Company's employees to identify and assess job-related risks, and that support our efforts to provide appropriate training and verify training competencies.** Performance measurement and accountability provides feedback and maintains focus on continuous improvement.

79.     On April 14, 2022, SSR Mining published its 2021 Environment, Social, and Governance ("ESG") and Sustainability Report (the "2021 ESG and Sustainability Report"). Therein, Defendants stated:

Case Study: Emergency Preparedness

Making sure we are adequately prepared for emergencies is a key part of our commitment to providing a safe environment, both for our people and the communities we work in. While the details of Emergency Plans vary by site, the fundamentals of our approach are consistent: well trained teams, **appropriate equipment**, **effective communication** and clear protocols.

For example, at our Çöpler Mine in Turkey, there are three dedicated emergency response personnel complemented by a team of 86 trained workers. A minimum of 20 trained emergency response workers are present on site at any one time.

Mock drills are performed periodically throughout the year to ensure all workers know what to do in the event of an emergency, and we have a target of a three-minute emergency response time.

The Mine also has **high specialized and sophisticated equipment on site**, and reflecting Çöpler's commitment to the community in 2019, the mine signed a protocol with the Sub-governor of Illiç to assist the district in dealing with emergencies such as traffic incidents.

80.     On February 22, 2023, SSR Mining filed its annual report on Form 10-K for the period ended December 31, 2022 (the "2022 10-K"), which stated, in relevant part:

*Health and Safety*

The Company is committed to the health and safety of its employees and does so **by creating and maintaining a safe working environment, equipment, work processes, effective safety and health management systems, and by complying with all applicable health and safety laws and regulations.** The Company acknowledges that there are inherent risks associated with the Company's business and, through proactive risk management, continuously strives to maximize the safety of its operations and minimize and control health and safety risks.

**The Company's safety framework emphasizes effective risk-centered management systems**, positive and effective work cultures and proactive

37

leadership to drive culture enhancement. The Company focuses on balancing the human and technical aspects of safety: blending leadership behaviors with traditional management activities to create a safe, productive culture. The Company ensures that its workers understand their individual roles and contributions to safe production and a safe workplace. In this way, the Company's employees maintain safety awareness, recognize hazards and analyze risk in their daily activities. ***The technical aspects of safety are addressed through established systems, policies and procedures that enable the Company's employees to identify and assess job-related risks, and that support our efforts to provide appropriate training and verify training competencies.*** Performance measurement and accountability provides feedback and maintains focus on continuous improvement.

81.    On April 14, 2023, SSR Mining published its 2022 ESG and Sustainability

Report, which stated the following regarding "Emergency Preparedness":

Making sure we are adequately prepared for emergencies is a key part of our commitment to providing a safe environment, both for our people and the communities we work in. While the details of Emergency Plans vary by site, the fundamentals of our approach are consistent: well-trained teams, ***appropriate equipment, effective communication*** and clear protocols.

Each site develops and manages emergency response activities, with the focus on surface or underground rescue and response. Our rescue teams coordinate activities in their regions to encourage mutual aid, share best practices and generally improve performance.

For example, at our Çöpler Mine in Türkiye, there are three dedicated emergency response personnel complemented by a team of 86 trained workers. A minimum of 20 trained emergency response workers are present on-site at any one time. Our Marigold Mine in Nevada has partnered with Valmy's Volunteer Fire Department to coordinate emergency responses in Humboldt County. Members of Marigold's Emergency Response Team (ERT) are enrolled as Valmy Volunteer Firefighters and have received necessary training to respond to fire emergencies.

Mock drills are performed periodically throughout the year to ensure all workers know what to do in the event of an emergency, and we have a target of a three-minute emergency response time.

As part of emergency preparedness in 2022, we also finalized a detailed communication strategy to manage crisis communications within the organization at the local, regional, national and international level. We

38

modeled the plan to suit various expected emergency scenarios, which will help in engaging with our stakeholders quickly, truthfully and accurately.

82.    The 2022 ESG and Sustainability Report also stated the following regarding health and safety:

At SSR Mining, health and safety have always been and will always be a foundational value. Mining as an industry has a range of inherent risks and failure to implement to develop and implement robust standards can result in serious and life-altering injuries, loss of life and damage to assets. However, we believe that with appropriate controls, sound management of factors to minimize risk and robust employee engagement, the majority of safety incidents are preventable.

Our number-one objective, above anything else, is to reduce harm and reduce incidents that hurt our employees and business partners. It is clear from our performance in 2022 that we have more work to do in both of these areas. Safety begins with leadership and engagement, identifying and controlling risk, the elimination of hazards, improving ongoing training and responding appropriately when the unexpected happens.

Safety at SSR Mining is governed by our Health and Safety Policy which sets out a commitment to:

- A safety culture that addresses safety and health both as a company and a personal value for us and those we work with

- Protect the health and safety of employees and our business partners at all stages of the mine life cycle

- ***Provide employees and contractors with a safe working environment free from uncontrolled hazards***

- Implement effective safety, health and security systems at all operations

- Evaluate the health and safety implications of business decisions

- Measure and monitor the safety and health performance of our operation against set objectives and targets

- Promote initiatives that foster a safety culture

39

- Promote wellness and healthy lifestyles for our employees, local communities and those we work with

Our management approach to Safety and Health is overseen by our Senior Vice President, Environment, Health, Safety and Sustainability with support from our Director of Health & Safety and dedicated site-level teams, which include subject matter experts at each operation and each project.

83.    The above statements identified in ¶¶ 78-82 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) the SSR Mining lacked key systems at the Çöpler mine to monitor the movement and displacement of heap; (2) that, as a result, the Company was ill-equipped to respond to emergencies such as landslides at the heap leach pad; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

**B.    Statements Regarding Risks To The Company's Permits**

84.    The 2021 10-K also stated:

**The Company requires permits to conduct its operations, and delays in obtaining or failing to obtain such permits, or a failure to comply with the terms of any such permits that the Company has obtained, would adversely affect the Company's business.**

The Company's operations, including continued production at Çöpler, Marigold, Seabee and Puna, and further exploration, development and commencement of production on the Company's other mineral properties, require licenses, permits and other approvals from various governmental authorities, including land and water usage permits. Obtaining or renewing governmental permits is a complex and time-consuming process. The duration and success of efforts to obtain and renew permits are contingent upon many variables not within the Company's control.

The Company's ability to obtain the required permits and approvals to explore for, develop and operate mines and to successfully operate near

40

communities in the jurisdictions in which we operate depends in part on our ability to develop, operate and close mines in a manner that is consistent with the creation of social and economic benefits in the surrounding communities, which may or may not be required by law. ***Our ability to obtain permits and approvals and to operate near certain communities may be adversely impacted by real or perceived detrimental events associated with our activities or those of other mining companies affecting the environment, health and safety of communities in which we operate.*** Further, certain communities may challenge, or seek to challenge, permits and approvals granted to the Company, which may result in temporary or permanent suspension of such permits and approvals or the cessation of Company operations. Any delay or suspension of the Company's operations as a result of such challenges, whether such challenges have merit, may adversely affect the Company's business, results of operations or financial condition.

***Previously obtained permits and approvals may be suspended or revoked for many reasons, including through government or court action, or may be adjusted in a manner that adversely affects our operations, including our ability to explore or develop properties, commence production or continue operations.*** There can be no assurance that all permits, licenses and approvals that are required for the operations of the Company, including any for construction of mining facilities or conduct of mining, will be obtainable or renewable on reasonable terms, or at all. Delays or a failure to obtain such required permits, or the expiry, revocation or failure by the Company to comply with the terms of any such permits that it has obtained, would adversely affect the Company's business.

85.     The 2022 10-K stated:

**The Company requires permits to conduct its operations, and delays in obtaining or failing to obtain such permits, or a failure to comply with the terms of any such permits that the Company has obtained, would adversely affect the Company's business.**

The Company's operations, including continued production at Çöpler, Marigold, Seabee and Puna, and further exploration, development and commencement of production on the Company's other mineral properties, require licenses, permits and other approvals from various governmental authorities, including land and water usage permits. Obtaining or renewing governmental permits is a complex and time-consuming process. The duration and success of efforts to obtain and renew permits are contingent upon many variables not within the Company's control.

The Company's ability to obtain the required permits and approvals to explore for, develop and operate mines and to successfully operate near communities in the jurisdictions in which we operate depends in part on our ability to develop, operate and close mines in a manner that is consistent with the creation of social and economic benefits in the surrounding communities, which may or may not be required by law. ***Our ability to obtain permits and approvals and to operate near certain communities may be adversely impacted by real or perceived detrimental events associated with our activities or those of other mining companies affecting the environment, health and safety of communities in which we operate.*** Further, certain communities may challenge, or seek to challenge, permits and approvals granted to the Company, including, but not limited to, environmental impact assessments and other operating permits, which may result in temporary or permanent suspension of such permits and approvals or the cessation of Company operations. Any delay or suspension of the Company's operations as a result of such challenges, whether such challenges have merit, may adversely affect the Company's business, results of operations or financial condition.

***Previously obtained permits and approvals may be suspended or revoked for many reasons, including through government or court action, or may be adjusted in a manner that adversely affects our operations, including our ability to explore or develop properties, commence production or continue operations.*** There can be no assurance that all permits, licenses and approvals that are required for the operations of the Company, including any for construction of mining facilities or conduct of mining, will be obtainable or renewable on reasonable terms, or at all. Delays or a failure to obtain such required permits, or the expiry, revocation or failure by the Company to comply with the terms of any such permits that it has obtained, would adversely affect the Company's business.

86. The above statements identified in ¶¶ 84-85 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the heap leach pad at the Çöpler mine was significantly higher than industry norms; (2) that, as a result, the heap slope was unstable and could lead to landslides; (3) SSR Mining lacked key systems at the Çöpler mine to monitor the movement and displacement

of heap; (4) that, as a result of the foregoing, there was a significant risk that Çöpler's permits could be suspended; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

**C.     Statements Of Risks Purportedly Outside The Company's Control**

87.     The 2021 10-K purported to warn:

**Mining is inherently risky and subject to conditions and events beyond the Company's control.**

The development and operation of a mine or mine property is inherently risky and involves many risks that even a combination of experience, knowledge and careful evaluation may not be able to overcome, including:

- unusual or unexpected geological formations;

- metallurgical and other processing problems;

- shortages in materials or equipment and energy and electrical power supply interruptions or rationing;

- failure of engineered structures;

- inaccurate mineral modeling;

- unanticipated changes in inventory levels at heap-leach operations;

- metal losses;

- environmental hazards, including discharge of metals, concentrates, pollutants or hazardous chemicals;

- ground and water conditions;

- power outages;

- remote locations and inadequate infrastructure;

- community relations problems;

43

- labor disruptions;

- the availability and retention of skilled personnel;

- non-governmental organization or community activities;

- industrial accidents, including in connection with the operation of mining equipment, milling equipment and/or conveyor systems and accidents associated with the preparation and ignition of large-scale blasting operations, milling and processing;

- transportation incidents, including transportation of chemicals, explosions or other materials, transportation of large mining equipment and transportation of employees and business partners to and from sites;

- fall-of-ground accidents in underground operations;

- ***failure of mining pit slopes and tailings dam walls;***

- periodic interruptions due to inclement or hazardous weather conditions;

- flooding, explosions, fire, rockbursts, cave-ins ***and landslides***;

- seismic activity;

- changes to legal and regulatory requirements;

- security incidents, including activities of illegal or artisanal miners, gold bullion or concentrate theft, including in transport, and corruption and fraud;

- mechanical equipment and facility performance problems;

- failure of unproven or evolving technologies or loss of information integrity or data; and

- the availability of materials and equipment.

***These risks could result in*** damage to, or destruction of, mineral properties, production facilities or other properties, environmental damage, delays in mining, increased production costs, ***asset write downs, monetary losses and possible legal liability or penalties***, occupational illness or health issues, personal injury, ***and loss of life***, and/or facility and

44

workforce evacuation. The Company may not be able to obtain insurance to cover these risks at economically feasible premiums, or at all. The Company may suffer a material adverse effect on its business if it incurs losses related to any significant events that are not covered by the Company's insurance policies.

88.    The 2022 10-K purported to warn:

**Mining is inherently risky and subject to conditions and events beyond the Company's control.**

The development and operation of a mine or mine property is inherently risky and involves many risks that even a combination of experience, knowledge and careful evaluation may not be able to overcome, including: . . .  failure of mining pit slopes and tailings dam walls; . . . [and] flooding, explosions, fire, rockbursts, cave-ins and landslides; . . . .

For example, in June 2022, Türkiye's Ministry of Environment, Urbanization and Climate Change ("Ministry of Environment") temporarily suspended operations at the Çöpler mine site as a result of a leak of leach solution containing a small amount of diluted cyanide on June 21, 2022. The leak occurred from a pipeline that pumps diluted cyanide solution to Çöpler's heap leach pad. The Ministry of Environment ordered certain remediation and improvement initiatives to be undertaken. The Company completed these initiatives and received the required regulatory approvals from Türkiye's government authorities on September 22, 2022, at which time operations were restarted at the Çöpler mine. The leak and our remediation efforts led to a decline in production of gold and related product revenue during the third quarter of 2022, which impacted our financial results. In addition, as a result of the suspended operations at the Çöpler mine, we were also not in compliance with certain financial covenants under our Term Loan as of September 30, 2022. During the fourth quarter of 2022, we received a waiver for the non-compliance event from our lenders. See Note 18 to the to the Consolidated Financial Statements for additional information. We may also learn additional information about the leak at the Çöpler mine that materially adversely affects us and may lead to liabilities, including, but not limited to, monetary damages or settlement costs or liabilities related to compliance with applicable laws. Any such liabilities, individually or in the aggregate, could have a material adverse effect on our business, financial condition and results of operations.

These risks could result in damage to, or destruction of, mineral properties, production facilities or other properties, environmental damage, delays in mining, increased cost of sales, asset write downs, monetary losses and

45

possible legal liability or penalties, occupational illness or health issues, personal injury, and loss of life, and/or facility and workforce evacuation. The Company may not be able to obtain insurance to cover these risks at economically feasible premiums, or at all. The Company may suffer a material adverse effect on its business if it incurs losses related to any significant events that are not covered by the Company's insurance policies.

89.    The above statements identified in ¶¶ 87-88 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that the heap leach pad at the Çöpler mine was significantly higher than industry norms; (2) that, as a result, the heap slope was unstable; (3) SSR Mining lacked key systems at the Çöpler mine to monitor the movement and displacement of heap; (4) that the foregoing were foreseeable factors within the Company's control that contributed to a significant risk of landslides at the Çöpler mine; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

## VI.    CLASS ACTION ALLEGATIONS

90.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

91.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, SSR Mining's shares actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time

and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of SSR Mining shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by SSR Mining or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

92. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

93. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

94. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of SSR Mining; and

c) to what extent the members of the Class have sustained damages and the proper measure of damages.

47

95.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VII.    UNDISCLOSED ADVERSE FACTS

96.    The market for SSR Mining's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, SSR Mining's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired SSR Mining's securities relying upon the integrity of the market price of the Company's securities and market information relating to SSR Mining, and have been damaged thereby.

97.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of SSR Mining's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about SSR Mining's business, operations, and prospects as alleged herein.

48

98.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about SSR Mining's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## VIII.    LOSS CAUSATION

99.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

100.    The truth regarding the safety deficiencies was partially revealed, and/or the concealed risks materialized, beginning February 13, 2024.

101.    On February 13, 2024, before the market opened, SSR Mining announced the suspension of operations at the Çöpler mine due to a landslide. The same day, *PBS* reported that "safety risks were frequently ignored and inspections [were] not adequately carried out." On this news, SSR Mining's share price fell $5.22, or 53.7% per share, to close at $4.50 per share on February 13, 2024, on unusually high trading volume.

49

102.    On Friday, February 16, 2024, after the market closed, the Company announced that 8 of its employees were detained in connection with the Turkish Interior Department's ongoing investigation of the incident. On Sunday, February 18, 2024, SSR Mining announced that its environmental permit had been revoked by the Turkish Ministry of Environment, Urbanization, and Climate Change. On Monday, February 19 (President's Day) and Tuesday, February 20, analysts recognized the significance of these actions and warned investors that operations may never resume. On the news disseminated between February 16 and February 20, SSR Mining's share price fell $0.29, or 5.91%, to close at $4.62 per share on Tuesday, February 20, 2024, on unusually heavy trading volume.

103.    On February 27, 2024, after the market closed, SSR Mining retracted its guidance for the Çöpler mine due to the indefinite suspension of operations and expected to record an impairment of inventory and certain assets. Moreover, six employees were criminally charged related to the incident. On this news, the Company's share price fell $0.37, or 7.94%, to close at $4.29 per share on February 28, 2024, on unusually heavy trading volume.

104.    During the Class Period, Plaintiff and the Class purchased SSR Mining's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## IX.    ADDITIONAL SCIENTER ALLEGATIONS

105.    As alleged herein, Defendants acted with *scienter* since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding SSR Mining, their control over, and/or receipt and/or modification of SSR Mining's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning SSR Mining, participated in the fraudulent scheme alleged herein.

### A.    SSR Mining Did Not Have Required Monitoring Systems To Mitigate The Known Risk of Landslides In Open Pit Mining

106.    Mining is among the top human-triggered causes of landslides.[11] Open-pit mining erodes the surrounding land. That vulnerability can be exacerbated by rainfall or leaching, which can make the slope of the heap unstable and result in landslides. Many mining incidents across the globe were caused by excessive rainfall that led to flash floods.[12] The loss of sensitivity of the heap leach led to landslides in Bella Vista, Costa

---

[11]    https://www.nature.com/articles/s41598-023-42736-4

[12]    https://www.earthnetworks.com/blog/landslides-and-mines-a-constant-threat/
(detailing incidents in Central African Republic, Philippines, and Chile).

51

Rica (2007); Pajingo, Australia (2011); Fort Knox, Alaska (2012); and Cerro Verde, Peru

(2014).

107.    Purportedly to ensure the safety of mine workers, the Company had

instituted a triggering action response plan for the heap leach pad at Çöpler mine (as

produced by the Expert Committee Report):

*Table 5. Displacement critical level values according to the Triggering Action Response Plan (TARP) for heap leach and the actions to be taken in case of exceeding these values (Çöpler TARP, 2022)*

| | Operation Response Plan | | Emergency Response Plan | |
|---|---|---|---|---|
| Level | Green: Normal actions | Yellow: Warning | Orange: High Risk | Red: Loss of Integrity |
| Triggers, Visual inspections , Etude | • No movement or abnormal situation is observed | • <10 mm/day mild movement<br>• Continuous monitoring of HL by using radar | • Moderate movement, rate of movement between 10 and 20 mm/day<br>• Continuous monitoring of HL by using radar. | • >20mm/day Instantaneous velocity<br>• Continuous monitoring of HL by using radar |
| Anagold employee | - | No noticeable leach movement | • Ensure it is not in close movement area<br>• Promptly inform the security or your manager. | |
| Security | N/A | Promptly inform the shift manager | | |
| YL Operator | N/A | Promptly inform the shift manager. | Promptly contact the YL stacking operator to stop stacking. | |
| Manager / Regional Engineer | N/A | • Inform the Geotechnical Engineer for direction about the required barricade level<br>• Geotechnical Engineer will determine whether there is a HL failure.<br>• Barricade the area as directed by the Geotechnical Team.<br>• Determine whether this is a small HL failure.<br>• Evaluate the need for mitigation further movement risk by stopping stacking and/or decreasing watering together with | | |

| | | the Geotechnical Engineer, and secure the area to prevent unauthorized personnel access.<br>• Coordinate the Incident Reporting process, as required. |
|---|---|---|
| Geotechnic al Engineer | N/A | • Evaluate potential failure inside or outside of the beam<br>• Instruct the Manager and/or Regional Engineer to ensure safety of the area including barricading.<br>• Provide instructions for the next steps including additional monitoring for action and correction actions. |

108.    To take the measures contemplated by the response plan, SSR Mining was required to institute effective monitoring and warning systems. According to the Expert Committee Report, the following systems are "required" to monitor heap leach and to mitigate the risk of landslide:

- Topographic monitoring: Precise GPS sensors to detect millimetric movements on the surface of the heap, and regular topographic mapping to determine potential landslide areas;

- Geotechnical monitoring: Inclinometer to track movements inside the heap and sliding surfaces, piezometer to track water pressure inside the heap, and deformation meter to monitor/track regression and deformations inside the heap;

- Remote monitoring: light detection and ranging to monitor changes on the surface of the heap;

- System for data collection and analysis; and

- Instruments to collect data and monitor in real-time to allow early warnings

109.    Though SSR Mining used radar and prism data to monitor heap leach deformations, the Expert Committee Report found that tension in pore water is not monitored, measuring instruments were not placed sufficiently, and there was no

centralized data collection and analysis. The failure to implement these safety systems is directly related to the devastating impact of the landslide at the Çöpler mine.

110.   For example, without a centralized data collection and analysis unit, the heap leach displacement and radar displacement data were not analyzed effectively. The heap leach displacement over the week preceding the landslide (below) shows that the limit of 10 mm per day of movement was exceeded on February 8, 2024, which should have initiated an orange alarm. Yet no security measures were taken.



*Figure 7. Graphic of heap leach displacement for the last week before landslide*

111.   Moreover, radar displacement between August 2023 and February 2024 shows that heap displacement "increased since January," which coincides with blasts conducted during Phase 5 construction. The displacement velocity was approximately 25 mm per day after January 5, 2024, which "required red warning actions" according to the Expert Committee Report.

112.    Therefore, the Company failed to institute the required monitoring and warning systems. This failure paralyzed the Company from following its triggering action response plan, including early evacuation.

113.    The Company's Board of Directors has an Environment, Health, Safety & Sustainability Committee (later renamed the Technical, Safety, and Sustainability Committee) that oversees, monitors and reviews SSR Mining's "practice and performance in areas of safety, health, environment, community and stakeholder relationships and environmental management (including areas of water management and climate change)." These responsibilities included a regular assessment of "safety and health related risks across each part of our mines [to] ensure that we are aware of the specific risks in each part of the mine and [that] the most appropriate hazard controls are implemented." The governance structure to exercise these oversight duties directly involves the Individual Defendants, as reflected below:[13]

---

[13]    The left image is from 2021 ESG and Sustainability Report, and the right image is from 2022 ESG and Sustainability Report.



114.    By virtue of their role in the Company's oversight of safety and environment risks, the Individual Defendants were in a position to know of the absence of requisite monitoring systems or, given the prevalent risk of landslides in open pit mining, they were reckless in not knowing.

## B.    Çöpler Was A Core Asset For The Company

115.    At all relevant times, Çöpler was a material part of the Company's revenue. In the wake of the landslide, analysts commented that the Company's net asset value ("NAV") declined significantly in their research notes issued on February 13, 2024. For example, Canaccord wrote that "***Çöpler accounted for 42% of our prior operating NAV*** for the company" and, as a result of the indefinite suspension, "our NAV has declined by 55% to $10.64/sh [and] our 2024E EBITDA estimate by 59%." Scotiabank agreed that Çöpler was "42% of our asset NAV estimate," and the mine was similarly valued by other analysts (RBC Capital Markets, "~40%"; TD Cowen, "~34%"; UBS, "~30%"). CIBC Capital Markets believed that Çöpler "represents ~45% of the NAV," and given the ongoing uncertainties, "a better way to look at the company might be its NAV excluding Copler, which then totals $8.75/sh." This underscores that Çöpler was a core asset to the Company's operations.

116.    During his tenure as CEO of Alacer, Defendant Antal had overseen Çöpler, which was Alacer's only asset. As a result, he knew or should have known the monitoring systems at the mine, as well as that the height of the heap leach pad grossly exceeded norms.[14]

---

[14]    *See, e.g.,* Thiel, Richard and Smith, Mark. "State of the practice review of heap leach pad design issues." GEOTEXTILES AND GEOMEMBRANES, Vol. 22:6 (2004) (heap heights approach 150 meters, and slope instability caused be "extreme heights and base pressures" is a key concern for leach pads)

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

117.    The market for SSR Mining's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, SSR Mining's securities traded at artificially inflated prices during the Class Period.  On April 20, 2022, the Company's share price closed at a Class Period high of $24.42 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of SSR Mining's securities and market information relating to SSR Mining, and have been damaged thereby.

118.    During the Class Period, the artificial inflation of SSR Mining's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about SSR Mining's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of SSR Mining and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

58

119.  At all relevant times, the market for SSR Mining's securities was an efficient market for the following reasons, among others:

a.  SSR Mining shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.  As a regulated issuer, SSR Mining filed periodic public reports with the SEC and/or the NASDAQ;

c.  SSR Mining regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d.  SSR Mining was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

120.  As a result of the foregoing, the market for SSR Mining's securities promptly digested current information regarding SSR Mining from all publicly available sources and reflected such information in SSR Mining's share price. Under these circumstances, all purchasers of SSR Mining's securities during the Class Period suffered similar injury through their purchase of SSR Mining's securities at artificially inflated prices and a presumption of reliance applies.

121.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.   Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.    NO SAFE HARBOR

122.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because

at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of SSR Mining who knew that the statement was false when made.

## XII.    CLAIMS FOR RELIEF

### FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

123.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

124.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase SSR Mining's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

125.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for SSR Mining's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued

either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

126. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about SSR Mining's financial well-being and prospects, as specified herein.

127. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of SSR Mining's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about SSR Mining and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

128. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the

Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

129. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing SSR Mining's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

130. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of SSR Mining's securities was artificially inflated during the Class Period. In ignorance

63

of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired SSR Mining's securities during the Class Period at artificially high prices and were damaged thereby.

131.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that SSR Mining was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their SSR Mining securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

132.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

133.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

134.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

135.   Individual Defendants acted as controlling persons of SSR Mining within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

136.   In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

65

137.    As set forth above, SSR Mining and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## XIV.    JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 15, 2024

*/s/ Daniella Quitt*
**GLANCY PRONGAY & MURRAY LLP**
Daniella Quitt
745 Fifth Avenue, 5th Floor
New York, NY 10151
Telephone: (212) 935-7400

66

dquitt@glancylaw.com

Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
rprongay@glancylaw.com
prajesh@glancylaw.com

*Counsel for Lead Plaintiff and Lead Counsel for
the Class*